**VOLUME I, PAGES 1 TO 14044**

**2024-2062, 2024-2063**

**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

---

**BOARD OF REGENTS OF THE UNIVERSITY OF TEXAS SYSTEM, TISSUEGEN, INC.,**

*Plaintiffs-Cross-Appellants,*

v.

**BOSTON SCIENTIFIC CORP.,**

*Defendant-Appellant.*

---

On appeal from the U.S. District Court
for the District of Delaware (Hon. Gregory B. Williams), No. 18-cv-392

---

# NONCONFIDENTIAL JOINT APPENDIX (VOLUME I OF III)

---


John P. Lahad
Brian D. Melton
Corey M. Lipschutz
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, TX 77002
(713) 651-9366
jlahad@susmangodfrey.com

Michael W. Shore
THE SHORE FIRM LLP
5646 Milton Street, Suite 423
Dallas, TX 75206
(214) 593-9110

*Counsel for Board of Regents of the University of Texas System and TissueGen, Inc.*

Pratik A. Shah
Z.W. Julius Chen
Rachel J. Elsby
Kristen E. Loveland
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, NW
Washington, DC 20006
(202) 887-4000
pshah@akingump.com

Michael P. Kahn
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
Bank of America Tower
New York, NY 10036
(212) 872-1000

*Counsel for Boston Scientific Corp.*

## TABLE OF CONTENTS


| DATE | DESCRIPTION | ECF No. | APPX NO. |
|---|---|---|---|
| | **VOLUME I** | | |
| 02/15/2023 | Judgment Following Jury Verdict (Case No. 1:18-cv-00392-GBW) | 342 | Appx1-2 |
| 06/28/2024 | Amended Judgment (Case No. 1:18-cv-00392-GBW) | 372 | Appx3-4 |
| 06/05/2024 | Memorandum Opinion on Post Trial Motions (Case No. 1:18-cv-00392-GBW) | 368 | Appx5-40 |
| 06/05/2024 | Order on Memorandum Opinion (Dkt. 368) (Case No. 1:18-cv-00392-GBW) | 369 | Appx41-42 |
| N/A | United States District Court for the Western District of Texas (Austin Division) Docket, Case No. 1:17-cv-01103-LY | N/A | Appx43-48 |
| N/A | United States District Court for the District of Delaware Docket, Case No. 1:18-cv-00392-GBW | N/A | Apx49-93 |
| N/A | U.S. Patent No. 6,596,296 | 1-1 | Appx94-121 |
| N/A | U.S. Patent No. 7,033,603 | 1-3 | Appx122-153 |

| DATE | DESCRIPTION | ECF No. | APPX NO. |
|---|---|---|---|
| 11/20/2017 | Complaint for Patent Infringement with Exhibits A-D and Civil Cover Sheet, filed by Board of Regents, The University of Texas System, TissueGen, Inc. | 1 | Appx154-173; |
| | Exhibit A, U.S. Patent No. 6,596,296 | | Appx174-202; |
| | Exhibit B, Claim Chart for Claim 1 of the ’296 Patent | | Appx203-210; |
| | Exhibit C, U.S. Patent No. 7,033,603 | | Appx211-243; |
| | Exhibit D, Claim Chart for Claim 19 of the ’603 Patent | | Appx244-248; |
| | Civil Cover Sheet | | Appx249-250 |
| 08/25/2020 | Excerpt of Notice of Service of Initial Claim Chart Under Paragraph 7(c) of the Scheduling Order filed by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 08/25/2020) | 61 | Appx349; |
| | Excerpt of Exhibit A (Initial Claim Chart Relating Each Known Accused Product to the Asserted Claims Each Such Product Allegedly Infringes) | | Appx351-353 |

| Date | Description | ECF No. | Appx No. |
|---|---|---|---|
| 03/09/2021 | Excerpt of Appendix regarding Joint Claim Construction Brief, filed by Board of Regents, The University of Texas System, TissueGen, Inc. with Exhibits 1-55<br><br>Excerpt of Exhibit 37, Declaration of Kinam Park, Ph.D. | 81 | Appx431;<br><br>Appx1161-1162; Appx1181-1183 |
| 03/15/2021 | Excerpt of Amended Joint Claim Construction Chart, filed by Board of Regents, The University of Texas System, TissueGen, Inc. | 85 | Appx1854-1857 |
| 04/15/2021 | Excerpt of Memorandum Order regarding Claim Construction | 90 | Appx1928; Appx1931-1933 |
| 06/14/2022 | Excerpt of Sealed – Concise Statement on Motion for Summary Judgment of Noninfringement, filed by Boston Scientific Corporation (Redacted version at ECF No. 208) | 202 | Appx2692-2695 |
| 06/14/2022 | Excerpt of Sealed – Declaration of Michael J. Farnan in Support of Defendant's Opening Brief in Support of It's Omnibus Motion for Summary Judgment and Motion to Exclude Expert Testimony with Exhibits 1-54, filed by Boston Scientific Corporation (Redacted version at ECF No. 209)<br><br>Excerpt of Exhibit 1, Declaration of David J. Mooney, Ph.D. in Support of Boston Scientific's Motion for Summary Judgment and *Daubert* Motion | 203 | Appx2700;<br><br>Appx2706-2707; |

| DATE | DESCRIPTION | ECF No. | APPX NO. |
|---|---|---|---|
| | Excerpt of Exhibit 1 to Declaration: Rebuttal Expert Report of David J. Mooney, Ph.D. Regarding Noninfringement of U.S. Patent No. 6,596,296 | | Appx2709-2710; Appx2753-2755; |
| | Excerpt of Exhibit 8, Document produced by Defendant bates-numbered BSC-UTEX-00110553-BSC-UTEX-00110594 | | Appx3062-3063; Appx3082-3084; |
| | Exhibit 9, Video produced by Defendant bates-numbered BSC-UTEX-00284603 | | Appx3105-3106; |
| | Excerpt of Exhibit 12, Document produced by Defendant beginning with bates-number BSC-UTEX-00031766 | | Appx3143-3144; Appx3147-3149; |
| | Excerpt of Exhibit 18, Document produced by Defendant beginning with bates-number BSC-UTEX-00110122 | | Appx3229-3231 |
| 06/21/2022 | Excerpt of Redacted – Opening Brief in Support Motion to Preclude Expert Testimony, Motion for Summary Judgment of Noninfringement, Motion for Summary Judgment of No Willful Infringement, filed by Boston Scientific Corporation (Sealed version at ECF No. 200) | 206 | Appx3812; Appx3820-3822 |
| 10/06/2022 | Excerpt of Memorandum and Order for Summary Judgment of Noninfringement | 243 | Appx8603-8605 |

| DATE | DESCRIPTION | ECF NO. | APPX NO. |
|---|---|---|---|
| 10/26/2022 | Excerpt of Joint Claim Construction Brief | 245 | Appx8621; Appx8623-8625; Appx8627-8629 |
| 10/28/2022 | Motion to Bifurcate, filed by Boston Scientific Corporation | 247 | Appx9777-9778 |
| 10/28/2022 | Excerpt of Sealed – Opening Brief in Support of Motion to Bifurcate, filed by Boston Scientific Corporation (Redacted version at ECF No. 251) | 248 | Appx9779; Appx9783-9785 |
| 11/02/2022 | Excerpt of Redacted – Joint Appendix regarding Joint Claim Construction Brief, filed by Boston Scientific Corporation with Exhibits 1-27 (Sealed version at ECF No. 246) | 250 | Appx9839; |
| | Excerpt of Exhibit 2, Declaration of David J. Mooney, Ph.D. in Support of Boston Scientific's Motion for Summary Judgment and *Daubert* Motion | | Appx9872-9873; |
| | Excerpt of Exhibit 1 to Declaration: Rebuttal Expert Report of David J. Mooney, PH.D. Regarding Noninfringement of U.S. Patent No. 6,596,296 | | Appx9875-9876; Appx9882-9885; Appx9889-9897; |
| | Excerpt of Exhibit 3, Excerpts from Callister, William D., Material Science and Engineering: An Introduction, Seventh Edition, John Wiley & Sons, Inc., 2007 | | Appx10020-10021; Appx10054-10056; Appx10068-10070; |

| DATE | DESCRIPTION | ECF No. | APPX NO. |
|---|---|---|---|
| | Excerpt of Exhibit 4, Excerpts from Yasuhiro Murase, Akihiko Nagai, 2 – Melt spinning, Editor(s); T. Nakajima, K. Kajiwara, J.E. McIntyre, Advanced Fiber Spinning Technology, Woodhead Publishing, 1994 | | Appx10078-10079; Appx10093-10095; |
| | Excerpt of Exhibit 7, Excerpts from Rebuttal Expert Report of William G. Pitt, Ph.D and Attachments A-D, dated November 25, 2019, *Bd. of Regents, The Univ. of Tex. Sys., et al. v. Ethicon, Inc., et al.*, Case No. 17-cv-1084-LY (W.D. Tex.) | | Appx10169-10170; Appx10173-10176; |
| | Excerpt of Exhibit 9, Declaration of William G. Pitt, Ph.D. In Support of Plaintiffs' Mini-*Markman* Position | | Appx10182-10185; Appx10190-10194; |
| | Excerpt of Attachment 1, Exhibit A to Exhibit 9: Expert Report of William G. Pitt, Ph.D | | Appx10200-10201; Appx10223-10229; |
| | Excerpt of Exhibit 10, Excerpts from Concise Encyclopedia of Polymer Science & Engineering, 73-74, 374-95 (1990) | | Appx10462-10463; Appx10482-10484; |
| | Excerpt of Exhibit 11, Excerpts from Jastrzcbski, The Nature and Properties of Eng'g Materials, 80-107, 155-195, 372-420 (1987) | | Appx10489-10490; Appx10602-10608; |
| | Excerpt of Exhibit 18, Rebuttal Declaration of David J. Mooney, Ph.D. in Response to Plaintiffs' New Claim Construction and in | | Appx10837-10838; Appx10842-10844 |

| DATE | DESCRIPTION | ECF NO. | APPX NO. |
|---|---|---|---|
| | Support of Boston Scientific's Construction of "Polymer Fiber" | | |
| 11/17/2022 | Memorandum Opinion regarding Claim Construction | 255 | Appx11175-11195 |
| 12/02/2022 | Memorandum Order on Motion to Bifurcate | 260 | Appx11318-11323 |
| 01/19/2023 | Verdict Form - Phase 1 | 296 | Appx13346-13350 |
| 01/25/2023 | Excerpt of Preliminary Jury Instructions (Phase I) | 316 | Appx13691; Appx13695-13697; Appx13699-13701 |
| 01/31/2023 | Excerpt of Final Jury Instructions (Phase 1) | 326 | Appx13823; Appx13828-13830; Appx13837-13839; Appx13845-13847; Appx13849-13851 |
| 02/01/2023 | Excerpt of Final Jury Instructions (Phase 2) | 329 | Appx13863; Appx13867-13869 |
| 02/01/2023 | Redacted – Jury Verdict (Phase 1) (Sealed Version at ECF No. 331) | 332 | Appx13887-13891 |
| 02/01/2023 | Redacted – Jury Verdict (Phase 2) (Sealed Version at ECF No. 333) | 334 | Appx13894-13898 |

| DATE | DESCRIPTION | ECF NO. | APPX NO. |
|---|---|---|---|
| 03/15/2023 | Sealed – Opening Brief in Support of Motion to Alter Judgment and Award Enhanced Damages Under 35 USC 284, filed by Board of Regents, The University of Texas System, TissueGen, Inc. with Exhibits 1-2 (Redacted Version at ECF No. 353) | 350 | Appx13941-13966; |
| | Exhibit 1, Declaration of Justin V. Lewis | | Appx13967-14041; |
| | Exhibit 2, Declaration of Jonathan Gibson in Support of Plaintiffs' Brief in Support of Motion for (1) Enhanced Damages Under §284 and (2) Pre- and Post-Judgment Interest | | Appx14042-14044 |
| **VOLUME II** | | | |
| 03/22/2023 | Redacted – Opening Brief in Support of Motion for New Trial *and, in the Alternative* Motion for Judgment as a Matter of Law, filed by Boston Scientific Corporation (Sealed Version at ECF No. 346) | 351 | Appx14045-14072 |

| **DATE** | **DESCRIPTION** | **ECF NO.** | **APPX NO.** |
|---|---|---|---|
| 03/22/2023 | Excerpt of Redacted – Declaration in Support of Opening Brief in Support of Motion for New Trial *and, in the Alternative* Motion for Judgment as a Matter of Law, filed by Boston Scientific Corporation with Exhibits 1-8 (Sealed Version at ECF No. 347)<br><br>Exhibit 1Ai, Slide 49 Video of Plaintiffs' Opening Demonstratives<br><br>Exhibit 1Aii, Slide 51 Video of Plaintiffs' Opening Demonstratives<br><br>Excerpt of Exhibit 3, January 27, 2023 Joint Letter | 352 | Appx14073;<br><br>Appx14143;<br><br>Appx14144;<br><br>Appx15291-15292; Appx15295-15297 |
| 04/19/2023 | Excerpt of Redacted – Answering Brief in Opposition to Motion for New Trial and, in the Alternative Motion for Judgment as a Matter of Law filed by Board of Regents, The University of Texas System, TissueGen, Inc. (Sealed Version at ECF No. 354) | 360 | Appx15798; Appx15806-15808 |
| 05/03/2023 | Excerpt of Redacted – Reply Brief on Motion for New Trial and, in the Alternative Motion for Judgment as a Matter of Law, filed by Boston Scientific Corporation (Sealed Version at ECF No. 363) | 364 | Appx16571; Appx16576-16578 |
| 07/03/2024 | Notice of Appeal to the Federal Circuit of Dkt. 342 Judgment and Dkt. 372 Amended Judgment | 373 | Appx17313-17314 |

| DATE | DESCRIPTION | ECF NO. | APPX NO. |
|---|---|---|---|
| 07/03/2024 | Notice of Appeal to the Federal Circuit of Dkt. 368 Memorandum Opinion, Dkt. 369 Order, Dkt. 372 Amended Judgment | 374 | Appx17315-17316 |
| 01/25/2023 | Excerpt of Trial Transcript (Vol. I) | N/A | Appx17317-17318; Appx17369-17371; Appx17379-17429; Appx17447-17450; Appx17452-17454; Appx17470-17473; Appx17484-17544; Appx17547-17549; Appx17551-17553 |
| 01/26/2023 | Excerpt of Trial Transcript (Vol. II) | N/A | Appx17600-17601; Appx17609-17612; Appx17671-17674; Appx17685-17695; Appx17699-17712; Appx17733-17735; Appx17737-17739; Appx17755-17757; Appx17772-17776; Appx17780-17782; Appx17788-17790; Appx17798-17801; Appx17824-17826; Appx17834-17836; Appx17842-17848; Appx17873-17877 |

| DATE | DESCRIPTION | ECF No. | APPX NO. |
|---|---|---|---|
| 01/27/2023 | Excerpt of Trial Transcript (Vol. III) | N/A | Appx17930-17933; Appx17938-17941; Appx17943-18009; Appx18017-18020; Appx18029-18031; Appx18045-18054; Appx18058-18061; Appx18103-18105; Appx18115-18118; Appx18132-18134; Appx18142-18156; Appx18165-18179; Appx18184-18191; Appx18194-18196 |
| 01/30/2023 | Excerpt of Trial Transcript (Vol. IV) | N/A | Appx18213-18214; Appx18231-18235; Appx18244-18249; Appx18260-18263; Appx18277-18283; Appx18288-18309; Appx18314-18319; Appx18328-18330; Appx18333-18356; Appx18364-18369; Appx18377-18382; Appx18392-18394; Appx18397-18399; Appx18415-18417 |
| 01/31/2023 | Excerpt of Redacted Trial Transcript (Vol. V) | N/A | Appx18472-18473; Appx18525-18527; Appx18634-18641; Appx18644-18648; Appx18671-18684 |

| Date | Description | ECF No. | Appx No. |
|---|---|---|---|
| N/A | Sealed – Trial Exhibit No. JTX002, Synergy § 7.2 PMA, Pharmaceutical Development [BSC-UTEX-00110475-496] | N/A | Appx18778-18799 |
| N/A | Sealed – Trial Exhibit No. JTX004, Synergy Drug Eluting Stent Coating Process [VIDEO] [BSC-UTEX-00284603] | N/A | Appx18842 |
| N/A | Trial Exhibit No. JTX008, Final five-year clinical outcomes in the EVOLVE trial: A randomized evaluation of a novel bioabsorbable polymer-coated, everolimus-eluting stent [BSC-UTEX-00110122-136] [Allocco Ex. 3] | N/A | Appx18849-18863 |
| N/A | Sealed – Trial Exhibit No. PTX026, PPT TissueGen Developing Revolutionary Peripheral Stent Solutions, Jan. 2009 [UT-BSC0009408-426] | N/A | Appx23850-23868 |
| N/A | Sealed – Trial Exhibit No. PTX036, Table E.T1 - Strut and Connector Dimensions for Synergy and Premier | N/A | Appx23870 |

| Date | Description | ECF No. | Appx No. |
|---|---|---|---|
| **VOLUME III** | | | |
| N/A | Sealed – Trial Exhibit No. PTX038, Answer to ROG 2 and ROG 3 [BSC-UTEX-00109806-824, BSC-UTEX-00109825, BSC-UTEX-00109826-842, BSC-UTEX-00109843-858, BSC-UTEX-00109859-867, BSC-UTEX-00109868-873, BSC-UTEX-00109874-875, BSC-UTEX-00109876-877, BSC-UTEX-00109878-879, BSC-UTEX-00109880-881, BSC-UTEX-00109882-883, BSC-UTEX-00109884-885, BSC-UTEX-00109886-936] | N/A | Appx23871-24015 |
| N/A | Sealed – Trial Exhibit No. PTX042, SYNERGY PMA Appx. 7.2 [BSC-UTEX-00110497-552] [BSC1-Chen Ex. 15] | N/A | Appx24271-24326 |
| N/A | Sealed – Trial Exhibit No. PTX047, FESEMs of Coatings of SYNERGY SV, WH, and LV models [BSC-UTEX-00110137-474] | N/A | Appx24371-24708 |
| N/A | Excerpt of Sealed – Trial Exhibit No. PTX049, SYNERGY Particulate Assessment 90761466 [BSC-UTEX-00205005-041] | N/A | Appx24709-24710; Appx24731-24733 |
| N/A | Excerpt of Sealed – Trial Exhibit No. PTX050, 2009.07.07 Particulate Review & Discussion with FDA [BSC-UTEX-00201385-401] | N/A | Appx24746; Appx24749-24751 |

| DATE | DESCRIPTION | ECF NO. | APPX NO. |
|---|---|---|---|
| N/A | Excerpt of Sealed – Trial Exhibit No. PTX051, SYNERGY IDE G120123/S002 Deficiency Response [BSC-UTEX-00213774-069] | N/A | Appx24763; Appx24888-24891 |
| N/A | Trial Exhibit No. PTX052, Weber et al. US2009/0030504 – CERTIFIED [UT-BSC0090954-971] | N/A | Appx25059-25076 |
| N/A | Sealed – Trial Exhibit No. PTX065 Email [Peddle, Ballinger, Moynihan] attaching Color TG handout [BSC-UTEX-00292727-729] | N/A | Appx25077-25079 |
| N/A | Sealed – Trial Exhibit No. PTX067, Email chain (Nelson, Moynihan, Ballinger, Brown, Vbenezia, Davidson) re: Possible TCT Meeting TissueGen, Inc. [UT-BSC0020767-772] [BSC-Moynihan Ex. 1] | N/A | Appx25080-25085 |
| N/A | Sealed – Trial Exhibit No. PTX069, Email chain (Nelson, Moynihan) with attachments ("TissueGen handout April 2009.pdf," "TissueGen Executive Summary April 2009.pdf") [UT-BSC-0020869-894] [BSC-Moyni han Ex.2] | N/A | Appx25086-25111 |
| N/A | Sealed – Trial Exhibit No. PTX072, CDRH Premarket Review Submission Cover Sheet with attached 05.21.09 Letter attaching 06.04.09 FDA PowerPoint [BSC-UTEX-00197895-940 | N/A | Appx25112-25157 |

| DATE | DESCRIPTION | ECF NO. | APPX NO. |
|---|---|---|---|
| N/A | Sealed – Trial Exhibit No. PTX073, Email chain (Moynihan, Nelson, Knowles] re TissueGen [UT-BSC0088278-279] | N/A | Appx25158-25159 |
| N/A | Trial Exhibit No. PTX143, Book, IUPAC Compendium of Chemical Terminology (Dissolution) [UT-BSC0085269] | N/A | Appx25500 |
| N/A | Trial Exhibit No. DTX018, U.S. Patent 5,364,627 to Song, Gradual Release Structures Made From Fiber Spinning Techniques [BSC-UTEX-00029286 BSC-UTEX-00029300] | N/A | Appx25635-25649 |
| N/A | Sealed – Trial Exhibit No. DTX300, BSC-FDA Meeting: Drug-Eluting Biodegradable Polymer Coating on Metallic Stent [BSC-UTEX-00201346 BSC-UTEX-00201359] | N/A | Appx26088-26101 |

**CONFIDENTIAL MATERIAL OMITTED**

The material omitted at Appx2694-2695, Appx2753-2755, Appx3082-3084, and Appx13951 describes the Synergy Stent's coating process; the material omitted at Appx3063 describes the Synergy Stent's manufacturing process; the material omitted at Appx3106 and Appx18842 are video of the Synergy Stent's coating process; the material omitted at Appx3144 describes the commercial Synergy Stent product; the material omitted at Appx3147-3149 describes the Synergy Stent's device and operation; the material omitted at Appx9890 describes the Synergy

Stent's polymer composition; the material omitted at Appx13891 and Appx13898 contains the signature of the jury foreperson; the material omitted at Appx13941 describes the nature of the brief; the material omitted at Appx13948 describes a design submitted to the FDA; the material omitted at Appx13956 describes Synergy Stent sales; the material omitted at Appx13962 describes the relevant Boston Scientific market share; the material omitted at Appx14043 describes TissueGen's financing; the material omitted at Appx14060-14061 describes a coating technology agreement; the material omitted at Appx18525 describes confidential arrangements with hospitals; the material omitted at Appx18526-18527 describes pricing arrangements and per-unit profits; the material omitted at Appx18649 references confidential agreements; the material omitted at Appx18778-18799 and Appx24271-24326 describes the Synergy Stent's development; the material omitted at Appx23850-23868 describe a TissueGen investment; the material omitted at Appx23870 describe strut and connector dimensions for Synergy Stent; the material omitted at Appx23871-24015 are Defendant's objections and responses to Plaintiff's interrogatories; the material omitted at Appx24371-024708 are images of Synergy Stent coatings; the material omitted at Appx24709-24710, Appx24731-24733, Appx24746, and Appx24749-24751 describe particulate assessments of the Synergy Stent system; the material omitted at Appx24763 and Appx24888-24891 describe the Synergy Stent's deficiency response; the material omitted at Appx25077-25079,

Appx25080-25085, Appx25086-25111, and Appx25158-25159 are emails regarding TissueGen; and the material omitted at Appx25112-25157 and Appx26088-26101 are slides regarding Boston Scientific's drug product testing.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM, and TISSUEGEN, INC., Plaintiffs, v. BOSTON SCIENTIFIC CORPORATION, Defendant. | Case No. 18-392-GBW |

**[PROPOSED] JUDGMENT FOLLOWING JURY VERDICT**

This 15th day of February 2023, the Court having held a bifurcated jury trial consisting of two phases that began on January 25, 2023, and the jury having rendered unanimous verdicts for each trial phase on January 31, 2023 (*see* D.I. 332 (Phase 1); D.I. 334 (Phase 2)), pursuant to Fed. R. Civ. P. 58(b), IT IS HEREBY ORDERED that:

1. Judgment is entered in favor of the Board of Regents, the University of Texas System and TissueGen, Inc. ("Plaintiffs") and against Boston Scientific Corporation ("Defendant") with respect to direct infringement and induced infringement of claims 1, 11, 17, and 26 of U.S. Pat. No. 6,596,296 (the "'296 patent");

2. Judgment is entered in favor of Plaintiffs and against Defendant with respect to willful infringement of the '296 patent;

3. Judgment is entered in favor of Plaintiffs and against Defendant with respect to the validity of claims 1, 11, 17, and 26 of the '296 patent; and

4. Judgment is entered in favor of Plaintiffs and against Defendant for damages in the amount of $42,000,000.00 (forty-two million dollars) for direct and indirect infringement of the '296 patent.

IT IS FURTHER ORDERED that the deadline for any party to move for costs and attorneys' fees (including under 35 U.S.C. § 285) is extended to within fourteen (14) days after the time for appeal has expired or within fourteen (14) days after issuance of the mandate from the appellate court, and no party shall file any such motion before that time.

This Judgment is subject to modification following the Court's consideration of the parties' post-trial motions.

Hon. Gregory B. Williams
United States District Judge

Case 1:18-cv-00392-GBW Document 371 Filed 06/27/24 Page 1 of 2 PageID #: 19456

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM, and TISSUEGEN, INC.,

Plaintiffs,

v.

BOSTON SCIENTIFIC CORPORATION,

Defendant.

Case No. 18-392-GBW

**[PROPOSED] AMENDED JUDGMENT**

This 28th day of June 2024, the Court having held a bifurcated trial consisting of two phases that began on January 25, 2023, the jury having rendered unanimous verdicts for each trial phase on January 31, 2023 (*see* D.I. 332 (Phase 1); D.I. 334 (Phase 2)), and the Court having entered a Memorandum Opinion (D.I. 368) and Order (D.I. 369) resolving the parties' post-trial motion on June 5, 2024, pursuant to Fed. R. Civ. P. 58(b), IT IS HEARBY ORDERED that:

1. Judgment is entered in favor of the Board of Regents, the University of Texas System, and TissueGen, Inc. ("Plaintiffs") and against Boston Scientific Corporation ("Defendant") with respect to direct infringement and induced infringement of claims 1, 11, 17, and 26 of U.S. Patent No. 6,596,296 (the "'296 patent");

2. Judgment is entered in favor of the Defendant and against the Plaintiff with respect to no willful infringement of the '296 patent and no enhanced damages;

3. Judgment is entered in favor of Plaintiffs and against Defendant with respect to the validity of claims 1, 11, 17, and 26 of the '296 patent;

4. Judgment is entered in favor of Plaintiffs and against Defendant for damages in the amount of $42,000,000.00 (forty-two million dollars) for direct and indirect infringement of the '296 patent, with pre-judgment interest in the amount of $7,436,328, and post-judgment interest to accrue, beginning February 15, 2023, at 4.87% computed daily and compounded annually.

IT IS FURTHER ORDERED that the deadline for any party to move for costs and attorneys' fees (including under 35 U.S.C. § 285) is extended to within fourteen (14) days after the time for appeal has expired or within fourteen (14) days after issuance of the mandate from the appellate court, and no party shall file any such motion before that time.

The Honorable Gregory B. Williams
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEMS, and TISSUEGEN, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>BOSTON SCIENTIFIC CORPORATION,<br><br>Defendant. | C.A. No. 18-392 |

Stamatios Stamoulis, STAMOULIS & WEINBLATT LLC, Wilmington, DE; Michael W. Shore, Chijioke E. Offor, Alex Q. Jacobs, THE SHORE FIRM, Dallas, Texas; Brian D. Melton, John P. Lahad, Corey M. Lipschutz, SUSMAN GODFREY L.L.P, Houston, Texas

*Counsel for Plaintiffs*

Brian E. Farnan, Michael J. Farnan, FARNAN LLP, Wilmington, DE; Michael P. Kahn, AKIN GUMP STRAUSS HAUER & FELD LLP, New York, NY; Rachel J. Elsby, AKIN GUMP STRAUSS HAUER & FELD LLP, Washington D.C; Chad Drown, Timothy E. Grimsrud, Katherine S. Razavi, Lauren J.F. Barta, Doowon R. Chung, N. Chethana Perera, FAEGRE DRINKER BIDDLE & REATH LLP, Minneapolis, MN; David J.F. Gross, FAEGRE DRINKER BIDDLE & REATH LLP, East Palo Alto, CA; Evan J. Kline-Wedeen, FAEGRE DRINKER BIDDLE & REATH LLP, Chicago, Illinois; Christopher J. Burrell, FAEGRE DRINKER BIDDLE & REATH LLP, Washington, D.C.

*Counsel for Defendant*

**MEMORANDUM OPINION**

June 5, 2024
Wilmington, Delaware

GREGORY B. WILLIAMS
U.S. DISTRICT JUDGE

After a bifurcated trial, the jury returned a verdict for Plaintiffs Board of Regents, the University of Texas Systems, and Tissuegen, Inc. (collectively, "Plaintiffs"), against Defendant Boston Scientific ("Defendant"). D.I. 332; D.I. 334. The jury found that Defendant directly and indirectly infringed U.S. Patent No. 6,596,296 (the "'296 patent") and awarded Plaintiffs $42 million in damages. *Id.* The jury also found that Defendant's infringement was willful. *Id.* Now pending before the Court are Defendant's Motions for a New Trial and Judgment as a Matter of Law (D.I. 345) and Plaintiffs' Motion for Enhanced Damages and Pre- and Post-Judgment Interest (D.I. 349). Having reviewed the motions and all relevant briefing, the Court finds that: (1) Defendant's Motion for a New Trial is DENIED; (2) Defendant's Motion for Judgment as a Matter of Law is GRANTED as to willful infringement and is otherwise DENIED; (3) Plaintiffs' Motion for Enhanced Damages is DENIED; (4) Plaintiffs' Motion for Pre-Judgment Interest is GRANTED in the amount of $7,436,328; and (5) Plaintiffs' Motion for Post-Judgment Interest is GRANTED at a rate of 4.87% computed daily and compounded annually.

## 1. INTRODUCTION

On November 20, 2017, Plaintiffs initiated this litigation against Defendant alleging, among other things, infringement of the '296 patent. D.I. 1. The '296 patent, titled "Drug Releasing Biodegradable Fiber Implant" claims a biodegradable fiber format that can be used in the delivery of drugs. According to Plaintiffs, Defendant infringed the '296 patent by producing and selling Synergy™ stents which, like Plaintiffs' patented technology, utilized a biodegradable

polymer fiber to deliver drugs. D.I. 124, ¶¶ 65-66, 80. Plaintiffs asserted claims against Defendant for direct and induced infringement of claims 1, 11, 17, and 26 of the '296 patent (hereinafter, the "Asserted Claims"). *Id.* at ¶ 79. In response, Defendant alleged that one or more of the asserted claims of the '296 patent is invalid. D.I. 238 at 24-25.

On December 12, 2022, the Court issued an order to bifurcate trial into two phases. D.I. 260. Following the first phase of trial, the jury ruled in favor of Plaintiffs on infringement of the '296 patent and denied Defendant's claims of invalidity. D.I. 331. After phase two, the jury found for Plaintiffs on their claims that Defendants induced infringement of the '296 patent and that Defendant's infringement of Plaintiffs' patented technology was willful. D.I. 333. Finally, the jury found that Defendant's infringement entitled Plaintiffs to reasonable royalty damages totaling $42 million. *Id.* at 4. Judgment was entered on February 15, 2023. D.I. 342.

Defendant now moves for a new trial under Rule 59(a) on the grounds that Plaintiffs engaged in improper conduct during their opening statements, introduced improper evidence and argument throughout the trial, and invited the jury to render a verdict based on improper considerations during closing. D.I. 345. Defendant also moves for judgment as a matter of law under Rule 50(b) on the grounds that the Asserted Claims are anticipated and lack written description as a matter of law; no reasonable jury could have found infringement based on the Court's constructions of "fiber" and "immiscible;" Plaintiffs failed to present sufficient evidence to support their damages theory; and no reasonable jury could have found willful infringement. *Id.*

Given the jury's finding of willful infringement, Plaintiffs seek enhancement of the jury's damages award under 35 U.S.C. § 284. D.I. 350. Additionally, Plaintiffs seek pre-judgment interest pursuant to the "de facto rule" of federal courts and post-judgment interest under 28

U.S.C. § 1961. *Id.* at 1. Defendant opposes Plaintiffs' motion for enhanced damages and contends that Plaintiffs' request for pre-judgment interest should be denied as premature or, alternatively, reduced. D.I. 355 at 2.

### 2. LEGAL STANDARD

#### a. Judgment as a Matter of Law

A court may enter JMOL against the non-moving party where it "finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on [an] issue." FED. R. CIV. P. 50(a)(1). However, JMOL is appropriate "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993). Entry of JMOL is a remedy to be invoked only "sparingly." *CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc.*, 357 F.3d 375, 383 (3d Cir. 2004).

Following a jury trial, a renewed motion for JMOL under Rule 50(b) may be granted only if the movant demonstrates "that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusion(s) implied [by] the jury's verdict cannot in law be supported by those findings." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348 (Fed. Cir. 1998) (alteration in original) (internal quotation marks omitted). Substantial evidence requires such relevant evidence that a reasonable mind might accept it as adequate to support the finding under review. *See Enplas Display Device Corp. v. Seoul Semiconductor Co.*, 909 F.3d 398, 407 (Fed. Cir. 2018). In determining whether substantial evidence supports the jury verdict, the Court cannot make credibility determinations, weigh the evidence, or substitute its own conclusions for that of the jury where the record evidence supports multiple inferences. *See*

*Lightning Lube*, 4 F.3d at 1166. The standards that govern a Rule 50(b) motion, however, "vary according to whether the movant has the burden of proof." *Fireman's Fund Ins. Co. v. Videfreeze Corp.*, 540 F.2d 1171, 1177 (3d Cir. 1976).

To grant JMOL in favor of a party with the burden of proof, the court "must be able to say not only that there is sufficient evidence to support the finding [sought by the moving party] ... but additionally that there is insufficient evidence for permitting any different finding." *Id.* (quoting 9 WIGMORE ON EVIDENCE § 2495 at 306 (3d ed. 1940)); *see also Amgen Inc. v. Hospira, Inc.*, 944 F.3d 1327, 1333 (Fed. Cir. 2019) ("[W]here the movant b[ears] the burden of proof on an issue, JMOL is only granted where 'there is insufficient evidence for permitting any different finding.'" (quoting *Fireman's Fund*, 540 F.2d at 1177)); *Deere & Co. v. Agco Corp. et al*, C.A. No. 18-827-CFC, 659 F.Supp.3d 418 (D. Del. March 28, 2023).

**b. Motion for New Trial**

Under Fed. R. Civ. P. 59, "a new trial should only be granted when a 'miscarriage of justice would result if the verdict were to stand,' the verdict 'cries out to be overturned,' or the verdict 'shocks the conscience.'" *Roche Diagnostics Corp. v. Meso Scale Diagnostics, LLC*, 503 F. Supp. 3d 156, 166 (D. Del. 2020); *see also Intellectual Ventures I, LLC v. Canon Inc.*, 104 F. Supp. 3d 629, 637 (D. Del. 2015) ("[T]he court should grant a new trial on the basis that the verdict was against the weight of the evidence only where a miscarriage of justice would result if the verdict were to stand.").

**3. DISCUSSION**

For the reasons stated below, the Court (1) grants Defendant's motion for judgment as a matter of law as to willfulness and denies Defendant's motion for judgment as a matter of law as

to invalidity, infringement, and damages; (2) denies Defendant's motion for a new trial; (3) denies Plaintiffs' motion for enhanced damages; and (4) grants Plaintiffs' motion for pre- and post-judgment interest.

**a. Judgment As a Matter of Law**

i. *Defendant is not entitled to JMOL on the issue of whether Song anticipates the asserted claims.*

Defendant contends that Song anticipates the asserted claims, and "there is no record evidence that supports the jury's finding otherwise." D.I. 364 at 12. For the following reasons, the Court disagrees.

"A single prior art reference anticipates a patent claim if it expressly or inherently describes each and every limitation set forth in the patent claim." *Trintec Indus., Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292, 1295 (Fed. Cir. 2002). While a single reference may expressly anticipate a claim where the reference explicitly discloses each and every claim limitation, the prior art need not be ipsissimis verbis (i.e., use identical words as those recited in the claims) to be expressly anticipating. *Structural Rubber Prods. Co. v. Park Rubber Co.*, 749 F.2d 707, 716 (Fed.Cir.1984). "Instead, a reference may still anticipate if that reference teaches that the disclosed components or functionalities may be combined and one of skill in the art would be able to implement the combination." *Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331, 1344 (Fed. Cir. 2016) (finding that "the reference anticipated the claims even without a particular disclosure of the specific combination recited in the disputed claims.").

The '296 patent claims "biodegradable polymer fibers capable of controlled delivery of therapeutic agents." '296 patent, Abstract. Claim 1 of the '296 patent, the only independent claim asserted by Plaintiffs, discloses "[a] composition comprising at least one biodegradable

polymer fiber wherein said fiber is composed of a first phase and a second phase, the first and second phases being immiscible, and wherein the second phase comprises one or more therapeutic agents." '296 patent, claim 1. Song similarly describes "delivery systems for the gradual release of active agents and processes for making such systems and is particularly directed to delivery systems using heat sensitive active agents with biodegradable polymers and melt spinning processes for making such systems." D.I. 347, Ex. 6 (hereinafter, "Song"), Abstract.

According to Defendant, Song anticipates claim 1 of the '296 patent by "disclos[ing] that its 'invention is a fiber having a support matrix' [], 'made up of wall material' [] that 'can be any spinnable synthetic or natural polymer' [], including 'biodegradable polymers'[]" and an "active agent [that] is dispersed throughout the support matrix." D.I. 346 at 12-13 (internal citations omitted). Defendant notes that, just like claim 1, Song also asserts that "[t]he active agent and wall material . . . must be immiscible with each other." *Id.* (internal citations omitted).

Plaintiffs, on the other hand, argue that claim 1 is not anticipated because "Song fails to disclose [the limitations of claim 1] **together in an enabled embodiment where the second phase is noncontiguous** (i.e., is composed of discrete regions) as claimed in the '296 patent." D.I. 354 at 6 (emphasis added). Specifically, Plaintiffs argue that "Song lacks any example of an embodiment involving a biodegradable polymer with drug in a noncontiguous phase." *Id.* Plaintiffs also contend that "biodegradability" has a different meaning in Song than it does in the '296 patent. Each argument is considered in turn below.

1. *Plaintiffs' Enablement Claims:*

According to Plaintiffs, the "'296 patent requires drug in a noncontiguous phase (i.e. discrete drug-containing regions) within a biodegradable polymer fiber." D.I. 354 at 6. During trial, Plaintiffs' expert, Dr. Pitt, testified that the asserted claims of the '296 patent disclose a fiber with discrete drug-containing regions dispersed throughout the fiber. *See* Tr. 900:2-901:12. Dr. Pitt explained that Song, on the other hand, does not disclose a fiber with discreate regions but instead "teaches that you have contiguous channels." *Id.* at 898:13-899:3. According to Dr. Pitt,

> Contiguous means that you've got these regions that are touching each other, stretching out the length of this fiber, and when there's contact with the solution, which is water or saliva, this stuff just starts to dissolve and go out the ends. So that's not a discrete region."

*Id.* at 900:10-15. Because Song teaches a fiber with contiguous channels, Dr. Pitt noted that Song and the '296 patent disclosed fibers that differ in the way each releases drug particles. *Id* at 901:3-8. Specifically, Dr. Pitt argued that Song delivers drugs from the fiber's "front end and [] back end" whereas, in the '296 patent, "you have a fiber, and it's biodegrading, and the drug is coming out in the radial direction instead of going out the ends. *Id.* Thus, according to Dr. Pitt, because Song does not disclose a biodegradable polymer with a non-contiguous drug phase, Song cannot anticipate the asserted claims. *Id.* at 901:9-12. Plaintiffs raise the same argument in response to Defendant's renewed motion for JMOL. *See* D.I. 354 at 5-6 (arguing that anticipation cannot be proven because "Song lacks any example of an embodiment involving a biodegradable polymer with drug in a noncontiguous phase").

According to Defendant, Dr. Pitt's testimony regarding the noncontiguous drug phases in the '296 patent cannot be used to distinguish the asserted claims from Song because the asserted

claims do not require that the fiber include drug-containing channels that are noncontiguous or discrete. D.I. 363 at 1-2. Thus, according to Defendant, Plaintiffs erred by introducing testimony on a feature not required by the claims. D.I. 363 at 2. The Court agrees.

Anticipation challenges "focus only on the limitations **actually recited in the claims.**" *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1252-54 (Fed. Cir. 2014) (finding that asserted patent where "[b]oth the district court and DDR introduced a limitation found neither in the '572 patent's claims nor the parties' stipulated construction.") (emphasis added). "It is the claims that define the claimed invention[,] [a]nd it is claims, not specifications, that are anticipated." *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1570-71 (Fed. Cir. 1988), *cert. denied*, 465 U.S. 1026, 104 S.Ct. 1284, 79 L.Ed.2d 687 (1984) ("A claim is anticipated only if each and every element **as set forth in the claim** is found, either expressly or inherently described, in a single prior art reference."). Accordingly, a patentee cannot "avoid [an] anticipating disclosure" by "engage[ing] in a *post hoc* attempt to redefine the claimed invention by impermissibly incorporating language appearing in the specification into the claims." *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). While "it is entirely proper to use the specification to interpret what the patentee meant by a word or phrase in the claim," the patentee cannot rely on "extraneous limitation appearing in the specification . . . ." *Id.* (internal quotations omitted). "[B]y 'extraneous," the Federal Circuit meant "a limitation read into a claim from the specification wholly apart from any need to interpret ... particular words or phrases in the claim." *Id.* (internal quotations omitted).

In this matter, there is no dispute that claim 1 of the '296 patent does not explicitly recite a fiber with "noncontiguous" phases and does not assert "dispersed discrete regions that release the drug." Additionally, Plaintiffs did not allege that any terms in claim 1 of the '296 patent

required a construction that would read the "noncontiguous" phase requirement into the claim, and the Court never adopted a construction requiring such a limitation. Thus, to the extent that Plaintiffs inject the "noncontiguous" phase limitation into the asserted claims from the specification's description of the invention, the Court agrees with Defendant that the limitation cannot be used to differentiate the asserted claims from the prior art. D.I. 346, n. 2; *MobileMedia Ideas v. Apple*, 780 F.3d 1159, 1172 (Fed. Cir. 2015).

Because, as explained in more detail below, Defendant cannot challenge Plaintiffs' arguments differentiating "biodegradable" polymers as asserted in the '296 patent from "biodegradable" polymers in Song, Defendant is not entitled to JMOL on the issue of anticipation.

2. *Plaintiffs' Arguments on "Biodegradability"*:

During his trial testimony, Dr. Pitt testified that Song also failed to anticipate the asserted claims because Song did not cover "biodegradable" polymers as asserted in the '296 patent. Tr. 898: 5-11. According to Dr. Pitt, "even though biodegradable polymers are mentioned in passing [in Song]," Song is not "directed to biodegradability in the same manner as the '296 patent." *Id.* at 898:13-899:3. In making this argument, Dr. Pitt construed "biodegradable," as used in the '296 patent, to mean that the asserted fiber must "biodegrade [in order] to release the [drug] agent." *Id.* at 899:2. Defendant contends that this testimony should be disregarded because: (1) Dr. Pitt "conceded that Song anticipates the asserted claims," and (2) Dr. Pitt's testimony improperly construed the term "biodegradable." D.I. 346 at 13-14; D.I. 363 at n. 5. For the following reasons, the Court finds neither argument persuasive.

First, while Dr. Pitt testified that "claim 1 talks about a biodegradable polymer . . . [not] taught in Song," Defendant argues that Dr. Pitt "later ***recanted*** that testimony after being impeached by his prior deposition testimony." D.I. 346 at 13 (emphasis added). Specifically, Defendant highlighted during trial Dr. Pitt's deposition testimony in which he explained that "one of [Song's] examples is using a biodegradable polymer, and the second phase is solely and only the therapeutic agent." Tr. 911:17-19. Defendant noted that Dr. Pitt also testified during his deposition that the second phase disclosed by the Song example "is [an] active agent [and] is immiscible with the [first] phase that is the wall material" and noted that the first phase, in turn, "is the polymer, and in some cases that could be biodegradable." *Id.* at 912:17-23, 913:24-914:9. When faced with this deposition testimony during cross-examination, Dr. Pitt admitted to each statement and confirmed that he had no "problem with the jury relying on [his] sworn [deposition] answers." *Id.* at 914:19-22. Thus, Defendant argues that Dr. Pitt "did not contradict" Defendant's evidence of anticipation "on cross-examination or otherwise," but instead admitted once more that Song discloses each limitation of the asserted claims. D.I. 346 at 13-14.

Dr. Pitt, however, *did* present testimony that countered Defendant's anticipation claims by testifying during trial that, among other things, Song is not "directed to biodegradability in the same manner as the '296 patent." Tr. 899:4-6; *see also id.* at 897:24-899:3. While Defendant argues that Dr. Pitt "later recanted th[is] testimony on cross-examination," Defendant cites an exchange in which counsel for Defendant sought to impeach Dr. Pitt by confronting him with his prior deposition testimony. D.I. 346 at 12 (citing Tr. 911:10-21, 912:16-23, 913:22-914:9). In seeking to impeach Dr. Pitt, however, Defendant asked whether Dr. Pitt was "asked [certain] question[s] and . . . g[a]ve [certain] answer[s] at your deposition" and limited Dr. Pitt's response

by noting that "it's really important right now that [Dr. Pitt] not inject anything new without approval from people." Tr. 910:18-20, 911:10-11, 912:11-12, 912:16-17, 913:22-23. Thereafter, Dr. Pitt merely admitted to making certain statements during his deposition. *See, e.g.*, 911:20-21 (Q: "Did you give that testimony" A: Yes.").

While Dr. Pitt also noted that the jury could rely on his deposition testimony, at no point did Dr. Pitt retract his prior inconsistent trial testimony. *See id.* at 914:19-22. For instance, Defendant cannot identify any testimony in which Dr. Pitt adopted his deposition testimony or alleged that his trial testimony was inaccurate. Indeed, Dr. Pitt was not asked whether he still agreed with his deposition testimony, and Defendant also did not permit Dr. Pitt to explain the discrepancies, if any, between his description of Song during his deposition and during trial. Thus, the Court agrees with Plaintiffs that Dr. Pitt did not concede his prior admissions, and the jury was entitled to "assess[] credibility" and disregard any or all of Dr. Pitt's prior deposition testimony in favor of his testimony at trial. D.I. 354 at 6-7.

Second, Defendant argues that Dr. Pitt's testimony on biodegradability should be disregarded because "the Court did not construe 'biodegradable.'" D.I. 363, n. 5. According to Defendant, because claim construction is a question of law, "[w]hether a polymer 'breaks down chemically and mechanically' is [] irrelevant" and should be disregarded for purposes of determining anticipation. *Id.* While the Court notes that it is generally "improper for an expert witness to testify before the jury regarding claim construction when a claim has been construed by the Court," "[t]here is no requirement that every term appearing in the claims must be specifically defined or used in the specification." *Cirba Inc. v. VMware, Inc.*, No. CV 19-742-LPS, 2020 WL 5910112, at *8 (D. Del. Oct. 6, 2020) (internal citations omitted). Moreover, Defendant did not object to Dr. Pitt's testimony on "biodegradability" during trial. By failing to

object to Dr. Pitt's construction of a claim term, Defendant "waived any challenge to the jury's finding of [no anticipation] based on this testimony." *See ATEN Int'l Co. v. Uniclass Tech. Co.*, 932 F.3d 1364, 1370 (Fed. Cir. 2019). Therefore, Defendant cannot claim that Dr. Pitt's construction of "biodegradable" was improper. *See id.* ("By failing to object, ATEN has waived any challenge to the jury's finding of infringement based on this testimony.").

Given the above—and because Defendant carried the burden of proof on anticipation—the Court cannot find that "'there is insufficient evidence for permitting any finding'" but JMOL. *See Amgen Inc. v. Hospira, Inc.*, 944 F.3d 1327, 1333 (Fed. Cir. 2019) (internal citations omitted). Defendant's motion for JMOL on anticipation is therefore DENIED.

ii. *Defendant is not entitled to JMOL on the issue of whether the Asserted Claims lack written description.*

In deciding a written description challenge to a patent, "[t]he primary consideration is factual and depends on the nature of the invention and the amount of knowledge imparted to those skilled in the art by the disclosure." *In re Wertheim*, 541 F.2d 257, 262, 191 USPQ 90, 96 (CCPA 1976) (emphasis added). Where a jury decides the issue of written description, the Court may only review the jury's factual findings for substantial evidence. *See B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1423, 43 USPQ2d 1896, 1899 (Fed.Cir.1997).

Defendant argues that the claims lack written description support because the specification does not describe a fiber with two immiscible phases. D.I. 346 at 14; *see* '296 patent, claim 1 ("A composition comprising at least one biodegradable polymer fiber wherein *said fiber is composed of a first phase and a second phase, the first and second phases being immiscible…*") (emphasis added). Plaintiffs disagree and argue that the examples in the specification necessarily disclose the fabrication of fibers with the required immiscible phases.

D.I. 354 at 7. In response, Defendant contends that those examples do not provide written description support because the claimed phases must be immiscible in the fiber and those examples merely discuss whether the substances used to create the fiber are miscible. D.I. 363 at 3. Thus, Defendant argues that Plaintiffs have failed to show that the inventor was in possession of a fiber that contains two immiscible phases as of the filing date of the '296 patent. D.I. 346 at 14 (citing *Ariad Pharm. V. Eli Lilly*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc)). The Court disagrees.

Specifically, the Court finds that Plaintiffs presented sufficient evidence at trial to show that the specification discloses a fiber with two immiscible phases. Mr. Nelson, one inventor of the '296 patent, testified about the process of creating the fibers claimed in the '296 patent. Tr. 194:25-198:10. Mr. Nelson explained that, at a high level, the claimed fibers can be created using an emulsion of two solutions: an oily solution that consists of a polymer dissolved in an oily solvent, and a water solution that consists of water, a drug, and a stabilizing molecule. *Id.* According to Mr. Nelson, the emulsion is then extruded through a coagulating bath that extracts the oily solvent and leaves "a solidified polymer that had now trapped inside it these dispersed, discreet drug-loaded sites." *Id.* at 197:8-21.

A reasonable juror could conclude that Mr. Nelson's testimony describes a fiber with two immiscible phases, given Mr. Nelson's testimony that the extrusion process results in a "polymer" (the first phase) that contains "dispersed, discreet drug loaded sites" (the second phase) *See* D.I. 90 at 1 (construing "first phase" as "the polymer portion of the fiber" and "second phase" as "the discrete drug-containing regions dispersed throughout the fiber"). A reasonable juror could also conclude that Mr. Nelson's high-level explanation of the fiber-making process is disclosed in the specification, because Example 1 of the '296 patent mirrors

Mr. Nelson's testimony. '296 patent, 17:40-19:35, *see also id.* at 18:23-18:28 ("Because solvent (A) is highly miscible with coagulating bath solvent (B), it freely diffuses from the polymer solution stream, into the coagulating bath. The polymer, however, is not soluble in solvent (B), and therefore begins to precipitate upon itself, forming the outer sheath of a fiber and trapping virtually all of the dispersed aqueous phase of the emulsion within the forming fiber. In this way, the fiber is loaded with the drug or protein of interest."). Mr. Nelson's testimony was supported by Dr. Pitt who similarly explained that Examples 1, 4, and 15 disclose fabrication of a fiber with a first and second immiscible phase. Tr. 890:1-19, 891:6-22, 892:17-893:17.[1]

Given the above, the Court finds that the jury's verdict was supported by "substantial evidence." *See B. Braun Med.*, 124 F.3d at 1423. Accordingly, the Court DENIES Defendant's motion for a new trial or JMOL regarding whether the claims of the '296 patent lack written description.

iii. *Plaintiffs presented sufficient evidence that the Synergy™ stent is a "fiber."*

Defendant argues that no reasonable jury could find that Defendant infringed the asserted claims because, (1) "[a]t trial, [], Plaintiffs employed their own unique constructions of 'fiber,' and otherwise relied on evidence unrelated to Synergy and therefore not relevant to infringement," and (2) "[Dr.] Pitt admitted that he never provided an opinion that the Synergy coating is thread-like[.]" D.I. 346 at 15-16 (cleaned up). For the following reasons, the Court disagrees with each of Defendant's arguments in support of JMOL.

As to Defendant's claim that Plaintiffs employed an improper construction of "fiber," Defendant highlights testimony from Dr. Pitt in which he distinguished between a film-like

[1] The Court agrees with Defendants that Dr. Pitt's description of example 5 does not describe a fiber with two immiscible phases because the second phase is outside of the fiber. *See* '296 patent at 21:1-22-15.

polymer and a fiber polymer. D.I. 346 at 16 (citing Tr. 615:3-6). This testimony was given after Defendant asked Dr. Pitt whether "the BSC coating is film-like." Tr. 625:14-16. Dr. Pitt responded that it was not film-like "[b]ecause it has a long shape. It's much longer than it is thick or wide, so that's the definition of a fiber." *Id.* at 625:23-626:4. However, during *Markman*, the Court construed the term "fiber" "as taking its plain and ordinary meaning to a person of ordinary skill in the art, which is a 'thread-like structure **of any length or shape**.'" D.I. 256 (emphasis added). Defendant argues that, in doing so, the Court rejected Plaintiffs' argument that "a 'fiber' is something with more length than width." D.I. 346 at 16. Thus, according to Defendant, Plaintiffs erred by permitting Dr. Pitt to introduce a definition of "fiber" that, inconsistent with the Court's construction, referenced the "rejected length-to-width characterization." *Id.*

Typically, once the Court construes a term, "that legal determination governs for purposes of trial[,] [and] [n]o party may contradict the court's construction to a jury." *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1321 (Fed. Cir. 2009). Moreover, "[w]here an infringement verdict relies on incorrect construction of the disputed claim terms, this court may grant JMOL, or order a new trial to correct the error, depending on the degree of difference between the incorrect construction and the correct construction." *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1333 (Fed. Cir. 2008). In this matter, however, the Court is not persuaded that Dr. Pitt injected a new construction of the term "fiber." Rather, the Court agrees with Plaintiffs that, when Dr. Pitt denied that BSC coating was film-like, he was merely "opin[ing] that the polymer structures [] satisfied the fiber limitation, [because] they were threadlike structures." D.I. 354 at 10. Given that witnesses representing both parties testified to the

correlation between "thread-like" and the "length-to-width ratio," the Court finds Plaintiffs' argument to be most supported by the record.

Indeed, throughout his trial testimony, Dr. Pitt explained that the "length-to-width ratio characterization" is relevant to determining whether a fiber is "thread-like." In describing how one determines whether a fiber is "tread-like," for instance, Dr. Pitt cited testimony from Defendant's Vice President of Clinical, Dr. Allocco, noting that "one thing that goes into the determination of whether a fiber is 'thread-like' is the presence of a 'large aspect ratio' as to the length and width of the polymer fiber." Tr. 595:7-16; *see also id.* at 351:5-13 (Allocco testimony noting same). Dr. Pitt agreed with Dr. Allocco and adopted Dr. Allocco's definition of "thread-like" to support his expert opinions. *Id.* at 595:11-16.

Further, Plaintiffs, "as [the] verdict winner[s]," must be given "the benefit of all logical inferences that could be drawn from the evidence presented" and must have "all conflicts in the evidence [resolved] in [their] favor." *See Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1348 (3d Cir. 1991). Thus, while Dr. Pitt later testified that the "definition of fiber" required a "long shape," the Court will assume that the testimony highlighted by Defendant was not an attempt by Dr. Pitt or Plaintiffs to contradict the Court's construction of "fiber," given Dr. Pitt's prior testimony associating the length-to-width ratio with "thread-like."

Defendant argues, however, that even Dr. Pitt's testimony describing "thread-like" as having a "large length and width ratio" is inconsistent with the Court's *Markman* opinion. D.I. 346 at 16. Specifically, Defendant contends that the length and width limitation contradicts the Court's finding that a fiber can have any length and width. *Id.* In construing the term "fiber," however, the Court held that fiber could be "any length or width" in response to claims by Plaintiffs that "fiber" required "[a] volume of matter having a small cross section and a length at

least 100 times greater than its width or diameter[.]" D.I. 255 at 7 (citing D.I. 245 at 5). The Court rejected this argument and explained that it would not read a particular size or length requirement into the construction of "fiber" by requiring a specified minimum ratio. *Id.* at 12. As the Court noted, intrinsic evidence showed that the fiber could have a length that was not "at least 100 times greater than its width or diameter." *Id.* For instance, "Figures 1, 2, and 3a [of the '296 patent] display fibers of varying lengths." *Id.* Thus, the Court held that "a construction that limits a fiber to a ***particular . . . length*** would be inconsistent" with the patent. *Id.* (citing '296 patent at figs. 1, 2, 3a) (emphasis added). In doing so, the Court did not reject the argument that the length of a fiber would be longer than its width for the fiber to be "thread-like." Accordingly, Dr. Pitt's description of a "thread-like" fiber during trial does not warrant JMOL.

Defendant also contends that JMOL is warranted because "Plaintiffs failed to compare the actual features of 'the accused device' to the asserted claims," choosing instead to raise several unrelated and improper infringement arguments. D.I. 346 at 16. For instance, Defendant claims that Plaintiffs improperly relied "on irrelevant Strickler and Weber applications—not the accused product— . . . to prove infringement." *Id.* In response, Plaintiffs contend that the Strickler and Weber applications were introduced as "party opponent admissions as to what Defendant considered to be a polymer fiber before litigation." D.I. 354 at 11. The Court agrees. In introducing the Weber application, Plaintiffs asked Dr. Pitt to highlight "what [Boston Scientific] describ[ed] as a fiber in the Weber application." Tr. 603:12-13. Plaintiffs solicited similar testimony from Dr. Pitt regarding Strickler and explained that the testimony would "inform [the jury] as to what Boston Scientific, in a non-litigation context, referred to as a fiber." *Id.* at 599:22-24, 601:5-6. During cross-examination, Defendant countered Dr. Pitt's testimony by noting that the applications were "obviously not at issue in this case," and Dr. Pitt agreed. *Id.*

at 638:6-9. Defendant's experts similarly testified that Strickler and Weber were not relevant to the accused products. *Id.* at 738:1-739:23. Considering this testimony and the totality of the circumstances, the Court does not believe that the jury was misled into relying on the Strickler and Weber applications over the accused products.

Defendant next argues that "Plaintiffs relied on evidence related to the 'shape' of a hypothetical 'particulate' that could break off from the Synergy coating, which has no bearing on whether the actual Synergy coating constitutes a fiber." D.I. 346 at 16. Yet, the Court agrees with Plaintiffs that nothing in the Court's claim construction prevented the jury from finding that the coating—"the polymer around the outside surface of the [] SYNERGY stent"—was a fiber. D.I. 354 at 11. Thus, the Court finds no support for Defendant's claim that the shape of the "particulate" had "no bearing on whether the actual Synergy coating constitutes a fiber." D.I. 346 at 16.

Defendant also contends that Plaintiffs "relied on mock-ups of 'what the polymer fiber ***might look like*** if it was removed from the Synergy stent[]" but failed to prove that "the unadulterated Synergy coating has a 'thread-like' structure." *Id.* at 16-17 (emphasis in original). While Defendant claims that Plaintiffs, through Dr. Pitt, "cut the models into pieces that he described as 'thread-like' shapes," *id.*, Dr. Pitt cut across a connector to access the fiber covering one serpentine loop around the stent and, in viewing the "scale model[] of one serpentine loop," found that the fiber met the characteristics of a "thread-like" fiber. Tr. 598:17-22. As Plaintiffs note, Dr. Pitt introduced the model as a demonstrative "during witness testimony to help the jury visualize admitted evidence—namely the dimensions and aspect ratios of the accused polymer structures." D.I. 354 at 12. Further, because Defendant does not claim that the model did not represent an accurate or full piece of fiber taken from a serpentine loop in a Synergy™ stent, the

Court disagrees with Defendant's description of the model as "altered." D.I. 346 at 17. Here again, while Defendant claims that Dr. Pitt failed to prove whether an unadulterated Synergy™ coating would constitute a "thread-like" structure, Defendant identifies no reason why the fiber would lose its "thread-like" properties merely when connected to the serpentine loop. *Cf. Drexelbrook Controls v. Endress-Hauser*, 989 F.2d 1201, *3 (Fed. Cir. 1993) (overturning rejection of JMOL where expert relied on "altered version of the accused product *with the rivet removed*") (emphasis added).

Finally, Defendant argues that "Plaintiffs presented only conclusory assertions by Pitt that the coating [of the accused product] is 'thread-like.'" D.I. 346 at 17 (internal citations omitted). Yet, Dr. Pitt testified extensively about his findings regarding the length, width, and height of the polymer around each ring of the Synergy™ stent and why the properties met the characteristics of a "thread-like" structure. Tr. 553:4-556:23. The Court agrees with Plaintiffs that Dr. Pitt showed that he "determined that each abluminal polymer structure adhered around the outside of a given ring of a Synergy™ stent was (1) three dimensional, (2) continuous, and had (3) a ratio of length to width greater than 160:1." D.I. 354 at 10 (internal citations omitted). Further, Plaintiffs introduced FDA documents in which Defendant described detached polymer particulates as "fibers" and "ribbon-like." Tr. 554:2-555:5. From these documents alone, the jury had sufficient reason to find that the Synergy™ stent includes a fiber. Therefore, the Court disagrees with Defendant's claim that such a finding by the jury was not supported by sufficient evidence. Accordingly, Defendant's motion for JMOL of no infringement for failure to show that the accused products contain a fiber is DENIED.

iv. *Plaintiffs presented sufficient evidence that the Synergy™ stent includes immiscible phases.*

According to Defendant, the jury erred by finding infringement because Plaintiffs failed to prove that the Synergy™ stents include "immiscible" phases. D.I. 346 at 17-18. Specifically, Defendant argues that Dr. Pitt opined "that the term 'immiscible' imposes a requirement that the first and second phases be incapable of forming," which was contrary to the Court's construction of the term "immiscible." *Id.* Therefore, Defendant contends that the testimony must be disregarded. *Id.* Without the benefit of Dr. Pitt's testimony on the issue of "immiscibility," Defendant argues that "[t]he ***only testing in the record*** demonstrated that the materials in the purported first and second phases—PLGA and everolimus—were miscible," thus warranting JMOL on the issue of infringement. *Id.* at 17 (emphasis in original). For the following reasons, the Court disagrees.

The Court construed the term "immiscible" to mean "incapable of dissolving into one another." D.I. 90 at 1. While the Court's construction did not impose an explicit "single phase" requirement, Dr. Pitt testified that, in order for the phases to be "capable of dissolv[ing] into one another," the phases must be able to dissolve completely. Tr. 573:13-574:2 (testifying that, when phases "dissolve into one another," "[t]here's only one phase"). According to Dr. Pitt, there is "no such thing as slightly miscible [phases]" or partial dissolution of phases. *Id.* at 575:4-10. Rather, "phases [are either] miscible or immiscible." *Id.* Thus, Dr. Pitt explained that, because the Synergy™ stent is described as having "separated drug- and PLGA-rich phases," there was no argument that the phases did not dissolve into one another, thus making them immiscible. *Id.* at 577:13-17.

This testimony does not contradict the Court's construction but rather describes the Court's construction to the jury. *Id.* at 654:24-655:1 (noting that Dr. Pitt referenced "single

phase" in order "to explain" Court's construction of "immiscible"). While Dr. Mooney disagreed with Dr. Pitt's testimony and introduced his own explanation of the Court's construction, Defendant did not object to this testimony during trial. *See id.* at 750:11-15 (testimony from Dr. Mooney explaining that "the term 'immiscible' is an absolute [and] means that they simply cannot dissolve in each other. If they can dissolve a little bit, they are not immiscible. If they can dissolve a lot, they are not immiscible"). Because Defendant failed to object, the Court will not address Defendant's arguments challenging Dr. Pitt's description of "immiscible phases" under the Court's construction. *See Energy Transp. Grp., Inc. v. Sonic Innovations, Inc.*, No. CA 05-422 GMS, 2011 WL 2222066, at n.8 (D. Del. June 7, 2011), *aff'd sub nom. Energy Transp. Grp., Inc. v. William Demant Holding A/S*, 697 F.3d 1342 (Fed. Cir. 2012) ("If the defendants believed that ETG was attempting to introduce evidence based on something other than the court's claim construction, they should have objected to the evidence.").

Given Dr. Pitt's testimony that "phases [are either] miscible or immiscible," a reasonable jury could have found that the Synergy™ stent satisfied the "immiscible" phases limitation of the asserted claims of the '296 patent. Accordingly, the Court DENIES Defendant's motion for JMOL of no infringement for failure to show that the accused products satisfy the immiscible phases limitation of the asserted claims of the '296 patent.

v. *Plaintiffs presented sufficient evidence to support their damages theory.*

Defendant next contends that "[m]ultiple critical defects invalidate Plaintiffs' damages theory." D.I. 346 at 18. Specifically, Defendant argues that Plaintiffs erred by presenting a damages case "focused solely on the value of the biodegradability of the fiber and [] silent on the value of the immiscibility of the fiber's phases." *Id.* According to Defendant, Plaintiffs' damages expert, Mr. Garratt, improperly introduced "conclusory and speculative" apportionment

opinions to the jury and, without such improper testimony, Defendant contends that "no reasonable jury could have found sufficient evidence supporting Plaintiffs' damages. *Id.* at 19.

"A jury award of damages is reviewed by [the district court] for substantial evidence. That award is entitled to deference." *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 426 F.Supp.2d 211, 214 (D.Del.2006) (citation omitted). As the Federal Circuit has explained, "[t]he jury's award should stand unless it is grossly excessive, not supported by evidence, or based on only speculation or guesswork." *Fujifilm Corp. v. Benun*, 605 F.3d 1366, 1372 (Fed. Cir. 2010).

While Defendant claims that the award was based on speculation and guesswork, the Court finds that Plaintiffs' damages expert, Mr. Lewis, established the "incremental profit" that the patented invention adds to the end product by subtracting the per unit profit Defendant earned from sales of the Promus PREMIER™ and Promus ELITE™ stents from the per unit profit Defendant earned from the accused Synergy™ stent. Tr. 1091:6-1093:19. As Plaintiffs note, in making his findings, "Mr. Lewis relied on the opinions of Plaintiffs' technical and medical experts, Dr. Pitt and Dr. Garratt, that the only material difference between Defendant's Synergy™ and Promus™ stents was the use of the claimed invention" as well as "Defendant's sales training materials showing that the accused Synergy™ fiber structure was 'the key differentiator' between the Synergy™ and Promus™ products." D.I. 354 at 12-13 (internal citations omitted); Tr. 1091:18-23 (noting that "Dr. Pitt and Dr. Garratt [] really weren't able to find any material difference between Synergy and Primus that wasn't related to the bioabsorbable coating"); Tr. 1092:3-7 (referencing Boston Scientific's "training documents"). This evidence undermines Defendant's clam that Mr. Lewis' apportionment of at least 90% to 100% was conclusory and speculative.

Additionally, Defendant's claim that "Plaintiffs' damages case presented at trial focused solely on the value of the biodegradability of the fiber and was silent on the value of the immiscibility of the fiber's phases" is without merit. *See* D.I. 34 at 19. Mr. Lewis did not assign value to the polymer fiber merely because the fiber was biodegradable. Rather, Mr. Lewis recognized the jury's finding of infringement and sought to value the entire infringing Synergy™ polymer. *See* Tr. 1125:6-8 (recognizing the jury's finding that Synergy™ infringed the asserted claims). In doing so, Mr. Lewis compared the price of stents sold by Defendant that did not contain the infringing polymer fiber with the Synergy™ stent. *See* Tr. 1123:22-1126:13 (explaining Mr. Lewis's reliance on the Promus stent, which "does not infringe the '296 patent," to determine that "Promus made this much profit. SYNERGY made this much profit. And here's the amount that SYNERGY made more the incremental profit compared to Promus"). Like Plaintiffs, the Court finds no need for Mr. Lewis to "break up the value of the invention into pieces," given his testimony that Promus did not contain an infringing fiber. D.I. 354 at 13. The Court also agrees that Defendant failed to explain how or why Mr. Lewis's methodology could justify JMOL on damages. *Id.*

Accordingly, the jury's award will stand, and Defendant's request for JMOL is denied.

vi. *The record does not support a finding of willful infringement.*

Finally, Defendant contends that it is entitled to JMOL on willful infringement because "Plaintiffs presented no evidence that Boston Scientific has a specific intent to infringe the '296 [p]atent." D.I. 346 at 19. The Court agrees.

As the Supreme Court has explained, "[t]he sort of conduct warranting enhanced damages has been variously described in our cases as willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate." *Halo Elecs.,*

*Inc. v. Pulse Elecs., Inc.*, — U.S. —, 136 S. Ct. 1923, 1932, 195 L.Ed.2d 278 (2016). Indeed, a finding of willfulness is "generally reserved for egregious cases of culpable behavior." *Id.* Thus, "[t]o establish willfulness, the patentee must show the accused infringer had a specific intent to infringe at the time of the challenged conduct." *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 987 (Fed. Cir. 2021). The evidence must "transform simple 'intentional or knowing' infringement into egregious, sanctionable behavior." *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1308 (Fed. Cir. 2019) (internal citations omitted).

Plaintiffs contend that they satisfied this standard by presenting "compelling evidence that Boston Scientific copied the technology and ideas claims in the '296 Patent." D.I. 350 at 3. Specifically, Plaintiffs argue that "[t]he timeline of events establishes—nearly as a matter of law—that, led by its R&D team, Boston Scientific copied" the '296 patent. *Id.* Included in this timeline was a presentation given by Boston Scientific to the FDA on or about October 1, 2008, in which Boston Scientific disclosed its initial plans for a "Drug-Eluting Biodegradable Polymer Coating on Metallic Stent." *Id.* According to Plaintiffs, during this initial FDA presentation, Boston Scientific did not call their primarily-burst-release design "Evolution" and did not disclose any drug-to-polymer ratio or "suggest[] that immiscible, discrete (i.e. individually separate), drug-containing phase regions are dispersed throughout the abluminal continuous coating." *Id.*

Plaintiffs' timeline also cites to a meeting held on October 16, 2008 and a subsequent FDA presentation held in June 2009. *Id.* at 3-5. Plaintiffs note that, during the October 2008 meeting, a Boston Scientific employee, Dr. Nelson, presented to Mary Beth Moynihan, Boston Scientific's VP of Research and Development, and Kevin Ballinger, Boston Scientific's Vice President, on "TissueGen use[] [of] biodegradation, as well as polymer composition and format

to tune drug delivery" and TissueGen's "Solid Patent Foundation," including the '296 patent. *Id.* at 4. According to Plaintiffs, shortly thereafter, "in the spring of 2009, Ms. Moynihan sought and received 'additional information' about the patented technology, promptly shared the information with multiple executives leading Boston Scientific's research and development team, and confirmed that she and 'Kevin Ballinger (VP, R&D)' reviewed Dr. Nelson's materials." *Id.*

Finally, Plaintiffs noted that, in June 2009, during a second FDA presentation, Boston Scientific "provided far more detail and more specifics about a controlled extended-release design called 'Evolution,'" which showed that Boston Scientific "settled on 85:15 PLGA polymer formulation using everolimus in a 45:55 drug to polymer ratio to be released over approximately 90 days at varying rates." *Id.* at 4-5. According to Plaintiffs, during this second presentation, Boston Scientific described a polymer technology with many of the characteristics that "lie at the heart of the asserted claims of the '296 Patent," including immiscible, discrete (i.e. individually separate), dispersed drug-containing phase regions, where the "drug and polymer are not mixed" and the "flexible polymer and brittle drug phases coexist separately from each other." *Id.* Plaintiffs argue that the jury's finding of willful infringement was reasonable, given evidence that Defendant's high-level employees "had knowledge of the '296 Patent and TissueGen's 'Revolutionary' technology during the exact period (Fall 2008–2009) when Boston Scientific's FDA presentations "evolved" to include the patented features." *Id.* at 6.

While Plaintiffs argue that Defendant failed to refute any of Plaintiffs' evidence of copying, the Court, even accepting Plaintiffs' evidence as true and weighing all logical inferences in Plaintiffs' favor, finds that the record was insufficient to establish that Defendant's "conduct rose to the level of wanton, malicious, and bad-faith behavior required for willful

infringement." *SRI Int'l*, 930 F.3d at 1309. Specifically, the Court, like Defendant, finds that Plaintiffs have not presented sufficient evidence that Defendant acted with the specific intent to willfully infringe the asserted technology. D.I. 346 at 19.

The Federal Circuit's holding in *Bayer Healthcare* is particularly illustrative. Just as in this matter, plaintiff in *Bayer* accused defendant of willfully infringing the asserted patent by "consciously redirect[ing] its own research . . . after learning about [plaintiff's patented] invention." *Bayer*, 989 F.3d at 987-88. In support of the claim that defendant acted willfully, plaintiff in *Bayer* relied on defendant's "internal documents" which discussed the asserted patent. *Id.* Plaintiff in *Bayer* also highlighted two presentations made to the FDA by defendant describing the infringing product. *Id.* According to plaintiff, the first of the two presentations occurred before defendant reviewed the asserted patent and revealed defendant's "initial approach with FVIII conjugates was random PEGylation." *Id.* at 988. Plaintiff argued that the second presentation, which took place after defendant learned of plaintiff's patent, revealed that defendant "switched to targeted, B-domain PEGylation," just as claimed in the plaintiff's technology. *Id.* at 980, 988. According to plaintiff, the inexplicable shift in defendant's technology between the company's initial and later approach proved that defendant "consciously redirected its own research . . . after learning about [plaintiff's] invention" and justified a jury finding of willful infringement. *Id.* The Federal Circuit disagreed.

According to the Federal Circuit, the evidence presented by plaintiff revealed defendant's knowledge of the asserted patent and supported plaintiff's claim that defendant infringed plaintiff's patented technology. *Id.* at 988. While "[k]nowledge of the asserted patent and evidence of infringement is necessary," however, the court noted that "[such evidence was] not sufficient[] for a finding of willfulness," which "requires deliberate or intentional infringement."

*Id.* Thus, despite plaintiff's claims that defendant added infringing elements to the accused product only after learning about plaintiff's patented technology, the Federal Circuit found that plaintiff's evidence did not show that defendant acted with the necessary intent to willfully infringe the asserted patent. *Id.* Thus, the *Bayer* court overturned the jury's finding of willfulness. *Id.*

Similarly, in this case, while Plaintiffs contend that Boston Scientific redirected its technology after "review[ing] Plaintiffs' patented 'technology and ideas,'" such evidence is insufficient to establish that Defendant acted intentionally and deliberately to infringe on Plaintiffs' patent rights. Just as in *Bayer,* the internal Boston Scientific documents and FDA presentations highlighted by Plaintiffs are sufficient to support Plaintiffs' claims that Defendant had knowledge of and infringed the '296 patent but fall short of proving that Defendant acted with the requisite intent to willfully infringe. As such, Defendants' motion for JMOL on willful infringement is GRANTED.[2]

**b. Plaintiffs' Motion for a New Trial**

Defendant also moves for a new trial on the grounds that Plaintiffs' counsel engaged in misconduct that improperly influenced the jury's verdict. D.I. 346 at 2-11. Specifically, Defendant contends that Plaintiffs improperly referenced Defendant's decision not to file for *inter partes* reexamination of the '296 patent during Plaintiff's opening statements and continued to improperly reference Defendant's decision not to file an IPR during trial. *Id.* at 6-7. Defendant also contends that Plaintiffs' counsel improperly appealed to bias and emotion throughout the proceedings by, *inter alia*, (1) describing the "clear and convincing" standard for

[2] Given the Court's holding granting Defendant's JMOL on willful infringement, Plaintiffs' Motion to Amend the Judgment to Include Enhanced Damages (D.I. 349) is DENIED as moot.

proving invalidity as "the standard that we use if they want to involuntarily admit you to a psychiatric hospital", or "to take your kids away", (2) playing a video of a child lying to her parents and a baseball player lying about steroid use, and (3) telling the jury that that one Boston Scientific witness "told the truth" while another was a "paid witness to tell you that fiber doesn't mean fiber". D.I. 346 at 4-6 (citing Tr. 90:18-19, 91:2, 105:21-23, 106:6-9).

A new trial is proper with respect to such claims if Plaintiffs made prejudicial remarks and it is "reasonably probable" those prejudicial remarks influenced the jury's verdict. *Draper v. Airco, Inc.*, 580 F.2d 91, 97 (3d Cir. 1978). Even if the Court agreed with Defendant that some of Plaintiffs statements at trial were prejudicial, when viewed in the context of the entire record and the Court's curative instructions, the Court is not convinced that any of those statements had a reasonable probability of influencing the jury's verdict.

Plaintiffs' reference to the clear and convincing standard and comparison of that standard to the standard for taking away a child from a parent does not require a new trial. After Defendant objected to Plaintiffs' characterization of that standard, the Court instructed the jury that "opening statements are not evidence and they are not instructions on the law. The Court will instruct you on the law later, this is just attorney argument." Tr. at 106:2-5. The Court also instructed the jury that opening statements were not evidence in its Preliminary Instructions. *See* D.I. 316. And the Court once again instructed the jury on the clear and convincing standard during its Final Instructions. Tr. 1019:7-13 (explaining that "[c]lear and convincing evidence means evidence that is highly probable that a fact is true" and "[p]roof by clear and convincing evidence is a higher burden than proof by preponderance of the evidence"). The Court finds that the curative instruction and jury instructions were sufficient to remedy any prejudice from Plaintiffs' statements. Specifically, the Court finds that this case is distinguishable from *Carrier*

*Corp. v. Goodman Glob., Inc.*, 162 F. Supp. 3d 345, 368-369 (D. Del. 2016), where "both parties were aggressive litigators to the detriment of the trial record" such that "any gratuitous argument [was] sufficient to tip the balance for the wrong reason." *Id.*

Likewise, Plaintiffs' reference to Defendant's decision not to institute IPR also does not require a new trial. The Court allowed some questioning on that issue after Defendant opened the door to such questioning by arguing that the trial was Defendant's "only opportunity" to challenge the '296 patent. *See* Tr. 155:18-156:22. During Plaintiffs' closing statements, Plaintiffs argued that Dr. Mooney's testimony that the '296 patent would not have issued if the patent examiner had been aware of Song was not credible because Defendant had the opportunity to file an IPR but did not do so. Tr. 954:14-955:7. The Court found that Plaintiffs' argument went beyond the scope of the limited questioning that the Court allowed. *See* Tr. 960:16-23. Accordingly, the Court issued a curative instruction informing the jury that "whether a party filed an IPR or not has no bearing on the issues you're going to be asked to decide." Tr. 962:1-3. The Court finds that this curative instruction was sufficient to remedy any prejudice from Plaintiffs' statements regarding IPR.

The Court has also reviewed the remainder of the statements that Defendant contends improperly bolstered Plaintiffs' counsel's credibility or improperly appealed to bias and emotion. *See* D.I. 346 at 4-5; 9-10. The Court is not convinced that those statements were misconduct as opposed to aggressive advocacy, and none of the statements were prejudicial in the sense of affecting a substantial right in the context of the entire record. *Lucent Techs., Inc. v. Newbridge Networks Corp.*, 168 F. Supp. 2d 181, 261 (D. Del. 2001) ("In the case of alleged attorney misconduct, the party seeking a new trial must demonstrate that the attorney's conduct constitutes misconduct, and not merely aggressive advocacy, and that the misconduct is

prejudicial in the sense of affecting a substantial right in the context of the entire trial record.") Accordingly, viewing the record as a whole, and in light of the Court's curative instructions, the Court cannot conclude that Plaintiffs' arguments were "so egregious as to make it reasonably probable that the jury was improperly influenced" to warrant a new trial. *Id.*; *Snider v. Sterling Airways, Inc.*, 2017 WL 6336596, at *10 (E.D. Pa. Sept. 5, 2017) ("[A] litigant is entitled to a fair trial but not a perfect one, for there are no perfect trials.").

**c. Plaintiffs' Motion for Pre-and Post-Judgment Interest**

According to Plaintiffs, "[t]he law unequivocally compels, if not outright requires, an award of pre-judgment and post-judgment interest." D.I. 350 at 17. Thus, Plaintiffs seek pre-judgment interest on the jury's $42 million damages award at the prime rate, compounded quarterly which, according to Plaintiffs, equates to $10,947,425 of prejudgment interest through February 15, 2023, the date of the judgment on the verdict. Plaintiffs additionally seek post-judgment interest at 4.87% computed daily and compounded annually. *Id.* at 1. Defendant moves the Court to deny as premature or, alternatively, reduce Plaintiffs' sought pre-judgment interest. D.I. 355 at 1. For the following reasons, the Court finds that Plaintiffs are entitled to pre- and post-judgment interest; however, Plaintiffs' pre-judgment interest calculations are reduced to reflect interest on royalty payments.

i. *Plaintiffs' Request for Pre-Judgment Interest Is Not Premature.*

"In cases of patent infringement, 'prejudgment interest should be awarded [under 35 U.S.C. § 284] absent some justification for withholding such an award.'" *Tristrata Tech., Inc. v. Mary Kay, Inc.*, 423 F.Supp.2d 456, 471 (D. Del. 2006) (citing *GM Corp. v. Devex Corp.*, 461 U.S. 648, 657, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983)). As Plaintiffs' note, "prejudgment

interest is the rule, not the exception." D.I. 350 at 18 (citing *Schwendimann v. Arkwright Advanced Coating, Inc.*, 959 F.3d 1065, 1076 (Fed. Cir. 2020)). "As a general matter, prejudgment interest should ordinarily be awarded in patent cases to provide patent owners with complete compensation." *LG Display Co. v. AU Optronics Corp.*, 722 F.Supp.2d 466, 475 (D. Del. 2010). According to the Federal Circuit, district courts have "'great discretion' when determining the applicable interest rate for an award of prejudgment interest." *See Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991).

Defendant contends, however, that Plaintiffs' request for prejudgment interest should be denied because the request is premature given "there are considerable uncertainties due to the trial record and the disconnect between the evidence and the jury's verdicts." D.I. 355 at 17. However, as the Court noted above, the jury's damages award of $42 million was supported by the trial record, and the Court's decision upholds the jury's findings on all grounds but willfulness. *See supra* at 6-24. Thus, the Court disagrees with Defendant's claims that there remains "significant issues with both the liability and damages evidence Plaintiffs presented at trial" and finds no reason to further postpone the award of prejudgment interest. *See* D.I. 355 at 17.

ii. *Plaintiffs' Pre-Judgment Interest Calculations is Reduced to Reflect Interest on Royalty Payments.*

Alternatively, Defendant contends that Plaintiffs' request for prejudgment interest should be reduced because (1) Plaintiffs are responsible for a two-year delay in litigation; (2) the jury's damages award should be treated as a running royalty; and (3) prejudgment interest should be awarded under the Treasury Bill, not the higher Prime rate. D.I. 355 at 18. Each argument is considered in turn below.

1. *Defendant fails to prove that Plaintiffs' two-year delay resulted in any prejudice.*

According to Defendant, the Court should reduce Plaintiffs' prejudgment interest demand because "Plaintiffs initiated this case with a complaint in the Western District of Texas, an improper venue[,] [] and . . . [a]fter the Texas court dismissed the case, Plaintiffs then dedicated over two years to appealing the resulting transfer order, including a petition to the Supreme Court, while this case was stayed." *Id.* Thus, Defendant argues that Plaintiffs are not entitled to prejudgment interest before the stay was lifted on April 30, 2020. *Id.* at 18-19. While "undue delay" may justify a court's decision to deny or reduce prejudgment interest, our courts have held that, "[u]ness delay causes prejudice to the defendant, however, it does not support a denial of prejudgment interest." *Green Mountain Glass LLC v. Saint-Gobain Containers, Inc.*, 300 F. Supp. 3d 610, 627 (D. Del. 2018), *aff'd sub nom. Green Mountain Glass, LLC v. Saint-Gobain Containers, Inc.*, 773 F. App'x 619 (Fed. Cir. 2019); *see also Lummus Industries. Inc., v. D.M. & E. Corp.*, 862 F.2d 267, 275 (Fed. Cir. 1988). As Plaintiffs note, Defendant "does not even claim it suffered prejudice." D.I. 361 at 6. Additionally, Plaintiffs have presented some evidence that Defendant may have benefitted from the stay, given that Defendant "continued to sell and profit from infringing products" during that time. *Id.* at 6-7. Because Defendant failed to present evidence that it suffered prejudice, the Court denies Defendant's claim that "prejudgment interest should be awarded between April 30, 2020 (when stay was lifted) and February 15, 2023 (when judgment was entered)." D.I. 355 at 19.

2. *Pre-judgment interest will be awarded using the Prime rate.*

Additionally, Defendant contends that Plaintiffs' pretrial interest should be awarded "under the Treasury Bill rate (the rate set by statute for post-judgment interest under § 1961), as

opposed to the higher Prime rate requested by Plaintiffs . . . ." D.I. 355 at 20. The Court disagrees.

Courts in this district "have recognized that the prime rate best compensate[s] a patentee for lost revenues during the period of infringement because the prime rate represents the cost of borrowing money, which is 'a better measure of the harm suffered as a result of the loss of the use of money over time.'" *IMX, Inc. v. LendingTree, LLC*, 469 F.Supp.2d 203, 227 (D. Del. 2007) (internal citations omitted). While Defendant argues against using the Prime rate because "there is no evidence that UTBOR was required to borrow any money due to Boston Scientific's alleged infringement," such evidence is not required. *See* D.I. 355 at 20. Indeed, "decisions of this District have used the prime rate even when there was no evidence that the patentee was borrowing money or experiencing a risk of non-payment." *Idenix Pharms. LLC v. Gilead Scis., Inc.*, 271 F. Supp. 3d 694, 705 (D. Del. 2017). As Defendant presents no other reason to use the lower Treasury Bill rate, the Court will apply the Prime rate, as is "the most common practice in the District of Delaware." *Id.*

3. *The jury's damages award should be treated as a running royalty.*

Finally, Defendant argues that Plaintiffs' prejudgment interest should be reduced because "neither party argued that damages should be calculated as a lump sum at trial; instead, both parties' experts unambiguously applied a running royalty approach for calculating damages." D.I. 355 at 19. Defendant contends that, by treating the jury's award as a lump sum, Plaintiffs seek $3.5 million of extra prejudgment interest. *Id.* Plaintiffs, on the other hand, argue that they are entitled to treat the jury award as a lump sum because "[t]he jury in this case awarded $42 million in damages without any mention or indication of how the award was calculated." D.I. 350 at 19-20. Plaintiffs contend that a royalty rate cannot be extrapolated from the record

because "[t]he jury was not instructed on a running royalty damages theory." *Id.* The Court disagrees.

The trial record reveals that both Plaintiffs' and Defendant's damages experts utilized per unit royalties tied to the actual sales of Synergy™ to calculate damages. For instance, Plaintiffs' expert, Mr. Lewis, explained that he used the number of Synergy™ units imported into the United States during the damages period and "multipl[ied] it times the incremental revenue or incremental profit that [Defendant] made per SYNERGY unit to get a total of the benefit achieved from selling SYNERGY." Tr. 1095:8-16. Defendant's expert, Mr. Hass, similarly offered testimony based on per unit royalties and the actual sales of Synergy™. *See id.* at 1232:1-7. As Defendant notes, "no expert provided any testimony about a lump-sum award at trial." D.I. 355 at 19. Thus, this matter is comparable to *Trading Technologies International, Inc. v. IBG LLC*, where the court found that "[b]oth parties' damages experts offered damages opinions based on the reasonable royalty IBG and TT would hypothetically negotiate at the start of the infringement period and their suggested award amounts were tied to actual use or access to the patented invention." 2022 WL 103894, at *3 (N.D. Ill. Jan. 11, 2022). "Based on the damages testimony offered at trial," the court in *Trading Technologies* found that "it [was] reasonable to conclude that the jury's award most likely reflects a running royalty amount rather than a lumpsum payment." *Id.* ("To treat the damages award as a lumpsum and charge interest on it over the course of the infringement period would overcompensate TT by awarding it interest on money it would not have yet received."). This Court finds the same to be the case here.

Given the clear trial record, the Court finds that awarding pre-judgment interest on royalty payments offers the most accurate result and avoids overcompensating Plaintiffs by

awarding them interest they would not have yet received. Accordingly, the Court will award Plaintiffs prejudgment interest on a running royalty rate, which would yield $7,436,328 in interest. As Defendant does not challenge Plaintiffs' request for post-judgment interest, the Court awards post-judgment interest to accrue at 4.87% computed daily and compounded annually.

## 4. CONCLUSION

For the foregoing reasons, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** Defendant's Motions for a New Trial and Judgment as a Matter of Law (D.I. 345). Additionally, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** Plaintiffs' Motion for Enhanced Damages and Pre- and Post-Judgment Interest (D.I. 349). An appropriate Order will follow.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEMS, and TISSUEGEN, INC.,

Plaintiffs,

v.

BOSTON SCIENTIFIC CORPORATION,

Defendant.

C.A. No. 18-392

**ORDER**

At Wilmington this 5th day of June 2024:

For the reasons set forth in the Memorandum Opinion issued this day, **IT IS HEREBY ORDERED** that:

1. Defendant's Motions for a New Trial and for Judgment as a Matter of Law (D.I. 345) are **GRANTED-IN-PART** and **DENIED-IN-PART** as follows:
    a. Defendant's Motion for a New Trial is **DENIED**;
    b. Defendant's Motion for Judgment as a Matter of Law of Anticipation is **DENIED**;
    c. Defendant's Motion for Judgment as a Matter of Law of Lack of Written Description is **DENIED**;
    d. Defendant's Motion for Judgment as a Matter of Law of no Infringement is **DENIED**;

e. Defendant's Motion for Judgment as a Matter of Law of No Damages is **DENIED**; and

f. Defendant's Motion for Judgment as a Matter of Law of No Willful Infringement is **GRANTED**.

2. Plaintiffs' Motion for Enhanced Damages and Pre- and Post-Judgment Interest (D.I. 349) is **GRANTED-IN-PART** and **DENIED-IN-PART** as follows:

a. Plaintiffs' Motion for Enhanced Damages is **DENIED**;

b. Plaintiffs' Motion for Pre-Judgment Interest is **GRANTED** in the amount of $7,436,328; and

c. Plaintiffs' Motion for Post-Judgment Interest to accrue at 4.87% computed daily and compounded annually is **GRANTED**.

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

CLOSED,PATENT/TRADEMARK

# U.S. District Court [LIVE]
# Western District of Texas (Austin)
# CIVIL DOCKET FOR CASE #: 1:17-cv-01103-LY

Board of Regents, The University of Texas System et al v. Boston Scientific Corporation
Assigned to: Judge Lee Yeakel
Case in other court: USCA for the Federal Circuit, 18-01700
Cause: 35:271 Patent Infringement

Date Filed: 11/20/2017
Date Terminated: 03/12/2018
Jury Demand: Plaintiff
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

**Plaintiff**

**Board of Regents, The University of Texas System** represented by

**Ari B. Rafilson**
Shore Chan LLP
901 Main Street, Suite 3300
Dallas, TX 75202
214-593-9114
Fax: 214-593-9111
Email: arafilson@cjsjlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Chijioke E. Offor**
Shore Chan DePumpo LLP
901 Main Street, Suite 3300
Dallas, TX 75202
214-593-9128
Fax: 214-593-9111
Email: chiji@profferevans.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher L. Evans**
Offor Evans PLLC
1122 Jackson Street
Ste 901
Dallas, TX 75202
214-593-9121
Email: chris@profferevans.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael W. Shore**
The Shore Firm
901 Main Street
Ste 3300
Dallas, TX 75202

214-593-9140
Fax: 214-593-9111
Email: mshore@shorefirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul T. Beeler**
Shore Chan DePumpo LLP
901 Main Street, Suite 3300
Dallas, TX 75202
214-593-9110
Fax: 214-593-9111
Email: pbeeler@shorechan.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Alfonso Garcia Chan**
McKool Smith P.C.
300 Crescent Court, Suite 1500
Ste 1500
Dallas, TX 75201
214-978-4022
Email: achan@kslaw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**TissueGen, Inc.** represented by **Chijioke E. Offor**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael W. Shore**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alfonso Garcia Chan**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Boston Scientific Corporation** represented by **Hannah D. Sibiski**
Arnold & Porter Kaye Scholer LLP
700 Louisiana St., Suite 4000
Houston, TX 77002
713-576-2400
Fax: 713-576-2499
Email: hannah.sibiski@aporter.com
*LEAD ATTORNEY*

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John E. Nilsson**
Arnold & Porter Kaye Scholer
601 Massachusetts Ave., N.W.
Washginton, DC 20001
202-942-5000
Fax: 202-942-5999
Email: John.Nilsson@apks.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher M. Odell**
Arnold & Porter
Bank of America
700 Louisiana Street
Suite 1600
Houston, TX 77002
(713) 576-2401
Fax: (713) 576-2401
Email: christopher.odell@apks.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/20/2017 | 1 | COMPLAINT *Plaintiffs' Original Complaint for Patent Infringement* ( Filing fee $ 400 receipt number 0542-10198934). No Summons requested at this time, filed by Board of Regents, The University of Texas System, TissueGen, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Civil Cover Sheet)(Chan, Alfonso) (Entered: 11/20/2017) |
| 11/20/2017 | | Case assigned to Judge Lee Yeakel. CM WILL NOW REFLECT THE JUDGE INITIALS AS PART OF THE CASE NUMBER. PLEASE APPEND THESE JUDGE INITIALS TO THE CASE NUMBER ON EACH DOCUMENT THAT YOU FILE IN THIS CASE. (afd) (Entered: 11/21/2017) |
| 11/20/2017 | | DEMAND for Trial by Jury by Board of Regents, The University of Texas System, TissueGen, Inc.. (afd) (Entered: 11/21/2017) |
| 11/21/2017 | 2 | Report on Patent/Trademark sent to U.S. Patent and Trademark Office with copy of Complaint. (afd) (Entered: 11/21/2017) |
| 12/08/2017 | 3 | REQUEST FOR ISSUANCE OF SUMMONS by Board of Regents, The University of Texas System, TissueGen, Inc.. *for Boston Scientific Corp.* (Chan, Alfonso) (Entered: 12/08/2017) |
| 12/11/2017 | 4 | Summons Issued as to Boston Scientific Corporation. (klw) (Entered: 12/11/2017) |
| 12/21/2017 | 5 | NOTICE of Attorney Appearance by Christopher M. Odell on behalf of Boston Scientific Corporation. Attorney Christopher M. Odell added to party Boston Scientific Corporation(pty:dft) (Odell, Christopher) (Entered: 12/21/2017) |
| 12/21/2017 | 6 | Unopposed MOTION for Extension of Time to File Answer re 1 Complaint, by Boston Scientific Corporation. (Attachments: # 1 Proposed Order)(Odell, Christopher) (Entered: 12/21/2017) |

| | | |
|---|---|---|
| 12/26/2017 | 7 | ORDER GRANTING 6 Motion for Extension of Time to Answer re 1 Complaint. Boston Scientific Corporation answer due 2/1/2018. Signed by Judge Lee Yeakel. (klw) (Entered: 12/26/2017) |
| 12/27/2017 | 8 | MOTION to Appear Pro Hac Vice by Christopher M. Odell *for John E. Nilsson* ( Filing fee $ 100 receipt number 0542-10306586) by on behalf of Boston Scientific Corporation. (Attachments: # 1 Proposed Order)(Odell, Christopher) (Entered: 12/27/2017) |
| 12/28/2017 | 9 | ORDER GRANTING 8 Motion for John Nilsson to Appear Pro Hac Vice on behalf of Defendant. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Signed by Judge Lee Yeakel. (klw) (Entered: 01/02/2018) |
| 01/05/2018 | 10 | SUMMONS Returned Executed by Board of Regents, The University of Texas System, TissueGen, Inc. Boston Scientific Corporation served on 12/11/2017, answer due 1/2/2018. (Chan, Alfonso) Modified on 1/5/2018 to correct text and answer deadline (klw). (Entered: 01/05/2018) |
| 01/05/2018 | | Reset Deadlines: Boston Scientific Corporation answer due 1/2/2018. (klw) (Entered: 01/05/2018) |
| 01/05/2018 | | Notice of Correction: re 10 Summons Returned Executed. **Docket text and answer deadline corrected.** (klw) (Entered: 01/05/2018) |
| 02/01/2018 | 11 | MOTION to Dismiss *Under Fed. R. Civ. P. 12(B)(3)* by Boston Scientific Corporation. (Attachments: # 1 Proposed Order, # 2 Declaration of Paul Donhauser)(Odell, Christopher) (Entered: 02/01/2018) |
| 02/07/2018 | 12 | ORDER setting Initial Pretrial Conference for 2/14/2018 09:30 AM before Judge Lee Yeakel and Staying Action. Signed by Judge Lee Yeakel. (td) (Entered: 02/07/2018) |
| 02/12/2018 | 13 | ORDER resetting Initial Pretrial Conference for 3/13/2018 09:30 AM before Judge Lee Yeakel. Signed by Judge Lee Yeakel. (klw) (Entered: 02/12/2018) |
| 02/15/2018 | 14 | Response in Opposition to Motion, filed by Board of Regents, The University of Texas System, TissueGen, Inc., re 11 MOTION to Dismiss *Under Fed. R. Civ. P. 12(B)(3)* filed by Defendant Boston Scientific Corporation (Shore, Michael) (Entered: 02/15/2018) |
| 02/16/2018 | 15 | Letters to Christopher Evans, Ari Rafilson and Paul Beeler re: non-admitted status. (klw) (Entered: 02/16/2018) |
| 02/22/2018 | 16 | REPLY to Response to Motion, filed by Boston Scientific Corporation, re 11 MOTION to Dismiss *Under Fed. R. Civ. P. 12(B)(3)* filed by Defendant Boston Scientific Corporation (Odell, Christopher) (Entered: 02/22/2018) |
| 02/26/2018 | 17 | MOTION to Appear Pro Hac Vice by Alfonso Garcia Chan *For Christopher L. Evans* ( Filing fee $ 100 receipt number 0542-10499964) by on behalf of Board of Regents, The University of Texas System, TissueGen, Inc.. (Attachments: # 1 Proposed Order Pro Hac Vice)(Chan, Alfonso) (Entered: 02/26/2018) |
| 02/26/2018 | 18 | *(Counsel advised wrong name is on the motion - 20 Corrected motion filed.)* MOTION to Appear Pro Hac Vice by Alfonso Garcia Chan *for Paul T. Beeler* ( Filing fee $ 100 receipt number 0542-10499979) by on behalf of Board of Regents, The University of Texas System, TissueGen, Inc.. (Attachments: # 1 Proposed Order Pro Hac Vice)(Chan, Alfonso) Modified on 2/27/2018 (klw). (Entered: 02/26/2018) |
| 02/26/2018 | 19 | MOTION to Appear Pro Hac Vice by Alfonso Garcia Chan *for Paul T. Beeler* ( Filing fee $ 100 receipt number 0542-10499988) by on behalf of Board of Regents, The University of |

| | | |
|---|---|---|
| | | Texas System, TissueGen, Inc.. (Attachments: # 1 Proposed Order Pro Hac Vice)(Chan, Alfonso) (Entered: 02/26/2018) |
| 02/26/2018 | 20 | CORRECTED MOTION to Appear Pro Hac Vice by Alfonso Garcia Chan *for Ari B. Rafilson* ( Filing fee $ 100 receipt number 0542-10499979 paid w/ original 18 Motion to Appear Pro Hac Vice) by Board of Regents, The University of Texas System, TissueGen, Inc. (Attachments: # 1 Proposed Order Pro Hac Vice)(Chan, Alfonso) Modified on 2/27/2018 to clarify text (klw). (Entered: 02/26/2018) |
| 02/28/2018 | 21 | ORDER GRANTING 19 Motion for Paul Beeler to Appear Pro Hac Vice on behalf of Plaintiffs. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Signed by Judge Lee Yeakel. (klw) (Entered: 02/28/2018) |
| 02/28/2018 | 22 | ORDER GRANTING 20 Motion for Ari Rafilson to Appear Pro Hac Vice on behalf of Plaintiffs. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Signed by Judge Lee Yeakel. (klw) (Entered: 02/28/2018) |
| 02/28/2018 | 23 | ORDER GRANTING 17 Motion for Christopher Evans to Appear Pro Hac Vice on behalf of Plaintiffs. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Signed by Judge Lee Yeakel. (klw) (Entered: 02/28/2018) |
| 03/08/2018 | 24 | MOTION to Appear Pro Hac Vice by Christopher M. Odell *for Hannah DeMarco Sibiski* ( Filing fee $ 100 receipt number 0542-10544371) by on behalf of Boston Scientific Corporation. (Attachments: # 1 Proposed Order)(Odell, Christopher) (Entered: 03/08/2018) |
| 03/09/2018 | 25 | RULE 7 DISCLOSURE STATEMENT filed by Board of Regents, The University of Texas System, TissueGen, Inc.. (Offor, Chijioke) (Entered: 03/09/2018) |
| 03/12/2018 | 26 | ORDER GRANTING 24 Motion for Hannah DeMarco Sibiski to Appear Pro Hac Vice on behalf of Boston Scientific Corp. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Signed by Judge Lee Yeakel. (klw) (Entered: 03/12/2018) |
| 03/12/2018 | 27 | ORDER GRANTING to an EXTENT Defendant's 11 Motion to Dismiss Plaintiff's Complaint. IT IS ORDERED that this action is TRANSFERRED to the United States District Court of Delaware. Signed by Judge Lee Yeakel. (klw) (Entered: 03/12/2018) |
| 03/13/2018 | | Case transferred from TXWD has been received and opened in Delaware District as case number 1:18-cv-392. (klw) (Entered: 03/13/2018) |
| 03/13/2018 | 28 | Report on Patent/Trademark sent to U.S. Patent and Trademark Office. (klw) (Entered: 03/13/2018) |
| 03/13/2018 | 29 | Appeal of Order entered by District Judge 27 by Board of Regents, The University of Texas System, TissueGen, Inc.. No filing fee submitted (Shore, Michael) (Entered: 03/13/2018) |
| 03/13/2018 | | Notice of Appeal to the Federal Circuit by Board of Regents, The University of Texas System, TissueGen, Inc. Filing fee $ 505 DUE. (klw) Modified on 3/19/2018 to correct appeal fee amount (klw). (Entered: 03/13/2018) |

| | | |
|---|---|---|
| 03/19/2018 | 30 | Transmittal of Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit. (Attachments: # 1 Information Sheet)(klw) (Entered: 03/19/2018) |
| 03/21/2018 | 31 | Appeal Filing fee received in the amount of $505, receipt number 100032691. (klw) (Entered: 03/22/2018) |
| 09/05/2019 | 32 | USCA Federal Circuit Opinion and Judgment affirming the district court's transfer order. (lt) (Entered: 09/05/2019) |
| 11/15/2019 | 33 | Federal Circuit MANDATE issued. (lt) (Entered: 11/15/2019) |


| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 10/15/2024 15:20:14 | | | |
| **PACER Login:** | nyag0054 | **Client Code:** | 490006.0013 |
| **Description:** | Docket Report | **Search Criteria:** | 1:17-cv-01103-LY |
| **Billable Pages:** | 5 | **Cost:** | 0.50 |

CLOSED,APPEAL,Multi-Media Docs,PATENT

# U.S. District Court
# District of Delaware (Wilmington)
# CIVIL DOCKET FOR CASE #: 1:18-cv-00392-GBW

Board of Regents, The University of Texas System et al v. Boston Scientific Corporation
Assigned to: Judge Gregory B. Williams
Case in other court: Texas Western, 1:17-cv-01103
24-02062
24-02063
Cause: 35:271 Patent Infringement

Date Filed: 03/13/2018
Date Terminated: 06/28/2024
Jury Demand: Plaintiff
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

**Plaintiff**

**Board of Regents, The University of Texas System**

represented by

**Stamatios Stamoulis**
Stamoulis & Weinblatt LLC
800 N. West Street, Third Floor
Wilmington, DE 19801
(302) 999-1540
Email: stamoulis@swdelaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alex Q. Jacobs**
Email: ajacobs@shorefirm.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Chijioke E. Offor**
Email: coffor@shorechan.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Corey M. Lipschutz**
Email: clipschutz@susmangodfrey.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael W. Shore**
Email: mshore@shorechan.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samuel E Joyner**
Email: sjoyner@shorechan.com
*TERMINATED: 01/11/2022*
*PRO HAC VICE*

**William D. Ellerman**
Email: wellerman@mckoolsmith.com
*TERMINATED: 09/12/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **TissueGen, Inc.** | represented by | **Stamatios Stamoulis**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Alex Q. Jacobs**<br>(See above for address)<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**Brian D. Melton**<br>(<br>Email: bmelton@susmangodfrey.com<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**Chijioke E. Offor**<br>(See above for address)<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**Corey M. Lipschutz**<br>(See above for address)<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**John P. Lahad**<br>Email: jlahad@susmangodfrey.com<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**Samuel E Joyner**<br>(See above for address)<br>*TERMINATED: 01/11/2022*<br>*PRO HAC VICE*<br><br>**William D. Ellerman**<br>(See above for address)<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |

V.

**Defendant**

| | | |
|---|---|---|
| **Boston Scientific Corporation** | represented by | **Brian E. Farnan**<br>Farnan LLP |

919 North Market Street
12th Floor
Wilmington, DE 19801
(302) 777-0300
Fax: (302) 777-0301
Email: bfarnan@farnanlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael J. Farnan**
Farnan LLP
919 North Market Street
12th Floor
Wilmington, DE 19801
302-777-0338
Fax: 302-421-5870
Email: mfarnan@farnanlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Chad M. Drown**
Email: chad.drown@faegredrinker.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher J. Burrell**
UNDELIVERABLE EMAIL 1/7/14
Email: chris.burrell@faegredrinker.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David J.F. Gross**
Email: david.gross@faegredrinker.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Doowon Chung**
Email: Doowon.Chung@Faegredrinker.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Edmond Ahadome**
UNDELIVERABLE EMAIL 6/22/2021
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elliot Choi**
Email: echoi@mayerbrown.com
*TERMINATED: 10/14/2022*
*PRO HAC VICE*

**Evan J. Kline-Wedeen**
Email: evan.kline-
wedeen@faegredrinker.com

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jacob M. Bass**
Email: jacob.bass@arnoldporter.com
*TERMINATED: 07/27/2021*
*PRO HAC VICE*

**James R. Ferguson**
Email: jferguson@mayerbrown.com
*TERMINATED: 01/04/2023*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John E. Nilsson**
Email: John.Nilsson@arnoldporter.com
*TERMINATED: 07/27/2021*
*PRO HAC VICE*

**Karen L. Pascale**
Young, Conaway, Stargatt & Taylor LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
Email: kpascale@ycst.com
*TERMINATED: 10/19/2020*

**Katherine S. Razavi**
Email: kate.razavi@faegredrinker.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lauren J.F. Barta**
Email: lauren.barta@faegredrinker.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew M. Wolf**
Email: matthew.wolf@arnoldporter.com
*TERMINATED: 07/27/2021*
*PRO HAC VICE*

**Melissa A. Anyetei**
Email: manyetei@mayerbrown.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael P. Kahn**
Email: mkahn@akingump.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael J. Word**

Email: MWord@mayerbrown.com
*TERMINATED: 02/21/2023*
*PRO HAC VICE*

**Nicholas M. Nyemah**
Email: nicholas.nyemah@arnoldporter.com
*TERMINATED: 07/27/2021*
*PRO HAC VICE*

**Nirvani Chethana Perera**
Email: chethana.perera@faegredrinker.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel J. Elsby**
Email: relsby@akingump.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rebecca L. Neubauer**
Email:
Rebecca.Neubauer@arnoldporter.com
*TERMINATED: 07/27/2021*
*PRO HAC VICE*

**Timothy E. Grimsrud**
Email: tim.grimsrud@faegredrinker.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/20/2017 | 1 | COMPLAINT *Plaintiffs' Original Complaint for Patent Infringement* ( Filing fee $ 400 receipt number 0542-10198934). No Summons requested at this time, filed by Board of Regents, The University of Texas System, TissueGen, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Civil Cover Sheet)(Chan, Alfonso) [Transferred from Texas Western on 3/13/2018.] (Entered: 11/20/2017) |
| 11/20/2017 | | Case assigned to Judge Lee Yeakel. CM WILL NOW REFLECT THE JUDGE INITIALS AS PART OF THE CASE NUMBER. PLEASE APPEND THESE JUDGE INITIALS TO THE CASE NUMBER ON EACH DOCUMENT THAT YOU FILE IN THIS CASE. (afd) [Transferred from Texas Western on 3/13/2018.] (Entered: 11/21/2017) |
| 11/20/2017 | | DEMAND for Trial by Jury by Board of Regents, The University of Texas System, TissueGen, Inc.. (afd) [Transferred from Texas Western on 3/13/2018.] (Entered: 11/21/2017) |
| 11/21/2017 | 2 | Report on Patent/Trademark sent to U.S. Patent and Trademark Office with copy of Complaint. (afd) [Transferred from Texas Western on 3/13/2018.] (Entered: 11/21/2017) |
| 12/08/2017 | 3 | REQUEST FOR ISSUANCE OF SUMMONS by Board of Regents, The University of Texas System, TissueGen, Inc.. *for Boston Scientific Corp.* (Chan, Alfonso) [Transferred from Texas Western on 3/13/2018.] (Entered: 12/08/2017) |

| | | |
|---|---|---|
| 12/11/2017 | 4 | Summons Issued as to Boston Scientific Corporation. (klw) [Transferred from Texas Western on 3/13/2018.] (Entered: 12/11/2017) |
| 12/21/2017 | 5 | NOTICE of Attorney Appearance by Christopher M. Odell on behalf of Boston Scientific Corporation. Attorney Christopher M. Odell added to party Boston Scientific Corporation(pty:dft) (Odell, Christopher) [Transferred from Texas Western on 3/13/2018.] (Entered: 12/21/2017) |
| 12/21/2017 | 6 | Unopposed MOTION for Extension of Time to File Answer re 1 Complaint, by Boston Scientific Corporation. (Attachments: # 1 Proposed Order)(Odell, Christopher) [Transferred from Texas Western on 3/13/2018.] (Entered: 12/21/2017) |
| 12/26/2017 | 7 | ORDER GRANTING 6 Motion for Extension of Time to Answer re 1 Complaint. Boston Scientific Corporation answer due 2/1/2018. Signed by Judge Lee Yeakel. (klw) [Transferred from Texas Western on 3/13/2018.] (Entered: 12/26/2017) |
| 12/27/2017 | 8 | MOTION to Appear Pro Hac Vice by Christopher M. Odell *for John E. Nilsson* ( Filing fee $ 100 receipt number 0542-10306586) by on behalf of Boston Scientific Corporation. (Attachments: # 1 Proposed Order)(Odell, Christopher) [Transferred from Texas Western on 3/13/2018.] (Entered: 12/27/2017) |
| 12/28/2017 | 9 | ORDER GRANTING 8 Motion for John Nilsson to Appear Pro Hac Vice on behalf of Defendant. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Signed by Judge Lee Yeakel. (klw) [Transferred from Texas Western on 3/13/2018.] (Entered: 01/02/2018) |
| 01/05/2018 | 10 | SUMMONS Returned Executed by Board of Regents, The University of Texas System, TissueGen, Inc. Boston Scientific Corporation served on 12/11/2017, answer due 1/2/2018. (Chan, Alfonso) Modified on 1/5/2018 to correct text and answer deadline (klw). [Transferred from Texas Western on 3/13/2018.] (Entered: 01/05/2018) |
| 01/05/2018 | | Reset Deadlines: Boston Scientific Corporation answer due 1/2/2018. (klw) [Transferred from Texas Western on 3/13/2018.] (Entered: 01/05/2018) |
| 01/05/2018 | | Notice of Correction: re 10 Summons Returned Executed. **Docket text and answer deadline corrected.** (klw) [Transferred from Texas Western on 3/13/2018.] (Entered: 01/05/2018) |
| 02/01/2018 | 11 | MOTION to Dismiss *Under Fed. R. Civ. P. 12(B)(3)* by Boston Scientific Corporation. (Attachments: # 1 Proposed Order, # 2 Declaration of Paul Donhauser)(Odell, Christopher) [Transferred from Texas Western on 3/13/2018.] (Entered: 02/01/2018) |
| 02/07/2018 | 12 | ORDER setting Initial Pretrial Conference for 2/14/2018 09:30 AM before Judge Lee Yeakel and Staying Action. Signed by Judge Lee Yeakel. (td) [Transferred from Texas Western on 3/13/2018.] (Entered: 02/07/2018) |
| 02/12/2018 | 13 | ORDER resetting Initial Pretrial Conference for 3/13/2018 09:30 AM before Judge Lee Yeakel. Signed by Judge Lee Yeakel. (klw) [Transferred from Texas Western on 3/13/2018.] (Entered: 02/12/2018) |
| 02/15/2018 | 14 | Response in Opposition to Motion, filed by Board of Regents, The University of Texas System, TissueGen, Inc., re 11 MOTION to Dismiss *Under Fed. R. Civ. P. 12(B)(3)* filed by Defendant Boston Scientific Corporation (Shore, Michael) [Transferred from Texas Western on 3/13/2018.] (Entered: 02/15/2018) |
| 02/16/2018 | 15 | Letters to Christopher Evans, Ari Rafilson and Paul Beeler re: non-admitted status. (klw) [Transferred from Texas Western on 3/13/2018.] (Entered: 02/16/2018) |

| | | |
|---|---|---|
| 02/22/2018 | 16 | REPLY to Response to Motion, filed by Boston Scientific Corporation, re 11 MOTION to Dismiss *Under Fed. R. Civ. P. 12(B)(3)* filed by Defendant Boston Scientific Corporation (Odell, Christopher) [Transferred from Texas Western on 3/13/2018.] (Entered: 02/22/2018) |
| 02/26/2018 | 17 | MOTION to Appear Pro Hac Vice by Alfonso Garcia Chan *For Christopher L. Evans* ( Filing fee $ 100 receipt number 0542-10499964) by on behalf of Board of Regents, The University of Texas System, TissueGen, Inc.. (Attachments: # 1 Proposed Order Pro Hac Vice)(Chan, Alfonso) [Transferred from Texas Western on 3/13/2018.] (Entered: 02/26/2018) |
| 02/26/2018 | 18 | *(Counsel advised wrong name is on the motion - 20 Corrected motion filed.)* MOTION to Appear Pro Hac Vice by Alfonso Garcia Chan *for Paul T. Beeler* ( Filing fee $ 100 receipt number 0542-10499979) by on behalf of Board of Regents, The University of Texas System, TissueGen, Inc.. (Attachments: # 1 Proposed Order Pro Hac Vice)(Chan, Alfonso) Modified on 2/27/2018 (klw). [Transferred from Texas Western on 3/13/2018.] (Entered: 02/26/2018) |
| 02/26/2018 | 19 | MOTION to Appear Pro Hac Vice by Alfonso Garcia Chan *for Paul T. Beeler* ( Filing fee $ 100 receipt number 0542-10499988) by on behalf of Board of Regents, The University of Texas System, TissueGen, Inc.. (Attachments: # 1 Proposed Order Pro Hac Vice) (Chan, Alfonso) [Transferred from Texas Western on 3/13/2018.] (Entered: 02/26/2018) |
| 02/26/2018 | 20 | CORRECTED MOTION to Appear Pro Hac Vice by Alfonso Garcia Chan *for Ari B. Rafilson* ( Filing fee $ 100 receipt number 0542-10499979 paid w/ original 18 Motion to Appear Pro Hac Vice) by Board of Regents, The University of Texas System, TissueGen, Inc. (Attachments: # 1 Proposed Order Pro Hac Vice)(Chan, Alfonso) Modified on 2/27/2018 to clarify text (klw). [Transferred from Texas Western on 3/13/2018.] (Entered: 02/26/2018) |
| 02/28/2018 | 21 | ORDER GRANTING 19 Motion for Paul Beeler to Appear Pro Hac Vice on behalf of Plaintiffs. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Signed by Judge Lee Yeakel. (klw) [Transferred from Texas Western on 3/13/2018.] (Entered: 02/28/2018) |
| 02/28/2018 | 22 | ORDER GRANTING 20 Motion for Ari Rafilson to Appear Pro Hac Vice on behalf of Plaintiffs. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Signed by Judge Lee Yeakel. (klw) [Transferred from Texas Western on 3/13/2018.] (Entered: 02/28/2018) |
| 02/28/2018 | 23 | ORDER GRANTING 17 Motion for Christopher Evans to Appear Pro Hac Vice on behalf of Plaintiffs. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Signed by Judge Lee Yeakel. (klw) [Transferred from Texas Western on 3/13/2018.] (Entered: 02/28/2018) |
| 03/08/2018 | 24 | MOTION to Appear Pro Hac Vice by Christopher M. Odell *for Hannah DeMarco Sibiski* ( Filing fee $ 100 receipt number 0542-10544371) by on behalf of Boston Scientific Corporation. (Attachments: # 1 Proposed Order)(Odell, Christopher) [Transferred from Texas Western on 3/13/2018.] (Entered: 03/08/2018) |
| 03/09/2018 | 25 | RULE 7 DISCLOSURE STATEMENT filed by Board of Regents, The University of Texas System, TissueGen, Inc.. (Offor, Chijioke) [Transferred from Texas Western on 3/13/2018.] (Entered: 03/09/2018) |

| | | |
|---|---|---|
| 03/12/2018 | 26 | ORDER GRANTING 24 Motion for Hannah DeMarco Sibiski to Appear Pro Hac Vice on behalf of Boston Scientific Corp. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Signed by Judge Lee Yeakel. (klw) [Transferred from Texas Western on 3/13/2018.] (Entered: 03/12/2018) |
| 03/12/2018 | 27 | ORDER GRANTING to an EXTENT Defendant's 11 Motion to Dismiss Plaintiff's Complaint. IT IS ORDERED that this action is TRANSFERRED to the United States District Court of Delaware. Signed by Judge Lee Yeakel. (klw) [Transferred from Texas Western on 3/13/2018.] (Entered: 03/12/2018) |
| 03/13/2018 | 28 | Record of case transferred in from District of Texas Western; Case Number in Other District: 1:17-cv-01103. Copy of Docket Sheet and original file (Entered: 03/13/2018) |
| 03/13/2018 | 29 | Local Counsel Letter sent. Notice of Compliance deadline set for 4/16/2018. (fms) (Main Document 29 replaced on 3/13/2018) (fms). (Entered: 03/13/2018) |
| 03/14/2018 | | Case Assigned to Judge Gregory M. Sleet. Please include the initials of the Judge (GMS) after the case number on all documents filed. (rjb) (Entered: 03/14/2018) |
| 03/28/2018 | 30 | NOTICE of Appearance by Stamatios Stamoulis on behalf of Board of Regents, The University of Texas System, TissueGen, Inc. (Stamoulis, Stamatios) (Entered: 03/28/2018) |
| 04/02/2018 | 31 | MOTION for Pro Hac Vice Appearance of Attorney Michael W. Shore, Alfonso G. Chan, and Chijioke E. Offor - filed by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 04/02/2018) |
| 04/03/2018 | 32 | Joint STATEMENT Pursuant to Local Rule 81.2 by Boston Scientific Corporation. (Pascale, Karen) Modified on 4/4/2018 (mdb). (Entered: 04/03/2018) |
| 04/03/2018 | 33 | NOTICE of Appearance by Karen L. Pascale on behalf of Boston Scientific Corporation (Pascale, Karen) (Entered: 04/03/2018) |
| 04/04/2018 | | SO ORDERED - re 31 MOTION for Pro Hac Vice Appearance of Attorney Michael W. Shore, Alfonso G. Chan, and Chijioke E. Offor filed by Board of Regents, The University of Texas System, TissueGen, Inc.. Ordered by Judge Gregory M. Sleet on 4/4/2018. (mdb) (Entered: 04/04/2018) |
| 04/04/2018 | | SO ORDERED - re 32 Statement and Request to Stay Case Pending Appeal in Federal Circuit. Case stayed. Ordered by Judge Gregory M. Sleet on 4/4/2018. (mdb) (Entered: 04/04/2018) |
| 09/20/2018 | | Case reassigned to Judge Maryellen Noreika. Please include the initials of the Judge (MN) after the case number on all documents filed. (jcs) (Entered: 09/20/2018) |
| 01/24/2019 | 34 | NOTICE of Change of Address by Stamatios Stamoulis (Stamoulis, Stamatios) (Entered: 01/24/2019) |
| 03/12/2020 | 35 | ORAL ORDER - IT IS HEREBY ORDERED that on or before 3/26/2020 the parties shall filed a joint status letter. ORDERED by Judge Maryellen Noreika on 3/12/2020. (dlw) (Entered: 03/12/2020) |
| 03/26/2020 | 36 | Joint STATUS REPORT by Board of Regents, The University of Texas System. (Stamoulis, Stamatios) (Entered: 03/26/2020) |
| 04/29/2020 | 37 | Letter to The Honorable Maryellen Noreika from Stamatios Stamoulis regarding status report - re 35 Oral Order. (Stamoulis, Stamatios) (Entered: 04/29/2020) |

| | | |
|---|---|---|
| 04/30/2020 | 38 | ORAL ORDER - IT IS HEREBY ORDERED that the Stay is LIFTED. IT IS FURTHER ORDERED that the parties shall confer regarding proposed dates in the scheduling order and shall submit a proposed order, including a proposal for the length and timing of trial, to the Court no later than thirty (30) days from the date of this Order. The parties are to use the Court's form scheduling order, which is posted at http://www.ded.uscourts.gov (see Chambers, Judge Noreika, Forms). If there are disputes or issues that the Court needs to address in the proposed scheduling order, the parties shall direct the Court to the paragraph numbers in which those appear in a cover letter to the Court. ORDERED by Judge Maryellen Noreika on 4/30/2020. (dlw) (Entered: 04/30/2020) |
| 05/04/2020 | 39 | MOTION for Pro Hac Vice Appearance of Attorney Samuel E. Joyner - filed by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 05/04/2020) |
| 05/05/2020 | | SO ORDERED re 39 MOTION for Pro Hac Vice Appearance of Attorney Samuel E. Joyner filed by Board of Regents, The University of Texas System, TissueGen, Inc. ORDERED by Judge Maryellen Noreika on 5/5/2020. (dlw) (Entered: 05/05/2020) |
| 05/07/2020 | | Pro Hac Vice Attorney Samuel E Joyner for Board of Regents, The University of Texas System and TissueGen, Inc. added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (mal) (Entered: 05/07/2020) |
| 05/11/2020 | 40 | ANSWER to 1 Complaint, with Jury Demand by Boston Scientific Corporation.(Pascale, Karen) (Entered: 05/11/2020) |
| 05/11/2020 | 41 | MOTION for Pro Hac Vice Appearance of Attorney Matthew M. Wolf, Attorney John E. Nilsson and Attorney Rebecca L. Neubauer - filed by Boston Scientific Corporation. (Pascale, Karen) (Entered: 05/11/2020) |
| 05/12/2020 | | SO ORDERED re 41 MOTION for Pro Hac Vice Appearance of Attorney Matthew M. Wolf, Attorney John E. Nilsson and Attorney Rebecca L. Neubauer filed by Boston Scientific Corporation. ORDERED by Judge Maryellen Noreika on 5/12/2020. (dlw) (Entered: 05/12/2020) |
| 05/13/2020 | | Pro Hac Vice Attorney Rebecca L. Neubauer, John E. Nilsson and Matthew M. Wolf for Boston Scientific Corporation added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (mal) (Entered: 05/13/2020) |
| 05/14/2020 | | Pro Hac Vice Attorney Chijioke E. Offor for Board of Regents, The University of Texas System and TissueGen, Inc. added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (kmd) (Entered: 05/14/2020) |
| 05/29/2020 | 42 | Joint STIPULATION TO EXTEND TIME to file Proposed Scheduling Order to June 5, 2020 - filed by Boston Scientific Corporation. (Pascale, Karen) (Entered: 05/29/2020) |
| 05/29/2020 | | SO ORDERED re 42 Joint STIPULATION TO EXTEND TIME to file Proposed Scheduling Order to June 5, 2020. ORDERED by Judge Maryellen Noreika on 5/29/2020. (dlw) (Entered: 05/29/2020) |
| 06/05/2020 | 43 | PROPOSED ORDER - [Proposed] Scheduling Order - re 38 Oral Order,,, Order Lifting Stay,, by Boston Scientific Corporation. (Attachments: # 1 Letter to The Honorable Maryellen Noreika from Karen L. Pascale regarding Proposed Scheduling Order) (Pascale, Karen) (Entered: 06/05/2020) |

| | | |
|---|---|---|
| 06/08/2020 | 44 | Oral Order Setting Telephonic Scheduling Conference: IT IS HEREBY ORDERED that a Telephonic Scheduling Conference is set for 6/11/2020 at 01:00 PM before Judge Maryellen Noreika. Counsel shall provide a dial-in for the teleconference by emailing this Court's judicial administrator. ORDERED by Judge Maryellen Noreika on 6/8/2020. (dlw) (Entered: 06/08/2020) |
| 06/11/2020 | | Minute Entry for proceedings held before Judge Maryellen Noreika - Telephonic Scheduling Conference held on 6/11/2020. The parties' proposed schedule ( 43 ) is REJECTED; the parties shall confer and resubmit a new proposed schedule that is typically entered in these cases. The parties may request early summary judgment briefing at the claim construction after the Court issues its ruling on the claim terms. (Court Reporter Dale Hawkins.) (mdb) (Entered: 06/11/2020) |
| 06/19/2020 | 45 | Official Transcript of Teleconference held on 6/11/20 before Judge Maryellen Noreika. Court Reporter Dale C. Hawkins,Email: Dale_Hawkins@ded.uscourts.gov. Transcript may be viewed at the court public terminal or order/purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date, it may be obtained through PACER. Redaction Request due 7/10/2020. Redacted Transcript Deadline set for 7/20/2020. Release of Transcript Restriction set for 9/17/2020. (Triozzi, Heather) (Entered: 06/19/2020) |
| 06/26/2020 | 46 | PROPOSED ORDER - [Revised Proposed] Scheduling Order - re Scheduling Conference, by Boston Scientific Corporation. (Attachments: # 1 Letter to The Honorable Maryellen Noreika from Karen L. Pascale regarding Revised Proposed Scheduling Order) (Pascale, Karen) (Entered: 06/26/2020) |
| 06/29/2020 | 47 | SCHEDULING ORDER: Case referred to the Magistrate Judge for the purpose of exploring ADR. Joinder of Parties due by 9/15/2021. Amended Pleadings due by 9/15/2021. Fact Discovery completed by 2/22/2022. Opening Expert Reports due by 3/15/2022. Rebuttal Expert Reports due by 4/15/2022. Reply Expert Reports due 5/15/2022. Dispositive Motions due by 6/14/2022. Answering Brief due 6/28/2022. Reply Brief due 7/8/2022. Claim Construction Opening Brief served by 12/15/2020. Claim Construction Answering Brief served by 1/15/2021. Claim Construction Reply Brief served by 1/29/2021. Claim Construction Surreply Brief served by 2/15/2021. Joint Claim Construction Brief filed by 3/1/2021. A Markman Hearing is set for 3/19/2021 at 10:00 AM before Judge Maryellen Noreika. A Pretrial Conference is set for 11/7/2022 at 04:30 PM in Courtroom 4A before Judge Maryellen Noreika. A 5-day Jury Trial is set for 11/14/2022 at 09:30 AM in Courtroom 4A before Judge Maryellen Noreika. Signed by Judge Maryellen Noreika on 6/29/2020. (dlw) (Entered: 06/29/2020) |
| 06/29/2020 | | CASE REFERRED to Magistrate Judge Jennifer L. Hall for Mediation. Please see Standing Order dated January 20, 2016, regarding disclosure of confidential ADR communications. A link to the standing order is provided here for your convenience at https://www.ded.uscourts.gov/sites/ded/files/forms/StandingOrderforADR-Mediation.pdf (cak) (Entered: 06/29/2020) |
| 07/02/2020 | 48 | MOTION for Pro Hac Vice Appearance of Attorney Jacob Michael Bass - filed by Boston Scientific Corporation. (Pascale, Karen) (Entered: 07/02/2020) |
| 07/06/2020 | | SO ORDERED re 48 MOTION for Pro Hac Vice Appearance of Attorney Jacob Michael Bass filed by Boston Scientific Corporation. ORDERED by Judge Maryellen Noreika on 7/6/2020. (dlw) (Entered: 07/06/2020) |
| 07/06/2020 | 49 | ORDER Setting Mediation Conference: A Telephone Conference is scheduled for Monday, August 31, 2020 at 11:30 AM Eastern Time before Judge Jennifer L. Hall to discuss ADR. Plaintiffs' counsel shall initiate the call to chambers. (*See Order for details). Signed by Judge Jennifer L. Hall on 7/6/2020. (ceg) (Entered: 07/06/2020) |

| | | |
|---|---|---|
| 07/07/2020 | 50 | Joint STIPULATION TO EXTEND TIME for service of Initial Disclosures pursuant to Rule 26(a)(1) and Paragraph 3 of the D. Del. Default Standard to August 10, 2020 - filed by Boston Scientific Corporation. (Pascale, Karen) (Entered: 07/07/2020) |
| 07/07/2020 | | SO ORDERED re 50 Joint STIPULATION TO EXTEND TIME for service of Initial Disclosures pursuant to Rule 26(a)(1) and Paragraph 3 of the D. Del. Default Standard to August 10, 2020. ORDERED by Judge Maryellen Noreika on 7/7/2020. (dlw) (Entered: 07/07/2020) |
| 07/09/2020 | 51 | NOTICE OF SERVICE of Plaintiffs disclosures and production pursuant to Paragraph 7(a) of the Scheduling Order (Dkt. 47) filed by Board of Regents, The University of Texas System, TissueGen, Inc..(Stamoulis, Stamatios) (Entered: 07/09/2020) |
| 07/10/2020 | 52 | MOTION for Pro Hac Vice Appearance of Attorney Nicholas M. Nyemah and Attorney Edmond Ahadome - filed by Boston Scientific Corporation. (Pascale, Karen) (Entered: 07/10/2020) |
| 07/10/2020 | | SO ORDERED re 52 MOTION for Pro Hac Vice Appearance of Attorney Nicholas M. Nyemah and Attorney Edmond Ahadome filed by Boston Scientific Corporation. ORDERED by Judge Maryellen Noreika on 7/10/2020. (dlw) (Entered: 07/10/2020) |
| 07/10/2020 | | Pro Hac Vice Attorney Jacob M. Bass for Boston Scientific Corporation added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (kmd) (Entered: 07/10/2020) |
| 07/13/2020 | | Pro Hac Vice Attorney Nicholas M. Nyemah for Boston Scientific Corporation added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (mal) (Entered: 07/13/2020) |
| 07/21/2020 | 53 | PROPOSED ORDER // Agreed Protective Order by Board of Regents, The University of Texas System, TissueGen, Inc. (Stamoulis, Stamatios) Modified on 7/22/2020 (dlw). (Main Document 53 replaced on 7/23/2020) (dlw). (Entered: 07/21/2020) |
| 07/23/2020 | | Pro Hac Vice Attorney Edmond Ahadome for Boston Scientific Corporation added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (kmd) (Entered: 07/23/2020) |
| 07/23/2020 | 54 | AGREED PROTECTIVE ORDER. Signed by Judge Maryellen Noreika on 7/23/2020. (dlw) (Entered: 07/23/2020) |
| 07/24/2020 | 55 | STIPULATION of Dismissal Without Prejudice of '603 Patent Infringement Claims by Board of Regents, The University of Texas System, TissueGen, Inc. (Stamoulis, Stamatios) Modified on 7/27/2020 (dlw). (Entered: 07/24/2020) |
| 07/27/2020 | 56 | SO ORDERED re 55 Stipulation of Dismissal Without Prejudice of '603 Patent Infringement Claims. Signed by Judge Maryellen Noreika on 7/27/2020. (dlw) (Entered: 07/27/2020) |
| 08/10/2020 | 57 | NOTICE OF SERVICE of 1) Boston Scientific's Rule 26(a)(1) Initial Disclosures, and 2) Boston Scientific's Initial ESI Disclosures Pursuant to Paragraph 3 of the Court's Default Standard for Discovery filed by Boston Scientific Corporation.(Pascale, Karen) (Entered: 08/10/2020) |
| 08/10/2020 | 58 | NOTICE OF SERVICE of Plaintiffs disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1), the Courts Scheduling Order (Dkt. 47), and Paragraph 3 of the District of Delawares Default Standard for Discovery, Including Discovery of |

| | | |
|---|---|---|
| | | Electronically Stored Information (ESI) filed by Board of Regents, The University of Texas System, TissueGen, Inc..(Stamoulis, Stamatios) (Entered: 08/10/2020) |
| 08/11/2020 | 59 | NOTICE OF SERVICE of Defendant's core technical documents pursuant to Paragraph 4(b) of the D. Del. Default Standard and Paragraph 7(b) of Scheduling Order (D.I. 47) filed by Boston Scientific Corporation.(Pascale, Karen) (Entered: 08/11/2020) |
| 08/18/2020 | 60 | MOTION for Pro Hac Vice Appearance of Attorney Melissa A. Anyetei, Attorney James R. Ferguson, Attorney Michael J. Word and Attorney Elliot Choi - filed by Boston Scientific Corporation. (Pascale, Karen) (Entered: 08/18/2020) |
| 08/18/2020 | | SO ORDERED re 60 MOTION for Pro Hac Vice Appearance of Attorney Melissa A. Anyetei, Attorney James R. Ferguson, Attorney Michael J. Word and Attorney Elliot Choi filed by Boston Scientific Corporation. ORDERED by Judge Maryellen Noreika on 8/18/2020. (dlw) (Entered: 08/18/2020) |
| 08/19/2020 | | Pro Hac Vice Attorney Melissa A. Anyetei, James R. Ferguson, Michael J. Word, Elliot Choi for Boston Scientific Corporation added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (kmd) (Entered: 08/19/2020) |
| 08/25/2020 | 61 | NOTICE OF SERVICE of Initial Claim Chart Under Paragraph 7(c) of the Scheduling Order filed by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 08/25/2020) |
| 08/31/2020 | 62 | ORAL ORDER Setting Mediation Conference: A Status Telephone Conference is scheduled for May 3, 2021 at 11:00 AM Eastern Time before Judge Jennifer L. Hall. Plaintiffs' counsel shall initiate the call to chambers. ORDERED by Judge Jennifer L. Hall on 8/31/2020. (ceg) (Entered: 08/31/2020) |
| 09/15/2020 | 63 | Joint STIPULATION to Amend Protective Order re 54 Protective Order by Boston Scientific Corporation. (Pascale, Karen) (Entered: 09/15/2020) |
| 09/16/2020 | 64 | SO ORDERED re 63 Stipulation to Amend Protective Order. Signed by Judge Maryellen Noreika on 9/16/2020. (dlw) (Entered: 09/16/2020) |
| 09/25/2020 | 65 | NOTICE OF SERVICE of Boston Scientific Corporation's Initial Invalidity Contentions filed by Boston Scientific Corporation.(Pascale, Karen) (Entered: 09/25/2020) |
| 10/19/2020 | 66 | NOTICE OF SUBSTITUTION OF COUNSEL re Boston Scientific Corporation: Entry of appearance of attorney Michael J. Farnan. Attorney Young Conaway Stargatt & Taylor LLP terminated. (Farnan, Michael) (Entered: 10/19/2020) |
| 10/19/2020 | 67 | NOTICE of Appearance by Brian E. Farnan on behalf of Boston Scientific Corporation (Farnan, Brian) (Entered: 10/19/2020) |
| 11/18/2020 | 68 | NOTICE of Discovery Disclosures by Board of Regents, The University of Texas System, TissueGen, Inc. (Stamoulis, Stamatios) (Entered: 11/18/2020) |
| 11/19/2020 | 69 | NOTICE OF SERVICE of Boston Scientific Corporation's Preliminary List of Claim Terms and Proposed Constructions filed by Boston Scientific Corporation.(Farnan, Brian) (Entered: 11/19/2020) |
| 11/30/2020 | 70 | STIPULATION TO EXTEND TIME certain Claim Construction Deadlines to Various Dates - filed by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 11/30/2020) |
| 12/01/2020 | | SO ORDERED re 70 STIPULATION TO EXTEND TIME for certain Claim Construction Deadlines to Various Dates (Set/Reset Scheduling Order Deadlines: Claim Construction Opening Brief served by 12/29/2020. Claim Construction Answering Brief |

| | | |
|---|---|---|
| | | served by 1/29/2021. Claim Construction Reply Brief served by 2/9/2021. Claim Construction Surreply Brief served by 2/26/2021. Joint Claim Construction Brief filed by 3/8/2021). ORDERED by Judge Maryellen Noreika on 12/1/2020. (dlw) (Entered: 12/01/2020) |
| 12/15/2020 | 71 | CLAIM Construction Chart by Board of Regents, The University of Texas System, TissueGen, Inc.. (Weinblatt, Richard) Modified on 12/16/2020 (dlw). (Entered: 12/15/2020) |
| 12/16/2020 | | CORRECTING ENTRY: D.I. 71 has been deleted from the docket as it was an incomplete filing. D.I. 72 now appears as D.I. 71. (dlw) (Entered: 12/16/2020) |
| 01/11/2021 | 72 | NOTICE OF SERVICE of Defendant Boston Scientific Corporation's Combined First Set of Requests for Production of Documents and Things Propounded upon Plaintiffs Board of Regents, The University of Texas System; and Tissuegen, Inc. filed by Boston Scientific Corporation.(Farnan, Brian) (Entered: 01/11/2021) |
| 02/09/2021 | 73 | NOTICE OF SERVICE of Plaintiffs Objections and Responses to Defendants Combined First Set of Requests for Production of Documents and Things Propounded Upon Plaintiffs filed by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 02/09/2021) |
| 02/12/2021 | 74 | NOTICE OF SERVICE of Subpoena to Testify at a Deposition in a Civil Action on Kinam Park, Defendant's Claim Construction Expert filed by Board of Regents, The University of Texas System, TissueGen, Inc.(Stamoulis, Stamatios) Modified on 2/16/2021 (dlw). (Entered: 02/12/2021) |
| 02/15/2021 | 75 | NOTICE OF SERVICE of Defendant Boston Scientific Corporation's Combined Second Set of Requests for Production of Documents and Things Propounded upon Plaintiffs Board of Regents, The University of Texas System; and Tissuegen, Inc. filed by Boston Scientific Corporation.(Farnan, Brian) (Entered: 02/15/2021) |
| 02/22/2021 | 76 | NOTICE OF SERVICE of William G. Pitt Subpoena filed by Boston Scientific Corporation. (Attachments: # 1 Exhibit 1)(Farnan, Brian) (Entered: 02/22/2021) |
| 03/08/2021 | 77 | STIPULATION TO EXTEND TIME to submit the Joint Claim Construction Brief, Technology Tutorials (optional), and Joint Letter Submission to March 9, 2021 - filed by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 03/08/2021) |
| 03/09/2021 | 78 | NOTICE of filing the following Non-Paper material(s) in multi media format: Boston Scientific Corporation's Technology Tutorial. Original Non-paper material(s) to be filed with the Clerk's Office. Notice filed by Brian E. Farnan on behalf of Boston Scientific Corporation (Farnan, Brian) (Entered: 03/09/2021) |
| 03/09/2021 | | SO ORDERED re 77 STIPULATION TO EXTEND TIME to submit the Joint Claim Construction Brief, Technology Tutorials (optional), and Joint Letter Submission to March 9, 2021. ORDERED by Judge Maryellen Noreika on 3/9/2021. (dlw) (Entered: 03/09/2021) |
| 03/09/2021 | 79 | NOTICE of filing the following Non-Paper material(s) in multi media format: Plaintiff's Technology Tutorial. Original Non-paper material(s) to be filed with the Clerk's Office. Notice filed by Stamatios Stamoulis on behalf of Board of Regents, The University of Texas System, TissueGen, Inc. (Stamoulis, Stamatios) (Entered: 03/09/2021) |
| 03/09/2021 | 80 | JOINT CLAIM CONSTRUCTION BRIEF filed by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 03/09/2021) |

| | | |
|---|---|---|
| 03/09/2021 | 81 | APPENDIX re 80 Joint Claim Construction Brief by Board of Regents, The University of Texas System, TissueGen, Inc.. (Attachments: # 1 Exhibit 1-15, # 2 Exhibit 16-24, # 3 Exhibit 25-26, # 4 Exhibit 27-31, # 5 Exhibit 32-41, # 6 Exhibit 42-48, # 7 Exhibit 49-55) (Stamoulis, Stamatios) (Entered: 03/09/2021) |
| 03/09/2021 | 82 | Letter to the Honorable Maryellen Noreika from Stamatios Stamoulis regarding Time Request for Oral Argument at Claim Construction Hearing. (Stamoulis, Stamatios) (Entered: 03/09/2021) |
| 03/10/2021 | 83 | ORAL ORDER - IT IS HEREBY ORDERED that the 3/19/2021 Markman Hearing shall be held remotely. The Court is setting aside two hours for the hearing with the time to be split equally between the parties. The parties may use their allotted time for argument and/or witness examination/cross-examination. Counsel shall meet and confer to determine the format for the hearing (i.e. - teleconference or videoconference) and shall email the connection credentials to this Court's judicial administrator. Any slide presentations the parties wish to use during the hearing shall be emailed (in PDF format) to MN_Civil@ded.uscourts.gov no later than 24 hours prior to the hearing. ORDERED by Judge Maryellen Noreika on 3/10/2021. (dlw) (Entered: 03/10/2021) |
| 03/10/2021 | 84 | ORAL ORDER re 80 Joint Claim Construction Brief - On or before 3/15/2021, local and lead counsel (i.e., those attorneys that will be leading trial) for the parties shall meet and confer and file an amended joint claim construction chart that sets forth the terms that remain in dispute. The meet and confer shall focus on an attempt to reach agreement on any remaining disputed terms where possible and on an attempt to focus the dispute over the remaining terms in light of the joint claim construction brief. Accompanying any amended joint claim construction chart, the parties shall file a letter with the Court identifying by name each individual who participated in the meet and confer, when and how that meet and confer occurred and how long it lasted. If no agreements on constructions have been reached or if no dispute has been narrowed on the meet and confer, the letter shall so state and the parties need not file an amended joint claim construction chart. ORDERED by Judge Maryellen Noreika on 3/10/2021. (dlw) (Entered: 03/10/2021) |
| 03/15/2021 | 85 | AMENDED Joint CLAIM Construction Chart by Board of Regents, The University of Texas System, TissueGen, Inc. (Stamoulis, Stamatios) Modified on 3/16/2021 (dlw). (Entered: 03/15/2021) |
| 03/15/2021 | 86 | Letter to the Honorable Maryellen Noreika from Stamatios Stamoulis regarding Amended Joint Claim Construction Chart - re 84 Oral Order,,,,. (Stamoulis, Stamatios) (Entered: 03/15/2021) |
| 03/16/2021 | 87 | NOTICE OF SERVICE of Plaintiffs Objections and Responses to Defendants Combined Second Set of Requests for Production of Documents and Things Propounded Upon Plaintiffs filed by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 03/16/2021) |
| 03/18/2021 | 88 | ORAL ORDER - WHEREAS, the public has a right to access all public in-court proceedings; and WHEREAS, pursuant to the Court's 3/18/2020 Standing Order In re: Court Operations Under the Exigent Circumstances Created by COVID-19 (as modified), the 3/19/2021 Markman Hearing will be conducted via teleconference/videoconference; THEREFORE, IT IS HEREBY ORDERED that dial-in information to access this hearing is available by contacting Chambers at 302-573-6470. All participants must dial-in no later than 5 minutes prior to the start of the hearing. All participants (including any media and members of the public) are reminded that recording or broadcasting proceedings is STRICTLY PROHIBITED. ORDERED by Judge Maryellen Noreika on 3/18/2021. (dlw) (Entered: 03/18/2021) |

| | | |
|---|---|---|
| 03/19/2021 | | Minute Entry for proceedings held before Judge Maryellen Noreika - Markman Hearing held on 3/19/2021. (Court Reporter Dale Hawkins.) (mdb) (Entered: 03/19/2021) |
| 04/13/2021 | 89 | Official Transcript of Markman Hearing (Remote) held on 3/19/21 before Judge Maryellen Noreika. Court Reporter Dale C. Hawkins,Email: Dale_Hawkins@ded.uscourts.gov. Transcript may be viewed at the court public terminal or order/purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date, it may be obtained through PACER. Redaction Request due 5/4/2021. Redacted Transcript Deadline set for 5/14/2021. Release of Transcript Restriction set for 7/12/2021. (Triozzi, Heather) (Entered: 04/13/2021) |
| 04/15/2021 | 90 | MEMORANDUM ORDER REGARDING CLAIM CONSTRUCTION. Signed by Judge Maryellen Noreika on 4/15/2021. (dlw) (Entered: 04/15/2021) |
| 05/03/2021 | 91 | ORAL ORDER Setting Mediation Conference: A Status Telephone Conference is scheduled for January 3, 2022 at 11:00 AM Eastern Time before Judge Jennifer L. Hall. Plaintiffs' counsel shall initiate the call to chambers. ORDERED by Judge Jennifer L. Hall on 5/3/2021. (ceg) (Entered: 05/03/2021) |
| 05/14/2021 | 92 | NOTICE OF SERVICE of Subpoena Directed to JANEL HURTADO filed by Board of Regents, The University of Texas System, TissueGen, Inc..(Stamoulis, Stamatios) (Entered: 05/14/2021) |
| 05/24/2021 | 93 | NOTICE OF SERVICE of Defendant Boston Scientific Corporation's Combined Third Set of Requests for Production of Documents and Things Propounded Upon Plaintiffs Board of Regents, The University of Texas System, and Tissuegen, Inc. filed by Boston Scientific Corporation.(Farnan, Brian) (Entered: 05/24/2021) |
| 06/01/2021 | 94 | NOTICE OF SERVICE of Plaintiffs First Set of Discovery to Defendant filed by Board of Regents, The University of Texas System, TissueGen, Inc..(Stamoulis, Stamatios) (Entered: 06/01/2021) |
| 06/04/2021 | 95 | NOTICE to Take Deposition of Janel Hurtado on June 23, 2021 filed by Board of Regents, The University of Texas System, TissueGen, Inc..(Stamoulis, Stamatios) (Entered: 06/04/2021) |
| 06/21/2021 | 96 | NOTICE OF SERVICE of Plaintiffs Objections and Responses to Defendants Combined Third First Set of Requests for Production of Documents and Things Propounded Upon Plaintiffs filed by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 06/21/2021) |
| 06/23/2021 | 97 | MOTION for Pro Hac Vice Appearance of Attorney Corey M. Lipschutz - filed by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 06/23/2021) |
| 06/24/2021 | | SO ORDERED re 97 MOTION for Pro Hac Vice Appearance of Attorney Corey M. Lipschutz filed by Board of Regents, The University of Texas System, TissueGen, Inc. ORDERED by Judge Maryellen Noreika on 6/24/2021. (dlw) (Entered: 06/24/2021) |
| 06/28/2021 | 98 | NOTICE OF SERVICE of Boston Scientific Corporation's Objections and Responses to Board of Regents, The University of Texas System, and Tissuegen. Inc.'s First Set of Discovery Requests filed by Boston Scientific Corporation.(Farnan, Brian) (Entered: 06/28/2021) |
| 06/29/2021 | 99 | NOTICE to Take Deposition of Scott Bluni on July 20, 2021 filed by Board of Regents, The University of Texas System, TissueGen, Inc..(Stamoulis, Stamatios) (Entered: 06/29/2021) |

| | | |
|---|---|---|
| 06/29/2021 | 100 | NOTICE OF SERVICE of Plaintiffs Second Set of Discovery to Defendant filed by Board of Regents, The University of Texas System, TissueGen, Inc..(Stamoulis, Stamatios) (Entered: 06/29/2021) |
| 07/02/2021 | 101 | NOTICE OF SERVICE of Subpoena Directed to Jeffrey W. Moses filed by Board of Regents, The University of Texas System, TissueGen, Inc..(Stamoulis, Stamatios) (Entered: 07/02/2021) |
| 07/07/2021 | | Pro Hac Vice Attorney Corey M. Lipschutz for Board of Regents, The University of Texas System and for TissueGen, Inc. added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (twk) (Entered: 07/07/2021) |
| 07/07/2021 | 102 | NOTICE OF SERVICE of Plaintiffs Third Set of Discovery to Defendant filed by Board of Regents, The University of Texas System, TissueGen, Inc..(Stamoulis, Stamatios) (Entered: 07/07/2021) |
| 07/07/2021 | 103 | MOTION for Pro Hac Vice Appearance of Attorney William D. Ellerman - filed by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 07/07/2021) |
| 07/08/2021 | | SO ORDERED re 103 MOTION for Pro Hac Vice Appearance of Attorney William D. Ellerman filed by Board of Regents, The University of Texas System, TissueGen, Inc. ORDERED by Judge Maryellen Noreika on 7/8/2021. (dlw) (Entered: 07/08/2021) |
| 07/08/2021 | | Pro Hac Vice Attorney William D. Ellerman for Board of Regents, The University of Texas System, and for TissueGen, Inc. added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (twk) (Entered: 07/08/2021) |
| 07/12/2021 | 104 | NOTICE OF SERVICE of Defendant Boston Scientific Corporation's Combined First Set of Interrogatories Propounded Upon Plaintiffs Board of Regents, The University of Texas System, and Tissuegen, Inc. filed by Boston Scientific Corporation.(Farnan, Brian) (Entered: 07/12/2021) |
| 07/12/2021 | 105 | NOTICE OF SERVICE of Plaintiffs Fourth Set of Discovery to Defendant filed by Board of Regents, The University of Texas System, TissueGen, Inc..(Stamoulis, Stamatios) (Entered: 07/12/2021) |
| 07/26/2021 | 106 | NOTICE OF SERVICE of Boston Scientific Corporation's Objections and Responses to Board of Regents, The University of Texas System, and Tissuegen. Inc.'s Second Set of Discovery Requests filed by Boston Scientific Corporation.(Farnan, Brian) (Entered: 07/26/2021) |
| 07/27/2021 | 107 | NOTICE requesting Clerk to remove Matthew M. Wolf, Jacob M. Bass, John E. Nilsson, Nicholas M. Nyemah, and Rebecca L. Neubauer of Arnold & Porter Kaye Scholer LLP as co-counsel.. (Farnan, Brian) (Entered: 07/27/2021) |
| 08/03/2021 | 108 | NOTICE OF SERVICE of Boston Scientific Corporation's Objections and Responses to Board of Regents, The University of Texas System, and Tissuegen. Inc.'s Third Set of Discovery filed by Boston Scientific Corporation.(Farnan, Brian) (Entered: 08/03/2021) |
| 08/09/2021 | 109 | NOTICE to Take Deposition of Rodney Schoenleben on August 11, 2021 filed by Board of Regents, The University of Texas System, TissueGen, Inc..(Stamoulis, Stamatios) (Entered: 08/09/2021) |

| | | |
|---|---|---|
| 08/09/2021 | 110 | NOTICE to Take Deposition of James Beaubout on August 10, 2021 filed by Board of Regents, The University of Texas System, TissueGen, Inc..(Stamoulis, Stamatios) (Entered: 08/09/2021) |
| 08/10/2021 | 111 | NOTICE OF SERVICE of Boston Scientific Corporation's Objections and Responses to Board of Regents, The University of Texas System, and Tissuegen, Inc.'s Fourth Set of Discovery filed by Boston Scientific Corporation.(Farnan, Brian) (Entered: 08/10/2021) |
| 08/10/2021 | 112 | NOTICE OF SERVICE of Plaintiffs Objections and Responses to Defendants Combined First Set of Interrogatories Propounded Upon Plaintiffs filed by Board of Regents, The University of Texas System, TissueGen, Inc..(Stamoulis, Stamatios) (Entered: 08/10/2021) |
| 08/16/2021 | 113 | NOTICE OF SERVICE of Boston Scientific Corporation's Supplemental Objections and Responses to Board of Regents, The University of Texas System, and Tissuegen. Inc.'s Interrogatories 2-8 filed by Boston Scientific Corporation.(Farnan, Brian) (Entered: 08/16/2021) |
| 08/16/2021 | 114 | NOTICE OF SERVICE of Plaintiffs Fifth Set of Discovery to Defendant filed by Board of Regents, The University of Texas System, TissueGen, Inc..(Stamoulis, Stamatios) (Entered: 08/16/2021) |
| 08/16/2021 | 115 | NOTICE to Take Deposition of Dan Zaic on August 18, 2021 filed by Board of Regents, The University of Texas System, TissueGen, Inc..(Stamoulis, Stamatios) (Entered: 08/16/2021) |
| 08/16/2021 | 116 | NOTICE to Take Deposition of Kim Robertson on August 19, 2021 filed by Board of Regents, The University of Texas System, TissueGen, Inc..(Stamoulis, Stamatios) (Entered: 08/16/2021) |
| 08/18/2021 | 117 | NOTICE OF SERVICE of Defendant Boston Scientific Corporation's Combined Fourth Set of Requests for Production of Documents and Things Propounded Upon Plaintiffs Board of Regents, The University of Texas System; and Tissuegen, Inc. filed by Boston Scientific Corporation.(Farnan, Brian) (Entered: 08/18/2021) |
| 08/18/2021 | 118 | NOTICE to Take Deposition of Jeffrey W. Moses on August 25, 2021 filed by Board of Regents, The University of Texas System, TissueGen, Inc..(Stamoulis, Stamatios) (Entered: 08/18/2021) |
| 08/24/2021 | 119 | STIPULATION to Amend Protective Order by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 08/24/2021) |
| 08/25/2021 | 120 | SO ORDERED re 119 Stipulation to Amend Protective Order. Signed by Judge Maryellen Noreika on 8/25/2021. (dlw) (Entered: 08/25/2021) |
| 08/30/2021 | 121 | NOTICE OF SERVICE of Plaintiffs First Supplemental Objections and Responses to Defendants Combined First Set of Interrogatories filed by Board of Regents, The University of Texas System, TissueGen, Inc..(Stamoulis, Stamatios) (Entered: 08/30/2021) |
| 09/14/2021 | 122 | NOTICE OF SERVICE of Boston Scientific Corporation's Objections and Responses to Board of Regents, The University of Texas System, and Tissuegen. Inc.'s Fifth Set of Discovery Requests filed by Boston Scientific Corporation.(Farnan, Brian) (Entered: 09/14/2021) |

| | | |
|---|---|---|
| 09/15/2021 | 123 | UNOPPOSED MOTION for Leave to File Amended Complaint - filed by Board of Regents, The University of Texas System, TissueGen, Inc.. (Attachments: # 1 Exhibit A - Proposed Amended Complaint, # 2 Exhibit B - Redline of Amended Complaint) (Stamoulis, Stamatios) Modified on 9/17/2021 (dlw). (Entered: 09/15/2021) |
| 09/17/2021 | | SO ORDERED re 123 UNOPPOSED MOTION for Leave to File Amended Complaint. ORDERED by Judge Maryellen Noreika on 9/17/2021. (dlw) (Entered: 09/17/2021) |
| 09/17/2021 | 124 | FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT against Boston Scientific Corporation- filed by Board of Regents, The University of Texas System, TissueGen, Inc.(dlw) (Entered: 09/17/2021) |
| 09/17/2021 | 125 | NOTICE OF SERVICE of Plaintiffs Objections and Responses to Defendants Combined Fourth Set of Requests for Production of Documents and Things Propounded Upon Plaintiffs filed by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 09/17/2021) |
| 09/22/2021 | 126 | STIPULATION TO EXTEND TIME for Defendant to answer, move, or otherwise respond to Plaintiffs' First Amended Complaint to 10/15/2021 - filed by Boston Scientific Corporation. (Farnan, Brian) (Entered: 09/22/2021) |
| 09/23/2021 | | SO ORDERED re 126 STIPULATION TO EXTEND TIME for Defendant to answer, move, or otherwise respond to Plaintiffs' First Amended Complaint to 10/15/2021 (Set/Reset Answer Deadlines: Boston Scientific Corporation answer due 10/15/2021). ORDERED by Judge Maryellen Noreika on 9/23/2021. (dlw) (Entered: 09/23/2021) |
| 10/04/2021 | 127 | NOTICE OF SERVICE of Plaintiffs Sixth Set of Discovery to Defendant filed by Board of Regents, The University of Texas System, TissueGen, Inc..(Stamoulis, Stamatios) (Entered: 10/04/2021) |
| 10/15/2021 | 128 | MOTION to Dismiss for Lack of Jurisdiction Over the Subject Matter - filed by Boston Scientific Corporation. (Farnan, Brian) (Entered: 10/15/2021) |
| 10/15/2021 | 129 | [SEALED] OPENING BRIEF in Support re 128 MOTION to Dismiss for Lack of Jurisdiction Over the Subject Matter filed by Boston Scientific Corporation.Answering Brief/Response due date per Local Rules is 10/29/2021. (Farnan, Brian) (Entered: 10/15/2021) |
| 10/15/2021 | 130 | [SEALED] DECLARATION of James R. Ferguson re 129 Opening Brief in Support by Boston Scientific Corporation. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C) (Farnan, Brian) Modified on 10/18/2021 (mdb). (Entered: 10/15/2021) |
| 10/22/2021 | 131 | REDACTED VERSION of 129 Opening Brief in Support, by Boston Scientific Corporation. (Farnan, Brian) (Entered: 10/22/2021) |
| 10/22/2021 | 132 | REDACTED VERSION of 130 Declaration by Boston Scientific Corporation. (Attachments: # 1 Exhibits A-C)(Farnan, Brian) (Entered: 10/22/2021) |
| 10/25/2021 | 133 | STIPULATION TO EXTEND TIME for Plaintiffs to respond to Defendants Motion To Dismiss Plaintiff Board Of Regents Under Rules 12(b)(1) and 12(b)(6) (D.I. 128) and sealed Opening Brief In Support Of Its Motion To Dismiss Plaintiff Board Of Regents Under Rules 12(b)(1) and 12(b)(6) (D.I. 129) to November 8, 2021 - filed by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 10/25/2021) |

| | | |
|---|---|---|
| 10/25/2021 | 134 | NOTICE OF SERVICE of Plaintiffs Third Supplemental Objections and Responses to Defendants Combined First Set of Interrogatories filed by Board of Regents, The University of Texas System, TissueGen, Inc..(Stamoulis, Stamatios) (Entered: 10/25/2021) |
| 10/26/2021 | | SO ORDERED re 133 STIPULATION TO EXTEND TIME for Plaintiffs to respond to Defendant's Motion To Dismiss (D.I. 128) and Sealed Opening Brief (Set Briefing Schedule: re 128 MOTION to Dismiss for Lack of Jurisdiction Over the Subject Matter - Answering Brief due 11/8/2021). ORDERED by Judge Maryellen Noreika on 10/26/2021. (dlw) (Entered: 10/26/2021) |
| 11/03/2021 | 135 | NOTICE OF SERVICE of Boston Scientific Corporation's Objections and Responses to Board of Regents, The University of Texas System, and Tissuegen. Inc.'s Sixth Set of Discovery filed by Boston Scientific Corporation.(Farnan, Brian) (Entered: 11/03/2021) |
| 11/08/2021 | 136 | [SEALED] ANSWERING BRIEF in Opposition re 128 MOTION to Dismiss for Lack of Jurisdiction Over the Subject Matter filed by Board of Regents, The University of Texas System, TissueGen, Inc. Reply Brief due date per Local Rules is 11/15/2021. (Stamoulis, Stamatios) Modified on 11/9/2021 (dlw). (Entered: 11/08/2021) |
| 11/09/2021 | | CORRECTING ENTRY: D.I. 136 has been placed UNDER SEAL at the request of counsel. (dlw) (Entered: 11/09/2021) |
| 11/09/2021 | 137 | NOTICE to Take Deposition of Tom Marron on December 9, 2021 filed by Board of Regents, The University of Texas System, TissueGen, Inc..(Stamoulis, Stamatios) (Entered: 11/09/2021) |
| 11/09/2021 | 138 | NOTICE to Take Deposition of Phillippe Le Tutor on December 7, 2021 filed by Board of Regents, The University of Texas System, TissueGen, Inc..(Stamoulis, Stamatios) (Entered: 11/09/2021) |
| 11/10/2021 | 139 | STIPULATION TO EXTEND TIME for Defendant to file its reply brief in support of its Motion to Dismiss to 11/22/2021 - filed by Boston Scientific Corporation. (Farnan, Brian) (Entered: 11/10/2021) |
| 11/12/2021 | | SO ORDERED, re 139 STIPULATION TO EXTEND TIME for Defendant to file its reply brief in support of its Motion to Dismiss to 11/22/2021 filed by Boston Scientific Corporation, Set Briefing Schedule: re 128 MOTION to Dismiss for Lack of Jurisdiction Over the Subject Matter . (Reply Brief due 11/22/2021). ORDERED by Judge Maryellen Noreika on 11/12/2021. (mdb) (Entered: 11/12/2021) |
| 11/15/2021 | 140 | NOTICE OF SERVICE of Plaintiffs Seventh Set of Discovery to Defendant filed by Board of Regents, The University of Texas System, TissueGen, Inc..(Stamoulis, Stamatios) (Entered: 11/15/2021) |
| 11/22/2021 | 141 | [SEALED] REPLY BRIEF re 128 MOTION to Dismiss for Lack of Jurisdiction Over the Subject Matter filed by Boston Scientific Corporation. (Farnan, Brian) (Entered: 11/22/2021) |
| 11/23/2021 | 142 | REDACTED VERSION of 136 Answering Brief in Opposition, by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 11/23/2021) |
| 11/29/2021 | 143 | REDACTED VERSION of 141 Reply Brief by Boston Scientific Corporation. (Farnan, Brian) (Entered: 11/29/2021) |

| | | |
|---|---|---|
| 12/06/2021 | 144 | NOTICE OF SERVICE of Subpoenas to Paula Waggoner Taylor, Nadir Alikacem, Delia Dahm, Kevin D. Nelson, Andreas A. Romero-Sanchez, and George M. Smith filed by Boston Scientific Corporation.(Farnan, Brian) (Entered: 12/06/2021) |
| 12/07/2021 | 145 | NOTICE to Take Deposition of Dr. Kevin D. Nelson on 1/14/2022 filed by Boston Scientific Corporation.(Farnan, Brian) (Entered: 12/07/2021) |
| 12/14/2021 | 146 | NOTICE OF SERVICE of Boston Scientific Corporation's Objections and Responses to Board of Regents, The University of Texas System, and Tissuegen. Inc.'s Seventh Set of Discovery Requests filed by Boston Scientific Corporation.(Farnan, Brian) (Entered: 12/14/2021) |
| 12/15/2021 | 147 | NOTICE OF SERVICE of Plaintiffs' Final Infringemnt Contentions filed by Board of Regents, The University of Texas System, TissueGen, Inc..(Stamoulis, Stamatios) (Entered: 12/15/2021) |
| 01/10/2022 | 148 | NOTICE requesting Clerk to remove Samuel E. Joyner as co-counsel. Reason for request: Withdrawal. (Stamoulis, Stamatios) (Entered: 01/10/2022) |
| 01/19/2022 | 149 | NOTICE OF SERVICE of Boston Scientific Corporation's Final Invalidity Contentions filed by Boston Scientific Corporation.(Farnan, Brian) (Entered: 01/19/2022) |
| 01/20/2022 | 150 | NOTICE OF SERVICE of Plaintiffs Eighth Set of Discovery to Defendant filed by Board of Regents, The University of Texas System, TissueGen, Inc..(Stamoulis, Stamatios) (Entered: 01/20/2022) |
| 01/24/2022 | 151 | NOTICE OF SERVICE of Defendant Boston Scientific Corporation's Combined Fifth Set of Discovery Propounded Upon Plaintiffs Board of Regents, The University of Texas System; and Tissuegen, Inc. filed by Boston Scientific Corporation.(Farnan, Brian) (Entered: 01/24/2022) |
| 01/25/2022 | 152 | NOTICE OF SERVICE of Plaintiffs Ninth Set of Discovery to Defendant filed by Board of Regents, The University of Texas System, TissueGen, Inc..(Stamoulis, Stamatios) (Entered: 01/25/2022) |
| 01/26/2022 | 153 | NOTICE OF SERVICE of Boston Scientific Corporation's Supplemental Objections and Responses to Board of Regents, The University of Texas System, and Tissuegen. Inc.'s Interrogatories No. 10-12 filed by Boston Scientific Corporation.(Farnan, Brian) (Entered: 01/26/2022) |
| 01/26/2022 | 154 | NOTICE to Take Deposition of Andres Romero-Sanchez on 2/14/2022 filed by Boston Scientific Corporation.(Farnan, Brian) (Entered: 01/26/2022) |
| 01/26/2022 | 155 | NOTICE to Take Deposition of Dominic Allocco on February 11, 2022 filed by Board of Regents, The University of Texas System, TissueGen, Inc..(Stamoulis, Stamatios) (Entered: 01/26/2022) |
| 01/27/2022 | 156 | NOTICE OF SERVICE of Plaintiffs Notice of Rule 30(b)(6) Deposition of Boston Scientific Corporation filed by Board of Regents, The University of Texas System, TissueGen, Inc..(Stamoulis, Stamatios) (Entered: 01/27/2022) |
| 01/28/2022 | 157 | NOTICE to Take Deposition of Paula Waggoner Taylor on 2/17/2022 filed by Boston Scientific Corporation.(Farnan, Brian) (Entered: 01/28/2022) |
| 01/28/2022 | 158 | NOTICE to Take Deposition of Dr. Brent Crowe on 2/18/2022 filed by Boston Scientific Corporation.(Farnan, Brian) (Entered: 01/28/2022) |

| | | |
|---|---|---|
| 01/28/2022 | 159 | NOTICE to Take Deposition of John Akers on February 10, 2022 filed by Board of Regents, The University of Texas System, TissueGen, Inc..(Stamoulis, Stamatios) (Entered: 01/28/2022) |
| 02/01/2022 | 160 | NOTICE to Take Deposition of Delia Dahm on 2/14/2022 filed by Boston Scientific Corporation. (Attachments: # 1 Exhibit A)(Farnan, Brian) (Entered: 02/01/2022) |
| 02/01/2022 | 161 | NOTICE to Take Deposition of Lekha Gopalakrishnan on 2/16/2022 filed by Boston Scientific Corporation. (Attachments: # 1 Exhibit A)(Farnan, Brian) (Entered: 02/01/2022) |
| 02/07/2022 | 162 | [SEALED] NOTICE to Take Deposition of TissueGen, Inc. on 2/22/2022 filed by Boston Scientific Corporation.(Farnan, Brian) (Entered: 02/07/2022) |
| 02/10/2022 | 163 | STIPULATION TO EXTEND TIME of certain case deadlines to various dates - filed by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 02/10/2022) |
| 02/11/2022 | 164 | SO ORDERED re 163 STIPULATION TO EXTEND TIME of certain case deadlines to various dates (Set/Reset Scheduling Order Deadlines: Opening Expert Reports due by 3/25/2022. Rebuttal Expert Reports due by 4/25/2022). SEE STIPULATION FOR COMPLETE DETAILS. Signed by Judge Maryellen Noreika on 2/11/2022. (dlw) (Entered: 02/11/2022) |
| 02/11/2022 | 165 | NOTICE to Take Deposition of George M. Smith, Ph.D. on 2/21/2022 filed by Boston Scientific Corporation. (Attachments: # 1 Exhibit A)(Farnan, Brian) (Entered: 02/11/2022) |
| 02/14/2022 | 166 | NOTICE to Take Deposition of Board of Regents, the University of Texas System on 2/22/2022 filed by Boston Scientific Corporation.(Farnan, Brian) (Entered: 02/14/2022) |
| 02/14/2022 | 167 | REDACTED VERSION of 162 Notice to Take Deposition by Boston Scientific Corporation. (Farnan, Brian) (Entered: 02/14/2022) |
| 02/23/2022 | 168 | NOTICE OF SERVICE of Boston Scientific Corporation's Objections and Responses to Board of Regents, The University of Texas System, and Tissuegen. Inc.'s Requests for Admission Nos. 9-10, Interrogatories Nos. 14-21 and Request for Production Nos. 28-50 filed by Boston Scientific Corporation.(Farnan, Brian) (Entered: 02/23/2022) |
| 02/24/2022 | 169 | NOTICE OF SERVICE of Plaintiffs Objections and Responses to Defendants Combined Fifth Set of Discovery Propounded Upon Plaintiffs filed by Board of Regents, The University of Texas System, TissueGen, Inc..(Stamoulis, Stamatios) (Entered: 02/24/2022) |
| 02/25/2022 | 170 | NOTICE OF SERVICE of Boston Scientific Corporation's Amended Final Invalidity Contentions filed by Boston Scientific Corporation.(Farnan, Brian) (Entered: 02/25/2022) |
| 03/03/2022 | 171 | STIPULATION TO EXTEND TIME for deadline to complete Party 30(b)(6) depositions to March 16, 2022 - filed by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 03/03/2022) |
| 03/04/2022 | | SO ORDERED re 171 STIPULATION TO EXTEND deadline to complete Party 30(b)(6) depositions to March 16, 2022. ORDERED by Judge Maryellen Noreika on 3/4/2022. (dlw) (Entered: 03/04/2022) |
| 03/07/2022 | 172 | NOTICE OF SERVICE of Boston Scientific Corporation's Supplemental Objections and Responses to Board of Regents, The University of Texas System, and Tissuegen. Inc.'s Interrogatories Nos. 14-16, 18, 20, and 21 filed by Boston Scientific Corporation.(Farnan, Brian) (Entered: 03/07/2022) |

| | | |
|---|---|---|
| 03/07/2022 | 173 | NOTICE OF SERVICE of Plaintiffs Combined Supplemental Objections and Responses to Defendants Discovery Propounded Upon Plaintiffs filed by Board of Regents, The University of Texas System, TissueGen, Inc..(Stamoulis, Stamatios) (Entered: 03/07/2022) |
| 03/09/2022 | 174 | NOTICE OF SERVICE of Boston Scientific Corporation's Responses to Notice of 30(B)(6) Deposition filed by Boston Scientific Corporation.(Farnan, Brian) (Entered: 03/09/2022) |
| 03/10/2022 | 175 | NOTICE OF SERVICE of Boston Scientific Corporation's Amended Objections and Responses to Notice of 30(B)(6) Deposition filed by Boston Scientific Corporation. (Farnan, Brian) (Entered: 03/10/2022) |
| 03/14/2022 | 176 | NOTICE OF SERVICE of Plaintiffs Combined Supplemental Objections and Responses to Defendants Discovery Propounded Upon Plaintiffs filed by Board of Regents, The University of Texas System, TissueGen, Inc..(Stamoulis, Stamatios) (Entered: 03/14/2022) |
| 03/15/2022 | 177 | NOTICE OF SERVICE of Plaintiff Board of Regents, The University of Texas Systems Objections to Defendants Rule 30(b)(6) Notice of Deposition filed by Board of Regents, The University of Texas System.(Stamoulis, Stamatios) (Entered: 03/15/2022) |
| 03/15/2022 | 178 | NOTICE OF SERVICE of TissueGens Objections to Defendants Rule 30(b)(6) Notice of Deposition to TissueGen, Inc. filed by TissueGen, Inc..(Stamoulis, Stamatios) (Entered: 03/15/2022) |
| 03/18/2022 | 179 | STIPULATION TO EXTEND TIME Submission of Expert Reports to April 1, 2022 - filed by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 03/18/2022) |
| 03/21/2022 | | SO ORDERED re 179 STIPULATION TO EXTEND TIME for he Submission of Expert Reports (Set/Reset Scheduling Order Deadlines: Opening Expert Reports due by 4/1/2022. Rebuttal Expert Reports due by 5/2/2022. Reply Expert Reports due by 6/1/2022). ORDERED by Judge Maryellen Noreika on 3/21/2022. (dlw) (Entered: 03/21/2022) |
| 03/30/2022 | 180 | MOTION for Pro Hac Vice Appearance of Attorney Timothy E. Grimsrud, Chad M. Drown, Katherine S. Razavi, Lauren J.F. Barta, Christopher J. Burrell, and David J.F. Gross - filed by Boston Scientific Corporation. (Farnan, Michael) (Entered: 03/30/2022) |
| 03/31/2022 | | SO ORDERED re 180 MOTION for Pro Hac Vice Appearance of Attorney Timothy E. Grimsrud, Chad M. Drown, Katherine S. Razavi, Lauren J.F. Barta, Christopher J. Burrell, and David J.F. Gross filed by Boston Scientific Corporation. ORDERED by Judge Maryellen Noreika on 3/31/2022. (dlw) (Entered: 03/31/2022) |
| 03/31/2022 | 181 | NOTICE OF SERVICE of Plaintiffs Combined Supplemental Objections and Responses to Defendants Discovery Propounded Upon Plaintiffs filed by Board of Regents, The University of Texas System, TissueGen, Inc..(Stamoulis, Stamatios) (Entered: 03/31/2022) |
| 03/31/2022 | 182 | MOTION for Pro Hac Vice Appearance of Attorney Ari B. Rafilson - filed by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 03/31/2022) |
| 04/01/2022 | | Pro Hac Vice Attorney Timothy E. Grimsrud and Lauren J.F. Barta for Boston Scientific Corporation added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (mpb) (Entered: 04/01/2022) |

| | | |
|---|---|---|
| 04/04/2022 | | SO ORDERED, re 182 MOTION for Pro Hac Vice Appearance of Attorney Ari B. Rafilson filed by Board of Regents, The University of Texas System, TissueGen, Inc.. ORDERED by Judge Maryellen Noreika on 4/4/2022. (mdb) (Entered: 04/04/2022) |
| 04/04/2022 | 183 | STIPULATION to Amend Protective Order by Boston Scientific Corporation. (Farnan, Brian) (Entered: 04/04/2022) |
| 04/04/2022 | 184 | SO ORDERED, re 183 Stipulation to Amend Protective Order filed by Boston Scientific Corporation. Signed by Judge Maryellen Noreika on 4/4/2022. (mdb) (Entered: 04/04/2022) |
| 04/06/2022 | | CASE NO LONGER REFERRED to Magistrate Judge Hall for the purpose of exploring ADR. Please see the Court's Standing Order No. 2022-2 dated March 14, 2022. (ceg) (Entered: 04/06/2022) |
| 05/03/2022 | 185 | NOTICE OF SERVICE of (i) Rebuttal Expert Report of David J. Mooney, Ph.D. Regarding Noninfringement of U.S. Patent No. 6,596,296; (ii) Rebuttal Expert Report of Dean J. Kereiakes, M.D.; and (iii) Rebuttal Expert Report of David A. Haas filed by Boston Scientific Corporation.(Farnan, Brian) (Entered: 05/03/2022) |
| 05/03/2022 | 186 | NOTICE OF SERVICE of Validity Expert Report of William G. Pitt, Ph.D. filed by Board of Regents, The University of Texas System, TissueGen, Inc..(Stamoulis, Stamatios) (Entered: 05/03/2022) |
| 05/05/2022 | | Pro Hac Vice Attorney Christopher J. Burrell and Chad M. Drown for Boston Scientific Corporation added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (mpb) (Entered: 05/05/2022) |
| 05/06/2022 | | Pro Hac Vice Attorneys Katherine S. Razavi and David J.F. Gross for Boston Scientific Corporation added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (srs) (Entered: 05/06/2022) |
| 05/31/2022 | 187 | NOTICE OF SERVICE of the Notices of Deposition of: (i) Justin V. Lewis; (ii) Dr. William G. Pitt; and (iii) Dr. Kirk N. Garratt filed by Boston Scientific Corporation. (Farnan, Brian) (Entered: 05/31/2022) |
| 06/02/2022 | 188 | NOTICE OF SERVICE of Supplement to April 1, 2022 Expert Report of William G. Pitt, Ph.D. filed by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 06/02/2022) |
| 06/02/2022 | 189 | NOTICE OF SERVICE of (1) Notice of Deposition of David Mooney, Ph.D.; (2) Notice of Deposition of Kinam Park, and (3) Notice of Deposition of Dr. Dean Kereiakes filed by Board of Regents, The University of Texas System, TissueGen, Inc..(Stamoulis, Stamatios) (Entered: 06/02/2022) |
| 06/13/2022 | 190 | NOTICE OF SERVICE of Addendum to the Expert Report of Kirk N. Garratt MSC MD MSCAI FACC and Corrected Addendum to the Expert Report of Kirk N. Garratt MSC MD MSCAI FACC filed by Board of Regents, The University of Texas System, TissueGen, Inc..(Stamoulis, Stamatios) (Entered: 06/13/2022) |
| 06/14/2022 | 191 | MOTION to Exclude the Testimony of David A. Haas - filed by Board of Regents, The University of Texas System, TissueGen, Inc. (Stamoulis, Stamatios) Modified on 6/15/2022 (dlw). (Entered: 06/14/2022) |
| 06/14/2022 | 192 | OPENING BRIEF in Support re 191 MOTION to Exclude the Testimony of David A. Haas filed by Board of Regents, The University of Texas System, TissueGen, Inc. |

| | | |
|---|---|---|
| | | Answering Brief/Response due date per Local Rules is 6/28/2022. (Stamoulis, Stamatios) Modified on 6/15/2022 (dlw). (Entered: 06/14/2022) |
| 06/14/2022 | 193 | [SEALED] APPENDIX re 192 Opening Brief in Support, by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 06/14/2022) |
| 06/14/2022 | 194 | MOTION for Summary Judgment on the Issue of Definiteness - filed by Board of Regents, The University of Texas System, TissueGen, Inc. (Stamoulis, Stamatios) Modified on 6/15/2022 (dlw). (Entered: 06/14/2022) |
| 06/14/2022 | 195 | OPENING BRIEF in Support re 194 MOTION for Summary Judgment on the Issue of Definiteness filed by Board of Regents, The University of Texas System, TissueGen, Inc. Answering Brief/Response due date per Local Rules is 6/28/2022. (Attachments: # 1 Exhibit 1-2)(Stamoulis, Stamatios) Modified on 6/15/2022 (dlw). (Entered: 06/14/2022) |
| 06/14/2022 | 196 | [SEALED] EXHIBIT 3 re 195 Opening Brief in Support on Issue of Definiteness (Sealed Exhibit 3) by Board of Regents, The University of Texas System, TissueGen, Inc. (Stamoulis, Stamatios) Modified on 6/15/2022 (dlw). (Entered: 06/14/2022) |
| 06/14/2022 | 197 | MOTION for Summary Judgment of No Willful Infringement - filed by Boston Scientific Corporation. (Farnan, Michael) Modified on 6/15/2022 (dlw). (Entered: 06/14/2022) |
| 06/14/2022 | 198 | MOTION for Summary Judgment of Noninfringement - filed by Boston Scientific Corporation. (Farnan, Michael) Modified on 6/15/2022 (dlw). (Entered: 06/14/2022) |
| 06/14/2022 | 199 | MOTION to Preclude Expert Testimony - filed by Boston Scientific Corporation. (Attachments: # 1 Rule 7.1.1 Certification)(Farnan, Michael) Modified on 6/15/2022 (dlw). (Entered: 06/14/2022) |
| 06/14/2022 | 200 | [SEALED] OPENING BRIEF in Support re 199 MOTION to Preclude Expert Testimony, 198 MOTION for Summary Judgment of Noninfringement, 197 MOTION for Summary Judgment of No Willful Infringement filed by Boston Scientific Corporation. Answering Brief/Response due date per Local Rules is 6/28/2022. (Farnan, Michael) Modified on 6/15/2022 (dlw). (Entered: 06/14/2022) |
| 06/14/2022 | 201 | [SEALED] CONCISE STATEMENT re 197 MOTION for Summary Judgment of No Willful Infringement by Boston Scientific Corporation. (Farnan, Michael) Modified on 6/15/2022 (dlw). (Entered: 06/14/2022) |
| 06/14/2022 | 202 | [SEALED] CONCISE STATEMENT re 198 MOTION for Summary Judgment of Noninfringement by Boston Scientific Corporation. (Farnan, Michael) Modified on 6/15/2022 (dlw). (Entered: 06/14/2022) |
| 06/14/2022 | 203 | [SEALED] DECLARATION Of Michael J. Farnan re 200 Opening Brief in Support by Boston Scientific Corporation. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34, # 35 Exhibit 35, # 36 Exhibit 36, # 37 Exhibit 37, # 38 Exhibit 38, # 39 Exhibit 39, # 40 Exhibit 40, # 41 Exhibit 41, # 42 Exhibit 42, # 43 Exhibit 43, # 44 Exhibit 44, # 45 Exhibit 45, # 46 Exhibit 46, # 47 Exhibit 47, # 48 Exhibit 48, # 49 Exhibit 49, # 50 Exhibit 50, # 51 Exhibit 51, # 52 Exhibit 52, # 53 Exhibit 53, # 54 Exhibit 54)(Farnan, Michael) Modified on 6/15/2022 (dlw). (Entered: 06/14/2022) |

| | | |
|---|---|---|
| 06/14/2022 | 204 | NOTICE of filing the following Non-Paper material(s) in multi media format: two USB drives containing Exhibit 9 to the Declaration of Michael J. Farnan. Original Non-paper material(s) to be filed with the Clerk's Office. Notice filed by Michael J. Farnan on behalf of Boston Scientific Corporation (Farnan, Michael) (Entered: 06/14/2022) |
| 06/15/2022 | 205 | ORAL ORDER DENYING 194 MOTION for Summary Judgment on the Issue of Definiteness - WHEREAS, pursuant to the 47 Scheduling Order, a separate concise statement of facts shall be filed with any summary judgment motion; and WHEREAS, Plaintiff did not file such statement with its 194 Motion for Summary Judgment. THEREFORE, IT IS HEREBY ORDERED that the motion is DENIED for failure to comply with this Court's procedures set forth in the Scheduling Order. ORDERED Maryellen Noreika on 6/15/2022. (dlw) (Entered: 06/15/2022) |
| 06/21/2022 | 206 | REDACTED VERSION of 200 Opening Brief in Support, by Boston Scientific Corporation. (Farnan, Michael) (Entered: 06/21/2022) |
| 06/21/2022 | 207 | REDACTED VERSION of 201 Statement by Boston Scientific Corporation. (Farnan, Michael) (Entered: 06/21/2022) |
| 06/21/2022 | 208 | REDACTED VERSION of 202 Statement by Boston Scientific Corporation. (Farnan, Michael) (Entered: 06/21/2022) |
| 06/21/2022 | 209 | REDACTED VERSION of 203 Declaration,,,, by Boston Scientific Corporation. (Attachments: # 1 Exhibits 1-14, # 2 Exhibits 15-23, # 3 Exhibits 24-30, # 4 Exhibits 31-48, # 5 Exhibits 49-54)(Farnan, Michael) (Entered: 06/21/2022) |
| 06/22/2022 | 210 | REDACTED VERSION of 193 Appendix by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 06/22/2022) |
| 06/22/2022 | 211 | REDACTED VERSION of 196 Appendix by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 06/22/2022) |
| 06/28/2022 | 212 | [SEALED] ANSWERING BRIEF in Opposition re 191 MOTION to Exclude the Testimony of David A. Haas filed by Boston Scientific Corporation. Reply Brief due date per 47 Scheduling Order is 7/8/2022. (Farnan, Michael) Modified on 6/29/2022 (dlw). (Entered: 06/28/2022) |
| 06/28/2022 | 213 | [SEALED] STATEMENT of Genuine Issues of Material Fact re Infringement by Board of Regents, The University of Texas System, TissueGen, Inc. (Stamoulis, Stamatios) Modified on 6/29/2022 (dlw). (Entered: 06/28/2022) |
| 06/28/2022 | 214 | [SEALED] ANSWERING BRIEF in Opposition re 199 MOTION to Preclude Expert Testimony, 198 MOTION for Summary Judgment of Noninfringement, 197 MOTION for Summary Judgment of No Willful Infringement filed by Board of Regents, The University of Texas System, TissueGen, Inc. Reply Brief due date per 47 Scheduling Order is 7/8/2022. (Stamoulis, Stamatios) Modified on 6/29/2022 (dlw). (Main Document 214 replaced on 7/5/2022) (dlw). (Entered: 06/28/2022) |
| 06/28/2022 | 215 | [SEALED] APPENDIX re 214 Answering Brief in Opposition, by Board of Regents, The University of Texas System, TissueGen, Inc.. (Attachments: # 1 Exhibit A-S, # 2 Exhibit T-AA, # 3 Exhibit BB-DD, # 4 Exhibit EE-JJ)(Stamoulis, Stamatios) (Entered: 06/28/2022) |
| 06/28/2022 | 216 | [SEALED] STATEMENT in Response to Facts Regarding Willfulness (D.I. 201) by Board of Regents, The University of Texas System, TissueGen, Inc. (Stamoulis, Stamatios) Modified on 6/29/2022 (dlw). (Entered: 06/28/2022) |
| 06/28/2022 | 217 | [SEALED] STATEMENT in Response to Facts Regarding Non-Infringment (D.I. 202) by Board of Regents, The University of Texas System, TissueGen, Inc. (Stamoulis, |

| | | |
|---|---|---|
| | | Stamatios) Modified on 6/29/2022 (dlw). (Entered: 06/28/2022) |
| 06/30/2022 | | Pro Hac Vice Attorney Michael W. Shore for Board of Regents, The University of Texas System added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (mpb) (Entered: 06/30/2022) |
| 07/01/2022 | 218 | STIPULATION TO EXTEND TIME to file the redacted versions of their oppositions to summary judgment and Daubert motions to 7/15/2022 - filed by Boston Scientific Corporation. (Farnan, Brian) (Entered: 07/01/2022) |
| 07/05/2022 | | CORRECTING ENTRY: D.I. 214 has been replaced on the docket at the request of counsel. (dlw) (Entered: 07/05/2022) |
| 07/05/2022 | | SO ORDERED re 218 STIPULATION TO EXTEND TIME to file the redacted versions of their oppositions to summary judgment and Daubert motions to 7/15/2022. ORDERED by Judge Maryellen Noreika on 7/5/2022. (dlw) (Entered: 07/05/2022) |
| 07/08/2022 | 219 | [SEALED] REPLY BRIEF re 191 MOTION to Exclude the Testimony of David A. Haas filed by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 07/08/2022) |
| 07/08/2022 | 220 | [SEALED] REPLY BRIEF re 199 MOTION to Preclude Expert Testimony, 198 MOTION for Summary Judgment of Noninfringement, 197 MOTION for Summary Judgment of No Willful Infringement filed by Boston Scientific Corporation. (Farnan, Michael) (Entered: 07/08/2022) |
| 07/08/2022 | 221 | [SEALED] STATEMENT re 213 Statement // Defendant's Response to Plaintiffs' Concise Statement of Facts Regarding Noninfringement by Boston Scientific Corporation. (Farnan, Michael) Modified on 7/11/2022 (dlw). (Entered: 07/08/2022) |
| 07/08/2022 | 222 | [SEALED] DECLARATION of Michael J. Farnan re 220 Reply Brief by Boston Scientific Corporation. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8)(Farnan, Michael) Modified on 7/11/2022 (dlw). (Entered: 07/08/2022) |
| 07/15/2022 | 223 | REDACTED VERSION of 212 Answering Brief in Opposition, by Boston Scientific Corporation. (Farnan, Michael) (Entered: 07/15/2022) |
| 07/15/2022 | 224 | REDACTED VERSION of 220 Reply Brief, by Boston Scientific Corporation. (Farnan, Michael) (Entered: 07/15/2022) |
| 07/15/2022 | 225 | REDACTED VERSION of 221 Defendant's Response to Plaintiffs' Concise Statement of Facts Regarding Noninfringement by Boston Scientific Corporation. (Farnan, Michael) Modified on 7/15/2022 (mdb). (Entered: 07/15/2022) |
| 07/15/2022 | 226 | REDACTED VERSION of 222 Declaration, by Boston Scientific Corporation. (Attachments: # 1 Exhibits 1-8)(Farnan, Michael) (Entered: 07/15/2022) |
| 07/15/2022 | 227 | REDACTED VERSION of 213 Statement by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 07/15/2022) |
| 07/15/2022 | 228 | REDACTED VERSION of 214 Answering Brief in Opposition, by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 07/15/2022) |
| 07/15/2022 | 229 | REDACTED VERSION of 216 Statement by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 07/15/2022) |

| | | |
|---|---|---|
| 07/15/2022 | 230 | REDACTED VERSION of 217 Statement by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 07/15/2022) |
| 07/15/2022 | 231 | REDACTED VERSION of 219 Reply Brief by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 07/15/2022) |
| 07/18/2022 | 232 | REDACTED VERSION of 215 Appendix, by Board of Regents, The University of Texas System, TissueGen, Inc.. (Attachments: # 1 Exhibit A-S, # 2 Exhibit T-AA, # 3 Exhibit BB-DD, # 4 Exhibit EE-JJ)(Stamoulis, Stamatios) (Entered: 07/18/2022) |
| 07/29/2022 | 233 | ORAL ORDER Setting Telephonic Hearing on 128 MOTION to Dismiss for Lack of Jurisdiction Over the Subject Matter: IT IS HEREBY ORDERED that a telephonic Motion Hearing is set for 8/16/2022 at 11:00 AM before Judge Maryellen Noreika. The Court is setting aside thirty (30) minutes for the hearing with the time split equally between the parties. Any slide presentations the parties wish to use during the hearing shall be emailed (in PDF format) to MN_civil@ded.uscourts.gov no later than 24 hours prior to the hearing with hard copies delivered to the Clerk's office within one (1) hour after submission. Counsel may, however, agree upon a different time to exchange their respective slides. Counsel shall provide a teleconference dial-in number and code for the teleconference by emailing this Court's judicial administrator. ORDERED by Judge Maryellen Noreika on 7/29/2022. (dlw) (Entered: 07/29/2022) |
| 07/29/2022 | 234 | NOTICE OF SERVICE of Letter to Opposing Counsel filed by Board of Regents, The University of Texas System, TissueGen, Inc..(Stamoulis, Stamatios) (Entered: 07/29/2022) |
| 08/05/2022 | 235 | MOTION for Pro Hac Vice Appearance of Attorney John P. Lahad and Brian D. Melton - filed by TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 08/05/2022) |
| 08/08/2022 | | SO ORDERED re 235 MOTION for Pro Hac Vice Appearance of Attorney John P. Lahad and Brian D. Melton filed by TissueGen, Inc. ORDERED by Judge Maryellen Noreika on 8/8/2022. (dlw) (Entered: 08/08/2022) |
| 08/08/2022 | | Pro Hac Vice Attorney Brian D. Melton, and John P. Lahad for TissueGen, Inc. added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (smg) (Entered: 08/08/2022) |
| 08/16/2022 | | Minute Entry for proceedings held before Judge Maryellen Noreika - Telephone Conference held on 8/16/2022. The defendant's motion to dismiss ( 128 ) is DENIED; the transcript shall serve as the Court's ruling. Further, a joint letter regarding settlement discussions is due by Friday, August 26, 2022. (Court Reporter Dale Hawkins.) (mdb) (Entered: 08/16/2022) |
| 08/26/2022 | 236 | Joint Letter to The Honorable Maryellen Noreika from Stamatios Stamoulis and Brian E. Farnan regarding summary of settlement discussions between parties principals - re Telephone Conference,, Terminate Motions,. (Stamoulis, Stamatios) (Main Document 236 replaced on 8/29/2022) (dlw). (Entered: 08/26/2022) |
| 08/29/2022 | 237 | Official Transcript of Teleconference held on 08/16/2022 before Judge Maryellen Noreika. Court Reporter/Transcriber Dale C. Hawkins,Email: Dale_Hawkins@ded.uscourts.gov. Transcript may be viewed at the court public terminal or order/purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, it may be obtained through PACER. Redaction Request due 9/19/2022. Redacted Transcript Deadline set for 9/29/2022. Release of Transcript Restriction set for 11/28/2022. (dh) (Entered: 08/29/2022) |

| | | |
|---|---|---|
| 08/29/2022 | | CORRECTING ENTRY: D.I. 236 has been replaced on the docket at the request of counsel to correct a PDF conversation error. (dlw) (Entered: 08/29/2022) |
| 08/30/2022 | 238 | ANSWER to Amended Complaint, re: 124 Amended Complaint with Jury Demand by Boston Scientific Corporation.(Farnan, Michael) (Entered: 08/30/2022) |
| 09/07/2022 | | Case Reassigned to Judge Gregory B Williams. Please include the initials of the Judge (GBW) after the case number on all documents filed. (apk) (Entered: 09/07/2022) |
| 09/08/2022 | 239 | NOTICE of Change of Address by Stamatios Stamoulis (Stamoulis, Stamatios) (Entered: 09/08/2022) |
| 09/12/2022 | 240 | NOTICE of Withdrawal of Counsel Alfonso G. Chan, William D. Ellerman, and Ari Rafilson by Board of Regents, The University of Texas System, TissueGen, Inc. (Stamoulis, Stamatios) (Entered: 09/12/2022) |
| 09/23/2022 | 241 | STIPULATION to amend the Stipulated Protective Order by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 09/23/2022) |
| 09/27/2022 | | SO ORDERED, re 241 STIPULATION to amend the Stipulated Protective Order filed by Board of Regents, The University of Texas System, TissueGen, Inc. Signed by Judge Gregory B. Williams on 9/26/22. (ntl) (Entered: 09/27/2022) |
| 09/29/2022 | 242 | Letter to The Honorable Gregory B. Williams from Brian E. Farnan regarding Pretrial Conference and Trial Dates. (Farnan, Brian) (Entered: 09/29/2022) |
| 10/06/2022 | 243 | MEMORANDUM ORDER re 198 MOTION for Summary Judgment of Noninfringement filed by Boston Scientific Corporation and 197 MOTION for Summary Judgment of No Willful Infringement filed by Boston Scientific Corporation are DENIED. A Final Pretrial Conference is set for 1/12/2023 at 03:00 PM in Courtroom 6B. A 5-day Jury Trial is set for 1/25/2023 at 09:30 AM in Courtroom 6B. A Markman Hearing is set for 11/7/2022 at 04:00 PM in Courtroom 6B. Signed by Judge Gregory B. Williams on 10/6/22. (ntl) (Entered: 10/06/2022) |
| 10/14/2022 | 244 | NOTICE requesting Clerk to remove Elliot Choi as co-counsel.. (Farnan, Brian) (Entered: 10/14/2022) |
| 10/26/2022 | 245 | JOINT CLAIM CONSTRUCTION BRIEF - *("Polymer Fiber")* filed by Boston Scientific Corporation. (Farnan, Michael) (Entered: 10/26/2022) |
| 10/26/2022 | 246 | [SEALED] Joint APPENDIX re 245 Joint Claim Construction Brief by Boston Scientific Corporation. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27)(Farnan, Michael) Modified on 10/26/2022 (ntl). (Entered: 10/26/2022) |
| 10/26/2022 | | CORRECTING ENTRY: D.I. 246 placed under seal per request of counsel. (ntl) (Entered: 10/26/2022) |
| 10/28/2022 | 247 | MOTION to Bifurcate - filed by Boston Scientific Corporation. (Attachments: # 1 Rule 7.1.1 Certification)(Farnan, Michael) (Entered: 10/28/2022) |
| 10/28/2022 | 248 | [SEALED] OPENING BRIEF in Support re 247 MOTION to Bifurcate filed by Boston Scientific Corporation.Answering Brief/Response due date per Local Rules is 11/14/2022. (Farnan, Michael) (Entered: 10/28/2022) |

| | | |
|---|---|---|
| 10/28/2022 | 249 | [SEALED] DECLARATION re 248 Opening Brief in Support by Boston Scientific Corporation. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4) (Farnan, Michael) (Entered: 10/28/2022) |
| 11/02/2022 | 250 | REDACTED VERSION of 246 Appendix,, by Boston Scientific Corporation. (Attachments: # 1 Exhibits 1-8, # 2 Exhibits 9-11, # 3 Exhibits 12-27)(Farnan, Michael) (Entered: 11/02/2022) |
| 11/04/2022 | 251 | REDACTED VERSION of 248 Opening Brief in Support by Boston Scientific Corporation. (Farnan, Michael) (Entered: 11/04/2022) |
| 11/04/2022 | 252 | REDACTED VERSION of 249 Declaration by Boston Scientific Corporation. (Attachments: # 1 Exhibits 1-4)(Farnan, Michael) (Entered: 11/04/2022) |
| 11/07/2022 | | The Markman hearing scheduled for 11/07/2022 at 04:00 PM will now be held in Courtroom 4B. (smg) (Entered: 11/07/2022) |
| 11/07/2022 | | Minute Entry for proceedings held before Judge Gregory B. Williams - Markman Hearing held on 11/7/2022. (Court Reporter: Deanna Warner, warnerdeanna@gmail.com). (twk) (Entered: 11/07/2022) |
| 11/14/2022 | 253 | [SEALED] ANSWERING BRIEF in Opposition re 247 MOTION to Bifurcate filed by Board of Regents, The University of Texas System, TissueGen, Inc..Reply Brief due date per Local Rules is 11/21/2022. (Stamoulis, Stamatios) (Entered: 11/14/2022) |
| 11/14/2022 | 254 | [SEALED] APPENDIX re 253 Answering Brief in Opposition by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 11/14/2022) |
| 11/17/2022 | 255 | MEMORANDUM OPINION re claim construction. Signed by Judge Gregory B. Williams on 11/17/22. (ntl) (Entered: 11/17/2022) |
| 11/17/2022 | 256 | ORDER re 255 Memorandum Opinion regarding claim construction. Signed by Judge Gregory B. Williams on 11/17/22. (ntl) (Entered: 11/17/2022) |
| 11/21/2022 | 257 | REPLY BRIEF re 247 MOTION to Bifurcate filed by Boston Scientific Corporation. (Farnan, Brian) (Entered: 11/21/2022) |
| 11/21/2022 | 258 | REDACTED VERSION of 253 Answering Brief in Opposition by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 11/21/2022) |
| 11/21/2022 | 259 | REDACTED VERSION of 254 Appendix by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 11/21/2022) |
| 12/02/2022 | 260 | MEMORANDUM ORDER re 247 MOTION to Bifurcate filed by Boston Scientific Corporation is GRANTED. Signed by Judge Gregory B. Williams on 12/2/22. (ntl) (Entered: 12/02/2022) |
| 12/12/2022 | 261 | MEMORANDUM ORDER re 199 MOTION to Preclude Expert Testimony filed by Boston Scientific Corporation is DENIED; 191 MOTION to Exclude the Testimony of David A. Haas filed by Board of Regents, The University of Texas System, TissueGen, Inc. is DENIED. Signed by Judge Gregory B. Williams on 12/12/22. (ntl) (Entered: 12/12/2022) |
| 12/20/2022 | 262 | Proposed Pretrial Order by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 12/20/2022) |
| 12/20/2022 | 263 | [SEALED] APPENDIX re 262 Proposed Pretrial Order by Board of Regents, The University of Texas System, TissueGen, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, |

| | | |
|---|---|---|
| | | # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21)(Stamoulis, Stamatios) (Entered: 12/20/2022) |
| 12/22/2022 | 264 | NOTICE OF SERVICE of Boston Scientific's Notice Pursuant to 35 U.S.C. § 282 filed by Boston Scientific Corporation.(Farnan, Brian) (Entered: 12/22/2022) |
| 12/22/2022 | 265 | NOTICE OF SERVICE of Subpoena filed by Board of Regents, The University of Texas System, TissueGen, Inc..(Stamoulis, Stamatios) (Entered: 12/22/2022) |
| 12/28/2022 | 266 | REDACTED VERSION of 263 Appendix,, by Board of Regents, The University of Texas System, TissueGen, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21)(Stamoulis, Stamatios) (Attachment 13 replaced on 12/29/2022) (ntl). (Attachment 14 replaced on 12/29/2022) (ntl). (Attachment 15 replaced on 12/29/2022) (ntl). (Entered: 12/28/2022) |
| 12/29/2022 | | CORRECTING ENTRY: Corrected documents added to D.I. 266 per request of counsel (Exhibits 13, 14, and 15). (ntl) (Entered: 12/29/2022) |
| 01/03/2023 | 267 | MOTION for Pro Hac Vice Appearance of Attorney Evan J. Kline-Wedeen, Doowon R. Chung, and N. Chethana Perera - filed by Boston Scientific Corporation. (Farnan, Michael) (Entered: 01/03/2023) |
| 01/03/2023 | 268 | Proposed Jury Instructions by Board of Regents, The University of Texas System, TissueGen, Inc. *Phase 1 Preliminary Jury Instructions*. (Stamoulis, Stamatios) (Entered: 01/03/2023) |
| 01/03/2023 | 269 | Proposed Jury Instructions by Board of Regents, The University of Texas System, TissueGen, Inc. *Phase 1 Final Jury Instructions*. (Stamoulis, Stamatios) (Entered: 01/03/2023) |
| 01/03/2023 | 270 | VERDICT SHEET by Board of Regents, The University of Texas System, TissueGen, Inc. *Proposed Verdict Form*. (Stamoulis, Stamatios) (Entered: 01/03/2023) |
| 01/03/2023 | 271 | Proposed Jury Instructions by Board of Regents, The University of Texas System, TissueGen, Inc. *Phase 2 Preliminary Jury Instructions*. (Stamoulis, Stamatios) (Entered: 01/03/2023) |
| 01/03/2023 | 272 | Proposed Jury Instructions by Board of Regents, The University of Texas System, TissueGen, Inc. *Phase 2 Final Jury Instructions*. (Stamoulis, Stamatios) (Entered: 01/03/2023) |
| 01/03/2023 | 273 | VERDICT SHEET by Board of Regents, The University of Texas System, TissueGen, Inc. *Proposed Verdict Form (Phase 2)*. (Stamoulis, Stamatios) (Entered: 01/03/2023) |
| 01/03/2023 | 274 | Proposed Voir Dire by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 01/03/2023) |
| 01/04/2023 | | SO ORDERED, re 267 MOTION for Pro Hac Vice Appearance of Attorney Evan J. Kline-Wedeen, Doowon R. Chung, and N. Chethana Perera filed by Boston Scientific Corporation. Signed by Judge Gregory B. Williams on 1/4/23. (ntl) (Entered: 01/04/2023) |
| 01/04/2023 | 275 | NOTICE requesting Clerk to remove James R. Ferguson as co-counsel.. (Farnan, Brian) (Entered: 01/04/2023) |

| | | |
|---|---|---|
| 01/04/2023 | | Pro Hac Vice Attorney Doowon Chung, Nirvani Chethana Perera, and Evan J. Kline-Wedeen for Boston Scientific Corporation added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (mpb) (Entered: 01/04/2023) |
| 01/12/2023 | | Minute Entry for proceedings held before Judge Gregory B. Williams - Pretrial Conference held on 1/12/2023. (Court Reporter M. Rolfe.) (ntl) (Entered: 01/13/2023) |
| 01/13/2023 | 276 | ORDER regarding the Court's rulings on the parties' motions in limine and other pretrial matters discussed during yesterday's pretrial conference. Signed by Judge Gregory B. Williams on 1/13/23. (ntl) (Entered: 01/13/2023) |
| 01/17/2023 | 277 | Witness List by Boston Scientific Corporation. (Farnan, Michael) (Entered: 01/17/2023) |
| 01/17/2023 | 278 | [SEALED] Exhibit List *(Identification by Phase)* by Boston Scientific Corporation. (Farnan, Michael) (Entered: 01/17/2023) |
| 01/17/2023 | 279 | [SEALED] Letter to the Honorable Gregory B. Williams from Stamatios Stamoulis regarding Secondary Considerations Testimony. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Stamoulis, Stamatios) (Main Document 279 replaced on 1/18/2023) (ntl). (Entered: 01/17/2023) |
| 01/17/2023 | 280 | Witness List by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 01/17/2023) |
| 01/17/2023 | 281 | [SEALED] Exhibit List by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 01/17/2023) |
| 01/17/2023 | 282 | MOTION for Pro Hac Vice Appearance of Attorney Alex Q. Jacobs - filed by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 01/17/2023) |
| 01/18/2023 | | CORRECTING ENTRY: Corrected letter added to D.I. 279 per request of counsel. (ntl) (Entered: 01/18/2023) |
| 01/18/2023 | 283 | Letter to the Honorable Gregory B. Williams from Stamatios Stamoulis regarding Stipulation of Admitted Facts. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Stamoulis, Stamatios) (Entered: 01/18/2023) |
| 01/18/2023 | 284 | Letter to The Honorable Gregory B. Williams from Michael J. Farnan regarding Motion to Quash Trial Subpoena. (Attachments: # 1 Exhibit A)(Farnan, Michael) (Entered: 01/18/2023) |
| 01/18/2023 | 285 | Joint Letter to The Honorable Gregory B. Williams from Michael J. Farnan regarding Marking Instruction. (Attachments: # 1 Exhibit A)(Farnan, Michael) (Entered: 01/18/2023) |
| 01/18/2023 | 286 | [SEALED] Letter to The Honorable Gregory B. Williams from Michael J. Farnan regarding Response on Secondary Considerations - re 279 Letter. (Attachments: # 1 Exhibit A)(Farnan, Michael) (Entered: 01/18/2023) |
| 01/19/2023 | | SO ORDERED, re 282 MOTION for Pro Hac Vice Appearance of Attorney Alex Q. Jacobs filed by Board of Regents, The University of Texas System, TissueGen, Inc. Signed by Judge Gregory B. Williams on 1/19/23. (ntl) (Entered: 01/19/2023) |
| 01/19/2023 | 287 | Letter to the Honorable Gregory B. Williams from Stamatios Stamoulis regarding Plaintiffs' Trial Witness Subpoena - re 284 Letter. (Stamoulis, Stamatios) (Entered: 01/19/2023) |

| | | |
|---|---|---|
| 01/19/2023 | | Pro Hac Vice Attorney Alex Q. Jacobs for Board of Regents, The University of Texas System and TissueGen, Inc. added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (mpb) (Entered: 01/19/2023) |
| 01/19/2023 | 288 | Official Transcript of Pretrial Conference held on 01.12.2023 before Judge Gregory Williams. Court Reporter/Transcriber Michele Rolfe,Email: michele_rolfe@ded.uscourts.gov. Transcript may be viewed at the court public terminal or order/purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, it may be obtained through PACER. Redaction Request due 2/9/2023. Redacted Transcript Deadline set for 2/21/2023. Release of Transcript Restriction set for 4/19/2023. (Rolfe, Michele) (Entered: 01/19/2023) |
| 01/19/2023 | 289 | ORAL ORDER: The Court instructed Plaintiffs Board of Regents, the University of Texas System ("UTBOR") and TissueGen, Inc. ("TissueGen") (collectively, "Plaintiffs") to "describe what objective indicia of non-obviousness that UTBOR and TissueGen seek to present--and what evidence they seek to raise related thereto--at trial and where and when UTBOR and TissueGen have disclosed such objective indicia of non-obviousness to BSC" and sought responsive briefing from Defendant Boston Scientific Corp. ("BSC"). D.I. 276 9. Having reviewed the parties' briefing, D.I. 279; D.I. 286, the Court finds as follows: Plaintiff had several prior opportunities to advise BSC of any claims of copying or other objective indicia of non-obviousness. Plaintiffs admitted that they disclosed only one secondary indicium of non-obviousness, "teaching away by prior art," in their response to BSC's interrogatory seeking what objective indicia of non-obviousness that Plaintiffs were asserting in this action. D.I. 279 at 4; D.I. 286 at 2 (quoting the interrogatory). Plaintiffs' First Amended Complaint, D.I. 124, and the two partial deposition transcripts that Plaintiffs submitted as attachments to their briefing on this issue, D.I. 279-1; D.I. 279-2, fail to mention the words "copy" or "steal" and thus could not have put BSC on notice of a copying defense. BSC's expert report recited various objective indicia of non-obviousness and explained the expert's understanding that Plaintiffs did not rely on those objective indicia of non-obviousness, which should again have prompted Plaintiffs to disclose such defenses if Plaintiffs were asserting any of them. D.I. 286-1 620, 631-32, 635, 639, 640, 645, 648, 651. BSC specifically mentioned the lack of UTBOR's argument or evidence regarding the secondary considerations of commercial success or copying in its briefing on the Motion for Bifurcation, D.I. 248 at 13, and UTBOR did not refute BSC's argument, D.I. 253. To now permit UTBOR and TissueGen to assert and disclose previously-undisclosed defenses to BSC's invalidity counterclaims, such as copying and other objective indicia of non-obviousness, approximately two weeks before trial would be highly prejudicial to BSC. Significantly, the Court's Scheduling Order permitted BSC to "submit an expert opinion in reply to any expert report or opinion on objective indicia of non-obviousness[,]" D.I. 47 8(f)(i) and D.I. 179, and Plaintiffs' lack of disclosure deprived BSC of the opportunity to submit such an opinion. Moreover, the fact that Plaintiffs previously disclosed "teaching away by prior art" but did not previously disclose "copying" or any other objective indicia of non-obviousness is revealing. Federal Rule of Civil Procedure 37(c)(1) provides: "If a party fails to provide information... as required by Rule 26(a) or (e), the party is not allowed to use that information... to supply evidence... at a trial, unless the failure was substantially justified or is harmless." The Third Circuit considers the Pennypack factors on such issues. An analysis of the Pennypack factors, which Plaintiffs agree apply here, D.I. 279 at 4, reveals that BSC would suffer substantial prejudice and there would be no way for the Court to grant BSC adequate time to prepare for Plaintiffs' new theories and have trial as scheduled; the parties' dispute signifies the importance of the objective indicia evidence; and the likelihood of substantial disagreements between the parties about the |

| | | |
|---|---|---|
| | | admissibility of evidence that supports objective indicia of non-obviousness, such as copying, could "disrupt the orderly and efficient trial of the case[,]" LabMD Inc. v. Boback, 47 F.4th 164, 189 (3d Cir. 2022). However, the Court does not assume Plaintiffs acted in bad faith. Further, the concept of "teaching away by prior art" is generally used to refute the idea that certain prior art alleged to render a patent obvious taught away from the patent at the time of the invention. See Galderma Lab'ys, L.P. v. Tolmar, Inc., 737 F.3d 731, 737-38 (Fed. Cir. 2013); In re Mouttet, 686 F.3d 1322, 1333 (Fed. Cir. 2012) ("A reference that properly teaches away can preclude a determination that the reference renders a claim obvious."). Thus, IT IS HEREBY ORDERED that, with the exception of "teaching away by prior art", Plaintiffs may not cross-examine any BSC witness about, as to, or introduce evidence of copying or any other objective indicia of non-obviousness to rebut BSC's obviousness claim. The Court expects that any "teaching away by prior art" rebuttal during Phase 1 of the trial would focus on the content of the prior art, and not on the knowledge, intent, or internal deliberations of BSC. ORDERED by Judge Gregory B. Williams on 1/19/23. (ntl) (Entered: 01/19/2023) |
| 01/19/2023 | 290 | [SEALED] Letter to The Honorable Gregory B. Williams from Michael J. Farnan regarding Objections to Plaintiffs' Demonstrative Models. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H)(Farnan, Michael) (Entered: 01/19/2023) |
| 01/19/2023 | 291 | ORAL ORDER: The Court has reviewed Plaintiffs' description of the meet-and-confer that occurred on Tuesday, January 17, 2023 related to facts to which Plaintiffs believe Defendant should stipulate. D.I. 283. IT IS HEREBY ORDERED that, no later than Friday, January 20, 2023 at 2:00 PM, Plaintiffs shall docket (and shall email to Defendant a Microsoft Word or Excel version of) a table that, in the first column, lists each fact to which Plaintiffs believe Defendant should stipulate and in the second column, provides a pin citation to Defendant's admission; the table shall have blank third and fourth columns. No later than Monday, January 23 at 12:00 PM, Defendant shall docket (and shall email to Plaintiffs a Microsoft Word or Excel version of) the same table, except that, in the third column, Defendant shall state whether it agrees to stipulate to the fact or shall provide a precise reason it refuses to do so and one or more pin citations to support its refusal. For example, if Defendant never admitted a fact, Defendant shall identify the specific parts of the fact to which Defendant has and has not admitted. No later than Monday, January 23, 2023 at 9:00 PM, Plaintiffs shall docket (and shall email to both the Court and Defendant a Microsoft Word or Excel version of) the same table Defendant submitted, except that Plaintiffs shall submit any response to Defendants in the fourth column, again with supporting pin citations. ORDERED by Judge Gregory B. Williams on 1/19/23. (ntl) (Entered: 01/19/2023) |
| 01/19/2023 | 292 | Letter to The Honorable Gregory B. Williams from Michael J. Farnan regarding Revisions to Jury Instructions. (Farnan, Michael) (Entered: 01/19/2023) |
| 01/19/2023 | 293 | Letter to The Honorable Gregory B. Williams from Stamatios Stamoulis regarding Plaintiff's Proposed Revisions to Jury Instructions and Verdict Forms. (Stamoulis, Stamatios) (Entered: 01/19/2023) |
| 01/19/2023 | 294 | Proposed Jury Instructions by Board of Regents, The University of Texas System, TissueGen, Inc. *Preliminary Jury Instructions (Phase 1)*. (Stamoulis, Stamatios) (Entered: 01/19/2023) |
| 01/19/2023 | 295 | Proposed Jury Instructions by Board of Regents, The University of Texas System, TissueGen, Inc. *Final Jury Instructions (Phase 1)*. (Stamoulis, Stamatios) (Entered: 01/19/2023) |

| | | |
|---|---|---|
| 01/19/2023 | 296 | VERDICT SHEET by Board of Regents, The University of Texas System, TissueGen, Inc. *Verdict Form (Phase 1)*. (Stamoulis, Stamatios) (Entered: 01/19/2023) |
| 01/19/2023 | 297 | Proposed Jury Instructions by Board of Regents, The University of Texas System, TissueGen, Inc. *Preliminary Jury Instructions (Phase 2)*. (Stamoulis, Stamatios) (Entered: 01/19/2023) |
| 01/19/2023 | 298 | Proposed Jury Instructions by Board of Regents, The University of Texas System, TissueGen, Inc. *Final Jury Instructions (Phase 2)*. (Stamoulis, Stamatios) (Entered: 01/19/2023) |
| 01/19/2023 | 299 | VERDICT SHEET by Board of Regents, The University of Texas System, TissueGen, Inc. *Verdict Form (Phase 2)*. (Stamoulis, Stamatios) (Entered: 01/19/2023) |
| 01/20/2023 | 300 | NOTICE of Compliance with Court Order Regarding Proposed Stipulations by Board of Regents, The University of Texas System, TissueGen, Inc. re 291 Order,,,,,, (Attachments: # 1 Exhibit 1)(Stamoulis, Stamatios) (Entered: 01/20/2023) |
| 01/20/2023 | 301 | MEMORANDUM ORDER re jury instruction on patent marking. Signed by Judge Gregory B. Williams on 1/20/23. (Attachment (1) patent marking instruction) (ntl) (Entered: 01/20/2023) |
| 01/20/2023 | 302 | Letter to the Honorable Gregory B. Williams from Stamatios Stamoulis regarding Responding to Defendant's Letter Regarding Demonstratives - re 290 Letter,. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Stamoulis, Stamatios) (Entered: 01/20/2023) |
| 01/20/2023 | 303 | MEMORANDUM ORDER re 284 BSC's motion to quash Plaintiffs' subpoena is GRANTED-IN-PART and DENIED-IN-PART. Signed by Judge Gregory B. Williams on 1/20/23. (ntl) (Entered: 01/20/2023) |
| 01/23/2023 | 304 | MULTI MEDIA DOCUMENT filed by Board of Regents, The University of Texas System, TissueGen, Inc. in the form of AVI files on a disc. Filing related to 302 Letter. (Media on file in Clerk's Office). (ntl) (Entered: 01/23/2023) |
| 01/23/2023 | 305 | ORAL ORDER: Defendant Boston Scientific Corporation ("BSC") alleges that certain demonstrative exhibits from Plaintiffs Board of Regents, The University of Texas System ("UTBOR") and TissueGen, Inc. ("TissueGen") (collectively, "Plaintiffs") lack foundation, were not timely disclosed, and should be excluded under Federal Rules of Evidence ("FRE") 403 and 611(a). D.I. 290. First, Plaintiffs' expert, Dr. William Pitt ("Pitt"), created (or had someone create) these demonstratives (which are models of the Synergy stents) using a 3D printer. D.I. 302 at 1-2. BSC argues that Dr. Pitt is "not certified as an expert" in fields related to 3D printing "to provide requisite foundation and authenticate these models under FRE 901." D.I. 290 at 1. Plaintiffs argue that Pitt need not have expertise in 3D printing software to use a 3D-printed model. D.I. 302 at 2. FRE 901(a) requires that a proponent of evidence "must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). "That burden is slight, requiring only sufficient evidence from which the fact-finder could legitimately infer that the evidence is what the proponent claims it to be." Berger v. Zeghibe, 465 F. App'x 174, 18384 (3d Cir. 2012) (internal quotation marks and citation omitted). While the Court reserves a final ruling until the Court hears Pitt's testimony at trial, Pitt's certification that the demonstratives promulgated are accurate models of items Pitt has, himself, viewed under a microscope, see D.I. 302 at 2, should provide adequate foundation. Second, BSC argues that the demonstratives "would also constitute new and undisclosed expert opinions" that "the Synergy coating is separable from the underlying stent architecture... or that the models are representative of the Synergy stents...." D.I. 290 at 2. However, the Court finds that an expert should not be expected to opine on the accuracy of demonstratives in the expert's reports, because the purpose of demonstratives |

| | | |
|---|---|---|
| | | is for the expert to demonstrate the expert's opinions formed through the expert discovery process. Rather, as the parties previously agreed, the parties must exchange demonstratives just prior to their use at trial. D.I. 262 70. BSC's third and fourth arguments collapse into one: Because Plaintiffs made their models with a different fiber, stent material, and "fabrication process" than those used in the accused products, and since the demonstratives incorrectly "suggest that the Synergy coating may be (1) removed in one complete piece, and (2) replaced on the stent at-will[,]" the demonstratives lack any probative value and should be excluded under FRE 403. D.I. 290 at 2-3. Plaintiffs respond that, while their demonstratives are not "made exactly like a complex commercial product[,]" Plaintiffs disclosed the models with sufficient time to permit BSC to prepare cross-examination as to any discrepancies. D.I. 302 at 3-4. FRE 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of... unfair prejudice, confusing the issues, misleading the jury,... or needlessly presenting cumulative evidence." Further, under Rule 611(a), the Court has discretion to control "the mode... of... presenting evidence so as to: (a) make those procedures effective for determining the truth...." Here, the demonstratives will help Pitt explain his opinions to the jury, and BSC's opportunity to cross-examine Pitt reduces the risk of unfair prejudice and helps promote truth-seeking under Rule 611(a). Further, the Court's jury instructions--that demonstrative exhibits "are not evidence, and should not be considered as evidence[,]" D.I. 295 at 10--will reduce the risk of jury confusion. The Court reserves any ruling as to whether the demonstratives are used in a needlessly cumulative manner until trial. For these reasons, the Court DENIES BSC's motion (D.I. 290) to exclude the demonstrative exhibits pictured at D.I. 290-2, D.I. 290-3, D.I. 290-4, and D.I. 290-5. ORDERED by Judge Gregory B. Williams on 1/23/23. (ntl) (Entered: 01/23/2023) |
| 01/23/2023 | 306 | STATEMENT *Chart regarding Joint Statement of Stipulated Facts* by Boston Scientific Corporation. (Attachments: # 1 Exhibit 1)(Farnan, Michael) (Entered: 01/23/2023) |
| 01/23/2023 | 307 | Letter to The Honorable Gregory B. Williams from Michael J. Farnan regarding Chart of Stipulated Facts Submitted by Plaintiffs - re 283 Letter, 306 Statement. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Farnan, Michael) (Entered: 01/23/2023) |
| 01/23/2023 | 308 | ORAL ORDER: Plaintiffs Board of Regents, The University of Texas System ("UTBOR") and TissueGen, Inc. ("TissueGen") (collectively, "Plaintiffs") and Defendant Boston Scientific Corporation ("BSC") have proposed several additional edits to the Court's jury instructions. First, the parties agree that the Court should add the following to Phase I Preliminary Jury Instruction XIII: "This trial has been split into two phases. The presentation of evidence is currently scheduled to be completed by Tuesday, January 31, 2023." D.I. 292 at 2; D.I. 294 at 16. The Court accepts this proposal. BSC proposes six additional edits. (1) To resolve the inconsistency between proposed Phase 1 Preliminary Jury Instruction VII, D.I. 294 at 8, and Phase 1 Final Jury Instruction 1.12, D.I. 295 at 12, the Court agrees-in-part with BSC's first proposal and amends Phase 1 Preliminary Jury Instruction VII to read: "On this issue, Boston Scientific has the burden of proof and must prove by clear and convincing evidence that the patent is invalid. Clear and convincing evidence means evidence that it is highly probable that a fact is true." (2) BSC argues that the Court should not say that "fiber" takes its "plain and ordinary meaning" in Phase I Final Jury Instruction 3.2 because plain meaning and "a specific claim construction... are mutually exclusive concepts." D.I. 292 at 2. The Court rejects this edit because it would not confuse a jury to state that a term takes its plain and ordinary meaning and to state what that meaning is. (3) BSC asks the Court to instruct the jury that it "may not determine infringement based on the content of a patent application...." D.I. 292 at 3. However, Phase 1 Final Jury Instruction 3.4 already recites that "[a] patent claim is infringed only if the accused product includes each and every limitation in the Asserted Claim." D.I. 295 at 20. That language would not permit a jury to compare an accused |

| | | |
|---|---|---|
| | | product or patent claims to a patent application. Thus, the Court rejects BSC's proposal as unnecessary. (4) BSC asks the Court to revisit its ruling during the final pretrial conference and add the word "actually" into Phase 1 Final Jury Instruction 4.6 such that it reads: "The written description requirement is designed to ensure that the inventor [actually] invented the claimed subject matter...." D.I. 292 at 4; D.I. 295 at 28. However, the instruction communicates the same message with or without the word "actually." Thus, the Court rejects the proposal to revisit its prior construction. See D.I. 288 at 44:12-19. (5) BSC asks the Court to reject two of Plaintiffs' proposals in Phase 2 Final Jury Instruction 3, both of which would remind the jury that it found in Phase 1 that Boston Scientific Limited infringed the '296 patent. D.I. 292 at 5; D.I. 298 at 5. Consistent with the Court's bifurcation order in this case, D.I. 260 at 6, the jury must determine in Phase 1 whether Boston Scientific Limited infringes any claims of the '296 patent, D.I. 296 at 3. Thus, the Court agrees with Plaintiffs that it must instruct the jury that the jury already determined in Phase 1 "that acts actually carried out by Boston Scientific Limited directly infringed" claims of the '296 patent. Thus, the Court accepts Plaintiffs' second proposed addition. D.I. 298 at 5. However, Plaintiffs' first proposed addition to Phase 2 Final Jury Instruction 3 is duplicative and, thus, the Court rejects it. (6) BSC requests certain amendments to the verdict forms in both phases of this case that--to the extent they are specified--appear to be inconsistent with the Court's prior jury instruction rulings. D.I. 292 at 5. Thus, the Court rejects BSC's proposal. ORDERED by Judge Gregory B. Williams on 1/23/23. (ntl) (Entered: 01/23/2023) |
| 01/23/2023 | 309 | ORAL ORDER: Plaintiffs Board of Regents, The University of Texas System ("UTBOR") and TissueGen, Inc. ("TissueGen") (collectively, "Plaintiffs") propose one additional edit to the Phase 1 Final Jury Instructions, two additional edits to the Phase 2 Final Jury Instructions, and one edit to each of the proposed verdict forms in this case, in addition to the one edit to which Defendant Boston Scientific Corporation ("BSC") has agreed and that the Court accepted. D.I. 293; D.I. 292 at 2. (1) Plaintiffs ask the Court to instruct on three secondary indicia of non-obviousness: "[w]hether others tried and failed to make the claimed invention[,]" copying, and "[w]hether the inventor proceeded contrary to accepted wisdom in the field." D.I. 295 at 27. BSC opposes this addition. D.I. 292 at 4. The Court has rejected all secondary indicia of non-obviousness other than "teaching away by prior art" as untimely. D.I. 289. Since Plaintiffs request a jury instruction on rejected secondary indicia only, the Court rejects Plaintiffs' proposal. (2) Plaintiffs ask that Phase 2 Final Jury Instruction 4.5 be revised to read: "the amount you find as damages must be based on the value attributable to the patented technology, as distinct from... UTBOR's and TissueGen's size or market position" rather than "Boston Scientific's size or market position." D.I. 293 at 1-2; D.I. 298 at 13. The parties initially jointly proposed that the text read "Boston Scientific's," D.I. 272 at 22, but Plaintiffs argue that this proposed instruction was meant to track the Federal Circuit Bar Association ("FCBA") Model Instruction B.5.12, D.I. 293 at 1. The Court agrees both that the proposed instruction directly tracks the FCBA Model and that the FCBA Model instructs on "[the patent holder's] size or market position." Model Patent Jury Instructions, at 74, FCBA, https://tinyurl.com/4fj68ys4. Thus, the Court accepts Plaintiffs' proposal. (3) Plaintiffs object to the Court's Phase 2 Final Jury Instruction 4.6. D.I. 293 at 2; D.I. 298 at 14. Plaintiffs argue that a non-infringing substitute has to be "acceptable to all purchasers" and viewed by buyers "as equivalent to the patented device." D.I. 293 at 2 (cleaned up). However, Plaintiffs cite for their argument, see D.I. 293 at 2, a case that discussed non-infringing substitutes in the context of lost profits damages, see Am. Seating Co. v. USSC Grp., Inc., 514 F.3d 1262, 1270 (Fed. Cir. 2008), rather than the reasonable royalty damages at issue here. Plaintiffs' argument is also incorrect in the lost profits context, since, "if there is a noninfringing alternative which any given purchaser would have found acceptable and bought, then the patentee cannot obtain lost profits for that particular sale." Mentor Graphics Corp. v. EVE-USA, Inc., 851 F.3d 1275, 1286 |

| | | |
|---|---|---|
| | | (Fed. Cir. 2017) (footnote omitted). Thus, the alternative need be acceptable to only one purchaser to affect lost profit damages, not to all purchasers. The Court rejects Plaintiffs' second proposal and, instead, retains the jury instruction adopted from Complete Genomics v. Illumina, C.A. No. 19-970, D.I. 404 at 38; D.I. 272 at 23 & n.38. (4) Plaintiffs propose to modify question No. 1 of the Phase 1 Verdict form to ask whether "Boston Scientific directly infringed one or more of claims 1, 11, 17, and 26 of the '296 patent," D.I. 293 at 2-3, rather than whether "Boston Scientific's Synergy stents infringe any of the following claims[,]" D.I. 296 at 2. During the pretrial conference, BSC offered that it would "reflect" on such an edit. D.I. 288 at 46:24-47:2. Under the Patent Act, "whoever... makes, uses, offers to sell, or sells any patented invention... infringes the patent." 35 U.S.C. § 271(a). Since the Court has adopted a separate question that asks whether Boston Scientific Limited, a BSC subsidiary, directly infringed, D.I. 296 at 3, and since Phase 1 Jury Instruction 3.4 already connects BSC's infringement to whether its product "includes each and every limitation in the Asserted Claim[,]" D.I. 295 at 20, the Court adopts Plaintiffs' proposed amendment to the verdict form. The Court also amends Phase 1 Final Jury Instruction 3.4 to change "Boston Scientific" to "Boston Scientific and/or Boston Scientific Limited" to clarify for the jury that the same analysis applies to Phase 1 Verdict Sheet Question Nos. 1 and 2. (5) Plaintiffs propose to add to the Phase 2 Verdict Sheet a new Question No. 3 that asks whether UTBOR and TissueGen proved that "TissueGen did not make, offer to sell, or sell products... that practiced the '296 patent[.]" D.I. 293 at 3. Plaintiffs also propose to remove current Question No. 4, id., which asks whether UTBOR and TissueGen proved their compliance with the marking requirement, D.I. 299 at 5. Since the Court proposes to instruct the jury that UTBOR and TissueGen must prove that (i) they did not make a product that practices the '296 patent, (ii) they complied with the marking requirement, or (iii) they complied with the actual notice requirement, D.I. 301-1 at 2, the Court adopts-in-part Plaintiffs' proposal. The Court adopts Plaintiffs' proposed Question No. 3, D.I. 293 at 3, but adds "UTBOR and" before "TissueGen" for consistency with the Court's marking instruction, D.I. 301-1, to which Plaintiffs did not object in relevant part, D.I. 285 at 2. The Court retains its current Question No. 4, makes its current Question No. 3 into Question No. 5, and makes its current Question Nos. 5 and 6 into Question Nos. 6 and 7, respectively. See D.I. 299. These edits also maintain consistency with the order in the Court's marking instruction. D.I. 301-1. Finally, the Court amends the newly-numbered Question No. 7 to have a first answer line labeled "Before November 20, 2017: $" and a second answer line labeled "On or After November 20, 2017: $". This will allow the Court to more easily determine the proper damages amount. ORDERED by Judge Gregory B. Williams on 1/23/23. (Entered: 01/23/2023) |
| 01/23/2023 | 310 | NOTICE of of Compliance with D.I. 291 Regarding Proposed Stipulations by Board of Regents, The University of Texas System, TissueGen, Inc. re 291 Order,,,,,, (Attachments: # 1 Exhibit 1)(Stamoulis, Stamatios) (Entered: 01/23/2023) |
| 01/24/2023 | 311 | ORAL ORDER: The Court has reviewed the submissions made by Plaintiffs Board of Regents, The University of Texas System ("UTBOR") and TissueGen, Inc. ("TissueGen") (collectively, "Plaintiffs") and Defendant Boston Scientific Corp. ("BSC"), D.I. 310-1, pursuant to the Court's order, D.I. 291. (1) The parties agree that statements 1-10, 12-14, 20, and 58 (as revised) were included in the Joint Statement of Uncontested Facts (D.I. 263-1). D.I. 310-1 at passim. The parties agree that statement 11 is no longer applicable to this case. Thus, the Court declines to find those facts stipulated to here. (2) BSC already agreed to admit statements 21-29 and 59-61, and the parties agree to rephrase statements 66-71. See D.I. 310-1 at passim. Thus, the Court adopts the parties' agreed-upon position as uncontested. (3) As to statements 15-19, BSC argues that Plaintiffs isolate favored portions of U.S. Patent No. 6,596,296 (the "'296 Patent") and such an "improper characterization" is "unnecessarily cumulative" under Federal Rule of Evidence ("FRE") 403. D.I. 310-1 at 6-10. The Court agrees with BSC, since the '296 Patent will be in |

evidence and, thus, these unnecessarily cumulative stipulations would have almost no "probative value." Fed. R. Evid. 403. (4) BSC argues that the statements 30, 31, 34-36 are about the so-called "Strickler patent" and, thus, are relevant only to Phase 2 of this trial. D.I. 310-1 at 13-20. However, Plaintiffs may use the "Strickler patent" in Phase 1 as evidence to show that BSC "admits that [a]coating on similar products to the accused products [is a] fiber[]." D.I. 288 at 71:18-72:14. (The Court notes that the issue is not "how a person of ordinary skill in the art (POSITA') would interpret and use the term fiber[,]'" D.I. 310-1 at 13, but, rather, is whether a POSA would understand the polymer coating on the Synergy stent to be a "fiber" as the Court has construed that term. Plaintiffs must avoid re-arguing claim construction to the jury. D.I. 255 at 18-19.) Also, Plaintiffs have revised their proposed statements 30, 31, and 36 so as to remove language not found in BSC's Answer to the Amended Complaint (D.I. 238). D.I. 310-1 at 13-15, 20 (removing inventor first names, the phrase "when the application was filed," and additional words). Thus, the Court adopts, as uncontested, statements 30, 31, and 36 as modified, and the Court adopts as uncontested, in lieu of statements 34 and 35, the first two sentences in D.I. 238 para. 47, excluding the phrase "Boston Scientific admits that". (5) Consistent with (4), statements 32-33 and 41 are relevant in Phase 1 to connecting the Strickler patent to BSC. D.I. 310-1 at 16-17, 28. The Court disagrees with BSC and finds no risk of unfair prejudice under FRE 403 by reciting Mr. Scott Bluni's titles at two different companies. Thus, the Court adopts statements 32-33 and 41 as uncontested. (6) As to statements 37-40, 47-50, 65, 74-78, and 86-90, BSC argues that most of these statements improperly isolate words or phrases in documents, email exchanges, or websites. D.I. 310-1 at passim. Since the Court discerns no compromise between the parties, the Court denies Plaintiffs' request to add these to the Joint Statement of Uncontested Facts. (7) BSC argues that statements 42-46 would violate the Court's order that this case be bifurcated if introduced in Phase 1, and Plaintiffs agree only to introduce these statements in Phase 2. See D.I. 310-1 at 28-30. Thus, the Court adopts statements 42-46 as uncontested only in Phase 2. (8) BSC argues that statements 51 and 52 may not be introduced in Phase 1, and Plaintiffs agree that they will not introduce these statements in Phase 1. D.I. 310-1 at 35-36. Plaintiffs also revise statement 52 to use the exact language used in BSC's Answer to the Amended Complaint. See D.I. 238 para. 62; D.I. 310-1 at 36. The Court finds no danger of unfair prejudice by reciting Ms. Moynihan's or Mr. Ballinger's positions at BSC and that such titles have substantial probative value in Phase 2. See id. at 35-36. Thus, the Court adopts as uncontested statement 51 and, as revised, statement 52, only in Phase 2. (9) The parties disagree as to whether statements 53-57, which concern a stent not at issue in this case, are relevant. D.I. 310-1 at 37-38. The Court cannot determine whether or how this information is relevant until it sees evidence at trial and, thus, declines to find those facts uncontested here. (10) The parties offer differing versions of statements 62-64. D.I. 310-1 at 40-42. Since the Court discerns no compromise between the parties, the Court denies Plaintiffs' request to add these to the Joint Statement of Uncontested Facts. (11) BSC argues that it did not admit the facts contained in statement 72, and Plaintiffs do not contest that argument. D.I. 310-1 at 47. Thus, the Court declines to adopt statement 72 as uncontested. (12) BSC argues that statements 73, 96, and 97 are irrelevant to Phase 1. D.I. 310-1 at 49, 73-74. Since Plaintiffs nowhere agree to use these statements only in Phase 2, the parties disagree as to the statements and, thus, the Court declines to adopt these statements as uncontested. (13) BSC argues that statements 79-85 rewrite or omit portions of BSC's Answer to the Amended Complaint (D.I. 238), and Plaintiffs appear to offer no compromise statement. D.I. 310-1 at 56-62. Since the Court discerns no compromise between the parties, the Court declines to add these to the Joint Statement of Uncontested Facts. (14) BSC argues that statements 91, 92, 98, and 99 did not appear as written in BSC's Answer (D.I. 238). D.I. 310-1 at 70, 74-75. However, these statements refer to events in this litigation that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FRE 201(b)(2). Thus, the Court takes judicial notice of

| | | |
|---|---|---|
| | | statements 91, 92, 98, and 99 and adopts those statements as uncontested facts. (15) The Court agrees with BSC that Plaintiffs failed to provide a pin cite for statement 93, that statement 94 is a mere legal conclusion, and that the risk of prejudice to BSC from suggesting that BSC failed to contest infringement far outweighs any relevance that statement 95 may have to Plaintiffs' case. See D.I. 310-1 at 71-73. Thus, the Court declines to adopt those statements as uncontested. (16) Finally, so as to avoid unfair prejudice, the Court requires that any party using a stipulated statement must (a) read and (if displaying) display the statement word-for-word and in its entirety and (b) simply assert the fact, rather than recite with each fact that the parties have agreed thereto. The Court is concerned that jurors may emphasize stipulated facts over non-stipulated facts because lawyers recite that the parties have agreed thereto, which could unfairly prejudice a party under FRE 403. Thus, IT IS HEREBY ORDERED that statements 21-29, 32-33, 41, 59-61, 91-92, and 98-99 of D.I. 310-1 are adopted as uncontested facts; statements 30-31, 34-35, 36, and 66-71 of D.I. 310-1 are adopted as modified in this Order as uncontested facts; statements 42-46 and 51 of D.I. 310-1 are adopted as uncontested facts in Phase 2 only; and statement 52 of D.I. 310-1 is adopted as modified in this Order as an uncontested fact in Phase 2 only. ORDERED by Judge Gregory B. Williams on 1/24/23. (ntl) (Entered: 01/24/2023) |
| 01/24/2023 | 312 | REDACTED VERSION of 278 Exhibit List by Boston Scientific Corporation. (Farnan, Michael) (Entered: 01/24/2023) |
| 01/24/2023 | 313 | REDACTED VERSION of 279 Letter by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 01/24/2023) |
| 01/24/2023 | 314 | REDACTED VERSION of 281 Exhibit List by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 01/24/2023) |
| 01/25/2023 | 315 | Voir Dire Questions. (ntl) (Entered: 01/25/2023) |
| 01/25/2023 | 316 | Preliminary Jury Instructions (Phase I). (ntl) (Entered: 01/25/2023) |
| 01/25/2023 | | Minute Entry for proceedings held before Judge Gregory B. Williams - Jury Trial held on 1/25/2023. (Court Reporter M. Rolfe.) (ntl) (Entered: 01/26/2023) |
| 01/26/2023 | | Minute Entry for proceedings held before Judge Gregory B. Williams - Jury Trial held on 1/26/2023. (Court Reporter M. Rolfe.) (ntl) (Entered: 01/27/2023) |
| 01/27/2023 | 317 | MOTION to Limit and Restrict the Testimony of Dr. Bhave - filed by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 01/27/2023) |
| 01/27/2023 | | Minute Entry for proceedings held before Judge Gregory B. Williams - Jury Trial held on 1/27/2023. (Court Reporter M. Rolfe.) (ntl) (Entered: 01/30/2023) |
| 01/29/2023 | 318 | Letter to The Honorable Gregory B. Williams from Michael J. Farnan regarding Plaintiffs' Unbifurcation Request. (Farnan, Michael) (Entered: 01/29/2023) |
| 01/29/2023 | 319 | MOTION to Strike *Testimony and for a Limiting Instruction* - filed by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 01/29/2023) |
| 01/29/2023 | 320 | OPENING BRIEF in Support re 319 MOTION to Strike *Testimony and for a Limiting Instruction* filed by Board of Regents, The University of Texas System, TissueGen, Inc..Answering Brief/Response due date per Local Rules is 2/13/2023. (Attachments: # 1 Exhibit 1)(Stamoulis, Stamatios) (Entered: 01/29/2023) |
| 01/29/2023 | 321 | Letter to the Honorable Gregory B. Williams from Stamatios Stamoulis regarding Responding to Defendant's Bifurcation Letter Letter - re 318 Letter. (Stamoulis, |

| | | |
|---|---|---|
| | | Stamatios) (Main Document 321 replaced on 1/30/2023) (ntl). (Entered: 01/29/2023) |
| 01/29/2023 | 322 | Letter to the Honorable Gregory B. Williams from Stamatios Stamoulis regarding Seeking Limiting Instruction Related to Choi Prior Art Reference. (Attachments: # 1 Exhibit 1)(Stamoulis, Stamatios) (Entered: 01/29/2023) |
| 01/30/2023 | 323 | Letter to The Honorable Gregory B. Williams from Michael J. Farnan regarding Response to Choi Curative Instruction - re 322 Letter. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Farnan, Michael) (Entered: 01/30/2023) |
| 01/30/2023 | 324 | ANSWERING BRIEF in Opposition re 319 MOTION to Strike *Testimony and for a Limiting Instruction* filed by Boston Scientific Corporation.Reply Brief due date per Local Rules is 2/6/2023. (Attachments: # 1 Exhibit A)(Farnan, Michael) (Entered: 01/30/2023) |
| 01/30/2023 | | CORRECTING ENTRY: Corrected document added to D.I. 321 per request of counsel. (ntl) (Entered: 01/30/2023) |
| 01/30/2023 | | Minute Entry for proceedings held before Judge Gregory B. Williams - Jury Trial held on 1/30/2023. (Court Reporter M. Rolfe.) (ntl) (Entered: 01/31/2023) |
| 01/31/2023 | 325 | ORAL ORDER: Since Dr. Aparna Bhave did not testify in Phase 1 of this trial and for the reasons stated on the record during trial on January 30, 2023, IT IS HEREBY ORDERED that Plaintiffs' Motion to Restrict the Scope of Testimony from Aparna Bhave, Ph.D. (D.I. 317) is DENIED as MOOT and that Plaintiffs' Motion to Strike Testimony and for a Limiting Instruction Regarding Boston Scientific's Arguments on the Method of Manufacturing a Fiber (D.I. 319) is DENIED, save that the Court added the following to jury instruction 3.2: "Further, the Court has found that the '296 patent is not limited to any specific manufacturing process." ORDERED by Judge Gregory B. Williams on 1/31/23. (ntl) (Entered: 01/31/2023) |
| 01/31/2023 | 326 | Final Jury Instructions (Phase 1). (ntl) (Entered: 01/31/2023) |
| 01/31/2023 | 327 | VERDICT FORM (Phase 1). (ntl) (Entered: 01/31/2023) |
| 01/31/2023 | | Minute Entry for proceedings held before Judge Gregory B. Williams - Jury Trial completed on 1/31/2023. (Court Reporter M. Rolfe.) (ntl) (Entered: 02/01/2023) |
| 02/01/2023 | 328 | ORAL ORDER: Within seven (7) days from today, the parties shall jointly submit a form of order to enter judgment on the verdict. On the same date, the parties shall submit a joint proposed briefing schedule for all post-trial motions that each party intends to file, including but not limited to, any motion for enhanced damages, if any. Unless otherwise ordered by the Court, both sides are limited to a maximum total of twenty (20) pages of opening briefs, twenty (20) pages of answering briefs, and ten (10) pages of reply briefs relating to any post-trial motions filed by that side, no matter how many such motions are filed. ORDERED by Judge Gregory B. Williams on 2/1/23. (ntl) (Entered: 02/01/2023) |
| 02/01/2023 | 329 | Final Jury Instructions (Phase 2). (ntl) (Entered: 02/01/2023) |
| 02/01/2023 | 330 | VERDICT FORM (Phase 2). (ntl) (Entered: 02/01/2023) |
| 02/01/2023 | 331 | [SEALED] JURY VERDICT (Phase 1). (ntl) (Entered: 02/01/2023) |
| 02/01/2023 | 332 | REDACTED VERSION of 331 Jury Verdict (Phase 1). (ntl) (Entered: 02/01/2023) |
| 02/01/2023 | 333 | [SEALED] JURY VERDICT (Phase 2). (ntl) (Entered: 02/01/2023) |
| 02/01/2023 | 334 | REDACTED VERSION of 333 Jury Verdict (Phase 2). (ntl) (Entered: 02/01/2023) |
| 02/01/2023 | 335 | Preliminary Jury Instructions (Phase 2). (ntl) (Entered: 02/01/2023) |

| | | |
|---|---|---|
| 02/01/2023 | 336 | [SEALED] Jury Notes. (ntl) (Entered: 02/01/2023) |
| 02/08/2023 | 337 | STATUS REPORT *Joint Post-Trial Status Report and Briefing Schedule* by Board of Regents, The University of Texas System, TissueGen, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Stamoulis, Stamatios) (Entered: 02/08/2023) |
| 02/09/2023 | 338 | ORAL ORDER: The Court has reviewed the parties' Joint Post-Trial Status Report and Briefing Schedule (D.I. 337). First, the Court adopts the parties' proposed schedule and maintains its original page limits. Thus, IT IS HEREBY ORDERED that opening briefs of no more than 20 pages per side for all post-trial motions filed are due twenty-eight (28) days after entry of judgment; answering briefs of no more than 20 pages per side for all post-trial motions filed are due twenty-eight (28) days after opening briefs are due; and reply briefs of no more than 10 pages per side for all post-trial motions filed are due fourteen (14) days after answering briefs are due. Second, Plaintiffs Board of Regents, The University of Texas System and TissueGen, Inc. (collectively, "Plaintiffs") must move for pre- and post-judgment interest in post-trial briefing, since the parties appear to have disputes concerning "the contours and potential limitations" on such interest. See D.I. 337 at 10. Third, the Court agrees with Boston Scientific Corp. ("BSC") about the time for any party to move for attorneys' fees and/or costs. Thus, IT IS HEREBY FURTHER ORDERED that, on or before February 14, 2023, the parties shall jointly file a proposed final judgment that matches BSC's proposal, D.I. 337-3, except that "for infringement" should be replaced with "for direct and indirect infringement" in the fourth numbered paragraph. ORDERED by Judge Gregory B. Williams on 2/9/23. (ntl) (Entered: 02/09/2023) |
| 02/14/2023 | 339 | Joint PROPOSED ORDER Entering Judgment Following Jury Verdict by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 02/14/2023) |
| 02/14/2023 | 340 | MOTION for Pro Hac Vice Appearance of Attorney Michael P. Kahn and Rachel Elsby - filed by Boston Scientific Corporation. (Attachments: # 1 Certification, # 2 Certification) (Farnan, Michael) (Entered: 02/14/2023) |
| 02/14/2023 | 341 | STIPULATION to Amend Protective Order by Boston Scientific Corporation. (Farnan, Michael) (Entered: 02/14/2023) |
| 02/15/2023 | 342 | JUDGMENT FOLLOWING JURY VERDICT in favor of Board of Regents, The University of Texas System, TissueGen, Inc. against Boston Scientific Corporation in the amount of $42,000,000 (See Judgment for further details). Signed by Judge Gregory B. Williams on 2/15/23. (ntl) (Entered: 02/15/2023) |
| 02/16/2023 | | SO ORDERED, re 340 MOTION for Pro Hac Vice Appearance of Attorney Michael P. Kahn and Rachel Elsby filed by Boston Scientific Corporation. Signed by Judge Gregory B. Williams on 2/16/23. (ntl) (Entered: 02/16/2023) |
| 02/16/2023 | | SO ORDERED, re 341 STIPULATION to Amend Protective Order filed by Boston Scientific Corporation. Signed by Judge Gregory B. Williams on 2/16/23. (ntl) (Entered: 02/16/2023) |
| 02/20/2023 | 343 | NOTICE requesting Clerk to remove Michael J. Word as co-counsel.. (Farnan, Michael) (Entered: 02/20/2023) |
| 02/27/2023 | | Pro Hac Vice Attorney Michael P. Kahn for Boston Scientific Corporation added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (mpb) (Entered: 02/27/2023) |

| | | |
|---|---|---|
| 03/02/2023 | | Pro Hac Vice Attorney Rachel J. Elsby for Boston Scientific Corporation added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (mpb) (Entered: 03/02/2023) |
| 03/03/2023 | 344 | STIPULATION to Stay Execution or Enforcement of the Judgment by Boston Scientific Corporation. (Farnan, Michael) (Entered: 03/03/2023) |
| 03/07/2023 | | SO ORDERED, re 344 STIPULATION to Stay Execution or Enforcement of the Judgment filed by Boston Scientific Corporation. Signed by Judge Gregory B. Williams on 3/7/23. (ntl) (Entered: 03/07/2023) |
| 03/15/2023 | 345 | MOTION for New Trial *and, in the Alternative*, MOTION for Judgment as a Matter of Law - filed by Boston Scientific Corporation. (Farnan, Michael) (Entered: 03/15/2023) |
| 03/15/2023 | 346 | [SEALED] OPENING BRIEF in Support re 345 MOTION for New Trial *and, in the Alternative* MOTION for Judgment as a Matter of Law filed by Boston Scientific Corporation.Answering Brief/Response due date per Local Rules is 3/29/2023. (Farnan, Michael) (Entered: 03/15/2023) |
| 03/15/2023 | 347 | [SEALED] DECLARATION re 346 Opening Brief in Support, *of Michael J. Farnan* by Boston Scientific Corporation. (Attachments: # 1 Exhibit 1, # 2 Exhibit 1A, # 3 Exhibit 1Ai, # 4 Exhibit 1Aii, # 5 Exhibit 1B, # 6 Exhibit 1C, # 7 Exhibit 1D, # 8 Exhibit 2, # 9 Exhibit 2A, # 10 Exhibit 2B, # 11 Exhibit 2C, # 12 Exhibit 2D, # 13 Exhibit 2E, # 14 Exhibit 2F, # 15 Exhibit 2G, # 16 Exhibit 2H, # 17 Exhibit 2I, # 18 Exhibit 2J, # 19 Exhibit 2K, # 20 Exhibit 2L, # 21 Exhibit 2M, # 22 Exhibit 2N, # 23 Exhibit 2O, # 24 Exhibit 2P, # 25 Exhibit 3, # 26 Exhibit 3A, # 27 Exhibit 3B, # 28 Exhibit 3C, # 29 Exhibit 3D, # 30 Exhibit 4, # 31 Exhibit 5, # 32 Exhibit 6, # 33 Exhibit 7, # 34 Exhibit 8) (Farnan, Michael) (Entered: 03/15/2023) |
| 03/15/2023 | 348 | NOTICE of filing the following Non-Paper material(s) in multi media format: two USB drives containing Exhibits 1Ai and 1Aii to the Declaration of Michael J. Farnan. Original Non-paper material(s) to be filed with the Clerk's Office. Notice filed by Michael J. Farnan on behalf of Boston Scientific Corporation (Farnan, Michael) (Entered: 03/15/2023) |
| 03/15/2023 | 349 | MOTION to Alter Judgment *and Award Enhanced Damages Under 35 USC 284* - filed by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 03/15/2023) |
| 03/15/2023 | 350 | [SEALED] OPENING BRIEF in Support re 349 MOTION to Alter Judgment *and Award Enhanced Damages Under 35 USC 284* filed by Board of Regents, The University of Texas System, TissueGen, Inc..Answering Brief/Response due date per Local Rules is 3/29/2023. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Stamoulis, Stamatios) (Entered: 03/15/2023) |
| 03/22/2023 | 351 | REDACTED VERSION of 346 Opening Brief in Support, by Boston Scientific Corporation. (Farnan, Michael) (Entered: 03/22/2023) |

| | | |
|---|---|---|
| 03/22/2023 | 352 | REDACTED VERSION of 347 Declaration,,, by Boston Scientific Corporation. (Attachments: # 1 Exhibit 1, # 2 Exhibit 1A, # 3 Exhibit 1Ai, # 4 Exhibit 1Aii, # 5 Exhibit 1B, # 6 Exhibit 1C, # 7 Exhibit 1D, # 8 Exhibit 2, # 9 Exhibit 2A, # 10 Exhibit 2B, # 11 Exhibit 2C, # 12 Exhibit 2D, # 13 Exhibit 2E, # 14 Exhibit 2F, # 15 Exhibit 2G, # 16 Exhibit 2H, # 17 Exhibit 2I, # 18 Exhibit 2J, # 19 Exhibit 2K, # 20 Exhibit 2L, # 21 Exhibit 2M, # 22 Exhibit 2N, # 23 Exhibit 2O, # 24 Exhibit 2P, # 25 Exhibit 3, # 26 Exhibit 3A, # 27 Exhibit 3B, # 28 Exhibit 3C, # 29 Exhibit 3D, # 30 Exhibit 4, # 31 Exhibit 5, # 32 Exhibit 6, # 33 Exhibit 7, # 34 Exhibit 8)(Farnan, Michael) (Entered: 03/22/2023) |
| 03/23/2023 | 353 | REDACTED VERSION of 350 Opening Brief in Support, by Board of Regents, The University of Texas System, TissueGen, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (Stamoulis, Stamatios) (Entered: 03/23/2023) |
| 04/12/2023 | 354 | [SEALED] ANSWERING BRIEF in Opposition re 345 MOTION for New Trial *and, in the Alternative* MOTION for Judgment as a Matter of Law filed by Board of Regents, The University of Texas System, TissueGen, Inc. Reply Brief due date per Local Rules is 4/19/2023. (Stamoulis, Stamatios) Modified on 4/12/2023 (ntl). (Entered: 04/12/2023) |
| 04/12/2023 | 355 | [SEALED] POST TRIAL BRIEF *Boston Scientific Corporation's Answering Brief in Opposition to Plaintiffs' Motion for Enhanced Damages under § 284 and Pre- and Post-Judgment Interest* by Boston Scientific Corporation. (Farnan, Michael) (Entered: 04/12/2023) |
| 04/12/2023 | 356 | DECLARATION re 355 POST Trial Brief, by Boston Scientific Corporation. (Attachments: # 1 Exhibit 1)(Farnan, Michael) (Entered: 04/12/2023) |
| 04/12/2023 | 357 | [SEALED] DECLARATION re 355 POST Trial Brief, *of David A. Haas* by Boston Scientific Corporation. (Farnan, Michael) (Entered: 04/12/2023) |
| 04/12/2023 | | Remark: D.I. 354 placed under seal per request of counsel. (ntl) (Entered: 04/12/2023) |
| 04/19/2023 | 358 | REDACTED VERSION of 355 POST Trial Brief, by Boston Scientific Corporation. (Farnan, Michael) (Entered: 04/19/2023) |
| 04/19/2023 | 359 | REDACTED VERSION of 357 Declaration *of David A. Haas* by Boston Scientific Corporation. (Farnan, Michael) (Entered: 04/19/2023) |
| 04/19/2023 | 360 | REDACTED VERSION of 354 Answering Brief in Opposition, by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 04/19/2023) |
| 04/26/2023 | 361 | REPLY BRIEF re 349 MOTION to Alter Judgment *and Award Enhanced Damages Under 35 USC 284* filed by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 04/26/2023) |
| 04/26/2023 | 362 | [SEALED] DECLARATION re 361 Reply Brief *of Stamatios Stamoulis* by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 04/26/2023) |
| 04/26/2023 | 363 | [SEALED] REPLY BRIEF re 345 MOTION for New Trial *and, in the Alternative* MOTION for Judgment as a Matter of Law filed by Boston Scientific Corporation. (Farnan, Michael) (Entered: 04/26/2023) |
| 05/03/2023 | 364 | REDACTED VERSION of 363 Reply Brief by Boston Scientific Corporation. (Farnan, Michael) (Entered: 05/03/2023) |
| 05/03/2023 | 365 | REDACTED VERSION of 362 Declaration by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 05/03/2023) |

| | | |
|---|---|---|
| 10/27/2023 | 366 | NOTICE of Supplemental Authority by Board of Regents, The University of Texas System, TissueGen, Inc. re 354 Answering Brief in Opposition, (Stamoulis, Stamatios) (Entered: 10/27/2023) |
| 10/31/2023 | 367 | STATEMENT re 366 Notice (Other) *Boston Scientific Corporation's Response to Plaintiffs' Notice of Supplemental Authority* by Boston Scientific Corporation. (Farnan, Michael) (Entered: 10/31/2023) |
| 06/05/2024 | 368 | MEMORANDUM OPINION RE: Post Trial Motions. Signed by Judge Gregory B. Williams on 6/5/2024. (lnb) (Main Document 368 replaced on 6/5/2024) (lnb). (Entered: 06/05/2024) |
| 06/05/2024 | 369 | ORDER re 368 Memorandum Opinion: 1. Defendant's Motions for a New Trial and for Judgment as a Matter of Law (D.I. 345) are GRANTED-IN-PART and DENIED-IN-PART as follows: a. Defendant's Motion for a New Trial is DENIED; b. Defendant's Motion for Judgment as a Matter of Law of Anticipation is DENIED; c. Defendant's Motion for Judgment as a Matter of Law of Lack of Written Description is DENIED; d. Defendant's Motion for Judgment as a Matter of Law of no Infringement is DENIED; e. Defendant's Motion for Judgment as a Matter of Law of No Damages is DENIED; and f. Defendant's Motion for Judgment as a Matter of Law of No Willful Infringement is GRANTED. 2. Plaintiffs' Motion for Enhanced Damages and Pre- and Post-Judgment Interest (D.I. 349) is GRANTED-IN-PART and DENIED-IN-PART as follows: a. Plaintiffs' Motion for Enhanced Damages is DENIED; b. Plaintiffs' Motion for Pre-Judgment Interest is GRANTED in the amount of $7,436,328; and c. Plaintiffs' Motion for Post-Judgment Interest to accrue at 4.87% computed daily and compounded annually is GRANTED. Signed by Judge Gregory B. Williams on 6/5/2024. (lnb) (Entered: 06/05/2024) |
| 06/27/2024 | 370 | STIPULATION to Stay Execution or Enforcement of Judgment by Boston Scientific Corporation. (Farnan, Michael) (Entered: 06/27/2024) |
| 06/27/2024 | 371 | PROPOSED ORDER [Proposed] Amended Judgment by Boston Scientific Corporation. (Farnan, Michael) (Entered: 06/27/2024) |
| 06/28/2024 | 372 | AMENDED JUDGMENT in favor of Board of Regents, The University of Texas System, TissueGen, Inc. against Boston Scientific Corporation for damages in the amount of $42,000,000.00 (forty-two million dollars) for direct and indirect infringement of the '296 patent, with pre-judgment interest in the amount of $7,436,328, and post-judgment interest to accrue, beginning February 15, 2023, at 4.87% computed daily and compounded annually. (CASE CLOSED). Signed by Judge Gregory B. Williams on 6/28/24. (jaa) (Entered: 06/28/2024) |
| 07/03/2024 | 373 | NOTICE OF APPEAL to the Federal Circuit of 342 Judgment, 372 Judgment,, . Appeal filed by Boston Scientific Corporation. (Farnan, Michael) (Entered: 07/03/2024) |
| 07/03/2024 | | APPEAL - Credit Card Payment received re 373 Notice of Appeal (Federal Circuit) filed by Boston Scientific Corporation. ( Filing fee $605, receipt number ADEDC-4443848.) (Farnan, Michael) (Entered: 07/03/2024) |
| 07/03/2024 | | Notification regarding 373 Notice of Appeal (Federal Circuit) sent to Reporter Hawkins (jfm) (Entered: 07/03/2024) |
| 07/03/2024 | | Notification regarding 373 Notice of Appeal (Federal Circuit) sent to Reporter Warner (jfm) (Entered: 07/03/2024) |
| 07/03/2024 | | Notification regarding 373 Notice of Appeal (Federal Circuit) sent to Reporter Rolfe (jfm) (Entered: 07/03/2024) |

| | | |
|---|---|---|
| 07/03/2024 | | Notice of Appeal and Docket Sheet to US Court of Appeals for the Federal Circuit re 373 Notice of Appeal (Federal Circuit). (jfm) (Entered: 07/03/2024) |
| 07/03/2024 | 374 | NOTICE OF APPEAL to the Federal Circuit of 368 Memorandum Opinion, 369 Order,,,, 372 Judgment,, . Appeal filed by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 07/03/2024) |
| 07/03/2024 | | APPEAL - Credit Card Payment received re 374 Notice of Appeal (Federal Circuit) filed by Board of Regents, The University of Texas System, TissueGen, Inc.. ( Filing fee $605, receipt number ADEDC-4444508.) (Stamoulis, Stamatios) (Entered: 07/03/2024) |
| 07/03/2024 | | Notification regarding 374 Notice of Appeal (Federal Circuit) sent to Reporter Hawkins (jfm) (Entered: 07/05/2024) |
| 07/03/2024 | | Notification regarding 374 Notice of Appeal (Federal Circuit) sent to Reporter Warner (jfm) (Entered: 07/05/2024) |
| 07/03/2024 | | Notification regarding 374 Notice of Appeal (Federal Circuit) sent to Reporter Rolfe (jfm) (Entered: 07/05/2024) |
| 07/05/2024 | | Notice of Appeal and Docket Sheet to US Court of Appeals for the Federal Circuit re 374 Notice of Appeal (Federal Circuit). (jfm) (Entered: 07/09/2024) |
| 07/10/2024 | 375 | NOTICE of Docketing Record on Appeal from USCA for the Federal Circuit re 374 Notice of Appeal (Federal Circuit) filed by Board of Regents, The University of Texas System, TissueGen, Inc. USCA Case Number 2024-2062. (lnb) (Entered: 07/10/2024) |
| 07/10/2024 | 376 | NOTICE of Docketing Record on Appeal from USCA for the Federal Circuit re 373 Notice of Appeal (Federal Circuit) filed by Boston Scientific Corporation. USCA Case Number 2024-2063. (lnb) (Entered: 07/10/2024) |


| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 10/15/2024 15:59:41 | | | |
| **PACER Login:** | nyag0054 | **Client Code:** | 490006.0013 |
| **Description:** | Docket Report | **Search Criteria:** | 1:18-cv-00392-GBW Start date: 1/1/1975 End date: 10/15/2024 |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

US006596296B1

(12) **United States Patent**
**Nelson et al.**

(10) **Patent No.: US 6,596,296 B1**
(45) **Date of Patent: Jul. 22, 2003**

(54) **DRUG RELEASING BIODEGRADABLE FIBER IMPLANT**

(75) Inventors: **Kevin D. Nelson**, Arlington, TX (US); **Andres A. Romero-Sanchez**, Arlington, TX (US); **George M. Smith**, Lexington, KY (US); **Nadir Alikacem**, Allen, TX (US); **Delia Radulescu**, Arlington, TX (US); **Paula Waggoner**, Burleson, TX (US); **Zhibing Hu**, Denton, TX (US)

(73) Assignee: **Board of Regents, The University of Texas System**, Austin, TX (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 14 days.

(21) Appl. No.: **09/632,457**

(22) Filed: **Aug. 4, 2000**

**Related U.S. Application Data**

(60) Provisional application No. 60/147,827, filed on Aug. 6, 1999.

(51) **Int. Cl.**[7] .......................... **A61F 2/02**; A61K 47/30
(52) **U.S. Cl.** .......................... **424/426**; 514/772.3
(58) **Field of Search** .......................... 424/426; 514/772.3

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,464,321 A | 8/1984 | Pittalis et al. | 264/83 |
| 4,965,128 A | 10/1990 | Greidanus et al. | 428/398 |
| 5,166,187 A | 11/1992 | Collombel et al. | 514/21 |
| 5,263,984 A | 11/1993 | Li et al. | 623/15 |
| 5,290,271 A | 3/1994 | Jernberg | 604/891.1 |
| 5,342,348 A | 8/1994 | Kaplan | 605/891.1 |
| 5,444,113 A * | 8/1995 | Sinclair et al. | 524/306 |
| 5,567,612 A | 10/1996 | Vacanti et al. | 435/240.23 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 328 050 | 8/1989 |
| WO | WO 98/20190 | 5/1998 |
| WO | WO 00/47716 | 8/2000 |

OTHER PUBLICATIONS

Aigner et al., "Cartilage tissue engineering with novel nonwoven structured biomaterial based on hyaluronic acid benzyl ester," *J. of Biomed. Materials Res.*, 42:172–181, 1998.

Breitbart et al., "Tissue engineered bone repair of calvarial defects using cultured periosteal cells," *Plastic & Reconstructive Surgery*, 101:567–574, 1998.

Cao et al., "Comparative study of the use of poly(glycolic acid), calcium alginate and pluronics in the engineering of autologous porcine cartilage," *J. of Biomaterials Sci Polymer Edition*, 9:475–487, 1998.

Dillon et al., "The influence of physical structure and charge on neurite extension in a 3D hydrogel scaffold," *J. of Biomaterials Sci., Polymer Ed.*, 9:1049–1069, 1998.

Elcin et al., "Xenotransplantation of fetal porcine hepatocytes in rats using a tissue engineering approach," *Artificial Organs*, 23:146–152, 1999.

(List continued on next page.)

*Primary Examiner*—Carlos A. Azpuru
(74) *Attorney, Agent, or Firm*—Jenkens & Gilchrist, P.C.

(57) **ABSTRACT**

The invention provides tissue engineering compositions and methods wherein three-dimensional matrices for growing cells are prepared for in vitro and in vivo use. The matrices comprise biodegradable polymer fibers capable of the controlled delivery of therapeutic agents. The spatial and temporal distribution of released therapeutic agents is controlled by use of defined nonhomogeneous patterns of therapeutic agents in the matrices.

**32 Claims, 11 Drawing Sheets**



OTHER PUBLICATIONS

Estrera et al., "The cytoplasmic domain of C–CAM1 tumor suppressor is necessary and sufficient for suppressing the tumorigenicity of prostate cancer cells," *Biochem Biophys Res Commun*, 263:797–803, 1999.

Fauza et al., "Videofetoscopically assisted fetal tissue engineering: skin replacement," *J. of Pediatric Surgery*, 33:357–361, 1998.

Grande et al., "Evaluation of matrix scaffolds for tissue engineering of articular cartilage grafts," *J. of Biomed. Mat. Res.*, 34:211–220, 1997.

Heath and Rutkowski, "The development of bioartificial nerve grafts for peripheral–nerve regeneration," *TIBTECH*, 16:163–168, 1998.

Hoerstrup et al., "Fluorescence activated cell sorting: a reliable method in tissue engineering of a bioprosthetic heart valve," *Annals of Thoracic Surgery*, 66:1653–1657, 1998.

Hoerstrup et al., "Tissue engineering: a new approach in cardiovascular surgery–seeding of human fibroblasts on resorbable mesh," *Swiss Surgery*, 2:23–25, 1998.

Isogai et al., "Formation of phalanges and small joints by tissue–engineering," *J. of Bone & Joint Surgery*, 81A:306–316, 1999.

Martin et al., "In vitro differentiation of chick embryo bone marrow stromal cells into cartilaginous and bone–like tissues," *J. of Orthopaedic Res.*, 16:181–189, 1998.

Romero, Andres A., Home page posted at bme@mednet.swmed.edu.

Sacks et al., "Collagen fiber architecture of a cultured dermal tissue," *J. of Biomed. Engineering*, 119:124–127, 1997.

Shinoka et al., "Creation of viable pulmonary artery autografts through tissue engineering," *J. of Thoracic & Cardiovascular Surgery*, 115:536–546, 1998.

Sims et al., "Tissue engineered neocartilage using plasma derived polymer substrates and chondrocytes," *Plastic & Reconstructive Surgery*, 101:1580–1585, 1998.

Vunjak–Novakovic et al., "Dynamic cell seeding of polymer scaffolds for cartilage tissue engineering," *Biotechnology Progress*, 14:193–202, 1998.

Wong and Mooney, "Synthesis and properties of biodegradable polymers used as synthetic matrices for tissue engineering," *In: Synthetic Biodegradable Polymer Scaffolds*, (Atala and Mooney, eds.), Birkhauser Press, Boston, MA, pp. 51–82, 1997.

Yoo and Atala, "A novel gene delivery system using urothelial tissue engineered neoorgans," *J. of Urology*, 158:1066–1070, 1997.

* cited by examiner




*FIG. 1*




*FIG. 2*




*FIG. 3a*




*FIG. 3b*




*FIG. 4*




*FIG. 5*




*FIG. 6*




*FIG. 7*


INFUSION
COAGULATION
WINDING
LUBRICATION SYSTEM
LUER ADAPTOR AND DISPENSING TIP
ROLLER
FIBER
SYRINGE
DOPE
TUBE
SYRINGE INFUSIONER
COLLECTING BOBBIN
ROLLER
POOL
COAGULATION FLUID
ROLLER

*FIG. 8*



150.0
125.0
100.0
75.0
50.0
25.0
0.0
ult. strength [MPa]
20
25
30
35
40
45
Vw/Vi
10-WT%
8-WT%
7.5-WT%


*FIG. 9a*



250%
200%
150%
100%
50%
0%
% Elongation
20
25
30
35
40
45
Vw/Vi


*FIG. 9b*




*FIG. 10a*




*FIG. 10 b*




*FIG. 12*



FIG. 11a



*FIG. 11b*



FIG. 11c



FIG. 13




FIG. 14




FIG. 15

# DRUG RELEASING BIODEGRADABLE FIBER IMPLANT

The present invention claims priority to provisional application serial No. 60/147,827, filed Aug. 6, 1999.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention relates to the field of medicine and tissue engineering, and in particular to drug releasing biodegradable implants.

2. Description of Related Art

Tissue engineering is a discipline wherein living cells are used to replace functional loss because of injury, disease, or birth defect in an animal or human. These replacement cells can be autologous, allogenic, or, in limited circumstances, xenogenic. The field of tissue engineering is a new area of medicine and optimal procedures have yet to be elucidated.

At present, there are several primary avenues investigators are using to engineer tissues. One is to harvest cells from a healthy donor, preferably from the same individual, or at least from an appropriate donor of the same species, and grow those cells on a scaffold in vitro. This scaffold is typically a three-dimensional polymer network, often composed of biodegradable fibers. Cells adherent to the polymer network can then typically be induced to multiply. This cell filled scaffold can be implanted into the impaired host with the goal that the cells will perform their physiological function and avoid destruction by the host immune system. To this end, it is important that purified cell lines are used, as the introduction of non-self immune cells can up-regulate a strong host immune attack. The difficulty with this approach is the scaffolding must be small, as no cell can survive more than a couple millimeters away from a source of oxygen and nutrients. Therefore, large scaffolds cannot be used, as the scaffold will not vascularize adequately in time to save the cells in the interior regions.

In another approach, an empty three-dimensional, biodegradable polymer scaffold is directly implanted in the patient, with the goal of inducing the correct type of cells from the host's body to migrate into the polymer scaffold. The benefit is that vascularization can happen simultaneously with migration of cells into the matrix. A major problem is that there is currently no way to ensure that the appropriate cell types will migrate into the scaffold, and that the mechanical and biological properties will be maintained to provide the patient's physiological need.

In both of the above approaches, the scaffold may be biodegradable, meaning that over time it will break down both chemically and mechanically. As this break down occurs, the cells secrete their own extracellular matrix, which plays a critical role in cell survival and function. In normal tissue, there is an active and dynamic reciprocal exchange between the constitutive cells of the tissue and the surrounding extracellular matrix. The extracellular matrix provides chemical signals that regulate the morphological properties and phenotypic traits of cells and may induce division, differentiation or even cell death. In addition, the cells are also constantly rearranging the extracellular matrix. Cells both degrade and rebuild the extracellular matrix and secrete chemicals into the matrix to be used later by themselves or other cells that may migrate into the area. It has also been discovered that the extracellular matrix is one of the most important components in embryological development. Pioneering cells secrete chemical signals that help following cells differentiate into the appropriate final phenotype. For example, such chemical signals cause the differentiation of neural crest cells into axons, smooth muscle cells or neurons.



The integrated relationship between extracellular matrix and tissue cells establishes the extracellular matrix as an important parameter in tissue engineering. If cells are desired to behave in a specific manner, then the extracellular matrix must provide the appropriate environment and appropriate chemical/biological signals to induce that behavior for that cell type. Currently it is not possible to faithfully reproducer a biologically active extracellular matrix. Consequently, some investigators use a biodegradable matrix that enables the cells to create their own extracellular matrix as the exogenous matrix degrades.

In the above-described approaches to tissue engineering, a polymer scaffolding provides not only the mechanical support, but also the three-dimensional shape that is desired for the new tissue or organ. Because cells must be close to a source of oxygen and nutrients in order to survive and function, a major current limitation is that of blood supply. Most current methodologies provide no specific means of actively assisting the incorporation of blood vessels into and throughout the polymer matrix. This places limitations on the physical size and shape of the polymer matrix. The only current tissue-engineering device that has made it into widespread clinical use is artificial skin, which by definition is of limited thickness. The present invention provides compositions and methods that promote the directed migration of appropriate cell types into the engineered extracellular matrix. By directing specific three-dimensional cell migration and functional patterns, directed vascularization can be induced, which overcomes the current limitations on the shape and size of polymer implants. It also ensures that appropriate cell types will be physically located in specific locations within the matrix. Compositions and methods are provided to modulate phenotypic expression as a function of both time and space.

## SUMMARY OF THE INVENTION

The present invention provides tissue engineering compositions and methods wherein three-dimensional matrices for growing cells are prepared for in vitro and in vivo use. The matrices comprise biodegradable polymer fibers capable of the controlled delivery of therapeutic agents. The spatial and temporal distribution of released therapeutic agents is controlled by the use of predefined nonhomogeneous patterns of polymer fibers, which are capable of releasing one or more therapeutic agents as a function of time. The terms "scaffold," "scaffold matrix" and "fiber-scaffold" are also used herein to describe the three dimensional matrices of the invention. "Defined nonhomogeneous pattern" in the context of the current application means the incorporation of specific fibers into a scaffold matrix such that a desired three-dimensional distribution of one or more therapeutic agents within the scaffold matrix is achieved. The distribution of therapeutic agents within the matrix fibers controls the subsequent spatial distribution within the interstitial medium of the matrix following release of the agents from the polymer fibers. In this way, the spatial contours of desired concentration gradients can be created within the three dimensional matrix structure and in the immediate surroundings of the matrix. Temporal distribution is controlled by the polymer composition of the fiber and by the use of coaxial layers within a fiber.

One aspect of the present invention is a biocompatible implant composition comprising a scaffold of biodegradable

polymer fibers. In various embodiments of the present invention, the distance between the fibers may be about 50 microns, about 70 microns, about 90 microns, about 100 microns, about 120 microns, about 140 microns, about 160 microns, about 180 microns, about 200 microns, about 220 microns, about 240 microns, about 260 microns, about 280 microns, about 300 microns, about 320 microns, about 340 microns, about 360 microns, about 380 microns, about 400 microns, about 450 microns or about 500 microns. In various embodiments the distance between the fibers may be less than 50 microns or greater than 500 microns.

Additionally, it is envisioned that in various embodiments of the invention, the fibers will have a diameter of about 20 microns, about 40 microns, about 60 microns, about 80 microns, about 100 microns, about 120 microns, about 140 microns, about 160 microns, about 180 microns, about 200 microns, about 220 microns, about 240 microns, about 260 microns, about 280 microns, about 300 microns, about 320 microns, about 340 microns, about 360 microns, about 380 microns, about 400 microns, about 450 microns or about 500 microns (including intermediate lengths). In various embodiments the diameter of the fibers may be less than about 20 microns or greater than about 500 microns. Preferably, the diameter of the fibers will be from about 60 microns to about 80 microns.

"About", in this one context is intended to mean a range of from 1–10 microns, which includes the intermediate lengths within the range. It will be readily understood that "intermediate lengths", in this context, means any length between the quoted ranges, such as 21, 22, 23, 24, 25, 26, 27, 28, 29 etc.; 30, 31, 32, etc.; 50, 51, 52, 53, etc.; 100, 101, 102, 103, etc.; 150, 151, 152, 153, etc.; including all integers through the 200–500 range.

The inventors also contemplate that the matrix may be woven, non-woven, braided, knitted, or a combination of two or more such preparations. For example, potential applications such as artificial arteries may well use a combination of woven, non-woven and knitted preparations or a combination of all four preparations. In certain embodiments of the invention, braided compositions may find particular utility for use with tendons and ligaments. Such braiding may, for example, provide superior strength.

In certain embodiments of the invention, the fibers containing one or more therapeutic agents are distributed within the scaffold matrix in a defined nonhomogeneous pattern. In one embodiment, the fibers may comprise two or more subsets of fibers that differ in biodegradable polymer content. The fibers or subsets of fibers may comprise a plurality of co-axial biodegradable polymer layers.

In another embodiment of the present invention, the fibers or a subset of fibers, contain one or more therapeutic agents such that the concentration of the therapeutic agent or agents varies along the longitudinal axis of the fibers or subset of fibers. The concentration of the active agent or agents may vary linearly, exponentially or in any desired fashion, as a function of distance along the longitudinal axis of a fiber. The variation may be monodirectional, that is, the content of one or more therapeutic agents decreases from the first end of the fibers or subset of the fibers to the second end of the fibers or subset of the fibers. The content may also vary in a bidirection fashion, that is, the content of the therapeutic agent or agents increases from the first ends of the fibers or subset of the fibers to a maximum and then decreases towards the second ends of the fibers or subset of the fibers.

In certain embodiments of the present invention, a subset of fibers comprising the scaffold may contain no therapeutic agent. For fibers that contain one or more therapeutic agents, the agent or agents may include a growth factor, an immunodulator, a compound that promotes angiogenesis, a compound that inhibits angiogenesis, an anti-inflammatory compound, an antibiotic, a cytokine, an anti-coagulation agent, a procoagulation agent, a chemotactic agent, an agents that promotes apoptosis, an agent that inhibits apoptosis, a mitogenic agent, a radioactive agent, a contrast agent for imaging studies, a viral vector, a polynucleotide, therapeutic genes, DNA, RNA, a polypeptide, a glycosaminoglycan, a carbohydrate, a glycoprotein. The therapeutic agents may also include those drugs that are to be administered for long-term maintenance to patients such as cardiovascular drugs, including blood pressure, pacing, anti-arrhythmia, beta-blocking drugs, and calcium channel based drugs. Therapeutic agents of the present invention also include anti-tremor and other drugs for epilepsy or other movement disorders. These agents may also include long term medications such as contraceptives and fertility drugs. They could comprise neurologic agents such as dopamine and related drugs as well as psychological or other behavioral drugs. The therapeutic agents may also include chemical scavengers such as chelators, and antioxidants. Wherein the therapeutic agent promotes angiogenesis, that agent may be vascular endothelial growth factor. The therapeutic agents may be synthetic or natural drugs, proteins, DNA, RNA, or cells (genetically altered or not). As used in the specification and claims, following long-standing patent law practice, the terms "a" and "an," when used in conjunction with the word "comprising" or "including" means one or more.

In general, the present invention contemplates the use of any drug incorporated in the biodegradable polymer fibers of the invention. The word "drug" as used herein is defined as a chemical capable of administration to an organism, which modifies or alters the organism's physiology. More preferably the word "drug" as used herein is defined as any substance intended for use in the treatment or prevention of disease. Drug includes synthetic and naturally occurring toxins and bioaffecting substances as well as recognized pharmaceuticals, such as those listed in "The Physicians Desk Reference," 471st edition, pages 101–321; "Goodman and Gilman's The Pharmacological Basis of Therapeutics" 8th Edition (1990), pages 84–1614 and 1655–1715; and "The United States Pharmacopeia, The National Formulary", USP XXII NF XVII (1990), the compounds of these references being herein incorporated by reference. The term "drug" also includes compounds that have the indicated properties that are not yet discovered or available in the U.S. The term "drug" includes pro-active, activated, and metabolized forms of drugs.

The biodegradable polymer may be a single polymer or a co-polymer or blend of polymers and may comprise poly (L-lactic acid), poly(DL-lactic acid), polycaprolactone, poly (glycolic acid), polyanhydride, chitosan, or sulfonated chitosan, or natural polymers or polypeptides, such as reconstituted collagen or spider silk.

One aspect of the present invention is a drug-delivery fiber composition comprising a biodegradable polymer fiber containing one or more therapeutic agents. In one embodiment, the content of the one or more therapeutic agents within the fiber varies along the longitudinal axis of the fiber such that the content of the therapeutic agent or agents decreases from the first end of the fiber to the second end of the fiber. In another embodiment, the fiber comprises a plurality of co-axial layers of biodegradable polymers. The drug delivery fiber composition may be implanted into many

sites in the body including dermal tissues, cardiac tissue, soft tissues, nerves, bones, and the eye. Ocular implantation has particular use for treatment of cataracts, diabetically induced proliferative retinopathy and non-proliferative retinopathy, glaucoma, macular degeneration, and pigmentosa XXXX.

Another aspect of the present invention is a method of controlling the spatial and temporal concentration of one or more therapeutic agents within a fiber-scaffold implant, comprising implanting a fiber-scaffold into a host. The spatial concentrations may be provided across multiple fibers, or alternatively along a single fiber by imposing a concentration gradient along the length of a fiber. The fiber-scaffold typically comprises biodegradable polymer fibers containing one or more therapeutic agents, wherein the therapeutic agent or agents are distributed in the fiber-scaffold in a defined nonhomogeneous pattern. The host will typically be an animal, preferably a mammal and more preferably a human.

Yet another aspect of the present invention is a method of producing a fiber-scaffold for preparing an implant capable of controlling the spatial and temporal concentration of one or more therapeutic agents. This method generally comprises forming biodegradable polymer fibers into a three dimensional fiber-scaffold. The biodegradable polymer fibers contain one or more therapeutic agents. The therapeutic agent or agents are distributed in the fiber-scaffold in a defined nonhomogeneous pattern.

It is further envisioned that the scaffold of the invention may be used to direct and/or organize tissue structure, cell migration and matrix deposition and participate in or promote general wound healing.

In another embodiment of the invention, a method is provided for creating a drug releasing fiber from chitosan comprising use of hydrochloric acid as a solvent and Tris base as a coagulating bath. The hydrochloric acid concentration may be, for example, from about 0.25% to about 5%, or from about 1% to about 2%, including all concentrations within such ranges. In the method, the tris base concentration may be, for example, from about 2% to about 25%, from about 4% to about 17%, or from about 5% to about 15%, including all concentrations within such ranges. The method may, in one embodiment of the invention, comprise a heterogeneous mixture comprising chitosans with different degrees of deacetylation. The method may also comprise creating a drug releasing fiber comprising segments of chitosan with different degrees of deacetylation.

A drug releasing fiber in accordance with the invention may be created, for example, from chitosan and extracellular matrix. In creating a drug releasing fiber in accordance with the invention, the chitosan concentration may be, for example, from about 0.5 wt. % to about 10 wt. %, from about 1 wt. % to about 7 wt. %, from about 2 wt. % to about 5 wt. %, from about 3 wt. % to about 4 wt. %, or about 3.5 wt. %. In one embodiment of the invention, the Matrigel. The extracellular matrix concentration may be from about 1 vol. % to about 20 vol. %, from about 2 vol. % to about 15 vol. %, from about 3 vol. % to about 10 vol. %, or from about 4 vol. % to about 6 vol. %, including about 5 vol. %. In the method, the fiber may be coated with said extracellular matrix.

Chitosan used in accordance with the invention may be sulfated or unsulfated. In one embodiment of the invention, when sulfated chitosan is used the concentration may be from about 0.025 wt. % to about 2 wt. %, from about 0.05 wt. % to about 1 wt. %, from about 0.1 wt. % to about 0.5 wt. %, or from about 0.15 wt. % to about 0.3 wt. %, including about 0.2 wt. %. In the method, chitosan and sulfated chitosan may be extruded into a fiber.

In still another embodiment of the invention, a method is provided of creating a drug releasing fiber, the method comprising adding poly(L-lactic acid) microspheres to chitosan in acid and a coagulation bath. In the method, the acid may be, for example, acetic acid or hydrochloric acid. Where the acid is hydrochloric acid, the concentration may be, for example, from about 0.25% to about 5%, or from about 1% to about 2%, including 1.2 vol. % and all other concentrations within such ranges. The chitosan concentration may be, for example, from about 0.5 wt. % to about 10 wt. %, from about 1 wt. % to about 7 wt. %, from about 2 wt. % to about 5 wt. %, from about 3 wt. % to about 4 wt. %, or about 3.5 wt. %. The coagulation bath may comprise sodium hydroxide, for example, in a concentration of about 1 vol. % to about 20 vol. %, 2 vol. % to about 15 vol. %, 3 vol. % to about 10 vol. %, 4 vol. % to about 7 vol. %, or about 4 vol. % to about 6 vol. %, including about 5 vol. %. In one embodiment of the invention, the method comprises adding poly(L-lactic acid) microspheres to a solution of about 3.5 wt. % chitosan in from about 1 vol. % hydrochloric acid to about 2 vol. % hydrochloric acid and using a coagulation bath comprising from about 5 vol. % tris base to about 15 vol. % tris base. The method may further comprise adding a surfactant to the solution, including albumin, for example, from about 1 wt. % to about 5 wt. % of said albumin, including about 3 wt. %. In yet another embodiment of the invention, a composition of chitosan fibers is provided comprising microspheres of a second polymer, said microspheres comprising one or more biological molecules. The composition may comprise a surfactant that is a biological molecule.

In yet another embodiment of the invention, a composition is provided comprising a fiber containing chitosan and an extracellular matrix. The chitosan may be sulfated or non-sulfated.

In yet another embodiment of the invention, a composition is provided comprising a three-dimensional scaffold, said scaffold comprising fibers that are woven, non-woven, or knitted, wherein said fibers comprise any of the compositions described herein above. A composition in accordance with the invention may, in one embodiment, comprise fibers containing chitosan, extracellular matrix and a biological molecule. The chitosan may sulfated non-sulfated.

In yet another embodiment of the invention, a composition is provided comprising a heterogeneous scaffold of fibers a biological molecule as described above, wherein the biological molecule not the same for all fibers of the scaffold. In the composition, the degree of deacetylation may vary as a function of distance along the fiber. The composition may an extracellular matrix. The composition may also, in certain embodiments of the invention, comprise sulfated or non-sulfated chitosan.

## BRIEF DESCRIPTION OF THE DRAWINGS

The following drawings form part of the present specification and are included to further demonstrate certain aspects of the present invention. The invention may be better understood by reference to one or more of these drawings in combination with the detailed description of specific embodiments presented herein.

FIG. 1: Shows fibers configured in a complex three-dimensional woven scaffolding with patterning. Each of the individual fibers may be loaded with one or more therapeutic agents. The numerals **21–27** denote fibers loaded with therapeutic agents.

FIG. 2: Shows fibers configured in a three-dimensional non-woven scaffolding without patterning. Each of the individual fibers may be loaded with one or more therapeutic agents. All fibers may contain the same therapeutic agent(s) or, a variety of different agents may be used in other fibers in the same scaffolding. The numerals 21–25 denote fibers loaded with therapeutic agents.

FIG. 3A and FIG. 3B: Fibers can provide the body with short term mechanical support in such applications as stents. FIG. 3A illustrates that a single polymer fiber can maintain the lumen of any tubular body, such as arteries, veins, or ducts. FIG. 3B illustrates that multiple polymer fibers can maintain the lumen of tubular bodies. The numerals 21–25 denote fibers loaded with therapeutic agents.

FIG. 4: Fibers can be coated to form co-axial fibers. FIG. 4 shows that a fiber may have multiple component coatings, with each component loaded with different therapeutic agents. The numerals 11–13 denote therapeutic agents.

FIG. 5: Shows the release kinetics of a coated fiber, as shown in FIG. 4, having a two component coating with each component loaded with different therapeutic agents. The numerals 11–13 denote therapeutic agents.

FIG. 6: Fibers may contain linear gradients of therapeutic agents along their length. FIG. 6 illustrates a fiber containing a linear gradient of therapeutic agent along its length (top) and graphically illustrates the linear gradient (bottom).

FIG. 7: Shows a banded fiber having more than one therapeutic agent with possibly varying concentrations along its length. The distribution and frequency of the bands can be changed as desired. The numerals 11–12 denote therapeutic agents.

FIG. 8: Depicts an apparatus for fabrication of polymer fibers containing therapeutic agents.

FIG. 9A and FIG. 9B: By varying the ratio of the infusion speed of the polymer emulsion into the coagulating bath to the linear winding speed of the lathe, very surprising changes in the mechanical properties was observed. FIG. 9A graphically illustrates changes in the ultimate strength [Mpa] when the ratio of winding speed to the infusion speed is varied. Results shown are for polymers having 10-wt %, 8-wt %, and 7.5-wt %. FIG. 9B graphically illustrates changes in percent elongation with varying ratios of winding velocity (Vw) to infusion velocity (Vi).

FIG. 10A and FIG. 10B: The mechanical properties of fibers change as a function of polymer solvent(s), coagulating bath solvent(s), interaction of the solvent system, winding speed to infusion speed ratio, total time in the coagulating bath, ratio of aqueous phase to polymer solution phase in emulsion, and the quality of the surfactant. FIG. 10A graphically illustrates changes in ultimate strength with polymer concentration (wt %) when the winding speed to infusion speed ratio (Vw/Vi) is 26.82 and 23.49. FIG. 10B illustrates changes in elasticity with polymer weight percent for the same ratios.

FIG. 11A, FIG. 11B and FIG. 11C: Fibers have been produced with varying surface textures. FIG. 11A shows a fiber having a smooth surface texture. FIG. 11B shows a fiber having a veloured surface texture. FIG. 11C shows a fiber having a longitudinally grooved surface texture.

FIG. 12: Illustrates variations in the diameter of fibers as a function of the winding speed to infusion speed ratio (Vw/Vi) and of weight percent.

FIG. 13: Illustrates the use of a butterfly valve at a "Y" junction to gradually change the ratio of two solutions to achieve a concentration gradient down the length of a fiber.

FIG. 14: Illustrates the use of independent pumps and a mixing chamber to establish a well-controlled gradient with known change in concentration per centimeter length. The numerals 13 and 14 denote polymer solutions, with and without therapeutic agents respectively; 30 denotes Pump 1, 31 denotes Pump 2 and 32 denotes the mixing chamber in place.

FIG. 15: Illustrates parallel arrays of fibers packed into silicon rubber of other suitable material tubes and loaded with neurotrophins for axonal growth. The numeral 21 denotes fibers loaded with neutrophins, 22 denotes fibers loaded with other cytokines or growth factors, and 50 denotes a tube (made from silicone rubber or other material) to hold the fiber bundle in place.

## DESCRIPTION OF ILLUSTRATIVE EMBODIMENTS

The present invention provides compositions and methods to create a heterogeneous, woven, knitted, or non-woven or braided three-dimensional matrix for growing cells in tissue engineering applications. These scaffolds can be used in vitro and in vivo, and due to their heterogeneity can create both spatial and temporal distributions of therapeutic agents. In this invention, therapeutic agents may include drugs, proteins, peptides, mono- and di-saccharides, polysaccharides, glycoproteins, DNA, RNA, viruses, or other biological molecules of interest. The term therapeutic agent in this invention also includes radioactive materials used to help destroy harmful tissues such as tumors in the local area, or to inhibit growth of healthy tissues, such as in current stent applications; or markers to be used in imaging studies.

A. Three Dimensional Fiber Matrix

To create the heterogeneous scaffolds of the present invention, the therapeutic agents are encapsulated into individual fibers of the matrix by methods to be described herein. The therapeutic agents are released from each individual fiber slowly, and in a controlled manner. The fiber format has many advantages as a drug delivery platform over other slow drug-releasing agents known to those familiar in the art such as microspheres, porous plugs or patches. The primary advantage of fibers is that they can provide complex three-dimensional woven (FIG. 1), or non-woven (FIG. 2) scaffolding, with or without patterning, to allow cells to attach, spread, differentiate, and mature into appropriately functioning cells. Because they can form patterns, a "smart fabric" can be woven to induce cells of specific types to migrate to specific regions of the scaffold due to specific chemotactic factors being released. This scaffold mimics the function of the extracellular matrix material both during embryological development and in post-embryological tissues. Additionally, filaments could be formed into a unique scaffold that provides a growth substrate for tissue repair or reconstruction that is not reminiscent of a natural like structure.

Because of the ability to weave patterns to induce appropriate cell types into specific regions, it is possible to incorporate strands that will induce the formation of blood vessels into the fabric. This may be accomplished by providing fibers that release growth factors such as vascular endothelial growth factor (VEGF). By appropriate spacing of VEGF containing-fibers into the weave pattern, large tissues may be engineered, and the cells in such tissues can be provided with a sufficient blood supply and thereby receive oxygen and nutrients and enable the removal of waste products.

Fibers also have the advantage of providing the body with short term mechanical support in such applications as stents

(FIGS. 3A and 3B), wherein the polymer fiber can maintain the lumen of any tubular body, such as arteries, veins, ducts (e.g. bile duct, ureter, urethra, trachea, etc.), organs of the digestive track such as esophagus, intestine, colon, and connective tissue such as tendons, ligaments, muscle and bone. The fibers provide a useful structure to support mechanical strength or tension during the healing process. Fibers may also be useful to promote neural regeneration or reconstruction of nerves or spinal cord.

Further, fibers can be coated, forming co-axial fibers as shown in FIG. 4. Each coating can be of a different polymer material, or combination of polymers, and each layer can release a different therapeutic agent or combination of therapeutic agents. The coating can also be physically divided into multiple sections, meaning that if desired, different therapeutic agents can be released in various directions. For example, as depicted in FIG. 4, a fiber may have a two component coating, with each component loaded with different therapeutic agents. Therefore, not only is spatial distribution of various therapeutic agents possible, as described above, but these agents may have different release kinetics, thus yielding temporal distribution of therapeutic agents. The release kinetics of such a coated fiber is characterized in FIG. 5. For example, if a fiber has two coatings over the core polymer, then three different therapeutic agents or combinations of therapeutic agents can be released. The outside coating will release its therapeutic agents followed by the inner coating material and finally from the core fiber. Therefore, each polymer system has its own release kinetics profile that can be adjusted by polymer type and processing conditions for that particular coating layer. Each coating can consist of different polymers as well as being loaded with different molecules. This provides the ability to control release kinetics at each layer. The ability to release different agents at different times is particularly important in tissue engineering, because cells that are rapidly dividing often do not display the specialized functions of non-dividing cells of the same type of class. With the present invention, it is possible, by release of the appropriate therapeutic agents, to induce cells to first migrate to a specific location, then enter a rapid division phase to fill the tissue space, and then differentiate into a functional form.

Additionally, cells are known to follow concentration gradients. It is the change in concentration of a particular factor that appears to be important for directed cell migration. Therefore, the present invention provides a method of achieving gradients of therapeutic agents along the length of the fibers. A linear gradient is depicted in FIGS. 6A and 6B. By methods disclosed in this invention, this concentration gradient can be linear, exponential, or any other shape as a function of distance along the length of the fiber. It can also be bidirectional, meaning that it can be low at both ends and reach a maximum in the middle for example. This induces the cells to migrate and grow in specific directions along the fibers. By extension, by methods disclosed in this invention, a banded fiber can also be produced, as shown in FIG. 7. The distribution and frequency of these bands can be changed as desired. Therefore, the therapeutic agents delivery aspect of this invention goes far beyond simple drug-delivery microspheres or plugs, and the fiber based "smart scaffold" exceeds typical fiber based matrices into orchestrating the development of viable tissue, providing a three-dimensional biological architecture as well as mechanical support.

B. Biodegradable Polymers

Preferred polymers for use in the present invention include single polymer, co-polymer or a blend of polymers of poly(L-lactic acid), poly(DL-lactic acid),



polycaprolactone, poly(glycolic acid), polyanhydride, chitosan, or sulfonated chitosan. Naturally occurring polymers may also be used such as reconstituted collagen or natural silks. Those of skill in the art will understand that these polymers are just examples of a class of biodegradable polymer matrices that may be used in this invention. Further biodegradable matrices include polyanhydrides, polyorthoesters, and poly(amino acids) (Peppas and Langer, 1994). Any such matrix may be utilized to fabricate a biodegradable polymer matrix with controlled properties for use in this invention. Further biodegradable polymers that produce non-toxic degradation products are listed in Table 1.

TABLE 1

| Main Polymers Recognized as Biodegradable |
|---|
| Synthetic |
| Polypeptides |
| Polydepsipeptides |
| Nylon-2/nylon-6 copolyamides |
| Aliphatic polyesters |
| Poly(glycolic acid) (PGA) and copolymers |
| Poly(lactic acid) (PLA) and copolymer |
| Poly(alkylene succinates) |
| Poly(hydroxy butyrate) (PHB) |
| Poly(butylene diglycolate) |
| Poly(ε-caprolactone) and copolymers |
| Polydihydropyrans |
| Polyphosphazenes |
| Poly(ortho ester) |
| Poly(cyano acrylates) |
| Natural |
| Modified polysaccharides |
| cellulose, starch, chitin |
| Modified proteins |
| collagen, fibrin |

Adapted from Wong and Mooney, 1997.

C. Agents That Promote Angiogenesis

One class of therapeutic agents to be encapsulated by the polymer fibers of the present invention are therapeutic agents that promote angiogenesis. The successful engineering of new tissue requires the establishment of a vascular network. The induction of angiogenesis is mediated by a variety of factors, any of which may be used in conjunction with the present invention (Folkman and Klagsbrun, 1987, and references cited therein, each incorporated herein in their entirety by reference). Examples of angiogenic factors includes, but is not limited to: vascular endothelial growth factor (VEGF) or vascular permeability factor (VPF); members of the fibroblast growth factor family, including acidic fibroblast growth factor (AFGF) and basic fibroblast growth factor (bFGF); interleukin-8 (IL-8); epidermal growth factor (EGF); platelet-derived growth factor (PDGF) or platelet-derived endothelial cell growth factor (PD-ECGF); transforming growth factors alpha and beta (TGF-α, TGF-β); tumor necrosis factor alpha (TNF-α); hepatocyte growth factor (HGF); granulocyte-macrophage colony stimulating factor (GM-CSF); insulin growth factor-1 (IGF-1); angiogenin; angiotropin; fibrin and nicotinamide (Folkman, 1986, 1995; Auerbach and Auerbach, 1994; Fidler and Ellis, 1994; Folkman and Klagsbrun, 1987; Nagy et al., 1995)

D. Cytokines

In certain embodiments the use of particular cytokines incorporated in the polymer fibers of the present invention is contemplated. Table 2 below is an exemplary, but not limiting, list of cytokines and related factors contemplated for use in the present invention.

TABLE 2

| Cytokine | Reference |
|---|---|
| Human IL-1 | March et al., Nature, 315:641, 1985 |
| Murine IL-1 | Lomedico et al., Nature, 312:458, 1984 |
| Human IL-I | March et al., Nature, 315:641, 1985; Auron et al., Proc. Natl. Acad. Sci. USA, 81:7907, 1984 |
| Murine IL-1 | Gray, J. Immunol., 137:3644, 1986; Telford, NAR, 14:9955, 1986 |
| Human IL-1ra | Eisenberg et al., Nature, 343:341, 1990 |
| Human IL-2 | Taniguchi et al., Nature, 302:305, 1983; Maeda et al., Biochem. Biophys. Res. Commun., 115:1040, 1983 |
| Human IL-2 | Taniguchi et al., Nature, 302:305, 1983 |
| Human IL-3 | Yang et al., Cell, 47:3, 1986 |
| Murine IL-3 | Yokota et al., Proc. Natl. Acad. Sci. USA, 81:1070, 1984; Fung et al., Nature, 307:233, 1984; Miyatake et al., Proc. Natl. Acad. Sci. USA, 82:316, 1985 |
| Human IL-4 | Yokota et al., Proc. Natl. Acad. Sci. USA, 83:5894, 1986 |
| Murine IL-4 | Norma et al., Nature, 319:640, 1986; Lee et al., Proc. Natl. Acad. Sci. USA, 83:2061, 1986 |
| Human IL-5 | Azuma et al., Nuc. Acids Res., 14:9149, 1986 |
| Murine IL-5 | Kinashi et al., Nature, 324:70, 1986; Mizuta et al., Growth Factors, 1:51, 1988 |
| Human IL-6 | Hirano et al., Nature, 324:73, 1986 |
| Murine IL-6 | Van Snick et al., Eur. J. Immunol., 18:193, 1988 |
| Human IL-7 | Goodwin et al., Proc. Natl. Acad. Sci. USA, 86:302, 1989 |
| Murine IL-7 | Namen et al., Nature, 333:571, 1988 |
| Human IL-8 | Schmid et al., J. Immunol., 139:250, 1987; Matsushima et al., J Exp. Med., 167:1883, 1988; Lindley et al., Proc. Natl. Acad. Sci. USA, 85:9199, 1988 |
| Human IL-9 | Renauld et al., J. Immunol., 144:4235, 1990 |
| Murine IL-9 | Renauld et al., J. Immunol., 144:4235, 1990 |
| Human Angiogenin | Kurachi et al., Biochemistry, 24:5494, 1985 |
| Human GRO | Richmond et al., EMBO J., 7:2025, 1988 |
| Murine MIP-1 | Davatelis et al., J. Exp. Med., 167:1939, 1988 |
| Murine MIP-1 | Sherry et al., J. Exp. Med., 168:2251, 1988 |
| Human MIF | Weiser et al., Proc. Natl. Acad. Sci. USA, 86:7522, 1989 |
| Human G-CSF | Nagata et al., Nature, 319:415, 1986; Souza et al., Science, 232:61, 1986 |
| Human GM-CSF | Cantrell et al., Proc. Natl. Acad. Sci. USA, 82:6250, 1985; Lee et al., Proc. Natl. Acad. Sci. USA, 82:4360, 1985; Wong et al., Science, 228:810, 1985 |
| Murine GM-CSF | Gough et al., EMBO J., 4:645, 1985 |
| Human M-CSF | Wong, Science, 235:1504, 1987; Kawasaki, Science, 230; 291, 1985; Ladner, EMBO J., 6:2693, 1987 |
| Human EGF | Smith et al., Nuc. Acids Res., 10:4467, 1982; Bell et al., NAR, 14:8427, 1986 |
| Human TGF- | Derynck et al., Cell, 38:287, 1984 |
| Human FGF acidic | Jaye et al., Science, 233:541, 1986; Gimenez-Gallego et al., Biochem. Biophys. Res. Commun., 138:611, 1986; Harper et al, Biochem., 25:4097, 1986 |
| Human -ECGF | Jaye et al., Science, 233:541, 1986 |
| Human FGF basic | Abraham et al., EMBO J., 5:2523, 1986; Sommer et al., Biochem. Biophys. Res. Comm., 144:543, 1987 |
| Murine IFN- | Higashi et al., J. Biol. Chem., 258:9522, 1983; Kuga, NAR, 17:3291, 1989 |
| Human IFN- | Gray et al., Nature, 295:503, 1982; Devos et al., NAR, 10:2487, 1982; Rinderknecht, J. Biol. Chem., 259:6790, 1984 |
| Human IGF-I | Jansen et al., Nature, 306:609, 1983; Rotwein et al., J. Biol. Chem., 261:4828, 1986 |
| Human IGF-II | Bell et al., Nature, 310:775, 1984 |
| Human -NGF chain | Ullrich et al., Nature, 303:821, 1983 |
| Human NT-3 | Huang EJ. Et al., Development. 126(10):2191–203, 1999 May. |
| Human PDGF A chain | Betsholtz et al., Nature, 320:695, 1986 |
| Human PDGF B chain | Johnsson et al., EMBO J., 3:921, 1984; Collins et al., Nature, 316:748, 1985 |
| Human TGF-1 | Derynck et al., Nature, 316:701, 1985 |
| Human TNF- | Pennica et al., Nature, 312:724, 1984; Fransen et al., Nuc. Acids Res., 13:4417, 1985 |
| Human TNF- | Gray et al., Nature, 312:721, 1984 |
| Murine TNF- | Gray et al., Nucl. Acids Res., 15:3937, 1987 |
| Human E-Selectin | Bevilacqua et al., Science, 243:1160, 1989; Hensley et al., J. Biol. Chem., 269:23949, 1994 |
| Human ICAM-1 | Simmons et al., Nature, 331:624, 1988 |
| Human PECAM | Simmons et al., J. Exp. Med., 171:2147, 1990 |
| Human VCAM-1 | Hession et al., J. Biol. Chem., 266:6682; Osborn et al., Cell, 59:1203, 1989 |
| Human L-Selectin | Ord et al., J. Biol. Chem., 265:7760, 1990; Tedder et al., |

TABLE 2-continued

| Cytokine | Reference |
|---|---|
| (membrane bound) | J. Exp. Med., 170:123, 1989 |
| Human L-Selectin | Ord et al., J. Biol. Chem., 265:7760, 1990; Tedder et al., |
| (soluble form) | J. Exp. Med., 170:123, 1989 |
| Human Calcitonin | Le Moullec et al., FEBS Lett., 167:93, 1984 |
| Human Hirudin | Dodt et al., FEBS Lett., 165:180, 1984 |
| (*E. coli* optimized) | |

E. Polynucelotides

The polynucleotides to be incorporated within the polymer fibers of the present invention, extend to the full variety of nucleic acid molecules. The nucleic acids thus include genomic DNA, cDNAs, single stranded DNA, double stranded DNA, triple stranded DNA, oligonucleotides, Z-DNA, mRNA, tRNA and other RNAs. DNA molecules are generally preferred, even where the DNA is used to express a therapeutic RNA, such as a ribozyme or antisense RNA.

A "gene" or DNA segment encoding a selected protein or RNA, generally refers to a DNA segment that contains sequences encoding the selected protein or RNA, but is isolated away from, or purified free from, total genomic DNA of the species from which the DNA is obtained. Included within the terms "gene" and "DNA segment", are DNA segments and smaller fragments of such segments, and also recombinant vectors, including, for example, plasmids, cosmids, phage, retroviruses, adenoviruses, and the like.

The term "gene" is used for simplicity to refer to a functional protein or peptide encoding unit. As will be understood by those in the art, this functional term includes both genomic sequences and cDNA sequences. "Isolated substantially away from other coding sequences" means that the gene of interest forms the significant part of the coding region of the DNA segment, and that the DNA segment does not contain large portions of naturally-occurring coding DNA, such as large chromosomal fragments or other functional genes or cDNA coding regions. Of course, this refers to the DNA segment as originally isolated, and does not exclude genes or coding regions, such as sequences encoding leader peptides or targeting sequences, later added to the segment by the hand of man.

The present invention does not require that highly purified DNA or vectors be used, so long as any coding segment employed encodes a selected protein or RNA and does not include any coding or regulatory sequences that would have a significant adverse effect on the target cells. Therefore, it will also be understood that useful nucleic acid sequences may include additional residues, such as additional noncoding sequences flanking either of the 5' or 3' portions of the coding region or may include various internal sequences, i.e., introns, that are known to occur within genes.

Many suitable DNA segments may be obtained from existing, including commercial sources. One may also obtain a new DNA segment encoding a protein of interest using any one or more of a variety of molecular biological techniques generally known to those skilled in the art. For example, cDNA or genomic libraries may be screened using primers or probes with designed sequences. Polymerase chain reaction (PCR) may also be used to generate a DNA fragment encoding a protein of interest.

After identifying an appropriate selected gene or DNA molecule, it may be inserted into any one of the many vectors currently known in the art, so that it will direct the expression and production of the selected protein when incorporated into a target cell. In a recombinant expression vector, the coding portion of the DNA segment is positioned under the control of a promoter/enhancer element. The promoter may be in the form of the promoter that is naturally associated with a selected gene, as may be obtained by isolating the 5' non-coding sequences located upstream of the coding segment or exon, for example, using recombinant cloning and/or PCR technology.

In other embodiments, it is contemplated that certain advantages will be gained by positioning the coding DNA segment under the control of a recombinant, or heterologous, promoter. As used herein, a recombinant or heterologous promoter is intended to refer to a promoter that is not normally associated with a selected gene in its natural environment. Such promoters may include those normally associated with other selected genes, and/or promoters isolated from any other bacterial, viral, eukaryotic, or mammalian cell. Naturally, it will be important to employ a promoter that effectively directs the expression of the DNA segment in the chosen target cells.

The use of recombinant promoters to achieve protein expression is generally known to those of skill in the art of molecular biology, for example, see Sambrook et al. (1989; incorporated herein by reference). The promoters employed may be constitutive, or inducible, and can be used under the appropriate conditions to direct high level or regulated expression of the introduced DNA segment. Expression of genes under the control of constitutive promoters does not require the presence of a specific substrate to induce gene expression and will occur under all conditions of cell growth. In contrast, expression of genes controlled by inducible promoters is responsive to the presence or absence of an inducing agent.

Promoters isolated from the genome of viruses that grow in mammalian cells, e.g., RSV, vaccinia virus 7.5K, SV40, HSV, adenoviruses MLP, MMTV LTR and CMV promoters, may be used herewith, as well as promoters produced by recombinant DNA or synthetic techniques. Currently preferred promoters are those such as CMV, RSV LTR, the SV40 promoter alone, and the SV40 promoter in combination with the SV40 enhancer.

Exemplary tissue specific promoter/enhancer elements and transcriptional control regions that exhibit tissue specificity include, but are not limited to: the elastase I gene control region that is active in pancreatic acinar cells; the insulin gene control region that is active in pancreatic cells; the immunoglobulin gene control region that is active in lymphoid cells; the albumin, 1-antitrypsin and -fetoprotein gene control regions that are active in liver; the -globin gene control region that is active in myeloid cells; the myelin basic protein gene control region that is active in oligodendrocyte cells in the brain; the myosin light chain-2 gene control region that is active in skeletal muscle; and the gonadotropic releasing hormone gene control region that is active in the hypothalamus. U.S. application Ser. No. 08/631,334, filed Apr. 12, 1996 and PCT Application Serial

No. PCT/US97/07301, filed Apr. 11, 1997, are both incorporated herein by reference for the purposes of incorporating references even further describing the foregoing elements.

Specific initiation signals may also be required for sufficient translation of inserted protein coding sequences. These signals include the ATG initiation codon and adjacent sequences. In cases where the entire coding sequence, including the initiation codon and adjacent sequences are inserted into the appropriate expression vectors, no additional translational control signals may be needed. However, in cases where only a portion of the coding sequence is inserted, exogenous translational control signals, including the ATG initiation codon should be provided. The initiation codon must be in phase with the reading frame of the protein coding sequences to ensure translation of the entire insert. These exogenous translational control signals and initiation codons can be of a variety of origins, both natural and synthetic. The efficiency and control of expression may be enhanced by the inclusion of transcription attenuation sequences, enhancer elements, etc.

A variety of vectors may be used including, but not limited to, those derived from recombinant bacteriophage DNA, plasmid DNA or cosmid DNA. For example, plasmid vectors such as pBR322, pUC 19/18, pUC 118, 119 and the M13 mp series of vectors may be used. Bacteriophage vectors may include gt10, gt11, gt18–23, ZAP/R and the EMBL series of bacteriophage vectors. Cosmid vectors that may be utilized include, but are not limited to, pJB8, pCV 103, pCV 107, pCV 108, pTM, pMCS, pNNL, pHSG274, COS202, COS203, pWE15, pWE16 and the charomid 9 series of vectors. Vectors that allow for the in vitro transcription of RNA, such as SP6 vectors, may also be used to produce large quantities of RNA that may be incorporated into matrices.

The selected genes and DNA segments may also be in the form of a DNA insert located within the genome of a recombinant virus, such as, for example a recombinant herpes virus, retroviruses, vaccinia viruses, adenoviruses, adeno-associated viruses or bovine papilloma virus. While integrating vectors may be used, non-integrating systems, which do not transmit the gene product to daughter cells for many generations will often be preferred. In this way, the gene product is expressed during a defined biological process, e.g., a wound healing process, and as the gene is diluted out in progeny generations, the amount of expressed gene product is diminished.

In such embodiments, to place the gene in contact with a target cell, one would prepare the recombinant viral particles, the genome of which includes the gene insert, and contact the target cells or tissues via release from the polymer fiber of the present ,invention, whereby the virus infects the cells and transfers the genetic material. The following U.S. patents are each incorporated herein by reference for even further exemplification of viral gene therapy: U.S. Pat. No. 5,747,469, concerning adenovirus, retrovirus, adeno-associated virus, herpes virus and cytomegalovirus gene therapy; U.S. Pat. No. 5,631,236, concerning adenovirus gene therapy; and U.S. Pat. No. 5,672,344, concerning herpesvirus gene therapy.

Genes with sequences that vary from those described in the literature are also contemplated for use in the invention, so long as the altered or modified gene still encodes a protein that functions to effect the target cells in the desired (direct or indirect) manner. These sequences include those caused by point mutations, those due to the degeneracies of the genetic code or naturally occurring allelic variants, and further modifications that have been introduced by genetic engineering, i.e., by the hand of man.

Techniques for introducing changes in nucleotide sequences that are designed to alter the functional properties of the encoded proteins or polypeptides are well known in the art, e.g., U.S. Pat. No. 4,518,584, incorporated herein by reference, which techniques are also described in further detail herein. Such modifications include the deletion, insertion or substitution of bases, and thus, changes in the amino acid sequence. Changes may be made to increase the activity of a protein, to increase its biological stability or half-life, to change its glycosylation pattern, confer temperature sensitivity or to alter the expression pattern of the protein, and the like. All such modifications to the nucleotide sequences are encompassed by this invention.

It is an advantage of the present invention that one or more than one selected gene may be used in the gene transfer methods and compositions. The nucleic acid delivery methods may thus entail the administration of one, two, three, or more, selected genes. The maximum number of genes that may be applied is limited only by practical considerations, such as the effort involved in simultaneously preparing a large number of gene constructs or even the possibility of eliciting an adverse cytotoxic effect. The particular combination of genes may be chosen to alter the same, or different, biochemical pathways. For example, a growth factor gene may be combined with a hormone gene; or a first hormone and/or growth factor gene may be combined with a gene encoding a cell surface receptor capable of interacting with the polypeptide product of the first gene.

In using multiple genes, they may be combined on a single genetic construct under control of one or more promoters, or they may be prepared as separate constructs of the same of different types. Thus, an almost endless combination of different genes and genetic constructs may be employed. Certain gene combinations may be designed to, or their use may otherwise result in, achieving synergistic effects on cell stimulation and tissue growth, any and all such combinations are intended to fall within the scope of the present invention. Indeed, many synergistic effects have been described in the scientific literature, so that one of ordinary skill in the art would readily be able to identify likely synergistic gene combinations, or even gene-protein combinations.

It will also be understood that, if desired, the nucleic segment or gene could be administered in combination with further agents, such as, e.g. proteins or polypeptides or various pharmaceutically active agents. So long as genetic material forms part of the composition, there is virtually no limit to other components which may also be included, given that the additional agents do not cause a significant adverse effect upon contact with the target cells or tissues. The nucleic acids may thus be delivered along with various other agents, for example, in certain embodiments one may wish to administer an angiogenic factor as disclosed in U.S. Pat. No. 5,270,300 and incorporated herein by reference.

As the chemical nature of genes, i.e., as a string of nucleotides, is essentially invariant, and as the process of gene transfer and expression are fundamentally the same, it will be understood that the type of genes transferred by the fiber matrices of the present invention is virtually limitless. This extends from the transfer of a mixture of genetic material expressing antigenic or immunogenic fragments for use in DNA vaccination; to the stimulation of cell function, as in wound-healing; to aspects of cell killing, such as in transferring tumor suppressor genes, antisense oncogenes or apoptosis-inducing genes to cancer cells.

By way of example only, genes to be supplied by the invention include, but are not limited to, those encoding and

expressing: hormones, growth factors, growth factor receptors, interferons, interleukins, chemokines, cytokines, colony stimulating factors and chemotactic factors; transcription and elongation factors, cell cycle control proteins, including kinases and phosphatases, DNA repair proteins, apoptosis-inducing genes; apoptosis-inhibiting genes, oncogenes, antisense oncogenes, tumor suppressor genes; angiogenic and anti-angiogenic proteins; immune response stimulating and modulating proteins; cell surface receptors, accessory signaling molecules and transport proteins; enzymes; and anti-bacterial and anti-viral proteins.

F. Kits

All the essential materials and reagents required for the various aspects of the present invention may be assembled together in a kit. The kits of the present invention also will typically include a means for containing the vials comprising the desired components in close confinement for commercial sale such as, e.g., injection or blow-molded plastic containers into which the desired vials are retained. Irrespective of the number or type of containers, the kits of the invention are typically packaged with instructions for use of the kit components.

## G. EXAMPLES

The following examples are included to demonstrate preferred embodiments of the invention. It should be appreciated by those of skill in the art that the techniques disclosed in the examples which follow represent techniques discovered by the inventor to function well in the practice of the invention, and thus can be considered to constitute preferred modes for its practice. However, those of skill in the art should, in light of the present disclosure, appreciate that many changes can be made in the specific embodiments which are disclosed and still obtain a like or similar result without departing from the spirit and scope of the invention.

### Example 1

### Fabrication of Polymer Fibers Containing Therapeutic Agents

In one embodiment of the present invention, the following procedure is used to create the drug-releasing fibers. The apparatus is depicted in FIG. **8**. First, a biodegradable polymer such as poly(L-lactic acid) (PLLA), poly(DL-lactic acid), polycaprolactone, poly(glycolic acid), polyanhydride, or copolymers or blends of these or other biodegradable polymers are dissolved in some appropriate solvent (A) at concentrations ranging from 5 to 30 wt % depending on the type of polymer, 10 wt % being preferred for PLLA. In this embodiment, solvent (A) has low miscibility with water, and is very miscible with the coagulation bath solvent (B). Preferred choices of solvent (A) include chloroform and methylene chloride. Once the polymer is dissolved, an aqueous solution containing both the biomolecules(s) of interest and a surfactant, is added to the polymer solution. The concentration of the aqueous emulsion is typically in the range of 1 to 50% v/v of the polymer solution, 4–10% being most typical for monofilament PLLA fibers. The surfactant can be one or a combination of substances familiar to those skilled in the art, such as bovine serum albumin (BSA), poly(vinyl alcohol), pluronics, or biological surfactants such as the family of phospholipids. Other surfactants not specifically mentioned here, but known to those skilled in the art are included by extension. In a typical use, BSA is used as the surfactant at concentrations ranging from about 10 fold to 100 fold higher than the biological molecule of interest, with typical concentrations ranging from 10 wt % to 50 wt % of the aqueous phase.

Using some form of mechanical energy such as sonication, vortexing, or shear forces generated by forcing the liquid through a small orifice, a water-in-oil type emulsion is formed between the aqueous and organic phases. This emulsion must be stable for periods far in excess of time required for extrusion. The size of the dispersed aqueous phase droplets is primarily dependent on the quality of the surfactant, and the amount of mechanical energy imparted to the system in forming the emulsion. The aqueous phase size is an important variable in both release kinetics and mechanical properties of the fiber.

The emulsion is then extruded into a coagulating bath containing solvent (B). The polymer emulsion is extruded into the coagulation bath through a dispensing tip ranging in size from 16 gage down to 30 gage. Solvent (B) must be highly miscible with solvent (A), and must be a non-solvent for the polymer; isopropyl alcohol is the most typical choice but any solvent that is a non-solvent for the polymer and highly miscible with solvent (A) will work. For example hexane is very miscible with methylene chloride yet is a non-solvent for the polymer, therefore, methylene chloride and hexane make a good solvent and coagulating bath combination. Because solvent (A) is highly miscible with coagulating bath solvent (B), it freely diffuses from the polymer solution stream, into the coagulating bath. The polymer, however, is not soluble in solvent (B), and therefore begins to precipitate upon itself, forming the outer sheath of a fiber and trapping virtually all of the dispersed aqueous phase of the emulsion within the forming fiber. In this way, the fiber is loaded with the drug or protein of interest. The forming fiber may be passed over a series of rollers within the coagulation bath to provide a fixed path length through the coagulation bath should a fixed path length be desired. The fiber is drawn from the coagulation bath at a determined rate. In the laboratory, the inventors have used a cylinder attached to a modified variable-speed lathe that can accurately maintain its angular velocity. The drawn and extruded fiber is then removed from the cylinder and either freeze-dried, frozen, or oven dried and placed in a desecrator or freezer, depending upon recommended storage conditions of the loaded biomolecules.

By varying the ratio of the infusion speed of the polymer emulsion into the coagulating bath to the linear winding speed of the of the lathe, very surprising changes in the mechanical properties of the fibers have been found, as shown in FIGS. **9**A and **9**B. The mechanical properties of the fibers change as a function of the following variables: polymer solvent(s), coagulating bath solvent(s), intermiscibility of the solvent system, winding speed to infusion speed ratio, total time in the coagulating bath, ratio of aqueous phase to polymer solution phase in the emulsion, and the quality of the surfactant. Changes in mechanical properties as a function of several of these variables are shown in FIGS. **10**A and **10**B.

Another surprising discovery was that the surface texture of the finished fiber could also be controlled by appropriate choices of solvent and polymer systems. The inventors have produced fibers with surface textures that vary from smooth, to veloured, to longitudinally grooved as shown in FIGS. **11**A–**11**C. These changes in surface texture have practical applications to cell growth in providing surfaces with greater adhesive properties in the case of the veloured texture, and better contact guidance in the case of the longitudinally grooved fibers. All of the changes in mechanical properties and surface texture significantly affect the release kinetics of therapeutic agents.

The diameter of the fibers has been controlled by processing conditions as shown in FIG. **12**. Because the pro-

cessing parameters that control the mechanical properties, surface texture, diameter, and release kinetics are known fibers with specific properties for specific uses can be tailor made

That biological therapeutic agents retain biological activity throughout this fabrication process can be shown with a sandwich ELISA where the agent loaded into the fiber was the Fab fragment of mouse IgG. For the ELISA to detect the presence of the Fab fragment, the biological activity of both binding epitopes must be maintained.

In another embodiment of the fabrication process, a poor solvent for the polymer is added to the polymer solution such as toluene. The addition of the poor solvent changes the mechanical properties of the fiber.

In another fabrication embodiment, up to 20% v/v of the polymer solvent is added to the coagulation bath solvent. The addition of the polymer solvent decreases the concentration gradient from inside the fiber to outside the fiber. This changes the diffusion rate and hence the rate at which the outer sheath of the fiber forms. The rate of this outer sheath formation is critical to the surface texture of the fibers and the mechanical properties of the fiber, and to the release kinetics of the biomolecule.

In another fabrication embodiment, a thickening solution, such as glycerol, is added to the coagulation bath. This increases the viscosity of the coagulation bath, and changes the specific gravity of the coagulation bath. Both of these variables have resulted in substantially increased ability to form loaded fibers. The concentration of glycerol varies from 8 to 20% v/v.

Alternatively, coaxial fibers can be fabricated in a single process by methods familiar to those skilled in the art of extrusion. Using these techniques, various polymer(s) and biomolecule(s) can be added in each layer of the coaxial fiber.

Example 2

Fabrication of Polymer Fibers Containing Variable Concentrations of Therapeutic Agents

In another fabrication embodiment, the process is similar to that described in Example 1, with the exception that a concentration gradient is applied down the length of the fiber. This is accomplished by having two solutions. One is a polymer emulsion containing the therapeutic agent(s) of interest, and the other does not contain therapeutic agents, or contains different biomolecules. The gradient is accomplished by continuously changing the ratio of the two solutions during the extrusion process. This can be accomplished in a number of ways including a butterfly valve at a "Y" junction as shown in FIG. **13**, or using independent pumps with or without a mixing chamber as shown in FIG. **14**. In this way, a well-controlled gradient is established with known change in concentration per centimeter length. Another embodiment of the present invention is the creation of "banded" fibers. In banded fibers, there are several possible configurations; in one embodiment, both polymer solutions are emulsions containing different biomolecules. This is accomplished in the same way as the gradient, where the gradient is a series of step-functions, switching alternately from emulsion A to emulsion B.

In a second embodiment, one of the bands if from a polymer emulsion containing one or more biomolecules as in other embodiments described herein. The other band is a polymer segment that acts as a sealant so that the finished fibers can be cut to pre-specified lengths so that each end of the finished fibers will be sealed at both ends. In each of these embodiments, the band lengths are independently adjustable. These gradient and banded fibers may be used with or without a concentric coating as described in the next example.

Example 3

Fabrication of Polymer Fibers With Concentric Coatings

In yet another fabrication embodiment, a pre-existing fiber is loaded through a spinneret and through the coagulation bath. The liquid polymer emulsion is added in a "T" or "Y" junction and coats the fiber before entering a coagulation bath. Thus concentric coatings are applied to the fiber, with each coating having the ability to contain a different therapeutic agent(s) as shown in FIG. **4**. The coating polymer may be the same or different from the core polymer. There may be molecules attached to the core fiber to increase the adhesion of the coating polymer. For example, a thin layer of BSA, may improve the adhesion of chitosan to poly(L-lactic acid). By an intricate spinneret, two or more polymer emulsions each containing a different biomolecule can be put in the coating. This is accomplished by bringing all coating materials into the spinneret, with baffles separating each coating polymer stream. This allows fibers to release different molecules as a function of angular position around the fiber. In certain embodiments, the spinneret may have a non-circular shape, thereby forming fibers with any desired cross-sectional shape. This is true of the core fiber as well as the coating polymers.

An alternative fabrication technique is to use specially designed multilumen spinnerets to create standard fiber structures well known to those familiar in the art, such as core and sheath, islands in the sea, etc.

Example 4

Fabrication of Environmentally Responsive Polymer Gel Fibers

In a different fabrication embodiment, environmentally responsive polymer hydrogels are formed in nanosphere size by emulsion polymerization or other methods. Such nanospheres are then incorporated into fibers. "Environmentally responsive gels" are intended to represent polymer gels that exhibit a substantial change in their physical characteristics as the environment surrounding the gels undergoes relatively small changes. Polymer hydrogels that have been found to be useful in the present invention include poly(N-isopropylacrylamide) (NIPA) and poly(acrylic acid) (PAA) gels. For example, NIPA gels have the ability to undergo dramatic volume changes of 100 fold in response to a small (2–3C) temperature change. These nanospheres may be loaded with biological molecules by soaking them in an aqueous solution of the biomolecules. These loaded nanospheres are then dried and added to the polymer solution with or without forming an emulsion. All other fabrication processes are the same. This process then creates a fiber that is temperature sensitive. The NIPA phase transition can be adjusted by those skilled in the art to occur at 38–39C. This now provides a fiber that is responsive to the physiological state of the patient. It has a dramatic increase in release kinetics if the patient begins to run a fever, and because this is a reversible phenomenon, the release kinetics slow down again once body temperature returns to normal.

Example 5

Chitosan Based Fibers

In another fabrication embodiment, rather than ester based synthetic polymers described above, naturally occurring polysaccharides such as chitosan may be used as the polymer system. It is well known in the art that chitosan fibers can be made by dissolving the chitosan in 3% acetic acid, and using 5% sodium hydroxide as the coagulation bath. The inventors have found that one can use 1% hydrochloric acid to dissolve the chitosan, that the chitosan concentrations can go as low as 2.5 wt %, and good quality fibers are obtained if the coagulation bath consists of Tris base in concentrations ranging from 5 to 15% (FIG. 1). This is the first reporting of chitosan fibers extruded under these conditions.

Chitosan is a biodegradable polymer. Chitosan is enzymatically degraded by lysozyme, which is present in plasma, in the interstitial fluid, as well as intracellularly. Since the action of lysozyme on chitosan is dependent on the presence of acetyl groups on the polymer backbone, one can modulate, under specific circumstances, the release rate of the fibers described above by two alternative ways: a) one is to extrude fibers as described above from a heterogeneous mixture consisting of chitosan polymers each with a different degree of deacetylation. In this way, one can maintain the level of released drug in the optimal range for the necessary period of time; b) another possibility is to extrude segmented fibers of chitosan, wherein each segment is made from chitosan having a different degree of deacetylation as described in FIG. 2. This latter approach can have applications for migratory cells by creating a temporal gradient along the fiber.

The inventors have also mixed reconstituted basement membrane extract (matrigel, Becton Dickinson, Bedford, Mass.) with chitosan dissolved in hydrochloric acid, and have demonstrated the ability to extrude good quality fibers using a coagulation bath consisting of Tris base in concentrations ranging from 10 to 15%. In this case, it was found that axonal extension was improved over chitosan alone. ELISA confirmed the presence of the two major proteins of matrigel (laminin and collagen type IV) in the fibers. These proteins also retained biological activity as demonstrated by in vitro neuron attachment and axonal extension. Another possibility is to coat the same Tris base extruded chitosan fibers with matrigel.

In a surprising finding, if the inventors sulfate the chitosan prior to adding the matrigel, neuron attachment and axon extension are improved dramatically compared to the case of matrigel and untreated chitosan (FIG. 3, FIG. 4). Using the same chemical extrusion conditions, the inventors could extrude polymer fibers made of 0.2% sulfated chitosan with 3.2% unmodified chitosan with or without matrigel as a co-extruded substance.

It is well known in the art that sulfated chitosan has heparin-like, anticoagulant properties due to their similar chemical structure. The fibers made of unmodified chitosan dissolved in hydrochloric acid and extruded in Tris base can be coated with sulfated chitosan or with matrigel and sulfated chitosan. This may yield fibers with inherent anticoagulant properties that can also be loaded with active drugs. This may have substantial clinical application in fabricating vascular stents and other medical devices that come in direct contact with blood, and require mechanical strength, and/or the ability to deliver drugs.

The relatively harsh acidic and basic environment in which chitosan fibers are extruded as described above substantially limits the range of biomolecules that can be incorporated into the fiber to only those biomolecules that can withstand very large pH transitions. Therefore, to overcome this inherent limitation, the inventors have developed a new approach to retain the bioactivity of even the most sensitive biomolecules loaded into chitosan fibers. In this embodiment, sensitive biomolecules of interest are loaded into PLLA microspheres using solvent evaporation or other techniques well known in the drug delivery literature. These PLLA microspheres are then mixed with 3.5 wt % chitosan solution and extruded as described above. A chitosan fiber loaded with PLLA microspheres will form when this mixture is extruded using either acetic acid and sodium hydroxide or 1.2% hydrochloric acid and 10 to 15% Tris base. The PLLA microspheres can protect the sensitive biomolecules from the harsh processing conditions of the chitosan fibers.

Example 6

Neural Tissue Engineering

In this aspect of the present invention, parallel arrays of fibers are packed into silicon rubber or other suitable material tubes and loaded with neurotrophins for axonal growth as shown in FIG. 15. These bundles of fibers are placed in severed peripheral or central nerves. The neurotrophins may be loaded in a linear or some other appropriate gradient. This device is implanted bridging the gap between the ends of the nerve stumps. As the fibers release neurotrophins, axons begin to migrate out of the proximal end, across the fiber bundle and into the distal nerve end. Once in the distal end, guidance cues are provided by existing Schwann or glial cells and reconnections can then be made. It has been previously found that axons receive contact guidance by these fiber bundles and are able to traverse at least 1.8 cm in a rat sciatic nerve resection using non-loaded fibers. The optimal density of unloaded fibers in the tube is approximately 32 fibers in a 1.5 mm diameter tube for rat sciatic nerve growth.

Example 7

Preparation and Use of Polymer Fiber Stents

In another embodiment, fibers can be loaded with a drug of interest and used in stents or other medical devices where mechanical strength is required. The stents can be woven in such a manner as to have loaded fibers intermingled with unloaded fibers if needed for mechanical properties.

Fibers can also be used in conjunction with commercially available stents to deliver drugs at the placement site. In this case, the fibers would not provide any mechanical support, but would only serve as a drug delivery reservoir.

Example 8

Preparation and Use of Wound Dressings

In another embodiment, a gauze or dressing can be made from these fibers. This dressing can have two sides, an upper surface that will release molecules for re-epithelialization and provide a substrate for these cells. The bottom surface will promote regeneration of dermal tissue. This dressing is designed for dermal wound healing, including burns, full thickness dermal wounds and chronic or non-healing wounds and sores. Each fiber can be coated to provide temporal release of drugs or factors to correspond to the three phases of dermal wound healing.

For example, in the case of a dressing designed for trauma patients, the first chemical to be released could be a pro-

coagulant to help stop the bleeding. The next layer could then release cytokines to help recruit neutrophils and macrophages for the next phase of wound healing. Finally, a release of factors to help with reducing excessive scar tissue and to inhibit contractions, which are particularly disabling to burn patients.

Example 9

Fabrication of Artificial Arteries

It may be possible to construct an artificial artery using techniques described herein. A series of hollow, cylindrical sections can be knitted, woven, braided or fabricated using non-woven technology with fibers loaded with various biological agents. The innermost cylinder is preferably tightly woven and contains drugs or agents to promote migrating, spreading and functioning of an intact endothelial cell layer. The next cylinder is composed of a woven or knitted architecture with fibers predominately circumferentially wound around the inner cylinder. This layer will induce the migration and proliferation of smooth muscle fibers, and promote the expression of elastin to create the internal elastic media. The next cylinder is composed of knitted or non-woven fibers and will contain drugs to promote the ingrowth of fibroblasts, macrophages and the creation of extracellular matrix. The last layer will compose longitudinal fibers that will promote the vascularization of the arterial cells via an artificial vasa vasorum, created by VEGF releasing fibers, or other promoters of angiogenesis.

Example 10

Drug Delivery Scaffold

In another application embodiment, these fibers can be used for drug delivery scaffolds in places where a fiber format is preferred to that of a microsphere. For example, for drug delivery directly to the blood stream, a fiber can be attached to a vessel wall, and be contained entirely within the blood vessel. Microspheres cannot flow through the circulatory system, as they will become trapped at some level, potentially compromising the downstream tissue. The fibers, however, can release drugs and not cause any problems with occluding downstream branches so long as the fiber remains intact. Other locations where a fiber may make more sense than microspheres may include the eye, where the spheres may be more likely to interfere with the subject's vision. A fiber could be tacked down and not float into the field of view. Fibers may be able to stay in place better than microspheres, particularly within a space where the fiber can be coiled. In this way, the mechanical tension within the fiber will cause it to push against the sides of the tissue space and thus remain in position.

Example 11

In Situ Arteriogenesis

Similar in scope to example 9, is in situ arteriogenesis. In this embodiment, a fiber bundle containing VEGF or a similar substitute is placed into the body with both ends of the fiber bundle near or touching an existing blood vessel. As the fiber begins to release VEGF or its substitute, endothelial cells from the existing blood vessel will be induced to migrate out from the existing vessel following a process similar to normal angiogenesis. The leading endothelial cells will traverse the path of the fiber bundle, thus creating a new blood vessel along the path of the fiber bundle. This fiber bundle may have several forms, it may exist of single or a few fibers that only release VEGF or its substitute, or it may be a tube with VEGF or similar growth factor that is chemotactic for endothelial cells on the inside, and a different factor for smooth muscles on the outside. In this way, the size of the created vessel may be determined. In this application, cells are guided into initially cell-free scaffoldings by cell-specific growth factors.

Example 12

Bone Fracture Healing

In another wound healing embodiment, proteins known to enhance bone fracture healing are loaded into a fiber. This fiber can then be wrapped around the bone at the site of the fracture, releasing the growth factors and enhancing the rate of fracture repair.

These fibers can either be in a helical structure (single or multiple helix), or they may be woven into a loose, open weave. Either in the helical or in the woven format, the fibers are placed around the bone fragments, holding them in place while releasing their growth factors.

In the case of a non-healing fracture that is due to lost or poor blood supply to the fracture site, a fiber or set of fibers containing VEGF or its equivalent may be used to enhance blood supply to the fractured area.

In this embodiment, bone fractures may be healed at accelerated rates compared to non-treated fractures, and non-unions may be healed in certain cases.

Example 13

Skin Ulcer Healing

Similar to example 8 which described one form of dermal wound healing, another important example of this technology is the potential of healing chronic skin ulcers of various origins, such as diabetic foot ulcers, venous ulcers and general pressure sores. These conditions, and potentially other similar conditions may be healed based on creating a non-woven mesh of fibers that release factors known to accelerate dermal wound healing, for example, platelet derived growth factor (PDGF), transforming growth factor-beta (TGF-beta), and VEGF or similar protein. This non-woven mesh can be inserted or packed directly into the ulcer or wound, where these growth factors can help accelerate the wound-healing process. These dressings can be designed for healing dermal sores and ulcers. In this case, there is little need to reduce bleeding; rather one of the biggest needs of these patients, particularly those with diabetic ulcers is lack of blood supply to the wound site. Therefore, factors that induce angiogenesis may be able to increase circulation and help to rejuvenate the tissue at the site of the sore or ulcer.

Each dressing can be designed for the particular needs of the various types of wounds or sores by altering the biomolecules that are released, and the kinetics at which they are released.

Example 14

Muscle Grafts

In another embodiment, parallel arrays of fibers may be loaded with muscle stem cells. These stem cells can be of cardiac, smooth or skeletal muscle origin. Once these muscle stem cells are seeded onto the fiber array, the fibers can be mechanically stretched in vitro to help these cells

align and differentiate properly. Alignment may also be achieved by using fibers of very small diameter. Our experience with axons indicates that with fibers on the order of 50 μm diameter tend to help cells align parallel to the axis of the fibers. Other fibers in this bundle can release angiogenic factors to create a vascular supply for the muscle cells. In the case of skeletal or smooth muscle tissue, fibers for nerve growth can also be included to induce the formation of neuromuscular junctions. Various experimental conditions used to harvest, isolate, reproduce and differentiate these stem cells are known to those skilled in the art, and is not a part of this patent.

Example 15

Alternative Fiber Fabrication Procedure 1

To fabricate small volumes of polymer on the order of 100 μl of polymer solution, the following method has been developed. Create the emulsion as described in example 1. Add this emulsion to a small container, such as a 1 ml FALCON® tube that has been modified by inserting a 20 to 30 gauge needle through the bottom of the tube, 23 gauge being most typical. Place this tube into a modified 50 ml tube that is full of the coagulating bath solvent. Place the tubes in a centrifuge and spin between 500 to 1200 rpm, 700 being most typical. The centrifugal force will push the small volume of polymer emulsion through the needle and into the coagulating fluid. By similar solvent exchanges as described in example 1, a fiber is formed. This method uses substantially less polymer emulsion with very little wasted emulsion.

Example 16

Alternative Fiber Fabrication Procedure 2

As an alternative fabrication procedure, the coagulation solvent(s) are flowed through long vertical tubes at a prescribed rate and the polymer solution is extruded into the flowing stream of coagulation solvent(s). The flow from the tube exits into a bath. The fiber passes over one or more bobbins and is taken from the bath and wound onto a spool. The solvent flow rate, the rate of polymer extrusion, the composition of the polymer solution/emulsion, the composition of the coagulating bath solvent(s), the rate at which the fiber is wound, any drawing that may take place between successive bobbins, and any additional baths or treatments will affect the fiber mechanical and chemical properties as well as the release kinetics of the loaded biological materials.

Example 17

Treatment of Glaucoma

Similar to drug delivery in the eye, described in example 10, and the neural stent described briefly in example 6, glaucoma may be treated by combining an intraocular drug delivery with a neural treatment applied to the optic nerve. Retinal ganglion cells undergo apoptosis leading to death of the axons of the optic nerve. It is hypothesized that if the cells could be supported both within the eye as well as along the path of the optic nerve, the cells may be able to survive. A fiber bundle that releases growth factors such as NT-4, BDNF, CNTF, may be applied topically to the exterior of the optic nerve. Simultaneously, fibers that release apoptosis inhibitors, or factors to support the retinal ganglion cells are implanted within the eye. This combined effort may prolong or save the sight of those suffering from glaucoma.

As is seen from the preceding examples, other tissues, organs, or structures are possible to weave once the basic physiologic structure is understood. This can be extended to organs of the digestive system, musculoskeletal system, urological system, circulatory system, nervous system.

All of the compositions and methods disclosed and claimed herein can be made and executed without undue experimentation in light of the present disclosure. While the compositions and methods of this invention have been described in terms of preferred embodiments, it will be apparent to those of skill in the art that variations may be applied to the compositions and methods and in the steps or in the sequence of steps of the method described herein without departing from the concept, spirit and scope of the invention. More specifically, it will be apparent that certain agents which are both chemically and physiologically related may be substituted for the agents described herein while the same or similar results would be achieved. All such similar substitutes and modifications apparent to those skilled in the art are deemed to be within the spirit, scope and concept of the invention as defined by the appended claims.

REFERENCES

The following references, to the extent that they provide exemplary procedural or other details supplementary to those set forth herein, are specifically incorporated herein by reference.

Aigner, Tegeler, Hutzler, Campoccia, Pavesio, Hammer, Kastenbauer, Naumann, "Cartilage tissue engineering with novel nonwoven structured biomaterial based on hyaluronic acid benzyl ester," *J. of Biomed. Materials Res.*, 42(2):172–81, 1998.

Auerbach and Auerbach, "Angiogenesis inhibition: a review," *Pharmac. Ther.*, 63:265, 1994.

Breitbart, Grande, Kessler, Ryaby, Fitzsimmons, Grant, "Tissue engineered bone repair of calvarial defects using cultured periosteal cells," *Plastic & Reconstructive Surgery*, 101(3):567–74, 1998.

Cao, Rodriguez, Vacanti, Ibarra, Arevalo, Vacanti, "Comparative study of the use of poly(glycolic acid), calcium alginate and pluronics in the engineering of autologous porcine cartilage," *J. of Biomaterials Sci., Polymer Edition*, 9(5):475–87, 1998.

Dillon, Yu, Sridharan, Ranieri, Bellamkonda, "The influence of physical structure and charge on neurite extension in a 3D hydrogel scaffold," *J. of Biomaterials Sci., Polymer Ed.*, 9(10):1049–69, 1998.

Elcin, Dixit, Lewin, Gitnick, "Xenotransplantation of fetal porcine hepatocytes in rats using atissue engineering approach," *Artificial Organs*, 23(2):146–52, 1999.

Fauza, Fishman, Mehegan, Atala, "Videofetoscopically assisted fetal tissue engineering: skin replacement," *J. of Pediatric Surgery*, 33(2):357–61, 1998.

Fidler and Ellis, "The implications of angiogenesis for the biology and therapy of cancer metastasis," *Cell*, 79:185, 1994.

Folkman and Klagsbrun, "Angiogenic factors," *Science*, 235:442–447, 1987.

Folkman, "How is blood vessel growth regulated in normal and neoplastic tissue," *Cancer Res.*, 46:467, 1986.

Folkman, J., "Angiogenesis in cancer, vascular, rheumatoid and other disease," *Nature Med.*, 1:27, 1995.

Grande, Halberstadt, Naughton, Schwartz, Manji, "Evaluation of matrix scaffolds for tissue engineering of articular cartilage grafts," *J. of Biomed. Mat. Res.*, 34(2):211–20, 1997.

Gutsche, Lo, Zurlo, Yager, Leong, "Engineering of a sugar-derivatized porous network for hepatocyte culture," *Biomaterials*, 17(3):387–93, 1996.

Hoerstrup, Zund, Lachat, Schoeberlein, Uhlschmid, Vogt, Turina, "Tissue engineering: a new approach in cardiovascular surgery-seeding of human fibroblasts on resorbable mesh," *Swiss Surgery*, (Suppl.), 2:23–5, 1998.

Hoerstrup, Zund, Schoeberlein, Ye, Vogt, Turina, "Fluorescence activated cell sorting: a reliable method in tissue engineering of a bioprosthetic heart valve," *Annals of Thoracic Surgery*, 665(5):1653–7, 1998.

Isogai, Landis, Kim, Gerstenfeld, Upton, Vacanti, "Formation of phalanges and small joints by tissue-engineering," *J. of Bone & Joint Surgery, American Vol.*, 81(3):306–16, 1999.

Martin, Padera, Vunjak-Novakovic, Freed, "In vitro differentiation of chick embryo bone marrow stromal cells into cartilaginous and bone-like tissues," *J. of Orthopaedic Res.*, 16(2):181–9, 1998.

Nagy et al., "Pathogenesis of ascites tumor growth: vascular permeability factor, vascular hyperpermeability, and ascites fluid accumulation," *Cancer Res.*, 55:360, 1995.

Peppas and Langer, "New challenges in biomaterials," *Science*, 263:1715–1720, 1994.

Peter, Miller, Yasko, Yaszemski, Mikos, "Polymer concepts in tissue engineering," *J. of Biomed. Materials Res.*, 43(4):422–7, 1998.

Sacks, Chuong, Petroll, Kwan, Halberstadt, "Collagen fiber architecture of a cultured dermal tissue," *J. of Biomed. Engineering*, 119(1):124–7, 1997. Sambrook et al., *Molecular Cloning: A Laboratory Manual*, Cold Spring Harbor Laboratory Press, Cold Spring Harbor, N.Y., 1989.

Shinoka, Shum-Tim, Ma, Tanel, Isogai, Langer, Vacanti, Mayer, "Creation of viable pulmonary artery autografts through tissue engineering," *J. of Thoracic & Cardiovascular Surgery*, 115(3):536–45, 1998.

Sims, Butler, Cao, Casanova, Randolph, Black, Vacanti, Yaremchuk, "Tissue engineered neocartilage using plasma derived polymer substrates and chondrocytes," *Plastic & Reconstructive Surgery*, 101(6):1580–5, 1998.

Vunjak-Novakovic, Obradovic, Martin, Bursac, Langer, Freed, "Dynamic cell seeding of polymer scaffolds for cartilage tissue engineering," *Biotechnology Progress*, 14(2):193–202, 1998.

Whang, Tsai, Nam, Aitken, Sprague, Patel, Healy, "Ectopic bone formation via rhBMP-2 delivery from porous bioabsorbably polymer scaffolds," *J. of Biomed. Materials Res.*, 42(4):491–9, 1998.

Wong and Mooney, "Synthesis and properties of biodegradable polymers used in tissue engineering," In: *Synthetic Biodegradable Polymer Scaffolds*, (Atala and Mooney, eds.), Birkhauser Press, Boston, Mass., pp. 51–82, 1997.

Yoo and Atala, "A novel gene delivery system using urothelial tissue engineered neoorgans," *J. of Urology*, 158(3 Pt 2):1066–70, 1997.

What is claimed is:

1. A composition comprising at least one biodegradable polymer fiber wherein said fiber is composed of a first phase and a second phase, the first and second phases being immiscible, and wherein the second phase comprises one or more therapeutic agents.

2. The composition of claim 1, wherein said second phase is derived from an aqueous solution, a hydrogel or polymer.

3. The composition of claim 1, wherein said fiber forms a scaffold and further wherein, said second phase is manipulated to form an internal porous structure within the fiber.

4. The composition of claim 1, wherein said fiber is woven, braided or knitted in an assembly with other fibers, and at least one fiber in the assembly comprises one or more therapeutic agents.

5. The composition of claim 1, wherein the one or more therapeutic agents are distributed within the second phase in a nonhomogenous pattern.

6. The composition of claim 1, wherein the concentration of said one or more therapeutic agents varies along the longitudinal axis of the fiber.

7. The composition of claim 6, wherein the concentration of said one or more therapeutic agents varies linearly, exponentially or in any desired fashion, as a function of distance along the longitudinal axis of the fiber.

8. The composition of claim 1, wherein the concentration of said one or more therapeutic agents decreases from a first end of the fiber to a second end of the fiber.

9. The composition of claim 1, wherein said one or more therapeutic agents vary in a bidirectional manner, and the content of said one or more therapeutic agents increases from the first end of said fiber to a maximum and then decreases towards the second end of said fiber.

10. The composition of claim 1, further comprising at least one biodegradable polymer fiber containing no therapeutic agent.

11. The composition of claim 1, wherein said one or more therapeutic agents are selected from the group consisting of drugs, proteins, enzymes, growth factors, immunomodulators, compounds promoting angiogenesis, compounds inhibiting angiogenesis, anti-inflammatory compounds, antibiotics, cytokines, anti-coagulation agents, procoagulation agents, chemotactic agents, agents to promote apoptosis, agents to inhibit apoptosis, and mitogenic agents.

12. The composition of claim 1, wherein said one or more therapeutic agents include a radioactive agent or a contrast agent for imaging studies.

13. The composition of claim 1, wherein said one or more therapeutic agents is selected from the group consisting of viral vector, polynucleotide and polypeptide.

14. The composition of claim 1, wherein said one or more therapeutic agents comprise an angiogenesis-promoting agent.

15. The composition of claim 14, wherein said angiogenesis-promoting agent is vascular endothelial growth factor.

16. The composition of claim 1, wherein said biodegradable polymer is a single polymer, a co-polymer, or a mixture of polymers selected from the group consisting of polypeptides, polydepsipeptides, nylon copolyamides, aliphatic polyesters, polydihydropyrans, polyphosphazenes, poly(ortho ester), poly(cyano acrylates), polyanhydride, modified polysaccharides and modified proteins.

17. The composition of claim 16, wherein said aliphatic polyesters are selected from the group consisting of poly (glycolic acid), poly(lactic acid), poly(alkylene succinates) poly(hydroxybutyrate), poly(butylene diglycolate), poly (epsilon-caprolactone) and copolymers, blends and mixtures thereof.

18. The composition of claim 16, wherein said modified polysaccharides are selected from the group consisting of cellulose, starch-alginate and the glycosaminoglycans, chondroitin sulfate, heparin, heparin sulfate, dextran, dextran sulfate, chitin, chitosan and chitosan sulfate.

19. The composition of claim 16, wherein said modified proteins are selected from the group consisting of collagen and fibrin.

20. The composition of claim 1, wherein said fiber comprises a plurality of polymer layers, wherein an outer layer circumscribes an adjacent inner layer.

21. The composition of claim 20, wherein said plurality of layers optionally contain one or more therapeutic agents.

**22**. The composition of claim **21**, wherein said one or more therapeutic agents are released over time from said plurality of layers.

**23**. The composition of claim **1**, wherein the fiber contains more than one therapeutic agent along its length.

**24**. The composition of claim **23**, wherein the concentration of said more than one therapeutic agent varies along the length of said subset of fibers.

**25**. The composition of claim **23**, wherein said more than one therapeutic agents are released at varying rates over time from said fiber.

**26**. The composition of claim **1**, wherein said one or more therapeutic agents are released at varying rates over time from said fiber.

**27**. A composition comprising a three-dimensional scaffold, said scaffold comprising fibers that are woven, non-woven, or knitted, or braided, wherein said fibers comprise fibers containing chitosan or a reconstituted extracellular matrix composition.

**28**. The composition of claim **27**, wherein said chitosan is sulfated chitosan.

**29**. A composition comprising fibers containing chitosan, reconstituted extracellular matrix composition and a therapeutic agent.

**30**. The composition of claim **29**, wherein said chitosan is sulfated chitosan.

**31**. The composition of claim **21**, wherein said one or more therapeutic agents are distributed within the plurality of layers in a nonhomogenous pattern.

**32**. The composition of claim **31**, wherein the concentration of said one or more therapeutic agents varies linearly, exponentially or in any desired fashion, as a function of distance within the plurality of layers.

* * * * *

US007033603B2

(12) **United States Patent**
**Nelson et al.**

(10) **Patent No.: US 7,033,603 B2**
(45) **Date of Patent: *Apr. 25, 2006**

(54) **DRUG RELEASING BIODEGRADABLE FIBER FOR DELIVERY OF THERAPEUTICS**

(75) Inventors: **Kevin D. Nelson**, Arlington, TX (US); **Brent B. Crow**, Fort Worth, TX (US)

(73) Assignee: **Board of Regents The University of Texas**, Austin, TX (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 54 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/428,901**

(22) Filed: **May 2, 2003**

(65) **Prior Publication Data**

US 2004/0028655 A1 Feb. 12, 2004

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/632,457, filed on Aug. 4, 2000, now Pat. No. 6,596,296.

(60) Provisional application No. 60/147,827, filed on Aug. 6, 1999.

(51) **Int. Cl.**
***A61F 2/02*** (2006.01)
***A61K 47/30*** (2006.01)

(52) **U.S. Cl.** .................................. **424/426**; 514/772.3

(58) **Field of Classification Search** ............... 424/426; 514/772.3

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,464,321 A | 8/1984 | Pittalis et al. | 264/83 |
| 4,965,128 A | 10/1990 | Greidanus et al. | 428/398 |
| 5,166,187 A | 11/1992 | Collombel et al. | 514/21 |
| 5,263,984 A | 11/1993 | Li et al. | 623/15 |
| 5,270,300 A | 12/1993 | Hunziker | 514/12 |
| 5,290,271 A | 3/1994 | Jernberg | 604/891.1 |
| 5,342,348 A | 8/1994 | Kaplan | 605/891.1 |
| 5,567,612 A | 10/1996 | Vacanti et al. | 435/240.23 |
| 6,596,296 B1 * | 7/2003 | Nelson et al. | 424/426 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 328 050 A2 | 8/1989 |
| WO | WO 98/20190 | 5/1998 |
| WO | WO 00/47716 | 8/2000 |

OTHER PUBLICATIONS

Aigner et al., "Cartilage tissue engineering with novel nonwoven structured biomaterial based on hyaluronic acid benzyl ester," *J. of Biomed. Materials Res.*, 42(2):172-81, 1998.

(Continued)

*Primary Examiner*—Carlos A. Azpuru
(74) *Attorney, Agent, or Firm*—Morgan, Lewis & Bockius LLP

(57) **ABSTRACT**

The present invention relates to fiber compositions comprising gels or hydrogels. The invention further relates to the composition of a gel or hydrogel loaded biodegradable fiber and methods of fabricating such fibers. The present invention further provides tissue engineering and drug-delivery compositions and methods wherein three-dimensional matrices for growing cells are prepared for in vitro and in vivo use. The invention also relates to methods of manipulating the rate of therapeutic agent release by changing both the biodegradable polymer properties as well as altering the properties of the incorporated gel or hydrogel.

**34 Claims, 11 Drawing Sheets**



OTHER PUBLICATIONS

Auerbach and Auerbach, "Angiogenesis inhibition: a review," *Pharmac. Ther.*, 63:265, 1994.

Breitbart et al., "Tissue engineered bone repair of calvarial defects using cultured periosteal cells," *Plastic & Reconstructive Surgery*, 101(3):567-74, 1998.

Cao et al., "Comparative study of the use of poly(glycolic acid), calcium alginate and pluronics in the engineering of autologous porcine cartilage," *J. of Biomaterials Sci., Polymer Edition*, 9(5):475-87, 1998.

Dillon et al., "The influence of physical structure and charge on neurite extension in a 3D hydrogel scaffold," *J. of Biomaterials Sci., Polymer Ed.*, 9(10):1049-69, 1998.

Elcin et al., "Xenotransplantation of fetal porcine hepatocytes in rats using a tissue engineering approach," *Artificial Organs*, 23(2):146-52, 1999.

Fidler and Ellis, "The implications of angiogenesis for the biology and therapy of cancer metastasis," *Cell*, 79:185, 1994.

Folkman and Klagsbrun, "Angiogenic factors," *Science*, 235:442-447, 1987.

Folkman, "How is blood vessel growth regulated in normal and neoplastic tissue," *CancerRes.*, 46:467, 1986.

Folkman, J., "Angiogenesis in cancer, vascular, rheumatoid and other disease," *NatureMed.*, 1:27, 1995.

Grande et al., "Evaluation of matrix scaffolds for tissue engineering of articular cartilage grafts," *J. of Biomed. Mat. Res.*, 34(2):211-20, 1997.

Gutsche et al., "Engineering of a sugar-derivatized porous network for hepatocyte culture," *Biomaterials*, 17(3):387-93, 1996.

Hoerstrup et al., "Tissue engineering: a new approach in cardiovascular surgery-seeding of human fibroblasts on resorbable mesh," *Swiss Surgery*, (Suppl.), 2:23-5, 1998.

Hoerstrup et al., " Fluorescence activated cell sorting: a reliable method in tissue engineering of a bioprosthetic heart valve," *Annals of Thoracic Surgery*, 665(5):1653-7, 1998.

Isogai et al., "Formation of phalanges and small joints by tissue-engineering," *J. of Bone & Joint Surgery, American* vol., 81(3):306-16, 1999.

Martin et al., "In vitro differentiation of chick embryo bone marrow stromal cells into cartilaginous and bone-like tissues," *J. of Orthopaedic Res.*, 16(2):181-9, 1998.

Nagy et al., "Pathogenesis of ascites tumor growth: vascular permeability factor, vascular hyperpermeability, and ascites fluid accumulation," *Cancer Res.*, 55:360, 1995.

Peppas and Langer, "New challenges in biomaterials," *Science*, 263:1715-1720, 1994.

Peter et al., "Polymer concepts in tissue engineering," *J. of Biomed. Materials Res.*, 43(4):422-7, 1998.

Sacks et al., "Collagen fiber architecture of a cultured dermal tissue," *J. of Biomed. Engineering*, 119(1):124-7, 1997.

Shinoka et al., "Creation of viable pulmonary artery autografts through tissue engineering," *J. of Thoracic & Cardiovascular Surgery*, 115(3):536-45, 1998.

Sims et al., "Tissue engineered neocartilage using plasma derived polymer substrates and chondrocytes," *Plastic & Reconstructive Surgery*, 101(6):1580-5, 1998.

Vunjak-Novakovic et al., "Dynamic cell seeding of polymer scaffolds for cartilage tissue engineering," *Biotechnology Progress*, 14(2):193-202, 1998.

Whang et al., "Ectopic bone formation via rhBMP-2 delivery from porous bioabsorbably polymer scaffolds," *J. of Biomed. Materials Res.*, 42(4):491-9, 1998.

Wong and Mooney, "Synthesis and properties of biodegradable polymers used in tissue engineering," *In: Synthetic Biodegradable Polymer Scaffolds*, (Atala and Mooney, eds. ), Birkhauser Press, Boston, MA, pp. 51-82, 1997.

Yoo and Atala, "A novel gene delivery system using urothelial tissue engineered neoorgans," *J. of Urology*, 158(3 Pt 2):1066-70, 1997.

Fauza et al., "Videofetoscopically assisted fetal tissue engineering: skin replacement," *J. of Pediatric Surgery*, 33(2):357-61, 1998.

* cited by examiner




*FIG. 1A*




*FIG. 1C*




*FIG. 1B*




*FIG. 1D*




*FIG. 2A*




*FIG. 2C*




*FIG. 2B*




*FIG. 2D*




*FIG. 3A*




*FIG. 3C*




*FIG. 3B*




*FIG. 3D*




*FIG. 4A*




*FIG. 4C*




*FIG. 4B*




*FIG. 4D*




*FIG. 5A*




*FIG. 5C*




*FIG. 5B*




*FIG. 5D*




*FIG. 6A*




*FIG. 6C*




*FIG. 6B*




*FIG. 6D*


Programmable Syringe Pumps
Outer Fiber Spinning Dope
Inner Fiber Spinning Dope
Spinneret
Septum
Inner Coagulant
Extrusion Tube
Coagulant
Support
Fiber Line
Winding Spool
Fiber Guide
Non-Solvent Bath

*FIG. 7*


Bore Tubing
T-Fitting
Septum
Luer Lock Fitting
Bore Tubing Exit

*FIG. 8*


Programmable Syringe Pumps
Outer Fiber Spinning Dope
Inner Coagulant
Spinneret
Septum
Extrusion Tube
Coagulant
Support
Fiber Line
Winding Spool
Fiber Guide
Non-Solvent Bath

*FIG. 9*


Bore Tubing
T-Fitting
Septum
Outer Fluid Flow
Luer Lock Fitting
Bore Tubing Exit

*FIG. 10*




*FIG. 11*

## DRUG RELEASING BIODEGRADABLE FIBER FOR DELIVERY OF THERAPEUTICS

### CROSS REFERENCES TO RELATED APPLICATIONS

This application is a continuation-in-part of application Ser. No. 09/632,457, filed Aug. 4, 2000 now U.S. Pat. No. 6,596,296, which claims the benefit of U.S. Provisional Application No. 60/147,827, filed Aug. 6, 1999.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention relates to the field of medicine and tissue engineering, and in particular to drug releasing biodegradable fibers used in the delivery of therapeutics.

2. Description of Related Art

Tissue engineering is a discipline wherein living cells are used to replace cells lost as a result of injury, disease, or birth defect in an animal or human. These replacement cells can be autologous, allogenic, or xenogenic. The field of tissue engineering is a new area of medicine and optimal procedures have yet to be elucidated.

At present, there are several avenues for engineering tissues. One avenue is to harvest cells from a healthy donor, preferably from the same individual, or at least from an appropriate donor of the same species, and grow those cells on a scaffold in vitro. This scaffold is typically a three-dimensional polymer network, often composed of biodegradable fibers. Cells adherent to the polymer network can then typically be induced to multiply. This cell filled scaffold can be implanted into the impaired host with the goal that the cells will perform their physiological function and avoid destruction by the host immune system. To this end, it is important that purified cell lines are used, as the introduction of non-self immune cells can up-regulate a strong host immune attack. The difficulty with this approach is the scaffolding must be small, as no cell can survive more than a couple millimeters away from a source of oxygen and nutrients. Therefore, large scaffolds cannot be used, as the scaffold will not vascularize adequately in time to save the cells in the interior regions.

In another approach, an empty three-dimensional, biodegradable polymer scaffold is directly implanted in the patient, with the goal of inducing the correct type of cells from the host's body to migrate into the polymer scaffold. The benefit is that vascularization can happen simultaneously with migration of cells into the matrix. A major problem is that there is currently no way to ensure that the appropriate cell types will migrate into the scaffold, and that the mechanical and biological properties will be maintained to provide the patient's physiological need.

In both of the above approaches, the scaffold may be biodegradable, meaning that over time it will break down both chemically and mechanically. As this break down occurs, the cells secrete their own extracellular matrix, which plays a critical role in cell survival and function. In normal tissue, there is an active and dynamic reciprocal exchange between the constitutive cells of the tissue and the surrounding extracellular matrix. The extracellular matrix provides chemical signals that regulate the morphological properties and phenotypic traits of cells and may induce division, differentiation or even cell death. In addition, the cells are also constantly rearranging the extracellular matrix. Cells both degrade and rebuild the extracellular matrix and secrete chemicals into the matrix to be used later by themselves or other cells that may migrate into the area. It has also been discovered that the extracellular matrix is one of the most important components in embryological development. Pioneering cells secrete chemical signals that help following cells differentiate into the appropriate final phenotype. For example, such chemical signals cause the differentiation of neural crest cells into axons, smooth muscle cells or neurons.

The integrated relationship between extracellular matrix and tissue cells establishes the extracellular matrix as an important parameter in tissue engineering. If cells are desired to behave in a specific manner, then the extracellular matrix must provide the appropriate environment and appropriate chemical/biological signals to induce that behavior for that cell type. Currently it is not possible to faithfully reproduce a biologically active extracellular matrix. Consequently, some investigators use a biodegradable matrix that enables the cells to create their own extracellular matrix as the exogenous matrix degrades.

In the above-described approaches to tissue engineering, a polymer scaffold provides not only the mechanical support, but also the three-dimensional shape that is desired for the new tissue or organ. Because cells must be close to a source of oxygen and nutrients in order to survive and function, a major current limitation is that of blood supply. Most current methodologies provide no specific means of actively assisting the incorporation of blood vessels into and throughout the polymer matrix. This places limitations on the physical size and shape of the polymer matrix. The only current tissue-engineering device that has made it into widespread clinical use is artificial skin, which by definition is of limited thickness. The present invention provides compositions and methods that promote the directed migration of appropriate cell types into the engineered extracellular matrix. By directing specific three-dimensional cell migration and functional patterns, directed vascularization can be induced, which overcomes the current limitations on the shape and size of polymer implants. It also ensures that appropriate cell types will be physically located in specific locations within the matrix. Compositions and methods are provided to modulate phenotypic expression as a function of both time and space.

Most of the drug delivery from polymeric drug-loaded vehicles is based on the following formats: microspheres, nano-particles, foams, films, liposomes, polymeric micelles, or viral packages. There are a number of inherent disadvantages with respect to the above mentioned formats. Several of the above mentioned drug delivery formats do not remain in place after they have been implanted. As a result retrieval of the implant is not possible in the case of an adverse reaction to the implant. Additionally, these formats display high surface area per unit volume, which leads to quick drug release times, a feature that is antithetical to the goal of drug delivery. Furthermore, the amount of drug that can be loaded into the above mentioned formats is somewhat limited. Some of these formats cannot be used in conditions which in addition to drug delivery, also require mechanical support.

The present invention provides a fiber composition that does not possess the disadvantages of the drug delivery formats known in the prior art.

### SUMMARY OF THE INVENTION

The present invention relates to fiber compositions comprising gels or hydrogels. The invention further relates to the composition of a gel or hydrogel loaded biodegradable fiber and methods of fabricating such fibers. The present inven-

tion further provides tissue engineering and drug-delivery compositions and methods wherein three-dimensional matrices for growing cells are prepared for in vitro and in vivo use. The invention also relates to methods of manipulating the rate of therapeutic agent release by changing both the biodegradable polymer properties as well as altering the properties of the incorporated gel or hydrogel.

An embodiment of the invention provides a drug delivery composition comprising at least one fiber, wherein said fiber comprises a first component and a second component, and wherein said first component is a biodegradable polymer and said second component is selected from the group consisting of a gel and a hydrogel. Another embodiment of the invention provides a drug delivery composition comprising a fiber, wherein said fiber comprises a first component and a second component, and wherein said first component is a biodegradable polymer and said second component is water, and further wherein said water is present as an inner core. A further embodiment of the invention provides a drug delivery composition comprising a fiber, wherein said fiber comprises an emulsion consisting essentially of a gel or hydrogel. An embodiment of the invention provides drug delivery composition comprising a fiber, wherein said fiber comprises a first component, and wherein said first component is a gel or hydrogel and further wherein said fiber comprises a hollow bore. An embodiment of the invention provides a scaffold composition comprising one or more fibers, wherein said fibers comprise a first component and a second component, and wherein said first component is a biodegradable polymer and said second component is selected from the group consisting of a gel and a hydrogel. Embodiments of the invention also provide methods of manufacturing the fibers of the present invention.

## BRIEF DESCRIPTION OF THE DRAWINGS

The following drawings form part of the present specification and are included to further demonstrate certain aspects of the present invention. The invention may be better understood by reference to one or more of these drawings in combination with the detailed description of specific embodiments presented herein. The drawings are not intended to limit the scope of the invention.

FIG. **1**A depicts a bicomponent fiber with a water bore (**10**) and a wall comprising a hydrophobic polymer (**20**).

FIG. **1**B depicts a bicomponent fiber with a water bore (**10**), a wall comprising a hydrophobic polymer (**20**) and a water emulsion (**30**).

FIG. **1**C depicts a bicomponent fiber with a water bore (**10**), a wall comprising a hydrophobic polymer (**20**), and a gel or hydrogel emulsion (**40**).

FIG. **1**D depicts a bicomponent fiber with a water bore (**10**), a wall comprising a hydrophobic polymer (**20**), and both water and gel or hydrogel emulsions (**50**).

FIG. **2**A depicts a bicomponent fiber with a gel or hydrogel bore (**60**) and a wall comprising a hydrophobic polymer (**20**).

FIG. **2**B depicts a bicomponent fiber with a gel or hydrogel bore (**60**), a wall comprising a hydrophobic polymer (**20**), and a water emulsion (**30**).

FIG. **2**C depicts a bicomponent fiber with a gel or hydrogel bore (**60**), a wall comprising a hydrophobic polymer (**20**), and a gel or hydrogel emulsion (**40**).

FIG. **2**D depicts a bicomponent fiber with a gel or hydrogel bore (**60**), a wall comprising a hydrophobic polymer (**20**) and both water emulsions and gel or hydrogel emulsions (**50**).



FIG. **3**A depicts a bicomponent fiber with a gel or hydrogel bore (**60**) and a wall comprising a hydrophobic polymer (**20**) that comprises a drug (**70**).

FIG. **3**B depicts a bicomponent fiber with a polymer bore (**80**) surrounded by a gel or hydrogel wall (**90**).

FIG. **3**C depicts a bicomponent fiber with a polymer bore (**80**) comprising a water emulsion (**30**) that is surrounded by a gel or hydrogel wall (**90**).

FIG. **3**D depicts a bicomponent fiber with a polymer bore (**80**) comprising a gel or hydrogel emulsion (**40**) that is surrounded by a gel or hydrogel wall (**90**).

FIG. **4**A depicts a bicomponent fiber with a polymer bore (**80**) comprising a water emulsion and a gel or hydrogel emulsion (**50**) that is surrounded by a gel or hydrogel wall (**90**).

FIG. **4**B depicts a multicomponent fiber with a gel or hydrogel bore (**60**) surrounded by two hydrophobic polymer walls (**20 and 100**), with the outer polymer wall comprising a water emulsion (**30**) and the inner polymer wall comprising a gel or hydrogel emulsion (**40**).

FIG. **4**C depicts a monofilament fiber comprising a hydrophobic polymer (**100**) and a gel or hydrogel emulsion (**40**).

FIG. **4**D depicts a monofilament fiber comprising a hydrophobic polymer (**100**) and a water emulsion and a gel or hydrogel emulsion (**50**).

FIG. **5**A depicts a bicomponent fiber with a hydrophobic polymer bore (**90**), and a wall comprising a hydrophobic polymer (**20**) that comprises a gel or hydrogel emulsion (**40**).

FIG. **5**B depicts a bicomponent fiber with a hydrophobic polymer bore (**90**) and a wall comprising a hydrophobic polymer (**20**) comprising a water emulsion and a gel or hydrogel emulsion (**50**).

FIG. **5**C depicts a bicomponent fiber with a hydrophobic polymer bore (**90**) comprising a water emulsion (**30**) and a wall comprising a hydrophobic polymer (**20**) that comprises a gel or hydrogel emulsion (**40**).

FIG. **5**D depicts a bicomponent fiber with a hydrophobic polymer bore (**90**) comprising a gel or hydrogel emulsion (**40**) and a wall comprising a hydrophobic polymer (**20**) that comprises a gel or hydrogel emulsion (**40**).

FIG. **6**A depicts a bicomponent fiber with a hydrophobic polymer bore (**90**) comprising a water emulsion and a gel or hydrogel emulsion (**50**) and a wall comprising a hydrophobic polymer (**20**) that comprises a gel or hydrogel emulsion (**40**).

FIG. **6**B depicts a bicomponent fiber with a hydrophobic polymer bore (**90**) comprising a water emulsion (**30**) and a wall comprising a hydrophobic polymer (**20**) that comprises a water emulsion and a gel, or hydrogel emulsion (**50**).

FIG. **6**C depicts a bicomponent fiber with a hydrophobic polymer bore (**90**) comprising a gel or hydrogel emulsion (**40**) and a wall comprising a hydrophobic polymer (**20**) comprises a water emulsion and a gel or hydrogel emulsion (**50**).

FIG. **6**D depicts a bicomponent fiber with a hydrophobic polymer bore (**90**) comprising both water and gel or hydrogel emulsions (**50**) and a wall comprising a hydrophobic polymer (**20**) comprising both water and gel or hydrogel emulsions (**50**).

FIG. **7** depicts a wet extrusion apparatus used to extrude fibers of the invention.

FIG. **8** depicts a spinneret used in the present invention.

FIG. **9** depicts a triple apparatus used in the extrusion of fibers of the invention.

FIG. **10** depicts a triple spinneret used in the manufacture of multicomponent fibers.

FIG. 11 depicts the flow of a therpeutic through the walls of an emulsion-loaded fiber.

## DESCRIPTION OF ILLUSTRATIVE EMBODIMENTS

An embodiment of the invention provides a drug delivery composition comprising at least one fiber, wherein said fiber comprises a first component and a second component, and wherein said first component is a biodegradable polymer and said second component is selected from the group consisting of a gel and a hydrogel. Another embodiment of the invention provides a drug delivery composition comprising a fiber, wherein said fiber comprises a first component and a second component, and wherein said first component is a biodegradable polymer and said second component is water, and further wherein said water is present as an inner core. A further embodiment of the invention provides a drug delivery composition comprising a fiber, wherein said fiber comprises an emulsion consisting essentially of a gel or hydrogel. An embodiment of the invention provides drug delivery composition comprising a fiber, wherein said fiber comprises a first component, and wherein said first component is a gel or hydrogel and further wherein said fiber comprises a hollow bore. An embodiment of the invention provides a scaffold composition comprising one or more fibers, wherein said fibers comprise a first component and a second component, and wherein said first component is a biodegradable polymer and said second component is selected from the group consisting of a gel and a hydrogel. Embodiments of the invention also provide methods of manufacturing the fibers of the present invention.

An embodiment of the invention provides a bi-component fiber where the inner bore of the fiber, i.e., inside diameter of the fiber, comprises a gel or hydrogel and the outer wall of the fiber comprises a biodegradable polymer. As used herein, the term "gel" refers to a colloidal system with at least two phases, one of which forms a continuous three-dimensional network that acts as an elastic solid. As used herein, the term "hydrogel" refers to a colloid in which a dispersed phase (colloid) is combined with a continuous phase (water) to produce a viscous jellylike product.

An alternate embodiment of the invention provides the inverse of the above, i.e. where the outer wall comprises a gel or hydrogel and the inner bore comprises a biodegradable polymer fiber.

Another embodiment of the invention provides a monofilament fiber where a hydrogel or gel is dispersed randomly throughout the biodegradable polymer layer(s). This configuration results in distinct phase separation where the biodegradable polymer fiber constitutes a continuous phase and the gel or hydrogel constitutes a disperse phase. As used herein, a "continuous phase" refers to the liquid in a disperse system in which solids are suspended or droplets of another liquid are dispersed. As used herein, a "disperse phase" refers to the phase of a disperse system consisting of particles or droplets of one system dispersed through another system.

In certain embodiments, where the gel or hydrogel concentration is zero, a water-bored fiber is provided i.e., a fiber in which water is present within the inside diameter of the fiber. In this case, water, optionally in combination with other materials, comprises the inner core of the fiber and the biodegradable polymer fiber comprises the surrounding sheath of the fiber. In an alternate embodiment, the biodegradable polymer fiber sheath comprises a dispersion of gel or hydrogel. In another embodiment, the biodegradable polymer fiber sheath comprises a dispersion of water in place of a dispersion of gel or hydrogel. In other embodiments, the biodegradable polymer fiber sheath comprises a dispersion of water together with a dispersion of gel and hydrogel.



In an embodiment of the invention, the above described fibers are combined with fibers of similar composition. In other embodiments, fibers of dissimilar type and composition are combined.

In an embodiment, a therapeutic agent is incorporated into one or more of the above described fibers, present individually or in combination. In other embodiments, a drug is incorporated into one or more of the above described fibers, present individually or in combination.

In certain embodiments of the invention, a layer of a fiber circumscribes a layer of an adjacent inner fiber. The inner fiber is approximately centered within the outer fiber. In certain embodiments, one or more of the layers of the circumscribed fibers comprise a hydrogel or a gel in the wall of the fiber or in the bore of the fiber. In additional embodiments, a gel or a hydrogel is incorporated as a dispersed phase within the biodegradable polymer of one or more layers of the fibers. Additional embodiments of the invention provide multi-layered fibers, where each layer comprises varying compositions of gels, hydrogels and therapeutic agents. Certain embodiments of the invention provide fibers comprising more than one kind of therapeutic agent within its one or more layers.

The invention further relates to methods of manipulating the rate of therapeutic agent release by changing both the biodegradable polymer properties as well as altering the properties of the incorporated gel or hydrogel. A therapeutic agent-loaded fiber is suitable for implantation in animals, or more preferably in humans as either single strands for use as a therapeutic agent delivery vehicles, or together with other fibers (of either similar or different type) for the formation of a fiber-based scaffold for use in tissue engineering, wound healing, regenerative medicine, or other medically related applications. These fibers may also be used outside the body to create scaffolds for cell culture, tissue culture, or in vitro organogenesis, wherein specific three-dimensional structures of these fibers may be woven, knitted, braided, used as a non-woven mesh, or maintained as parallel, non-parallel, twisted or random arrays for the creation of complex three-dimensional scaffolds. As each fiber within said fiber scaffold might be loaded with different therapeutic agents, and each with a different release kinetics profile, it may be possible to induce specific cell growth into specific regions of the scaffold. This provides the ability to create complicated three-dimensional biological architecture by deliberate placement of specific fibers at specific locations within the fiber scaffold. These three dimensional biological structures may or may not be biomemetic in their design. By the same means, it is possible to release different therapeutic agents to one section of the cell culture, tissue culture, or organoid than to another within the same sample.

This type of complex three-dimensional fiber scaffold may also be implanted into an animal, or a human to induce specific biological responses at different locations within said fiber scaffold. This is accomplished by designing the fiber scaffold such that fibers with specific therapeutic agents and specific release profiles are placed at specific locations within the scaffold. This enables the control of both temporal and spatial therapeutic agent delivery from the fiber scaffold.

"Defined nonhomogeneous pattern" in the context of the current application means the incorporation of specific fibers into a scaffold matrix such that a desired three-dimensional

distribution of one or more therapeutic agents within the scaffold matrix is achieved. The distribution of therapeutic agents within the fibers, and possibly within their centers, controls the subsequent spatial distribution within the interstitial medium of the matrix scaffold following release of the agents from the polymer fibers. In this way, the spatial contours of desired concentration gradients can be created within the three dimensional scaffold structure and in the immediate surroundings of the scaffold matrix. Temporal distribution is controlled by the polymer composition and gel or hydrogel composition of the fiber and by the use of multi-layers within a fiber.

One aspect of the present invention is a biocompatible implant composition comprising a scaffold of biodegradable polymer fibers. In various embodiments of the present invention, the distance between the fibers may be about 20 microns, about 70 microns, about 90 microns, about 100 microns, about 120 microns, about 140 microns, about 160 microns, about 180 microns, about 200 microns, about 220 microns, about 240 microns, about 260 microns, about 280 microns, about 300 microns, about 320 microns, about 340 microns, about 360 microns, about 380 microns, about 400 microns, about 450 microns or about 500 microns. In various embodiments the distance between the fibers may be less than 50 microns or greater than 500 microns.

Additionally, it is envisioned that in various embodiments of the invention, the fibers will have a diameter of about 20 microns, about 40 microns, about 60 microns, about 80 microns, about 100 microns, about 120 microns, about 140 microns, about 160 microns, about 180 microns, about 200 microns, about 220 microns, about 240 microns, about 260 microns, about 280 microns, about 300 microns, about 320 microns, about 340 microns, about 360 microns, about 380 microns, about 400 microns, about 450 microns or about 500 microns (including intermediate lengths). In various embodiments the diameter of the fibers may be less than about 20 microns or greater than about 500 microns. Additionally, large fibers with diameters up to 3.5 cm are envisioned for certain embodiments. Preferably, the diameter of the fibers will be from about 60 microns to about 500 microns.

In another embodiment of the present invention, the fibers or a subset of fibers, contain one or more therapeutic agents such that the concentration of the therapeutic agent or agents varies along the longitudinal axis of the fibers or subset of fibers. The concentration of the active agent or agents may vary linearly, exponentially or in any desired fashion, as a function of distance along the longitudinal axis of a fiber. The variation may be monodirectional, that is, the content of one or more therapeutic agents decreases from the first end of the fibers or subset of the fibers to the second end of the fibers or subset of the fibers. The content may also vary in a bidirection fashion, that is, the content of the therapeutic agent or agents increases from the first ends of the fibers or subset of the fibers to a maximum and then decreases towards the second ends of the fibers or subset of the fibers.

In certain embodiments of the present invention, a subset of fibers comprising the scaffold may contain no therapeutic agent. For fibers that contain one or more therapeutic agents, the agent or agents may include: a growth factor, an immunodulator, a compound that promotes angiogenesis, a compound that inhibits angiogenesis, an anti-inflammatory compound, an antibiotic, a cytokine, an anti-coagulation agent, a procoagulation agent, a chemotactic agent, agents that promotes apoptosis, an agent that inhibits apoptosis, a mitogenic agent, a radioactive agent, a contrast agent for imaging studies, a viral vector, a polynucleotide, therapeutic



genes, DNA, RNA, a polypeptide, a glycosaminoglycan, a carbohydrate, a glycoprotein. The therapeutic agents may also include those drugs that are to be administered for long-term maintenance to patients such as cardiovascular drugs, including blood pressure, pacing, anti-arrhythmia, beta-blocking drugs, and calcium channel based drugs. Therapeutic agents of the present invention also include anti-tremor and other drugs for epilepsy or other movement disorders. These agents may also include long-term medications such as contraceptives and fertility drugs. They could comprise neurologic agents such as dopamine and related drugs as well as psychological or other behavioral drugs. The therapeutic agents may also include chemical scavengers such as chelators, antioxidants and nutritional agents. Wherein the therapeutic agent promotes angiogenesis, that agent may be vascular endothelial growth factor. The therapeutic agents may be synthetic or natural drugs, proteins, DNA, RNA, or cells (genetically altered or not). As used in the specification and claims, following long-standing patent law practice, the terms "a" and "an," when used in conjunction with the word "comprising" or "including" means one or more.

In general, the present invention contemplates the use of any drug incorporated in the biodegradable polymer fibers of the invention. The word "drug" as used herein is defined as a chemical capable of administration to an organism, which modifies or alters the organism's physiology. More preferably the word "drug" as used herein is defined as any substance intended for use in the treatment or prevention of disease. Drug includes synthetic and naturally occurring toxins and bioaffecting substances as well as recognized pharmaceuticals, such as those listed in "The Physicians Desk Reference," 471st edition, pages 101–321; "Goodman and Gilman's The Pharmacological Basis of Therapeutics" 8th Edition (1990), pages 84–1614 and 1655–1715; and "The United States Pharmacopela, The National Formulary", USP XXII NF XVII (1990), the compounds of these references being herein incorporated by reference. The term "drug" also includes compounds that have the indicated properties that are not yet discovered or available in the U.S. The term "drug" includes pro-active, activated, and metabolized forms of drugs. Tissue stimulating factors are also included such as: dimers of Platelet Derived Growth Factor (PDGF), insulin-like growth factor-1 (IGF-1), IGF-2, basic Fibroblast Growth Factor (bFGF), acidic FGF, Vascular Endothelial Cell Growth Factor (VEGF), Nerve Growth Factor (NGF), Neurotrophic Factor 3 (NT-3), Neurotrophic Factor 4 (NT-4), Brain Derived Neurotrophic Factor (BDNF), Endothelial Growth Factor (EGF), Insulin, Interleukin 1 (Il-1), Tumor Necrosis Factor alpha (TNFα.), Connective Tissue Growth Factor (CTGF), Transforming Growth Factor alpha (TGFα), and all other growth factors and cytokines, as well as para-thyroid hormone (PTH), prostaglandin such as Prostaglandin E-1 and Prostaglandin E-2, Macrophage Colony Stimulating Factor (MCSF), and corticosteroids such as dexamethasone, prednisolone, and corticosterone.

The present invention also contemplates the use of hydrogel forming material within the core of the fibers. Hydrogels are structurally stable, synthetic polymer or biopolymer matrices that are highly hydrated. These materials may absorb up to thousands of times their weight in water, (Hoffman, A. S., Advanced Drug delivery Reviews, 43 (2000), 3–12). Hydrogels can be classified into two broad categories: reversible or physical and irreversible or chemical. The networks in physical gels are held together by molecular entanglements and/or secondary forces including

ionic, H-bonding or hydrophobic forces. Physical hydrogels are characterized by significant changes in the rheological properties as a function of temperature, ionic concentration, and dilution. Chemical gels, also called permanent gels, are characterized by chemically crosslinked networks. When crosslinked, these gels reach an equilibrium swelling level in aqueous solutions which depends mainly on the crosslink density.

The preparation of hydrogels can be achieved by a variety of methods well known to those of ordinary skill in the art. Physical gels can be formed by: heating or cooling certain polymer solutions (cool agarose, for example), using freeze-thaw cycles to form polymer microcrystals, reducing the solution pH to form a H-bonded gel between two different polymers in the same aqueous solution, mixing solutions of a polyanion and a polycation to form a complex coacervate gel, gelling a polyelectrolyte solution with a multivalent ion of opposite charge, reticulation of linear polymers, grafting of synthetic polymers onto naturally occurring macromolecules, and chelation of polycations (Hoffman, A. S., Advanced Drug delivery Reviews, 43 (2000), 3–12). Chemical gels can be created by crosslinking polymers in the solid state or in solution with radiation, chemical crosslinkers like glutaraldehyde, or multifunctional reactive compounds. They can also be made by copolymerizing a monomer and a crosslinker in solution, copolymerizing a monomer and a multifunctional macromer, polymerizing a monomer within a different solid polymer to form an IPN gel, or chemically converting a hydrophobic polymer to a hydrogel (Hoffman, A. S., Advanced Drug delivery Reviews, 43 (2000), 3–12); Hennick, W. F. and van Nostrum, C. F., Advanced Drug Delivery Reviews, 54 (2002), 13–26.

The present invention contemplates the use of hydrogel precursor materials and non-gelling proteins and polysaccharides within the bore of the fibers. Hydrogel precursor materials are the same materials as those that form hydrogels, but they are not exposed to the agents or conditions that normally gel the materials, or can be other proteins and polysaccharides that form gels but not hydrogels. For example, alginate salts, such as sodium alginate, are gelled in the presence of divalent cations, such as calcium, while other materials create hydrogels via a change in pH or temperature. Certain embodiments of the invention comprise the use of precursor materials that are never gelled. Other embodiments of the invention comprise the use of precursor materials in the fabrication process that later may form gels or hydrogels. The formation of gels or hydrogels in the fiber layer may take place as a part of the fiber fabrication process, after the fiber has been fabricated, or after the application of an appropriate type of external stimuli, including placing the fiber in vitro or in vivo. The terms "gel" or "hydrogel" as used herein is intended to include the formed gel or hydrogel as well as the appropriate precursor molecules involved in the formation of gels and hydrogels.

The biodegradable polymer used for fiber construction may be a single polymer or a co-polymer or blend of polymers and may comprise poly(L-lactic acid), poly(DL-lactic acid), polycaprolactone, poly(glycolic acid), polyanhydride, or natural polymers or polypeptides, such as reconstituted collagen or spider silk and polysaccharides.

The fibers of the claimed invention are manufactured using wet or dry/wet (dry jet wet) spinning. Each method affects the final properties of the fiber being constructed. Wet spinning is a process in which a polymeric material is extruded into a liquid bath containing a coagulant. The coagulant is typically comprised of a non-solvent for the polymer that is miscible with the solvent in the polymer solution, but it can also contain a solvent/non-solvent mixture. In dry jet wet spinning, the polymer solution is first exposed to an air gap before entering the coagulation bath.



In an embodiment of the invention, the fiber comprises a plurality of co-axial layers of biodegradable polymers. The drug delivery fiber of the present invention may be implanted into many sites in the body including dermal tissues, cardiac tissue, soft tissues, nerves, bones, and the eye. Ocular implantation has particular use for treatment of cataracts, diabetically induced proliferative retinopathy and non-proliferative retinopathy, glaucoma, and macular degeneration.

A further aspect of the present invention is a method of producing a fiber-scaffold for preparing an implant capable of controlling the spatial and temporal concentration of one or more therapeutic agents. This method generally comprises forming biodegradable polymer fibers into a three dimensional fiber-scaffold. The biodegradable polymer fibers contain one or more therapeutic agents. The therapeutic agent or agents are distributed in the fiber-scaffold in a defined nonhomogeneous pattern.

In certain embodiments of the invention, gels and hydrogels comprised in the fiber layers may exist at infinitely dilute concentrations, i.e., the concentration of gel or hydrogel is zero, and water is used with or without other substances and/or active agents, including therapeutic agents, in place of the gel or hydrogel.

In one embodiment of this invention, the preferred material for the hydrogel contained in the bore of the fiber will be alginate or modified alginate material. Alginate molecules are comprised of (1–4)-linked β-D-mannuronic acid (M units) and (α-L-guluronic acid (G units) monomers, which vary in proportion and sequential distribution along the polymer chain. Alginate polysaccharides are polyelectrolyte systems that have a strong affinity for divalent cations (e.g. $Ca^{2+}$, $Sr^{2+}$, $Ba^{2+}$) and form stable hydrogels when exposed to these molecules. The biodegradable polymer is poly(L-lactic acid) (PLLA). In an embodiment, the alginate is contained as the inner core and the PLLA is the outer sheath. The concentration of alginate is in the range of 0.25 w/v % to 100 w/v % (i.e., g/100 ml water), preferably in the range of 0.75 w/v % to 20 w/v %, and most preferably at a concentration of 1 w/v %. The source and composition of alginate directly affects its usable concentration.

In another embodiment of this invention, the PLLA sheath surrounding the inner gel or hydrogel core comprises a cocktail of PLLA polymers of different molecular weights as a means of increasing the degradation rate. The proportions of the PLLA polymers and the range of the polymer molecular weights can vary. In an exemplary embodiment, the polymer cocktail comprises 80% by weight of a PLLA polymer of Mw=100,000 Daltons; 15% by weight of a polymer of Mw=2,000 Daltons; and 5% by weight of a polymer Mw=300,000 Daltons.

In another embodiment of the invention, the PLLA sheath surrounding the inner gel or hydrogel core is comprised of two phases, a continuous phase comprising a biodegradable polymer and a dispersed phase comprising an aqueous phase stabilized by a surfactant. The aqueous phase may optionally comprise therapeutic agents. The amount of the dispersed phase ranges from about 0% to about 85% by weight relative to the weight of the fiber. In a preferred embodiment the amount of the dispersed phase ranges from about 33% to about 50% by weight relative to the weight of the fiber. As the ratio of the dispersed phase increases, so does the rate of

degradation of the polymer. This leads to increased release rates of loaded therapeutic agents.

In an embodiment of this invention, agents that are designed to degrade the gel or hydrogel are loaded into the dispersed aqueous phase of the biodegradable polymer component of the fiber (as described above). This agent is released into the gel or hydrogel slowly over time to break down the gel or hydrogel. This increases therapeutic agent release rates. In addition, many of the potential gels and hydrogels are not directly biodegradable within animals, or more especially humans. Therefore, this planned degradation helps the body to eliminate the gels or hydrogels when they are no longer needed.

In an embodiment, the alginate is gelled internally by the addition of gelling agents added directly to the alginate solution. Typical gelling agents include calcium chloride, calcium carbonate, calcium-EDTA (Ethylene Diamine Tetraacetic Acid), or other compounds containing bivalent cations that are well known to those skilled in the art. The concentration of the gelation agent ranges from about 5 mM to about 100 mM, more preferably from about 12 mM to about 50 mM, and most preferably from about 15 mM to 30 mM. The range chosen is determined by desired hydrogel properties. If not readily soluble at neutral pH, the gelling agent is typically activated by a drop in pH of the solution. This acidification can be achieved through a number of acids or lactones. This list includes, but is not limited to, citric acid, hydrochloric acid, D-glucono-delta-lactone, and glacial acetic acid.

In another embodiment, the gel or hydrogel is gelled externally by incorporating the gelling agent source into the biodegradable fiber. Alternately, the gelling agent source is added to a water phase that is loaded into one or more layers of the biodegradable polymer. In this way, the gelling agent is slowly released into the gel or hydrogel as the fiber degrades. In certain embodiments, as the fiber degrades and becomes weaker and more porous, the gel becomes more tightly cross-linked. In this way, it may be possible to continuously alter the release rate as the fiber degrades. Release rates tend to increase as the polymer becomes more porous, in this case, this trend would be offset by the gel becoming more tightly cross-linked, hence retarding release rates through the gel or hydrogel as the fiber degrades.

In another embodiment, the gelling agent is soluble in the polymer solvent and is mixed with the polymer solution at the time of fiber fabrication. In this embodiment, rather than the gelling agent being maintained in an aqueous phase, it is molecularly mixed with the polymer. The same net effect of releasing the gelling agent into the gel or hydrogel slowly as the fiber degrades. This embodiment allows the use of organically soluble sources of gelling agents.

In another embodiment, the gelation agents are carried within the alginate solution that are activated over time, such as within lipospheres, microspheres, nanoparticles or other encapsulants that are activated later. These may be slowly activated over time, or purposefully activated by some external event. This will result in the gel either being strengthened, or maintained over time.

In another embodiment of the invention, the gel or hydrogel is the exterior sheath and the biodegradable polymer is the interior core. In this embodiment the gelling agent is in the coagulating bath, which would be an external gelation.

The present invention provides compositions and methods to create single, drug releasing fibers as well as the composition and methods to create a heterogeneous, woven, knitted, braided, non-woven, twisted, parallel array or random three-dimensional fiber scaffold for growing cells in



tissue engineering applications. These scaffolds can be used in vitro and in vivo, and due to their heterogeneity can create both spatial and temporal distributions of therapeutic agents. In this invention, therapeutic agents may include drugs, proteins, peptides, mono- and di-saccharides, polysaccharides, glycoproteins, DNA, RNA, viruses, or other biological molecules of interest. The term therapeutic agent in this invention also includes radioactive materials used to help destroy harmful tissues such as tumors in the local area, or to inhibit growth of healthy tissues, such as in current stent applications; or markers to be used in imaging studies.

A. Three Dimensional Fiber Scaffolds

To create the heterogeneous scaffolds of the present invention, the therapeutic agents are encapsulated into individual fibers of the matrix by methods to be described herein. The therapeutic agents are released from each individual fiber slowly, and in a controlled manner. The fiber format has many advantages as a drug delivery platform over other slow drug-releasing agents known to those familiar in the art such as microspheres, porous plugs or patches. The primary advantage of fibers is that they can provide complex three-dimensional woven, or non-woven scaffolding, with or without patterning, to allow cells to attach, spread, differentiate, and mature into appropriately functioning cells. Because they can form patterns, a "smart scaffold" can be produced to induce cells of specific types to migrate to specific regions of the scaffold due to specific chemotactic factors being released. This scaffold mimics the function of the extracellular matrix material both during embryological development and in post-embryological tissues. Additionally, filaments could be formed into a unique scaffold that provides a growth substrate for tissue repair or reconstruction that is not reminiscent of a natural like structure.

Because of the ability to weave patterns to induce appropriate cell types into specific regions, it is possible to incorporate strands that will induce the formation of blood vessels into the fabric. This may be accomplished by providing fibers that release growth factors such as vascular endothelial growth factor (VEGF). By appropriate spacing of VEGF containing-fibers into the weave pattern, large tissues may be engineered, and the cells in such tissues can be provided with a sufficient blood supply and thereby receive oxygen and nutrients and enable the removal of waste products.

Fibers also have the advantage of providing the body with short term mechanical support in such applications as stents, wherein the polymer fiber can maintain the lumen of any tubular body, such as arteries, veins, ducts (e.g. bile duct, ureter, urethra, trachea, etc.), organs of the digestive track such as esophagus, intestine, colon, and connective tissue such as tendons, ligaments, muscle and bone. The fibers provide a useful structure to support mechanical strength or tension during the healing process. Fibers may also be useful to promote neural regeneration or reconstruction of nerves or spinal cord.

B. Fiber Formats

There are a large number of combinations and variations within the scope of this invention. This invention covers gel or hydrogel combinations with a biodegradable polymer fiber in a multi-layer, multi-component format, where each layer is fully contained within the next outer layer, and the inner layer is generally centered within the outer layer. These layers can be comprised of different gels or hydrogels, or different biodegradable polymers.

This invention also includes the use of gels or hydrogels as a dispersed phase within biodegradable polymer layer, wherein the continuous phase is the biodegradable polymer

phase. The dispersed phase may be stabilized by either an internal or external surfactant.

In the case of the dispersed gel or hydrogel within the biodegradable polymer layer, and in the case of the gel or hydrogel layer being interior to a biodegradable polymer layer, an allowable special case is that the concentration of the hydrogel is zero. This means that water may be used (with or without the inclusion of other substances) in the place of the gel or hydrogel.

As an additional special case, it may be possible for the polymer concentration in the innermost core to be zero, in which case the solvent normally used with the polymer is replaced by a non-solvent. In this case, the non-solvent core acts as an internal coagulating bath. The result is that a hollow fiber is created. This special case can occur with or without a gel or hydrogel exterior to the biodegradable polymer layer(s) and with or without a dispersed gel, hydrogel or water phase within the biodegradable polymer layer(s).

This leads to a large number of potential combinations. The basic types are external biodegradable polymer with internal gel or hydrogel, and the inverse design, i.e. gel or hydrogel external with the biodegradable polymer as the internal core. In each of these combinations, the biodegradable polymer layer may or may not have a dispersed water, gel or hydrogel phase. Another case is a monofilament fiber with a gel or hydrogel dispersed phase.

C. Release Kinetics of Individual Fibers

Further, there are various means for controlling the release kinetics of the therapeutic agent, thus temporally controlling the release of the therapeutic agent. The following discussion will pertain only to the fiber format wherein the polymer sheath surrounds an inner core of gel or hydrogel. The first point of control for the polymer is to mix low molecular weight polymer in with the higher molecular weight, fiber forming polymers. In this way, the lower molecular weight component is able to rapidly degrade and diffuse from the fiber, making the fiber more porous. This makes the interior therapeutic agents within the gel or hydrogel more accessible. A second means of accelerating the release rate of the fiber is to create a bi-phasic fiber, wherein the continuous phase is the biodegradable polymer, and the dispersed phase is aqueous pockets that are stabilized by a surfactant. As the concentration of the dispersed phase increases, a pathway is created from the outside to the inner gel or hydrogel where the only polymer that must be degraded is between the various pockets of the dispersed aqueous phase. This has the effect of leaving much less polymer to degrade to connect the gel or hydrogel to the outside world, thus accelerating the release of the therapeutic agent. It is also possible for this dispersed aqueous phase to contain the same or a different drug or therapeutic agent. In this case, the drug or therapeutic agent in the dispersed aqueous phase will be released first, followed by the release of the therapeutic agent in the gel or hydrogel. To alter the release kinetics of the drug or therapeutic agent in the polymer fiber wall, it is possible to slightly adapt the above description such that the dispersed phase is now a gel or hydrogel as opposed to being aqueous. In this case, the fluid pathway shortening exists as in the case of an aqueous dispersed phase; however, the connecting pathway must now go through pockets of gel or hydrogel, wherein the diffusion of the therapeutic agent is retarded compared to a purely aqueous pathway. The degree to which the diffusion is retarded is a function of the type of gel or hydrogel, the type and degree of cross-linking, and the concentration of the gel or hydrogel. All of these parameters are within the control of the entity forming the fiber. It is also possible to control the concentration of the dispersed aqueous or gel phase within the biodegradable polymer as a function of distance along the long axis of the fiber. By this means, it is possible to have different release kinetics at one end of the fiber than at the other, with a defined gradient of release kinetics down the length of the fiber. This change in release kinetics may or may not be combined with a gradient of therapeutic agent concentration. By the same means, it is possible to have the content of the disperse phase vary as a function of distance down the polymer fiber such that at one end the dispersed phase would be for example purely aqueous and at the second end of the fiber, the dispersed phase could be a gel or hydrogel. Other gradients are also possible including varying concentrations of the gel within the disperse phase. Thus a great deal of control is available on the release kinetics of the fiber. Aside from these changes in the polymer wall of the fiber, it is also possible to control the release kinetics from this fiber by altering the type, concentration, and degree of cross-linking within the gel or hydrogel in the core of the fiber, which contains a therapeutic agent.

The ability to dynamically change the release kinetics of the gel or hydrogel being loaded into the core or as a dispersed phase within a biodegradable polymer fiber over the course of the drug delivery period constitutes an important aspect of the invention. This affords unique opportunities that are not possible to be present in other forms of drug delivery from gels or hydrogels. The first means of control available because of the gel being loaded into a biodegradable polymer fiber is the ability of this fiber to release agents known to cross link the gel. In this way, over time, the cross-linking density of the gel actually increases, which will retard the release of the therapeutic agent. This release of the cross linking agent from the biodegradable polymer fiber sheath is itself controllable by means outlined above, i.e. using a cocktail of molecular weights, or changing the concentration of the dispersed aqueous phase. As a special case of the biodegradable polymer fiber sheath is a multi-layer, and multi-component biodegradable polymer sheath. This allows the creation of directional specificity, as well as changes in the release kinetics from each layer of the biodegradable polymer fiber sheath. For example, consider the case of two layers of biodegradable polymer fiber in the sheath. The innermost layer could contain agents that act to cross link the gel or hydrogel core of the fiber, and this layer could be composed of a biodegradable polymer that has a rapid degradation rate. Further, this layer could contain a high degree of dispersed aqueous phase. In this same example, the outermost layer may be composed of a different biodegradable polymer with a different degradation rate, and a different concentration of dispersed aqueous (or gel or hydrogel) dispersed phase, including zero. This example would create a situation where the cross-linking agent would be delivered inwardly to the gel or hydrogel in the core of the fiber over time, thus creating a situation wherein the diffusion coefficient of the therapeutic agent loaded into the gel or hydrogel in the core of the fiber decreases over time.

Another special case is where the polymer fiber contains agents that degrade the gel or hydrogel in the core of the fiber. Using the same logic as explained above, this too creates a situation where the diffusion coefficient of the therapeutic agent in the gel or hydrogel in the core or dispersed within the fiber changes continuously over time. In this case, however, the diffusion rate increases over time. This particular case also has the advantage that the body of the animal or preferably the human into which the fiber is

implanted may not have the specific enzymes or other chemical conditions required to degrade the gel or hydrogel. In this case, loading appropriate degradation agents into the wall of the fiber allows the degradation of the gel or hydrogel, and thus aids the clearance of the gel or hydrogel from the host. Again, as described above, the release of the degradation agents is largely controllable by changing properties of the biodegradable polymer layers in the sheath of the fiber.

By these methods, it is seen that the release kinetics of the therapeutic agent from a gel or hydrogel core or dispersed in a sheath of biodegradable polymer fiber is alterable by virtue of the presence of biodegradable polymer sheath.

In the case where the gel or hydrogel is the exterior layer and the biodegradable polymer is the core of the fiber. In this case the biodegradable polymer core may consist of one or more multi-component layers as described above, and again each layer may contain a different concentration of dispersed aqueous or gel or hydrogel phase, which may or may not themselves carry therapeutic agents. The overall release of therapeutic agent(s) from the fiber is controlled by the location of the therapeutic agents, either in the gel or hydrogel exterior, or within the biodegradable polymer core or both. By the same means as described above, the exterior gel or hydrogel release kinetics may be altered by the release of cross-linking, or degrading agents from the biodegradable polymer fiber core. As these agents are released from the biodegradable polymer fiber core, they will alter the properties of the exterior gel or hydrogel, thus decreasing or increasing the diffusion of the therapeutic agent from the exterior gel or hydrogel. For any therapeutic agent(s) within the biodegradable polymer core, the release of these agents is controlled on two levels. First, as explained above the type and molecular weight distribution of the polymer itself changes the release kinetics, as well known to those skilled in the art. In addition to this, the concentration of any dispersed aqueous or gel or hydrogel phase will alter the release from the biodegradable polymer. However, as the gel or hydrogel is surrounding the biodegradable fiber, all therapeutic agents within the biodegradable polymer must diffuse through the gel or hydrogel. Therefore, any changes to the diffusion of the therapeutic agent(s) through the gel or hydrogel also directly affect the release of any therapeutic agents within the core of the fiber. Therefore, in this case, one can change the release kinetics of the fiber by altering both the gel and the biodegradable polymer segments.

If the dispersed phase is a gel or hydrogel that also contains the therapeutic agent, then the release of that therapeutic agent is controllable by the same means of choice of biodegradable polymer, molecular weight distribution, and concentration of the dispersed phase. In addition, the properties of the gel or hydrogel also alter the release of the therapeutic agent from the dispersed phase within the monofilament fiber.

D. Biodegradable Polymers

Preferred polymers for use in the present invention include single polymer, co-polymer or a blend of polymers of poly(L-lactic acid), poly(DL-lactic acid), polycaprolactone, poly(glycolic acid) or polyanhydride. Naturally occurring polymers may also be used such as reconstituted collagen or natural silks. Those of skill in the art will understand that these polymers are just examples of a class of biodegradable polymer matrices that may be used in this invention. Further biodegradable matrices include polyanhydrides, polyorthoesters, and poly(amino acids) (Peppas and Langer, 1994). Any such matrix may be utilized to fabricate a biodegradable polymer matrix with controlled



properties for use in this invention. A non-exhaustive list of biodegradable polymers that produce non-toxic degradation products are listed in Table 1.

TABLE 1

| Biodegradable polymers |
| --- |
| Synthetic |
| Polypeptides |
| Polydepsipeptides |
| Nylon-2/nylon-6 copolyamides |
| Aliphatic polyesters |
| Poly(glycolic acid) (PGA) and copolymers |
| Poly(lactic acid) (PLA) and copolymer |
| Poly(alkylene succinates) |
| Poly(hydroxy butyrate) (PHB) |
| Poly(butylene diglycolate) |
| Poly(ε-caprolactone) and copolymers |
| Polydihydropyrans |
| Polyphosphazenes |
| Poly(ortho ester) |
| Poly(cyano acrylates) |
| Natural |
| Modified polysaccharides |
| cellulose, starch, chitin |
| Modified proteins |
| collagen, fibrin |

Adapted from Wong and Mooney, 1997.

E. Types of Gels and Hydrogels

In simple terms, a gel is a liquid system that acts like a solid. More technically defined, a gel is a colloidal system with at least two phases, one of which forms a continuous three-dimensional network that acts as an elastic solid. Gel formation through physical, molecular, or chemical association results in an infinite molecular weight for the system. The viscoelastic material formed has a storage modulus, G', that is greater than the loss modulus, G", and both G' and G" are almost independent of frequency. [E. R. Morris, Polysaccharide solution properties: origin, rheological characterization and implications for food systems, Frontiers in Carbohydrate Research 1: Food Applications (R. P. Millane, J. N. BeMiller, and R. Chandrasekaran, eds.), Elsevier, London, 1989, p. 132.] The storage modulus characterizes the rigidity of the sample, while the loss modulus characterizes the resistance of the sample to flow. [Damodaran, Srinivasan, Food Proteins and Their Applications, Food Science and Technology (Marcel Dekker, Inc.); New York Marcel Dekker, Inc., 1997.] Examples are polymer solutions, micellar solutions, microemulsions and, in more recent years, the field has been extended with the large number of organic solvents that are gelled by the presence of small organic molecules at very low concentrations.

A hydrogel is defined as a colloid in which the disperse phase (the colloid) has combined with the continuous phase (water) to produce a viscous jellylike product. [Dictionary of Chemical Terms, 4th Ed., McGraw Hill (1989)]. Hydrogels are able to swell rapidly in excess water and retain large volumes of water in their swollen structures. The polymeric material comprising the hydrogel can absorb more than 20% of its weight in water, though formed hydrogels are insoluble in water and they maintain three-dimensional networks. [Amidon, Gordon L., Transport Processes in Pharmaceutical Systems, Drugs and the Pharmaceutical Sciences; v. 102 New York Marcel Dekker, Inc., 2000]. They are usually made of hydrophilic polymer molecules crosslinked either

by chemical bonds or by other cohesion forces such as ionic interaction, hydrogen bonding, or hydrophobic interaction. [J. I. Kroschwitz, Concise Encyclopedia of Polymer Science and Engineering, New York, Wiley, XXIX, p 1341, 1990.]

Hydrogels are -elastic solids in the sense that there exists a remembered reference configuration to which the system returns even after being deformed for a very long time.

An organogel is defined as an organic phase with an interlaced polymeric component. Preferred solvents include non-toxic organic solvents including, but not limited to, dimethyl sulfoxide (DMSO), mineral oils and vegetable oils. The term "organogel" was initially used to describe a specific concept of gelation, by a gelatin solution, of a water-in-oil inverse microemulsion (see Luisi et al. Colloid & Polymer Science, 1990, vol. 268, p. 356–374). The term has recently been extended to gelled systems comprising two immiscible phases (water in oil) stabilized in lecithin enriched with phosphatidylcholine and usually hydrogenated (see Williman et al. Journal of Pharmaceutical Sciences, 1992, vol. 81, p. 871–874, and Schchipunov et al., Colloid Journal, 1995, vol. 57, p. 556–560). These emulsions have a lamellar phase and are in the form of gels even in the absence of gelling agents, hence the name organogels, which denotes this type of emulsion irrespective of the orientation of the emulsion (Water-in-Oil or Oil-in-Water).

The types of gel materials used in the present invention include polysaccharides, including but not be limited to, amylose, amylopectin, glycogen, cellulose, hyaluronate, chondroitin, heparin, dextrin, inulin, mannan, chitin, galactose, guar gum, carrageenan, agar, furcellaran, xanthan gum, other hydrocolloid gums, pectin, locust bean gum, acacia, ghatti gum, pentosan, arabinogalactan, synthetic derivatives thereof, and mixtures thereof

Examples of materials which can form hydrogels include natural and synthetic polysaccharides and other natural and synthetic polymers and their derivatives, and combinations of these. Suitable polysaccharides and polymers include but are not limited to: amylose, amylopectin, glycogen, cellulose, hyaluronic acid, chondroitin sulfate, heparin, dextrin, inulin, mannan, chitin, galactose, guar gum, carrageenan, agar, furcellaran, xanthan gum, other hydrocolloid gums, pectic acid and pectin, locust bean gum, acacia, ghatti gum, pentosan, arabinogalactan, alginates and alginate derivatives, gellan, gellan gum, glucose, collagen (and gelatin), cellulose, carboxymethylcellulose, hydroxymethylcellulose, hydroxypropylmethylcellulose, methylcellulose, and methoxycellulose, fibrin, xanthan and xanthan gum, agarose, chitosan (polycationic polysaccharide polymers), albumin, human gamma globulin, pullulan, carrageenan (polyanionic polysaccharide polymers), dextrin, dextran, dextran sulfate, keratin, inulin, dextrose, amylose, glycogen, amylopectin, polylysine and other polyamino acids, polyesters such as polyhydroxybutyrate and polyphosphazines, poly(vinyl alcohols), poly(alkylene oxides) particularly poly(ethylene oxides), polyethylene glycol (including PEO-PPO-PEO and the like block copolymers like Pluronics®), poly(allylamines) (PAM), poly(acrylates), modified styrene polymers, pluronic polyols, polyoxamers, polypropylenes, polyurethanes, poly(uronic acids), polyvinyl chloride, poly (vinylpyrrolidone) and copolymers, graft copolymers, synthetic derivatives, blends and other mixtures of the above. Polysaccharides are the preferred polymers for this invention. Alginate, for example, is biocompatible, non-cytotoxic, non-carcinogenic, non-inflammatory, and non-immunogenic, and, therefore, a good candidate for use.



F. Types of Polymeric Materials

Exemplary natural polymers include naturally occurring polysaccharides, such as, for example, arabinans, fructans, fucans, galactans, galacturonans, glucans, mannans, xylans (such as, for example, inulin), levan, fucoidan, carrageenan, galatocarolose, pectic acid, pectins, including amylose, pullulan, glycogen, amylopectin, cellulose, dextran, dextrin, dextrose, glucose, polyglucose, polydextrose, pustulan, chitin, agarose, keratin, chondroitin, dermatan, hyaluronic acid, alginic acid, xanthan gum, starch and various other natural homopolymer or heteropolymers, such as those containing one or more of the following aldoses, ketoses, acids or amines: erythrose, threose, ribose, arabinose, xylose, lyxose, allose, altrose, glucose, dextrose, mannose, gulose, idose, galactose, talose, erythrulose, ribulose, xylulose, psicose, fructose, sorbose, tagatose, mannitol, sorbitol, lactose, sucrose, trehalose, maltose, cellobiose, glycine, serine, threonine, cysteine, tyrosine, asparagine, glutamine, aspartic acid, glutamic acid, lysine, arginine, histidine, glucuronic acid, gluconic acid, glucaric acid, galacturonic acid, mannuronic acid, glucosamine, galactosamine, and neuraminic acid, and naturally occurring derivatives thereof Accordingly, suitable polymers include, for example, proteins, such as albumin.

Exemplary semi-synthetic polymers include carboxymethylcellulose, hydroxymethylcellulose, hydroxypropylmethylcellulose, methylcellulose, and methoxycellulose. Exemplary synthetic polymers include polyphosphazenes, polyethylenes (such as, for example, polyethylene glycol (including the class of compounds referred to as Pluronics®, commercially available from BASF, Parsippany, N.J.), polyoxyethylene, and polyethylene terephthlate), polypropylenes (such as, for example, polypropylene glycol), polyurethanes, polyvinyl alcohol (PVA), polyvinyl chloride and polyvinylpyrrolidone, polyamides including nylon, polystyrene, polylactic acids, fluorinated hydrocarbon polymers, fluorinated carbon polymers (such as, for example, polytetrafluoroethylene), acrylate, methacrylate, and polymethylmethacrylate, and derivatives thereof.

The polymeric materials are selected from those materials which can be polymerized or their viscosity altered in vivo by application of exogenous means, for example, by application of light, ultrasound, radiation, or chelation, alone or in the presence of added catalyst, or by endogenous means, for example, a change to physiological pH, diffusion of calcium ions (alginate) or borate ions (polyvinyl alcohol) into the polymer, or change in temperature to body temperature (37° C.).

G. Agents that Promote Angiogenesis

One class of therapeutic agents to be encapsulated by the polymer fibers of the present invention are therapeutic agents that promote angiogenesis. The successful engineering of new tissue requires the establishment of a vascular network. The induction of angiogenesis is mediated by a variety of factors, any of which may be used in conjunction with the present invention (Folkman and Klagsbrun, 1987, and references cited therein, each incorporated herein in their entirety by reference). Examples of angiogenic factors includes, but is not limited to: vascular endothelial growth factor (VEGF) or vascular permeability factor (VPF); members of the fibroblast growth factor family, including acidic fibroblast growth factor (aFGF) and basic fibroblast growth factor (bFGF); interleukin-8 (IL-8); epidermal growth factor (EGF); platelet-derived growth factor (PDGF) or platelet-derived endothelial cell growth factor (PD-ECGF); transforming growth factors alpha and beta (TGF-α, TGF-β); tumor necrosis factor alpha (TNF-α); hepatocyte growth

factor (HGF); granulocyte-macrophage colony stimulating factor (GM-CSF); insulin growth factor-1 (IGF-1); angiogenin; angiotropin; angiotensin; fibrin and nicotinamide (Folkman, 1986, 1995; Auerbach and Auerbach, 1994; Fidler and Ellis, 1994; Folkman and Klagsbrun, 1987; Nagy et al., 1995).

H. Cytokines

In certain embodiments the use of particular cytokines incorporated in the polymer fibers of the present invention is contemplated. Table 2 below is an exemplary, but not limiting, list of cytokines and related factors contemplated for use in the present invention.

TABLE 2

| Cytokine | Reference |
|---|---|
| Human IL-1 | March et al., Nature, 315: 641, 1985 |
| Murine IL-1 | Lomedico et al., Nature, 312: 458, 1984 |
| Human IL-1 | March et al., Nature, 315: 641, 1985; Auron et al., Proc. Natl. Acad. Sci. U.S.A., 81: 7907, 1984 |
| Murine IL-1 | Gray, J. Immunol., 137: 3644, 1986; Telford, NAR, 14: 9955, 1986 |
| Human IL-1ra | Eisenberg et al., Nature, 343: 341, 1990 |
| Human IL-2 | Taniguchi et al., Nature, 302: 305, 1983; Maeda et al., Biochem. Biophys. Res. Commun., 115: 1040, 1983 |
| Human IL-2 | Taniguchi et al., Nature, 302: 305, 1983 |
| Human IL-3 | Yang et al., Cell, 47: 3, 1986 |
| Murine IL-3 | Yokota et al., Proc. Natl. Acad. Sci. U.S.A., 81: 1070, 1984; Fung et al., Nature, 307: 233, 1984; Miyatake et al., Proc. Natl. Acad. Sci. U.S.A., 82: 316, 1985 |
| Human IL-4 | Yokota et al., Proc. Natl. Acad. Sci. U.S.A., 83: 5894, 1986 |
| Murine IL-4 | Noma et al., Nature, 319: 640, 1986; Lee et al., Proc. Natl. Acad. Sci. U.S.A., 83: 2061, 1986 |
| Human IL-5 | Azuma et al., Nuc. Acids Res., 14: 9149, 1986 |
| Murine IL-5 | Kinashi et al., Nature, 324: 70, 1986; Mizuta et al., Growth Factors, 1: 51, 1988 |
| Human IL-6 | Hirano et al., Nature, 324: 73, 1986 |
| Murine IL-6 | Van Snick et al., Eur. J. Immunol., 18: 193, 1988 |
| Human IL-7 | Goodwin et al., Proc. Natl. Acad. Sci. U.S.A., 86: 302, 1989 |
| Murine IL-7 | Namen et al., Nature, 333: 571, 1988 |
| Human IL-8 | Schmid et al., J. Immunol., 139: 250, 1987; Matsushima et al., J. Exp. Med. 167: 1883, 1988; Lindley et al., Proc. Natl. Acad. Sci. U.S.A., 85: 9199, 1988 |
| Human IL-9 | Renauld et al., J. Immunol., 144: 4235, 1990 |
| Murine IL-9 | Renauld et al., J. Immunol., 144: 4235, 1990 |
| Human Angiogenin | Kurachi et al., Biochemistry, 24: 5494, 1985 |
| Human GRO | Richmond et al., EMBO J., 7: 2025, 1988 |
| Murine MIP-1 | Davatelis et al., J. Exp. Med., 167: 1939, 1988 |
| Murine MIP-1 | Sherry et al., J. Exp. Med., 168: 2251, 1988 |
| Human MIF | Weiser et al., Proc. Natl. Acad. Sci. U.S.A., 86: 7522, 1989 |
| Human G-CSF | Nagata et al., Nature, 319: 415, 1986; Souza et al., Science, 232: 61, 1986 |
| Human GM-CSF | Cantrell et al., Proc. Natl. Acad. Sci. U.S.A., 82: 6250, 1985; Lee et al., Proc. Natl. Acad. Sci. U.S.A., 82: 4360, 1985; Wong et al., Science, 228: 810, 1985 |
| Murine GM-CSF | Gough et al., EMBO J., 4: 645, 1985 |
| Human M-CSF | Wong, Science, 235: 1504, 1987; Kawasaki, Science, 230: 291, 1985; Ladner, EMBO J., 6: 2693, 1987 |
| Human EGF | Smith et al., Nuc. Acids Res., 10: 4467, 1982; Bell et al., NAR, 14: 8427, 1986 |
| Human TGF- | Derynck et al., Cell, 38: 287, 1984 |
| Human FGF acidic | Jaye et al., Science, 233: 541, 1986; Gimenez-Gallego et al., Biochem. Biophys. Res. Commun., 138: 611, 1986; Harper et al., Biochem., 25: 4097, 1986 |
| Human-ECGF | Jaye et al., Science, 233: 541, 1986 |
| Human FGF basic | Abraham et al., EMBO J., 5: 2523, 1986; Sommer et al., Biochem. Biophys. Res. Comm., 144: 543, 1987 |
| Murine IFN- | Higashi et al., J. Biol. Chem., 258: 9522, 1983; Kuga, NAR, 17: 3291, 1989 |
| Human IFN- | Gray et al., Nature, 295: 503, 1982; Devos et al., NAR, 10: 2487, 1982; Rinderknecht, J. Biol. Chem., 259: 6790, 1984 |
| Human IGF-I | Jansen et al., Nature, 306: 609, 1983; Rotwein et al., J. Biol. Chem., 261: 4828, 1986 |
| Human IGF-II | Bell et al., Nature, 310: 775, 1984 |
| Human-NGF chain | Ullrich et al., Nature, 303: 821, 1983 |
| Human NT-3 | Huang EJ. Et al., Development. 126(10): 2191–203, 1999 May. |
| Human PDGF A chain | Betsholtz et al., Nature, 320: 695, 1986 |
| Human PDGF B chain | Johnsson et al., EMBO J., 3: 921, 1984; Collins et al., Nature, 316: 748, 1985 |
| Human TGF-1 | Derynck et al., Nature, 316: 701, 1985 |
| Human TNF- | Pennica et al., Nature, 312: 724, 1984; Fransen et al., Nuc. Acids Res., 13: 4417, 1985 |
| Human TNF- | Gray et al., Nature, 312: 721, 1984 |
| Murine TNF- | Gray et al., Nucl. Acids Res., 15: 3937, 1987 |
| Human E-Selectin | Bevilacqua et al., Science, 243: 1160, 1989; Hensley et al., J. Biol. Chem., 269: 23949, 1994 |
| Human ICAM-1 | Simmons et al., Nature, 331: 624, 1988 |
| Human PECAM | Simmons et al., J. Exp. Med., 171: 2147, 1990 |
| Human VCAM-1 | Hession et al., J. Biol. Chem., 266: 6682; Osborn et al., Cell, 59: 1203, 1989 |
| Human L-Selectin (membrane bound) | Ord et al., J. Biol. Chem., 265: 7760, 1990; Tedder et al., J. Exp. Med., 170: 123, 1989 |
| Human L-Selectin (soluble form) | Ord et al., J. Biol. Chem., 265: 7760, 1990; Tedder et al., J. Exp. Med., 170: 123, 1989 |
| Human Calcitonin | Le Moullec et al., FEBS Lett., 167: 93, 1984 |
| Human Hirudin (*E. coli* optimized) | Dodt et al., FEBS Lett., 165: 180, 1984 |

G. Polynucelotides

The polynucleotides to be incorporated within the polymer fibers of the present invention extend to the full variety of nucleic acid molecules. The nucleic acids thus include genomic DNA, cDNAs, single stranded DNA, double stranded DNA, triple stranded DNA, oligonucleotides, Z-DNA, mRNA, tRNA and other RNAs. DNA molecules are generally preferred, even where the DNA is used to express a therapeutic RNA, such as a ribozyme or antisense RNA.

A "gene" or DNA segment encoding a selected protein or RNA, generally refers to a DNA segment that contains sequences encoding the selected protein or RNA, but is isolated away from, or purified free from, total genomic DNA of the species from which the DNA is obtained. Included within the terms "gene" and "DNA segment", are DNA segments and smaller fragments of such segments, and also recombinant vectors, including, for example, plasmids, cosmids, phage, retroviruses, adenoviruses, and the like.

The term "gene" is used for simplicity to refer to a functional protein or peptide encoding unit. As will be understood by those in the art, this functional term includes both genomic sequences and cDNA sequences. "Isolated substantially away from other coding sequences" means that the gene of interest forms the significant part of the coding region of the DNA segment, and that the DNA segment does not contain large portions of naturally-occurring coding DNA, such as large chromosomal fragments or other functional genes or cDNA coding regions. Of course, this refers to the DNA segment as originally isolated, and does not exclude genes or coding regions, such as sequences encoding leader peptides or targeting sequences, later added to the segment by the hand of man.

The present invention does not require that highly purified DNA or vectors be used, so long as any coding segment employed encodes a selected protein or RNA and does not include any coding or regulatory sequences that would have a significant adverse effect on the target cells. Therefore, it will also be understood that useful nucleic acid sequences may include additional residues, such as additional non-coding sequences flanking either of the 5' or 3' portions of the coding region or may include various internal sequences, i.e., introns, that are known to occur within genes.

Many suitable DNA segments may be obtained from existing, including commercial sources. One may also obtain a new DNA segment encoding a protein of interest using any one or more of a variety of molecular biological techniques generally known to those skilled in the art. For example, cDNA or genomic libraries may be screened using primers or probes with designed sequences. Polymerase chain reaction (PCR) may also be used to generate a DNA fragment encoding a protein of interest.

After identifying an appropriate selected gene or DNA molecule, it may be inserted into any one of the many vectors currently known in the art, so that it will direct the expression and production of the selected protein when incorporated into a target cell. In a recombinant expression vector, the coding portion of the DNA segment is positioned under the control of a promoter/enhancer element. The promoter may be in the form of the promoter that is naturally associated with a selected gene, as may be obtained by isolating the 5' non-coding sequences located upstream of the coding segment or exon, for example, using recombinant cloning and/or PCR technology.

In other embodiments, it is contemplated that certain advantages will be gained by positioning the coding DNA segment under the control of a recombinant, or heterologous, promoter. As used herein, a recombinant or heterologous promoter is intended to refer to a promoter that is not normally associated with a selected gene in its natural environment. Such promoters may include those normally associated with other selected genes, and/or promoters isolated from any other bacterial, viral, eukaryotic, or mammalian cell. Naturally, it will be important to employ a promoter that effectively directs the expression of the DNA segment in the chosen target cells.

The use of recombinant promoters to achieve protein expression is generally known to those of skill in the art of molecular biology, for example, see Sambrook et al (1989; incorporated herein by reference). The promoters employed may be constitutive, or inducible, and can be used under the appropriate conditions to direct high level or regulated expression of the introduced DNA segment. Expression of genes under the control of constitutive promoters does not require the presence of a specific substrate to induce gene expression and will occur under all conditions of cell growth. In contrast, expression of genes controlled by inducible promoters is responsive to the presence or absence of an inducing agent.

Promoters isolated from the genome of viruses that grow in mammalian cells, e.g., RSV, vaccinia virus 7.5K, SV40, HSV, adenoviruses MLP, MMTV LTR and CMV promoters, may be used herewith, as well as promoters produced by recombinant DNA or synthetic techniques. Currently preferred promoters are those such as CMV, RSV LTR, the SV40 promoter alone, and the SV40 promoter in combination with the SV40 enhancer.

Exemplary tissue specific promoter/enhancer elements and transcriptional control regions that exhibit tissue specificity include, but are not limited to: the elastase I gene control region that is active in pancreatic acinar cells; the insulin gene control region that is active in pancreatic cells; the immunoglobulin gene control region that is active in lymphoid cells; the albumin, 1-antitrypsin and -fetoprotein gene control regions that are active in liver; the -globin gene control region that is active in myeloid cells; the myelin basic protein gene control region that is active in oligodendrocyte cells in the brain; the myosin light chain-2 gene control region that is active in skeletal muscle; and the gonadotropic releasing hormone gene control region that is active in the hypothalamus.

Specific initiation signals may also be required for sufficient translation of inserted protein coding sequences. These signals include the ATG initiation codon and adjacent sequences. In cases where the entire coding sequence, including the initiation codon and adjacent sequences are inserted into the appropriate expression vectors, no additional translational control signals may be needed. However, in cases where only a portion of the coding sequence is inserted, exogenous translational control signals, including the ATG initiation codon should be provided. The initiation codon must be in phase with the reading frame of the protein coding sequences to ensure translation of the entire insert. These exogenous translational control signals and initiation codons can be of a variety of origins, both natural and synthetic. The efficiency and control of expression may be enhanced by the inclusion of transcription attenuation sequences, enhancer elements, etc.

A variety of vectors may be used including, but not limited to, those derived from recombinant bacteriophage DNA, plasmid DNA or cosmid DNA. For example, plasmid vectors such as pBR322, pUC 19/18, pUC 118, 119 and the M13 mp series of vectors may be used. Bacteriophage vectors may include gt10, gt11, gt18–23, ZAP/R and the EMBL series of bacteriophage vectors. Cosmid vectors that may be utilized include, but are not limited to, pJB8, pCV 103, pCV 107, pCV 108, pTM, pMCS, pNNL, pHSG274, COS202, COS203, pWE15, pWE16 and the charomid 9 series of vectors. Vectors that allow for the in vitro transcription of RNA, such as SP6 vectors, may also be used to produce large quantities of RNA that may be incorporated into matrices.

The selected genes and DNA segments may also be in the form of a DNA insert located within the genome of a recombinant virus, such as, for example a recombinant herpes virus, retroviruses, vaccinia viruses, adenoviruses, adeno-associated viruses or bovine papilloma virus. While integrating vectors may be used, non-integrating systems, which do not transmit the gene product to daughter cells for many generations will often be preferred. In this way, the gene product is expressed during a defined biological process, e.g., a wound healing process, and as the gene is diluted out in progeny generations, the amount of expressed gene product is diminished.

In such embodiments, to place the gene in contact with a target cell, one would prepare the recombinant viral particles, the genome of which includes the gene insert, and contact the target cells or tissues via release from the polymer fiber of the present invention, whereby the virus infects the cells and transfers the genetic material.

Genes with sequences that vary from those described in the literature are also contemplated for use in the invention, so long as the altered or modified gene still encodes a protein that functions to effect the target cells in the desired (direct or indirect) manner. These sequences include those caused by point mutations, those due to the degeneracies of the genetic code or naturally occurring allelic variants, and

further modifications that have been introduced by genetic engineering, i.e., by the hand of man.

Techniques for introducing changes in nucleotide sequences that are designed to alter the functional properties of the encoded proteins or polypeptides are well known in the art. Such modifications include the deletion, insertion or substitution of bases, and thus, changes in the amino acid sequence. Changes may be made to increase the activity of a protein, to increase its biological stability or half-life, to change its glycosylation pattern, confer temperature sensitivity or to alter the expression pattern of the protein, and the like. All such modifications to the nucleotide sequences are encompassed by this invention.

It is an advantage of the present invention that one or more than one selected gene may be used in the gene transfer methods and compositions. The nucleic acid delivery methods may thus entail the administration of one, two, three, or more, selected genes. The maximum number of genes that may be applied is limited only by practical considerations, such as the effort involved in simultaneously preparing a large number of gene constructs or even the possibility of eliciting an adverse cytotoxic effect. The particular combination of genes may be chosen to alter the same, or different, biochemical pathways. For example, a growth factor gene may be combined with a hormone gene; or a first hormone and/or growth factor gene may be combined with a gene encoding a cell surface receptor capable of interacting with the polypeptide product of the first gene.

In using multiple genes, they may be combined on a single genetic construct under control of one or more promoters, or they may be prepared as separate constructs of the same of different types. Thus, an almost endless combination of different genes and genetic constructs may be employed. Certain gene combinations may be designed to, or their use may otherwise result in, achieving synergistic effects on cell stimulation and tissue growth, any and all such combinations are intended to fall within the scope of the present invention. Indeed, many synergistic effects have been described in the scientific literature, so that one of ordinary skill in the art would readily be able to identify likely synergistic gene combinations, or even gene-protein combinations.

It will also be understood that, if desired, the nucleic segment or gene could be administered in combination with further agents, such as, e.g. proteins or polypeptides or various pharmaceutically active agents. So long as genetic material forms part of the composition, there is virtually no limit to other components which may also be included, given that the additional agents do not cause a significant adverse effect upon contact with the target cells or tissues. The nucleic acids may thus be delivered along with various other agents, for example, in certain embodiments one may wish to administer an angiogenic factor as disclosed in U.S. Pat. No. 5,270,300 and incorporated herein by reference.

As the chemical nature of genes, i.e., as a string of nucleotides, is essentially invariant, and as the process of gene transfer and expression are fundamentally the same, it will be understood that the type of genes transferred by the fiber matrices of the present invention is virtually limitless. This extends from the transfer of a mixture of genetic material expressing antigenic or immunogenic fragments for use in DNA vaccination; to the stimulation of cell function, as in wound-healing; to aspects of cell killing, such as in transferring tumor suppressor genes, antisense oncogenes or apoptosis-inducing genes to cancer cells.

By way of example only, genes to be supplied by the invention include, but are not limited to, those encoding and expressing: hormones, growth factors, growth factor receptors, interferons, interleukins, chemokines, cytokines, colony stimulating factors and chemotactic factors; transcription and elongation factors, cell cycle control proteins, including kinases and phosphatases, DNA repair proteins, apoptosis-inducing genes; apoptosis-inhibiting genes, oncogenes, antisense oncogenes, tumor suppressor genes; angiogenic and anti-angiogenic proteins; immune response stimulating and modulating proteins; cell surface receptors, accessory signaling molecules and transport proteins; enzymes; and anti-bacterial and anti-viral proteins.

H. Kits

All the essential materials and reagents required for the various aspects of the present invention may be assembled together in a kit. The kits of the present invention also will typically include a means for containing the vials comprising the desired components in close confinement for commercial sale such as, e.g., injection or blow-molded plastic containers into which the desired vials are retained. Irrespective of the number or type of containers, the kits of the invention are typically packaged with instructions for use of the kit components.

## WORKING EXAMPLES

The following examples are included to demonstrate preferred embodiments of the invention and are not intended to limit the scope of the invention in any way. It should be appreciated by those of skill in the art that the techniques disclosed in the examples which follow represent techniques discovered by the inventor to function well in the practice of the invention, and thus can be considered to constitute preferred modes for its practice. However, those of skill in the art should, in light of the present disclosure, appreciate that many changes can be made in the specific embodiments which are disclosed and still obtain a like or similar result without departing from the spirit and scope of the invention.

### Example 1

### Extrusion of Gel or Hydrogel Bored Fibers

In one embodiment of the present invention, the following procedure is used to create gel or hydrogel bored drug-releasing fibers. The apparatus used is depicted in FIG. 7, which details a fiber spinneret in which a coagulant bore fluid is fed through a small diameter hypodermic tube, which is centered in a blunt-end hypodermic needle. However, any similar configuration including scaled-up versions and specifically built apparatus' are included within the scope of the invention. This configuration allows for an annulus of polymer to flow through the spinneret, bored by a water-based gel or hydrogel. First, a biodegradable polymer such as poly(L-lactic acid) (PLLA), poly(DL-lactic acid), polycaprolactone, poly(glycolic acid), polyanhydride, or copolymers or blends of these or other biodegradable polymers is dissolved in some appropriate solvent (A) at concentrations ranging from 5 to 30 wt % depending on the type of polymer, 10 wt % being preferred for PLLA at 200 kD molecular weight. In this embodiment, solvent (A) has low miscibility with water, and is very miscible with the coagulation bath solvent (B), but not with the water in the gel or hydrogel in the bore. The water does not function as a solvent or non-solvent in this application. Preferred choices of solvent (A) include chloroform and methylene chloride. Once the polymer is dissolved in the chosen solvent, a non-solvent (solvent C) is typically added to the polymer solution in an

appropriate concentration to reduce the solvation power of the solvent system, yet not bring the solution to its cloud point. This non-solvent is highly miscible with solvent (A), and with solvent (B), and in some cases may be the same as solvent (B). Typical choices include iso-octane, cyclohexane, and hexane. This non-solvent brings the polymer in the solution close to its cloud point, so that the solution will more quickly precipitate to form a fiber when extruded into the coagulant bath, solvent (B).

The gel or hydrogel is prepared using standard procedures known to those who practice the art. As an example, for an internally gelled alginate bore fluid, sodium alginate powder is first dissolved in distilled-deionized water to yield a concentration in the range of 0.5 to 50 wt %, with 1 wt % being desired for this-example. Once dissolved, the solution is sterile filtered to provide an appropriate stock for the gel extrusion process. To promote internal gelation of the alginate, an appropriate quantity of calcium carbonate, $CaCO_3$, is added to the solution and mixed thoroughly by vortexing, sonicating, or homogenizing. Calcium carbonate is not soluble in water at neutral pH, so the powder ultimately is suspended in the alginate solution. To this solution, an appropriate quantity of D-Glucono-delta-Lactone (GDL) is added to slowly drop the solution pH, which initiates liberation of free $Ca^{++}$ from the $CaCO_3$ to cross-link the guluronic acid residues in the alginate, thus forming a hydrogel. The rate of gelation and the properties of the gel can be controlled through the concentration of $CaCO_3$ and the ration of GDL to $CaCO_3$ used in the solution.

The prepared gel solution and the polymer solution are then immediately extruded into the coagulating bath containing solvent (B), through the spinneret device depicted in FIG. **8**, such that the polymer flows around a center tube containing the gel or hydrogel and, if desired, a drug of choice either dissolved in the gel, or encapsulated in nanospheres or liposomes and suspended in the gel. The polymer solution and gel or hydrogel core are extruded into the coagulation bath through a spinneret according to the size of the desired fiber, as these fibers are not typically drawn, the final fiber size is close to the spinneret size. The optimum ration of outer annulus to inner gel or hydrogel diameter needs to be experimentally determined. For example, to obtain fibers whose outer diameter are approximately 500 μm, the inventor's laboratory has used an outer lumen of 18 gage with a 24 or 25 gage inner lumen for the bore fluid. Any water-based gel, precursor hydrogel component, or hydrogel can be delivered through the center tube. Frequently, the inner gel or hydrogel is carrying a drug that is incompatible with organic solvents, or the gel or hydrogel does not tolerate the presence of organic solvents. Therefore, it is generally preferred that the solvent for the gel or hydrogel (generally water) is immiscible with solvents (A), (B) and (C). Solvent (B) must be highly miscible with solvents (A) and (C), immiscible with the water component of the bore fluid, and must be a non-solvent for the polymer; hexane and pentane are the most typical choices, but any solvent that meets the above criteria and quickly draws the solvent from the polymer solution will theoretically work. Wherefore, chloroform and pentane make a good solvent and coagulating bath combination with iso-octane as the added non-solvent. Because solvent (A) is highly miscible with coagulating bath solvent (B), it freely diffuses from the polymer solution stream into the coagulating bath, reducing the solvent power of the polymer solution below the cloud point, which causes the polymer to begin to precipitate to form a solid polymer sheath. Occasionally, the polymer sheath must begin to precipitate and form before it is subjected to the



stress of being exposed to the gel or hydrogel flowing in the inner lumen. This requires that the axial positions of the inner lumen protrude below the outlet of the outer annulus (0–2 mm typical in inventor's laboratory) to ensure that the polymer solution is exposed to the coagulant bath just prior to the gel or hydrogel bore fluid contacting the polymer. The non-solvent (C), incorporated into the polymer solution accelerates the precipitation process. As neither solvent (A) nor (B) freely diffuse into the bore fluid, only a single coagulant front is created as the polymer exits the spinneret, thereby encapsulating the bore gel or hydrogel. The distance the fiber drops into the coagulating bath is important to the formation of the fiber and its ultimate properties, and is typically 10–30 cm. In the inventor's laboratory, the fiber has been allowed to freely fall and collect at the bottom of the coagulating bath container; however, other designs including drawing the fiber out of the coagulating bat are included as part of this invention. The extruded fiber may be post-processed and stored in a number of ways including freeze-dried, frozen, or oven dried and placed in a desecrator or freezer, depending upon recommended storage conditions of the loaded biomolecules and the properties of the gel or hydrogel.

Example 2

Extrusion of a Gel Coated Polymer Fiber

In another embodiment of the present invention, a PLLA or other biodegradable polymer fiber coated with a hydrogel is created. The extrusion process is similar to that described, except the coagulant bath used contains a coagulant or crosslinker for the hydrogel. The polymer and hydrogel are extruded through a spinneret similar to that previously described, with the polymer solution (possibly containing a drug in a dispersed aqueous or gel phase) extruded through the inner bore of the spinneret and the gel or hydrogel (possibly containing a drug) solution extruded through the outer annulus of the spinneret. The solutions are prepared as described or as otherwise known to those who practice the art, and are extruded at the same time through the spinneret. In the case of a dual lumen spinneret, the polymer solution is extruded without direct exposure to a coagulant. In this case, the polymer solvent must be removed by a post-processing step, or if there are no reasons to the contrary, the coagulating bath may contain a mixture of solvents, at least one of which miscible with both water and the polymer solvent; examples of which include isopropyl alcohol, acetone etc. This will allow the polymer solvent (typically chloroform or methylene chloride) to leave through the gel or hydrogel exterior layer being carried by the water miscible solvent. The coagulant bath also contains a solution known to those who practice the art that crosslinks or otherwise forms the gel or hydrogel. In the case of alginate hydrogel, the coagulant bath can be an appropriate concentration solution of $CaCl_2$ in water. As the polymer solution, and alginate solution flow from the spinneret, the alginate solution (which could contain $CaCO_3$ and GDL as noted above) contacts the coagulant and is crosslinked by calcium ions in the solution. If a polymer coagulant is used, solvent in the polymer/emulsion will diffuse into the coagulant and the polymer will form a fiber. If no coagulant is used, the polymer solution will be encapsulated by the rapidly crosslinking alginate solution such that an alginate shelled fiber will form. The residual solvent within the polymer can be removed by appropriate post-processing techniques.

Example 3

Extrusion of Gel or Hydrogel Exterior Hollow Fibers Using a Coagulant Bore Fluid

In one embodiment of the present invention, the following procedure is used to create gel or hydrogel exterior, hollow fibers. The apparatus includes a triple lumen spinneret, which also implies three pumps. The coagulant bath consists of a glass tube mounted vertically with one end immersed into reservoir of coagulant bath consists of a glass tube mounted vertically with one end immersed into a reservoir of coagulant fluid, and the other end sealed with a septum. Coagulant is drawn into the tube from the reservoir by piercing the septum with a needle and extracting the air in the tube with a large volume syringe. When filled, the syringe needle is removed and the septum seals the tube. As in example 2, the coagulant must include a means of gelling the exterior layer of gel or hydrogel. Again, in the case of alginate for example, a solution of calcium chloride may be appropriate. The gel or hydrogel solution flows through the outermost lumen, the biodegradable polymer through the inner lumen, and a coagulant for the polymer as defined above, flows through the innermost lumen. The fiber is drawn from the coagulation bath at a determined rate. In the laboratory, the inventors have used a cylinder attached to a modified variable-speed lathe that can accurately maintain its angular velocity. The drawn and extruded fiber is then removed from the cylinder and coagulant in the center of the fiber without collapsing the fiber. Residual coagulant and water are removed by freeze-drying, freezing or oven drying the fiber and placing it into a desecrator or freezer, depending upon recommended storage conditions.

Example 4

Extrusion of Hollow Fibers Using Water as a Bore Fluid (Water Bore Fiber)

In one embodiment of the present invention, the following procedure is used to create water-bored drug-released fibers. The apparatus is similar to that used in Example 1. This configuration allows for an annulus of polymer to flow through the spinneret, bored by a water-based fluid. First, a biodegradable polymer such as poly(L-lactic acid) (PLLA), poly(DL-lactic acid), polycaprolactone, poly(glycolic acid), polyanhydride, or copolymers or blends of these or other biodegradable polymers is dissolved in some appropriate solvent (A) at concentrations ranging from 5 to 30 wt % depending on the type of polymer, 10 wt % being preferred for PLLA at 200 kD molecular weight. In this embodiment, solvent (A) has low miscibility with water, and is very miscible with the coagulation bath solvent (B), but not with the water in the bore. The water does not function as a solvent or non-solvent in this application. Preferred choices of solvent (A) include chloroform and methylene chloride. Once the polymer is dissolved in the chosen solvent, a non-solvent is added to the polymer solution in an appropriate concentration to reduce the solvating power of the solvent system of the polymer, yet not bring the solution to its cloud point. This non-solvent (solvent C) is highly miscible with solvent (A), and with solvent (B). Typical choices include iso-octane, cyclohexane, and hexane. This non-solvent brings the polymer in the solution close to its point of coagulation, so that the solution will more quickly form a fiber when extruded into the coagulant bath.



The polymer solution is then extruded into a coagulating bath containing solvent (B), though a spinneret device such that the polymer flows around a center tube containing water and, if desired, a drug of choice either dissolved in the water, or encapsulated in nanospheres or liposomes and suspended in the water. The polymer solution is extruded into the coagulation bath through a dispensing tip ranging in size from 16 gage down to 27 gage, with the hypodermic tubing containing the water bore fluid appropriately sized to fit within the chosen dispensing tip. Any water-based fluid can be delivered through the center tube, provided this solution is immiscible with solvent (A). Solvent (B) must be highly miscible with solvents (A) and (C), and must be a non-solvent for the polymer; hexane and pentane are the most typical choices, but any solvent that is a non-solvent for the polymer and highly miscible with solvents (A) and (C) will work for this application, provided it quickly draws the solvent from the polymer solution. For example pentane is very miscible with chloroform and iso-octane, yet is a non-solvent for the polymer. Therefore, chloroform, iso-octane and pentane make a good solvent, non-solvent, and coagulating bath combination. Because solvent (A) is highly miscible with coagulating bath solvent (B), it freely diffuses from the polymer solution stream into the coagulating bath. The relative axial positions of the inner hypodermic tubing and the dispensing tip are adjusted to assure the annulus of polymer solution is exposed to the coagulant bath prior to the water bore contacting the polymer. The non-solvent incorporated into the polymer solution accelerates the precipitation process, such that a shell is formed in the polymer that entraps the bore solution. Neither solvent (A) nor (C) freely diffuse into the bore fluid, so only a single coagulant front is created as the polymer exits the spinneret. Additionally, the immiscibility of the solvents with the bore protects it and its contents. The coagulant bath used for this application consists of a 250 ml or greater flask into which the fiber is allowed to drop and spool as it coagulates. The height of the drop is important to the formation of the fiber, and is typically 10–30 cm. The extruded fiber is removed from the flask and either freeze-dried, frozen, or oven dried and placed in a desecrator or freezer, depending upon recommended storage conditions.

Example 5

Alternate Fabrication Technique for Example 1, for Hydrophilic Fiber

The only difference is to use as a coagulating bath a molecule such as poly(ethylene glycol) (PEG) of low molecular weight (in the range of 200 to 600 Daltons is typical). This polymer is miscible with chloroform and methylene chloride, yet a non-solvent for the polymer, such as PLLA. Therefore, it qualifies as a coagulation bath, however, this unique coagulating bath creates an interpenetrating network of PEG in the wall of the fiber, making them hydrophilic upon exposure to an aqueous environment. This can have interesting implications for implantation and may alter cellular response to the fibers.

Example 6

Neural Tissue Engineering

In this aspect of the present invention, parallel arrays of fibers are packed into tubes and loaded with neurotrophins for axonal growth. The tube may be a very large version of

a fiber of composition claimed in this invention, wherein the gel or hydrogel core may have a concentration of zero, or alternatively, be designed with an outer sheath of gel or hydrogel, with a multi-component inner core of gel or hydrogel with an intermediate layer consisting of biodegradable polymer. The innermost gel or hydrogel may have a concentration of zero, and the biodegradable polymer layer may be loaded with therapeutic agents either in a dispersed phase or directly mixed with the polymer. The exterior gel or hydrogel may also contain therapeutic agents as may the interior gel or hydrogel. Within the tube is a parallel array of fibers, whose composition may or may not be described by this invention or our prior invention. For this example, at least one component, either the tube, or at least one fiber must be of a composition as described in this invention. This array of fibers inside the tube is placed in severed peripheral or central nerves. The therapeutic agents may be loaded in a linear or some other appropriate gradient in every element of the device in which they are loaded (the exterior gel or hydrogel of the tube, the intermediate biodegradable polymer layer, or the innermost core of the tube, as well as the individual fibers within the tube in any and all possible constituents as described herein), but the gradient can differ in every occurrence within the device as desired. This device is implanted bridging the gap between the ends of the nerve stumps. As the device releases its therapeutic agents, which may consist of neurotrophins, anti-inflammatory agents, angiogenic factors, specific chemotactic or chemorepulsive agents etc., axons, vasculature, and other supporting cells and tissues begin to migrate across the lesion. Once the axons reach the distal end, guidance cues are provided by existing Schwann or glial cells and reconnections can then be made. It has been previously found that axons receive contact guidance by these fiber bundles and are able to traverse at least 1.8 cm in a rat sciatic nerve resection using non-loaded fibers. The optimal density of unloaded fibers in the tube is approximately 32 fibers in a 1.5 mm diameter tube for rat sciatic nerve growth.

Example 7

Preparation and use of Polymer Fiber Stents

In another embodiment, fibers can be loaded with a drug of interest and used in stents or other medical devices where mechanical strength is required. The stents can be woven in such a manner as to have loaded fibers intermingled with unloaded fibers if needed for mechanical properties.

Fibers can also be used in conjunction with commercially available stents to deliver drugs at the placement site. In this case, the fibers would not provide any mechanical support, but would only serve as a drug delivery reservoir.

Example 8

Preparation and use of Wound Dressings

In another embodiment, a gauze or dressing can be made from these fibers. This dressing can have two sides, an upper surface that will release molecules for re-epithelialization and provide a substrate for these cells. The bottom surface will promote regeneration of dermal tissue. This dressing is designed for dermal wound healing, including burns, full thickness dermal wounds and chronic or non-healing wounds and sores. Each fiber can have multi-component, multi-layer configuration to provide temporal release of drugs or factors that roughly correspond to the three phases of dermal wound healing.

As one example, in the case of a dressing designed for trauma patients, the first chemical to be released could be a pro-coagulant to help stop the bleeding. The next layer could then release cytokines to help recruit neutrophils and macrophages for the next phase of wound healing. Finally, a release of factors to help with reducing excessive scar tissue and to inhibit contractions, which are particularly disabling to burn patients.

Example 9

Fabrication of Artificial Arteries

It may be possible to construct an artificial artery using techniques described herein. A series of hollow, concentric cylindrical sections can be knitted, woven, braided or fabricated using non-woven technology with fibers loaded with various biological agents. The innermost cylinder is preferably tightly woven and contains drugs or agents to promote migrating, spreading and functioning of an intact endothelial cell layer. The next cylinder is composed of a woven or knitted architecture with fibers predominately circumferentially wound around the inner cylinder. This layer will induce the migration and proliferation of smooth muscle fibers, and promote the expression of elastin to create the internal elastic media. The next cylinder is composed of knitted or non-woven fibers and will contain drugs to promote the ingrowth of fibroblasts, macrophages and the creation of extracellular matrix. The last layer will compose longitudinal fibers that will promote the vascularization of the arterial cells via an artificial vasa vasorum, created by VEGF releasing fibers, or other promoters of angiogenesis.

Example 10

Drug Delivery Scaffold

In another application embodiment, these fibers can be used for drug delivery scaffolds in places where a fiber format is appropriate. For example, inside the eye, where microspheres or other formats may be more likely to interfere with the subject's vision, a fiber could be tacked down and not float into the field of view. Fibers may be able to stay in place better than microspheres or other formats such as nanoparticles, hydrogels, etc.

Example 11

Directed in situ Angiogenesis

In this embodiment, one or more fibers containing one or more of the family of angiogenic factors such as VEGF, bFGF, angiotensin or others known to induce angiogenesis are placed into the body along the path where the directed angiogenesis is desired. As the fiber begins to release the angiogenic factors endothelial cells from the surrounding vasculature will be induced to migrate out towards the fiber(s) following a process similar to normal angiogenesis. The fiber(s) used may have one or more of the compositions described in this invention, or it may be a tube with VEGF or similar growth factor that is chemotactic for endothelial cells on the inside, and a different factor for smooth muscles on the outside. In this way, the size of the created vessel may be determined. In this application, cells are guided into initially cell-free scaffoldings by cell-specific growth factors.

Example 12

Bone Fracture Healing

In another wound healing embodiment, proteins known to enhance bone fracture healing are loaded into a fiber. This fiber can then be wrapped around the bone at the site of the fracture, releasing the growth factors and enhancing the rate of fracture repair.

These fibers can either be in a helical structure (single or multiple helix), or they may be woven into a loose, open weave. Either in the helical or in the woven format, the fibers are placed around the bone fragments, holding them in place while releasing their growth factors.

In the case of a non-healing fracture that is due to lost or poor blood supply to the fracture site, a fiber or set of fibers containing VEGF or its equivalent may be used to enhance blood supply to the fractured area.

In this embodiment, bone fractures may be healed at accelerated rates compared to non-treated fractures, and non-unions may be healed in certain cases.

In yet a third bone healing application, fibers releasing pain relieving drugs may be used in the local area of the fracture. In this case, the fiber may be used in cases where plates, screws or other orthopedic devices are implanted or other surgical manipulations of the bone are performed. The local pain relief may lead the patient to apply load to the fracture sooner and may lead to a stronger and more rapid mend, as well as making life more comfortable for the patient.

Example 13

Skin Ulcer Healing

Similar to example 8 which described one form of dermal wound healing, another important example of this technology is the potential of healing chronic skin ulcers of various origins, such as diabetic foot ulcers, venous ulcers and general pressure sores. These conditions, and potentially other similar conditions may be healed based on creating a non-woven mesh of fibers that release factors known to accelerate dermal wound healing, for example, platelet derived growth factor (PDGF), transforming growth factor-beta (TGF-beta), and VEGF or similar protein. This non-woven mesh can be inserted or packed directly into the ulcer or wound, where these growth factors can help accelerate the wound-healing process. These dressings can be designed for healing dermal sores and ulcers. In this case, there is little need to reduce bleeding; rather one of the biggest needs of these patients, particularly those with diabetic ulcers is lack of blood supply to the wound site. Therefore, factors that induce angiogenesis may be able to increase circulation and help to rejuvenate the tissue at the site of the sore or ulcer.

Each dressing can be designed for the particular needs of the various types of wounds or sores by altering the biomolecules that are released, and the kinetics at which they are released.

Example 14

Muscle Grafts

In another embodiment, parallel arrays of fibers may be loaded with muscle stem cells. These stem cells can be of cardiac, smooth or skeletal muscle origin. Once these muscle stem cells are seeded onto the fiber array, the fibers



can be mechanically stretched in vitro to help these cells align and differentiate properly. Alignment may also-be achieved by using fibers of very small diameter. Our experience with axons indicates that with fibers on the order of 50 μm diameter tend to help cells align parallel to the axis of the fibers. Other fibers in this bundle can release angiogenic factors to create a vascular supply for the muscle cells. In the case of skeletal or smooth muscle tissue, fibers for nerve growth can also be included to induce the formation of neuromuscular junctions. Various experimental conditions used to harvest, isolate, reproduce and differentiate these stem cells are known to those skilled in the art, and is not a part of this patent.

Example 15

Treatment of Glaucoma

Similar to drug delivery in the eye, described in example 10, and the neural stent described briefly in example 6, glaucoma may be treated by combining an intraocular drug delivery with a neural treatment applied to the optic nerve. Retinal ganglion cells undergo apoptosis leading to death of the axons of the optic nerve. It is hypothesized that if the cells could be supported both within the eye as well as along the path of the optic nerve, the cells may be able to survive. A fiber bundle that releases growth factors such as NT-4, BDNF, CNTF, may be applied topically to the exterior of the optic nerve. Simultaneously, fibers that release apoptosis inhibitors, or factors to support the retinal ganglion cells are implanted within the eye. This combined effort may prolong or save the sight of those suffering from glaucoma.

As is seen from the preceding examples, other tissues, organs, or structures are possible to weave once the basic physiologic structure is understood. This can be extended to organs of the digestive system, musculoskeletal system, urological system, circulatory system, and nervous system.

Example 16

Creation of a Gel or Hydrogel Core in a Biodegradable Polymer Sheath that Contains a Dispersed Aqueous Phase

In another embodiment of the invention, gel bored fibers may also contain therapeutic agents in a dispersed aqueous, gel or hydrogel phase within the biodegradable polymer fiber wall. The apparatus and extrusion conditions are similar to example 1 except as noted here.

Once the polymer is dissolved in solvent (A), an aqueous solution or a gel or a hydrogel (including precursors) containing both the biomolecules(s) of interest and a surfactant is added to the polymer solution. Additionally, a surfactant can be added to solvent (A). The concentration of the aqueous phase is typically in the range of 1 to 70% v/v of the polymer solution, 4–20% being most typical for gel or hydrogel filled PLLA fibers. The surfactant can be one or a combination of substances familiar to those skilled in the art, such as bovine serum albumin (BSA), poly(vinyl alcohol), pluronics, or biological surfactants such as the family of phospholipids. Other surfactants not specifically mentioned here, but known to those skilled in the art are included by extension. In a typical use, BSA is used as the surfactant at concentrations ranging from about 10 fold to 100 fold higher than the biological molecule of interest, with typical concentrations ranging from 2 wt % to 50 wt % of the aqueous phase. Note that the inventors experience has demonstrated

that high protein concentrations are difficult in the case of a gel or hydrogel, and therefore, the surfactant of choice may depend on the type of the dispersed phase.

Using some form of mechanical energy such as sonication, vortexing, or shear forces generated by forcing the liquid through a small orifice, a water-in-oil type emulsion is formed between the aqueous and organic phases. Depending on the volume of aqueous solution relative to the polymer solution, emulsification can be accomplished in stages, using partial additions of the aqueous phase until the total volume is incorporated into the polymer solution. This emulsion must be stable for periods far in excess of time required for extrusion to insure homogeneity of the emulsion throughout the extrusion process. The size of the dispersed aqueous phase droplets is primarily dependent on the quality of the surfactant, and the total amount of mechanical energy imparted to the system in forming the emulsion. The aqueous phase size is an important variable in both release kinetics and mechanical properties of the fiber. This emulsion is then used as the polymer solution, and all other details are the same as explained in example 1.

### Example 17

#### Creation of a Gel or Hydrogel Exterior Fiber with a Biodegradable Polymer Fiber Core Containing a Dispersed Aqueous, Gel, or Hydrogel Phase Within the Fiber Wall

This example is similar to example 2 in all details except that a dispersed phase is added to the polymer solution as described in example 16.

### Example 18

#### Creation of a Gel or Hydrogel Exterior Hollow Fiber with a Dispersed Gel or Hydrogel Phase Within the Fiber Wall

This example is similar to example 3 in all details except that a dispersed phase is added to the polymer solution as described in example 16.

### Example 19

#### Creation of a Water-bore Fiber with a Dispersed Aqueous, Gel or Hydrogel Phase Within the Wall of the Fiber

This example is similar to example 4 in all details except that a dispersed phase is added to the polymer solution as described in example 16.

All of the compositions and methods disclosed and claimed herein can be made and executed without undue experimentation in light of the present disclosure. While the compositions and methods of this invention have been described in terms of preferred embodiments, it will be apparent to those of skill in the art that variations may be applied to the compositions and methods and in the steps or in the sequence of steps of the method described herein without departing from the concept, spirit and scope of the invention. More specifically, it will be apparent that certain agents which are both chemically and physiologically related may be substituted for the agents described herein while the same or similar results would be achieved. All such similar substitutes and modifications apparent to those skilled in the art are deemed to be within the spirit, scope and concept of the invention as defined by the appended claims.

## REFERENCES

The following references, to the extent that they provide exemplary procedural or other details supplementary to those set forth herein, are specifically incorporated herein by reference.

Aigner, Tegeler, Hutzler, Campoccia, Pavesio, Hammer, Kastenbauer, Naumann, "Cartilage tissue engineering with novel nonwoven structured biomaterial based on hyaluronic acid benzyl ester," *J. of Biomed. Materials Res.*, 42(2): 172–81, 1998.

Auerbach and Auerbach, "Angiogenesis inhibition: a review," *Pharmac. Ther.*, 63:265, 1994.

Breitbart, Grande, Kessler, Ryaby, Fitzsimmons, Grant, "Tissue engineered bone repair of calvarial defects using cultured periosteal cells," *Plastic & Reconstructive Surgery*, 101(3):567–74, 1998.

Cao, Rodriguez, Vacanti, Ibarra, Arevalo, Vacanti, "Comparative study of the use of poly(glycolic acid), calcium alginate and pluronics in the engineering of autologous porcine cartilage," *J. of Biomaterials Sci., Polymer Edition*, 9(5):475–87, 1998.

Dillon, Yu, Sridharan, Ranieri, Bellamkonda, "The influence of physical structure and charge on neurite extension in a 3D hydrogel scaffold," *J. of Biomaterials Sci., Polymer Ed.*, 9(10):1049–69, 1998.

Elcin, Dixit, Lewin, Gitnick, "Xenotransplantation of fetal porcine hepatocytes in rats using a tissue engineering approach," *Artificial Organs*, 23(2):146–52, 1999.

Fauza, Fishman, Mehegan, Atala, "Videofetoscopically assisted fetal tissue engineering: skin replacement," *J. of Pediatric Surgery*, 33(2):357–61, 1998.

Fidler and Ellis, "The implications of angiogenesis for the biology and therapy of cancer metastasis," *Cell*, 79:185, 1994.

Folkman and Klagsbrun, "Angiogenic factors," *Science*, 235:442–447, 1987.

Folkman, "How is blood vessel growth regulated in normal and neoplastic tissue," *Cancer Res.*, 46:467, 1986.

Folkman, J., "Angiogenesis in cancer, vascular, rheumatoid and other disease," *Nature Med.*, 1:27, 1995.

Grande, Halberstadt, Naughton, Schwartz, Manji, "Evaluation of matrix scaffolds for tissue engineering of articular cartilage grafts," *J. of Biomed. Mat. Res.*, 34(2):211–20, 1997.

Gutsche, Lo, Zurlo, Yager, Leong, "Engineering of a sugar-derivatized porous network for hepatocyte culture," *Biomaterials*, 17(3):387–93, 1996.

Hoerstrup, Zund, Lachat, Schoeberlein, Uhlschmid, Vogt, Turina, "Tissue engineering: a new approach in cardiovascular surgery-seeding of human fibroblasts on resorbable mesh," *Swiss Surgery*, (Suppl.), 2:23–5, 1998.

Hoerstrup, Zund, Schoeberlein, Ye, Vogt, Turina, "Fluorescence activated cell sorting: a reliable method in tissue engineering of a bioprosthetic heart valve," *Annals of Thoracic Surgery*, 665(5):1653–7, 1998.

Isogai, Landis, Kim, Gerstenfeld, Upton, Vacanti, "Formation of phalanges and small joints by tissue-engineering," *J. of Bone & Joint Surgery, American Vol.*, 81(3):306–16, 1999.

Martin, Padera, Vunjak-Novakovic, Freed, "In vitro differentiation of chick embryo bone marrow stromal cells into cartilaginous and bone-like tissues," *J. of Orthopaedic Res.*, 16(2):181–9, 1998.

Nagy et al., "Pathogenesis of ascites tumor growth: vascular permeability factor, vascular hyperpermeability, and ascites fluid accumulation." *Cancer Res.*, 55:360, 1995.

Peppas and Langer, "New challenges in biomaterials," Science, 263:1715–1720, 1994.

Peter, Miller, Yasko, Yaszemski, Mikos, "Polymer concepts in tissue engineering," *J. of Biomed. Materials Res.*, 43(4):422–7, 1998.

Sacks, Chuong, Petroll, Kwan, Halberstadt, "Collagen fiber architecture of a cultured dermal tissue," *J. of Biomed. Engineering*, 119(1):124–7, 1997.

Sambrook et al., *Molecular Cloning: A Laboratory Manual*, Cold Spring Harbor Laboratory Press, Cold Spring Harbor, N.Y., 1989.

Shinoka, Shum-Tim, Ma, Tanel, Isogai, Langer, Vacanti, Mayer, "Creation of viable pulmonary artery autografts through tissue engineering," *J. of Thoracic & Cardiovascular Surgery*, 115(3):536–45, 1998.

Sims, Butler, Cao, Casanova, Randolph, Black, Vacanti, Yaremchuk, "Tissue engineered neocartilage using plasma derived polymer substrates and chondrocytes," *Plastic & Reconstructive Surgery*, 101(6):1580–5, 1998.

Vunjak-Novakovic, Obradovic, Martin, Bursac, Langer, Freed, "Dynamic cell seeding of polymer scaffolds for cartilage tissue engineering," *Biotechnology Progress*, 14(2):193–202, 1998.

Whang, Tsai, Nam, Aitken, Sprague, Patel, Healy, "Ectopic bone formation via rhBMP-2 delivery from porous bioabsorbably polymer scaffolds," *J. of Biomed. Materials Res.*, 42(4):491–9, 1998.

Wong and Mooney, "Synthesis and properties of biodegradable polymers used in tissue engineering," *In: Synthetic Biodegradable Polymer Scaffolds*, (Atala and Mooney, eds.), Birkhauser Press, Boston, Mass., pp. 51–82, 1997.

Yoo and Atala, "A novel gene delivery system using urothelial tissue engineered neoorgans," *J. of Urology*, 158(3 Pt 2):1066–70, 1997.

What is claimed is:

1. A drug delivery composition comprising at least one fiber having a bore and a wall, wherein said fiber comprises a first component and a second component, and wherein said first component is a biodegradable polymer and said second component is selected from the group consisting of a gel and a hydrogel.

2. The composition of claim 1 wherein said first component is present in the fiber bore and said second component is present in the fiber wall.

3. The composition of claim 1 wherein said second component is present in the fiber bore and said first component is present in the fiber wall.

4. The composition of claim 1 further comprising at least one additional fiber, wherein said additional fiber circumscribes an adjacent inner fiber.

5. The composition of claim 4 wherein said adjacent inner fiber is approximately centered within the outer fiber.

6. The composition of claim 1, wherein a therapeutic agent is loaded into the gel or hydrogel.

7. The composition of claim 6, wherein the therapeutic agent is a growth factor.

8. The composition of claim 7, wherein said growth factor is a promoter of angiogenesis.

9. The composition of claim 7, wherein said growth factor promotes nerve regeneration.

10. The composition of claim 6, wherein the therapeutic agent is a virus.

11. The composition of claim 6, wherein the therapeutic agent is selected from the group consisting of protein, enzymes, transcription factors, signaling molecules, internal messengers, second messengers, kinases, proteases, cytokines, chemokines, structural proteins, interleukins, hormones, anti-coagulants, pro-coagulants, anti-inflammatory agents, antibiotics, agents that promote angiogenesis, agents that inhibit angiogenesis, growth factors, immunomodulators, chemotactic agents, agents that promote apoptosis, agents that inhibit apoptosis, and mitogenic agents.

12. The composition of claim 1, wherein said gel or hydrogel is a precursor gel or precursor hydrogel.

13. The composition of claim 1, wherein said biodegradable polymer fiber comprises a hydrophobic drug.

14. The composition of claim 1, wherein said gel or hydrogel comprises a radioactive material.

15. A drug delivery composition comprising a fiber, wherein said fiber comprises a first component and a second component, and wherein said first component is a biodegradable polymer and said second component is water, and further wherein said water is present as an inner core.

16. The composition of claim 15 further comprising at least one additional fiber, wherein said additional fiber circumscribes an adjacent inner fiber.

17. The composition of claim 16 wherein said adjacent inner fiber is approximately centered within the outer fiber.

18. The composition of claim 15, wherein said biodegradable polymer fiber comprises a hydrophobic drug.

19. A drug delivery composition comprising a fiber, wherein said fiber comprises an emulsion consisting essentially of a gel or hydrogel.

20. A drug delivery composition comprising a fiber, wherein said fiber comprises a first component, and wherein said first component is a gel or hydrogel and further wherein said fiber comprises a hollow bore.

21. A scaffold composition comprising one or more fibers, wherein said fibers comprise a first component and a second component and wherein said first component is a biodegradable polymer and said second component is selected from the group consisting of a gel and a hydrogel.

22. The composition of claim 21 wherein said first component is present in the fiber bore and said second component is present in the fiber wall.

23. The composition of claim 21 wherein said second component is present in the fiber bore and said first component is present in the fiber wall.

24. The composition of claim 21 further comprising at least one additional fiber, wherein said additional fiber circumscribes an adjacent inner fiber.

25. The composition of claim 24 wherein said adjacent inner fiber is approximately centered within the outer fiber.

26. The composition of claim 21, wherein therapeutic agent is loaded into the gel or hydrogel.

27. The composition of claim 26, wherein the therapeutic agent is a growth factor.

28. The composition of claim 27, wherein said growth factor is a promoter of angiogenesis.

29. The composition of claim 27, wherein said growth factor promotes nerve regeneration.

30. The composition of claim 26, wherein the therapeutic agent is a virus.

31. The composition of claim 26, wherein the therapeutic agent is selected from the group consisting of protein, enzymes, transcription factors, signaling molecules, internal

messengers, second messengers, kinases, proteases, cytokines, chemokines, structural proteins, interleukins, hormones, anti-coagulants, pro-coagulant, anti-inflammatory agents, antibiotics, agents that promote angiogenesis, agents that inhibit angiogenesis, growth factors, immunomodulators, chemotactic agents, agents that promote apoptosis, agents that inhibit apoptosis, and mitogenic agents.

**32**. The composition of claim **21**, wherein said gel or hydrogel is a precursor gel or precursor hydrogel.

**33**. The composition of claim **21**, wherein said biodegradable polymer fiber comprises a hydrophobic drug.

**34**. The composition of claim **21**, wherein said gel or hydrogel comprises a radioactive material.

* * * * *

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM; and TISSUEGEN, INC., *Plaintiffs,* *v.* BOSTON SCIENTIFIC CORP., *Defendant.* | CASE NO. 1:17-cv-01103 JURY TRIAL DEMANDED |

**PLAINTIFFS' ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT**

1. Plaintiffs BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM ("UT") and TISSUEGEN, INC. ("TissueGen") (collectively, "Plaintiffs"), by and through their undersigned counsel, file this Original Complaint against Defendant BOSTON SCIENTIFIC CORPORATION ("Boston Scientific" or "Defendant") as follows:

## I. THE PARTIES

2. UT is an agency of the State of Texas and is the assignee and owner of patents relating to drug-releasing biodegradable fibers used in the delivery of therapeutics, including U.S. Patent Nos. 6,596,296 (the "'296 Patent") and 7,033,603 (the "'603 Patent"). UT has its principal place of business at 201 West 7th Street, Austin, Texas 78701. For the avoidance of doubt, UT neither waives its sovereign immunity nor consents to any suit or proceeding filed separate from this action, including but not limited to any declaratory judgment action or *inter partes* review.

3. TissueGen is the developer of ELUTE® fiber and the exclusive licensee of the

'296 Patent and '603 Patent. ELUTE® fiber is a groundbreaking biodegradable fiber format for advanced drug delivery, nerve regeneration, and tissue engineering. TissueGen was established in 2000 by Dr. Kevin Nelson, while still faculty in Biomedical Engineering at The University of Texas at Arlington, following his research with Dr. George Smith at UT Southwestern Medical Center at Dallas. TissueGen is a Delaware corporation with a principal place of business at 2110 Research Row, Suite 330, Dallas, Texas 75235.

4. Defendant BOSTON SCIENTIFIC CORPORATION ("Boston Scientific") is a Delaware corporation with a principal place of business at 300 Boston Scientific Way, Marlborough, Massachusetts 01752 and may be served through its registered agent, Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701, or wherever else it may be found.

## II. JURISDICTION AND VENUE

5. This action arises under the patent laws of the United States, 35 U.S.C. § 1 *et seq.* This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

6. UT is an arm of the State of Texas, and has sovereign immunity. *See* TEX. EDUC. CODE § 61.003; TEX. GOV'T CODE § 441.101(3); *Tegic Comm'ns, Corp. v. Board of Regents of Univ. of Tex. Sys.*, 458 F.3d 1335, 1344-45 (Fed. Cir. 2006); *Xechem Int'l, Inc. v. Univ. of Tex. M.D. Anderson Cancer Ctr.*, 382 F.3d 1324, 1327-28 (Fed. Cir. 2004); *Northern Ins. Co. of N.Y. v. Chatham Cty., Ga.*, 547 U.S. 189, 193 (2006).

7. Venue is proper in the Western District of Texas because UT has sovereign immunity and this Court has personal jurisdiction over Defendant.

8. This Court has personal jurisdiction over Boston Scientific. Defendant has conducted and does conduct business within the State of Texas and the Western District of

Texas. Defendant is registered to conduct business in Texas with the Texas Secretary of State. Defendant has purposefully and voluntarily availed itself of the privileges of conducting business in the United States, the State of Texas, and the Western District of Texas by continuously and systematically placing goods into the stream of commerce through an established distribution channel with the expectation that they will be purchased by consumers in Texas and this District. Upon information and belief, Boston Scientific employs sales representatives in this District and/or has an agency relationship with sales representatives to promote sales of its products in this District.

9. Plaintiffs' causes of action arise directly from Defendant's business contacts and other activities in the State of Texas and this District. Upon information and belief, Defendant has committed acts of infringement in this District giving rise to this action and does business in this District, making sales and/or providing service and support for its customers, in this District. Defendant purposefully and voluntarily sold one or more of its infringing products with the expectation that they would be purchased by consumers in this District. These infringing products have been and continue to be purchased by consumers in this District. Defendant has committed acts of patent infringement within the United States, the State of Texas, and the Western District of Texas.

10. Venue is proper in the Western District of Texas because UT is an arm of the State of Texas, has the same sovereign immunity as the State of Texas, it would offend the dignity of the State to require it to pursue persons who have harmed the State outside the territory of Texas, and the State of Texas cannot be compelled to respond to any counterclaims, whether compulsory or not, outside its territory due to the Eleventh Amendment.

## III. TISSUEGEN'S FOUNDATION

11. In the late 1990s, TissueGen's founder Dr. Kevin D. Nelson, while still faculty in Biomedical Engineering at The University of Texas at Arlington, was inspired to investigate delivering drugs directly from an extruded fiber while working to develop biodegradable vascular stents and microspheres for delivering non-toxic drugs to the inner ear.

12. Dr. Nelson's early work was followed by collaborations with Dr. George Smith at UT Southwestern Medical Center at Dallas, a leading researcher working on peripheral nerve regeneration, as well as Dr. Nadir Alikacem at the Callier Center, Texas Woman's University.

13. Working in peripheral nerve regeneration, Dr. Nelson and Dr. Smith showed fascicle formation in regenerated nerves with the aid of fibers, convincing Dr. Nelson that the fiber-based drug delivery technology had commercial viability.

14. The peripheral nerve regeneration work was the culmination of a long line of extremely successful experiments that demonstrated the benefit of drug delivery fibers in numerous applications.

15. With Dr. Alikacem, for example, Dr. Nelson demonstrated the ability to load a small pharmaceutical agent into a fiber to help stem the blindness that results from diabetes.

16. In 2000, Dr. Nelson embarked upon the path to commercialization by founding TissueGen, Inc. Dr. Nelson's work led to several issued patents, ultimately assigned to UT and licensed exclusively to TissueGen, including the '296 Patent and the '603 Patent.

17. Following relentless development efforts spanning more than a decade,

TissueGen has brought the scientific promise of implantable drug delivery via biodegradable fibers to commercial reality.

18. In 2013, TissueGen commercially released ELUTE® fiber, a groundbreaking biodegradable fiber format for advanced drug delivery, nerve regeneration, and tissue engineering.

19. ELUTE® fiber may directly replace standard fibers used in medical devices, including, but not limited to, biodegradable textiles currently on the market, and provide significantly improved clinical outcomes by delivering therapeutic agents directly at the site of the implant.

20. By delivering therapeutic agents including, but not limited to, pharmaceuticals and growth factors at the topical application or implant site, ELUTE® fiber may enable medical devices, including but not limited to cardiovascular stents, to aid the body's healing and regenerative processes.

## IV. COUNT I: INFRINGEMENT OF U.S. PATENT NO. 6,596,296 B1

21. Plaintiffs repeat and re-allege every allegation of the prior paragraphs as though set forth fully herein.

22. On July 22, 2003, U.S. Patent No. 6,596,296 B1 (the "'296 Patent")—titled "Drug Releasing Biodegradable Fiber Implant"—was duly and legally issued by the United States Patent and Trademark Office to Board of Regents, The University of Texas System, as assignee of named inventors Kevin D. Nelson, Andres A. Romero-Sanchez, George M. Smith, Nadir Alikacem, Delia Radulescu, Paula Waggoner, and Zhibing Hu. A true and correct copy of the '296 Patent is attached hereto as **Exhibit A**.

23. UT is the owner of all right, title, and interest in and to the '296 Patent and has granted TissueGen an exclusive license "to manufacture, have manufactured, use, have

used, and/or Sell or have Sold" products including inventions and discoveries covered by the '296 Patent and "to otherwise exploit" UT's rights in information or discoveries covered by the '296 Patent.

24. The '296 Patent is directed to useful and novel compositions that provide for three-dimensional matrices for in vitro and in vivo use comprised of biodegradable polymer fibers capable of the controlled delivery of therapeutic agents.

25. Each claim of the '296 Patent is valid and enforceable and enjoys a statutory presumption of validity separate, apart, and in addition to the statutory presumption of validity enjoyed by every other of its claims. 35 U.S.C. § 282.

26. Upon information and belief, Defendant has been, and is currently, directly and/or indirectly infringing one or more claims of the '296 Patent in violation of 35 U.S.C. § 271, including as stated below.

27. Upon information and belief, Defendant has directly infringed, literally and/or under the doctrine of equivalents, and will continue to directly infringe claims of the '296 Patent by making, using, selling, offering to sell, and/or importing into the United States products that embody or practice the apparatus and/or method covered by one or more claims of the '296 Patent, including but not limited to the following products: Defendant's SYNERGY™ Everolimus-Eluting Platinum Chromium Coronary Stent System (Monorail™ Catheter), including the following products: H7493926008220, H7493926012220, H7493926016220, H7493926020220, H7493926024220, H7493926028220, H7493926032220, H7493926038220, H7493926008250, H7493926012250, H7493926016250, H7493926020250, H7493926024250, H7493926028250, H7493926032250, H7493926038250, H7493926008270,

H7493926012270, H7493926016270, H7493926020270, H7493926024270, H7493926028270, H7493926032270, H7493926038270, H7493926008300, H7493926012300, H7493926016300, H7493926020300, H7493926024300, H7493926028300, H7493926032300, H7493926038300, H7493926008350, H7493926012350, H7493926016350, H7493926020350, H7493926024350, H7493926028350, H7493926032350, H7493926038350, H7493926008400, H7493926012400, H7493926016400, H7493926020400, H7493926024400, H7493926028400, H7493926032400, H7493926038400 and any other products offered and/or sold under the SYNERGY™ Everolimus-Eluting Platinum Chromium Coronary Stent System (Monorail™ Catheter) name (the "Monorail™ Catheter Products"); Defendant's SYNERGY™ Everolimus-Eluting Platinum Chromium Coronary Stent System (Over-The-Wire), including the following products: H7493926108220, H7493926112220, H7493926116220, H7493926120220, H7493926124220, H7493926128220, H7493926132220, H7493926138220, H7493926108250, H7493926112250, H7493926116250, H7493926120250, H7493926124250, H7493926128250, H7493926132250, H7493926138250, H7493926108270, H7493926112270, H7493926116270, H7493926120270, H7493926124270, H7493926128270, H7493926132270, H7493926138270, H7493926108300, H7493926112300, H7493926116300, H7493926120300, H7493926124300, H7493926128300, H7493926132300, H7493926138300, H7493926108350, H7493926112350, H7493926116350, H7493926120350, H7493926124350, H7493926128350, H7493926132350, H7493926138350, H7493926108400, H7493926112400, H7493926116400, H7493926120400, H7493926124400,

H7493926128400, H7493926132400, H7493926138400 and any other products offered and/or sold under the SYNERGY™ Everolimus-Eluting Platinum Chromium Coronary Stent System (Over-the-Wire Catheter) name (the "SYNERGY™ Over-The-Wire Products"); and Defendant's products within the scope of FDA PMA Number P150003 (the "P150003 Products") (collectively, the "'296 Accused Products").

28. On information and belief, Defendant indirectly infringes the '296 Patent by inducing others to infringe one or more claims of the '296 Patent through sale and/or use of the '296 Accused Products. On information and belief, at least as a result of the filing of this action, Defendant is aware of the '296 Patent; is aware that its actions with regards to distributors, resellers, and/or end users of the '296 Accused Products would induce infringement; and despite such awareness will continue to take active steps—such as creating and disseminating the '296 Accused Products and product manuals, instructions, promotional and marketing materials, and/or technical materials to distributors, resellers, and end users—encouraging others to infringe the '296 Patent with the specific intent to induce such infringement.

29. Plaintiffs adopt, and incorporate by reference, as if fully stated herein, the attached claim chart for claim 1 of the '296 Patent, which is attached hereto as **Exhibit B**. The claim chart describes and demonstrates how Defendant infringes the '296 Patent. In addition, Plaintiffs allege that Defendant infringes one or more additional claims of the '296 Patent in a similar manner.

**A. MONORAIL™ CATHETER PRODUCTS**

30. At least one of the Monorail™ Catheter Products includes a biodegradable polymer fiber. For example, at least one of the Monorail™ Catheter Products is composed of bioabsorbable polymer.

31. The biodegradable polymer fiber included in at least one of the Monorail™ Catheter Products comprises a first phase and a second phase. For example, the biodegradable polymer fiber included in at least one of the Monorail™ Catheter Products comprises polymer structure and structure containing pharmacological agents.

32. The first phase and the second phase comprising the biodegradable polymer fiber included in at least one of the Monorail™ Catheter Products are immiscible. For example, the polymer structure and the structure containing pharmacological agents comprising the biodegradable polymer fiber included in at least one of the Monorail™ Catheter Products are immiscible.

33. The second phase comprising the biodegradable polymer fiber included in at least one of the Monorail™ Catheter Products includes at least one therapeutic agent. For example, at least one therapeutic agent (e.g., everolimus) is included in the structure containing pharmacological agents comprising the biodegradable polymer fiber included in at least one of the Monorail™ Catheter Products.

34. The second phase comprising the biodegradable polymer fiber included in at least one of the Monorail™ Catheter Products is derived from an aqueous solution, a hydrogel, or a polymer.

35. The therapeutic agent included in the second phase comprising the biodegradable polymer fiber included in at least one of the Monorail™ Catheter Products is a drug, a protein, an enzyme, a growth factor, an immunomodulator, a compound promoting angiogenesis, a compound inhibiting angiogenesis, an anti-inflammatory compound, an antibiotic, a cytokine, an anti-coagulation agent, a pro-coagulation agent, a chemotactic agent, an agent to promote apoptosis, an agent to inhibit apoptosis, or a

mitogenic agent. For example, one or more antimicrobial agents are included in the structure containing pharmacological agents comprising the biodegradable polymer fiber included in at least one of the Monorail™ Catheter Products.

36. The biodegradable polymer fiber included in at least one of the Monorail™ Catheter Products is a single polymer, a co-polymer, or a mixture of polymers.

37. The biodegradable polymer fiber included in at least one of the Monorail™ Catheter Products is a single polymer, a co-polymer, or a mixture of polymers selected from the group consisting of polypeptides, polydepsipeptides, nylon copolyamides, aliphatic polyesters, polydihydropyrans, polyphosphazenes, poly(ortho ester), poly(cyano acrylates), polyanhydride, modified polysaccharides and modified proteins.

38. The biodegradable polymer fiber included in at least one of the Monorail™ Catheter Products includes aliphatic polyesters selected from the group consisting of poly(glycolic acid), poly(lactic acid), poly(alkylene succinates) poly(hydroxybutyrate), poly(butylene diglycolate), poly(epsilon-caprolactone) and copolymers, blends and mixtures thereof.

39. The therapeutic agent included the biodegradable polymer fiber included in at least one of the Monorail™ Catheter Products is released over time from said fiber.

## B. SYNERGY™ Over-The-Wire Products

40. At least one of the SYNERGY™ Over-The-Wire Products includes a biodegradable polymer fiber. For example, at least one of the SYNERGY™ Over-The-Wire Products is composed of bioabsorbable polymer.

41. The biodegradable polymer fiber included in at least one of the SYNERGY™ Over-The-Wire Products comprises a first phase and a second phase. For example, the biodegradable polymer fiber included in at least one of the SYNERGY™ Over-The-Wire

Products comprises polymer structure and structure containing pharmacological agents.

42. The first phase and the second phase comprising the biodegradable polymer fiber included in at least one of the SYNERGY™ Over-The-Wire Products are immiscible. For example, the polymer structure and the structure containing pharmacological agents comprising the biodegradable polymer fiber included in at least one of the SYNERGY™ Over-The-Wire Products are immiscible.

43. The second phase comprising the biodegradable polymer fiber included in at least one of the SYNERGY™ Over-The-Wire Products includes at least one therapeutic agent. For example, at least one therapeutic agent (e.g., everolimus) is included in the structure containing pharmacological agents comprising the biodegradable polymer fiber included in at least one of the SYNERGY™ Over-The-Wire Products.

44. The second phase comprising the biodegradable polymer fiber included in at least one of the SYNERGY™ Over-The-Wire Products is derived from an aqueous solution, a hydrogel, or a polymer.

45. The therapeutic agent included in the second phase comprising the biodegradable polymer fiber included in at least one of the SYNERGY™ Over-The-Wire Products is a drug, a protein, an enzyme, a growth factor, an immunomodulator, a compound promoting angiogenesis, a compound inhibiting angiogenesis, an anti-inflammatory compound, an antibiotic, a cytokine, an anti-coagulation agent, a pro-coagulation agent, a chemotactic agent, an agent to promote apoptosis, an agent to inhibit apoptosis, or a mitogenic agent. For example, one or more antimicrobial agents are included in the structure containing pharmacological agents comprising the biodegradable polymer fiber included in at least one of the SYNERGY™ Over-The-Wire Products.

46. The biodegradable polymer fiber included in at least one of the SYNERGY™ Over-The-Wire Products is a single polymer, a co-polymer, or a mixture of polymers.

47. The biodegradable polymer fiber included in at least one of the SYNERGY™ Over-The-Wire Products is a single polymer, a co-polymer, or a mixture of polymers selected from the group consisting of polypeptides, polydepsipeptides, nylon copolyamides, aliphatic polyesters, polydihydropyrans, polyphosphazenes, poly(ortho ester), poly(cyano acrylates), polyanhydride, modified polysaccharides and modified proteins.

48. The biodegradable polymer fiber included in at least one of the SYNERGY™ Over-The-Wire Products includes aliphatic polyesters selected from the group consisting of poly(glycolic acid), poly(lactic acid), poly(alkylene succinates) poly(hydroxybutyrate), poly(butylene diglycolate), poly(epsilon-caprolactone) and copolymers, blends and mixtures thereof.

49. The therapeutic agent included the biodegradable polymer fiber included in at least one of the SYNERGY™ Over-The-Wire Products is released over time from said fiber.

### C. P150003 PRODUCTS

50. At least one of the P150003 Products includes a biodegradable polymer fiber. For example, at least one of the P150003 Products is composed of bioabsorbable polymer.

51. The biodegradable polymer fiber included in at least one of the P150003 Products comprises a first phase and a second phase. For example, the biodegradable polymer fiber included in at least one of the P150003 Products comprises polymer structure and structure containing pharmacological agents.

52. The first phase and the second phase comprising the biodegradable polymer fiber included in at least one of the P150003 Products are immiscible. For example, the polymer structure and the structure containing pharmacological agents comprising the

biodegradable polymer fiber included in at least one of the P150003 Products are immiscible.

53. The second phase comprising the biodegradable polymer fiber included in at least one of the P150003 Products includes at least one therapeutic agent. For example, at least one therapeutic agent (e.g., everolimus) is included in the structure containing pharmacological agents comprising the biodegradable polymer fiber included in at least one of the P150003 Products.

54. The second phase comprising the biodegradable polymer fiber included in at least one of the P150003 Products is derived from an aqueous solution, a hydrogel, or a polymer.

55. The therapeutic agent included in the second phase comprising the biodegradable polymer fiber included in at least one of the P150003 Products is a drug, a protein, an enzyme, a growth factor, an immunomodulator, a compound promoting angiogenesis, a compound inhibiting angiogenesis, an anti-inflammatory compound, an antibiotic, a cytokine, an anti-coagulation agent, a pro-coagulation agent, a chemotactic agent, an agent to promote apoptosis, an agent to inhibit apoptosis, or a mitogenic agent. For example, one or more antimicrobial agents are included in the structure containing pharmacological agents comprising the biodegradable polymer fiber included in at least one of the P150003 Products.

56. The biodegradable polymer fiber included in at least one of the P150003 Products is a single polymer, a co-polymer, or a mixture of polymers.

57. The biodegradable polymer fiber included in at least one of the P150003 Products is a single polymer, a co-polymer, or a mixture of polymers selected from the

group consisting of polypeptides, polydepsipeptides, nylon copolyamides, aliphatic polyesters, polydihydropyrans, polyphosphazenes, poly(ortho ester), poly(cyano acrylates), polyanhydride, modified polysaccharides and modified proteins.

58. The biodegradable polymer fiber included in at least one of the P150003 Products includes aliphatic polyesters selected from the group consisting of poly(glycolic acid), poly(lactic acid), poly(alkylene succinates) poly(hydroxybutyrate), poly(butylene diglycolate), poly(epsilon-caprolactone) and copolymers, blends and mixtures thereof.

59. The therapeutic agent included the biodegradable polymer fiber included in at least one of the P150003 Products is released over time from said fiber.

60. Defendant's acts of infringement have caused and will continue to cause substantial and irreparable damage to Plaintiffs.

61. As a result of Defendant's infringement of the '296 Patent, Plaintiffs have been damaged. Plaintiffs are, therefore, entitled to damages pursuant to 35 U.S.C. § 284 in an amount that presently cannot be pled but that will be determined at trial.

## V. COUNT II: INFRINGEMENT OF U.S. PATENT NO. 7,033,603 B2

62. Plaintiffs repeat and re-allege each and every allegation of the prior paragraphs as though set forth fully herein.

63. On April 25, 2006, U.S. Patent No. 7,033,603 B2 (the "'603 Patent")—titled "Drug Releasing Biodegradable Fiber for Delivery of Therapeutics"—was duly and legally issued by the United States Patent and Trademark Office on April 25, 2006 to Board of Regents, The University of Texas System, as assignee of named inventors Kevin D. Nelson and Brent B. Crow. A true and correct copy of the '603 Patent is attached hereto as **Exhibit C**.

64. The Board is the owner of all right, title, and interest in and to the '603 Patent

and has granted TissueGen an exclusive license "to manufacture, have manufactured, use, have used, and/or Sell or have Sold" products including inventions and discoveries covered by the '603 Patent and "to otherwise exploit" the Board's rights in information or discoveries covered by the '603 Patent.

65. The '603 Patent is directed to useful and novel compositions that provide for three-dimensional matrices for in vitro and in vivo use comprised of biodegradable polymer fibers capable of the controlled delivery of therapeutic agents.

66. Each and every claim of the '603 Patent is valid and enforceable and enjoys a statutory presumption of validity separate, apart, and in addition to the statutory presumption of validity enjoyed by every other of its claims. 35 U.S.C. § 282.

67. Upon information and belief, Defendant has been, and is currently, directly and/or indirectly infringing one or more claims of the '603 Patent in violation of 35 U.S.C. § 271, including as stated below.

68. Upon information and belief, Defendant has directly infringed, literally and/or under the doctrine of equivalents, and will continue to directly infringe claims of the '603 Patent by making, using, selling, offering to sell, and/or importing into the United States products that embody or practice the apparatus and/or method covered by one or more claims of the '603 Patent, including but not limited to the following products: Defendant's SYNERGY™ Everolimus-Eluting Platinum Chromium Coronary Stent System (Monorail™ Catheter), including the following products: H7493926008220, H7493926012220, H7493926016220, H7493926020220, H7493926024220, H7493926028220, H7493926032220, H7493926038220, H7493926008250, H7493926012250, H7493926016250, H7493926020250, H7493926024250,

H7493926028250, H7493926032250, H7493926038250, H7493926008270, H7493926012270, H7493926016270, H7493926020270, H7493926024270, H7493926028270, H7493926032270, H7493926038270, H7493926008300, H7493926012300, H7493926016300, H7493926020300, H7493926024300, H7493926028300, H7493926032300, H7493926038300, H7493926008350, H7493926012350, H7493926016350, H7493926020350, H7493926024350, H7493926028350, H7493926032350, H7493926038350, H7493926008400, H7493926012400, H7493926016400, H7493926020400, H7493926024400, H7493926028400, H7493926032400, H7493926038400 and any other products offered and/or sold under the SYNERGY™ Everolimus-Eluting Platinum Chromium Coronary Stent System (Monorail™ Catheter) name (the "Monorail™ Catheter Products"); Defendant's SYNERGY™ Everolimus-Eluting Platinum Chromium Coronary Stent System (Over-The-Wire), including the following products: H7493926108220, H7493926112220, H7493926116220, H7493926120220, H7493926124220, H7493926128220, H7493926132220, H7493926138220, H7493926108250, H7493926112250, H7493926116250, H7493926120250, H7493926124250, H7493926128250, H7493926132250, H7493926138250, H7493926108270, H7493926112270, H7493926116270, H7493926120270, H7493926124270, H7493926128270, H7493926132270, H7493926138270, H7493926108300, H7493926112300, H7493926116300, H7493926120300, H7493926124300, H7493926128300, H7493926132300, H7493926138300, H7493926108350, H7493926112350, H7493926116350, H7493926120350, H7493926124350, H7493926128350, H7493926132350, H7493926138350, H7493926108400,

H7493926112400, H7493926116400, H7493926120400, H7493926124400, H7493926128400, H7493926132400, H7493926138400 and any other products offered and/or sold under the SYNERGY™ Everolimus-Eluting Platinum Chromium Coronary Stent System (Over-the-Wire Catheter) name (the "SYNERGY™ Over-The-Wire Products"); and Defendant's products within the scope of FDA PMA Number P150003 (the "P150003 Products") (collectively, the "'603 Accused Products").

69. On information and belief, Defendant indirectly infringes the '603 Patent by inducing others to infringe one or more claims of the '603 Patent through sale and/or use of the '603 Accused Products. On information and belief, at least as a result of the filing of this action, Defendant is aware of the '603 Patent; is aware that its actions with regards to distributors, resellers, and/or end users of the '603 Accused Products would induce infringement; and despite such awareness will continue to take active steps—such as, creating and disseminating the '603 Accused Products and product manuals, instructions, promotional and marketing materials, and/or technical materials to distributors, resellers, and end users—encouraging others to infringe the '603 Patent with the specific intent to induce such infringement.

70. Plaintiffs adopt, and incorporate by reference, as if fully stated herein, the attached claim chart for claim 19 of the '603 Patent, which is attached hereto as **Exhibit D**. The claim chart describes and demonstrates how Defendant infringes the '603 Patent. In addition, Plaintiffs allege that Defendant infringes one or more additional claims of the '603 Patent in a similar manner.

## A. MONORAIL™ CATHETER PRODUCTS

71. At least one of the Monorail™ Catheter Products includes a drug delivery composition.

72. The drug delivery composition included in at least one of the Monorail™ Catheter Products includes at least one fiber.

73. The fiber comprising the drug delivery composition included in at least one of the Monorail™ Catheter Products includes an emulsion consisting of a hydrogel or a colloidal system with at least two phases, one of which phases forms a continuous three-dimensional network that acts as an elastic solid.

**B. SYNERGY™ OVER-THE-WIRE PRODUCTS**

74. At least one of the SYNERGY™ Over-The-Wire Products includes a drug delivery composition.

75. The drug delivery composition included in at least one of the SYNERGY™ Over-The-Wire Products includes at least one fiber.

76. The fiber comprising the drug delivery composition included in at least one of the SYNERGY™ Over-The-Wire Products includes an emulsion consisting of a hydrogel or a colloidal system with at least two phases, one of which phases forms a continuous three-dimensional network that acts as an elastic solid.

**C. P150003 PRODUCTS**

77. At least one of the P150003 Products includes a drug delivery composition.

78. The drug delivery composition included in at least one of the P150003 Products includes at least one fiber.

79. The fiber comprising the drug delivery composition included in at least one of the P150003 Products includes an emulsion consisting of a hydrogel or a colloidal system with at least two phases, one of which phases forms a continuous three-dimensional network that acts as an elastic solid.

80. Defendant's acts of infringement have caused and will continue to cause

substantial and irreparable damage to Plaintiffs.

81. As a result of Defendant's infringement of the '603 Patent, Plaintiffs have been damaged. Plaintiffs are, therefore, entitled to damages pursuant to 35 U.S.C. § 284 in an amount that presently cannot be pled but that will be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED,** Plaintiffs pray for entry of judgment against Defendant as follows:

A. A judgment that Defendant has infringed and continues to infringe the '296 Patent and the '603 Patent, directly and/or indirectly, as alleged herein;

B. That Defendant provides to Plaintiffs an accounting of all gains, profits, and advantages derived by Defendant's infringement of the '296 Patent and the '603 Patent, and that Plaintiffs be awarded damages adequate to compensate them for the wrongful infringement by Defendant, in accordance with 35 U.S.C. § 284;

C. That Plaintiffs be awarded any other supplemental damages and interest on all damages, including, but not limited to, attorney fees available under 35 U.S.C. § 285;

D. That the Court permanently enjoin Defendant and all those in privity with Defendant from making, having made, selling, offering for sale, distributing, and/or using products that infringe the '296 Patent and the '603 Patent, including the '296 Accused Products and the '603 Accused Products, in the United States; and

E. That Plaintiffs be awarded such other and further relief and all remedies available at law.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury on all issues triable to a jury.

Dated: November 20, 2017

Respectfully submitted,

*/s/ Alfonso G. Chan*
Michael W. Shore (Texas 18294915)
mshore@shorechan.com
Alfonso G. Chan (Texas 24012408)
achan@shorechan.com
Chijioke E. Offor (Texas 24065840)
coffor@shorechan.com

SHORE CHAN DEPUMPO LLP
901 Main Street, Suite 3300
Dallas, Texas 75202
Telephone (214) 593-9110
Facsimile (214) 593-9111

**COUNSEL FOR PLAINTIFFS BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM and TISSUEGEN, INC.**

# EXHIBIT A

US006596296B1

(12) **United States Patent**
**Nelson et al.**

(10) **Patent No.:** **US 6,596,296 B1**
(45) **Date of Patent:** **Jul. 22, 2003**

(54) **DRUG RELEASING BIODEGRADABLE FIBER IMPLANT**

(75) Inventors: **Kevin D. Nelson**, Arlington, TX (US); **Andres A. Romero-Sanchez**, Arlington, TX (US); **George M. Smith**, Lexington, KY (US); **Nadir Alikacem**, Allen, TX (US); **Delia Radulescu**, Arlington, TX (US); **Paula Waggoner**, Burleson, TX (US); **Zhibing Hu**, Denton, TX (US)

(73) Assignee: **Board of Regents, The University of Texas System**, Austin, TX (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 14 days.

(21) Appl. No.: **09/632,457**

(22) Filed: **Aug. 4, 2000**

**Related U.S. Application Data**

(60) Provisional application No. 60/147,827, filed on Aug. 6, 1999.

(51) **Int. Cl.**[7] .......................... **A61F 2/02**; A61K 47/30
(52) **U.S. Cl.** .......................... **424/426**; 514/772.3
(58) **Field of Search** .......................... 424/426; 514/772.3

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,464,321 A | 8/1984 | Pittalis et al. | 264/83 |
| 4,965,128 A | 10/1990 | Greidanus et al. | 428/398 |
| 5,166,187 A | 11/1992 | Collombel et al. | 514/21 |
| 5,263,984 A | 11/1993 | Li et al. | 623/15 |
| 5,290,271 A | 3/1994 | Jernberg | 604/891.1 |
| 5,342,348 A | 8/1994 | Kaplan | 605/891.1 |
| 5,444,113 A * | 8/1995 | Sinclair et al. | 524/306 |
| 5,567,612 A | 10/1996 | Vacanti et al. | 435/240.23 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 328 050 | 8/1989 |
| WO | WO 98/20190 | 5/1998 |
| WO | WO 00/47716 | 8/2000 |

OTHER PUBLICATIONS

Aigner et al., "Cartilage tissue engineering with novel nonwoven structured biomaterial based on hyaluronic acid benzyl ester," *J. of Biomed. Materials Res.*, 42:172–181, 1998.

Breitbart et al., "Tissue engineered bone repair of calvarial defects using cultured periosteal cells," *Plastic & Reconstructive Surgery*, 101:567–574, 1998.

Cao et al., "Comparative study of the use of poly(glycolic acid), calcium alginate and pluronics in the engineering of autologous porcine cartilage," *J. of Biomaterials Sci Polymer Edition*, 9:475–487, 1998.

Dillon et al., "The influence of physical structure and charge on neurite extension in a 3D hydrogel scaffold," *J. of Biomaterials Sci., Polymer Ed.*, 9:1049–1069, 1998.

Elcin et al., "Xenotransplantation of fetal porcine hepatocytes in rats using a tissue engineering approach," *Artificial Organs*, 23:146–152, 1999.

(List continued on next page.)

*Primary Examiner*—Carlos A. Azpuru
(74) *Attorney, Agent, or Firm*—Jenkens & Gilchrist, P.C.

(57) **ABSTRACT**

The invention provides tissue engineering compositions and methods wherein three-dimensional matrices for growing cells are prepared for in vitro and in vivo use. The matrices comprise biodegradable polymer fibers capable of the controlled delivery of therapeutic agents. The spatial and temporal distribution of released therapeutic agents is controlled by use of defined nonhomogeneous patterns of therapeutic agents in the matrices.

**32 Claims, 11 Drawing Sheets**



OTHER PUBLICATIONS

Estrera et al., "The cytoplasmic domain of C–CAM1 tumor suppressor is necessary and sufficient for suppressing the tumorigenicity of prostate cancer cells," *Biochem Biophys Res Commun*, 263:797–803, 1999.

Fauza et al., "Videofetoscopically assisted fetal tissue engineering: skin replacement," *J. of Pediatric Surgery*, 33:357–361, 1998.

Grande et al., "Evaluation of matrix scaffolds for tissue engineering of articular cartilage grafts," *J. of Biomed. Mat. Res.*, 34:211–220, 1997.

Heath and Rutkowski, "The development of bioartificial nerve grafts for peripheral–nerve regeneration," *TIBTECH*, 16:163–168, 1998.

Hoerstrup et al., "Fluorescence activated cell sorting: a reliable method in tissue engineering of a bioprosthetic heart valve," *Annals of Thoracic Surgery*, 66:1653–1657, 1998.

Hoerstrup et al., "Tissue engineering: a new approach in cardiovascular surgery–seeding of human fibroblasts on resorbable mesh," *Swiss Surgery*, 2:23–25, 1998.

Isogai et al., "Formation of phalanges and small joints by tissue–engineering," *J. of Bone & Joint Surgery*, 81A:306–316, 1999.

Martin et al., "In vitro differentiation of chick embryo bone marrow stromal cells into cartilaginous and bone–like tissues," *J. of Orthopaedic Res.*, 16:181–189, 1998.

Romero, Andres A., Home page posted at bme@mednet.swmed.edu.

Sacks et al., "Collagen fiber architecture of a cultured dermal tissue," *J. of Biomed. Engineering*, 119:124–127, 1997.

Shinoka et al., "Creation of viable pulmonary artery autografts through tissue engineering," *J. of Thoracic & Cardiovascular Surgery*, 115:536–546, 1998.

Sims et al., "Tissue engineered neocartilage using plasma derived polymer substrates and chondrocytes," *Plastic & Reconstructive Surgery*, 101:1580–1585, 1998.

Vunjak–Novakovic et al., "Dynamic cell seeding of polymer scaffolds for cartilage tissue engineering," *Biotechnology Progress*, 14:193–202, 1998.

Wong and Mooney, "Synthesis and properties of biodegradable polymers used as synthetic matrices for tissue engineering," *In: Synthetic Biodegradable Polymer Scaffolds*, (Atala and Mooney, eds.), Birkhauser Press, Boston, MA, pp. 51–82, 1997.

Yoo and Atala, "A novel gene delivery system using urothelial tissue engineered neoorgans," *J. of Urology*, 158:1066–1070, 1997.

* cited by examiner




FIG. 1




FIG. 2




FIG. 3a




*FIG. 3b*




*FIG. 4*




*FIG. 5*




*FIG. 6*




*FIG. 7*


INFUSION
COAGULATION
WINDING
LUBRICATION SYSTEM
LUER ADAPTOR AND DISPENSING TIP
ROLLER
FIBER
SYRINGE
DOPE
TUBE
SYRINGE INFUSIONER
COLLECTING BOBBIN
ROLLER
POOL
COAGULATION FLUID
ROLLER

*FIG. 8*


150.0
125.0
100.0
75.0
50.0
25.0
0.0
ult. strength [MPa]
20
25
30
35
40
45
Vw/Vi
10-WT%
8-WT%
7.5-WT%

*FIG. 9a*


250%
200%
150%
100%
50%
0%
% Elongation
20
25
30
35
40
45
Vw/Vi

*FIG. 9b*




*FIG. 10a*




*FIG. 10 b*




*FIG. 12*



FIG. 11a



FIG. 11b



FIG. 11c



FIG. 13




FIG. 14




FIG. 15

## DRUG RELEASING BIODEGRADABLE FIBER IMPLANT

The present invention claims priority to provisional application serial No. 60/147,827, filed Aug. 6, 1999.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention relates to the field of medicine and tissue engineering, and in particular to drug releasing biodegradable implants.

2. Description of Related Art

Tissue engineering is a discipline wherein living cells are used to replace functional loss because of injury, disease, or birth defect in an animal or human. These replacement cells can be autologous, allogenic, or, in limited circumstances, xenogenic. The field of tissue engineering is a new area of medicine and optimal procedures have yet to be elucidated.

At present, there are several primary avenues investigators are using to engineer tissues. One is to harvest cells from a healthy donor, preferably from the same individual, or at least from an appropriate donor of the same species, and grow those cells on a scaffold in vitro. This scaffold is typically a three-dimensional polymer network, often composed of biodegradable fibers. Cells adherent to the polymer network can then typically be induced to multiply. This cell filled scaffold can be implanted into the impaired host with the goal that the cells will perform their physiological function and avoid destruction by the host immune system. To this end, it is important that purified cell lines are used, as the introduction of non-self immune cells can up-regulate a strong host immune attack. The difficulty with this approach is the scaffolding must be small, as no cell can survive more than a couple millimeters away from a source of oxygen and nutrients. Therefore, large scaffolds cannot be used, as the scaffold will not vascularize adequately in time to save the cells in the interior regions.

In another approach, an empty three-dimensional, biodegradable polymer scaffold is directly implanted in the patient, with the goal of inducing the correct type of cells from the host's body to migrate into the polymer scaffold. The benefit is that vascularization can happen simultaneously with migration of cells into the matrix. A major problem is that there is currently no way to ensure that the appropriate cell types will migrate into the scaffold, and that the mechanical and biological properties will be maintained to provide the patient's physiological need.

In both of the above approaches, the scaffold may be biodegradable, meaning that over time it will break down both chemically and mechanically. As this break down occurs, the cells secrete their own extracellular matrix, which plays a critical role in cell survival and function. In normal tissue, there is an active and dynamic reciprocal exchange between the constitutive cells of the tissue and the surrounding extracellular matrix. The extracellular matrix provides chemical signals that regulate the morphological properties and phenotypic traits of cells and may induce division, differentiation or even cell death. In addition, the cells are also constantly rearranging the extracellular matrix. Cells both degrade and rebuild the extracellular matrix and secrete chemicals into the matrix to be used later by themselves or other cells that may migrate into the area. It has also been discovered that the extracellular matrix is one of the most important components in embryological development. Pioneering cells secrete chemical signals that help following cells differentiate into the appropriate final phe-



notype. For example, such chemical signals cause the differentiation of neural crest cells into axons, smooth muscle cells or neurons.

The integrated relationship between extracellular matrix and tissue cells establishes the extracellular matrix as an important parameter in tissue engineering. If cells are desired to behave in a specific manner, then the extracellular matrix must provide the appropriate environment and appropriate chemical/biological signals to induce that behavior for that cell type. Currently it is not possible to faithfully reproducer a biologically active extracellular matrix. Consequently, some investigators use a biodegradable matrix that enables the cells to create their own extracellular matrix as the exogenous matrix degrades.

In the above-described approaches to tissue engineering, a polymer scaffolding provides not only the mechanical support, but also the three-dimensional shape that is desired for the new tissue or organ. Because cells must be close to a source of oxygen and nutrients in order to survive and function, a major current limitation is that of blood supply. Most current methodologies provide no specific means of actively assisting the incorporation of blood vessels into and throughout the polymer matrix. This places limitations on the physical size and shape of the polymer matrix. The only current tissue-engineering device that has made it into widespread clinical use is artificial skin, which by definition is of limited thickness. The present invention provides compositions and methods that promote the directed migration of appropriate cell types into the engineered extracellular matrix. By directing specific three-dimensional cell migration and functional patterns, directed vascularization can be induced, which overcomes the current limitations on the shape and size of polymer implants. It also ensures that appropriate cell types will be physically located in specific locations within the matrix. Compositions and methods are provided to modulate phenotypic expression as a function of both time and space.

### SUMMARY OF THE INVENTION

The present invention provides tissue engineering compositions and methods wherein three-dimensional matrices for growing cells are prepared for in vitro and in vivo use. The matrices comprise biodegradable polymer fibers capable of the controlled delivery of therapeutic agents. The spatial and temporal distribution of released therapeutic agents is controlled by the use of predefined nonhomogeneous patterns of polymer fibers, which are capable of releasing one or more therapeutic agents as a function of time. The terms "scaffold," "scaffold matrix" and "fiber-scaffold" are also used herein to describe the three dimensional matrices of the invention. "Defined nonhomogeneous pattern" in the context of the current application means the incorporation of specific fibers into a scaffold matrix such that a desired three-dimensional distribution of one or more therapeutic agents within the scaffold matrix is achieved. The distribution of therapeutic agents within the matrix fibers controls the subsequent spatial distribution within the interstitial medium of the matrix following release of the agents from the polymer fibers. In this way, the spatial contours of desired concentration gradients can be created within the three dimensional matrix structure and in the immediate surroundings of the matrix. Temporal distribution is controlled by the polymer composition of the fiber and by the use of coaxial layers within a fiber.

One aspect of the present invention is a biocompatible implant composition comprising a scaffold of biodegradable

polymer fibers. In various embodiments of the present invention, the distance between the fibers may be about 50 microns, about 70 microns, about 90 microns, about 100 microns, about 120 microns, about 140 microns, about 160 microns, about 180 microns, about 200 microns, about 220 microns, about 240 microns, about 260 microns, about 280 microns, about 300 microns, about 320 microns, about 340 microns, about 360 microns, about 380 microns, about 400 microns, about 450 microns or about 500 microns. In various embodiments the distance between the fibers may be less than 50 microns or greater than 500 microns.

Additionally, it is envisioned that in various embodiments of the invention, the fibers will have a diameter of about 20 microns, about 40 microns, about 60 microns, about 80 microns, about 100 microns, about 120 microns, about 140 microns, about 160 microns, about 180 microns, about 200 microns, about 220 microns, about 240 microns, about 260 microns, about 280 microns, about 300 microns, about 320 microns, about 340 microns, about 360 microns, about 380 microns, about 400 microns, about 450 microns or about 500 microns (including intermediate lengths). In various embodiments the diameter of the fibers may be less than about 20 microns or greater than about 500 microns. Preferably, the diameter of the fibers will be from about 60 microns to about 80 microns.

"About", in this one context is intended to mean a range of from 1–10 microns, which includes the intermediate lengths within the range. It will be readily understood that "intermediate lengths", in this context, means any length between the quoted ranges, such as 21, 22, 23, 24, 25, 26, 27, 28, 29 etc.; 30, 31, 32, etc.; 50, 51, 52, 53, etc.; 100, 101, 102, 103, etc.; 150, 151, 152, 153, etc.; including all integers through the 200–500 range.

The inventors also contemplate that the matrix may be woven, non-woven, braided, knitted, or a combination of two or more such preparations. For example, potential applications such as artificial arteries may well use a combination of woven, non-woven and knitted preparations or a combination of all four preparations. In certain embodiments of the invention, braided compositions may find particular utility for use with tendons and ligaments. Such braiding may, for example, provide superior strength.

In certain embodiments of the invention, the fibers containing one or more therapeutic agents are distributed within the scaffold matrix in a defined nonhomogeneous pattern. In one embodiment, the fibers may comprise two or more subsets of fibers that differ in biodegradable polymer content. The fibers or subsets of fibers may comprise a plurality of co-axial biodegradable polymer layers.

In another embodiment of the present invention, the fibers or a subset of fibers, contain one or more therapeutic agents such that the concentration of the therapeutic agent or agents varies along the longitudinal axis of the fibers or subset of fibers. The concentration of the active agent or agents may vary linearly, exponentially or in any desired fashion, as a function of distance along the longitudinal axis of a fiber. The variation may be monodirectional, that is, the content of one or more therapeutic agents decreases from the first end of the fibers or subset of the fibers to the second end of the fibers or subset of the fibers. The content may also vary in a bidirection fashion, that is, the content of the therapeutic agent or agents increases from the first ends of the fibers or subset of the fibers to a maximum and then decreases towards the second ends of the fibers or subset of the fibers.

In certain embodiments of the present invention, a subset of fibers comprising the scaffold may contain no therapeutic agent. For fibers that contain one or more therapeutic agents, the agent or agents may include a growth factor, an immunodulator, a compound that promotes angiogenesis, a compound that inhibits angiogenesis, an anti-inflammatory compound, an antibiotic, a cytokine, an anti-coagulation agent, a procoagulation agent, a chemotactic agent, an agents that promotes apoptosis, an agent that inhibits apoptosis, a mitogenic agent, a radioactive agent, a contrast agent for imaging studies, a viral vector, a polynucleotide, therapeutic genes, DNA, RNA, a polypeptide, a glycosaminoglycan, a carbohydrate, a glycoprotein. The therapeutic agents may also include those drugs that are to be administered for long-term maintenance to patients such as cardiovascular drugs, including blood pressure, pacing, anti-arrhythmia, beta-blocking drugs, and calcium channel based drugs. Therapeutic agents of the present invention also include anti-tremor and other drugs for epilepsy or other movement disorders. These agents may also include long term medications such as contraceptives and fertility drugs. They could comprise neurologic agents such as dopamine and related drugs as well as psychological or other behavioral drugs. The therapeutic agents may also include chemical scavengers such as chelators, and antioxidants. Wherein the therapeutic agent promotes angiogenesis, that agent may be vascular endothelial growth factor. The therapeutic agents may be synthetic or natural drugs, proteins, DNA, RNA, or cells (genetically altered or not). As used in the specification and claims, following long-standing patent law practice, the terms "a" and "an," when used in conjunction with the word "comprising" or "including" means one or more.

In general, the present invention contemplates the use of any drug incorporated in the biodegradable polymer fibers of the invention. The word "drug" as used herein is defined as a chemical capable of administration to an organism, which modifies or alters the organism's physiology. More preferably the word "drug" as used herein is defined as any substance intended for use in the treatment or prevention of disease. Drug includes synthetic and naturally occurring toxins and bioaffecting substances as well as recognized pharmaceuticals, such as those listed in "The Physicians Desk Reference," 471st edition, pages 101–321; "Goodman and Gilman's The Pharmacological Basis of Therapeutics" 8th Edition (1990), pages 84–1614 and 1655–1715; and "The United States Pharmacopeia, The National Formulary", USP XXII NF XVII (1990), the compounds of these references being herein incorporated by reference. The term "drug" also includes compounds that have the indicated properties that are not yet discovered or available in the U.S. The term "drug" includes pro-active, activated, and metabolized forms of drugs.

The biodegradable polymer may be a single polymer or a co-polymer or blend of polymers and may comprise poly (L-lactic acid), poly(DL-lactic acid), polycaprolactone, poly (glycolic acid), polyanhydride, chitosan, or sulfonated chitosan, or natural polymers or polypeptides, such as reconstituted collagen or spider silk.

One aspect of the present invention is a drug-delivery fiber composition comprising a biodegradable polymer fiber containing one or more therapeutic agents. In one embodiment, the content of the one or more therapeutic agents within the fiber varies along the longitudinal axis of the fiber such that the content of the therapeutic agent or agents decreases from the first end of the fiber to the second end of the fiber. In another embodiment, the fiber comprises a plurality of co-axial layers of biodegradable polymers. The drug delivery fiber composition may be implanted into many

sites in the body including dermal tissues, cardiac tissue, soft tissues, nerves, bones, and the eye. Ocular implantation has particular use for treatment of cataracts, diabetically induced proliferative retinopathy and non-proliferative retinopathy, glaucoma, macular degeneration, and pigmentosa XXXX.

Another aspect of the present invention is a method of controlling the spatial and temporal concentration of one or more therapeutic agents within a fiber-scaffold implant, comprising implanting a fiber-scaffold into a host. The spatial concentrations may be provided across multiple fibers, or alternatively along a single fiber by imposing a concentration gradient along the length of a fiber. The fiber-scaffold typically comprises biodegradable polymer fibers containing one or more therapeutic agents, wherein the therapeutic agent or agents are distributed in the fiber-scaffold in a defined nonhomogeneous pattern. The host will typically be an animal, preferably a mammal and more preferably a human.

Yet another aspect of the present invention is a method of producing a fiber-scaffold for preparing an implant capable of controlling the spatial and temporal concentration of one or more therapeutic agents. This method generally comprises forming biodegradable polymer fibers into a three dimensional fiber-scaffold. The biodegradable polymer fibers contain one or more therapeutic agents. The therapeutic agent or agents are distributed in the fiber-scaffold in a defined nonhomogeneous pattern.

It is further envisioned that the scaffold of the invention may be used to direct and/or organize tissue structure, cell migration and matrix deposition and participate in or promote general wound healing.

In another embodiment of the invention, a method is provided for creating a drug releasing fiber from chitosan comprising use of hydrochloric acid as a solvent and Tris base as a coagulating bath. The hydrochloric acid concentration may be, for example, from about 0.25% to about 5%, or from about 1% to about 2%, including all concentrations within such ranges. In the method, the tris base concentration may be, for example, from about 2% to about 25%, from about 4% to about 17%, or from about 5% to about 15%, including all concentrations within such ranges. The method may, in one embodiment of the invention, comprise a heterogeneous mixture comprising chitosans with different degrees of deacetylation. The method may also comprise creating a drug releasing fiber comprising segments of chitosan with different degrees of deacetylation.

A drug releasing fiber in accordance with the invention may be created, for example, from chitosan and extracellular matrix. In creating a drug releasing fiber in accordance with the invention, the chitosan concentration may be, for example, from about 0.5 wt. % to about 10 wt. %, from about 1 wt. % to about 7 wt. %, from about 2 wt. % to about 5 wt. %, from about 3 wt. % to about 4 wt. %, or about 3.5 wt. %. In one embodiment of the invention, the Matrigel. The extracellular matrix concentration may be from about 1 vol. % to about 20 vol. %, from about 2 vol. % to about 15 vol. %, from about 3 vol. % to about 10 vol. %, or from about 4 vol. % to about 6 vol. %, including about 5 vol. %. In the method, the fiber may be coated with said extracellular matrix.

Chitosan used in accordance with the invention may be sulfated or unsulfated. In one embodiment of the invention, when sulfated chitosan is used the concentration may be from about 0.025 wt. % to about 2 wt. %, from about 0.05 wt. % to about 1 wt. %, from about 0.1 wt. % to about 0.5 wt. %, or from about 0.15 wt. % to about 0.3 wt. %, including about 0.2 wt. %. In the method, chitosan and sulfated chitosan may be extruded into a fiber.

In still another embodiment of the invention, a method is provided of creating a drug releasing fiber, the method comprising adding poly(L-lactic acid) microspheres to chitosan in acid and a coagulation bath. In the method, the acid may be, for example, acetic acid or hydrochloric acid. Where the acid is hydrochloric acid, the concentration may be, for example, from about 0.25% to about 5%, or from about 1% to about 2%, including 1.2 vol. % and all other concentrations within such ranges. The chitosan concentration may be, for example, from about 0.5 wt. % to about 10 wt. %, from about 1 wt. % to about 7 wt. %, from about 2 wt. % to about 5 wt. %, from about 3 wt. % to about 4 wt. %, or about 3.5 wt. %. The coagulation bath may comprise sodium hydroxide, for example, in a concentration of about 1 vol. % to about 20 vol. %, 2 vol. % to about 15 vol. %, 3 vol. % to about 10 vol. %, 4 vol. % to about 7 vol. %, or about 4 vol. % to about 6 vol. %, including about 5 vol. %. In one embodiment of the invention, the method comprises adding poly(L-lactic acid) microspheres to a solution of about 3.5 wt. % chitosan in from about 1 vol. % hydrochloric acid to about 2 vol. % hydrochloric acid and using a coagulation bath comprising from about 5 vol. % tris base to about 15 vol. % tris base. The method may further comprise adding a surfactant to the solution, including albumin, for example, from about 1 wt. % to about 5 wt. % of said albumin, including about 3 wt. %. In yet another embodiment of the invention, a composition of chitosan fibers is provided comprising microspheres of a second polymer, said microspheres comprising one or more biological molecules. The composition may comprise a surfactant that is a biological molecule.

In yet another embodiment of the invention, a composition is provided comprising a fiber containing chitosan and an extracellular matrix. The chitosan may be sulfated or non-sulfated.

In yet another embodiment of the invention, a composition is provided comprising a three-dimensional scaffold, said scaffold comprising fibers that are woven, non-woven, or knitted, wherein said fibers comprise any of the compositions described herein above. A composition in accordance with the invention may, in one embodiment, comprise fibers containing chitosan, extracellular matrix and a biological molecule. The chitosan may sulfated non-sulfated.

In yet another embodiment of the invention, a composition is provided comprising a heterogeneous scaffold of fibers a biological molecule as described above, wherein the biological molecule not the same for all fibers of the scaffold. In the composition, the degree of deacetylation may vary as a function of distance along the fiber. The composition may an extracellular matrix. The composition may also, in certain embodiments of the invention, comprise sulfated or non-sulfated chitosan.

## BRIEF DESCRIPTION OF THE DRAWINGS

The following drawings form part of the present specification and are included to further demonstrate certain aspects of the present invention. The invention may be better understood by reference to one or more of these drawings in combination with the detailed description of specific embodiments presented herein.

FIG. 1: Shows fibers configured in a complex three-dimensional woven scaffolding with patterning. Each of the individual fibers may be loaded with one or more therapeutic agents. The numerals **21–27** denote fibers loaded with therapeutic agents.

FIG. 2: Shows fibers configured in a three-dimensional non-woven scaffolding without patterning. Each of the individual fibers may be loaded with one or more therapeutic agents. All fibers may contain the same therapeutic agent(s) or, a variety of different agents may be used in other fibers in the same scaffolding. The numerals **21–25** denote fibers loaded with therapeutic agents.

FIG. **3**A and FIG. **3**B: Fibers can provide the body with short term mechanical support in such applications as stents. FIG. **3**A illustrates that a single polymer fiber can maintain the lumen of any tubular body, such as arteries, veins, or ducts. FIG. **3**B illustrates that multiple polymer fibers can maintain the lumen of tubular bodies. The numerals **21–25** denote fibers loaded with therapeutic agents.

FIG. **4**: Fibers can be coated to form co-axial fibers. FIG. **4** shows that a fiber may have multiple component coatings, with each component loaded with different therapeutic agents. The numerals **11–13** denote therapeutic agents.

FIG. **5**: Shows the release kinetics of a coated fiber, as shown in FIG. **4**, having a two component coating with each component loaded with different therapeutic agents. The numerals **11–13** denote therapeutic agents.

FIG. **6**: Fibers may contain linear gradients of therapeutic agents along their length. FIG. **6** illustrates a fiber containing a linear gradient of therapeutic agent along its length (top) and graphically illustrates the linear gradient (bottom).

FIG. **7**: Shows a banded fiber having more than one therapeutic agent with possibly varying concentrations along its length. The distribution and frequency of the bands can be changed as desired. The numerals **11–12** denote therapeutic agents.

FIG. **8**: Depicts an apparatus for fabrication of polymer fibers containing therapeutic agents.

FIG. **9**A and FIG. **9**B: By varying the ratio of the infusion speed of the polymer emulsion into the coagulating bath to the linear winding speed of the lathe, very surprising changes in the mechanical properties was observed. FIG. **9**A graphically illustrates changes in the ultimate strength [Mpa] when the ratio of winding speed to the infusion speed is varied. Results shown are for polymers having 10-wt %, 8-wt %, and 7.5-wt %. FIG. **9**B graphically illustrates changes in percent elongation with varying ratios of winding velocity (Vw) to infusion velocity (Vi).

FIG. **10**A and FIG. **10**B: The mechanical properties of fibers change as a function of polymer solvent(s), coagulating bath solvent(s), interaction of the solvent system, winding speed to infusion speed ratio, total time in the coagulating bath, ratio of aqueous phase to polymer solution phase in emulsion, and the quality of the surfactant. FIG. **10**A graphically illustrates changes in ultimate strength with polymer concentration (wt %) when the winding speed to infusion speed ratio (Vw/Vi) is 26.82 and 23.49. FIG. **10**B illustrates changes in elasticity with polymer weight percent for the same ratios.

FIG. **11**A, FIG. **11**B and FIG. **11**C: Fibers have been produced with varying surface textures. FIG. **11**A shows a fiber having a smooth surface texture. FIG. **11**B shows a fiber having a veloured surface texture. FIG. **11**C shows a fiber having a longitudinally grooved surface texture.

FIG. **12**: Illustrates variations in the diameter of fibers as a function of the winding speed to infusion speed ratio (Vw/Vi) and of weight percent.

FIG. **13**: Illustrates the use of a butterfly valve at a "Y" junction to gradually change the ratio of two solutions to achieve a concentration gradient down the length of a fiber.



FIG. **14**: Illustrates the use of independent pumps and a mixing chamber to establish a well-controlled gradient with known change in concentration per centimeter length. The numerals **13** and **14** denote polymer solutions, with and without therapeutic agents respectively; **30** denotes Pump **1**, **31** denotes Pump **2** and **32** denotes the mixing chamber in place.

FIG. **15**: Illustrates parallel arrays of fibers packed into silicon rubber of other suitable material tubes and loaded with neurotrophins for axonal growth. The numeral **21** denotes fibers loaded with neutrophins, **22** denotes fibers loaded with other cytokines or growth factors, and **50** denotes a tube (made from silicone rubber or other material) to hold the fiber bundle in place.

## DESCRIPTION OF ILLUSTRATIVE EMBODIMENTS

The present invention provides compositions and methods to create a heterogeneous, woven, knitted, or non-woven or braided three-dimensional matrix for growing cells in tissue engineering applications. These scaffolds can be used in vitro and in vivo, and due to their heterogeneity can create both spatial and temporal distributions of therapeutic agents. In this invention, therapeutic agents may include drugs, proteins, peptides, mono- and di-saccharides, polysaccharides, glycoproteins, DNA, RNA, viruses, or other biological molecules of interest. The term therapeutic agent in this invention also includes radioactive materials used to help destroy harmful tissues such as tumors in the local area, or to inhibit growth of healthy tissues, such as in current stent applications; or markers to be used in imaging studies.

A. Three Dimensional Fiber Matrix

To create the heterogeneous scaffolds of the present invention, the therapeutic agents are encapsulated into individual fibers of the matrix by methods to be described herein. The therapeutic agents are released from each individual fiber slowly, and in a controlled manner. The fiber format has many advantages as a drug delivery platform over other slow drug-releasing agents known to those familiar in the art such as microspheres, porous plugs or patches. The primary advantage of fibers is that they can provide complex three-dimensional woven (FIG. **1**), or non-woven (FIG. **2**) scaffolding, with or without patterning, to allow cells to attach, spread, differentiate, and mature into appropriately functioning cells. Because they can form patterns, a "smart fabric" can be woven to induce cells of specific types to migrate to specific regions of the scaffold due to specific chemotactic factors being released. This scaffold mimics the function of the extracellular matrix material both during embryological development and in post-embryological tissues. Additionally, filaments could be formed into a unique scaffold that provides a growth substrate for tissue repair or reconstruction that is not reminiscent of a natural like structure.

Because of the ability to weave patterns to induce appropriate cell types into specific regions, it is possible to incorporate strands that will induce the formation of blood vessels into the fabric. This may be accomplished by providing fibers that release growth factors such as vascular endothelial growth factor (VEGF). By appropriate spacing of VEGF containing-fibers into the weave pattern, large tissues may be engineered, and the cells in such tissues can be provided with a sufficient blood supply and thereby receive oxygen and nutrients and enable the removal of waste products.

Fibers also have the advantage of providing the body with short term mechanical support in such applications as stents

(FIGS. 3A and 3B), wherein the polymer fiber can maintain the lumen of any tubular body, such as arteries, veins, ducts (e.g. bile duct, ureter, urethra, trachea, etc.), organs of the digestive track such as esophagus, intestine, colon, and connective tissue such as tendons, ligaments, muscle and bone. The fibers provide a useful structure to support mechanical strength or tension during the healing process. Fibers may also be useful to promote neural regeneration or reconstruction of nerves or spinal cord.

Further, fibers can be coated, forming co-axial fibers as shown in FIG. 4. Each coating can be of a different polymer material, or combination of polymers, and each layer can release a different therapeutic agent or combination of therapeutic agents. The coating can also be physically divided into multiple sections, meaning that if desired, different therapeutic agents can be released in various directions. For example, as depicted in FIG. 4, a fiber may have a two component coating, with each component loaded with different therapeutic agents. Therefore, not only is spatial distribution of various therapeutic agents possible, as described above, but these agents may have different release kinetics, thus yielding temporal distribution of therapeutic agents. The release kinetics of such a coated fiber is characterized in FIG. 5. For example, if a fiber has two coatings over the core polymer, then three different therapeutic agents or combinations of therapeutic agents can be released. The outside coating will release its therapeutic agents followed by the inner coating material and finally from the core fiber. Therefore, each polymer system has its own release kinetics profile that can be adjusted by polymer type and processing conditions for that particular coating layer. Each coating can consist of different polymers as well as being loaded with different molecules. This provides the ability to control release kinetics at each layer. The ability to release different agents at different times is particularly important in tissue engineering, because cells that are rapidly dividing often do not display the specialized functions of non-dividing cells of the same type of class. With the present invention, it is possible, by release of the appropriate therapeutic agents, to induce cells to first migrate to a specific location, then enter a rapid division phase to fill the tissue space, and then differentiate into a functional form.

Additionally, cells are known to follow concentration gradients. It is the change in concentration of a particular factor that appears to be important for directed cell migration. Therefore, the present invention provides a method of achieving gradients of therapeutic agents along the length of the fibers. A linear gradient is depicted in FIGS. 6A and 6B. By methods disclosed in this invention, this concentration gradient can be linear, exponential, or any other shape as a function of distance along the length of the fiber. It can also be bidirectional, meaning that it can be low at both ends and reach a maximum in the middle for example. This induces the cells to migrate and grow in specific directions along the fibers. By extension, by methods disclosed in this invention, a banded fiber can also be produced, as shown in FIG. 7. The distribution and frequency of these bands can be changed as desired. Therefore, the therapeutic agents delivery aspect of this invention goes far beyond simple drug-delivery microspheres or plugs, and the fiber based "smart scaffold" exceeds typical fiber based matrices into orchestrating the development of viable tissue, providing a three-dimensional biological architecture as well as mechanical support.

B. Biodegradable Polymers

Preferred polymers for use in the present invention include single polymer, co-polymer or a blend of polymers of poly(L-lactic acid), poly(DL-lactic acid),



polycaprolactone, poly(glycolic acid), polyanhydride, chitosan, or sulfonated chitosan. Naturally occurring polymers may also be used such as reconstituted collagen or natural silks. Those of skill in the art will understand that these polymers are just examples of a class of biodegradable polymer matrices that may be used in this invention. Further biodegradable matrices include polyanhydrides, polyorthoesters, and poly(amino acids) (Peppas and Langer, 1994). Any such matrix may be utilized to fabricate a biodegradable polymer matrix with controlled properties for use in this invention. Further biodegradable polymers that produce non-toxic degradation products are listed in Table 1.

TABLE 1

| Main Polymers Recognized as Biodegradable |
|---|
| Synthetic |
| Polypeptides |
| Polydepsipeptides |
| Nylon-2/nylon-6 copolyamides |
| Aliphatic polyesters |
| Poly(glycolic acid) (PGA) and copolymers |
| Poly(lactic acid) (PLA) and copolymer |
| Poly(alkylene succinates) |
| Poly(hydroxy butyrate) (PHB) |
| Poly(butylene diglycolate) |
| Poly(ε-caprolactone) and copolymers |
| Polydihydropyrans |
| Polyphosphazenes |
| Poly(ortho ester) |
| Poly(cyano acrylates) |
| Natural |
| Modified polysaccharides |
| cellulose, starch, chitin |
| Modified proteins |
| collagen, fibrin |

Adapted from Wong and Mooney, 1997.

C. Agents That Promote Angiogenesis

One class of therapeutic agents to be encapsulated by the polymer fibers of the present invention are therapeutic agents that promote angiogenesis. The successful engineering of new tissue requires the establishment of a vascular network. The induction of angiogenesis is mediated by a variety of factors, any of which may be used in conjunction with the present invention (Folkman and Klagsbrun, 1987, and references cited therein, each incorporated herein in their entirety by reference). Examples of angiogenic factors includes, but is not limited to: vascular endothelial growth factor (VEGF) or vascular permeability factor (VPF); members of the fibroblast growth factor family, including acidic fibroblast growth factor (AFGF) and basic fibroblast growth factor (bFGF); interleukin-8 (IL-8); epidermal growth factor (EGF); platelet-derived growth factor (PDGF) or platelet-derived endothelial cell growth factor (PD-ECGF); transforming growth factors alpha and beta (TGF-α, TGF-β); tumor necrosis factor alpha (TNF-α); hepatocyte growth factor (HGF); granulocyte-macrophage colony stimulating factor (GM-CSF); insulin growth factor-1 (IGF-1); angiogenin; angiotropin; fibrin and nicotinamide (Folkman, 1986, 1995; Auerbach and Auerbach, 1994; Fidler and Ellis, 1994; Folkman and Klagsbrun, 1987; Nagy et al., 1995)

D. Cytokines

In certain embodiments the use of particular cytokines incorporated in the polymer fibers of the present invention is contemplated. Table 2 below is an exemplary, but not limiting, list of cytokines and related factors contemplated for use in the present invention.

TABLE 2

| Cytokine | Reference |
| --- | --- |
| Human IL-1 | March et al., Nature, 315:641, 1985 |
| Murine IL-1 | Lomedico et al., Nature, 312:458, 1984 |
| Human IL-I | March et al., Nature, 315:641, 1985; Auron et al., Proc. Natl. Acad. Sci. USA, 81:7907, 1984 |
| Murine IL-1 | Gray, J. Immunol., 137:3644, 1986; Telford, NAR, 14:9955, 1986 |
| Human IL-1ra | Eisenberg et al., Nature, 343:341, 1990 |
| Human IL-2 | Taniguchi et al., Nature, 302:305, 1983; Maeda et al., Biochem. Biophys. Res. Commun., 115:1040, 1983 |
| Human IL-2 | Taniguchi et al., Nature, 302:305, 1983 |
| Human IL-3 | Yang et al., Cell, 47:3, 1986 |
| Murine IL-3 | Yokota et al., Proc. Natl. Acad. Sci. USA, 81:1070, 1984; Fung et al., Nature, 307:233, 1984; Miyatake et al., Proc. Natl. Acad. Sci. USA, 82:316, 1985 |
| Human IL-4 | Yokota et al., Proc. Natl. Acad. Sci. USA, 83:5894, 1986 |
| Murine IL-4 | Norma et al., Nature, 319:640, 1986; Lee et al., Proc. Natl. Acad. Sci. USA, 83:2061, 1986 |
| Human IL-5 | Azuma et al., Nuc. Acids Res., 14:9149, 1986 |
| Murine IL-5 | Kinashi et al., Nature, 324:70, 1986; Mizuta et al., Growth Factors, 1:51, 1988 |
| Human IL-6 | Hirano et al., Nature, 324:73, 1986 |
| Murine IL-6 | Van Snick et al., Eur. J. Immunol., 18:193, 1988 |
| Human IL-7 | Goodwin et al., Proc. Natl. Acad. Sci. USA, 86:302, 1989 |
| Murine IL-7 | Namen et al., Nature, 333:571, 1988 |
| Human IL-8 | Schmid et al., J. Immunol., 139:250, 1987; Matsushima et al., J Exp. Med., 167:1883, 1988; Lindley et al., Proc. Natl. Acad. Sci. USA, 85:9199, 1988 |
| Human IL-9 | Renauld et al., J. Immunol., 144:4235, 1990 |
| Murine IL-9 | Renauld et al., J. Immunol., 144:4235, 1990 |
| Human Angiogenin | Kurachi et al., Biochemistry, 24:5494, 1985 |
| Human GRO | Richmond et al., EMBO J., 7:2025, 1988 |
| Munne MIP-1 | Davatelis et al., J. Exp. Med., 167:1939, 1988 |
| Murine MIP-1 | Sherry et al., J. Exp. Med., 168:2251, 1988 |
| Human MIF | Weiser et al., Proc. Natl. Acad. Sci. USA, 86:7522, 1989 |
| Human G-CSF | Nagata et al., Nature, 319:415, 1986; Souza et al., Science, 232:61, 1986 |
| Human GM-CSF | Cantrell et al., Proc. Natl. Acad. Sci. USA, 82:6250, 1985; Lee et al., Proc. Natl. Acad. Sci. USA, 82:4360, 1985; Wong et al., Science, 228:810, 1985 |
| Murine GM-CSF | Gough et al., EMBO J., 4:645, 1985 |
| Human M-CSF | Wong, Science, 235:1504, 1987; Kawasaki, Science, 230; 291, 1985; Ladner, EMBO J., 6:2693, 1987 |
| Human EGF | Smith et al., Nuc. Acids Res., 10:4467, 1982; Bell et al., NAR, 14:8427, 1986 |
| Human TGF- | Derynck et al., Cell, 38:287, 1984 |
| Human FGF acidic | Jaye et al., Science, 233:541, 1986; Gimenez-Gallego et al., Biochem. Biophys. Res. Commun., 138:611, 1986; Harper et al, Biochem., 25:4097, 1986 |
| Human -ECGF | Jaye et al., Science, 233:541, 1986 |
| Human FGF basic | Abraham et al., EMBO J., 5:2523, 1986; Sommer et al., Biochem. Biophys. Res. Comm., 144:543, 1987 |
| Murine IFN- | Higashi et al., J. Biol. Chem., 258:9522, 1983; Kuga, NAR, 17:3291, 1989 |
| Human IFN- | Gray et al., Nature, 295:503, 1982; Devos et al., NAR, 10:2487, 1982; Rinderknecht, J. Biol. Chem., 259:6790, 1984 |
| Human IGF-I | Jansen et al., Nature, 306:609, 1983; Rotwein et al., J. Biol. Chem., 261:4828, 1986 |
| Human IGF-II | Bell et al., Nature, 310:775, 1984 |
| Human -NGF chain | Ullrich et al., Nature, 303:821, 1983 |
| Human NT-3 | Huang EJ. Et al., Development. 126(10):2191–203, 1999 May. |
| Human PDGF A chain | Betsholtz et al., Nature, 320:695, 1986 |
| Human PDGF B chain | Johnsson et al., EMBO J., 3:921, 1984; Collins et al., Nature, 316:748, 1985 |
| Human TGF-1 | Derynck et al., Nature, 316:701, 1985 |
| Human TNF- | Pennica et al., Nature, 312:724, 1984; Fransen et al., Nuc. Acids Res., 13:4417, 1985 |
| Human TNF- | Gray et al., Nature, 312:721, 1984 |
| Murine TNF- | Gray et al., Nucl. Acids Res., 15:3937, 1987 |
| Human E-Selectin | Bevilacqua et al., Science, 243:1160, 1989; Hensley et al., J. Biol. Chem., 269:23949, 1994 |
| Human ICAM-1 | Simmons et al., Nature, 331:624, 1988 |
| Human PECAM | Simmons et al., J. Exp. Med., 171:2147, 1990 |
| Human VCAM-1 | Hession et al., J. Biol. Chem., 266:6682; Osborn et al., Cell, 59:1203, 1989 |
| Human L-Selectin | Ord et al., J. Biol. Chem., 265:7760, 1990; Tedder et al., |

TABLE 2-continued

| Cytokine | Reference |
|---|---|
| (membrane bound) | J. Exp. Med., 170:123, 1989 |
| Human L-Selectin | Ord et al., J. Biol. Chem., 265:7760, 1990; Tedder et al., |
| (soluble form) | J. Exp. Med., 170:123, 1989 |
| Human Calcitonin | Le Moullec et al., FEBS Lett., 167:93, 1984 |
| Human Hirudin | Dodt et al., FEBS Lett., 165:180, 1984 |
| (*E. coli* optimized) | |

E. Polynucelotides

The polynucleotides to be incorporated within the polymer fibers of the present invention, extend to the full variety of nucleic acid molecules. The nucleic acids thus include genomic DNA, cDNAs, single stranded DNA, double stranded DNA, triple stranded DNA, oligonucleotides, Z-DNA, mRNA, tRNA and other RNAs. DNA molecules are generally preferred, even where the DNA is used to express a therapeutic RNA, such as a ribozyme or antisense RNA.

A "gene" or DNA segment encoding a selected protein or RNA, generally refers to a DNA segment that contains sequences encoding the selected protein or RNA, but is isolated away from, or purified free from, total genomic DNA of the species from which the DNA is obtained. Included within the terms "gene" and "DNA segment", are DNA segments and smaller fragments of such segments, and also recombinant vectors, including, for example, plasmids, cosmids, phage, retroviruses, adenoviruses, and the like.

The term "gene" is used for simplicity to refer to a functional protein or peptide encoding unit. As will be understood by those in the art, this functional term includes both genomic sequences and cDNA sequences. "Isolated substantially away from other coding sequences" means that the gene of interest forms the significant part of the coding region of the DNA segment, and that the DNA segment does not contain large portions of naturally-occurring coding DNA, such as large chromosomal fragments or other functional genes or cDNA coding regions. Of course, this refers to the DNA segment as originally isolated, and does not exclude genes or coding regions, such as sequences encoding leader peptides or targeting sequences, later added to the segment by the hand of man.

The present invention does not require that highly purified DNA or vectors be used, so long as any coding segment employed encodes a selected protein or RNA and does not include any coding or regulatory sequences that would have a significant adverse effect on the target cells. Therefore, it will also be understood that useful nucleic acid sequences may include additional residues, such as additional non-coding sequences flanking either of the 5' or 3' portions of the coding region or may include various internal sequences, i.e., introns, that are known to occur within genes.

Many suitable DNA segments may be obtained from existing, including commercial sources. One may also obtain a new DNA segment encoding a protein of interest using any one or more of a variety of molecular biological techniques generally known to those skilled in the art. For example, cDNA or genomic libraries may be screened using primers or probes with designed sequences. Polymerase chain reaction (PCR) may also be used to generate a DNA fragment encoding a protein of interest.

After identifying an appropriate selected gene or DNA molecule, it may be inserted into any one of the many vectors currently known in the art, so that it will direct the expression and production of the selected protein when incorporated into a target cell. In a recombinant expression vector, the coding portion of the DNA segment is positioned under the control of a promoter/enhancer element. The promoter may be in the form of the promoter that is naturally associated with a selected gene, as may be obtained by isolating the 5' non-coding sequences located upstream of the coding segment or exon, for example, using recombinant cloning and/or PCR technology.

In other embodiments, it is contemplated that certain advantages will be gained by positioning the coding DNA segment under the control of a recombinant, or heterologous, promoter. As used herein, a recombinant or heterologous promoter is intended to refer to a promoter that is not normally associated with a selected gene in its natural environment. Such promoters may include those normally associated with other selected genes, and/or promoters isolated from any other bacterial, viral, eukaryotic, or mammalian cell. Naturally, it will be important to employ a promoter that effectively directs the expression of the DNA segment in the chosen target cells.

The use of recombinant promoters to achieve protein expression is generally known to those of skill in the art of molecular biology, for example, see Sambrook et al. (1989; incorporated herein by reference). The promoters employed may be constitutive, or inducible, and can be used under the appropriate conditions to direct high level or regulated expression of the introduced DNA segment. Expression of genes under the control of constitutive promoters does not require the presence of a specific substrate to induce gene expression and will occur under all conditions of cell growth. In contrast, expression of genes controlled by inducible promoters is responsive to the presence or absence of an inducing agent.

Promoters isolated from the genome of viruses that grow in mammalian cells, e.g., RSV, vaccinia virus 7.5K, SV40, HSV, adenoviruses MLP, MMTV LTR and CMV promoters, may be used herewith, as well as promoters produced by recombinant DNA or synthetic techniques. Currently preferred promoters are those such as CMV, RSV LTR, the SV40 promoter alone, and the SV40 promoter in combination with the SV40 enhancer.

Exemplary tissue specific promoter/enhancer elements and transcriptional control regions that exhibit tissue specificity include, but are not limited to: the elastase I gene control region that is active in pancreatic acinar cells; the insulin gene control region that is active in pancreatic cells; the immunoglobulin gene control region that is active in lymphoid cells; the albumin, 1-antitrypsin and -fetoprotein gene control regions that are active in liver; the -globin gene control region that is active in myeloid cells; the myelin basic protein gene control region that is active in oligodendrocyte cells in the brain; the myosin light chain-2 gene control region that is active in skeletal muscle; and the gonadotropic releasing hormone gene control region that is active in the hypothalamus. U.S. application Ser. No. 08/631,334, filed Apr. 12, 1996 and PCT Application Serial

No. PCT/US97/07301, filed Apr. 11, 1997, are both incorporated herein by reference for the purposes of incorporating references even further describing the foregoing elements.

Specific initiation signals may also be required for sufficient translation of inserted protein coding sequences. These signals include the ATG initiation codon and adjacent sequences. In cases where the entire coding sequence, including the initiation codon and adjacent sequences are inserted into the appropriate expression vectors, no additional translational control signals may be needed. However, in cases where only a portion of the coding sequence is inserted, exogenous translational control signals, including the ATG initiation codon should be provided. The initiation codon must be in phase with the reading frame of the protein coding sequences to ensure translation of the entire insert. These exogenous translational control signals and initiation codons can be of a variety of origins, both natural and synthetic. The efficiency and control of expression may be enhanced by the inclusion of transcription attenuation sequences, enhancer elements, etc.

A variety of vectors may be used including, but not limited to, those derived from recombinant bacteriophage DNA, plasmid DNA or cosmid DNA. For example, plasmid vectors such as pBR322, pUC 19/18, pUC 118, 119 and the M13 mp series of vectors may be used. Bacteriophage vectors may include gt10, gt11, gt18–23, ZAP/R and the EMBL series of bacteriophage vectors. Cosmid vectors that may be utilized include, but are not limited to, pJB8, pCV 103, pCV 107, pCV 108, pTM, pMCS, pNNL, pHSG274, COS202, COS203, pWE15, pWE16 and the charomid 9 series of vectors. Vectors that allow for the in vitro transcription of RNA, such as SP6 vectors, may also be used to produce large quantities of RNA that may be incorporated into matrices.

The selected genes and DNA segments may also be in the form of a DNA insert located within the genome of a recombinant virus, such as, for example a recombinant herpes virus, retroviruses, vaccinia viruses, adenoviruses, adeno-associated viruses or bovine papilloma virus. While integrating vectors may be used, non-integrating systems, which do not transmit the gene product to daughter cells for many generations will often be preferred. In this way, the gene product is expressed during a defined biological process, e.g., a wound healing process, and as the gene is diluted out in progeny generations, the amount of expressed gene product is diminished.

In such embodiments, to place the gene in contact with a target cell, one would prepare the recombinant viral particles, the genome of which includes the gene insert, and contact the target cells or tissues via release from the polymer fiber of the present ,invention, whereby the virus infects the cells and transfers the genetic material. The following U.S. patents are each incorporated herein by reference for even further exemplification of viral gene therapy: U.S. Pat. No. 5,747,469, concerning adenovirus, retrovirus, adeno-associated virus, herpes virus and cytomegalovirus gene therapy; U.S. Pat. No. 5,631,236, concerning adenovirus gene therapy; and U.S. Pat. No. 5,672,344, concerning herpesvirus gene therapy.

Genes with sequences that vary from those described in the literature are also contemplated for use in the invention, so long as the altered or modified gene still encodes a protein that functions to effect the target cells in the desired (direct or indirect) manner. These sequences include those caused by point mutations, those due to the degeneracies of the genetic code or naturally occurring allelic variants, and further modifications that have been introduced by genetic engineering, i.e., by the hand of man.

Techniques for introducing changes in nucleotide sequences that are designed to alter the functional properties of the encoded proteins or polypeptides are well known in the art, e.g., U.S. Pat. No. 4,518,584, incorporated herein by reference, which techniques are also described in further detail herein. Such modifications include the deletion, insertion or substitution of bases, and thus, changes in the amino acid sequence. Changes may be made to increase the activity of a protein, to increase its biological stability or half-life, to change its glycosylation pattern, confer temperature sensitivity or to alter the expression pattern of the protein, and the like. All such modifications to the nucleotide sequences are encompassed by this invention.

It is an advantage of the present invention that one or more than one selected gene may be used in the gene transfer methods and compositions. The nucleic acid delivery methods may thus entail the administration of one, two, three, or more, selected genes. The maximum number of genes that may be applied is limited only by practical considerations, such as the effort involved in simultaneously preparing a large number of gene constructs or even the possibility of eliciting an adverse cytotoxic effect. The particular combination of genes may be chosen to alter the same, or different, biochemical pathways. For example, a growth factor gene may be combined with a hormone gene; or a first hormone and/or growth factor gene may be combined with a gene encoding a cell surface receptor capable of interacting with the polypeptide product of the first gene.

In using multiple genes, they may be combined on a single genetic construct under control of one or more promoters, or they may be prepared as separate constructs of the same of different types. Thus, an almost endless combination of different genes and genetic constructs may be employed. Certain gene combinations may be designed to, or their use may otherwise result in, achieving synergistic effects on cell stimulation and tissue growth, any and all such combinations are intended to fall within the scope of the present invention. Indeed, many synergistic effects have been described in the scientific literature, so that one of ordinary skill in the art would readily be able to identify likely synergistic gene combinations, or even gene-protein combinations.

It will also be understood that, if desired, the nucleic segment or gene could be administered in combination with further agents, such as, e.g. proteins or polypeptides or various pharmaceutically active agents. So long as genetic material forms part of the composition, there is virtually no limit to other components which may also be included, given that the additional agents do not cause a significant adverse effect upon contact with the target cells or tissues. The nucleic acids may thus be delivered along with various other agents, for example, in certain embodiments one may wish to administer an angiogenic factor as disclosed in U.S. Pat. No. 5,270,300 and incorporated herein by reference.

As the chemical nature of genes, i.e., as a string of nucleotides, is essentially invariant, and as the process of gene transfer and expression are fundamentally the same, it will be understood that the type of genes transferred by the fiber matrices of the present invention is virtually limitless. This extends from the transfer of a mixture of genetic material expressing antigenic or immunogenic fragments for use in DNA vaccination; to the stimulation of cell function, as in wound-healing; to aspects of cell killing, such as in transferring tumor suppressor genes, antisense oncogenes or apoptosis-inducing genes to cancer cells.

By way of example only, genes to be supplied by the invention include, but are not limited to, those encoding and

expressing: hormones, growth factors, growth factor receptors, interferons, interleukins, chemokines, cytokines, colony stimulating factors and chemotactic factors; transcription and elongation factors, cell cycle control proteins, including kinases and phosphatases, DNA repair proteins, apoptosis-inducing genes; apoptosis-inhibiting genes, oncogenes, antisense oncogenes, tumor suppressor genes; angiogenic and anti-angiogenic proteins; immune response stimulating and modulating proteins; cell surface receptors, accessory signaling molecules and transport proteins; enzymes; and anti-bacterial and anti-viral proteins.

F. Kits

All the essential materials and reagents required for the various aspects of the present invention may be assembled together in a kit. The kits of the present invention also will typically include a means for containing the vials comprising the desired components in close confinement for commercial sale such as, e.g., injection or blow-molded plastic containers into which the desired vials are retained. Irrespective of the number or type of containers, the kits of the invention are typically packaged with instructions for use of the kit components.

### G. EXAMPLES

The following examples are included to demonstrate preferred embodiments of the invention. It should be appreciated by those of skill in the art that the techniques disclosed in the examples which follow represent techniques discovered by the inventor to function well in the practice of the invention, and thus can be considered to constitute preferred modes for its practice. However, those of skill in the art should, in light of the present disclosure, appreciate that many changes can be made in the specific embodiments which are disclosed and still obtain a like or similar result without departing from the spirit and scope of the invention.

#### Example 1

#### Fabrication of Polymer Fibers Containing Therapeutic Agents

In one embodiment of the present invention, the following procedure is used to create the drug-releasing fibers. The apparatus is depicted in FIG. **8**. First, a biodegradable polymer such as poly(L-lactic acid) (PLLA), poly(DL-lactic acid), polycaprolactone, poly(glycolic acid), polyanhydride, or copolymers or blends of these or other biodegradable polymers are dissolved in some appropriate solvent (A) at concentrations ranging from 5 to 30 wt % depending on the type of polymer, 10 wt % being preferred for PLLA. In this embodiment, solvent (A) has low miscibility with water, and is very miscible with the coagulation bath solvent (B). Preferred choices of solvent (A) include chloroform and methylene chloride. Once the polymer is dissolved, an aqueous solution containing both the biomolecules(s) of interest and a surfactant, is added to the polymer solution. The concentration of the aqueous emulsion is typically in the range of 1 to 50% v/v of the polymer solution, 4–10% being most typical for monofilament PLLA fibers. The surfactant can be one or a combination of substances familiar to those skilled in the art, such as bovine serum albumin (BSA), poly(vinyl alcohol), pluronics, or biological surfactants such as the family of phospholipids. Other surfactants not specifically mentioned here, but known to those skilled in the art are included by extension. In a typical use, BSA is used as the surfactant at concentrations ranging from about 10 fold to 100 fold higher than the biological molecule of interest, with typical concentrations ranging from 10 wt % to 50 wt % of the aqueous phase.



Using some form of mechanical energy such as sonication, vortexing, or shear forces generated by forcing the liquid through a small orifice, a water-in-oil type emulsion is formed between the aqueous and organic phases. This emulsion must be stable for periods far in excess of time required for extrusion. The size of the dispersed aqueous phase droplets is primarily dependent on the quality of the surfactant, and the amount of mechanical energy imparted to the system in forming the emulsion. The aqueous phase size is an important variable in both release kinetics and mechanical properties of the fiber.

The emulsion is then extruded into a coagulating bath containing solvent (B). The polymer emulsion is extruded into the coagulation bath through a dispensing tip ranging in size from 16 gage down to 30 gage. Solvent (B) must be highly miscible with solvent (A), and must be a non-solvent for the polymer; isopropyl alcohol is the most typical choice but any solvent that is a non-solvent for the polymer and highly miscible with solvent (A) will work. For example hexane is very miscible with methylene chloride yet is a non-solvent for the polymer, therefore, methylene chloride and hexane make a good solvent and coagulating bath combination. Because solvent (A) is highly miscible with coagulating bath solvent (B), it freely diffuses from the polymer solution stream, into the coagulating bath. The polymer, however, is not soluble in solvent (B), and therefore begins to precipitate upon itself, forming the outer sheath of a fiber and trapping virtually all of the dispersed aqueous phase of the emulsion within the forming fiber. In this way, the fiber is loaded with the drug or protein of interest. The forming fiber may be passed over a series of rollers within the coagulation bath to provide a fixed path length through the coagulation bath should a fixed path length be desired. The fiber is drawn from the coagulation bath at a determined rate. In the laboratory, the inventors have used a cylinder attached to a modified variable-speed lathe that can accurately maintain its angular velocity. The drawn and extruded fiber is then removed from the cylinder and either freeze-dried, frozen, or oven dried and placed in a desecrator or freezer, depending upon recommended storage conditions of the loaded biomolecules.

By varying the ratio of the infusion speed of the polymer emulsion into the coagulating bath to the linear winding speed of the of the lathe, very surprising changes in the mechanical properties of the fibers have been found, as shown in FIGS. **9**A and **9**B. The mechanical properties of the fibers change as a function of the following variables: polymer solvent(s), coagulating bath solvent(s), intermiscibility of the solvent system, winding speed to infusion speed ratio, total time in the coagulating bath, ratio of aqueous phase to polymer solution phase in the emulsion, and the quality of the surfactant. Changes in mechanical properties as a function of several of these variables are shown in FIGS. **10**A and **10**B.

Another surprising discovery was that the surface texture of the finished fiber could also be controlled by appropriate choices of solvent and polymer systems. The inventors have produced fibers with surface textures that vary from smooth, to veloured, to longitudinally grooved as shown in FIGS. **11**A–**11**C. These changes in surface texture have practical applications to cell growth in providing surfaces with greater adhesive properties in the case of the veloured texture, and better contact guidance in the case of the longitudinally grooved fibers. All of the changes in mechanical properties and surface texture significantly affect the release kinetics of therapeutic agents.

The diameter of the fibers has been controlled by processing conditions as shown in FIG. **12**. Because the pro-

cessing parameters that control the mechanical properties, surface texture, diameter, and release kinetics are known fibers with specific properties for specific uses can be tailor made

That biological therapeutic agents retain biological activity throughout this fabrication process can be shown with a sandwich ELISA where the agent loaded into the fiber was the Fab fragment of mouse IgG. For the ELISA to detect the presence of the Fab fragment, the biological activity of both binding epitopes must be maintained.

In another embodiment of the fabrication process, a poor solvent for the polymer is added to the polymer solution such as toluene. The addition of the poor solvent changes the mechanical properties of the fiber.

In another fabrication embodiment, up to 20% v/v of the polymer solvent is added to the coagulation bath solvent. The addition of the polymer solvent decreases the concentration gradient from inside the fiber to outside the fiber. This changes the diffusion rate and hence the rate at which the outer sheath of the fiber forms. The rate of this outer sheath formation is critical to the surface texture of the fibers and the mechanical properties of the fiber, and to the release kinetics of the biomolecule.

In another fabrication embodiment, a thickening solution, such as glycerol, is added to the coagulation bath. This increases the viscosity of the coagulation bath, and changes the specific gravity of the coagulation bath. Both of these variables have resulted in substantially increased ability to form loaded fibers. The concentration of glycerol varies from 8 to 20% v/v.

Alternatively, coaxial fibers can be fabricated in a single process by methods familiar to those skilled in the art of extrusion. Using these techniques, various polymer(s) and biomolecule(s) can be added in each layer of the coaxial fiber.

### Example 2

### Fabrication of Polymer Fibers Containing Variable Concentrations of Therapeutic Agents

In another fabrication embodiment, the process is similar to that described in Example 1, with the exception that a concentration gradient is applied down the length of the fiber. This is accomplished by having two solutions. One is a polymer emulsion containing the therapeutic agent(s) of interest, and the other does not contain therapeutic agents, or contains different biomolecules. The gradient is accomplished by continuously changing the ratio of the two solutions during the extrusion process. This can be accomplished in a number of ways including a butterfly valve at a "Y" junction as shown in FIG. **13**, or using independent pumps with or without a mixing chamber as shown in FIG. **14**. In this way, a well-controlled gradient is established with known change in concentration per centimeter length. Another embodiment of the present invention is the creation of "banded" fibers. In banded fibers, there are several possible configurations; in one embodiment, both polymer solutions are emulsions containing different biomolecules. This is accomplished in the same way as the gradient, where the gradient is a series of step-functions, switching alternately from emulsion A to emulsion B.

In a second embodiment, one of the bands if from a polymer emulsion containing one or more biomolecules as in other embodiments described herein. The other band is a polymer segment that acts as a sealant so that the finished fibers can be cut to pre-specified lengths so that each end of the finished fibers will be sealed at both ends. In each of these embodiments, the band lengths are independently adjustable. These gradient and banded fibers may be used with or without a concentric coating as described in the next example.

### Example 3

### Fabrication of Polymer Fibers With Concentric Coatings

In yet another fabrication embodiment, a pre-existing fiber is loaded through a spinneret and through the coagulation bath. The liquid polymer emulsion is added in a "T" or "Y" junction and coats the fiber before entering a coagulation bath. Thus concentric coatings are applied to the fiber, with each coating having the ability to contain a different therapeutic agent(s) as shown in FIG. **4**. The coating polymer may be the same or different from the core polymer. There may be molecules attached to the core fiber to increase the adhesion of the coating polymer. For example, a thin layer of BSA, may improve the adhesion of chitosan to poly(L-lactic acid). By an intricate spinneret, two or more polymer emulsions each containing a different biomolecule can be put in the coating. This is accomplished by bringing all coating materials into the spinneret, with baffles separating each coating polymer stream. This allows fibers to release different molecules as a function of angular position around the fiber. In certain embodiments, the spinneret may have a non-circular shape, thereby forming fibers with any desired cross-sectional shape. This is true of the core fiber as well as the coating polymers.

An alternative fabrication technique is to use specially designed multilumen spinnerets to create standard fiber structures well known to those familiar in the art, such as core and sheath, islands in the sea, etc.

### Example 4

### Fabrication of Environmentally Responsive Polymer Gel Fibers

In a different fabrication embodiment, environmentally responsive polymer hydrogels are formed in nanosphere size by emulsion polymerization or other methods. Such nanospheres are then incorporated into fibers. "Environmentally responsive gels" are intended to represent polymer gels that exhibit a substantial change in their physical characteristics as the environment surrounding the gels undergoes relatively small changes. Polymer hydrogels that have been found to be useful in the present invention include poly(N-isopropylacrylamide) (NIPA) and poly(acrylic acid) (PAA) gels. For example, NIPA gels have the ability to undergo dramatic volume changes of 100 fold in response to a small (2–3C) temperature change. These nanospheres may be loaded with biological molecules by soaking them in an aqueous solution of the biomolecules. These loaded nanospheres are then dried and added to the polymer solution with or without forming an emulsion. All other fabrication processes are the same. This process then creates a fiber that is temperature sensitive. The NIPA phase transition can be adjusted by those skilled in the art to occur at 38–39C. This now provides a fiber that is responsive to the physiological state of the patient. It has a dramatic increase in release kinetics if the patient begins to run a fever, and because this is a reversible phenomenon, the release kinetics slow down again once body temperature returns to normal.

Example 5

Chitosan Based Fibers

In another fabrication embodiment, rather than ester based synthetic polymers described above, naturally occurring polysaccharides such as chitosan may be used as the polymer system. It is well known in the art that chitosan fibers can be made by dissolving the chitosan in 3% acetic acid, and using 5% sodium hydroxide as the coagulation bath. The inventors have found that one can use 1% hydrochloric acid to dissolve the chitosan, that the chitosan concentrations can go as low as 2.5 wt %, and good quality fibers are obtained if the coagulation bath consists of Tris base in concentrations ranging from 5 to 15% (FIG. 1). This is the first reporting of chitosan fibers extruded under these conditions.

Chitosan is a biodegradable polymer. Chitosan is enzymatically degraded by lysozyme, which is present in plasma, in the interstitial fluid, as well as intracellularly. Since the action of lysozyme on chitosan is dependent on the presence of acetyl groups on the polymer backbone, one can modulate, under specific circumstances, the release rate of the fibers described above by two alternative ways: a) one is to extrude fibers as described above from a heterogeneous mixture consisting of chitosan polymers each with a different degree of deacetylation. In this way, one can maintain the level of released drug in the optimal range for the necessary period of time; b) another possibility is to extrude segmented fibers of chitosan, wherein each segment is made from chitosan having a different degree of deacetylation as described in FIG. 2. This latter approach can have applications for migratory cells by creating a temporal gradient along the fiber.

The inventors have also mixed reconstituted basement membrane extract (matrigel, Becton Dickinson, Bedford, Mass.) with chitosan dissolved in hydrochloric acid, and have demonstrated the ability to extrude good quality fibers using a coagulation bath consisting of Tris base in concentrations ranging from 10 to 15%. In this case, it was found that axonal extension was improved over chitosan alone. ELISA confirmed the presence of the two major proteins of matrigel (laminin and collagen type IV) in the fibers. These proteins also retained biological activity as demonstrated by in vitro neuron attachment and axonal extension. Another possibility is to coat the same Tris base extruded chitosan fibers with matrigel.

In a surprising finding, if the inventors sulfate the chitosan prior to adding the matrigel, neuron attachment and axon extension are improved dramatically compared to the case of matrigel and untreated chitosan (FIG. 3, FIG. 4). Using the same chemical extrusion conditions, the inventors could extrude polymer fibers made of 0.2% sulfated chitosan with 3.2% unmodified chitosan with or without matrigel as a co-extruded substance.

It is well known in the art that sulfated chitosan has heparin-like, anticoagulant properties due to their similar chemical structure. The fibers made of unmodified chitosan dissolved in hydrochloric acid and extruded in Tris base can be coated with sulfated chitosan or with matrigel and sulfated chitosan. This may yield fibers with inherent anticoagulant properties that can also be loaded with active drugs. This may have substantial clinical application in fabricating vascular stents and other medical devices that come in direct contact with blood, and require mechanical strength, and/or the ability to deliver drugs.

The relatively harsh acidic and basic environment in which chitosan fibers are extruded as described above substantially limits the range of biomolecules that can be incorporated into the fiber to only those biomolecules that can withstand very large pH transitions. Therefore, to overcome this inherent limitation, the inventors have developed a new approach to retain the bioactivity of even the most sensitive biomolecules loaded into chitosan fibers. In this embodiment, sensitive biomolecules of interest are loaded into PLLA microspheres using solvent evaporation or other techniques well known in the drug delivery literature. These PLLA microspheres are then mixed with 3.5 wt % chitosan solution and extruded as described above. A chitosan fiber loaded with PLLA microspheres will form when this mixture is extruded using either acetic acid and sodium hydroxide or 1.2% hydrochloric acid and 10 to 15% Tris base. The PLLA microspheres can protect the sensitive biomolecules from the harsh processing conditions of the chitosan fibers.

Example 6

Neural Tissue Engineering

In this aspect of the present invention, parallel arrays of fibers are packed into silicon rubber or other suitable material tubes and loaded with neurotrophins for axonal growth as shown in FIG. 15. These bundles of fibers are placed in severed peripheral or central nerves. The neurotrophins may be loaded in a linear or some other appropriate gradient. This device is implanted bridging the gap between the ends of the nerve stumps. As the fibers release neurotrophins, axons begin to migrate out of the proximal end, across the fiber bundle and into the distal nerve end. Once in the distal end, guidance cues are provided by existing Schwann or glial cells and reconnections can then be made. It has been previously found that axons receive contact guidance by these fiber bundles and are able to traverse at least 1.8 cm in a rat sciatic nerve resection using non-loaded fibers. The optimal density of unloaded fibers in the tube is approximately 32 fibers in a 1.5 mm diameter tube for rat sciatic nerve growth.

Example 7

Preparation and Use of Polymer Fiber Stents

In another embodiment, fibers can be loaded with a drug of interest and used in stents or other medical devices where mechanical strength is required. The stents can be woven in such a manner as to have loaded fibers intermingled with unloaded fibers if needed for mechanical properties.

Fibers can also be used in conjunction with commercially available stents to deliver drugs at the placement site. In this case, the fibers would not provide any mechanical support, but would only serve as a drug delivery reservoir.

Example 8

Preparation and Use of Wound Dressings

In another embodiment, a gauze or dressing can be made from these fibers. This dressing can have two sides, an upper surface that will release molecules for re-epithelialization and provide a substrate for these cells. The bottom surface will promote regeneration of dermal tissue. This dressing is designed for dermal wound healing, including burns, full thickness dermal wounds and chronic or non-healing wounds and sores. Each fiber can be coated to provide temporal release of drugs or factors to correspond to the three phases of dermal wound healing.

For example, in the case of a dressing designed for trauma patients, the first chemical to be released could be a pro-

coagulant to help stop the bleeding. The next layer could then release cytokines to help recruit neutrophils and macrophages for the next phase of wound healing. Finally, a release of factors to help with reducing excessive scar tissue and to inhibit contractions, which are particularly disabling to burn patients.

Example 9

Fabrication of Artificial Arteries

It may be possible to construct an artificial artery using techniques described herein. A series of hollow, cylindrical sections can be knitted, woven, braided or fabricated using non-woven technology with fibers loaded with various biological agents. The innermost cylinder is preferably tightly woven and contains drugs or agents to promote migrating, spreading and functioning of an intact endothelial cell layer. The next cylinder is composed of a woven or knitted architecture with fibers predominately circumferentially wound around the inner cylinder. This layer will induce the migration and proliferation of smooth muscle fibers, and promote the expression of elastin to create the internal elastic media. The next cylinder is composed of knitted or non-woven fibers and will contain drugs to promote the ingrowth of fibroblasts, macrophages and the creation of extracellular matrix. The last layer will compose longitudinal fibers that will promote the vascularization of the arterial cells via an artificial vasa vasorum, created by VEGF releasing fibers, or other promoters of angiogenesis.

Example 10

Drug Delivery Scaffold

In another application embodiment, these fibers can be used for drug delivery scaffolds in places where a fiber format is preferred to that of a microsphere. For example, for drug delivery directly to the blood stream, a fiber can be attached to a vessel wall, and be contained entirely within the blood vessel. Microspheres cannot flow through the circulatory system, as they will become trapped at some level, potentially compromising the downstream tissue. The fibers, however, can release drugs and not cause any problems with occluding downstream branches so long as the fiber remains intact. Other locations where a fiber may make more sense than microspheres may include the eye, where the spheres may be more likely to interfere with the subject's vision. A fiber could be tacked down and not float into the field of view. Fibers may be able to stay in place better than microspheres, particularly within a space where the fiber can be coiled. In this way, the mechanical tension within the fiber will cause it to push against the sides of the tissue space and thus remain in position.

Example 11

In Situ Arteriogenesis

Similar in scope to example 9, is in situ arteriogenesis. In this embodiment, a fiber bundle containing VEGF or a similar substitute is placed into the body with both ends of the fiber bundle near or touching an existing blood vessel. As the fiber begins to release VEGF or its substitute, endothelial cells from the existing blood vessel will be induced to migrate out from the existing vessel following a process similar to normal angiogenesis. The leading endothelial cells will traverse the path of the fiber bundle, thus creating a new blood vessel along the path of the fiber bundle. This fiber bundle may have several forms, it may exist of single or a few fibers that only release VEGF or its substitute, or it may be a tube with VEGF or similar growth factor that is chemotactic for endothelial cells on the inside, and a different factor for smooth muscles on the outside. In this way, the size of the created vessel may be determined. In this application, cells are guided into initially cell-free scaffoldings by cell-specific growth factors.

Example 12

Bone Fracture Healing

In another wound healing embodiment, proteins known to enhance bone fracture healing are loaded into a fiber. This fiber can then be wrapped around the bone at the site of the fracture, releasing the growth factors and enhancing the rate of fracture repair.

These fibers can either be in a helical structure (single or multiple helix), or they may be woven into a loose, open weave. Either in the helical or in the woven format, the fibers are placed around the bone fragments, holding them in place while releasing their growth factors.

In the case of a non-healing fracture that is due to lost or poor blood supply to the fracture site, a fiber or set of fibers containing VEGF or its equivalent may be used to enhance blood supply to the fractured area.

In this embodiment, bone fractures may be healed at accelerated rates compared to non-treated fractures, and non-unions may be healed in certain cases.

Example 13

Skin Ulcer Healing

Similar to example 8 which described one form of dermal wound healing, another important example of this technology is the potential of healing chronic skin ulcers of various origins, such as diabetic foot ulcers, venous ulcers and general pressure sores. These conditions, and potentially other similar conditions may be healed based on creating a non-woven mesh of fibers that release factors known to accelerate dermal wound healing, for example, platelet derived growth factor (PDGF), transforming growth factor-beta (TGF-beta), and VEGF or similar protein. This non-woven mesh can be inserted or packed directly into the ulcer or wound, where these growth factors can help accelerate the wound-healing process. These dressings can be designed for healing dermal sores and ulcers. In this case, there is little need to reduce bleeding; rather one of the biggest needs of these patients, particularly those with diabetic ulcers is lack of blood supply to the wound site. Therefore, factors that induce angiogenesis may be able to increase circulation and help to rejuvenate the tissue at the site of the sore or ulcer.

Each dressing can be designed for the particular needs of the various types of wounds or sores by altering the biomolecules that are released, and the kinetics at which they are released.

Example 14

Muscle Grafts

In another embodiment, parallel arrays of fibers may be loaded with muscle stem cells. These stem cells can be of cardiac, smooth or skeletal muscle origin. Once these muscle stem cells are seeded onto the fiber array, the fibers can be mechanically stretched in vitro to help these cells

align and differentiate properly. Alignment may also be achieved by using fibers of very small diameter. Our experience with axons indicates that with fibers on the order of 50 μm diameter tend to help cells align parallel to the axis of the fibers. Other fibers in this bundle can release angiogenic factors to create a vascular supply for the muscle cells. In the case of skeletal or smooth muscle tissue, fibers for nerve growth can also be included to induce the formation of neuromuscular junctions. Various experimental conditions used to harvest, isolate, reproduce and differentiate these stem cells are known to those skilled in the art, and is not a part of this patent.

Example 15

Alternative Fiber Fabrication Procedure 1

To fabricate small volumes of polymer on the order of 100 μl of polymer solution, the following method has been developed. Create the emulsion as described in example 1. Add this emulsion to a small container, such as a 1 ml FALCON® tube that has been modified by inserting a 20 to 30 gauge needle through the bottom of the tube, 23 gauge being most typical. Place this tube into a modified 50 ml tube that is full of the coagulating bath solvent. Place the tubes in a centrifuge and spin between 500 to 1200 rpm, 700 being most typical. The centrifugal force will push the small volume of polymer emulsion through the needle and into the coagulating fluid. By similar solvent exchanges as described in example 1, a fiber is formed. This method uses substantially less polymer emulsion with very little wasted emulsion.

Example 16

Alternative Fiber Fabrication Procedure 2

As an alternative fabrication procedure, the coagulation solvent(s) are flowed through long vertical tubes at a prescribed rate and the polymer solution is extruded into the flowing stream of coagulation solvent(s). The flow from the tube exits into a bath. The fiber passes over one or more bobbins and is taken from the bath and wound onto a spool. The solvent flow rate, the rate of polymer extrusion, the composition of the polymer solution/emulsion, the composition of the coagulating bath solvent(s), the rate at which the fiber is wound, any drawing that may take place between successive bobbins, and any additional baths or treatments will affect the fiber mechanical and chemical properties as well as the release kinetics of the loaded biological materials.

Example 17

Treatment of Glaucoma

Similar to drug delivery in the eye, described in example 10, and the neural stent described briefly in example 6, glaucoma may be treated by combining an intraocular drug delivery with a neural treatment applied to the optic nerve. Retinal ganglion cells undergo apoptosis leading to death of the axons of the optic nerve. It is hypothesized that if the cells could be supported both within the eye as well as along the path of the optic nerve, the cells may be able to survive. A fiber bundle that releases growth factors such as NT-4, BDNF, CNTF, may be applied topically to the exterior of the optic nerve. Simultaneously, fibers that release apoptosis inhibitors, or factors to support the retinal ganglion cells are implanted within the eye. This combined effort may prolong or save the sight of those suffering from glaucoma.

As is seen from the preceding examples, other tissues, organs, or structures are possible to weave once the basic physiologic structure is understood. This can be extended to organs of the digestive system, musculoskeletal system, urological system, circulatory system, nervous system.

All of the compositions and methods disclosed and claimed herein can be made and executed without undue experimentation in light of the present disclosure. While the compositions and methods of this invention have been described in terms of preferred embodiments, it will be apparent to those of skill in the art that variations may be applied to the compositions and methods and in the steps or in the sequence of steps of the method described herein without departing from the concept, spirit and scope of the invention. More specifically, it will be apparent that certain agents which are both chemically and physiologically related may be substituted for the agents described herein while the same or similar results would be achieved. All such similar substitutes and modifications apparent to those skilled in the art are deemed to be within the spirit, scope and concept of the invention as defined by the appended claims.

REFERENCES

The following references, to the extent that they provide exemplary procedural or other details supplementary to those set forth herein, are specifically incorporated herein by reference.


Aigner, Tegeler, Hutzler, Campoccia, Pavesio, Hammer, Kastenbauer, Naumann, "Cartilage tissue engineering with novel nonwoven structured biomaterial based on hyaluronic acid benzyl ester," *J. of Biomed. Materials Res.*, 42(2):172–81, 1998.

Auerbach and Auerbach, "Angiogenesis inhibition: a review," *Pharmac. Ther.*, 63:265, 1994.

Breitbart, Grande, Kessler, Ryaby, Fitzsimmons, Grant, "Tissue engineered bone repair of calvarial defects using cultured periosteal cells," *Plastic & Reconstructive Surgery*, 101(3):567–74, 1998.

Cao, Rodriguez, Vacanti, Ibarra, Arevalo, Vacanti, "Comparative study of the use of poly(glycolic acid), calcium alginate and pluronics in the engineering of autologous porcine cartilage," *J. of Biomaterials Sci., Polymer Edition*, 9(5):475–87, 1998.

Dillon, Yu, Sridharan, Ranieri, Bellamkonda, "The influence of physical structure and charge on neurite extension in a 3D hydrogel scaffold," *J. of Biomaterials Sci., Polymer Ed.*, 9(10):1049–69, 1998.

Elcin, Dixit, Lewin, Gitnick, "Xenotransplantation of fetal porcine hepatocytes in rats using atissue engineering approach," *Artificial Organs*, 23(2):146–52, 1999.

Fauza, Fishman, Mehegan, Atala, "Videofetoscopically assisted fetal tissue engineering: skin replacement," *J. of Pediatric Surgery*, 33(2):357–61, 1998.

Fidler and Ellis, "The implications of angiogenesis for the biology and therapy of cancer metastasis," *Cell*, 79:185, 1994.

Folkman and Klagsbrun, "Angiogenic factors," *Science*, 235:442–447, 1987.

Folkman, "How is blood vessel growth regulated in normal and neoplastic tissue," *Cancer Res.*, 46:467, 1986.

Folkman, J., "Angiogenesis in cancer, vascular, rheumatoid and other disease," *Nature Med.*, 1:27, 1995.

Grande, Halberstadt, Naughton, Schwartz, Manji, "Evaluation of matrix scaffolds for tissue engineering of articular cartilage grafts," *J. of Biomed. Mat. Res.*, 34(2):211–20, 1997.

Gutsche, Lo, Zurlo, Yager, Leong, "Engineering of a sugar-derivatized porous network for hepatocyte culture," *Biomaterials*, 17(3):387–93, 1996.

Hoerstrup, Zund, Lachat, Schoeberlein, Uhlschmid, Vogt, Turina, "Tissue engineering: a new approach in cardiovascular surgery-seeding of human fibroblasts on resorbable mesh," *Swiss Surgery*, (Suppl.), 2:23–5, 1998.

Hoerstrup, Zund, Schoeberlein, Ye, Vogt, Turina, "Fluorescence activated cell sorting: a reliable method in tissue engineering of a bioprosthetic heart valve," *Annals of Thoracic Surgery*, 665(5):1653–7, 1998.

Isogai, Landis, Kim, Gerstenfeld, Upton, Vacanti, "Formation of phalanges and small joints by tissue-engineering," *J. of Bone & Joint Surgery, American Vol.*, 81(3):306–16, 1999.

Martin, Padera, Vunjak-Novakovic, Freed, "In vitro differentiation of chick embryo bone marrow stromal cells into cartilaginous and bone-like tissues," *J. of Orthopaedic Res.*, 16(2):181–9, 1998.

Nagy et al., "Pathogenesis of ascites tumor growth: vascular permeability factor, vascular hyperpermeability, and ascites fluid accumulation," *Cancer Res.*, 55:360, 1995.

Peppas and Langer, "New challenges in biomaterials," *Science*, 263:1715–1720, 1994.

Peter, Miller, Yasko, Yaszemski, Mikos, "Polymer concepts in tissue engineering," *J. of Biomed. Materials Res.*, 43(4):422–7, 1998.

Sacks, Chuong, Petroll, Kwan, Halberstadt, "Collagen fiber architecture of a cultured dermal tissue," *J. of Biomed. Engineering*, 119(1):124–7, 1997. Sambrook et al., *Molecular Cloning: A Laboratory Manual*, Cold Spring Harbor Laboratory Press, Cold Spring Harbor, N.Y., 1989.

Shinoka, Shum-Tim, Ma, Tanel, Isogai, Langer, Vacanti, Mayer, "Creation of viable pulmonary artery autografts through tissue engineering," *J. of Thoracic & Cardiovascular Surgery*, 115(3):536–45, 1998.

Sims, Butler, Cao, Casanova, Randolph, Black, Vacanti, Yaremchuk, "Tissue engineered neocartilage using plasma derived polymer substrates and chondrocytes," *Plastic & Reconstructive Surgery*, 101(6):1580–5, 1998.

Vunjak-Novakovic, Obradovic, Martin, Bursac, Langer, Freed, "Dynamic cell seeding of polymer scaffolds for cartilage tissue engineering," *Biotechnology Progress*, 14(2):193–202, 1998.

Whang, Tsai, Nam, Aitken, Sprague, Patel, Healy, "Ectopic bone formation via rhBMP-2 delivery from porous bioabsorbably polymer scaffolds," *J. of Biomed. Materials Res.*, 42(4):491–9, 1998.

Wong and Mooney, "Synthesis and properties of biodegradable polymers used in tissue engineering," In: *Synthetic Biodegradable Polymer Scaffolds*, (Atala and Mooney, eds.), Birkhauser Press, Boston, Mass., pp. 51–82, 1997.

Yoo and Atala, "A novel gene delivery system using urothelial tissue engineered neoorgans," *J. of Urology*, 158(3 Pt 2):1066–70, 1997.

What is claimed is:

1. A composition comprising at least one biodegradable polymer fiber wherein said fiber is composed of a first phase and a second phase, the first and second phases being immiscible, and wherein the second phase comprises one or more therapeutic agents.

2. The composition of claim 1, wherein said second phase is derived from an aqueous solution, a hydrogel or polymer.

3. The composition of claim 1, wherein said fiber forms a scaffold and further wherein, said second phase is manipulated to form an internal porous structure within the fiber.

4. The composition of claim 1, wherein said fiber is woven, braided or knitted in an assembly with other fibers, and at least one fiber in the assembly comprises one or more therapeutic agents.

5. The composition of claim 1, wherein the one or more therapeutic agents are distributed within the second phase in a nonhomogenous pattern.

6. The composition of claim 1, wherein the concentration of said one or more therapeutic agents varies along the longitudinal axis of the fiber.

7. The composition of claim 6, wherein the concentration of said one or more therapeutic agents varies linearly, exponentially or in any desired fashion, as a function of distance along the longitudinal axis of the fiber.

8. The composition of claim 1, wherein the concentration of said one or more therapeutic agents decreases from a first end of the fiber to a second end of the fiber.

9. The composition of claim 1, wherein said one or more therapeutic agents vary in a bidirectional manner, and the content of said one or more therapeutic agents increases from the first end of said fiber to a maximum and then decreases towards the second end of said fiber.

10. The composition of claim 1, further comprising at least one biodegradable polymer fiber containing no therapeutic agent.

11. The composition of claim 1, wherein said one or more therapeutic agents are selected from the group consisting of drugs, proteins, enzymes, growth factors, immunomodulators, compounds promoting angiogenesis, compounds inhibiting angiogenesis, anti-inflammatory compounds, antibiotics, cytokines, anti-coagulation agents, procoagulation agents, chemotactic agents, agents to promote apoptosis, agents to inhibit apoptosis, and mitogenic agents.

12. The composition of claim 1, wherein said one or more therapeutic agents include a radioactive agent or a contrast agent for imaging studies.

13. The composition of claim 1, wherein said one or more therapeutic agents is selected from the group consisting of viral vector, polynucleotide and polypeptide.

14. The composition of claim 1, wherein said one or more therapeutic agents comprise an angiogenesis-promoting agent.

15. The composition of claim 14, wherein said angiogenesis-promoting agent is vascular endothelial growth factor.

16. The composition of claim 1, wherein said biodegradable polymer is a single polymer, a co-polymer, or a mixture of polymers selected from the group consisting of polypeptides, polydepsipeptides, nylon copolyamides, aliphatic polyesters, polydihydropyrans, polyphosphazenes, poly(ortho ester), poly(cyano acrylates), polyanhydride, modified polysaccharides and modified proteins.

17. The composition of claim 16, wherein said aliphatic polyesters are selected from the group consisting of poly (glycolic acid), poly(lactic acid), poly(alkylene succinates) poly(hydroxybutyrate), poly(butylene diglycolate), poly (epsilon-caprolactone) and copolymers, blends and mixtures thereof.

18. The composition of claim 16, wherein said modified polysaccharides are selected from the group consisting of cellulose, starch-alginate and the glycosaminoglycans, chondroitin sulfate, heparin, heparin sulfate, dextran, dextran sulfate, chitin, chitosan and chitosan sulfate.

19. The composition of claim 16, wherein said modified proteins are selected from the group consisting of collagen and fibrin.

20. The composition of claim 1, wherein said fiber comprises a plurality of polymer layers, wherein an outer layer circumscribes an adjacent inner layer.

21. The composition of claim 20, wherein said plurality of layers optionally contain one or more therapeutic agents.

**22**. The composition of claim **21**, wherein said one or more therapeutic agents are released over time from said plurality of layers.

**23**. The composition of claim **1**, wherein the fiber contains more than one therapeutic agent along its length.

**24**. The composition of claim **23**, wherein the concentration of said more than one therapeutic agent varies along the length of said subset of fibers.

**25**. The composition of claim **23**, wherein said more than one therapeutic agents are released at varying rates over time from said fiber.

**26**. The composition of claim **1**, wherein said one or more therapeutic agents are released at varying rates over time from said fiber.

**27**. A composition comprising a three-dimensional scaffold, said scaffold comprising fibers that are woven, non-woven, or knitted, or braided, wherein said fibers comprise fibers containing chitosan or a reconstituted extracellular matrix composition.

**28**. The composition of claim **27**, wherein said chitosan is sulfated chitosan.

**29**. A composition comprising fibers containing chitosan, reconstituted extracellular matrix composition and a therapeutic agent.

**30**. The composition of claim **29**, wherein said chitosan is sulfated chitosan.

**31**. The composition of claim **21**, wherein said one or more therapeutic agents are distributed within the plurality of layers in a nonhomogenous pattern.

**32**. The composition of claim **31**, wherein the concentration of said one or more therapeutic agents varies linearly, exponentially or in any desired fashion, as a function of distance within the plurality of layers.

* * * * *

# EXHIBIT B

**US6596296 Boston Scientific Synergy Everolimus-Eluting Pt-Cr Coronary Stent**

Claim 1

A composition comprising at least one **(A) biodegradable polymer fiber**

**(A)**




**Sources:** http://www.bostonscientific.com/en-US/products/stents--coronary/bioabsorbable-polymer-stent.html

Claim 1

A composition comprising at least one (A) biodegradable polymer fiber

IV. WARNINGS AND PRECAUTIONS

The warnings and precautions can be found in the SYNERGY™ Everolimus-Eluting Platinum Chromium Coronary Stent System labeling

V. DEVICE DESCRIPTION

The SYNERGY™ Everolimus-Eluting Platinum Chromium Coronary Stent System (SYNERGY) is a device/drug combination product that provides a mechanical structure for vascular lumen support (primary mode of action) and a pharmacological agent (everolimus) targeted towards reducing the injury response. The System consists of a drug/polymer-coated balloon-expandable stent, pre-mounted on a Monorail™ (MR) or Over-The-Wire (OTW) delivery catheter. The stent is made from a platinum chromium alloy (PtCr). The drug/polymer coating consists of a bioabsorbable polymer, poly (D,L-lactide-co-glycolide) (PLGA), and the active pharmaceutical ingredient, everolimus. The characteristics of the SYNERGY stent system are described in **Table V-T1**.

**Table V-T1: SYNERGY™ Everolimus-Eluting Platinum Chromium Coronary Stent System Product Description**

| | SYNERGY Monorail Stent Delivery System | SYNERGY Over-the-Wire Stent Delivery System |
|---|---|---|
| Available Stent Lengths (mm) | 8, 12, 16, 20, 24, 28, 32, 38 | |
| Available Stent Diameters (mm) | 2.25, 2.50, 2.75, 3.00, 3.50, 4.00 | |
| Stent Material | Platinum Chromium Alloy (PtCr) | |
| Stent Strut Thickness | 0.074 mm for diameters 2.25 mm to 2.75 mm<br>0.079 mm for diameters 3.00mm to 3.50 mm<br>0.081 mm for diameter of 4.00 mm | |
| Drug Product | An abluminal (outer surface of the stent) coating of a polymer carrier with approximately 1 µg of everolimus per mm² of total stent surface area with a maximum nominal drug content of 287.2 µg on the largest stent (4.00 x 38 mm). | |
| **Delivery System** | | |
| Effective Length | 144 cm | |
| Delivery System Y-Adapter Ports | Single access port to inflation lumen. Guidewire exit port is located approximately 25 cm from tip. Designed for guidewire ≤0.014 inches (0.36 mm) | Y-Connector (Side arm for access to balloon inflation/deflation lumen. Straight arm is continuous with shaft inner lumen). Designed for guidewire ≤0.014 inches (0.36 mm) |
| Stent Delivery | A balloon, with two radiopaque balloon markers, nominally placed 0.4 mm (0.016 inches) beyond the stent at each end. | |
| Balloon Inflation Pressure | Nominal Inflation Pressure:<br>• Diameters 2.25 mm, 2.50 mm, 2.75 mm, 3.00 mm, 3.50 mm, 4.00 mm: 11 atm (1117 kPa) | |
| | Rated Burst Inflation Pressure:<br>• Diameters 2.25 mm – 2.75 mm: 18 atm (1827 kPa)<br>• Diameters 3.00 mm – 4.00 mm: 16 atm (1620 kPa) | |



**DEVICE DESCRIPTION**

The SYNERGY™ Everolimus-Eluting Platinum Chromium Coronary Stent System (SYNERGY) is a device/drug combination product that provides a mechanical structure for vascular lumen support (primary mode of action) and a pharmacological agent (everolimus) targeted towards reducing the injury response. The System consists of a drug/polymer-coated balloon-expandable stent, pre-mounted on a Monorail™ (MR) or Over-The-Wire (OTW) delivery catheter. The stent is made from a platinum chromium alloy (PtCr). The drug/polymer coating consists of a bioabsorbable polymer, poly (D,L-lactide-co-glycolide) (PLGA), and the active pharmaceutical ingredient, everolimus. The characteristics of the SYNERGY stent system are described in **Table V-T1**.

**Sources:** FDA P150003 PMA, 2015

| Claim 1 |
|---|
| A composition comprising at least one (A) biodegradable polymer fiber |

Poly (lactic-co-glycolic acid) (PLGA) copolymers have been broadly used in controlled drug release applications. Because these polymers are biodegradable, they provide an attractive option for drug delivery vehicles. There are a variety of material, processing, and physiological factors that impact the degradation rates of PLGA polymers and concurrent drug release kinetics. This work is intended to provide a comprehensive and collective review of the physicochemical and physiological factors that dictate the degradation behavior of PLGA polymers and drug release from contemporary PLGA-based drug-polymer products. In conjunction with the existing experimental results, analytical and numerical theories developed to predict drug release from PLGA-based polymers are summarized and correlated with the experimental observations.




**Sources:** Polymer degradation and drug delivery in PLGA-based drug-polymer applications: a review of experiments and theories, PubMed ID: #27098357, 2016

Claim 1

wherein said fiber is composed of a **(B) first phase** and a **(C) second phase,**

IV. WARNINGS AND PRECAUTIONS

The warnings and precautions can be found in the SYNERGY™ Everolimus-Eluting Platinum Chromium Coronary Stent System labeling.

V. DEVICE DESCRIPTION

The SYNERGY™ Everolimus-Eluting Platinum Chromium Coronary Stent System (SYNERGY) is a device/drug combination product that provides a mechanical structure for vascular lumen support (primary mode of action) and a pharmacological agent (everolimus) targeted towards reducing the injury response. The System consists of a drug/polymer-coated balloon-expandable stent, pre-mounted on a Monorail™ (MR) or Over-The-Wire (OTW) delivery catheter. The stent is made from a platinum chromium alloy (PtCr). The drug/polymer coating consists of a bioabsorbable polymer, poly (D,L-lactide-co-glycolide) (PLGA), and the active pharmaceutical ingredient, everolimus. The characteristics of the SYNERGY stent system are described in **Table V-T1**.

**Table V-T1: SYNERGY™ Everolimus-Eluting Platinum Chromium Coronary Stent System Product Description**

| | SYNERGY Monorail Stent Delivery System | SYNERGY Over-the-Wire Stent Delivery System |
|---|---|---|
| Available Stent Lengths (mm) | 8, 12, 16, 20, 24, 28, 32, 38 | |
| Available Stent Diameters (mm) | 2.25, 2.50, 2.75, 3.00, 3.50, 4.00 | |
| Stent Material | Platinum Chromium Alloy (PtCr) | |
| Stent Strut Thickness | 0.074 mm for diameters 2.25 mm to 2.75 mm<br>0.079 mm for diameters 3.00mm to 3.50 mm<br>0.081 mm for diameter of 4.00 mm | |
| Drug Product | An abluminal (outer surface of the stent) coating of a polymer carrier with approximately 1 µg of everolimus per mm² of total stent surface area with a maximum nominal drug content of 287.2 µg on the largest stent (4.00 x 38 mm). | |
| Delivery System | | |
| Effective Length | 144 cm | |
| Delivery System Y-Adapter Ports | Single access port to inflation lumen. Guidewire exit port is located approximately 25 cm from tip. Designed for guidewire ≤0.014 inches (0.36 mm) | Y-Connector (Side arm for access to balloon inflation/deflation lumen. Straight arm is continuous with shaft inner lumen). Designed for guidewire ≤0.014 inches (0.36 mm) |
| Stent Delivery | A balloon, with two radiopaque balloon markers, nominally placed 0.4 mm (0.016 inches) beyond the stent at each end | |
| Balloon Inflation Pressure | Nominal Inflation Pressure:<br>• Diameters 2.25 mm, 2.50 mm, 2.75 mm, 3.00 mm, 3.50 mm, 4.00 mm: 11 atm (1117 kPa) | |
| | Rated Burst Inflation Pressure:<br>• Diameters 2.25 mm – 2.75 mm: 18 atm (1827 kPa)<br>• Diameters 3.00 mm – 4.00 mm: 16 atm (1620 kPa) | |

PMA P150003: FDA Summary of Safety and Effectiveness Data Page 2

**DEVICE DESCRIPTION**

The SYNERGY™ Everolimus-Eluting Platinum Chromium Coronary Stent System (SYNERGY) is a device/drug combination product that provides a mechanical structure for vascular lumen support (primary mode of action) and a pharmacological agent (everolimus) targeted towards reducing the injury response. The System consists of a drug/polymer-coated balloon-expandable stent, pre-mounted on a Monorail™ (MR) or Over-The-Wire (OTW) delivery catheter. The stent is made from a platinum chromium alloy (PtCr). The drug/polymer coating consists of a bioabsorbable polymer, poly (D,L-lactide-co-glycolide) (PLGA), and the active pharmaceutical ingredient, everolimus. The characteristics of the SYNERGY stent system are described in **Table V-T1**.

(B)

(C)

**Sources:** FDA P150003 PMA, 2015

Claim 1

the **first** and **second phases** (D) being immiscible,

IV. WARNINGS AND PRECAUTIONS

The warnings and precautions can be found in the SYNERGY™ Everolimus-Eluting Platinum Chromium Coronary Stent System labeling.

V. DEVICE DESCRIPTION

The SYNERGY™ Everolimus-Eluting Platinum Chromium Coronary Stent System (SYNERGY) is a device/drug combination product that provides a mechanical structure for vascular lumen support (primary mode of action) and a pharmacological agent (everolimus) targeted towards reducing the injury response. The System consists of a drug/polymer-coated balloon-expandable stent, pre-mounted on a Monorail™ (MR) or Over-The-Wire (OTW) delivery catheter. The stent is made from a platinum chromium alloy (PtCr). The drug/polymer coating consists of a bioabsorbable polymer, poly (D,L-lactide-co-glycolide) (PLGA), and the active pharmaceutical ingredient, everolimus. The characteristics of the SYNERGY stent system are described in **Table V-T1**.

**Table V-T1: SYNERGY™ Everolimus-Eluting Platinum Chromium Coronary Stent System Product Description**

| | SYNERGY Monorail Stent Delivery System | SYNERGY Over-the-Wire Stent Delivery System |
|---|---|---|
| Available Stent Lengths (mm) | 8, 12, 16, 20, 24, 28, 32, 38 | |
| Available Stent Diameters (mm) | 2.25, 2.50, 2.75, 3.00, 3.50, 4.00 | |
| Stent Material | Platinum Chromium Alloy (PtCr) | |
| Stent Strut Thickness | 0.074 mm for diameters 2.25 mm to 2.75 mm<br>0.079 mm for diameters 3.00mm to 3.50 mm<br>0.081 mm for diameter of 4.00 mm | |
| Drug Product | An abluminal (outer surface of the stent) coating of a polymer carrier with approximately 1 µg of everolimus per mm² of total stent surface area with a maximum nominal drug content of 287.2 µg on the largest stent (4.00 x 38 mm). | |
| Delivery System | | |
| Effective Length | 144 cm | |
| Delivery System Y-Adapter Ports | Single access port to inflation lumen. Guidewire exit port is located approximately 25 cm from tip. Designed for guidewire ≤0.014 inches (0.36 mm) | Y-Connector (Side arm for access to balloon inflation/deflation lumen. Straight arm is continuous with shaft inner lumen). Designed for guidewire ≤0.014 inches (0.36 mm) |
| Stent Delivery | A balloon, with two radiopaque balloon markers, nominally placed 0.4 mm (0.016 inches) beyond the stent at each end | |
| Balloon Inflation Pressure | Nominal Inflation Pressure:<br>• Diameters 2.25 mm, 2.50 mm, 2.75 mm, 3.00 mm, 3.50 mm, 4.00 mm: 11 atm (1117 kPa) | |
| | Rated Burst Inflation Pressure:<br>• Diameters 2.25 mm – 2.75 mm: 18 atm (1827 kPa)<br>• Diameters 3.00 mm – 4.00 mm: 16 atm (1620 kPa) | |

PMA P150003: FDA Summary of Safety and Effectiveness Data    Page 2

(B)

**DEVICE DESCRIPTION**

The SYNERGY™ Everolimus-Eluting Platinum Chromium Coronary Stent System (SYNERGY) is a device/drug combination product that provides a mechanical structure for vascular lumen support (primary mode of action) and a pharmacological agent (everolimus) targeted towards reducing the injury response. The System consists of a drug/polymer-coated balloon-expandable stent, pre-mounted on a Monorail™ (MR) or Over-The-Wire (OTW) delivery catheter. The stent is made from a platinum chromium alloy (PtCr). The drug/polymer coating consists of a bioabsorbable polymer, poly (D,L-lactide-co-glycolide) (PLGA), and the active pharmaceutical ingredient, everolimus. The characteristics of the SYNERGY stent system are described in **Table V-T1**.

(C)

**Sources:** FDA P150003 PMA, 2015

Claim 1

the **first** and **second phases** (D) being immiscible,

**(D)**

| | |
|---|---|
| Drug Product | An abluminal (outer surface of the stent) coating of a polymer carrier with approximately 1 μg of everolimus per $mm^2$ of total stent surface area with a maximum nominal drug content of 287.2 μg on the largest stent (4.00 x 38 mm). |

IV. WARNINGS AND PRECAUTIONS

The warnings and precautions can be found in the SYNERGY™ Everolimus-Eluting Platinum Chromium Coronary Stent System labeling.

V. DEVICE DESCRIPTION

The SYNERGY™ Everolimus-Eluting (SYNERGY) is a device/drug combinat for vascular lumen support (primary mo (everolimus) targeted towards reducing drug/polymer-coated balloon-expandable stent, pre-mounted on a Monorail™ (MR) or Over-The-Wire (OTW) delivery catheter. The stent is made from a platinum chromium alloy (PtCr). The drug/polymer coating consists of a bioabsorbable polymer, poly (D,L-lactide-co-glycolide) (PLGA), and the active pharmaceutical ingredient, everolimus. The characteristics of the SYNERGY stent system are described in **Table V-T1**.

**Table V-T1: SYNERGY™ Everolimus-Eluting Platinum Chromium Coronary Stent System Product Description**

| | SYNERGY Monorail Stent Delivery System | SYNERGY Over-the-Wire Stent Delivery System |
|---|---|---|
| Available Stent Lengths (mm) | 8, 12, 16, 20, 24, 28, 32, 38 | |
| Available Stent Diameters (mm) | 2.25, 2.50, 2.75, 3.00, 3.50, 4.00 | |
| Stent Material | Platinum Chromium Alloy (PtCr) | |
| Stent Strut Thickness | 0.074 mm for diameters 2.25 mm to 2.75 mm<br>0.079 mm for diameters 3.00mm to 3.50 mm<br>0.081 mm for diameter of 4.00 mm | |
| Drug Product | An abluminal (outer surface of the stent) coating of a polymer carrier with approximately 1 μg of everolimus per $mm^2$ of total stent surface area with a maximum nominal drug content of 287.2 μg on the largest stent (4.00 x 38 mm). | |
| Delivery System | | |
| Effective Length | 144 cm | |
| Delivery System Y-Adapter Ports | Single access port to inflation lumen. Guidewire exit port is located approximately 25 cm from tip. Designed for guidewire ≤0.014 inches (0.36 mm) | Y-Connector (Side arm for access to balloon inflation/deflation lumen. Straight arm is continuous with shaft inner lumen). Designed for guidewire ≤0.014 inches (0.36 mm) |
| Stent Delivery | A balloon, with two radiopaque balloon markers, nominally placed 0.4 mm (0.016 inches) beyond the stent at each end. | |
| Balloon Inflation Pressure | Nominal Inflation Pressure:<br>• Diameters 2.25 mm, 2.50 mm, 2.75 mm, 3.00 mm, 3.50 mm, 4.00 mm: 11 atm (1117 kPa) | |
| | Rated Burst Inflation Pressure:<br>• Diameters 2.25 mm – 2.75 mm: 18 atm (1827 kPa)<br>• Diameters 3.00 mm – 4.00 mm: 16 atm (1620 kPa) | |

PMA P150003: FDA Summary of Safety and Effectiveness Data Page 2

**Sources:** FDA P150003 PMA, 2015

Claim 1

and wherein the **second phase** comprises **(E) one or more therapeutic agents**.

IV. WARNINGS AND PRECAUTIONS

The warnings and precautions can be found in the SYNERGY™ Everolimus-Eluting Platinum Chromium Coronary Stent System labeling.

V. DEVICE DESCRIPTION

The SYNERGY™ Everolimus-Eluting Platinum Chromium Coronary Stent System (SYNERGY) is a device/drug combination product that provides a mechanical structure for vascular lumen support (primary mode of action) and a pharmacological agent (everolimus) targeted towards reducing the injury response. The System consists of a drug/polymer-coated balloon-expandable stent, pre-mounted on a Monorail™ (MR) or Over-The-Wire (OTW) delivery catheter. The stent is made from a platinum chromium alloy (PtCr). The drug/polymer coating consists of a bioabsorbable polymer, poly (D,L-lactide-co-glycolide) (PLGA), and the active pharmaceutical ingredient, everolimus. The characteristics of the SYNERGY stent system are described in **Table V-T1**.

**Table V-T1: SYNERGY™ Everolimus-Eluting Platinum Chromium Coronary Stent System Product Description**

| | SYNERGY Monorail Stent Delivery System | SYNERGY Over-the-Wire Stent Delivery System |
|---|---|---|
| Available Stent Lengths (mm) | 8, 12, 16, 20, 24, 28, 32, 38 | |
| Available Stent Diameters (mm) | 2.25, 2.50, 2.75, 3.00, 3.50, 4.00 | |
| Stent Material | Platinum Chromium Alloy (PtCr) | |
| Stent Strut Thickness | 0.074 mm for diameters 2.25 mm to 2.75 mm<br>0.079 mm for diameters 3.00mm to 3.50 mm<br>0.081 mm for diameter of 4.00 mm | |
| Drug Product | An abluminal (outer surface of the stent) coating of a polymer carrier with approximately 1 µg of everolimus per mm² of total stent surface area with a maximum nominal drug content of 287.2 µg on the largest stent (4.00 x 38 mm). | |
| Delivery System | | |
| Effective Length | 144 cm | |
| Delivery System Y-Adapter Ports | Single access port to inflation lumen. Guidewire exit port is located approximately 25 cm from tip. Designed for guidewire ≤0.014 inches (0.36 mm) | Y-Connector (Side arm for access to balloon inflation/deflation lumen. Straight arm is continuous with shaft inner lumen). Designed for guidewire ≤0.014 inches (0.36 mm) |
| Stent Delivery | A balloon, with two radiopaque balloon markers, nominally placed 0.4 mm (0.016 inches) beyond the stent at each end. | |
| Balloon Inflation Pressure | Nominal Inflation Pressure:<br>• Diameters 2.25 mm, 2.50 mm, 2.75 mm, 3.00 mm, 3.50 mm, 4.00 mm: 11 atm (1117 kPa) | |
| | Rated Burst Inflation Pressure:<br>• Diameters 2.25 mm – 2.75 mm: 18 atm (1827 kPa)<br>• Diameters 3.00 mm – 4.00 mm: 16 atm (1620 kPa) | |



**DEVICE DESCRIPTION**

The SYNERGY™ Everolimus-Eluting Platinum Chromium Coronary Stent System (SYNERGY) is a device/drug combination product that provides a mechanical structure for vascular lumen support (primary mode of action) and a pharmacological agent (everolimus) targeted towards reducing the injury response. The System consists of a drug/polymer-coated balloon-expandable stent, pre-mounted on a Monorail™ (MR) or Over-The-Wire (OTW) delivery catheter. The stent is made from a platinum chromium alloy (PtCr). The drug/polymer coating consists of a bioabsorbable polymer, poly (D,L-lactide-co-glycolide) (PLGA), and the active pharmaceutical ingredient, everolimus. The characteristics of the SYNERGY stent system are described in **Table V-T1**.

**(E)**

**Sources:** FDA P150003 PMA, 2015

# EXHIBIT C

US007033603B2

(12) **United States Patent**
**Nelson et al.**

(10) **Patent No.: US 7,033,603 B2**
(45) **Date of Patent: *Apr. 25, 2006**

(54) **DRUG RELEASING BIODEGRADABLE FIBER FOR DELIVERY OF THERAPEUTICS**

(75) Inventors: **Kevin D. Nelson**, Arlington, TX (US); **Brent B. Crow**, Fort Worth, TX (US)

(73) Assignee: **Board of Regents The University of Texas**, Austin, TX (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 54 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/428,901**

(22) Filed: **May 2, 2003**

(65) **Prior Publication Data**

US 2004/0028655 A1 Feb. 12, 2004

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/632,457, filed on Aug. 4, 2000, now Pat. No. 6,596,296.

(60) Provisional application No. 60/147,827, filed on Aug. 6, 1999.

(51) **Int. Cl.**
***A61F 2/02*** (2006.01)
***A61K 47/30*** (2006.01)

(52) **U.S. Cl.** .................................. **424/426**; 514/772.3

(58) **Field of Classification Search** ............... 424/426; 514/772.3

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,464,321 A | 8/1984 | Pittalis et al. | 264/83 |
| 4,965,128 A | 10/1990 | Greidanus et al. | 428/398 |
| 5,166,187 A | 11/1992 | Collombel et al. | 514/21 |
| 5,263,984 A | 11/1993 | Li et al. | 623/15 |
| 5,270,300 A | 12/1993 | Hunziker | 514/12 |
| 5,290,271 A | 3/1994 | Jernberg | 604/891.1 |
| 5,342,348 A | 8/1994 | Kaplan | 605/891.1 |
| 5,567,612 A | 10/1996 | Vacanti et al. | 435/240.23 |
| 6,596,296 B1 * | 7/2003 | Nelson et al. | 424/426 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 328 050 A2 | 8/1989 |
| WO | WO 98/20190 | 5/1998 |
| WO | WO 00/47716 | 8/2000 |

OTHER PUBLICATIONS

Aigner et al., "Cartilage tissue engineering with novel nonwoven structured biomaterial based on hyaluronic acid benzyl ester," *J. of Biomed. Materials Res.*, 42(2):172-81, 1998.

(Continued)

*Primary Examiner*—Carlos A. Azpuru
(74) *Attorney, Agent, or Firm*—Morgan, Lewis & Bockius LLP

(57) **ABSTRACT**

The present invention relates to fiber compositions comprising gels or hydrogels. The invention further relates to the composition of a gel or hydrogel loaded biodegradable fiber and methods of fabricating such fibers. The present invention further provides tissue engineering and drug-delivery compositions and methods wherein three-dimensional matrices for growing cells are prepared for in vitro and in vivo use. The invention also relates to methods of manipulating the rate of therapeutic agent release by changing both the biodegradable polymer properties as well as altering the properties of the incorporated gel or hydrogel.

**34 Claims, 11 Drawing Sheets**



OTHER PUBLICATIONS

Auerbach and Auerbach, "Angiogenesis inhibition: a review," *Pharmac. Ther.*, 63:265, 1994.

Breitbart et al., "Tissue engineered bone repair of calvarial defects using cultured periosteal cells," *Plastic & Reconstructive Surgery*, 101(3):567-74, 1998.

Cao et al., "Comparative study of the use of poly(glycolic acid), calcium alginate and pluronics in the engineering of autologous porcine cartilage," *J. of Biomaterials Sci., Polymer Edition*, 9(5):475-87, 1998.

Dillon et al., "The influence of physical structure and charge on neurite extension in a 3D hydrogel scaffold," *J. of Biomaterials Sci., Polymer Ed.*, 9(10):1049-69, 1998.

Elcin et al., "Xenotransplantation of fetal porcine hepatocytes in rats using a tissue engineering approach," *Artificial Organs*, 23(2):146-52, 1999.

Fidler and Ellis, "The implications of angiogenesis for the biology and therapy of cancer metastasis," *Cell*, 79:185, 1994.

Folkman and Klagsbrun, "Angiogenic factors," *Science*, 235:442-447, 1987.

Folkman, "How is blood vessel growth regulated in normal and neoplastic tissue," *CancerRes.*, 46:467, 1986.

Folkman, J., "Angiogenesis in cancer, vascular, rheumatoid and other disease," *NatureMed.*, 1:27, 1995.

Grande et al., "Evaluation of matrix scaffolds for tissue engineering of articular cartilage grafts," *J. of Biomed. Mat. Res.*, 34(2):211-20, 1997.

Gutsche et al., "Engineering of a sugar-derivatized porous network for hepatocyte culture," *Biomaterials*, 17(3):387-93, 1996.

Hoerstrup et al., "Tissue engineering: a new approach in cardiovascular surgery-seeding of human fibroblasts on resorbable mesh," *Swiss Surgery*, (Suppl.), 2:23-5, 1998.

Hoerstrup et al., " Fluorescence activated cell sorting: a reliable method in tissue engineering of a bioprosthetic heart valve," *Annals of Thoracic Surgery*, 665(5):1653-7, 1998.

Isogai et al., "Formation of phalanges and small joints by tissue-engineering," *J. of Bone & Joint Surgery, American* vol., 81(3):306-16, 1999.

Martin et al., "In vitro differentiation of chick embryo bone marrow stromal cells into cartilaginous and bone-like tissues," *J. of Orthopaedic Res.*, 16(2):181-9, 1998.

Nagy et al., "Pathogenesis of ascites tumor growth: vascular permeability factor, vascular hyperpermeability, and ascites fluid accumulation," *Cancer Res.*, 55:360, 1995.

Peppas and Langer, "New challenges in biomaterials," *Science*, 263:1715-1720, 1994.

Peter et al., "Polymer concepts in tissue engineering," *J. of Biomed. Materials Res.*, 43(4):422-7, 1998.

Sacks et al., "Collagen fiber architecture of a cultured dermal tissue," *J. of Biomed. Engineering*, 119(1):124-7, 1997.

Shinoka et al., "Creation of viable pulmonary artery autografts through tissue engineering," *J. of Thoracic & Cardiovascular Surgery*, 115(3):536-45, 1998.

Sims et al., "Tissue engineered neocartilage using plasma derived polymer substrates and chondrocytes," *Plastic & Reconstructive Surgery*, 101(6):1580-5, 1998.

Vunjak-Novakovic et al., "Dynamic cell seeding of polymer scaffolds for cartilage tissue engineering," *Biotechnology Progress*, 14(2):193-202, 1998.

Whang et al., "Ectopic bone formation via rhBMP-2 delivery from porous bioabsorbably polymer scaffolds," *J. of Biomed. Materials Res.*, 42(4):491-9, 1998.

Wong and Mooney, "Synthesis and properties of biodegradable polymers used in tissue engineering," *In: Synthetic Biodegradable Polymer Scaffolds*, (Atala and Mooney, eds. ), Birkhauser Press, Boston, MA, pp. 51-82, 1997.

Yoo and Atala, "A novel gene delivery system using urothelial tissue engineered neoorgans," *J. of Urology*, 158(3 Pt 2):1066-70, 1997.

Fauza et al., "Videofetoscopically assisted fetal tissue engineering: skin replacement," *J. of Pediatric Surgery*, 33(2):357-61, 1998.

* cited by examiner




*FIG. 1A*




*FIG. 1C*




*FIG. 1B*




*FIG. 1D*




FIG. 2A




FIG. 2C




FIG. 2B




FIG. 2D




*FIG. 3A*




*FIG. 3C*




*FIG. 3B*




*FIG. 3D*




FIG. 4A




FIG. 4C




FIG. 4B




FIG. 4D




*FIG. 5A*




*FIG. 5C*




*FIG. 5B*




*FIG. 5D*




*FIG. 6A*




*FIG. 6C*




*FIG. 6B*




*FIG. 6D*

Case 1:18-cv-00392-MN Document 1-3 Filed 11/20/17 Page 9 of 33 PageID #: 66


Programmable Syringe Pumps
Outer Fiber Spinning Dope
Inner Fiber Spinning Dope
Spinneret
Septum
Inner Coagulant
Extrusion Tube
Coagulant
Support
Fiber Line
Winding Spool
Fiber Guide
Non-Solvent Bath

*FIG. 7*


Bore Tubing
T-Fitting
Septum
Luer Lock Fitting
Bore Tubing Exit

*FIG. 8*


Programmable Syringe Pumps
Outer Fiber Spinning Dope
Inner Coagulant
Spinneret
Septum
Extrusion Tube
Coagulant
Support
Fiber Line
Winding Spool
Fiber Guide
Non-Solvent Bath

*FIG. 9*


Bore Tubing
T-Fitting
Septum
Outer Fluid Flow
Luer Lock Fitting
Bore Tubing Exit

*FIG. 10*




*FIG. 11*

## DRUG RELEASING BIODEGRADABLE FIBER FOR DELIVERY OF THERAPEUTICS

### CROSS REFERENCES TO RELATED APPLICATIONS

This application is a continuation-in-part of application Ser. No. 09/632,457, filed Aug. 4, 2000 now U.S. Pat. No. 6,596,296, which claims the benefit of U.S. Provisional Application No. 60/147,827, filed Aug. 6, 1999.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention relates to the field of medicine and tissue engineering, and in particular to drug releasing biodegradable fibers used in the delivery of therapeutics.

2. Description of Related Art

Tissue engineering is a discipline wherein living cells are used to replace cells lost as a result of injury, disease, or birth defect in an animal or human. These replacement cells can be autologous, allogenic, or xenogenic. The field of tissue engineering is a new area of medicine and optimal procedures have yet to be elucidated.

At present, there are several avenues for engineering tissues. One avenue is to harvest cells from a healthy donor, preferably from the same individual, or at least from an appropriate donor of the same species, and grow those cells on a scaffold in vitro. This scaffold is typically a three-dimensional polymer network, often composed of biodegradable fibers. Cells adherent to the polymer network can then typically be induced to multiply. This cell filled scaffold can be implanted into the impaired host with the goal that the cells will perform their physiological function and avoid destruction by the host immune system. To this end, it is important that purified cell lines are used, as the introduction of non-self immune cells can up-regulate a strong host immune attack. The difficulty with this approach is the scaffolding must be small, as no cell can survive more than a couple millimeters away from a source of oxygen and nutrients. Therefore, large scaffolds cannot be used, as the scaffold will not vascularize adequately in time to save the cells in the interior regions.

In another approach, an empty three-dimensional, biodegradable polymer scaffold is directly implanted in the patient, with the goal of inducing the correct type of cells from the host's body to migrate into the polymer scaffold. The benefit is that vascularization can happen simultaneously with migration of cells into the matrix. A major problem is that there is currently no way to ensure that the appropriate cell types will migrate into the scaffold, and that the mechanical and biological properties will be maintained to provide the patient's physiological need.

In both of the above approaches, the scaffold may be biodegradable, meaning that over time it will break down both chemically and mechanically. As this break down occurs, the cells secrete their own extracellular matrix, which plays a critical role in cell survival and function. In normal tissue, there is an active and dynamic reciprocal exchange between the constitutive cells of the tissue and the surrounding extracellular matrix. The extracellular matrix provides chemical signals that regulate the morphological properties and phenotypic traits of cells and may induce division, differentiation or even cell death. In addition, the cells are also constantly rearranging the extracellular matrix. Cells both degrade and rebuild the extracellular matrix and secrete chemicals into the matrix to be used later by themselves or other cells that may migrate into the area. It has also been discovered that the extracellular matrix is one of the most important components in embryological development. Pioneering cells secrete chemical signals that help following cells differentiate into the appropriate final phenotype. For example, such chemical signals cause the differentiation of neural crest cells into axons, smooth muscle cells or neurons.



The integrated relationship between extracellular matrix and tissue cells establishes the extracellular matrix as an important parameter in tissue engineering. If cells are desired to behave in a specific manner, then the extracellular matrix must provide the appropriate environment and appropriate chemical/biological signals to induce that behavior for that cell type. Currently it is not possible to faithfully reproduce a biologically active extracellular matrix. Consequently, some investigators use a biodegradable matrix that enables the cells to create their own extracellular matrix as the exogenous matrix degrades.

In the above-described approaches to tissue engineering, a polymer scaffold provides not only the mechanical support, but also the three-dimensional shape that is desired for the new tissue or organ. Because cells must be close to a source of oxygen and nutrients in order to survive and function, a major current limitation is that of blood supply. Most current methodologies provide no specific means of actively assisting the incorporation of blood vessels into and throughout the polymer matrix. This places limitations on the physical size and shape of the polymer matrix. The only current tissue-engineering device that has made it into widespread clinical use is artificial skin, which by definition is of limited thickness. The present invention provides compositions and methods that promote the directed migration of appropriate cell types into the engineered extracellular matrix. By directing specific three-dimensional cell migration and functional patterns, directed vascularization can be induced, which overcomes the current limitations on the shape and size of polymer implants. It also ensures that appropriate cell types will be physically located in specific locations within the matrix. Compositions and methods are provided to modulate phenotypic expression as a function of both time and space.

Most of the drug delivery from polymeric drug-loaded vehicles is based on the following formats: microspheres, nano-particles, foams, films, liposomes, polymeric micelles, or viral packages. There are a number of inherent disadvantages with respect to the above mentioned formats. Several of the above mentioned drug delivery formats do not remain in place after they have been implanted. As a result retrieval of the implant is not possible in the case of an adverse reaction to the implant. Additionally, these formats display high surface area per unit volume, which leads to quick drug release times, a feature that is antithetical to the goal of drug delivery. Furthermore, the amount of drug that can be loaded into the above mentioned formats is somewhat limited. Some of these formats cannot be used in conditions which in addition to drug delivery, also require mechanical support.

The present invention provides a fiber composition that does not possess the disadvantages of the drug delivery formats known in the prior art.

### SUMMARY OF THE INVENTION

The present invention relates to fiber compositions comprising gels or hydrogels. The invention further relates to the composition of a gel or hydrogel loaded biodegradable fiber and methods of fabricating such fibers. The present inven-

tion further provides tissue engineering and drug-delivery compositions and methods wherein three-dimensional matrices for growing cells are prepared for in vitro and in vivo use. The invention also relates to methods of manipulating the rate of therapeutic agent release by changing both the biodegradable polymer properties as well as altering the properties of the incorporated gel or hydrogel.

An embodiment of the invention provides a drug delivery composition comprising at least one fiber, wherein said fiber comprises a first component and a second component, and wherein said first component is a biodegradable polymer and said second component is selected from the group consisting of a gel and a hydrogel. Another embodiment of the invention provides a drug delivery composition comprising a fiber, wherein said fiber comprises a first component and a second component, and wherein said first component is a biodegradable polymer and said second component is water, and further wherein said water is present as an inner core. A further embodiment of the invention provides a drug delivery composition comprising a fiber, wherein said fiber comprises an emulsion consisting essentially of a gel or hydrogel. An embodiment of the invention provides drug delivery composition comprising a fiber, wherein said fiber comprises a first component, and wherein said first component is a gel or hydrogel and further wherein said fiber comprises a hollow bore. An embodiment of the invention provides a scaffold composition comprising one or more fibers, wherein said fibers comprise a first component and a second component, and wherein said first component is a biodegradable polymer and said second component is selected from the group consisting of a gel and a hydrogel. Embodiments of the invention also provide methods of manufacturing the fibers of the present invention.

## BRIEF DESCRIPTION OF THE DRAWINGS

The following drawings form part of the present specification and are included to further demonstrate certain aspects of the present invention. The invention may be better understood by reference to one or more of these drawings in combination with the detailed description of specific embodiments presented herein. The drawings are not intended to limit the scope of the invention.

FIG. **1**A depicts a bicomponent fiber with a water bore (**10**) and a wall comprising a hydrophobic polymer (**20**).

FIG. **1**B depicts a bicomponent fiber with a water bore (**10**), a wall comprising a hydrophobic polymer (**20**) and a water emulsion (**30**).

FIG. **1**C depicts a bicomponent fiber with a water bore (**10**), a wall comprising a hydrophobic polymer (**20**), and a gel or hydrogel emulsion (**40**).

FIG. **1**D depicts a bicomponent fiber with a water bore (**10**), a wall comprising a hydrophobic polymer (**20**), and both water and gel or hydrogel emulsions (**50**).

FIG. **2**A depicts a bicomponent fiber with a gel or hydrogel bore (**60**) and a wall comprising a hydrophobic polymer (**20**).

FIG. **2**B depicts a bicomponent fiber with a gel or hydrogel bore (**60**), a wall comprising a hydrophobic polymer (**20**), and a water emulsion (**30**).

FIG. **2**C depicts a bicomponent fiber with a gel or hydrogel bore (**60**), a wall comprising a hydrophobic polymer (**20**), and a gel or hydrogel emulsion (**40**).

FIG. **2**D depicts a bicomponent fiber with a gel or hydrogel bore (**60**), a wall comprising a hydrophobic polymer (**20**) and both water emulsions and gel or hydrogel emulsions (**50**).

FIG. **3**A depicts a bicomponent fiber with a gel or hydrogel bore (**60**) and a wall comprising a hydrophobic polymer (**20**) that comprises a drug (**70**).

FIG. **3**B depicts a bicomponent fiber with a polymer bore (**80**) surrounded by a gel or hydrogel wall (**90**).

FIG. **3**C depicts a bicomponent fiber with a polymer bore (**80**) comprising a water emulsion (**30**) that is surrounded by a gel or hydrogel wall (**90**).

FIG. **3**D depicts a bicomponent fiber with a polymer bore (**80**) comprising a gel or hydrogel emulsion (**40**) that is surrounded by a gel or hydrogel wall (**90**).

FIG. **4**A depicts a bicomponent fiber with a polymer bore (**80**) comprising a water emulsion and a gel or hydrogel emulsion (**50**) that is surrounded by a gel or hydrogel wall (**90**).

FIG. **4**B depicts a multicomponent fiber with a gel or hydrogel bore (**60**) surrounded by two hydrophobic polymer walls (**20 and 100**), with the outer polymer wall comprising a water emulsion (**30**) and the inner polymer wall comprising a gel or hydrogel emulsion (**40**).

FIG. **4**C depicts a monofilament fiber comprising a hydrophobic polymer (**100**) and a gel or hydrogel emulsion (**40**).

FIG. **4**D depicts a monofilament fiber comprising a hydrophobic polymer (**100**) and a water emulsion and a gel or hydrogel emulsion (**50**).

FIG. **5**A depicts a bicomponent fiber with a hydrophobic polymer bore (**90**), and a wall comprising a hydrophobic polymer (**20**) that comprises a gel or hydrogel emulsion (**40**).

FIG. **5**B depicts a bicomponent fiber with a hydrophobic polymer bore (**90**) and a wall comprising a hydrophobic polymer (**20**) comprising a water emulsion and a gel or hydrogel emulsion (**50**).

FIG. **5**C depicts a bicomponent fiber with a hydrophobic polymer bore (**90**) comprising a water emulsion (**30**) and a wall comprising a hydrophobic polymer (**20**) that comprises a gel or hydrogel emulsion (**40**).

FIG. **5**D depicts a bicomponent fiber with a hydrophobic polymer bore (**90**) comprising a gel or hydrogel emulsion (**40**) and a wall comprising a hydrophobic polymer (**20**) that comprises a gel or hydrogel emulsion (**40**).

FIG. **6**A depicts a bicomponent fiber with a hydrophobic polymer bore (**90**) comprising a water emulsion and a gel or hydrogel emulsion (**50**) and a wall comprising a hydrophobic polymer (**20**) that comprises a gel or hydrogel emulsion (**40**).

FIG. **6**B depicts a bicomponent fiber with a hydrophobic polymer bore (**90**) comprising a water emulsion (**30**) and a wall comprising a hydrophobic polymer (**20**) that comprises a water emulsion and a gel, or hydrogel emulsion (**50**).

FIG. **6**C depicts a bicomponent fiber with a hydrophobic polymer bore (**90**) comprising a gel or hydrogel emulsion (**40**) and a wall comprising a hydrophobic polymer (**20**) comprises a water emulsion and a gel or hydrogel emulsion (**50**).

FIG. **6**D depicts a bicomponent fiber with a hydrophobic polymer bore (**90**) comprising both water and gel or hydrogel emulsions (**50**) and a wall comprising a hydrophobic polymer (**20**) comprising both water and gel or hydrogel emulsions (**50**).

FIG. **7** depicts a wet extrusion apparatus used to extrude fibers of the invention.

FIG. **8** depicts a spinneret used in the present invention.

FIG. **9** depicts a triple apparatus used in the extrusion of fibers of the invention.

FIG. **10** depicts a triple spinneret used in the manufacture of multicomponent fibers.

FIG. 11 depicts the flow of a therpeutic through the walls of an emulsion-loaded fiber.

## DESCRIPTION OF ILLUSTRATIVE EMBODIMENTS

An embodiment of the invention provides a drug delivery composition comprising at least one fiber, wherein said fiber comprises a first component and a second component, and wherein said first component is a biodegradable polymer and said second component is selected from the group consisting of a gel and a hydrogel. Another embodiment of the invention provides a drug delivery composition comprising a fiber, wherein said fiber comprises a first component and a second component, and wherein said first component is a biodegradable polymer and said second component is water, and further wherein said water is present as an inner core. A further embodiment of the invention provides a drug delivery composition comprising a fiber, wherein said fiber comprises an emulsion consisting essentially of a gel or hydrogel. An embodiment of the invention provides drug delivery composition comprising a fiber, wherein said fiber comprises a first component, and wherein said first component is a gel or hydrogel and further wherein said fiber comprises a hollow bore. An embodiment of the invention provides a scaffold composition comprising one or more fibers, wherein said fibers comprise a first component and a second component, and wherein said first component is a biodegradable polymer and said second component is selected from the group consisting of a gel and a hydrogel. Embodiments of the invention also provide methods of manufacturing the fibers of the present invention.

An embodiment of the invention provides a bi-component fiber where the inner bore of the fiber, i.e., inside diameter of the fiber, comprises a gel or hydrogel and the outer wall of the fiber comprises a biodegradable polymer. As used herein, the term "gel" refers to a colloidal system with at least two phases, one of which forms a continuous three-dimensional network that acts as an elastic solid. As used herein, the term "hydrogel" refers to a colloid in which a dispersed phase (colloid) is combined with a continuous phase (water) to produce a viscous jellylike product.

An alternate embodiment of the invention provides the inverse of the above, i.e. where the outer wall comprises a gel or hydrogel and the inner bore comprises a biodegradable polymer fiber.

Another embodiment of the invention provides a monofilament fiber where a hydrogel or gel is dispersed randomly throughout the biodegradable polymer layer(s). This configuration results in distinct phase separation where the biodegradable polymer fiber constitutes a continuous phase and the gel or hydrogel constitutes a disperse phase. As used herein, a "continuous phase" refers to the liquid in a disperse system in which solids are suspended or droplets of another liquid are dispersed. As used herein, a "disperse phase" refers to the phase of a disperse system consisting of particles or droplets of one system dispersed through another system.

In certain embodiments, where the gel or hydrogel concentration is zero, a water-bored fiber is provided i.e., a fiber in which water is present within the inside diameter of the fiber. In this case, water, optionally in combination with other materials, comprises the inner core of the fiber and the biodegradable polymer fiber comprises the surrounding sheath of the fiber. In an alternate embodiment, the biodegradable polymer fiber sheath comprises a dispersion of gel or hydrogel. In another embodiment, the biodegradable



polymer fiber sheath comprises a dispersion of water in place of a dispersion of gel or hydrogel. In other embodiments, the biodegradable polymer fiber sheath comprises a dispersion of water together with a dispersion of gel and hydrogel.

In an embodiment of the invention, the above described fibers are combined with fibers of similar composition. In other embodiments, fibers of dissimilar type and composition are combined.

In an embodiment, a therapeutic agent is incorporated into one or more of the above described fibers, present individually or in combination. In other embodiments, a drug is incorporated into one or more of the above described fibers, present individually or in combination.

In certain embodiments of the invention, a layer of a fiber circumscribes a layer of an adjacent inner fiber. The inner fiber is approximately centered within the outer fiber. In certain embodiments, one or more of the layers of the circumscribed fibers comprise a hydrogel or a gel in the wall of the fiber or in the bore of the fiber. In additional embodiments, a gel or a hydrogel is incorporated as a dispersed phase within the biodegradable polymer of one or more layers of the fibers. Additional embodiments of the invention provide multi-layered fibers, where each layer comprises varying compositions of gels, hydrogels and therapeutic agents. Certain embodiments of the invention provide fibers comprising more than one kind of therapeutic agent within its one or more layers.

The invention further relates to methods of manipulating the rate of therapeutic agent release by changing both the biodegradable polymer properties as well as altering the properties of the incorporated gel or hydrogel. A therapeutic agent-loaded fiber is suitable for implantation in animals, or more preferably in humans as either single strands for use as a therapeutic agent delivery vehicles, or together with other fibers (of either similar or different type) for the formation of a fiber-based scaffold for use in tissue engineering, wound healing, regenerative medicine, or other medically related applications. These fibers may also be used outside the body to create scaffolds for cell culture, tissue culture, or in vitro organogenesis, wherein specific three-dimensional structures of these fibers may be woven, knitted, braided, used as a non-woven mesh, or maintained as parallel, non-parallel, twisted or random arrays for the creation of complex three-dimensional scaffolds. As each fiber within said fiber scaffold might be loaded with different therapeutic agents, and each with a different release kinetics profile, it may be possible to induce specific cell growth into specific regions of the scaffold. This provides the ability to create complicated three-dimensional biological architecture by deliberate placement of specific fibers at specific locations within the fiber scaffold. These three dimensional biological structures may or may not be biomemetic in their design. By the same means, it is possible to release different therapeutic agents to one section of the cell culture, tissue culture, or organoid than to another within the same sample.

This type of complex three-dimensional fiber scaffold may also be implanted into an animal, or a human to induce specific biological responses at different locations within said fiber scaffold. This is accomplished by designing the fiber scaffold such that fibers with specific therapeutic agents and specific release profiles are placed at specific locations within the scaffold. This enables the control of both temporal and spatial therapeutic agent delivery from the fiber scaffold.

"Defined nonhomogeneous pattern" in the context of the current application means the incorporation of specific fibers into a scaffold matrix such that a desired three-dimensional

distribution of one or more therapeutic agents within the scaffold matrix is achieved. The distribution of therapeutic agents within the fibers, and possibly within their centers, controls the subsequent spatial distribution within the interstitial medium of the matrix scaffold following release of the agents from the polymer fibers. In this way, the spatial contours of desired concentration gradients can be created within the three dimensional scaffold structure and in the immediate surroundings of the scaffold matrix. Temporal distribution is controlled by the polymer composition and gel or hydrogel composition of the fiber and by the use of multi-layers within a fiber.

One aspect of the present invention is a biocompatible implant composition comprising a scaffold of biodegradable polymer fibers. In various embodiments of the present invention, the distance between the fibers may be about 20 microns, about 70 microns, about 90 microns, about 100 microns, about 120 microns, about 140 microns, about 160 microns, about 180 microns, about 200 microns, about 220 microns, about 240 microns, about 260 microns, about 280 microns, about 300 microns, about 320 microns, about 340 microns, about 360 microns, about 380 microns, about 400 microns, about 450 microns or about 500 microns. In various embodiments the distance between the fibers may be less than 50 microns or greater than 500 microns.

Additionally, it is envisioned that in various embodiments of the invention, the fibers will have a diameter of about 20 microns, about 40 microns, about 60 microns, about 80 microns, about 100 microns, about 120 microns, about 140 microns, about 160 microns, about 180 microns, about 200 microns, about 220 microns, about 240 microns, about 260 microns, about 280 microns, about 300 microns, about 320 microns, about 340 microns, about 360 microns, about 380 microns, about 400 microns, about 450 microns or about 500 microns (including intermediate lengths). In various embodiments the diameter of the fibers may be less than about 20 microns or greater than about 500 microns. Additionally, large fibers with diameters up to 3.5 cm are envisioned for certain embodiments. Preferably, the diameter of the fibers will be from about 60 microns to about 500 microns.

In another embodiment of the present invention, the fibers or a subset of fibers, contain one or more therapeutic agents such that the concentration of the therapeutic agent or agents varies along the longitudinal axis of the fibers or subset of fibers. The concentration of the active agent or agents may vary linearly, exponentially or in any desired fashion, as a function of distance along the longitudinal axis of a fiber. The variation may be monodirectional, that is, the content of one or more therapeutic agents decreases from the first end of the fibers or subset of the fibers to the second end of the fibers or subset of the fibers. The content may also vary in a bidirection fashion, that is, the content of the therapeutic agent or agents increases from the first ends of the fibers or subset of the fibers to a maximum and then decreases towards the second ends of the fibers or subset of the fibers.

In certain embodiments of the present invention, a subset of fibers comprising the scaffold may contain no therapeutic agent. For fibers that contain one or more therapeutic agents, the agent or agents may include: a growth factor, an immunodulator, a compound that promotes angiogenesis, a compound that inhibits angiogenesis, an anti-inflammatory compound, an antibiotic, a cytokine, an anti-coagulation agent, a procoagulation agent, a chemotactic agent, agents that promotes apoptosis, an agent that inhibits apoptosis, a mitogenic agent, a radioactive agent, a contrast agent for imaging studies, a viral vector, a polynucleotide, therapeutic genes, DNA, RNA, a polypeptide, a glycosaminoglycan, a carbohydrate, a glycoprotein. The therapeutic agents may also include those drugs that are to be administered for long-term maintenance to patients such as cardiovascular drugs, including blood pressure, pacing, anti-arrhythmia, beta-blocking drugs, and calcium channel based drugs. Therapeutic agents of the present invention also include anti-tremor and other drugs for epilepsy or other movement disorders. These agents may also include long-term medications such as contraceptives and fertility drugs. They could comprise neurologic agents such as dopamine and related drugs as well as psychological or other behavioral drugs. The therapeutic agents may also include chemical scavengers such as chelators, antioxidants and nutritional agents. Wherein the therapeutic agent promotes angiogenesis, that agent may be vascular endothelial growth factor. The therapeutic agents may be synthetic or natural drugs, proteins, DNA, RNA, or cells (genetically altered or not). As used in the specification and claims, following long-standing patent law practice, the terms "a" and "an," when used in conjunction with the word "comprising" or "including" means one or more.

In general, the present invention contemplates the use of any drug incorporated in the biodegradable polymer fibers of the invention. The word "drug" as used herein is defined as a chemical capable of administration to an organism, which modifies or alters the organism's physiology. More preferably the word "drug" as used herein is defined as any substance intended for use in the treatment or prevention of disease. Drug includes synthetic and naturally occurring toxins and bioaffecting substances as well as recognized pharmaceuticals, such as those listed in "The Physicians Desk Reference," 471st edition, pages 101–321; "Goodman and Gilman's The Pharmacological Basis of Therapeutics" 8th Edition (1990), pages 84–1614 and 1655–1715; and "The United States Pharmacopeia, The National Formulary", USP XXII NF XVII (1990), the compounds of these references being herein incorporated by reference. The term "drug" also includes compounds that have the indicated properties that are not yet discovered or available in the U.S. The term "drug" includes pro-active, activated, and metabolized forms of drugs. Tissue stimulating factors are also included such as: dimers of Platelet Derived Growth Factor (PDGF), insulin-like growth factor-1 (IGF-1), IGF-2, basic Fibroblast Growth Factor (bFGF), acidic FGF, Vascular Endothelial Cell Growth Factor (VEGF), Nerve Growth Factor (NGF), Neurotrophic Factor 3 (NT-3), Neurotrophic Factor 4 (NT-4), Brain Derived Neurotrophic Factor (BDNF), Endothelial Growth Factor (EGF), Insulin, Interleukin 1 (Il-1), Tumor Necrosis Factor alpha (TNFα.), Connective Tissue Growth Factor (CTGF), Transforming Growth Factor alpha (TGFα), and all other growth factors and cytokines, as well as para-thyroid hormone (PTH), prostaglandin such as Prostaglandin E-1 and Prostaglandin E-2, Macrophage Colony Stimulating Factor (MCSF), and corticosteroids such as dexamethasone, prednisolone, and corticosterone.

The present invention also contemplates the use of hydrogel forming material within the core of the fibers. Hydrogels are structurally stable, synthetic polymer or biopolymer matrices that are highly hydrated. These materials may absorb up to thousands of times their weight in water, (Hoffman, A. S., Advanced Drug delivery Reviews, 43 (2000), 3–12). Hydrogels can be classified into two broad categories: reversible or physical and irreversible or chemical. The networks in physical gels are held together by molecular entanglements and/or secondary forces including

ionic, H-bonding or hydrophobic forces. Physical hydrogels are characterized by significant changes in the rheological properties as a function of temperature, ionic concentration, and dilution. Chemical gels, also called permanent gels, are characterized by chemically crosslinked networks. When crosslinked, these gels reach an equilibrium swelling level in aqueous solutions which depends mainly on the crosslink density.

The preparation of hydrogels can be achieved by a variety of methods well known to those of ordinary skill in the art. Physical gels can be formed by: heating or cooling certain polymer solutions (cool agarose, for example), using freeze-thaw cycles to form polymer microcrystals, reducing the solution pH to form a H-bonded gel between two different polymers in the same aqueous solution, mixing solutions of a polyanion and a polycation to form a complex coacervate gel, gelling a polyelectrolyte solution with a multivalent ion of opposite charge, reticulation of linear polymers, grafting of synthetic polymers onto naturally occurring macromolecules, and chelation of polycations (Hoffman, A. S., Advanced Drug delivery Reviews, 43 (2000), 3–12). Chemical gels can be created by crosslinking polymers in the solid state or in solution with radiation, chemical crosslinkers like glutaraldehyde, or multifunctional reactive compounds. They can also be made by copolymerizing a monomer and a crosslinker in solution, copolymerizing a monomer and a multifunctional macromer, polymerizing a monomer within a different solid polymer to form an IPN gel, or chemically converting a hydrophobic polymer to a hydrogel (Hoffman, A. S., Advanced Drug delivery Reviews, 43 (2000), 3–12); Hennick, W. F. and van Nostrum, C. F., Advanced Drug Delivery Reviews, 54 (2002), 13–26.

The present invention contemplates the use of hydrogel precursor materials and non-gelling proteins and polysaccharides within the bore of the fibers. Hydrogel precursor materials are the same materials as those that form hydrogels, but they are not exposed to the agents or conditions that normally gel the materials, or can be other proteins and polysaccharides that form gels but not hydrogels. For example, alginate salts, such as sodium alginate, are gelled in the presence of divalent cations, such as calcium, while other materials create hydrogels via a change in pH or temperature. Certain embodiments of the invention comprise the use of precursor materials that are never gelled. Other embodiments of the invention comprise the use of precursor materials in the fabrication process that later may form gels or hydrogels. The formation of gels or hydrogels in the fiber layer may take place as a part of the fiber fabrication process, after the fiber has been fabricated, or after the application of an appropriate type of external stimuli, including placing the fiber in vitro or in vivo. The terms "gel" or "hydrogel" as used herein is intended to include the formed gel or hydrogel as well as the appropriate precursor molecules involved in the formation of gels and hydrogels.

The biodegradable polymer used for fiber construction may be a single polymer or a co-polymer or blend of polymers and may comprise poly(L-lactic acid), poly(DL-lactic acid), polycaprolactone, poly(glycolic acid), polyanhydride, or natural polymers or polypeptides, such as reconstituted collagen or spider silk and polysaccharides.

The fibers of the claimed invention are manufactured using wet or dry/wet (dry jet wet) spinning. Each method affects the final properties of the fiber being constructed. Wet spinning is a process in which a polymeric material is extruded into a liquid bath containing a coagulant. The coagulant is typically comprised of a non-solvent for the



polymer that is miscible with the solvent in the polymer solution, but it can also contain a solvent/non-solvent mixture. In dry jet wet spinning, the polymer solution is first exposed to an air gap before entering the coagulation bath.

In an embodiment of the invention, the fiber comprises a plurality of co-axial layers of biodegradable polymers. The drug delivery fiber of the present invention may be implanted into many sites in the body including dermal tissues, cardiac tissue, soft tissues, nerves, bones, and the eye. Ocular implantation has particular use for treatment of cataracts, diabetically induced proliferative retinopathy and non-proliferative retinopathy, glaucoma, and macular degeneration.

A further aspect of the present invention is a method of producing a fiber-scaffold for preparing an implant capable of controlling the spatial and temporal concentration of one or more therapeutic agents. This method generally comprises forming biodegradable polymer fibers into a three dimensional fiber-scaffold. The biodegradable polymer fibers contain one or more therapeutic agents. The therapeutic agent or agents are distributed in the fiber-scaffold in a defined nonhomogeneous pattern.

In certain embodiments of the invention, gels and hydrogels comprised in the fiber layers may exist at infinitely dilute concentrations, i.e., the concentration of gel or hydrogel is zero, and water is used with or without other substances and/or active agents, including therapeutic agents, in place of the gel or hydrogel.

In one embodiment of this invention, the preferred material for the hydrogel contained in the bore of the fiber will be alginate or modified alginate material. Alginate molecules are comprised of (1–4)-linked β-D-mannuronic acid (M units) and (α-L-guluronic acid (G units) monomers, which vary in proportion and sequential distribution along the polymer chain. Alginate polysaccharides are polyelectrolyte systems that have a strong affinity for divalent cations (e.g. $Ca^{2+}$, $Sr^{2+}$, $Ba^{2+}$) and form stable hydrogels when exposed to these molecules. The biodegradable polymer is poly(L-lactic acid) (PLLA). In an embodiment, the alginate is contained as the inner core and the PLLA is the outer sheath. The concentration of alginate is in the range of 0.25 w/v % to 100 w/v % (i.e., g/100 ml water), preferably in the range of 0.75 w/v % to 20 w/v %, and most preferably at a concentration of 1 w/v %. The source and composition of alginate directly affects its usable concentration.

In another embodiment of this invention, the PLLA sheath surrounding the inner gel or hydrogel core comprises a cocktail of PLLA polymers of different molecular weights as a means of increasing the degradation rate. The proportions of the PLLA polymers and the range of the polymer molecular weights can vary. In an exemplary embodiment, the polymer cocktail comprises 80% by weight of a PLLA polymer of Mw=100,000 Daltons; 15% by weight of a polymer of Mw=2,000 Daltons; and 5% by weight of a polymer Mw=300,000 Daltons.

In another embodiment of the invention, the PLLA sheath surrounding the inner gel or hydrogel core is comprised of two phases, a continuous phase comprising a biodegradable polymer and a dispersed phase comprising an aqueous phase stabilized by a surfactant. The aqueous phase may optionally comprise therapeutic agents. The amount of the dispersed phase ranges from about 0% to about 85% by weight relative to the weight of the fiber. In a preferred embodiment the amount of the dispersed phase ranges from about 33% to about 50% by weight relative to the weight of the fiber. As the ratio of the dispersed phase increases, so does the rate of

degradation of the polymer. This leads to increased release rates of loaded therapeutic agents.

In an embodiment of this invention, agents that are designed to degrade the gel or hydrogel are loaded into the dispersed aqueous phase of the biodegradable polymer component of the fiber (as described above). This agent is released into the gel or hydrogel slowly over time to break down the gel or hydrogel. This increases therapeutic agent release rates. In addition, many of the potential gels and hydrogels are not directly biodegradable within animals, or more especially humans. Therefore, this planned degradation helps the body to eliminate the gels or hydrogels when they are no longer needed.

In an embodiment, the alginate is gelled internally by the addition of gelling agents added directly to the alginate solution. Typical gelling agents include calcium chloride, calcium carbonate, calcium-EDTA (Ethylene Diamine Tetraetic Acid), or other compounds containing bivalent cations that are well known to those skilled in the art. The concentration of the gelation agent ranges from about 5 mM to about 100 mM, more preferably from about 12 mM to about 50 mM, and most preferably from about 15 mM to 30 mM. The range chosen is determined by desired hydrogel properties. If not readily soluble at neutral pH, the gelling agent is typically activated by a drop in pH of the solution. This acidification can be achieved through a number of acids or lactones. This list includes, but is not limited to, citric acid, hydrochloric acid, D-glucono-delta-lactone, and glacial acetic acid.

In another embodiment, the gel or hydrogel is gelled externally by incorporating the gelling agent source into the biodegradable fiber. Alternately, the gelling agent source is added to a water phase that is loaded into one or more layers of the biodegradable polymer. In this way, the gelling agent is slowly released into the gel or hydrogel as the fiber degrades. In certain embodiments, as the fiber degrades and becomes weaker and more porous, the gel becomes more tightly cross-linked. In this way, it may be possible to continuously alter the release rate as the fiber degrades. Release rates tend to increase as the polymer becomes more porous, in this case, this trend would be offset by the gel becoming more tightly cross-linked, hence retarding release rates through the gel or hydrogel as the fiber degrades.

In another embodiment, the gelling agent is soluble in the polymer solvent and is mixed with the polymer solution at the time of fiber fabrication. In this embodiment, rather than the gelling agent being maintained in an aqueous phase, it is molecularly mixed with the polymer. The same net effect of releasing the gelling agent into the gel or hydrogel slowly as the fiber degrades. This embodiment allows the use of organically soluble sources of gelling agents.

In another embodiment, the gelation agents are carried within the alginate solution that are activated over time, such as within lipospheres, microspheres, nanoparticles or other encapsulants that are activated later. These may be slowly activated over time, or purposefully activated by some external event. This will result in the gel either being strengthened, or maintained over time.

In another embodiment of the invention, the gel or hydrogel is the exterior sheath and the biodegradable polymer is the interior core. In this embodiment the gelling agent is in the coagulating bath, which would be an external gelation.

The present invention provides compositions and methods to create single, drug releasing fibers as well as the composition and methods to create a heterogeneous, woven, knitted, braided, non-woven, twisted, parallel array or random three-dimensional fiber scaffold for growing cells in tissue engineering applications. These scaffolds can be used in vitro and in vivo, and due to their heterogeneity can create both spatial and temporal distributions of therapeutic agents. In this invention, therapeutic agents may include drugs, proteins, peptides, mono- and di-saccharides, polysaccharides, glycoproteins, DNA, RNA, viruses, or other biological molecules of interest. The term therapeutic agent in this invention also includes radioactive materials used to help destroy harmful tissues such as tumors in the local area, or to inhibit growth of healthy tissues, such as in current stent applications; or markers to be used in imaging studies.

A. Three Dimensional Fiber Scaffolds

To create the heterogeneous scaffolds of the present invention, the therapeutic agents are encapsulated into individual fibers of the matrix by methods to be described herein. The therapeutic agents are released from each individual fiber slowly, and in a controlled manner. The fiber format has many advantages as a drug delivery platform over other slow drug-releasing agents known to those familiar in the art such as microspheres, porous plugs or patches. The primary advantage of fibers is that they can provide complex three-dimensional woven, or non-woven scaffolding, with or without patterning, to allow cells to attach, spread, differentiate, and mature into appropriately functioning cells. Because they can form patterns, a "smart scaffold" can be produced to induce cells of specific types to migrate to specific regions of the scaffold due to specific chemotactic factors being released. This scaffold mimics the function of the extracellular matrix material both during embryological development and in post-embryological tissues. Additionally, filaments could be formed into a unique scaffold that provides a growth substrate for tissue repair or reconstruction that is not reminiscent of a natural like structure.

Because of the ability to weave patterns to induce appropriate cell types into specific regions, it is possible to incorporate strands that will induce the formation of blood vessels into the fabric. This may be accomplished by providing fibers that release growth factors such as vascular endothelial growth factor (VEGF). By appropriate spacing of VEGF containing-fibers into the weave pattern, large tissues may be engineered, and the cells in such tissues can be provided with a sufficient blood supply and thereby receive oxygen and nutrients and enable the removal of waste products.

Fibers also have the advantage of providing the body with short term mechanical support in such applications as stents, wherein the polymer fiber can maintain the lumen of any tubular body, such as arteries, veins, ducts (e.g. bile duct, ureter, urethra, trachea, etc.), organs of the digestive track such as esophagus, intestine, colon, and connective tissue such as tendons, ligaments, muscle and bone. The fibers provide a useful structure to support mechanical strength or tension during the healing process. Fibers may also be useful to promote neural regeneration or reconstruction of nerves or spinal cord.

B. Fiber Formats

There are a large number of combinations and variations within the scope of this invention. This invention covers gel or hydrogel combinations with a biodegradable polymer fiber in a multi-layer, multi-component format, where each layer is fully contained within the next outer layer, and the inner layer is generally centered within the outer layer. These layers can be comprised of different gels or hydrogels, or different biodegradable polymers.

This invention also includes the use of gels or hydrogels as a dispersed phase within biodegradable polymer layer, wherein the continuous phase is the biodegradable polymer

phase. The dispersed phase may be stabilized by either an internal or external surfactant.

In the case of the dispersed gel or hydrogel within the biodegradable polymer layer, and in the case of the gel or hydrogel layer being interior to a biodegradable polymer layer, an allowable special case is that the concentration of the hydrogel is zero. This means that water may be used (with or without the inclusion of other substances) in the place of the gel or hydrogel.

As an additional special case, it may be possible for the polymer concentration in the innermost core to be zero, in which case the solvent normally used with the polymer is replaced by a non-solvent. In this case, the non-solvent core acts as an internal coagulating bath. The result is that a hollow fiber is created. This special case can occur with or without a gel or hydrogel exterior to the biodegradable polymer layer(s) and with or without a dispersed gel, hydrogel or water phase within the biodegradable polymer layer(s).

This leads to a large number of potential combinations. The basic types are external biodegradable polymer with internal gel or hydrogel, and the inverse design, i.e. gel or hydrogel external with the biodegradable polymer as the internal core. In each of these combinations, the biodegradable polymer layer may or may not have a dispersed water, gel or hydrogel phase. Another case is a monofilament fiber with a gel or hydrogel dispersed phase.

C. Release Kinetics of Individual Fibers

Further, there are various means for controlling the release kinetics of the therapeutic agent, thus temporally controlling the release of the therapeutic agent. The following discussion will pertain only to the fiber format wherein the polymer sheath surrounds an inner core of gel or hydrogel. The first point of control for the polymer is to mix low molecular weight polymer in with the higher molecular weight, fiber forming polymers. In this way, the lower molecular weight component is able to rapidly degrade and diffuse from the fiber, making the fiber more porous. This makes the interior therapeutic agents within the gel or hydrogel more accessible. A second means of accelerating the release rate of the fiber is to create a bi-phasic fiber, wherein the continuous phase is the biodegradable polymer, and the dispersed phase is aqueous pockets that are stabilized by a surfactant. As the concentration of the dispersed phase increases, a pathway is created from the outside to the inner gel or hydrogel where the only polymer that must be degraded is between the various pockets of the dispersed aqueous phase. This has the effect of leaving much less polymer to degrade to connect the gel or hydrogel to the outside world, thus accelerating the release of the therapeutic agent. It is also possible for this dispersed aqueous phase to contain the same or a different drug or therapeutic agent. In this case, the drug or therapeutic agent in the dispersed aqueous phase will be released first, followed by the release of the therapeutic agent in the gel or hydrogel. To alter the release kinetics of the drug or therapeutic agent in the polymer fiber wall, it is possible to slightly adapt the above description such that the dispersed phase is now a gel or hydrogel as opposed to being aqueous. In this case, the fluid pathway shortening exists as in the case of an aqueous dispersed phase; however, the connecting pathway must now go through pockets of gel or hydrogel, wherein the diffusion of the therapeutic agent is retarded compared to a purely aqueous pathway. The degree to which the diffusion is retarded is a function of the type of gel or hydrogel, the type and degree of cross-linking, and the concentration of the gel or hydrogel. All of these parameters are within the



control of the entity forming the fiber. It is also possible to control the concentration of the dispersed aqueous or gel phase within the biodegradable polymer as a function of distance along the long axis of the fiber. By this means, it is possible to have different release kinetics at one end of the fiber than at the other, with a defined gradient of release kinetics down the length of the fiber. This change in release kinetics may or may not be combined with a gradient of therapeutic agent concentration. By the same means, it is possible to have the content of the disperse phase vary as a function of distance down the polymer fiber such that at one end the dispersed phase would be for example purely aqueous and at the second end of the fiber, the dispersed phase could be a gel or hydrogel. Other gradients are also possible including varying concentrations of the gel within the disperse phase. Thus a great deal of control is available on the release kinetics of the fiber. Aside from these changes in the polymer wall of the fiber, it is also possible to control the release kinetics from this fiber by altering the type, concentration, and degree of cross-linking within the gel or hydrogel in the core of the fiber, which contains a therapeutic agent.

The ability to dynamically change the release kinetics of the gel or hydrogel being loaded into the core or as a dispersed phase within a biodegradable polymer fiber over the course of the drug delivery period constitutes an important aspect of the invention. This affords unique opportunities that are not possible to be present in other forms of drug delivery from gels or hydrogels. The first means of control available because of the gel being loaded into a biodegradable polymer fiber is the ability of this fiber to release agents known to cross link the gel. In this way, over time, the cross-linking density of the gel actually increases, which will retard the release of the therapeutic agent. This release of the cross linking agent from the biodegradable polymer fiber sheath is itself controllable by means outlined above, i.e. using a cocktail of molecular weights, or changing the concentration of the dispersed aqueous phase. As a special case of the biodegradable polymer fiber sheath is a multilayer, and multi-component biodegradable polymer sheath. This allows the creation of directional specificity, as well as changes in the release kinetics from each layer of the biodegradable polymer fiber sheath. For example, consider the case of two layers of biodegradable polymer fiber in the sheath. The innermost layer could contain agents that act to cross link the gel or hydrogel core of the fiber, and this layer could be composed of a biodegradable polymer that has a rapid degradation rate. Further, this layer could contain a high degree of dispersed aqueous phase. In this same example, the outermost layer may be composed of a different biodegradable polymer with a different degradation rate, and a different concentration of dispersed aqueous (or gel or hydrogel) dispersed phase, including zero. This example would create a situation where the cross-linking agent would be delivered inwardly to the gel or hydrogel in the core of the fiber over time, thus creating a situation wherein the diffusion coefficient of the therapeutic agent loaded into the gel or hydrogel in the core of the fiber decreases over time.

Another special case is where the polymer fiber contains agents that degrade the gel or hydrogel in the core of the fiber. Using the same logic as explained above, this too creates a situation where the diffusion coefficient of the therapeutic agent in the gel or hydrogel in the core or dispersed within the fiber changes continuously over time. In this case, however, the diffusion rate increases over time. This particular case also has the advantage that the body of the animal or preferably the human into which the fiber is

implanted may not have the specific enzymes or other chemical conditions required to degrade the gel or hydrogel. In this case, loading appropriate degradation agents into the wall of the fiber allows the degradation of the gel or hydrogel, and thus aids the clearance of the gel or hydrogel from the host. Again, as described above, the release of the degradation agents is largely controllable by changing properties of the biodegradable polymer layers in the sheath of the fiber.

By these methods, it is seen that the release kinetics of the therapeutic agent from a gel or hydrogel core or dispersed in a sheath of biodegradable polymer fiber is alterable by virtue of the presence of biodegradable polymer sheath.

In the case where the gel or hydrogel is the exterior layer and the biodegradable polymer is the core of the fiber. In this case the biodegradable polymer core may consist of one or more multi-component layers as described above, and again each layer may contain a different concentration of dispersed aqueous or gel or hydrogel phase, which may or may not themselves carry therapeutic agents. The overall release of therapeutic agent(s) from the fiber is controlled by the location of the therapeutic agents, either in the gel or hydrogel exterior, or within the biodegradable polymer core or both. By the same means as described above, the exterior gel or hydrogel release kinetics may be altered by the release of cross-linking, or degrading agents from the biodegradable polymer fiber core. As these agents are released from the biodegradable polymer fiber core, they will alter the properties of the exterior gel or hydrogel, thus decreasing or increasing the diffusion of the therapeutic agent from the exterior gel or hydrogel. For any therapeutic agent(s) within the biodegradable polymer core, the release of these agents is controlled on two levels. First, as explained above the type and molecular weight distribution of the polymer itself changes the release kinetics, as well known to those skilled in the art. In addition to this, the concentration of any dispersed aqueous or gel or hydrogel phase will alter the release from the biodegradable polymer. However, as the gel or hydrogel is surrounding the biodegradable fiber, all therapeutic agents within the biodegradable polymer must diffuse through the gel or hydrogel. Therefore, any changes to the diffusion of the therapeutic agent(s) through the gel or hydrogel also directly affect the release of any therapeutic agents within the core of the fiber. Therefore, in this case, one can change the release kinetics of the fiber by altering both the gel and the biodegradable polymer segments.

If the dispersed phase is a gel or hydrogel that also contains the therapeutic agent, then the release of that therapeutic agent is controllable by the same means of choice of biodegradable polymer, molecular weight distribution, and concentration of the dispersed phase. In addition, the properties of the gel or hydrogel also alter the release of the therapeutic agent from the dispersed phase within the monofilament fiber.

D. Biodegradable Polymers

Preferred polymers for use in the present invention include single polymer, co-polymer or a blend of polymers of poly(L-lactic acid), poly(DL-lactic acid), polycaprolactone, poly(glycolic acid) or polyanhydride. Naturally occurring polymers may also be used such as reconstituted collagen or natural silks. Those of skill in the art will understand that these polymers are just examples of a class of biodegradable polymer matrices that may be used in this invention. Further biodegradable matrices include polyanhydrides, polyorthoesters, and poly(amino acids) (Peppas and Langer, 1994). Any such matrix may be utilized to fabricate a biodegradable polymer matrix with controlled properties for use in this invention. A non-exhaustive list of biodegradable polymers that produce non-toxic degradation products are listed in Table 1.

TABLE 1

| Biodegradable polymers |
|---|
| Synthetic |
| Polypeptides |
| Polydepsipeptides |
| Nylon-2/nylon-6 copolyamides |
| Aliphatic polyesters |
| Poly(glycolic acid) (PGA) and copolymers |
| Poly(lactic acid) (PLA) and copolymer |
| Poly(alkylene succinates) |
| Poly(hydroxy butyrate) (PHB) |
| Poly(butylene diglycolate) |
| Poly(ε-caprolactone) and copolymers |
| Polydihydropyrans |
| Polyphosphazenes |
| Poly(ortho ester) |
| Poly(cyano acrylates) |
| Natural |
| Modified polysaccharides |
| cellulose, starch, chitin |
| Modified proteins |
| collagen, fibrin |

Adapted from Wong and Mooney, 1997.

E. Types of Gels and Hydrogels

In simple terms, a gel is a liquid system that acts like a solid. More technically defined, a gel is a colloidal system with at least two phases, one of which forms a continuous three-dimensional network that acts as an elastic solid. Gel formation through physical, molecular, or chemical association results in an infinite molecular weight for the system. The viscoelastic material formed has a storage modulus, G', that is greater than the loss modulus, G", and both G' and G" are almost independent of frequency. [E. R. Morris, Polysaccharide solution properties: origin, rheological characterization and implications for food systems, Frontiers in Carbohydrate Research 1: Food Applications (R. P. Millane, J. N. BeMiller, and R. Chandrasekaran, eds.), Elsevier, London, 1989, p. 132.] The storage modulus characterizes the rigidity of the sample, while the loss modulus characterizes the resistance of the sample to flow. [Damodaran, Srinivasan, Food Proteins and Their Applications, Food Science and Technology (Marcel Dekker, Inc.); New York Marcel Dekker, Inc., 1997.] Examples are polymer solutions, micellar solutions, microemulsions and, in more recent years, the field has been extended with the large number of organic solvents that are gelled by the presence of small organic molecules at very low concentrations.

A hydrogel is defined as a colloid in which the disperse phase (the colloid) has combined with the continuous phase (water) to produce a viscous jellylike product. [Dictionary of Chemical Terms, 4th Ed., McGraw Hill (1989)]. Hydrogels are able to swell rapidly in excess water and retain large volumes of water in their swollen structures. The polymeric material comprising the hydrogel can absorb more than 20% of its weight in water, though formed hydrogels are insoluble in water and they maintain three-dimensional networks. [Amidon, Gordon L., Transport Processes in Pharmaceutical Systems, Drugs and the Pharmaceutical Sciences; v. 102 New York Marcel Dekker, Inc., 2000]. They are usually made of hydrophilic polymer molecules crosslinked either

by chemical bonds or by other cohesion forces such as ionic interaction, hydrogen bonding, or hydrophobic interaction. [J. I. Kroschwitz, Concise Encyclopedia of Polymer Science and Engineering, New York, Wiley, XXIX, p 1341, 1990.]

Hydrogels are -elastic solids in the sense that there exists a remembered reference configuration to which the system returns even after being deformed for a very long time.

An organogel is defined as an organic phase with an interlaced polymeric component. Preferred solvents include non-toxic organic solvents including, but not limited to, dimethyl sulfoxide (DMSO), mineral oils and vegetable oils. The term "organogel" was initially used to describe a specific concept of gelation, by a gelatin solution, of a water-in-oil inverse microemulsion (see Luisi et al. Colloid & Polymer Science, 1990, vol. 268, p. 356–374). The term has recently been extended to gelled systems comprising two immiscible phases (water in oil) stabilized in lecithin enriched with phosphatidylcholine and usually hydrogenated (see Williman et al. Journal of Pharmaceutical Sciences, 1992, vol. 81, p. 871–874, and Schchipunov et al., Colloid Journal, 1995, vol. 57, p. 556–560). These emulsions have a lamellar phase and are in the form of gels even in the absence of gelling agents, hence the name organogels, which denotes this type of emulsion irrespective of the orientation of the emulsion (Water-in-Oil or Oil-in-Water).

The types of gel materials used in the present invention include polysaccharides, including but not be limited to, amylose, amylopectin, glycogen, cellulose, hyaluronate, chondroitin, heparin, dextrin, inulin, mannan, chitin, galactose, guar gum, carrageenan, agar, furcellaran, xanthan gum, other hydrocolloid gums, pectin, locust bean gum, acacia, ghatti gum, pentosan, arabinogalactan, synthetic derivatives thereof, and mixtures thereof

Examples of materials which can form hydrogels include natural and synthetic polysaccharides and other natural and synthetic polymers and their derivatives, and combinations of these. Suitable polysaccharides and polymers include but are not limited to: amylose, amylopectin, glycogen, cellulose, hyaluronic acid, chondroitin sulfate, heparin, dextrin, inulin, mannan, chitin, galactose, guar gum, carrageenan, agar, furcellaran, xanthan gum, other hydrocolloid gums, pectic acid and pectin, locust bean gum, acacia, ghatti gum, pentosan, arabinogalactan, alginates and alginate derivatives, gellan, gellan gum, glucose, collagen (and gelatin), cellulose, carboxymethylcellulose, hydroxymethylcellulose, hydroxypropylmethylcellulose, methylcellulose, and methoxycellulose, fibrin, xanthan and xanthan gum, agarose, chitosan (polycationic polysaccharide polymers), albumin, human gamma globulin, pullulan, carrageenan (polyanionic polysaccharide polymers), dextrin, dextran, dextran sulfate, keratin, inulin, dextrose, amylose, glycogen, amylopectin, polylysine and other polyamino acids, polyesters such as polyhydroxybutyrate and polyphosphazines, poly(vinyl alcohols), poly(alkylene oxides) particularly poly(ethylene oxides), polyethylene glycol (including PEO-PPO-PEO and the like block copolymers like Pluronics®), poly(allylamines) (PAM), poly(acrylates), modified styrene polymers, pluronic polyols, polyoxamers, polypropylenes, polyurethanes, poly(uronic acids), polyvinyl chloride, poly (vinylpyrrolidone) and copolymers, graft copolymers, synthetic derivatives, blends and other mixtures of the above. Polysaccharides are the preferred polymers for this invention. Alginate, for example, is biocompatible, non-cytotoxic, non-carcinogenic, non-inflammatory, and non-immunogenic, and, therefore, a good candidate for use.

F. Types of Polymeric Materials

Exemplary natural polymers include naturally occurring polysaccharides, such as, for example, arabinans, fructans, fucans, galactans, galacturonans, glucans, mannans, xylans (such as, for example, inulin), levan, fucoidan, carrageenan, galatocarolose, pectic acid, pectins, including amylose, pullulan, glycogen, amylopectin, cellulose, dextran, dextrin, dextrose, glucose, polyglucose, polydextrose, pustulan, chitin, agarose, keratin, chondroitin, dermatan, hyaluronic acid, alginic acid, xanthan gum, starch and various other natural homopolymer or heteropolymers, such as those containing one or more of the following aldoses, ketoses, acids or amines: erythrose, threose, ribose, arabinose, xylose, lyxose, allose, altrose, glucose, dextrose, mannose, gulose, idose, galactose, talose, erythrulose, ribulose, xylulose, psicose, fructose, sorbose, tagatose, mannitol, sorbitol, lactose, sucrose, trehalose, maltose, cellobiose, glycine, serine, threonine, cysteine, tyrosine, asparagine, glutamine, aspartic acid, glutamic acid, lysine, arginine, histidine, glucuronic acid, gluconic acid, glucaric acid, galacturonic acid, mannuronic acid, glucosamine, galactosamine, and neuraminic acid, and naturally occurring derivatives thereof Accordingly, suitable polymers include, for example, proteins, such as albumin.

Exemplary semi-synthetic polymers include carboxymethylcellulose, hydroxymethylcellulose, hydroxypropylmethylcellulose, methylcellulose, and methoxycellulose. Exemplary synthetic polymers include polyphosphazenes, polyethylenes (such as, for example, polyethylene glycol (including the class of compounds referred to as Pluronics®, commercially available from BASF, Parsippany, N.J.), polyoxyethylene, and polyethylene terephthlate), polypropylenes (such as, for example, polypropylene glycol), polyurethanes, polyvinyl alcohol (PVA), polyvinyl chloride and polyvinylpyrrolidone, polyamides including nylon, polystyrene, polylactic acids, fluorinated hydrocarbon polymers, fluorinated carbon polymers (such as, for example, polytetrafluoroethylene), acrylate, methacrylate, and polymethylmethacrylate, and derivatives thereof.

The polymeric materials are selected from those materials which can be polymerized or their viscosity altered in vivo by application of exogenous means, for example, by application of light, ultrasound, radiation, or chelation, alone or in the presence of added catalyst, or by endogenous means, for example, a change to physiological pH, diffusion of calcium ions (alginate) or borate ions (polyvinyl alcohol) into the polymer, or change in temperature to body temperature (37° C.).

G. Agents that Promote Angiogenesis

One class of therapeutic agents to be encapsulated by the polymer fibers of the present invention are therapeutic agents that promote angiogenesis. The successful engineering of new tissue requires the establishment of a vascular network. The induction of angiogenesis is mediated by a variety of factors, any of which may be used in conjunction with the present invention (Folkman and Klagsbrun, 1987, and references cited therein, each incorporated herein in their entirety by reference). Examples of angiogenic factors includes, but is not limited to: vascular endothelial growth factor (VEGF) or vascular permeability factor (VPF); members of the fibroblast growth factor family, including acidic fibroblast growth factor (aFGF) and basic fibroblast growth factor (bFGF); interleukin-8 (IL-8); epidermal growth factor (EGF); platelet-derived growth factor (PDGF) or platelet-derived endothelial cell growth factor (PD-ECGF); transforming growth factors alpha and beta (TGF-α, TGF-β); tumor necrosis factor alpha (TNF-α); hepatocyte growth

factor (HGF); granulocyte-macrophage colony stimulating factor (GM-CSF); insulin growth factor-1 (IGF-1); angiogenin; angiotropin; angiotensin; fibrin and nicotinamide (Folkman, 1986, 1995; Auerbach and Auerbach, 1994; Fidler and Ellis, 1994; Folkman and Klagsbrun, 1987; Nagy et al., 1995).

H. Cytokines

In certain embodiments the use of particular cytokines incorporated in the polymer fibers of the present invention is contemplated. Table 2 below is an exemplary, but not limiting, list of cytokines and related factors contemplated for use in the present invention.

TABLE 2

| Cytokine | Reference |
|---|---|
| Human IL-1 | March et al., Nature, 315: 641, 1985 |
| Murine IL-1 | Lomedico et al., Nature, 312: 458, 1984 |
| Human IL-1 | March et al., Nature, 315: 641, 1985; Auron et al., Proc. Natl. Acad. Sci. U.S.A., 81: 7907, 1984 |
| Murine IL-1 | Gray, J. Immunol., 137; 3644, 1986; Telford, NAR, 14: 9955, 1986 |
| Human IL-1ra | Eisenberg et al., Nature, 343: 341, 1990 |
| Human IL-2 | Taniguchi et al., Nature, 302: 305, 1983; Maeda et al., Biochem. Biophys. Res. Commun., 115: 1040, 1983 |
| Human IL-2 | Taniguchi et al., Nature, 302: 305, 1983 |
| Human IL-3 | Yang et al., Cell, 47: 3, 1986 |
| Murine IL-3 | Yokota et al., Proc. Natl. Acad. Sci. U.S.A., 81: 1070, 1984; Fung et al., Nature, 307: 233, 1984; Miyatake et al., Proc. Natl. Acad. Sci. U.S.A., 82: 316, 1985 |
| Human IL-4 | Yokota et al., Proc. Natl. Acad. Sci. U.S.A., 83: 5894, 1986 |
| Murine IL-4 | Norma et al., Nature, 319: 640, 1986; Lee et al., Proc. Natl. Acad. Sci. U.S.A., 83: 2061, 1986 |
| Human IL-5 | Azuma et al., Nuc. Acids Res., 14: 9149, 1986 |
| Murine IL-5 | Kinashi et al., Nature, 324: 70, 1986; Mizuta et al., Growth Factors, 1: 51, 1988 |
| Human IL-6 | Hirano et al., Nature, 324: 73, 1986 |
| Murine IL-6 | Van Snick et al., Eur. J. Immunol., 18: 193, 1988 |
| Human IL-7 | Goodwin et al., Proc. Natl. Acad. Sci. U.S.A., 86: 302, 1989 |
| Murine IL-7 | Namen et al., Nature, 333: 571, 1988 |
| Human IL-8 | Schmid et al., J. Immunol., 139: 250, 1987; Matsushima et al., J. Exp. Med. 167: 1883, 1988; Lindley et al., Proc. Natl. Acad. Sci. U.S.A., 85: 9199, 1988 |
| Human IL-9 | Renauld et al., J. Immunol., 144: 4235, 1990 |
| Murine IL-9 | Renauld et al., J. Immunol., 144: 4235, 1990 |
| Human Angiogenin | Kurachi et al., Biochemistry, 24: 5494, 1985 |
| Human GRO | Richmond et al., EMBO J., 7: 2025, 1988 |
| Murine MIP-1 | Davatelis et al., J. Exp. Med., 167: 1939, 1988 |
| Murine MIP-1 | Sherry et al., J. Exp. Med., 168: 2251, 1988 |
| Human MIF | Weiser et al., Proc. Natl. Acad. Sci. U.S.A., 86: 7522, 1989 |
| Human G-CSF | Nagata et al., Nature, 319: 415, 1986; Souza et al., Science, 232: 61, 1986 |
| Human GM-CSF | Cantrell et al., Proc. Natl. Acad. Sci. U.S.A., 82: 6250, 1985; Lee et al., Proc. Natl. Acad. Sci. U.S.A., 82: 4360, 1985; Wong et al., Science, 228: 810, 1985 |
| Murine GM-CSF | Gough et al., EMBO J., 4: 645, 1985 |
| Human M-CSF | Wong, Science, 235: 1504, 1987; Kawasaki, Science, 230; 291, 1985; Ladner, EMBO J., 6: 2693, 1987 |
| Human EGF | Smith et al., Nuc. Acids Res., 10: 4467, 1982; Bell et al., NAR, 14: 8427, 1986 |
| Human TGF- | Derynck et al., Cell, 38: 287, 1984 |
| Human FGF acidic | Jaye et al., Science, 233: 541, 1986; Gimenez-Gallego et al., Biochem. Biophys. Res. Commun., 138: 611, 1986; Harper et al., Biochem., 25: 4097, 1986 |
| Human-ECGF | Jaye et al., Science, 233: 541, 1986 |
| Human FGF basic | Abraham et al., EMBO J., 5: 2523, 1986; Sommer et al., Biochem. Biophys. Res. Comm., 144: 543, 1987 |

TABLE 2-continued

| Cytokine | Reference |
|---|---|
| Murine IFN- | Higashi et al., J. Biol. Chem., 258: 9522, 1983; Kuga, NAR, 17: 3291, 1989 |
| Human IFN- | Gray et al., Nature, 295: 503, 1982; Devos et al., NAR, 10: 2487, 1982; Rinderknecht, J. Biol. Chem., 259: 6790, 1984 |
| Human IGF-I | Jansen et al., Nature, 306: 609, 1983; Rotwein et al., J. Biol. Chem., 261: 4828, 1986 |
| Human IGF-II | Bell et al., Nature, 310: 775, 1984 |
| Human-NGF chain | Ullrich et al., Nature, 303: 821, 1983 |
| Human NT-3 | Huang EJ. Et al., Development, 126(10): 2191–203, 1999 May. |
| Human PDGF A chain | Betsholtz et al., Nature, 320: 695, 1986 |
| Human PDGF B chain | Johnsson et al., EMBO J., 3: 921, 1984; Collins et al., Nature, 316: 748, 1985 |
| Human TGF-1 | Derynck et al., Nature, 316: 701, 1985 |
| Human TNF- | Pennica et al., Nature, 312: 724, 1984; Fransen et al., Nuc. Acids Res., 13: 4417, 1985 |
| Human TNF- | Gray et al., Nature, 312: 721, 1984 |
| Murine TNF- | Gray et al., Nucl. Acids Res., 15: 3937, 1987 |
| Human E-Selectin | Bevilacqua el al., Science, 243: 1160, 1989; Hensley et al., J. Biol. Chem., 269: 23949, 1994 |
| Human ICAM-1 | Simmons et al., Nature, 331: 624, 1988 |
| Human PECAM | Simmons et al., J. Exp. Med., 171: 2147, 1990 |
| Human VCAM-1 | Hession et al., J. Biol. Chem., 266: 6682; Osborn et al., Cell, 59: 1203, 1989 |
| Human L-Selectin (membrane bound) | Ord et al., J. Biol. Chem., 265: 7760, 1990; Tedder et al., J. Exp. Med., 170: 123, 1989 |
| Human L-Selectin (soluble form) | Ord et al., J. Biol. Chem., 265: 7760, 1990; Tedder et al., J. Exp. Med., 170: 123, 1989 |
| Human Calcitonin | Le Moullec et al., FEBS Lett., 167: 93, 1984 |
| Human Hirudin (*E. coli* optimized) | Dodt et al., FEBS Lett., 165: 180, 1984 |

G. Polynucelotides

The polynucleotides to be incorporated within the polymer fibers of the present invention extend to the full variety of nucleic acid molecules. The nucleic acids thus include genomic DNA, cDNAs, single stranded DNA, double stranded DNA, triple stranded DNA, oligonucleotides, Z-DNA, mRNA, tRNA and other RNAs. DNA molecules are generally preferred, even where the DNA is used to express a therapeutic RNA, such as a ribozyme or antisense RNA.

A "gene" or DNA segment encoding a selected protein or RNA, generally refers to a DNA segment that contains sequences encoding the selected protein or RNA, but is isolated away from, or purified free from, total genomic DNA of the species from which the DNA is obtained. Included within the terms "gene" and "DNA segment", are DNA segments and smaller fragments of such segments, and also recombinant vectors, including, for example, plasmids, cosmids, phage, retroviruses, adenoviruses, and the like.

The term "gene" is used for simplicity to refer to a functional protein or peptide encoding unit. As will be understood by those in the art, this functional term includes both genomic sequences and cDNA sequences. "Isolated substantially away from other coding sequences" means that the gene of interest forms the significant part of the coding region of the DNA segment, and that the DNA segment does not contain large portions of naturally-occurring coding DNA, such as large chromosomal fragments or other functional genes or cDNA coding regions. Of course, this refers to the DNA segment as originally isolated, and does not exclude genes or coding regions, such as sequences encoding leader peptides or targeting sequences, later added to the segment by the hand of man.

The present invention does not require that highly purified DNA or vectors be used, so long as any coding segment employed encodes a selected protein or RNA and does not include any coding or regulatory sequences that would have a significant adverse effect on the target cells. Therefore, it will also be understood that useful nucleic acid sequences may include additional residues, such as additional non-coding sequences flanking either of the 5' or 3' portions of the coding region or may include various internal sequences, i.e., introns, that are known to occur within genes.

Many suitable DNA segments may be obtained from existing, including commercial sources. One may also obtain a new DNA segment encoding a protein of interest using any one or more of a variety of molecular biological techniques generally known to those skilled in the art. For example, cDNA or genomic libraries may be screened using primers or probes with designed sequences. Polymerase chain reaction (PCR) may also be used to generate a DNA fragment encoding a protein of interest.

After identifying an appropriate selected gene or DNA molecule, it may be inserted into any one of the many vectors currently known in the art, so that it will direct the expression and production of the selected protein when incorporated into a target cell. In a recombinant expression vector, the coding portion of the DNA segment is positioned under the control of a promoter/enhancer element. The promoter may be in the form of the promoter that is naturally associated with a selected gene, as may be obtained by isolating the 5' non-coding sequences located upstream of the coding segment or exon, for example, using recombinant cloning and/or PCR technology.

In other embodiments, it is contemplated that certain advantages will be gained by positioning the coding DNA segment under the control of a recombinant, or heterologous, promoter. As used herein, a recombinant or heterologous promoter is intended to refer to a promoter that is not normally associated with a selected gene in its natural environment. Such promoters may include those normally associated with other selected genes, and/or promoters isolated from any other bacterial, viral, eukaryotic, or mammalian cell. Naturally, it will be important to employ a promoter that effectively directs the expression of the DNA segment in the chosen target cells.

The use of recombinant promoters to achieve protein expression is generally known to those of skill in the art of molecular biology, for example, see Sambrook et al (1989; incorporated herein by reference). The promoters employed may be constitutive, or inducible, and can be used under the appropriate conditions to direct high level or regulated expression of the introduced DNA segment. Expression of genes under the control of constitutive promoters does not require the presence of a specific substrate to induce gene expression and will occur under all conditions of cell growth. In contrast, expression of genes controlled by inducible promoters is responsive to the presence or absence of an inducing agent.

Promoters isolated from the genome of viruses that grow in mammalian cells, e.g., RSV, vaccinia virus 7.5K, SV40, HSV, adenoviruses MLP, MMTV LTR and CMV promoters, may be used herewith, as well as promoters produced by recombinant DNA or synthetic techniques. Currently preferred promoters are those such as CMV, RSV LTR, the SV40 promoter alone, and the SV40 promoter in combination with the SV40 enhancer.

Exemplary tissue specific promoter/enhancer elements and transcriptional control regions that exhibit tissue specificity include, but are not limited to: the elastase I gene control region that is active in pancreatic acinar cells; the insulin gene control region that is active in pancreatic cells; the immunoglobulin gene control region that is active in lymphoid cells; the albumin, 1-antitrypsin and -fetoprotein gene control regions that are active in liver; the -globin gene control region that is active in myeloid cells; the myelin basic protein gene control region that is active in oligodendrocyte cells in the brain; the myosin light chain-2 gene control region that is active in skeletal muscle; and the gonadotropic releasing hormone gene control region that is active in the hypothalamus.

Specific initiation signals may also be required for sufficient translation of inserted protein coding sequences. These signals include the ATG initiation codon and adjacent sequences. In cases where the entire coding sequence, including the initiation codon and adjacent sequences are inserted into the appropriate expression vectors, no additional translational control signals may be needed. However, in cases where only a portion of the coding sequence is inserted, exogenous translational control signals, including the ATG initiation codon should be provided. The initiation codon must be in phase with the reading frame of the protein coding sequences to ensure translation of the entire insert. These exogenous translational control signals and initiation codons can be of a variety of origins, both natural and synthetic. The efficiency and control of expression may be enhanced by the inclusion of transcription attenuation sequences, enhancer elements, etc.

A variety of vectors may be used including, but not limited to, those derived from recombinant bacteriophage DNA, plasmid DNA or cosmid DNA. For example, plasmid vectors such as pBR322, pUC 19/18, pUC 118, 119 and the M13 mp series of vectors may be used. Bacteriophage vectors may include gt10, gt11, gt18–23, ZAP/R and the EMBL series of bacteriophage vectors. Cosmid vectors that may be utilized include, but are not limited to, pJB8, pCV 103, pCV 107, pCV 108, pTM, pMCS, pNNL, pHSG274, COS202, COS203, pWE15, pWE16 and the charomid 9 series of vectors. Vectors that allow for the in vitro transcription of RNA, such as SP6 vectors, may also be used to produce large quantities of RNA that may be incorporated into matrices.

The selected genes and DNA segments may also be in the form of a DNA insert located within the genome of a recombinant virus, such as, for example a recombinant herpes virus, retroviruses, vaccinia viruses, adenoviruses, adeno-associated viruses or bovine papilloma virus. While integrating vectors may be used, non-integrating systems, which do not transmit the gene product to daughter cells for many generations will often be preferred. In this way, the gene product is expressed during a defined biological process, e.g., a wound healing process, and as the gene is diluted out in progeny generations, the amount of expressed gene product is diminished.

In such embodiments, to place the gene in contact with a target cell, one would prepare the recombinant viral particles, the genome of which includes the gene insert, and contact the target cells or tissues via release from the polymer fiber of the present invention, whereby the virus infects the cells and transfers the genetic material.

Genes with sequences that vary from those described in the literature are also contemplated for use in the invention, so long as the altered or modified gene still encodes a protein that functions to effect the target cells in the desired (direct or indirect) manner. These sequences include those caused by point mutations, those due to the degeneracies of the genetic code or naturally occurring allelic variants, and

further modifications that have been introduced by genetic engineering, i.e., by the hand of man.

Techniques for introducing changes in nucleotide sequences that are designed to alter the functional properties of the encoded proteins or polypeptides are well known in the art. Such modifications include the deletion, insertion or substitution of bases, and thus, changes in the amino acid sequence. Changes may be made to increase the activity of a protein, to increase its biological stability or half-life, to change its glycosylation pattern, confer temperature sensitivity or to alter the expression pattern of the protein, and the like. All such modifications to the nucleotide sequences are encompassed by this invention.

It is an advantage of the present invention that one or more than one selected gene may be used in the gene transfer methods and compositions. The nucleic acid delivery methods may thus entail the administration of one, two, three, or more, selected genes. The maximum number of genes that may be applied is limited only by practical considerations, such as the effort involved in simultaneously preparing a large number of gene constructs or even the possibility of eliciting an adverse cytotoxic effect. The particular combination of genes may be chosen to alter the same, or different, biochemical pathways. For example, a growth factor gene may be combined with a hormone gene; or a first hormone and/or growth factor gene may be combined with a gene encoding a cell surface receptor capable of interacting with the polypeptide product of the first gene.

In using multiple genes, they may be combined on a single genetic construct under control of one or more promoters, or they may be prepared as separate constructs of the same of different types. Thus, an almost endless combination of different genes and genetic constructs may be employed. Certain gene combinations may be designed to, or their use may otherwise result in, achieving synergistic effects on cell stimulation and tissue growth, any and all such combinations are intended to fall within the scope of the present invention. Indeed, many synergistic effects have been described in the scientific literature, so that one of ordinary skill in the art would readily be able to identify likely synergistic gene combinations, or even gene-protein combinations.

It will also be understood that, if desired, the nucleic segment or gene could be administered in combination with further agents, such as, e.g. proteins or polypeptides or various pharmaceutically active agents. So long as genetic material forms part of the composition, there is virtually no limit to other components which may also be included, given that the additional agents do not cause a significant adverse effect upon contact with the target cells or tissues. The nucleic acids may thus be delivered along with various other agents, for example, in certain embodiments one may wish to administer an angiogenic factor as disclosed in U.S. Pat. No. 5,270,300 and incorporated herein by reference.

As the chemical nature of genes, i.e., as a string of nucleotides, is essentially invariant, and as the process of gene transfer and expression are fundamentally the same, it will be understood that the type of genes transferred by the fiber matrices of the present invention is virtually limitless. This extends from the transfer of a mixture of genetic material expressing antigenic or immunogenic fragments for use in DNA vaccination; to the stimulation of cell function, as in wound-healing; to aspects of cell killing, such as in transferring tumor suppressor genes, antisense oncogenes or apoptosis-inducing genes to cancer cells.

By way of example only, genes to be supplied by the invention include, but are not limited to, those encoding and expressing: hormones, growth factors, growth factor receptors, interferons, interleukins, chemokines, cytokines, colony stimulating factors and chemotactic factors; transcription and elongation factors, cell cycle control proteins, including kinases and phosphatases, DNA repair proteins, apoptosis-inducing genes; apoptosis-inhibiting genes, oncogenes, antisense oncogenes, tumor suppressor genes; angiogenic and anti-angiogenic proteins; immune response stimulating and modulating proteins; cell surface receptors, accessory signaling molecules and transport proteins; enzymes; and anti-bacterial and anti-viral proteins.

H. Kits

All the essential materials and reagents required for the various aspects of the present invention may be assembled together in a kit. The kits of the present invention also will typically include a means for containing the vials comprising the desired components in close confinement for commercial sale such as, e.g., injection or blow-molded plastic containers into which the desired vials are retained. Irrespective of the number or type of containers, the kits of the invention are typically packaged with instructions for use of the kit components.

## WORKING EXAMPLES

The following examples are included to demonstrate preferred embodiments of the invention and are not intended to limit the scope of the invention in any way. It should be appreciated by those of skill in the art that the techniques disclosed in the examples which follow represent techniques discovered by the inventor to function well in the practice of the invention, and thus can be considered to constitute preferred modes for its practice. However, those of skill in the art should, in light of the present disclosure, appreciate that many changes can be made in the specific embodiments which are disclosed and still obtain a like or similar result without departing from the spirit and scope of the invention.

### Example 1

### Extrusion of Gel or Hydrogel Bored Fibers

In one embodiment of the present invention, the following procedure is used to create gel or hydrogel bored drug-releasing fibers. The apparatus used is depicted in FIG. 7, which details a fiber spinneret in which a coagulant bore fluid is fed through a small diameter hypodermic tube, which is centered in a blunt-end hypodermic needle. However, any similar configuration including scaled-up versions and specifically built apparatus' are included within the scope of the invention. This configuration allows for an annulus of polymer to flow through the spinneret, bored by a water-based gel or hydrogel. First, a biodegradable polymer such as poly(L-lactic acid) (PLLA), poly(DL-lactic acid), polycaprolactone, poly(glycolic acid), polyanhydride, or copolymers or blends of these or other biodegradable polymers is dissolved in some appropriate solvent (A) at concentrations ranging from 5 to 30 wt % depending on the type of polymer, 10 wt % being preferred for PLLA at 200 kD molecular weight. In this embodiment, solvent (A) has low miscibility with water, and is very miscible with the coagulation bath solvent (B), but not with the water in the gel or hydrogel in the bore. The water does not function as a solvent or non-solvent in this application. Preferred choices of solvent (A) include chloroform and methylene chloride. Once the polymer is dissolved in the chosen solvent, a non-solvent (solvent C) is typically added to the polymer solution in an

appropriate concentration to reduce the solvation power of the solvent system, yet not bring the solution to its cloud point. This non-solvent is highly miscible with solvent (A), and with solvent (B), and in some cases may be the same as solvent (B). Typical choices include iso-octane, cyclohexane, and hexane. This non-solvent brings the polymer in the solution close to its cloud point, so that the solution will more quickly precipitate to form a fiber when extruded into the coagulant bath, solvent (B).

The gel or hydrogel is prepared using standard procedures known to those who practice the art. As an example, for an internally gelled alginate bore fluid, sodium alginate powder is first dissolved in distilled-deionized water to yield a concentration in the range of 0.5 to 50 wt %, with 1 wt % being desired for this-example. Once dissolved, the solution is sterile filtered to provide an appropriate stock for the gel extrusion process. To promote internal gelation of the alginate, an appropriate quantity of calcium carbonate, $CaCO_3$, is added to the solution and mixed thoroughly by vortexing, sonicating, or homogenizing. Calcium carbonate is not soluble in water at neutral pH, so the powder ultimately is suspended in the alginate solution. To this solution, an appropriate quantity of D-Glucono-delta-Lactone (GDL) is added to slowly drop the solution pH, which initiates liberation of free $Ca^{++}$ from the $CaCO_3$ to cross-link the guluronic acid residues in the alginate, thus forming a hydrogel. The rate of gelation and the properties of the gel can be controlled through the concentration of $CaCO_3$ and the ration of GDL to $CaCO_3$ used in the solution.

The prepared gel solution and the polymer solution are then immediately extruded into the coagulating bath containing solvent (B), through the spinneret device depicted in FIG. **8**, such that the polymer flows around a center tube containing the gel or hydrogel and, if desired, a drug of choice either dissolved in the gel, or encapsulated in nanospheres or liposomes and suspended in the gel. The polymer solution and gel or hydrogel core are extruded into the coagulation bath through a spinneret according to the size of the desired fiber, as these fibers are not typically drawn, the final fiber size is close to the spinneret size. The optimum ration of outer annulus to inner gel or hydrogel diameter needs to be experimentally determined. For example, to obtain fibers whose outer diameter are approximately 500 μm, the inventor's laboratory has used an outer lumen of 18 gage with a 24 or 25 gage inner lumen for the bore fluid. Any water-based gel, precursor hydrogel component, or hydrogel can be delivered through the center tube. Frequently, the inner gel or hydrogel is carrying a drug that is incompatible with organic solvents, or the gel or hydrogel does not tolerate the presence of organic solvents. Therefore, it is generally preferred that the solvent for the gel or hydrogel (generally water) is immiscible with solvents (A), (B) and (C). Solvent (B) must be highly miscible with solvents (A) and (C), immiscible with the water component of the bore fluid, and must be a non-solvent for the polymer; hexane and pentane are the most typical choices, but any solvent that meets the above criteria and quickly draws the solvent from the polymer solution will theoretically work. Wherefore, chloroform and pentane make a good solvent and coagulating bath combination with iso-octane as the added non-solvent. Because solvent (A) is highly miscible with coagulating bath solvent (B), it freely diffuses from the polymer solution stream into the coagulating bath, reducing the solvent power of the polymer solution below the cloud point, which causes the polymer to begin to precipitate to form a solid polymer sheath. Occasionally, the polymer sheath must begin to precipitate and form before it is subjected to the stress of being exposed to the gel or hydrogel flowing in the inner lumen. This requires that the axial positions of the inner lumen protrude below the outlet of the outer annulus (0–2 mm typical in inventor's laboratory) to ensure that the polymer solution is exposed to the coagulant bath just prior to the gel or hydrogel bore fluid contacting the polymer. The non-solvent (C), incorporated into the polymer solution accelerates the precipitation process. As neither solvent (A) nor (B) freely diffuse into the bore fluid, only a single coagulant front is created as the polymer exits the spinneret, thereby encapsulating the bore gel or hydrogel. The distance the fiber drops into the coagulating bath is important to the formation of the fiber and its ultimate properties, and is typically 10–30 cm. In the inventor's laboratory, the fiber has been allowed to freely Call and collect at the bottom of the coagulating bath container; however, other designs including drawing the fiber out of the coagulating bat are included as part of this invention. The extruded fiber may be post-processed and stored in a number of ways including freeze-dried, frozen, or oven dried and placed in a desecrator or freezer, depending upon recommended storage conditions of the loaded biomolecules and the properties of the gel or hydrogel.



### Example 2

### Extrusion of a Gel Coated Polymer Fiber

In another embodiment of the present invention, a PLLA or other biodegradable polymer fiber coated with a hydrogel is created. The extrusion process is similar to that described, except the coagulant bath used contains a coagulant or crosslinker for the hydrogel. The polymer and hydrogel are extruded through a spinneret similar to that previously described, with the polymer solution (possibly containing a drug in a dispersed aqueous or gel phase) extruded through the inner bore of the spinneret and the gel or hydrogel (possibly containing a drug) solution extruded through the outer annulus of the spinneret. The solutions are prepared as described or as otherwise known to those who practice the art, and are extruded at the same time through the spinneret. In the case of a dual lumen spinneret, the polymer solution is extruded without direct exposure to a coagulant. In this case, the polymer solvent must be removed by a post-processing step, or if there are no reasons to the contrary, the coagulating bath may contain a mixture of solvents, at least one of which miscible with both water and the polymer solvent; examples of which include isopropyl alcohol, acetone etc. This will allow the polymer solvent (typically chloroform or methylene chloride) to leave through the gel or hydrogel exterior layer being carried by the water miscible solvent. The coagulant bath also contains a solution known to those who practice the art that crosslinks or otherwise forms the gel or hydrogel. In the case of alginate hydrogel, the coagulant bath can be an appropriate concentration solution of $CaCl_2$ in water. As the polymer solution, and alginate solution flow from the spinneret, the alginate solution (which could contain $CaCO_3$ and GDL as noted above) contacts the coagulant and is crosslinked by calcium ions in the solution. If a polymer coagulant is used, solvent in the polymer/emulsion will diffuse into the coagulant and the polymer will form a fiber. If no coagulant is used, the polymer solution will be encapsulated by the rapidly crosslinking alginate solution such that an alginate shelled fiber will form. The residual solvent within the polymer can be removed by appropriate post-processing techniques.

Example 3

Extrusion of Gel or Hydrogel Exterior Hollow Fibers Using a Coagulant Bore Fluid

In one embodiment of the present invention, the following procedure is used to create gel or hydrogel exterior, hollow fibers. The apparatus includes a triple lumen spinneret, which also implies three pumps. The coagulant bath consists of a glass tube mounted vertically with one end immersed into reservoir of coagulant bath consists of a glass tube mounted vertically with one end immersed into a reservoir of coagulant fluid, and the other end sealed with a septum. Coagulant is drawn into the tube from the reservoir by piercing the septum with a needle and extracting the air in the tube with a large volume syringe. When filled, the syringe needle is removed and the septum seals the tube. As in example 2, the coagulant must include a means of gelling the exterior layer of gel or hydrogel. Again, in the case of alginate for example, a solution of calcium chloride may be appropriate. The gel or hydrogel solution flows through the outermost lumen, the biodegradable polymer through the inner lumen, and a coagulant for the polymer as defined above, flows through the innermost lumen. The fiber is drawn from the coagulation bath at a determined rate. In the laboratory, the inventors have used a cylinder attached to a modified variable-speed lathe that can accurately maintain its angular velocity. The drawn and extruded fiber is then removed from the cylinder and coagulant in the center of the fiber without collapsing the fiber. Residual coagulant and water are removed by freeze-drying, freezing or oven drying the fiber and placing it into a desecrator or freezer, depending upon recommended storage conditions.

Example 4

Extrusion of Hollow Fibers Using Water as a Bore Fluid (Water Bore Fiber)

In one embodiment of the present invention, the following procedure is used to create water-bored drug-released fibers. The apparatus is similar to that used in Example 1. This configuration allows for an annulus of polymer to flow through the spinneret, bored by a water-based fluid. First, a biodegradable polymer such as poly(L-lactic acid) (PLLA), poly(DL-lactic acid), polycaprolactone, poly(glycolic acid), polyanhydride, or copolymers or blends of these or other biodegradable polymers is dissolved in some appropriate solvent (A) at concentrations ranging from 5 to 30 wt % depending on the type of polymer, 10 wt % being preferred for PLLA at 200 kD molecular weight. In this embodiment, solvent (A) has low miscibility with water, and is very miscible with the coagulation bath solvent (B), but not with the water in the bore. The water does not function as a solvent or non-solvent in this application. Preferred choices of solvent (A) include chloroform and methylene chloride. Once the polymer is dissolved in the chosen solvent, a non-solvent is added to the polymer solution in an appropriate concentration to reduce the solvating power of the solvent system of the polymer, yet not bring the solution to its cloud point. This non-solvent (solvent C) is highly miscible with solvent (A), and with solvent (B). Typical choices include iso-octane, cyclohexane, and hexane. This non-solvent brings the polymer in the solution close to its point of coagulation, so that the solution will more quickly form a fiber when extruded into the coagulant bath.

The polymer solution is then extruded into a coagulating bath containing solvent (B), though a spinneret device such that the polymer flows around a center tube containing water and, if desired, a drug of choice either dissolved in the water, or encapsulated in nanospheres or liposomes and suspended in the water. The polymer solution is extruded into the coagulation bath through a dispensing tip ranging in size from 16 gage down to 27 gage, with the hypodermic tubing containing the water bore fluid appropriately sized to fit within the chosen dispensing tip. Any water-based fluid can be delivered through the center tube, provided this solution is immiscible with solvent (A). Solvent (B) must be highly miscible with solvents (A) and (C), and must be a non-solvent for the polymer; hexane and pentane are the most typical choices, but any solvent that is a non-solvent for the polymer and highly miscible with solvents (A) and (C) will work for this application, provided it quickly draws the solvent from the polymer solution. For example pentane is very miscible with chloroform and iso-octane, yet is a non-solvent for the polymer. Therefore, chloroform, iso-octane and pentane make a good solvent, non-solvent, and coagulating bath combination. Because solvent (A) is highly miscible with coagulating bath solvent (B), it freely diffuses from the polymer solution stream into the coagulating bath. The relative axial positions of the inner hypodermic tubing and the dispensing tip are adjusted to assure the annulus of polymer solution is exposed to the coagulant bath prior to the water bore contacting the polymer. The non-solvent incorporated into the polymer solution accelerates the precipitation process, such that a shell is formed in the polymer that entraps the bore solution. Neither solvent (A) nor (C) freely diffuse into the bore fluid, so only a single coagulant front is created as the polymer exits the spinneret. Additionally, the immiscibility of the solvents with the bore protects it and its contents. The coagulant bath used for this application consists of a 250 ml or greater flask into which the fiber is allowed to drop and spool as it coagulates. The height of the drop is important to the formation of the fiber, and is typically 10–30 cm. The extruded fiber is removed from the flask and either freeze-dried, frozen, or oven dried and placed in a desecrator or freezer, depending upon recommended storage conditions.

Example 5

Alternate Fabrication Technique for Example 1, for Hydrophilic Fiber

The only difference is to use as a coagulating bath a molecule such as poly(ethylene glycol) (PEG) of low molecular weight (in the range of 200 to 600 Daltons is typical). This polymer is miscible with chloroform and methylene chloride, yet a non-solvent for the polymer, such as PLLA. Therefore, it qualifies as a coagulation bath, however, this unique coagulating bath creates an interpenetrating network of PEG in the wall of the fiber, making them hydrophilic upon exposure to an aqueous environment. This can have interesting implications for implantation and may alter cellular response to the fibers.

Example 6

Neural Tissue Engineering

In this aspect of the present invention, parallel arrays of fibers are packed into tubes and loaded with neurotrophins for axonal growth. The tube may be a very large version of

a fiber of composition claimed in this invention, wherein the gel or hydrogel core may have a concentration of zero, or alternatively, be designed with an outer sheath of gel or hydrogel, with a multi-component inner core of gel or hydrogel with an intermediate layer consisting of biodegradable polymer. The innermost gel or hydrogel may have a concentration of zero, and the biodegradable polymer layer may be loaded with therapeutic agents either in a dispersed phase or directly mixed with the polymer. The exterior gel or hydrogel may also contain therapeutic agents as may the interior gel or hydrogel. Within the tube is a parallel array of fibers, whose composition may or may not be described by this invention or our prior invention. For this example, at least one component, either the tube, or at least one fiber must be of a composition as described in this invention. This array of fibers inside the tube is placed in severed peripheral or central nerves. The therapeutic agents may be loaded in a linear or some other appropriate gradient in every element of the device in which they are loaded (the exterior gel or hydrogel of the tube, the intermediate biodegradable polymer layer, or the innermost core of the tube, as well as the individual fibers within the tube in any and all possible constituents as described herein), but the gradient can differ in every occurrence within the device as desired. This device is implanted bridging the gap between the ends of the nerve stumps. As the device releases its therapeutic agents, which may consist of neurotrophins, anti-inflammatory agents, angiogenic factors, specific chemotactic or chemorepulsive agents etc., axons, vasculature, and other supporting cells and tissues begin to migrate across the lesion. Once the axons reach the distal end, guidance cues are provided by existing Schwann or glial cells and reconnections can then be made. It has been previously found that axons receive contact guidance by these fiber bundles and are able to traverse at least 1.8 cm in a rat sciatic nerve resection using non-loaded fibers. The optimal density of unloaded fibers in the tube is approximately 32 fibers in a 1.5 mm diameter tube for rat sciatic nerve growth.

Example 7

Preparation and use of Polymer Fiber Stents

In another embodiment, fibers can be loaded with a drug of interest and used in stents or other medical devices where mechanical strength is required. The stents can be woven in such a manner as to have loaded fibers intermingled with unloaded fibers if needed for mechanical properties.

Fibers can also be used in conjunction with commercially available stents to deliver drugs at the placement site. In this case, the fibers would not provide any mechanical support, but would only serve as a drug delivery reservoir.

Example 8

Preparation and use of Wound Dressings

In another embodiment, a gauze or dressing can be made from these fibers. This dressing can have two sides, an upper surface that will release molecules for re-epithelialization and provide a substrate for these cells. The bottom surface will promote regeneration of dermal tissue. This dressing is designed for dermal wound healing, including burns, full thickness dermal wounds and chronic or non-healing wounds and sores. Each fiber can have multi-component, multi-layer configuration to provide temporal release of drugs or factors that roughly correspond to the three phases of dermal wound healing.



As one example, in the case of a dressing designed for trauma patients, the first chemical to be released could be a pro-coagulant to help stop the bleeding. The next layer could then release cytokines to help recruit neutrophils and macrophages for the next phase of wound healing. Finally, a release of factors to help with reducing excessive scar tissue and to inhibit contractions, which are particularly disabling to burn patients.

Example 9

Fabrication of Artificial Arteries

It may be possible to construct an artificial artery using techniques described herein. A series of hollow, concentric cylindrical sections can be knitted, woven, braided or fabricated using non-woven technology with fibers loaded with various biological agents. The innermost cylinder is preferably tightly woven and contains drugs or agents to promote migrating, spreading and functioning of an intact endothelial cell layer. The next cylinder is composed of a woven or knitted architecture with fibers predominately circumferentially wound around the inner cylinder. This layer will induce the migration and proliferation of smooth muscle fibers, and promote the expression of elastin to create the internal elastic media. The next cylinder is composed of knitted or non-woven fibers and will contain drugs to promote the ingrowth of fibroblasts, macrophages and the creation of extracellular matrix. The last layer will compose longitudinal fibers that will promote the vascularization of the arterial cells via an artificial vasa vasorum, created by VEGF releasing fibers, or other promoters of angiogenesis.

Example 10

Drug Delivery Scaffold

In another application embodiment, these fibers can be used for drug delivery scaffolds in places where a fiber format is appropriate. For example, inside the eye, where microspheres or other formats may be more likely to interfere with the subject's vision, a fiber could be tacked down and not float into the field of view. Fibers may be able to stay in place better than microspheres or other formats such as nanoparticles, hydrogels, etc.

Example 11

Directed in situ Angiogenesis

In this embodiment, one or more fibers containing one or more of the family of angiogenic factors such as VEGF, bFGF, angiotensin or others known to induce angiogenesis are placed into the body along the path where the directed angiogenesis is desired. As the fiber begins to release the angiogenic factors endothelial cells from the surrounding vasculature will be induced to migrate out towards the fiber(s) following a process similar to normal angiogenesis. The fiber(s) used may have one or more of the compositions described in this invention, or it may be a tube with VEGF or similar growth factor that is chemotactic for endothelial cells on the inside, and a different factor for smooth muscles on the outside. In this way, the size of the created vessel may be determined. In this application, cells are guided into initially cell-free scaffoldings by cell-specific growth factors.

### Example 12

### Bone Fracture Healing

In another wound healing embodiment, proteins known to enhance bone fracture healing are loaded into a fiber. This fiber can then be wrapped around the bone at the site of the fracture, releasing the growth factors and enhancing the rate of fracture repair.

These fibers can either be in a helical structure (single or multiple helix), or they may be woven into a loose, open weave. Either in the helical or in the woven format, the fibers are placed around the bone fragments, holding them in place while releasing their growth factors.

In the case of a non-healing fracture that is due to lost or poor blood supply to the fracture site, a fiber or set of fibers containing VEGF or its equivalent may be used to enhance blood supply to the fractured area.

In this embodiment, bone fractures may be healed at accelerated rates compared to non-treated fractures, and non-unions may be healed in certain cases.

In yet a third bone healing application, fibers releasing pain relieving drugs may be used in the local area of the fracture. In this case, the fiber may be used in cases where plates, screws or other orthopedic devices are implanted or other surgical manipulations of the bone are performed. The local pain relief may lead the patient to apply load to the fracture sooner and may lead to a stronger and more rapid mend, as well as making life more comfortable for the patient.

### Example 13

### Skin Ulcer Healing

Similar to example 8 which described one form of dermal wound healing, another important example of this technology is the potential of healing chronic skin ulcers of various origins, such as diabetic foot ulcers, venous ulcers and general pressure sores. These conditions, and potentially other similar conditions may be healed based on creating a non-woven mesh of fibers that release factors known to accelerate dermal wound healing, for example, platelet derived growth factor (PDGF), transforming growth factor-beta (TGF-beta), and VEGF or similar protein. This non-woven mesh can be inserted or packed directly into the ulcer or wound, where these growth factors can help accelerate the wound-healing process. These dressings can be designed for healing dermal sores and ulcers. In this case, there is little need to reduce bleeding; rather one of the biggest needs of these patients, particularly those with diabetic ulcers is lack of blood supply to the wound site. Therefore, factors that induce angiogenesis may be able to increase circulation and help to rejuvenate the tissue at the site of the sore or ulcer.

Each dressing can be designed for the particular needs of the various types of wounds or sores by altering the biomolecules that are released, and the kinetics at which they are released.

### Example 14

### Muscle Grafts

In another embodiment, parallel arrays of fibers may be loaded with muscle stem cells. These stem cells can be of cardiac, smooth or skeletal muscle origin. Once these muscle stem cells are seeded onto the fiber array, the fibers can be mechanically stretched in vitro to help these cells align and differentiate properly. Alignment may also-be achieved by using fibers of very small diameter. Our experience with axons indicates that with fibers on the order of 50 μm diameter tend to help cells align parallel to the axis of the fibers. Other fibers in this bundle can release angiogenic factors to create a vascular supply for the muscle cells. In the case of skeletal or smooth muscle tissue, fibers for nerve growth can also be included to induce the formation of neuromuscular junctions. Various experimental conditions used to harvest, isolate, reproduce and differentiate these stem cells are known to those skilled in the art, and is not a part of this patent.



### Example 15

### Treatment of Glaucoma

Similar to drug delivery in the eye, described in example 10, and the neural stent described briefly in example 6, glaucoma may be treated by combining an intraocular drug delivery with a neural treatment applied to the optic nerve. Retinal ganglion cells undergo apoptosis leading to death of the axons of the optic nerve. It is hypothesized that if the cells could be supported both within the eye as well as along the path of the optic nerve, the cells may be able to survive. A fiber bundle that releases growth factors such as NT-4, BDNF, CNTF, may be applied topically to the exterior of the optic nerve. Simultaneously, fibers that release apoptosis inhibitors, or factors to support the retinal ganglion cells are implanted within the eye. This combined effort may prolong or save the sight of those suffering from glaucoma.

As is seen from the preceding examples, other tissues, organs, or structures are possible to weave once the basic physiologic structure is understood. This can be extended to organs of the digestive system, musculoskeletal system, urological system, circulatory system, and nervous system.

### Example 16

### Creation of a Gel or Hydrogel Core in a Biodegradable Polymer Sheath that Contains a Dispersed Aqueous Phase

In another embodiment of the invention, gel bored fibers may also contain therapeutic agents in a dispersed aqueous, gel or hydrogel phase within the biodegradable polymer fiber wall. The apparatus and extrusion conditions are similar to example 1 except as noted here.

Once the polymer is dissolved in solvent (A), an aqueous solution or a gel or a hydrogel (including precursors) containing both the biomolecules(s) of interest and a surfactant is added to the polymer solution. Additionally, a surfactant can be added to solvent (A). The concentration of the aqueous phase is typically in the range of 1 to 70% v/v of the polymer solution, 4–20% being most typical for gel or hydrogel filled PLLA fibers. The surfactant can be one or a combination of substances familiar to those skilled in the art, such as bovine serum albumin (BSA), poly(vinyl alcohol), pluronics, or biological surfactants such as the family of phospholipids. Other surfactants not specifically mentioned here, but known to those skilled in the art are included by extension. In a typical use, BSA is used as the surfactant at concentrations ranging from about 10 fold to 100 fold higher than the biological molecule of interest, with typical concentrations ranging from 2 wt % to 50 wt % of the aqueous phase. Note that the inventors experience has demonstrated

that high protein concentrations are difficult in the case of a gel or hydrogel, and therefore, the surfactant of choice may depend on the type of the dispersed phase.

Using some form of mechanical energy such as sonication, vortexing, or shear forces generated by forcing the liquid through a small orifice, a water-in-oil type emulsion is formed between the aqueous and organic phases. Depending on the volume of aqueous solution relative to the polymer solution, emulsification can be accomplished in stages, using partial additions of the aqueous phase until the total volume is incorporated into the polymer solution. This emulsion must be stable for periods far in excess of time required for extrusion to insure homogeneity of the emulsion throughout the extrusion process. The size of the dispersed aqueous phase droplets is primarily dependent on the quality of the surfactant, and the total amount of mechanical energy imparted to the system in forming the emulsion. The aqueous phase size is an important variable in both release kinetics and mechanical properties of the fiber. This emulsion is then used as the polymer solution, and all other details are the same as explained in example 1.

### Example 17

#### Creation of a Gel or Hydrogel Exterior Fiber with a Biodegradable Polymer Fiber Core Containing a Dispersed Aqueous, Gel, or Hydrogel Phase Within the Fiber Wall

This example is similar to example 2 in all details except that a dispersed phase is added to the polymer solution as described in example 16.

### Example 18

#### Creation of a Gel or Hydrogel Exterior Hollow Fiber with a Dispersed Gel or Hydrogel Phase Within the Fiber Wall

This example is similar to example 3 in all details except that a dispersed phase is added to the polymer solution as described in example 16.

### Example 19

#### Creation of a Water-bore Fiber with a Dispersed Aqueous, Gel or Hydrogel Phase Within the Wall of the Fiber

This example is similar to example 4 in all details except that a dispersed phase is added to the polymer solution as described in example 16.

All of the compositions and methods disclosed and claimed herein can be made and executed without undue experimentation in light of the present disclosure. While the compositions and methods of this invention have been described in terms of preferred embodiments, it will be apparent to those of skill in the art that variations may be applied to the compositions and methods and in the steps or in the sequence of steps of the method described herein without departing from the concept, spirit and scope of the invention. More specifically, it will be apparent that certain agents which are both chemically and physiologically related may be substituted for the agents described herein while the same or similar results would be achieved. All such similar substitutes and modifications apparent to those skilled in the art are deemed to be within the spirit, scope and concept of the invention as defined by the appended claims.

## REFERENCES

The following references, to the extent that they provide exemplary procedural or other details supplementary to those set forth herein, are specifically incorporated herein by reference.

Aigner, Tegeler, Hutzler, Campoccia, Pavesio, Hammer, Kastenbauer, Naumann, "Cartilage tissue engineering with novel nonwoven structured biomaterial based on hyaluronic acid benzyl ester," *J. of Biomed. Materials Res.*, 42(2): 172–81, 1998.

Auerbach and Auerbach, "Angiogenesis inhibition: a review," *Pharmac. Ther.*, 63:265, 1994.

Breitbart, Grande, Kessler, Ryaby, Fitzsimmons, Grant, "Tissue engineered bone repair of calvarial defects using cultured periosteal cells," *Plastic & Reconstructive Surgery*, 101(3):567–74, 1998.

Cao, Rodriguez, Vacanti, Ibarra, Arevalo, Vacanti, "Comparative study of the use of poly(glycolic acid), calcium alginate and pluronics in the engineering of autologous porcine cartilage," *J. of Biomaterials Sci., Polymer Edition*, 9(5):475–87, 1998.

Dillon, Yu, Sridharan, Ranieri, Bellamkonda, "The influence of physical structure and charge on neurite extension in a 3D hydrogel scaffold," *J. of Biomaterials Sci., Polymer Ed.*, 9(10):1049–69, 1998.

Elcin, Dixit, Lewin, Gitnick, "Xenotransplantation of fetal porcine hepatocytes in rats using a tissue engineering approach," *Artificial Organs*, 23(2):146–52, 1999.

Fauza, Fishman, Mehegan, Atala, "Videofetoscopically assisted fetal tissue engineering: skin replacement," *J. of Pediatric Surgery*, 33(2):357–61, 1998.

Fidler and Ellis, "The implications of angiogenesis for the biology and therapy of cancer metastasis," *Cell*, 79:185, 1994.

Folkman and Klagsbrun, "Angiogenic factors," *Science*, 235:442–447, 1987.

Folkman, "How is blood vessel growth regulated in normal and neoplastic tissue," *Cancer Res.*, 46:467, 1986.

Folkman, J., "Angiogenesis in cancer, vascular, rheumatoid and other disease," *Nature Med.*, 1:27, 1995.

Grande, Halberstadt, Naughton, Schwartz, Manji, "Evaluation of matrix scaffolds for tissue engineering of articular cartilage grafts," *J. of Biomed. Mat. Res.*, 34(2):211–20, 1997.

Gutsche, Lo, Zurlo, Yager, Leong, "Engineering of a sugar-derivatized porous network for hepatocyte culture," *Biomaterials*, 17(3):387–93, 1996.

Hoerstrup, Zund, Lachat, Schoeberlein, Uhlschmid, Vogt, Turina, "Tissue engineering: a new approach in cardiovascular surgery-seeding of human fibroblasts on resorbable mesh," *Swiss Surgery*, (Suppl.), 2:23–5, 1998.

Hoerstrup, Zund, Schoeberlein, Ye, Vogt, Turina, "Fluorescence activated cell sorting: a reliable method in tissue engineering of a bioprosthetic heart valve," *Annals of Thoracic Surgery*, 665(5):1653–7, 1998.

Isogai, Landis, Kim, Gerstenfeld, Upton, Vacanti, "Formation of phalanges and small joints by tissue-engineering," *J. of Bone & Joint Surgery, American Vol.*, 81(3):306–16, 1999.

Martin, Padera, Vunjak-Novakovic, Freed, "In vitro differentiation of chick embryo bone marrow stromal cells into cartilaginous and bone-like tissues," *J. of Orthopaedic Res.*, 16(2):181–9, 1998.

Nagy et al., "Pathogenesis of ascites tumor growth: vascular permeability factor, vascular hyperpermeability, and ascites fluid accumulation." *Cancer Res.*, 55:360, 1995.

Peppas and Langer, "New challenges in biomaterials," Science, 263:1715-1720, 1994.

Peter, Miller, Yasko, Yaszemski, Mikos, "Polymer concepts in tissue engineering," *J. of Biomed. Materials Res.*, 43(4):422-7, 1998.

Sacks, Chuong, Petroll, Kwan, Halberstadt, "Collagen fiber architecture of a cultured dermal tissue," *J. of Biomed. Engineering*, 119(1):124-7, 1997.

Sambrook et al., *Molecular Cloning: A Laboratory Manual*, Cold Spring Harbor Laboratory Press, Cold Spring Harbor, N.Y., 1989.

Shinoka, Shum-Tim, Ma, Tanel, Isogai, Langer, Vacanti, Mayer, "Creation of viable pulmonary artery autografts through tissue engineering," *J. of Thoracic & Cardiovascular Surgery*, 115(3):536-45, 1998.

Sims, Butler, Cao, Casanova, Randolph, Black, Vacanti, Yaremchuk, "Tissue engineered neocartilage using plasma derived polymer substrates and chondrocytes," *Plastic & Reconstructive Surgery*, 101(6):1580-5, 1998.

Vunjak-Novakovic, Obradovic, Martin, Bursac, Langer, Freed, "Dynamic cell seeding of polymer scaffolds for cartilage tissue engineering," *Biotechnology Progress*, 14(2):193-202, 1998.

Whang, Tsai, Nam, Aitken, Sprague, Patel, Healy, "Ectopic bone formation via rhBMP-2 delivery from porous bioabsorbably polymer scaffolds," *J. of Biomed. Materials Res.*, 42(4):491-9, 1998.

Wong and Mooney, "Synthesis and properties of biodegradable polymers used in tissue engineering," *In: Synthetic Biodegradable Polymer Scaffolds*, (Atala and Mooney, eds.), Birkhauser Press, Boston, Mass., pp. 51-82, 1997.

Yoo and Atala, "A novel gene delivery system using urothelial tissue engineered neoorgans," *J. of Urology*, 158(3 Pt 2):1066-70, 1997.

What is claimed is:

**1**. A drug delivery composition comprising at least one fiber having a bore and a wall, wherein said fiber comprises a first component and a second component, and wherein said first component is a biodegradable polymer and said second component is selected from the group consisting of a gel and a hydrogel.

**2**. The composition of claim **1** wherein said first component is present in the fiber bore and said second component is present in the fiber wall.

**3**. The composition of claim **1** wherein said second component is present in the fiber bore and said first component is present in the fiber wall.

**4**. The composition of claim **1** further comprising at least one additional fiber, wherein said additional fiber circumscribes an adjacent inner fiber.

**5**. The composition of claim **4** wherein said adjacent inner fiber is approximately centered within the outer fiber.

**6**. The composition of claim **1**, wherein a therapeutic agent is loaded into the gel or hydrogel.

**7**. The composition of claim **6**, wherein the therapeutic agent is a growth factor.

**8**. The composition of claim **7**, wherein said growth factor is a promoter of angiogenesis.

**9**. The composition of claim **7**, wherein said growth factor promotes nerve regeneration.

**10**. The composition of claim **6**, wherein the therapeutic agent is a virus.



**11**. The composition of claim **6**, wherein the therapeutic agent is selected from the group consisting of protein, enzymes, transcription factors, signaling molecules, internal messengers, second messengers, kinases, proteases, cytokines, chemokines, structural proteins, interleukins, hormones, anti-coagulants, pro-coagulants, anti-inflammatory agents, antibiotics, agents that promote angiogenesis, agents that inhibit angiogenesis, growth factors, immunomodulators, chemotactic agents, agents that promote apoptosis, agents that inhibit apoptosis, and mitogenic agents.

**12**. The composition of claim **1**, wherein said gel or hydrogel is a precursor gel or precursor hydrogel.

**13**. The composition of claim **1**, wherein said biodegradable polymer fiber comprises a hydrophobic drug.

**14**. The composition of claim **1**, wherein said gel or hydrogel comprises a radioactive material.

**15**. A drug delivery composition comprising a fiber, wherein said fiber comprises a first component and a second component, and wherein said first component is a biodegradable polymer and said second component is water, and further wherein said water is present as an inner core.

**16**. The composition of claim **15** Anther comprising at least one additional fiber, wherein said additional fiber circumscribes an adjacent inner fiber.

**17**. The composition of claim **16** wherein said adjacent inner fiber is approximately centered within the outer fiber.

**18**. The composition of claim **15**, wherein said biodegradable polymer fiber comprises a hydrophobic drug.

**19**. A drug delivery composition comprising a fiber, wherein said fiber comprises an emulsion consisting essentially of a gel or hydrogel.

**20**. A drug delivery composition comprising a fiber, wherein said fiber comprises a first component, and wherein said first component is a gel or hydrogel and further wherein said fiber comprises a hollow bore.

**21**. A scaffold composition comprising one or more fibers, wherein said fibers comprise a first component and a second component and wherein said first component is a biodegradable polymer and said second component is selected from the group consisting of a gel and a hydrogel.

**22**. The composition of claim **21** wherein said first component is present in the fiber bore and said second component is present in the fiber wall.

**23**. The composition of claim **21** wherein said second component is present in the fiber bore and said first component is present in the fiber wall.

**24**. The composition of claim **21** further comprising at least one additional fiber, wherein said additional fiber circumscribes an adjacent inner fiber.

**25**. The composition of claim **24** wherein said adjacent inner fiber is approximately centered within the outer fiber.

**26**. The composition of claim **21**, wherein therapeutic agent is loaded into the gel or hydrogel.

**27**. The composition of claim **26**, wherein the therapeutic agent is a growth factor.

**28**. The composition of claim **27**, wherein said growth factor is a promoter of angiogenesis.

**29**. The composition of claim **27**, wherein said growth factor promotes nerve regeneration.

**30**. The composition of claim **26**, wherein the therapeutic agent is a virus.

**31**. The composition of claim **26**, wherein the therapeutic agent is selected from the group consisting of protein, enzymes, transcription factors, signaling molecules, internal

messengers, second messengers, kinases, proteases, cytokines, chemokines, structural proteins, interleukins, hormones, anti-coagulants, pro-coagulant, anti-inflammatory agents, antibiotics, agents that promote angiogenesis, agents that inhibit angiogenesis, growth factors, immunomodulators, chemotactic agents, agents that promote apoptosis, agents that inhibit apoptosis, and mitogenic agents.

**32**. The composition of claim **21**, wherein said gel or hydrogel is a precursor gel or precursor hydrogel.

**33**. The composition of claim **21**, wherein said biodegradable polymer fiber comprises a hydrophobic drug.

**34**. The composition of claim **21**, wherein said gel or hydrogel comprises a radioactive material.

* * * * *

# EXHIBIT D

**USP7033603 Boston Scientific Synergy Everolimus-Eluting Pt-Cr Coronary Stent**

Claim 19

**A drug delivery composition** comprising a fiber,

IV. WARNINGS AND PRECAUTIONS

The warnings and precautions can be found in the SYNERGY™ Everolimus-Eluting Platinum Chromium Coronary Stent System labeling.

V. DEVICE DESCRIPTION

The SYNERGY™ Everolimus-Eluting Platinum Chromium Coronary Stent System (SYNERGY) is a device/drug combination product that provides a mechanical structure for vascular lumen support (primary mode of action) and a pharmacological agent (everolimus) targeted towards reducing the injury response. The System consists of a drug/polymer-coated balloon-expandable stent, pre-mounted on a Monorail™ (MR) or Over-The-Wire (OTW) delivery catheter. The stent is made from a platinum chromium alloy (PtCr). The drug/polymer coating consists of a bioabsorbable polymer, poly (D,L-lactide-co-glycolide) (PLGA), and the active pharmaceutical ingredient, everolimus. The characteristics of the SYNERGY stent system are described in **Table V-T1**.

**Table V-T1: SYNERGY™ Everolimus-Eluting Platinum Chromium Coronary Stent System Product Description**

| | **SYNERGY** Monorail Stent Delivery System | **SYNERGY** Over-the-Wire Stent Delivery System |
|---|---|---|
| Available Stent Lengths (mm) | 8, 12, 16, 20, 24, 28, 32, 38 | |
| Available Stent Diameters (mm) | 2.25, 2.50, 2.75, 3.00, 3.50, 4.00 | |
| Stent Material | Platinum Chromium Alloy (PtCr) | |
| Stent Strut Thickness | 0.074 mm for diameters 2.25 mm to 2.75 mm<br>0.079 mm for diameters 3.00mm to 3.50 mm<br>0.081 mm for diameter of 4.00 mm | |
| Drug Product | An abluminal (outer surface of the stent) coating of a polymer carrier with approximately 1 µg of everolimus per mm² of total stent surface area with a maximum nominal drug content of 287.2 µg on the largest stent (4.00 x 38 mm). | |
| **Delivery System** | | |
| Effective Length | 144 cm | |
| Delivery System Y-Adapter Ports | Single access port to inflation lumen. Guidewire exit port is located approximately 25 cm from tip. Designed for guidewire ≤0.014 inches (0.36 mm) | Y-Connector (Side arm for access to balloon inflation/deflation lumen. Straight arm is continuous with shaft inner lumen). Designed for guidewire ≤0.014 inches (0.36 mm) |
| Stent Delivery | A balloon, with two radiopaque balloon markers, nominally placed 0.4 mm (0.016 inches) beyond the stent at each end. | |
| Balloon Inflation Pressure | Nominal Inflation Pressure:<br>• Diameters 2.25 mm, 2.50 mm, 2.75 mm, 3.00 mm, 3.50 mm, 4.00 mm: 11 atm (1117 kPa) | |
| | Rated Burst Inflation Pressure:<br>• Diameters 2.25 mm – 2.75 mm: 18 atm (1827 kPa)<br>• Diameters 3.00 mm – 4.00 mm: 16 atm (1620 kPa) | |



**DEVICE DESCRIPTION**

The SYNERGY™ Everolimus-Eluting Platinum Chromium Coronary Stent System (SYNERGY) is a device/drug combination product that provides a mechanical structure for vascular lumen support (primary mode of action) and a pharmacological agent (everolimus) targeted towards reducing the injury response. The System consists of a drug/polymer-coated balloon-expandable stent, pre-mounted on a Monorail™ (MR) or Over-The-Wire (OTW) delivery catheter. The stent is made from a platinum chromium alloy (PtCr). The drug/polymer coating consists of a bioabsorbable polymer, poly (D,L-lactide-co-glycolide) (PLGA), and the active pharmaceutical ingredient, everolimus. The characteristics of the SYNERGY stent system are described in **Table V-T1**.

**Sources:** FDA P150003 PMA, 2015

**USP7033603 Boston Scientific Synergy Everolimus-Eluting Pt-Cr Coronary Stent**

Claim 19

**A drug delivery composition** comprising a fiber,




**Sources:** http://www.bostonscientific.com/en-US/products/stents--coronary/bioabsorbable-polymer-stent.html

Claim 19

wherein said fiber comprises an **emulsion consisting essentially of a gel** or hydrogel

IV. WARNINGS AND PRECAUTIONS

The warnings and precautions can be found in the SYNERGY™ Everolimus-Eluting Platinum Chromium Coronary Stent System labeling.

V. DEVICE DESCRIPTION

The SYNERGY™ Everolimus-Eluting Platinum Chromium Coronary Stent System (SYNERGY) is a device/drug combination product that provides a mechanical structure for vascular lumen support (primary mode of action) and a pharmacological agent (everolimus) targeted towards reducing the injury response. The System consists of a drug/polymer-coated balloon-expandable stent, pre-mounted on a Monorail™ (MR) or Over-The-Wire (OTW) delivery catheter. The stent is made from a platinum chromium alloy (PtCr). The drug/polymer coating consists of a bioabsorbable polymer, poly (D,L-lactide-co-glycolide) (PLGA), and the active pharmaceutical ingredient, everolimus. The characteristics of the SYNERGY stent system are described in **Table V-T1**.

**Table V-T1: SYNERGY™ Everolimus-Eluting Platinum Chromium Coronary Stent System Product Description**

| | SYNERGY Monorail Stent Delivery System | SYNERGY Over-the-Wire Stent Delivery System |
|---|---|---|
| Available Stent Lengths (mm) | 8, 12, 16, 20, 24, 28, 32, 38 | |
| Available Stent Diameters (mm) | 2.25, 2.50, 2.75, 3.00, 3.50, 4.00 | |
| Stent Material | Platinum Chromium Alloy (PtCr) | |
| Stent Strut Thickness | 0.074 mm for diametert 2.25 mm to 2.75 mm<br>0.079 mm for diameters 3.00mm to 3.50 mm<br>0.081 mm for diameter of 4.00 mm | |
| Drug Product | An abluminal (outer surface of the stent) coating of a polymer carrier with approximately 1 μg of everolimus per mm² of total stent surface area with a maximum nominal drug content of 287.2 μg on the largest stent (4.00 x 38 mm). | |
| Delivery System | | |
| Effective Length | 144 cm | |
| Delivery System Y-Adapter Ports | Single access port to inflation lumen. Guidewire exit port is located approximately 25 cm from tip. Designed for guidewire ≤0.014 inches (0.36 mm) | Y-Connector (Side arm for access to balloon inflation/deflation lumen. Straight arm is continuous with shaft inner lumen). Designed for guidewire ≤0.014 inches (0.36 mm) |
| Stent Delivery | A balloon, with two radiopaque balloon markers, nominally placed 0.4 mm (0.016 inches) beyond the stent at each end. | |
| Balloon Inflation Pressure | Nominal Inflation Pressure:<br>• Diameters 2.25 mm, 2.50 mm, 2.75 mm, 3.00 mm, 3.50 mm, 4.00 mm: 11 atm (1117 kPa) | |
| | Rated Burst Inflation Pressure:<br>• Diameters 2.25 mm – 2.75 mm: 18 atm (1827 kPa)<br>• Diameters 3.00 mm – 4.00 mm: 16 atm (1620 kPa) | |

PMA P150003: FDA Summary of Safety and Effectiveness Data Page 2

**DEVICE DESCRIPTION**

The SYNERGY™ Everolimus-Eluting Platinum Chromium Coronary Stent System (SYNERGY) is a device/drug combination product that provides a mechanical structure for vascular lumen support (primary mode of action) and a pharmacological agent (everolimus) targeted towards reducing the injury response. The System consists of a drug/polymer-coated balloon-expandable stent, pre-mounted on a Monorail™ (MR) or Over-The-Wire (OTW) delivery catheter. The stent is made from a platinum chromium alloy (PtCr). The drug/polymer coating consists of a bioabsorbable polymer, poly (D,L-lactide-co-glycolide) (PLGA), and the active pharmaceutical ingredient, everolimus. The characteristics of the SYNERGY stent system are described in **Table V-T1**.

An embodiment of the invention provides a bi-component fiber where the inner bore of the fiber, i.e., inside diameter of the fiber, comprises a gel or hydrogel and the outer wall of the fiber comprises a biodegradable polymer. As used herein, the term "gel" refers to a colloidal system with at least two phases, one of which forms a continuous three-dimensional network that acts as an elastic solid. As used herein, the term "hydrogel" refers to a colloid in which a dispersed phase (colloid) is combined with a continuous phase (water) to produce a viscous jellylike product.

**Sources:** FDA P150003 PMA, 2015, US7036603, Col. 5, lines 33-42

Claim 19

wherein said fiber comprises an **emulsion consisting essentially of a gel** or hydrogel

IV. WARNINGS AND PRECAUTIONS

The warnings and precautions can be found in the SYNERGY™ Everolimus-Eluting Platinum Chromium Coronary Stent System labeling.

V. DEVICE DESCRIPTION

The SYNERGY™ Everolimus-Eluting (SYNERGY) is a device/drug combinat for vascular lumen support (primary mo (everolimus) targeted towards reducing drug/polymer-coated balloon-expandable stent, pre-mounted on a Monorail™ (MR) or Over-The-Wire (OTW) delivery catheter. The stent is made from a platinum chromium alloy (PtCr). The drug/polymer coating consists of a bioabsorbable polymer, poly (D,L-lactide-co-glycolide) (PLGA), and the active pharmaceutical ingredient, everolimus. The characteristics of the SYNERGY stent system are described in **Table V-T1**.

| Drug Product | An abluminal (outer surface of the stent) coating of a <u>polymer carrier</u> with approximately 1 µg of everolimus per mm$^2$ of total stent surface area with a maximum nominal drug content of 287.2 µg on the largest stent (4.00 x 38 mm). |
|---|---|

**Table V-T1: SYNERGY™ Everolimus-Eluting Platinum Chromium Coronary Stent System Product Description**

| | SYNERGY Monorail Stent Delivery System | SYNERGY Over-the-Wire Stent Delivery System |
|---|---|---|
| Available Stent Lengths (mm) | 8, 12, 16, 20, 24, 28, 32, 38 | |
| Available Stent Diameters (mm) | 2.25, 2.50, 2.75, 3.00, 3.50, 4.00 | |
| Stent Material | Platinum Chromium Alloy (PtCr) | |
| Stent Strut Thickness | 0.074 mm for diameters 2.25 mm to 2.75 mm<br>0.079 mm for diameters 3.00mm to 3.50 mm<br>0.081 mm for diameter of 4.00 mm | |
| Drug Product | An abluminal (outer surface of the stent) coating of a polymer carrier with approximately 1 µg of everolimus per mm$^2$ of total stent surface area with a maximum nominal drug content of 287.2 µg on the largest stent (4.00 x 38 mm). | |
| **Delivery System** | | |
| Effective Length | 144 cm | |
| Delivery System Y-Adapter Ports | Single access port to inflation lumen. Guidewire exit port is located approximately 25 cm from tip. Designed for guidewire ≤0.014 inches (0.36 mm) | Y-Connector (Side arm for access to balloon inflation/deflation lumen. Straight arm is continuous with shaft inner lumen). Designed for guidewire ≤0.014 inches (0.36 mm) |
| Stent Delivery | A balloon, with two radiopaque balloon markers, nominally placed 0.4 mm (0.016 inches) beyond the stent at each end. | |
| Balloon Inflation Pressure | Nominal Inflation Pressure:<br>• Diameters 2.25 mm, 2.50 mm, 2.75 mm, 3.00 mm, 3.50 mm, 4.00 mm: 11 atm (1117 kPa)<br>Rated Burst Inflation Pressure:<br>• Diameters 2.25 mm – 2.75 mm: 18 atm (1827 kPa)<br>• Diameters 3.00 mm – 4.00 mm: 16 atm (1620 kPa) | |

PMA P150003: FDA Summary of Safety and Effectiveness Data Page 2

An embodiment of the invention provides a bi-component fiber where the inner bore of the fiber, i.e., inside diameter of the fiber, comprises a gel or hydrogel and the outer wall of the fiber comprises a biodegradable polymer. As used herein, the term "gel" refers to a colloidal system with at least two phases, one of which forms a continuous three-dimensional network that acts as an elastic solid. As used herein, the term "hydrogel" refers to a colloid in which a dispersed phase (colloid) is combined with a continuous phase (water) to produce a viscous jellylike product.

**Sources:** FDA P150003 PMA, 2015, US7036603, Col. 5, lines 33-42

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM, AND TISSUEGEN, INC.

**(b)** County of Residence of First Listed Plaintiff Travis
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Shore Chan DePumpo LLP, 901 Main Street, Suite 3300, Dallas, TX; 214/593-9110

## DEFENDANTS

BOSTON SCIENTIFIC CORP.

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*

*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

Other:
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☒ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
35 U.S.C. Sec. 271

Brief description of cause:
Patent Infringement

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*: JUDGE DOCKET NUMBER

DATE
11/20/2017

SIGNATURE OF ATTORNEY OF RECORD
/s/ Alfonso Garcia Chan

**FOR OFFICE USE ONLY**

RECEIPT # AMOUNT APPLYING IFP JUDGE MAG. JUDGE

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b) County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c) Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II. Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III. Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV. Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V. Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI. Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII. Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII. Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM AND TISSUEGEN, INC., *Plaintiffs*, v. BOSTON SCIENTIFIC CORPORATION *Defendant.* | ) | C.A. No. 1:18-cv-00392 (MN) |

**NOTICE OF SERVICE OF PLAINTIFFS' INITIAL CLAIM CHART UNDER PARAGRAPH 7(C) OF THE SCHEDULING ORDER**

PLEASE TAKE NOTICE that, pursuant to Paragraph 7(c) of the Scheduling Order (Dkt. 47), Plaintiffs have served and attached as Exhibit A hereto their initial claim chart relating each known accused product to the asserted claims each such product allegedly infringes.

Respectfully Submitted,

*/s/ Stamatios Stamoulis*

Stamatios Stamoulis (#4606)
**STAMOULIS & WEINBLATT LLC**
800 N. West Street, Third Floor
Wilmington, DE 19801
(302) 999-1540
stamoulis@swdelaw.com

*Attorneys for Plaintiffs*

OF COUNSEL:

Michael W. Shore
Alfonso Garcia Chan
Samuel E. Joyner
Chijioke E. Offor
SHORE CHAN DEPUMPO LLP
901 Main Street, Suite 3300
Dallas, TX 75202
(214) 593-9110
mshore@shorechan.com
achan@shorechan.com
sjoyner@shorechan.com
coffor@shorechan.com

*Attorneys for Plaintiffs*

# EXHIBIT A

| Claim | The SYNERGY BP Stents Infringe '296 Patent Claims 1, 11, 12, 17, and 26[†] |
|---|---|
| 11.0 | Literally, the SYNERGY BP Stents infringe '296 patent claim 11 (and claim 1)[1] because:<br><br>(a) each such stent includes at least one "biodegradable polymer fiber" in the form of an ultrathin threadlike bioabsorbable 85:15 PLGA polymer structure positioned on the outside surface (side in contact with the coronary artery wall) of any one serpentine ring of the stent;[2]<br><br>(b) such threadlike bioabsorbable polymer structure is composed of a "first phase," in the form of an 85:15 PLGA polymer-rich matrix, that is not miscible with a "second phase," in the form of discrete, everolimus-rich domains that are dispersed throughout the 85:15 PLGA polymer-rich matrix;[3] and<br><br>(c) everolimus may be fairly characterized as a "therapeutic agent," "immunomodulator," and "compound inhibiting angiogenesis" in that it has immunosuppressant properties, has anti-angiogenic properties, and is included in a locally therapeutic amount.[4] |




[1] '296 patent claim 11 depends from claim 1, and fairly may be read as: 11. A composition comprising at least one biodegradable polymer fiber wherein said fiber is composed of a first phase and a second phase, the first and second phases being immiscible, and wherein the second phase comprises one or more therapeutic agents; [and] wherein said one or more therapeutic agents are selected from the group consisting of drugs, proteins, enzymes, growth factors, immunomodulators, compounds promoting angiogenesis, compounds inhibiting angiogenesis, anti-inflammatory compounds, antibiotics, cytokines, anti-coagulation agents, procoagulation agents, chemotactic agents, agents to promote apoptosis, agents to inhibit apoptosis, and mitogenic agents.

[2] *PMA 150003: FDA Summary of Safety and Effectiveness Data* ("PMA 150003 SSED"), pp. 2-5; *PMA 150003: Labeling* ("PMA 15003 Labeling I"), §§ 2.3, 2.3.2; *PMA 150003: Labeling Part 2* ("PMA 15003 Labeling II"), p. 1 ("Polymer Coating"); Gentile et al., *An overview of poly(lactic-co-glycolic) acid (PLGA)-based biomaterials for bone tissue engineering,*" Int'l Journal of Molecular Sciences vol. 15,3 (Feb. 28, 2014), pp. 3640-59.

[3] *See Final five-year clinical outcomes in the EVOLVE trial: A randomised evaluation of a novel bioabsorbable polymer-coated, everolimus-eluting stent*, p. 4; PMA 150003 SSED, p. 19 (identifying use of residual solvents DMF and THF having drastically different vapor pressures).

[4] *See* PMA 150003 SSED, pp. 4-5; PMA 15003 Labeling I, §§ 2.3, 2.3.1, 6.10, 7.1, 7.2; PMA 15003 Labeling II"), p. 1 ("SYNERGY Drug-Eluting Stent," "Drug Release"); Saunders et al., *The mammalian target of rapamycin inhibitor RAD001 (everolimus) synergizes with chemotherapeutic agents, ionizing radiation and proteasome inhibitors in pre-B acute lymphocytic leukemia*, Haematologica vol. 96,1 (2011), pp. 69-77; Shinohara et al., *Sirolimus as a potential radiosensitizer in squamous cell cancer of the head and neck*," Head & Neck vol. 31,3 (2009), pp. 406-11.

| Claim | The SYNERGY BP Stents Infringe '296 Patent Claims 1, 11, 12, 17, and 26† |
|---|---|
| 12.0 | Under the doctrine of equivalents, the SYNERGY BP Stents infringe '296 patent claim 12[5] because: <br><br> (a) each such stent includes at least one "biodegradable polymer fiber" in the form of an ultrathin threadlike bioabsorbable 85:15 PLGA polymer structure positioned on the outside surface (side in contact with the coronary artery wall) of any one serpentine ring of the stent;[6] <br><br> (b) such threadlike bioabsorbable polymer structure is composed of a "first phase," in the form of an 85:15 PLGA polymer-rich matrix, that is not miscible with a "second phase," in the form of discrete, everolimus-rich domains that are dispersed throughout the 85:15 PLGA polymer-rich matrix;[7] and <br><br> (c) everolimus may be fairly characterized as a "therapeutic agent," "immunomodulator," and "compound inhibiting angiogenesis" in that it has immunosuppressant properties, has anti-angiogenic properties, and is included in a locally therapeutic amount; and, under the doctrine of equivalents, a second phase containing "everolimus" can be fairly characterized as an insubstantial change from a second phase containing a radioactive agent in that (i) everolimus is a radiosensitizer, (ii) everolimus has been shown to have a synergistic effect with radiation in killing tumors and inhibiting cell growth, (iii) and, notwithstanding the foregoing, like the "radioactive materials" contemplated in or about column 8, line 26 through column 8, line 30 of the '296 patent, everolimus may be fairly characterized as "materials used to help destroy harmful tissues such as tumors in the local area, or to inhibit growth of healthy tissues."[8] <br><br>   |

[5] '296 patent claim 12 depends from claim 1, and fairly may be read as: 12. A composition comprising at least one biodegradable polymer fiber wherein said fiber is composed of a first phase and a second phase, the first and second phases being immiscible, and wherein the second phase comprises one or more therapeutic agents; [and] wherein said one or more therapeutic agents include a radioactive agent or a contrast agent for imaging studies.

[6] *See* Footnote 2, herein.

[7] *See* Footnote 3, herein.

[8] *See* Footnote 4, herein.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM AND TISSUEGEN, INC., *Plaintiffs,* v. BOSTON SCIENTIFIC CORPORATION *Defendant.* | C.A. No. 18-cv-392-MN |

**APPENDIX TO PARTIES' JOINT**
**CONSOLIDATED CLAIM CONSTRUCTION BRIEF**

# EXHIBIT 37

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM, and TISSUEGEN, INC.,<br><br>Plaintiffs,<br>v.<br><br>BOSTON SCIENTIFIC CORPORATION,<br><br>Defendant. | C.A. No. 18-392-MN |

**DECLARATION OF KINAM PARK, PH.D.**

I declare under penalty of perjury that the foregoing is true and correct.

January 29, 2021
Date

Kinam Park

emulsion is a liquid system in which droplets of one liquid are dispersed in another liquid. In such a case, the oil and water are said to form two immiscible "phases" of the emulsion.

64. Unlike liquids, two solids cannot dissolve into each other as long as they remain in a solid state. Consequently, when applied to solid phases, the concepts of "miscibility" and "immiscibility" refer to the ability of the phases to dissolve into each other when they are both in a liquid state. Such a liquid state can occur either before or after the creation of the solid composition.

65. For example, a two-phased solid can be created by using a solvent to dissolve two immiscible materials into a solution and then removing the solvent through drying. A method patented by BSC affiliates uses a solvent to create two "immiscible polymer phases" by dissolving the polymers into a solution and then drying the resulting product to remove the solvent. *See* Ex. 36, U.S. Patent No. 7,939,094, at 2:4-8, 40-49, 8:64-9:3.

66. A two-phased solid can also be converted to a liquid state, and the resulting mixture may be miscible, immiscible or partially miscible. This can be accomplished by (1) melting the two solid phases and then determining the extent to which the resulting liquids can dissolve into each other; or (2) adding a solvent to the two solid phases, and then determining the extent to which the resulting liquids can dissolve into each other.

67. Whether two solids are miscible or immiscible will often depend on the method used to convert the solids to liquids. Two solids might be *immiscible* when melted, but completely *miscible* in the presence of a specific solvent. For example, a drug known as itraconazole and a well-known polymer are immiscible when melted, but completely miscible in the presence of a

specific solvent (ethyl acetate).[1] The addition of one solvent to two solids may result in a miscible solution, whereas the addition of another solvent to the same solids may not dissolve either solid at all. For example, both the polymer PLGA and the drug paclitaxel can be dissolved in dimethyl formamide, but only the drug can be dissolved in ethanol, and neither the drug nor the polymer can be dissolved in water. Ex. 19, Park et al. (2019); Ex. 20, WO 2016/020664; Ex. 21, Paclitaxel Product Information. The same is true for many other drugs, including rispiridone and PLGA. Ex. 22, Risperal February 2005 Label; Ex. 23, Garner et al. (2018).

68. Thus, the miscibility or immiscibility of two solids depends on many factors, including whether the relevant focus is on how the solids were created or how the solids can be converted into liquids. Without additional context, a person skilled in the art cannot determine what is meant by "immiscible" when that term is applied to two solids.

69. The language of claim 1 does not provide any guidance on the scope of the invention. The claim simply describes a polymer fiber comprising a "first and second phase, the first and second phases being immiscible," with the second phase containing a therapeutic agent. The claim does not explain how the concept of "immiscibility" applies to a solid composition.

70. The specification also does not provide any guidance on claim scope. The specification does not mention the term "immiscible," or it does not explain how it applies to two phases in the solid state. To the extent the specification provides any information, Example 1 describes the fabrication of the fiber from an "emulsion."

---

1 Ex. 30, Sarode et al. (2013), at 371, 372-75, 382. Likewise, two well-known polymers (poly (L,L-lactide and poly (з-caprolactone)) are immiscible when melted (resulting in phase separation), but miscible in the presence of a solvent (chloroform). Ex. 31, R. Dell'Erba et al. (2001).

71. Based on Example 1, Plaintiffs argued in the *Ethicon* case that the phrase "the first and second phases being immiscible" refers to the emulsion used to create the fiber:

> It is clear that the phrase 'a first phase and a second phase, the first and second phases being immiscible' has the same scope as the term emulsion.
>
> * * *
>
> And the term 'a first phase and a second phase, the first and second phases being immiscible' means an emulsion. To conclude otherwise would render the word 'immiscible' in the claims superfluous.

Ex. 11, Pl. *Ethicon* Claim Const. Br., at 10, 13, 14-17 (emphasis added). To support the claim, Plaintiffs cited their expert who opined that an artisan would understand the phrase "the first and second phases being immiscible" to have the same scope as the term "emulsions."

72. However, in Example 1, the specification also discloses the removal of the emulsion by drying the fiber. '296 Patent at 18:36-40. As a result, the final product recited in Claim 1 is a solid composition containing no liquid. But, the specification nowhere explains how the two phases in a solid composition can be said to be "immiscible."

73. Finally, the prosecution history also provides no guidance on the meaning of the phrase "the first and second phases being immiscible." During prosecution, the PTO rejected the Applicant's claim that the polymer fiber comprises an "emulsion" containing a therapeutic agent. The PTO stressed that the claimed invention is a composition claim, not a method claim, and the final composition "no longer contains any fluid, let alone an emulsion." Ex. 5, Final Rejection, at 4. In response, the Applicant introduced the concept of "immiscibility" by amending its claims to include for the first time the phrase "the first and second phases being immiscible." However, the Applicant never explained exactly how the concept of "immiscibility" applied to two phases in a solid state.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM AND TISSUEGEN, INC.,<br><br>*Plaintiffs,*<br><br>v.<br><br>BOSTON SCIENTIFIC CORPORATION,<br><br>*Defendant.* | C.A. No. 18-cv-392-MN |

**PARTIES' AMENDED JOINT CLAIM CONSTRUCTION CHART**

Pursuant to the Court's Oral Order (D.I. 84), Plaintiffs BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM and TISSUEGEN, INC. (collectively, "The University") and Defendant BOSTON SCIENTIFIC CORPORATION ("BSC") have met and conferred and hereby submit this Amended Joint Claim Construction Chart setting forth for the Court the claim terms of United States Patent No. 6,596,296 (the "'296 Patent") that remain in dispute, together with the parties' proposed constructions of the disputed claim language and citations to the supporting intrinsic evidence.[1]

[1] The parties reserve the right to rely on additional intrinsic evidence during the claim construction briefing and hearing, including, but not limited to, the intrinsic evidence cited by the other party. By the submission of this chart, BSC does not waive any invalidity defenses, including those contained within its Preliminary Invalidity Contentions served on September 25, 2020. BSC reserves the right to argue that the asserted claims of the '296 Patent are invalid under 35 U.S.C. § 112(b) (formerly 35 U.S.C. § 112, second paragraph) based upon information learned through the course of fact discovery and/or developed through expert discovery.

The parties have agreed to the following constructions.

**United States Patent No. 6,596,296**

| Claim Term | Joint Proposed Construction |
|---|---|
| "first phase"<br><br>('296 Patent, Claims 1, 11, 12, 16, 17, and 26) | the polymer portion of the fiber |
| "second phase"<br><br>('296 Patent, Claims 1, 11, 12, 16, 17, and 26) | the discrete drug-containing regions dispersed throughout the fiber |
| "immiscible"<br><br>('296 Patent, Claims 1, 11, 12, 16, 17, and 26) | incapable of dissolving into one another |

The parties dispute the constructions of the following terms.

**United States Patent No. 6,596,296**

| No. | Disputed Claim Term | The University's Proposed Construction | The University's Intrinsic Evidence | BSC's Proposed Construction | BSC's Intrinsic Evidence |
|---|---|---|---|---|---|
| 1 | "fiber"<br><br>('296 Patent, Claims 1, 11, 12, 16, 17, and 26) | No construction necessary.<br><br>Alternately: unit of matter having a high length-to-width ratio (e.g., 100:1) and a small cross section. | [US6596296 File History] 2003-01-08 Response to Office Action at 5-6.<br><br>[US6596296] FIGS. 1-3B, 4, 6, 7, 8, 15; Abstract, 1:20-30, 3:12-65, 4:52-57, 6:38-42, 6:63-7:7, 7:8-14, 7:33-34, 8:32-9:63, 9:64-10:12, 10:13-38, 18:12-34, 19:5-10, 20:9-32, 22:43-47, 23:10-53, 24:18-22, 25:35-49, 26:61-64, 27:54-58, 27:64-67.<br><br>[WO 98/20190 to Martin] 1:1-8, 2:15-18, 6:31-7:4, 8:9-14, 17:23-19:17.<br><br>[US7033603] 1:54-56, 2:43-60, 9:58-10:14, 12:12-55, 12:56-64, 6:15-28, 6:29-56, 7:13-56, 11:63-12:11, 15:55-16:30. | slender threadlike structure—e.g., a filament | • '296 Patent, at Abstract, 1:23-26, 2:41-3:25, 3:34-4:1, 4:60-65, 5:9-16, 5:60-61, 6:1-2, 6:38-43, 6:63-7:14, 7:15-18, 7:19-23, 7:23-27, 7:28-34, 7:43-45, 7:56-61, 8:8-14, 8:32-54, Table 1, 8:55-10:67, 13:13-17:22, 17:36-26:20, 17:36-19:36, 18:12-34, 19:37-20:5, 20:6-20:36, 20:37-67, 21:1-22:16, 22:17-38, 22:39-52, 22:53-23:6, 23:7-30, 23:31-53, 23:54-24:8, 24:10-30, 24:31-58, 24:60-25:12, 25:13-31, 25:32-49, 25:50-26:20, Figures 1-4, 6-8, 11-15, Claims 1, 3, 4, 6, 7, 8, 9, 10, 20, 23-27, 29.<br>• U.S. Patent Appl. No. 09/632,457, at 9/13/2002 Response to Office Action.<br>U.S. Patent Appl. No. 09/632,457, at 1/8/2003 |

| No. | Disputed Claim Term | The University's Proposed Construction | The University's Intrinsic Evidence | BSC's Proposed Construction | BSC's Intrinsic Evidence |
|---|---|---|---|---|---|
| | | | | | Response to Office Action. |
| 2 | "the first and second phases being immiscible" ('296 Patent, Claims 1, 11, 12, 16, 17, and 26) | In response to Defendant's position that this term is indefinite, Plaintiffs state that this claim term is not indefinite. | [US6596296 File History] 2003-01-08 Response to Office Action at 5-6; 2002-09-13 Response to Office Action at 4-9.<br><br>[US6596296] FIGS. 4, 6, 7, 13, 14; Claims 1, 2, 3; Abstract, 7:15-18, 7:24-32, 7:35-44, 7:45-55, 9:10-63, 17:36-18:53, 19:32-20:37, 25:13-31, 25:32-49, 27:54-58.<br><br>[US7033603] 5:47-58, 10:57-11:2, 13:40-55, 14:1-17. | Indefinite | • '296 Patent, at 2:44-45, 4:32-34, 4:58- 60, 5:24-25, 7:33-55, 17:36-26:20, Table 1, Claims 1, 2, 3, 5, 16-19.<br>• U.S. Patent Appl. No. 09/632,457, at 1/8/2003 Response to Office Action. |
| 3 | "radioactive agent" ('296 Patent, Claim 12) | radioactive material used to help destroy harmful tissues such as tumors in the local area, or to inhibit growth of healthy tissues | [US6596296] 4:1-11, 8:26-31, 28:30-32. | a substance capable of spontaneously emitting alpha, beta, or gamma rays by the disintegration of the nuclei of atoms | • '296 Patent, at 4:1-16, 8:26-31, Claim 12 |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM AND TISSUEGEN, INC., | ) | |
| Plaintiffs, | ) | C.A. No. 18-cv-392 (MN) |
| v. | ) | |
| BOSTON SCIENTIFIC CORPORATION, | ) | |
| Defendant. | ) | |

**MEMORANDUM ORDER**

At Wilmington this 15th day of April 2021:

IT IS HEREBY ORDERED that the claim terms of U.S. Patent No. 6,596,296 ("the '296 Patent") with agreed-upon constructions are construed as follows (*see* D.I. 85)[1]:

1. "first phase" means "the polymer portion of the fiber" ('296 Patent, claims 1, 11, 12, 16, 17, & 26);
2. "second phase" means "the discrete drug-containing regions dispersed throughout the fiber" ('296 Patent, claims 1, 11, 12, 16, 17, & 26); and
3. "immiscible" means "incapable of dissolving into one another" ('296 Patent, claims 1, 11, 12, 16, 17, & 26).

Further, as announced at the hearing on March 19, 2021, IT IS HEREBY ORDERED that the disputed claim terms of the '296 Patent are construed as follows:

1. "fiber" shall have its plain and ordinary meaning ('296 Patent, claims 1, 11, 12, 16, 17, & 26);

---

1 The parties filed two Joint Claim Construction Charts. D.I. 71; D.I. 85. The Court refers to and considers the final chart, D.I. 85, Parties' Amended Joint Claim Construction Chart dated March 15, 2021.

including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. Expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Phillips*, 415 F.3d at 1318. Nonetheless, courts must not lose sight of the fact that "expert reports and testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.* Overall, although extrinsic evidence "may be useful to the court," it is "less reliable" than intrinsic evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318–19. Where the intrinsic record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics*, 90 F.3d at 1583).

## II. THE COURT'S RULING

The Court's rulings regarding the disputed claim terms of the '296 Patent were announced from the bench at the conclusion of the hearing. The Court's rulings are as follows:

> At issue are the disputed claim terms of U.S. Patent No. 6,596,296. We started with three disputed terms and reached agreement on one of them during the hearing.
>
> I am prepared to rule on the remaining two disputes. I will not be issuing a written opinion, but I will issue an order stating my rulings. I want to emphasize before I announce my decisions that although I am not issuing a written opinion, we have followed a full and thorough process before making the decisions I am about to state. I have reviewed the patent in dispute and all of the evidence submitted by the parties. There was full briefing on each of the disputed terms and each party submitted a technology tutorial. There has been argument here today. All of that has been carefully considered.
>
> Now as to my rulings. As an initial matter I am not going to read into the record my understanding of claim construction law

generally. I have a legal standard section that I have included in earlier opinions including recently in *Purewick Corporation v. Sage Products, LLC*, Civil Action No. 19-1508. I incorporate that law and adopt it into my rulings and will also set it out in the order that I issue.

As to a person of ordinary skill in the art, the parties through their experts have offered some different definitions. The parties, however, have not asserted that the differences are relevant to the issues before me today. Now the disputed terms.

The first term is "fiber" in claims 1, 11, 12, 16, 17, and 26 of the '296 Patent. Plaintiffs propose that no construction is necessary or alternatively "a unit of matter having a high length-to-width ratio, e.g., 100 to 1, and a small cross-section." Defendant proposes the construction "a slender threadlike structure – e.g., a filament," and asserts that the term should not be construed to encompass coating, layers or films.

Here I agree with Plaintiffs that "fiber" need not be construed beyond its plain and ordinary meaning. The patent uses the term fiber repeatedly throughout and used the term according to its plain and ordinary meaning. The fibers described can be different lengths including very short.[3] They may be, but need not be, woven into support structures[4] and may be used as drug delivery reservoirs with metal stents,[5] or they may be attached directly to vessel walls or tacked down in the eye[6]. These fibers may be made by various solvent exchange methods.[7]

Defendant does not disagree with any of that. Instead, Defendant contends that I should construe fiber because the parties have raised a dispute regarding the scope of the claim. As I probed the issue today during argument, it seemed like the real dispute is not over whether a fiber is threadlike as in Defendant's proposed construction, but rather whether the term "fiber" can encompass what Defendant says is a coating. As I understand the issue based on what I have before me, that does not appear to be an issue of

---

3 (*See, e.g.*, '296 Patent at 6:63–7:14, 7:24–32; *id.* at FIGS. 1, 2, 3A, 3B, 6, 7).

4 (*See, e.g.*, *id.* at 8:41–45).

5 (*See, e.g.*, *id.* at 22:40–51 (Example 7)).

6 (*See, e.g.*, *id.* at 23:31–54 (Example 10)).

7 (*See, e.g.*, *id.* at 17:36–19:36 (Example 1), 19:37–20:5 (Example 2), 20:6–36 (Example 3), 25:13–31 (Example 15), 25:32–49 (Example 16)).

claim construction but rather is an issue of fact as to whether a coating that covers some structure can itself be a fiber that must also meet the other requirements of the claim fiber. If, however, it turns out that I'm wrong about that and as the record develops that really is a claim construction dispute, Defendant can raise the issue again in connection with summary judgment briefing to the extent appropriate.

The second term is "the first and second phases being immiscible," also in claims 1, 11, 12, 16, 17 and 26 of the '296 Patent. The parties agree that the word "immiscible" means "incapable of being dissolved into one another." But Defendant asserts that the entire phrase should be found to be indefinite. Plaintiffs disagree.

Defendant bears the burden of proving indefiniteness by clear and convincing evidence. Here I do have some concerns about this term. There is nothing in the specification about immiscibility. And Defendant has offered arguments that a POSA would not understand when or how immiscibility is to be determined, and that as Plaintiffs would construe the term immiscibility is meaningless. But I am not convinced at this time that Defendant has met its burden of proving indefiniteness on the record before me, so as no one has offered a construction, I will give this term its plain and ordinary meaning. But again, after the fact and expert discovery, Defendant may raise the issue if necessary.

The third term is "radioactive agent."[8] During the hearing the parties agreed to the construction "an agent that pertains to, exhibits, or is caused by an element that spontaneously emits radiation resulting from changes in the nuclei of atoms of the elements." I will adopt that construction.

Maryellen Noreika
The Honorable Maryellen Noreika
United States District Judge

---

[8] This term is in claim 12 of the '296 Patent.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM, and TISSUEGEN, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>BOSTON SCIENTIFIC CORPORATION,<br><br>Defendant. | C.A. No. 18-392-MN<br><br>**FILED UNDER SEAL** |

**BOSTON SCIENTIFIC'S CONCISE STATEMENT OF FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT**

Pursuant to the Court's Scheduling Order (D.I. 47, ¶ 15(c)), Defendant Boston Scientific Corporation ("Boston Scientific") submits this Concise Statement of Facts in Support of its Motion for Summary Judgment of Noninfringement. All exhibits cited herein are attached to the Declaration of Michael Farnan submitted concurrently herewith.

## CONCISE STATEMENT OF FACTS

1. The Board of Regents, The University of Texas System and TissueGen, Inc. (collectively, "Plaintiffs") assert that Boston Scientific's "Synergy" brand coronary stents infringe claims 1, 11, 12, 17, and 26 of U.S. Patent No. 6,596,296 (the "'296 patent"). (D.I. 124 ¶ 79.)

### Facts Relating to the '296 Patent

2. Independent claim 1 of the '296 patent recites "[a] composition comprising at least one biodegradable ***polymer fiber*** wherein said fiber is composed of a first phase and a second phase, ***the first and second phases being immiscible***, and wherein the second phase comprises one or more therapeutic agents." (Ex. 15 at Cl. 1 (emphasis added).)

3. During prosecution of the '296 patent, the emulsion-based fiber fabrication process outlined in Example 1 of the specification was identified as the only written description support for claim 1. (*Compare* Ex. 23 at UT-BSC0024618-24 *with* Ex. 15 at 17:37-19:36.)

4. Example 1 discloses a form of "wet spinning" process involving the extrusion and drawing of a polymer fiber through a coagulation bath. (Ex. 1 ¶ 30; Ex. 29 at 59:5-60:7; Ex. 15 at 6:1-2, 18:11-14, 18:33-34, 18:36-37, 25:45-49.)

5. The '296 patent does not disclose or teach a method of making a polymer fiber that does not involve spinning and/or extrusion. (Ex. 1 ¶¶ 58-60.)

### Facts Relating to the Accused Synergy Stents

6. The accused Synergy stents include (1) a platinum chromium metal stent, and (2) a drug-eluting biodegradable polymer coating that is applied to the abluminal surface of the metal stent. (*See, e.g.*, Ex. 4; Ex. 8 at BSC-UTEX-00110561, -71-72.)

7. The biodegradable polymer coating includes poly-lactic-co-glycolic acid ("PLGA") polymer and the drug everolimus. (Ex. 4; Ex. 8 at BSC-UTEX-00110557.)

8. The specific PLGA polymer used in the Synergy coating—85:15 PLGA—is an amorphous polymer. (Ex. 1 ¶ 25; Ex. 5 at BSC-UTEX-00036891.)

9. [redacted]

10. [redacted]

11. [redacted]

12. [redacted]

**Noninfringement Ground #1: Facts Showing that the Coating Applied to the Synergy Stents is Not a "Polymer Fiber"**

13. Plaintiffs contend that the biodegradable polymer coating applied to the Synergy stents constitutes the claimed biodegradable polymer fiber. (Ex. 7 ¶¶ 28, 31.)

14. During claim construction, the Court declined to construe the term "fiber" beyond its plain and ordinary meaning, but explained that if the record reveals this to be "a claim

construction dispute, Defendant can raise the issue again in connection with summary judgment briefing to the extent appropriate." (D.I. 90 at 5-6.)

15. The developed record has revealed that there is a dispute between the parties and their experts as to the scope of the term "polymer fiber" such that the term must be construed. (*Compare* Ex. 1 ¶¶ 26-37 *with* Ex. 19 at 190:12-192:4 *and* Ex. 7 ¶ 26.)

16. A person of ordinary skill would understand "polymer fiber" to mean a thread-like or filamentous structure made of polymers that have a common molecular orientation. (Ex. 1 ¶ 96.)

17. The amorphous 85:15 PLGA polymer used to form the Synergy coating has randomly oriented polymer molecule chains and would be unable to spontaneously form a fiber without undergoing a spinning and/or extrusion process to draw or stretch the polymer chains into a common molecular orientation. (Ex. 1 ¶¶ 20, 25, 102-105, 108-109.)

18. Boston Scientific's [redacted] does not involve spinning and/or extrusion to draw or stretch the polymer chains into a common molecular orientation. (Ex. 1 ¶¶ 102-105.)

19. Dr. Pitt did not perform any testing to assess whether the Synergy coating has independent structural integrity or a common molecular orientation of polymer molecules. (*See* Ex. 7 ¶ 31; Ex. 19 at 120:25-121:22; Ex. 1 ¶¶ 106-07.)

20. Dr. Pitt does not dispute that Boston Scientific's [redacted] is not a spinning and/or extrusion process. (*See* Ex. 7 ¶ 31.)

21. Boston Scientific's [redacted] does not involve stretching or drawing to orient polymer molecules in a common molecular orientation as in a "polymer fiber." (Ex. 8 at BSC-UTEX-00110570-577; Ex. 9; Ex. 1 ¶¶ 102-105.)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM, and TISSUEGEN, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>BOSTON SCIENTIFIC CORPORATION,<br><br>Defendant. | C.A. No. 18-392-MN<br><br>**FILED UNDER SEAL** |

**DECLARATION OF MICHAEL J. FARNAN IN SUPPORT OF DEFENDANT'S OPENING BRIEF IN SUPPORT OF ITS OMNIBUS MOTION FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE EXPERT TESTIMONY**

I, Michael J. Farnan, declare as follows:

1. I am an attorney at Farnan LLP in Wilmington, Delaware. I am one of the lawyers representing Boston Scientific Corporation ("Defendant") in connection with the above action. This declaration is made on my personal knowledge and belief, and I could and would testify competently as the contents if called as a witness.

2. Attached hereto as **Exhibit 1** is a true and correct copy of the Declaration of David J. Mooney, Ph.D. in Support of Boston Scientific's Motion for Summary Judgment and *Daubert* Motion.

3. Attached hereto as **Exhibit 2** is a true and correct copy of excerpts from a document produced by Defendant beginning with bates-number BSC-UTEX-00292378.

4. Attached hereto as **Exhibit 3** is a true and correct copy of excerpts from a document produced by Defendant beginning with bates-number BSC-UTEX-00292249.

# Exhibit 1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM, and TISSUEGEN, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>BOSTON SCIENTIFIC CORPORATION,<br><br>Defendant | C.A. No. 18-392-MN |

**DECLARATION OF DAVID J. MOONEY, PH.D. IN SUPPORT OF BOSTON SCIENTIFIC CORPORATION'S MOTION FOR SUMMARY JUDGEMENT AND *DAUBERT* MOTION**

I, David J. Mooney, Ph.D., hereby declare as follows:

1. I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath. I have been engaged on behalf of Boston Scientific Corporation to provide my opinion and to testify as an expert witness on various issues in the above-captioned case.

2. A true and correct copy of my Rebuttal Expert Report provided in this case is attached as Exhibit 1.

3. All of my opinions in my Report, and the bases of those opinions, are true and correct to the best of my knowledge and belief.

4. If asked to do so, I expect to testify at trial in this case regarding the statements and opinions set forth in my Report.

# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM, and TISSUEGEN, INC.,<br><br>Plaintiffs,<br>v.<br><br>BOSTON SCIENTIFIC CORPORATION,<br><br>Defendant. | C.A. No. 18-392-MN<br><br>CONFIDENTIAL |

**REBUTTAL EXPERT REPORT OF DAVID J. MOONEY, PH.D.**
**REGARDING NONINFRINGEMENT OF U.S. PATENT NO. 6,596,296**

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

# Exhibit 8

REDACTED - SUBJECT TO PROTECTIVE ORDER



[redacted]

[redacted]

REDACTED - SUBJECT TO PROTECTIVE ORDER



[redacted]

REDACTED - SUBJECT TO PROTECTIVE ORDER



[redacted]

# Exhibit 9

# FILE PRODUCED IN NATIVE FORMAT

**NATIVE DOCUMENT FILED UNDER SEAL**

# Exhibit 12

REDACTED - SUBJECT TO PROTECTIVE ORDER



[redacted]

REDACTED - SUBJECT TO PROTECTIVE ORDER



[redacted]

REDACTED - SUBJECT TO PROTECTIVE ORDER



[redacted]

REDACTED - SUBJECT TO PROTECTIVE ORDER



[redacted]

# Exhibit 18


2016 euro PCR
Final five-year clinical outcomes in the EVOLVE trial:
A randomised evaluation of a novel bioabsorbable
polymer-coated, everolimus-eluting stent
Ian T. Meredith AM
MBBS, PhD, FRACP, FCSANZ, FACC, FSCAI, FAPSIC
MonashHeart, Monash Medical Centre & Monash University
Melbourne, Australia
Stefan Verheye, Christophe Dubois, Joseph Dens, Bruno
Farah, Didier Carrié, Simon Walsh, Keith Oldroyd, Olivier
Varenne, Seif El-Jack, Raul Moreno, Dominic J. Allocco,
Keith D. Dawkins, on behalf of the EVOLVE investigators
EVOLVE
Session: Contemporary DES: focus on bioresorbable polymers (part 1)
Date: Thursday, May 19th, 2016
Time: 14:45 – 16:45
Location: Room 343


2016 euro PCR
The SYNERGY Stent
EVOLVE
PLGA rich domain*
Drug rich domain*
Ultrathin Abluminal Coating
Platinum Chromium Platform
• 74µm (0.0029in) strut thickness
↑ Visibility
↑ Strength
↑ Flexibility
↑ Conformability
↓ Recoil
Everolimus-Eluting
• 100µg/cm2
• 3 month release time
• 45% / 55% mix of drug and polymer
Bioabsorbable Polymer Coating (PLGA)
• Abluminal
• 4µm thick
• 85:15 ratio
• <4 month absorption time
*FESEM image 10K x

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM, and TISSUEGEN, INC.,

Plaintiffs,

v.

BOSTON SCIENTIFIC CORPORATION,

Defendant.

Case No. 18-392-MN

**FILED UNDER SEAL**

# BOSTON SCIENTIFIC'S OPENING BRIEF IN SUPPORT OF ITS OMNIBUS MOTION FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE EXPERT TESTIMONY

Dated: June 14, 2022


Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE 19801
Tel. (302) 777-0300
Fax (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Melissa A. Anyetei (*pro hac vice*)
James R. Ferguson (*pro hac vice*)
Michael J. Word (*pro hac vice*)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 782-0600
Facsimile: (312) 706-8503
manyetei@mayerbrown.com
jferguson@mayerbrown.com
mword@mayerbrown.com

Elliot Choi (*pro hac vice*)
MAYER BROWN LLP
1221 Avenue of the Americas

Chad Drown (*pro hac vice*)
Timothy E. Grimsrud (*pro hac vice*)
Katherine S. Razavi (*pro hac vice*)
Lauren J.F. Barta (*pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Telephone: (612) 766-7000
Facsimile: (612) 766-1600
chad.drown@faegredrinker.com
tim.grimsrud@faegredrinker.com
kate.razavi@faegredrinker.com
lauren.barta@faegredrinker.com

## INTRODUCTION

The Board of Regents, The University of Texas System ("UTBOR") and TissueGen, Inc. ("TissueGen") (collectively, "Plaintiffs") are trying to improperly expand the scope of their now expired U.S. Patent No. 6,596,296 ("the '296 patent") to cover unrelated and noninfringing technology of Boston Scientific Corporation ("Boston Scientific"). The expired patent covers polymer fibers, not fibers or polymers generally, and Boston Scientific's accused stent uses only a polymer coating, not a polymer fiber. The expired patent also requires the use of two discrete phases that are also "immiscible," which this Court construed, based on agreement of the parties, to mean "incapable of dissolving into one another." But the polymer coating and drug on Boston Scientific's stent—the alleged two phases—undisputedly are capable of dissolving into one another and are at least slightly miscible and not discrete. For these reasons—(1) use of a coating instead of a polymer fiber, and (2) use of miscible phases (3) that are not discrete—Boston Scientific's technology does not infringe the '296 patent. In claiming otherwise, Plaintiffs are taking positions that are not only unsupported by the evidence but are also inconsistent with the opinions and testimony of *their own expert* in a prior case involving *the same patent*. Plaintiffs are also pursuing damages theories that are not viable under established Federal Circuit precedent. Accordingly, Boston Scientific now seeks summary judgment of noninfringement, or in the alternative, no willful infringement and exclusion of Plaintiffs' damages opinions.

## NATURE AND STAGE OF THE PROCEEDINGS

This is a patent case. Plaintiffs assert that Boston Scientific's "Synergy" brand coronary stents (the "Accused Products") infringe claims 1, 11-12, 17, and 26 (the "Asserted Claims") of the '296 patent.

This Court issued a Memorandum Order regarding claim construction on April 15, 2021. (D.I. 90.) Plaintiffs filed a First Amended Complaint on September 17, 2021. (D.I. 124.) In

response, Boston Scientific filed a motion to dismiss on October 15, 2021 seeking to remove UTBOR from this case for lack of standing. (D.I. 128.) The motion to dismiss UTBOR is still pending, and Boston Scientific has not yet filed an answer to the First Amended Complaint. Fact discovery closed on February 22, 2022 (D.I. 47 at 4), and the parties have served opening and responsive expert reports. Trial is scheduled to begin on November 14, 2022. (D.I. 47 at 12.)

## SUMMARY OF ARGUMENTS[1]

1. The Court should grant summary judgment of noninfringement because the Accused Products do not include a "polymer fiber" as required by the Asserted Claims. In connection with this argument, Boston Scientific asks the Court to construe the term "polymer fiber," as it has become clear through expert discovery that the parties dispute the meaning and scope of this term.

2. The Court should grant summary judgment of noninfringement because the Accused Products do not include first and second "immiscible" phases as required by the Asserted Claims. Rather, the PLGA polymer and everolimus drug in the Synergy coating are at least "slightly miscible."

3. The Court should grant summary judgment of noninfringement because the Accused Products do not include "a first phase" (*i.e.*, "the polymer portion of the fiber") and a "second phase" (*i.e.*, "the discrete drug-containing regions dispersed throughout the fiber") as claimed. Plaintiffs' expert admits that the polymer-rich domains of the Synergy coating include at least some drug, and the drug-rich domains of the coating include at least some polymer.

4. In the alternative, the Court should grant summary judgment of no willful infringement. Plaintiffs cannot show that Boston Scientific had pre-suit knowledge of the '296 patent. Even if

[1] In a good-faith effort to keep this motion targeted, Boston Scientific is only moving for summary judgment on three of its noninfringement defenses. *See Dali Wireless, Inc. v. CommScope Techs. LLC*, C.A. No. 19-952 (MN), D.I. 290 (D. Del. Dec. 8, 2021). Boston Scientific has several other strong noninfringement and invalidity defenses.

it did, knowledge alone is not enough, and there is no evidence of deliberate or willful conduct.

5. Also in the alternative, the Court should exclude the testimony of Plaintiffs' damages expert Justin Lewis because each of his opinions fails to reliably apportion value and/or violates the entire market value rule. Dr. Kirk Garratt's opinion that 90% of all people who bought the accused Synergy product did so because of the allegedly patented feature should also be excluded because his opinion fails multiple reliability requirements.

## BACKGROUND

The '296 patent generally relates to "biodegradable polymer fibers" with a therapeutic agent. (Ex. 15 at 27:54-58.) Boston Scientific provides a technical overview below concerning polymers and polymer engineering to help the Court understand (1) the biodegradable polymer fibers as claimed in the '296 patent and (2) the drug-eluting polymer coating applied to the accused Synergy stent products.

### I. Polymers And Polymer Engineering

Polymer engineering concerns the design and manufacture of polymeric materials. Polymers may be used to form many types of useful polymeric materials including "plastics, elastomers (or rubbers), *fibers*, *coatings*, adhesives, foams, and films." (Ex. 3 at 549.)[2]

The molecules that form polymers are composed of repeating structural units called monomers that are polymerized together in elongated molecular chains. (Ex. 1 ¶ 16; Ex. 2 at 3; Ex. 3 at 492.)[3] In the solid state, polymers have two general types of morphologies: amorphous and semi-crystalline. (Ex. 1 ¶ 19.) When a polymer is amorphous, its chain-like molecules are oriented randomly and are often intertwined (akin to cooked spaghetti). (*Id.*) When a polymer is semi-crystalline, the polymer has crystalline regions dispersed within the remaining amorphous

[2] All emphasis added unless noted.

[3] All citations to Exhibit 1 refer to the Rebuttal Expert Report of David J. Mooney.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM and TISSUEGEN, Inc.<br><br>Plaintiffs,<br><br>v.<br><br>BOSTON SCIENTIFIC Corp.<br><br>Defendant. | Civil Action No. 18-392-GBW |

**MEMORANDUM ORDER**

Plaintiffs TissueGen, Inc. (TissueGen) and the Board of Regents, The University of Texas System (collectively, "UT") allege that Defendant Boston Scientific Corp.'s ("BSC") "Synergy" brand coronary stents (the "Accused Products") infringe claims 1, 11, 12, 17, and 26 (the "Asserted Claims") of U.S. Patent No. 6,596,296 ("the '296 patent"). D.I. 124 ¶¶ 1–3, 79. Pending before the Court are BSC's Motion for Summary Judgment of No Willful Infringement (D.I. 197) and Motion for Summary Judgment of Noninfringement (D.I. 198). The Court has reviewed BSC's briefing, statements of fact, and response to statements of fact, D.I. 200; D.I. 201; D.I. 202; D.I. 220; D.I. 221, and UT's briefing, statement of facts, and responses to statements of fact, D.I. 213; D.I. 214; D.I. 216; D.I. 217. The Court will deny both Motions because there are genuine issues of material fact in dispute between the parties. No hearing is necessary. The Court writes for the benefit of the parties and assumes familiarity with the case.

## I. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). "A genuine issue of material fact is one that could lead a reasonable jury to find in favor of the nonmoving party." *Bletz v. Corrie*, 974 F.3d 306, 308 (3d Cir. 2020). "The court must review the record as a whole, draw all reasonable inferences in favor of the nonmoving party, and must not 'weigh the evidence or make credibility determinations.'" *Id.* (citation omitted). The Court must enter summary judgment if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [its] case, and on which [the non-moving] party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 204 (3d Cir. 2022) (quoting *Celotex*, 477 U.S. at 322). The Federal Circuit "reviews a district court's grant of summary judgment under the law of the regional circuit, here the Third Circuit." *Acceleration Bay LLC v. 2K Sports, Inc.*, 15 F.4th 1069, 1075 (Fed. Cir. 2021).

## II. DISCUSSION

BSC argues that the Court must grant summary judgment of noninfringement because (1) the "biodegradable polymer coating" it applies to its stent is not "thread-like" or "filamentous" and lacks "a common orientation of the polymer molecules"; (2) the coating's drug and polymer are not "immiscible"; and (3) the drug-rich and polymer-rich regions of its stent overlap. D.I. 200 at 11–12. UT disputes each of BSC's arguments, D.I. 214 at 3, and the parties dispute the proper construction of the term "polymer fiber," D.I. 200 at 11; D.I. 214 at 3. BSC further argues that the Court must grant summary judgment of no willful infringement because "[t]he record does not contain any evidence even remotely meeting" the "high standard" needed to show willful infringement. D.I. 200 at 32. UT argues that its evidence of willful infringement is "sufficient" to send the issue to a jury. D.I. 214 at 18. The Court finds for UT as to both summary judgment motions. The Court will reschedule trial and hold a separate hearing to construe the disputed term.

### A. Non-Infringement

The Court considers each of BSC's three arguments for summary judgment of non-infringement in turn.

#### 1. Whether the Accused Products Contain a "Fiber" or "Polymer Fiber"

The Court finds that, regardless of the claim construction adopted, the parties have a genuine dispute of material fact as to whether the Accused Products contain a "fiber" or "polymer fiber."

The parties' disputes relate to Claim 1 of the '296 patent:

> A composition comprising at least one biodegradable polymer fiber wherein said fiber is composed of a first phase and a second phase, the first and second phases being immiscible, and wherein the second phase comprises one or more therapeutic agents.

D.I. 1-1 at 27:54–58. On April 15, 2021, the Court construed "fiber" to "have its plain and ordinary meaning." D.I. 90 at 1. The Court explained that the '296 patent uses the term "fiber" "according to its plain and ordinary meaning." D.I. 90 at 5. "[I]t seemed like the real dispute," the Court explained, "is not over whether a fiber is threadlike . . . but rather whether the term 'fiber' can encompass what [BSC] says is a coating," which, the Court said, "is an issue of fact as to whether a coating that covers some structure can itself be a fiber that must also meet the other requirements of the claim fiber." D.I. 90 at 5–6. BSC could, the Court explained, reraise the issue at summary judgment if "that really is a claim construction dispute . . . ." D.I. 90 at 6.

BSC now asks the Court to reconsider its construction of "fiber" and to construe the term "polymer fiber." D.I. 200 at 13. BSC asserts that a "polymer fiber" is "a thread-like or filamentous polymer structure that at least includes common orientation of the polymer molecules." D.I. 200 at 12. Thus, BSC argues, "[UT's] claims fail as a matter of law because no evidence shows that the polymer in the Synergy coating has, for example, a thread-like or

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM, and TISSUEGEN, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>BOSTON SCIENTIFIC CORPORATION,<br><br>Defendant. | Case No. 18-392-GBW |

**BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM, TISSUEGEN AND BOSTON SCIENTIFIC CORPORATION'S JOINT CLAIM CONSTRUCTION BRIEF**

**("POLYMER FIBER")**

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Diodem, LLC v. Lumenis, Inc.*,
2004 WL 5651051 (C.D. Cal. Aug. 17, 2004) .......... 2

*Evertz Microsystems Ltd. v. Lawo Inc.*,
2020 WL 4722993 (D. Del. Aug. 13, 2020) .......... 16

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) .......... 1, 2, 12

*Teva Pharm. v. Sandoz, Inc.*,
574 U.S. 318 (2015) .......... 3, 11

**BOSTON SCIENTIFIC CORPORATION'S OPENING POSITION ("POLYMER FIBER")**

Claim 1 of the '296 patent does not claim merely a "fiber"—it claims a "***polymer*** fiber." (Ex. 1, 27:54-58.)[1] A person of skill in the art ("POSA") would understand the claimed "polymer fiber" to have its ordinary and customary meaning of "a thread-like or filamentous polymer structure that at least includes common orientation of the polymer molecules." (D.I. 200 at 22- 27.) This ordinary and customary meaning is supported by the (1) background science, (2) intrinsic evidence, and (3) extrinsic evidence. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313-14 (Fed. Cir. 2005) (holding that "the ordinary and customary meaning of a claim term is the meaning that the term would have to a [POSA]" and that "[i]n many cases … determining the ordinary and customary meaning of the claim requires examination of terms that have particular meaning in a field of art").

**I. The Background Science Supports Boston Scientific's Construction.**

Polymers are large molecules that are composed of elongated chains of molecules. (Ex. 2, ¶¶16-21.) Different types of polymers can be engineered into different structures, including "plastics, elastomers (or rubbers), ***fibers***, coatings, adhesives, foams, and films." (Ex. 3, 549.) As Boston Scientific's expert Dr. Mooney explains, a POSA would understand that a "polymer fiber" is "a thread-like or filamentous structure made of polymer" with a number of polymer-specific characteristics, including polymer chains that "have a common longitudinal orientation —i.e., a uniaxial orientation[.]" (Ex. 2, ¶26.) The common molecular orientation of the polymer chains is what imparts key functionality and characteristics that define a polymer fiber. (*Id.*, ¶¶27-29, 36- 37, 99.) Creating the common molecular orientation of the polymer chains is done by extrusion (also termed "spinning") where the polymer chains are stretched or drawn to form a polymer fiber. (*Id.*, ¶¶26-37.) This understanding of polymer fibers is consistent with the scientific literature.

[1] Emphasis added unless indicated.

(Ex. 3, 539 ("During drawing the molecular chains slip past one another and become ***highly oriented*** ...."); Ex. 4, 13 ("***[U]niaxial orientation*** is a structural characteristic of fibers."); Ex. 5, 99 ("Fibers are made by ***spinning***, a process resembling ***extrusion***.").)

## II. The Intrinsic Evidence Supports Boston Scientific's Construction.

Claim 1 "provide[s] substantial guidance," *Phillips*, 415 F.3d at 1314, because the patentees chose to claim a particular type of fiber—a "polymer fiber." As described above, polymer fibers have an ordinary and customary meaning in the art. *See Diodem, LLC v. Lumenis, Inc.*, 2004 WL 5651051, at *23 (C.D. Cal. Aug. 17, 2004) (construing "optical fiber" as opposed to just "fiber" because "it is inappropriate to break up a technical term with an identified meaning in the art"); *accord Phillips*, 415 F.3d at 1313-14.

The specification of the '296 patent is consistent with the above background science and does not suggest any departure from the ordinary and customary meaning of "polymer fiber." *Phillips*, 415 F.3d at 1315. The '296 patent consistently describes a polymer fiber as being a "strand," a "filament," or a "monofilament." (Ex. 1, 8:51-58, 17:55-57; Ex. 2, ¶¶61-65.) The figures of the '296 patent also show polymer fibers as thread-like or filamentous structures, where the fibers are labeled numerals 21-28:




FIG. 1 FIG. 2 FIG. 3a

consult expert testimony "in order to understand, for example, the background science or the meaning of a term in the relevant art").

Moreover, this is the unusual case in which Plaintiffs' own expert, Dr. Pitt, supports Boston Scientific's construction. In another case involving the same '296 patent (the "*Ethicon* case"), Dr. Pitt stated that polymer fibers are, among other things, "***thread-like monofilament*** and multifilament structures" that are "spun by extrusion" and "drawn" and "stretched" to "provide ***molecular orientation***." (Ex. 7, Attachment B ¶3.) Thus, Dr. Pitt's admission that a polymer fiber is a "***thread-like monofilament***" that has "***molecular orientation***" (*id.*) neatly tracks Boston Scientific's proposed construction of "a ***thread-like or filamentous polymer structure*** that at least includes ***common orientation of the polymer molecules***."

Moreover, in the *Ethicon* case, Dr. Pitt went so far as to testify "under penalty of perjury" that in order for a polymer to be "fiber-forming," it is a "requirement[]" that the polymer "should have chains capable of being oriented" and that the polymer chains "should not relax and begin to lose orientation at ambient temperature":

> To be ***fiber-forming***, a polymer (a) should be dissolvable or meltable for ***extrusion***; (b) should have linear and long polymer chains ... (d) ***should have chains capable of being oriented***; and (e) ***should not relax and begin to lose orientation at ambient temperature***. An ordinary artisan would have known that polymers that do not meet such ***requirements*** can still be used to make films, molded articles, and the like, but they are ***not*** useful for fibrous applications.

(Ex. 8, ¶26.)

In sum, the (1) background science, (2) intrinsic evidence, and (3) extrinsic evidence all confirm that a POSA would understand the claimed "polymer fiber" to have its ordinary and customary meaning of "a thread-like or filamentous polymer structure that at least includes common orientation of the polymer molecules.

## ANSWERING BRIEF STATING PLAINTIFFS' MINI-MARKMAN POSITION

## I. PLAINTIFFS' POSITION

A POSITA reading the '296 patent in 1999 would have understood the claimed "biodegradable polymer fiber" means "a fiber capable of releasing drug slowly, in a controlled manner over time as the polymer breaks down chemically and mechanically in animal or human tissue." At the first *Markman* hearing, the Court correctly concluded the term "fiber" itself requires no construction beyond its ordinary meaning. (D.I. 90 at 5.) Sources from both experts agree: the ordinary meaning of "fiber" is "a volume of matter having a small cross section and a length at least 100 times greater than its width or diameter." (Ex. 9, Pitt Decl. ¶ 20; Ex. 2 at ¶ 99.)

| "biodegradable polymer fiber" / "polymer fiber" | "fiber" |
|---|---|
| A fiber capable of releasing drug slowly, in a controlled manner over time as the polymer breaks down chemically and mechanically in animal or human tissue | A volume of matter having a small cross section and a length at least 100 times greater than its width or diameter |

Plaintiffs' position should be adopted. It is tied to the specification which makes clear the core of the invention is polymer degradation in a fiber format for controlling the time and spatial distribution of drug release in tissue. (Ex. 1, 2:45-50; Ex. 9, Validity Report at ¶ 24.h.) In contrast, "polymer fiber" is not a term of art; and the words "thread" and "orientation" never appear in the patent. (Ex. 1; Ex. 9, Pitt Decl. at ¶ 7.) The patent teaches making and using fibers with any cross-sectional shape and unoriented polymer chains for purposes that do not require strength in the axial direction. (Ex. 1, 8:66-9:6, 22:40-51, 20:7-36; Ex. 9, Pitt Decl. at ¶ 32-44.) BSC is simply wants the Court to decide the issue of whether the ultra-thin ribbon-like polymer that coats the outside of the accused SYNERGY stent infringes that '296 patent.

### A. Plaintiffs' position should be adopted.

The '296 patent is titled "Drug Releasing Biodegradable Fiber Implant," and claim 1 covers "[a] composition comprising at least one **biodegradable polymer fiber** wherein **said fiber** is" made up of biodegradable polymer and drug organized into a two-phase structure.[2] (Ex. 1, 27:54-58; Ex. 16, 1.) Based on agreed constructions, the claimed phase separated fiber requires a biodegradable polymer phase portion with discrete drug-containing phase regions dispersed throughout it, these two phases being immiscible. (Ex. 16, 1.)

Numerous disclosures in the patent shape the POSITA's understanding of the claimed fiber. First, in column 1, at 1:49-51, after describing prior attempts to repair impaired host tissue with polymer fiber implants or scaffolds, the patent states: "the scaffold may be **biodegradable, meaning that over time it will break down both chemically and mechanically**." (Ex. 1, 1:12-51; Ex. 9, Pitt Declaration at ¶ 9-10, Pitt Validity Report at ¶ 21-22.)

Second, after describing drug delivery limitations of prior scaffolds, in column 2, at 2:39-65, the patent states: (1) the invention provides for scaffolds that "comprise **biodegradable polymer fibers capable of the controlled delivery therapeutic agents**"; where (2) temporal and spatial release is controlled using "**patterns of polymer fibers, which are capable of releasing one or more therapeutic agents as a function of time**"; and that (3) temporal release "is **controlled by** the polymer composition of the fiber and by the **use of coaxial layers within a fiber**." (Ex. 1, 2:39-50, 2:63-65).

Third, the patent discloses multiple solvent-based methods of encapsulating drugs into fibers fabricated from polymer solutions/emulsions, and states in column 8, at 8:32-37, that drugs are "**released from each individual fiber slowly, and in a controlled manner**" (*Id.*, 8:32-37; Ex. 9,

[2] All emphasis added unless stated otherwise.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM, and TISSUEGEN, INC.,<br><br>*Plaintiffs*,<br><br>v.<br><br>BOSTON SCIENTIFIC CORPORATION,<br><br>*Defendant*. | Case No. 18-392-GBW |

**BOSTON SCIENTIFIC'S MOTION TO BIFURCATE**

Pursuant to Fed. R. Civ. P. 42(b), and consistent with this Court's recognition of the "potential value of bifurcation" in this case, (D.I. 243 at 17), Defendant Boston Scientific Corporation ("Boston Scientific") hereby moves the Court for an Order bifurcating the issues of direct infringement and invalidity into a first phase at trial, and, only if necessary, the issues of willfulness, damages, and the knowledge and intent elements of induced infringement into a second phase at trial before the same jury. The specific grounds for this Motion are set forth in Boston Scientific's Opening Brief In Support Of Its Motion to Bifurcate, filed contemporaneously herewith.

Dated: October 28, 2022

Respectfully submitted,

FARNAN LLP

/s/ *Michael J. Farnan*

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
Tel. (302) 777-0300
Fax (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Chad Drown (*pro hac vice*)
Timothy E. Grimsrud (*pro hac vice*)
Katherine S. Razavi (*pro hac vice*)
Lauren J.F. Barta (*pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Telephone: (612) 766-7000
Facsimile: (612) 766-1600
chad.drown@faegredrinker.com
tim.grimsrud@faegredrinker.com
kate.razavi@faegredrinker.com
lauren.barta@faegredrinker.com

David J.F. Gross (*pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
1950 University Avenue, Suite 450
East Palo Alto, CA 94303
Telephone: (650) 324-6700
Facsimile: (650) 324-6701
david.gross@faegredrinker.com

Christopher J. Burrell (*pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
1500 K Street NW, Suite 1120
Washington, D.C. 20005
Telephone: (202) 842-8800
Facsimile: (202) 842-8465
chris.burrell@faegredrinker.com

Melissa A. Anyetei (*pro hac vice*)
James R. Ferguson (*pro hac vice*)
Michael J. Word (*pro hac vice*)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 782-0600
Facsimile: (312) 706-8503
manyetei@mayerbrown.com
jferguson@mayerbrown.com
mword@mayerbrown.com

***Attorneys for Boston Scientific Corporation***

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM, and TISSUEGEN, INC.,<br><br>*Plaintiffs*,<br><br>v.<br><br>BOSTON SCIENTIFIC CORPORATION,<br><br>*Defendant*. | Case No. 18-392-GBW<br><br>**REDACTED COPY** |

**BOSTON SCIENTIFIC CORPORATION'S OPENING BRIEF**
**IN SUPPORT OF ITS MOTION TO BIFURCATE**


OF COUNSEL:

Chad Drown (*pro hac vice*)
Timothy E. Grimsrud (*pro hac vice*)
Katherine S. Razavi (*pro hac vice*)
Lauren J.F. Barta (*pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH LLP 2200
Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Telephone: (612) 766-7000
Facsimile: (612) 766-1600
chad.drown@faegredrinker.com
tim.grimsrud@faegredrinker.com
kate.razavi@faegredrinker.com
lauren.barta@faegredrinker.com

David J.F. Gross (*pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH LLP 1950
University Avenue, Suite 450
East Palo Alto, CA 94303
Telephone: (650) 324-6700
Facsimile: (650) 324-6701
david.gross@faegredrinker.com

FARNAN LLP

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
Tel. (302) 777-0300
Fax (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com


DATED: October 28, 2022

*Mike's Train House, Inc. v. Broadway Ltd. Imports, LLC*,
2011 WL 1045630 (D. Md. Mar. 17, 2011)....................*passim*

*Novartis Corp. Teva Pharm. USA, Inc. Novartis Corp. v. Watson Labs., Inc.*,
2008 WL 10973750 (D.N.J. Oct. 29, 2008).................... 1

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
2009 WL 2742750 (D. Del. Aug. 26, 2009) ....................*passim*

*Water Techs. Corp. v. Calco, Ltd.*,
850 F.2d 660 (Fed. Cir. 1988) ....................4, 11

**Statutes, Rules & Regulations**

35 U.S.C. § 102.................... 7

35 U.S.C. § 103.................... 7

35 U.S.C. § 112.................... 7

35 U.S.C. § 271(a).................... 6

35 U.S.C. § 271(b).................... 6

35 U.S.C. § 287....................7, 8, 17

Local Rule 7.1.1 .................... 1

Fed. R. Civ. P. 42(b)....................1, 4, 8, 9

Pursuant to Rule 42(b), defendant Boston Scientific Corporation ("Boston Scientific") respectfully requests the Court to bifurcate the issues of direct infringement and invalidity into one phase of trial and the issues of willfulness, damages, and knowledge and intent for induced infringement into a second phase of trial. This bifurcation will do three things: (1) increase judicial efficiency by potentially eliminating up to two days of trial, four expert witnesses (two of whom are practicing interventional cardiologists), at least three fact witnesses, and dozens of exhibits if the first phase results in non-infringement or invalidity; (2) enhance juror comprehension by separately focusing on the technical aspects of direct infringement and invalidity in what is already a complex case; and (3) reduce prejudice to Boston Scientific by requiring the jury to first determine whether the accused Synergy stent meets all limitations of an asserted claim and whether the asserted claims are invalid before the jury hears inflammatory evidence about alleged knowledge, intent, and financial information regarding alleged damages.[1]

## I. INTRODUCTION

"[B]ifurcation is appropriate, if not necessary, in all but exceptional patent cases." *Robert Bosch LLC v. Pylon Mfg. Corp.*, 2009 WL 2742750, at *1 (D. Del. Aug. 26, 2009); *Dutch Branch of Streamserve Dev. AB v. Exstream Software, LLC*, 2009 WL 2705932, at *1 (D. Del. Aug. 26, 2009) (same). Indeed, "bifurcation of complex patent trials has become common." *Enzo Life Scis., Inc. v. Digene Corp.*, 2003 WL 21402512, at *5 (D. Del. June 10, 2003). "[N]umerous courts have recognized that bifurcation is particularly appropriate in patent cases, because it minimizes jury confusion of the complex issues involved, expedites trial of liability, and, depending on the outcome of the liability trial, potentially eliminates the costs" and time of trying the remaining issues. *Novartis Corp. Teva Pharm. USA, Inc. Novartis Corp. v. Watson Labs., Inc.*,

[1] Prior to bringing this Motion, counsel for Boston Scientific met-and-conferred with counsel for Plaintiffs pursuant to Local Rule 7.1.1. Plaintiffs declined to agree to any form of bifurcation.

2008 WL 10973750, at *2 (D.N.J. Oct. 29, 2008) (internal quotations omitted); *accord* February 24, 2022 Oral Order, *Magnolia Medical Technologies, Inc. v. Kurin, Inc.*, 1:19-CV-00097 (bifurcating damages, willfulness, and invalidity from liability issues); *Greatbatch Ltd. v. AVX Corp.*, 2016 WL 7217625, at *7 (D. Del. Dec. 13, 2016), *aff'd*, 813 F. App'x 609 (Fed. Cir. 2020) (bifurcating willfulness from liability issues); *Brit. Telecommunications PLC v. Google Inc.*, 2013 WL 3814329, at *2 (D. Del. July 22, 2013) (bifurcating damages from liability issues); *Lab. Skin Care, Inc. v. Ltd. Brands, Inc.*, 757 F. Supp. 2d 431, 442 (D. Del. 2010) (bifurcating damages and willfulness from liability issues). Consistent with this practice, Chief Judge Connolly recently incorporated a ***presumption*** of bifurcation into his form scheduling order for patent cases:

> Unless otherwise agreed to by the parties and the Court, the trial will be phased such that the issues of willful infringement and damages will be tried only if there is a finding of infringement.

(Declaration of Michael J. Farnan ISO Boston Scientific's Opening Brief ISO its Motion to Bifurcate ("Farnan Decl."), Ex. 1 at ¶ 27.)[2]

This is precisely the type of case warranting bifurcation, especially in view of the Court recognizing "the potential value of bifurcation where, as here, the issue of willfulness [was] close at summary judgment." (D.I. 243 at 17.) Moreover, because "a jury that has been exposed to evidence and arguments that Defendants behaved badly may be less objective in deciding the issue of infringement" and invalidity, that unfair prejudice also "warrants separating the issue of infringement, which is a purely objective determination, from the issues of willfulness ***and*** inducement, which involve inquiries into Defendant['s] state[] of mind." *Mike's Train House, Inc. v. Broadway Ltd. Imports, LLC*, 2011 WL 1045630, at *2 (D. Md. Mar. 17, 2011). Accordingly, Boston Scientific requests that the Court bifurcate the trial into two phases: (1) the jury should first

[2] All emphasis added unless otherwise indicated.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM, and TISSUEGEN, INC.,

Plaintiffs,

v.

BOSTON SCIENTIFIC CORPORATION,

Defendant.

Case No. 18-392-GBW

**APPENDIX TO PARTIES' JOINT CLAIM CONSTRUCTION BRIEF**
**("POLYMER FIBER")**

Dated: October 26, 2022

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE 19801
Tel. (302) 777-0300
Fax (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com
*Attorneys for Boston Scientific Corporation*

OF COUNSEL

Chad Drown (*pro hac vice*)
Timothy E. Grimsrud (*pro hac vice*)
Katherine S. Razavi (*pro hac vice*)
Lauren J.F. Barta (*pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Telephone: (612) 766-7000
Facsimile: (612) 766-1600
chad.drown@faegredrinker.com

Stamatios Stamoulis (No. 4606)
STAMOULIS & WEINBLATT LLC
800 N. West Street, Third Floor
Wilmington, DE 19801
(302) 999-1540
stamoulis@swdelaw.com
*Attorneys for Board of Regents, the University of Texas System and TissueGen, Inc.*

OF COUNSEL

THE SHORE FIRM
Michael W. Shore (*pro hac vice*)
Chijioke E. Offor (*pro hac vice*)
901 Main Street, Suite 3300
Dallas, TX 75202
(214) 593-9110
mshore@shorefirm.com
coffor@shorefirm.com
*Attorneys for Board of Regents, the University of Texas System and TissueGen, Inc.*

# Exhibit 2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM, and TISSUEGEN, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>BOSTON SCIENTIFIC CORPORATION,<br><br>Defendant | C.A. No. 18-392-MN |

**DECLARATION OF DAVID J. MOONEY, PH.D. IN SUPPORT OF BOSTON SCIENTIFIC CORPORATION'S MOTION FOR SUMMARY JUDGEMENT AND *DAUBERT* MOTION**

I, David J. Mooney, Ph.D., hereby declare as follows:

1. I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath. I have been engaged on behalf of Boston Scientific Corporation to provide my opinion and to testify as an expert witness on various issues in the above-captioned case.

2. A true and correct copy of my Rebuttal Expert Report provided in this case is attached as Exhibit 1.

3. All of my opinions in my Report, and the bases of those opinions, are true and correct to the best of my knowledge and belief.

4. If asked to do so, I expect to testify at trial in this case regarding the statements and opinions set forth in my Report.

# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM, and TISSUEGEN, INC.,

Plaintiffs,

v.

BOSTON SCIENTIFIC CORPORATION,

Defendant.

C.A. No. 18-392-MN

CONFIDENTIAL

**REBUTTAL EXPERT REPORT OF DAVID J. MOONEY, PH.D.**
**REGARDING NONINFRINGEMENT OF U.S. PATENT NO. 6,596,296**

4. I have also been asked to evaluate Dr. Pitt's opinion that TissueGen's "Archer Stent Presentation" discloses the components of the Synergy stent. As set forth further below, it is my opinion that the "Archer Stent Presentation" discloses a device that is substantially different than the Synergy stent.

5. I have also been asked to evaluate what, if any, technical contributions Boston Scientific would have been required to make in order to achieve the Synergy stent that are separate and apart from the disclosure of the '296 Patent. As discussed further below, it is my opinion that Boston Scientific had to make significant contributions in order to achieve a workable design that are not even purported to be disclosed by the '296 Patent. For example, the '296 Patent does not discuss how to make a workable stent, abluminal coating, the specific PLG polymer, its molecular weight, the appropriate solvent system for fabrication, considerations relating to using everolimus as a drug, the drug-polymer mass ratio, delivery system, or commercially scalable manufacturing process.

6. I have also been asked to evaluate and respond to Dr. Pitt's opinion that the only material difference between the Synergy stents and the Promus stents was the bioabsorbable polymer used in the Synergy stent. As discussed further below, it is my opinion that from a design perspective there are multiple material differences between Synergy and Promus beyond the durability of the coating. For example, Synergy includes an abluminal coating whereas Promus includes a conformal coating; Synergy's coating is much thinner than Promus's coating; Synergy's stent struts are thinner than Promus's stent struts; Synergy's stent scaffold design has been modified to create enhanced flexibility; and there are differences in the delivery systems that impact the flexibility and pushability of the system.

7. I was also asked to provide an opinion on the relative importance of the therapeutic drug versus the polymer carrier in a drug-eluting stent. In my opinion, the drug itself is more important than the polymer carrier because it provides the therapeutic benefits.

8. I reserve the right to supplement or modify my opinions, if warranted, and to offer additional testimony rebutting any evidence or arguments advanced by Plaintiffs, and to comment on any reports submitted in connection with this litigation. I also may testify in rebuttal to testimony or opinions offered by other witnesses. At any hearing and/or trial, I may rely on materials and documents produced in this litigation by any of the parties to the litigation, as well as documents that the parties have exchanged. I may further rely on visual aids and demonstrative exhibits.

## III. A PERSON OF ORDINARY SKILL IN THE ART

9. In connection with the opinions discussed herein I apply the same definition of a person of ordinary skill in the art ("POSA") as stated in Section III of my Opening Report. I considered the qualifications of a person of ordinary skill in the relevant art for the '296 Patent as of August 6, 1999, the filing date of U.S. Provisional App. No. 60/147,827 to which the '296 Patent claims priority. In my opinion, a POSA would have a Ph.D. in chemistry, chemical engineering, materials science, or a related field and several years of experience working in the fields of the '296 Patent, drug delivery and/or tissue engineering. My opinions are based on my many years of research experience in these fields.

10. I understand that Plaintiffs' expert, William G. Pitt, Ph.D., previously opined that a POSA for purposes of the '296 Patent would have had a master's degree in chemistry, chemical engineering, biochemistry, biomedical engineering, materials science, polymer science, or a similar discipline with two or more years of experience working with polymeric compositions, including some experience with biodegradable polymers and polymeric fibers. (*See* William G.

Pitt, Ph.D. Rebuttal Decl. dated February 9, 2021 ("Pitt Decl.") ¶ 6; *and* William G. Pitt, Ph.D. Decl. dated Sept. 10, 2018, ¶ 11 (Dkt. No. 41-9, *Bd. of Regents, The Univ. of Tex. Sys., et al.* v. *Ethicon, Inc., et al.*, Case No. 17-cv-1084-LY (W.D. Tex.)) ("Pitt Ethicon Decl.").) I further understand that Plaintiffs contend that claim 1 of the '296 Patent should be afforded an October 30, 1996 priority date. First, my opinions do not change even if Dr. Pitt's view of a POSA were applied. Accordingly, in forming my opinions, I have considered and applied both my definition of a POSA and Dr. Pitt's definition of a POSA, and all of my opinions are the same under either definition. Second, my opinions do not change whether a 1999 or 1996 date is applied, also under either definition of a POSA.

## IV. LEGAL STANDARDS REGARDING PATENT INFRINGEMENT

11. I understand that Plaintiffs bear the burden of proof in this lawsuit to prove by a preponderance of evidence that Boston Scientific has infringed one or more of the Asserted Claims of the '296 Patent. I further understand that it is not Boston Scientific's burden to prove its noninfringement defense.

12. I further understand that a determination of infringement is a two-step process. First, the claims of the patent must be properly interpreted to determine their scope and meaning at the claim construction stage. I understand that the Court has construed certain claim terms for the '296 Patent in its Memorandum Order regarding claim construction dated April 15, 2021 (Dkt. No. 90) (the "Claim Construction Order"), and I have applied these constructions in my analysis. Second, the properly interpreted claims are compared with the Accused Products.

13. I understand that there are two types of direct infringement: literal infringement and infringement under the doctrine of equivalents. I further understand that literal infringement of a patent claim occurs only when the Accused Product contains every limitation recited in the claim. On the other hand, infringement of a patent claim under the doctrine of equivalents occurs when

there are only insubstantial differences between an element in the Accused Product and a claim limitation, or the element in the Accused Product performs substantially the same function in substantially the same way to obtain substantially the same result as the claim limitation.

14. I understand that a dependent claim incorporates all of the limitations of the independent claim from which it depends. Thus, if an independent claim is not infringed, then any claim that depends from that independent claim is also not infringed.

15. I have applied these legal standards in forming my opinions concerning noninfringement.

## V. RELEVANT TECHNOLOGY BACKGROUND

### A. Polymers

16. Polymers are large molecules or macromolecules that are composed of repeating structural units and are formed by a process called polymerization. (Polymer Chemistry, page 3; *see also* Callister Textbook at 492.) The repeating structural units are called monomers. (Polymer Chemistry, page 3; *see also* Callister Textbook at 492.) A co-polymer is a polymer that has two different types of monomers that repeat to form the polymer. (Polymer Chemistry, page 7; *see also* Callister Textbook at 495, 507-08.) Schematic representations of co-polymers are shown below:




22. The properties of a polymer will differ depending on its morphology.

23. The polymer relevant to this case, PLGA, may range from fully amorphous to partially crystalline.

24. As shown in the below images, the lactide monomer has methyl groups ($CH_3$) (circled in red) that can have one of two directionalities (called a "D" or "L" conformation). The left image includes two "L" methyl groups, the middle image includes two "D" methyl groups, and the right image includes one "L" and one "D" methyl groups. If all of the lactide monomers in a polymer include methyl groups of the same conformation (either "D" or "L"), when aligned it will be easier to crystallize. On the other hand, if a polymer includes a combination of lactide monomers with methyl groups of both conformations ("D,L" lactide) the polymer is likely to be amorphous.



(image from: Effect of Crystallinity on PLA's Microbiological Behaviour - Scientific Figure on ResearchGate. Available from: https://www.researchgate.net/figure/a-LL-lactide-b-DD-lactide-c-DL-lactid-meso-lactide_fig1_256558366 (with annotation).)

25. The polymer on the Synergy stent is amorphous [redacted]; Azimi, B. et al., Poly (lactide -co- glycolide) Fiber: An Overview, Journal of Engineered Fibers and Fabrics, Volume 9, Issue 1, 49 (2014) ("All PLGAs are amorphous rather than crystalline.").)

**B. Formation Of Polymer Fibers**

26. A "polymer fiber" refers generally to a threadlike or filamentous structure made of polymer that has been drawn and/or pulled such that the polymer chains generally have a common longitudinal orientation—i.e., a uniaxial orientation—along with independent structural integrity. Indeed, it is the drawing and pulling of the polymers that results in their independent structural integrity, aspect ratio, and common molecular longitudinal orientation, which in turn provides the polymers with physical strength and integrity.

27. As a general matter, most polymers do not spontaneously form a "polymer fiber." This is because the polymer molecules are randomly arrayed, which does not provide the polymer with the common (or uniaxial) molecular orientation, independent structural integrity, or aspect ratio that characterizes a polymer fiber. Rather, to form a "polymer fiber," the polymers need to have a drawing, stretching, or pulling force imposed upon them to literally draw out the long chains

of polymer and induce a morphology in which the polymers are drawn to induce a common molecular orientation. (Callister Textbook at 538 ("[A]ppreciable tensile deformation of semicrystalline polymers produces a highly oriented structure. This process of orientation is referred to as drawing, and is commonly used to improve the mechanical properties of polymer fibers and films (this is discussed in more detail in Section 15.24)."); *id*. at 539 ("On a commercial basis, one of the most important techniques used to improve mechanical strength and tensile modulus is to permanently deform the polymer in tension. This procedure is sometimes termed ***drawing***, and corresponds to the neck extension process illustrated in Figure 15.4. In terms of property alterations, drawing is the polymer analog of strain hardening in metals. ***It is an important stiffening and strengthening technique*** that is employed in the ***production of fibers*** and films. During drawing the molecular chains slip past one another and become highly oriented; for semicrystalline materials the chains assume conformation similar to that represented schematically in Figure 15.13d."); *id*. ("Degrees of strengthening and stiffening will depend on the extent of deformation (or extension) of the material. Furthermore, the properties of drawn polymers are highly anisotropic. For those materials drawn in uniaxial tension, tensile modulus and strength values are significantly greater in the direction of deformation than in other directions.").) Schematic representations of this deformation is shown below:




**Figure 15.4** Schematic tensile stress–strain curve for a semicrystalline polymer. Specimen contours at several stages of deformation are included. (From Jerold M. Schultz, *Polymer Materials Science*, copyright © 1974, p. 488. Reprinted by permission of Prentice Hall, Inc., Englewood Cliffs, NJ.)




**Figure 15.13** Stages in the plastic deformation of a semicrystalline polymer. (*a*) Two adjacent chain-folded lamellae and interlamellar amorphous material after elastic deformation (also shown as Figure 15.12*c*). (*b*) Tilting of lamellar chain folds. (*c*) Separation of crystalline block segments. (*d*) Orientation of block segments and tie chains with the tensile axis in the final plastic deformation stage. (From Schultz, Jerold M., *Polymer Materials Science*, 1st edition, © 1974, pp. 500, 501. Adapted by permission of Pearson Education, Inc., Upper Saddle River, NJ.)

28. In addition, typically in order to create polymer fibers, one would choose polymers with a high molecular weight and that can crystallize because that creates strength in the resulting fiber. (Callister Textbook at 554 ("The molecular weight of fiber materials should be relatively high or the molten material will be too weak and will break during the drawing process. Also, because the tensile strength increases with degree of crystallinity, the structure and configuration of the chains should allow the production of a highly crystalline polymer.").)

29. Accordingly, the formation of a "polymer fiber" requires special processing—i.e., manufacturing—conditions. (Callister Textbook at 554 ("To be useful as a textile material, a fiber polymer must have a host of rather restrictive physical and chemical properties. While in use, fibers may be subject to a variety of mechanical deformations—stretching, twisting, shearing, and abrasion. Consequently, they must have a high tensile strength (over a relatively wide temperature range) and a high modulus of elasticity, as well as abrasion resistance. These properties are governed by the chemistry of the polymer chains and also by the fiber drawing process.").) In

particular, to form a "polymer fiber," the polymer must be subject to extrusion or spinning processes. (Callister Textbook at 568 ("The process by which fibers are formed from bulk polymer material is termed spinning."); *id*. ("Two other techniques that involve producing fibers from solutions of dissolved polymers are ***dry spinning*** and ***wet spinning***."); *id*. at 570 ("Many polymeric materials may be spun into fibers, which are used primarily in textiles. Mechanical, thermal, and chemical characteristics of these materials are especially critical."); Polymer Chemistry at 99 ("Fibers are made by ***spinning***, a process resembling extrusion."); Nelson Chapter at UT-BSC0072355, at 356-364 (describing "methods for fabricating fibers" and identifying extrusion and spinning techniques.) This is because, in order to form a "polymer fiber," the polymer molecules must be drawn, pulled, or stretched so that the polymer molecules align along the same general axis in order to create a fiber structure.

30. My opinion is consistent with Ms. Dahm, an inventor of the '296 Patent, who confirmed that an extrusion or spinning process is necessary to form such a fiber. (02/14/2022 Dahm Dep. Tr. at 43:23-44:54 ("[Q.] So would you say that extrusion or spinning is required to form a fiber? A. Yes. . . . Q. Would you say that all fibers require some sort of extrusion process to form? A. Yes.").)

31. My opinion is also consistent with Dr. Pitt's opinion in the prior *Ethicon* litigation, where he explained that "an ordinary artisan would have understood fibers are melt-spun, solution dry-spun, or solution wet-spun by extrusion from a spinneret head, and then pulled, stretched, conditioned, before being wound onto bobbins." (2019-11-25 Rebuttal Expert Report of Dr. Pitt, Attachment B ¶ 16 (emphasis added).) Dr. Pitt further opined that "[a]n ordinary artisan would have understood that fibers (at least before they are cut) are long, threadlike monofilament and multifilament structures that are spun by extrusion through a spinnerets or very fine holes, drawn,

stretched (to provide molecular orientation), and possibly annealed (to enhance dimensional stability and/or biological performance) to obtain the mechanical properties desired." (*Id.* ¶ 3).

32. For example, in a generic melt spinning process, a polymer is melted and molten polymer is forced through a spinneret containing tens to hundreds of fine holes from an extruder as shown below. (Man made fibers – processing and fabrication – Britannica.com.) The strands of molten fiber that emerge from the spinneret are cooled, then heated to below their melting point and drawn to reduce the cross-section and produce longitudinal orientation in the polymer, increasing its tensile strength. An image of a generic melt-spinning process is depicted below:




(image from: Man made fibers – processing and fabrication – Britannica.com.)

33. In wet spinning, which is a form of a solution spinning process, a desired polymer is dissolved into a suitable solvent, and the polymers are spun from the polymer/solvent solution to form a fiber. The figure below illustrates a generic wet spinning process where the polymer is pumped into the spinneret and the filaments produced in the spinning bath are passed through one or more coagulating baths to remove solvent and yield solid filaments. (Man made fibers – processing and fabrication – Britannica.com.) The spinning process itself yields some alignment and subsequent drawing can increase that alignment. An image of a generic wet-spinning process is depicted below:




34. In dry spinning, another form of a solution spinning process, the polymer is pumped into the spinneret, which is placed in an enclosed chamber for solvent recovery as shown below. (https://textilestudycenter.com/melt-spinning-dry-spinning-and-wet-spinning-method/.) After it exits the spinneret, the solvent evaporates inside the drying tower, where an inert gas at an elevated temperature is supplied. (Rheology and Processing of Polymeric Materials: Volume 2: Polymer Processing, page 262.) "The inert gas leaving the drying tower carries most, if not all, of the solvent from the spin dope." (*Id.*) A generic dry-spinning process is depicted below:




35. In an electrospinning process, the polymer is also pumped into the spinneret and then electric forces draw the polymer molecules into nanofibers towards a collector. A generic electrospinning process is depicted below:




(image available at: https://pub.iapchem.org/ojs/index.php/admet/article/view/844.)

36. Spinning technology using melt extrusion and spin-draw processes transforms polymeric materials into highly oriented polymer fibers. (Textile Research Journal - Structure-property relationship of melt spinning polypropylene fibers containing inorganic particulate CaCO3 fillers, at 1419.) In particular, a POSA would have understood that this orientation provides a "uniaxial orientation" that is "realized by the unfolding of [polymer's] folded chains by stretching." (Nakajima, T., Advanced Fiber Spinning Technology, at 13 (1994).) Indeed, "uniaxial orientation is a structural characteristic of fibers." (*Id.*)

37. This leads to functional enhancements to the material. For example, by increasing the uniformity of the molecular orientation, the tensile properties of the resulting fiber are also enhanced. (Rheology and Processing of Polymeric Materials: Volume 2: Polymer Processing, page 261.)

### C. Polymer Coatings

38. Oftentimes, a POSA does not desire to use a polymer in the form of a fiber, but instead desires to have a free-standing film and/or coat an existing device or substrate with a layer of polymer. In my opinion, a POSA would understand that a polymer coating is distinct from a

polymer fiber. (*See* Callister Textbook at 554-55 (differentiating fibers and coating); Polymer Chemistry at 27-30 (same).)

39. Unlike polymer fibers, the orientation of individual polymer molecules in a polymer coating is typically random, including because the polymers have not been imparted with any particular molecular orientation. A polymer coating also would not have independent structure or a high aspect ratio. Indeed, many commonly used techniques for making a polymer coating do not utilize any type of extrusion and/or spinning techniques and therefore do not impart drawing, stretching, and/or pulling forces on the polymer molecules. As a result, the polymers in the coating are amorphous (or potentially semi-crystalline) and do not have any type of uniaxial orientation and lack independent structure, and do not form a fiber.

40. For example, a commonly used technique for making a coating is solvent casting, which involves applying a polymer to a substrate to form a coating or film on the substrate. In a typical solvent casting process, the desired polymer is dissolved in a solvent to create a pool either on a substrate or in a mold. Then the solvents are typically allowed to evaporate or are removed through a drying step. In this type of process, there is no stretching or pulling step and the polymers remain in their natural amorphous (or potentially semi-crystalline) morphology. Accordingly, the polymers in a coating made from a solvent casting process are not "polymer fibers," including because they have not been imparted with any processing to align the molecular orientations of the polymers.

41. My opinion is consistent with Dr. Pitt. As Dr. Pitt previously explained, "simple casting" of a film on to flat plates involves "no fiber or formation of fiber." (*Ethicon* Pitt Invalidity Report, Attachment A, p. 2.) As Dr. Pitt further explained, "[p]olymer films are easily made by dissolving the polymer in a volatile solvent, and then pouring the solution of polymer and solvent

# Exhibit 3

# Materials Science and Engineering
## An Introduction

**Table 15.4 Tabulation of Important Characteristics and Typical Applications for Five Commercial Elastomers**

| *Chemical Type* | *Trade (Common) Names* | *Elongation (%)* | *Useful Temperature Range [°C (°F)]* | *Major Application Characteristics* | *Typical Applications* |
|---|---|---|---|---|---|
| Natural poly-isoprene | Natural rubber (NR) | 500–760 | −60 to 120 (−75 to 250) | Excellent physical properties; good resistance to cutting, gouging, and abrasion; low heat, ozone, and oil resistance; good electrical properties | Pneumatic tires and tubes; heels and soles; gaskets |
| Styrene-butadiene copolymer | GRS, Buna S (SBR) | 450–500 | −60 to 120 (−75 to 250) | Good physical properties; excellent abrasion resistance; not oil, ozone, or weather resistant; electrical properties good, but not outstanding | Same as natural rubber |
| Acrylonitrile-butadiene copolymer | Buna A, Nitrile (NBR) | 400–600 | −50 to 150 (−60 to 300) | Excellent resistance to vegetable, animal, and petroleum oils; poor low-temperature properties; electrical properties not outstanding | Gasoline, chemical, and oil hose; seals and O-rings; heels and soles |
| Chloroprene | Neoprene (CR) | 100–800 | −50 to 105 (−60 to 225) | Excellent ozone, heat, and weathering resistance; good oil resistance; excellent flame resistance; not as good in electrical applications as natural rubber | Wire and cable; chem. tank linings; belts, hoses, seals, and gaskets |
| Polysiloxane | Silicone (VMQ) | 100–800 | −115 to 315 (−175 to 600) | Excellent resistance to high and low temperatures; low strength; excellent electrical properties | High- and low-temperature insulation; seals, diaphragms; tubing for food and medical uses |

**Sources:** Adapted from C. A. Harper (Editor), *Handbook of Plastics and Elastomers.* Copyright © 1975 by McGraw-Hill Book Company, reproduced with permission; and Materials Engineering's *Materials Selector,* copyright Penton/IPC.

For many applications (e.g., automobile tires), the mechanical properties of even vulcanized rubbers are not satisfactory in terms of tensile strength, abrasion and tear resistance, and stiffness. These characteristics may be further improved by additives such as carbon black (Section 16.2).

Finally, some mention should be made of the silicone rubbers. For these materials, the backbone chain is made of alternating silicon and oxygen atoms:



where R and R′ represent side-bonded atoms such as hydrogen or groups of atoms such as $CH_3$. For example, polydimethylsiloxane has the repeat unit




Of course, as elastomers, these materials are crosslinked.

The silicone elastomers possess a high degree of flexibility at low temperatures [to −90°C (−130°F)] and yet are stable to temperatures as high as 250°C (480°F). In addition, they are resistant to weathering and lubricating oils, which makes them particularly desirable for applications in automobile engine compartments. Biocompatibility is another of their assets, and, therefore, they are often employed in medical applications such as blood tubing. A further attractive characteristic is that some silicone rubbers vulcanize at room temperature (RTV rubbers).

### Concept Check 15.9

During the winter months, the temperature in some parts of Alaska may go as low as −55°C (−65°F). Of the elastomers natural isoprene, styrene-butadiene, acrylonitrile-butadiene, chloroprene, and polysiloxane, which would be suitable for automobile tires under these conditions? Why?

*[The answer may be found at www.wiley.com/college/callister (Student Companion Site).]*

### Concept Check 15.10

Silicone polymers may be prepared to exist as liquids at room temperature. Cite differences in molecular structure between them and the silicone elastomers. *Hint:* You may want to consult Sections 14.5 and 15.9.

*[The answer may be found at www.wiley.com/college/callister (Student Companion Site).]*

## 15.17 FIBERS

fiber

The **fiber** polymers are capable of being drawn into long filaments having at least a 100:1 length-to-diameter ratio. Most commercial fiber polymers are utilized in the textile industry, being woven or knit into cloth or fabric. In addition, the aramid fibers are employed in composite materials, Section 16.8. To be useful as a textile material, a fiber polymer must have a host of rather restrictive physical and chemical properties. While in use, fibers may be subjected to a variety of mechanical deformations—stretching, twisting, shearing, and abrasion. Consequently, they must have a high tensile strength (over a relatively wide temperature range) and a high modulus of elasticity, as well as abrasion resistance. These properties are governed by the chemistry of the polymer chains and also by the fiber drawing process.

The molecular weight of fiber materials should be relatively high or the molten material will be too weak and will break during the drawing process. Also, because the tensile strength increases with degree of crystallinity, the structure and configuration of the chains should allow the production of a highly crystalline polymer. That translates into a requirement for linear and unbranched chains that are

symmetrical and have regular repeat units. Polar groups in the polymer also improve the fiber-forming properties by increasing both crystallinity and the intermolecular forces between the chains.

Convenience in washing and maintaining clothing depends primarily on the thermal properties of the fiber polymer, that is, its melting and glass transition temperatures. Furthermore, fiber polymers must exhibit chemical stability to a rather extensive variety of environments, including acids, bases, bleaches, dry cleaning solvents, and sunlight. In addition, they must be relatively nonflammable and amenable to drying.

## 15.18 MISCELLANEOUS APPLICATIONS

### Coatings

Coatings are frequently applied to the surface of materials to serve one or more of the following functions: (1) to protect the item from the environment that may produce corrosive or deteriorative reactions; (2) to improve the item's appearance; and (3) to provide electrical insulation. Many of the ingredients in coating materials are polymers, the majority of which are organic in origin. These organic coatings fall into several different classifications, as follows: paint, varnish, enamel, lacquer, and shellac.

Many common coatings are *latexes*. A latex is a stable suspension of small insoluble polymer particles dispersed in water. These materials have become increasingly popular because they don't contain large quantities of organic solvents that are emitted into the environment—that is, they have low volatile organic compound (VOC) emissions. VOCs react in the atmosphere to produce smog. Large users of coatings such as automobile manufacturers continue to reduce their VOC emissions to comply with environmental regulations.

### Adhesives

**adhesive**

An **adhesive** is a substance used to bond together the surfaces of two solid materials (termed "adherends"). There are two types of bonding mechanisms: mechanical and chemical. For mechanical there is actual penetration of the adhesive into surface pores and crevices. Chemical bonding involves intermolecular forces between the adhesive and adherend, which forces may be covalent and/or van der Waals; degree of van der Waals bonding is enhanced when the adhesive material contains polar groups.

Although natural adhesives (animal glue, casein, starch, and rosin) are still used for many applications, a host of new adhesive materials based on synthetic polymers have been developed; these include polyurethanes, polysiloxanes (silicones), epoxies, polyimides, acrylics, and rubber materials. Adhesives may be used to join a large variety of materials—viz. metals, ceramics, polymers, composites, skin, etc.—and the choice of which adhesive to use will depend on such factors as (1) the materials to be bonded and their porosities; (2) the required adhesive properties (i.e., whether the bond is to be temporary or permanent); (3) maximum/minimum exposure temperatures; and (4) processing conditions.

For all but the pressure-sensitive adhesives (discussed below), the adhesive material is applied as a low-viscosity liquid, so as to cover evenly and completely the adherend surfaces, and allow for maximum bonding interactions. The actual bonding joint forms as the adhesive undergoes a liquid-to-solid transition (or cures), which may be accomplished through either a physical process (e.g., crystallization, solvent evaporation) or a chemical process [e.g., addition polymerization, condensation polymerization (Section 15.20), vulcanization]. Characteristics of a sound joint should include high shear, peel, and fracture strengths.




**Figure 15.25** Schematic diagram of an extruder. (Reprinted with permission from *Encyclopædia Britannica*, © 1997 by Encyclopædia Britannica, Inc.)

is successively compacted, melted, and formed into a continuous charge of viscous fluid (Figure 15.25). Extrusion takes place as this molten mass is forced through a die orifice. Solidification of the extruded length is expedited by blowers, a water spray, or bath. The technique is especially adapted to producing continuous lengths having constant cross-sectional geometries—for example, rods, tubes, hose channels, sheets, and filaments.

### Blow Molding

The blow-molding process for the fabrication of plastic containers is similar to that used for blowing glass bottles, as represented in Figure 13.8. First, a parison, or length of polymer tubing, is extruded. While still in a semimolten state, the parison is placed in a two-piece mold having the desired container configuration. The hollow piece is formed by blowing air or steam under pressure into the parison, forcing the tube walls to conform to the contours of the mold. Of course the temperature and viscosity of the parison must be carefully regulated.

### Casting

Like metals, polymeric materials may be cast, as when a molten plastic material is poured into a mold and allowed to solidify. Both thermoplastic and thermosetting plastics may be cast. For thermoplastics, solidification occurs upon cooling from the molten state; however, for thermosets, hardening is a consequence of the actual polymerization or curing process, which is usually carried out at an elevated temperature.

## 15.23 FABRICATION OF ELASTOMERS

Techniques used in the actual fabrication of rubber parts are essentially the same as those discussed for plastics as described above—that is, compression molding, extrusion, and so on. Furthermore, most rubber materials are vulcanized (Section 15.9) and some are reinforced with carbon black (Section 16.2).

### Concept Check 15.14

For a rubber component that, in its final form is to be vulcanized, should vulcanization be carried out prior to or subsequent to the forming operation? Why? *Hint:* you may want to consult Section 15.9.

[*The answer may be found at www.wiley.com/college/callister (Student Companion Site).*]

## 15.24 FABRICATION OF FIBERS AND FILMS

### Fibers

spinning

The process by which fibers are formed from bulk polymer material is termed **spinning.** Most often, fibers are spun from the molten state in a process called melt spinning. The material to be spun is first heated until it forms a relatively viscous liquid. Next, it is pumped through a plate called a spinneret, which contains numerous small, typically round holes. As the molten material passes through each of these orifices, a single fiber is formed, which is rapidly solidified by cooling with air blowers or a water bath.

The crystallinity of a spun fiber will depend on its rate of cooling during spinning. The strength of fibers is improved by a postforming process called drawing, as discussed in Section 15.8. Again, drawing is simply the permanent mechanical elongation of a fiber in the direction of its axis. During this process the molecular chains become oriented in the direction of drawing (Figure 15.13*d*), such that the tensile strength, modulus of elasticity, and toughness are improved. The cross section of melt spun, drawn fibers is nearly circular, and the properties are uniform throughout the cross section.

Two other techniques that involve producing fibers from solutions of dissolved polymers are *dry spinning* and *wet spinning*. For dry spinning the polymer is dissolved in a volatile solvent. The polymer-solvent solution is then pumped through a spinneret into a heated zone; here the fibers solidify as the solvent evaporates. In wet spinning, the fibers are formed by passing a polymer-solvent solution through a spinneret directly into a second solvent that causes the polymer fiber to come out of (i.e., precipitate from) the solution. For both of these techniques, a skin first forms on the surface of the fiber. Subsequently, some shrinkage occurs such that the fiber shrivels up (like a raisin); this leads to a very irregular cross-section profile, which causes the fiber to become stiffer (i.e., increases the modulus of elasticity).




**Figure 15.26** Schematic diagram of an apparatus that is used to form thin polymer films. (Reprinted with permission from *Encyclopædia Britannica*, © 1997 by Encyclopædia Britannica, Inc.)

### Films

Many films are simply extruded through a thin die slit; this may be followed by a rolling (calendering) or drawing operation that serves to reduce thickness and improve strength. Alternatively, film may be blown: continuous tubing is extruded through an annular die; then, by maintaining a carefully controlled positive gas pressure inside the tube and by drawing the film in the axial direction as it emerges from the die, the material expands around this trapped air bubble like a balloon (Figure 15.26). As a result the wall thickness is continuously reduced to produce a thin cylindrical film which can be sealed at the end to make garbage bags, or which may be cut and laid flat to make a film. This is termed a biaxial drawing process and produces films that are strong in both stretching directions. Some of the newer films are produced by coextrusion; that is, multilayers of more than one polymer type are extruded simultaneously.

## SUMMARY

#### Stress–Strain Behavior

On the basis of stress–strain behavior, polymers fall within three general classifications: brittle, plastic, and highly elastic. These materials are neither as strong nor as stiff as metals, and their mechanical properties are sensitive to changes in temperature and strain rate. However, their high flexibilities, low densities, and resistance to corrosion make them the materials of choice for many applications.

#### Viscoelastic Deformation

Viscoelastic mechanical behavior, being intermediate between totally elastic and totally viscous, is displayed by a number of polymeric materials. It is characterized by the relaxation modulus, a time-dependent modulus of elasticity. The magnitude of the relaxation modulus is very sensitive to temperature; critical to the in-service temperature range for elastomers is this temperature dependence.

#### Fracture of Polymers

Fracture strengths of polymeric materials are low relative to metals and ceramics. Both brittle and ductile fracture modes are possible, and some thermoplastic materials experience a ductile-to-brittle transition with a lowering of temperature, an increase in strain rate, and/or an alteration of specimen thickness or geometry. In some thermoplastics, the crack-formation process may be preceded by crazing; crazing can lead to an increase in ductility and toughness of the material.

#### Deformation of Semicrystalline Polymers

During the elastic deformation of a semicrystalline polymer having a spherulitic structure that is stressed in tension, the molecules in amorphous regions elongate in the stress direction. In addition, molecules in crystallites experience bending and stretching, which causes a slight increase in lamellar thickness.

The mechanism of plastic deformation for spherulitic polymers was also presented. Tensile deformation occurs in several stages as both amorphous tie chains and chain-folded block segments (which separate from the ribbon-like lamellae) become oriented with the tensile axis. Also, during deformation the shapes of

# Exhibit 4

# Advanced fiber spinning technology

**Edited by Professor T Nakajima**
*President, Society of Fiber Science and Technology, Japan*

WOODHEAD PUBLISHING LIMITED




1.5 Apparatus for oriented crystallization of polyethylene from solution.[30]

### 1.3.3 Gelation and phase separation

Recently, theoretical and experimental studies on gelation and phase separation of polymer systems have flourished. According to experiments on a polyvinylalcohol (PVA)–water system by Komatsu *et al.*,[32] the sol–gel transition curve intersects the SD (spinodal decomposition) curve as shown in Fig. 1.6, and the phase diagram is partitioned into four areas:

(i) Area corresponding to a homogeneous sol state.
(ii) Area in which liquid–liquid separation takes place due to SD but gelation does not occur.
(iii) Area in which gelation takes place due to SD.
(iv) Area in which gelation takes place without any liquid–liquid separation.

The molecular orientation induced by the flow of such a solution, needless to say, shifts these curves. In dry spinning of the system in question, the path which the system follows on the phase diagram changes according to the spinning conditions and consequently the mode of structure formation and the structure itself in the spun filament will vary. As for structure formation in wet spinning of a three-component system, an excellent analysis has been presented in Reference 5.




1.6 Phase diagram of PVA-water system for sol–gel transition (solid curve), spinodal (broken curve) and binodal (dotted curve).[32]

## 1.4 Fiber structure

For flexible polymers, uniaxial orientation is realised by the unfolding of their folded chains by stretching. Such orientation is also given to a rigid polymer by elongational flow of a liquid crystalline phase of the polymer; uniaxial orientation is a structural characteristic of fibers. The fiber structure in commercial fibers has been investigated by transmission electron microscopy (TEM), scanning electron microscopy (SEM), X-ray diffraction, and so on. Though only the outline fiber structure has been described so far, a more detailed picture of fiber structure obtained by recent TEM studies[33] will follow. In the context of the present chapter, the following section should only be regarded as a supplement. The authors hope, however, that it will assist readers in understanding the relationship between structure and physical properties of fibers.

### *1.4.1 Fiber structure of flexible chain polymers*

#### *1.4.1.1 Polyethylene (PE)*

We first turn to a brief discussion of the fiber structure in an oriented thin film of PE.[33] The specimen was prepared by stretching, by a factor of 3–4, a thin film of PE spread on the surface of hot water and thereafter annealing it at 126°C. Figure 1.7(a) is a dark-field image using the 110 and 200 reflections on the equator (see the inset of Fig. 1.7), showing crystallites of about 20 nm length and width; crystallites which are

properly oriented to give 110 or 200 reflections used for imaging appear as bright spots. These crystallites tend to align themselves in a line along the fiber axis (vertical direction), which suggests the presence of microfibrils in the specimen. Here and there, we often find domains where the crystallites surrounded by the amorphous part appear to have coherency of orientation over 200–300 nm along the fiber axis. Due to uniaxial orientation, the dark-field image (Fig. 1.7(b)) using the 002 reflection on the meridian is on the whole rather uniform in brightness and accordingly has lower contrast than Fig. 1.7(a).

Figure 1.7(c) is a phase-contrast image of the same specimen, which was taken at a fairly large amount of defocus. This figure clearly demonstrates wavy lamellae stacked in the direction of the fiber axis. Since the lateral dimension of these lamellae is much larger than that of the crystallites, it is deduced that each of the lamellae is a mosaic-like aggregate of crystallites. In conclusion, the oriented film of PE has two faces of fibrillar and lamellar structure. PE is too labile under electron irradiation to elucidate such seemingly contradictory features of structure by high-resolution TEM.



(a) (b) (c)

1.7 Dark-field image of polyethylene (PE). (a) Using the 110 and 200 reflections. (b) Using the 002 reflection. (c) Using the phase-contrast image. The inset is the corresponding electron diffraction pattern. The stretching direction is vertical.

### *1.4.1.2 Poly(aryl-ether-ether-ketone) (PEEK)*

Next, we turn to the oriented thin film of PEEK.[34] PEEK is fairly resistant to electron bombardment and, thus, is a suitable material to take lattice images by high-resolution TEM. Several drops of a hot solution of PEEK in α-chloronaphthalene were sandwiched between two glass slides at 300°C. Just after evaporation of the solvent, a thin molten film of PEEK between the slides was oriented and crystallized by displacing one of the two slides. Figure 1.8(a) is the (110) lattice image of such a specimen, and Fig. 1.8(b) demonstrates the relationship between

# Exhibit 7

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM AND TISSUEGEN, INC., | § § § § | |
| PLAINTIFFS, | § | Case No. 1:17-cv-01084-LY |
| v. | § § § | |
| ETHICON, INC. AND ETHICON US, LLC, | § § § | |
| DEFENDANTS. | § | |

**REBUTTAL EXPERT REPORT OF WILLIAM G. PITT, Ph.D.**

Signed in Provo, Utah
on November 25, 2019

William G. Pitt
William G. Pitt, Ph.D.

**REBUTTAL EXPERT REPORT OF WILLIAM G. PITT, PH.D.**

## I. INTRODUCTION

1. **Dr. Mooney's Report ("Mooney") is about obviousness.** I reviewed Mooney and the art identified therein. As potential prior art, Mooney identifies nine primary, purportedly anticipatory references (Choi, Jeong, Song, Fuisz, Hutchinson, Zoladex, Fildes, Montgomery, Dinelli) and six secondary references (ordinary artisan's knowledge, Sidman, Billmeyer, Curatolo, Marconi, Dinelli '584) that an ordinary artisan purportedly would have combined with a primary reference to make the inventions claimed in the asserted '296 patent claims (hereinafter "Dr. Nelson's invention"). Attachment C to this report is a chart summarizing the specific anticipation and obviousness allegations set forth in Mooney. As Attachment C reflects, the allegations set forth in Mooney (see e.g. ¶¶ 190, 198, 288, 323, 383, 470) are that each primary reference anticipates certain asserted patent claims ***or*** renders those ***same*** claims obvious in view a secondary reference. Thus, at the outset, it is my opinion that there simply cannot be clear and convincing evidence of anticipation of any claim by any of the art identified in Mooney.

2. **An ordinary artisan would know not all film-forming polymers are fiber-forming.** In Attachment B, I set forth opinions concerning the knowledge of an ordinary artisan, including my opinion that an ordinary artisan would have known that of the many different types of polymers, most can be made into useful films or used to make molded articles, but only a few can be made into useful fibers. That is, an ordinary artisan would have understood that not all polymers are capable of being melt or solution spun through a spinneret to prepare continuous filaments that can be woven, knitted, or braided alone or in combination with other fibers to form medical textiles and various other applications. To be film-forming, a polymer (a) should be dissolvable or meltable for extrusion; (b) should have linear and long polymer chains; (c) should have simple, small, or polar side groups; (d) should have chains capable of being oriented; and (e) should not relax and begin to lose chain orientation at ambient temperature. An ordinary artisan would have known that polymers that do not meet such requirements can still be used to make molded articles, and the like, but they are not useful for fibrous applications. An ordinary artisan further would have understood the theoretical advantages and major problems concerning various matrix materials and structures often deployed in drug delivery vehicles and other medical applications.

3. Further, in my opinion, the highlighted disclosures found in U.S. Patent No. 4,351,337 ("Sidman"), titled Biodegradable, Implantable Drug Delivery Device, and Process for Preparing and Using the Same, and U.S. Patent No. 6,162,537 ("Martin"), titled Implantable Fibers and Medical Articles, would have been within the knowledge of an ordinary artisan in the art of polymeric drug delivery devices at the time of Dr. Nelson's invention. Thus, in my opinion, an ordinary artisan would have understood and appreciate the concepts, principles, and material interactions highlighted therein. I provide further details concerning the knowledge of an ordinary artisan at the time of the invention in Attachment B.

4. It also remains my opinion that an ordinary artisan would possess a masters degree in chemistry, chemical engineering, biochemistry, biomedical engineering, materials science, polymer science, or a similar discipline with two or more years of experience working with polymeric compositions, including some experience with biodegradable polymers and polymeric fibers. I continue to apply this level of skill to all times relevant to my analysis. In my opinion, provided proper background, an ordinary artisan need not have a Ph.D. to understand the technology and scientific principles at issue in this case. I have taught these principles to masters degree candidates, and they were fully capable of understanding them.

5. **The '296 patent explicitly discloses process that results in a final fiber with two immiscible phases.** Further, as I stated in my October 18, 2019 infringement report, with regard to the

1. In my opinion, collectively, the highlighted disclosures found in U.S. Patent No. 4,351,337 ("Sidman"), titled *Biodegradable, Implantable Drug Delivery Device, and Process for Preparing and Using the Same*, and U.S. Patent No. 6,162,537 ("Martin"), titled *Implantable Fibers and Medical Articles*, would have been within the knowledge of an ordinary artisan in the art of polymeric drug delivery devices at the time of Dr. Nelson's invention. Thus, in my opinion, an ordinary artisan would have understood and appreciate the concepts, principles, and material interactions highlighted in Sidman and Martin, and would have understood at least the concepts, principles, and material interactions described below.

2. Further, an ordinary artisan would have known that there are many different types of polymers, including naturally occurring and synthetic polymers, each having unique chemical structure and potential properties that affect their usefulness. Further, some polymers are biodegradable (bioabsorbable, resorbable) and biocompatible, while others are not. An ordinary artisan would know that examples of biodegradable polymers include (Martin 6:25-41) "polyglycolides, polydioxanones, polyhydroxyalkanoates, polylactides, [some] alginates, collagens, chitosans, polyalkylene oxalate[s], polyanhydrides, poly(glycolide-co-trimethylene carbonate), [some] polyesteramides, polydepsipeptides and the like. More specifically, substantially resorbable polymers include polyglycolic acid and polylactic acid, and copolymers of glycolic acid with lactic acid or .epsilon.-caprolactone or trimethylene carbonate. In addition to these polyesters are the polyester-ethers such as poly-p-dioxanone."

3. An ordinary artisan would have known that of the many different types of polymers, most can be made into useful films or used to make molded articles, but only a few can be made into useful fibers. An ordinary artisan would have understood that fibers (at least before they are cut) are long, thread-like monofilament and multifilament structures that are spun by extrusion through a spinnerets or very fine holes, drawn, stretched (to provide molecular orientation), and possibly annealed (to enhance dimensional stability and/or biological performance) to obtain the mechanical properties desired. An ordinary artisan would also know that forming or spinning a fiber by extrusion may involve melt spinning, dry solution spinning, or wet solution spinning. An ordinary artisan would have known that a fiber can be woven, knitted, or braided alone or in combination with other fibers to form fabrics for various medical applications.

4. That is, an ordinary artisan would have understood that not all polymers are capable of being melt or solution spun through a spinneret to prepare continuous filaments that can be woven, knitted, or braided alone or in combination with other fibers to form medical textiles and various other applications. This is because a polymer must meet certain requirements before it can be successfully and efficiently converted into a fibrous product. An ordinary artisan would have understood that these requirements include that the polymers: (a) should be dissolvable or meltable for extrusion; (b) should have long polymer chains; (c) should have simple, small, or polar side groups; (d) should have chains capable of being oriented; and (e) should not relax and begin to lose stiffness at ambient temperature. An ordinary artisan would have known that polymers that do not meet such requirements can be used to make molded articles, and the like, but they are difficult to use in fibrous applications.

5. An ordinary artisan would have known of common fiber-forming polymers. Further, Martin's disclosure (7:12-32) shows an ordinary artisan would understand common fiber-forming polymers include a cellulosic (linen, cotton, rayon, acetate), protein (wool, silk), polyamide, polyester, polyolefin, vinyl, acrylic, polytetrafluoroethylene polyphenylene sulfide, aramid, polyurethane, a polyester/polyether block copolymer. An ordinary artisan would have known that common non-absorbable fiber-forming polymers include polyamides, aromatic polyesters such as polyethylene terephthalate, polyacrylonitrile, polyethylene, polypropylene, linen, etc. An ordinary artisan would have known that common biodegradable fiber-forming polymers include natural collagenous material or synthetic resins including those derived from glycolic acid, glycolide, lactic acid, lactide, dioxanone, polycaprolactone, epsilon-caprolactone, trimethylene carbonate,

etc., and various combinations of these and related monomers. An ordinary artisan would have known that specific examples of fiber-forming polymers include: polyglycolide, poly(lactide-co-glycolide), poly(alkylene oxalate), and poly(anhydride esters), polypropylene, and polyethylene, to name a few.

6. Among other things, Sidman shows (2:18-4:40) an ordinary artisan would have known that the distinct theoretical advantages and major disadvantages of drug delivery implants may depend on the type of matrix material and structural design deployed. An ordinary artisan would have known the various advantages and disadvantages set forth in Sidman concerning at least [a] carboxymethyl cellulose, polyvinyl alcohol, and other water-soluble material materials (2:26-30); [b] hydrogels, gelatin, collagens and other water-swellable matrix materials (2:30-41); [c] polyglycolic acids, polylactic acids, and other biodegradable and biocompatible matrix materials that degrade by hydrolysis (2:42-3:6); [d] silicone rubbers that are not absorbed by the living body into which they are implanted.

7. Sidman also shows (3:16-22) an ordinary artisan would have understood that polymeric implants typically "[had] been fabricated either in the form of closed hollow tubes or capsules (with or without a sponge sleeve) in which the drug is contained for diffusion through the tube walls; or they have been made up into structures of homogeneous polymer-drug blends." An ordinary artisan would also know that water soluble and hydrophilic materials are incompatible and/or insoluble with hydrophobic materials, and thus hydrophilic material will not generally diffuse through surrounding hydrophobic material and hydrophobic material will not generally diffuse through surrounding hydrophilic material.

8. Sidman's disclosure shows (2:18-21) an ordinary artisan would have understood that a number of materials and several different structural designs have been proposed for subcutaneous implants and further explains the disadvantages a various matrix materials. Sidman's disclosure shows (2:21-25) an ordinary artisan would have understood that prior art materials proposed for subcutaneous implants include "hydrogels, gelatin, carboxymethyl cellulose, organopolysiloxane rubbers, polyurethanes, waxes, polyvinyl alcohol, polyglycolic acid, and polylactic acid."

9. Sidman's disclosure shows (2:26-30) an ordinary artisan would have understood water soluble matrix materials (e.g. carboxymethyl cellulose, polyvinyl alcohol) may be "unsatisfactory because it is not possible to control the drug release rate from them over any appreciable length of time."

10. Sidman's disclosure shows (2:18-21) an ordinary artisan would have understood water-swellable matrix materials (e.g. hydrogels, gelatin, collagens) may be unsatisfactory because they "provide inherently rapid drug release because of their inability to retain the drug in a swelled condition." Sidman also teaches that such water-swellable materials (e.g. gelatin) have "extremely complex chemical structure" such that there appears to be "there appears to no satisfactory way to control or adjust its physical properties for use as a matrix implant."

11. Sidman's disclosure shows (2:42-50, 2:57-59) an ordinary artisan would have understood delivery that absorbable, biocompatible polymer matrix materials (e.g. polyglycolic acids, polylactic acids, and mixtures thereof) in which the drug is physically entrapped "make it possible to provide biodegradable and biocompatible implant devices having less rapid release rates." Sidman's disclosure shows (2:50-57) this is so because drug in such devices is released "not by diffusing through a polymeric membrane, but by hydrolytic breakdown of the polymer matrix itself." Sidman's disclosure shows (2:50-57) that as the "polymeric matrix disintegrates, the enclosed drug is released into the surrounding body fluids" and that "[b]y the time all of the drug has been released from the matrix, the polymer fragments have been almost completely absorbed."

12. Sidman also shows (2:57-3:6) an ordinary artisan would have understood however that such absorbable, biocompatible matrix materials may be unsatisfactory because "they present serious problems in the accurate control of release rates" that "arise because the polylactic acids and polyglycolic acids in degradation break down to form lactic acid and glycolic acid." Sidman also teaches "[d]egradation [in such materials] is the result of hydrolysis which is dependent upon both pH and degree of crystallinity of the polymers. Since the products of these hydrolysis reactions are acids, there is a tendency for the products that do not immediately diffuse away from the implant site to accelerate further hydrolysis. In addition, the crystalline regions degrade at a much slower rate than the amorphous regions, thus giving rise to a nonuniform degradation pattern and a porous structure from which the drugs may be released at an uncontrollable rate."

13. Sidman's disclosure shows (3:7-24) an ordinary artisan would have understood nonabsorbable matrix materials (e.g. silicone rubbers) may be unsatisfactory because they not absorbable by the living organisms into which they are introduced and normally require removal by surgery.

14. As Figures 2-7 and Examples 1, 5, and 6 of Sidman's disclosure show, an ordinary artisan would have known simple solvent casting and injection molding techniques for fabricating thin-film and rod-, tube-, and cylindrically shaped drug delivery devices as shown. An ordinary artisan would also know that the fabrication method shown in Sidman Example 5 (21:25-40) is similar to injection molding, but since the liquid-like material is not being squeezed into a mold cavity, it is called extrusion. Sidman Example 5 makes a rod-shaped device by adding sufficient solvent to a dry blended drug-polymer mixture to make a "50% solids paste," placing this "moldable mass" in a steel compression mold having "a die cavity adapted to accept a screw-in die," and then "exerting moderate pressure on a plunger" to extrude the rods. The material is extruded into air or into a water bath (to cool it down if needed, not to coagulate it).

15. An ordinary artisan would also know that in the vernacular of polymer manufacturing, rods, beams, and pipes are extruded without much (if any) pulling or stretching, and this is one of their differentiating characteristics from extruded fibers. Thus, an ordinary artisan would also know film devices, plugs, rods, cylinders, tubes and the like are not fibers and that the shapes themselves are no indication of whether their structure can be made filamentous.

16. Martin's disclosure (Figs. 2-5, Fig. 9, 9:22-44:39) shows an ordinary artisan would have understood fibers are melt-spun, solution dry-spun, or solution wet-spun by extrusion from a spinneret head, and then pulled, stretched, conditioned, before being wound onto bobbins. In contrast, a rod is never wound onto a bobbin or take-up reel.

17. Further, consistent with the usage of the term in Dr. Nelson's patent, Martin's disclosure (Fig. 1A, 4:50-5:19, 9:14-21) shows ordinary artisans would have understood "fiber" to include "filaments, staple fibers formed therefrom and monofilament or multifilament fibers" and further would have understood that a fiber or "strand of fibers" could be woven, braided, or knitted in assembly with other fibers to form various patterns, a "fabric."

# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM and TISSUEGEN, INC., *Plaintiffs*, v. BOSTON SCIENTIFIC CORPORATION, *Defendant*. | ) | C.A. No. 1:18-cv-00392-GBW |

**DECLARATION OF WILLIAM G. PITT IN SUPPORT OF PLAINTIFFS' MINI-MARKMAN POSITION**

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: October 18, 2022:

William G. Pitt

I, William G. Pitt, Ph.D., hereby declare as follows:

1. I have been engaged on behalf of Board of Regents, The University of Texas System ("UTBOR") and TissueGen, Inc. ("TissueGen") (collectively, "Plaintiffs") to provide my opinions and to testify as an expert witness on various technical issues in the above captioned case. I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

2. **Attachment I** to this declaration is a true and correct copy of my Declaration of William G. Pitt, Ph.D. in Opposition to Defendant's Motion for Summary Judgment and *Daubert*. provided in this case.

3. **Attachment II** to this declaration is my Validity Expert Report of William G. Pitt, Ph.D. provided in this case.

4. The opinions set forth in my reports are true and correct to the best of my knowledge and belief, and I expect to testify regarding the opinions and statements set forth in my reports provided in this case if asked to do so.

5. Also, given and in response to Defendant's new claim construction theories and the Court's order setting a mini-Markman hearing concerning the meaning of the fiber claimed in the '296 patent, I make the following opinions and provide the following statements which are true and correct to the best of my knowledge and belief. If asked to do so, I expect to testify at trial in this case regarding the statements in the reports I submitted in this case and the statements I set forth in this declaration.

**Polymers**

6. A polymer is a type of matter in which the individual molecules making up the matter are long chains of atoms connected in what is called a polymer chain. Thus, a polymer is a collection of polymer molecules in a similar way to how water is a collection of water molecules. "Polymer" refers to the ensemble, and "polymer molecule" refers to an individual polymer molecule within the ensemble.

7. Many objects in our world are made of polymers, from plastic bags to super glue to foam cushions. Polymer is a material, just as glass, metal, or cotton is a material. To indicate that something is a "polymer fiber" is akin to indicating that something is a "leather bag" or a "metal cup." That is to say, "polymer fiber" is not a term of the art. A person skilled in the art ("POSA") would not understand the term "polymer fiber" to have any particular meaning other than to specify the material comprising the fiber. I am not aware of any dictionary, encyclopedia, or other scientific source relied on by experts in my field that defines a "polymer fiber."

**Polymer Molecules**

8. Polymer molecules differ from other types of molecules (water, sugar, oxygen molecules, etc.) in that they are very large molecules. Polymer molecules can be linear strings of atoms, branched strings of atoms, or even networks of atoms. The name "polymer" arises because they are made by the joining, usually end to end, of small molecules called monomers. The "mer" refers to the repeat unit: a monomer has one unit, a dimer has two units, a trimer has three units, and a polymer has many units. These repeated units connect to each other by special bonds known in organic chemistry. The linear connection of atoms down the length of a long polymer molecule is known as the backbone of the polymer. There are small side groups of atoms sticking out from this backbone. Sometimes, the backbone can branch into other polymer chains. [Jastrzebski, UT-BSC0027191 at 268-270]

**Biodegradable Polymers**

9. The subset of polymers generally known as non-biodegradable polymers most often have only carbon atoms in the backbone which makes them non-reactive with water. On the other hand, biodegradable polymers most often have other atoms such as oxygen and nitrogen in the backbone in addition to carbon atoms. For example, a biodegradable polyester such as poly(lactic acid) is composed of monomers that originally have one acid and one alcohol group at opposite ends of the monomer, which react with each other to form ester groups linking the monomers together. The reaction to form the ester groups links hundreds or thousands or more monomers together in a very long chain to form a polymer called a polyester. These ester bonds are strong, but they can be broken down over time by reaction with water molecules. This reaction turns the linking ester bond back into an unconnected acid group and an alcohol group and thus forms a break in the backbone of the polymer chain. More reactions with water create more breaks in the

Source: U.S. 6,596,296, Figure 4
(showing cross section of co-axial fiber)




*FIG. 4*

FIG. 4: Fibers can be coated to form co-axial fibers. FIG. 4 shows that a fiber may have multiple component coatings, with each component loaded with different therapeutic agents. The numerals **11–13** denote therapeutic agents.

Source: U.S. 6,596,296, Figure 3a




*FIG. 3a*

FIG. 3A and FIG. 3B: Fibers can provide the body with short term mechanical support in such applications as stents. FIG. 3A illustrates that a single polymer fiber can maintain the lumen of any tubular body, such as arteries, veins, or ducts. FIG. 3B illustrates that multiple polymer fibers can maintain the lumen of tubular bodies. The numerals **21–25** denote fibers loaded with therapeutic agents.

22. Thus, at the time of the '296 patent, or by way of it, at least the following solvent-based techniques could be used to make fibers taking on ribbon-like polymer shapes.

23. **Concentric coating.** This technique is described in columns 7:15-18,[iii] 9:10-42,[iv] and 20:8-32[v] (example 3) of the '296 patent and illustrated in Figure 4 (reproduced above). This technique shapes the fiber by taking advantage of the geometry of a preexisting substrate that already has the fiber format. A polymer solution is coated onto the outside of the pre-existing substrate. The substrate is then passed through the coagulation bath where the fiber forms from the coating as the polymer solution that coated the substrate has its solvent extracted.

24. **Dry spinning.** The technique involves forcing polymer solution through a spinneret. A spinneret is a plate with many small holes in it, like a shower head. As the solution exits the spinneret, air is used to evaporate the solvent away, leaving behind solid fibers that are collected on a take-up wheel. [Concise Encyclopedia at UT-BSC0002117].

25. **Wet spinning.** Wet spinning involves two solvents: one the polymer can dissolve into and another it cannot. A solution of polymer and first solvent is extruded into a bath of the

second solvent. As the first solvent diffuses into the second, there is less and less of the first solvent to keep the polymer dissolved. As a result, the fiber precipitates out of the solution into a solid polymer shaped in cross section generally like the extruded solution was shaped. [Concise Encyclopedia at UT-BSC0002117].

26. **Electrospinning.** Electrospinning is a procedure that does not use a spinneret. [Concise Encyclopedia at UT-BSC0002117]. In electrospinning, a tiny stream of polymer solution is produced by pulling charged, dissolved polymer from a metal orifice using electrical forces. The produced fibers form as the solvent evaporates during flight of the tiny stream toward a charged target (a surface with a very large voltage potential).

**Polymer Chain Orientation (Stretching)**

27. Generally, fibers produced by any of the above processes have no appreciable orientation in the polymer chains since fibers made from polymer solutions have negligible or no polymer chain alignment without subsequent stretching. This is because when the polymer chains are dissolved in the solvent, they have a random orientation. Dry spinning, wet spinning, and electrospinning have sufficient solvent present when the solution exits the orifice that the polymer chains quickly diffuse to a random conformation before the liquid column turns into a solid fiber. In dry spinning and electrospinning, the liquid column is in free fall in air as the solid fiber forms during solvent evaporation; there are no shear stresses imposed and entropy keeps the polymer conformations random as the solid fiber forms. In wet spinning, the liquid column moves through another liquid moving at about the same speed as the liquid column, which imposes no or negligible shear stress. With outward diffusion of the first solvent into the bath, a sheath of precipitated polymer forms on the exterior of the moving liquid; because the sheath moves at the same speed as the interior polymer solution and as the external liquid there are no shear stresses imposed and entropy keeps the polymer conformations random as they lock into place during

precipitation. Fibers made by dry spinning and wet spinning are pulled over rollers to a collecting bobbin. These are free turning rollers or wheels that move with the fiber and change its direction of travel, eventually going to the collecting bobbin. By definition, a solid fiber (or at least a solid outer sheath) has formed before the fiber encounters the first roller, because if it were still a liquid column it could not both change direction and be released from the roller toward the next roller. Thus, these fibers described above are formed before application of any orienting stresses.

28. If orientation in the fiber is desired, such alignment is done after the fiber is formed—that is, after the processes described above. The combination of friction on rollers and differential speed of rollers is one method to stretch the fiber in its axial direction. [Concise Encyclopedia at UT-BSC0002116-7]. **Stretching orients at least some of the polymer chain segments in the axial direction which increases tensile strength in that direction**. This may be useful for medical sutures but is not needed or may not be desirable for other applications, including many applications described in the '296 patent (e.g. drug delivery scaffolds and stents).

29. One of the most common methods of stretching a formed fiber is to pass an already formed solid fiber along a path of multiple windings on a first roller, through a spatial gap, and then along multiple windings on a second roller. The multiple windings provide sufficient friction that the fiber moves at the speed of the surface of the roller. To stretch the fiber, the surface of the second roller rotates at a rate faster than that of the first roller. Thus, the fiber must be moving faster at the second roller than at the first roller, and the only way for this to happen is that the fiber is forced to be stretched in the gap between the rollers.

30. The rate of stretching is controlled by the differential in the surface speed of the rollers and the distance between the rollers. Sometimes there are multiple stretching operations in sequence, which stretches the fiber in stages between rollers. In illustrations of fiber processing,

stretching operations are identified by sequential rollers or bobbins with multiple windings of the fiber around a roller or bobbin. Dr. Mooney has placed such illustrations in his reports. I reiterate that, as shown in Dr. Mooney's illustrations, stretching always happens after the fiber is formed. The stretching operation between rollers of different speed is also called drawing.

**The '296 Patent's Unoriented Fibers**

31. A POSA would understand from reading the '296 patent that the fibers formed in the coagulation fluids of Examples 1, 2, 3, 4 and 15 lack polymer chain orientation.

Examples 1-2, and 4

32. For instance, Example 1 of the '296 patent depicts the synthesis of a fiber without any sort of orientation introduced in the formation process. This is a wet spinning process. In a 10 wt% solution of PLLA in solvent, the polymer chains are in a random orientation. That is, the polymer is dissolved in much solvent, and the polymer chains are randomly oriented when the liquid solution passes into the coagulation bath.

33. Figure 8 of the '296 patent illustrates the wet spinning apparatus, and it is cited in Example 1. The liquid solution of polymer in solvent exits the needle in the downward direction on the left side of the pool of coagulation fluid – the coagulation bath.

34. The solvent A diffuses into the coagulation fluid (solvent B) and eventually diffuses away sufficiently to form a solid outer sheath of the fiber before the time that the liquid stream contacts the first roller in the lower left corner of the coagulation bath. My observations in my lab indicate that this takes 1 to 2 seconds. However, the relaxation of any orientation due to flow in the needle occurs in milliseconds or less from the exit of the needle. The chains have no net orientation by the time the sheath of solid polymer forms. This happens before the formed solid sheath of the fiber encounters the first roller in Figure 8 of the '296 patent.

35. If the material were still liquid at the first roller, the liquid would not turn a corner and proceed horizontally; but a fiber with a solid outer sheath would turn the corner. If a fiber were not yet formed at the first roller, the liquid would stick to the roller and drip downward into the bottom of the coagulation bath. Before reaching this first roller, the outer solid sheath of the fiber has formed. It is possible that the fiber is entirely solid at this point, or it is possible that liquid is still present in the interior. Either way, the fiber has a solid surface sheath allowing it to turn that corner and continue horizontally through the bath while more of solvent A diffuses from the interior of the fiber. A fiber with a solid surface sheath around a core of liquid emulsion is still a solid fiber with a hollow cross section.

36. Figure 8 shows a second roller in the lower right corner of the coagulation bath whose purpose is to turn the direction of the fiber upward toward the surface. There is a third roller above the liquid surface on the right side of the bath that turns the fiber toward the take-up spool or collecting bobbin.

37. Nowhere in this illustration of Figure 8 is there evidence of successive rollers turning at controlled and different speeds. These appear to be passive roller wheels that move by the friction of the fiber passing over them. The speed of the surface of the rollers is controlled by the speed of the collecting bobbin. It would be highly unusual to submerge electronically controlled rollers in the severe chemical environment of a coagulation bath. When stretching between adjacent roller of differential speed is done, it is usually done in an air environment that will not damage the motors controlling the rollers. Neither in Example 1 nor elsewhere in the '296 patent does it say that the rollers in Figure 8 are a stretching operation.

38. In Examples 2 and 4, the fiber formation process is the same, except that different polymer solutions or combinations of polymer solutions are used.

# ATTACHMENT I

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM and TISSUEGEN, INC., | ) | |
| *Plaintiffs*, | ) | C.A. No. 1:18-cv-00392 (MN) |
| v. | ) | |
| BOSTON SCIENTIFIC CORPORATION, | ) | |
| *Defendant.* | ) | |

**DECLARATION OF WILLIAM G. PITT IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUGEMENT AND DAUBERT**

I, William G. Pitt, Ph.D., hereby declare as follows:

1. I have been engaged on behalf of Board of Regents, The University of Texas System ("UTBOR") and TissueGen, Inc. ("TissueGen") (collectively, "Plaintiffs") to provide my opinions and to testify as an expert witness on various technical issues in the above captioned case. I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

2. Exhibit A to this declaration is a trued and correct copy of my opening Expert Report on infringement provided in this case.

3. Exhibit B to this declaration is a true and correct copy of my supplement to my opening expert report on infringement provided in this case.

4. The opinions set forth in my reports are true and correct to the best of my knowledge and belief and I expect to testify regarding the opinions and statements set forth in my reports provided in this case if asked to do so.

# EXHIBIT A

**SIGNATURE PAGE**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM; AND TISSUEGEN, INC., *Plaintiffs*, | ) | C.A. No. 1:18-cv-00392 (MN) |
| v. | ) | |
| BOSTON SCIENTIFIC CORPORATION *Defendant*. | ) | |

**EXPERT REPORT OF WILLIAM G. PITT, Ph.D.**

Signed April 1, 2022, in Provo, Utah

William G. Pitt

William G. Pitt, Ph.D.

## TABLE OF CONTENTS


Signature Page ..... 1

Table of Contents ..... 2

Relevant Qualifications ..... 3

Preliminary Understandings and Opinions Summary ..... 1

Technical Opinions ..... 2

I. The '296 patent ..... 2

II. Opinions Concerning Infringement by SYNERGY ..... 3

A. SYNERGY's Technical Characteristics ..... 3

B. The Court's Claim Constructions and Unconstrued Terms ..... 7

C. SYNERGY Infringes '296 Patent Claim 1 ..... 8

D. SYNERGY Infringes '296 Patent Claims 11, 12, 17, and 26 ..... 15

III. Opinions Concerning Differences Between SYNERGY and PREMIER ..... 16

IV. Opinions Concerning Miscellaneous Matters ..... 17

A. Strickler ..... 17

B. The Archer Stent Presentation ..... 18

Table A.T1 (Attachments) ..... 21

Table A.T2 (Appendix – Materials Considered) ..... 22

## RELEVANT QUALIFICATIONS

1. I, William G. Pitt, am currently the Harvey Fletcher Professor of Chemical Engineering (an endowed professorship) at Brigham Young University (BYU), in the Chemical Engineering Department, and an Adjunct Research Professor in the Biomedical Engineering Department of the University of Utah. I have at least 39 years of experience in the fields of biomedical engineering, materials science, polymer engineering, and drug delivery. I joined BYU as a faculty member in the Chemical Engineering Department in 1987 and was appointed Pope Professor of Chemical Engineering (an endowed chair) from 2007 through 2012. I earned a Bachelor of Science degree in Chemical Engineering from Brigham Young University (BYU) in 1983 and a Ph.D. in Chemical Engineering with a minor in Materials Science from the University of Wisconsin-Madison in 1987.

2. During my 35 years as a faculty member at BYU, I have taught in the areas of polymer engineering, biomedical engineering, materials science, and transport phenomena. My training and subsequent research in my own independent laboratory has been principally focused on polymeric biomaterials and drug delivery. My research includes, among other things, the development of new materials, techniques and methodologies to deliver therapeutics at controlled rates and to specific locations, and the applications of these technologies in the biomedical, pharmaceutical, and biological fields. My work applies principles of polymer chemistry and physics, chemical and mechanical engineering, molecular and cell biology, and biocompatible materials. I am a named inventor on nine U.S. patents. I have written over 169 peer-reviewed publications in various areas of science and engineering, including areas of drug and gene delivery, ultrasonic-enhanced drug delivery, polymer synthesis, polymer surface chemistry and modification, novel biomedical materials, blood-contacting polymers, biofilms, and the rapid separation of bacteria from blood, among other areas.

3. Throughout my career I have served on various boards and committees in the fields of biomedical engineering, materials science, polymer engineering, and drug delivery. For example, I have been an active member of the American Institute of Chemical Engineers since 1985, serving on several committees, and in 2016, I was elected as a Fellow of that Institute. I am also a member of the Society for Biomaterials, Controlled Release Society, and Society for Biological Engineering. Further, since 2004, I have served as a member of the Editorial Board of Journal of Biomaterial Science, Polymer Edition, which publishes fundamental research on the properties of polymeric biomaterials and the mechanisms of interaction between such biomaterials and living organisms, with special emphasis on the molecular and cellular levels. Since 2008, I have served as a member of the Editorial Board of Colloids and Surfaces B: Biointerfaces, an international journal devoted to fundamental and applied research on colloid and interfacial phenomena in relation to systems of biological origin, having particular relevance to the medical, pharmaceutical, biotechnological, food, and cosmetic fields.

4. Given my education, training, research, experience, and knowledge, which are more fully described in my curriculum vitae, I've been retained as an expert witness to provide my opinions on technical issues, such as patent infringement, technical characteristics of certain products, and what is shown by certain technical writings. I am being paid an hourly consulting rate ($400/hour) for my time spent working on this matter and am reimbursed for direct expenses. I have no personal interest in this litigation, nor any professional or financial connections to either party. In the last four years, I have testified at depositions on October 8, 2018 (Provo, UT) and December 20, 2019 (Dallas, Texas) in *Board of Regents, The University of Texas System, et al., v. Ethicon, Inc.*, et al.; and on

March 1, 2021 (Provo, UT) in *Board of Regents, The University of Texas System, et al., v. Boston Scientific Corporation.*

## PRELIMINARY UNDERSTANDINGS AND OPINIONS SUMMARY

5. Per the Amended Complaint [Dkt. 124 ¶¶ 1-2], Plaintiffs allege they are, respectively, the exclusive owner (UTBOR) and exclusive licensee (TissueGen) of U.S. Patent No. 6,596,296 ("'296 patent"), titled "Drug Releasing Biodegradable Fiber Implant," issued July 22, 2003, from an application (No. 09/632,457), filed August 4, 2000. The provisional application (No. 60/147,827) leading to the '296 patent was filed August 6, 1999.

6. Per the Amended Complaint [Dkt. 124 ¶¶ 46-62, 78-86, 87-91, 92-94], Plaintiffs allege that, with knowledge of the '296 patent, defendant BSC directly, indirectly, and willfully infringed claims 1, 11, 12, 17, and 26, by importing, selling, and actively encouraging sale and use of, certain drug-eluting stents that elute everolimus from an abluminal bioabsorbable PLGA polymer. The accused products are those authorized for the U.S. market under FDA PMA No. P150003 and supplements thereto (e.g. S003, S055, S058) and include products identified by UPNs in BSC-UTEX-00109825. I refer to all such accused products as "SYNERGY." But I understand BSC has marketed certain of the products under the trade name "SYNERGY XD" (e.g. P150003/S058). I understand SYNERGY XD introduced certain changes to the SYNERGY stent delivery system. [See e.g. BSC-UTEX-00135207, 262].

7. I am aware defendant BSC has marketed everolimus-eluting permanent polymer drug-eluting stents in the U.S. under the trade names "Promus PREMIER" (e.g. P110010/S096) and "Promus ELITE" (e.g. P110010/S154). I refer to all such products collectively as "PREMIER," although I understand ELITE introduced certain changes to the PREMIER stent delivery system.

8. In preparing the opinions set forth herein, I reviewed Plaintiffs' Original and Amended Complaint; the '296 patent; the Court's April 15, 2021 Markman Order; infringement claim charts; portions of BSC's FDA submissions; internal BSC studies, technical reports, and videos; deposition testimony; patent disclosures arising from work at BSC; and relevant portions of BSC's discovery answers, among other documents identified in the appendix of materials cited. I visually inspected SYNERGY and PREMIER specimens obtained from BSC.

9. In my opinion, an ordinary artisan in the fields of the '296 patent (medicine, tissue engineering) would possess a master's degree in chemistry, chemical or mechanical engineering, biochemistry, biomedical engineering, materials science, polymer science, or a similar discipline with two or more years of experience working with polymeric compositions, including some experience with biodegradable polymers and polymeric fibers. My opinions, as the knowledge and skill of an ordinary artisan, are informed as described in the following endnote.[1]

10. In my opinion, SYNERGY infringes '296 patent claims 1, 11, 12, 17, and 26. §§ II.

11. In my opinion, the only material difference between SYNERGY and PREMIER is the use of the '296 patent's technology. § III.

12. My opinions concerning certain technical disclosures are set forth in § V.

13. If asked, I may offer brief testimony concerning stents and how they are used.[2]

## TECHNICAL OPINIONS

### I. The '296 patent

14. The '296 patent is titled "Drug Releasing Biodegradable Fiber Implant"; and claim 1 recites such a composition that includes at least one biodegradable polymer fiber made up of two phases of material that are mixed but do not form a single phase in fiber:

> 1. A composition comprising at least one biodegradable polymer fiber wherein said fiber is composed of a first phase and a second phase, the first and second phases being immiscible, and wherein the second phase comprises one or more therapeutic agents.

15. The '296 patent [2:40-65, Abstract] explains such drug-loaded, phase-separated biodegradable polymer fibers are "capable of controlled delivery of therapeutic agents" and provide for "three-dimensional matrices" where "spatial and temporal distribution" of released therapeutics can be controlled based on "patterns of polymer fibers." The '296 patent [2:50-52] also calls such three-dimensional matrices "scaffold," "scaffold matrix," and "fiber-scaffold." As shown in Figure 1.F1 below, the '296 patent illustrates [Figs. 1, 2, 3a-b] examples of fiber matrices. The patent discloses the fiber format and fiber matrices can be useful in medical applications such as stents [Figs. 3a-b; 7:8-14, 8:26-31, 22:40-52; Example 7], where they may provide mechanical support [22:40-47] or simply serve as a drug delivery reservoir [22:48-51]. In addition to stents, the patent describes several other useful applications [e.g. Examples 6, 7, 9, 10, 11, 14, 17] for the fiber matrices of the invention.

Figure 1.F1




*FIG. 1*




*FIG. 3a*




*FIG. 3b*

16. The '296 patent also describes several examples for fabricating the biodegradable polymer fibers of the invention [Examples 1, 2, 3, 4, 15, 16]. As an initial matter, these examples teach core concepts about forming biodegradable polymer fibers without melt processing. Example 1 teaches that a biodegradable polymer can be formed by dissolving polymer in a solvent and then removing sufficient amounts of solvent from the liquid polymer mixture while it is holding the shape of a fiber. For example, fiber formation is identified where once-dissolved polymer chains solidify holding the shape of a fiber, as solvent is extracted from a solvent-polymer mixture. Example 3 teaches that fibers can be formed on pre-existing substrates by causing a liquid polymer solution to hold the shape of a fiber on the substrate and then removing sufficient amounts of solvent.

17. The fabrication examples teach core concepts for making the biodegradable polymer fibers of the invention without melt processing techniques. At a conceptual level, the examples teach

# EXHIBIT 10

Case 1:18-cv-00392-GBW Document 250-2 Filed 11/02/22 Page 282 of 431 PageID #: 10828

# CONCISE ENCYCLOPEDIA OF POLYMER SCIENCE AND ENGINEERING

UT-BSC0002097

**Table 11. Typical Properties[a] of Fibrous Electrical Insulation Materials[b]**

| Material | Specific gravity | Thickness, mm | Elongation, % | Tensile strength, MPa[c] |
|---|---|---|---|---|
| *Inorganic* | | | | |
| asbestos paper (with no binder) | 0.72 | 0.088 | | 0.90 |
| glass cloth (with epoxy resin) | 1.3–1.45 | 0.12–0.25 | 2.3 | MD: 110–250 |
| | | | 2.4 | CD: 66–131 |
| *Organic* | | | | |
| cellulosic, standard kraft paper | 0.68–1.35 | 0.25 | 3.5 | MD: 90–145 |
| | | | 7.5 | CD: 19–55 |
| aramid paper | 1.01 | 0.25 | 21 | |
| (calender, no binder) | | | 18 | |
| polyester paper (with epoxy resin) | 1.5 | 0.38 | 24 | MD: 46 |
| | | | 5–24 | CD: 30 |
| laminates (mat/film/mat) | 0.97 | 0.25 | 42 | |
| | | | 46 | |

[a] Not for establishing specifications.
[b] Source: published product data and DuPont test results.
[c] To convert MPa to psi, multiply by 145.

of electronic signals over metal wires, but optical fibers have many other uses based on their unique ability to transmit light. For example, they are used in decorative objects and signs.

**Electronics.** Fibers are making substantial contributions to the miniaturization of electronic computer components. A printed-circuit or wiring board (PCB or PWB) functions primarily as an electrically insulating substrate on which various electrical or electronic components (resistors, capacitors, integrated circuits, etc.) are mounted, connected by relatively thin copper lines. PCBs eliminate bulky wiring, increase reliability of circuitry and interconnections, and provide miniaturization advantages. PCBs, mostly composites, are found in computers, telecommunications equipment, and electronics for military, automotive, industrial, and consumer uses. Table 10 compares properties of the three reinforcing fibers that are generally recognized as meeting the requirements for use in rigid printed-circuit boards.

**Electrical Insulation.** Inorganic fibers used for electrical insulation are asbestos and glass. Predominant synthetic fibers are polyesters and aromatic polyamides (aramids).

In most cases, fibers are used in fabricated form such as woven or nonwoven fabric or paper with or without resin impregnation. There are endless variations and combinations of fibrous, film, and resin systems. Table 11 compares the important properties of selected fibrous electrical insulation materials in their most widely used form.

### BIBLIOGRAPHY

*Geotextile Engineering Manual*, Federal Highway Administration/National Highway Institute, 1984.

D. Annis and co-workers in E. Chiellini and P. Giusti, eds., *Polymers in Medicine*, Plenum Publishing Corp., New York, 1983.

D. Tanner, A. K. Dhingra, and J. J. Pigliacampi, *J. Met.* 38(3), 21 (1986).

*Analysis of the Market for PWB's and Related Materials for the Year 1982*, Institute for Interconnecting and Packaging of Electronic Circuits, 1982 Program of the Technology/Marketing Research Council, 1982.

Ashok K. Dhingra
Herbert G. Lauterbach
E.I. du Pont de Nemours & Co., Inc.

## FIBERS, INORGANIC.

See Inorganic fibers.

## FIBERS, MANUFACTURE

Polyester, nylon, acrylic, polypropylene, and viscose fibers are today the principal commodity products (see also Polyamides, fibers; Polyesters, fibers; Olefin fibers). Various higher priced specialty fibers are manufactured on a smaller scale. These include the elastane (spandex) fibers, which possess elastomeric properties, and the aramid fibers, which possess high strength and modulus or high chemical and flame resistance (see also Fibers, engineering; Fibers, elastomeric).

Man-made fibers, which include those made from natural organic polymers as well as synthetic organic polymers, are mostly produced by a process of extrusion through fine holes that is known as spinning, a word derived from and still applied to the formation of yarns from fibers of any kind. Since the natural polymers and their derivatives undergo decomposition at or below their melting points, they can be converted into a form suitable for spinning only by dissolution. Consequently, the two processes for extruding polymer solutions, known as wet and dry spinning, were developed well before the third process, melt spinning.

Usually the product obtained from the spinning process is not directly suitable for commercial use. If the polymer has undergone little or no orientation during extrusion, the resulting fiber is relatively weak or undergoes irreversible extension. In such cases the filaments are stretched or drawn immediately after extrusion or as a separate operation to increase tensile strength. They may then be subjected to further operations, according to the final usage. Thermal setting and thermal relaxation processes provide dimensional stability;

twisting and interlacing provide interfilament cohesion; texturing provides a voluminous yarn; crimping and cutting provide staple products similar in length and processing behavior to natural fibers.

Continuous-filament yarn, which consists of a small number of roughly parallel, continuous, individual filaments of unlimited length held together by a slight twist or by intermingling, is usually packaged as a tube or cone. Staple fiber is made up of a very large number of discontinuous, randomly oriented, individual fibers normally shipped in a box or bale. It is usually subjected to a series of processes, culminating in textile spinning to yarn. The precursor of staple fiber is tow, which consists of a large number of roughly parallel, continuous filaments. It is converted by cutting or breaking into staple fiber or directly into a top or sliver, intermediate stages between staple fiber and yarn. In the latter case the filaments remain parallel.

Substantial amounts of fiber are also sold as monofilament, which is a single filament yarn of substantially greater diameter than those present in continuous filament and staple yarn, and as tapes, fibrillated tapes, and slit-film products. In addition, certain types of so-called nonwoven fabric are directly formed from continuous filaments without isolation of a yarn. Products of this type include melded and spun-bonded fabrics.

Individual polymers and the fibers derived from them are dealt with in other articles in this Encyclopedia (see also FIBERS; POLYAMIDES, FIBERS; POLYESTERS, FIBERS). Polymers of natural origin that have been converted into fibers by manufacturing processes include cellulose (derived mainly from wood pulp), which is the source of cupro, viscose, modal, acetate, and triacetate fibers; alginic acid from seaweed, used to spin alginate fibers; and arachin, zein, and casein, from peanuts, maize, and milk, respectively, and soya-bean protein, which have each been the basis of protein-fiber manufacture. Synthetic polymers for fiber production are made by melt, solution, and suspension techniques; addition and condensation polymerization; chain-growth and step-growth processes; free-radical, anionic, and cationic mechanisms; and homogeneous and heterogeneous methods. Continuous polymerization processes are then used to produce polymers for commodity fibers. Many synthetic fibers are based on copolymers that contain units introduced to modify physical or chemical properties such as dyeability, solubility, or flame retardancy.

### Spinning Processes

The most commonly used spinning processes are melt spinning, dry spinning, and wet spinning.

***Melt Spinning.*** Melt spinning was developed in the late 1930s for nylon-6 and nylon-6,6 and is now used for several fibers, including polyamides, polyesters, and polyolefins. In this process molten polymer is forced by an extruder or gear pump through the fine holes in a spinneret and solidified by passage through cool air to a driven roll that draws the fibers away from the face of the spinneret (Fig. 1).

***Dry Spinning.*** In dry spinning, a polymer solution is extruded from a spinneret through a zone in which the solvent is rapidly evaporated, leaving filaments that are wound up at speeds up to about 1000 m/min (Fig. 2).

***Wet Spinning.*** In wet spinning, a polymer solution is extruded from a spinneret into a nonsolvent that coagulates (ie, precipitates) the polymer (Fig. 3). In some cases, such as the viscose process, both the solution and the precipitation stages involve chemical reaction. Conventional wet spinning is by far the slowest in linear velocity of the principal processes, but since it permits very short distances between the holes in the spinneret face, a single spinneret may carry a very large number of holes. Hence, the productivity from a single spinning position may be very high.




**Figure 1.** Typical melt-spinning arrangement.

Other types of fiber-forming process include: reaction spinning; dispersion, emulsion, and suspension spinning; fusion-melt spinning; phase-separation spinning; and gel spinning.

Numerous techniques for producing fibers without using a spinneret have been devised, including centrifugal spinning, electrostatic spinning, and tack spinning.

### Fiber-orientation Processes

Processes for manufacturing fibers usually convert an isotropic polymer into a highly anisotropic form. The macromolecules are constrained, resulting in main chains more nearly parallel to the axis of the fiber. The more closely the chains parallel the axis, the more highly oriented the fiber is said to be.

Yarns and tows are usually drawn to orient them by stretching them between two rolls or two sets of rolls. The individual filaments thus extend irreversibly to several times their original length. The ratio of the stretched length to the unstretched length, which is controlled by the ratio of the surface speeds of the rolls, is known as the draw ratio. In many cases heat is applied to the filaments just before or during stretching in order to facilitate the process.

In recent years, modified spinning processes that introduce orientation into the yarns at the extrusion stage have been developed for some fibers. In the case of melt-spun fibers this is achieved by using very high wind-up speeds. Some of these




**Figure 2.** Typical dry-spinning arrangement.

processes provide a partially oriented yarn, which requires only a small draw ratio to complete the orientation, whereas others provide a fully oriented yarn directly without further drawing.

### Twisting and Intermingling

Continuous-filament yarns that lack cohesion between filaments serve poorly in textile manufacturing operations because of their tendency to form a ribbon over surfaces such as guides and because individual filaments may become sufficiently separated from the rest to snag and break. Traditionally, cohesion is provided by introducing twist into the filament bundle. Conventional up-twisting and down-twisting processes, as practiced generally in the textile industry, are frequently applied to filament-yarn production. In draw-twisting, the drawing stage is integrated sequentially with down-twisting. Introduction of true twist by methods such as this is slow and expensive and for many products has been replaced by the much faster process of draw-winding. The most important method of introducing cohesion into draw-wound yarns is intermingling, which employs air jets to produce turbulent zones in which individual filaments in a yarn are slightly interlaced. Intermingling is sometimes used as an ancillary to other processes such as draw texturing, where it creates yarn cohesion and also generates specialty products such as heather yarns. Here two or more yarns are combined in the intermingling jet (comingling). When filament yarns of higher twist or folded yarns are required, the two-for-one twisting technique is employed.

### Textured Yarns

The extruded and drawn synthetic yarns consist of straight and parallel filaments. Texturing introduces permanent distortions, crimp, loops, coils, or crinkles without destroying the essential continuity of the filaments. This improves the texture of the yarns and extends their range of applications.

Some texturing processes also introduce stretch properties. The most important texturing processes for continuous-filament yarns are false-twist texturing, air-jet (entanglement) texturing, stuffer-box texturing and jet texturing (using hot air or steam in the jet). The first two are usually applied to relatively light yarns for apparel use, and the last two to heavier yarns for carpets and upholstery. False-twist texturing is almost invariably combined with drawing, sometimes sequentially, but more often in the process known as simultaneous draw texturing in which drawing and texturing processes are carried out within the same zone.

### Tow, Top, and Staple Fiber

Tow for staple fiber manufacture passes after drawing through a number of ancillary processes, which may include washing,




**Figure 3.** Typical wet-spinning arrangement: A, solution vessel; B and F, filters; C, feed vessel; D, heat exchanger; E, metering pump; G, spinneret; H, spin bath containing coagulant; I, haul-off roll.

# EXHIBIT 11

COWANS CAMP

JASTRZEBSKI

# THE NATURE AND PROPERTIES OF engineering materials

Second Edition

SI Version

### Plasticizers

Plasticizers are materials that are added to polymeric materials to increase their plasticity and flexibility. Plasticizers range from solvents with high boiling points to nonvolatile oils and resinous materials. There are three general types of materials used as plasticizers: (1) vegetable oils (nondrying type); (2) monomeric chemicals of high boiling points; and (3) polymeric resinous materials of low molecular weight. The action of plasticizers is considered to be the weakening of the intermolecular forces between macromolecules. This results in greater freedom of movement of the polymeric macromolecules, increasing the flexibility and plasticity of the material but, at the same time, reducing its tensile strength and chemical resistance. The effect of plasticizers is to lower $T_g$ of amorphous polymers and to decrease the degree of crystallinity of crystalline polymers. The amount of plasticizers added controls the final properties of plastics. For example, PVC is produced as rigid nonplasticized, rigid partially plasticized, and flexible rubbery-type polymer. The most widely used plasticizers are various phthalates.

### Fillers and Reinforcing Agents

In order to counteract the weakening effect of the plasticizer, fillers and various reinforcing agents are added. Fillers improve the strength, impact resistance, heat resistance, dimensional stability, and other similar properties of the polymer. The quantitative aspect of the reinforcement effects of various fillers and fibers is discussed in Chapter 14.

### Stabilizers and Other Additives

Stabilizers are added to prevent decomposition or deterioration of the polymer under the action of light, atmosphere, and other possible external environmental factors. For example, the addition of carbon black, which is also a very effective filler, to polyethylene resin prevents photochemical degradation of the material by excluding light. Antioxidants are a special kind of stabilizers that prevent or inhibit the oxidation of the polymeric resin. Such additives are usually compounds (phenols, aromatic amines, aminophenols, aldehydes, and ketones) that show preference for reacting with oxygen in the air. Other additives used are antistats, blowing agents, colorants, organic peroxides, and flame retardants.

### Flame Retardants

Most polymers in their pure form, except poly(tetrafluoroethylene), polyimides, melamine-formaldehyde, and some other aromatic high-temperature resistant polymers, are affected by flame. However, the number of self-extinguishing polymers is much larger and includes chlorinated polyethers, nylons, polyphenyl oxides, polycarbonates, polysulfones, and silicones. In order to increase the flame retardancy of a given polymer a



UT-BSC0027303

Appx010602

number of additives are used. These may be antimony compounds, various phosphorous compounds, chlorinated phosphates, and polyphosphonates. Halogenated paraffins have been widely used in industry for years. Other inorganic compounds such as aluminum trihydrate, ammonium sulfamate, barium metaborate, and zinc borates are also frequently used.

### Crosslinking Agents

When compounding thermosetting resins, curing or crosslinking agents are used that can be added to the molding powder or to the resin just before its final form or application. Compounding of various rubbers is accomplished similarly, but in addition to the above ingredients with variable proportions, crosslinking or vulcanizing agents with accelerators and catalysts must always be added to carry out the required degree of crosslinking.

## 10-17 FORMING OPERATIONS

In most forming operations the polymer is subjected to intensive shearing and stressing, usually at molten or nearly molten states. This results in the deformation and orientation of the polymer chains, imparting to the polymer a specific molecular configuration and morphology of the final product. This is particularly strongly marked during spinning, drawing, blowing, and rolling processes, which produce fibers and films. Most forming operations, especially molding, extrusion, and casting involve melting or softening the polymer by heating it to such a temperature at which it will flow usually through a narrow nozzle under pressure to fill the cavity of the mold. At such conditions, most polymeric resins are highly viscous materials having viscosities between $10^3$ and $10^8$ Pa·s, depending on the temperature and pressure. Furthermore, the presence of fillers and other additives may considerably affect the rheological characteristics of the polymer melts. Usually, polymer melts behave as pseudoplastic materials whose viscosity decreases rapidly with increasing shearing rate. Furthermore, they exhibit viscoelastic behavior that becomes more and more pronounced on gradual cooling of the polymer during molding or extrusion operations. During the polymer flow, the whole polymer chains cannot slide over one another completely, but movement occurs by segmental motion. The movement of the entire chain length is restricted because of numerous entanglements between the chains.

### Molding

Molding is our most widely used forming operations; it involves injection molding, blow molding, compression molding, and transfer molding. Many of the problems that arise during molding, especially injection molding, are caused by the rapid changes of the volume and the density of the polymer with pressure and temperature. The increase in density with decreasing temperatures at constant pressure results in considerable shrinkage of the polymer which, in some cases, may result in cracks and imperfections in the

molded article. Furthermore, this also gives rise to the strains within the body that will adversely affect the mechanical properties and heat resistance of the polymer. To counteract the natural thermal shrinkage occurring on cooling of the polymer from its melt temperature to room temperature, injection molding is usually carried out at as high a pressure as practically feasible. This is because the density of the polymer increases with pressure. When the molding pressure is released, the polymer will tend to expand according to relation

$$\beta = -\frac{1}{V}\left(\frac{\partial V}{\partial P}\right)T \qquad (10\text{-}58)$$

where $\beta$ is the compressibility factor, $V$ is the specific volume of the polymer, and $P$ and $T$ are the pressure and temperature, respectively. For all substances the volume decreases with increasing pressure; hence the compressibility factor is always a positive quantity.

However, the effect of molding pressure on crystalline polymers in reducing thermal shrinkage is much less than in amorphous polymers. This is because crystallization occurring on cooling from the molten state results in much denser material than the amorphous one, causing considerable volume changes. Thus even very high injection pressure cannot prevent excessive shrinkage of the crystalline polymers. The increasing pressure increases the packing density of the polymer chains and favors crystallization at higher temperatures than that for lower molding pressures.

Another cause of strains in the molded article is due to the orientation of the polymer molecules during its flow into the mold and through the orifice. On cooling in the cold mold this orientation of the chains becomes frozen; furthermore, a nonuniform cooling of the polymer within the mold also contributes to frozen strains. For example, in thick molding, a stiff outer skin may be formed, while the interior is still fluid. Since the polymer in the interior will subsequently solidify, it will set up stresses in the outer skin. The presence of frozen strains frequently results in the development of a multitude of very small, almost infinitesimal platelike cracks on the surface of the plastic. This phenomenon is called crazing; it may also occur as the result of tensile load acting on the plastic for a long time. Another effect of the presence of frozen strains is a lowering of the distortion temperature of the plastic.

### Extrusion

In the extrusion process, the polymer is continuously forced along a screw through a region of high temperature and pressure where it is melted and compacted and then forced through a die, shaped to give the final article. At the entry to the die the polymer melt is subjected to rapidly changing deformation rates. The energy imparted to the material during the deformation is not only used up to cause the polymer to flow, but some part of it is stored as the elastic energy. This causes normal stresses in the material,

which will subsequently relax during the flow of the polymer through a die. When this relaxation occurs after the material has left the die, the swelling of the extrudate occurs and surface irregularities result. This phenomenon, known as the Tordello's effect or melt fracture, is due to the recovery of the elastic shear strain in the exit region. To avoid this swelling, the relaxation time of the extruded polymer should be less than its residence time during the flow in the die. This can be controlled by decreasing the rate of flow through a die, increasing the length of a die, or increasing the polymer temperature in the die.

#### Rolling and Drawing

During drawing or rolling operations, the resultant deformation consists of (1) the instantaneous elastic deformation caused by the distortions of the bond angle and bond stretching; (2) the molecular alignment, which involves mobilization of the whole chains or their segments or plastic deformation in the crystallites; and (3) the nonrecoverable viscous flow.

The orientation can be predominantly uniaxial or biaxial but, in general, the orientation appears to be a combination of the two. In uniaxial orientation a polymer is stretched in one direction. For example, during the drawing of fibers, the polymer chains align in the direction of stretching.

Orientation can be accomplished by cold drawing and hot drawing. Cold drawing of the polymers is carried out below its annealing temperature. Cold drawing, as compared to hot drawing, requires considerable expenditure of energy to produce desired deformation; it results in the residual or internal stresses, which may be subsequently removed by annealing.

Some fiber-forming polymers can be cold-drawn in the form of ribbons or fibers to many times of their original length. The process quite similar to stretching the rubber (with nylon a 400% extension is possible before breaking occurs). In a molecular sense, drawing is a flow process, similar to rubber-elastic stretching, in which a parallel orientation of the polymer chains and the chain segments occurs until the chains are so interlocked (because of crystallization) that a further gliding past each other becomes impossible. However, even before drawing, there is some crystallization. Hot drawing refers to the deformation of crystalline or semicrystalline polymers at temperatures between the annealing temperature and the melting point as, for example, in polyethylene, at around 80°C. However, hot drawing, which involves both simultaneous annealing and hardening rates, does not produce significant residual stresses.

Hot drawing imparts to the polymer a high degree of crystal orientation, and it is a preferred method for producing commercial fibers and films because high deformation rates could be obtained. Rolling through compression rollers is similar in some respect to the hot- and cold-drawing operations. If the polymer is rolled below its annealing range or if it is deformed very rapidly, residual stresses will be present.

Orientation of the amorphous polymer is carried out above its glass-transition temperatures where polymer chains have sufficient mobility to disentangle and align themselves in a preferred direction. Below $T_g$, in its glass state, the polymer fractures in a brittle manner during orientation.

### Strengthening Effect

The strengthening of the polymer through the predeformation is phenomenologically identical to the strain hardening observed and utilized in metals. The strain at which hardening sets in depends on the actual polymer. This occurs only when a substantial amount of orientation hardening has taken place and, consequently, at characteristic necking strains. This indicates that such differences are due to some structural features of the polymer. For example, necking strains are: PVC 0.4 to 1.5, polycarbonate 2.24, polystyrene 3.5, nylon 2.8 to 3.5, and polyethylene 8 to 10.

## 10-18 MOLECULAR ORIENTATION AND MORPHOLOGY

Deformation of a polycrystalline film results in an orientation of both crystalline and noncrystalline (amorphous) regions with respect to the deformation direction. As the polymer is deformed, spherulites change from a spherical to a spheroidal shape. When the spherulites are deformed, the substructure of crystalline and noncrystalline regions reorient. As the deformation continues, crystal reorganization proceeds by the process of lamellar slip, orientation, and separation, until the crystal lamellae in all regions of the spherulite become aligned with their helix axis direction nearly parallel to the deformation direction. Further extension of the polymer results in a new deformation mechanism, crystal cleavage. The substructure is no longer spherulitic but has evolved into a fibrillar structure.

It has been a well-established fact that orientation of the polymer enhances its tendency for crystallization as, for example, crystallization of natural rubbers. Thus, on stretching, the stiffness and the strength of the polymer in the stretch direction is increased about 25 times of the original value. However, in the direction perpendicular to the stretch direction, the oriented polymer is weak and tends to split. This behavior is of little importance in fibers where stress is usually applied in one direction but, in films, more uniform proproperties are required. This is achieved by stretching the film in two directions at right angles to each other so as to orient the molecules randomly within the plane.

### Films

The rate of cooling and the degree of stretching determine the structure and final properties of the produced film. Rapid cooling results in very fine spherulites or amorphous regions, depending on the nature of the polymer. This gives a hazy appearance to the film. The film then may undergo further



UT-BSC0027307

crystallization and increase the size of spherulites, which may make it opaque.

The phenomenon of the retractive force caused by stretching of the polymers is used in production of the shrinkable films. The films are biaxially stretched and then used for package. Then, on application of heat, the retractive forces relax, causing shrinkage of the film that will tightly fit the package material. Such films may exhibit shrinkage up to 20%. Much greater shrinkage and stronger films for packaging can be obtained by irradiation. The film is irradiated so that a certain degree of crosslinking is produced. The film is then heated and stretched biaxially, cooled, and rolled up. Then such a film is used for the packaging and, after wrapping, it is again reheated. This causes relaxation of stresses and return to its original dimensions at the time of irradiation. The shrinkage may be as high as 70% but, usually, the films of average shrinkage from 30 to 50% are produced.

### Fibers

A fiber is defined as a unit of matter having a length at least 100 times greater than its width or diameter. A filament, on the other hand, is an individual strand of continuous length. In order to impart to the polymer fibers desirable mechanical characteristics, drawing is performed after spinning. A draw ratio (or drawing conditions) is selected according to the properties of the polymer and desired properties of the fiber. If fiber that was essentially unoriented is drawn to different tensions at 80°C, two processes occur; (1) the noncrystalline chains become oriented, and (2) crystallization occurs. The noncrystalline chains seem to decrease in orientation with increasing temperature by an amount of shrinkage. At high temperatures, a high draw ratio can be obtained because the crystallites fracture under the combined action of heat and stress. Actually, spherulites also fracture during cold drawing but, at this temperature, they do not have a chance to align themselves. An increase in temperature results in an increased crystallinity of the fiber. The natural draw ratio is not affected by strain rate. Young's modulus is determined more by molecular orientation than by the number of interlamellar ties. The modulus increases with the draw ratio. For high tensile strength, high draw ratios (about 6 to 10) are used. After drawing, cold drawn fibers are usually annealed in order to increase their crystallinity and to remove the residual stresses within the fiber.

## 10-19 ANNEALING

In all forming processes polymers are subjected to many conditions that cause internal stresses and frozen strains. This adversely affects the physical properties, heat resistance, and thermal stability of polymers. To eliminate or reduce these defects, polymeric materials are subjected to annealing. At present only the amorphous thermoplastic polymers undergo commercial annealing if high quality of the object such as dimensional stability, optimum

strength, and heat resistance are required. Thermosetting polymers are usually not annealed.

Annealing is carried out by heating the plastic object to a temperature just below its glass transition temperature, soaking it for a suitable time, and subsequently slowly cooling to room temperature. During annealing, the chain mobility increases so much that the highly strained macromolecules can relax almost completely and the relaxation of internal stresses and frozen strains occur according to the Maxwell relation (see Equation 7-70):

$$\sigma=\sigma_0 e^{-t/T_{rel}} \tag{10-59}$$

Figure 10-8 illustrates the changes in the specific volume of an amorphous polymer with temperature for different cooling rates. We can see that for




**FIGURE 10-8** Specific volume-temperature curves for an amorphous polymer. Curve *Q* results from quenching, curve *S* from slow (equilibrium) cooling. $T_g$ and $T_g'$ are the glass transition temperatures of the polymer on quenching and slow cooling, respectively. *DE* represents the volume change on annealing the quenched polymer at the annealing temperature $T_a$, which is only slightly below the glass-transition temperature $T_g$. Points *B* and *C* represent the specific volumes at room temperature $T_r$ on quenching and slow cooling, respectively. (From *Annealing* by Z. D. Jastrzebski, *Encyclopedia of Polymer Science and Technology*, Vol. 2, p. 140, edited by H. Mark, John Wiley & Sons, Inc., New York, 1966.)

# Exhibit 18

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM and TISSUEGEN, INC., *Plaintiffs*, v. BOSTON SCIENTIFIC CORPORATION, *Defendant.* | ) | C.A. No. 1:18-cv-00392-GBW |

**REBUTTAL DECLARATION OF DAVID J. MOONEY, PH.D.**
**IN RESPONSE TO PLAINTIFFS' NEW CLAIM CONSTRUCTIONS AND**
**IN SUPPORT OF BOSTON SCIENTIFIC'S CONSTRUCTION OF "POLYMER FIBER"**

I, David J. Mooney, Ph.D., hereby declare as follows:

## I. INTRODUCTION

1. I have been engaged on behalf of Boston Scientific Corporation to provide my opinion and to testify as an expert witness concerning the meaning of "polymer fiber" in U.S. Patent No. 6,596,296 ("the '296 Patent") in the above-captioned case. I have specifically been asked to provide an opinion responding to Dr. Pitt's Declaration in Support of Plaintiffs' Mini-Markman Position ("Pitt CC Decl.") and Plaintiffs' Answering Brief Stating Plaintiffs' Mini-Markman Position ("Answering Brief") dated October 18, 2022, which set forth new constructions for "biodegradable polymer fiber"/"polymer fiber" and a new revised construction for "fiber" to which I have not previously had the opportunity to respond.

2. I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

12. Regardless of which definition of a POSA applies, I qualified as a POSA as of August 6, 1999. In addition, my opinions are the same under either definition of a POSA.

## IV. RELEVANT LEGAL STANDARDS

13. I am not a lawyer, but I have been informed of several legal standards that guide the claim construction process.

### A. General Claim Construction Principles

14. I understand that claim terms are generally understood to have the ordinary and customary meaning that a POSA would have attributed to them in the context of the claim language and specification. Accordingly, I understand that claim terms are not read in a vacuum and that the meaning of the claim terms is determined in view of the specification. I understand that the specification is generally considered to be the best guide regarding the meaning of a claim term.

15. I understand that the prosecution history is also instructive regarding the meaning of a claim term.

16. I understand that the specification and prosecution history are commonly referred to as the intrinsic evidence.

17. I further understand that, in addition to the intrinsic evidence (i.e., the specification and the prosecution history), extrinsic evidence such as expert testimony, dictionaries, and treatises can be instructive regarding the meaning of a claim term so long as it is not inconsistent with the intrinsic evidence.

### B. Indefiniteness

18. I understand that patents are presumed to be valid under 35 U.S.C. § 282 and, therefore, a construction should not render a claim invalid or meaningless unless it is the only claim construction that is consistent with the claim's language and the written description. I

understand that the same principles that govern claim construction apply to the determination of whether allegedly indefinite claim language is subject to construction. I understand that a patent is not invalid for indefiniteness unless its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

## V. OPINIONS

### A. The Term "Polymer Fiber" Is A Well-Known Term To A POSA

19. As previously explained in my Rebuttal Report, in my opinion a POSA would have understood a "polymer fiber" to mean "a thread-like or filamentous polymer structure with a number of characteristics, including independent structural integrity, an aspect ratio of greater length than width, and a common orientation of the polymer molecules." (Rebuttal Report, ¶ 96.)

20. Contrary to Dr. Pitt's opinion that "polymer fiber" is not a term of art (Pitt CC Decl. at ¶ 7), "polymer fiber" is a term of art that is well known to a POSA. (Callister, William D., Material Science and Engineering: An Introduction, Seventh Edition, John Wiley & Sons, Inc., 2007 ("Callister") [BSC-UTEX-00292249] at 568 ("In wet spinning, the fibers are formed by passing a polymer-solvent solution through a spinneret directly into a second solvent that causes the polymer fiber to come out of (i.e., precipitate from) the solution"); Azimi, B., Nourpanah, P., Rabiee, M., & Arbab, S. (2014). Poly (lactide -co- glycolide) Fiber: An Overview. Journal of Engineered Fibers and Fabrics ("Azimi") [BSC-UTEX-00292169] at 50 ("The difference in properties observed between a 7.5 w/v% fiber and an 8 w/v% fiber was due to macro structural changes in the polymer fiber.").) Consistent with my opinion that "polymer fiber" has meaning to a POSA, the abstract of the '296 Patent uses the term "polymer fiber" and the term is used many

times throughout the invention summary. (*See, e.g.*, '296 Patent at Abstract, 2:48, 2:60, 7:10, 7:12, 7:33-34, 9:1, 10:41, 17:8.)

21. As previously discussed in my Rebuttal Report, a POSA would understand that different structures can be made with polymers, such as films, coatings, and fibers. (*See* Rebuttal Report, ¶¶ 38-40.) A POSA would further understand that these different structures have different characteristics. As discussed in my Rebuttal Report, a POSA would understand that a polymer fiber is characterized, at least in part, by: independent structural integrity, an aspect ratio of greater length than width, and a common molecular orientation of the polymer molecules. (*See id.*, ¶¶ 26-27, 61, 96.)

### B. The '296 Patent Only Describes Processes That Would Impart Molecular Orientation To The Claimed Fiber

22. As a preliminary matter, I note Dr. Pitt admits that when a "force creates a high shear in the [polymer solution] fluid, the polymer chains on average may attain some orientation in the direction of the stress[.]" (Pitt CC Decl., ¶ 16.) In addition, Dr. Pitt agrees with me that as a foundational principle, "[s]tretching orients at least some of the polymer chain segments in the axial direction which increases tensile strength in that direction." (*Id.*, ¶ 28.)[1] It also appears that Dr. Pitt agrees with my opinion that stretching (drawing) can be accomplished through the use of rollers. (*Id.*, ¶¶ 29-30.) But, Dr. Pitt opines that the '296 Patent Examples do not describe "[s]tretching (a/k/a drawing)" during formation of the disclosed polymer fibers, and therefore

[1] To illustrate an example wet spinning process involving stretching of a polymer fiber, I reproduced a figure from the Encyclopedia Britannica in my Rebuttal Report that Dr. Pitt addresses in paragraph 43 of his new declaration. (*See* Pitt CC Decl., ¶ 16.) However, Dr. Pitt's characterizations of that figure are inaccurate. A POSA would know that the entire illustrated process involves the making of a fiber, and that stretching (or drawing) is occurring throughout, including over the roller as shown in the "spin bath." (*See* Rebuttal Report, ¶ 33.) The polymer chains of the fiber being formed in that image are already being oriented in the "spin bath" via shear stress during extrusion from the spinnerette and stretching over the roller.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM and TISSUEGEN, Inc.<br><br>Plaintiffs,<br><br>v.<br><br>BOSTON SCIENTIFIC Corp.<br><br>Defendant. | Civil Action No. 18-392-GBW |

Stamatios Stamoulis, STAMOULIS & WEINBLATT LLC, Wilmington, Delaware; Michael W. Shore, Alfonso G. Chan, Chijioke E. Offor, SHORE CHAN DEPUMPO LLP, Dallas, Texas; Brian D. Melton, John P. Lahad, Corey M. Lipschutz, SUSMAN GODFREY LLP, Houston, Texas

*Counsel for Plaintiffs*

Brian E. Farnan, Michael J. Farnan, FARNAN LLP, Wilmington, Delaware; Chad Drown, Timothy E. Grimsrud, Katherine S. Razavi, Lauren J.F. Barta, FAEGRE DRINKER BIDDLE & REATH LLP, Minneapolis, Minnesota; David J.F. Gross, FAEGRE DRINKER BIDDLE & REATH LLP, East Palo Alto, California; Christopher J. Burrell, FAEGRE DRINKER BIDDLE & REATH LLP, Washington, D.C.; Melissa A. Anyetei, James R. Ferguson, Michael J. Word, MAYER BROWN LLP, Chicago, Illinois

*Counsel for Defendant*

**MEMORANDUM OPINION**

November 17, 2022
Wilmington, Delaware

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

Plaintiffs TissueGen, Inc. ("TissueGen") and the Board of Regents, the University of Texas System (collectively, "UT") allege that Defendant Boston Scientific Corp.'s ("BSC") "Synergy" brand coronary stents (the "Accused Products") infringe claims 1, 11, 12, 17, and 26 (the "Asserted Claims") of U.S. Patent No. 6,596,296 ("the '296 patent"). D.I. 124 ¶¶ 1–3, 79. Before the Court is BSC's renewed request for claim construction as to "polymer fiber." D.I. 200 at 13; D.I. 243 at 7. The Court has considered the parties' joint claim construction brief, D.I. 245, and held a *Markman* hearing on November 7, 2022 ("Tr. __"). For the reasons below, the Court declines to construe "biodegradable polymer fiber"; construes "fiber" rather than "polymer fiber"; and construes "fiber" as having its plain and ordinary meaning to a person of ordinary skill in the art ("POSA"), which is "a thread-like structure of any length or shape."

## I. BACKGROUND

On November 20, 2017, UT filed suit against BSC for infringement of the '296 patent and an additional patent no longer at issue. D.I. 1 at 1; D.I. 56 at 1. On April 15, 2021, the Court announced four agreed upon constructions (*) and two disputed constructions:

| Term | Construction | Citations ('296 Patent) |
|---|---|---|
| "first phase"* | "the polymer portion of the fiber" | Claims 1, 11, 12, 16, 17, & 26 |
| "second phase"* | "the discrete drug-containing regions dispersed throughout the fiber" | *Id.* |
| "immiscible"* | "incapable of dissolving into one another" | *Id.* |
| "fiber" | plain and ordinary meaning | *Id.* |
| "the first and second phases being immiscible" | not indefinite; plain and ordinary meaning | *Id.* |
| "radioactive agent"* | "an agent that pertains to, exhibits, or is caused by an element that spontaneously emits radiation resulting from changes in the nuclei of atoms of the elements" | Claim 12 |

D.I. 90 at 1–2. As to the "fiber" term, the Court provided the following explanation of its ruling:

> I agree with [UT] that "fiber" need not be construed beyond its plain and ordinary meaning. The patent uses the term fiber repeatedly throughout and used the term according to its plain and ordinary meaning. The fibers described can be different lengths including very short. [(*See, e.g.*, D.I. 1-1 at 6:63–7:14, 7:24–32; *id.* at Figs. 1, 2, 3A, 3B, 6, 7).] They may be, but need not be, woven into support structures[,] [(*See, e.g.*, *id.* at 8:41–45)][,] and may be used as drug delivery reservoirs with metal stents, [(*See, e.g.*, *id.* at 22:40–51 (ex. 7))][,] or they may be attached directly to vessel walls or tacked down in the eye[,] [(*See, e.g.*, *id.* at 23:31–54 (ex. 10))]. These fibers may be made by various solvent exchange methods. [(*See, e.g.*, *id.* at 17:36–19:36 (ex. 1), 19:37–20:5 (ex. 2), 20:6–36 (ex. 3), 25:13–31 (ex. 15), 25:32–49 (ex. 16)).]
>
> [BSC] does not disagree with any of that. Instead, [BSC] contends that I should construe fiber because the parties have raised a dispute regarding the scope of the claim. As I probed the issue today during argument, it seemed like the real dispute is not over whether a fiber is threadlike as in [BSC]'s proposed construction, but rather whether the term "fiber" can encompass what [BSC] says is a coating. As I understand the issue based on what I have before me, that does not appear to be an issue of claim construction but rather is an issue of fact as to whether a coating that covers some structure can itself be a fiber that must also meet the other requirements of the claim fiber. If, however, it turns out that I'm wrong about that and[,] as the record develops[,] [it] really is a claim construction dispute, [BSC] can raise the issue again in connection with summary judgment briefing to the extent appropriate.

D.I. 90 at 5–6.

On September 17, 2021, UT filed the operative complaint, UT's First Amended Complaint for Patent Infringement (D.I. 124, the "Complaint"). On August 30, 2022, BSC filed its Answer to the Complaint, denied UT's infringement allegations, and asserted defenses and counterclaims of invalidity for, among others, lack of written description. D.I. 238 at 23–25.

On June 14, 2022, BSC filed a Motion for Summary Judgment of Noninfringement. D.I. 198. In its briefing on that motion, BSC argued that "the developed record . . . has clearly revealed that there is a dispute between the parties as to the meaning of the term 'polymer fiber' and not just its factual application." D.I. 200 at 13 (cleaned up). UT argued that the Court need not construe "fiber" because "[b]oth parties agree that a fiber must have a high aspect ratio and a

small cross-section" and because BSC was asking "the Court to import new limitations" into the definition of "polymer fiber." D.I. 214 at 15. On October 6, 2022, the Court denied BSC's summary judgment motion because "the parties have a genuine dispute of material fact regardless of how the Court would construe the term 'fiber' or 'polymer fiber' . . . ." D.I. 243 at 7. However, the Court explained, "[s]ince BSC continues to insist that the Court's prior claim construction of plain and ordinary meaning was incorrect, the Court will treat BSC's briefing here as a motion for claim construction as to the term 'polymer fiber.'" D.I. 243 at 7.

BSC argued in its summary judgment briefing that

> [t]he accused [BSC] Synergy stents are composed of (1) a platinum chromium metal stent having a number of linked, serpentine rings, and (2) a drug-eluting biodegradable coating that is applied to the outside (abluminal) surface of the metal stent. The biodegradable coating includes a polymer (poly-lactic-co-glycolic acid ("PLGA")) and a drug (everolimus). As shown, the coating applied to the Synergy stents includes "PLGA-rich domains" and "drug-rich domains." When it is applied to the metal stent, the coating solution includes the drug everolimus, the polymer PLGA, and solvents.

D.I. 200 at 9 (citations omitted). UT did not dispute that description. D.I. 214 at 8 (explaining that "there is no true dispute" regarding those characteristics of the Accused Products).

"Polymer fiber" and "biodegradable polymer fiber" appear only in Claim 1 of the Asserted Claims:

> 1. A composition comprising at least one *biodegradable polymer fiber* wherein said *fiber* is composed of a first phase and a second phase, the first and second phases being immiscible, and wherein the second phase comprises one or more therapeutic agents.

D.I. 1-1 at 27:54–29:14 (emphases added).

BSC argues that a POSA "would understand the claimed 'polymer fiber' to have its ordinary and customary meaning of "a thread-like or filamentous polymer structure that at least includes common orientation of the polymer molecules." D.I. 245 at 1. UT responds that "[a]

[POSA] reading the '296 patent in 1999 would have understood the claimed 'biodegradable polymer fiber' means 'a fiber capable of releasing drug slowly, in a controlled manner over time as the polymer breaks down chemically and mechanically in animal or human tissue.'" D.I. 245 at 5. UT adds that a "fiber" is "a three-dimensional format having a small cross section and length much greater than its width." D.I. 245 at 15. BSC responds that the Court should decline to construe "fiber" or "biodegradable polymer fiber" because UT's request failed to comply with the Court's order as to this *Markman* hearing. D.I. 245 at 13.

## II. LEGAL STANDARDS

"'[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citation omitted); *Aventis Pharms. Inc. v. Amino Chemicals Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) (same). "[T]here is no magic formula or catechism for conducting claim construction." *Phillips*, 415 F.3d at 1324. The Court is free to attach the appropriate weight to appropriate sources "in light of the statutes and policies that inform patent law." *Id.* The ultimate question of the proper construction of a patent is a question of law, although "subsidiary factfinding is sometimes necessary." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 326–27 (2015) (citing *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996)).

"The words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history."[1] *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed.

[1] "Strictly speaking, the specification includes both the written description and the claims. In common parlance, however, 'specification' is used to refer only to the written description component of a patent." Tun-Jen Chiang & Lawrence B. Solum, *The Interpretation-Construction Distinction in Patent Law*, 123 Yale L.J. 530, 538, n.17 (2013). The Court will endeavor to use "written description" where intended in the "Discussion" section of this Memorandum Opinion.

Cir. 2012) (citing *Phillips*, 415 F.3d at 1312–13); *Unwired Planet, LLC v. Apple Inc.*, 829 F.3d 1353, 1358 (Fed. Cir. 2016) (similar). The "'only two exceptions to this general rule'" are (1) when a patentee defines a term or (2) disavowal of "'the full scope of a claim term either in the specification or during prosecution.'" *Thorner*, 669 F.3d at 1365 (citation omitted).

The Court "'first look[s] to, and primarily rel[ies] on, the intrinsic evidence,'" which includes the claims, written description, and prosecution history and "'is usually dispositive.'" *Personalized Media Commc'ns, LLC v. Apple Inc.*, 952 F.3d 1336, 1340 (Fed. Cir. 2020) (citation omitted). "[T]he specification ' . . . is the single best guide to the meaning of a disputed term.'" *Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*, 811 F.3d 1334, 1340 (Fed. Cir. 2016) (citation omitted). "'[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess.' When the patentee acts as its own lexicographer, that definition governs." *Cont'l Cirs. LLC v. Intel Corp.*, 915 F.3d 788, 796 (Fed. Cir. 2019) (quoting *Phillips*, 415 F.3d at 1316). However, "'[the Court] do[es] not read limitations from the embodiments in the specification into the claims.'" *MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307, 1310 (Fed. Cir. 2017) (citation omitted)). The specification "is not a substitute for, nor can it be used to rewrite, the chosen claim language." *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004).

The Court "should also consider the patent's prosecution history, if it is in evidence." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370; *Cont'l Cirs.*, 915 F.3d at 796 (same). The prosecution history may "'demonstrat[e] how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution . . . .'" *SpeedTrack, Inc. v. Amazon.com*, 998 F.3d 1373, 1377 (Fed. Cir. 2021) (quoting *Phillips*, 415 F.3d at 1317).

The Court may "need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 574 U.S. at 331. "Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980; *Phillips*, 415 F.3d at 1317 (same). Extrinsic evidence may be useful, but it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Cont'l Cirs.*, 915 F.3d at 799 (internal quotation marks and citations omitted). However, "[p]atent documents are written for persons familiar with the relevant field . . . . Thus resolution of any ambiguity arising from the claims and specification may be aided by extrinsic evidence of usage and meaning of a term in the context of the invention." *Verve, LLC v. Crane Cams, Inc.*, 311 F.3d 1116, 1119 (Fed. Cir. 2002); *see Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 899 (2014) (explaining that patents are addressed "to those skilled in the relevant art").

## III. CONSTRUCTION OF DISPUTED TERMS

The Court construes "fiber" rather than "polymer fiber." The Court finds that "fiber" takes its plain and ordinary meaning to a POSA, which is "a thread-like structure of any length or shape." The Court declines UT's request that it construe "biodegradable polymer fiber" as untimely and unnecessary.

### A. Construction of "Fiber"

BSC argues that "polymer fiber" is "a term of art with a well understood meaning." D.I. 245 at 11. UT counters that the invention describes a "fiber format" and that "'polymer fiber' is not a term of art . . . ." D.I. 245 at 5. The Court finds that it should construe "fiber."

Claim 1 claims a "composition comprising at least one biodegradable polymer *fiber* where said *fiber* is composed . . . ." D.I. 1-1 at 27:54–55 (emphases added). Claim 2 claims the

composition of Claim 1 wherein the "second phase is derived from . . . a hydrogel or polymer[,]" and Claims 3 and 4 claim the composition of Claim 1 "where said fiber" either "forms a scaffold" or "is woven . . . with other fibers . . . ." D.I. 1-1 at 27:59–65. The claims, thus, clarify that the relevant structure is a "fiber," while "polymer" describes a material used to create a "fiber." *See* D.I. 1-1 at 29:15–30:7 (independent claims with "fibers," not "polymer fibers").

The written description supports this understanding. The '296 patent regularly invokes a "biodegradable polymer fiber." *See, e.g.*, D.I. 1-1 at 2:44, 4:33, 4:59, 5:13–14, 5:23–25. It also separately defines "biodegradable" as "over time it will break down both chemically and mechanically." D.I. 1-1 at 1:49–51. Thus, the patent modifies "fiber" with "biodegradable," a term with its own meaning in the art. The patent uses "biodegradable," *see, e.g.*, D.I. 1-1 at 1:10–11 (implants), 4:52 (polymer), 10:5–6 (polymer matrices), and "polymer," *see, e.g.*, D.I. 1-1 at 1:42 (scaffold), 2:23 (matrix), 3:50 (layers), similarly, to modify nouns aside from "fiber." Thus, "polymer" also has an independent meaning in the art. *See also* D.I. 1-1 at 9:64–10:9 (giving "examples of a class of biodegradable polymer matrices that may be used in this invention"). Lastly, the '296 patent clarifies that polymer fibers' capability for "the controlled delivery of therapeutic agents" over time, D.I. 1-1 at 2:44–45, is not a characteristic of the "polymer fiber," but, rather, follows from the use of different polymer types, therapeutic agents, and coatings in the invention, *see, e.g.*, D.I. 1-1 at 2:63–65 (controlling "[t]emporal distribution" with "polymer composition"), 9:10–35 (using polymer coatings with different release kinetics).

The Court finds that it should construe "fiber." UT asks that the Court construe "fiber" to take its ordinary meaning. UT first argues that the ordinary meaning of "fiber" is "[a] volume of matter having a small cross section and a length at least 100 times greater than its width or diameter[.]" D.I. 245 at 5. However, after BSC explained that UT's expert, Dr. William Pitt,

contradicted UT's proposal, D.I. 245 at 13; *see also* D.I. 246-22 ¶ 31(e) (opining that, where the "length-to-width ratio" exceeds "50[,]" the "polymeric compositions fit the definition of fiber, in the plain and ordinary definition"), UT argued that "'fiber' is a term of art understood as a three-dimensional format having a small cross section and length much greater than its width[,]" D.I. 245 at 15. BSC takes issue with any "meaning of polymer fiber limited to a single characteristic of shape . . . ." D.I. 245 at 13. For the reasons below, the Court finds that the plain and ordinary meaning of fiber to a POSA is "a thread-like structure of any length or shape."[3]

**i. Intrinsic Evidence**

The Court "'first look[s] to, and primarily rel[ies] on, the intrinsic evidence . . . , which is usually dispositive.'" *Personalized Media Commc'ns*, 952 F.3d at 1340 (citation omitted). While the '296 patent describes some thread-like embodiments, it does not define "fiber."

BSC argues that "[t]he '296 patent consistently describes a polymer fiber as being a 'strand,' a 'filament,' or a 'monofilament.'" D.I. 245 at 2 (citing D.I. 1-1 at 8:51–58, 17:55–57). The written description explains that one illustrative embodiment is a "Three Dimensional Fiber Matrix." D.I. 1-1 at 8:32. To make the matrix, "therapeutic agents are encapsulated into individual fibers of the matrix"; in that embodiment, "filaments could be formed into a unique scaffold that provides a growth substrate for tissue repair" and "it is possible to incorporate strands that will induce the formation of blood vessels into the fabric." D.I. 1-1 at 8:51–58. The nouns "filament" and "strand" do not appear in the specification outside of this single

[3] UT has previously conceded the potential advantages of a construction of "fiber" as "thread-like." During the first *Markman* hearing, the Court proposed to construe "fiber" as "threadlike, but . . . [it] is not imputing any particular size, length . . . ." D.I. 89 at 8:13–16. UT, by way of its counsel, responded that the Court's proposal "would make sense" but expressed concern that the Court was reading an unnecessary "limitation into the claims." D.I. 89 at 8:17–21; *see also* D.I. 89 at 10:12–15 ("[The Court's proposed definition of "threadlike"] does give . . . a vision of the structure that you're looking at. . . . [But] we do not believe that it is an accurate depiction.").

embodiment. In one of 17 examples of "preferred embodiments of the invention[,]" the written description explains that a POSA should create an "aqueous emulsion" of two solutions, and it gives a specific ratio that is "most typical for monofilament [poly(L-lactic acid)] fibers." D.I. 1-1 at 17:26, 17:55–57. The word monofilament does not recur anywhere else in the specification. Additionally, the word thread appears nowhere in the '296 patent.

BSC further points out that "[t]he figures of the '296 patent [] show polymer fibers as thread-like or filamentous structures, where the fibers are labeled numerals 21–28[.]" D.I. 245 at 2. BSC points in its briefing to Figures 1, 2, and 3a. D.I. 245 at 2. The written description explains that each figure shows fibers arranged either in scaffolding or so as to support a "tubular body," such as an artery or vein. D.I. 6:63–7:14. The figures show the fibers as independent thread-like strands:




FIG. 1




FIG. 2




FIG. 3a

D.I. 1-1, figs. 1, 2, 3a. UT argues that Figure 4 rejects a "thread-like" requirement because it shows "discrete drug-containing phase regions . . . dispersed in the cross section of a polymer of a fiber [] formed by 'coating' the outside of a core fiber" rather than a fiber that "look[s] like a thread." D.I. 245 at 9 (citations omitted). Figure 4 "shows that a fiber may have multiple component coatings, with each component loaded with different therapeutic agents." D.I. 1-1 at 7:15–19. The written description further teaches that "fibers can be coated, forming co-axial fibers as shown in FIG 4. Each coating can be of a different polymer material . . . . The coating

can also be physically divided into multiple sections . . . ." D.I. 1-1 at 9:10–19. However, the patent clarifies that such a "coated fiber" is only one fiber, not multiple fibers. *See* D.I. 1-1 at 9:23–26. Thus, Figure 4 fails to support the assertion that a fiber need not be thread-like.

UT pointed to Example 3 at oral argument as evidence that the '296 patent affirmatively disclaims any requirement that a fiber be thread-like. *See* Tr. at 44:7–45:11. Example 3 explains that a single fiber may have "concentric coatings" applied to it that are made of different polymers and that contain different therapeutic agents. D.I. 1-1 at 20:10–36. It nowhere suggests that the coatings, themselves, are polymers. *See* D.I. 1-1 at 20:31–32 (distinguishing between "the core fiber" and "the coating polymers"). Example 3 explains that an artisan may form "fibers with any desired cross-sectional shape[,]" D.I. 1-1 at 20:29–32, and the Court agrees with UT, Tr. at 44:7–19, that the Court should clarify for jurors that a "fiber" can take any shape. However, Example 3 fails to support the assertion that a fiber need not be thread-like.

The written description and claims of the '296 patent both would support a thread-like structure and do not disclaim a requirement that a fiber be thread-like. However, the '296 patent does not define fiber, *see* D.I. 1-1 at 2:50–4:51 (defining terms), and it does not answer whether a "fiber" must be thread-like, which is the real dispute between the parties, *see* D.I. 245 at 4 (asserting that a "fiber" must be "thread-like"), 8 (arguing that nothing "in the art or record require[s]" that a "fiber" be thread-like or a filament). Here, "resolution of [the] ambiguity arising from the claims and specification may be aided by extrinsic evidence of usage and meaning of a term in the context of the invention." *Verve*, 311 F.3d at 1119.

The intrinsic evidence does not support that a "fiber" must have common orientation of the polymer molecules. UT argues that the patent's process for "making polymer fibers . . . necessarily provide[s] molecular orientation of the polymers." D.I. 245 at 3. The '296 patent

does not include the words "common" or "orientation" and does not include the phrase "polymer molecules." *See* D.I. 1-1. However, the parties' equally-credible experts disagree as to whether any of the '296 patent's embodiments lack common molecular orientation. *Compare* D.I. 246-9 ¶ 32 ("Example 1 of the '296 patent depicts the synthesis of a fiber without any sort of orientation introduced in the formation process."), *with* D.I. 246-18 ¶ 22 ("I disagree with Dr. Pitt's ultimate opinion . . . . In my opinion, the '296 Patent Examples uniformly describe processes that draw or stretch the polymer during the formation of the fiber, which would then necessarily impart common molecular orientation. . . .").

The Court also considers the prosecution history. BSC argues that it would be appropriate to read restrictions in Example 1 of the '296 patent into Claim 1. BSC asserts that

> the [written description] describes making polymer fibers using standard extrusion processes that, through drawing and stretching, necessarily provide molecular orientation of the polymers. [(Citing BSC's expert)]. Example 1 of the '296 patent—which the patentee identified as the ***only*** written description support for Claim 1 [(citing the prosecution history)]—describes a process in which a polymer is "drawn" and "extruded" into a fiber [(citation omitted)]. Indeed, the patent's "apparatus for fabrication of polymer fibers" illustrated in Figure 8 shows polymers being extruded and drawn . . . .

D.I. 245 at 3 (emphasis in original); *see* D.I. 246-6 at 32–36 (including the text of Example 1 on pages 27–31); D.I. 246-6 at 53 ("Support for [what is now Claim 1] can be found at pages 28 and 29 of the Specification . . . ."). UT does not appear to respond directly to this argument. However, at this Court's original *Markman* hearing, BSC explained that "[o]ur construction is not limited to any manufacturing method[,]" D.I. 89 at 11:25–12:1; *see also* D.I. 89 at 29:11–12, and BSC reiterated that before the Court, Tr. at 52:8–16 ("We're not saying the method of manufacturing in and of itself is a limitation."). As a result, the Court cannot assume that "standard extrusion processes" are the only means to create a fiber (or, more specifically, a fiber

of polymer). Thus, the Court finds that the intrinsic evidence does not require—but also does not disclaim—common molecular orientation of the fiber.

The intrinsic evidence does, however, show that a fiber may be any shape or length. For example, one embodiment teaches fibers "cut to pre-specified lengths," D.I. 1-1 at 19:67, and Figures 1, 2, and 3a, shown above, display fibers of varying lengths, D.I. 1-1 at figs. 1, 2, 3a. As explained above, Example 3 describes "certain embodiments" in which fibers may be formed "with any desired cross-sectional shape." D.I. 1-1 at 20:29–32. Thus, a construction that limits a fiber to a particular shape or length would be inconsistent with the written description of the '296 patent. The intrinsic evidence also shows that fibers may, but need not be, woven into three-dimensional "scaffolding" to support cell and tissue growth. *See, e.g.*, D.I. 1-1 at 8:41–58. Fibers can be used "to deliver drugs at the placement site" of a metal stent without providing "any mechanical support[,]" D.I. 1-1 at 22:40–51, and can be attached to an existing structure, such as a blood vessel, D.I. 1-1 at 23:31–54. The patent promotes the variety of applications which fibers may support.

**ii. Extrinsic Evidence**

The Court finds as a factual matter that a POSA would have understood the plain and ordinary meaning of "fiber" to be "a thread-like structure of any length or shape." The parties do not contest that Dr. Pitt and Dr. David Mooney, BSC's expert, are both POSAs. D.I. 246-9, Attachment I, Ex. A ¶¶ 1–4 (explaining that Dr. Pitt has a Ph.D. in chemical engineering and experience with polymers and drug delivery); D.I. 246-18 ¶¶ 4–9 (explaining that Dr. Mooney has a Ph.D. in chemical engineering and experience with polymers and drug delivery); *see also* D.I. 246-18 ¶¶ 10–11 (describing minimum requirements for a POSA).

Dr. Mooney opines that "[a] 'polymer fiber' refers generally to a threadlike or filamentous structure made of polymer that has been drawn and/or pulled such that the polymer

chains generally have a common longitudinal orientation . . . ." D.I. 246-2, Ex. 1 ¶ 26. Dr. Mooney insists that "polymer fiber," rather than "fiber," is the proper term of art at issue, but Dr. Mooney explains that, in a polymer fiber, "the polymers have been stretched and/or pulled such that the polymers . . . have an independent, filament or thread-like structure." D.I. 246-2, Ex. 1 ¶ 134. Thus, a "fiber" would also be "thread-like," since the stretching and pulling of the polymers makes them into fibers. Dr. Mooney similarly said that a "fiber" being "threadlike" was "consistent with" his own opinion. D.I. 246-2, Ex. 1 ¶ 31.

BSC and UT disagree as to whether Dr. Pitt has similarly opined that a fiber is thread-like. *See* D.I. 245 at 11, 16. In *Board of Regents v. Ethicon*, C.A. No. 17-1084-LY, UT alleged that Defendant Ethicon "practice[d] claims of the '296 patent[,]" the same patent that is at issue here. No. 17-1084, D.I. 93 ¶¶ 2, 5. In Dr. Pitt's Rebuttal Expert Report, dated November 25, 2019, Dr. Pitt explained that Attachment B "set forth opinions concerning the knowledge of an ordinary artisan, including my opinion that an ordinary artisan would have known that . . . most [polymers] can be made into useful films . . . , but only a few can be made into useful fibers." D.I. 246-7 at 5. In Attachment B, Dr. Pitt gave the following opinion:

> An ordinary artisan would have known that of the many different types of polymers, most can be made into useful films or used to make molded articles, but only a few can be made into useful fibers. An ordinary artisan would have understood that ***fibers*** (at least before they are cut) ***are long, threadlike monofilament and multifilament structures*** that are spun by extrusion through a spinnerets or very fine holes, drawn, stretched (to provide molecular orientation), and possibly annealed (to enhance dimensional stability and/or biological performance) to obtain the mechanical properties desired. An ordinary artisan would also know that forming or spinning a fiber by extrusion may involve melt spinning, dry solution spinning, or wet solution spinning. An ordinary artisan would have known that a fiber can be woven, knitted, or braided alone or in combination with other fibers to form fabrics for various medical applications.

D.I. 246-7 at 6 (emphases added). Dr. Pitt argues that his opinions were taken out of context. Dr. Pitt explains that "[t]he context" of his statement was "a discussion of the Choi '709 patent in

which a polymer film is simply cast by pouring a polymer solution containing two solvents and one polymer into a mold and drying it." D.I. 246-9, Attachment I ¶ 38. Dr. Mooney—who was also defendant's expert in *Ethicon*—had opined that the '296 patent was obvious because of the "Choi" patent, and Dr. Pitt responded that the "Choi" patent had not taught the "fiber forming process" described in the '296 patent. *Id.* ¶¶ 38–39. Dr. Pitt argues that he was elucidating certain operations that could be performed on polymers to make them into "useful fibers" and that he never opined that "such additional operations were required for the fiber to remain a fiber that meets the other limitations of the claims." *Id.* ¶¶ 39–40. "None of these words were used as requirements or limitations on 'the plain and ordinary definition of fiber'" since they were pulled from embodiments. *Id.* ¶ 40.

The Court does not find Dr. Pitt's distinction meaningful. First, Dr. Pitt argues that he was using terms from the '296 patent, *Id.* ¶¶ 39–40 ("I used words from Examples in the '296 patent . . . ."), but Dr. Pitt describes "fibers" as "thread-like" even though "thread" never appears in the '296 patent, *see* D.I. 1-1. Second, Dr. Pitt opined that an "ordinary artisan would have understood that *fibers* . . . are long, threadlike" even though he referred to "useful fibers" in the sentence prior. D.I. 246-7 at 6 (emphasis added). The use of "fibers" just after "useful fibers" suggests either that Dr. Pitt did not find important the distinction between "fibers" and "useful fibers" in the context of the '296 patent or that Dr. Pitt intended a distinction and, thus, spoke of all fibers, not just useful fibers, when he explained that fibers "are long, threadlike monofilament and multifilament structures . . . ." *Id.* Both interpretations undermine Dr. Pitt's argument. Third, Dr. Pitt could still have provided a definition of "fiber" in the context of an anticipation opinion in *Ethicon*. Dr. Pitt attests before this Court that the "fiber forming process" of the '296 patent rendered it non-obvious over the "Choi" reference in *Ethicon*. D.I. 246-9, Attachment I ¶¶

38–39. UT argued before the Court in *Ethicon* that "Choi does not disclose or teach an ordinary artisan a 'fiber' that includes the claimed second phase." No. 17-1084, D.I. 131 at 6. Thus, the Court reads Dr. Pitt's opinion as defining "fiber" as used in the context of the '296 patent.

One reading of Dr. Pitt's opinion is that it described only one (albeit preferred) process to make a "fiber" in the '296 patent, rather than opining as to all fibers that the '296 patent claims. As UT argued in *Ethicon*, Dr. Pitt opined that "fiber fabrication of the type described in UT's '296 patent" is difficult. No. 17-1084, D.I. 131 at 6–7. However, the Court finds it substantially more likely that Dr. Pitt sought to opine on the definition of "fiber" as used throughout the '296 patent. Dr. Pitt argued that a major innovation of the '296 patent was the creation of a fiber with discrete drug-containing regions (i.e., the "second phase"), and that argument supported the distinction between the '296 patent's drug-containing fiber and the "Choi" patent's drug-containing film. *See* No. 17-1084, D.I. 131 at 6–7. Thus, the Court finds as a factual matter that Dr. Pitt defined "fiber" as used in the context of the '296 patent in the *Ethicon* case.[4]

The Court finds as a factual matter that both Dr. Mooney and Dr. Pitt agree that a "fiber," as understood by a POSA in the context of the '296 patent, means a "thread-like structure." The Court recognizes that Dr. Pitt in *Ethicon* also opined that "fibers . . . are stretched (to provide molecular orientation) . . . ." D.I. 246-7 at 6. Dr. Mooney's opinion is similar. *See* D.I. 246-2, Ex. 1 ¶ 26. However, Dr. Pitt described stretching as part of a process of manufacturing such

[4] The Court's conclusion finds further support in UT's references elsewhere in *Ethicon* to a "fiber" as "thread-like." *See* No. 17-1084, D.I. 160-1 at 3 (describing in proposed *voir dire* questions "[a] major issue in this case" with reference to "a thread-like polymer fiber"); D.I. 160-3 at 2 (explaining in *voir dire* that "[t]he '296 patent generally relates to implantable thread-like polymer fibers"); D.I. 160-12 (explaining in proposed jury instructions that "[t]he patent-in-suit generally relates to implantable thread-like polymer fibers"); *see also* No. 17-1084, D.I. 41 (describing the "benefits" of the fiber "format" to include "that fiber filaments or strands can be woven" (cleaned up)).

fibers (along with, e.g., extrusion), D.I. 246-7 at 6, and Dr. Mooney uses similar terminology, D.I. 246-2, Ex. 1 ¶ 65 ("[A] POSA would understand the '296 Patent's disclosure that the polymer has been 'drawn' or 'extruded' into a fiber as necessarily imparting the fiber with a common orientation of the polymer molecules."). BSC has stated multiple times before this Court that it does not limit its construction to a method of manufacturing. *See* D.I. 89 at 11:25–12:1, 29:11–12; Tr. at 52:8–16. The experts otherwise disagree as to whether a "fiber" necessarily has a common molecular orientation. *Compare* D.I. 246-9 ¶ 27 ("[F]ibers produced by any of the above processes have no appreciable orientation in the polymer chains . . . ."), *with* D.I. 246-18 ¶ 25 ("[A] POSA would understand that a claimed fiber that has been 'drawn and extruded' would necessarily have common molecular orientation." (citation omitted)). Therefore, the Court will not effectively import a manufacturing process into the definition of "fiber" based on extrinsic evidence alone by requiring that the fiber have a common orientation.

Two qualified POSAs agree that the ordinary meaning of "fiber" to a POSA, in the context of the '296 patent, is a thread-like structure, and the intrinsic evidence clarifies that such a structure may be of any length or shape. Therefore, the Court construes "fiber" to take its plain and ordinary meaning to a POSA, which is "a thread-like structure of any length or shape."

**B. UT's Request to Construe "Fiber" and "Biodegradable Polymer Fiber"**

UT asks that the Court construe "biodegradable polymer fiber" to mean "[a] fiber capable of releasing drug slowly, in a controlled manner over time as the polymer breaks down chemically and mechanically in animal or human tissue[.]" D.I. 245 at 5.

The Court declines to construe "biodegradable polymer fiber" because UT's request that the Court do so is untimely. The Court issued its claim construction Memorandum Order in this case on April 15, 2021. D.I. 90. Therein, the Court explained that, if the parties' dispute as to the construction of the term "fiber" "really is a claim construction dispute, [BSC] can raise the

issue again in connection with summary judgment briefing to the extent appropriate." D.I. 90 at 6. UT did not at that time move for reargument to ask that the Court now construe a new term. *See* Del. Loc. Civ. R. 7.1.5(a). Per the Court's direction, BSC raised construction of "polymer fiber" (rather than of "fiber") in its June 14, 2022 opening brief for summary judgment of noninfringement. *See* D.I. 200 at 13. UT did not request that the Court construe the term "biodegradable polymer fiber" in its responsive briefing. *See* D.I. 214 at 17 ("Assuming *arguendo*, the Court adopts [BSC]'s proposed construction of 'polymer fiber,' which it should not, summary judgment is still unwarranted."). Instead, UT waited until October 26, 2022 to first request that the Court construe "biodegradable polymer fiber." D.I. 245 at 5. Thus, the Court declines to construe the term because UT's request for claim construction is untimely. Additionally, UT's failure to even mention the term "biodegradable polymer fiber" in its Sur-Reply Brief suggests that UT has dropped its request for claim construction. D.I. 245 at 15–16 (referencing "the drug-releasing biodegradable polymer format").

However, even if UT's request was timely and had not been dropped, the intrinsic evidence does not support the limitations that UT asks the Court to read into the term "biodegradable polymer fiber." UT points to column 2, lines 39–65, of the '296 patent, D.I. 245 at 6, which explains that the invention provides "three-dimensional matrices for growing cells" that "comprise biodegradable polymer fibers capable of the controlled delivery of therapeutic agents" "over time[,]" D.I. 1-1 at 2:39–50. This language provides no support for UT's contention that a "biodegradable polymer fiber" must be capable of releasing a drug "slowly." UT also points to language in one of the invention's embodiments, D.I. 245 at 6–7, which explains that "[t]he therapeutic agents are released from each individual fiber slowly, and in a controlled manner[,]" D.I. 1-1 at 8:36–40. However, the words "slow" and "slowly" are not used

in the written description or claims outside of illustrative embodiment A and Example 4, a "preferred embodiment[] of the invention." D.I. 1-1 at 8:36–40, 17:26, 20:66. The Court should not limit a term's construction "on the basis of a single exemplary embodiment, as [UT] urge[s]" here. *Supercell Oy v. GREE, Inc.*, 2021 WL 4452082, at *4 (Fed. Cir. Sept. 29, 2021); *see SIPCO, LLC v. Emerson Elec. Co.*, 980 F.3d 865, 872 (Fed. Cir. 2020) ("[T]he [Patent Trial and Appeal Board] did not err in declining to import exemplary embodiments . . . from the specification into the broader claim term . . . ."). Lastly, the written description clarifies that "[t]he host [of the fiber-scaffold] will *typically* be an animal, preferably a mammal and more preferably a human." D.I. 1-1 at 5:16–18 (emphasis added). Thus, the invention need not be used "in animal or human tissue." The Court would reject UT's proposed construction even if timely and not dropped.[5]

**C. Permissible Scope of the Parties' Arguments Before the Jury**

"[I]t is improper to argue claim construction to the jury because the 'risk of confusing the jury is high when experts opine on claim construction.'" *Cordis Corp. v. Bos. Sci. Corp.*, 561 F.3d 1319, 1337 (Fed. Cir. 2009) (citation omitted); *C R Bard, Inc. v. AngioDynamics Inc.*, 2018 WL 3130622, at *11 (D. Del. June 26, 2018) (similar). Thus, the parties should not revisit before the jury the Court's decisions here. BSC may not argue that the fiber recited in Claim 1

[5] Parts of the proposed definition find support in the '296 patent. For example, UT argues that the Court should construe "biodegradable polymer fiber" to "break[] down chemically and mechanically" "over time" because the patent teaches that investigators in the field of tissue engineering implant cells on a "biodegradable" scaffolding, "meaning that over time it will break down both chemically and mechanically." D.I. 245 at 5–6; D.I. 1-1 at 1:12–51. BSC does not appear to oppose this portion of UT's request. D.I. 245 at 13; *see* D.I. 246-18 (mentioning "breaks down chemically and mechanically" only once). Thus, if the term had actually been in dispute, the Court would have construed "biodegradable" as "breaks down chemically and mechanically over time." Additionally, the written description explains that the "biodegradable polymer fiber" is "capable of the controlled delivery of therapeutic agents," *see* D.I. 245 at 5–6; D.I. 1-1 at 2:44–45.

must have a common molecular orientation. *See* Section III.A., *supra*. Similarly, UT may not argue that a "biodegradable polymer fiber" must be capable of releasing a drug slowly or that the invention must be used in animal or human tissue. *See* Section III.B., *supra*.

Rather, the parties may argue before the jury whether "the term 'fiber' can encompass what [BSC] says is a coating." D.I. 90 at 5–6. UT has maintained that a construction of "thread-like" would not eliminate its infringement case. *See* D.I. 89 at 17:14–17 ("[I]f the construction was threadlike . . . , that still can include a coating."); D.I. 214 at 17 (explaining that "summary judgment is still unwarranted" even if "the Court adopts [BSC]'s proposed construction of 'polymer fiber'"). As UT explained at the prior *Markman* hearing, UT alleges that the biodegradable coating applied to each narrow ring included in the Accused Product is a fiber that meets the requirements of Claim 1 of the '296 patent. D.I. 89 at 23:13–20. The Court does not understand its construction to resolve whether such a "coating" is one of the claimed "fibers," since the Court's construction does not, for example, require that the claimed "fiber" be solid rather than hollow or that the claimed fiber be free-standing. *See, e.g.*, D.I. 1-1 at 22:43–51 (explaining that a fiber may "be used in conjunction with commercially available stents" and "would not provide any mechanical support"). It is for a jury to decide whether the coating on the rings of BSC's metal stent is, in fact, a "fiber"—a thread-like structure of any length of shape—as claimed in Claim 1.

## IV. CONCLUSION

For the reasons explained above, the Court construes "fiber" as taking its plain and ordinary meaning, which is "a thread-like structure of any length or shape." The Court declines as untimely the request to construe "biodegradable polymer fiber" and construes "fiber" rather than "polymer fiber."

The Court will issue an Order consistent with this Memorandum Opinion.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM and TISSUEGEN, Inc.<br>Plaintiffs,<br>v.<br>BOSTON SCIENTIFIC Corp.<br>Defendant. | Civil Action No. 18-392-GBW |

## MEMORANDUM ORDER

Plaintiffs TissueGen, Inc.'s and the Board of Regents, The University of Texas System's (collectively, "UT") First Amended Complaint alleges that Defendant Boston Scientific Corp. ("BSC") directly, indirectly, and willfully infringed, via its "Synergy" brand coronary stents (the "Accused Products"), claims 1, 11, 12, 17, and 26 (the "Asserted Claims") of U.S. Patent No. 6,596,296 ("the '296 patent"). D.I. 124 ¶¶ 1–3, 79, 89, 93–94. Pending before the Court is BSC's Motion to Bifurcate (D.I. 247, the "Motion"). The Court has reviewed the parties' briefing. D.I. 248; D.I. 253; D.I. 257. The Court grants the Motion because bifurcation could conserve judicial resources and will enhance juror comprehension.

## I. BACKGROUND

On October 6, 2022, the Court denied motions by BSC for summary judgment of noninfringement and no willful infringement, set a final pretrial conference for January 12, 2023, and set a five-day jury trial to begin on January 25, 2023.[1] D.I. 243 at 1, 17. In its Memorandum Order, the Court gave the parties the following instructions:

[1] The Court is scheduled to preside over a different jury trial from January 17 to January 23. *See* C.A. Docket No. 20-887, D.I. 284. Thus, the parties should try to resolve pretrial and evidentiary issues well before trial.

> No later than October 21, 2022, the parties shall meet and confer to determine whether to bifurcate infringement and invalidity from damages and willfulness and try this case in two phases to a single jury. The Court recognizes the potential value of bifurcation where, as here, the issue of willfulness is close at summary judgment. The Court instructs the parties to consider what evidence may be limited to a willfulness/damages phase. After the parties meet and confer, either party may file . . . a motion to bifurcate that describes what evidence should be limited to a willfulness/damages phase.

D.I. 243 at 16–17. The parties met and conferred, D.I. 248 at 1 n.1, and this Motion followed.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 42(b) permits the Court to order a separate trial of one or more separate issues "[f]or convenience, to avoid prejudice, or to expedite and economize . . . ." If a party moves for bifurcation, it has the burden to establish that bifurcation "is appropriate." *SenoRx, Inc. v. Hologic, Inc.*, 920 F. Supp. 2d 565, 567 (D. Del. 2013) (citations omitted); *Sprint Commc'ns Co. L.P. v. Charter Commc'ns, Inc.*, 2021 WL 982730, at *1 (D. Del. Mar. 16, 2021). The district court has "broad discretion" when it decides "whether to separate the issues[,]" *Idzojtic v. Pennsylvania R. Co.*, 456 F.2d 1228, 1230 (3d Cir. 1972); *see Thabault v. Chait*, 541 F.3d 512, 529 (3d Cir. 2008) (citing *Idzojtic*, 456 F.3d at 1230), though "'bifurcation remains the exception rather than the rule.'" *Sprint Commc'ns*, 2021 WL 982730, at *1 (citation omitted). The Court "'should consider whether bifurcation will avoid prejudice, conserve judicial resources, and enhance juror comprehension . . . .'" *Id.* (citation omitted); *see* 9A Arthur R. Miller & Charles Allan Wright, Federal Practice and Procedure § 2388 (3d ed. 2022) (explaining that decisions under Rule 42(b) are "left to the sound discretion of the trial court").

## III. DISCUSSION

BSC asks the Court to bifurcate trial into two phases: first, direct patent infringement and invalidity and, second, willful infringement, damages, "and knowledge and intent for induced infringement . . . ." D.I. 248 at 1. BSC argues that bifurcation will potentially reduce trial length

and the need for witness testimony, "enhance juror comprehension by separately focusing on the technical aspects of direct infringement and invalidity[,]" and reduce prejudice from "inflammatory" willful infringement evidence. D.I. 248 at 1. UT argues that bifurcation would "expos[e] the jury to redundant and piecemeal testimony" without aiding jury comprehension or meaningfully reducing prejudice. D.I. 253 at 1. The Court grants the Motion because bifurcation could conserve judicial economy and will enhance juror comprehension.

**A. Conservation Judicial Resources**

The Court finds that a bifurcated trial may conserve judicial resources. UT argues that overlapping testimony between BSC's two proposed phases would require additional trial days. D.I. 253 at 3. For example, in both its direct and willful infringement cases, UT will discuss and present witness testimony relevant to a prior BSC patent application and BSC's application to FDA to sell the Accused Products. D.I. 253 at 3–6. However, the use of a single jury in both trial phases will allow jurors to carry background about witnesses and documents from the first phase into the second phase of trial. Further, UT acknowledges that the substance of several of the witnesses' testimony will differ by phase. For example, UT will call "Defendant's corporate representative and employees such as Dr. Yen Lane Chen" at the infringement phase to testify "that fibers can be applied to and formed on the outer surface of a stent," but will call them at the willfulness phase to testify about interactions with the inventor of and knowledge of the '296 patent. *See* D.I. 253 at 4, 6. Thus, UT's witnesses may not need to repeat testimony in both trial phases. *See* D.I. 248 at 14 (listing issues that BSC argues are confined to the second phase).

The Court could also save multiple days of trial—e.g., by eliminating expert damages testimony—if the jury finds for BSC on infringement or invalidity. UT argues that no reduction in trial time would result if the jury finds for UT in the first phase. D.I. 253 at 7–8. However, the Court need not fully discount that potential reduction in trial time because it is not

guaranteed. *See Lab'y Skin Care, Inc. v. Ltd. Brands, Inc.*, 757 F. Supp. 2d 431, 442 (D. Del. 2010) (discussing benefits of bifurcation from a possible finding of no liability); *see also* D.I. 257 at 2 (same). UT is also incorrect that jury deliberation in the middle of trial will increase case length. *See* D.I. 253 at 7. The jury must deliberate as to the same issues, whether after a first phase or after the whole trial. Thus, the Court finds that the potential savings in judicial resources from bifurcation far outweigh the minimal costs a phased trial may impose.

**B. Juror Comprehension**

BSC argues that a phased trial would focus jurors' attention on a limited number of legal issues and a smaller set of relevant evidence. D.I. 248 at 14. The Court agrees with UT that, "in this District, juries routinely decide complex liability and damages issues at the same trial." *Evertz Microsystems Ltd. v. Lawo Inc.*, 2021 WL 706457, at *2 (D. Del. Feb. 23, 2021); D.I. 253 at 8. However, a focus only on technical issues in the first phase, such as what the parties argue that the prior art teaches, will help jurors comprehend evidence of invalidity and infringement. *See* D.I. 248 at 14–15 (describing technical issues likely to emerge at trial).

UT contends that BSC's bifurcation proposal is "convoluted" and unprecedented because it separates induced infringement into two phases: first, direct infringement and, second, "knowledge and intent" to induce infringement. D.I. 253 at 9. "A defendant is liable for induced infringement under [35 U.S.C.] § 271(b) if the defendant took certain affirmative acts to bring about the commission by others of acts of infringement and had knowledge that the induced acts constitute patent infringement." *Roche Diagnostics Corp. v. Meso Scale Diagnostics, LLC*, 30 F.4th 1109, 1117–18 (Fed. Cir. 2022) (internal quotation marks and citations omitted). In its Amended Complaint, UT alleges that BSC "actively induced third-party direct infringement" of the Asserted Claims of the '296 patent by encouraging (i) "surgeons and other clinicians" to use and (ii) BSC subsidiaries and affiliates "to sell, offer to sell, and/or import" the Accused

Products. D.I. 124 ¶ 89. The jury must first decide whether the Accused Products infringe the Asserted Claims to decide direct infringement, and the jury must then consider whether BSC had knowledge of infringement and the intent to infringe when it evaluates willful infringement. *See SRI Int'l, Inc. v. Cisco Sys., Inc.*, 14 F.4th 1323, 1330 (Fed. Cir. 2021) (requiring a finding of "'deliberate or intentional infringement'" (citation omitted)). Thus, the Court finds that BSC's proposed separation of the issues is logical, rather than convoluted, and helpful to the jury.

**C. Prejudice**

The Court finds that a reduction in prejudice to BSC weighs in favor of bifurcation. BSC argues that UT is "likely to tell a story" that UT "got an important patent and told [BSC] about their technology; [BSC] was greedy, intentionally stole the invention," and profited therefrom; and UT "got nothing." D.I. 248 at 10. That story, BSC argues, has nothing "to do with the objective question of whether the [Accused Products] meet[] all the limitations" of the Asserted Claims of the '296 patent "or whether the patent is invalid." *Id.* UT does not challenge BSC's description of UT's likely trial narrative. Instead, UT argues that BSC's "claims of prejudice are predicated on the false premise that the issues related to knowledge and intent of inducement, willfulness, and damages may be compartmentalized from the rest of this case." D.I. 253 at 10. Rather, UT argues, the need to present a piecemeal case to the jury will prejudice UT. *Id.*

As explained above, even where witnesses and documents overlap across the two trial phases, the substance of the testimony that UT will elicit from witnesses will differ by trial phase. Thus, UT will not suffer meaningful prejudice from bifurcation. UT's description of BSC's alleged willful infringement could encourage a jury to find that BSC infringed the '296 patent for reasons unrelated to a comparison of the Accused Products to the Asserted Claims. The Court also found that "UT's evidence of post-suit willfulness is limited." D.I. 243 at 16 n.3. That finding increases the risk that UT's willfulness evidence could bias the jury's infringement

and invalidity decisions. However, "[c]ourts regularly ask juries to set aside their biases and resolve thorny factual questions." *Victaulic Co. v. ASC Engineered Sols., LLC*, 2022 WL 4748619, at *4 (D. Del. Oct. 3, 2022) (footnote omitted). When the Court weighs the risk of prejudice to BSC against the ability to mitigate that prejudice (e.g., through a jury instruction), the Court finds that the potential to reduce prejudice to BSC weighs in favor of bifurcation.

## IV. CONCLUSION

For the reasons above, the Court finds that BSC has met its burden and the Court will bifurcate the trial into two phases. During the first phase, the jury will hear evidence of direct infringement and invalidity and evaluate and rule on those issues. During the second phase, if necessary, the jury will hear evidence on willful infringement, damages, and knowledge and intent for induced infringement. Each side will have thirteen (13) hours to present their complete case, inclusive of argument time (e.g., raising evidentiary issues to the Court), and the parties may allocate their respective trial time across the two phases as they so choose. Typically, the Court will split argument time evenly between the parties. The parties shall submit proposed preliminary and final jury instructions for each phase of the trial "seven (7) business days before the final pretrial conference."[2] *See* D.I. 47 ¶ 20.

WHEREFORE, at Wilmington this 2nd of December, 2022, **IT IS HEREBY ORDERED** that BSC's Motion to Bifurcate (D.I. 247) is **GRANTED**.

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

[2] For an example of jury instructions in a phased trial, *see* C.A. Docket No. 19-97-CFC, D.I. 447; D.I. 448; D.I. 449; D.I. 450 (including only infringement in the first phase and invalidity and damages in the second phase).

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM and TISSUEGEN, INC., *Plaintiffs*, v. BOSTON SCIENTIFIC CORPORATION, *Defendant*. | ) | C.A. No. 1:18-cv-00392-GBW |

# VERDICT FORM (PHASE 1)

**Instructions**: When answering the following questions and completing this Verdict Form, please follow the directions provided and follow the Jury Instructions that you have been given. Your answer to each question must be unanimous. Some of the questions contain legal terms that are defined and explained in the Jury Instructions. Please refer to the Jury Instructions if you are unsure about the meaning or usage of any legal term that appears in the questions below.

As used herein:

1. "UTBOR" refers to Plaintiff The Board of Regents, The University of Texas System;
2. "TissueGen" refers to Plaintiff TissueGen, Inc.;
3. "Boston Scientific" refers to Defendant Boston Scientific Corporation; and
4. The "'296 Patent" refers to U.S. Patent No. 6,596,296.

**QUESTION NO. 1:**

Did UTBOR and TissueGen prove by a preponderance of the evidence that Boston Scientific's Synergy stents infringe any of the following claims of the '296 patent?

"Yes" is a finding in favor of the UTBOR and TissueGen.

"No" is a finding in favor of Boston Scientific.

| | **YES** | **NO** |
|---|---|---|
| Claim 1 | | |
| Claim 11 | | |
| Claim 17 | | |
| Claim 26 | | |

**QUESTION NO.2:**

Did Plaintiffs UTBOR and TissueGen prove by a preponderance of the evidence that Boston Scientific Limited [a Boston Scientific subsidiary] directly infringed one or more of claims 1, 11, 17, and 26 of the '296 patent?

"Yes" is a finding in favor of the UTBOR and TissueGen.

"No" is a finding in favor of Boston Scientific.

| | **YES** | **NO** |
|---|---|---|
| Claim 1 | | |
| Claim 11 | | |
| Claim 17 | | |
| Claim 26 | | |

**QUESTION NO. 3:**

Did Boston Scientific prove by clear and convincing evidence any of the following claims of the '296 Patent are invalid?

"Yes" is a finding in favor of Boston Scientific.

"No" is a finding in favor of UTBOR and TissueGen.

| | **YES** | **NO** |
|---|---|---|
| Claim 1 | | |
| Claim 11 | | |
| Claim 17 | | |
| Claim 26 | | |

You have now reached the end of the verdict form and you should review it to ensure that it entirely reflects your unanimous determinations. The Foreperson should then sign the verdict form in the space below and notify the Court Security Officer that you have reached a verdict. The Foreperson should retain possession of the verdict form and bring it to the courtroom with the jury.

Signed: ____________________________________

Dated: ___________________

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM and TISSUEGEN, INC., *Plaintiffs*, | ) | C.A. No. 1:18-cv-00392-GBW |
| v. | ) | C.A. No. 1:18-cv-00392-GBW |
| BOSTON SCIENTIFIC CORPORATION, *Defendant*. | ) | |

**PRELIMINARY JURY INSTRUCTIONS (PHASE 1)**

## III. UNITED STATES PATENTS

As I just mentioned, this case is about patents. To help you understand what patents are, why they are needed, the role of the Patent Office, and why disputes over patents arise you will now be shown a video. This video was prepared by the Federal Judicial Center, not the parties in this case, to help introduce you to the patent system. During the video, reference will be made to a sample patent. A copy of the sample patent is contained in your juror notebooks for you to follow along. The video will run for approximately 17 minutes. At the conclusion of the video, I will provide you with additional instructions.

[*The video will be played.*]

## IV. EVIDENCE

The evidence from which you are to find the facts consists of the following:

1. The testimony of the witnesses;
2. Documents and other things received as exhibits;
3. Any facts that are stipulated--that is, formally agreed to by the parties; and
4. Facts that the Court takes judicial notice of and that I instruct you to take as true.

The following things are not evidence:

1. Statements, arguments, and questions of the lawyers for the parties in this case;
2. Objections by the lawyers;
3. Any testimony I tell you to disregard; and
4. Anything you may see or hear about this case outside the courtroom.

You must make your decision based only on the evidence that you see and hear in court. Do not let rumors, suspicions, or anything else that you may see or hear outside of court influence your decision in any way.

You should use your common sense in weighing the evidence. Consider it in light of your everyday experience with people and events and give it whatever weight you believe it deserves. If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

There are rules that control what can be received into evidence. When a lawyer asks a question or offers an exhibit into evidence, and a lawyer on the other side thinks that it is not permitted by the rules of evidence, that lawyer may object. This simply means that the lawyer is requesting that I make a decision on a particular rule of evidence. You should not be influenced by the fact that an objection is made. Objections to questions are not evidence. Lawyers have an obligation to their clients to make objections when they believe that evidence being offered is

improper under the rules of evidence. You should not be influenced by the objection or by the court's ruling on it. If the objection is sustained, ignore the question. If it is overruled, treat the answer like any other. If you are instructed that some item of evidence is received for a limited purpose only, you must follow that instruction.

Also, certain testimony or other evidence may be ordered struck from the record and you will be instructed to disregard this evidence. Do not consider any testimony or other evidence that gets struck or excluded. Do not speculate about what a witness might have said or what an exhibit might have shown.

There are two types of evidence: direct and circumstantial. Direct evidence is direct proof of a fact, such as testimony of an eyewitness. Circumstantial evidence is proof of a fact or facts from which you may infer or conclude that other facts do or do not exist. For example, the fact that it snowed overnight could be proven directly ("I saw it snow last night") or circumstantially ("When I went to sleep the grass was green, when I woke up there was a foot of snow on the ground"). Do not be concerned about whether evidence is "direct evidence" or "circumstantial evidence." You should consider and weigh all of the evidence that is presented to you.

## VI. EXPERT TESTIMONY

Expert testimony is testimony from a person who has a special skill or knowledge in some science, profession, or business. This skill or knowledge is not common to the average person but has been acquired by the expert through special study or experience. In weighing expert testimony, you may consider the expert's qualifications, the reasons for the expert's opinions, and the reliability of the information supporting the expert's opinions, as well as the factors I have previously mentioned for weighing testimony of any other witness. Expert testimony should receive whatever weight and credit you think appropriate, given all the other evidence in the case. You are free to accept or reject the testimony of experts, just as with any other witness.

## VII. BURDENS OF PROOF

In any legal action, facts must be proven by a required standard of evidence, known as the "burden of proof." In a case involving patents, two different burdens of proof are used. The first is called "preponderance of the evidence." The second is called "clear and convincing evidence."

Plaintiffs UTBOR and TissueGen assert that Boston Scientific infringes the '296 Patent. Plaintiffs UTBOR and TissueGen bear the burden of proving infringement by a preponderance of the evidence. That means Plaintiffs UTBOR and TissueGen to prevail must prove to you, in light of all the evidence, that what they claim is more likely true than not. To put it differently, if you were to put the evidence in support of Plaintiffs UTBOR's and TissueGen's claims and Boston Scientific's evidence weighing against their claims on opposite sides of a scale, the evidence supporting Plaintiffs UTBOR's and TissueGen's claims would have to make the scales tip slightly on their side.

Boston Scientific contends that the claims of the '296 patent are invalid. On this issue, Boston Scientific has the burden of proof and must prove by clear and convincing evidence that the patent is invalid. Clear and convincing evidence means evidence that it is highly probable that a fact is true. This is a higher standard of proof than proof by a preponderance of the evidence. You may have heard of the term "proof beyond a reasonable doubt." That is a stricter standard of proof and it applies only to criminal cases. It does not apply in civil cases such as this. You should therefore not consider that burden of proof in this case.

## VIII. DEPOSITION TESTIMONY

I will now talk about the form of some of the evidence you will hear during trial. You may hear witnesses testify through deposition testimony. A deposition is the sworn testimony of a witness taken before trial. The witness is placed under oath and swears to tell the truth, and lawyers for each party may ask questions. A court reporter is present and records the questions and answers. The deposition may also be recorded on videotape.

Deposition testimony is entitled to the same consideration and is to be judged, insofar as possible, in the same way as if the witness had been present to testify.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM and TISSUEGEN, INC., | ) | |
| *Plaintiffs*, | ) | C.A. No. 1:18-cv-00392-GBW |
| v. | ) | C.A. No. 1:18-cv-00392-GBW |
| BOSTON SCIENTIFIC CORPORATION, | ) | |
| *Defendant*. | ) | |

**<u>FINAL JURY INSTRUCTIONS (PHASE 1)</u>**

### 1.3 EVIDENCE DEFINED

You must make your decision based only on the evidence that you saw and heard here in court. Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way. The evidence in this case includes only what the witnesses said while they were testifying under oath, including deposition transcript testimony that has been played by video or read to you, the exhibits that I allowed into evidence, matters I have instructed you to take judicial notice of, and the stipulations to which the lawyers agreed.

Certain models, reproductions, charts, summaries, and graphics have been used to illustrate certain evidence and testimony from witnesses. Unless I have specifically admitted them into evidence, these models, reproductions, charts, summaries, and graphics are not themselves evidence, even if they refer to, identify, or summarize evidence, and you will not have these demonstratives in the jury room.

Nothing else is evidence. The lawyers' statements and arguments are not evidence. The arguments of the lawyers are offered solely as an aid to help you in your determination of the facts. Their questions and objections are not evidence. My legal rulings are not evidence. You should not be influenced by a lawyer's objection or by my ruling on that objection. Any of my comments and questions are not evidence.

During the trial I may have not let you hear the answers to some of the questions that the lawyers asked. I also may have ruled that you could not see some of the exhibits that the lawyers wanted you to see. And, sometimes I may have ordered you to disregard things that you saw or heard, or that I struck from the record. You must completely ignore all of these things. Do not speculate about what a witness might have said or what an exhibit might have shown. These things are not evidence, and you are bound by your oath not to let them influence your decision in any way. Make your decision based only on the evidence, as I have defined it here, and nothing else.

## 1.4 DIRECT AND CIRCUMSTANTIAL EVIDENCE

During the preliminary instructions, I told you about "direct evidence" and "circumstantial evidence." I will now remind you what each means.

Direct evidence is simply evidence like the testimony of an eyewitness which, if you believe it, directly proves a fact. If a witness testified that he saw it raining outside, and you believe him, that would be direct evidence that it was raining.

Circumstantial evidence is simply a chain of circumstances that indirectly proves a fact. If someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining.

It is your job to decide how much weight to give the direct and circumstantial evidence. The law makes no distinction between the weight that you should give to either one, nor does it say that one is any better evidence than the other. You should consider all the evidence, both direct and circumstantial, and give it whatever weight you believe it deserves.

## 1.5 CONSIDERATION OF EVIDENCE

You should use your common sense in weighing the evidence. Consider it in light of your everyday experience with people and events, and give it whatever weight you believe it deserves. If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

### 1.12 USE OF NOTES

You may have taken notes during trial to assist your memory. As I instructed you at the beginning of the case, you should use caution in consulting your notes. There is generally a tendency I think to attach undue importance to matters which one has written down. Some testimony which is considered unimportant at the time presented, and thus not written down, takes on greater importance later in the trial in light of all the evidence presented. Therefore, your notes are only a tool to aid your own individual memory, and you should not compare notes with other jurors in determining the content of any testimony or in evaluating the importance of any evidence. Your notes are not evidence, and are by no means a complete outline of the proceedings or a list of the highlights of the trial.

Above all, your memory should be the greatest asset when it comes time to deliberate and render a decision in this case.

### 1.13 BURDENS OF PROOF

In any legal action, facts must be proven by a required standard of evidence, known as the "burden of proof." In a patent case such as this, there are two different burdens of proof that are used. The first is called "preponderance of the evidence." The second is called "clear and convincing evidence." I told you about these two standards of proof during my preliminary instructions to you and I will now remind you what they mean.

Plaintiffs UTBOR and TissueGen assert that Boston Scientific infringes the '296 patent. Plaintiffs UTBOR and TissueGen have the burden of proving their infringement claims by a "preponderance of the evidence." That means Plaintiffs UTBOR and TissueGen had to prove to you, in light of all the evidence, that what they claim is more likely true than not. To say it differently, if you were to put the evidence of Plaintiffs UTBOR and TissueGen and the evidence of Boston Scientific on opposite sides of a scale, the evidence supporting Plaintiffs UTBOR and TissueGen's claims would have to make the scales tip slightly on their side in each instance. If the scale should remain equal or tip in favor of Boston Scientific, you must find for Boston Scientific.

In addition to denying Plaintiffs UTBOR and TissueGen's claims that it infringes, Boston Scientific asserts that the asserted claims of the '296 patent are invalid. A party challenging the validity of a patent—in this instance, Boston Scientific—has the burden to prove that the asserted claims are invalid by clear and convincing evidence. Clear and convincing evidence means evidence that it is highly probable that a fact is true. Proof by clear and convincing evidence is a higher burden than proof by a preponderance of the evidence.

You may have heard of the "beyond a reasonable doubt" burden of proof from criminal cases. That requirement is the highest burden of proof. It does not apply to civil cases and, therefore, you should put it out of your mind.

## 2. THE PARTIES AND THEIR CONTENTIONS

### 2.1 THE PARTIES

I will now review for you the parties in this action, and the positions of the parties that you will have to consider in reaching your verdict.

As I have previously told you, the plaintiffs in this case are The Board of Regents of the University of Texas System and TissueGen, Inc. We have referred to the plaintiffs as the Plaintiffs UTBOR and TissueGen. The defendant in this case is Boston Scientific Corporation. We have referred to it as Boston Scientific.

Plaintiff UTBOR is the owner of U.S. Patent Number 6,596,296 and TissueGen holds an exclusive license from Plaintiff UTBOR to the patent. During this case, we have referred the patent by its last three digits, the '296 Patent, often, just the patent-in-suit or the Asserted Patent.

### 3.3 INFRINGEMENT—GENERALLY

I will now instruct you as to the rules you must follow when deciding whether Plaintiffs have proven that Boston Scientific has infringed the '296 patent. You must determine whether UTBOR and TissueGen have proven literal infringement of claims 1, 11, 17, and 26 of the '296 patent.

Infringement is assessed on a claim-by-claim basis. Therefore, there may be infringement of one claim but no infringement of another. There is one exception. If you find that an independent claim is not infringed, there cannot be infringement of any dependent claim that depends directly or indirectly from that claim. On the other hand, if you find that an independent claim has been infringed, you must still separately decide whether the accused products meet the additional requirements of any dependent claim to determine whether that dependent claim has also been infringed.

### 3.4 DIRECT INFRINGEMENT BY "LITERAL INFRINGEMENT"

To prove direct infringement, UTBOR and TissueGen must prove by a preponderance of the evidence, that Boston Scientific and/or Boston Scientific Limited during the time the '296 patent was in force, (1) made, used, sold, offered for sale within, or imported into the United States a product that meets the requirements of an Asserted Claim and (2) did so without UTBOR's and TissueGen's permission. A patent claim is infringed only if the accused product includes each and every limitation in the Asserted Claim. However, the presence of other features in the accused product beyond the claimed elements does not avoid infringement, as long as every claimed element is present.

# 4. INVALIDITY

## 4.1 INVALIDITY—BURDEN OF PROOF

I will now instruct you on the rules you must follow in deciding whether or not Boston Scientific has proven that the Asserted Claims are invalid.

A party challenging the validity of a patent—in this instance, Boston Scientific—has the burden to prove that the asserted claims are invalid by clear and convincing evidence. Clear and convincing evidence means evidence that it is highly probable that a fact is true. Proof by clear and convincing evidence is a higher burden than proof by a preponderance of the evidence.

Like infringement, you must determine whether each asserted claim is invalid on a claim-by-claim basis. You must determine separately for each claim whether that claim is invalid. If one claim of a patent is invalid, this does not mean that any other claim is necessarily invalid.

Claims are construed in the same way for determining infringement as for determining invalidity. You must apply the claim language consistently and in the same manner for issues of infringement and for issues of invalidity.

### 4.3 INVALIDITY—PRIOR ART

In order for someone to be entitled to a patent, the invention must actually be "new" ~~and not obvious~~ over what came before, which is referred to as the prior art. Prior art is considered in determining whether the Asserted Claims of the '296 patent are anticipated. Prior art may include items that were publicly known or that have been used or offered for sale, or references, such as publications or patents, that disclose the claimed invention or elements of the claimed invention. U.S. Pat. No. 5,364,627 to Song ("Song") is prior art to the '296 patent.

### 4.4 INVALIDITY—ANTICIPATION

In order for someone to be entitled to a patent, the invention must actually be "new." If an invention is not new, it is said to be "anticipated." Boston Scientific contends that the asserted claims of the '296 patent are invalid because the claimed inventions are anticipated. Boston Scientific must convince you of this by clear and convincing evidence.

Specifically, Boston Scientific contends that Song anticipates the Asserted Claims of the '296 patent.

Anticipation must be determined on a claim-by-claim basis. Boston Scientific must prove by clear and convincing evidence that all of the requirements of a claim are present in a single piece of prior art. To anticipate the invention, the prior art does not have to use the same words as the claim, but all of the requirements of the claim must have been disclosed and arranged as in the claim. The claim requirements may either be disclosed expressly or inherently—that is, necessarily implied—but must be disclosed in sufficient detail that a person having ordinary skill in the art of the invention, looking at that one reference, could make and use the claimed invention.

Where Boston Scientific is relying on prior art that was not considered by the PTO during examination, you may consider whether that prior art is significantly different and more relevant than the prior art that the PTO did consider. If you decide it is different and more relevant, you may weigh that prior art more heavily when considering whether the challenger has carried its clear-and-convincing burden of proving invalidity.

### 4.5 INVALIDITY—WRITTEN DESCRIPTION

The patent law contains certain requirements for the part of the patent called the specification. The written description requirement is designed to ensure that the inventor invented the claimed subject matter and was in possession of the full scope of claimed invention as of the patent's effective filing date. Boston Scientific contends that the Asserted Claims of the '296 patent are invalid because the specification of the '296 patent does not contain an adequate written description of the invention.

To succeed, Boston Scientific must show by clear and convincing evidence that a person having ordinary skill in the field reading the patent specification as of the effective filing date of the '296 Patent would not have recognized that it describes the full scope of the invention as it is finally claimed in the Asserted Claims of the '296 Patent. If a patent claim lacks adequate written description, it is invalid.

In deciding whether the patent satisfies this written description requirement, you must consider the description from the viewpoint of a person having ordinary skill in the field of technology of the patent as of the effective filing date. The specification must describe the full scope of the claimed invention, including each element thereof, either expressly or inherently. A claimed element is disclosed inherently if a person having ordinary skill in the field as of the effective filing date would have understood that the element is necessarily present in what the specification discloses. It is not sufficient that the specification discloses only enough to make the claimed invention obvious to the person having ordinary skill.

The written description does not have to be in the exact words of the claim. The requirement may be satisfied by any combination of the words, structures, figures, diagrams, formulas, etc., contained in the patent specification. Adequate written description does not require either examples or an actual reduction to practice of the claimed invention(s). It is not necessary

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM and TISSUEGEN, INC.,

*Plaintiffs*,

v.

BOSTON SCIENTIFIC CORPORATION,

*Defendant*.

C.A. No. 1:18-cv-00392-GBW

C.A. No. 1:18-cv-00392-GBW

**<u>FINAL JURY INSTRUCTIONS</u>**
**<u>(PHASE 2)</u>**

## 1.3 BURDENS OF PROOF

In any legal action, facts must be proven by a required standard of evidence, known as the "burden of proof." In this phase of the case, Plaintiffs UTBOR and TissueGen bear the burden of proof on the issues. Plaintiffs UTBOR and TissueGen have the burden of proving willful infringement, the amount of money damages, and induced infringement by a "preponderance of the evidence." That means UTBOR and TissueGen had to prove to you, in light of all the evidence, that what they claim is more likely true than not. To say it differently, if you were to put the evidence of UTBOR and TissueGen and the evidence of Boston Scientific on opposite sides of a scale, the evidence supporting UTBOR's and TissueGen's claims would have to make the scales tip slightly to their side in each instance. If the scale should remain equal or tip in favor of Boston Scientific, you must find for Boston Scientific.

## 2. WILLFULNESS

Because you have found that Boston Scientific infringed one or more claims of the '296 patent, then you must now also determine whether or not such infringement was willful.

To show that infringement was willful, Plaintiffs must prove by a preponderance of the evidence that Boston Scientific knew of the '296 patent and intentionally infringed at least one asserted claim of the patent. To show willfulness, you must find that Boston Scientific has engaged in conduct evidencing deliberate or reckless disregard for the Plaintiffs' patent rights. However, you may not find that infringement was willful merely because Boston Scientific knew about the '296 patent, without more. In determining whether Plaintiffs have proven that Boston Scientific's infringement was willful, you must consider all the circumstances and assess Boston Scientific's knowledge at the time the challenged conduct occurred.

If you determine that any infringement was willful, you may not allow that decision to affect the amount of any damages award you give for infringement.

## 3. INDUCED INFRINGEMENT

Boston Scientific is liable for active inducement of a claim only if Plaintiffs UTBOR and TissueGen prove by a preponderance of the evidence:

(1) that acts actually carried out by Boston Scientific Limited directly infringed that claim;

(2) that Boston Scientific took action during the time the '296 patent was in force that was intended to cause and led to the infringing acts by Boston Scientific Limited; and

(3) that Boston Scientific was aware of the '296 patent and knew that the acts, if taken, would constitute infringement of that patent, or that Boston Scientific believed there was a high probability that the acts by Boston Scientific Limited would infringe the '296 patent and Boston Scientific took deliberate steps to avoid learning of that infringement.

Here, you have already found that Boston Scientific Limited directly infringed the '296 patent, which satisfies the first element. In this Phase of trial, you must determine whether UTBOR and TissueGen have proven by a preponderance of the evidence elements (2) and (3).

If you find that Boston Scientific was aware of the patent, but believed that the acts it encouraged did not infringe that patent, Boston Scientific cannot be liable for inducement.

In order to establish active inducement of infringement, it is not sufficient that Boston Scientific Limited directly infringed the claim. Nor is it sufficient that Boston Scientific was aware of the acts by Boston Scientific Limited that allegedly constituted the direct infringement. Rather, in order to find active inducement of infringement, you must find either that Boston Scientific specifically intended Boston Scientific Limited to infringe the '296 patent or that Boston Scientific believed there was a high probability that Boston Scientific Limited would infringe the '296 patent,

read in open court 1/31/23

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM and TISSUEGEN, INC., *Plaintiffs*, | ) | C.A. No. 1:18-cv-00392-GBW |
| v. | ) | C.A. No. 1:18-cv-00392-GBW |
| BOSTON SCIENTIFIC CORPORATION, *Defendant*. | ) | |

## VERDICT FORM (PHASE 1)

**Instructions**: When answering the following questions and completing this Verdict Form, please follow the directions provided and follow the Jury Instructions that you have been given. Your answer to each question must be unanimous. Some of the questions contain legal terms that are defined and explained in the Jury Instructions. Please refer to the Jury Instructions if you are unsure about the meaning or usage of any legal term that appears in the questions below.

As used herein:

1. "UTBOR" refers to Plaintiff The Board of Regents, The University of Texas System;
2. "TissueGen" refers to Plaintiff TissueGen, Inc.;
3. "Boston Scientific" refers to Defendant Boston Scientific Corporation; and
4. The "'296 Patent" refers to U.S. Patent No. 6,596,296.

**QUESTION NO. 1:**

Did UTBOR and TissueGen prove by a preponderance of the evidence that Boston Scientific directly infringed one or more of claims 1, 11, 17, and 26 of the '296 patent?

"Yes" is a finding in favor of the UTBOR and TissueGen.

"No" is a finding in favor of Boston Scientific.

| | YES | NO |
|---|---|---|
| Claim 1 | Yes | |
| Claim 11 | Yes | |
| Claim 17 | Yes | |
| Claim 26 | Yes | |

**If you answer "Yes" to Question No. 1 as to any given claim, you must answer "Yes" to Question No. 2 as to that claim. If you answer "no" to Question No. 1 as to any given claim, you should skip Question No. 2 as to only that claim. You must still answer Question No. 3 as to each claim.**

**QUESTION NO.2:**

Did Plaintiffs UTBOR and TissueGen prove by a preponderance of the evidence that Boston Scientific Limited [a Boston Scientific subsidiary] directly infringed one or more of claims 1, 11, 17, and 26 of the '296 patent?

"Yes" is a finding in favor of the UTBOR and TissueGen.

"No" is a finding in favor of Boston Scientific.

| | YES | NO |
|---|---|---|
| Claim 1 | yes | |
| Claim 11 | yes | |
| Claim 17 | yes | |
| Claim 26 | yes | |

**QUESTION NO. 3:**

Did Boston Scientific prove by clear and convincing evidence any of the following claims of the '296 Patent are invalid?

"Yes" is a finding in favor of Boston Scientific.

"No" is a finding in favor of UTBOR and TissueGen.

| | YES | NO |
|---|---|---|
| Claim 1 | | NO |
| Claim 11 | | NO |
| Claim 17 | | [redacted] |
| Claim 26 | | NO |

You have now reached the end of the verdict form and you should review it to ensure that it entirely reflects your unanimous determinations. The Foreperson should then sign the verdict form in the space below and notify the Court Security Officer that you have reached a verdict. The Foreperson should retain possession of the verdict form and bring it to the courtroom with the jury.

Signed: REDACTED

Dated: 31 JAN 2023

Read In Open Court 1/31/23 NTD

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM and TISSUEGEN, INC., | ) | |
| *Plaintiffs*, | ) | C.A. No. 1:18-cv-00392-GBW |
| | ) | C.A. No. 1:18-cv-00392-GBW |
| v. | ) | |
| BOSTON SCIENTIFIC CORPORATION, | ) | |
| *Defendant*. | ) | |

**VERDICT FORM**
**(PHASE 2)**

**Instructions**: When answering the following questions and completing this Verdict Form, please follow the directions provided and follow the Jury Instructions that you have been given. Your answer to each question must be unanimous. Some of the questions contain legal terms that are defined and explained in the Jury Instructions. Please refer to the Jury Instructions if you are unsure about the meaning or usage of any legal term that appears in the questions below.

As used herein:

1. "UTBOR" refers to Plaintiff The Board of Regents, The University of Texas System;
2. "TissueGen" refers to Plaintiff TissueGen, Inc.;
3. "Boston Scientific" refers to Defendant Boston Scientific Corporation; and
4. The "'296 Patent" refers to U.S. Patent No. 6,596,296.

**QUESTION NO. 1:**

Did UTBOR and TissueGen prove by a preponderance of the evidence that Boston Scientific induced infringement of any of the following claims of the '296 Patent?

"Yes" is a finding in favor of UTBOR and TissueGen.

"No" is a finding in favor of Boston Scientific.

| | YES | NO |
|---|---|---|
| Claim 1 | yes | |
| Claim 11 | yes | |
| Claim 17 | yes | |
| Claim 26 | yes | |

**QUESTION NO. 2:**

Did UTBOR and TissueGen prove by a preponderance of the evidence that Boston Sci[illegible] infringement of any of the claims of the '296 Patent was willful?

"Yes" is a finding in favor of UTBOR and TissueGen.

"No" is a finding in favor of Boston Scientific.

**Yes:** Yes **No:** ________________

**QUESTION NO. 3:**

What amount of damages have UTBOR and TissueGen proven by a preponderance of the evidence that they are entitled to as a reasonable royalty for Boston Scientific's infringement of the '296 patent between November 20, 2017 and August 18, 2020?

Answer: $ 42,000,000
Forty-Two Million

You have now reached the end of the verdict form and you should review it to ensure that it entirely reflects your unanimous determinations. The Foreperson should then sign the verdict form in the space below and notify the Court Security Officer that you have reached a verdict. The Foreperson should retain possession of the verdict form and bring it to the courtroom with the jury.

Signed: REDACTED

Dated: 31 JAN 2023

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM; and TISSUEGEN, INC.,** | ) | |
| ***Plaintiffs,*** | ) | **C.A. No. 1:18-cv-00392 (GBW)** |
| **v.** | ) | [redacted] |
| **BOSTON SCIENTIFIC CORPORATION,** | ) | |
| ***Defendant.*** | ) | |

# PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR ENHANCED DAMAGES UNDER § 284 AND PRE- AND POST-JUDGMENT INTEREST

Date: March 15, 2023

Stamatios Stamoulis (#4606)
STAMOULIS & WEINBLATT LLC
800 N. West Street, Third Floor
Wilmington, DE 19801
(302) 999-1540
stamoulis@swdelaw.com

*Attorneys for Plaintiffs*

OF COUNSEL:

Michael W. Shore
Chijioke E. Offor
THE SHORE FIRM
901 Main Street, Suite 3300
Dallas, Texas 75202
(214) 593-9110
mshore@shorefirm.com
coffor@shorefirm.com

*Attorneys for Plaintiffs*

Brian D. Melton
John P. Lahad
Corey M. Lipschutz
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Tel: (713) 651-9366
Fax: (713) 654-6666
bmelton@susmangodfrey.com
jlahad@susmangodfrey.com
clipschutz@susmangodfrey.com

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... iii

NATURE AND STATE OF THE PROCEEDINGS .......... 1

SUMMARY OF THE ARGUMENT .......... 1

STATEMENT OF FACTS .......... 2

ARGUMENT .......... 2

A. Boston Scientific's Willful Infringement Warrants Enhanced Damages .......... 2

1. The Standard for Enhanced Damages .......... 2

2. The *Read* Factors Support Enhanced Damages .......... 3

Factor 1: Boston Scientific Copied the Patented Technology .......... 3

Factor 2: Boston Scientific Did Not Have a Good Faith Belief of Non-infringement or Invalidity .......... 7

Factor 3: Boston Scientific Violated the Court's Order and Sought to Mislead the Jury .......... 7

Factor 4: Boston Scientific's Size and Financial Condition Supports Enhancement .......... 11

Factor 5: This Was Not a Close Case .......... 11

Factor 6: Boston Scientific's Misconduct Spanned Several Years .......... 13

Factor 7: Boston Scientific Took No Remedial Action .......... 15

Factor 8: Boston Scientific Was Motivated to Harm Plaintiffs .......... 16

Factor 9: Boston Scientific Attempted to Conceal its Misconduct .......... 17

B. Plaintiffs Are Entitled to Interest .......... 17

1. The Court Should Award Pre-Judgment Interest at the Prime Rate, Compounded Quarterly, on the $42 Million Verdict Beginning November 20, 2017 .......... 18

2. Post-Judgment Interest is Required by Statute .......... 20

CONCLUSION .......... 20

# TABLE OF AUTHORITIES

## CASES:

*Acantha LLC v. DePuy Synthes Sales Inc.*,
406 F. Supp. 3d 742 (E.D. Wis. 2019) .......... 16

*Alfred E. Mann Foundation for Scientific Res. v. Cochlear Corp.*,
No. 07-8108, 2018 WL 6190604 (C.D. Cal. Nov. 4, 2018) .......... *passim*

*Amgen Inc. v. Hospira*,
336 F. Supp. 3d 333 (D. Del. 2018) .......... 20

*Apple Inc. v. Samsung Elecs. Co.*,
258 F. Supp. 3d 1013 (N.D. Cal. 2017) .......... 3, 8

*ArcherDX, LLC v. Qiagen Scis., LLC*,
No. CV 18-1019 (MN), 2022 WL 4597877 (D. Del. Sept. 30, 2022) .......... 20

*Ateliers de la Haute-Garonne v. Broetje Automation-USA Inc.*,
85 F. Supp. 3d 768 (D. Del. 2015) .......... 19, 20

*Bayer Healthcare LLC v. Baxalta Inc.*,
No. 16-CV-1122-RGA, 2019 WL 4016235 (D. Del. Aug. 26, 2019) .......... 20

*Comcast IP Holdings I, LLC v. Sprint Commc'ns Co. L.P*,
No. 12-CV-0205-RGA, 2015 WL 4730899 (D. Del. Aug. 10, 2015) .......... 20, 21

*Creative Internet Advert. Corp. v. Yahoo! Inc.*,
689 F. Supp. 2d 858 (E.D. Tex. 2010) .......... 16

*EagleView Techs., Inc. v. Xactware Sols., Inc.*,
522 F. Supp. 3d 40 (D.N.J. 2021) .......... *passim*

*Energy Transp. Group, Inc. v. William Demant Holding A/S*,
697 F.3d 1342 (Fed. Cir. 2012) .......... 19

*Focus Prods. Group Int'l, LLC v. Kartri Sales Co., Inc.*,
No. 15 Civ. 10154, 2022 WL 17851810 (S.D.N.Y. Dec. 22, 2022) .......... 10, 15, 16

*Funai Elec. Co., Ltd. v. Daewoo Elecs. Corp.*,
593 F. Supp. 2d 1088 (N.D. Cal. 2009) .......... 17

*General Motors v. Devex Corp.*,
461 U.S. 648 (1983) .......... 19

*Georgetown Rail Equipment Co. v. Holland L.P.*,
No. 6:13-cv-366, 2016 WL 3346084 (E.D. Tex. June 16, 2016) .................................... 7, 8, 12

*Green Mtn. Glass LLC v. Saint-Gobain Containers, Inc.*,
300 F. Supp. 610 (D. Del. 2018) ........................................................................ 3, 7, 20

*Halo Electronics, Inc. v. Pulse Electronics, Inc.*,
579 U.S. 93 (2016) ............................................................................................ 2, 3

*Idenix Pharms. LLC v. Gilead Scis., Inc.*,
271 F. Supp. 3d 694 (D. Del. 2017) ......................................................................... 20

*Izzo Golf Inc. v. King Par Golf Incorporated*,
2019 WL 4023562 (W.D.N.Y. Aug. 27, 2019) ............................................................ 15

*Jiaxing Super Lighting Elec. Appliance Co., Ltd. v. CH Lighting Tech. Co., Ltd.*,
No. 6:20-cv-18, 2022 WL 3371630 (W.D. Tex. Aug. 16, 2022) ................................ 14, 16, 18

*LG Display Co., Ltd. v. AU Optronics Corp.*,
722 F. Supp. 2d 466 (D. Del. 2010) ......................................................................... 20

*Lone Star Tech. Innovations, LLC v. ASUSTek Computer, Inc.*,
No. 6:19-CV-59, 2022 WL 4494312 (E.D. Tex. Aug. 18, 2022) ............................................ 8

*Nox Medical Ehf v. Natus Neurology Inc.*,
No. 1:15-cv-709, 2018 WL 6427686 (D. Del. Dec. 7, 2018) ............................................ 15

*Probatter Sports, LLC v. Sports Tutor, Inc.*,
586 F. Supp. 3d 80 (D. Conn. 2022) ...................................................................... 15, 16

*Read Corp. v. Portec, Inc.*,
970 F.2d 816 (Fed. Cir. 1992) ............................................................................ *passim*

*Schwendimann v. Arkwright Advanced Coating, Inc.*,
959 F.3d 1065 (Fed. Cir. 2020) ........................................................................... 19, 21

*Sensonics v. Aerosonic Corp.*,
81 F.3d 1566 (Fed. Cir. 1996) ................................................................................ 19

*Siemens Mobility, Inc. v. Westinghouse Air Brake Techs. Corp.*,
No. 16-284-LPS, 2019 WL 3240521 (D. Del. July 18, 2019) ............................................ 3

*Sterner Lighting, Inc. v. Allied Elec. Supply, Inc.*,
431 F.2d 539 (5th Cir. 1970) ................................................................................. 11

*Telcordia Techs., Inc. v. Cisco Sys., Inc.*,
592 F. Supp. 2d 727 (D. Del. 2009) ........ 20

*Tinnus Enters., LLC v. Telebrands Corp.*,
369 F. Supp. 3d 704 (E.D. Tex. 2019) ........ 14

*White v. Dunbar*,
119 U.S. 47, 7 S.Ct. 72 (1886) ........ 11

**STATUTES:**

28 U.S.C. § 1961 ........ 2, 21, 22

35 U.S.C. § 284 ........ *passim*

35 U.S.C. § 286 ........ 21

35 U.S.C. § 287 ........ 21

## NATURE AND STATE OF THE PROCEEDINGS

Plaintiffs, The Board of Regents of The University of Texas System ("UTBOR") and TissueGen, Inc. ("TissueGen") (collectively "Plaintiffs"), filed this lawsuit on November 20, 2017. D.I. 1. The Court presided over a bifurcated trial ending January 31, 2023. The jury returned a phase-one verdict finding Defendant, Boston Scientific Corporation ("Boston Scientific" and/or "Defendant"), infringed asserted claims 1, 11, 17, and 26 of the '296 Patent and that Boston Scientific failed to prove any claims invalid. D.I. 332. Later the same day, the jury returned its phase-two verdict finding that Boston Scientific's infringement was willful, that it had induced infringement, and that the damages Boston Scientific inflicted totaled $42 million. D.I. 334.

## SUMMARY OF THE ARGUMENT

1. The jury unanimously returned two verdicts in favor of Plaintiffs. Given the jury's verdict that Boston Scientific willfully infringed U.S. Patent No. 6,596,296 (the "'296 Patent"), Plaintiffs seek enhancement of the jury's damages award under 35 U.S.C. § 284. Boston Scientific's copying, trial tactics, lack of good faith defenses, the verdict itself, and the remaining circumstances of this case amply support an enhancement of $42 million.

2. Additionally, Plaintiffs also are entitled to pre-judgment and post-judgment interest. Pre-judgment interest is the *de facto* rule in federal courts. No reason exists to deviate from that Rule. Likewise, interest at the prime rate, compounded quarterly, is the common practice in this District and is significantly less than TissueGen's 8% cost of capital. Plaintiffs calculate pre-judgment interest to be $10,947,425 through February 15, 2023, the date the Court entered judgment.

3. Finally, post-judgment interest is statutorily required and governed by 28 U.S.C. § 1961. Plaintiffs calculate post-judgment interest to accrue at 4.87% computed daily and compounded annually.

## STATEMENT OF FACTS

The relevant facts are raised and cited as needed below.

## ARGUMENT

### A. Boston Scientific's Willful Infringement Warrants Enhanced Damages..

The jury concluded that Boston Scientific's infringement of the '296 Patent was willful, *i.e.*, that Boston Scientific "engaged in conduct evidencing a deliberate or reckless disregard for the Plaintiffs' patent rights." D.I. 329.4 (Phase 2 Jury Instructions). Given the verdict and the circumstances of this case, the Court should enhance damages by $42 million.

#### 1. The Standard for Enhanced Damages.

The Court has discretion to enhance damages up to three times the jury's award. 35 U.S.C. § 284 ("… the court may increase the damages up to three times the amount found or assessed"). In *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 579 U.S. 93, 105–10 (2016), the Supreme Court "eschew[ed] any rigid formula for awarding enhanced damages under § 284" and held that "district courts are to be guided by the sound legal principles developed over nearly two centuries of application and interpretation of the Patent Act." Such principles "channel the exercise of discretion, limiting the award of enhanced damages to egregious cases of misconduct beyond typical infringement." *Id.* at 110. Boston Scientific's misconduct transcends typical infringement.

In *Read Corp. v. Portec, Inc.*, 970 F.2d 816 (Fed. Cir. 1992), the Federal Circuit established factors for district courts to evaluate when considering whether to enhance damages. While *Halo* abrogated *Read*, the *Read* factors remain "useful guideposts."[1] The *Read* factors include: (1)

[1] *See, EagleView Techs., Inc. v. Xactware Sols., Inc.*, 522 F. Supp. 3d 40, 48 (D.N.J. 2021) (citing *Apple Inc. v. Samsung Elecs. Co.*, 258 F. Supp. 3d 1013, 1030 (N.D. Cal. 2017)); *Siemens Mobility, Inc. v. Westinghouse Air Brake Techs. Corp.*, No. 16-284-LPS, 2019 WL 3240521, at *7–8 (D. Del. July 18, 2019) (applying *Read* factors); *Green Mtn. Glass LLC v. Saint-Gobain Containers, Inc.*, 300 F. Supp. 610, 629 (D. Del. 2018) (same).

whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) defendant's size and financial condition; (5) closeness of the case; (6) duration of defendant's misconduct; (7) remedial action by defendant; (8) defendant's motivation for harm; and (9) whether defendant attempted to conceal its misconduct. Each of these factors supports enhancement in this case.

### 2. The *Read* Factors Support Enhanced Damages.

***Factor 1: Boston Scientific Copied the Patented Technology***

Plaintiffs adduced compelling evidence that Boston Scientific copied the technology and ideas claimed in the '296 Patent. The evidence proved that Boston Scientific used the patented technology in the Synergy™ stent and in early versions called "Evolution." The timeline of events establishes—nearly as a matter of law—that, led by its R&D team, Boston Scientific copied.

On or about October 1, 2008, Boston Scientific presented the FDA with initial plans for a "Drug-Eluting Biodegradable Polymer Coating on Metallic Stent." DTX 300. Focused on "delivery of paclitaxel or everolimus with a reduced and diminishing polymer load," Boston Scientific disclosed the two designs it was considering. DTX 300.6–7. [redacted] The other was a coating configured as abluminal continuous strips providing "primarily burst release" of the drug within 30 days using PLGA polymer that takes 5–8 months to degrade. *Id*. The presentation does not call the primarily-burst -release -design "Evolution." *Id*. It does not disclose any drug-to-polymer ratio. *Id*. And it never suggests that immiscible, discrete (i.e. individually separate), drug-containing phase regions are dispersed throughout the abluminal continuous coating. *Id*. Thus, Boston Scientific's rudimentary stent was in the very early

conceptual stages in early October 2008.

About two weeks after Boston Scientific's 2008 FDA meeting, on October 16, 2008, Dr. Nelson gave a technology presentation to Mary Beth Moynihan and Kevin Ballinger, who was Vice President of Research & Development at Boston Scientific. PTX 26; Trial Tr. at 1207:10–22, 1209:23–1210:6; *see also* PTX 73.1. The presentation focused on the "Revolutionary" drug-eluting stent solutions TissueGen was developing. PTX 26.1. It emphasized that "TissueGen uses biodegradation, as well as polymer composition and format to tune drug delivery." PTX 26.4. It also described TissueGen's ARCHER stent, a flat coil fiber, and polymer degradation times relative to drug release, and most critically, disclosed TissueGen's "Solid Patent Foundation," which included the '296 Patent. PTX 26. Dr. Nelson left Ms. Moynihan and Mr. Ballinger with a two-page executive summary as well. PTX 65. Ms. Moynihan, who was also a vice president at Boston Scientific, acknowledged that she and Mr. Ballinger received Dr. Nelson's overview of the patented "technology and plans" and found the "technology and ideas" to be "interesting." PTX 67.2. Notably, Ms. Moynihan and Mr. Ballinger did not disparage the technology disclosed in the '296 Patent as not being novel, already in existence, or already in development at Boston Scientific. To the contrary, in the spring of 2009, Ms. Moynihan sought and received "additional information" about the patented technology, promptly shared the information with multiple executives leading Boston Scientific's research and development team, and confirmed that she and "Kevin Ballinger (VP, R&D)" reviewed Dr. Nelson's materials. PTX 69.1–2; PTX 70; PTX 73.1.

In June of 2009, after reviewing Plaintiffs' patented "technology and ideas," Boston Scientific's research and development team made another presentation to the FDA. PTX 72; PTX 72.8. This presentation provided far more detail and more specifics about a controlled extended-release design called "Evolution." For example, it shows that Boston Scientific had

settled on 85:15 PLGA polymer formulation using everolimus in a 45:55 drug to polymer ratio to be released over approximately 90 days at varying rates. PTX 72.11. The June 2009 FDA presentation showed immiscible, discrete (i.e. individually separate), dispersed drug-containing phase regions, explaining that "Drug and polymer are not mixed" and that "flexible polymer and brittle drug phases coexist separately from each other." PTX 72.20. Immiscible, discrete, and dispersed drug-containing phase regions lie at the heart of the asserted claims of the '296 Patent.

Boston Scientific made no effort to rebut this evidence of copying the Synergy™ stent's design. Boston Scientific did not adduce any specific evidence showing its derived the "Evolution" design independent of the '296 Patent or the patented technology, or before Ms. Moynihan and Mr. Ballinger met with Dr. Nelson in 2008. PTX 72.8; PTX 73.1. Nor did Boston Scientific dispute that at least two of its Vice-Presidents who were researching and developing its drug-eluting stents had knowledge of the '296 Patent and TissueGen's "Revolutionary" technology during the exact period (Fall 2008–2009) when Boston Scientific's FDA presentations "evolved" to include the patented features. PTX 69.1–2; PTX 70; PTX 73.1.

Boston Scientific's purported willfulness defense consisted entirely of self-serving, conclusory testimony from Dr. Dominic Allocco and Dr. Aparna Bhave. Putting aside whether these witnesses even understood what it meant to willfully infringe a patent, neither witness participated in the ***design*** of the Synergy™ stent. Dr. Allocco led the clinical trials for the Synergy™ stent and gave presentations about it to physicians. Trial Tr. at 325:25–326:7. There is no evidence he was involved in the Synergy™ stent's design. Thus, he merely alleged that "Boston Scientific had done extensive work on the Synergy stent" at the time of the 2009 FDA presentation. Trial Tr. at 1245:14–17. This superficial statement, devoid of any detail, hardly constitutes any sort of rebuttal to willfulness.

[redacted] The most she could say was that ***she*** was not a willful infringer. Trial Tr. at 1247:17–19. Neither could speak on behalf of the dozens of other Boston Scientific engineers and employees involved in the Evolution/Synergy design process. Trial Tr. 1249:12–1250:1. And neither witness could explain why Boston Scientific used a polymer identified in the '296 Patent, used a drug category identified in the '296 Patent, and used both in a thread-like structure having a microstructure meeting the claims of the '296 Patent. This evidentiary void is underscored by the fact that ***none*** of the senior research and development executives to whom Ms. Moynihan provided the TissueGen presentation appeared at trial to rebut this evidence of copying and explain the development of the Synergy™ stent's design. Ms. Moynihan said nothing to defend Boston Scientific, either at trial or in her deposition. By contrast, the Boston Scientific witness who designed the Synergy™ stent, Dr. Chen, admitted that a coating process could result in a fiber. Trial Tr. at 494:22–25. Boston Scientific's perfunctory response to Plaintiffs' willfulness case speaks volumes.

The jury credited Plaintiffs' evidence of copying and declined to adopt Boston Scientific's threadbare rebuttal. Courts have found this factor to favor enhancement in similar circumstances. For example, in *Alfred E. Mann Foundation for Scientific Res. v. Cochlear Corp.,* No. 07-8108, 2018 WL 6190604, at *25 (C.D. Cal. Nov. 4, 2018), there was evidence that "Cochlear was aware of and that it deliberately copied" the technology of the patent-in-suit. The court ruled that the first *Read* factor favored enhancement, noting "[t]hat [Cochlear] developed a very similar system under these circumstances is strong evidence of copying and favors enhancing damages." *Id.*[2]

---

[2] *See also Green Mountain*, 300 F. Supp. 3d at 628 (finding factor 1 to favor enhancement because "the jury presumably found the facts to be more consistent with Plaintiffs' characterization than Defendant's"); *EagleView*, 522 F. Supp. 3d at 49 ("Whether this conclusively proves 'deliberate copying,' as Defendants urge, is not the standard; the Court is satisfied that these facts meet

***Factor 2: Boston Scientific Did Not Have a Good Faith Belief of Non-infringement or Invalidity***

There is no evidence that Boston Scientific investigated the scope of the ’296 Patent and formed a good faith belief that it was invalid or not infringed. Indeed, the evidence suggests otherwise. Boston Scientific elected not to seek an *inter partes* review or *ex parte* reexamination of the asserted claims despite the lower evidentiary burdens. Trial Tr. at 925:16–22. Nor did Boston Scientific produce or rely on an opinion of counsel or similar defense. That Boston Scientific presented zero evidence of any investigation or good faith belief confirms that this factor weighs heavily in favor of enhancement.[3]

***Factor 3: Boston Scientific Violated the Court’s Order and Sought to Mislead the Jury***

This factor concerns the infringer’s behavior as a party to the litigation. *EagleView*, 522 Supp. 3d at 51. “Typically, ‘litigation misconduct’ refers to bringing vexatious or unjustified suits, discovery abuses, failure to obey orders of the court, or acts that unnecessarily prolong litigation.” *Apple*, 258 F. Supp. 3d at 1032. Boston Scientific did not act vexatiously or abuse discovery pretrial; however, at trial, Boston Scientific repeatedly flaunted and failed to obey the Court’s *Markman* order and attempted to introduce evidence in violation of orders on motions *in limine*.

Boston Scientific repeatedly elicited testimony from its expert Dr. Mooney that was

Plaintiff’s preponderance of the evidence burden as to this factor.”). *Georgetown Rail Equipment Co. v. Holland L.P.*, No. 6:13-cv-366, 2016 WL 3346084, at *17 (E.D. Tex. June 16, 2016) (same).

[3] *See EagleView*, 522 F. Supp. 3d at 51 (“[T]he record is devoid of any evidence that Defendants had someone investigate EagleView’s patents, a fact that also weighs in favor of enhanced damages.”); *Lone Star Tech. Innovations, LLC v. ASUSTek Computer, Inc.*, No. 6:19-CV-59, 2022 WL 4494312, at *6 (E.D. Tex. Aug. 18, 2022) (finding second factor favoring enhancement because of defendant’s failure to plead an advice of counsel defense and its “failure to present evidence of a good faith belief of invalidity during the jury trial”); *Georgetown Rail*, 2022 WL 3346084, at *18 (same, because “there is no evidence that Holland made an investigation into the scope of Georgetown’s patent rights, made any attempt to design around the patent, or had a good faith belief of noninfringement”).

inconsistent with the Court's claim construction of the term "fiber." Neither the claim language nor the Court's claim construction limited the claimed "polymer fiber" to any specific method of manufacture or creation. JTX 001; D.I. 90, D.I. 255. The Court made it abundantly clear that Boston Scientific could not argue that the claims were so limited. D.I. 276 at 1–2 (precluding evidence that "fibers must have a common molecular structure or that Claim 1 … is limited by a method of manufacturing"). Despite these orders and instructions, during his direct examination, Dr. Mooney testified—in many instances using broad, narrative, non-responsive answers—that fibers could only be created using spinning techniques. Trial Tr. at 725:8–23, 736:6–24; D.I. 320. This testimony was designed to make it appear that no other methods existed to create the claimed fiber. Dr. Mooney repeatedly insinuated that Boston Scientific could not infringe because it used a roll-coating technique. *Id*. Incredibly, Dr. Mooney even testified that he did not recall "being aware of other processes besides spinning and extrusion for making fibers" at the time of his report. Trial Tr. at 810:5–7.[4] This was in direct contravention of the Court's orders and pretrial admonitions.

Dr. Mooney's testimony also ran afoul of the Court's rulings during trial. Dr. Mooney argued that the Synergy™ stent did not infringe because Boston Scientific used an "amorphous" polymer, which according to Dr. Mooney, "would not be a polymer that one would typically want to choose or be suitable for making a fiber." Trial Tr. at 804:25–805:2. Prior to Dr. Mooney's testimony, however, Plaintiffs objected to two of his demonstratives, reproduced below, that reflected this same opinion regarding the suitability of "amorphous" polymers.

[4]Tellingly, Boston Scientific unsuccessfully attempted to thwart cross-examination on other processes for forming fibers. *See* Trial Tr. at 806:18–807:20 ("THE COURT: He has the right to ask are there other manufacturing processes. The Court's claim construction did not limit it to any particular process.").







The Court sustained Plaintiffs' objection to these two demonstratives after asking Dr. Mooney a handful of questions outside the presence of the jury. Trial Tr. at 541:14–543:20 ("So I'm going to sustain the objection to 19 and 44 as well."). Dr. Mooney flouted this ruling and testified at length regarding the non-suitability of amorphous structures. Trial Tr. at 718:19–719:1, 789:24–790:3, 804:25–805:2. Presumably, the Court did not intend to leave the door open for Dr. Mooney to offer testimony identical in substance to the struck demonstratives. Dr. Mooney should not have offered this opinion and Boston Scientific should not have elicited this testimony. Such tactics support enhancement.[5]

Additionally, Boston Scientific adduced misleading evidence regarding the miscibility element of claim 1, which states "the first and second *phases* being immiscible." JTX 001.28 (emphasis added). But Boston Scientific repeatedly and knowingly sought to mislead the jury by

[5] *Focus Prods. Group Int'l, LLC v. Kartri Sales Co., Inc.*, No. 15 Civ. 10154, 2022 WL 17851810, at *77 (S.D.N.Y. Dec. 22, 2022) (favoring enhancement because defendants "reiterated arguments that the Court had rejected").

conflating immiscibility of *phases* and immiscibility of *substances*. Trial Tr. at 393:7–14, 744:6–749:17. Boston Scientific and its witnesses repeatedly referred to a statement in JTX 002.6 that "there was slight miscibility between everolimus and PLGA in the SYNERGY Clinical coating." *See also* Trial Tr. at 393:8–394:3. But as Boston Scientific, its witnesses, and its counsel undoubtedly understood, everolimus and PLGA are substances, not phases of the polymer fiber. There is no miscibility of phases in the finished Synergy™ stent as sold and offered for sale. Indeed, the sentence relied upon by Boston Scientific concludes with the language "separate drug and PLGA rich *phases* are detected as observed in the FESEM images shown in Figure 7.2-F1 above." JTX 002.6 (emphasis added).

In the subsequent paragraph of the same document, Boston Scientific told the FDA that "there is no significant physical interaction between the two coating components, everolimus and PLGA, and *a phase separation is observed in the drug coating layer, with two distinct phases*." *Id*. (emphasis added); PTX 051.221 ("Specifically, the testing confirmed the presence of two distinct glass transition temperatures (Tg) associated with everolimus and PLGA as well as a phase separation between everolimus drug domain and PLGA matrix ….). That Boston Scientific could only rely on one line in one exhibit referencing *substances*—and then attempt to use that one line to mislead the jury into finding non-infringement regarding *phases*—establishes that Boston Scientific knew its non-infringement theory as to the immiscibility element was legally and factually baseless.[6] Boston Scientific's intentional mischaracterization goes beyond zealous

[6] Further, Boston Scientific argued that the Song reference disclosed immiscibility of two phases even though the two substances in Song were in contact with each other—the same configuration found in the Synergy™ stents. Trial Tr. at 773:6–17, 779:4– 20. In that sense, Boston Scientific viewed the claims one way for non-infringement and another way for invalidity, violating the principle that a patent claim should not be treated like a "nose of wax." *Sterner Lighting, Inc. v. Allied Elec. Supply, Inc.*, 431 F.2d 539, 544 (5th Cir. 1970) (citing *White v. Dunbar*, 119 U.S. 47, 51, 7 S.Ct. 72 (1886)).

advocacy and further justifies enhancement. *See EagleView*, 522 F. Supp. 3d at 51 (factor favored enhancement in part because "Defendants repeatedly acted in a manner that ignored the weaknesses of their own arguments").

***Factor 4: Boston Scientific's Size and Financial Condition Supports Enhancement***

In evaluating this factor, "the proper focus is on the size and financial condition of the infringer and not on the ability of a plaintiff to protect its patent" and a "significant size disparity between plaintiff and defendant supports enhanced damages." *Alfred E. Mann*, 2018 WL 6190604 at *29. Boston Scientific is a publicly traded company with a market capitalization of over $67 billion. *See* https://finance.yahoo.com/quote/BSX/ (last visited March 8, 2023). During trial, the evidence showed that Boston Scientific generated [redacted] in revenue from sales of the Accused Products between November 2017 and August 2020. Trial Tr. at 1225:3–8. The jury's damages verdict thus reflects [redacted] of that revenue. Trial Tr. at 1095:17–25. Boston Scientific has retained (and will retain) all pre-litigation revenue and profits in addition to all sales of the Accused Products since August 2020. Trial Tr. at 1094:6–14. Boston Scientific continues to retain the benefits of its pre-litigation infringement and will continue to benefit financially from making, using and selling the claimed invention for years to come at no additional cost. Boston Scientific will not be unduly prejudiced by a $42 million enhancement.[7]

***Factor 5: This Was Not a Close Case***

The jury took very little time in reaching the unanimous verdicts in favor of Plaintiffs on every submitted issue: direct infringement, no invalidity, willfulness, and induced infringement and obtained [redacted] of the damages requested.

Boston Scientific's witnesses and documents undermined its non-infringement defenses.

---

[7] *EagleView*, 522 F. Supp. 3d at 40 (fourth factor supports enhancement based on defendant's financial condition and ability to pay); *Georgetown Rail*, 2022 WL 3346084, at *18-19 (same).

Dr. Allocco could not cogently explain why certain long and thin structures of various lengths and shapes were "thread-like" but the polymer fiber on the Synergy™ stent was not. *Compare* Trial Tr. at 351:5–355:24 *with* Trial Tr. at 401:14–403:23. Indeed, Dr. Allocco testified that he would just "know" if the Synergy™ stent coating formed a "fiber." Trial Tr. at 403:11–23.

Boston Scientific's sole technical expert, Dr. Mooney, likewise adopted the non-scientific "looking-at-it" approach, applying his expertise at "looking at things" to reach an opinion that the polymer on the Synergy™ stent is not thread-like because "[i]t's pretty obvious when you just look at it. If you actually look at the actual stent itself and the coating, as I said, this view or a magnified view, you don't see anything thread-like there." Trial Tr. at 711:12–21. In stark contrast, Plaintiffs' expert, Dr. Pitt, detailed his investigation and analysis and laid the proper analytical and scientific foundation for its consideration (unlike Dr. Mooney who laid no foundation for his opinions and relied on *ipse dixit*). Trial Tr. at 527:14–529:22. Dr. Pitt's testimony was supported by calculating the lengths, widths, and aspect ratios of the Synergy™ stent struts, a scale model, and applying the Court's claim construction. *See* PTX 35; PTX 36; Trial Tr. 592:3–595:24. Moreover, Boston Scientific's own documents eviscerated its non-infringement defense as to immiscibility, repeatedly describing the two phases as immiscible. *See, e.g.*, JTX 002.4–002.6 (describing the drug coating layer on the Synergy as having "two distinct phases").

As to invalidity, Boston Scientific relied on one patent directed to chewing gum, the Song reference, for anticipation. Trial Tr. at 813:22–24. Boston Scientific dropped its obviousness defense altogether after forcing the Plaintiffs to expend significant resources addressing it pretrial. Trial Tr. at 813:19. The written description defense was asserted without addressing the specification's multiple examples and disclosures of emulsions, which are necessarily composed of two immiscible phases. *Compare* Trial Tr. at 765:9–766:21 *with* Trial Tr. at 890:1–892:2.

The jury rejected each of Boston Scientific's contrived non-infringement and invalidity defenses and given its verdict, did not find any of Boston Scientific's witnesses credible. What's more, the jury did not take long to render its unanimous verdicts. As to phase 1, the jury left the courtroom to deliberate at 4:15 p.m., and adjourned for the evening at 5:39 p.m. Trial Tr. at 1036:17–18; 1040:10–11. The jury returned with its verdict on January 31, 2023 at 10:34 a.m. Assuming the jury began its deliberation on January 31, 2023 at 9:30 a.m., the typical start time for the Court's trial day, the jury deliberated for less than 2.5 hours on Phase 1. Similarly, the jury left the courtroom at 6:06 p.m. to deliberate for Phase 2 and returned at 7:25 p.m. to return its verdict. Trial Tr. at 1282:4–5, 15–16. The jury took about 80 minutes to find Boston Scientific's infringement willful, find that it induced infringement, and that it owed $42 million in damages. The evidence was overwhelming and clearly one-sided. Courts have ruled that similar circumstances militate in favor of enhanced damages under this *Read* factor.[8] The same reasoning applies here.

***Factor 6: Boston Scientific's Misconduct Spanned Several Years***

"Continuing to sell infringing products after receiving notice of infringement, during the course of the litigation and/or after a finding of infringement supports an enhancement of damages." *Alfred E. Mann*, 2018 WL 6190604, at *30. In *EagleView*, the Court concluded that the proper consideration of time for this *Read* factor is the "duration of infringement when the defendant had knowledge of the patent" rather than whether the infringer continued to infringe

[8] *See, e.g., EagleView*, 522 F. Supp. 3d at 52 ("This case was not close. After a two-week trial, the jury reached a verdict in about two hours. Plaintiff won every significant issue at trial as well."); *Tinnus Enters., LLC v. Telebrands Corp.*, 369 F. Supp. 3d 704, 723–724 (E.D. Tex. 2019) ("At the end of the six-day trial, the jury deliberated for just two-and-a-half hours before finding that Defendants infringed the patents-in-suit, that the patents-in-suit were valid and that Defendants' infringement was willful."); *Jiaxing Super Lighting Elec. Appliance Co., Ltd. v. CH Lighting Tech. Co., Ltd.*, No. 6:20-cv-18, 2022 WL 3371630, at *8 (W.D. Tex. Aug. 16, 2022) ("This factor favors enhancement in view of the Jury's quick and lopsided decision.").

*after* a finding of infringement. 522 F. Supp. 3d at 53. And "a long duration [of misconduct] tends to support enhanced damages more than a short duration." *Probatter Sports, LLC v. Sports Tutor, Inc.*, 586 F. Supp. 3d 80, 118 (D. Conn. 2022) (citing cases).

In this case, Dr. Nelson presented his technology and the '296 Patent to Boston Scientific in October 2008. *See supra*. Boston Scientific's Vice-President, Mary Beth Moynihan, followed up the next month and the parties exchanged additional communications at that time. PTX 67. Dr. Nelson reached out to Ms. Moynihan the following April 2009 seeking strategic partnership or acquisition. PTX 69.2. Ms. Moynihan invited Dr. Nelson to forward to her any additional information about TissueGen. *Id.* Dr. Nelson provided an executive summary and PowerPoint presentation in response. PTX 69.1. Boston Scientific then said nothing. Instead, it misused the technology of the '296 Patent in its Synergy™ stents, which launched in the third quarter of 2015. Trial Tr. at 1127:25–1129:4. Plaintiffs initiated this action on November 20, 2017, D.I. 1, and the '296 Patent expired on August 18, 2020. On January 31, 2023, the jury returned its willful infringement verdict. D.I. 334. Accordingly, Boston Scientific's intentional, deliberate, and wanton unauthorized use, manufacture, sale, offer for sale, and importation of the Synergy™ stents spanned five years. This does not include the time Boston Scientific spent from 2008 to 2015 using the patented technology in its R&D and clinical trials of the Synergy™ stent.

Misconduct as long as Boston Scientific's willful infringement has been held to favor enhancement.[9] This factor favors enhancement here as well.

---

[9] *See Nox Medical Ehf v. Natus Neurology Inc.*, No. 1:15-cv-709, 2018 WL 6427686, at *4 (D. Del. Dec. 7, 2018) (finding factor six to support enhancement because "[t]hree years is an objectively lengthy time to knowingly infringe a valid patent"); *Izzo Golf Inc. v. King Par Golf Incorporated*, 2019 WL 4023562, at *7 (W.D.N.Y. Aug. 27, 2019) (same, given that defendant continued to sell infringing golf bags until three years after litigation commenced); *Focus Prods.* 2022 WL 17851810, at *77 (same because "Defendants' misconduct lasted nearly three years before litigation commenced, and then persisted for nearly another three years").

***Factor 7: Boston Scientific Took No Remedial Action***

Courts have explained that this factor concerns "whether conduct during the pendency of the suit evinces an unrepentant defendant"[10] There is no evidence that Boston Scientific took any remedial action once this lawsuit was filed. To the contrary, Boston Scientific continued to infringe willfully even after Plaintiffs filed suit. During trial, Boston Scientific attempted to argue that its Promus™ stent was an acceptable non-infringing alternative, Trial Tr. 1130:13–1131:17, but it is uncontroverted that Boston Scientific continued to market and sell the infringing Synergy™ stents without interruption through the damages period despite the availability of its FDA-approved Promus™ stent alternative. *Id.*; *see also* Trial Tr. at 1174:23–1175:10.

Boston Scientific's inaction, indifference, and continued infringement compel enhancement. In *Alfred E. Mann*, 2022 WL 6190604, at *31, the Court found that this factor *strongly* supported enhancement because the defendant Cochlear "took no remedial action, such as attempting to design around the patent," "failed to inquire about licensing the technology," and did not explain "what remedial action it has taken for infringing virtually the entire life of the patent."[11] Boston Scientific may argue that its inaction is excused because it asserted non-infringement and invalidity defenses. The court in *Jiaxing Super Lighting* rejected this exact argument: "It is difficult for Defendants to maintain a good-faith belief that they do not infringe

---

[10] *Jiaxing Super Lighting*, 2022 WL 3371630, at * 9 (citing *Acantha LLC v. DePuy Synthes Sales Inc.*, 406 F. Supp. 3d 742, 761 (E.D. Wis. 2019)); *see also Creative Internet Advert. Corp. v. Yahoo! Inc.*, 689 F. Supp. 2d 858, 869 (E.D. Tex. 2010) ("This factor looks to whether the defendant ceased the sale of the infringing product during the pendency of the litigation.").

[11] *See also EagleView*, 522 F. Supp. 3d at 54 ("Defendants continued to infringe, seemingly took no efforts to design around the patent, and kept their products on the market until the very end."); *Focus Products*, 2022 WL 17851810, at *77 ("Seventh, the record does not reflect any remedial actions taken by defendants. On the contrary, they continued to infringe until after the Court's *Markman* ruling three years into this litigation. This factor, too, favors plaintiffs."); *Probatter*, 586 F. Supp. 3d at 119 ("Therefore, the Court finds that Sports Tutors failure to take any remedial efforts supports enhanced damages.").

until either this Court, or a higher court, vacates the Jury's verdict. Or at least the Court will presume as much given that a jury verdict considerably narrows their ability to ultimately prevail in this dispute." 2022 WL 3371630, at *9.[12] This factor weighs heavily in favor of enhancement.

***Factor 8: Boston Scientific Was Motivated to Harm Plaintiffs***

"Where, as here, the infringer engages in infringing conduct to gain an edge over the patentee in a competitive market, this factor weighs in favor of enhanced damages." *Alfred E. Mann*, 2018 WL 6190604, at *32 (citing *Funai Elec. Co., Ltd. v. Daewoo Elecs. Corp.*, 593 F. Supp. 2d 1088, 1116–17 (N.D. Cal. 2009), *aff'd*, 616 F.3d 1357 (Fed. Cir. 2010)). Additionally, "courts are even more willing to find that this factor should enhance damages when the evidence supports the conclusion that the infringer preferred taking the risk of infringement over designing a non-infringing device." *EagleView*, 522 F. Supp. 3d at 54 (cleaned up).

Although Boston Scientific and UTBOR do not compete in the market, UTBOR's exclusive licensee, TissueGen, does "make biodegradable devices that deliver drug upon being implanted into the body." Trial Tr. at 163:9–11. In that sense, TissueGen does compete with Boston Scientific as to drug delivery devices and sought to partner with Boston Scientific in developing the technology for use in coronary stents. PTX 26; Trial Tr. at 1206:24–25, 1207:10–15. Boston Scientific received information from TissueGen as part of TissueGen's efforts to find a partner or investor. PTX 67. Then, instead of investing or partnering with TissueGen, Boston Scientific encouraged TissueGen to send more information and then used it to develop the Synergy™ stent knowing that TissueGen did not have the financial means to challenge Boston Scientific. PTX 69; PTX 73. As a result of its willful infringement, Boston Scientific achieved

[12] *See also EagleView*, 522 F. Supp. 3d at 53–54 (rejecting argument that defendants "were under no obligation to take remedial action until after the jury verdict because they maintained a subjective, good-faith belief that their actions were non-infringing").

[redacted]—[redacted] with respect to drug-eluting stents. *See* JTX016.16; Trial Tr. at 1109:25–1110:14. Boston Scientific's motivation to increase its market share (and thus obtain additional profits) at Plaintiffs' expense and to Plaintiffs' detriment favor enhancement.

***Factor 9: Boston Scientific Attempted to Conceal its Misconduct***

This final factor concerns whether a defendant attempted to conceal its misconduct. *Jiaxing Super Lighting*, 2022 WL 3371630, at *9. Dr. Nelson presented the patented technology and other materials to Boston Scientific in October 2008 (PTX 26; Trial Tr. at 1207:10-22) and had follow-up discussions with them in the April–May 2009 time frame (PTX 69; PTX 73). Dr. Nelson did not hear back from Boston Scientific after May 2009. Trial Tr. at 1210:19–1211:1. Unbeknownst to Dr. Nelson and his colleagues, Boston Scientific had begun incorporating the patented technology into the Synergy™ stents, as reflected in a presentation made to the FDA. *See* PTX 72. Boston Scientific did not credit Dr. Nelson or TissueGen nor did it seek to license or sublicense the '296 Patent from UTBOR or TissueGen. This conduct militates in favor enhancement.

The evidence establishes that Boston Scientific's conduct was willful, deliberate, and consciously wrongful. In addition to the jury's finding, the evidence established that Boston Scientific copied the patented technology and tried to avoid infringement by disregarding the Court's orders and misleading the jury. Boston Scientific's misconduct went on for years without any evidence of a good faith belief of non-infringement or invalidity. Ultimately, this case was not a close call for the jury, and enhanced damages should be awarded.

**B. Plaintiffs Are Entitled to Interest.**

The law unequivocally compels, if not outright requires, an award of pre-judgment and post-judgment interest. Plaintiffs' entitlement to interest begins with the language of § 284, which states that upon a finding for the claimant, "the court *shall* award the claimant damages adequate

to compensate for the infringement … *together with interest and costs as fixed by the court*." 35 U.S.C. § 284 (emphasis added). Given this statutory mandate, the Supreme Court has said, "[a]n award of interest from the time that the royalty payments would have been received merely serves to make the patent owner whole, since his damages consist not only of the value of the royalty payments but also of the forgone use of the money between the time of infringement and the date of the judgment." *General Motors v. Devex Corp*., 461 U.S. 648, 655–56 (1983). The same justifications compel awarding interest to Plaintiffs.

**1. The Court Should Award Pre-Judgment Interest at the Prime Rate, Compounded Quarterly, on the $42 Million Verdict Beginning November 20, 2017**

In *General Motors*, the Supreme Court stated that "prejudgment interest should ordinarily be awarded absent some justification for withholding such an award, [therefore] a decision to award prejudgment interest will only be set aside if it constitutes an abuse of discretion." *Id.* The Federal Circuit likewise has repeatedly noted that "prejudgment interest is the rule, not the exception." *Schwendimann v. Arkwright Advanced Coating, Inc*., 959 F.3d 1065, 1076 (Fed. Cir. 2020) (quoting *Sensonics v. Aerosonic Corp*., 81 F.3d 1566, 1574 (Fed. Cir. 1996)); *Energy Transp. Group, Inc. v. William Demant Holding A/S*, 697 F.3d 1342, 1358 (Fed. Cir. 2012) (affirming a district court's ruling "following the standard rule of awarding pre-judgment interest"). In *Sensonics*, the Federal Circuit explained that "the denial of prejudgment interest simply creates an incentive to prolong litigation, and that prejudgment interest in patent cases is withheld only under exceptional circumstances." 81 F.3d 1374–75. District courts, including and especially those in this District, agree unequivocally. In *Ateliers de la Haute-Garonne v. Broetje Automation-USA Inc*., 85 F. Supp. 3d 768, 783 (D. Del. 2015), Judge Stark reiterated that "[p]rejudgment interest on a damages award based on patent infringement is the rule under 35

U.S.C. § 284." In *Green Mountain Glass LLC v. Saint-Gobain Containers, Inc.*, 300 F. Supp. 3d 610, 627 (D. Del. 2018), Judge Sleet stated, "As a general matter, prejudgment interest should ordinarily be awarded in patent cases to provide patent owners with complete compensation."[13] There is no reason to deviate from "the rule" in this instance. Without pre-judgment interest, Plaintiffs will not obtain a complete remedy for Boston Scientific's infringement.

Just as awarding pre-judgment interest is the rule, using the prime rate, compounded quarterly, is by far the most common practice by Courts in this District.[14] There is no reason to deviate from this common practice in this case especially where TissueGen's cost of capital is 8%, a rate higher than that requested for pre-judgment interest. *See* Exhibit 2 (Gibson Decl.) at ¶2.

The jury in this case awarded $42 million in damages without any mention or indication of

---

[13] *See also Amgen Inc. v. Hospira*, 336 F. Supp. 3d 333, 363 (D. Del. 2018) (Andrews, J.) (awarding prejudgment interest); *LG Display Co., Ltd. v. AU Optronics Corp*., 722 F. Supp. 2d 466, 475 (D. Del. 2010) (Farnan, J.) (same).

[14] *See, e.g., ArcherDX, LLC v. Qiagen Scis., LLC*, No. CV 18-1019 (MN), 2022 WL 4597877, at *18 (D. Del. Sept. 30, 2022) (Noreika, J.) ("In sum, the judgment shall be amended to include prejudgment interest compounded quarterly at the prime rate for the $841,756 in lost profits in connection with Defendants' RNA-related products sold in the Unites States, $752,00613 in royalties for sales of DNA-related products in the Unites States and $2,240,303 in royalties for sales abroad."); *Bayer Healthcare LLC v. Baxalta Inc*., No. 16-CV-1122-RGA, 2019 WL 4016235, at *7 (D. Del. Aug. 26, 2019) (Andrews, J.), *aff'd*, 989 F.3d 964 (Fed. Cir. 2021) ("Accordingly, I will award Bayer prejudgment interest at the prime rate, compounded quarterly."); *Amgen*, 336 F. Supp. 3d at 364 ("Accordingly, I will award Amgen prejudgment interest using the prime rate compounded quarterly and applied against the $70 million lump-sum reasonable royalty award beginning on November 10, 2013."); *Idenix Pharms. LLC v. Gilead Scis., Inc*., 271 F. Supp. 3d 694, 705 (D. Del. 2017) (Stark, J.) ("As requested by Idenix, the Court will apply the prime rate. This is by far the most common practice in the District of Delaware."); *Ateliers*, 85 F. Supp. 3d at 783 ("Prejudgment interest in this case will be calculated at the prime rate, compounded quarterly, from the date of the first patent infringement through the date of judgment."); *Comcast IP Holdings I, LLC v. Sprint Commc'ns Co. L.P*, No. 12-CV-0205-RGA, 2015 WL 4730899, at *10 (D. Del. Aug. 10, 2015) (Andrews, J.), *aff'd sub nom., Comcast IP Holdings I LLC v. Sprint Commc'ns Co., L.P*., 850 F.3d 1302 (Fed. Cir. 2017) ("The Court agrees with Comcast that the appropriate interest rate is the prime rate, compounded quarterly."); *Telcordia Techs., Inc. v. Cisco Sys., Inc.*, 592 F. Supp. 2d 727, 749 (D. Del. 2009) (Sleet, J.), *aff'd in part, vacated in part, remanded*, 612 F.3d 1365 (Fed. Cir. 2010) ("Accordingly, the court will order Cisco to pay prejudgment interest at the prime rate, compounded quarterly.").

how the award was calculated. Accordingly, this damages award must be treated as a lump sum. *Amgen*, 336 F. Supp. 3d at 363. When damages are limited pursuant to 35 U.S.C. § 286 or 35 U.S.C. § 287(a), pre-judgment interest may begin to accrue when the underlying damages become available. Under Federal Circuit law, pre-judgment interest is properly assessed against the entire lump sum amount beginning on the first date of infringement. *Schwendiman*, 959 F.3d at 1076 (citing *Comcast IP Holdings*, 850 F.3d at 1315). Because damages in this case became available when Plaintiffs filed suit, pre-judgment interest begins to accrue on November 20, 2017.

Plaintiffs have calculated prejudgment interest to be $10,947,425 through February 15, 2023, the date of the judgment on the verdict. Plaintiffs attach the declaration of Justin Lewis, their damages expert, to show how this figure was calculated. *See* Exhibit 1 at ¶2.

### 2. Post-Judgment Interest is Required by Statute

Post-judgment interest is mandatory under 28 U.S.C. § 1961. Section 1961(a) states, "Interest ***shall*** be allowed on ***any*** money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a) (emphasis added). The calculation of the interest is likewise set by § 1961(a). *See id.* ("Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding."). Plaintiffs and their expert have calculated post-judgment interest to accrue at 4.87% computed daily and compounded annually. *See* Exhibit 1 at ¶4.

## CONCLUSION

Plaintiffs respectfully request that the Court (1) award enhanced damages of $42 million in addition to the jury's award of $42 million in compensatory damages, (2) award pre-judgment interest at the prime rate beginning November 20, 2017, which totals $10,947,425 and (3) award post-judgment interest in accordance with 28 U.S.C. § 1961.

Respectfully Submitted,

*/s/ Stamatios Stamoulis*
Stamatios Stamoulis (#4606)
STAMOULIS & WEINBLATT LLC
800 N. West Street, Third Floor
Wilmington, DE 19801
(302) 999-1540
stamoulis@swdelaw.com

*Attorneys for Plaintiffs*

OF COUNSEL:

Michael W. Shore
Chijioke E. Offor
THE SHORE FIRM
901 Main Street, Suite 3300
Dallas, Texas 75202
(214) 593-9110
mshore@shorefirm.com
coffor@shorefirm.com

Brian D. Melton
John P. Lahad
Corey M. Lipschutz
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Tel: (713) 651-9366
Fax: (713) 654-6666
bmelton@susmangodfrey.com
jlahad@susmangodfrey.com
clipschutz@susmangodfrey.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 15, 2023, the foregoing was served via e-mail upon all counsel of record for the parties.

*/s/ Stamatios Stamoulis*
Stamatios Stamoulis

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM and TISSUEGEN, INC., *Plaintiffs*, v. BOSTON SCIENTIFIC CORPORATION, *Defendant*. | ) | C.A. No. 1:18-cv-00392-GBW |

**DECLARATION OF JUSTIN V. LEWIS**

I, Justin V. Lewis, declare and state as follows:

1. I am a Managing Director at Ocean Tomo. I have been retained by Plaintiffs in the above captioned matter to analyze certain accounting, financial, and other business data in order to identify the appropriate compensation for Plaintiffs to receive. I submit this declaration specifically to address the calculation of pre-judgment and post-judgment interest.

2. My calculations for pre-judgment interest are set forth in Exhibit 1 to this declaration. I have calculated pre-judgment interest based upon the *Wall Street Journal* Prime Rate ("Prime Rate"), compounded quarterly. I calculated pre-judgment interest beginning on the date this action was filed (November 20, 2017). For each quarter I calculated the weighted average Prime Rate for that quarter and assessed that rate against the outstanding principal for that quarter. A list of the daily Prime Rates which I used to calculate the weighted average Prime Rate for each quarter is set forth in Exhibit 2. I have calculated pre-judgment interest accrued through February 15, 2023, the date the Court entered judgment, to be $10,947,425.

3. I understand that post-judgment interest after February 15, 2023 is governed by statute. Specifically, I understand that 28 U.S.C. § 1961(a) states that post-judgment interest "shall

be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." I further understand that post-judgment interest "shall be computed daily to the date of payment . . . and shall be compounded annually." *See* 28 U.S.C. § 1961(b).

4. The weekly average 1-year constant maturity Treasury yield may be downloaded from the Federal Reserve website. *See* https://www.uscourts.gov/services-forms/fees/post-judgment-interest-rate and https://www.federalreserve.gov/datadownload/Choose.aspx?rel=H.15. Attached as Exhibit 3 is a list of the weekly average 1-year constant maturity Treasury yield for the past year. The most recent entry preceding the date of the judgment was published on February 10, 2023 and is 4.87%. Accordingly, I have calculated post-judgment interest to accrue at 4.87% computed daily to the date of payment and compounded annually.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 15th day of March, 2023

Justin Lewis

Justin V. Lewis

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 1: Calculation of Potential Prejudgment Interest on Royalty Damages

| Period | [a] Starting Principal | [b] Average U.S. Prime Rate [1] [2] | [c] Annual Period | [d] = [a] x [b] x [c] Compounded Interest [3] | [e] Damages [4] | [f] = [a] + [d] + [e] Ending Principal |
|---|---|---|---|---|---|---|
| | | | | | $ 42,000,000 | $ 42,000,000 |
| November 20, 2017 to December 31, 2017 | $ 42,000,000 | 4.36% | 0.12 | $ 210,575 | $ - | $ 42,210,575 |
| January 1, 2018 to March 31, 2018 | $ 42,210,575 | 4.53% | 0.25 | $ 477,800 | $ - | $ 42,688,376 |
| April 1, 2018 to June 30, 2018 | $ 42,688,376 | 4.80% | 0.25 | $ 511,909 | $ - | $ 43,200,284 |
| July 1, 2018 to September 30, 2018 | $ 43,200,284 | 5.01% | 0.25 | $ 541,177 | $ - | $ 43,741,462 |
| October 1, 2018 to December 31, 2018 | $ 43,741,462 | 5.28% | 0.25 | $ 577,673 | $ - | $ 44,319,134 |
| January 1, 2019 to March 31, 2019 | $ 44,319,134 | 5.50% | 0.25 | $ 609,388 | $ - | $ 44,928,522 |
| April 1, 2019 to June 30, 2019 | $ 44,928,522 | 5.50% | 0.25 | $ 617,767 | $ - | $ 45,546,290 |
| July 1, 2019 to September 30, 2019 | $ 45,546,290 | 5.30% | 0.25 | $ 603,055 | $ - | $ 46,149,345 |
| October 1, 2019 to December 31, 2019 | $ 46,149,345 | 4.83% | 0.25 | $ 557,115 | $ - | $ 46,706,460 |
| January 1, 2020 to March 31, 2020 | $ 46,706,460 | 4.40% | 0.25 | $ 514,220 | $ - | $ 47,220,680 |
| April 1, 2020 to June 30, 2020 | $ 47,220,680 | 3.25% | 0.25 | $ 383,668 | $ - | $ 47,604,348 |
| July 1, 2020 to September 30, 2020 | $ 47,604,348 | 3.25% | 0.25 | $ 386,785 | $ - | $ 47,991,134 |
| October 1, 2020 to December 31, 2020 | $ 47,991,134 | 3.25% | 0.25 | $ 389,928 | $ - | $ 48,381,062 |
| January 1, 2021 to March 31, 2021 | $ 48,381,062 | 3.25% | 0.25 | $ 393,096 | $ - | $ 48,774,158 |
| April 1, 2021 to June 30, 2021 | $ 48,774,158 | 3.25% | 0.25 | $ 396,290 | $ - | $ 49,170,448 |
| July 1, 2021 to September 30, 2021 | $ 49,170,448 | 3.25% | 0.25 | $ 399,510 | $ - | $ 49,569,958 |
| October 1, 2021 to December 31, 2021 | $ 49,569,958 | 3.25% | 0.25 | $ 402,756 | $ - | $ 49,972,714 |
| January 1, 2022 to March 31, 2022 | $ 49,972,714 | 3.29% | 0.25 | $ 411,581 | $ - | $ 50,384,294 |
| April 1, 2022 to June 30, 2022 | $ 50,384,294 | 3.95% | 0.25 | $ 497,614 | $ - | $ 50,881,909 |
| July 1, 2022 to September 30, 2022 | $ 50,881,909 | 5.37% | 0.25 | $ 683,034 | $ - | $ 51,564,943 |
| October 1, 2022 to December 31, 2022 | $ 51,564,943 | 6.84% | 0.25 | $ 881,368 | $ - | $ 52,446,311 |
| January 1, 2023 to February 15, 2023 | $ 52,446,311 | 7.58% | 0.13 | $ 501,114 | $ - | $ 52,947,425 |
| **Total** | | | | **$ 10,947,425** | **$ 42,000,000** | |

**Sources/Notes:**
[1] See Exhibit 2; Assumes an average interest rate for the relevant periods from November 20, 2017 to February 15, 2023.
[2] See *http://www.fedprimerate.com/wall_street_journal_prime_rate_history.htm* .
[3] Assumes interest accrues on the award as of the date of suit.
[4] The jury awarded $42.0 million in damages.

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 11/20/2017 | 11 | Q4 | 2017 | Q4 2017 | 4.25% |
| 11/21/2017 | 11 | Q4 | 2017 | Q4 2017 | 4.25% |
| 11/22/2017 | 11 | Q4 | 2017 | Q4 2017 | 4.25% |
| 11/23/2017 | 11 | Q4 | 2017 | Q4 2017 | 4.25% |
| 11/24/2017 | 11 | Q4 | 2017 | Q4 2017 | 4.25% |
| 11/25/2017 | 11 | Q4 | 2017 | Q4 2017 | 4.25% |
| 11/26/2017 | 11 | Q4 | 2017 | Q4 2017 | 4.25% |
| 11/27/2017 | 11 | Q4 | 2017 | Q4 2017 | 4.25% |
| 11/28/2017 | 11 | Q4 | 2017 | Q4 2017 | 4.25% |
| 11/29/2017 | 11 | Q4 | 2017 | Q4 2017 | 4.25% |
| 11/30/2017 | 11 | Q4 | 2017 | Q4 2017 | 4.25% |
| 12/1/2017 | 12 | Q4 | 2017 | Q4 2017 | 4.25% |
| 12/2/2017 | 12 | Q4 | 2017 | Q4 2017 | 4.25% |
| 12/3/2017 | 12 | Q4 | 2017 | Q4 2017 | 4.25% |
| 12/4/2017 | 12 | Q4 | 2017 | Q4 2017 | 4.25% |
| 12/5/2017 | 12 | Q4 | 2017 | Q4 2017 | 4.25% |
| 12/6/2017 | 12 | Q4 | 2017 | Q4 2017 | 4.25% |
| 12/7/2017 | 12 | Q4 | 2017 | Q4 2017 | 4.25% |
| 12/8/2017 | 12 | Q4 | 2017 | Q4 2017 | 4.25% |
| 12/9/2017 | 12 | Q4 | 2017 | Q4 2017 | 4.25% |
| 12/10/2017 | 12 | Q4 | 2017 | Q4 2017 | 4.25% |
| 12/11/2017 | 12 | Q4 | 2017 | Q4 2017 | 4.25% |
| 12/12/2017 | 12 | Q4 | 2017 | Q4 2017 | 4.25% |
| 12/13/2017 | 12 | Q4 | 2017 | Q4 2017 | 4.25% |
| 12/14/2017 | 12 | Q4 | 2017 | Q4 2017 | 4.50% |
| 12/15/2017 | 12 | Q4 | 2017 | Q4 2017 | 4.50% |
| 12/16/2017 | 12 | Q4 | 2017 | Q4 2017 | 4.50% |
| 12/17/2017 | 12 | Q4 | 2017 | Q4 2017 | 4.50% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 12/18/2017 | 12 | Q4 | 2017 | Q4 2017 | 4.50% |
| 12/19/2017 | 12 | Q4 | 2017 | Q4 2017 | 4.50% |
| 12/20/2017 | 12 | Q4 | 2017 | Q4 2017 | 4.50% |
| 12/21/2017 | 12 | Q4 | 2017 | Q4 2017 | 4.50% |
| 12/22/2017 | 12 | Q4 | 2017 | Q4 2017 | 4.50% |
| 12/23/2017 | 12 | Q4 | 2017 | Q4 2017 | 4.50% |
| 12/24/2017 | 12 | Q4 | 2017 | Q4 2017 | 4.50% |
| 12/25/2017 | 12 | Q4 | 2017 | Q4 2017 | 4.50% |
| 12/26/2017 | 12 | Q4 | 2017 | Q4 2017 | 4.50% |
| 12/27/2017 | 12 | Q4 | 2017 | Q4 2017 | 4.50% |
| 12/28/2017 | 12 | Q4 | 2017 | Q4 2017 | 4.50% |
| 12/29/2017 | 12 | Q4 | 2017 | Q4 2017 | 4.50% |
| 12/30/2017 | 12 | Q4 | 2017 | Q4 2017 | 4.50% |
| 12/31/2017 | 12 | Q4 | 2017 | Q4 2017 | 4.50% |
| 1/1/2018 | 1 | Q1 | 2018 | Q1 2018 | 4.50% |
| 1/2/2018 | 1 | Q1 | 2018 | Q1 2018 | 4.50% |
| 1/3/2018 | 1 | Q1 | 2018 | Q1 2018 | 4.50% |
| 1/4/2018 | 1 | Q1 | 2018 | Q1 2018 | 4.50% |
| 1/5/2018 | 1 | Q1 | 2018 | Q1 2018 | 4.50% |
| 1/6/2018 | 1 | Q1 | 2018 | Q1 2018 | 4.50% |
| 1/7/2018 | 1 | Q1 | 2018 | Q1 2018 | 4.50% |
| 1/8/2018 | 1 | Q1 | 2018 | Q1 2018 | 4.50% |
| 1/9/2018 | 1 | Q1 | 2018 | Q1 2018 | 4.50% |
| 1/10/2018 | 1 | Q1 | 2018 | Q1 2018 | 4.50% |
| 1/11/2018 | 1 | Q1 | 2018 | Q1 2018 | 4.50% |
| 1/12/2018 | 1 | Q1 | 2018 | Q1 2018 | 4.50% |
| 1/13/2018 | 1 | Q1 | 2018 | Q1 2018 | 4.50% |
| 1/14/2018 | 1 | Q1 | 2018 | Q1 2018 | 4.50% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 1/15/2018 | 1 | Q1 | 2018 | Q1 2018 | 4.50% |
| 1/16/2018 | 1 | Q1 | 2018 | Q1 2018 | 4.50% |
| 1/17/2018 | 1 | Q1 | 2018 | Q1 2018 | 4.50% |
| 1/18/2018 | 1 | Q1 | 2018 | Q1 2018 | 4.50% |
| 1/19/2018 | 1 | Q1 | 2018 | Q1 2018 | 4.50% |
| 1/20/2018 | 1 | Q1 | 2018 | Q1 2018 | 4.50% |
| 1/21/2018 | 1 | Q1 | 2018 | Q1 2018 | 4.50% |
| 1/22/2018 | 1 | Q1 | 2018 | Q1 2018 | 4.50% |
| 1/23/2018 | 1 | Q1 | 2018 | Q1 2018 | 4.50% |
| 1/24/2018 | 1 | Q1 | 2018 | Q1 2018 | 4.50% |
| 1/25/2018 | 1 | Q1 | 2018 | Q1 2018 | 4.50% |
| 1/26/2018 | 1 | Q1 | 2018 | Q1 2018 | 4.50% |
| 1/27/2018 | 1 | Q1 | 2018 | Q1 2018 | 4.50% |
| 1/28/2018 | 1 | Q1 | 2018 | Q1 2018 | 4.50% |
| 1/29/2018 | 1 | Q1 | 2018 | Q1 2018 | 4.50% |
| 1/30/2018 | 1 | Q1 | 2018 | Q1 2018 | 4.50% |
| 1/31/2018 | 1 | Q1 | 2018 | Q1 2018 | 4.50% |
| 2/1/2018 | 2 | Q1 | 2018 | Q1 2018 | 4.50% |
| 2/2/2018 | 2 | Q1 | 2018 | Q1 2018 | 4.50% |
| 2/3/2018 | 2 | Q1 | 2018 | Q1 2018 | 4.50% |
| 2/4/2018 | 2 | Q1 | 2018 | Q1 2018 | 4.50% |
| 2/5/2018 | 2 | Q1 | 2018 | Q1 2018 | 4.50% |
| 2/6/2018 | 2 | Q1 | 2018 | Q1 2018 | 4.50% |
| 2/7/2018 | 2 | Q1 | 2018 | Q1 2018 | 4.50% |
| 2/8/2018 | 2 | Q1 | 2018 | Q1 2018 | 4.50% |
| 2/9/2018 | 2 | Q1 | 2018 | Q1 2018 | 4.50% |
| 2/10/2018 | 2 | Q1 | 2018 | Q1 2018 | 4.50% |
| 2/11/2018 | 2 | Q1 | 2018 | Q1 2018 | 4.50% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 2/12/2018 | 2 | Q1 | 2018 | Q1 2018 | 4.50% |
| 2/13/2018 | 2 | Q1 | 2018 | Q1 2018 | 4.50% |
| 2/14/2018 | 2 | Q1 | 2018 | Q1 2018 | 4.50% |
| 2/15/2018 | 2 | Q1 | 2018 | Q1 2018 | 4.50% |
| 2/16/2018 | 2 | Q1 | 2018 | Q1 2018 | 4.50% |
| 2/17/2018 | 2 | Q1 | 2018 | Q1 2018 | 4.50% |
| 2/18/2018 | 2 | Q1 | 2018 | Q1 2018 | 4.50% |
| 2/19/2018 | 2 | Q1 | 2018 | Q1 2018 | 4.50% |
| 2/20/2018 | 2 | Q1 | 2018 | Q1 2018 | 4.50% |
| 2/21/2018 | 2 | Q1 | 2018 | Q1 2018 | 4.50% |
| 2/22/2018 | 2 | Q1 | 2018 | Q1 2018 | 4.50% |
| 2/23/2018 | 2 | Q1 | 2018 | Q1 2018 | 4.50% |
| 2/24/2018 | 2 | Q1 | 2018 | Q1 2018 | 4.50% |
| 2/25/2018 | 2 | Q1 | 2018 | Q1 2018 | 4.50% |
| 2/26/2018 | 2 | Q1 | 2018 | Q1 2018 | 4.50% |
| 2/27/2018 | 2 | Q1 | 2018 | Q1 2018 | 4.50% |
| 2/28/2018 | 2 | Q1 | 2018 | Q1 2018 | 4.50% |
| 3/1/2018 | 3 | Q1 | 2018 | Q1 2018 | 4.50% |
| 3/2/2018 | 3 | Q1 | 2018 | Q1 2018 | 4.50% |
| 3/3/2018 | 3 | Q1 | 2018 | Q1 2018 | 4.50% |
| 3/4/2018 | 3 | Q1 | 2018 | Q1 2018 | 4.50% |
| 3/5/2018 | 3 | Q1 | 2018 | Q1 2018 | 4.50% |
| 3/6/2018 | 3 | Q1 | 2018 | Q1 2018 | 4.50% |
| 3/7/2018 | 3 | Q1 | 2018 | Q1 2018 | 4.50% |
| 3/8/2018 | 3 | Q1 | 2018 | Q1 2018 | 4.50% |
| 3/9/2018 | 3 | Q1 | 2018 | Q1 2018 | 4.50% |
| 3/10/2018 | 3 | Q1 | 2018 | Q1 2018 | 4.50% |
| 3/11/2018 | 3 | Q1 | 2018 | Q1 2018 | 4.50% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 3/12/2018 | 3 | Q1 | 2018 | Q1 2018 | 4.50% |
| 3/13/2018 | 3 | Q1 | 2018 | Q1 2018 | 4.50% |
| 3/14/2018 | 3 | Q1 | 2018 | Q1 2018 | 4.50% |
| 3/15/2018 | 3 | Q1 | 2018 | Q1 2018 | 4.50% |
| 3/16/2018 | 3 | Q1 | 2018 | Q1 2018 | 4.50% |
| 3/17/2018 | 3 | Q1 | 2018 | Q1 2018 | 4.50% |
| 3/18/2018 | 3 | Q1 | 2018 | Q1 2018 | 4.50% |
| 3/19/2018 | 3 | Q1 | 2018 | Q1 2018 | 4.50% |
| 3/20/2018 | 3 | Q1 | 2018 | Q1 2018 | 4.50% |
| 3/21/2018 | 3 | Q1 | 2018 | Q1 2018 | 4.50% |
| 3/22/2018 | 3 | Q1 | 2018 | Q1 2018 | 4.75% |
| 3/23/2018 | 3 | Q1 | 2018 | Q1 2018 | 4.75% |
| 3/24/2018 | 3 | Q1 | 2018 | Q1 2018 | 4.75% |
| 3/25/2018 | 3 | Q1 | 2018 | Q1 2018 | 4.75% |
| 3/26/2018 | 3 | Q1 | 2018 | Q1 2018 | 4.75% |
| 3/27/2018 | 3 | Q1 | 2018 | Q1 2018 | 4.75% |
| 3/28/2018 | 3 | Q1 | 2018 | Q1 2018 | 4.75% |
| 3/29/2018 | 3 | Q1 | 2018 | Q1 2018 | 4.75% |
| 3/30/2018 | 3 | Q1 | 2018 | Q1 2018 | 4.75% |
| 3/31/2018 | 3 | Q1 | 2018 | Q1 2018 | 4.75% |
| 4/1/2018 | 4 | Q2 | 2018 | Q2 2018 | 4.75% |
| 4/2/2018 | 4 | Q2 | 2018 | Q2 2018 | 4.75% |
| 4/3/2018 | 4 | Q2 | 2018 | Q2 2018 | 4.75% |
| 4/4/2018 | 4 | Q2 | 2018 | Q2 2018 | 4.75% |
| 4/5/2018 | 4 | Q2 | 2018 | Q2 2018 | 4.75% |
| 4/6/2018 | 4 | Q2 | 2018 | Q2 2018 | 4.75% |
| 4/7/2018 | 4 | Q2 | 2018 | Q2 2018 | 4.75% |
| 4/8/2018 | 4 | Q2 | 2018 | Q2 2018 | 4.75% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 4/9/2018 | 4 | Q2 | 2018 | Q2 2018 | 4.75% |
| 4/10/2018 | 4 | Q2 | 2018 | Q2 2018 | 4.75% |
| 4/11/2018 | 4 | Q2 | 2018 | Q2 2018 | 4.75% |
| 4/12/2018 | 4 | Q2 | 2018 | Q2 2018 | 4.75% |
| 4/13/2018 | 4 | Q2 | 2018 | Q2 2018 | 4.75% |
| 4/14/2018 | 4 | Q2 | 2018 | Q2 2018 | 4.75% |
| 4/15/2018 | 4 | Q2 | 2018 | Q2 2018 | 4.75% |
| 4/16/2018 | 4 | Q2 | 2018 | Q2 2018 | 4.75% |
| 4/17/2018 | 4 | Q2 | 2018 | Q2 2018 | 4.75% |
| 4/18/2018 | 4 | Q2 | 2018 | Q2 2018 | 4.75% |
| 4/19/2018 | 4 | Q2 | 2018 | Q2 2018 | 4.75% |
| 4/20/2018 | 4 | Q2 | 2018 | Q2 2018 | 4.75% |
| 4/21/2018 | 4 | Q2 | 2018 | Q2 2018 | 4.75% |
| 4/22/2018 | 4 | Q2 | 2018 | Q2 2018 | 4.75% |
| 4/23/2018 | 4 | Q2 | 2018 | Q2 2018 | 4.75% |
| 4/24/2018 | 4 | Q2 | 2018 | Q2 2018 | 4.75% |
| 4/25/2018 | 4 | Q2 | 2018 | Q2 2018 | 4.75% |
| 4/26/2018 | 4 | Q2 | 2018 | Q2 2018 | 4.75% |
| 4/27/2018 | 4 | Q2 | 2018 | Q2 2018 | 4.75% |
| 4/28/2018 | 4 | Q2 | 2018 | Q2 2018 | 4.75% |
| 4/29/2018 | 4 | Q2 | 2018 | Q2 2018 | 4.75% |
| 4/30/2018 | 4 | Q2 | 2018 | Q2 2018 | 4.75% |
| 5/1/2018 | 5 | Q2 | 2018 | Q2 2018 | 4.75% |
| 5/2/2018 | 5 | Q2 | 2018 | Q2 2018 | 4.75% |
| 5/3/2018 | 5 | Q2 | 2018 | Q2 2018 | 4.75% |
| 5/4/2018 | 5 | Q2 | 2018 | Q2 2018 | 4.75% |
| 5/5/2018 | 5 | Q2 | 2018 | Q2 2018 | 4.75% |
| 5/6/2018 | 5 | Q2 | 2018 | Q2 2018 | 4.75% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 5/7/2018 | 5 | Q2 | 2018 | Q2 2018 | 4.75% |
| 5/8/2018 | 5 | Q2 | 2018 | Q2 2018 | 4.75% |
| 5/9/2018 | 5 | Q2 | 2018 | Q2 2018 | 4.75% |
| 5/10/2018 | 5 | Q2 | 2018 | Q2 2018 | 4.75% |
| 5/11/2018 | 5 | Q2 | 2018 | Q2 2018 | 4.75% |
| 5/12/2018 | 5 | Q2 | 2018 | Q2 2018 | 4.75% |
| 5/13/2018 | 5 | Q2 | 2018 | Q2 2018 | 4.75% |
| 5/14/2018 | 5 | Q2 | 2018 | Q2 2018 | 4.75% |
| 5/15/2018 | 5 | Q2 | 2018 | Q2 2018 | 4.75% |
| 5/16/2018 | 5 | Q2 | 2018 | Q2 2018 | 4.75% |
| 5/17/2018 | 5 | Q2 | 2018 | Q2 2018 | 4.75% |
| 5/18/2018 | 5 | Q2 | 2018 | Q2 2018 | 4.75% |
| 5/19/2018 | 5 | Q2 | 2018 | Q2 2018 | 4.75% |
| 5/20/2018 | 5 | Q2 | 2018 | Q2 2018 | 4.75% |
| 5/21/2018 | 5 | Q2 | 2018 | Q2 2018 | 4.75% |
| 5/22/2018 | 5 | Q2 | 2018 | Q2 2018 | 4.75% |
| 5/23/2018 | 5 | Q2 | 2018 | Q2 2018 | 4.75% |
| 5/24/2018 | 5 | Q2 | 2018 | Q2 2018 | 4.75% |
| 5/25/2018 | 5 | Q2 | 2018 | Q2 2018 | 4.75% |
| 5/26/2018 | 5 | Q2 | 2018 | Q2 2018 | 4.75% |
| 5/27/2018 | 5 | Q2 | 2018 | Q2 2018 | 4.75% |
| 5/28/2018 | 5 | Q2 | 2018 | Q2 2018 | 4.75% |
| 5/29/2018 | 5 | Q2 | 2018 | Q2 2018 | 4.75% |
| 5/30/2018 | 5 | Q2 | 2018 | Q2 2018 | 4.75% |
| 5/31/2018 | 5 | Q2 | 2018 | Q2 2018 | 4.75% |
| 6/1/2018 | 6 | Q2 | 2018 | Q2 2018 | 4.75% |
| 6/2/2018 | 6 | Q2 | 2018 | Q2 2018 | 4.75% |
| 6/3/2018 | 6 | Q2 | 2018 | Q2 2018 | 4.75% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 6/4/2018 | 6 | Q2 | 2018 | Q2 2018 | 4.75% |
| 6/5/2018 | 6 | Q2 | 2018 | Q2 2018 | 4.75% |
| 6/6/2018 | 6 | Q2 | 2018 | Q2 2018 | 4.75% |
| 6/7/2018 | 6 | Q2 | 2018 | Q2 2018 | 4.75% |
| 6/8/2018 | 6 | Q2 | 2018 | Q2 2018 | 4.75% |
| 6/9/2018 | 6 | Q2 | 2018 | Q2 2018 | 4.75% |
| 6/10/2018 | 6 | Q2 | 2018 | Q2 2018 | 4.75% |
| 6/11/2018 | 6 | Q2 | 2018 | Q2 2018 | 4.75% |
| 6/12/2018 | 6 | Q2 | 2018 | Q2 2018 | 4.75% |
| 6/13/2018 | 6 | Q2 | 2018 | Q2 2018 | 4.75% |
| 6/14/2018 | 6 | Q2 | 2018 | Q2 2018 | 5.00% |
| 6/15/2018 | 6 | Q2 | 2018 | Q2 2018 | 5.00% |
| 6/16/2018 | 6 | Q2 | 2018 | Q2 2018 | 5.00% |
| 6/17/2018 | 6 | Q2 | 2018 | Q2 2018 | 5.00% |
| 6/18/2018 | 6 | Q2 | 2018 | Q2 2018 | 5.00% |
| 6/19/2018 | 6 | Q2 | 2018 | Q2 2018 | 5.00% |
| 6/20/2018 | 6 | Q2 | 2018 | Q2 2018 | 5.00% |
| 6/21/2018 | 6 | Q2 | 2018 | Q2 2018 | 5.00% |
| 6/22/2018 | 6 | Q2 | 2018 | Q2 2018 | 5.00% |
| 6/23/2018 | 6 | Q2 | 2018 | Q2 2018 | 5.00% |
| 6/24/2018 | 6 | Q2 | 2018 | Q2 2018 | 5.00% |
| 6/25/2018 | 6 | Q2 | 2018 | Q2 2018 | 5.00% |
| 6/26/2018 | 6 | Q2 | 2018 | Q2 2018 | 5.00% |
| 6/27/2018 | 6 | Q2 | 2018 | Q2 2018 | 5.00% |
| 6/28/2018 | 6 | Q2 | 2018 | Q2 2018 | 5.00% |
| 6/29/2018 | 6 | Q2 | 2018 | Q2 2018 | 5.00% |
| 6/30/2018 | 6 | Q2 | 2018 | Q2 2018 | 5.00% |
| 7/1/2018 | 7 | Q3 | 2018 | Q3 2018 | 5.00% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 7/2/2018 | 7 | Q3 | 2018 | Q3 2018 | 5.00% |
| 7/3/2018 | 7 | Q3 | 2018 | Q3 2018 | 5.00% |
| 7/4/2018 | 7 | Q3 | 2018 | Q3 2018 | 5.00% |
| 7/5/2018 | 7 | Q3 | 2018 | Q3 2018 | 5.00% |
| 7/6/2018 | 7 | Q3 | 2018 | Q3 2018 | 5.00% |
| 7/7/2018 | 7 | Q3 | 2018 | Q3 2018 | 5.00% |
| 7/8/2018 | 7 | Q3 | 2018 | Q3 2018 | 5.00% |
| 7/9/2018 | 7 | Q3 | 2018 | Q3 2018 | 5.00% |
| 7/10/2018 | 7 | Q3 | 2018 | Q3 2018 | 5.00% |
| 7/11/2018 | 7 | Q3 | 2018 | Q3 2018 | 5.00% |
| 7/12/2018 | 7 | Q3 | 2018 | Q3 2018 | 5.00% |
| 7/13/2018 | 7 | Q3 | 2018 | Q3 2018 | 5.00% |
| 7/14/2018 | 7 | Q3 | 2018 | Q3 2018 | 5.00% |
| 7/15/2018 | 7 | Q3 | 2018 | Q3 2018 | 5.00% |
| 7/16/2018 | 7 | Q3 | 2018 | Q3 2018 | 5.00% |
| 7/17/2018 | 7 | Q3 | 2018 | Q3 2018 | 5.00% |
| 7/18/2018 | 7 | Q3 | 2018 | Q3 2018 | 5.00% |
| 7/19/2018 | 7 | Q3 | 2018 | Q3 2018 | 5.00% |
| 7/20/2018 | 7 | Q3 | 2018 | Q3 2018 | 5.00% |
| 7/21/2018 | 7 | Q3 | 2018 | Q3 2018 | 5.00% |
| 7/22/2018 | 7 | Q3 | 2018 | Q3 2018 | 5.00% |
| 7/23/2018 | 7 | Q3 | 2018 | Q3 2018 | 5.00% |
| 7/24/2018 | 7 | Q3 | 2018 | Q3 2018 | 5.00% |
| 7/25/2018 | 7 | Q3 | 2018 | Q3 2018 | 5.00% |
| 7/26/2018 | 7 | Q3 | 2018 | Q3 2018 | 5.00% |
| 7/27/2018 | 7 | Q3 | 2018 | Q3 2018 | 5.00% |
| 7/28/2018 | 7 | Q3 | 2018 | Q3 2018 | 5.00% |
| 7/29/2018 | 7 | Q3 | 2018 | Q3 2018 | 5.00% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 7/30/2018 | 7 | Q3 | 2018 | Q3 2018 | 5.00% |
| 7/31/2018 | 7 | Q3 | 2018 | Q3 2018 | 5.00% |
| 8/1/2018 | 8 | Q3 | 2018 | Q3 2018 | 5.00% |
| 8/2/2018 | 8 | Q3 | 2018 | Q3 2018 | 5.00% |
| 8/3/2018 | 8 | Q3 | 2018 | Q3 2018 | 5.00% |
| 8/4/2018 | 8 | Q3 | 2018 | Q3 2018 | 5.00% |
| 8/5/2018 | 8 | Q3 | 2018 | Q3 2018 | 5.00% |
| 8/6/2018 | 8 | Q3 | 2018 | Q3 2018 | 5.00% |
| 8/7/2018 | 8 | Q3 | 2018 | Q3 2018 | 5.00% |
| 8/8/2018 | 8 | Q3 | 2018 | Q3 2018 | 5.00% |
| 8/9/2018 | 8 | Q3 | 2018 | Q3 2018 | 5.00% |
| 8/10/2018 | 8 | Q3 | 2018 | Q3 2018 | 5.00% |
| 8/11/2018 | 8 | Q3 | 2018 | Q3 2018 | 5.00% |
| 8/12/2018 | 8 | Q3 | 2018 | Q3 2018 | 5.00% |
| 8/13/2018 | 8 | Q3 | 2018 | Q3 2018 | 5.00% |
| 8/14/2018 | 8 | Q3 | 2018 | Q3 2018 | 5.00% |
| 8/15/2018 | 8 | Q3 | 2018 | Q3 2018 | 5.00% |
| 8/16/2018 | 8 | Q3 | 2018 | Q3 2018 | 5.00% |
| 8/17/2018 | 8 | Q3 | 2018 | Q3 2018 | 5.00% |
| 8/18/2018 | 8 | Q3 | 2018 | Q3 2018 | 5.00% |
| 8/19/2018 | 8 | Q3 | 2018 | Q3 2018 | 5.00% |
| 8/20/2018 | 8 | Q3 | 2018 | Q3 2018 | 5.00% |
| 8/21/2018 | 8 | Q3 | 2018 | Q3 2018 | 5.00% |
| 8/22/2018 | 8 | Q3 | 2018 | Q3 2018 | 5.00% |
| 8/23/2018 | 8 | Q3 | 2018 | Q3 2018 | 5.00% |
| 8/24/2018 | 8 | Q3 | 2018 | Q3 2018 | 5.00% |
| 8/25/2018 | 8 | Q3 | 2018 | Q3 2018 | 5.00% |
| 8/26/2018 | 8 | Q3 | 2018 | Q3 2018 | 5.00% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 8/27/2018 | 8 | Q3 | 2018 | Q3 2018 | 5.00% |
| 8/28/2018 | 8 | Q3 | 2018 | Q3 2018 | 5.00% |
| 8/29/2018 | 8 | Q3 | 2018 | Q3 2018 | 5.00% |
| 8/30/2018 | 8 | Q3 | 2018 | Q3 2018 | 5.00% |
| 8/31/2018 | 8 | Q3 | 2018 | Q3 2018 | 5.00% |
| 9/1/2018 | 9 | Q3 | 2018 | Q3 2018 | 5.00% |
| 9/2/2018 | 9 | Q3 | 2018 | Q3 2018 | 5.00% |
| 9/3/2018 | 9 | Q3 | 2018 | Q3 2018 | 5.00% |
| 9/4/2018 | 9 | Q3 | 2018 | Q3 2018 | 5.00% |
| 9/5/2018 | 9 | Q3 | 2018 | Q3 2018 | 5.00% |
| 9/6/2018 | 9 | Q3 | 2018 | Q3 2018 | 5.00% |
| 9/7/2018 | 9 | Q3 | 2018 | Q3 2018 | 5.00% |
| 9/8/2018 | 9 | Q3 | 2018 | Q3 2018 | 5.00% |
| 9/9/2018 | 9 | Q3 | 2018 | Q3 2018 | 5.00% |
| 9/10/2018 | 9 | Q3 | 2018 | Q3 2018 | 5.00% |
| 9/11/2018 | 9 | Q3 | 2018 | Q3 2018 | 5.00% |
| 9/12/2018 | 9 | Q3 | 2018 | Q3 2018 | 5.00% |
| 9/13/2018 | 9 | Q3 | 2018 | Q3 2018 | 5.00% |
| 9/14/2018 | 9 | Q3 | 2018 | Q3 2018 | 5.00% |
| 9/15/2018 | 9 | Q3 | 2018 | Q3 2018 | 5.00% |
| 9/16/2018 | 9 | Q3 | 2018 | Q3 2018 | 5.00% |
| 9/17/2018 | 9 | Q3 | 2018 | Q3 2018 | 5.00% |
| 9/18/2018 | 9 | Q3 | 2018 | Q3 2018 | 5.00% |
| 9/19/2018 | 9 | Q3 | 2018 | Q3 2018 | 5.00% |
| 9/20/2018 | 9 | Q3 | 2018 | Q3 2018 | 5.00% |
| 9/21/2018 | 9 | Q3 | 2018 | Q3 2018 | 5.00% |
| 9/22/2018 | 9 | Q3 | 2018 | Q3 2018 | 5.00% |
| 9/23/2018 | 9 | Q3 | 2018 | Q3 2018 | 5.00% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 9/24/2018 | 9 | Q3 | 2018 | Q3 2018 | 5.00% |
| 9/25/2018 | 9 | Q3 | 2018 | Q3 2018 | 5.00% |
| 9/26/2018 | 9 | Q3 | 2018 | Q3 2018 | 5.00% |
| 9/27/2018 | 9 | Q3 | 2018 | Q3 2018 | 5.25% |
| 9/28/2018 | 9 | Q3 | 2018 | Q3 2018 | 5.25% |
| 9/29/2018 | 9 | Q3 | 2018 | Q3 2018 | 5.25% |
| 9/30/2018 | 9 | Q3 | 2018 | Q3 2018 | 5.25% |
| 10/1/2018 | 10 | Q4 | 2018 | Q4 2018 | 5.25% |
| 10/2/2018 | 10 | Q4 | 2018 | Q4 2018 | 5.25% |
| 10/3/2018 | 10 | Q4 | 2018 | Q4 2018 | 5.25% |
| 10/4/2018 | 10 | Q4 | 2018 | Q4 2018 | 5.25% |
| 10/5/2018 | 10 | Q4 | 2018 | Q4 2018 | 5.25% |
| 10/6/2018 | 10 | Q4 | 2018 | Q4 2018 | 5.25% |
| 10/7/2018 | 10 | Q4 | 2018 | Q4 2018 | 5.25% |
| 10/8/2018 | 10 | Q4 | 2018 | Q4 2018 | 5.25% |
| 10/9/2018 | 10 | Q4 | 2018 | Q4 2018 | 5.25% |
| 10/10/2018 | 10 | Q4 | 2018 | Q4 2018 | 5.25% |
| 10/11/2018 | 10 | Q4 | 2018 | Q4 2018 | 5.25% |
| 10/12/2018 | 10 | Q4 | 2018 | Q4 2018 | 5.25% |
| 10/13/2018 | 10 | Q4 | 2018 | Q4 2018 | 5.25% |
| 10/14/2018 | 10 | Q4 | 2018 | Q4 2018 | 5.25% |
| 10/15/2018 | 10 | Q4 | 2018 | Q4 2018 | 5.25% |
| 10/16/2018 | 10 | Q4 | 2018 | Q4 2018 | 5.25% |
| 10/17/2018 | 10 | Q4 | 2018 | Q4 2018 | 5.25% |
| 10/18/2018 | 10 | Q4 | 2018 | Q4 2018 | 5.25% |
| 10/19/2018 | 10 | Q4 | 2018 | Q4 2018 | 5.25% |
| 10/20/2018 | 10 | Q4 | 2018 | Q4 2018 | 5.25% |
| 10/21/2018 | 10 | Q4 | 2018 | Q4 2018 | 5.25% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 10/22/2018 | 10 | Q4 | 2018 | Q4 2018 | 5.25% |
| 10/23/2018 | 10 | Q4 | 2018 | Q4 2018 | 5.25% |
| 10/24/2018 | 10 | Q4 | 2018 | Q4 2018 | 5.25% |
| 10/25/2018 | 10 | Q4 | 2018 | Q4 2018 | 5.25% |
| 10/26/2018 | 10 | Q4 | 2018 | Q4 2018 | 5.25% |
| 10/27/2018 | 10 | Q4 | 2018 | Q4 2018 | 5.25% |
| 10/28/2018 | 10 | Q4 | 2018 | Q4 2018 | 5.25% |
| 10/29/2018 | 10 | Q4 | 2018 | Q4 2018 | 5.25% |
| 10/30/2018 | 10 | Q4 | 2018 | Q4 2018 | 5.25% |
| 10/31/2018 | 10 | Q4 | 2018 | Q4 2018 | 5.25% |
| 11/1/2018 | 11 | Q4 | 2018 | Q4 2018 | 5.25% |
| 11/2/2018 | 11 | Q4 | 2018 | Q4 2018 | 5.25% |
| 11/3/2018 | 11 | Q4 | 2018 | Q4 2018 | 5.25% |
| 11/4/2018 | 11 | Q4 | 2018 | Q4 2018 | 5.25% |
| 11/5/2018 | 11 | Q4 | 2018 | Q4 2018 | 5.25% |
| 11/6/2018 | 11 | Q4 | 2018 | Q4 2018 | 5.25% |
| 11/7/2018 | 11 | Q4 | 2018 | Q4 2018 | 5.25% |
| 11/8/2018 | 11 | Q4 | 2018 | Q4 2018 | 5.25% |
| 11/9/2018 | 11 | Q4 | 2018 | Q4 2018 | 5.25% |
| 11/10/2018 | 11 | Q4 | 2018 | Q4 2018 | 5.25% |
| 11/11/2018 | 11 | Q4 | 2018 | Q4 2018 | 5.25% |
| 11/12/2018 | 11 | Q4 | 2018 | Q4 2018 | 5.25% |
| 11/13/2018 | 11 | Q4 | 2018 | Q4 2018 | 5.25% |
| 11/14/2018 | 11 | Q4 | 2018 | Q4 2018 | 5.25% |
| 11/15/2018 | 11 | Q4 | 2018 | Q4 2018 | 5.25% |
| 11/16/2018 | 11 | Q4 | 2018 | Q4 2018 | 5.25% |
| 11/17/2018 | 11 | Q4 | 2018 | Q4 2018 | 5.25% |
| 11/18/2018 | 11 | Q4 | 2018 | Q4 2018 | 5.25% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 11/19/2018 | 11 | Q4 | 2018 | Q4 2018 | 5.25% |
| 11/20/2018 | 11 | Q4 | 2018 | Q4 2018 | 5.25% |
| 11/21/2018 | 11 | Q4 | 2018 | Q4 2018 | 5.25% |
| 11/22/2018 | 11 | Q4 | 2018 | Q4 2018 | 5.25% |
| 11/23/2018 | 11 | Q4 | 2018 | Q4 2018 | 5.25% |
| 11/24/2018 | 11 | Q4 | 2018 | Q4 2018 | 5.25% |
| 11/25/2018 | 11 | Q4 | 2018 | Q4 2018 | 5.25% |
| 11/26/2018 | 11 | Q4 | 2018 | Q4 2018 | 5.25% |
| 11/27/2018 | 11 | Q4 | 2018 | Q4 2018 | 5.25% |
| 11/28/2018 | 11 | Q4 | 2018 | Q4 2018 | 5.25% |
| 11/29/2018 | 11 | Q4 | 2018 | Q4 2018 | 5.25% |
| 11/30/2018 | 11 | Q4 | 2018 | Q4 2018 | 5.25% |
| 12/1/2018 | 12 | Q4 | 2018 | Q4 2018 | 5.25% |
| 12/2/2018 | 12 | Q4 | 2018 | Q4 2018 | 5.25% |
| 12/3/2018 | 12 | Q4 | 2018 | Q4 2018 | 5.25% |
| 12/4/2018 | 12 | Q4 | 2018 | Q4 2018 | 5.25% |
| 12/5/2018 | 12 | Q4 | 2018 | Q4 2018 | 5.25% |
| 12/6/2018 | 12 | Q4 | 2018 | Q4 2018 | 5.25% |
| 12/7/2018 | 12 | Q4 | 2018 | Q4 2018 | 5.25% |
| 12/8/2018 | 12 | Q4 | 2018 | Q4 2018 | 5.25% |
| 12/9/2018 | 12 | Q4 | 2018 | Q4 2018 | 5.25% |
| 12/10/2018 | 12 | Q4 | 2018 | Q4 2018 | 5.25% |
| 12/11/2018 | 12 | Q4 | 2018 | Q4 2018 | 5.25% |
| 12/12/2018 | 12 | Q4 | 2018 | Q4 2018 | 5.25% |
| 12/13/2018 | 12 | Q4 | 2018 | Q4 2018 | 5.25% |
| 12/14/2018 | 12 | Q4 | 2018 | Q4 2018 | 5.25% |
| 12/15/2018 | 12 | Q4 | 2018 | Q4 2018 | 5.25% |
| 12/16/2018 | 12 | Q4 | 2018 | Q4 2018 | 5.25% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 12/17/2018 | 12 | Q4 | 2018 | Q4 2018 | 5.25% |
| 12/18/2018 | 12 | Q4 | 2018 | Q4 2018 | 5.25% |
| 12/19/2018 | 12 | Q4 | 2018 | Q4 2018 | 5.25% |
| 12/20/2018 | 12 | Q4 | 2018 | Q4 2018 | 5.50% |
| 12/21/2018 | 12 | Q4 | 2018 | Q4 2018 | 5.50% |
| 12/22/2018 | 12 | Q4 | 2018 | Q4 2018 | 5.50% |
| 12/23/2018 | 12 | Q4 | 2018 | Q4 2018 | 5.50% |
| 12/24/2018 | 12 | Q4 | 2018 | Q4 2018 | 5.50% |
| 12/25/2018 | 12 | Q4 | 2018 | Q4 2018 | 5.50% |
| 12/26/2018 | 12 | Q4 | 2018 | Q4 2018 | 5.50% |
| 12/27/2018 | 12 | Q4 | 2018 | Q4 2018 | 5.50% |
| 12/28/2018 | 12 | Q4 | 2018 | Q4 2018 | 5.50% |
| 12/29/2018 | 12 | Q4 | 2018 | Q4 2018 | 5.50% |
| 12/30/2018 | 12 | Q4 | 2018 | Q4 2018 | 5.50% |
| 12/31/2018 | 12 | Q4 | 2018 | Q4 2018 | 5.50% |
| 1/1/2019 | 1 | Q1 | 2019 | Q1 2019 | 5.50% |
| 1/2/2019 | 1 | Q1 | 2019 | Q1 2019 | 5.50% |
| 1/3/2019 | 1 | Q1 | 2019 | Q1 2019 | 5.50% |
| 1/4/2019 | 1 | Q1 | 2019 | Q1 2019 | 5.50% |
| 1/5/2019 | 1 | Q1 | 2019 | Q1 2019 | 5.50% |
| 1/6/2019 | 1 | Q1 | 2019 | Q1 2019 | 5.50% |
| 1/7/2019 | 1 | Q1 | 2019 | Q1 2019 | 5.50% |
| 1/8/2019 | 1 | Q1 | 2019 | Q1 2019 | 5.50% |
| 1/9/2019 | 1 | Q1 | 2019 | Q1 2019 | 5.50% |
| 1/10/2019 | 1 | Q1 | 2019 | Q1 2019 | 5.50% |
| 1/11/2019 | 1 | Q1 | 2019 | Q1 2019 | 5.50% |
| 1/12/2019 | 1 | Q1 | 2019 | Q1 2019 | 5.50% |
| 1/13/2019 | 1 | Q1 | 2019 | Q1 2019 | 5.50% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 1/14/2019 | 1 | Q1 | 2019 | Q1 2019 | 5.50% |
| 1/15/2019 | 1 | Q1 | 2019 | Q1 2019 | 5.50% |
| 1/16/2019 | 1 | Q1 | 2019 | Q1 2019 | 5.50% |
| 1/17/2019 | 1 | Q1 | 2019 | Q1 2019 | 5.50% |
| 1/18/2019 | 1 | Q1 | 2019 | Q1 2019 | 5.50% |
| 1/19/2019 | 1 | Q1 | 2019 | Q1 2019 | 5.50% |
| 1/20/2019 | 1 | Q1 | 2019 | Q1 2019 | 5.50% |
| 1/21/2019 | 1 | Q1 | 2019 | Q1 2019 | 5.50% |
| 1/22/2019 | 1 | Q1 | 2019 | Q1 2019 | 5.50% |
| 1/23/2019 | 1 | Q1 | 2019 | Q1 2019 | 5.50% |
| 1/24/2019 | 1 | Q1 | 2019 | Q1 2019 | 5.50% |
| 1/25/2019 | 1 | Q1 | 2019 | Q1 2019 | 5.50% |
| 1/26/2019 | 1 | Q1 | 2019 | Q1 2019 | 5.50% |
| 1/27/2019 | 1 | Q1 | 2019 | Q1 2019 | 5.50% |
| 1/28/2019 | 1 | Q1 | 2019 | Q1 2019 | 5.50% |
| 1/29/2019 | 1 | Q1 | 2019 | Q1 2019 | 5.50% |
| 1/30/2019 | 1 | Q1 | 2019 | Q1 2019 | 5.50% |
| 1/31/2019 | 1 | Q1 | 2019 | Q1 2019 | 5.50% |
| 2/1/2019 | 2 | Q1 | 2019 | Q1 2019 | 5.50% |
| 2/2/2019 | 2 | Q1 | 2019 | Q1 2019 | 5.50% |
| 2/3/2019 | 2 | Q1 | 2019 | Q1 2019 | 5.50% |
| 2/4/2019 | 2 | Q1 | 2019 | Q1 2019 | 5.50% |
| 2/5/2019 | 2 | Q1 | 2019 | Q1 2019 | 5.50% |
| 2/6/2019 | 2 | Q1 | 2019 | Q1 2019 | 5.50% |
| 2/7/2019 | 2 | Q1 | 2019 | Q1 2019 | 5.50% |
| 2/8/2019 | 2 | Q1 | 2019 | Q1 2019 | 5.50% |
| 2/9/2019 | 2 | Q1 | 2019 | Q1 2019 | 5.50% |
| 2/10/2019 | 2 | Q1 | 2019 | Q1 2019 | 5.50% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 2/11/2019 | 2 | Q1 | 2019 | Q1 2019 | 5.50% |
| 2/12/2019 | 2 | Q1 | 2019 | Q1 2019 | 5.50% |
| 2/13/2019 | 2 | Q1 | 2019 | Q1 2019 | 5.50% |
| 2/14/2019 | 2 | Q1 | 2019 | Q1 2019 | 5.50% |
| 2/15/2019 | 2 | Q1 | 2019 | Q1 2019 | 5.50% |
| 2/16/2019 | 2 | Q1 | 2019 | Q1 2019 | 5.50% |
| 2/17/2019 | 2 | Q1 | 2019 | Q1 2019 | 5.50% |
| 2/18/2019 | 2 | Q1 | 2019 | Q1 2019 | 5.50% |
| 2/19/2019 | 2 | Q1 | 2019 | Q1 2019 | 5.50% |
| 2/20/2019 | 2 | Q1 | 2019 | Q1 2019 | 5.50% |
| 2/21/2019 | 2 | Q1 | 2019 | Q1 2019 | 5.50% |
| 2/22/2019 | 2 | Q1 | 2019 | Q1 2019 | 5.50% |
| 2/23/2019 | 2 | Q1 | 2019 | Q1 2019 | 5.50% |
| 2/24/2019 | 2 | Q1 | 2019 | Q1 2019 | 5.50% |
| 2/25/2019 | 2 | Q1 | 2019 | Q1 2019 | 5.50% |
| 2/26/2019 | 2 | Q1 | 2019 | Q1 2019 | 5.50% |
| 2/27/2019 | 2 | Q1 | 2019 | Q1 2019 | 5.50% |
| 2/28/2019 | 2 | Q1 | 2019 | Q1 2019 | 5.50% |
| 3/1/2019 | 3 | Q1 | 2019 | Q1 2019 | 5.50% |
| 3/2/2019 | 3 | Q1 | 2019 | Q1 2019 | 5.50% |
| 3/3/2019 | 3 | Q1 | 2019 | Q1 2019 | 5.50% |
| 3/4/2019 | 3 | Q1 | 2019 | Q1 2019 | 5.50% |
| 3/5/2019 | 3 | Q1 | 2019 | Q1 2019 | 5.50% |
| 3/6/2019 | 3 | Q1 | 2019 | Q1 2019 | 5.50% |
| 3/7/2019 | 3 | Q1 | 2019 | Q1 2019 | 5.50% |
| 3/8/2019 | 3 | Q1 | 2019 | Q1 2019 | 5.50% |
| 3/9/2019 | 3 | Q1 | 2019 | Q1 2019 | 5.50% |
| 3/10/2019 | 3 | Q1 | 2019 | Q1 2019 | 5.50% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 3/11/2019 | 3 | Q1 | 2019 | Q1 2019 | 5.50% |
| 3/12/2019 | 3 | Q1 | 2019 | Q1 2019 | 5.50% |
| 3/13/2019 | 3 | Q1 | 2019 | Q1 2019 | 5.50% |
| 3/14/2019 | 3 | Q1 | 2019 | Q1 2019 | 5.50% |
| 3/15/2019 | 3 | Q1 | 2019 | Q1 2019 | 5.50% |
| 3/16/2019 | 3 | Q1 | 2019 | Q1 2019 | 5.50% |
| 3/17/2019 | 3 | Q1 | 2019 | Q1 2019 | 5.50% |
| 3/18/2019 | 3 | Q1 | 2019 | Q1 2019 | 5.50% |
| 3/19/2019 | 3 | Q1 | 2019 | Q1 2019 | 5.50% |
| 3/20/2019 | 3 | Q1 | 2019 | Q1 2019 | 5.50% |
| 3/21/2019 | 3 | Q1 | 2019 | Q1 2019 | 5.50% |
| 3/22/2019 | 3 | Q1 | 2019 | Q1 2019 | 5.50% |
| 3/23/2019 | 3 | Q1 | 2019 | Q1 2019 | 5.50% |
| 3/24/2019 | 3 | Q1 | 2019 | Q1 2019 | 5.50% |
| 3/25/2019 | 3 | Q1 | 2019 | Q1 2019 | 5.50% |
| 3/26/2019 | 3 | Q1 | 2019 | Q1 2019 | 5.50% |
| 3/27/2019 | 3 | Q1 | 2019 | Q1 2019 | 5.50% |
| 3/28/2019 | 3 | Q1 | 2019 | Q1 2019 | 5.50% |
| 3/29/2019 | 3 | Q1 | 2019 | Q1 2019 | 5.50% |
| 3/30/2019 | 3 | Q1 | 2019 | Q1 2019 | 5.50% |
| 3/31/2019 | 3 | Q1 | 2019 | Q1 2019 | 5.50% |
| 4/1/2019 | 4 | Q2 | 2019 | Q2 2019 | 5.50% |
| 4/2/2019 | 4 | Q2 | 2019 | Q2 2019 | 5.50% |
| 4/3/2019 | 4 | Q2 | 2019 | Q2 2019 | 5.50% |
| 4/4/2019 | 4 | Q2 | 2019 | Q2 2019 | 5.50% |
| 4/5/2019 | 4 | Q2 | 2019 | Q2 2019 | 5.50% |
| 4/6/2019 | 4 | Q2 | 2019 | Q2 2019 | 5.50% |
| 4/7/2019 | 4 | Q2 | 2019 | Q2 2019 | 5.50% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 4/8/2019 | 4 | Q2 | 2019 | Q2 2019 | 5.50% |
| 4/9/2019 | 4 | Q2 | 2019 | Q2 2019 | 5.50% |
| 4/10/2019 | 4 | Q2 | 2019 | Q2 2019 | 5.50% |
| 4/11/2019 | 4 | Q2 | 2019 | Q2 2019 | 5.50% |
| 4/12/2019 | 4 | Q2 | 2019 | Q2 2019 | 5.50% |
| 4/13/2019 | 4 | Q2 | 2019 | Q2 2019 | 5.50% |
| 4/14/2019 | 4 | Q2 | 2019 | Q2 2019 | 5.50% |
| 4/15/2019 | 4 | Q2 | 2019 | Q2 2019 | 5.50% |
| 4/16/2019 | 4 | Q2 | 2019 | Q2 2019 | 5.50% |
| 4/17/2019 | 4 | Q2 | 2019 | Q2 2019 | 5.50% |
| 4/18/2019 | 4 | Q2 | 2019 | Q2 2019 | 5.50% |
| 4/19/2019 | 4 | Q2 | 2019 | Q2 2019 | 5.50% |
| 4/20/2019 | 4 | Q2 | 2019 | Q2 2019 | 5.50% |
| 4/21/2019 | 4 | Q2 | 2019 | Q2 2019 | 5.50% |
| 4/22/2019 | 4 | Q2 | 2019 | Q2 2019 | 5.50% |
| 4/23/2019 | 4 | Q2 | 2019 | Q2 2019 | 5.50% |
| 4/24/2019 | 4 | Q2 | 2019 | Q2 2019 | 5.50% |
| 4/25/2019 | 4 | Q2 | 2019 | Q2 2019 | 5.50% |
| 4/26/2019 | 4 | Q2 | 2019 | Q2 2019 | 5.50% |
| 4/27/2019 | 4 | Q2 | 2019 | Q2 2019 | 5.50% |
| 4/28/2019 | 4 | Q2 | 2019 | Q2 2019 | 5.50% |
| 4/29/2019 | 4 | Q2 | 2019 | Q2 2019 | 5.50% |
| 4/30/2019 | 4 | Q2 | 2019 | Q2 2019 | 5.50% |
| 5/1/2019 | 5 | Q2 | 2019 | Q2 2019 | 5.50% |
| 5/2/2019 | 5 | Q2 | 2019 | Q2 2019 | 5.50% |
| 5/3/2019 | 5 | Q2 | 2019 | Q2 2019 | 5.50% |
| 5/4/2019 | 5 | Q2 | 2019 | Q2 2019 | 5.50% |
| 5/5/2019 | 5 | Q2 | 2019 | Q2 2019 | 5.50% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 5/6/2019 | 5 | Q2 | 2019 | Q2 2019 | 5.50% |
| 5/7/2019 | 5 | Q2 | 2019 | Q2 2019 | 5.50% |
| 5/8/2019 | 5 | Q2 | 2019 | Q2 2019 | 5.50% |
| 5/9/2019 | 5 | Q2 | 2019 | Q2 2019 | 5.50% |
| 5/10/2019 | 5 | Q2 | 2019 | Q2 2019 | 5.50% |
| 5/11/2019 | 5 | Q2 | 2019 | Q2 2019 | 5.50% |
| 5/12/2019 | 5 | Q2 | 2019 | Q2 2019 | 5.50% |
| 5/13/2019 | 5 | Q2 | 2019 | Q2 2019 | 5.50% |
| 5/14/2019 | 5 | Q2 | 2019 | Q2 2019 | 5.50% |
| 5/15/2019 | 5 | Q2 | 2019 | Q2 2019 | 5.50% |
| 5/16/2019 | 5 | Q2 | 2019 | Q2 2019 | 5.50% |
| 5/17/2019 | 5 | Q2 | 2019 | Q2 2019 | 5.50% |
| 5/18/2019 | 5 | Q2 | 2019 | Q2 2019 | 5.50% |
| 5/19/2019 | 5 | Q2 | 2019 | Q2 2019 | 5.50% |
| 5/20/2019 | 5 | Q2 | 2019 | Q2 2019 | 5.50% |
| 5/21/2019 | 5 | Q2 | 2019 | Q2 2019 | 5.50% |
| 5/22/2019 | 5 | Q2 | 2019 | Q2 2019 | 5.50% |
| 5/23/2019 | 5 | Q2 | 2019 | Q2 2019 | 5.50% |
| 5/24/2019 | 5 | Q2 | 2019 | Q2 2019 | 5.50% |
| 5/25/2019 | 5 | Q2 | 2019 | Q2 2019 | 5.50% |
| 5/26/2019 | 5 | Q2 | 2019 | Q2 2019 | 5.50% |
| 5/27/2019 | 5 | Q2 | 2019 | Q2 2019 | 5.50% |
| 5/28/2019 | 5 | Q2 | 2019 | Q2 2019 | 5.50% |
| 5/29/2019 | 5 | Q2 | 2019 | Q2 2019 | 5.50% |
| 5/30/2019 | 5 | Q2 | 2019 | Q2 2019 | 5.50% |
| 5/31/2019 | 5 | Q2 | 2019 | Q2 2019 | 5.50% |
| 6/1/2019 | 6 | Q2 | 2019 | Q2 2019 | 5.50% |
| 6/2/2019 | 6 | Q2 | 2019 | Q2 2019 | 5.50% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 6/3/2019 | 6 | Q2 | 2019 | Q2 2019 | 5.50% |
| 6/4/2019 | 6 | Q2 | 2019 | Q2 2019 | 5.50% |
| 6/5/2019 | 6 | Q2 | 2019 | Q2 2019 | 5.50% |
| 6/6/2019 | 6 | Q2 | 2019 | Q2 2019 | 5.50% |
| 6/7/2019 | 6 | Q2 | 2019 | Q2 2019 | 5.50% |
| 6/8/2019 | 6 | Q2 | 2019 | Q2 2019 | 5.50% |
| 6/9/2019 | 6 | Q2 | 2019 | Q2 2019 | 5.50% |
| 6/10/2019 | 6 | Q2 | 2019 | Q2 2019 | 5.50% |
| 6/11/2019 | 6 | Q2 | 2019 | Q2 2019 | 5.50% |
| 6/12/2019 | 6 | Q2 | 2019 | Q2 2019 | 5.50% |
| 6/13/2019 | 6 | Q2 | 2019 | Q2 2019 | 5.50% |
| 6/14/2019 | 6 | Q2 | 2019 | Q2 2019 | 5.50% |
| 6/15/2019 | 6 | Q2 | 2019 | Q2 2019 | 5.50% |
| 6/16/2019 | 6 | Q2 | 2019 | Q2 2019 | 5.50% |
| 6/17/2019 | 6 | Q2 | 2019 | Q2 2019 | 5.50% |
| 6/18/2019 | 6 | Q2 | 2019 | Q2 2019 | 5.50% |
| 6/19/2019 | 6 | Q2 | 2019 | Q2 2019 | 5.50% |
| 6/20/2019 | 6 | Q2 | 2019 | Q2 2019 | 5.50% |
| 6/21/2019 | 6 | Q2 | 2019 | Q2 2019 | 5.50% |
| 6/22/2019 | 6 | Q2 | 2019 | Q2 2019 | 5.50% |
| 6/23/2019 | 6 | Q2 | 2019 | Q2 2019 | 5.50% |
| 6/24/2019 | 6 | Q2 | 2019 | Q2 2019 | 5.50% |
| 6/25/2019 | 6 | Q2 | 2019 | Q2 2019 | 5.50% |
| 6/26/2019 | 6 | Q2 | 2019 | Q2 2019 | 5.50% |
| 6/27/2019 | 6 | Q2 | 2019 | Q2 2019 | 5.50% |
| 6/28/2019 | 6 | Q2 | 2019 | Q2 2019 | 5.50% |
| 6/29/2019 | 6 | Q2 | 2019 | Q2 2019 | 5.50% |
| 6/30/2019 | 6 | Q2 | 2019 | Q2 2019 | 5.50% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 7/1/2019 | 7 | Q3 | 2019 | Q3 2019 | 5.50% |
| 7/2/2019 | 7 | Q3 | 2019 | Q3 2019 | 5.50% |
| 7/3/2019 | 7 | Q3 | 2019 | Q3 2019 | 5.50% |
| 7/4/2019 | 7 | Q3 | 2019 | Q3 2019 | 5.50% |
| 7/5/2019 | 7 | Q3 | 2019 | Q3 2019 | 5.50% |
| 7/6/2019 | 7 | Q3 | 2019 | Q3 2019 | 5.50% |
| 7/7/2019 | 7 | Q3 | 2019 | Q3 2019 | 5.50% |
| 7/8/2019 | 7 | Q3 | 2019 | Q3 2019 | 5.50% |
| 7/9/2019 | 7 | Q3 | 2019 | Q3 2019 | 5.50% |
| 7/10/2019 | 7 | Q3 | 2019 | Q3 2019 | 5.50% |
| 7/11/2019 | 7 | Q3 | 2019 | Q3 2019 | 5.50% |
| 7/12/2019 | 7 | Q3 | 2019 | Q3 2019 | 5.50% |
| 7/13/2019 | 7 | Q3 | 2019 | Q3 2019 | 5.50% |
| 7/14/2019 | 7 | Q3 | 2019 | Q3 2019 | 5.50% |
| 7/15/2019 | 7 | Q3 | 2019 | Q3 2019 | 5.50% |
| 7/16/2019 | 7 | Q3 | 2019 | Q3 2019 | 5.50% |
| 7/17/2019 | 7 | Q3 | 2019 | Q3 2019 | 5.50% |
| 7/18/2019 | 7 | Q3 | 2019 | Q3 2019 | 5.50% |
| 7/19/2019 | 7 | Q3 | 2019 | Q3 2019 | 5.50% |
| 7/20/2019 | 7 | Q3 | 2019 | Q3 2019 | 5.50% |
| 7/21/2019 | 7 | Q3 | 2019 | Q3 2019 | 5.50% |
| 7/22/2019 | 7 | Q3 | 2019 | Q3 2019 | 5.50% |
| 7/23/2019 | 7 | Q3 | 2019 | Q3 2019 | 5.50% |
| 7/24/2019 | 7 | Q3 | 2019 | Q3 2019 | 5.50% |
| 7/25/2019 | 7 | Q3 | 2019 | Q3 2019 | 5.50% |
| 7/26/2019 | 7 | Q3 | 2019 | Q3 2019 | 5.50% |
| 7/27/2019 | 7 | Q3 | 2019 | Q3 2019 | 5.50% |
| 7/28/2019 | 7 | Q3 | 2019 | Q3 2019 | 5.50% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 7/29/2019 | 7 | Q3 | 2019 | Q3 2019 | 5.50% |
| 7/30/2019 | 7 | Q3 | 2019 | Q3 2019 | 5.50% |
| 7/31/2019 | 7 | Q3 | 2019 | Q3 2019 | 5.25% |
| 8/1/2019 | 8 | Q3 | 2019 | Q3 2019 | 5.25% |
| 8/2/2019 | 8 | Q3 | 2019 | Q3 2019 | 5.25% |
| 8/3/2019 | 8 | Q3 | 2019 | Q3 2019 | 5.25% |
| 8/4/2019 | 8 | Q3 | 2019 | Q3 2019 | 5.25% |
| 8/5/2019 | 8 | Q3 | 2019 | Q3 2019 | 5.25% |
| 8/6/2019 | 8 | Q3 | 2019 | Q3 2019 | 5.25% |
| 8/7/2019 | 8 | Q3 | 2019 | Q3 2019 | 5.25% |
| 8/8/2019 | 8 | Q3 | 2019 | Q3 2019 | 5.25% |
| 8/9/2019 | 8 | Q3 | 2019 | Q3 2019 | 5.25% |
| 8/10/2019 | 8 | Q3 | 2019 | Q3 2019 | 5.25% |
| 8/11/2019 | 8 | Q3 | 2019 | Q3 2019 | 5.25% |
| 8/12/2019 | 8 | Q3 | 2019 | Q3 2019 | 5.25% |
| 8/13/2019 | 8 | Q3 | 2019 | Q3 2019 | 5.25% |
| 8/14/2019 | 8 | Q3 | 2019 | Q3 2019 | 5.25% |
| 8/15/2019 | 8 | Q3 | 2019 | Q3 2019 | 5.25% |
| 8/16/2019 | 8 | Q3 | 2019 | Q3 2019 | 5.25% |
| 8/17/2019 | 8 | Q3 | 2019 | Q3 2019 | 5.25% |
| 8/18/2019 | 8 | Q3 | 2019 | Q3 2019 | 5.25% |
| 8/19/2019 | 8 | Q3 | 2019 | Q3 2019 | 5.25% |
| 8/20/2019 | 8 | Q3 | 2019 | Q3 2019 | 5.25% |
| 8/21/2019 | 8 | Q3 | 2019 | Q3 2019 | 5.25% |
| 8/22/2019 | 8 | Q3 | 2019 | Q3 2019 | 5.25% |
| 8/23/2019 | 8 | Q3 | 2019 | Q3 2019 | 5.25% |
| 8/24/2019 | 8 | Q3 | 2019 | Q3 2019 | 5.25% |
| 8/25/2019 | 8 | Q3 | 2019 | Q3 2019 | 5.25% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 8/26/2019 | 8 | Q3 | 2019 | Q3 2019 | 5.25% |
| 8/27/2019 | 8 | Q3 | 2019 | Q3 2019 | 5.25% |
| 8/28/2019 | 8 | Q3 | 2019 | Q3 2019 | 5.25% |
| 8/29/2019 | 8 | Q3 | 2019 | Q3 2019 | 5.25% |
| 8/30/2019 | 8 | Q3 | 2019 | Q3 2019 | 5.25% |
| 8/31/2019 | 8 | Q3 | 2019 | Q3 2019 | 5.25% |
| 9/1/2019 | 9 | Q3 | 2019 | Q3 2019 | 5.25% |
| 9/2/2019 | 9 | Q3 | 2019 | Q3 2019 | 5.25% |
| 9/3/2019 | 9 | Q3 | 2019 | Q3 2019 | 5.25% |
| 9/4/2019 | 9 | Q3 | 2019 | Q3 2019 | 5.25% |
| 9/5/2019 | 9 | Q3 | 2019 | Q3 2019 | 5.25% |
| 9/6/2019 | 9 | Q3 | 2019 | Q3 2019 | 5.25% |
| 9/7/2019 | 9 | Q3 | 2019 | Q3 2019 | 5.25% |
| 9/8/2019 | 9 | Q3 | 2019 | Q3 2019 | 5.25% |
| 9/9/2019 | 9 | Q3 | 2019 | Q3 2019 | 5.25% |
| 9/10/2019 | 9 | Q3 | 2019 | Q3 2019 | 5.25% |
| 9/11/2019 | 9 | Q3 | 2019 | Q3 2019 | 5.25% |
| 9/12/2019 | 9 | Q3 | 2019 | Q3 2019 | 5.25% |
| 9/13/2019 | 9 | Q3 | 2019 | Q3 2019 | 5.25% |
| 9/14/2019 | 9 | Q3 | 2019 | Q3 2019 | 5.25% |
| 9/15/2019 | 9 | Q3 | 2019 | Q3 2019 | 5.25% |
| 9/16/2019 | 9 | Q3 | 2019 | Q3 2019 | 5.25% |
| 9/17/2019 | 9 | Q3 | 2019 | Q3 2019 | 5.25% |
| 9/18/2019 | 9 | Q3 | 2019 | Q3 2019 | 5.00% |
| 9/19/2019 | 9 | Q3 | 2019 | Q3 2019 | 5.00% |
| 9/20/2019 | 9 | Q3 | 2019 | Q3 2019 | 5.00% |
| 9/21/2019 | 9 | Q3 | 2019 | Q3 2019 | 5.00% |
| 9/22/2019 | 9 | Q3 | 2019 | Q3 2019 | 5.00% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 9/23/2019 | 9 | Q3 | 2019 | Q3 2019 | 5.00% |
| 9/24/2019 | 9 | Q3 | 2019 | Q3 2019 | 5.00% |
| 9/25/2019 | 9 | Q3 | 2019 | Q3 2019 | 5.00% |
| 9/26/2019 | 9 | Q3 | 2019 | Q3 2019 | 5.00% |
| 9/27/2019 | 9 | Q3 | 2019 | Q3 2019 | 5.00% |
| 9/28/2019 | 9 | Q3 | 2019 | Q3 2019 | 5.00% |
| 9/29/2019 | 9 | Q3 | 2019 | Q3 2019 | 5.00% |
| 9/30/2019 | 9 | Q3 | 2019 | Q3 2019 | 5.00% |
| 10/1/2019 | 10 | Q4 | 2019 | Q4 2019 | 5.00% |
| 10/2/2019 | 10 | Q4 | 2019 | Q4 2019 | 5.00% |
| 10/3/2019 | 10 | Q4 | 2019 | Q4 2019 | 5.00% |
| 10/4/2019 | 10 | Q4 | 2019 | Q4 2019 | 5.00% |
| 10/5/2019 | 10 | Q4 | 2019 | Q4 2019 | 5.00% |
| 10/6/2019 | 10 | Q4 | 2019 | Q4 2019 | 5.00% |
| 10/7/2019 | 10 | Q4 | 2019 | Q4 2019 | 5.00% |
| 10/8/2019 | 10 | Q4 | 2019 | Q4 2019 | 5.00% |
| 10/9/2019 | 10 | Q4 | 2019 | Q4 2019 | 5.00% |
| 10/10/2019 | 10 | Q4 | 2019 | Q4 2019 | 5.00% |
| 10/11/2019 | 10 | Q4 | 2019 | Q4 2019 | 5.00% |
| 10/12/2019 | 10 | Q4 | 2019 | Q4 2019 | 5.00% |
| 10/13/2019 | 10 | Q4 | 2019 | Q4 2019 | 5.00% |
| 10/14/2019 | 10 | Q4 | 2019 | Q4 2019 | 5.00% |
| 10/15/2019 | 10 | Q4 | 2019 | Q4 2019 | 5.00% |
| 10/16/2019 | 10 | Q4 | 2019 | Q4 2019 | 5.00% |
| 10/17/2019 | 10 | Q4 | 2019 | Q4 2019 | 5.00% |
| 10/18/2019 | 10 | Q4 | 2019 | Q4 2019 | 5.00% |
| 10/19/2019 | 10 | Q4 | 2019 | Q4 2019 | 5.00% |
| 10/20/2019 | 10 | Q4 | 2019 | Q4 2019 | 5.00% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 10/21/2019 | 10 | Q4 | 2019 | Q4 2019 | 5.00% |
| 10/22/2019 | 10 | Q4 | 2019 | Q4 2019 | 5.00% |
| 10/23/2019 | 10 | Q4 | 2019 | Q4 2019 | 5.00% |
| 10/24/2019 | 10 | Q4 | 2019 | Q4 2019 | 5.00% |
| 10/25/2019 | 10 | Q4 | 2019 | Q4 2019 | 5.00% |
| 10/26/2019 | 10 | Q4 | 2019 | Q4 2019 | 5.00% |
| 10/27/2019 | 10 | Q4 | 2019 | Q4 2019 | 5.00% |
| 10/28/2019 | 10 | Q4 | 2019 | Q4 2019 | 5.00% |
| 10/29/2019 | 10 | Q4 | 2019 | Q4 2019 | 5.00% |
| 10/30/2019 | 10 | Q4 | 2019 | Q4 2019 | 4.75% |
| 10/31/2019 | 10 | Q4 | 2019 | Q4 2019 | 4.75% |
| 11/1/2019 | 11 | Q4 | 2019 | Q4 2019 | 4.75% |
| 11/2/2019 | 11 | Q4 | 2019 | Q4 2019 | 4.75% |
| 11/3/2019 | 11 | Q4 | 2019 | Q4 2019 | 4.75% |
| 11/4/2019 | 11 | Q4 | 2019 | Q4 2019 | 4.75% |
| 11/5/2019 | 11 | Q4 | 2019 | Q4 2019 | 4.75% |
| 11/6/2019 | 11 | Q4 | 2019 | Q4 2019 | 4.75% |
| 11/7/2019 | 11 | Q4 | 2019 | Q4 2019 | 4.75% |
| 11/8/2019 | 11 | Q4 | 2019 | Q4 2019 | 4.75% |
| 11/9/2019 | 11 | Q4 | 2019 | Q4 2019 | 4.75% |
| 11/10/2019 | 11 | Q4 | 2019 | Q4 2019 | 4.75% |
| 11/11/2019 | 11 | Q4 | 2019 | Q4 2019 | 4.75% |
| 11/12/2019 | 11 | Q4 | 2019 | Q4 2019 | 4.75% |
| 11/13/2019 | 11 | Q4 | 2019 | Q4 2019 | 4.75% |
| 11/14/2019 | 11 | Q4 | 2019 | Q4 2019 | 4.75% |
| 11/15/2019 | 11 | Q4 | 2019 | Q4 2019 | 4.75% |
| 11/16/2019 | 11 | Q4 | 2019 | Q4 2019 | 4.75% |
| 11/17/2019 | 11 | Q4 | 2019 | Q4 2019 | 4.75% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 11/18/2019 | 11 | Q4 | 2019 | Q4 2019 | 4.75% |
| 11/19/2019 | 11 | Q4 | 2019 | Q4 2019 | 4.75% |
| 11/20/2019 | 11 | Q4 | 2019 | Q4 2019 | 4.75% |
| 11/21/2019 | 11 | Q4 | 2019 | Q4 2019 | 4.75% |
| 11/22/2019 | 11 | Q4 | 2019 | Q4 2019 | 4.75% |
| 11/23/2019 | 11 | Q4 | 2019 | Q4 2019 | 4.75% |
| 11/24/2019 | 11 | Q4 | 2019 | Q4 2019 | 4.75% |
| 11/25/2019 | 11 | Q4 | 2019 | Q4 2019 | 4.75% |
| 11/26/2019 | 11 | Q4 | 2019 | Q4 2019 | 4.75% |
| 11/27/2019 | 11 | Q4 | 2019 | Q4 2019 | 4.75% |
| 11/28/2019 | 11 | Q4 | 2019 | Q4 2019 | 4.75% |
| 11/29/2019 | 11 | Q4 | 2019 | Q4 2019 | 4.75% |
| 11/30/2019 | 11 | Q4 | 2019 | Q4 2019 | 4.75% |
| 12/1/2019 | 12 | Q4 | 2019 | Q4 2019 | 4.75% |
| 12/2/2019 | 12 | Q4 | 2019 | Q4 2019 | 4.75% |
| 12/3/2019 | 12 | Q4 | 2019 | Q4 2019 | 4.75% |
| 12/4/2019 | 12 | Q4 | 2019 | Q4 2019 | 4.75% |
| 12/5/2019 | 12 | Q4 | 2019 | Q4 2019 | 4.75% |
| 12/6/2019 | 12 | Q4 | 2019 | Q4 2019 | 4.75% |
| 12/7/2019 | 12 | Q4 | 2019 | Q4 2019 | 4.75% |
| 12/8/2019 | 12 | Q4 | 2019 | Q4 2019 | 4.75% |
| 12/9/2019 | 12 | Q4 | 2019 | Q4 2019 | 4.75% |
| 12/10/2019 | 12 | Q4 | 2019 | Q4 2019 | 4.75% |
| 12/11/2019 | 12 | Q4 | 2019 | Q4 2019 | 4.75% |
| 12/12/2019 | 12 | Q4 | 2019 | Q4 2019 | 4.75% |
| 12/13/2019 | 12 | Q4 | 2019 | Q4 2019 | 4.75% |
| 12/14/2019 | 12 | Q4 | 2019 | Q4 2019 | 4.75% |
| 12/15/2019 | 12 | Q4 | 2019 | Q4 2019 | 4.75% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 12/16/2019 | 12 | Q4 | 2019 | Q4 2019 | 4.75% |
| 12/17/2019 | 12 | Q4 | 2019 | Q4 2019 | 4.75% |
| 12/18/2019 | 12 | Q4 | 2019 | Q4 2019 | 4.75% |
| 12/19/2019 | 12 | Q4 | 2019 | Q4 2019 | 4.75% |
| 12/20/2019 | 12 | Q4 | 2019 | Q4 2019 | 4.75% |
| 12/21/2019 | 12 | Q4 | 2019 | Q4 2019 | 4.75% |
| 12/22/2019 | 12 | Q4 | 2019 | Q4 2019 | 4.75% |
| 12/23/2019 | 12 | Q4 | 2019 | Q4 2019 | 4.75% |
| 12/24/2019 | 12 | Q4 | 2019 | Q4 2019 | 4.75% |
| 12/25/2019 | 12 | Q4 | 2019 | Q4 2019 | 4.75% |
| 12/26/2019 | 12 | Q4 | 2019 | Q4 2019 | 4.75% |
| 12/27/2019 | 12 | Q4 | 2019 | Q4 2019 | 4.75% |
| 12/28/2019 | 12 | Q4 | 2019 | Q4 2019 | 4.75% |
| 12/29/2019 | 12 | Q4 | 2019 | Q4 2019 | 4.75% |
| 12/30/2019 | 12 | Q4 | 2019 | Q4 2019 | 4.75% |
| 12/31/2019 | 12 | Q4 | 2019 | Q4 2019 | 4.75% |
| 1/1/2020 | 1 | Q1 | 2020 | Q1 2020 | 4.75% |
| 1/2/2020 | 1 | Q1 | 2020 | Q1 2020 | 4.75% |
| 1/3/2020 | 1 | Q1 | 2020 | Q1 2020 | 4.75% |
| 1/4/2020 | 1 | Q1 | 2020 | Q1 2020 | 4.75% |
| 1/5/2020 | 1 | Q1 | 2020 | Q1 2020 | 4.75% |
| 1/6/2020 | 1 | Q1 | 2020 | Q1 2020 | 4.75% |
| 1/7/2020 | 1 | Q1 | 2020 | Q1 2020 | 4.75% |
| 1/8/2020 | 1 | Q1 | 2020 | Q1 2020 | 4.75% |
| 1/9/2020 | 1 | Q1 | 2020 | Q1 2020 | 4.75% |
| 1/10/2020 | 1 | Q1 | 2020 | Q1 2020 | 4.75% |
| 1/11/2020 | 1 | Q1 | 2020 | Q1 2020 | 4.75% |
| 1/12/2020 | 1 | Q1 | 2020 | Q1 2020 | 4.75% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 1/13/2020 | 1 | Q1 | 2020 | Q1 2020 | 4.75% |
| 1/14/2020 | 1 | Q1 | 2020 | Q1 2020 | 4.75% |
| 1/15/2020 | 1 | Q1 | 2020 | Q1 2020 | 4.75% |
| 1/16/2020 | 1 | Q1 | 2020 | Q1 2020 | 4.75% |
| 1/17/2020 | 1 | Q1 | 2020 | Q1 2020 | 4.75% |
| 1/18/2020 | 1 | Q1 | 2020 | Q1 2020 | 4.75% |
| 1/19/2020 | 1 | Q1 | 2020 | Q1 2020 | 4.75% |
| 1/20/2020 | 1 | Q1 | 2020 | Q1 2020 | 4.75% |
| 1/21/2020 | 1 | Q1 | 2020 | Q1 2020 | 4.75% |
| 1/22/2020 | 1 | Q1 | 2020 | Q1 2020 | 4.75% |
| 1/23/2020 | 1 | Q1 | 2020 | Q1 2020 | 4.75% |
| 1/24/2020 | 1 | Q1 | 2020 | Q1 2020 | 4.75% |
| 1/25/2020 | 1 | Q1 | 2020 | Q1 2020 | 4.75% |
| 1/26/2020 | 1 | Q1 | 2020 | Q1 2020 | 4.75% |
| 1/27/2020 | 1 | Q1 | 2020 | Q1 2020 | 4.75% |
| 1/28/2020 | 1 | Q1 | 2020 | Q1 2020 | 4.75% |
| 1/29/2020 | 1 | Q1 | 2020 | Q1 2020 | 4.75% |
| 1/30/2020 | 1 | Q1 | 2020 | Q1 2020 | 4.75% |
| 1/31/2020 | 1 | Q1 | 2020 | Q1 2020 | 4.75% |
| 2/1/2020 | 2 | Q1 | 2020 | Q1 2020 | 4.75% |
| 2/2/2020 | 2 | Q1 | 2020 | Q1 2020 | 4.75% |
| 2/3/2020 | 2 | Q1 | 2020 | Q1 2020 | 4.75% |
| 2/4/2020 | 2 | Q1 | 2020 | Q1 2020 | 4.75% |
| 2/5/2020 | 2 | Q1 | 2020 | Q1 2020 | 4.75% |
| 2/6/2020 | 2 | Q1 | 2020 | Q1 2020 | 4.75% |
| 2/7/2020 | 2 | Q1 | 2020 | Q1 2020 | 4.75% |
| 2/8/2020 | 2 | Q1 | 2020 | Q1 2020 | 4.75% |
| 2/9/2020 | 2 | Q1 | 2020 | Q1 2020 | 4.75% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 2/10/2020 | 2 | Q1 | 2020 | Q1 2020 | 4.75% |
| 2/11/2020 | 2 | Q1 | 2020 | Q1 2020 | 4.75% |
| 2/12/2020 | 2 | Q1 | 2020 | Q1 2020 | 4.75% |
| 2/13/2020 | 2 | Q1 | 2020 | Q1 2020 | 4.75% |
| 2/14/2020 | 2 | Q1 | 2020 | Q1 2020 | 4.75% |
| 2/15/2020 | 2 | Q1 | 2020 | Q1 2020 | 4.75% |
| 2/16/2020 | 2 | Q1 | 2020 | Q1 2020 | 4.75% |
| 2/17/2020 | 2 | Q1 | 2020 | Q1 2020 | 4.75% |
| 2/18/2020 | 2 | Q1 | 2020 | Q1 2020 | 4.75% |
| 2/19/2020 | 2 | Q1 | 2020 | Q1 2020 | 4.75% |
| 2/20/2020 | 2 | Q1 | 2020 | Q1 2020 | 4.75% |
| 2/21/2020 | 2 | Q1 | 2020 | Q1 2020 | 4.75% |
| 2/22/2020 | 2 | Q1 | 2020 | Q1 2020 | 4.75% |
| 2/23/2020 | 2 | Q1 | 2020 | Q1 2020 | 4.75% |
| 2/24/2020 | 2 | Q1 | 2020 | Q1 2020 | 4.75% |
| 2/25/2020 | 2 | Q1 | 2020 | Q1 2020 | 4.75% |
| 2/26/2020 | 2 | Q1 | 2020 | Q1 2020 | 4.75% |
| 2/27/2020 | 2 | Q1 | 2020 | Q1 2020 | 4.75% |
| 2/28/2020 | 2 | Q1 | 2020 | Q1 2020 | 4.75% |
| 2/29/2020 | 2 | Q1 | 2020 | Q1 2020 | 4.75% |
| 3/1/2020 | 3 | Q1 | 2020 | Q1 2020 | 4.75% |
| 3/2/2020 | 3 | Q1 | 2020 | Q1 2020 | 4.75% |
| 3/3/2020 | 3 | Q1 | 2020 | Q1 2020 | 4.25% |
| 3/4/2020 | 3 | Q1 | 2020 | Q1 2020 | 4.25% |
| 3/5/2020 | 3 | Q1 | 2020 | Q1 2020 | 4.25% |
| 3/6/2020 | 3 | Q1 | 2020 | Q1 2020 | 4.25% |
| 3/7/2020 | 3 | Q1 | 2020 | Q1 2020 | 4.25% |
| 3/8/2020 | 3 | Q1 | 2020 | Q1 2020 | 4.25% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 3/9/2020 | 3 | Q1 | 2020 | Q1 2020 | 4.25% |
| 3/10/2020 | 3 | Q1 | 2020 | Q1 2020 | 4.25% |
| 3/11/2020 | 3 | Q1 | 2020 | Q1 2020 | 4.25% |
| 3/12/2020 | 3 | Q1 | 2020 | Q1 2020 | 4.25% |
| 3/13/2020 | 3 | Q1 | 2020 | Q1 2020 | 4.25% |
| 3/14/2020 | 3 | Q1 | 2020 | Q1 2020 | 4.25% |
| 3/15/2020 | 3 | Q1 | 2020 | Q1 2020 | 3.25% |
| 3/16/2020 | 3 | Q1 | 2020 | Q1 2020 | 3.25% |
| 3/17/2020 | 3 | Q1 | 2020 | Q1 2020 | 3.25% |
| 3/18/2020 | 3 | Q1 | 2020 | Q1 2020 | 3.25% |
| 3/19/2020 | 3 | Q1 | 2020 | Q1 2020 | 3.25% |
| 3/20/2020 | 3 | Q1 | 2020 | Q1 2020 | 3.25% |
| 3/21/2020 | 3 | Q1 | 2020 | Q1 2020 | 3.25% |
| 3/22/2020 | 3 | Q1 | 2020 | Q1 2020 | 3.25% |
| 3/23/2020 | 3 | Q1 | 2020 | Q1 2020 | 3.25% |
| 3/24/2020 | 3 | Q1 | 2020 | Q1 2020 | 3.25% |
| 3/25/2020 | 3 | Q1 | 2020 | Q1 2020 | 3.25% |
| 3/26/2020 | 3 | Q1 | 2020 | Q1 2020 | 3.25% |
| 3/27/2020 | 3 | Q1 | 2020 | Q1 2020 | 3.25% |
| 3/28/2020 | 3 | Q1 | 2020 | Q1 2020 | 3.25% |
| 3/29/2020 | 3 | Q1 | 2020 | Q1 2020 | 3.25% |
| 3/30/2020 | 3 | Q1 | 2020 | Q1 2020 | 3.25% |
| 3/31/2020 | 3 | Q1 | 2020 | Q1 2020 | 3.25% |
| 4/1/2020 | 4 | Q2 | 2020 | Q2 2020 | 3.25% |
| 4/2/2020 | 4 | Q2 | 2020 | Q2 2020 | 3.25% |
| 4/3/2020 | 4 | Q2 | 2020 | Q2 2020 | 3.25% |
| 4/4/2020 | 4 | Q2 | 2020 | Q2 2020 | 3.25% |
| 4/5/2020 | 4 | Q2 | 2020 | Q2 2020 | 3.25% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 4/6/2020 | 4 | Q2 | 2020 | Q2 2020 | 3.25% |
| 4/7/2020 | 4 | Q2 | 2020 | Q2 2020 | 3.25% |
| 4/8/2020 | 4 | Q2 | 2020 | Q2 2020 | 3.25% |
| 4/9/2020 | 4 | Q2 | 2020 | Q2 2020 | 3.25% |
| 4/10/2020 | 4 | Q2 | 2020 | Q2 2020 | 3.25% |
| 4/11/2020 | 4 | Q2 | 2020 | Q2 2020 | 3.25% |
| 4/12/2020 | 4 | Q2 | 2020 | Q2 2020 | 3.25% |
| 4/13/2020 | 4 | Q2 | 2020 | Q2 2020 | 3.25% |
| 4/14/2020 | 4 | Q2 | 2020 | Q2 2020 | 3.25% |
| 4/15/2020 | 4 | Q2 | 2020 | Q2 2020 | 3.25% |
| 4/16/2020 | 4 | Q2 | 2020 | Q2 2020 | 3.25% |
| 4/17/2020 | 4 | Q2 | 2020 | Q2 2020 | 3.25% |
| 4/18/2020 | 4 | Q2 | 2020 | Q2 2020 | 3.25% |
| 4/19/2020 | 4 | Q2 | 2020 | Q2 2020 | 3.25% |
| 4/20/2020 | 4 | Q2 | 2020 | Q2 2020 | 3.25% |
| 4/21/2020 | 4 | Q2 | 2020 | Q2 2020 | 3.25% |
| 4/22/2020 | 4 | Q2 | 2020 | Q2 2020 | 3.25% |
| 4/23/2020 | 4 | Q2 | 2020 | Q2 2020 | 3.25% |
| 4/24/2020 | 4 | Q2 | 2020 | Q2 2020 | 3.25% |
| 4/25/2020 | 4 | Q2 | 2020 | Q2 2020 | 3.25% |
| 4/26/2020 | 4 | Q2 | 2020 | Q2 2020 | 3.25% |
| 4/27/2020 | 4 | Q2 | 2020 | Q2 2020 | 3.25% |
| 4/28/2020 | 4 | Q2 | 2020 | Q2 2020 | 3.25% |
| 4/29/2020 | 4 | Q2 | 2020 | Q2 2020 | 3.25% |
| 4/30/2020 | 4 | Q2 | 2020 | Q2 2020 | 3.25% |
| 5/1/2020 | 5 | Q2 | 2020 | Q2 2020 | 3.25% |
| 5/2/2020 | 5 | Q2 | 2020 | Q2 2020 | 3.25% |
| 5/3/2020 | 5 | Q2 | 2020 | Q2 2020 | 3.25% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 5/4/2020 | 5 | Q2 | 2020 | Q2 2020 | 3.25% |
| 5/5/2020 | 5 | Q2 | 2020 | Q2 2020 | 3.25% |
| 5/6/2020 | 5 | Q2 | 2020 | Q2 2020 | 3.25% |
| 5/7/2020 | 5 | Q2 | 2020 | Q2 2020 | 3.25% |
| 5/8/2020 | 5 | Q2 | 2020 | Q2 2020 | 3.25% |
| 5/9/2020 | 5 | Q2 | 2020 | Q2 2020 | 3.25% |
| 5/10/2020 | 5 | Q2 | 2020 | Q2 2020 | 3.25% |
| 5/11/2020 | 5 | Q2 | 2020 | Q2 2020 | 3.25% |
| 5/12/2020 | 5 | Q2 | 2020 | Q2 2020 | 3.25% |
| 5/13/2020 | 5 | Q2 | 2020 | Q2 2020 | 3.25% |
| 5/14/2020 | 5 | Q2 | 2020 | Q2 2020 | 3.25% |
| 5/15/2020 | 5 | Q2 | 2020 | Q2 2020 | 3.25% |
| 5/16/2020 | 5 | Q2 | 2020 | Q2 2020 | 3.25% |
| 5/17/2020 | 5 | Q2 | 2020 | Q2 2020 | 3.25% |
| 5/18/2020 | 5 | Q2 | 2020 | Q2 2020 | 3.25% |
| 5/19/2020 | 5 | Q2 | 2020 | Q2 2020 | 3.25% |
| 5/20/2020 | 5 | Q2 | 2020 | Q2 2020 | 3.25% |
| 5/21/2020 | 5 | Q2 | 2020 | Q2 2020 | 3.25% |
| 5/22/2020 | 5 | Q2 | 2020 | Q2 2020 | 3.25% |
| 5/23/2020 | 5 | Q2 | 2020 | Q2 2020 | 3.25% |
| 5/24/2020 | 5 | Q2 | 2020 | Q2 2020 | 3.25% |
| 5/25/2020 | 5 | Q2 | 2020 | Q2 2020 | 3.25% |
| 5/26/2020 | 5 | Q2 | 2020 | Q2 2020 | 3.25% |
| 5/27/2020 | 5 | Q2 | 2020 | Q2 2020 | 3.25% |
| 5/28/2020 | 5 | Q2 | 2020 | Q2 2020 | 3.25% |
| 5/29/2020 | 5 | Q2 | 2020 | Q2 2020 | 3.25% |
| 5/30/2020 | 5 | Q2 | 2020 | Q2 2020 | 3.25% |
| 5/31/2020 | 5 | Q2 | 2020 | Q2 2020 | 3.25% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 6/1/2020 | 6 | Q2 | 2020 | Q2 2020 | 3.25% |
| 6/2/2020 | 6 | Q2 | 2020 | Q2 2020 | 3.25% |
| 6/3/2020 | 6 | Q2 | 2020 | Q2 2020 | 3.25% |
| 6/4/2020 | 6 | Q2 | 2020 | Q2 2020 | 3.25% |
| 6/5/2020 | 6 | Q2 | 2020 | Q2 2020 | 3.25% |
| 6/6/2020 | 6 | Q2 | 2020 | Q2 2020 | 3.25% |
| 6/7/2020 | 6 | Q2 | 2020 | Q2 2020 | 3.25% |
| 6/8/2020 | 6 | Q2 | 2020 | Q2 2020 | 3.25% |
| 6/9/2020 | 6 | Q2 | 2020 | Q2 2020 | 3.25% |
| 6/10/2020 | 6 | Q2 | 2020 | Q2 2020 | 3.25% |
| 6/11/2020 | 6 | Q2 | 2020 | Q2 2020 | 3.25% |
| 6/12/2020 | 6 | Q2 | 2020 | Q2 2020 | 3.25% |
| 6/13/2020 | 6 | Q2 | 2020 | Q2 2020 | 3.25% |
| 6/14/2020 | 6 | Q2 | 2020 | Q2 2020 | 3.25% |
| 6/15/2020 | 6 | Q2 | 2020 | Q2 2020 | 3.25% |
| 6/16/2020 | 6 | Q2 | 2020 | Q2 2020 | 3.25% |
| 6/17/2020 | 6 | Q2 | 2020 | Q2 2020 | 3.25% |
| 6/18/2020 | 6 | Q2 | 2020 | Q2 2020 | 3.25% |
| 6/19/2020 | 6 | Q2 | 2020 | Q2 2020 | 3.25% |
| 6/20/2020 | 6 | Q2 | 2020 | Q2 2020 | 3.25% |
| 6/21/2020 | 6 | Q2 | 2020 | Q2 2020 | 3.25% |
| 6/22/2020 | 6 | Q2 | 2020 | Q2 2020 | 3.25% |
| 6/23/2020 | 6 | Q2 | 2020 | Q2 2020 | 3.25% |
| 6/24/2020 | 6 | Q2 | 2020 | Q2 2020 | 3.25% |
| 6/25/2020 | 6 | Q2 | 2020 | Q2 2020 | 3.25% |
| 6/26/2020 | 6 | Q2 | 2020 | Q2 2020 | 3.25% |
| 6/27/2020 | 6 | Q2 | 2020 | Q2 2020 | 3.25% |
| 6/28/2020 | 6 | Q2 | 2020 | Q2 2020 | 3.25% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 6/29/2020 | 6 | Q2 | 2020 | Q2 2020 | 3.25% |
| 6/30/2020 | 6 | Q2 | 2020 | Q2 2020 | 3.25% |
| 7/1/2020 | 7 | Q3 | 2020 | Q3 2020 | 3.25% |
| 7/2/2020 | 7 | Q3 | 2020 | Q3 2020 | 3.25% |
| 7/3/2020 | 7 | Q3 | 2020 | Q3 2020 | 3.25% |
| 7/4/2020 | 7 | Q3 | 2020 | Q3 2020 | 3.25% |
| 7/5/2020 | 7 | Q3 | 2020 | Q3 2020 | 3.25% |
| 7/6/2020 | 7 | Q3 | 2020 | Q3 2020 | 3.25% |
| 7/7/2020 | 7 | Q3 | 2020 | Q3 2020 | 3.25% |
| 7/8/2020 | 7 | Q3 | 2020 | Q3 2020 | 3.25% |
| 7/9/2020 | 7 | Q3 | 2020 | Q3 2020 | 3.25% |
| 7/10/2020 | 7 | Q3 | 2020 | Q3 2020 | 3.25% |
| 7/11/2020 | 7 | Q3 | 2020 | Q3 2020 | 3.25% |
| 7/12/2020 | 7 | Q3 | 2020 | Q3 2020 | 3.25% |
| 7/13/2020 | 7 | Q3 | 2020 | Q3 2020 | 3.25% |
| 7/14/2020 | 7 | Q3 | 2020 | Q3 2020 | 3.25% |
| 7/15/2020 | 7 | Q3 | 2020 | Q3 2020 | 3.25% |
| 7/16/2020 | 7 | Q3 | 2020 | Q3 2020 | 3.25% |
| 7/17/2020 | 7 | Q3 | 2020 | Q3 2020 | 3.25% |
| 7/18/2020 | 7 | Q3 | 2020 | Q3 2020 | 3.25% |
| 7/19/2020 | 7 | Q3 | 2020 | Q3 2020 | 3.25% |
| 7/20/2020 | 7 | Q3 | 2020 | Q3 2020 | 3.25% |
| 7/21/2020 | 7 | Q3 | 2020 | Q3 2020 | 3.25% |
| 7/22/2020 | 7 | Q3 | 2020 | Q3 2020 | 3.25% |
| 7/23/2020 | 7 | Q3 | 2020 | Q3 2020 | 3.25% |
| 7/24/2020 | 7 | Q3 | 2020 | Q3 2020 | 3.25% |
| 7/25/2020 | 7 | Q3 | 2020 | Q3 2020 | 3.25% |
| 7/26/2020 | 7 | Q3 | 2020 | Q3 2020 | 3.25% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 7/27/2020 | 7 | Q3 | 2020 | Q3 2020 | 3.25% |
| 7/28/2020 | 7 | Q3 | 2020 | Q3 2020 | 3.25% |
| 7/29/2020 | 7 | Q3 | 2020 | Q3 2020 | 3.25% |
| 7/30/2020 | 7 | Q3 | 2020 | Q3 2020 | 3.25% |
| 7/31/2020 | 7 | Q3 | 2020 | Q3 2020 | 3.25% |
| 8/1/2020 | 8 | Q3 | 2020 | Q3 2020 | 3.25% |
| 8/2/2020 | 8 | Q3 | 2020 | Q3 2020 | 3.25% |
| 8/3/2020 | 8 | Q3 | 2020 | Q3 2020 | 3.25% |
| 8/4/2020 | 8 | Q3 | 2020 | Q3 2020 | 3.25% |
| 8/5/2020 | 8 | Q3 | 2020 | Q3 2020 | 3.25% |
| 8/6/2020 | 8 | Q3 | 2020 | Q3 2020 | 3.25% |
| 8/7/2020 | 8 | Q3 | 2020 | Q3 2020 | 3.25% |
| 8/8/2020 | 8 | Q3 | 2020 | Q3 2020 | 3.25% |
| 8/9/2020 | 8 | Q3 | 2020 | Q3 2020 | 3.25% |
| 8/10/2020 | 8 | Q3 | 2020 | Q3 2020 | 3.25% |
| 8/11/2020 | 8 | Q3 | 2020 | Q3 2020 | 3.25% |
| 8/12/2020 | 8 | Q3 | 2020 | Q3 2020 | 3.25% |
| 8/13/2020 | 8 | Q3 | 2020 | Q3 2020 | 3.25% |
| 8/14/2020 | 8 | Q3 | 2020 | Q3 2020 | 3.25% |
| 8/15/2020 | 8 | Q3 | 2020 | Q3 2020 | 3.25% |
| 8/16/2020 | 8 | Q3 | 2020 | Q3 2020 | 3.25% |
| 8/17/2020 | 8 | Q3 | 2020 | Q3 2020 | 3.25% |
| 8/18/2020 | 8 | Q3 | 2020 | Q3 2020 | 3.25% |
| 8/19/2020 | 8 | Q3 | 2020 | Q3 2020 | 3.25% |
| 8/20/2020 | 8 | Q3 | 2020 | Q3 2020 | 3.25% |
| 8/21/2020 | 8 | Q3 | 2020 | Q3 2020 | 3.25% |
| 8/22/2020 | 8 | Q3 | 2020 | Q3 2020 | 3.25% |
| 8/23/2020 | 8 | Q3 | 2020 | Q3 2020 | 3.25% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 8/24/2020 | 8 | Q3 | 2020 | Q3 2020 | 3.25% |
| 8/25/2020 | 8 | Q3 | 2020 | Q3 2020 | 3.25% |
| 8/26/2020 | 8 | Q3 | 2020 | Q3 2020 | 3.25% |
| 8/27/2020 | 8 | Q3 | 2020 | Q3 2020 | 3.25% |
| 8/28/2020 | 8 | Q3 | 2020 | Q3 2020 | 3.25% |
| 8/29/2020 | 8 | Q3 | 2020 | Q3 2020 | 3.25% |
| 8/30/2020 | 8 | Q3 | 2020 | Q3 2020 | 3.25% |
| 8/31/2020 | 8 | Q3 | 2020 | Q3 2020 | 3.25% |
| 9/1/2020 | 9 | Q3 | 2020 | Q3 2020 | 3.25% |
| 9/2/2020 | 9 | Q3 | 2020 | Q3 2020 | 3.25% |
| 9/3/2020 | 9 | Q3 | 2020 | Q3 2020 | 3.25% |
| 9/4/2020 | 9 | Q3 | 2020 | Q3 2020 | 3.25% |
| 9/5/2020 | 9 | Q3 | 2020 | Q3 2020 | 3.25% |
| 9/6/2020 | 9 | Q3 | 2020 | Q3 2020 | 3.25% |
| 9/7/2020 | 9 | Q3 | 2020 | Q3 2020 | 3.25% |
| 9/8/2020 | 9 | Q3 | 2020 | Q3 2020 | 3.25% |
| 9/9/2020 | 9 | Q3 | 2020 | Q3 2020 | 3.25% |
| 9/10/2020 | 9 | Q3 | 2020 | Q3 2020 | 3.25% |
| 9/11/2020 | 9 | Q3 | 2020 | Q3 2020 | 3.25% |
| 9/12/2020 | 9 | Q3 | 2020 | Q3 2020 | 3.25% |
| 9/13/2020 | 9 | Q3 | 2020 | Q3 2020 | 3.25% |
| 9/14/2020 | 9 | Q3 | 2020 | Q3 2020 | 3.25% |
| 9/15/2020 | 9 | Q3 | 2020 | Q3 2020 | 3.25% |
| 9/16/2020 | 9 | Q3 | 2020 | Q3 2020 | 3.25% |
| 9/17/2020 | 9 | Q3 | 2020 | Q3 2020 | 3.25% |
| 9/18/2020 | 9 | Q3 | 2020 | Q3 2020 | 3.25% |
| 9/19/2020 | 9 | Q3 | 2020 | Q3 2020 | 3.25% |
| 9/20/2020 | 9 | Q3 | 2020 | Q3 2020 | 3.25% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 9/21/2020 | 9 | Q3 | 2020 | Q3 2020 | 3.25% |
| 9/22/2020 | 9 | Q3 | 2020 | Q3 2020 | 3.25% |
| 9/23/2020 | 9 | Q3 | 2020 | Q3 2020 | 3.25% |
| 9/24/2020 | 9 | Q3 | 2020 | Q3 2020 | 3.25% |
| 9/25/2020 | 9 | Q3 | 2020 | Q3 2020 | 3.25% |
| 9/26/2020 | 9 | Q3 | 2020 | Q3 2020 | 3.25% |
| 9/27/2020 | 9 | Q3 | 2020 | Q3 2020 | 3.25% |
| 9/28/2020 | 9 | Q3 | 2020 | Q3 2020 | 3.25% |
| 9/29/2020 | 9 | Q3 | 2020 | Q3 2020 | 3.25% |
| 9/30/2020 | 9 | Q3 | 2020 | Q3 2020 | 3.25% |
| 10/1/2020 | 10 | Q4 | 2020 | Q4 2020 | 3.25% |
| 10/2/2020 | 10 | Q4 | 2020 | Q4 2020 | 3.25% |
| 10/3/2020 | 10 | Q4 | 2020 | Q4 2020 | 3.25% |
| 10/4/2020 | 10 | Q4 | 2020 | Q4 2020 | 3.25% |
| 10/5/2020 | 10 | Q4 | 2020 | Q4 2020 | 3.25% |
| 10/6/2020 | 10 | Q4 | 2020 | Q4 2020 | 3.25% |
| 10/7/2020 | 10 | Q4 | 2020 | Q4 2020 | 3.25% |
| 10/8/2020 | 10 | Q4 | 2020 | Q4 2020 | 3.25% |
| 10/9/2020 | 10 | Q4 | 2020 | Q4 2020 | 3.25% |
| 10/10/2020 | 10 | Q4 | 2020 | Q4 2020 | 3.25% |
| 10/11/2020 | 10 | Q4 | 2020 | Q4 2020 | 3.25% |
| 10/12/2020 | 10 | Q4 | 2020 | Q4 2020 | 3.25% |
| 10/13/2020 | 10 | Q4 | 2020 | Q4 2020 | 3.25% |
| 10/14/2020 | 10 | Q4 | 2020 | Q4 2020 | 3.25% |
| 10/15/2020 | 10 | Q4 | 2020 | Q4 2020 | 3.25% |
| 10/16/2020 | 10 | Q4 | 2020 | Q4 2020 | 3.25% |
| 10/17/2020 | 10 | Q4 | 2020 | Q4 2020 | 3.25% |
| 10/18/2020 | 10 | Q4 | 2020 | Q4 2020 | 3.25% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 10/19/2020 | 10 | Q4 | 2020 | Q4 2020 | 3.25% |
| 10/20/2020 | 10 | Q4 | 2020 | Q4 2020 | 3.25% |
| 10/21/2020 | 10 | Q4 | 2020 | Q4 2020 | 3.25% |
| 10/22/2020 | 10 | Q4 | 2020 | Q4 2020 | 3.25% |
| 10/23/2020 | 10 | Q4 | 2020 | Q4 2020 | 3.25% |
| 10/24/2020 | 10 | Q4 | 2020 | Q4 2020 | 3.25% |
| 10/25/2020 | 10 | Q4 | 2020 | Q4 2020 | 3.25% |
| 10/26/2020 | 10 | Q4 | 2020 | Q4 2020 | 3.25% |
| 10/27/2020 | 10 | Q4 | 2020 | Q4 2020 | 3.25% |
| 10/28/2020 | 10 | Q4 | 2020 | Q4 2020 | 3.25% |
| 10/29/2020 | 10 | Q4 | 2020 | Q4 2020 | 3.25% |
| 10/30/2020 | 10 | Q4 | 2020 | Q4 2020 | 3.25% |
| 10/31/2020 | 10 | Q4 | 2020 | Q4 2020 | 3.25% |
| 11/1/2020 | 11 | Q4 | 2020 | Q4 2020 | 3.25% |
| 11/2/2020 | 11 | Q4 | 2020 | Q4 2020 | 3.25% |
| 11/3/2020 | 11 | Q4 | 2020 | Q4 2020 | 3.25% |
| 11/4/2020 | 11 | Q4 | 2020 | Q4 2020 | 3.25% |
| 11/5/2020 | 11 | Q4 | 2020 | Q4 2020 | 3.25% |
| 11/6/2020 | 11 | Q4 | 2020 | Q4 2020 | 3.25% |
| 11/7/2020 | 11 | Q4 | 2020 | Q4 2020 | 3.25% |
| 11/8/2020 | 11 | Q4 | 2020 | Q4 2020 | 3.25% |
| 11/9/2020 | 11 | Q4 | 2020 | Q4 2020 | 3.25% |
| 11/10/2020 | 11 | Q4 | 2020 | Q4 2020 | 3.25% |
| 11/11/2020 | 11 | Q4 | 2020 | Q4 2020 | 3.25% |
| 11/12/2020 | 11 | Q4 | 2020 | Q4 2020 | 3.25% |
| 11/13/2020 | 11 | Q4 | 2020 | Q4 2020 | 3.25% |
| 11/14/2020 | 11 | Q4 | 2020 | Q4 2020 | 3.25% |
| 11/15/2020 | 11 | Q4 | 2020 | Q4 2020 | 3.25% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 11/16/2020 | 11 | Q4 | 2020 | Q4 2020 | 3.25% |
| 11/17/2020 | 11 | Q4 | 2020 | Q4 2020 | 3.25% |
| 11/18/2020 | 11 | Q4 | 2020 | Q4 2020 | 3.25% |
| 11/19/2020 | 11 | Q4 | 2020 | Q4 2020 | 3.25% |
| 11/20/2020 | 11 | Q4 | 2020 | Q4 2020 | 3.25% |
| 11/21/2020 | 11 | Q4 | 2020 | Q4 2020 | 3.25% |
| 11/22/2020 | 11 | Q4 | 2020 | Q4 2020 | 3.25% |
| 11/23/2020 | 11 | Q4 | 2020 | Q4 2020 | 3.25% |
| 11/24/2020 | 11 | Q4 | 2020 | Q4 2020 | 3.25% |
| 11/25/2020 | 11 | Q4 | 2020 | Q4 2020 | 3.25% |
| 11/26/2020 | 11 | Q4 | 2020 | Q4 2020 | 3.25% |
| 11/27/2020 | 11 | Q4 | 2020 | Q4 2020 | 3.25% |
| 11/28/2020 | 11 | Q4 | 2020 | Q4 2020 | 3.25% |
| 11/29/2020 | 11 | Q4 | 2020 | Q4 2020 | 3.25% |
| 11/30/2020 | 11 | Q4 | 2020 | Q4 2020 | 3.25% |
| 12/1/2020 | 12 | Q4 | 2020 | Q4 2020 | 3.25% |
| 12/2/2020 | 12 | Q4 | 2020 | Q4 2020 | 3.25% |
| 12/3/2020 | 12 | Q4 | 2020 | Q4 2020 | 3.25% |
| 12/4/2020 | 12 | Q4 | 2020 | Q4 2020 | 3.25% |
| 12/5/2020 | 12 | Q4 | 2020 | Q4 2020 | 3.25% |
| 12/6/2020 | 12 | Q4 | 2020 | Q4 2020 | 3.25% |
| 12/7/2020 | 12 | Q4 | 2020 | Q4 2020 | 3.25% |
| 12/8/2020 | 12 | Q4 | 2020 | Q4 2020 | 3.25% |
| 12/9/2020 | 12 | Q4 | 2020 | Q4 2020 | 3.25% |
| 12/10/2020 | 12 | Q4 | 2020 | Q4 2020 | 3.25% |
| 12/11/2020 | 12 | Q4 | 2020 | Q4 2020 | 3.25% |
| 12/12/2020 | 12 | Q4 | 2020 | Q4 2020 | 3.25% |
| 12/13/2020 | 12 | Q4 | 2020 | Q4 2020 | 3.25% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 12/14/2020 | 12 | Q4 | 2020 | Q4 2020 | 3.25% |
| 12/15/2020 | 12 | Q4 | 2020 | Q4 2020 | 3.25% |
| 12/16/2020 | 12 | Q4 | 2020 | Q4 2020 | 3.25% |
| 12/17/2020 | 12 | Q4 | 2020 | Q4 2020 | 3.25% |
| 12/18/2020 | 12 | Q4 | 2020 | Q4 2020 | 3.25% |
| 12/19/2020 | 12 | Q4 | 2020 | Q4 2020 | 3.25% |
| 12/20/2020 | 12 | Q4 | 2020 | Q4 2020 | 3.25% |
| 12/21/2020 | 12 | Q4 | 2020 | Q4 2020 | 3.25% |
| 12/22/2020 | 12 | Q4 | 2020 | Q4 2020 | 3.25% |
| 12/23/2020 | 12 | Q4 | 2020 | Q4 2020 | 3.25% |
| 12/24/2020 | 12 | Q4 | 2020 | Q4 2020 | 3.25% |
| 12/25/2020 | 12 | Q4 | 2020 | Q4 2020 | 3.25% |
| 12/26/2020 | 12 | Q4 | 2020 | Q4 2020 | 3.25% |
| 12/27/2020 | 12 | Q4 | 2020 | Q4 2020 | 3.25% |
| 12/28/2020 | 12 | Q4 | 2020 | Q4 2020 | 3.25% |
| 12/29/2020 | 12 | Q4 | 2020 | Q4 2020 | 3.25% |
| 12/30/2020 | 12 | Q4 | 2020 | Q4 2020 | 3.25% |
| 12/31/2020 | 12 | Q4 | 2020 | Q4 2020 | 3.25% |
| 1/1/2021 | 1 | Q1 | 2021 | Q1 2021 | 3.25% |
| 1/2/2021 | 1 | Q1 | 2021 | Q1 2021 | 3.25% |
| 1/3/2021 | 1 | Q1 | 2021 | Q1 2021 | 3.25% |
| 1/4/2021 | 1 | Q1 | 2021 | Q1 2021 | 3.25% |
| 1/5/2021 | 1 | Q1 | 2021 | Q1 2021 | 3.25% |
| 1/6/2021 | 1 | Q1 | 2021 | Q1 2021 | 3.25% |
| 1/7/2021 | 1 | Q1 | 2021 | Q1 2021 | 3.25% |
| 1/8/2021 | 1 | Q1 | 2021 | Q1 2021 | 3.25% |
| 1/9/2021 | 1 | Q1 | 2021 | Q1 2021 | 3.25% |
| 1/10/2021 | 1 | Q1 | 2021 | Q1 2021 | 3.25% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 1/11/2021 | 1 | Q1 | 2021 | Q1 2021 | 3.25% |
| 1/12/2021 | 1 | Q1 | 2021 | Q1 2021 | 3.25% |
| 1/13/2021 | 1 | Q1 | 2021 | Q1 2021 | 3.25% |
| 1/14/2021 | 1 | Q1 | 2021 | Q1 2021 | 3.25% |
| 1/15/2021 | 1 | Q1 | 2021 | Q1 2021 | 3.25% |
| 1/16/2021 | 1 | Q1 | 2021 | Q1 2021 | 3.25% |
| 1/17/2021 | 1 | Q1 | 2021 | Q1 2021 | 3.25% |
| 1/18/2021 | 1 | Q1 | 2021 | Q1 2021 | 3.25% |
| 1/19/2021 | 1 | Q1 | 2021 | Q1 2021 | 3.25% |
| 1/20/2021 | 1 | Q1 | 2021 | Q1 2021 | 3.25% |
| 1/21/2021 | 1 | Q1 | 2021 | Q1 2021 | 3.25% |
| 1/22/2021 | 1 | Q1 | 2021 | Q1 2021 | 3.25% |
| 1/23/2021 | 1 | Q1 | 2021 | Q1 2021 | 3.25% |
| 1/24/2021 | 1 | Q1 | 2021 | Q1 2021 | 3.25% |
| 1/25/2021 | 1 | Q1 | 2021 | Q1 2021 | 3.25% |
| 1/26/2021 | 1 | Q1 | 2021 | Q1 2021 | 3.25% |
| 1/27/2021 | 1 | Q1 | 2021 | Q1 2021 | 3.25% |
| 1/28/2021 | 1 | Q1 | 2021 | Q1 2021 | 3.25% |
| 1/29/2021 | 1 | Q1 | 2021 | Q1 2021 | 3.25% |
| 1/30/2021 | 1 | Q1 | 2021 | Q1 2021 | 3.25% |
| 1/31/2021 | 1 | Q1 | 2021 | Q1 2021 | 3.25% |
| 2/1/2021 | 2 | Q1 | 2021 | Q1 2021 | 3.25% |
| 2/2/2021 | 2 | Q1 | 2021 | Q1 2021 | 3.25% |
| 2/3/2021 | 2 | Q1 | 2021 | Q1 2021 | 3.25% |
| 2/4/2021 | 2 | Q1 | 2021 | Q1 2021 | 3.25% |
| 2/5/2021 | 2 | Q1 | 2021 | Q1 2021 | 3.25% |
| 2/6/2021 | 2 | Q1 | 2021 | Q1 2021 | 3.25% |
| 2/7/2021 | 2 | Q1 | 2021 | Q1 2021 | 3.25% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 2/8/2021 | 2 | Q1 | 2021 | Q1 2021 | 3.25% |
| 2/9/2021 | 2 | Q1 | 2021 | Q1 2021 | 3.25% |
| 2/10/2021 | 2 | Q1 | 2021 | Q1 2021 | 3.25% |
| 2/11/2021 | 2 | Q1 | 2021 | Q1 2021 | 3.25% |
| 2/12/2021 | 2 | Q1 | 2021 | Q1 2021 | 3.25% |
| 2/13/2021 | 2 | Q1 | 2021 | Q1 2021 | 3.25% |
| 2/14/2021 | 2 | Q1 | 2021 | Q1 2021 | 3.25% |
| 2/15/2021 | 2 | Q1 | 2021 | Q1 2021 | 3.25% |
| 2/16/2021 | 2 | Q1 | 2021 | Q1 2021 | 3.25% |
| 2/17/2021 | 2 | Q1 | 2021 | Q1 2021 | 3.25% |
| 2/18/2021 | 2 | Q1 | 2021 | Q1 2021 | 3.25% |
| 2/19/2021 | 2 | Q1 | 2021 | Q1 2021 | 3.25% |
| 2/20/2021 | 2 | Q1 | 2021 | Q1 2021 | 3.25% |
| 2/21/2021 | 2 | Q1 | 2021 | Q1 2021 | 3.25% |
| 2/22/2021 | 2 | Q1 | 2021 | Q1 2021 | 3.25% |
| 2/23/2021 | 2 | Q1 | 2021 | Q1 2021 | 3.25% |
| 2/24/2021 | 2 | Q1 | 2021 | Q1 2021 | 3.25% |
| 2/25/2021 | 2 | Q1 | 2021 | Q1 2021 | 3.25% |
| 2/26/2021 | 2 | Q1 | 2021 | Q1 2021 | 3.25% |
| 2/27/2021 | 2 | Q1 | 2021 | Q1 2021 | 3.25% |
| 2/28/2021 | 2 | Q1 | 2021 | Q1 2021 | 3.25% |
| 3/1/2021 | 3 | Q1 | 2021 | Q1 2021 | 3.25% |
| 3/2/2021 | 3 | Q1 | 2021 | Q1 2021 | 3.25% |
| 3/3/2021 | 3 | Q1 | 2021 | Q1 2021 | 3.25% |
| 3/4/2021 | 3 | Q1 | 2021 | Q1 2021 | 3.25% |
| 3/5/2021 | 3 | Q1 | 2021 | Q1 2021 | 3.25% |
| 3/6/2021 | 3 | Q1 | 2021 | Q1 2021 | 3.25% |
| 3/7/2021 | 3 | Q1 | 2021 | Q1 2021 | 3.25% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 3/8/2021 | 3 | Q1 | 2021 | Q1 2021 | 3.25% |
| 3/9/2021 | 3 | Q1 | 2021 | Q1 2021 | 3.25% |
| 3/10/2021 | 3 | Q1 | 2021 | Q1 2021 | 3.25% |
| 3/11/2021 | 3 | Q1 | 2021 | Q1 2021 | 3.25% |
| 3/12/2021 | 3 | Q1 | 2021 | Q1 2021 | 3.25% |
| 3/13/2021 | 3 | Q1 | 2021 | Q1 2021 | 3.25% |
| 3/14/2021 | 3 | Q1 | 2021 | Q1 2021 | 3.25% |
| 3/15/2021 | 3 | Q1 | 2021 | Q1 2021 | 3.25% |
| 3/16/2021 | 3 | Q1 | 2021 | Q1 2021 | 3.25% |
| 3/17/2021 | 3 | Q1 | 2021 | Q1 2021 | 3.25% |
| 3/18/2021 | 3 | Q1 | 2021 | Q1 2021 | 3.25% |
| 3/19/2021 | 3 | Q1 | 2021 | Q1 2021 | 3.25% |
| 3/20/2021 | 3 | Q1 | 2021 | Q1 2021 | 3.25% |
| 3/21/2021 | 3 | Q1 | 2021 | Q1 2021 | 3.25% |
| 3/22/2021 | 3 | Q1 | 2021 | Q1 2021 | 3.25% |
| 3/23/2021 | 3 | Q1 | 2021 | Q1 2021 | 3.25% |
| 3/24/2021 | 3 | Q1 | 2021 | Q1 2021 | 3.25% |
| 3/25/2021 | 3 | Q1 | 2021 | Q1 2021 | 3.25% |
| 3/26/2021 | 3 | Q1 | 2021 | Q1 2021 | 3.25% |
| 3/27/2021 | 3 | Q1 | 2021 | Q1 2021 | 3.25% |
| 3/28/2021 | 3 | Q1 | 2021 | Q1 2021 | 3.25% |
| 3/29/2021 | 3 | Q1 | 2021 | Q1 2021 | 3.25% |
| 3/30/2021 | 3 | Q1 | 2021 | Q1 2021 | 3.25% |
| 3/31/2021 | 3 | Q1 | 2021 | Q1 2021 | 3.25% |
| 4/1/2021 | 4 | Q2 | 2021 | Q2 2021 | 3.25% |
| 4/2/2021 | 4 | Q2 | 2021 | Q2 2021 | 3.25% |
| 4/3/2021 | 4 | Q2 | 2021 | Q2 2021 | 3.25% |
| 4/4/2021 | 4 | Q2 | 2021 | Q2 2021 | 3.25% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 4/5/2021 | 4 | Q2 | 2021 | Q2 2021 | 3.25% |
| 4/6/2021 | 4 | Q2 | 2021 | Q2 2021 | 3.25% |
| 4/7/2021 | 4 | Q2 | 2021 | Q2 2021 | 3.25% |
| 4/8/2021 | 4 | Q2 | 2021 | Q2 2021 | 3.25% |
| 4/9/2021 | 4 | Q2 | 2021 | Q2 2021 | 3.25% |
| 4/10/2021 | 4 | Q2 | 2021 | Q2 2021 | 3.25% |
| 4/11/2021 | 4 | Q2 | 2021 | Q2 2021 | 3.25% |
| 4/12/2021 | 4 | Q2 | 2021 | Q2 2021 | 3.25% |
| 4/13/2021 | 4 | Q2 | 2021 | Q2 2021 | 3.25% |
| 4/14/2021 | 4 | Q2 | 2021 | Q2 2021 | 3.25% |
| 4/15/2021 | 4 | Q2 | 2021 | Q2 2021 | 3.25% |
| 4/16/2021 | 4 | Q2 | 2021 | Q2 2021 | 3.25% |
| 4/17/2021 | 4 | Q2 | 2021 | Q2 2021 | 3.25% |
| 4/18/2021 | 4 | Q2 | 2021 | Q2 2021 | 3.25% |
| 4/19/2021 | 4 | Q2 | 2021 | Q2 2021 | 3.25% |
| 4/20/2021 | 4 | Q2 | 2021 | Q2 2021 | 3.25% |
| 4/21/2021 | 4 | Q2 | 2021 | Q2 2021 | 3.25% |
| 4/22/2021 | 4 | Q2 | 2021 | Q2 2021 | 3.25% |
| 4/23/2021 | 4 | Q2 | 2021 | Q2 2021 | 3.25% |
| 4/24/2021 | 4 | Q2 | 2021 | Q2 2021 | 3.25% |
| 4/25/2021 | 4 | Q2 | 2021 | Q2 2021 | 3.25% |
| 4/26/2021 | 4 | Q2 | 2021 | Q2 2021 | 3.25% |
| 4/27/2021 | 4 | Q2 | 2021 | Q2 2021 | 3.25% |
| 4/28/2021 | 4 | Q2 | 2021 | Q2 2021 | 3.25% |
| 4/29/2021 | 4 | Q2 | 2021 | Q2 2021 | 3.25% |
| 4/30/2021 | 4 | Q2 | 2021 | Q2 2021 | 3.25% |
| 5/1/2021 | 5 | Q2 | 2021 | Q2 2021 | 3.25% |
| 5/2/2021 | 5 | Q2 | 2021 | Q2 2021 | 3.25% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 5/3/2021 | 5 | Q2 | 2021 | Q2 2021 | 3.25% |
| 5/4/2021 | 5 | Q2 | 2021 | Q2 2021 | 3.25% |
| 5/5/2021 | 5 | Q2 | 2021 | Q2 2021 | 3.25% |
| 5/6/2021 | 5 | Q2 | 2021 | Q2 2021 | 3.25% |
| 5/7/2021 | 5 | Q2 | 2021 | Q2 2021 | 3.25% |
| 5/8/2021 | 5 | Q2 | 2021 | Q2 2021 | 3.25% |
| 5/9/2021 | 5 | Q2 | 2021 | Q2 2021 | 3.25% |
| 5/10/2021 | 5 | Q2 | 2021 | Q2 2021 | 3.25% |
| 5/11/2021 | 5 | Q2 | 2021 | Q2 2021 | 3.25% |
| 5/12/2021 | 5 | Q2 | 2021 | Q2 2021 | 3.25% |
| 5/13/2021 | 5 | Q2 | 2021 | Q2 2021 | 3.25% |
| 5/14/2021 | 5 | Q2 | 2021 | Q2 2021 | 3.25% |
| 5/15/2021 | 5 | Q2 | 2021 | Q2 2021 | 3.25% |
| 5/16/2021 | 5 | Q2 | 2021 | Q2 2021 | 3.25% |
| 5/17/2021 | 5 | Q2 | 2021 | Q2 2021 | 3.25% |
| 5/18/2021 | 5 | Q2 | 2021 | Q2 2021 | 3.25% |
| 5/19/2021 | 5 | Q2 | 2021 | Q2 2021 | 3.25% |
| 5/20/2021 | 5 | Q2 | 2021 | Q2 2021 | 3.25% |
| 5/21/2021 | 5 | Q2 | 2021 | Q2 2021 | 3.25% |
| 5/22/2021 | 5 | Q2 | 2021 | Q2 2021 | 3.25% |
| 5/23/2021 | 5 | Q2 | 2021 | Q2 2021 | 3.25% |
| 5/24/2021 | 5 | Q2 | 2021 | Q2 2021 | 3.25% |
| 5/25/2021 | 5 | Q2 | 2021 | Q2 2021 | 3.25% |
| 5/26/2021 | 5 | Q2 | 2021 | Q2 2021 | 3.25% |
| 5/27/2021 | 5 | Q2 | 2021 | Q2 2021 | 3.25% |
| 5/28/2021 | 5 | Q2 | 2021 | Q2 2021 | 3.25% |
| 5/29/2021 | 5 | Q2 | 2021 | Q2 2021 | 3.25% |
| 5/30/2021 | 5 | Q2 | 2021 | Q2 2021 | 3.25% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 5/31/2021 | 5 | Q2 | 2021 | Q2 2021 | 3.25% |
| 6/1/2021 | 6 | Q2 | 2021 | Q2 2021 | 3.25% |
| 6/2/2021 | 6 | Q2 | 2021 | Q2 2021 | 3.25% |
| 6/3/2021 | 6 | Q2 | 2021 | Q2 2021 | 3.25% |
| 6/4/2021 | 6 | Q2 | 2021 | Q2 2021 | 3.25% |
| 6/5/2021 | 6 | Q2 | 2021 | Q2 2021 | 3.25% |
| 6/6/2021 | 6 | Q2 | 2021 | Q2 2021 | 3.25% |
| 6/7/2021 | 6 | Q2 | 2021 | Q2 2021 | 3.25% |
| 6/8/2021 | 6 | Q2 | 2021 | Q2 2021 | 3.25% |
| 6/9/2021 | 6 | Q2 | 2021 | Q2 2021 | 3.25% |
| 6/10/2021 | 6 | Q2 | 2021 | Q2 2021 | 3.25% |
| 6/11/2021 | 6 | Q2 | 2021 | Q2 2021 | 3.25% |
| 6/12/2021 | 6 | Q2 | 2021 | Q2 2021 | 3.25% |
| 6/13/2021 | 6 | Q2 | 2021 | Q2 2021 | 3.25% |
| 6/14/2021 | 6 | Q2 | 2021 | Q2 2021 | 3.25% |
| 6/15/2021 | 6 | Q2 | 2021 | Q2 2021 | 3.25% |
| 6/16/2021 | 6 | Q2 | 2021 | Q2 2021 | 3.25% |
| 6/17/2021 | 6 | Q2 | 2021 | Q2 2021 | 3.25% |
| 6/18/2021 | 6 | Q2 | 2021 | Q2 2021 | 3.25% |
| 6/19/2021 | 6 | Q2 | 2021 | Q2 2021 | 3.25% |
| 6/20/2021 | 6 | Q2 | 2021 | Q2 2021 | 3.25% |
| 6/21/2021 | 6 | Q2 | 2021 | Q2 2021 | 3.25% |
| 6/22/2021 | 6 | Q2 | 2021 | Q2 2021 | 3.25% |
| 6/23/2021 | 6 | Q2 | 2021 | Q2 2021 | 3.25% |
| 6/24/2021 | 6 | Q2 | 2021 | Q2 2021 | 3.25% |
| 6/25/2021 | 6 | Q2 | 2021 | Q2 2021 | 3.25% |
| 6/26/2021 | 6 | Q2 | 2021 | Q2 2021 | 3.25% |
| 6/27/2021 | 6 | Q2 | 2021 | Q2 2021 | 3.25% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 6/28/2021 | 6 | Q2 | 2021 | Q2 2021 | 3.25% |
| 6/29/2021 | 6 | Q2 | 2021 | Q2 2021 | 3.25% |
| 6/30/2021 | 6 | Q2 | 2021 | Q2 2021 | 3.25% |
| 7/1/2021 | 7 | Q3 | 2021 | Q3 2021 | 3.25% |
| 7/2/2021 | 7 | Q3 | 2021 | Q3 2021 | 3.25% |
| 7/3/2021 | 7 | Q3 | 2021 | Q3 2021 | 3.25% |
| 7/4/2021 | 7 | Q3 | 2021 | Q3 2021 | 3.25% |
| 7/5/2021 | 7 | Q3 | 2021 | Q3 2021 | 3.25% |
| 7/6/2021 | 7 | Q3 | 2021 | Q3 2021 | 3.25% |
| 7/7/2021 | 7 | Q3 | 2021 | Q3 2021 | 3.25% |
| 7/8/2021 | 7 | Q3 | 2021 | Q3 2021 | 3.25% |
| 7/9/2021 | 7 | Q3 | 2021 | Q3 2021 | 3.25% |
| 7/10/2021 | 7 | Q3 | 2021 | Q3 2021 | 3.25% |
| 7/11/2021 | 7 | Q3 | 2021 | Q3 2021 | 3.25% |
| 7/12/2021 | 7 | Q3 | 2021 | Q3 2021 | 3.25% |
| 7/13/2021 | 7 | Q3 | 2021 | Q3 2021 | 3.25% |
| 7/14/2021 | 7 | Q3 | 2021 | Q3 2021 | 3.25% |
| 7/15/2021 | 7 | Q3 | 2021 | Q3 2021 | 3.25% |
| 7/16/2021 | 7 | Q3 | 2021 | Q3 2021 | 3.25% |
| 7/17/2021 | 7 | Q3 | 2021 | Q3 2021 | 3.25% |
| 7/18/2021 | 7 | Q3 | 2021 | Q3 2021 | 3.25% |
| 7/19/2021 | 7 | Q3 | 2021 | Q3 2021 | 3.25% |
| 7/20/2021 | 7 | Q3 | 2021 | Q3 2021 | 3.25% |
| 7/21/2021 | 7 | Q3 | 2021 | Q3 2021 | 3.25% |
| 7/22/2021 | 7 | Q3 | 2021 | Q3 2021 | 3.25% |
| 7/23/2021 | 7 | Q3 | 2021 | Q3 2021 | 3.25% |
| 7/24/2021 | 7 | Q3 | 2021 | Q3 2021 | 3.25% |
| 7/25/2021 | 7 | Q3 | 2021 | Q3 2021 | 3.25% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 7/26/2021 | 7 | Q3 | 2021 | Q3 2021 | 3.25% |
| 7/27/2021 | 7 | Q3 | 2021 | Q3 2021 | 3.25% |
| 7/28/2021 | 7 | Q3 | 2021 | Q3 2021 | 3.25% |
| 7/29/2021 | 7 | Q3 | 2021 | Q3 2021 | 3.25% |
| 7/30/2021 | 7 | Q3 | 2021 | Q3 2021 | 3.25% |
| 7/31/2021 | 7 | Q3 | 2021 | Q3 2021 | 3.25% |
| 8/1/2021 | 8 | Q3 | 2021 | Q3 2021 | 3.25% |
| 8/2/2021 | 8 | Q3 | 2021 | Q3 2021 | 3.25% |
| 8/3/2021 | 8 | Q3 | 2021 | Q3 2021 | 3.25% |
| 8/4/2021 | 8 | Q3 | 2021 | Q3 2021 | 3.25% |
| 8/5/2021 | 8 | Q3 | 2021 | Q3 2021 | 3.25% |
| 8/6/2021 | 8 | Q3 | 2021 | Q3 2021 | 3.25% |
| 8/7/2021 | 8 | Q3 | 2021 | Q3 2021 | 3.25% |
| 8/8/2021 | 8 | Q3 | 2021 | Q3 2021 | 3.25% |
| 8/9/2021 | 8 | Q3 | 2021 | Q3 2021 | 3.25% |
| 8/10/2021 | 8 | Q3 | 2021 | Q3 2021 | 3.25% |
| 8/11/2021 | 8 | Q3 | 2021 | Q3 2021 | 3.25% |
| 8/12/2021 | 8 | Q3 | 2021 | Q3 2021 | 3.25% |
| 8/13/2021 | 8 | Q3 | 2021 | Q3 2021 | 3.25% |
| 8/14/2021 | 8 | Q3 | 2021 | Q3 2021 | 3.25% |
| 8/15/2021 | 8 | Q3 | 2021 | Q3 2021 | 3.25% |
| 8/16/2021 | 8 | Q3 | 2021 | Q3 2021 | 3.25% |
| 8/17/2021 | 8 | Q3 | 2021 | Q3 2021 | 3.25% |
| 8/18/2021 | 8 | Q3 | 2021 | Q3 2021 | 3.25% |
| 8/19/2021 | 8 | Q3 | 2021 | Q3 2021 | 3.25% |
| 8/20/2021 | 8 | Q3 | 2021 | Q3 2021 | 3.25% |
| 8/21/2021 | 8 | Q3 | 2021 | Q3 2021 | 3.25% |
| 8/22/2021 | 8 | Q3 | 2021 | Q3 2021 | 3.25% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 8/23/2021 | 8 | Q3 | 2021 | Q3 2021 | 3.25% |
| 8/24/2021 | 8 | Q3 | 2021 | Q3 2021 | 3.25% |
| 8/25/2021 | 8 | Q3 | 2021 | Q3 2021 | 3.25% |
| 8/26/2021 | 8 | Q3 | 2021 | Q3 2021 | 3.25% |
| 8/27/2021 | 8 | Q3 | 2021 | Q3 2021 | 3.25% |
| 8/28/2021 | 8 | Q3 | 2021 | Q3 2021 | 3.25% |
| 8/29/2021 | 8 | Q3 | 2021 | Q3 2021 | 3.25% |
| 8/30/2021 | 8 | Q3 | 2021 | Q3 2021 | 3.25% |
| 8/31/2021 | 8 | Q3 | 2021 | Q3 2021 | 3.25% |
| 9/1/2021 | 9 | Q3 | 2021 | Q3 2021 | 3.25% |
| 9/2/2021 | 9 | Q3 | 2021 | Q3 2021 | 3.25% |
| 9/3/2021 | 9 | Q3 | 2021 | Q3 2021 | 3.25% |
| 9/4/2021 | 9 | Q3 | 2021 | Q3 2021 | 3.25% |
| 9/5/2021 | 9 | Q3 | 2021 | Q3 2021 | 3.25% |
| 9/6/2021 | 9 | Q3 | 2021 | Q3 2021 | 3.25% |
| 9/7/2021 | 9 | Q3 | 2021 | Q3 2021 | 3.25% |
| 9/8/2021 | 9 | Q3 | 2021 | Q3 2021 | 3.25% |
| 9/9/2021 | 9 | Q3 | 2021 | Q3 2021 | 3.25% |
| 9/10/2021 | 9 | Q3 | 2021 | Q3 2021 | 3.25% |
| 9/11/2021 | 9 | Q3 | 2021 | Q3 2021 | 3.25% |
| 9/12/2021 | 9 | Q3 | 2021 | Q3 2021 | 3.25% |
| 9/13/2021 | 9 | Q3 | 2021 | Q3 2021 | 3.25% |
| 9/14/2021 | 9 | Q3 | 2021 | Q3 2021 | 3.25% |
| 9/15/2021 | 9 | Q3 | 2021 | Q3 2021 | 3.25% |
| 9/16/2021 | 9 | Q3 | 2021 | Q3 2021 | 3.25% |
| 9/17/2021 | 9 | Q3 | 2021 | Q3 2021 | 3.25% |
| 9/18/2021 | 9 | Q3 | 2021 | Q3 2021 | 3.25% |
| 9/19/2021 | 9 | Q3 | 2021 | Q3 2021 | 3.25% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 9/20/2021 | 9 | Q3 | 2021 | Q3 2021 | 3.25% |
| 9/21/2021 | 9 | Q3 | 2021 | Q3 2021 | 3.25% |
| 9/22/2021 | 9 | Q3 | 2021 | Q3 2021 | 3.25% |
| 9/23/2021 | 9 | Q3 | 2021 | Q3 2021 | 3.25% |
| 9/24/2021 | 9 | Q3 | 2021 | Q3 2021 | 3.25% |
| 9/25/2021 | 9 | Q3 | 2021 | Q3 2021 | 3.25% |
| 9/26/2021 | 9 | Q3 | 2021 | Q3 2021 | 3.25% |
| 9/27/2021 | 9 | Q3 | 2021 | Q3 2021 | 3.25% |
| 9/28/2021 | 9 | Q3 | 2021 | Q3 2021 | 3.25% |
| 9/29/2021 | 9 | Q3 | 2021 | Q3 2021 | 3.25% |
| 9/30/2021 | 9 | Q3 | 2021 | Q3 2021 | 3.25% |
| 10/1/2021 | 10 | Q4 | 2021 | Q4 2021 | 3.25% |
| 10/2/2021 | 10 | Q4 | 2021 | Q4 2021 | 3.25% |
| 10/3/2021 | 10 | Q4 | 2021 | Q4 2021 | 3.25% |
| 10/4/2021 | 10 | Q4 | 2021 | Q4 2021 | 3.25% |
| 10/5/2021 | 10 | Q4 | 2021 | Q4 2021 | 3.25% |
| 10/6/2021 | 10 | Q4 | 2021 | Q4 2021 | 3.25% |
| 10/7/2021 | 10 | Q4 | 2021 | Q4 2021 | 3.25% |
| 10/8/2021 | 10 | Q4 | 2021 | Q4 2021 | 3.25% |
| 10/9/2021 | 10 | Q4 | 2021 | Q4 2021 | 3.25% |
| 10/10/2021 | 10 | Q4 | 2021 | Q4 2021 | 3.25% |
| 10/11/2021 | 10 | Q4 | 2021 | Q4 2021 | 3.25% |
| 10/12/2021 | 10 | Q4 | 2021 | Q4 2021 | 3.25% |
| 10/13/2021 | 10 | Q4 | 2021 | Q4 2021 | 3.25% |
| 10/14/2021 | 10 | Q4 | 2021 | Q4 2021 | 3.25% |
| 10/15/2021 | 10 | Q4 | 2021 | Q4 2021 | 3.25% |
| 10/16/2021 | 10 | Q4 | 2021 | Q4 2021 | 3.25% |
| 10/17/2021 | 10 | Q4 | 2021 | Q4 2021 | 3.25% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 10/18/2021 | 10 | Q4 | 2021 | Q4 2021 | 3.25% |
| 10/19/2021 | 10 | Q4 | 2021 | Q4 2021 | 3.25% |
| 10/20/2021 | 10 | Q4 | 2021 | Q4 2021 | 3.25% |
| 10/21/2021 | 10 | Q4 | 2021 | Q4 2021 | 3.25% |
| 10/22/2021 | 10 | Q4 | 2021 | Q4 2021 | 3.25% |
| 10/23/2021 | 10 | Q4 | 2021 | Q4 2021 | 3.25% |
| 10/24/2021 | 10 | Q4 | 2021 | Q4 2021 | 3.25% |
| 10/25/2021 | 10 | Q4 | 2021 | Q4 2021 | 3.25% |
| 10/26/2021 | 10 | Q4 | 2021 | Q4 2021 | 3.25% |
| 10/27/2021 | 10 | Q4 | 2021 | Q4 2021 | 3.25% |
| 10/28/2021 | 10 | Q4 | 2021 | Q4 2021 | 3.25% |
| 10/29/2021 | 10 | Q4 | 2021 | Q4 2021 | 3.25% |
| 10/30/2021 | 10 | Q4 | 2021 | Q4 2021 | 3.25% |
| 10/31/2021 | 10 | Q4 | 2021 | Q4 2021 | 3.25% |
| 11/1/2021 | 11 | Q4 | 2021 | Q4 2021 | 3.25% |
| 11/2/2021 | 11 | Q4 | 2021 | Q4 2021 | 3.25% |
| 11/3/2021 | 11 | Q4 | 2021 | Q4 2021 | 3.25% |
| 11/4/2021 | 11 | Q4 | 2021 | Q4 2021 | 3.25% |
| 11/5/2021 | 11 | Q4 | 2021 | Q4 2021 | 3.25% |
| 11/6/2021 | 11 | Q4 | 2021 | Q4 2021 | 3.25% |
| 11/7/2021 | 11 | Q4 | 2021 | Q4 2021 | 3.25% |
| 11/8/2021 | 11 | Q4 | 2021 | Q4 2021 | 3.25% |
| 11/9/2021 | 11 | Q4 | 2021 | Q4 2021 | 3.25% |
| 11/10/2021 | 11 | Q4 | 2021 | Q4 2021 | 3.25% |
| 11/11/2021 | 11 | Q4 | 2021 | Q4 2021 | 3.25% |
| 11/12/2021 | 11 | Q4 | 2021 | Q4 2021 | 3.25% |
| 11/13/2021 | 11 | Q4 | 2021 | Q4 2021 | 3.25% |
| 11/14/2021 | 11 | Q4 | 2021 | Q4 2021 | 3.25% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 11/15/2021 | 11 | Q4 | 2021 | Q4 2021 | 3.25% |
| 11/16/2021 | 11 | Q4 | 2021 | Q4 2021 | 3.25% |
| 11/17/2021 | 11 | Q4 | 2021 | Q4 2021 | 3.25% |
| 11/18/2021 | 11 | Q4 | 2021 | Q4 2021 | 3.25% |
| 11/19/2021 | 11 | Q4 | 2021 | Q4 2021 | 3.25% |
| 11/20/2021 | 11 | Q4 | 2021 | Q4 2021 | 3.25% |
| 11/21/2021 | 11 | Q4 | 2021 | Q4 2021 | 3.25% |
| 11/22/2021 | 11 | Q4 | 2021 | Q4 2021 | 3.25% |
| 11/23/2021 | 11 | Q4 | 2021 | Q4 2021 | 3.25% |
| 11/24/2021 | 11 | Q4 | 2021 | Q4 2021 | 3.25% |
| 11/25/2021 | 11 | Q4 | 2021 | Q4 2021 | 3.25% |
| 11/26/2021 | 11 | Q4 | 2021 | Q4 2021 | 3.25% |
| 11/27/2021 | 11 | Q4 | 2021 | Q4 2021 | 3.25% |
| 11/28/2021 | 11 | Q4 | 2021 | Q4 2021 | 3.25% |
| 11/29/2021 | 11 | Q4 | 2021 | Q4 2021 | 3.25% |
| 11/30/2021 | 11 | Q4 | 2021 | Q4 2021 | 3.25% |
| 12/1/2021 | 12 | Q4 | 2021 | Q4 2021 | 3.25% |
| 12/2/2021 | 12 | Q4 | 2021 | Q4 2021 | 3.25% |
| 12/3/2021 | 12 | Q4 | 2021 | Q4 2021 | 3.25% |
| 12/4/2021 | 12 | Q4 | 2021 | Q4 2021 | 3.25% |
| 12/5/2021 | 12 | Q4 | 2021 | Q4 2021 | 3.25% |
| 12/6/2021 | 12 | Q4 | 2021 | Q4 2021 | 3.25% |
| 12/7/2021 | 12 | Q4 | 2021 | Q4 2021 | 3.25% |
| 12/8/2021 | 12 | Q4 | 2021 | Q4 2021 | 3.25% |
| 12/9/2021 | 12 | Q4 | 2021 | Q4 2021 | 3.25% |
| 12/10/2021 | 12 | Q4 | 2021 | Q4 2021 | 3.25% |
| 12/11/2021 | 12 | Q4 | 2021 | Q4 2021 | 3.25% |
| 12/12/2021 | 12 | Q4 | 2021 | Q4 2021 | 3.25% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 12/13/2021 | 12 | Q4 | 2021 | Q4 2021 | 3.25% |
| 12/14/2021 | 12 | Q4 | 2021 | Q4 2021 | 3.25% |
| 12/15/2021 | 12 | Q4 | 2021 | Q4 2021 | 3.25% |
| 12/16/2021 | 12 | Q4 | 2021 | Q4 2021 | 3.25% |
| 12/17/2021 | 12 | Q4 | 2021 | Q4 2021 | 3.25% |
| 12/18/2021 | 12 | Q4 | 2021 | Q4 2021 | 3.25% |
| 12/19/2021 | 12 | Q4 | 2021 | Q4 2021 | 3.25% |
| 12/20/2021 | 12 | Q4 | 2021 | Q4 2021 | 3.25% |
| 12/21/2021 | 12 | Q4 | 2021 | Q4 2021 | 3.25% |
| 12/22/2021 | 12 | Q4 | 2021 | Q4 2021 | 3.25% |
| 12/23/2021 | 12 | Q4 | 2021 | Q4 2021 | 3.25% |
| 12/24/2021 | 12 | Q4 | 2021 | Q4 2021 | 3.25% |
| 12/25/2021 | 12 | Q4 | 2021 | Q4 2021 | 3.25% |
| 12/26/2021 | 12 | Q4 | 2021 | Q4 2021 | 3.25% |
| 12/27/2021 | 12 | Q4 | 2021 | Q4 2021 | 3.25% |
| 12/28/2021 | 12 | Q4 | 2021 | Q4 2021 | 3.25% |
| 12/29/2021 | 12 | Q4 | 2021 | Q4 2021 | 3.25% |
| 12/30/2021 | 12 | Q4 | 2021 | Q4 2021 | 3.25% |
| 12/31/2021 | 12 | Q4 | 2021 | Q4 2021 | 3.25% |
| 1/1/2022 | 1 | Q1 | 2022 | Q1 2022 | 3.25% |
| 1/2/2022 | 1 | Q1 | 2022 | Q1 2022 | 3.25% |
| 1/3/2022 | 1 | Q1 | 2022 | Q1 2022 | 3.25% |
| 1/4/2022 | 1 | Q1 | 2022 | Q1 2022 | 3.25% |
| 1/5/2022 | 1 | Q1 | 2022 | Q1 2022 | 3.25% |
| 1/6/2022 | 1 | Q1 | 2022 | Q1 2022 | 3.25% |
| 1/7/2022 | 1 | Q1 | 2022 | Q1 2022 | 3.25% |
| 1/8/2022 | 1 | Q1 | 2022 | Q1 2022 | 3.25% |
| 1/9/2022 | 1 | Q1 | 2022 | Q1 2022 | 3.25% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 1/10/2022 | 1 | Q1 | 2022 | Q1 2022 | 3.25% |
| 1/11/2022 | 1 | Q1 | 2022 | Q1 2022 | 3.25% |
| 1/12/2022 | 1 | Q1 | 2022 | Q1 2022 | 3.25% |
| 1/13/2022 | 1 | Q1 | 2022 | Q1 2022 | 3.25% |
| 1/14/2022 | 1 | Q1 | 2022 | Q1 2022 | 3.25% |
| 1/15/2022 | 1 | Q1 | 2022 | Q1 2022 | 3.25% |
| 1/16/2022 | 1 | Q1 | 2022 | Q1 2022 | 3.25% |
| 1/17/2022 | 1 | Q1 | 2022 | Q1 2022 | 3.25% |
| 1/18/2022 | 1 | Q1 | 2022 | Q1 2022 | 3.25% |
| 1/19/2022 | 1 | Q1 | 2022 | Q1 2022 | 3.25% |
| 1/20/2022 | 1 | Q1 | 2022 | Q1 2022 | 3.25% |
| 1/21/2022 | 1 | Q1 | 2022 | Q1 2022 | 3.25% |
| 1/22/2022 | 1 | Q1 | 2022 | Q1 2022 | 3.25% |
| 1/23/2022 | 1 | Q1 | 2022 | Q1 2022 | 3.25% |
| 1/24/2022 | 1 | Q1 | 2022 | Q1 2022 | 3.25% |
| 1/25/2022 | 1 | Q1 | 2022 | Q1 2022 | 3.25% |
| 1/26/2022 | 1 | Q1 | 2022 | Q1 2022 | 3.25% |
| 1/27/2022 | 1 | Q1 | 2022 | Q1 2022 | 3.25% |
| 1/28/2022 | 1 | Q1 | 2022 | Q1 2022 | 3.25% |
| 1/29/2022 | 1 | Q1 | 2022 | Q1 2022 | 3.25% |
| 1/30/2022 | 1 | Q1 | 2022 | Q1 2022 | 3.25% |
| 1/31/2022 | 1 | Q1 | 2022 | Q1 2022 | 3.25% |
| 2/1/2022 | 2 | Q1 | 2022 | Q1 2022 | 3.25% |
| 2/2/2022 | 2 | Q1 | 2022 | Q1 2022 | 3.25% |
| 2/3/2022 | 2 | Q1 | 2022 | Q1 2022 | 3.25% |
| 2/4/2022 | 2 | Q1 | 2022 | Q1 2022 | 3.25% |
| 2/5/2022 | 2 | Q1 | 2022 | Q1 2022 | 3.25% |
| 2/6/2022 | 2 | Q1 | 2022 | Q1 2022 | 3.25% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 2/7/2022 | 2 | Q1 | 2022 | Q1 2022 | 3.25% |
| 2/8/2022 | 2 | Q1 | 2022 | Q1 2022 | 3.25% |
| 2/9/2022 | 2 | Q1 | 2022 | Q1 2022 | 3.25% |
| 2/10/2022 | 2 | Q1 | 2022 | Q1 2022 | 3.25% |
| 2/11/2022 | 2 | Q1 | 2022 | Q1 2022 | 3.25% |
| 2/12/2022 | 2 | Q1 | 2022 | Q1 2022 | 3.25% |
| 2/13/2022 | 2 | Q1 | 2022 | Q1 2022 | 3.25% |
| 2/14/2022 | 2 | Q1 | 2022 | Q1 2022 | 3.25% |
| 2/15/2022 | 2 | Q1 | 2022 | Q1 2022 | 3.25% |
| 2/16/2022 | 2 | Q1 | 2022 | Q1 2022 | 3.25% |
| 2/17/2022 | 2 | Q1 | 2022 | Q1 2022 | 3.25% |
| 2/18/2022 | 2 | Q1 | 2022 | Q1 2022 | 3.25% |
| 2/19/2022 | 2 | Q1 | 2022 | Q1 2022 | 3.25% |
| 2/20/2022 | 2 | Q1 | 2022 | Q1 2022 | 3.25% |
| 2/21/2022 | 2 | Q1 | 2022 | Q1 2022 | 3.25% |
| 2/22/2022 | 2 | Q1 | 2022 | Q1 2022 | 3.25% |
| 2/23/2022 | 2 | Q1 | 2022 | Q1 2022 | 3.25% |
| 2/24/2022 | 2 | Q1 | 2022 | Q1 2022 | 3.25% |
| 2/25/2022 | 2 | Q1 | 2022 | Q1 2022 | 3.25% |
| 2/26/2022 | 2 | Q1 | 2022 | Q1 2022 | 3.25% |
| 2/27/2022 | 2 | Q1 | 2022 | Q1 2022 | 3.25% |
| 2/28/2022 | 2 | Q1 | 2022 | Q1 2022 | 3.25% |
| 3/1/2022 | 3 | Q1 | 2022 | Q1 2022 | 3.25% |
| 3/2/2022 | 3 | Q1 | 2022 | Q1 2022 | 3.25% |
| 3/3/2022 | 3 | Q1 | 2022 | Q1 2022 | 3.25% |
| 3/4/2022 | 3 | Q1 | 2022 | Q1 2022 | 3.25% |
| 3/5/2022 | 3 | Q1 | 2022 | Q1 2022 | 3.25% |
| 3/6/2022 | 3 | Q1 | 2022 | Q1 2022 | 3.25% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 3/7/2022 | 3 | Q1 | 2022 | Q1 2022 | 3.25% |
| 3/8/2022 | 3 | Q1 | 2022 | Q1 2022 | 3.25% |
| 3/9/2022 | 3 | Q1 | 2022 | Q1 2022 | 3.25% |
| 3/10/2022 | 3 | Q1 | 2022 | Q1 2022 | 3.25% |
| 3/11/2022 | 3 | Q1 | 2022 | Q1 2022 | 3.25% |
| 3/12/2022 | 3 | Q1 | 2022 | Q1 2022 | 3.25% |
| 3/13/2022 | 3 | Q1 | 2022 | Q1 2022 | 3.25% |
| 3/14/2022 | 3 | Q1 | 2022 | Q1 2022 | 3.25% |
| 3/15/2022 | 3 | Q1 | 2022 | Q1 2022 | 3.25% |
| 3/16/2022 | 3 | Q1 | 2022 | Q1 2022 | 3.50% |
| 3/17/2022 | 3 | Q1 | 2022 | Q1 2022 | 3.50% |
| 3/18/2022 | 3 | Q1 | 2022 | Q1 2022 | 3.50% |
| 3/19/2022 | 3 | Q1 | 2022 | Q1 2022 | 3.50% |
| 3/20/2022 | 3 | Q1 | 2022 | Q1 2022 | 3.50% |
| 3/21/2022 | 3 | Q1 | 2022 | Q1 2022 | 3.50% |
| 3/22/2022 | 3 | Q1 | 2022 | Q1 2022 | 3.50% |
| 3/23/2022 | 3 | Q1 | 2022 | Q1 2022 | 3.50% |
| 3/24/2022 | 3 | Q1 | 2022 | Q1 2022 | 3.50% |
| 3/25/2022 | 3 | Q1 | 2022 | Q1 2022 | 3.50% |
| 3/26/2022 | 3 | Q1 | 2022 | Q1 2022 | 3.50% |
| 3/27/2022 | 3 | Q1 | 2022 | Q1 2022 | 3.50% |
| 3/28/2022 | 3 | Q1 | 2022 | Q1 2022 | 3.50% |
| 3/29/2022 | 3 | Q1 | 2022 | Q1 2022 | 3.50% |
| 3/30/2022 | 3 | Q1 | 2022 | Q1 2022 | 3.50% |
| 3/31/2022 | 3 | Q1 | 2022 | Q1 2022 | 3.50% |
| 4/1/2022 | 4 | Q2 | 2022 | Q2 2022 | 3.50% |
| 4/2/2022 | 4 | Q2 | 2022 | Q2 2022 | 3.50% |
| 4/3/2022 | 4 | Q2 | 2022 | Q2 2022 | 3.50% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 4/4/2022 | 4 | Q2 | 2022 | Q2 2022 | 3.50% |
| 4/5/2022 | 4 | Q2 | 2022 | Q2 2022 | 3.50% |
| 4/6/2022 | 4 | Q2 | 2022 | Q2 2022 | 3.50% |
| 4/7/2022 | 4 | Q2 | 2022 | Q2 2022 | 3.50% |
| 4/8/2022 | 4 | Q2 | 2022 | Q2 2022 | 3.50% |
| 4/9/2022 | 4 | Q2 | 2022 | Q2 2022 | 3.50% |
| 4/10/2022 | 4 | Q2 | 2022 | Q2 2022 | 3.50% |
| 4/11/2022 | 4 | Q2 | 2022 | Q2 2022 | 3.50% |
| 4/12/2022 | 4 | Q2 | 2022 | Q2 2022 | 3.50% |
| 4/13/2022 | 4 | Q2 | 2022 | Q2 2022 | 3.50% |
| 4/14/2022 | 4 | Q2 | 2022 | Q2 2022 | 3.50% |
| 4/15/2022 | 4 | Q2 | 2022 | Q2 2022 | 3.50% |
| 4/16/2022 | 4 | Q2 | 2022 | Q2 2022 | 3.50% |
| 4/17/2022 | 4 | Q2 | 2022 | Q2 2022 | 3.50% |
| 4/18/2022 | 4 | Q2 | 2022 | Q2 2022 | 3.50% |
| 4/19/2022 | 4 | Q2 | 2022 | Q2 2022 | 3.50% |
| 4/20/2022 | 4 | Q2 | 2022 | Q2 2022 | 3.50% |
| 4/21/2022 | 4 | Q2 | 2022 | Q2 2022 | 3.50% |
| 4/22/2022 | 4 | Q2 | 2022 | Q2 2022 | 3.50% |
| 4/23/2022 | 4 | Q2 | 2022 | Q2 2022 | 3.50% |
| 4/24/2022 | 4 | Q2 | 2022 | Q2 2022 | 3.50% |
| 4/25/2022 | 4 | Q2 | 2022 | Q2 2022 | 3.50% |
| 4/26/2022 | 4 | Q2 | 2022 | Q2 2022 | 3.50% |
| 4/27/2022 | 4 | Q2 | 2022 | Q2 2022 | 3.50% |
| 4/28/2022 | 4 | Q2 | 2022 | Q2 2022 | 3.50% |
| 4/29/2022 | 4 | Q2 | 2022 | Q2 2022 | 3.50% |
| 4/30/2022 | 4 | Q2 | 2022 | Q2 2022 | 3.50% |
| 5/1/2022 | 5 | Q2 | 2022 | Q2 2022 | 3.50% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 5/2/2022 | 5 | Q2 | 2022 | Q2 2022 | 3.50% |
| 5/3/2022 | 5 | Q2 | 2022 | Q2 2022 | 3.50% |
| 5/4/2022 | 5 | Q2 | 2022 | Q2 2022 | 4.00% |
| 5/5/2022 | 5 | Q2 | 2022 | Q2 2022 | 4.00% |
| 5/6/2022 | 5 | Q2 | 2022 | Q2 2022 | 4.00% |
| 5/7/2022 | 5 | Q2 | 2022 | Q2 2022 | 4.00% |
| 5/8/2022 | 5 | Q2 | 2022 | Q2 2022 | 4.00% |
| 5/9/2022 | 5 | Q2 | 2022 | Q2 2022 | 4.00% |
| 5/10/2022 | 5 | Q2 | 2022 | Q2 2022 | 4.00% |
| 5/11/2022 | 5 | Q2 | 2022 | Q2 2022 | 4.00% |
| 5/12/2022 | 5 | Q2 | 2022 | Q2 2022 | 4.00% |
| 5/13/2022 | 5 | Q2 | 2022 | Q2 2022 | 4.00% |
| 5/14/2022 | 5 | Q2 | 2022 | Q2 2022 | 4.00% |
| 5/15/2022 | 5 | Q2 | 2022 | Q2 2022 | 4.00% |
| 5/16/2022 | 5 | Q2 | 2022 | Q2 2022 | 4.00% |
| 5/17/2022 | 5 | Q2 | 2022 | Q2 2022 | 4.00% |
| 5/18/2022 | 5 | Q2 | 2022 | Q2 2022 | 4.00% |
| 5/19/2022 | 5 | Q2 | 2022 | Q2 2022 | 4.00% |
| 5/20/2022 | 5 | Q2 | 2022 | Q2 2022 | 4.00% |
| 5/21/2022 | 5 | Q2 | 2022 | Q2 2022 | 4.00% |
| 5/22/2022 | 5 | Q2 | 2022 | Q2 2022 | 4.00% |
| 5/23/2022 | 5 | Q2 | 2022 | Q2 2022 | 4.00% |
| 5/24/2022 | 5 | Q2 | 2022 | Q2 2022 | 4.00% |
| 5/25/2022 | 5 | Q2 | 2022 | Q2 2022 | 4.00% |
| 5/26/2022 | 5 | Q2 | 2022 | Q2 2022 | 4.00% |
| 5/27/2022 | 5 | Q2 | 2022 | Q2 2022 | 4.00% |
| 5/28/2022 | 5 | Q2 | 2022 | Q2 2022 | 4.00% |
| 5/29/2022 | 5 | Q2 | 2022 | Q2 2022 | 4.00% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 5/30/2022 | 5 | Q2 | 2022 | Q2 2022 | 4.00% |
| 5/31/2022 | 5 | Q2 | 2022 | Q2 2022 | 4.00% |
| 6/1/2022 | 6 | Q2 | 2022 | Q2 2022 | 4.00% |
| 6/2/2022 | 6 | Q2 | 2022 | Q2 2022 | 4.00% |
| 6/3/2022 | 6 | Q2 | 2022 | Q2 2022 | 4.00% |
| 6/4/2022 | 6 | Q2 | 2022 | Q2 2022 | 4.00% |
| 6/5/2022 | 6 | Q2 | 2022 | Q2 2022 | 4.00% |
| 6/6/2022 | 6 | Q2 | 2022 | Q2 2022 | 4.00% |
| 6/7/2022 | 6 | Q2 | 2022 | Q2 2022 | 4.00% |
| 6/8/2022 | 6 | Q2 | 2022 | Q2 2022 | 4.00% |
| 6/9/2022 | 6 | Q2 | 2022 | Q2 2022 | 4.00% |
| 6/10/2022 | 6 | Q2 | 2022 | Q2 2022 | 4.00% |
| 6/11/2022 | 6 | Q2 | 2022 | Q2 2022 | 4.00% |
| 6/12/2022 | 6 | Q2 | 2022 | Q2 2022 | 4.00% |
| 6/13/2022 | 6 | Q2 | 2022 | Q2 2022 | 4.00% |
| 6/14/2022 | 6 | Q2 | 2022 | Q2 2022 | 4.00% |
| 6/15/2022 | 6 | Q2 | 2022 | Q2 2022 | 4.75% |
| 6/16/2022 | 6 | Q2 | 2022 | Q2 2022 | 4.75% |
| 6/17/2022 | 6 | Q2 | 2022 | Q2 2022 | 4.75% |
| 6/18/2022 | 6 | Q2 | 2022 | Q2 2022 | 4.75% |
| 6/19/2022 | 6 | Q2 | 2022 | Q2 2022 | 4.75% |
| 6/20/2022 | 6 | Q2 | 2022 | Q2 2022 | 4.75% |
| 6/21/2022 | 6 | Q2 | 2022 | Q2 2022 | 4.75% |
| 6/22/2022 | 6 | Q2 | 2022 | Q2 2022 | 4.75% |
| 6/23/2022 | 6 | Q2 | 2022 | Q2 2022 | 4.75% |
| 6/24/2022 | 6 | Q2 | 2022 | Q2 2022 | 4.75% |
| 6/25/2022 | 6 | Q2 | 2022 | Q2 2022 | 4.75% |
| 6/26/2022 | 6 | Q2 | 2022 | Q2 2022 | 4.75% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 6/27/2022 | 6 | Q2 | 2022 | Q2 2022 | 4.75% |
| 6/28/2022 | 6 | Q2 | 2022 | Q2 2022 | 4.75% |
| 6/29/2022 | 6 | Q2 | 2022 | Q2 2022 | 4.75% |
| 6/30/2022 | 6 | Q2 | 2022 | Q2 2022 | 4.75% |
| 7/1/2022 | 7 | Q3 | 2022 | Q3 2022 | 4.75% |
| 7/2/2022 | 7 | Q3 | 2022 | Q3 2022 | 4.75% |
| 7/3/2022 | 7 | Q3 | 2022 | Q3 2022 | 4.75% |
| 7/4/2022 | 7 | Q3 | 2022 | Q3 2022 | 4.75% |
| 7/5/2022 | 7 | Q3 | 2022 | Q3 2022 | 4.75% |
| 7/6/2022 | 7 | Q3 | 2022 | Q3 2022 | 4.75% |
| 7/7/2022 | 7 | Q3 | 2022 | Q3 2022 | 4.75% |
| 7/8/2022 | 7 | Q3 | 2022 | Q3 2022 | 4.75% |
| 7/9/2022 | 7 | Q3 | 2022 | Q3 2022 | 4.75% |
| 7/10/2022 | 7 | Q3 | 2022 | Q3 2022 | 4.75% |
| 7/11/2022 | 7 | Q3 | 2022 | Q3 2022 | 4.75% |
| 7/12/2022 | 7 | Q3 | 2022 | Q3 2022 | 4.75% |
| 7/13/2022 | 7 | Q3 | 2022 | Q3 2022 | 4.75% |
| 7/14/2022 | 7 | Q3 | 2022 | Q3 2022 | 4.75% |
| 7/15/2022 | 7 | Q3 | 2022 | Q3 2022 | 4.75% |
| 7/16/2022 | 7 | Q3 | 2022 | Q3 2022 | 4.75% |
| 7/17/2022 | 7 | Q3 | 2022 | Q3 2022 | 4.75% |
| 7/18/2022 | 7 | Q3 | 2022 | Q3 2022 | 4.75% |
| 7/19/2022 | 7 | Q3 | 2022 | Q3 2022 | 4.75% |
| 7/20/2022 | 7 | Q3 | 2022 | Q3 2022 | 4.75% |
| 7/21/2022 | 7 | Q3 | 2022 | Q3 2022 | 4.75% |
| 7/22/2022 | 7 | Q3 | 2022 | Q3 2022 | 4.75% |
| 7/23/2022 | 7 | Q3 | 2022 | Q3 2022 | 4.75% |
| 7/24/2022 | 7 | Q3 | 2022 | Q3 2022 | 4.75% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 7/25/2022 | 7 | Q3 | 2022 | Q3 2022 | 4.75% |
| 7/26/2022 | 7 | Q3 | 2022 | Q3 2022 | 4.75% |
| 7/27/2022 | 7 | Q3 | 2022 | Q3 2022 | 5.50% |
| 7/28/2022 | 7 | Q3 | 2022 | Q3 2022 | 5.50% |
| 7/29/2022 | 7 | Q3 | 2022 | Q3 2022 | 5.50% |
| 7/30/2022 | 7 | Q3 | 2022 | Q3 2022 | 5.50% |
| 7/31/2022 | 7 | Q3 | 2022 | Q3 2022 | 5.50% |
| 8/1/2022 | 8 | Q3 | 2022 | Q3 2022 | 5.50% |
| 8/2/2022 | 8 | Q3 | 2022 | Q3 2022 | 5.50% |
| 8/3/2022 | 8 | Q3 | 2022 | Q3 2022 | 5.50% |
| 8/4/2022 | 8 | Q3 | 2022 | Q3 2022 | 5.50% |
| 8/5/2022 | 8 | Q3 | 2022 | Q3 2022 | 5.50% |
| 8/6/2022 | 8 | Q3 | 2022 | Q3 2022 | 5.50% |
| 8/7/2022 | 8 | Q3 | 2022 | Q3 2022 | 5.50% |
| 8/8/2022 | 8 | Q3 | 2022 | Q3 2022 | 5.50% |
| 8/9/2022 | 8 | Q3 | 2022 | Q3 2022 | 5.50% |
| 8/10/2022 | 8 | Q3 | 2022 | Q3 2022 | 5.50% |
| 8/11/2022 | 8 | Q3 | 2022 | Q3 2022 | 5.50% |
| 8/12/2022 | 8 | Q3 | 2022 | Q3 2022 | 5.50% |
| 8/13/2022 | 8 | Q3 | 2022 | Q3 2022 | 5.50% |
| 8/14/2022 | 8 | Q3 | 2022 | Q3 2022 | 5.50% |
| 8/15/2022 | 8 | Q3 | 2022 | Q3 2022 | 5.50% |
| 8/16/2022 | 8 | Q3 | 2022 | Q3 2022 | 5.50% |
| 8/17/2022 | 8 | Q3 | 2022 | Q3 2022 | 5.50% |
| 8/18/2022 | 8 | Q3 | 2022 | Q3 2022 | 5.50% |
| 8/19/2022 | 8 | Q3 | 2022 | Q3 2022 | 5.50% |
| 8/20/2022 | 8 | Q3 | 2022 | Q3 2022 | 5.50% |
| 8/21/2022 | 8 | Q3 | 2022 | Q3 2022 | 5.50% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 8/22/2022 | 8 | Q3 | 2022 | Q3 2022 | 5.50% |
| 8/23/2022 | 8 | Q3 | 2022 | Q3 2022 | 5.50% |
| 8/24/2022 | 8 | Q3 | 2022 | Q3 2022 | 5.50% |
| 8/25/2022 | 8 | Q3 | 2022 | Q3 2022 | 5.50% |
| 8/26/2022 | 8 | Q3 | 2022 | Q3 2022 | 5.50% |
| 8/27/2022 | 8 | Q3 | 2022 | Q3 2022 | 5.50% |
| 8/28/2022 | 8 | Q3 | 2022 | Q3 2022 | 5.50% |
| 8/29/2022 | 8 | Q3 | 2022 | Q3 2022 | 5.50% |
| 8/30/2022 | 8 | Q3 | 2022 | Q3 2022 | 5.50% |
| 8/31/2022 | 8 | Q3 | 2022 | Q3 2022 | 5.50% |
| 9/1/2022 | 9 | Q3 | 2022 | Q3 2022 | 5.50% |
| 9/2/2022 | 9 | Q3 | 2022 | Q3 2022 | 5.50% |
| 9/3/2022 | 9 | Q3 | 2022 | Q3 2022 | 5.50% |
| 9/4/2022 | 9 | Q3 | 2022 | Q3 2022 | 5.50% |
| 9/5/2022 | 9 | Q3 | 2022 | Q3 2022 | 5.50% |
| 9/6/2022 | 9 | Q3 | 2022 | Q3 2022 | 5.50% |
| 9/7/2022 | 9 | Q3 | 2022 | Q3 2022 | 5.50% |
| 9/8/2022 | 9 | Q3 | 2022 | Q3 2022 | 5.50% |
| 9/9/2022 | 9 | Q3 | 2022 | Q3 2022 | 5.50% |
| 9/10/2022 | 9 | Q3 | 2022 | Q3 2022 | 5.50% |
| 9/11/2022 | 9 | Q3 | 2022 | Q3 2022 | 5.50% |
| 9/12/2022 | 9 | Q3 | 2022 | Q3 2022 | 5.50% |
| 9/13/2022 | 9 | Q3 | 2022 | Q3 2022 | 5.50% |
| 9/14/2022 | 9 | Q3 | 2022 | Q3 2022 | 5.50% |
| 9/15/2022 | 9 | Q3 | 2022 | Q3 2022 | 5.50% |
| 9/16/2022 | 9 | Q3 | 2022 | Q3 2022 | 5.50% |
| 9/17/2022 | 9 | Q3 | 2022 | Q3 2022 | 5.50% |
| 9/18/2022 | 9 | Q3 | 2022 | Q3 2022 | 5.50% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 9/19/2022 | 9 | Q3 | 2022 | Q3 2022 | 5.50% |
| 9/20/2022 | 9 | Q3 | 2022 | Q3 2022 | 5.50% |
| 9/21/2022 | 9 | Q3 | 2022 | Q3 2022 | 6.25% |
| 9/22/2022 | 9 | Q3 | 2022 | Q3 2022 | 6.25% |
| 9/23/2022 | 9 | Q3 | 2022 | Q3 2022 | 6.25% |
| 9/24/2022 | 9 | Q3 | 2022 | Q3 2022 | 6.25% |
| 9/25/2022 | 9 | Q3 | 2022 | Q3 2022 | 6.25% |
| 9/26/2022 | 9 | Q3 | 2022 | Q3 2022 | 6.25% |
| 9/27/2022 | 9 | Q3 | 2022 | Q3 2022 | 6.25% |
| 9/28/2022 | 9 | Q3 | 2022 | Q3 2022 | 6.25% |
| 9/29/2022 | 9 | Q3 | 2022 | Q3 2022 | 6.25% |
| 9/30/2022 | 9 | Q3 | 2022 | Q3 2022 | 6.25% |
| 10/1/2022 | 10 | Q4 | 2022 | Q4 2022 | 6.25% |
| 10/2/2022 | 10 | Q4 | 2022 | Q4 2022 | 6.25% |
| 10/3/2022 | 10 | Q4 | 2022 | Q4 2022 | 6.25% |
| 10/4/2022 | 10 | Q4 | 2022 | Q4 2022 | 6.25% |
| 10/5/2022 | 10 | Q4 | 2022 | Q4 2022 | 6.25% |
| 10/6/2022 | 10 | Q4 | 2022 | Q4 2022 | 6.25% |
| 10/7/2022 | 10 | Q4 | 2022 | Q4 2022 | 6.25% |
| 10/8/2022 | 10 | Q4 | 2022 | Q4 2022 | 6.25% |
| 10/9/2022 | 10 | Q4 | 2022 | Q4 2022 | 6.25% |
| 10/10/2022 | 10 | Q4 | 2022 | Q4 2022 | 6.25% |
| 10/11/2022 | 10 | Q4 | 2022 | Q4 2022 | 6.25% |
| 10/12/2022 | 10 | Q4 | 2022 | Q4 2022 | 6.25% |
| 10/13/2022 | 10 | Q4 | 2022 | Q4 2022 | 6.25% |
| 10/14/2022 | 10 | Q4 | 2022 | Q4 2022 | 6.25% |
| 10/15/2022 | 10 | Q4 | 2022 | Q4 2022 | 6.25% |
| 10/16/2022 | 10 | Q4 | 2022 | Q4 2022 | 6.25% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 10/17/2022 | 10 | Q4 | 2022 | Q4 2022 | 6.25% |
| 10/18/2022 | 10 | Q4 | 2022 | Q4 2022 | 6.25% |
| 10/19/2022 | 10 | Q4 | 2022 | Q4 2022 | 6.25% |
| 10/20/2022 | 10 | Q4 | 2022 | Q4 2022 | 6.25% |
| 10/21/2022 | 10 | Q4 | 2022 | Q4 2022 | 6.25% |
| 10/22/2022 | 10 | Q4 | 2022 | Q4 2022 | 6.25% |
| 10/23/2022 | 10 | Q4 | 2022 | Q4 2022 | 6.25% |
| 10/24/2022 | 10 | Q4 | 2022 | Q4 2022 | 6.25% |
| 10/25/2022 | 10 | Q4 | 2022 | Q4 2022 | 6.25% |
| 10/26/2022 | 10 | Q4 | 2022 | Q4 2022 | 6.25% |
| 10/27/2022 | 10 | Q4 | 2022 | Q4 2022 | 6.25% |
| 10/28/2022 | 10 | Q4 | 2022 | Q4 2022 | 6.25% |
| 10/29/2022 | 10 | Q4 | 2022 | Q4 2022 | 6.25% |
| 10/30/2022 | 10 | Q4 | 2022 | Q4 2022 | 6.25% |
| 10/31/2022 | 10 | Q4 | 2022 | Q4 2022 | 6.25% |
| 11/1/2022 | 11 | Q4 | 2022 | Q4 2022 | 6.25% |
| 11/2/2022 | 11 | Q4 | 2022 | Q4 2022 | 7.00% |
| 11/3/2022 | 11 | Q4 | 2022 | Q4 2022 | 7.00% |
| 11/4/2022 | 11 | Q4 | 2022 | Q4 2022 | 7.00% |
| 11/5/2022 | 11 | Q4 | 2022 | Q4 2022 | 7.00% |
| 11/6/2022 | 11 | Q4 | 2022 | Q4 2022 | 7.00% |
| 11/7/2022 | 11 | Q4 | 2022 | Q4 2022 | 7.00% |
| 11/8/2022 | 11 | Q4 | 2022 | Q4 2022 | 7.00% |
| 11/9/2022 | 11 | Q4 | 2022 | Q4 2022 | 7.00% |
| 11/10/2022 | 11 | Q4 | 2022 | Q4 2022 | 7.00% |
| 11/11/2022 | 11 | Q4 | 2022 | Q4 2022 | 7.00% |
| 11/12/2022 | 11 | Q4 | 2022 | Q4 2022 | 7.00% |
| 11/13/2022 | 11 | Q4 | 2022 | Q4 2022 | 7.00% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 11/14/2022 | 11 | Q4 | 2022 | Q4 2022 | 7.00% |
| 11/15/2022 | 11 | Q4 | 2022 | Q4 2022 | 7.00% |
| 11/16/2022 | 11 | Q4 | 2022 | Q4 2022 | 7.00% |
| 11/17/2022 | 11 | Q4 | 2022 | Q4 2022 | 7.00% |
| 11/18/2022 | 11 | Q4 | 2022 | Q4 2022 | 7.00% |
| 11/19/2022 | 11 | Q4 | 2022 | Q4 2022 | 7.00% |
| 11/20/2022 | 11 | Q4 | 2022 | Q4 2022 | 7.00% |
| 11/21/2022 | 11 | Q4 | 2022 | Q4 2022 | 7.00% |
| 11/22/2022 | 11 | Q4 | 2022 | Q4 2022 | 7.00% |
| 11/23/2022 | 11 | Q4 | 2022 | Q4 2022 | 7.00% |
| 11/24/2022 | 11 | Q4 | 2022 | Q4 2022 | 7.00% |
| 11/25/2022 | 11 | Q4 | 2022 | Q4 2022 | 7.00% |
| 11/26/2022 | 11 | Q4 | 2022 | Q4 2022 | 7.00% |
| 11/27/2022 | 11 | Q4 | 2022 | Q4 2022 | 7.00% |
| 11/28/2022 | 11 | Q4 | 2022 | Q4 2022 | 7.00% |
| 11/29/2022 | 11 | Q4 | 2022 | Q4 2022 | 7.00% |
| 11/30/2022 | 11 | Q4 | 2022 | Q4 2022 | 7.00% |
| 12/1/2022 | 12 | Q4 | 2022 | Q4 2022 | 7.00% |
| 12/2/2022 | 12 | Q4 | 2022 | Q4 2022 | 7.00% |
| 12/3/2022 | 12 | Q4 | 2022 | Q4 2022 | 7.00% |
| 12/4/2022 | 12 | Q4 | 2022 | Q4 2022 | 7.00% |
| 12/5/2022 | 12 | Q4 | 2022 | Q4 2022 | 7.00% |
| 12/6/2022 | 12 | Q4 | 2022 | Q4 2022 | 7.00% |
| 12/7/2022 | 12 | Q4 | 2022 | Q4 2022 | 7.00% |
| 12/8/2022 | 12 | Q4 | 2022 | Q4 2022 | 7.00% |
| 12/9/2022 | 12 | Q4 | 2022 | Q4 2022 | 7.00% |
| 12/10/2022 | 12 | Q4 | 2022 | Q4 2022 | 7.00% |
| 12/11/2022 | 12 | Q4 | 2022 | Q4 2022 | 7.00% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 12/12/2022 | 12 | Q4 | 2022 | Q4 2022 | 7.00% |
| 12/13/2022 | 12 | Q4 | 2022 | Q4 2022 | 7.00% |
| 12/14/2022 | 12 | Q4 | 2022 | Q4 2022 | 7.50% |
| 12/15/2022 | 12 | Q4 | 2022 | Q4 2022 | 7.50% |
| 12/16/2022 | 12 | Q4 | 2022 | Q4 2022 | 7.50% |
| 12/17/2022 | 12 | Q4 | 2022 | Q4 2022 | 7.50% |
| 12/18/2022 | 12 | Q4 | 2022 | Q4 2022 | 7.50% |
| 12/19/2022 | 12 | Q4 | 2022 | Q4 2022 | 7.50% |
| 12/20/2022 | 12 | Q4 | 2022 | Q4 2022 | 7.50% |
| 12/21/2022 | 12 | Q4 | 2022 | Q4 2022 | 7.50% |
| 12/22/2022 | 12 | Q4 | 2022 | Q4 2022 | 7.50% |
| 12/23/2022 | 12 | Q4 | 2022 | Q4 2022 | 7.50% |
| 12/24/2022 | 12 | Q4 | 2022 | Q4 2022 | 7.50% |
| 12/25/2022 | 12 | Q4 | 2022 | Q4 2022 | 7.50% |
| 12/26/2022 | 12 | Q4 | 2022 | Q4 2022 | 7.50% |
| 12/27/2022 | 12 | Q4 | 2022 | Q4 2022 | 7.50% |
| 12/28/2022 | 12 | Q4 | 2022 | Q4 2022 | 7.50% |
| 12/29/2022 | 12 | Q4 | 2022 | Q4 2022 | 7.50% |
| 12/30/2022 | 12 | Q4 | 2022 | Q4 2022 | 7.50% |
| 12/31/2022 | 12 | Q4 | 2022 | Q4 2022 | 7.50% |
| 1/1/2023 | 1 | Q1 | 2023 | Q1 2023 | 7.50% |
| 1/2/2023 | 1 | Q1 | 2023 | Q1 2023 | 7.50% |
| 1/3/2023 | 1 | Q1 | 2023 | Q1 2023 | 7.50% |
| 1/4/2023 | 1 | Q1 | 2023 | Q1 2023 | 7.50% |
| 1/5/2023 | 1 | Q1 | 2023 | Q1 2023 | 7.50% |
| 1/6/2023 | 1 | Q1 | 2023 | Q1 2023 | 7.50% |
| 1/7/2023 | 1 | Q1 | 2023 | Q1 2023 | 7.50% |
| 1/8/2023 | 1 | Q1 | 2023 | Q1 2023 | 7.50% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 1/9/2023 | 1 | Q1 | 2023 | Q1 2023 | 7.50% |
| 1/10/2023 | 1 | Q1 | 2023 | Q1 2023 | 7.50% |
| 1/11/2023 | 1 | Q1 | 2023 | Q1 2023 | 7.50% |
| 1/12/2023 | 1 | Q1 | 2023 | Q1 2023 | 7.50% |
| 1/13/2023 | 1 | Q1 | 2023 | Q1 2023 | 7.50% |
| 1/14/2023 | 1 | Q1 | 2023 | Q1 2023 | 7.50% |
| 1/15/2023 | 1 | Q1 | 2023 | Q1 2023 | 7.50% |
| 1/16/2023 | 1 | Q1 | 2023 | Q1 2023 | 7.50% |
| 1/17/2023 | 1 | Q1 | 2023 | Q1 2023 | 7.50% |
| 1/18/2023 | 1 | Q1 | 2023 | Q1 2023 | 7.50% |
| 1/19/2023 | 1 | Q1 | 2023 | Q1 2023 | 7.50% |
| 1/20/2023 | 1 | Q1 | 2023 | Q1 2023 | 7.50% |
| 1/21/2023 | 1 | Q1 | 2023 | Q1 2023 | 7.50% |
| 1/22/2023 | 1 | Q1 | 2023 | Q1 2023 | 7.50% |
| 1/23/2023 | 1 | Q1 | 2023 | Q1 2023 | 7.50% |
| 1/24/2023 | 1 | Q1 | 2023 | Q1 2023 | 7.50% |
| 1/25/2023 | 1 | Q1 | 2023 | Q1 2023 | 7.50% |
| 1/26/2023 | 1 | Q1 | 2023 | Q1 2023 | 7.50% |
| 1/27/2023 | 1 | Q1 | 2023 | Q1 2023 | 7.50% |
| 1/28/2023 | 1 | Q1 | 2023 | Q1 2023 | 7.50% |
| 1/29/2023 | 1 | Q1 | 2023 | Q1 2023 | 7.50% |
| 1/30/2023 | 1 | Q1 | 2023 | Q1 2023 | 7.50% |
| 1/31/2023 | 1 | Q1 | 2023 | Q1 2023 | 7.50% |
| 2/1/2023 | 2 | Q1 | 2023 | Q1 2023 | 7.75% |
| 2/2/2023 | 2 | Q1 | 2023 | Q1 2023 | 7.75% |
| 2/3/2023 | 2 | Q1 | 2023 | Q1 2023 | 7.75% |
| 2/4/2023 | 2 | Q1 | 2023 | Q1 2023 | 7.75% |
| 2/5/2023 | 2 | Q1 | 2023 | Q1 2023 | 7.75% |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 2: Daily United States Prime Rates

| Date | Month | Quarter | Year | Period | [1][2] Prime Rate |
|---|---|---|---|---|---|
| 2/6/2023 | 2 | Q1 | 2023 | Q1 2023 | 7.75% |
| 2/7/2023 | 2 | Q1 | 2023 | Q1 2023 | 7.75% |
| 2/8/2023 | 2 | Q1 | 2023 | Q1 2023 | 7.75% |
| 2/9/2023 | 2 | Q1 | 2023 | Q1 2023 | 7.75% |
| 2/10/2023 | 2 | Q1 | 2023 | Q1 2023 | 7.75% |
| 2/11/2023 | 2 | Q1 | 2023 | Q1 2023 | 7.75% |
| 2/12/2023 | 2 | Q1 | 2023 | Q1 2023 | 7.75% |
| 2/13/2023 | 2 | Q1 | 2023 | Q1 2023 | 7.75% |
| 2/14/2023 | 2 | Q1 | 2023 | Q1 2023 | 7.75% |
| 2/15/2023 | 2 | Q1 | 2023 | Q1 2023 | 7.75% |

**Notes/Sources:**

[1] http://www.fedprimerate.com/wall_street_journal_prime_rate_history.htm

[2] For days with no published prime rate, the most recently published prime rate is applied.

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 3: Weekly Average 1-Year Constant Maturity Treasury Yield

H.15 Selected Interest Rates for Mar 10, 2023

| | |
|---|---|
| Series Description | Market yield on U.S. Treasury securities at 1-year constant maturity, quoted on investment basis |
| Unit: | Percent:_Per_Year |
| Multiplier: | 1 |
| Currency: | NA |
| Unique Identifier: | H15/H15/RIFLGFCY01_N.WF |

| Time Period | RIFLGFCY01_N.WF |
|---|---|
| 2022-03-11 | 1.15 |
| 2022-03-18 | 1.30 |
| 2022-03-25 | 1.55 |
| 2022-04-01 | 1.67 |
| 2022-04-08 | 1.77 |
| 2022-04-15 | 1.81 |
| 2022-04-22 | 1.96 |
| 2022-04-29 | 2.03 |
| 2022-05-06 | 2.10 |
| 2022-05-13 | 2.00 |
| 2022-05-20 | 2.11 |
| 2022-05-27 | 2.02 |
| 2022-06-03 | 2.14 |
| 2022-06-10 | 2.34 |
| 2022-06-17 | 2.94 |
| 2022-06-24 | 2.83 |
| 2022-07-01 | 2.85 |
| 2022-07-08 | 2.86 |
| 2022-07-15 | 3.11 |
| 2022-07-22 | 3.12 |
| 2022-07-29 | 3.01 |
| 2022-08-05 | 3.12 |
| 2022-08-12 | 3.28 |
| 2022-08-19 | 3.25 |
| 2022-08-26 | 3.33 |
| 2022-09-02 | 3.48 |
| 2022-09-09 | 3.62 |
| 2022-09-16 | 3.91 |
| 2022-09-23 | 4.08 |
| 2022-09-30 | 4.07 |
| 2022-10-07 | 4.15 |
| 2022-10-14 | 4.38 |
| 2022-10-21 | 4.57 |
| 2022-10-28 | 4.56 |
| 2022-11-04 | 4.74 |
| 2022-11-11 | 4.73 |
| 2022-11-18 | 4.65 |
| 2022-11-25 | 4.76 |
| 2022-12-02 | 4.73 |
| 2022-12-09 | 4.72 |
| 2022-12-16 | 4.66 |

**The Board of Regents of The University of Texas System and TissueGen v. Boston Scientific Corporation**
Case No. 1:18-cv-00392 (GBW)
Exhibit 3: Weekly Average 1-Year Constant Maturity Treasury Yield

H.15 Selected Interest Rates for Mar 10, 2023

| | |
|---|---|
| Series Description | Market yield on U.S. Treasury securities at 1-year constant maturity, quoted on investment basis |
| Unit: | Percent:_Per_Year |
| Multiplier: | 1 |
| Currency: | NA |
| Unique Identifier: | H15/H15/RIFLGFCY01_N.WF |

| Time Period | RIFLGFCY01_N.WF |
|---|---|
| 2022-12-23 | 4.64 |
| 2022-12-30 | 4.73 |
| 2023-01-06 | 4.73 |
| 2023-01-13 | 4.70 |
| 2023-01-20 | 4.66 |
| 2023-01-27 | 4.69 |
| 2023-02-03 | 4.70 |
| 2023-02-10 | 4.87 |
| 2023-02-17 | 4.97 |
| 2023-02-24 | 5.06 |
| 2023-03-03 | 5.04 |

**[PAGE INTENTIONALLY BLANK]**

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM and TISSUEGEN, INC., *Plaintiffs*, v. BOSTON SCIENTIFIC CORPORATION, *Defendant*. | ) | C.A. No. 1:18-cv-00392-GBW<br>C.A. No. 1:18-cv-00392-GBW |

**DECLARATION OF JONATHAN GIBSON**
**IN SUPPORT OF**
**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR**
**(1) ENHANCED DAMAGES UNDER §284 AND**
**(2) PRE- AND POST-JUDGMENT INTEREST**

I, Jonathan Gibson, hereby declare as follows:

1. My name is Jonathan Gibson. I have personal knowledge of the facts set forth in this Declaration and if called as a witness, could and would testify competently to such facts under oath. I make this declaration under penalty of perjury in support of Plaintiffs' Brief in Support of its Motion for Enhanced Damages and Pre- and Post-Judgment Interest.

2. I am presently Chief Executive Officer of Plaintiff TissueGen, Inc. ("TissueGen"). I have been CEO of TissueGen since November 2022. [redacted] In that sense, TissueGen's cost of capital has been at least 8% since 2007.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: March 14, 2023

Jonathan Gibson

**CERTIFICATE OF SERVICE**

I hereby certify that on July 22, 2025, I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Federal Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and a nonconfidential copy of the document will be served by the CM/ECF system. In addition, a confidential copy of the document will be served upon counsel of record via email and overnight delivery.

*/s/ Pratik A. Shah*
Pratik A. Shah