**VOLUME II, PAGES 14045 TO 23870**

**2024-2062, 2024-2063**

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

---

**BOARD OF REGENTS OF THE UNIVERSITY OF TEXAS SYSTEM, TISSUEGEN, INC.,**

*Plaintiffs-Cross-Appellants,*

v.

**BOSTON SCIENTIFIC CORP.,**

*Defendant-Appellant.*

---

On appeal from the U.S. District Court for the District of Delaware (Hon. Gregory B. Williams), No. 18-cv-392

---

# NONCONFIDENTIAL JOINT APPENDIX (VOLUME II OF III)

---


John P. Lahad
Brian D. Melton
Corey M. Lipschutz
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, TX 77002
(713) 651-9366
jlahad@susmangodfrey.com

Michael W. Shore
THE SHORE FIRM LLP
5646 Milton Street, Suite 423
Dallas, TX 75206
(214) 593-9110

*Counsel for Board of Regents of the University of Texas System and TissueGen, Inc.*

Pratik A. Shah
Z.W. Julius Chen
Rachel J. Elsby
Kristen E. Loveland
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, NW
Washington, DC 20006
(202) 887-4000
pshah@akingump.com

Michael P. Kahn
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
Bank of America Tower
New York, NY 10036
(212) 872-1000

*Counsel for Boston Scientific Corp.*

## TABLE OF CONTENTS


| DATE | DESCRIPTION | ECF No. | APPX NO. |
|---|---|---|---|
| | **VOLUME I** | | |
| 02/15/2023 | Judgment Following Jury Verdict (Case No. 1:18-cv-00392-GBW) | 342 | Appx1-2 |
| 06/28/2024 | Amended Judgment (Case No. 1:18-cv-00392-GBW) | 372 | Appx3-4 |
| 06/05/2024 | Memorandum Opinion on Post Trial Motions (Case No. 1:18-cv-00392-GBW) | 368 | Appx5-40 |
| 06/05/2024 | Order on Memorandum Opinion (Dkt. 368) (Case No. 1:18-cv-00392-GBW) | 369 | Appx41-42 |
| N/A | United States District Court for the Western District of Texas (Austin Division) Docket, Case No. 1:17-cv-01103-LY | N/A | Appx43-48 |
| N/A | United States District Court for the District of Delaware Docket, Case No. 1:18-cv-00392-GBW | N/A | Apx49-93 |
| N/A | U.S. Patent No. 6,596,296 | 1-1 | Appx94-121 |
| N/A | U.S. Patent No. 7,033,603 | 1-3 | Appx122-153 |

| DATE | DESCRIPTION | ECF No. | APPX NO. |
|---|---|---|---|
| 11/20/2017 | Complaint for Patent Infringement with Exhibits A-D and Civil Cover Sheet, filed by Board of Regents, The University of Texas System, TissueGen, Inc. | 1 | Appx154-173; |
| | Exhibit A, U.S. Patent No. 6,596,296 | | Appx174-202; |
| | Exhibit B, Claim Chart for Claim 1 of the '296 Patent | | Appx203-210; |
| | Exhibit C, U.S. Patent No. 7,033,603 | | Appx211-243; |
| | Exhibit D, Claim Chart for Claim 19 of the '603 Patent | | Appx244-248; |
| | Civil Cover Sheet | | Appx249-250 |
| 08/25/2020 | Excerpt of Notice of Service of Initial Claim Chart Under Paragraph 7(c) of the Scheduling Order filed by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 08/25/2020) | 61 | Appx349; |
| | Excerpt of Exhibit A (Initial Claim Chart Relating Each Known Accused Product to the Asserted Claims Each Such Product Allegedly Infringes) | | Appx351-353 |

| DATE | DESCRIPTION | ECF NO. | APPX NO. |
|---|---|---|---|
| 03/09/2021 | Excerpt of Appendix regarding Joint Claim Construction Brief, filed by Board of Regents, The University of Texas System, TissueGen, Inc. with Exhibits 1-55 | 81 | Appx431; |
| | Excerpt of Exhibit 37, Declaration of Kinam Park, Ph.D. | | Appx1161-1162; Appx1181-1183 |
| 03/15/2021 | Excerpt of Amended Joint Claim Construction Chart, filed by Board of Regents, The University of Texas System, TissueGen, Inc. | 85 | Appx1854-1857 |
| 04/15/2021 | Excerpt of Memorandum Order regarding Claim Construction | 90 | Appx1928; Appx1931-1933 |
| 06/14/2022 | Excerpt of Sealed – Concise Statement on Motion for Summary Judgment of Noninfringement, filed by Boston Scientific Corporation (Redacted version at ECF No. 208) | 202 | Appx2692-2695 |
| 06/14/2022 | Excerpt of Sealed – Declaration of Michael J. Farnan in Support of Defendant's Opening Brief in Support of It's Omnibus Motion for Summary Judgment and Motion to Exclude Expert Testimony with Exhibits 1-54, filed by Boston Scientific Corporation (Redacted version at ECF No. 209) | 203 | Appx2700; |
| | Excerpt of Exhibit 1, Declaration of David J. Mooney, Ph.D. in Support of Boston Scientific's Motion for Summary Judgment and *Daubert* Motion | | Appx2706-2707; |

| DATE | DESCRIPTION | ECF No. | APPX NO. |
|---|---|---|---|
| | Excerpt of Exhibit 1 to Declaration: Rebuttal Expert Report of David J. Mooney, Ph.D. Regarding Noninfringement of U.S. Patent No. 6,596,296 | | Appx2709-2710; Appx2753-2755; |
| | Excerpt of Exhibit 8, Document produced by Defendant bates-numbered BSC-UTEX-00110553-BSC-UTEX-00110594 | | Appx3062-3063; Appx3082-3084; |
| | Exhibit 9, Video produced by Defendant bates-numbered BSC-UTEX-00284603 | | Appx3105-3106; |
| | Excerpt of Exhibit 12, Document produced by Defendant beginning with bates-number BSC-UTEX-00031766 | | Appx3143-3144; Appx3147-3149; |
| | Excerpt of Exhibit 18, Document produced by Defendant beginning with bates-number BSC-UTEX-00110122 | | Appx3229-3231 |
| 06/21/2022 | Excerpt of Redacted – Opening Brief in Support Motion to Preclude Expert Testimony, Motion for Summary Judgment of Noninfringement, Motion for Summary Judgment of No Willful Infringement, filed by Boston Scientific Corporation (Sealed version at ECF No. 200) | 206 | Appx3812; Appx3820-3822 |
| 10/06/2022 | Excerpt of Memorandum and Order for Summary Judgment of Noninfringement | 243 | Appx8603-8605 |

| DATE | DESCRIPTION | ECF NO. | APPX NO. |
|---|---|---|---|
| 10/26/2022 | Excerpt of Joint Claim Construction Brief | 245 | Appx8621; Appx8623-8625; Appx8627-8629 |
| 10/28/2022 | Motion to Bifurcate, filed by Boston Scientific Corporation | 247 | Appx9777-9778 |
| 10/28/2022 | Excerpt of Sealed – Opening Brief in Support of Motion to Bifurcate, filed by Boston Scientific Corporation (Redacted version at ECF No. 251) | 248 | Appx9779; Appx9783-9785 |
| 11/02/2022 | Excerpt of Redacted – Joint Appendix regarding Joint Claim Construction Brief, filed by Boston Scientific Corporation with Exhibits 1-27 (Sealed version at ECF No. 246) | 250 | Appx9839; |
| | Excerpt of Exhibit 2, Declaration of David J. Mooney, Ph.D. in Support of Boston Scientific's Motion for Summary Judgment and *Daubert* Motion | | Appx9872-9873; |
| | Excerpt of Exhibit 1 to Declaration: Rebuttal Expert Report of David J. Mooney, PH.D. Regarding Noninfringement of U.S. Patent No. 6,596,296 | | Appx9875-9876; Appx9882-9885; Appx9889-9897; |
| | Excerpt of Exhibit 3, Excerpts from Callister, William D., Material Science and Engineering: An Introduction, Seventh Edition, John Wiley & Sons, Inc., 2007 | | Appx10020-10021; Appx10054-10056; Appx10068-10070; |

| DATE | DESCRIPTION | ECF NO. | APPX NO. |
|---|---|---|---|
| | Excerpt of Exhibit 4, Excerpts from Yasuhiro Murase, Akihiko Nagai, 2 – Melt spinning, Editor(s); T. Nakajima, K. Kajiwara, J.E. McIntyre, Advanced Fiber Spinning Technology, Woodhead Publishing, 1994 | | Appx10078-10079; Appx10093-10095; |
| | Excerpt of Exhibit 7, Excerpts from Rebuttal Expert Report of William G. Pitt, Ph.D and Attachments A-D, dated November 25, 2019, *Bd. of Regents, The Univ. of Tex. Sys., et al. v. Ethicon, Inc., et al.*, Case No. 17-cv-1084-LY (W.D. Tex.) | | Appx10169-10170; Appx10173-10176; |
| | Excerpt of Exhibit 9, Declaration of William G. Pitt, Ph.D. In Support of Plaintiffs' Mini-*Markman* Position | | Appx10182-10185; Appx10190-10194; |
| | Excerpt of Attachment 1, Exhibit A to Exhibit 9: Expert Report of William G. Pitt, Ph.D | | Appx10200-10201; Appx10223-10229; |
| | Excerpt of Exhibit 10, Excerpts from Concise Encyclopedia of Polymer Science & Engineering, 73-74, 374-95 (1990) | | Appx10462-10463; Appx10482-10484; |
| | Excerpt of Exhibit 11, Excerpts from Jastrzcbski, The Nature and Properties of Eng'g Materials, 80-107, 155-195, 372-420 (1987) | | Appx10489-10490; Appx10602-10608; |
| | Excerpt of Exhibit 18, Rebuttal Declaration of David J. Mooney, Ph.D. in Response to Plaintiffs' New Claim Construction and in | | Appx10837-10838; Appx10842-10844 |

| DATE | DESCRIPTION | ECF No. | APPX NO. |
|---|---|---|---|
| | Support of Boston Scientific's Construction of "Polymer Fiber" | | |
| 11/17/2022 | Memorandum Opinion regarding Claim Construction | 255 | Appx11175-11195 |
| 12/02/2022 | Memorandum Order on Motion to Bifurcate | 260 | Appx11318-11323 |
| 01/19/2023 | Verdict Form - Phase 1 | 296 | Appx13346-13350 |
| 01/25/2023 | Excerpt of Preliminary Jury Instructions (Phase I) | 316 | Appx13691; Appx13695-13697; Appx13699-13701 |
| 01/31/2023 | Excerpt of Final Jury Instructions (Phase 1) | 326 | Appx13823; Appx13828-13830; Appx13837-13839; Appx13845-13847; Appx13849-13851 |
| 02/01/2023 | Excerpt of Final Jury Instructions (Phase 2) | 329 | Appx13863; Appx13867-13869 |
| 02/01/2023 | Redacted – Jury Verdict (Phase 1) (Sealed Version at ECF No. 331) | 332 | Appx13887-13891 |
| 02/01/2023 | Redacted – Jury Verdict (Phase 2) (Sealed Version at ECF No. 333) | 334 | Appx13894-13898 |

| DATE | DESCRIPTION | ECF No. | APPX NO. |
|---|---|---|---|
| 03/15/2023 | Sealed – Opening Brief in Support of Motion to Alter Judgment and Award Enhanced Damages Under 35 USC 284, filed by Board of Regents, The University of Texas System, TissueGen, Inc. with Exhibits 1-2 (Redacted Version at ECF No. 353) | 350 | Appx13941-13966; |
| | Exhibit 1, Declaration of Justin V. Lewis | | Appx13967-14041; |
| | Exhibit 2, Declaration of Jonathan Gibson in Support of Plaintiffs' Brief in Support of Motion for (1) Enhanced Damages Under §284 and (2) Pre- and Post-Judgment Interest | | Appx14042-14044 |
| | **VOLUME II** | | |
| 03/22/2023 | Redacted – Opening Brief in Support of Motion for New Trial *and, in the Alternative* Motion for Judgment as a Matter of Law, filed by Boston Scientific Corporation (Sealed Version at ECF No. 346) | 351 | Appx14045-14072 |

| DATE | DESCRIPTION | ECF No. | APPX NO. |
|---|---|---|---|
| 03/22/2023 | Excerpt of Redacted – Declaration in Support of Opening Brief in Support of Motion for New Trial *and, in the Alternative* Motion for Judgment as a Matter of Law, filed by Boston Scientific Corporation with Exhibits 1-8 (Sealed Version at ECF No. 347)<br><br>Exhibit 1Ai, Slide 49 Video of Plaintiffs' Opening Demonstratives<br><br>Exhibit 1Aii, Slide 51 Video of Plaintiffs' Opening Demonstratives<br><br>Excerpt of Exhibit 3, January 27, 2023 Joint Letter | 352 | Appx14073;<br><br>Appx14143;<br><br>Appx14144;<br><br>Appx15291-15292; Appx15295-15297 |
| 04/19/2023 | Excerpt of Redacted – Answering Brief in Opposition to Motion for New Trial and, in the Alternative Motion for Judgment as a Matter of Law filed by Board of Regents, The University of Texas System, TissueGen, Inc. (Sealed Version at ECF No. 354) | 360 | Appx15798; Appx15806-15808 |
| 05/03/2023 | Excerpt of Redacted – Reply Brief on Motion for New Trial and, in the Alternative Motion for Judgment as a Matter of Law, filed by Boston Scientific Corporation (Sealed Version at ECF No. 363) | 364 | Appx16571; Appx16576-16578 |
| 07/03/2024 | Notice of Appeal to the Federal Circuit of Dkt. 342 Judgment and Dkt. 372 Amended Judgment | 373 | Appx17313-17314 |

| Date | Description | ECF No. | Appx No. |
|---|---|---|---|
| 07/03/2024 | Notice of Appeal to the Federal Circuit of Dkt. 368 Memorandum Opinion, Dkt. 369 Order, Dkt. 372 Amended Judgment | 374 | Appx17315-17316 |
| 01/25/2023 | Excerpt of Trial Transcript (Vol. I) | N/A | Appx17317-17318; Appx17369-17371; Appx17379-17429; Appx17447-17450; Appx17452-17454; Appx17470-17473; Appx17484-17544; Appx17547-17549; Appx17551-17553 |
| 01/26/2023 | Excerpt of Trial Transcript (Vol. II) | N/A | Appx17600-17601; Appx17609-17612; Appx17671-17674; Appx17685-17695; Appx17699-17712; Appx17733-17735; Appx17737-17739; Appx17755-17757; Appx17772-17776; Appx17780-17782; Appx17788-17790; Appx17798-17801; Appx17824-17826; Appx17834-17836; Appx17842-17848; Appx17873-17877 |

| Date | Description | ECF No. | Appx No. |
|---|---|---|---|
| 01/27/2023 | Excerpt of Trial Transcript (Vol. III) | N/A | Appx17930-17933; Appx17938-17941; Appx17943-18009; Appx18017-18020; Appx18029-18031; Appx18045-18054; Appx18058-18061; Appx18103-18105; Appx18115-18118; Appx18132-18134; Appx18142-18156; Appx18165-18179; Appx18184-18191; Appx18194-18196 |
| 01/30/2023 | Excerpt of Trial Transcript (Vol. IV) | N/A | Appx18213-18214; Appx18231-18235; Appx18244-18249; Appx18260-18263; Appx18277-18283; Appx18288-18309; Appx18314-18319; Appx18328-18330; Appx18333-18356; Appx18364-18369; Appx18377-18382; Appx18392-18394; Appx18397-18399; Appx18415-18417 |
| 01/31/2023 | Excerpt of Redacted Trial Transcript (Vol. V) | N/A | Appx18472-18473; Appx18525-18527; Appx18634-18641; Appx18644-18648; Appx18671-18684 |

| DATE | DESCRIPTION | ECF NO. | APPX NO. |
|---|---|---|---|
| N/A | Sealed – Trial Exhibit No. JTX002, Synergy § 7.2 PMA, Pharmaceutical Development [BSC-UTEX-00110475-496] | N/A | Appx18778-18799 |
| N/A | Sealed – Trial Exhibit No. JTX004, Synergy Drug Eluting Stent Coating Process [VIDEO] [BSC-UTEX-00284603] | N/A | Appx18842 |
| N/A | Trial Exhibit No. JTX008, Final five-year clinical outcomes in the EVOLVE trial: A randomized evaluation of a novel bioabsorbable polymer-coated, everolimus-eluting stent [BSC-UTEX-00110122-136] [Allocco Ex. 3] | N/A | Appx18849-18863 |
| N/A | Sealed – Trial Exhibit No. PTX026, PPT TissueGen Developing Revolutionary Peripheral Stent Solutions, Jan. 2009 [UT-BSC0009408-426] | N/A | Appx23850-23868 |
| N/A | Sealed – Trial Exhibit No. PTX036, Table E.T1 - Strut and Connector Dimensions for Synergy and Premier | N/A | Appx23870 |

| DATE | DESCRIPTION | ECF No. | APPX NO. |
|---|---|---|---|
| **VOLUME III** | | | |
| N/A | Sealed – Trial Exhibit No. PTX038, Answer to ROG 2 and ROG 3 [BSC-UTEX-00109806-824, BSC-UTEX-00109825, BSC-UTEX-00109826-842, BSC-UTEX-00109843-858, BSC-UTEX-00109859-867, BSC-UTEX-00109868-873, BSC-UTEX-00109874-875, BSC-UTEX-00109876-877, BSC-UTEX-00109878-879, BSC-UTEX-00109880-881, BSC-UTEX-00109882-883, BSC-UTEX-00109884-885, BSC-UTEX-00109886-936] | N/A | Appx23871-24015 |
| N/A | Sealed – Trial Exhibit No. PTX042, SYNERGY PMA Appx. 7.2 [BSC-UTEX-00110497-552] [BSC1-Chen Ex. 15] | N/A | Appx24271-24326 |
| N/A | Sealed – Trial Exhibit No. PTX047, FESEMs of Coatings of SYNERGY SV, WH, and LV models [BSC-UTEX-00110137-474] | N/A | Appx24371-24708 |
| N/A | Excerpt of Sealed – Trial Exhibit No. PTX049, SYNERGY Particulate Assessment 90761466 [BSC-UTEX-00205005-041] | N/A | Appx24709-24710; Appx24731-24733 |
| N/A | Excerpt of Sealed – Trial Exhibit No. PTX050, 2009.07.07 Particulate Review & Discussion with FDA [BSC-UTEX-00201385-401] | N/A | Appx24746; Appx24749-24751 |

| DATE | DESCRIPTION | ECF NO. | APPX NO. |
|---|---|---|---|
| N/A | Excerpt of Sealed – Trial Exhibit No. PTX051, SYNERGY IDE G120123/S002 Deficiency Response [BSC-UTEX-00213774-069] | N/A | Appx24763; Appx24888-24891 |
| N/A | Trial Exhibit No. PTX052, Weber et al. US2009/0030504 – CERTIFIED [UT-BSC0090954-971] | N/A | Appx25059-25076 |
| N/A | Sealed – Trial Exhibit No. PTX065 Email [Peddle, Ballinger, Moynihan] attaching Color TG handout [BSC-UTEX-00292727-729] | N/A | Appx25077-25079 |
| N/A | Sealed – Trial Exhibit No. PTX067, Email chain (Nelson, Moynihan, Ballinger, Brown, Vbenezia, Davidson) re: Possible TCT Meeting TissueGen, Inc. [UT-BSC0020767-772] [BSC-Moynihan Ex. 1] | N/A | Appx25080-25085 |
| N/A | Sealed – Trial Exhibit No. PTX069, Email chain (Nelson, Moynihan) with attachments ("TissueGen handout April 2009.pdf," "TissueGen Executive Summary April 2009.pdf") [UT-BSC-0020869-894] [BSC-Moyni han Ex.2] | N/A | Appx25086-25111 |
| N/A | Sealed – Trial Exhibit No. PTX072, CDRH Premarket Review Submission Cover Sheet with attached 05.21.09 Letter attaching 06.04.09 FDA PowerPoint [BSC-UTEX-00197895-940 | N/A | Appx25112-25157 |

| DATE | DESCRIPTION | ECF NO. | APPX NO. |
|---|---|---|---|
| N/A | Sealed – Trial Exhibit No. PTX073, Email chain (Moynihan, Nelson, Knowles] re TissueGen [UT-BSC0088278-279] | N/A | Appx25158-25159 |
| N/A | Trial Exhibit No. PTX143, Book, IUPAC Compendium of Chemical Terminology (Dissolution) [UT-BSC0085269] | N/A | Appx25500 |
| N/A | Trial Exhibit No. DTX018, U.S. Patent 5,364,627 to Song, Gradual Release Structures Made From Fiber Spinning Techniques [BSC-UTEX-00029286 BSC-UTEX-00029300] | N/A | Appx25635-25649 |
| N/A | Sealed – Trial Exhibit No. DTX300, BSC-FDA Meeting: Drug-Eluting Biodegradable Polymer Coating on Metallic Stent [BSC-UTEX-00201346 BSC-UTEX-00201359] | N/A | Appx26088-26101 |

**CONFIDENTIAL MATERIAL OMITTED**

The material omitted at Appx2694-2695, Appx2753-2755, Appx3082-3084, and Appx13951 describes the Synergy Stent's coating process; the material omitted at Appx3063 describes the Synergy Stent's manufacturing process; the material omitted at Appx3106 and Appx18842 are video of the Synergy Stent's coating process; the material omitted at Appx3144 describes the commercial Synergy Stent product; the material omitted at Appx3147-3149 describes the Synergy Stent's device and operation; the material omitted at Appx9890 describes the Synergy

Stent's polymer composition; the material omitted at Appx13891 and Appx13898 contains the signature of the jury foreperson; the material omitted at Appx13941 describes the nature of the brief; the material omitted at Appx13948 describes a design submitted to the FDA; the material omitted at Appx13956 describes Synergy Stent sales; the material omitted at Appx13962 describes the relevant Boston Scientific market share; the material omitted at Appx14043 describes TissueGen's financing; the material omitted at Appx14060-14061 describes a coating technology agreement; the material omitted at Appx18525 describes confidential arrangements with hospitals; the material omitted at Appx18526-18527 describes pricing arrangements and per-unit profits; the material omitted at Appx18649 references confidential agreements; the material omitted at Appx18778-18799 and Appx24271-24326 describes the Synergy Stent's development; the material omitted at Appx23850-23868 describe a TissueGen investment; the material omitted at Appx23870 describe strut and connector dimensions for Synergy Stent; the material omitted at Appx23871-24015 are Defendant's objections and responses to Plaintiff's interrogatories; the material omitted at Appx24371-024708 are images of Synergy Stent coatings; the material omitted at Appx24709-24710, Appx24731-24733, Appx24746, and Appx24749-24751 describe particulate assessments of the Synergy Stent system; the material omitted at Appx24763 and Appx24888-24891 describe the Synergy Stent's deficiency response; the material omitted at Appx25077-25079,

Appx25080-25085, Appx25086-25111, and Appx25158-25159 are emails regarding TissueGen; and the material omitted at Appx25112-25157 and Appx26088-26101 are slides regarding Boston Scientific's drug product testing.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM, and TISSUEGEN, INC.,<br><br>*Plaintiffs*,<br><br>v.<br><br>BOSTON SCIENTIFIC CORPORATION,<br><br>*Defendant*. | Case No. 18-392-GBW<br><br>**FILED UNDER SEAL** |

**BOSTON SCIENTIFIC CORPORATION'S OPENING BRIEF IN SUPPORT OF ITS MOTIONS FOR A NEW TRIAL AND FOR JUDGMENT AS A MATTER OF LAW**

Dated: March 15, 2023

OF COUNSEL:

Chad Drown (*pro hac vice*)
Timothy E. Grimsrud (*pro hac vice*)
Katherine S. Razavi (*pro hac vice*)
Lauren J.F. Barta (*pro hac vice*)
Doowon R. Chung (*pro hac vice*)
N. Chethana Perera (*pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Telephone: (612) 766-7000
Facsimile: (612) 766-1600
chad.drown@faegredrinker.com
tim.grimsrud@faegredrinker.com
kate.razavi@faegredrinker.com
lauren.barta@faegredrinker.com
doowon.chung@faegredrinker.com
chethana.perera@faegredrinker.com

David J.F. Gross (*pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
1950 University Avenue, Suite 450

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE 19801
Tel. (302) 777-0300
Fax (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

East Palo Alto, CA 94303
Telephone: (650) 324-6700
Facsimile: (650) 324-6701
david.gross@faegredrinker.com

Christopher J. Burrell (*pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
1500 K Street NW, Suite 1120
Washington, D.C. 20005
Telephone: (202) 842-8800
Facsimile: (202) 842-8465
chris.burrell@faegredrinker.com

Evan J. Kline-Wedeen (*pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
320 S. Canal Street, Suite 3300
Chicago, Illinois 60606
Telephone: (312) 569-1000
Facsimile: (312) 569-3000
evan.kline-wedeen@faegredrinker.com

Michael P. Kahn (*pro hac vice*)
AKIN GUMP STRAUSS HAUER &
FELD LLP
One Bryant Park,
Bank of America Tower
New York, NY 10036-6745
Telephone: (212) 872-1000
mkahn@akingump.com

Rachel J. Elsby (*pro hac vice*)
AKIN GUMP STRAUSS HAUER &
FELD LLP
Robert S. Strauss Tower
2001 K Street, N.W.
Washington D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
relsby@akingump.com

# TABLE OF CONTENTS

**Page**


I. NATURE AND STAGE OF THE PROCEEDINGS ........ 1

II. SUMMARY OF THE ARGUMENT ........ 1

III. STATEMENT OF FACTS ........ 2

IV. ARGUMENT ........ 2

A. The Court Should Grant Boston Scientific's Rule 59(a) Motion For New Trial. ........ 2

1. Plaintiffs' Improper Phase 1 Opening Infected the Entire Trial. ........ 2

a. Opening Statements Contrary to the Law and the Court's Orders ........ 3

b. Improper Appeals to Bias and Emotion ........ 4

c. Counsel's Improper Bolstering Statements and Persistent Misconduct. ........ 5

2. Plaintiffs' Improper Conduct Continued with the Introduction of Evidence. ........ 6

3. Plaintiffs' Closings Magnified the Unfair Prejudice. ........ 9

B. The Court Should Grant Judgment As A Matter Of Law Under Rule 50(b) ........ 12

1. Song Anticipates the Asserted Claims as a Matter of Law. ........ 12

2. The Asserted Claims Lack Written Description Support as a Matter of Law. ........ 14

3. No Reasonable Jury Could Have Found Infringement Because the Synergy Stents Do Not Include a "Fiber" as Construed by the Court. ........ 15

4. No Reasonable Jury Could Have Found Infringement Because the Synergy Stents Do Not Include "Immiscible" Phases. ........ 17

5. No Reasonable Jury Could Have Found That Plaintiffs Presented Sufficient Evidence to Support Their Damages Theory. ........ 18

6. No Reasonable Jury Could Have Found Willful Infringement. ........ 19

V. CONCLUSION ........ 20

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*,
811 F.3d 1334 (Fed. Cir. 2016) ... 16

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
239 F.3d 1343 (Fed. Cir. 2001) ... 15

*Ariad Pharm., Inc. v. Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010) (en banc) ... 14

*Ayoub v. Spencer*,
550 F.2d 164 (3d Cir. 1977) ... 10, 12

*BASF Plant Sci., LP v. Commonwealth Sci. & Indus. Rsch. Organisation*,
28 F.4th 1247 (Fed. Cir. 2022) ... 19

*Bayer Healthcare LLC v. Baxalta, Inc.*,
989 F.3d 964 (Fed. Cir. 2021) ... 19

*Bullen v. Chaffinch*,
336 F. Supp. 2d 342 (D. Del. 2004) ... 2, 12

*Callaway Golf Co. v. Acushnet Co.*,
576 F.3d 1331 (Fed. Cir. 2009) ... 3

*Carrier Corp. v. Goodman Glob., Inc.*,
162 F. Supp. 3d 345 (D. Del. 2016) ... 5

*Cordis Corp. v. Bos. Sci. Corp.*,
658 F.3d 1347 (Fed. Cir. 2011) ... 16

*Draper v. Airco, Inc.*,
580 F.2d 91 (3d Cir. 1978) ... 4, 6, 10

*Drexelbrook Controls, Inc. v. Endress-Hauser, Inc.*,
989 F.2d 1201 (Fed. Cir. 1993) ... 17

*Ely v. Cabot Oil & Gas Corp.*,
2017 WL 1196510 (M.D. Pa. Mar. 31, 2017) ... 6

*Ericsson, Inc. v. D-Link Sys., Inc.*,
773 F.3d 1201 (Fed. Cir. 2014) ... 18

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
575 F.3d 1312 (Fed. Cir. 2009) ... 8, 16, 18

*Fineman v. Armstrong World Indus., Inc.*,
980 F.2d 171 (3d Cir. 1992)....................3, 5, 6

*Finjan, Inc. v. Symantec Corp*,
2013 WL 5302560 (D. Del. Sept. 19, 2013), *aff'd*, 577 F. App'x 999 (Fed. Cir. 2014)....................20

*Forest Labs. Inc. v. Abbott Labs.*,
239 F.3d 1305 (Fed. Cir. 2001)....................4, 7, 8

*Gov't of Virgin Islands v. Turner*,
409 F.2d 102 (3d Cir. 1968)....................5

*Idenix Pharms. LLC v. Gilead Scis., Inc.*,
941 F.3d 1149 (Fed. Cir. 2019)....................12

*Imperium IP Holdings (Cayman), Ltd. v. Samsung Elec. Co.*,
757 F. App'x 974 (Fed. Cir. 2019)....................13

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012)....................19

*Lawrence v. Superintendent Dallas SCI*,
849 F. App'x 386 (3d Cir. 2021)....................2

*LG Elecs. U.S.A., Inc.v. Whirlpool Corp.*,
798 F. Supp. 2d 541 (D. Del. 2011)....................15

*McMillan v. Weeks Marine, Inc.*,
478 F. Supp. 2d 651 (D. Del. 2007)....................3

*Melchior v. Hilite Int'l, Inc.*,
665 F. App'x 894 (Fed. Cir. 2016)....................13

*Minerva Surgical, Inc. v. Hologic, Inc.*,
2021 WL 3048447 (D. Del. July 20, 2021)....................18

*MobileMedia Ideas LLC v. Apple Inc.*,
780 F.3d 1159 (Fed. Cir. 2015)....................13, 17

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008)....................9

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
843 F.3d 1315 (Fed. Cir. 2016)....................14

*Reed v. Philadelphia, Bethlehem & New England R.R. Co.*,
939 F.2d 128 (3d Cir. 1991)....................10, 12

*Resqnet.com v. Lansa*,
594 F.3d 860 (Fed. Cir. 2010)....11

*Sysmex Corp. v. Beckman Coulter, Inc.*,
2022 WL 2292059 (D. Del. June 24, 2022)....3, 7

*TecSec, Inc. v. Adobe Inc.*,
978 F.3d 1278 (Fed. Cir. 2020)....18, 19

*TEK Glob., S.R.L. v. Sealant Sys. Int'l*,
920 F.3d 777 (Fed. Cir. 2019)....3

*United States v. Carter*,
417 F.2d 229 (3d Cir. 1969)....14

*Uniloc USA v. Samsung Elecs. Am.*,
2019 WL 2267212 (E.D. Tex. May 28, 2019)....11

*Vectura Ltd. v. GlaxoSmithKline LLC*,
397 F. Supp. 3d 579 (D. Del. 2019), *aff'd*, 981 F.3d 1030 (Fed. Cir. 2020)....2, 12

*Waddington N. Am. Inc. v. Sabert Corp.*,
2011 WL 3444150 (D.N.J. Aug. 5, 2011)....6

*Yoon Ja Kim v. ConAgra Foods, Inc.*,
465 F.3d 1312 (Fed. Cir. 2006)....17

**Statutes, Rules & Regulations**

Rule 50(b)....1, 12

Rule 59....1

Rule 59(a)....2

*Unless otherwise noted, all citations to "Tr." are to the trial transcript, all citations to "Ex." or "Exs." are to the Exhibits attached to the Declaration of Michael J. Farnan submitted herewith, and all emphases are added.

Throughout trial, Plaintiffs' counsel repeatedly made arguments that contradicted the law and the Court's orders, were not based on the record, appealed only to bias and passion, and were so pervasive they infected the entire trial. Plaintiffs' improper arguments ran afoul of guardrails set by established law and, in doing so, invited error by the Court as to key evidentiary rulings. Moreover, almost every time the Court admitted evidence conditioned on specific guardrails, Plaintiffs ignored them. Plaintiffs' improper conduct, and the erroneous evidentiary rulings it invited, obscured the issues, prejudiced Boston Scientific, and poisoned the verdict, which requires a new trial unless judgment as a matter of law is entered. To that end, when considering only the properly admitted evidence, no reasonable jury could have found for Plaintiffs for multiple reasons, including: (1) Plaintiffs' technical expert conceded anticipation of the asserted claims, (2) there is no evidence of written description support for the claimed "immiscible" phases, (3) Plaintiffs' infringement case was not based on the Court's claim constructions or evidence relevant to the accused products, (4) Plaintiffs' damages theory was based on flawed methodology and not supported by evidence, and (5) Plaintiffs did not present evidence to support a finding of willful infringement. Accordingly, Boston Scientific moves for a new trial under Rule 59 and, alternatively, renews its motion for judgment as a matter of law ("JMOL") under Rule 50(b).

## I. NATURE AND STAGE OF THE PROCEEDINGS

After a bifurcated trial, the jury returned a verdict against Boston Scientific, finding direct and indirect infringement, awarding damages in the amount of $42 million, and finding willful infringement. (D.I. 332; D.I. 334.) Judgment was entered on February 15, 2023. (D.I. 342.)

## II. SUMMARY OF THE ARGUMENT

1. Plaintiffs' arguments and conduct through the entire course of trial contradicted the law and the Court's orders, went outside the record, and appealed to bias and passion. Plaintiffs invited the Court to make erroneous evidentiary rulings that caused substantial error. Collectively,

it is beyond reasonably probable that the jury's consideration was compromised. The verdicts go against the clear weight of the properly considered evidence. A new trial is warranted.

2. Based only on the properly considered evidence, no reasonable jury could have found in favor of Plaintiffs on infringement, validity, willfulness, or damages. The Court should grant Boston Scientific's renewed motion for JMOL.

## III. STATEMENT OF FACTS

Plaintiffs repeatedly made arguments that contradicted the law and the Court's orders, were not based on the record or relevant evidence, and appealed only to bias and passion. Boston Scientific, on the other hand, presented overwhelming evidence to support its defenses. Accordingly, the Court should either grant a new trial or grant Boston Scientific JMOL.

## IV. ARGUMENT

### A. The Court Should Grant Boston Scientific's Rule 59(a) Motion For New Trial.

A court has broad discretion to grant a new trial in a variety of circumstances, including where "the jury's verdict is against the clear weight of the evidence," "substantial trial errors were made," "damages are excessive," *Bullen v. Chaffinch*, 336 F. Supp. 2d 342, 347 (D. Del. 2004), or counsel "made prejudicial remarks and it is 'reasonably probable' those prejudicial remarks influenced the jury's verdict," *Vectura v. Glaxosmithkline*, 981 F.3d 1030, 1042 (Fed. Cir. 2020). The record here—which "need not [be] view[ed] . . . in the light most favorable to the verdict winner"—compels the grant of a new trial for any one of those reasons. *Vectura v. GlaxoSmithKline*, 397 F. Supp. 3d 579, 586 (D. Del. 2019), *aff'd*, 981 F.3d 1030 (Fed. Cir. 2020).

#### 1. Plaintiffs' Improper Phase 1 Opening Infected the Entire Trial.

"[A] fundamental principle of trial advocacy" is that an opening statement "***is not an occasion for argument***." *Lawrence v. Superintendent Dallas SCI*, 849 F. App'x 386, 388 (3d Cir. 2021). Here, not only did Plaintiffs' Phase 1 opening violate this fundamental principle, they

violated it in a way that paved the way for a trial corrupted by arguments and evidence that contradicted the law and the Court's orders, appealed to bias and prejudice, and tainted evidence with counsel's repeated expression of personal opinion. Indeed, "improper conduct . . . so pervaded the trial as to infect the jury's verdict," *Fineman v. Armstrong World Indus.*, 980 F.2d 171, 206 (3d Cir. 1992), and invite "substantial error" in the Court's evidentiary rulings, *McMillan v. Weeks Marine*, 478 F. Supp. 2d 651, 655 (D. Del. 2007).

**a. Opening Statements Contrary to the Law and the Court's Orders**

**Improper IPR Arguments.** Post-grant proceedings (or here, the lack thereof) is "of little relevance" and carries the "risk of jury confusion." *Callaway Golf v. Acushnet*, 576 F.3d 1331, 1343 (Fed. Cir. 2009) (affirming exclusion of evidence regarding *inter partes* reexamination); *Sysmex v. Beckman Coulter*, 2022 WL 2292059, at *3 (D. Del. June 24, 2022) (finding "PTAB proceedings are not relevant and present a risk of confusing the jury"). Plaintiffs, however, argued that Boston Scientific did not believe in its invalidity case because Boston Scientific chose not to file an IPR on the asserted patent: "ask yourself, why would they not [file an IPR] ***if they thought the patent was invalid***? If they thought it was obviously invalid. They have a place they could go with a lower standard of proof." (Tr. 111:9-12.) These arguments—which the Federal Circuit has "caution[ed]" district courts against introducing, *TEK Glob., S.R.L. v. Sealant Sys. Int'l*, 920 F.3d 777, 784 n.1 (Fed. Cir. 2019)—formed the cornerstone of Plaintiffs' invalidity arguments and pushed the issue well "beyond the line" set by the Court. (Tr. 112:16.)

**Improper Arguments of Infringement by Unrelated Boston Scientific Patent Applications—Not the Accused Product.** Plaintiffs argued that Boston Scientific infringed the '296 Patent based on improper comparisons between the claims of the '296 Patent and two Boston Scientific patent applications ("Strickler" and "Weber"):

> [L]et's see how they use the term 'fiber" in this patent. . . Here, remember what the SYNERGY stent looks like. . . .You'll see the same zigzag pattern is on that stent. And it says, "Fibers, other embodiments' inorganic fibers are applied to individual elements of the expandable device . . ." And we see stent structure looks like the ***same***, the fibers on the outside of this stent, it's a fiber.

(Tr. 89:1-17; Ex. 1A at 23-27; Ex. 2A; Ex. 2E; Ex. 8.) But a plaintiff may not argue infringement by an accused product based on "a patent application that may or may not describe the product." *Forest Labs. v. Abbott Labs.*, 239 F.3d 1305, 1313 (Fed. Cir. 2001). Here, the prejudice was even worse, because Strickler and Weber have nothing to do with Synergy—Plaintiffs' expert, Dr. Pitt, later conceded that he was not aware of any Boston Scientific device "relating to Strickler" or Weber. (Tr. 639:12-23; *id.* 735:4-741:21 (Dr. Mooney explaining Strickler "has no relation to the coating on the Synergy stent" (at 735) and Weber is "unlike coated stents" like Synergy (at 739)).)

**Improper Damages Arguments in Phase 1.** Plaintiffs' counsel repeatedly violated the Court's bifurcation order by presenting arguments related to damages in Phase 1. (*See* D.I. 260, 4 (Phase 1 addressed only "technical issues" bearing on "invalidity and infringement").) For example, counsel implied that Boston Scientific was being vindictive and had no reason to challenge the validity of an expired patent: "If they don't infringe, ask yourself and ***make them tell you, why are you trying to invalidate a patent that is no longer enforced? It's expired***. . . ." (Tr. 108:1-3; *see also id.* 72:8-10.) The response, of course, is that Plaintiffs made a sizeable damages demand. But under the bifurcation order, Boston Scientific could not respond with such mitigating context. Similarly, Plaintiffs argued to the jury that Boston Scientific "got sued because ***they didn't want to pay***." (*Id.* 86:20-21.) As the Court recognized, this was improper. (*Id.* 87-88.)

### b. Improper Appeals to Bias and Emotion

Plaintiffs' opening featured a litany of arguments having nothing to do with the evidence or disputed issues and intended only to invoke passion, bias, and prejudice against Boston Scientific. Such arguments are strictly prohibited. *Draper v. Airco*, 580 F.2d 91, 95 (3d Cir. 1978)

("[J]urors must ultimately base their judgment on the evidence presented and the rational inferences therefrom. Thus, there must be limits to pleas of pure passion and there must be restraints against blatant appeals to bias and prejudice.").

For example, Plaintiffs equated the standard for proving invalidity with "the standard that we use if they want to ***involuntarily admit you to a psychiatric hospital***" (Tr. 105:21-23; 106:6-8), or "to ***take your kids away***" (*id.* 106:8-9), *i.e.*, for "making some of the most important decisions in your life" (*id.* 106:14-16). Such arguments unfairly biased the jury against Boston Scientific's invalidity defense. Indeed, a court in this District granted a new trial under similar circumstances after counsel invoked the "level of proof [] required to ***take away someone's kid***." *Carrier v. Goodman Glob.*, 162 F. Supp. 3d 345, 368-69 (D. Del. 2016).

As other examples, Plaintiffs played inappropriate videos of a little girl lying to her parents and baseball player Alex Rodriguez lying about steroids. (Tr. 101:18-102:15, 104:21-105:5; Exs. 1Ai-ii.) These videos served no purpose other than to suggest Boston Scientific's witnesses are liars—a tactic Plaintiffs confirmed later. (*Id.* 954:11-12.) The role of an opening "is not to poison the jury's mind against the defendant," *Gov't of Virgin Islands v. Turner*, 409 F.2d 102, 103 (3d Cir. 1968), but Plaintiffs' opening did just that. (*See* Tr. 81:24-82:12; 91:2, 100:12-16, 101:15-17.)

#### c. Counsel's Improper Bolstering Statements and Persistent Misconduct

**Bolstering:** Repeatedly, "plaintiffs' trial counsel also improperly provided his personal opinion as to the justness of his cause and injected his own credibility as an issue in the case." *Fineman*, 980 F.2d at 209. For example, over sustained objections, counsel bolstered his own credibility by discussing unrelated representations of other universities and highlighting that he appeared before the judge in the patent video. (Tr. 78:7-20; 105:2-10.) He injected his own opinion that (1) the patent was valid—"[N]o one else had done this before, I tell you that" (*id.* 81:3-4); (2)

that Boston Scientific "cannot possibly meet this [invalidity] standard" (*id.* 107:11); (3) that one Boston Scientific witness "told the truth" while another was a "paid witness to tell you that fiber doesn't mean fiber" (*id.* 90:18-19, 91:2); (4) that Boston Scientific will "spin" its documents "in a way that we believe you will find nonsensical" (*id.* 100:14-15); and (5) that Boston Scientific is "going to come and tell you today that up is down, black is white, red is green" (*id.* 91:20-22). Such comments have no place in an opening. *Fineman*, 980 F.2d at 209; *Draper*, 580 F.2d at 95.

**Persistent Misconduct: Plaintiffs Drew Seven Sustained Objections During Opening.** Plaintiffs' egregious and prejudicial opening is highlighted by ***seven*** sustained objections. (Tr. 78:18-20; 86:22-87:23; 105:6-8; 105:24-106:5; 109:19-110:2; 110:9-13; 111:14-112:16.) Throughout trial, Boston Scientific actively preserved its objections. (Decl. ¶¶ 2-19, Exs. 1-5.) But Plaintiffs' misconduct continuously "forc[ed] [Boston Scientific] into the dilemma of choosing between an objection to improper testimony, or foregoing an objection," which "created a wholly misleading impression for the jury." *Ely v. Cabot Oil & Gas*, 2017 WL 1196510, at *18 (M.D. Pa. Mar. 31, 2017); *Waddington N. Am. v. Sabert*, 2011 WL 3444150, at *5 (D.N.J. Aug. 5, 2011).

**2. Plaintiffs' Improper Conduct Continued with the Introduction of Evidence.**

Plaintiffs took the same tack with their witnesses and evidence. In particular, Plaintiffs strayed into numerous areas that the Federal Circuit has found improper and that this Court excluded in pre-trial rulings. Plaintiffs' counsel again injected his own opinions and editorialized on witness statements and credibility. (*See, e.g.*, Tr. 347:8-11; 357:9-23; 364:21-365:6; 421:18-422:2; 947:14-15; 954:11-13; 1000:17-18; 1232:12-13, 19-20; 1233:5-11; 1259:13-15.) The upshot was a jury verdict that cannot be squared with established principles of patent law or the admissible evidence.

**Improper Evidence Concerning IPRs.** Despite the Court's specific guardrails about referencing IPR proceedings (Tr. 112:11-16), Plaintiffs doubled down on their opening remarks,

and, over Boston Scientific's objections, presented a witness to testify about IPRs (*id.* 925:1-8). There were no IPRs filed in connection with this case. The fact that one could have been filed is completely irrelevant and testimony to that effect could serve only to confuse the jury. *See, e.g.*, *Sysmex*, 2022 WL 2292059 at *3. Plaintiffs' argument that Boston Scientific's invalidity defenses were not credible because an IPR was not filed was unfairly prejudicial.

**Improper Evidence and Arguments of Infringement Based on Patent Applications.** As discussed above, the Federal Circuit requires infringement to be determined with respect to the accused product—*i.e.*, Synergy—"not the content of a patent application that may or may not describe the product." *Forest Labs.*, 239 F.3d at 1313. To overcome Boston Scientific's motion *in limine* on this issue, Plaintiffs represented that they would not argue infringement based on Strickler and Weber (D.I. 288 at 71:18-24; Tr. 133:6-20), but this is precisely what they did, repeatedly emphasizing them as being the "same" as Synergy (*see* Tr. 88-89). Plaintiffs' technical expert, Pitt, argued infringement directly from these two applications:

> Q. . . . if it was a fiber in Strickler, why wouldn't it be a fiber on the SYNERGY stent?
> A. ***It is a fiber on the SYNERGY stent; same thing***.

(*Id.* 601:6-8; 602:19-604:5 (addressing Weber as being the "same"); 606:10-16 (comparing '296 patent to Weber).) Plaintiffs reiterated its comparison through Dr. Chen first by discussing a claim from ***Strickler*** reciting a "fibrous layer," (Tr. 494:5-25), and then by mischaracterizing it to suggest that Synergy includes a "fibrous layer" just like Strickler:

> Q. So you recall Dr. Chen talked about a coating being a fiber, correct? Or do you recall that? A. I recall that. Q. ***And is that what Boston Scientific does?*** A. ***Yes.***

(*Id.* 607:14-18; 91:2-4 ("Again, [Dr. Chen] told the truth, it has a fibrous layer, ***just like the SYNERGY stents***, just like what is claimed in the '296 patent."); 569:13-570:10; 599:22-600:1; 610:25-611:3.) Chen, however, testified that Strickler is "totally different" and is "not relevant to Synergy's coating technology" (*id.* 493:2-16), which Mooney confirmed (*id.* 735:4-741:21). Pitt

even conceded that he was not aware of any Boston Scientific device "relating to Strickler" or Weber. (Tr. 639:12-23.) Regardless of whether Strickler and Weber have any bearing on Synergy—and, again, they do not—Federal Circuit precedent precludes Plaintiffs from relying on them to argue infringement. *Forest Labs.*, 239 F.3d at 1313.

**Improper Arguments Contradicting Claim Constructions.** Plaintiffs repeatedly violated the Federal Circuit's edict that "[n]o party may contradict the court's construction to a jury." *Exergen v. Wal-Mart Stores*, 575 F.3d 1312, 1321 (Fed. Cir. 2009). For example, instead of providing evidence that Synergy's coating had a "threadlike ***structure***," as the Court's construction of "fiber" requires, Plaintiffs elicited voluminous testimony about "threadlike ***shape***." (Tr. 189:6-9; 342:20-343:3; 349:15-350:17; 350:24-351:13; 353:8-13; 355:8-14; 355:25-356:3; 358:4-6; 363:15-365:22; 552:25-553:3; 591:18-20; 592:13-593:17; 595:7-16.) Plaintiffs went even further, eliciting testimony under a meaning of "fiber" that the Court previously rejected, including that a fiber is merely defined as having more length than width, (*id.* 626:3-4 ("It's much longer than it is thick or wide, ***so that's the definition of a fiber***"); 938:4-25), and by referencing "threads" on a bolt (*id.* 357 ("What makes them threads?. .They are long and continuous, correct?"); Ex. 1D).[1]

Plaintiffs likewise elicited improper testimony on the "immiscible" term, by repeatedly emphasizing that the claimed first and second phases must be incapable of forming a ***"single phase"***—words that do not appear in the Court's construction:

> Q. But what you're adding today is "incapable of dissolving into one another to form a single phase," right, sir? That's a sentence you've used repeatedly, correct, sir? A. Yes.

(Tr. 653:25-654:4; 654:24-655:1.) Pitt also introduced a dictionary definition of "dissolution" to

[1] The Court also erred by excluding unquestionably relevant scientific evidence that would have countered Plaintiffs' improper infringement arguments, which further magnified the prejudice to Boston Scientific. (Tr. 541:2-3, 6-7; 543:19-20; *id.* 666:20-667:16; Decl., ¶¶ 2, Exs. 2B-D, 2L-P, 3A.) The Court also erred by excluding Boston Scientific's opening slides on the same. (Ex. 1C.)

further facilitate his infringement argument—an argument that, by his own admission, did not apply the Court's claim construction. (*Id.* 887:5-888:13; Ex. 3B.) This was error. *See O2 Micro Int'l v. Beyond Innovation Tech.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). Pitt later conceded that "single phase" was not part of the Court's construction of "immiscible":

> Q. And that – "to form a single phase" is ***literally not part*** of the Court's claim construction, you understand that, right, sir? A. ***Correct***.

(*Id.* 903:12-15; 902:15-20.) But the damage was done.

**Improper Evidence and Argument Concerning the "Hypothetical Negotiation."** During Phase 2, Plaintiffs' counsel improperly inserted himself into the hypothetical negotiation, misleading the jury by arguing that it was not a valid construct because "a reasonable person in that position [would] go hire somebody like me to negotiate for them." (Tr. 1233:6-11.) Plaintiffs' counsel is not a *Georgia-Pacific* factor—his presence (or absence) in the negotiation is irrelevant. Plaintiffs also denigrated the hypothetical negotiation analysis as a "fantasy," misleading the jury to conclude that it was not an appropriate methodology and thereby discrediting Boston Scientific's damages expert. (*Id.* 1232:12-23; 1233:5-6; 1261:1-16.) This was clearly prejudicial—the Federal Circuit has long endorsed the hypothetical negotiation methodology.

### 3. Plaintiffs' Closings Magnified the Unfair Prejudice.

Plaintiffs' conduct through trial culminated in stunningly improper closing arguments that invited the jury to render a verdict based on improper considerations.

**Repeated Improper Arguments from Opening and Evidentiary Presentations.** Plaintiffs' counsel repeated his improper characterizations of the standard of proof:

> if any of you think that the quality of evidence provided by Dr. Mooney is a ***quality of evidence that you feel comfortable being committed to an institution for, wow***. If any of you think that the level of evidence that Dr. Mooney provided would be ***good enough to take the children away from you by the state, wow***. (Tr. 951:21-952:1.)

He also directly compared Mooney to A-Rod, calling back to the video from his opening:

> "Mooney is the ***equivalent to A-Rod***," "[h]e ***wasn't paid*** $800 an hour ***to tell you the truth*** he was paid $800 an hour to get them out of trouble." (*Id.* 947:14-15; 954:11-12.)

Counsel also returned to Boston Scientific's decision not to file an IPR as evidence that the '296 Patent was valid. (*Id.* 954:14-955:7.) Plaintiffs' counsel again denigrated the universally accepted hypothetical negotiation approach as merely a "fantasy." (*Id.* 1261:3-15.) Counsel told the jury his opinion that Boston Scientific's case was "unwinnable," and its positions were "silly," "ridiculous," and "complete nonsense." (*Id.* 936:12-19; 943:3-944:5; 947:24-948:1; 1258:11; 1259:18.) And Plaintiffs improperly "[a]ppeal[ed] to the sympathy of jurors through references to financial disparity," *Draper*, 580 F.2d at 95, arguing that Boston Scientific "come[s] in here, little guy, you know what, you better not, you better not sue us, you better not, ***we'll bankrupt you***. . . You risk your entire company coming to a place like this." (Tr. 1258:15-20; 944:23-24.) These arguments appeal only to emotion and find no support in record evidence. The jury's decision could not reasonably be seen as unaffected by such brazen statements.

**Improper Arguments Outside Trial Record.** Beyond violating guardrails established by law and this Court's orders to assure a fair trial, Plaintiffs' closings violated the most basic tenet of trial practice: they went outside the trial record. *Ayoub v. Spencer*, 550 F.2d 164, 170 (3d Cir. 1977) ("Reversible error is committed when counsel's closing argument to the jury introduces extraneous matter which has a reasonable probability of influencing the verdict."); *Reed v. Philadelphia, Bethlehem & New England R.R.*, 939 F.2d 128, 133 (3d Cir. 1991) (same).

For example, Plaintiffs argued multiple "facts" and conclusions about an agreement referred to as [redacted] —none of which appear anywhere in the trial record: (1) Boston Scientific would be willing to pay [redacted] for a coating technology (Tr. 1256:22-1257:11); (2) "[i]t was so good, the TissueGen invention, that they dumped the technology that they were willing to pay [redacted] for. We replaced [redacted]. That's what happened" (*id.* 1271:6-9); and (3) the

[redacted] agreement "was an exact apples to apples comparison of what they are willing to pay for a coating technology" (*id.* 1256:25-1257:2). Each of these arguments was presented exclusively and for the first time by counsel during closing. [redacted] was never admitted into evidence. No witness mentioned the agreement or testified concerning its technical or economic comparability to the facts of this case. In fact, Plaintiffs' own damages expert never mentioned [redacted] and admitted that he did not give any opinion at trial "that there is any other license involving the '296 patent that is economically comparable to a hypothetical negotiation in this case." (*Id.* 1157:12-18.) With no record evidence, Plaintiffs made up their own and presented it to the jury in closing. *Uniloc USA v. Samsung Elecs. Am.*, 2019 WL 2267212, at *13 (E.D. Tex. May 28, 2019) ("argument cannot substitute for an absence of admissible evidence demonstrating that the licenses are comparable."); *Resqnet.com, v. Lansa*, 594 F.3d 860, 872 (Fed. Cir. 2010) (vacating damages when "[expert] did not even attempt to show that these agreements embody or use the claimed technology or otherwise show demand").

Plaintiffs also argued that a third-party license agreement relied on by Boston Scientific's damages expert was distinguishable based on third-party profit margin information. (*Id.* 1269:21-24.) Counsel admitted that such argued "facts" were "not in evidence." (*Id.* 1270:1.) Regarding willfulness, Plaintiffs' counsel also told the jury that Moynihan forwarded TissueGen information she received "to the senior vice president" and "president of endovascular, [and] the business development cardiology rhythm" (*id.* 1270:18-1271:2), but this too was nowhere in the record.

As a final example, during both Phase 1 and Phase 2 closings, Plaintiffs argued "facts" outside the trial record to undercut the credibility of Boston Scientific's witnesses. He argued that co-inventor Delia Dahm was "a paid Boston Scientific consultant" (*id.* 1000:17-18), and that Boston Scientific's physician expert had the CEO's number on his cell phone (*id.* 1259:13-15).

There was no evidence in the trial record to support either "fact," but that did not stop Plaintiffs.

Plaintiffs' blatant and persistent violation of such elementary trial practice far exceeded a reasonable probability of influencing the verdict. *Ayoub*, 550 F.2d at 170; *Reed*, 939 F.2d at 133.

* * *

Plaintiffs' misconduct contaminated both phases of trial. In view of the foregoing, "it is [beyond] 'reasonably probable'" that Plaintiffs' "prejudicial remarks influenced the jury's verdict," *Vectura*, 981 F.3d at 1042, and "substantial trial errors were made," *Bullen*, 336 F. Supp. 2d at 347. A new trial is warranted for these reasons and because, as established in the section below, the "verdict is against the clear weight of the evidence." *Id.*

### B. The Court Should Grant Judgment As A Matter Of Law Under Rule 50(b).

Plaintiffs resorted to the improper tactics described above to encourage the jury to decide the case based upon bias, prejudice and emotion, not record evidence. The evidence does not support Plaintiffs' case and Boston Scientific is entitled to JMOL. JMOL is appropriate when "a reasonable jury would not have had a legally sufficient evidentiary basis to find for the party on that issue." *Idenix Pharms. v. Gilead Scis.*, 941 F.3d 1149, 1153-54 (Fed. Cir. 2019).

#### 1. Song Anticipates the Asserted Claims as a Matter of Law.

Plaintiffs' expert conceded that Song anticipates the asserted claims. There is ***no record evidence*** that supports the jury's finding otherwise. This is dispositive regarding Boston Scientific's invalidity JMOL. Song discloses each element of the asserted claims, arranged in order, as explained by Mooney at trial. (Tr. 770:4-785:21.) As to claim 1, Song discloses that its "invention is a fiber having a support matrix" (Ex. 6, 2:35-39; Tr. 774:11-776:21), "made up of wall material" (Ex. 6, 2:35-37; Tr. 777:1-19), that "can be any spinnable synthetic or natural polymer" (Ex. 6, 5:1-2; Tr. 777:1-19), including "biodegradable polymers" (Ex. 6, 1:13-14; 5:10-12; Tr. 775:16-22). Further, "[a]n active agent is dispersed throughout the support matrix" (Ex. 6,

2:38-39; Tr. 777:20-778:8), that "can be . . . drugs . . . pharmaceuticals" or other example agents (Ex. 6, 4:32-66; Tr. 779:25-780:18), and Song requires that "[t]he active agent and wall material . . . ***must be immiscible with each other***" (Ex. 6, 5:5-9; Tr. 779:4-24). As to the dependent claims, Song teaches that its agents may be "anti-inflammatory substances" or "anti-coagulants" (Ex. 6, 4:32-66; Tr. 782:5-17), that such agents are "gradually released from the fiber" (Ex. 6, 1:61-65; Tr. 783:5-784:22), and contains examples of biodegradable polymers including "polyglycolic acid" (Ex. 6, 5:10-18; Tr. 782:18-783:4). Plaintiffs "did not contradict that testimony on cross-examination or otherwise." *Imperium IP Holdings v. Samsung Elec.*, 757 F. App'x 974, 978 (Fed. Cir. 2019) (reversing denial of JMOL of anticipation).

While Plaintiffs' expert, Pitt, initially argued that Song was not anticipatory for three specific reasons,[2] he later ***recanted*** that testimony on cross-examination after being impeached by his prior deposition testimony. Pitt conceded his prior admissions that Song discloses each limitation of the asserted claims that he had initially told the jury was missing:

- "I think one of [Song's] examples is using a biodegradable polymer, and the second phase is solely and only the therapeutic agent." (Tr. 911:10-21.)
- "The second phase is immiscible with the first phase, which is the polymer, and in some cases that could be biodegradable." (*Id.* 912:16-23.)
- "Well, I interpret that as meaning that the phase is active agent is immiscible with the phase that is the wall material." (*Id.* 913:22-914:9.)

At trial, Pitt left no doubt that he "[did not] have any problem" with the jury relying on his prior sworn testimony that supported a finding of anticipation (*id.* 914:10-22), which therefore became "a part of his oath-supported court-given testimony . . . admissible as substantive evidence for all

[2] Pitt also sought to distinguish Song on the basis that it did not concern stents (Tr. 896:11-18; 897:6-8), the method of releasing active agent was different (*id.* 896:19-22; 897:24-899:6; 900:21-901:8), and it teaches "contiguous" channels of agent (*id.* 900:8-20; *see* Exs. 3C-D). ***These are not claim limitations***. *See MobileMedia Ideas v. Apple*, 780 F.3d 1159, 1172 (Fed. Cir. 2015) (reversing JMOL denial where expert offered "only testimony unrelated to the actual limitation[s]"); *Melchior v. Hilite Int'l*, 665 F. App'x 894, 899 (Fed. Cir. 2016) ("[P]rior art cannot be distinguished on the ground that it lacks features that are not claim limitations.").

purposes." *United States v. Carter*, 417 F.2d 229, 231 n.8 (3d Cir. 1969).

In the face of Pitt's testimony, which affirmed Mooney's anticipation opinion, a reasonable jury could not have found the '296 Patent to be not anticipated. *See Power Integrations v. Fairchild Semiconductor Int'l*, 843 F.3d 1315, 1337-38 (Fed. Cir. 2016) (reversing denial of JMOL of anticipation where expert admitted presence of limitation in prior art). That evidence also makes it all the more likely that the jury was swayed by inappropriate considerations, such as Plaintiffs' IPR arguments, attempt to denigrate Song as a "bubble gum patent" (Tr. 855:22-23), and arguments that the standard for proving invalidity is akin to the standards to "involuntarily admit you to a psychiatric hospital" or "to take your kids away" (*id.* 105:21-23; 106:6-9).

**2. The Asserted Claims Lack Written Description Support as a Matter of Law.**

JMOL is also required here because no reasonable jury could find written description support. (*See* Tr. 763:6-769:6.) Mooney explained that the specification contains no description of a fiber with two immiscible phases. It does not: (1) include the word "immiscible"; (2) address the concept of immiscible phases; or (3) disclose figures, examples, descriptions, or data related to immiscible phases in a fiber. (*Id.* 763:14-764:3; 765:9-766:21; 767:23-769:13.) There is no evidence that a POSA would have recognized the disclosure of "immiscible" phases in a fiber (*id.* 767:2-19)—a term added to the claims years after the application was filed (*id.* 763:14-764:3). The purpose of the written description requirement is to convey to those skilled in the art, with reasonable clarity, that the applicants were in *possession* of the invention as of the filing date. *Ariad Pharm. v. Eli Lilly*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc). The specification must show the "inventor actually invented the invention claimed." *Id.* Here, the lead inventor, Nelson, testified he did not know what "immiscible" meant. (Tr. 272:5-7; 457:23-458:3; 890:23-25.)

Plaintiffs attempted to fill the gap in the written description through their expert Pitt, but the best Pitt was able to do was to present an argument that directly contradicted Plaintiffs' prior

positions. Plaintiffs' infringement theory was premised on the argument that immiscibility of substances did not mean immiscibility of phases. Plaintiffs successfully moved to preclude Boston Scientific from offering evidence regarding the immiscibility of substances by arguing that it would circumvent the Court's construction and confuse the jury. (*See, e.g.*, D.I. 266-17, 4.) In contrast, for written description, Plaintiffs elicited Pitt's testimony relying on examples of ***substances*** as evidence of written description of ***phases***. Three of Pitt's four examples of alleged written description support identified ***substances used in manufacturing*** a fiber—***not phases*** in a ***final fiber***. (*See* Tr. 890:9-13 (liquid substances; not phases); 890:15-19 (solvent with hydrogel and liquid chloroform substances); 891:6-9 (substances in an emulsion used to make a fiber).)[3] Pitt's fourth example is even less helpful to Plaintiffs—it concerns neither substances nor phases. That example describes a solid fiber in an aqueous solution. (*Id.* 890:20-891:5.) There is no evidence to counter Mooney's testimony that a POSA would not have understood the inventors possessed a fiber with two immiscible phases. There is no teaching in the specification that any of Pitt's examples include immiscible phases in a fiber. On this record, a reasonable jury would have been compelled to find the asserted claims invalid for lack of written description support. *See LG Elecs. v. Whirlpool*, 798 F. Supp. 2d 541, 559 (D. Del. 2011) (granting new trial on invalidity for lack of written description but stating preference to grant JMOL had it been preserved).

#### 3. No Reasonable Jury Could Have Found Infringement Because the Synergy Stents Do Not Include a "Fiber" as Construed by the Court.

The Court construed "fiber" to mean "a thread-like structure of any length or shape." (D.I. 255.) At trial, however, Plaintiffs employed their own unique constructions of "fiber," and

[3] Plaintiffs' attempt to show written description is undermined by their infringement arguments that only immiscibility of the final formed fiber is relevant. (Tr. 93:6-21 ("It's not what happens during manufacture"); 570:15-17; 575:20-576:2; 579:14-20; 892:11-16.) *Amazon.com v. Barnesandnoble.com*, 239 F.3d 1343, 1351 (Fed. Cir. 2001) ("[C]laims must be interpreted and given the same meaning for purposes of both validity and infringement analyses.").

otherwise relied on evidence unrelated to Synergy and therefore not relevant to infringement. Critically, Pitt admitted that he ***never provided an opinion*** that the Synergy coating is thread-like:

> Q. Sir, at any point in this case, have you opined that the polymer coating on Boston Scientific's accused SYNERGY stents is thread-like? A. No. (Tr. 615:3-6.)

Rather, as explained above in IV.A.2., Pitt ignored the Court's construction and argued broadly that a "fiber" is something with more length than width (*id.* 626:2-4; Exs. 2F-2H)—an argument this Court rejected during the mini-*Markman* (D.I. 255 at 13). Plaintiffs' arguments at trial all followed that rejected length-to-width characterization, which Plaintiffs referred to broadly as a "threadlike shape." (*E.g.*, Tr. 342:20-343:3; 349:15-350:17; 350:24-351:13; 353:8-13; 355:8-14; 355:25-356:3; 358:4-6; 363:15-365:22; 552:25-553:3; 591:18-20; 592:13-593:17; 595:7-16.) Because "[n]o party may contradict the court's construction to a jury," *Exergen*, 575 F.3d at 1321, all evidence based on this "incorrect understanding of the claim construction" must be disregarded, *Cordis v. Bos. Sci.*, 658 F.3d 1347, 1357 (Fed. Cir. 2011).

Plaintiffs' other infringement argument failed to compare the actual features of "the accused device" to the asserted claims, and therefore cannot support the jury's verdict. *Akzo Nobel Coatings v. Dow Chem.*, 811 F.3d 1334, 1341 (Fed. Cir. 2016). First, as explained in IV.A.2., Plaintiffs' infringement case focused on irrelevant Strickler and Weber applications—not the accused product—that cannot be used to prove infringement. (Tr. 493:2-16 (Chen testifying Strickler is "not relevant" to Synergy); 735:4-741:21 (Mooney explaining Strickler/Weber are not relevant to Synergy); 639:12-23 (Pitt conceding he is not aware of actual device relating to Strickler/Weber).) Second, Plaintiffs relied on evidence related to the "shape" of a hypothetical "particulate" that could break off from the Synergy coating, which has no bearing on whether the actual Synergy coating constitutes a fiber. (Exs. 2I-2K; Tr. 341:1-3; 370:2-371:3; 730:21-731:7.) Third, Pitt relied on mock-ups of "what the polymer fiber ***might look like*** if it was removed from

the Synergy stent." (*Id.* 595:25-596:3.) He cut the models into pieces that he described as "thread-like" shapes. (*Id.* 598:10-599:1.) But this has nothing to do with whether the unadulterated Synergy coating has a "threadlike structure." Infringement must be assessed based on the accused product ***as it actually exists***—not an altered version. *Drexelbrook Controls v. Endress-Hauser*, 989 F.2d 1201 (Fed. Cir. 1993) (overturning denial of JMOL where expert testified about "an altered version of the accused device with the rivet removed," and instructing that "a finding of infringement cannot be based on an altered device").

Aside from those extraneous arguments, Plaintiffs presented only conclusory assertions by Pitt that the coating is "thread-like." (Tr. 557:11-15; 595:23-24.) This is insufficient to sustain the jury's verdict. *See Yoon Ja Kim v. ConAgra Foods*, 465 F.3d 1312, 1320 (Fed. Cir. 2006) (affirming JMOL of no infringement where expert provided "conclusory testimony" and "presented no testimony based on the accused products themselves"); *see also MobileMedia*, 780 F.3d at 1172. On this record, no reasonable jury could have found that Synergy includes a "fiber."

**4. No Reasonable Jury Could Have Found Infringement Because the Synergy Stents Do Not Include "Immiscible" Phases.**

Plaintiffs also failed to adduce sufficient evidence that would have allowed the jury to find "immiscible" phases in the Synergy coating. As discussed above in IV.A.2., Pitt opined that the term "immiscible" imposes a requirement that the first and second phases be incapable of ***forming a "single phase."*** (Tr. 653:21-654:4; 654:24-655:1; 903:12-15.) Pitt, for example, repeatedly argued that the Synergy coating met the "immiscible" limitation based on his visual observation that the drug- and polymer-rich domains had not formed a "single phase." (*See, e.g.*, *id.* 564:20-565:8; 566:14-16; 566:21-567:3; 577:23-578:2; 651:11-653:17.) But the Court's construction of "immiscible"—"incapable of dissolving into one another"—did not include a "single phase" requirement. Thus, the entirety of Pitt's testimony on this issue was at odds with the binding,

agreed-upon construction of "immiscible," and must be disregarded. *See Minerva Surgical v. Hologic*, 2021 WL 3048447 at *6 (D. Del. July 20, 2021); *Exergen*, 575 F.3d at 1321.

The ***only testing in the record*** demonstrated that the materials in the purported first and second phases—PLGA and everolimus—were miscible, albeit slightly. (*Id.* 575:20-576:2; 658:2-8; 751:9-761:25; Ex. 7.) Based on that testing, as well as other evidence, Mooney testified that under the Court's construction of "immiscible," the Synergy coating does not have "immiscible" first and second phases. (Tr. 742:2-762:7.)

**5. No Reasonable Jury Could Have Found That Plaintiffs Presented Sufficient Evidence to Support Their Damages Theory.**

At trial, Plaintiffs singularly pursued damages based on an invalid apportionment opinion by Dr. Garratt attributing anywhere from "at least 90%" to "100%" of the incremental value to the "bioabsorbable polymer" or "biodegradable fiber coating." (Tr. 1125:15-1126:2, 1163:9-12, 1165:3-8.) Garratt's testimony was the main basis for Plaintiffs' damages expert's opinions. (Tr. 1097:11-14; 1108:5-10; 1111:21-1112:2; 1125:19-23; 1135:3-6, 15-19.) "[A] patent owner may waive its right to a damages award when it deliberately abandons valid theories of recovery in a singular pursuit of an ultimately invalid damages theory." *TecSec v. Adobe*, 978 F.3d 1278, 1291 (Fed. Cir. 2020). Multiple critical defects invalidate Plaintiffs' damages theory.

First, Federal Circuit law requires a patent owner to establish the "incremental value that the ***patented invention*** adds to the end product." *Ericsson v. D-Link Sys.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014). Here, the patented invention is a "biodegradable polymer fiber" that "is composed of a first phase and a second phase, the first and second phase ***being immiscible***, and wherein the second phase comprises one or more therapeutic agents." (D.I. 1-1, cl. 1.) Plaintiffs' damages case presented at trial focused solely on the value of the biodegradability of the fiber and was silent on the value of the immiscibility of the fiber's phases. Plaintiffs' damages fail for this reason alone.

Second, no reasonable jury could have relied on Garratt's conclusory and speculative "at least 90%" to "100%" apportionment opinion, which is set forth ***in its entirety*** below:

> Q. If you were asked to determine what percentage of the difference between a SYNERGY stent on one hand and a Promus stent on the other hand, should be attributed to that biodegradable fiber coating, about how much would you say?
> A. It would be a significant majority; 90 percent at least. (Tr. 1165:3-8.)

Garratt testified that he did not talk to anyone about this and did not conduct any survey to arrive at his apportionment figure. (*Id.* 1166:12-21; 1167:3-1168:6.) Garratt's "vague qualitative notions of the relative importance" of the Synergy stent's biodegradable coating, devoid of any studies or surveys, and agnostic as to whether such a coating had immiscible phases, is not a proper apportionment. *LaserDynamics v. Quanta Computer*, 694 F.3d 51, 69 (Fed. Cir. 2012).

In view of these defects, no reasonable jury could have found sufficient evidence supporting Plaintiffs' damages. The Federal Circuit has "observed that there can be an award of no damages where none were proven" such as in this case. *TecSec*, 978 F.3d at 1291.

**6. No Reasonable Jury Could Have Found Willful Infringement.**

"To establish willfulness, a patentee must show that the accused infringer had a ***specific intent to infringe*** at the time of the challenged conduct." *BASF Plant Sci. v. Commonwealth Sci. & Indus. Rsch. Organisation*, 28 F.4th 1247, 1274 (Fed. Cir. 2022). Plaintiffs presented no evidence that Boston Scientific had a specific intent to infringe the '296 Patent.[4]

Instead, Plaintiffs presented evidence pertaining to a separate question—whether Boston Scientific had ***knowledge*** of the '296 Patent. "Knowledge of the asserted patent," however, is "***not sufficient***" for "a finding of willfulness," *Bayer Healthcare v. Baxalta*, 989 F.3d 964, 988 (Fed. Cir. 2021), as a matter of law. None of Plaintiffs' "knowledge" evidence addressed infringement, specific intent or even mentioned the accused product: (1) TissueGen showed Boston Scientific

[4] Plaintiffs also never alleged willful infringement based on a theory of willful blindness.

personnel a presentation ("Archer Presentation") citing the '296 Patent on one slide in the context of peripheral stents (not coronary stents like Synergy), (Tr. 1207:10-1208:24, 1216:20-1218:7), and (2) Boston Scientific was allegedly interested in TissueGen's technology based on emails between Moynihan and Nelson, (*id.* 1209:6-1210:3). Plaintiffs presented no evidence that anyone who developed Synergy had knowledge of the Archer Presentation or the '296 Patent or that anyone searched for, obtained, or reviewed the '296 Patent. As set forth in IV.A.3., Plaintiffs tried to fill these gaps with attorney argument, which should be disregarded. (*Id.* 1063:10-12, 1063:20-1064:3, 1270:11-1271:9); *Finjan v. Symantec*, 2013 WL 5302560, at *25 (D. Del. Sept. 19, 2013), *aff'd*, 577 F. App'x 999 (Fed. Cir. 2014) ("attorney argument does not constitute evidence").

Plaintiffs' failure to provide evidence of specific intent to infringe is underscored by the summary judgment record. Plaintiffs opposed summary judgment of no willful infringement by relying on testimony they expected to elicit from Pitt and Chen at trial. (D.I. 214, 26-28.) The Court credited that anticipated testimony and denied Boston Scientific's motion because "a rational juror could credit Pitt's report that the concepts Nelson presented to Moynihan and Ballinger were 'indistinguishable' from those in the Accused Products" and "credit Pitt's and Chen's combined testimony to conclude that BSC was using this 'indistinguishable technology that met limitations specified in the '296 patent." (D.I. 243, 14-15.) Plaintiffs ***did not present any*** of this testimony at trial. Neither Pitt nor Chen testified in Phase 2. Nelson admitted that the Archer Presentation disclosed completely biodegradable, peripheral stents—not metal coronary stents with a biodegradable coating like Synergy. (Tr. 1214:22-24.) Under the evidence presented at trial, no reasonable jury could find willful infringement.

## V. CONCLUSION

For these reasons, Boston Scientific requests that the Court grant a new trial, or in the alternative, grant JMOL on the issues of infringement, invalidity, willfulness, and damages.

Dated March 15, 2023

Respectfully submitted,

FARNAN LLP

/s/ *Michael J. Farnan*

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
Tel. (302) 777-0300
Fax (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Chad Drown (*pro hac vice*)
Timothy E. Grimsrud (*pro hac vice*)
Katherine S. Razavi (*pro hac vice*)
Lauren J.F. Barta (*pro hac vice*)
Doowon R. Chung (*pro hac vice*)
N. Chethana Perera (*pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Telephone: (612) 766-7000
Facsimile: (612) 766-1600
chad.drown@faegredrinker.com
tim.grimsrud@faegredrinker.com
kate.razavi@faegredrinker.com
lauren.barta@faegredrinker.com
doowon.chung@faegredrinker.com
chethana.perera@faegredrinker.com

David J.F. Gross (*pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
1950 University Avenue, Suite 450
East Palo Alto, CA 94303
Telephone: (650) 324-6700
Facsimile: (650) 324-6701
david.gross@faegredrinker.com

Evan J. Kline-Wedeen (*pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
320 S. Canal Street, Suite 3300
Chicago, Illinois 60606
Telephone: (312) 569-1000

Michael P. Kahn (*pro hac vice*)
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park,
Bank of America Tower
New York, NY 10036-6745
Telephone: (212) 872-1000
mkahn@akingump.com

Rachel J. Elsby (*pro hac vice*)
AKIN GUMP STRAUSS HAUER & FELD LLP
Robert S. Strauss Tower
2001 K Street, N.W.
Washington D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
relsby@akingump.com

Facsimile: (312) 569-3000
evan.kline-wedeen@faegredrinker.com

Christopher J. Burrell (*pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
1500 K Street NW, Suite 1120
Washington, D.C. 20005
Telephone: (202) 842-8800
Facsimile: (202) 842-8465
chris.burrell@faegredrinker.com

***Attorneys for Boston Scientific Corporation***

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM, and TISSUEGEN, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>BOSTON SCIENTIFIC CORPORATION,<br><br>Defendant. | Case No. 18-392-GBW<br><br>**FILED UNDER SEAL** |

**DECLARATION OF MICHAEL J. FARNAN IN SUPPORT OF BOSTON SCIENTIFIC'S MOTIONS FOR NEW TRIAL AND JUDGMENT AS A MATTER OF LAW**

I, Michael J. Farnan, declare as follows:

1. I am an attorney at Farnan LLP in Wilmington, Delaware. I am one of the lawyers representing Boston Scientific Corporation ("Defendant") in connection with the above-referenced action. This declaration is made on my personal knowledge and belief, and I could and would testify competently as to the contents if called as a witness.

2. During the January 12, 2023 Pretrial Conference, the Court instructed the parties to notify the Court of any objections to witnesses, deposition designations, or other evidence to be presented via joint letter. (Pretrial Conference Hrg. Tr. at 12:1-7.) Pursuant to the Court's instruction, the parties submitted joint letters regarding objections on January 25, 26, 27, 30, and 31.

3. Attached hereto as **Exhibit 1** is a true and correct copy of the parties' January 25, 2023 joint letter to the Court regarding objections to demonstratives, exhibits, and deposition designations.

4. Attached as **Exhibit 1A** is a true and correct copy of Plaintiffs' Opening Demonstrative Slides that were exchanged.

5. Attached as **Exhibit 1Ai** is a true and correct copy of a video file used in Slide 49 of

*Board of Regents, the University of Texas System and TissueGen, Inc. v. Boston Scientific Corporation*, Case No. 18-392-GBW (D. Del.)

# EXHIBIT 1Ai

## Slip Sheet for Slide 49 Video of Plaintiffs' Opening Demonstratives

*Board of Regents, the University of Texas System and TissueGen, Inc. v. Boston Scientific Corporation*, Case No. 18-392-GBW (D. Del.)

# EXHIBIT 1Aii

## Slip Sheet for Slide 51 Video of Plaintiffs' Opening Demonstratives

*Board of Regents, the University of Texas System and TissueGen, Inc. v. Boston Scientific Corporation*, Case No. 18-392-GBW (D. Del.)

# EXHIBIT 3

## January 27, 2023 Joint Letter

**Plaintiffs' Objections to Boston Scientific's Demonstratives:**

The following objections need to be resolved by the Court before the examination of Dr. Mooney.

| **Defendant's Proposed Demonstrative Number (Dr. Mooney)** | **Plaintiffs' Objections to Plaintiffs' Proposed Demonstratives (Dr. Mooney)** | **BSC's Response** |
|---|---|---|
| Slide 19-20, 44-46 | FRE 401, 402, 403, Claim construction order, Plaintiff's MIL #3. BSC suggests that a "fiber" must include a particular type of polymer (i.e. one with a crystalline structure). These statements relate to BSC's prior arguments relating common molecular chain orientation. These arguments were previously rejected and has never found the term "fiber" to be limited only to crystalline polymers. Slides 45 and 46 are improper because they state an opinion of "No Polymer Fiber" based on this impermissible reasoning. | These topics are in direct rebuttal to Dr. Pitt's anticipated infringement opinions on the "fiber" limitation. For example, in their opening, Plaintiffs already told the jury that Synergy has "the same polymer listed in the patent" and "the same polymer coating on the outside that forms a fiber." (Trial Day 1 Tr. at 97:9-12), and BSC anticipates they will do the same with their expert.<br><br>Slides 19-20, 44-46 do not state that a particular type of polymer is required to form a polymer, nor do they state that "common molecular chain orientation" is a claim limitation. Instead, these slides set forth "some examples of polymer suitable for making a polymer fiber" and discuss exemplary attributes of polymers, such as whether they are "amorphous" or "crystalline," as part of that explanation. (*See* slides 19-20.) Slide 44 then explains that "Synergy uses amorphous polymer." The polymer on the Synergy stent is amorphous due to the combination of D,L lactide used to formulate the polymer, which is part of why the polymer coating on Synergy does not form a fiber.<br><br>In addition, Slides 45-46 are clearly relevant and not unduly prejudicial because they explain part of the investigation that Dr. Mooney did to evaluate whether the Synergy coating is a polymer fiber, including "whether the Synergy stent shows any indication of polymer fibers," "what polymer was used to make BSC's coating solution," and "what manufacturing process was |

| | | |
|---|---|---|
| | | of whether Boston Scientific's coating process causes the polymer not to form a fiber.<br>(Final Pretrial Conference Tr. Hrg. at 65:12-14 (ruling that "Boston Scientific may argue that the accused products manufacturing process causes its polymer coating not to form a thread-like structure.").)<br><br>These inventors are able to testify regarding their personal understanding of examples of how fibers may be formed, just as Dr. Nelson did. Moreover, Dr. Nelson testified that these other inventors contributed to the asserted patent. Such testimony is factual testimony from an inventor, not expert testimony.<br><br>Moreover, such inventor testimony should be allowed to be played for the jury. But even if it is not, experts are allowed to rely on hearsay. *Allscripts Healthcare, LLC v. Andor Health, LLC*, Civ. No. 21-704-MAK, 2022 WL 17403121, at *2 (D. Del. Aug. 9, 2022) (Plaintiff's expert "may rely upon hearsay to form the basis of his opinion if the hearsay is of the kind normally employed by experts in the field."). |
| Slide 71-73 | FRE 401, 402, 403, Claim construction order, Plaintiff's MIL #3. This compilation of various statements by Dr. Pitt is misleading to the jury. All of these statements were from prior to the Court issuing it final claim construction. Both Dr. Pitt and Dr. Mooney are required to follow and apply the Court's claim construction. Furthermore, some of these select out of context quotes seem to suggest a method of manufacture requirement, which has already been squarely rejected by the Court. | These topics are in direct rebuttal to Dr. Pitt's anticipated infringement opinions on the "fiber" limitation.<br><br>For example, Dr. Pitt opined that "[a]n ordinary artisan would have known that of the many different types of polymers, most can be made into useful films or used to make molded articles, but ***only a few can be made into useful fibers***." (*See* Slide 71.) The fact that not all polymers "can be made into useful fibers" is probative to the factual issue of whether the polymer used in the Synergy coating has been formed into a fiber.<br><br>As another example, Dr. Pitt opined that "[a]n ordinary artisan would have understood fibers are melt-spun, solution dry-spun, or solution wet-spun by extrusion from a spinneret head, and then |

| | | |
|---|---|---|
| | | pulled, stretched, conditioned, before being wound onto bobbins." (*See* Slide 72.) Dr. Pitt further opined that "Fibers (at least before they are cut) are long, threadlike monofilament and multifilament structures that are spun by extrusion through a spinnerets or very fine holes, drawn, stretched . . ." (*See* Slide 73.) These examples of processes for making a polymer fiber—from Plaintiffs' own expert—are probative to the factual issue of whether Boston Scientific's manufacturing process causes the polymer not to form a fiber. (Final Pretrial Conference Tr. Hrg. at 65:12-14 (ruling that "Boston Scientific may argue that the accused products manufacturing process causes its polymer coating not to form a thread-like structure.").) |

## Boston Scientific's Objections to Plaintiffs' Exhibits:

The following objections need to be resolved by the Court before the examination of Dr. Pitt. In particular, Boston Scientific objects to Dr. Pitt's exhibits that seek to change, dispute, or construe the Court's governing Claim Construction Orders in this matter.

**PTX137: IUPAC Compendium of Chemical Terminology, Definition of "Immiscibility"**

Boston Scientific's Objection: contrary to the Court's Claim Construction Orders.

Boston Scientific objects to PTX137, which is a ***definition*** of "immiscibility" that states "***Inability of a mixture to form a single phase***." PTX137 should be excluded because it seeks to change, dispute, and re-construe the Court's governing construction of "immiscible" as "incapable of dissolving into one another"—a construction that Plaintiffs agreed to during claim construction. D.I. 90 at 1. In addition, to the extent the Court excludes PTX137, the Court should also exclude Plaintiffs' designation for Smith at 80:22-82:16, which also discusses the IUPAC definition of immiscibility.

**PTX143: IUPAC Compendium of Chemical Terminology, Definition of "Dissolution"**

Boston Scientific's Objection: contrary to the Court's Claim Construction Orders.

Boston Scientific objects to PTX143, which is a definition of "dissolution" that states "The mixing of two phases with the formation of one new homogenous phase (i.e., the solution)." Plaintiffs intend to use this definition to alter, or further construe, the Court's governing construction of "immiscible" as "incapable of ***dissolving*** into one another." D.I. 90 at 1. Therefore, PTX143 should

be excluded because it seeks to alter, or further construe, the Court's governing construction of "immiscible."

**PTX147: The Language of Colloid and Interface Science: A Dictionary of Terms**

Boston Scientific's Objection: contrary to the Court's Claim Construction Orders.

Boston Scientific objects to PTX147, which includes a definition of "Continuous Phase" to mean "In a colloidal dispersion, the phase in which another phase of particles, droplets, or bubbles is dispersed." PTX147.5. Plaintiffs intend to use this definition to argue that the term "first phase" refers to a continuous phase. But "continuous phase" is not a part of the Court's governing construction of "first phase" as "the polymer portion of the fiber," which is a construction that Plaintiffs also agreed to during claim construction. D.I. 90 at 1. PTX147 also includes definitions of "Discontinuous Phase" and "Dispersed Phase." PTX147.6. As indicated by the red tabs in PTX147, Plaintiffs intend to use this definition to alter, or further construe, the Court's governing construction of "second phase" as "the discrete drug-containing regions ***dispersed*** throughout the fiber," which Plaintiffs also agreed to during claim construction. D.I. 90 at 1. Plaintiffs intend to use these definitions to argue that "dispersed" requires a "phase that is distributed, in the form of particles, droplets, or bubbles, in a second, immiscible phase that is continuous." PTX147 at PTX147.6. Therefore, PTX147 should be excluded because it seeks to alter, or further construe, the Court's governing constructions of "first phase" and "second phase."

**PTX146: The Use of Nomenclature in Dispersion Science and Technology**

Boston Scientific's Objection: contrary to the Court's Claim Construction Orders

Boston Scientific objects to PTX146, which includes definitions of "continuous phase," "dispersed phase," and "dispersion." *See* PTX146.10.PTX146 defines "continuous phase" as "Constituting the medium, a phase that exhibits continuity throughout the dispersion" and "dispersion" as "In general, a two-phase system in which discontinuities of any kind (solid, liquid, gas) are dispersed in a ***continuous phase*** of a different composition or state." PTX146.10 (emphasis in original). As discussed above with regards to PTX147, this discussion of "continuous phase" and "dispersion" is part of Plaintiffs attempt to alter, or further construe, the Court's governing constructions of "first phase" and "second phase." D.I. 90 at 1. Therefore, PTX146 should be excluded because it seeks to alter, or further construe the Court's governing constructions of "first phase" and "second phase."

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM and TISSUEGEN, INC., *Plaintiffs*, | ) | C.A. No. 1:18-cv-00392-GBW |
| v. | ) | |
| BOSTON SCIENTIFIC CORPORATION, *Defendant*. | ) | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO "DEFENDANT'S MOTION FOR A NEW TRIAL AND, IN THE ALTERNATIVE, MOTION FOR JUDGMENT AS A MATTER OF LAW"**

STAMOULIS & WEINBLATT LLC

Stamatios Stamoulis (No. 4606)
800 N. West Street, Third Floor
Wilmington, DE 19801
(302) 999-1540
stamoulis@swdelaw.com

*Counsel for Board of Regents, the University of Texas System and TissueGen, Inc.*

OF COUNSEL

THE SHORE FIRM
Michael W. Shore (*Pro hac vice*)
Chijioke E. Offor (*Pro hac vice*)
Alex Q. Jacobs (*Pro hac vice*)
901 Main Street, Suite 3300
Dallas, Texas 75202
(214) 593-9110
mshore@shorefirm.com
coffor@shorefirm.com
ajacobs@shorefirm.com

*Counsel for Board of Regents, the University of Texas System and TissueGen, Inc.*

SUSMAN GODFREY LLP
Brian D. Melton (*Pro hac vice*)
John P. Lahad (*Pro hac vice*)
Corey M. Lipschutz (*Pro hac vice*)
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
(713) 651-9366
bmelton@susmangodfrey.com
jlahad@susmangodfrey.com
clipschutz@susmangodfrey.com
*Counsel for TissueGen, Inc.*

evidence for permitting any different finding." *Amgen Inc. v. Hospira, Inc.*, 944 F.3d 1327, 1333 (Fed. Cir. 2019). BSC's JMOL fails.

### 1. Defendant failed to prove anticipation.

BSC relied on the Song patent as its sole allegedly anticipating reference. DTX 18; D.I. 326.24. To anticipate, Song must expressly or inherently disclose "all elements of a claimed invention arranged as in the claim," *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1334-35 (Fed. Cir. 2008), and "must enable one of ordinary skill in the art to make the [claimed] invention without undue experimentation," *Impax Labs., Inc. v. Aventis Pharms., Inc.*, 545 F.3d 1312, 1314 (Fed. Cir. 2008). This latter requirement means the reference must enable the claimed invention. *Impax*, 545 F.3d at 1312.

Despite acknowledging the need to show a "noncontiguous" second phase in Song (Tr. 778:6-15), BSC and its expert Dr. Mooney showed the jury (D.I. 347.1342-52) Figures 1 and 1A from Song, which illustrate embodiments of gradual release fibers where active agent is in a *contiguous* phase.[5] Song also discloses that, in the embodiments of Figures 1 and 1A, the drug

[5]*See* DTX 18.10 at 3:44-53 ("Another embodiment of a gradual release structure made in accordance with the present invention is illustrated in FIG. 1. In this embodiment the structure is in the form of a fiber 11 having a support matrix 12. The support matrix is made up of a wall material. An active agent 13 is dispersed throughout the support matrix and is in contact with itself forming a ***contiguous*** phase within the support matrix. The ends 14 and 15 of the support matrix have openings, exposing the active agent."); *see also* DTX 18.10 at 4:6-19 ("It is presently believed that the support matrix does not prevent the dissolution of the active agent because the active agent is in a *contiguous* phase. FIG. 1 and 1A. Rather, the support matrix serves to limit the rate of dissolution by restricting the area of active agent in direct contact with the solvent to the end of the channels within the support matrix. Thus, the solvent can gradually work its way into the fiber by following the *contiguous* phase of active agent."); *see also* DTX 18.10 at 3:63-4:5 ("As illustrated in FIG. 1A, the solvent first dissolves the active agent in the openings at the ends 14 and 15 of the support matrix. As this material is dissolved spaces or channels 13a in the support matrix are opened. The solvent fills these channels and begins to dissolve the newly exposed active agent, which was in contact with the now dissolved active agent located in the openings at ends of the support matrix. Thus, the length of the channels in the support matrix gradually increase as the active agent directly in contact with the solvent is dissolved.").

aspartame forms a *contiguous* phase within a support matrix of PVAc polymer.[6] Song distinguishes the embodiments of Figure 1 from 17% Aspartame in PVAc embodiments in which "the solid particles of Aspartame are isolated in the polymer" and cannot be released "without physical deformation of the polymeric structure." DTX 18.10 at 7:29-33.

At trial, Dr. Mooney did not testify that "PVAc" is a biodegradable polymer that breaks down chemically and mechanically over time.[7] Dr. Mooney did not identify a Song disclosure of any drug in a noncontiguous phase within a fiber composed of a biodegradable polymer. *See* Tr. 777:20-779:3. Dr. Mooney did not identify any Song disclosure of controlled release or variable release of any drug from a noncontiguous phase within a biodegradable polymer fiber.[8] Instead, Dr. Mooney pointed to Song Figure 1A and its disclosure of gradual release of a drug from a *contiguous* phase (D.I. 347.1352; Tr. 783:9-784:22). Dr. Mooney also testified that the varying rate of drug release was satisfied by Song because at some point the drug release would be zero when the drug ran out. Tr. 783:9-16, 853:21-854:13. That testimony alone destroyed Dr. Mooney's credibility.

Dr. Mooney did not point to any specific Song figure, embodiment, or disclosure of a fiber composed of a biodegradable polymer portion (i.e. where the polymer breaks down chemically and mechanically over time) with discrete drug-containing regions dispersed throughout the fiber.

---

[6] *See* DTX 18.12 at 7:19-38 (stating, among other things, "FIGS. 2 through 5 are SEPMs of fibers having 29% by weight Aspartame in PVAc that are prepared by the solution blending technique described above and extruded at 150° C. . . . At 29% loading, FIGS. 4 and 5, however, the solid particles of Aspartame form a contiguous phase as illustrated in FIG. 1. Thus, channels in the encapsulating structure are opened and the Aspartame is gradually released, until virtually none remains.").

[7] In its November 17, 2022 Claim Construction Order, the Court stated "[t]he Court would have construed 'biodegradable' as 'breaks down chemically and mechanically over time.'"

[8] In its November 17, 2022 Claim Construction Order, the Court stated "the written description [of the '296 patent] explains that the 'biodegradable polymer fiber' is 'capable of the controlled delivery of therapeutic agents[.]'" D.I. 255.18 n.5.

Nor did he show any disclosure of such a fiber capable of releasing drug at a variable rate over time. To remedy this deficiency, Dr. Mooney pointed to a few purely theoretical statements suggesting that a drug might not be in a contiguous phase. D.I. 347.1344; Tr. 778:6-779:3, 782:18-783:4. But Song lacks any example of an embodiment involving a biodegradable polymer with drug in a noncontiguous phase. Anticipation cannot be proven by picking and choosing disparate and unconnected statements from different embodiments to cobble together something never contemplated. *BlephEx, LLC v. Myco Industries, Inc.*, 24 F.4th 1391, 1400-02 (Fed. Cir. 2022) (instructing that "it is not enough that the prior art reference includes multiple, distinct teachings that the artisan might somehow combine to achieve the claimed invention to show anticipation").

Plaintiffs' expert Dr. Pitt provided his opinion that Song does not anticipate any of the claims. Song does not teach a drug in a noncontiguous phase within a fiber composed of a biodegradable polymer. Tr. 897:9-901:19. Song was distinguished by Dr. Pitt because Song discloses only the "gradual" non-varying release of drug from fibers composed of PVAc in a contiguous phase or contiguous channel. The '296 patent requires drug in a noncontiguous phase (i.e. discrete drug-containing regions) within a biodegradable polymer fiber. *Id.* Dr. Pitt did not "concede that Song anticipates the asserted claims." Whether Song suggests two immiscible phases or includes an example that uses a biodegradable polymer is not dispositive. As Dr. Pitt testified, Song fails to disclose those limitations together in an enabled embodiment where the second phase is noncontiguous (i.e., is composed of discrete regions) as claimed in the '296 patent. *BlephEx*, 24 F.4th at 1400-02.

In view of the expert testimony and the Song patent itself, the jury could have reasonably found that Song did not anticipate, and thus Defendant should be denied JMOL. The jury assessed credibility and had the right to believe Dr. Pitt, and discount Dr. Mooney's testimony, particularly

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM, and TISSUEGEN, INC.,

*Plaintiffs*,

v.

BOSTON SCIENTIFIC CORPORATION,

*Defendant*.

Case No. 18-392-GBW

**FILED UNDER SEAL**

**BOSTON SCIENTIFIC CORPORATION'S REPLY BRIEF IN SUPPORT OF ITS MOTIONS FOR A NEW TRIAL AND FOR JUDGMENT AS A MATTER OF LAW**

OF COUNSEL:

Chad Drown (*pro hac vice*)
Timothy E. Grimsrud (*pro hac vice*)
Katherine S. Razavi (*pro hac vice*)
Lauren J.F. Barta (*pro hac vice*)
Doowon R. Chung (*pro hac vice*)
N. Chethana Perera (*pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Telephone: (612) 766-7000
Facsimile: (612) 766-1600
chad.drown@faegredrinker.com
tim.grimsrud@faegredrinker.com
kate.razavi@faegredrinker.com
lauren.barta@faegredrinker.com
doowon.chung@faegredrinker.com
chethana.perera@faegredrinker.com

David J.F. Gross (*pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
1950 University Avenue, Suite 450
East Palo Alto, CA 94303

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE 19801
Tel. (302) 777-0300
Fax (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

DATED: April 26, 2023

"***noncontiguous***" phase of drug. (D.I. 354, 9-11.) But "noncontiguous" ***is not*** a claim limitation or part of any construction. As a matter of law, Song cannot be distinguished by a feature not required by the claims. *DDR Holdings v. Hotels.com*, 773 F.3d 1245, 1252-55 (Fed. Cir. 2014).[2] Moreover, Plaintiffs never sought a construction requiring "noncontiguous" phases and it "is too late at the JMOL stage to argue for or adopt a new and more detailed interpretation of the claim language and test the jury verdict by that new and more detailed interpretation." *Hewlett-Packard v. Mustek Sys.*, 340 F.3d 1314, 1320-21 (Fed. Cir. 2003). That said, if the claims had been construed to require a "noncontiguous" phase (they were not), Boston Scientific would still be entitled to JMOL. First, the Court would need to grant JMOL of ***no infringement*** because Plaintiffs presented no evidence at trial that Synergy includes a "noncontiguous" phase—no witness even uttered the word "noncontiguous" as to Synergy (likely because it is not actually a limitation).[3] Second, the Court would also need to grant JMOL of ***anticipation*** because Mooney presented clear and convincing evidence that Song teaches forming "contiguous" or "noncontiguous" phases in a fiber. (Tr. 777:20-779:3.)[4]

Plaintiffs' argument about whether Song discloses "controlled" or "variable" release is cabined to a single, dependent claim (Claim 26) and, in any event, also fails. (D.I. 354, 10.) Song unquestionably discloses the "released at varying rates over time" limitation of Claim 26, as

---

[2] Neither the claims nor the Court's claim construction orders (or the jury instructions) say anything about "noncontiguous." (*See* JTX001.28-29; D.I. 90; D.I. 255; D.I. 326, 21.)

[3] In another shocking twist, Plaintiffs assert in their motion for enhancement that Song and Synergy disclose "***the same configuration***" of phases. (D.I. 350, 15 n.6.) But under this logic, the Court must grant JMOL because this logic means Song/Synergy must either (1) ***lack*** immiscible phases (i.e., no infringement by Synergy), or (2) ***disclose*** immiscible phases (i.e., anticipation by Song).

[4] Unlike *BlephEx* where "multiple, distinct teachings" were combined, Song's "noncontiguous" teachings are explicit and a POSA "reading the reference, would 'at once envisage' the claimed arrangement or combination." *Blue Calypso v. Groupon*, 815 F.3d 1331, 1341 (Fed. Cir. 2016).

Mooney explained. (Tr. 783:5-784:22.) Plaintiffs' only response is the unexplained invective that Mooney somehow "destroyed" his credibility on this issue. Pitt ***did not even try*** to rebut Mooney on this issue. In fact, Pitt did not provide ***any*** testimony about "varying rates" or any dependent claims. (Tr. 896:11-901:22 (Pitt only addressing Claim 1).) Plaintiffs then fabricate the argument that Pitt distinguished Song based on disclosure of "'gradual' non-varying release of drug from fibers composed of PVAc." (D.I. 354, 11.) But Pitt never offered any such testimony.[5] Finally, with respect to enablement, Pitt conceded that Song is enabled (Tr. 909:1-7) and the prior art is presumed enabled, *Amgen v. Hoechst Marion Roussel*, 314 F.3d 1313, 1355 (Fed. Cir. 2003).

**B. The '296 Patent Is Invalid for Lack of Written Description.**

Plaintiffs similarly fail to identify a basis from which a reasonable jury could have found against Boston Scientific on written description. Mooney provided comprehensive testimony on this point with no meaningful counter by Plaintiffs. (*See* D.I. 346, 20-21.) Plaintiffs try to fault Mooney for not addressing certain figures and examples. That criticism is misplaced. Mooney testified that he considered ***all*** figures and examples in the '296 Patent and found that none provided written description support for immiscibility. (Tr. 763:6-769:6.)

Critically, Plaintiffs ***do not dispute*** that the only disclosures identified by Pitt are "fabrication examples," which address liquid ***substances*** used in ***making*** a fiber and not ***phases*** in a ***final fiber***. (D.I. 354, 13.)[6] As such, Pitt's testimony on written description is irrelevant because, as the Court repeatedly held, the claim requires immiscibility of ***phases***, not ***substances***. (*See* D.I. 243, 9 (holding that "immiscible" refers to phases, not substances); D.I. 288, 63:19-64:17 (same); *see also* D.I. 266-17, 4-5; Tr. 394:13-395:3.) Plaintiffs' arguments in this regard flatly contradict

[5] Whether a polymer "breaks down chemically and mechanically" is also irrelevant—the Court did not construe "biodegradable" and Pitt conceded that Song discloses biodegradable polymers.
[6] Pitt concedes that the "immiscible" phases must be present in the final fiber. (Tr. 892:11-16.)

their repeated arguments at trial and in their responsive brief that the miscibility of ***substances*** during manufacture is not relevant to the claims. Plaintiffs cannot take the opposite position in trying to avoid invalidity for lack of written description. *Amazon.com v. Barnesandnoble.com*, 239 F.3d 1343, 1351 (Fed. Cir. 2001) (claims are not a "nose of wax").[7]

Moreover, Plaintiffs' new argument that these examples "necessarily disclosed fabrication of fibers with the required immiscible phases" appears nowhere in the trial record. (D.I. 354, 13.) Pitt identified "emulsions" that were used in fiber manufacturing, i.e., before the fiber was formed. (Tr. 890:1-19, 891:6-22, 892:17-893:17.) There is no testimony from Pitt or any other witness that these emulsions resulted in a final fiber with immiscible phases as the claims require.[8] Plaintiffs cite testimony of co-inventor Nelson (D.I. 354, 13), but Nelson's testimony also concerned emulsions and "cannot establish written description support where none exists in the four corners of the specification." *Nuvo Pharms. v. Dr. Reddy's Lab'ys*, 923 F.3d 1368, 1381 (Fed. Cir. 2019).

### C. Plaintiffs Failed to Prove that Synergy Includes "Immiscible" Phases or a "Fiber" Under the Court's Claim Constructions.

Plaintiffs' response concerning infringement not only contradicts their invalidity argument, but also relies on a new and different claim construction of "immiscible." Plaintiffs' theory hinges on a purported requirement that the first and second phases are incapable of forming "a single phase" or "solution." (D.I. 354, 14.) This new argument requires an accused product to have "fully miscible" phases in order to avoid infringement. However, the formation of a "single phase" or "solution" is not a claim limitation. (*See* JTX001.28-29; D.I. 90; D.I. 255.) Even Pitt agrees. (Tr. 654:19-655:1, 903:12-15.) "Immiscible" "is an absolute" term that permits no dissolution. (*Id.*

[7] Plaintiffs wrongly accuse Boston Scientific of using one meaning for non-infringement and another for invalidity. Plaintiffs are using different meanings, and whichever is used, Boston Scientific prevails as to either non-infringement or invalidity.

[8] Notably, during prosecution, the Examiner rejected claims reciting an "emulsion" for lack of written description because "***the resultant fiber does not contain [a]n emulsion***." (PTX002.302.)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM, and TISSUEGEN, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>BOSTON SCIENTIFIC CORPORATION,<br><br>Defendant. | Case No. 18-392-GBW |

**NOTICE OF APPEAL**

Defendant Boston Scientific Corporation hereby appeals to the U.S. Court of Appeals for the Federal Circuit from the judgment in this case (D.I. 342), including as amended on June 28, 2024 (D.I. 372), and from all orders, opinions, decisions, and rulings prior to the entry of judgment.

Dated: July 3, 2024

Respectfully submitted,

FARNAN LLP

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
Tel. (302) 777-0300
Fax (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Michael P. Kahn (*pro hac vice*)
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park,
Bank of America Tower
New York, NY 10036-6745
Telephone: (212) 872-1000
mkahn@akingump.com

Rachel J. Elsby (*pro hac vice*)
AKIN GUMP STRAUSS HAUER & FELD LLP
Robert S. Strauss Tower
2001 K Street, N.W.
Washington D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
relsby@akingump.com

Timothy E. Grimsrud (admitted *pro hac vice*)
Chad M. Drown (admitted *pro hac vice*)
Katherine S. Razavi (admitted *pro hac vice*)
Lauren J.F. Barta (admitted *pro hac vice*)
Faegre Drinker Biddle & Reath LLP
2200 Wells Fargo Center
90 S. Seventh Street
Minneapolis, Minnesota 55402
(612) 766-7000
tim.grimsrud@faegredrinker.com

chad.drown@faegredrinker.com
kate.razavi@faegredrinker.com
lauren.barta@faegredrinker.com

Christopher J. Burrell (admitted *pro hac vice*)
Faegre Drinker Biddle & Reath LLP
1500 K Street NW, Suite 1100
Washington, DC 20005
(202) 230-5000
chris.burrell@faegredrinker.com

David J.F. Gross (admitted *pro hac vice*)
Faegre Drinker Biddle & Reath LLP
1950 University Avenue Suite 450
East Palo Alto, California 94303
(650) 324-6700
david.gross@faegredrinker.com

*Attorneys for Defendant Boston Scientific Corporation*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM and TISSUEGEN, INC., *Plaintiffs*, v. BOSTON SCIENTIFIC CORPORATION, *Defendant*. | ) | C.A. No. 1:18-cv-00392-GBW |

**PLAINTIFFS' NOTICE OF APPEAL**

Notice is hereby given that Plaintiffs Board of Regents, The University of Texas System ("UTBOR") and TissueGen, Inc. ("TissueGen") hereby appeal to the United States Court of Appeals for the Federal Circuit from the Amended Final Judgment (D.I. 372), entered in this action. Plaintiffs further appeal any and all Orders, rulings, findings, and/or conclusions of the Court adverse to Plaintiffs that comprise the judgment, in whole or part. Such rulings include, without limitation:

(1) the Court's Order (D.I. 369) entered on June 5, 2024 granting Defendant's Motion for Judgment as a Matter of Law of No Willful Infringement (D.I. 345) and denying Plaintiffs' Motion for Enhanced Damages (D.I. 349); and

(2) the Court's Memorandum Opinion (D.I. 368) entered on June 5, 2024 regarding the same.

The Federal Circuit has exclusive jurisdiction over this appeal because it is a civil action arising under one or more Acts of Congress relating to patents. 28 U.S.C. § 1295(a)(1); *see also* 28 U.S.C. § 1292(c)(2).

Respectfully Submitted,

*/s/ Stamatios Stamoulis*
Stamatios Stamoulis (#4606)
STAMOULIS & WEINBLATT LLC
800 N. West Street, Third Floor
Wilmington, DE 19801
Tel: (302) 999-1540
stamoulis@swdelaw.com

*Attorneys for Plaintiffs*

OF COUNSEL:

Michael W. Shore
THE SHORE FIRM
901 Main Street, Suite 3300
Dallas, Texas 75202
Tel: (214) 593-9110
mshore@shorefirm.com
*Attorneys for Plaintiffs*

Brian D. Melton
John P. Lahad
Corey M. Lipschutz
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Tel: (713) 651-9366
bmelton@susmangodfrey.com
jlahad@susmangodfrey.com
clipschutz@susmangodfrey.com

*Attorneys for Plaintiff*
*TissueGen, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that July 3, 2024, the foregoing was served via electronic mail upon counsel of record for the parties.

*/s/ Stamatios Stamoulis*
Stamatios Stamoulis

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM et al., | ) | Case No. 18-392-GBW |
| Plaintiffs, | ) | |
| v. | ) | |
| BOSTON SCIENTIFIC CORP., | ) | |
| Defendant. | ) | |

\- - - -

Wilmington, Delaware
Wednesday, January 25, 2023
*Trial Volume I*

\- - - -

BEFORE: HONORABLE GREGORY B. WILLIAMS
UNITED STATES DISTRICT COURT JUDGE

\- - - -

Michele L. Rolfe, RPR, CRR

APPEARANCES:

STAMOULIS & WEINBLATT LLC
BY: STAMATIOS STAMOULIS, ESQ.

-and-

SHORE CHAN DEPUMPO LLP
BY: CHIJIOKE OFFOR, ESQ.
COREY LIPSCHUTZ, ESQ.
MICHAEL SHORE, ESQ.

Counsel for Plaintiffs

FARNAN LLP
BY: MICHAEL FARNAN, ESQ.

-and-

FAEGRE DRINKER BIDDLE & REATH LLP
BY: TIMOTHY GRIMSRUD, ESQ.
CHAD DROWN, ESQ.
LAUREN BARTA, ESQ.
DAVID GROSS, ESQ.
KATHERINE RAZAVI, ESQ.
EVAN KLINE-WEDEEN, ESQ.

Counsel for Defendant

First, there may be facts or arguments that the examiner did not consider, such as prior art that was not located by the PTO or provided by the applicant. In addition, there is, of course, the possibility that mistakes were made or important information overlooked. Examiners have a lot of work to do, and no process is perfect.

Also, unlike a court proceeding, prosecution of a patent application takes place without input from people who might later be accused of infringement, so it is important that we provide a chance for someone who is accused of infringement to challenge the patent in court.

In deciding issues of infringement and validity, it is your job to decide the facts of the case. The judge will instruct you about the law, which may include the meaning of certain words or phrases contained in the patent.

So it is your primary duty as jurors to resolve any factual disputes, and in some cases, such as infringement and validity, to apply the law to those facts. To prove infringement, the patent holder must persuade you by what is called a preponderance of the evidence relating to the facts of the case, that the patent has been infringed. To prove invalidity, the alleged infringer must persuade you by what is called clear and convincing evidence that the patent is invalidity. The judge in your case will explain these and other terms and provide additional

instructions at the front time.

Good luck with your task and thank you for your service.

(End of video.)

THE COURT: All right. Ladies and gentlemen, let's talk about evidence. The evidence from which you are to find the facts consist of the following: The testimony of the witnesses; documents and other things received as exhibits; any facts that are stipulated, that is, formally agreed to by the parties; and facts that the Court takes judicial notice of and that I instruct you to take as true.

The following things are not evidence, and, again, I'll give you a copy of these instructions at some point: Statements, arguments, and questions for the lawyers for the party in this case. Objections by the lawyers. Any testimony that I tell you to disregard. And anything you may see or hear about this case outside of this courtroom. All those things are not evidence.

You must make your decision based only on the evidence that you see and hear in court. Do not let rumors, suspicions, or anything else that you may see or hear outside of court influence your decision in any way. You should use your common sense in weighing the evidence. Consider it in light of your everyday experience with people and events and give it whatever weight you believe it

deserves.

If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion. There are rules that control what can be received into evidence. When a lawyer asks a question or offers an exhibit into evidence, and a lawyer on the other side thinks that it is not permitted by the rules of evidence, that lawyer may object.

This simply means that the lawyer is requesting that I make a decision on a particular rule of evidence. You should not be influenced by the fact that an objection has been made. Objections to questions are not evidence. Lawyers have an obligation to their clients to make objections when they believe that evidence being offered is improper under the rules of evidence. You should not be influenced by the objection or by the Court's ruling on it. If the objection is sustained, ignore the question. If it is overruled, treat the answer like any other.

If you are instructed that some item of evidence is received for a limited purpose only, you must follow that instruction. Also, certain testimony or other evidence may be ordered struck from the record, and you will be instructed to disregard this evidence. Do not consider any testimony or other evidence that gets struck or excluded. Do not speculate about what a witness might have said or

to you nor you with them. In this way, any unwarranted and unnecessary suspicion about your fairness can be avoided.

If anyone should try to talk to you about the case, bring it to the Court's attention promptly.

Second, do not read or listen to anything touching on this case in any way. By that, I mean that if there is a newspaper or Internet article or television or radio report relating to this case, do not read the article or watch or listen to the report.

Third, do not try to do any research or investigate the case on your own. Let me elaborate: During the course of the trial, you must not conduct any independent research about the case, the matters of the case, and the individuals or indices of individuals in the case. In other words, you should not consult dictionaries or reference materials in print, electronic, or other format, or search websites or blogs on the Internet.

Also, again, should there happen to be a newspaper article or television or radio report relating to this case, do not read the article or watch or listen to the report.

It is important that you decide this case based solely on the evidence presented in the courtroom. Please do not try to find out information from any other sources. I know that many of you use cell phones, tablets, iPhones,

iPads, the Internet, and other tools of technology. You also must not talk to anyone about this case or use these tools to communicate electronically with anyone about the case. This includes your family and friends.

You may not communicate with anyone about the case on your cell phone, through e-mail, your tablet or iPhone or iPad, text messaging, on Twitter, through any blog or website, through any Internet chat room, or by way of any other social networking or media platforms, including Facebook, Twitter, LinkedIn, Instagram, TikTok, WeChat, WhatsApp, Snapchat, or YouTube.

Finally, do not form any opinion until all the evidence is in. Keep an open mind until you start your deliberations at the end of the case. I will give you detailed instructions on the law at the end of the case. And those instructions will control your deliberations and decision.

Let's talk about the course of the trial. The case will now begin. This trial has been split into two phases. The presentation of the evidence is currently scheduled to be completed by Tuesday, January 31, 2023.

First, each side may make an opening statement outlining their case. Opening statements are not evidence, but simply an outline to help you understand what each party expects the evidence will show.

Next, the parties will present their evidence. Plaintiffs, UTBOR and TissueGen, will present their witnesses and evidence in support of their claims. And Boston Scientific may cross-examine those witnesses.

When plaintiffs, UTBOR and TissueGen, are finished, Boston Scientific may present its witnesses and evidence. And plaintiffs, UTBOR and TissueGen, may cross-examine any witnesses presented by Boston Scientific.

Finally, plaintiffs, UTBOR and TissueGen, may offer rebuttal witnesses to Boston Scientific's claims and defenses.

After all the evidence is presented, the attorneys will offer closing arguments. The closing arguments are not evidence. Their purpose is to summarize and interpret the evidence for you.

I will then give you instructions on the law and describe for you the matters you must resolve. You then -- you will then retire to the jury room to deliberate on your verdict.

Trial schedule. Though you have heard me say this during the jury selection process, I want to, again, outline the schedule I expect to maintain during the course of this trial.

As I mentioned previously, once trial begins, this case is expected to take up to five business days to

try, between now and Tuesday, January 31. We will normally begin the day at 9:30 a.m., we will go until around 12:30 p.m., and after about a 45-minute break for lunch, continue until 5:30 p.m. There will be a 15-minute break in the morning and another 15-minute break in the afternoon.

What I have just outlined is a general schedule. It's possible there will be some interruptions, as I have to attend to other matters. The only significant exception to this schedule may occur when the case is submitted to you for your deliberations. At that point, you will be permitted to deliberate as late as you wish.

Please keep in mind that this is a timed trial. That means I have allocated each party a maximum number of hours in which to present all portions of its case. This allows me to assure you that we expect to be completed with this case by Tuesday.

Of course, you can help me keep us on schedule by being here promptly each morning and being ready to proceed at the end of each break.

That completes the preliminary jury instructions that I have for you, ladies and gentlemen. At this time, we're going to go into opening statements by the parties, and we're going to start with the plaintiffs.

OPENING STATEMENT

MR. SHORE: May it please the Court. Am I free

to move around the courtroom during opening statement?

THE COURT: You may.

MR. SHORE: Thank you very much.

Ladies and gentlemen of the jury, look around at each other for a second. This is the beauty of the jury. And the only thing I'm going to ask you to do about how you deliberate this case is respect. Respect each other's views.

Because the reason why there's a cross section of people; ages, genders, beliefs, systems, everything is because all of you have something unique to bring to each other if you'll just listen to one another and respect one another, because at the end of the day, one of the most important things to happen is you need to be able to go home and say I did the right thing. We did the right thing.

And so I'm going to guide you now through some of the evidence. I represent the Board of Regents of the University of Texas System, and TissueGen, a small company also based in Texas.

And before I get started, I have to use this because if I get anybody's name wrong, I will never be able to live it down. So some of the people that you're going to hear from that are here from TissueGen and the University of Texas, I'm going to ask them to stand up as I call their name and I'm going to tell you who they are so you know what

they are doing here.

I'm going to start with Dr. Kadura. Dr. Sheila Kadura is -- represents the UT System Board of Regents. She is here as their representative to observe and to probably tell them whether I do a good job.

She has an Ph.D. in molecular biology. And she is also a lawyer and works at the legal office at the University of Texas Board of Regents.

Next we have Teresa Schultz. She is a director of innovation and commercialization at the University of Texas at Arlington. And she has a master's degree in peptide chemistry. And she is also here to observe and she will be a witness in the case.

Tell you what, there are more degrees on this card than on a thermometer. Dr. Kevin Nelson. He has a master's in chemical engineering and a Ph.D. in biomechanical -- biomechanical engineering, and he -- biomedical, I'm sorry, engineering. And he will be a witness today. He is the lead inventor on the case and he also is one of the principles of TissueGen.

We also have in there Dr. William Pitt back here. He's an expert, he's going to be our primary expert witness in the case. He has a Ph.D. in chemical engineering, and also degrees in material science. He teaches at Brigham Young University and the University of

Utah. And he -- you're going to hear some more about him as well.

And, finally, John Gibson. He's the CEO of TissueGen.

We'll go into a little bit more about the relationship between the University of Texas and TissueGen and how that relationship evolved into the research and into the patents -- and the patent that we're involved in this case.

So let's get right into it. So the University of Texas, you've probably heard of it and you probably think of it as the guys with long horns on their helmets, but that's UT Austin. The University of Texas System is a lot more than the University of Texas at Austin.

The System was founded in 1883, has 22,000 faculty members, 93,000 healthcare professionals, researchers and support staff, almost a quarter of a million students across eight universities, and five healthcare systems.

The Board of Regents governs this system. They're appointed by our governor, whoever it may be at the time. They served for a term so they don't get fired. And they're confirmed by the Texas Senate.

Then we have TissueGen. TissueGen was founded by Dr. Nelson in 2000. It was founded to further the

technology that was developed at the University of Texas while he was a professor there to develop the technology in the '296 patent, the patent that's at issue here.

So this company was founded based upon the patent, the '296 patent, to develop this technology and bring it to market.

TissueGen is a research and development company. It's a small company, but it has done some amazing things, and you're going to see some of those things that it's done.

Now, we talked about this, that patents are a constitutional convention. So all the way back in 17 -- the 1780s, the Continental Congress understood you have to be able to protect inventors, but you also want to encourage inventors to publish. Why is that? Because if things are hidden as trade secrets or they are hidden or the process is so only I can do it and no one else can do it and it's hidden, what happens? Technology doesn't advance.

Almost all technology is built upon the shoulders of others. You'll see an invention, like a transmission, and then somebody will think, well, now that how I see the transmission works, maybe I can make an automatic transmission. And it builds and it builds and it builds. But it only builds if you can see it.

So what's the trade off to get people to let other people see their invention? Because if they just put

it out there, people will copy it. The biggest companies will take the smaller company's inventions, the smaller company can't do anything about it. So what's the deal?

Well, the deal is, if you show it, you'll get a certain period of time, called the pattern term, where you are exclusive, meaning you can prevent others from doing it, or you can give them a license.

And by giving them a license, you get compensated for your invention and so you don't feel like you're being taken advantage of, you can't be taken advantage of. And this was so important, this concept was so important that the Founding Fathers of the United States instructed Congress put forth laws to protect inventors, number one, but number two, to advance science and to advance commercial activity.

And Abraham Lincoln famously declared that patent rights added the fuel of interest to the fire of genius. So you can be a genius, and what's the fuel, the fuel is I know that I can be compensated, I know that I can be protected, and that's going to make me do more. That's going to make things go further.

So this is the -- this is what we're here about, United States patent 659 -- 6,596,296. And you'll see that it issued in 2003. And there's kind of an interesting thing about this patent. This patent has expired. What does that

mean?

I think you saw in the video that now that the patent is expired, anybody can use it for free. There is absolutely no requirement that anybody pay royalties going forward. There's absolutely no requirement that anybody compensate TissueGen or the University going forward, free.

Now, one -- I bring that up because later on we're going to talk about invalidity. And I want you to ask yourself, if they can use it for free now, why are they trying to invalidate it?

So here's the patent. Now, the patent, as you were told, has this front part, the background, the specification, this is the part of the patent that teaches a person of ordinary skill in the art how to practice the invention. This is how to do it. This is the forward part, is this is how to do it.

The last part of the patent is the claims, as you heard, that sets boundaries. I like analogies because I don't have a Ph.D. in molecular biology. I'm from a town of 310 people in east Texas, and so I like to understand things that can be explained in analogies.

So this is the analogy. The claims are like a deed for the property that covers whatever is on the property. The specification is like the blueprints to the house or whatever structure is on the property. So the

blueprints tells you, this is how you can build on this -- within the boundaries, and then the deed sets the boundaries.

Now, you don't have to explain every way to build a house. You don't have to explain every way to build a swimming pool, or whatever it is you want to put on the property. But you do have to explain one embodiment, one version sufficiently for people in the field to understand what you invented.

And that is also why, when you go to the Patent Office, the patent examiners that look at it are people who are trained in this field. They may not necessarily be at the same level as a Ph.D. or something like that, but they are people who are trained to understand this area of technology.

They are specialized, and they are segregated or put into fields where all the patents they look at, or most of the patents they look at, are going to be similar. Similar field, similar thing. That also helps them build up a lot of knowledge about what's going on because they are seeing all the cutting-edge things and all the patents in that field. So that's why they sort of silo them or put them into certain areas because it helps them be more efficient and smarter about how they do their job.

Let's talk about coronary artery disease. I am

going to get coronary artery disease. I love bacon cheeseburgers. I like bacon and eggs. I like steak, and my grandfather had stents placed in him, five of them over the course of his life. So genetically I'm also probably predisposed to do this. But we have all of these arteries -- hang on. I think I hit the wrong button. So we have all of these arteries -- I can't get my laser to work.

So we have all of these arteries that lead into your heart, and the problem is that these arteries get clogged. The part of the heart that is fed by those arteries gets what's called "ischemia." It means that that part of the muscle dies. It doesn't mean the whole muscle dies, but it means that small part of the muscle dies. If you don't fix that, the proliferation of ischemia ultimately could lead to a heart attack. So hopefully, you first heart attack, if I have one, will be not be what they call the widow-maker, the left descending artery clogs up, or you're dead before you hit the ground. Hopefully, it will be one of those ones where I have a chest pain or shortness of breath, and I can get to the hospital, and an interventional cardiologist will stick a thing in my leg, and it will take it up there to my heart. And then they'll open up my heart or open up the vessel and feed my heart and prevent a heart attack. But that's what this -- the products at issue in this case, the stents, are designed to do.

Now, this is a coronary artery stent. And you're looking at it, and you're going to look at the patent, and you're going to say, the patent does talk a little about stents. But what the patent is really talking about is -- on this particular picture, you'll see a little bit of blue. And the little bit of blue is a polymer fiber, or a polymer layer, or a polymer coating, that is only on the outside surface of the stent. And this polymer coating on the outside surface is also called the abluminal surface. So if you see documents it may say abliminal, I don't know why. But any way, it's the outside surface; that's the surface of the stent that is actually resting against the artery after the stent goes in.

So the reason why this polymer fiber is on the outside part of the stent is because it has medicine in it, and it's delivering medicine to only where it's needed, which is the artery wall. Because once you put one of these stents in, it's not like, okay, it's all over. Your artery can reclose. And guess what? When you put a stent in your artery, it irritates the artery wall because you're sticking something in the artery and that can cause inflammation, and inflammation can cause scar tissue; it can cause things to grow, and those things actually can help reclose your artery.

So the reason why you want it to deliver the

medicine, they want to deliver it right where it's needed and nowhere else. If you put the medicine in an IV, what happens? Goes all over your body. You have to use more of it. More medicine means more side effects. More side effects means more complications. So the whole idea behind this invention is, we are going to target the delivery of the drug right exactly to where it's needed and hopefully nowhere else.

And one of the benefits of this also is to allow the medicine that you take after you have these stents put in, blood thinners, things like that, can have some serious side effects. People used to have to take those medicines for like a year, 12 months, but once you had these stents delivering this drug through the polymer fiber invented by Dr. Nelson and his team, because of that, now you only have to take drugs for about two or three months. Less drug time, less side effects, less complications, that was the idea. And that idea was something that people have been thinking about for a long time. Trying to figure it out. And Dr. Nelson is the one who did it.

Right there, again, where we're talking about these drug-eluting, drug-delivering polymer fibers, it actually says, Fibers can be used in conjunction with commercially available stents to deliver drugs at the placement site. And in this case, the fibers would not

provide any mechanical support. The mechanical support comes from the metal stent. What they do is they serve as a drug delivery reservoir.

So that's what this case is about. It's not about the metal part. It's not about the delivery system. It's not about any of those things. What the patent covers is the fiber, the polymer fiber, the polymer mixture coated on the outside of the stent.

Right here, the '296 patent covers the biodegradable polymer fiber on the outside surface of the SYNERGY stents. That's the focus.

The patent does not have any requirements for how that polymer is made. It has no requirements for how you put it on the stent. There's multiple ways you can put a polymer on a stent, so Boston Scientific, I expect, is going to tell you that we don't infringe because of how we make our polymer. Patent is not about how it's made. Patent has nothing to do with how it's made. The patent only has to do with what that polymer is, how it exists in the finished product. And that will be clear.

So this is infringement. This is what you're going to be asked to figure out. Except as otherwise provided in this title, whoever, without authority, makes, uses, offers to sell, or sells any patented instrument, within the United States or imports into the United States,

any patented invention during the term of the patent infringes. So that's what you're going to be asked to determine.

Now, let's break this down a little bit. What is infringement without authority? That's the first thing. I do not believe this will be something you'll have to decide. I don't think it's in dispute. Boston University did not -- Boston Scientific -- and I apologize for saying Boston University. I represent them, and this is hard for me.

So Boston Scientific did not have permission from TissueGen or the University to practice the inventions described in the '296 patent. Only one company has permission; that's TissueGen. Now, the University of Texas, you're going to find out, many of the people who worked on this project were professors there. And like many other Universities I represent, Caltech, University of Virginia --

MR. GRIMSRUD: Objection, Your Honor. Relevance.

THE COURT: Sustained.

MR. SHORE: It's common in universities, and the University of Texas is the same way, they favor granting licenses to small start-up companies that are incubated within the university system. So when you see a lot of the companies that start out, they start out, actually, as

incubated companies within the university. And what happens is, not only did the University of Texas give TissueGen a license, because when you work for the university as a professor and you invent something, guess who owns your invention? The university. So all the professors who work for the University of Texas, who is funded by the state, by the taxpayers, by the public, those inventions belong to the University. So when TissueGen was formed, and the team left the University to go full time to try to develop this, they got a license from the University of Texas. And the University of Texas, also very common, owns an equity position in TissueGen. University of Texas is not just a licensor because it's incubated a company within the University system, they also own part of TissueGen.

So that is who has authority. Boston Scientific doesn't have authority, and I don't believe you're going to hear anybody say they do.

Now, "makes, uses, offers to sell, within the United States or imports to the United States during the term of the patent." So this is the actual act that is the act of infringement, making, using, selling, offering to sell. Boston Scientific made use, offered to sell, sold, and imported SYNERGY stents, from a factory they have in Ireland, within or to the United States during the term of the patent, which means before the patent expired. So the

time period we're talking about is before the patent expired.

None of those -- none of those, I believe, will be at issue. You're not going to have to decide -- I don't think you're going to have to decide that. I think the fact they made them, they sold them, they offered to sell them, I don't believe you're going to see any evidence to the contrary of that.

This is the issue. The only infringement issue is whether the SYNERGY stents are covered by one or more claims of the '296 patent. So this is the issue for you to decide. Does the patent cover or do the claims of the patent cover the SYNERGY biodegradable coating on the outside abluminal surface of the stent.

So, again, Dr. Nelson, he didn't do this by himself. He had a team. And the team of inventors were -- a lot of them were in Texas, Denton, Texas, Burleson, Arlington, Allen. One was in Kentucky. But you're going to hear the work this team did over many years, to develop this technology. And you're going to know and see Dr. Nelson is an incredibly bright man. His entire team at the University, brilliant people. And one of the things that you should also be asking yourself, this patent, they are going to claim it was obvious that this was nothing new. If it was obvious or nothing new, then you got to ask yourself,

why did a bunch of brilliant scientists at the University of Texas spend years having to try to develop this and figure out how to do it. And no one else had done this before, I tell you that.

Here's Claim 1, and it's pretty simple, pretty short. "A composition comprising at least one biodegradable polymer fiber wherein said fiber is composed of a first phase and a second phase. The first and second phases being immiscible, and wherein the second phase comprises one or more therapeutic agents."

The first thing I'm going to ask you to pay attention to -- if I can find the right pointer here. This term "comprising." Comprising means includes, but is not limited to. In other words, as long as the polymer fiber on the outside of the stent has these things, if it has other things it doesn't matter; it just has to have these things.

It's the same thing for the second phase, which we're going to talk about, as long as the second phase has a drug in it, or what they call a therapeutic agent, which is a drug, it can have anything else in it. It doesn't have to be pure. There's no requirement of purity in -- there's no requirement of purity in any of these phases because we have a comprising claim.

Now, you may say, That's kind of a short claim. Seems pretty simple. How could that possibly be valid? How

could that possibly cover something as complex as this? Remember, the specification teaches the claim's claim. This little claim, this little tiny claim here, just a few words, I wonder if any of you guys can guess what this is. That's Google. Where did Google come from? Stanford University. So with inventors who left Stanford University and formed Google, that's why Stanford is so rich. One of the reasons why Stanford is so rich.

So, again, the claims define the boundaries, like the deed, and the details go in the specifications. And you can have a relatively simple claim that can turn out, in this case, to be a trillion-dollar company.

So let's go through the elements. "The composition comprising." No one is going to deny that the polymer on the outside surface of the stent is a composition.

"At least one biodegradable polymer fiber." Biodegradable. They found out during research that if you put a stent in somebody, and the polymer is permanent, that's a bulkier thing. And the bulkier, the larger the thing that remains in your body, more inflammation, more complications, more chances of stenosis. So one of the big challenges was, how can we use a polymer fiber, a polymer coating, to deliver a drug and go away, disappear? Because that leaves less in the body to irritate the body and

irritate the vein. So this is not just trying to deliver the drug at the right place, it's trying to deliverer drug at the right place at the right time and then have the delivery mechanism disappear.

So what are we going to see proof of this? Well, in a lawsuit, you file what's called a complaint. And in Federal Court, the defendant is required to specifically deny or admit every fact that you put in your complaint. And this is supposed to narrow the issues for trial. It narrows the issues in dispute, so you know.

So in their answer to the complaint, Boston Scientific admits that the SYNERGY metallic stent is made of platinum chromium alloy, that's what the metal is made out of, it has an abluminal outside surface of the stent, biodegradable polymer coating that includes everolimus-rich domains. So they are admitting that the polymer outside of their stents is biodegradable.

Dominic Allocco, whom you'll hear from, in his deposition was asked: Did Boston Scientific ultimately achieve the goals of the Evolution stent project? Evolution is what became SYNERGY.

And he said that's a complicated question. What I would say is that we ultimately did develop a thin-strut, a bioresorbable polymer, drug-eluting stent.

So they admitted it in their answer. And their

scientist, their head of clinical also admitted it in his deposition. We do not believe that biodegradable polymer is in dispute.

Also, when they applied to the FDA -- and, again, you don't get to just make a stent and go sell it at Walgreen's or CVS or whatever you guys have up here. You actually have to go to the FDA and say, FDA, we want to put this in people's bodies. And not only do we want to put it in their bodies, we want to put it right in to their heart.

So you can image, if you want to put something in someone's body right next to their heart, the FDA kind of wants to make sure it's safe. And so you would have to go through what's called a premarket approval process, or PMA.

And the FDA makes you give them all kinds of clinical results, all kinds of information. They want to know everything about it so that they can be sure, as sure as they can be, that what you're doing isn't going to kill more people than it's going to help. So in other words, it has to be efficacious, it has to be helpful.

And so in their premarket approval, they actually told the FDA that the polymer that they use was bioabsorbable polymer, poly -- poly lactic-co-glycolide. And there's going to be a lot of words like that, and I'm going to mess them up, but you get it.

And by the way, that polymer that they use is

listed as one of the recommended polymers in the patent. So this is not, again, something that we believe is going to be at issue. The polymer is biodegradable, it's a polymer, it's even one of the polymers that's listed in the patent.

This is Dr. Yen-Lane Chen, she's a Ph.D. who worked for Boston Scientific. And I know that the judge told you about depositions. There's two kinds, basically. One is an individual's deposition. Like I say -- you say you want to depose Michael, and I got to sit down, raise my hand, and testify under oath, and I tell you what I know.

There's another kind of deposition called a corporate representative deposition. Corporations aren't people, so if you want to take a corporation's deposition, you send them topics for them that you want the deposition on, and they present someone.

And that person is responsible to find out all the information on those topics in the corporation, investigate them, and prepare to answer questions on behalf of the corporation.

Dr. Chen was the representative for Boston Scientific in her deposition. And she testified: Okay -- it's your under --

The question: "Okay. It's your understanding, though, that both the Evolution project and the Odyssey projects were projects that attempted to abluminal coat the

coronary stent, coated on the outside?"

"Yes."

"And abluminally coat such a stent with a biodegradable polymer?"

"Yes. We don't think this is an issue."

Their polymer is the polymer listed in the patent and it's biodegradable.

Now, fiber. Boston Scientific, we think, is going to come in and they are going to say what's on the outside of our stents is not a fiber, it's something else. And they are going to claim that the way they make it means it's not a fiber.

Again, there's nothing about process in the patent. Doesn't matter how you make it. Doesn't matter if you coat it. Doesn't matter if you -- it really doesn't matter what you do. The only thing that matters is the resulting structure, the composition.

And you're going to also find that before Boston Scientific got sued, they used the term "fiber" exactly like we're using it in the '296 patent. And then they got sued because they didn't want to pay. They got sued and they --

MR. GRIMSRUD: Objection, Your Honor, bifurcation.

MR. SHORE: Why do you think they got sued?

MR. GRIMSRUD: Sidebar?

THE COURT: Okay.

(Whereupon, a discussion was held as sidebar as follows:)

MR. GRIMSRUD: Your Honor, I was trying to not to object. This is like the fortieth time he's made reference to money. And in the first phase, we're not supposed to be talking about money and applying damages. That's all second phase. And he's done it three or four times now that the clear implication is that they think Boston Scientific owns them money and hasn't paid. That's the clear implication of everything that's being said here, and this is all second phase issues.

MR. SHORE: One of the --

MR. GRIMSRUD: Your Honor, the jury should be instructed to disregard what he said about that. It's improper and violates the order.

MR. SHORE: It doesn't violate anything. One of the elements is without authority, how do you hit authority the licenses. And, obviously, if they had a license they wouldn't be here.

THE COURT: Okay. Without authority is one thing, but referencing money is different, so you shouldn't be referencing money.

MR. SHORE: Okay. There's no need for instruction on that.

MR. GRIMSRUD: We disagree.

THE COURT: Because we did bifurcate the case, we will tell the jury to disregard any reference to money at this point.

MR. SHORE: Okay.

(Whereupon, the discussion held at sidebar concluded.)

THE COURT: Ladies and gentlemen of the jury, please disregard any statements that counsel has made with reference to money at this stage.

MR. SHORE: To rephrase, Boston Scientific did not want to seek authority to practice the invention. So that is why we're here. We're here because they chose to be here instead of they are seeking authority. We chose to be here because whatever authority they sought, we weren't going to give them, it's a disagreement.

So -- but how did they use the term "fiber" before they got sued? This is a patent application and it is assigned to a Boston Scientific wholly owned subsidiary. This is a company Boston Scientific uses to hold their own intellectual property.

This is a patent application by people who work for Boston Scientific, a person -- I'm not sure, I think it's a man -- it's Jan Weber, because he's from the -- he's from Holland. I think that's how you pronounce his name.

But let's see how they use the term "fiber" in this patent. And this is what we're going to show you.

Here, remember what the SYNERGY stent looks like. See those zigzag patterns on the stent? You'll see the same zigzag pattern is on that stent. And it says, "Fibers, other embodiment's inorganic fibers are applied to individual elements of the expandable device.

"For example, fibers, 200, the fiber, sits on the outside of the stent, may be applied -- applied or formed on the outer surface of the stent. Fibrous layer, 200, it's a fibrous layer -- a fibrous layer is a fiber, that's what makes it fibrous -- disposed over the underlying stent strut."

So this is how they use the term before they got sued.

And we see stent structure looks like the same, the fibers on the outside of this stent, it's a fiber. They also had another patent by a man named Strickler, Frederick Strickler, who, by the way, they are not going to bring to trial. Mr. Strickler won't be here -- none of the inventors of this these two patents will be here, neither one. Neither one will be here to explain why they used the word "fiber" the way they did for the case.

But this is another one. It's -- it's signed Boston Scientific or the Boston Scientific subsidiary. And

guess what they have? Again, we have another stent with the same pattern. There it is, same pattern. And you're going to see that they form an inner layer of multi-component fiber, so this one has a fiber on the inside and an outer layer of multicomponent fiber over the stent.

And, again, this is what you're seeing here in figure 5. You're going to see, there's a -- this is where -- the cut away. That's the cross section of the stent. And they are calling what is coating on the outside of that stent a fiber, and they are calling what they used to coat on the inside of the stent a fiber.

So, again, before they get sued, before there's an allegation, they know exactly what a fiber is, they use the term "fiber" consistently with how it's used in the '296 patent.

And now suddenly they are going to bring witnesses -- not the inventors of these patents -- but they are going to bring another paid witness to tell you that fiber doesn't mean fiber.

So, here it is again, the corporate representative from Boston Scientific who testified. And she was asked: "And so this is describing" -- she's talking about the Strickler patent -- "and so this is describing a scenario where a metal stent has a fibrous layer disposed over it; is that right?"

"Yes."

Again, she told the truth, it has a fibrous layer, just like the SYNERGY stents, just like what is claimed in the '296 patent.

And then she also -- you'll see her testify, "and do you understand this language to be describing a metal device having a substrate and a fibrous layer disclosed over it?"

"Yes."

Fibrous layer, covers that same serpentine structure, it's a fiber. And in claim 3, do you see a fibrous layer is the coating layer. So she's saying a coating can be a fiber.

"Is there any reason in your mind that a fiber, that a coating layer could not be a fibrous layer?"

"Yes, it can be a fibrous layer. It can be a coating layer, a coating layer can be a fiber layer."

So, again, before they got sued, that's how they used the term "fiber." Their own corporate representative admitted that's how they use "fiber." And they are going to come and tell you today that up is down, black is white, red is green.

So we have at least one biodegradable polymer fiber, and that's the -- that's some of the evidence, and there's a mountain of it, there's a lot more. But this

is -- for what I have time in an opening statement, this is established.

Now, wherein said fiber is composed of a first phase and a second phase. There's a couple of words that you need to keep in mind that mean the exact same thing. Phase and domain. Domain and phase. And we'll get into that and that will be explained by the experts and be explained throughout the case, but the word "domain" and the word "phase" mean the same thing.

Here we go back to Professor Chen -- Dr. Chen, the corporate representative of Boston Scientific. "And you guys at Boston Scientific actually submitted some documents to the FDA describing tests, such as MDSC. And some certain microscopy was done that determined that these drug-rich domain's and polymer-rich domain's in the final coating; is that correct?"

"Correct."

So she's telling you there's a drug-rich domain where the drug is located, primarily, and there's a polymer-rich domain. Two separate domains.

And, again, wherein said fiber is composed of a first phase and a second phase. And this is in the document they submitted to the FDA to get this fibrous layer on their stent approved.

Drug-rich domain. So you see these little

circles, those are the drug-rich domains. And then you see PLGA, that's the polymer. The polymer-rich domains, the white stuff. And you can see clear boundaries between the drug-rich domain and the polymer domain. They are not dissolved into one another, they are not mixed together.

After they are made, they stay separated. It's not what happens during manufacture, it's not what happens before they are finished. The claim claims them as they are sold, offered for sale, etc. And as they are sold, they are separate.

And you will not have any witness come in here and tell you that after these things are manufactured, that these domains, drug-rich domains and the polymer-rich domains are mixing together in the finished product. None of it. Because once they are finished, they are set.

Now, what you may hear is they are going to say, oh, well, the drug-rich domain has a little bit of polymer in it. And the polymer domain has a little bit of drug in it. That happened during the manufacture. But once they are manufactured, they are stable. They do not mix, they do not dissolve into one another. And remember the word "comprising," including but is not limited to.

So there's no requirement -- no requirement in the patent that the drug-rich domains be 100 percent drug, and there's no requirement in the patent that the

polymer-rich domains be 100 percent polymer. The only requirement is, once it's made, those two phases are separate. They don't dissolve into one another, and we don't believe that will be disputed.

I don't want you to think that those -- that this drug domain is liquid. It's not liquid; it's solid. This is what you call a fracture surface. So if you take a Tylenol pill and you break it and then you look at it, that's a fracture surface. Same here, except when you break a polymer, instead of breaking and having a flat, surface, it's like when you pull apart a plastic bag that you put your groceries in, it will have some sort of deformed-looking things. And the fact that the polymer part is deformed and the drug part is flat also tells you they are not mixed together. They are two separate things. They even break apart in a different way.

So -- wrong button.

And, again, go back to Dr. Allocco, and in the middle of this page 3, and page 3 is a presentation he gave, you'll see that. What is being depicted? He says "The drug and the polymer coating." And do you see the markings PLGA-rich domain? Remember that was the picture we just saw, PLGA-rich domain. And you see a drug-rich domain? And he says, yes, he's talking about this figure. And then he's going to say, "What does that convey?" He says, "You know,

it shows that the coating is not homogeneous." What does that mean? It means there's two coatings. There's not one. Or there's two phases, not one. If it was one phase or if it was mixing and dissolving into each other it would not be -- it would be homogeneous; it would be one thing. There are different regions, and some of those regions are rich in PLGA, and others are rich in drug. It's two phases.

So now, and there will be a lot of other scientific evidence on that, testing evidence, even assuming that they do deny that here, there will be a mountain of evidence showing there are two phases. They are separate, and in the finished product they do not dissolve with one another; they do not mix with one another. They stay separate.

So that's what this is, the first and seconds phases being miscible. Again, they get up and FLGA mixed with the drugs we use, if you put them in a blender, you can mix them together. The question is not whether the drug can be mixed with the polymer, it's whether or not the phases in the finished product mix together. They do not. And there will be no evidence that they do in a finished product. Not -- we're not talking about during the manufacturing process. We're not talking about in the process -- or if you take the two ingredients out of it, and you mix it in a beaker, that's not what we're talking about. The claim

says, in the product, the phases are separate. They are immiscible. They don't mix together.

So the Court's construction that you have, I think it's in your notebook, says, "incapable of dissolving into each other." We know they are incapable of dissolving into each other, and you'll find out because they don't dissolve into each other. In the finished product, in the stent polymer coating, they do not dissolve with each other. They do not mix with each other. They are stable and separate.

And this is some of the testing that you're going to see. Field emission scanning electronic microscope, FESEM. That's an image, and, again, you'll see that the drug phases and the polymer phases are separate. Confocal ramen spectroscopy. And again you'll see the test results are quite clear that you're going to see two different immiscible, non-mixing phases. And then modulating differential scanning calorimetry. You'll have to have an expert say exactly what that means. Again, I have a degree in medieval history, so I am not a biologist.

All right. So the first and seconds phases are immiscible. And the last element wherein the second phase comprises one or more therapeutic agents. All right. In their submission to the FDA, what do they call everolimus? It's an active pharmaceutical ingredient, a therapeutic

agent. It's an immuno-suppressant. In other words, it keeps that area where it is from getting inflamed that hasn't even been used from getting and, angry, so they want to suppress the immune system at that site, and it comes from rapamycin, a secondary metabolite produced during fermentation of certain strains.

You're also going to see that guess what is one of the therapeutic agents that's listed in the '296 patent, rapamycin. So we have the same polymer listed in the patent. We have the same therapeutic agent listed in the patent. We have the same polymer coating on the outside that forms a fiber. All of that in the patent.

And, again, in that coating, is it correct that you observed fairly spherical domains of everolimus distributed in the PLGA polymer matrix? Yes. So we see a drug-rich domain, and they appear to be spherical in this first polymer-rich domain. It's a drug. The drug is a therapeutic domain. I don't think it's going to be disputed. I certainly hope it's not going to be disputed, but it's there.

So there it is, and, again, you'll see a lot more evidence than what I just gave you.

So, and then we have Claim 26, which is another claim that you're going to be asked to consider. And that is wherein the therapeutic agents are released at varying

rates over time. And this is important because the whole idea of not having to take a drug for a year anymore, having to take blood thinners for a year after you get your stents the idea is you have to take those drugs for a shorter period of time because you have a focus drug not all being released immediately, but as the polymer biodegrades, the drug is released over time. And that's why choosing which polymer and choosing that polymer because it has a known degradation rate.

So what did we get, this is from a presentation, also something like this is in the FDA documents, but this is from a presentation that Dr. Allocco and the head medical officer at Boston Scientific wrote or helped write, and it reveals that the drug in the polymer is released -- about 20 percent of it is almost released immediately -- and then as the polymer degrades, polymer degrades, we're going to have the time line -- as the polymer degrades, more drug is released, and so it goes on for about four months. That meets the requirement that if drug is released over time, and that's a function of what polymer you use. And, of course, that's why the polymer they used is one of the polymers that's listed in the patent.

So, again, Dr. Allocco, does this image convey anything to you -- and he's talking about here, this image. "Does this image convey anything to you about the rate and

release of the drug?" It's released over time. And he tells you, "it becomes linear from about Day 2 to day 70 or 80 or 90, a smaller release between 90 and 120 days, so it is released, time released, over time. Meets the requirements of Claim 26 of the patent.

I'm going to go back and talk to you a little bit more about this. You've had it, so I'm going to go through this pretty quick. Preponderance of the evidence, more likely than not. If there's one more grain of sand on one side of the scale or the other, that's preponderance of the evidence. It's more than the other side. It doesn't have to be a lot more; it has to be a little bit more. And so when you're considering the evidence -- and we think -- I will tell you the evidence is overwhelming. But when you consider the evidence, the University and TissueGen just have to convince you that more evidence favors their position than favors the other side. That's the standard.

Now they have direct -- what is direct evidence? So direct evidence, as you said, you're going to hear from Dr. Nelson, you're going to hear from Ms. Schultz, and you're going to hear from Dr. Pitt. This is who you're going to hear from directly, along with a few others. We expect that they will call Dr. Allocco live; in fact, we'll call Dr. Allocco live in our case. And then there's Dr. Chen, who, I believe, will be called by deposition. And

then they are going to bring Aparna Bhave. I don't know anything about her. She's not been deposed. I don't know anything about her. I don't know what she's going to say. They say she's on the list. And Dr. David Mooney is their expert. That's direct testimony. That's direct evidence, and you'll get to see them.

Now, direct evidence is also documents, and here the patent, obviously the document, it's part of the evidence. What they submitted to the FDA, what they told the FDA about their own product, so they could get permission to put it in arteries next to people's hearts, and they are going to run away, I believe, from what they told the FDA to get this thing approved, to avoid you finding they have infringed. Or they are going to spin it in a way that we believe you will find nonsensical, and we will get to that in a bit.

And, of course, the presentation that they gave to doctors, when they went to try to sell this stent or get doctors to take this stent, they went and told doctors what they did and how they did it. And they're going to also, I believe, try to run away from some of these statements or spin them to mean something that I believe you will find to be not credible. We're going to get to credible in a minute.

Also direct evidence, admissions. The coating

consists of a bioabsorbable PLGA polymer and everolimus. They admitted that in their answer. The PLGA polymer provides controlled and sustained release of available everolimus through the intended timeframe during which the polymer is reabsorbed into the body. They admit the polymer is biodegradable, and the drug is released over time. Everolimus has a role as an antineoplastic agent and immunosuppressive agent, et cetera. That is admitting it's a therapeutic agent. It has action on the tissue in the body. They admitted it.

The SYNERGY metallic stent is made of an abluminal on the outside surface, biodegradable polymer coating that includes the drug, and drug-rich domain, and a PLGA domain. That pretty much admits everything.

I -- I'm going to be interested. I'm going to watch with you how they unadmit what they've already admitted.

Now, circumstantial evidence. I have used this little video a few times, and I know you heard about the snow thing. This is circumstantial evidence.

(Video played.)

"Hey, Jasmine, did you get into the Nutella:

"No.

"You didn't? Really?

"No.

"Promise?

"No.

"Jasmine, did you get in the Nutella?

"No.

"Really?

"No.

"Well, what did you do?

"I just washing the dishes."

Laughter.

Is it possible that she got Nutella all over her face washing the dishes? Is it possible? I think a preponderance of the evidence would state otherwise.

That's circumstantial evidence, the Nutella on her face, we didn't see her. We didn't see her eat the Nutella. I think she ate the Nutella.

Now, let's talk about expert witnesses. Our expert witness is a man named Dr. William Pitt. Dr. William Pitt has been concentrating his research and teaching in the area of biodegradable polymers that deliver drugs for 40 years. He sits on the editorial board of the two most relevant journals, the *Biomaterials Science, Polymer Edition*, so this is -- I had no idea that you could have a magazine or a journal that would be based upon something as narrow as *Biomaterials Science, Polymer Edition*. I think what would there be probably 50 people that subscribe to it.

I don't know, but it can't be very many. But this is a journal. It's peer-reviewed. So to put an article in this journal, it has to go to an editorial board that determines that what you are writing is scientifically sound. And he sits on the editorial board of this journal. Why is that important? Because when you sit on the editorial board of a journal, you see all the newest, coolest, most advanced stuff, because if there's one thing about professors, besides the fact that I can't understand most of what they say, is they love to share. They love to put their articles out. They love to tell everybody else what they are doing because as they tell everybody else what they are doing, they collaborate. They share. That journal is probably the most pertinent journal to anything related to this case, and he sits on the editorial board. And he's going to tell you during the invalidity portion of the case that he never saw anything like the '296 patent before. It wasn't obvious. It was, in fact, a significant breakthrough. And not only was it a significant breakthrough at the time, it was a significant breakthrough years afterwards.

He also sits on a journal called *Colloids and Surfaces B*. He'll explain it to you better. But basically, a colloid is something that has two phases, like a colloid that you might be most familiar with is if you like vinegar and oil salad dressing. The vinegar and oil are both there,

but they don't mix together. They may mix together a tiny bit at the margin, but you see the drops of the vinegar and drops of the oil; they don't mix together. I don't know how much people -- I don't want to say that, maybe a lot of people read it, but these are very specialized journals. He's on the editorial of them both and both of them go right to the heart of the issues in this case.

We went and found the best expert we possibly could.

Now, credibility. You're going to see some witnesses up there, and they are going to say some things, and you're going to have to decide whether they are telling the truth. I like to give this example. So if you're looking at a transcript, a document, and the question is: Did you steal -- did you embezzle the money from the PTA? And the answer on the thing is "no." Did you embezzle? No. Okay. But if you have a video of the question being asked and the answer, you might get something like this: Did you steal the bake sale money from the PTA? No. On the transcript that just says no.

(Video clip played.)

For the record, have you ever used steroids, human growth hormone, or any other performance-enhancing substance?

No.

(Video clip ended.)

Now, I first played that in a trial at Boston University. And you saw the judge on the video, the female judge is Judge Saris. I tried a case for Boston University so I had --

MR. GRIMSRUD: Objection, Your Honor, relevance, 403.

THE COURT: Yeah, sustained.

MR. SHORE: So anyway, that went over well in Boston.

Now, Boston Scientific is going to seek to invalidate in '296 patent. They carry a higher burden of proof, clear and convincing evidence.

Now, the Judge told you that it's not beyond a reasonable doubt, that's what you need to use in criminal cases. That's what we use in some places to put somebody to death. I mean, that's -- I don't believe in that, but that's how high that standard is, clear and convincing -- I mean beyond a reasonable doubt.

Clear and convincing evidence is a step down, but it's still serious, very serious. That's the standard that we use if they want to involuntary admit you to a psychiatric hospital, clear and convincing evidence.

MR. GRIMSRUD: Objection, Your Honor. The Court has the instructions on the standards, Your Honor. It's 403

relevance.

THE COURT: Again, jurors, as I instructed you earlier, opening statements are not evidence and they are not instructions on the law. The Court will instruct you on the law later, this is just attorney argument.

MR. SHORE: So, like I said, if they want to put you in a psychiatric hospital, they got to do that by clear and convincing evidence. If they want to take your kids away, they got to do that by clear and convincing evidence. That's the next step down. But it's still a high standard.

It's not just a little bit more than a preponderance of the evidence, the judge will instruct you. But what it means is highly probably that a fact is true. Some would say that these are -- this is the standard that you use in making some of the most important decisions in your life. Highly probable.

All right. Now, clear and convincing evidence, you may say, well, gosh, the University only has to prove by a preponderance of the evidence, these guys have to prove it by clear and convincing evidence, why?

That is because, under the law -- this is the patent code 35 U.S.C. -- a patent shall be presumed valid. So that's why they have to use a clear and convincing evidence standard because a patent is presumed to be valid. And it's presumed -- and every single individual claim is

presumed to be valid separate from the others.

So you're going to see claims, Claim 1 is what we call an independent claim, and it independently stands on its own. But there are also other claims that you're going to see, claim 11, claim 17, claim 26. Those claims depend from Claim 1. What that means is you have to prove -- we have to prove everything that's in Claim 1, plus, like you saw for 26, we have to also prove that the drug is time-released.

But, if you find claim 1 invalid, which I do not believe you will, they cannot possibly meet this standard, then you still can consider whether the dependent claims that have additional limitations are valid.

So presumed valid even though a dependant -- even though they may depend on an in valid claim. So the dependent claims can still be valid even though the independent claim is not.

The burden to establish the invalidity of a patent being claimed shall rest on the party asserting the invalidity. We don't have to prove anything related to validity. Now, they have to prove it. And if we think they put on a case that comes close, then -- we'll put on a rebuttal case.

But this is where you ask the question, and I want you to keep this question in your mind and see if they

answer it: If they don't infringe, ask yourself and make them tell you, why are you trying to invalidate a patent that is no longer enforced? It's expired.

They can go out and make their product all day long for the rest of -- until the end of time. So if they don't infringe, why would they take the time, money, and effort to try to invalidate something that they have every right to use now because the patent has expired? They infringe.

Now, you heard about patent examiners. Patent examiners -- and it can take three years for a patent examiner to get through the patent process. Yes, they are busy. But there's no time limit. Patent examiners can take as long as they want. There are patents that have been under examination for seven or eight years.

Now, if they do that to you, you can apply to the Patent Office for an extension of the term because they took so long. But a patent examiner has as much time as he or she needs to do whatever it is that they think they need to do to be sure, especially to be sure in an area like a medical device that's going to be implanted into somebody. Because, remember, it has to be new and it has to be useful.

So they have to determine that. So they are not going to willy-nilly just exam something and throw it out that is going into a human body next to your heart. And

these people who exam these types of patents on polymers, these are drug-eluting polymers, they do specialize in that field or area. Now, they may not have a Ph.D., that's not required, but they are the ones who see this art.

And they may tell you, well -- they are going to come up -- I think they have one or two references they are going to bring up, I'm not exactly sure. Song, I believe, is one.

They are going to come up and they are going to say, oh, well, this isn't on the face of patent, so that means the examiner never found it.

This book here, the Manual of Patent Examining Procedure, tells the patent examiners what types of art that they find should go on the face of the patent. They may look through hundreds of pieces of art, hundreds, that they don't identify and they don't have to identify. The only ones that go on the face of the patent are the ones that they found to be relevant.

MR. GRIMSRUD: Objection, Your Honor, this all lacks foundation. There's no witness to testify to any of this.

MR. SHORE: It will come out on cross, Your Honor. I'm going to take the MPEP right out on cross-examination and cross-examine their expert on it.

THE COURT: Well, you can do that on cross. It

doesn't have any foundation. You haven't presented a witness, that I see, that you have foundation for it.

MR. SHORE: I'll move on, Your Honor.

THE COURT: Thank you.

MR. SHORE: So, anyway, they have as much time as they want, they are not in a rush, they are not hurried. There is no rule or requirement that they can get anything out --

MR. GRIMSRUD: Same objection, Your Honor.

THE COURT: Sustained.

I mean, Mr. Shore, if you can get this out through cross and -- or on direct, you should do that as opposed to just -- yeah, you don't have a foundation for it.

MR. SHORE: Okay.

MR. GRIMSRUD: Your Honor, same objections, 401, 403, IPR. It doesn't have anything to do with this.

MR. SHORE: These objections were already denied.

MR. GRIMSRUD: There's no foundation on this.

THE COURT: Well, the -- I -- right. With respect to the demonstrative is fine, so we can continue.

MR. SHORE: You also see that in the answer that Boston Scientific admitted they did not file what was called an inter partes review. An inter partes review is where they had the chance, if they wanted to, to go to three

expert administrative patent judges -- and when I say "expert," I don't mean expert like here; I mean someone who has expertise in examining patents -- three judges. They could have gone there and they could have argued why this patent was invalid, in front of three experts or three patent judges.

And they could have done it on a lower preponderance of the evidence standard. Why would they not do that -- ask yourself, why would they not do that if they thought the patent was invalid? If they thought it was obviously invalid. They have a place they could go with a lower standard of proof where they didn't have to explain all the concepts --

MR. GRIMSRUD: Objection, Your Honor. Sidebar.

THE COURT: We can have a sidebar.

(Whereupon, a discussion was held at sidebar as follows:)

MR. GRIMSRUD: Your Honor, he's talking about IPR proceedings that have no relevance to this case, it's confusing, it's highly prejudicial. He's suggesting that we should have done an IPR proceeding. There's just -- that has nothing to do with this case, it's not relevant to anything, it's confusing and highly prejudicial.

The evidence in this case is going to be presented for the jury to decide, and whether or not we

filed an IPR has no bearing, no bearing at all on the jury's decision in this case.

MR. SHORE: It has a lot of bearing. First of all, there's no case law that says you can't do it, I have done it before. Second of all, it also shows if they thought the thing was invalid -- and they are going to get up -- it's so obvious invalid, it's almost an admission by conduct that they don't believe their own argument when they had the opportunity to use a lower standard of proof in the Patent Office to get this done.

THE COURT: Yeah, I don't believe that whether or not they filed an IPR is -- whether or not -- I don't know the history of whether they did or not, but with respect to the arguments that -- or the issues that are being decided by this jury, I think that some reference to it is fine, but I think you're going beyond the line.

MR. SHORE: Okay. I'll just skip to the next slide.

THE COURT: Okay.

MR. GRIMSRUD: Thank you, Your Honor.

(Whereupon, the discussion held at sidebar concluded.)

MR. SHORE: All right. So let's get back to us, juries, Patrick Henry, one of my favorites. Why do we love this trial by jury? Because it prevents the hand of

oppression from cutting you off. This gives me comfort, that as long as I have existence, my neighbors will protect me.

We're not asking you to protect the University, we're not asking you to protect TissueGen, we're asking you to protect everybody, both sides.

Consider the evidence, and respect one another's views, listen to one another, and work your way through the process. And at the end of the day, go home and feel comfortable that what you did together was the right thing. Thank you.

THE COURT: All right. Sidebar with counsel.

(Whereupon, a discussion was held at sidebar as follows:)

THE COURT: So, I wanted to get both sides' opening in before lunch, but it's now past 1:15.

Defendants, would you prefer to go or take the lunch now?

MR. DROWN: I don't know. I think it might be up to Your Honor. Do you think the jury would be a little like --

THE COURT: Yeah, I think they need a breath.

MR. DROWN: We should just do lunch then.

MR. SHORE: There's one other issue might want to bring up. We, the plaintiff, would like to call

which Your Honor knows, and we preserved those.

We want to be very clear that what happened in the opening was our worst fears of how they are going to use Strickler and Weber. And what happened in the opening, Your Honor, was directly contrary to controlling Federal Circuit law.

Because this is what happened, Your Honor. I have copies of their opening statement and I want to show you the sequence, if I may approach?

THE COURT: You may.

MR. DROWN: What happened in the opening, Your Honor, was the comparison of the Strickler and Weber patents, to our SYNERGY product, to suggest that SYNERGY infringes, and it went like this.

Slide 26, they showed the SYNERGY -- or the Strickler front page of the patent. Slide 27, they showed SYNERGY -- or the Strickler -- this is the Weber patent. This one is Strickler. So they show Strickler and say, see -- we were all here -- see the stent? See the stent? And pointed to it. And the very next slides they had was SYNERGY.

They did the same thing for Weber. They started out with Weber. Because this is Strickler, slide 27. The very next slide, slide 28, they put up, see, it's just like SYNERGY. And they did the same thing for Weber. It was the

exact same sequence.

Weber is slide 24. See the stent on Weber? See what it says? Then they showed SYNERGY. See, it's just like SYNERGY.

Your Honor was here. I don't think Your Honor was expecting that use of Strickler and Weber when Your Honor denied our objections to Strickler and Weber and denied our objections to use of Strickler and Weber in the opening.

But now that happened, it happened in front of the jury, and we can't take that back. So what we're asking for, Your Honor, is a curative instruction.

If I may approach?

A curative instruction. And just so the record is clear, Your Honor, that says: "Members of the jury, during plaintiffs' opening statements, plaintiffs' counsel stated that the Strickler and Weber patent applications are similar to Boston Scientific's SYNERGY stent.

"However, as I will instruct you in further detail after the presentation of evidence, infringement must be determined by comparing elements in the accused product to each limitation recited in the asserted claims of the '296 patent.

"You may not determine infringement based on the content of a patent application such as Strickler or Weber

that may or may not describe the accused product by comparing a patent application, such as Strickler and Weber, to the limitations recited in the asserted claims. You should disregard any argument made this morning to the contrary."

THE COURT: Well, during the preliminary jury instructions, the Court clearly advised the jury that attorney argument and opening statements are just that, attorney argument. It's not evidence and it's also not the law. And the Court will instruct the jury on the law, and we gave the jury what evidence is.

So for a curative instruction at this time, I'm going to deny that request. If you want to propose a -- some type of instruction that we place in the final jury instructions, we'll consider that at some point. So you should confer with counsel and see whether you guys can reach some agreement or something on the final instructions.

I did not hear them say "see," as you characterized it, during the openings, but I'll go back and look at the transcript.

MR. DROWN: Thank you, Your Honor.

MR. SHORE: Your Honor, may I briefly respond?

THE COURT: Yes.

MR. SHORE: Please look at the transcript. I never said they infringed Strickler. I never said they

infringed the other one. I said that the shape, the serpentine shape is the same, it's same format. And the way they used the word "fiber."

That is completely allowed, it has nothing to do with the cases. I did not claim that they infringed either one of those patents or that they practiced the invention or that those patents had two phases or a therapeutic agent or a biodegradable polymer fiber or anything. We were focused on the term -- the use of the term "fiber."

THE COURT: I understand.

Are defendants ready to proceed to their opening?

MR. DROWN: Yes, Your Honor.

THE COURT: All right. Let's bring in the jury.

(Whereupon, the jury entered the room at 2:49 p.m.)

THE COURT: All right. Counsel for defendants, you may proceed.

MR. GRIMSRUD: Your Honor, I'm going to put a board up. I have copies for the Court, if you'd like copies of the board.

Good afternoon. Welcome back. My name is Tim Grimsrud, and I represent Boston Scientific, and thank you all fir being here. What I'm going to be talking to you about and what I'm going to focus on is the law as

ordinary skill in the art, which is a thread-like structure of any length or shape. It's thread-like. That's what a fiber is; it's thread-like. The Court is going to give you that instruction; it's thread-like. And we all know what threads are. Thread-like. It's thread-like. That's what a fiber is, thread-like.

These are polymer fibers. The polymers that are made into threads, and they're thread-like. You get to use your common sense and experiences in this case too. And the Court gave a great instruction on that when you look at the evidence. The Court instructed you earlier, use your common sense.

And thread-like is thread-like. And we all know examples of threads, sewing thread, yarn. It's thread-like. And in plaintiffs' opening statement, they never mentioned anything about thread-like, and what the evidence is going to show -- and I'll walk through, I'll preview some of that for you. The evidence and the science, common sense, it will the SYNERGY stent does not have anything thread-like. It's literally like a coating of paint on a SYNERGY stent. And I'll show you the evidence on that. There's nothing thread-like.

And you know what else you're going to learn, plaintiffs' expert witness, who Mr. Shore talked about for quite a while, his name is Dr. Pitt. He did not give an

opinion in this case that applied the thread-like construction. Before this trial, he never offered an opinion that the SYNERGY stent has anything that's thread-like. And we'll show you that.

Mr. Shore also spent a lot of time talking about the Strickler patent and the Weber patent. Those aren't the patent in this case; the patent is the plaintiffs' patent. What the evidence will show is the Strickler and Weber patents that he's talking about, those are totally different than the SYNERGY stent. They have nothing to do with the SYNERGY stent. That's what the evidence will show.

He talked about Dr. Chen. She's a retired scientist from Boston Scientific, and he talked about how Dr. Chen had said something about the Strickler patent. You didn't hear all of the testimony. What Dr. Chen also said was that -- you didn't hear in the plaintiffs' opening, is that the SYNERGY stent, it doesn't use what's in Strickler. The Strickler patent and the SYNERGY stent are different. These are just different patents. They have nothing to do with this case.

What the Court will instruct you, what the law is, what's relevant to this case is the claim of the plaintiffs' patent. And what the language of the plaintiffs' patent is. And how that compares to the SYNERGY stent and whether the SYNERGY stent does what's in the

plaintiffs' patent, the '296 patent. And we'll show you what the evidence and the science, that the SYNERGY stent, it's different, it's missing various things in the plaintiffs' patent, including it doesn't have a fiber. There's no thread-like structure, and it also doesn't have this immiscible thing I'll talk about.

So there's two reasons why the SYNERGY stent, it doesn't infringe. These are not small details. These are fundamental requirements of the '296 patent that are -- that are just missing from the SYNERGY stent. And what the evidence will show is that what's going on here, what this case is really about, it's just about companies that do different things. And that happens all the time in America. Companies do different things.

And the plaintiffs, they go down different roads. The plaintiffs' road with the '296 patent is a very specific road where they have a thread-like structure, a fiber that's thread-like, and they have this immiscible thing. But it's a very specific road for a thread-like polymer. And Boston Scientific goes down a different road. Boston Scientific's SYNERGY stent, it's on a different road, doesn't have anything thread-like, doesn't have this immiscible thing. It's a different road. It's completely different.

What Boston Scientific does -- and I'll show

And so that's why, for the second reason, the SYNERGY stent also doesn't infringe, because there's nothing that's immiscible.

So it's these two reasons that the science, the evidence, common sense is going to show that the SYNERGY stent does not infringe any claims of the '296 patent.

Boston Scientific, the SYNERGY stent, it's simply on a different road, different track. The '296 patent went down one track of these thread-like structures that are incapable of dissolving into each other, they are immiscible; Boston Scientific, different road, they don't use that, they don't infringe.

Now, I want to switch -- talk about a separate defense, too. So I just covered noninfringement, that's what I was just talking about, the reasons why the evidence is going to show that the SYNERGY stent does not infringe any claims of the '296 patent.

Now I want to switch gears and talk about why the '296 patent is invalid. And this is a separate defense. And you heard from Mr. Shore, he was wondering, asking questions, why is Boston Scientific challenging this patent? Why does Boston Scientific contend it's invalid?

Well, it's a pretty straightforward answer, that the plaintiffs sued Boston Scientific. They filed this lawsuit, the plaintiffs did, not Boston Scientific. The

plaintiffs filed this lawsuit accusing Boston Scientific of infringement, accusing Boston Scientific of doing something that it does not do.

Boston Scientific doesn't infringe the '296 patent, doesn't use it. But when someone accuses Boston Scientific of doing something they don't do, they defend themselves. And it's their right under the law to challenge the validity of the patent. We saw that in the patent video.

It's Boston Scientific's right, as one of their defenses, in addition -- additional defenses to challenge whether this patent should have even issued in the first place.

And that's for a really good reason, as we also saw in the patent video. One of those reasons is that Boston Scientific was not involved in any way in getting the '296 patent.

And we'll talk about how the '296 patent came to be, how the -- how it actually came into existence, how the Patent Office allowed it in the first place, but that was plaintiffs' deal.

Plaintiffs were the one talking to the Patent Office, not Boston Scientific. So Boston Scientific never had any input to the patent examiner, never had a chance to give their opinion, show the patent examiner evidence on

whether or not the '296 patent is even a valid patent. This is the only opportunity that Boston Scientific has to do that, and it's an important role in the process to allow someone who is accused of infringement to challenge whether the patent is valid or not in the first place.

And that's for another good reason because the Patent Office they make mistakes. Just because there's a patent doesn't mean it's a valid patent. The Patent Office makes mistakes and that's why we're allowed to challenge it, because we're here today in this trial to determine, among other things, whether this patent is even valid in the first place.

And what we're going to show you is that there's important evidence that the Patent Office, the patent examiner, didn't have. And if the patent examiner had this evidence, the patent never would have issued in the place, it's invalid, it never should have been issued. And you saw this in the patent video, too. This is a -- this is -- you recognize this judge from the video, but he explained that there may be facts or arguments that the examiner did not consider, such as prior art that was not located by the Patent Office, that's PTO, or provided by the applicant.

So that's one of the reasons right there is that, you know, the Patent Office may not have had everything. The examiner, in particular, may not have had

everything. And, remember, it's a person; it's a patent examiner that was reviewing this patent. They make mistakes, and they might not have all the information. And that's what we're going to show you exactly, that is that they didn't have all of the information. They didn't have information that shows that this patent, it never should have issued because it's invalid.

And just as some background on this, what the evidence will show 1999, that's when the '296 patent was filed, when the plaintiffs filed their application. It was in August of 1999, I believe. At that time, the concept of having a biodegradable polymer fiber with a drug, that wasn't -- that was new. And Dr. Mooney will talk about this, too. Years before, for years before 1999, people had been using biodegradable polymer fibers with drugs, using them for drug delivery systems, things like that, for years, for many years. So the concept of having a biodegradable polymer fiber with a drug, that had been -- that had been known for years before the plaintiffs even filed for their application for the '296 patent.

But what the evidence will show is that when they filed their application in 1999, they tried to get a patent on this concept. And what I have on the screen here is, I'm just going to illustrate to you what the evidence is going to show on the timeline for how the plaintiffs got

Joint Exhibit 1 into evidence as the '296 patent.

THE COURT: Okay.

MR. GRIMSRUD: No objection.

MR. OFFOR: Andrew, can you call up Joint Exhibit 1, and let's go to page 2.

BY MR. OFFOR:

Q. And before we get into the specifics of the patent and the invention, Dr. Nelson, I'd like to walk the jury through the patent. Can you tell us what we see on the first page?

A. Sure. On the first page we see the patent number up in the upper right-hand corner, the title of the patent, the list of inventors, the assignee as the University of Texas System.

Q. And so what is the title of the patent?

A. The title of the patent is Drug Releasing Biodegradable Fiber Implant.

Q. And if we scroll through the next page -- the next couple of pages, what are we seeing here?

A. So these are various figures and graphs that were important in helping to explain the idea of the invention.

Q. And what about the pages that start with the columns?

A. So, excuse me, this is called the description or the specification of the patent, and this is where we -- the inventor describes what the patent is all about. It

provides, you know, an understanding of what the figures are, an explanation of what the patent is really all about.

MR. OFFOR: And if we can go to the last two pages.

And, Andrew, if you could blow up -- yes, there.

BY MR. OFFOR:

Q. What are we looking at here, Dr. Nelson?

A. So this is the claims of the patent. In our patent, it's one through 32, I believe.

MR. OFFOR: Andrew, can you call out figure one on page 4?

BY MR. OFFOR:

Q. What are we looking at, Dr. Nelson?

A. So this is an assembly of fibers as a mesh. At least one of these fibers is loaded with at least one therapeutic agent.

MR. OFFOR: And, Andrew, if you could call out figure 3A.

BY MR. OFFOR:

Q. Can you describe what we're looking at here?

A. Sure. This is a fiber that has been wrapped into a coil shape. And this fiber would be loaded with at least one therapeutic agent.

Q. And you've used the word "therapeutic agent," what do you mean by "therapeutic agent"?

A. Well, it's a medicine, right. It's something that's going to have therapeutic benefit in the body, so it could be something as simple as an Asprin, that's a therapeutic agent. It could be something much more complicated, and some replacement therapy or something.

Even things that we sometimes think of harmful, you know, radiation and viruss have been used therapeutically before. So it's -- you know, it's any compound that's designed to have a benefit to the person.

Q. And what are the fibers in the '296 patent, in your invention, what are they made out of?

A. They are made out of biodegradable polymers.

Q. And what is a biodegradable polymer?

A. A biodegradable polymer is a polymer that breaks down both chemically and mechanically in some kind of biologic environment. So in our case, the human body.

MR. OFFOR: Andrew, can you call up Plaintiffs' Demonstrative 1-2.

BY MR. OFFOR:

Q. Dr. Nelson, what is the '296 patent about?

A. It's a drug release from a biodegradable polymer fiber.

Q. How did you come up with that idea?

A. Well, in 1996, when I started my faculty job, I had the opportunity to work on two different projects. The

project on the left that you see was delivery of antibiotics to the -- I was working with Dr. Nathan Schwed, who is -- at that time with Texas Woman's University.

The project on the right was quite different. I was working with my former Ph.D. mentor, Dr. Robert Everhart and the University of Texas Southwestern Medical Center --

(Reporter clarification.)

THE WITNESS: Yes, I can. I'm sorry.

And my former mentor, Dr. Robert Everhart. And that was about delivering a virus to the artery wall.

BY MR. OFFOR:

Q. And what were you using to deliver drugs to the inner ear?

A. We used microspheres, small little balls that are loaded with drugs that can release slowly over time.

Q. And how about for the stent project, what were you using to deliver the virus?

A. We were using a stent.

Q. And what, generally, is a stent?

A. So a stent is a small tube-like structure that's used to prop open an artery.

Q. And why would somebody want to deliver a virus to the wall of an artery using a stent?

A. So, sometimes when an artery gets restricted due to whatever reason, a plaque buildup or whatever, and blood

flow is reduced, doctors will put a stent in to reopen that artery.

However, we found that even after the stent was in place, sometimes the artery would re-narrow again, and so the patient was right back where they started. And so the virus was designed to inhibit that renarrowing so that once the stent was in place, it would stay open and allow blood flow.

Q. And are you generally familiar with how a stent is placed?

A. Generally, yes. I brought a video to help me explain that.

MR. OFFOR: Your Honor, permission to walk through this video with Dr. Nelson.

THE COURT: Okay.

MR. OFFOR: Andrew, can you start the first frame of Plaintiffs' Demonstrative 1-3.

BY MR. OFFOR:

Q. Dr. Nelson, what are we looking at on the screen?

A. So this is an artist's rendition of a human heart. The arteries are in red.

MR. OFFOR: Andrew, can you go to the next frame, please.

BY MR. OFFOR:

Q. And what are we looking at here?

A. So this is a cutaway of one of those arteries. And we can see that the diameter of the artery is severely restricted by the yellow that we see there. And the yellow represents the plaque, so that's the bad guy there, right, that's what's closing down the artery and restricting blood flow.

MR. OFFOR: Andrew, can you play the next frame, please?

BY MR. OFFOR:

Q. What are we looking at here?

A. Well, so, it all -- this whole process really starts and hinges on having this delivery system. So it starts with having a catheter, right. The catheter is basically a hollow tube. It has an uninflated balloon near the end of that. And the stent is crimped down as small as it can be on that uninflated balloon. And it has to be really small, right, because the doctor has to put that into your artery. Nobody wants a bigger hole in their artery than they have to have.

And so we want to have this crimped down very small, and it needs to be able to get through the twisty, windy parts of the artery to get to the place where the doctor wants to implant it.

And so what you see in this picture is the -- the catheter is the blue tube, and the uninflated balloon is

shown there as the white part. You can see the little wires -- I don't know if I'm good enough with this to -- so you see the little wires here, that is the crimp down stent. And they moved that now into position.

MR. OFFOR: Andrew, could you play the next frame, please.

BY MR. OFFOR:

Q. Can you explain what we just saw here?

A. Yeah, so now the doctor inflates the balloon, and that inflating the balloon forces to stent to open up. So the stent is the thing looks like the chain link fence here in this picture. So you can see the inflated balloon and the stent, and still on the catheter, of course.

Q. And what happens next?

A. So what happens next is the doctor simply deflates the balloon, leaving the stent in place, and then it can remove the catheter. And the patient now has an open artery and that restriction is no longer there.

Q. Now, does this metal structure typically stay in the artery?

A. Yes.

MR. OFFOR: Andrew, can you call up Plaintiffs' Demonstrative 1 -4.

BY MR. OFFOR:

Q. At a high level, Dr. Nelson, can you tell us what

we're looking at on the screen?

A. Sure. These three pictures are from work that we were doing in 1996 on this stent project to deliver the virus to the artery wall.

Q. What is shown in picture B?

A. Picture B is the stent that we were using. On the left there is the sleeve that is the virus-containing part, on the right is the coil.

Q. So I don't see any metal in that picture, why is that?

A. This stent was -- you got comprised -- I'll try to get my words straight -- was made up from exclusively biodegradable polymers.

In this case we used two polymers, one was called poly-L-lactic acid, abbreviated PLLA, and the other was called one polycaprolactone, which is abbreviated PCL.

MR. OFFOR: And if we could go to picture A.

BY MR. OFFOR:

Q. What does picture A show?

A. So that is the fiber coil before the sleeve is wrapped around it.

MR. OFFOR: And if we could go to picture C.

BY MR. OFFOR:

Q. What does picture C show?

A. So picture C is that sleeve. And so if you were to

cut the stent in half and look IN down on the sleeve, that's -- so that tells us what the internal structure of that sleeve looks like.

MR. OFFOR: And if we could go back to picture A. And, actually, Andrew if you could blow up picture A and B together, side by side.

BY MR. OFFOR:

Q. Dr. Nelson, how does picture A, the fiber coil that's shown in picture A, relate to what's called a stent with polymer sleeve in picture B?

A. So picture A, the coils is the starting point, then that is covered with the sleeve part. So normally the functional stent would not look like what you would see in B. The whole thing would be covered with that sleeve. Just for purposes of this picture. We cut the sleeve off of half of it so you could see the underlying coil structure that's forming -- giving the form to the stent.

Q. And when were you working on this project?

A. So this was in '96, '97.

Q. And how did you get involved in this project again?

A. By -- I started as a faculty member, a research faculty member. I didn't get start-up funds, so my mentor Dr. Webb had an NIH grant, that this was a part of, so I became a coinvestigator on this NIH grant.

Q. Now, what is the purpose of the sleeve that you've

described?

A. So the purpose of the sleeve is to be a reservoir to hold the virus. When you see the cross section there's lots of pores and openings within that sleeve, and so the virus would be in there and that would deliver the virus to the artery wall.

Q. And what was the purpose of the coil that you described?

A. So the coil was used to hold -- similar to the video we just watched, the coil would hold the artery open and importantly hold the sleeve against the artery wall, so the virus could leach out of the sleeve and into the cells of the artery wall.

Q. And you said -- what were the stents made out of?

A. They were all biodegradable. Again, the two polymers PLLA and PCL.

Q. Was it just you working on this project, or was there a team working on this project?

A. No, this was a whole team. This was an NIH grant, so there were faculty from the University of Texas at Arlington and University of Texas Southwestern Medical Center.

Five-ish, I think, were a number of PIs and co-PIs on the this grant and then an army of graduate students and faculty and staff.

Q. How did you make the polymer fiber coils at that

time?

A. We made them by a process we called casting winding.

Q. Can you explain what that means?

A. Sure. So we started off with a polymer solution. So we take a polymer, dissolve it into a solvent. And so it's a clear liquid. And then we would pour that liquid onto a flat surface, and we would let some of that solvent evaporate. And as the solvent evaporates, the polymer becomes thicker and gooier and stickier. And when it gets to the right level of stickiness, you can then roll it up into a fiber.

Q. How many fibers would you say you made in that 1996/1997 time frame?

A. More than I should have, probably, or wanted to.

Q. And did your team publish any papers about the stent project of those fibers?

A. Yes, we published three different papers.

Q. And Dr. Nelson, in tab 2 and tab 3 of your notebook, I just wanted you to look at those two tabs and tell me if you recognize the papers. You don't have to say what they are, just tell us that you recognize those.

MR. GROSS: I'm sorry. I apologize. Objection. Prior ruling.

MR. OFFOR: Your Honor, if I may?

THE COURT: Okay. He just asked whether he

recognized it, so he hasn't moved to admit them into evidence, okay. So he can ask those questions.

BY MR. OFFOR:

Q. Do you recognize the papers that are in tab 2 and tab 3?

A. I do.

Q. Are those two of the papers that you published in the 1996 to 1998 time frame?

A. Yes, these papers were published by the research team.

MR. GROSS: Objection.

THE COURT: Okay. So you've hit the limit of admissible --

MR. OFFOR: Understood, Your Honor.

Andrew, if we could call up Plaintiffs' Demonstrative 1-7.

BY MR. OFFOR:

Q. Now, Dr. Nelson, you had mentioned you had this virus-loaded sleeve and it was placed over this fiber coil. Was this a good design for drug delivery in an artery?

A. Sort of, the best answer I could give. So we showed that we definitely were able to load this with a virus and that we were able to deliver the virus to an artery of an animal. But the sleeve, as you might be able to tell just by looking at it, was difficult to deploy in an animal, and

the sleeve also didn't limit or didn't slow down the release of the virus as well as it might have.

Q. Tell us why it was difficult to deploy?

A. Well, remember the video we saw. The metal stents, right, will crimp down onto the balloon catheter that's placed in the artery. And then once the doctor deflates the balloon, then they expand out very large, so the stents, to be clinically useful, have to be able to be both shrunk down and expand out. So this sleeve, as it was designed in 1996, was really not very capable of doing either of those. The size was pretty much fixed, and so clinically it didn't really have much opportunity for success.

Q. And why was it difficult to control how drugs were released?

A. So as you see from the picture that we're looking at there, there's lots of big pores and openings for the virus to flow in quickly, and then it would flow out quickly when placed into an animal. So experiments we did in the lab showed that 85 percent of the virus was released in just ten minutes, and we thought that was far too fast to be clinical useful.

Q. So why would that be too fast to be clinically useful?

A. Well, you got to imagine it takes some time just to snake that catheter up to the place to get to where you want

to place the stent. So if I want to use 85 percent of my virus in ten minutes, five or six or eight of those ten minutes would be chewed up just getting the stent into place. So we felt that we needed something that would release the virus over a much longer period.

Q. So it sounds like the sleeve was a problem; what did you do about it?

A. The sleeve was a problem. I would love to get rid of the sleeve but doing so left me with questions that I didn't know the answer to. How was I going to load and protect and deliver a virus if I didn't have the sleeve? That was -- that was the reservoir.

Q. And did you find an answer to that question?

A. Eventually, yes.

Q. Where?

A. From the inner ear research I was doing with Dr. Schwed.

Q. Andrew, can you call Up Plaintiffs' Demonstrative 1-8.

What was the goal of your inner ear research?

A. The goal of the research was to deliver antibiotics into this really delicate and fascinating structure of the inner ear to treat long-term persistent ear issues.

Q. And how did you try to meet that challenge?

A. Well, we thought that microspheres would be the

easiest approach due to their size and their ability to load and deliver drugs.

Q. Can you remind us again what a microsphere is?

A. Sure. So a microsphere is a teeny little sphere, a teeny little ball that's very, very small. You need a microscope to see it. It's loaded with a drug that can be slowly be released over time. They are so small that their size is measured in microns. So a micron is one-thousandth of a millimeter. So the human eye can't begin to see one micron, right?

So for perspective, a red blood cell is about seven microns in diameter. An average human hair is maybe 80 to 100 microns in diameter. So these balls are very, very, very, very small.

Q. And did you decide on a particular kind of microsphere?

A. Yeah, we decided what we wanted to use what is called a double emulsion microsphere.

Q. Can you tell us, generally, what a double emulsion microsphere is?

A. Sure. A double emulsion microsphere has distributed drug domains dispersed within this polymer spear. So actually what we see on this screen -- my chair is falling. I'm shrinking.

So if you cut one of these double emulsion

microspheres in half, it would look schematically like you see here. And so the shaded areas are the drug-rich domains, and so the drugs are in these areas, which is labeled water-soluble drugs. The part that's labeled polymer wall is the polymer that actually makes up the microsphere, makes it the solid little ball.

MR. OFFOR: Your Honor, I'd like to approach the witness with the demonstrative.

THE COURT: You may approach.

THE WITNESS: Thank you.

BY MR. OFFOR:

Q. So, Dr. Nelson, can you describe what I have just handed to you?

A. So this is an obviously very large image of one of these microsphere, and so it's a ball. If I were to cut it in half, what you can see, hopefully, from where you're sitting, is these empty void areas, that's the place in the microsphere where the drug would be. These are those drug-rich domains, and so the blue plastic here is the polymer that would make up the microsphere and the little dispersed phases, hollow parts, are the drug.

MR. OFFOR: Your Honor, may I approach?

THE COURT: Yes.

MR. OFFOR: So the drug has a reference. And if we may, may we hand those out to the jury?

THE COURT: You may pass it to them.

Pass one.

MR. GROSS: Your Honor, objection. Goes to the jury. Have it passed around.

THE COURT: That's it. They can look at one while he's talking. You don't have an objection to the demonstrative.

Did you give them one?

MR. GROSS: Yes, Your Honor. Are we giving one to every juror or just passing them around?

THE COURT: We're just passing one around, yes.

MR. GROSS: Okay.

BY MR. OFFOR:

Q. All right. Dr. Nelson, can you go ahead and just describe for me what I have handed you again?

A. Okay. So, again, this is a cut in half, double emulsion microsphere where we see there are very discreet regions of these drug-rich domains.

Q. And how did you learn how to make these back in 1996?

A. Well, like all professors, right, I followed papers in the literature. In particular, there was a paper from a professor from MIT named Dr. Robert Langer, who described making these microspheres, double emulsion microspheres and Dr. Larger discussed putting protein into these microspheres and showed that even protein retained its biologic activity

after being loaded into and releasing from one of these biodegradable microspheres.

Q. So what does a protein have to do with this case? Why did you -- why was that interesting?

A. Well, proteins are sensitive biological molecules, and, you know, in our stent project we were use viruses, which are also sensitive biological molecules, biological entities, so I was interested in, you know, things that could work with sensitive biologics.

Q. Why do you call them "sensitive"?

A. They are sensitive because they are easily damaged. They're readily damaged by heat, by exposure to solvents, and by lots of things. They can lose their biological activity relatively easily.

Q. And so is this structure, basically the structure that we see on the screen in the image under double emulsion microspheres, is this cross section something that you observed in 1996/1997?

A. Yes. Again, there are many papers in the literature, the early mid 90s is when this technology was kind of a hot thing and there was lots of publications and scientific and release and deliverer drugs from microspheres.

Q. Did you come to find this cross section important in any way?

A. Yes, very much so. So as opposed -- remember when we

talked about the sheath, right? The sheath had those big holes and pores, and so the virus would run in and just as easily run out, and so there's nothing about the polymer properties per se that slow down the delivery of the virus from the sheath.

But here in our little model of our microsphere, the only way to get from one of these drug-rich domains to the outside world is to somehow go through the polymer. So now the polymer is retarding or slowing down the drug release, and so the rate that the drug comes out of here is a property of the polymer. And so if I choose a different polymer, I would get a different release, and so I could tune release basically by adjusting my polymer.

MR. OFFOR: Andrew, can you call up Plaintiffs' Demonstrative 1-9.

BY MR. OFFOR:

Q. So, Dr. Nelson, we talked about the double emulsion microsphere and the stent project. What do they have to do with each other? What do they have to do with the '296 patent?

A. Great question. So as I said, I was really kind of stuck on the virus project. I desperately wanted to get rid of the sheath, but I couldn't figure out how I would load the project and deliver the virus, if all I had was the fiber. And I had done many things on that project, like we

changed from rolling fibers to make the stent to extruding. We bought a melt extruder, and I started melting extruders, we changed the sheath; that helped. We made multiple changes, but even after, you know, two years -- this is now by, you know, October of '97, almost two years later, I still hadn't gotten the stent to a point where it really had much clinical application. I hadn't really solved the fundamental problems. I still had to get rid of the sheath.

So as I'm puzzling on how to do that, I remembered my Dr. Nathan Schwed's experience of making these. And I said, wow, what if I could put this same drug-rich domain into a polymer fiber instead of into a microscope. Then suddenly all the lights went on for me, and I thought this is really cool, because now I could load this virus -- or a protein or whatever, because we already showed that microspheres work with sensitive biologics, and so I could use that same concept.

But now, instead of putting it into a microsphere, I could put it into a fiber. And so if I were to cut that fiber -- so if I took a piece of that fiber and cut it in half and looked down the cut piece, it would look just like this in cross section. It would have the same drug-rich domains dispersed throughout the cross-section of the fiber.

And that was my "aha moment" of how am I going

to achieve the goal of loading these sensitive biological molecules into a biodegradable fiber. And so now I knew exactly how I could load, protect, and deliver a virus if there was no sheath.

Q. What was your invention?

A. Well, so my invention is the creation of a biodegradable fiber that has immiscible drug-rich phases dispersed into the polymer structure of the fiber.

Q. How can we visualize that?

A. Figure 6 in the patent would probably be a good way to visualize that.

MR. OFFOR: Andrew, can you call up Joint Exhibit 1, please, and let's go to page 6.

BY MR. OFFOR:

Q. All right. Dr. Nelson, can you kind of explain what we're looking at here?

A. So there's a cylinder depicted on the top of the figure there, it's a circular tube. The asterisk-shaped symbol represents these drug-rich domains that are within the fiber. So the white is -- you know, it would be great if it was colored, I guess. But the white is the polymer and the asterisks are these drug-rich domains.

Q. And so the asterisks, are these -- what you call drug-rich domains, are they on the outside of the fiber or are they inside the fiber?

A. No, they are inside the fiber. Again, so the cross-section, if I were to cut that fiber, would look like this. And so now, using that technology, these would be the asterisks, right. So the asterisks are now these -- the hollowed out parts of the model.

Q. Okay. The fibers shown is a cylindrical shape. Is that -- the fiber, in your mind, is that limited by a cylindrical shape?

A. No.

MR. GROSS: Objection, Your Honor. Claim construction -- we can have a sidebar, Your Honor.

THE COURT: Let's have a sidebar.

(Whereupon, a discussion was held at sidebar as follows:)

MR. GROSS: So, Your Honor, respectfully, let me begin by saying counsel appears to be trying just get the invention story, memory, what was he doing, what was he thinking. What we can't have now is this person who is not an expert, has not been disclosed an expert opinion, has already said doesn't know what the claim terms are, and has no opinion to infringement, to turn to the jury and just start interpreting how the word "fiber" -- which is a defined term -- a threaded structure, something they disagreed with until a month ago, how that's a fiber because its shape.

He can talk about memory, invention story, what he was thinking, and if he had thoughts, that's fine. But not turning to the jury to interpret how that figure is or is not a fiber or how the shape shows its a fiber, anything like that, that's what I started to hear.

I know counsel is just trying to have it be about the story, I just wanted to say I thought we were starting to cross the line and wanted to raise it with Your Honor immediately.

MR. OFFOR: Your Honor, the question I asked is the fiber is depicted up here as a cylinder. In your mind, was the fiber limited by its shape at the time?

I don't see a problem with that. It's completely consistent with the claim construction. I'm not asking him to tell me its particular shape, isn't that actually part of the claim --

THE COURT: That's consistent with the claim construction, that question, all right. So that question is fine. So I understand your concern, you understand his concern.

MR. OFFOR: I think I'm doing a pretty decent job of not interpreting the patent.

THE COURT: All right.

(Whereupon, the discussion held at sidebar concluded.)

THE COURT: All right. Mr. Offor?

MR. OFFOR: Your Honor, may I re-ask the question?

THE COURT: Yes.

BY MR. OFFOR:

Q. Dr. Nelson, as I was saying, on this screen there was a fiber depicted as a cylinder on the screen. I said, in your mind at the time of your invention, was a fiber limited by its shape?

A. No, not at all. The cross-section could be a triangle, it could be a -- you know, whatever, it could be flat as a ribbon. And the -- the cross-sectional shape of the fiber makes no difference. The important part is that it has these drug-distributed domains throughout the structure of the polymer.

Q. And, again, I'm referring to this figure but I'm trying to speak on what you did at the time. Now, in this figure, we've got these drug domains that are -- drug-rich domains that seem to be increasing as we go from left to right, and I'm just asking you: Why is that?

A. Well, this was actually a really --

MR. GROSS: Objection, Your Honor.

The question currently about why something is not in a figure was not what was in his mind at the time of the filing of the patent application, which is the invention

story. And there is a difference between explaining what the figure means today and what he was thinking at the time. He just shifted again, Your Honor.

I could voir dire, Your Honor, for a couple of questions.

THE COURT: Okay. Let's do that.

Let's -- one second. Let me read this. And his question was limited to "at the time," he's not talking about now, he said "at the time."

MR. GROSS: Your Honor, if it's -- the witness's memory at the time, I withdraw the objection. I heard him use the current -- present tense.

THE COURT: He said at the time. Overruled.

BY MR. OFFOR:

Q. Dr. Nelson, can you answer the question. I'm talking about at the time. And can you explain, if you're thinking about what you were doing at the time, why would these drug-rich domains be increasing from -- as you go from left to right. I'm just trying to get an understanding of what's -- what that's showing?

A. So what that's showing is they -- they could be uniform, right, and that would be the easy answer, that would be the easiest thing to do. What we realized is that one more level of additional capability that this invention gave us was not only could we do this uniformly down the

fiber, but we could make it concentration grade.

If we could purposefully make it so there was more drug on one part of the fiber than on the other part of the fiber --

(Reporter clarification.)

THE WITNESS: I'm so sorry. I get too excited.

So we could make it concentration grade on purpose. And that way, that gives you the ability to release drug as a function of placement, which is really a fascinating concept.

And, so, this was the next level of additional benefit or gain that this invention had over current kinds of ideas.

BY MR. OFFOR:

Q. And did you see the fibers that you were creating at the time as providing some benefit over microspheres or over the sheath that you were working with in the virus project?

A. Absolutely. So the microspheres and the fiber both have the same cross section now, right, we've -- we have that. And so the -- in both cases, the release from the drug is dominated by the polymer properties, as the drug is always going to have to cross polymer to get out of the -- either the sphere or the fiber.

So on that basis, they are pretty much the same. But from there on, everything changes dramatically, if I

inject microspheres into a patient, they are going to scatter, they don't have any structure. But with a fiber, it's something I can hold, I can manipulate that structure, I could put assemblies of fibers together to create a scaffold.

And that scaffold would have the same advance fiber -- or same advance drug release capabilities as any individual fiber. So I could use this as an individual fiber, like a suture kind of application, or I could make scaffolds with these.

And so it dramatically expanded what would be able to be accomplished in the world of drug delivery and tissue engineering because I now had a manipulatable structure that allowed me to deliver drugs.

BY MR. OFFOR:

Q. And how did it compare to the sleeve, any advantages over the sleeve?

A. Lots of advantages over the sleeve. As we recall, in the sleeve, there was no polymer driving the release, it was all based on the geometry. Well, if I had a big pore, I got more drug; if I had a little pore, I got less drug. And there was no control over how much drug went into and came out of the sleeve. And so this was a significant step forward over the sleeve.

Q. Can you describe what you did, at a high level, to

create the fibers?

A. Sure. So we would -- would start with a beaker and put polymer in there and dissolve it in an oily solvent. Then in a separate beaker, we would put our drug and dissolve that in water, add a stabilizing molecule, combine those two beakers together, and create an emulsion.

And so an emulsion is where -- so if we think about this -- so I got the -- I've got the oily polymer solution, I've added my water, drug-containing solution. And instead of the oil in the water forming two separate phases, like your oil and water, vinegar, an emulsion is when the water now exists as tiny droplets distributed throughout that oil.

And so I don't have two lawyers, I just have a single, you know, milky-white kind of a thing. And if I look, I would have these little water droplets. Inside of that water droplet is the drug.

And while this is important for biological things, like the proteins and the viruses we were talking about, is if I'm a little protein molecule floating in this water droplet, I don't know that just on the outside is this oily solvent that would completely destroy me.

So inside of here, I'm safe, I'm happy as a clam because I'm protected inside of this water droplet. And so this was the way that I could load -- sorry -- load these

sensitive biological molecules into the fibers.
Q. I know you're excited --
A. I'm trying to calm down.
Q. Let's slow dawn. Take a sip of water. Okay.
And so I heard emulsion and polymer and water, bubbles, can we do that again, just a little bit --
A. A little slower. So the polymer solvent is an oily solution. When the water is added into that, when a -- in the form of an emulsion, it's little droplets that are dispersed throughout that oily polymer --
Q. So let's step back.
A. And that's the emulsion.
Q. Let's step back. You described two beakers?
A. Yes.
Q. And in one beaker, tell us what was in -- in the beaker on the left?
A. The beaker on my left is the polymer solution, and it's oily solvent.
Q. The beaker on the right?
A. The beaker on the right is water plus the drug, where the drug here would be the protein, the virus, the whatever drug that we were trying to make.
Q. And then what did you do with the two beakers?
A. So when -- when -- so you would add the water beaker to the polymer beaker with a stabilizing kind of molecule

that will make it -- instead of forming two layers, will make it form dispersed droplets within the polymer.

So I now have a milky-white solution -- emulsion is the right word. I would have this milky-white emulsion with little microscopic droplets of water, and inside each of those little droplets of water is the drug.

Q. And then what would you do from there?

A. So then I would take that emulsion and I would extrude it. I would put it into a coagulating bath, and that coagulating bath would extract the solvent and leave me with a solidified polymer that had now trapped inside it these dispersed, discreet drug-loaded sites.

Q. And you used the word "extruded." What did you mean by that?

A. So in this process, we used a -- it was called wet extrusion, so we would basically take the emulsion, put it into a syringe, and force it into the coagulating bath. And as it goes through the coagulating bath, the solvent extracts from the solution, and so it goes from being a liquid emulsion to being a sold fiber as it falls down through this coagulating bath as the solvent is extracted.

Q. So what is a coagulating bath?

A. So the coagulating bath is a -- is a fluid that is miscible, so going back to these words we've been hearing today. The coagulating bath is miscible with the solvent

that I used to make the emulsion, and so those two things mix very well. And so the solvent from the fiber would diffuse out into the coagulating bath, and that would -- now there's no more solvent -- well, there's limited solvent. Let's not get too hung up on words -- is that that removes the solvent enough that it becomes solid enough that it's now a fiber instead of just a stream of emulsion as it's coming out. It's fascinating to watch if it turns solid. Typically within just a few centimeters, it's solid enough that I can grab and manipulate.

THE COURT: Mr. Offor, at an appropriate time, we'll take a break. We've been going for about two hours.

MR. OFFOR: Let's take a break.

THE COURT: Take a break, all right.

(Jury left the room 4:16 p.m.)

THE COURT: Take a 15-minute break and be back at 4:30.

(Break taken.)

THE COURT: You may be seated. Bring the jury back.

(Whereupon, the jury entered the room at 4:31 p.m.)

THE COURT: Okay. Mr. Offor, you may continue.

BY MR. OFFOR:

Q. Dr. Nelson, when we left off, I think we were talking

about the coagulation bath. I just wanted to pick up at that point. Can you kind of explain what did a coagulation bath look like?

A. The one that we made was a narrow aluminum tank, maybe yea long and inch and a half, 2 inches wide. We poured the coagulating fluid in there. At one end we had the syringe to push the emulsion down into the coagulating fluid. There were a couple of rollers at the bottom so that the fiber, as it's formed, would take the path between those two fibers and then out of the bath, and then we could select it on a bobbin.

Q. And did you actually make fibers using this coagulation bath setup?

A. Yes.

Q. And did you watch fibers form?

A. Yes.

Q. The coagulation bath has fluid in it; is that right?

A. That's correct.

Q. And you said that there was a needle or some kind of needle at one end?

A. Yes.

Q. And what did you use the needle for?

A. So the needle -- so the syringe has a needle on the end of it, and so the needle is the dispensing to basically 1 -- and so is syringe is pushing the emulsion

down through the needle, and then the -- so it comes out of the needle still as the liquid emulsion, but then as the fluid of the coagulating bath is exposed to that fluid, the solvent from that emulsion is now extracted, goes out into the fluid of the coagulating bath. So as that solvent leaves, the polymer molecules precipitate on each other and form a fiber.

Q. So are you saying that -- so where in the coagulation bath does it form a fiber?

A. Very shortly. It's fascinating to watch. You start off with a clear liquid, and then maybe, depending on the polymer and the solvents and, you know, the whole list of parameters, but somewhere within a few millimeters to maybe three inches it goes from being a clear liquid to now a white fiber that falls down through the coagulating bath.

Q. Okay. So you said "falls down through the coagulating bath," so did that -- did that fiber that was forming, did it have any -- did it have strength?

A. No.

Q. Was it still a fiber, in your mind, at that time?

A. Yes.

Q. And so how did you typically pull a fiber out of the coagulation bath?

A. Very high advanced thing called tweezers, reached in and grabbed it, threaded it underneath the two rollers and

pulled it out.

Q. Now, if you can go back --

MR. OFFOR: Andrew, if you could pull up Joint Exhibit No. 1 and go to page 6, and let's take a look, again, at figure 6.

BY MR. OFFOR:

Q. And, again, Dr. Nelson, just so we're all on the same page, can you remind us what the cylinder is depicting and what the little asterisks is depicting.

A. So is cylinder is depicting a fiber that we extruded by this process we've just described. The asterisks are representing the drug-rich domains that are dispersed throughout the cross-section of the fibers, similar to what we have had in our demonstrative.

Q. And was you -- at the time of the 1997, 1998 timeframe, did you perceive -- did you believe that the fibers that you were creating, did you believe that the kind of drug you could incorporate into them was limited?

A. No.

Q. Why is that?

A. Well, so the emulsion would protect the drugs, like the proteins and stuff that we talked about, but we also could load drugs that didn't need protection, right. There was no -- there's no reason the drug has to have that protection. And so small molecule drugs, biologics, all

could be loaded into that process the same. It didn't -- it didn't make any difference.

Q. You said "small molecule drugs"; what do you mean by that?

A. Um, I guess the easiest way to say would be something you would pick up from your pharmacist or something, you know, a molecular -- a small molecular entity. You know, we didn't load aspirin, but I'll use aspirin as an illustrative of what I'm talking about.

Q. Then you used the term "biologics"; what did yo9u mean by that?

A. So biologics is something like a protein, something that is grown by a living organism, right. So it comes from cells in culture, it comes from an animal, or, you know, it's biologically derived.

Q. And so, again, just referring to figure 6 for demonstrative purposes, did your idea stop with being able to control drug release along the length of a fiber?

A. No. So sort of the next really cool idea is that we could now make a coaxial fiber. And so this fiber would now have multiple layers. And each of those layers could now have a different drug. They could be made out of a different polymer, so each layer could release it at its own rate, release its own drug, so now they're making, you know, these coaxial fibers. The possibilities become almost

limitless of what you can do with this technology.

MR. OFFOR: Andrew, could you call up figure 4 of Joint Exhibit 1.

BY MR. OFFOR:

Q. Dr. Nelson, can you describe what you mean by -- what you meant by "coaxial fibers" with respect to figure 4?

A. Okay. Sure. So the center that we're seeing there that has the asterisk symbol, you can think of that as seeing the fiber we were just looking at in figure 6 now turned end on, so we're looking at the end of it. But now it's a coaxial fiber, and so there's a layer over top of that represented by the part that contains the triangles and the part that contains the circles.

Q. So how many components would you say are in this -- that are represented in this image?

A. So this image has three components.

Q. And so what is the first component?

A. So the first component would be the centerpiece that has the, you know, it's the full circle with the asterisk representation of that drug.

Q. Okay. And is this a cross-section of a fiber?

A. Yes, so this would be the cross-section of a coaxial fiber.

Q. So, like, we're looking down into the --

A. Right, the fiber would run away from us deep into the

wall.
Q. What would be the second component?
A. The second component, doesn't really matter which one you choose, either the top half or the bottom half, the -- represented by either the triangles or the circles.
Q. And then the third component would be --
A. Would be the other one.
Q. Okay. And what do the triangles, circles and asterisks represent?
A. So they represent different drugs. So this represents a single coaxial fiber, but the single coaxial fiber is made out of three different polymers, and each polymer has its own drug in it. So there's three different drugs.
Presumptively all of these can be released at different rates because maybe one of those polymer degrades very slow, maybe another one degrades very fast, and so you could adjust the time, the degradation rate and, hence, the speed that the drug would come out individually, independently in each of those three components.
Q. I know we're looking at a cross-section, but I guess the circle in the middle, you say it was the first component, but that would have a length, right?
A. Correct.
Q. And then let's call the second component, this sort

of upside down U at the top.
A. Okay.
Q. That would also have a length, right?
A. Yes. Yes, it would be the same length as the middle.
MR. GROSS: Objection. Relevancy as to the length of the coating, the second component.
THE COURT: Overruled.
BY MR. OFFOR:
Q. And how about the bottom component, would that also have a length?
A. Yes.
Q. So is this -- I understand this is one fiber --
A. Correct.
Q. -- right?
Are you saying that the top component and the bottom component run the entire length of the center component?
A. Yes.
Q. And do all three components here in this picture -- again, I'm referring to the coaxial fibers that you were working on leading up to this invention. Does this -- would all three components contain polymer?
A. Yes.
Q. Okay. And all three components could contain drug-rich domains?

A. Correct.

Q. So where would the drug-rich domains be?

A. So the drug-rich domains are, again, distributed, similar to our analogy, so the circles would represent the drug-rich domains of drug -- well, it's number 13, we'll call it Drug 13. The triangles are Drug Number 12, and the asterisks are Drug Number 11.

Q. And did you say all three components could also contain polymer?

A. Yes, so all of those -- all of those drug-rich domains are distributed throughout a polymer, and the polymer that's surrounding Drug 13 doesn't have to be the same polymer as the polymer that's surrounding Drug 12 or the polymer that's surrounding Drug 11.

MR. OFFOR: Andrew, can you call up Plaintiffs' Demonstrative 1-15.

BY MR. OFFOR:

Q. And so, Dr. Nelson, what is useful or interesting about this kind of three-component fiber that you've just described?

A. So this is a great practical application. So in this application, this was designed to be a wound dressing, perhaps particularly for burn patients.

Q. And what do you mean by "wound dressing"?

A. A -- a dressing, a gauze, I'm not sure the right

word, something that hopefully would be available in a CVS, right, to be something that would help a patient heal.

Q. Okay. And so go ahead and continue.

A. And so the thing that makes this really fun is the -- let me see if I can use this.

So the graph that you see, this shows the rate of drug release over time. And so what this says is the green polymer and the green drug maybe are released very fast. And then, you know, so you get this kind of quick burst of that drug, and then it slowly decays. The pink may be lightly slower, but then it slowly decays. And then the yellow, much longer over time.

And so in the case of wound dressing, maybe the green is a drug that's going to stop bleeding. So you put that on, it's released very rapidly into the wound bed, and you stop bleeding.

The pink line that comes shortly thereafter may be a drug that would recruit white cells in to fight bacteria and infection that would be associated with that wound.

The yellow that's now much slower and persists over a much longer time could be maybe a drug that stops excessive scar tissue. So in burn patients, excessive scarring is a huge problem. And so here's an example where this concept of multicomponent fiber that each has its own

drug, its own release rate could be put into a practical application that would help a patient heal.

Q. And, Dr. Nelson, did you -- so you just described this wound healing application?

A. Yes.

Q. Was this the only way that these fibers could be used?

A. No, we thought of other ways as well.

Q. What else did you think of?

A. Well, stents, for example.

Q. Can you explain that in more detail?

A. Well, you all heard the story. This whole concept came about because I was trying to get rid of the sheath on the stent. And so we -- you know, the stent application was certainly at the heart of this invention.

Q. But the stent that you were talking about in your virus delivery project was a fully biodegradable, right?

A. That's correct.

Q. Okay. And so is that the limit -- I mean, let me say that differently.

Could this work with metal stents?

A. Absolutely.

Q. And why do you say "absolutely"?

A. So in the patent we talk about, if you -- you could use this with a commercially available stent, right, where

the fiber could be wrapped around the -- the commercially available stent in some way.

And the fiber now, rather than providing strength, doesn't have to because it's sitting on a metal scaffold. And so the fiber now just provides the drug delivery capability, and so you could apply a fiber to the outside of a metal stent. That fiber would then provide the drug delivery capability to -- to the metal stent.

Q. Is that something that you're just saying now or did you actually write that in your patent?

A. No, that's actually in the patent.

MR. OFFOR: Andrew, if you would, could you go column 22 on page 25. Could you blow up example 7.

BY MR. OFFOR:

Q. And, Dr. Nelson, is this an example that you included in your patent?

A. Yes.

Q. Okay. And can you just kind of tell us where you described the use of your fibers with the commercially available stents?

A. Well, the text that's highlighted explains that, where again, it's this concept of using a fiber in conjunction with a metal stent, applying the fiber to the outside surface of the stent to provide not mechanical support, but to serve as a drug delivery reservoir.

Q. And are there places in the body where using a fiber as a drug delivery mechanism would be better than using a microsphere?

A. Sure. Any time you need mechanical support, so whether that's a single fiber as a drug releasing suture, you know, if that were to be used in conjunction with other fibers that it's -- you know, it's a part of this invention that you can get mechanical support and pharmaceutical support from the same device.

Q. And what about in the arteries?

A. Sure. So if you -- so if we stay with this stent concept for a minute, a fiber wrapped around the stent is a -- is probably much more convenient or much easier to do than a fiber to try to put, you know, little microspheres along the surface of the stent or, you know, some other sort of concept.

And so the fiber could be, you know, pressed against the artery wall. The fiber then would be able to deliver the drug directly into the arterial wall and would treat the disease at the cite where the -- where it's needed.

Q. And why might a fiber be better than microspheres?

A. Well, I guess one reason is just the ease, right, microspheres could get rubbed off or whatever. It's probably easier in manufacturing. I'm not -- that's not my

area of expertise, so I can't speak to that. But I think that, overall, a smooth environment like a fiber would do well in that context.

THE COURT: Mr. Offor, let's keep him to his factual knowledge and not have him opine on anything. He's here as a fact witness.

MR. OFFOR: Yes, Your Honor.

BY MR. OFFOR:

Q. Dr. Nelson, was it you alone that turned these ideas into the '296 patent?

A. No, we had a team, and it was very much a team effort.

MR. OFFOR: Andrew, can you call up Plaintiffs' Demonstrative 1-10.

BY MR. OFFOR:

Q. And what are we seeing on this screen, Dr. Nelson?

A. These are the inventors on the '296 patent.

Q. And who was Andres Romero-Sanchez?

A. Andres was my first graduate student. He's the guy that built the coagulation bath that I described. He extruded the first fiber that we called the first prototype of this in 1998.

Q. And tell us about that first fiber, what was unique about it?

A. Well, so he used a very rich blue dye to -- as the

pretend drug, and so that was the drug that went into the emulsion. And we showed that we got this nice pretty blue fiber out the other end.
Q. And how about Paula Waggoner, who was she?
A. So Paula was another graduate student in my lab. Paula worked at loading proteins into these fibers, and so she was looking at therapeutic proteins and using this emulsion process we described to use therapeutic proteins.
Q. And how about Delia Radulescu?
A. So Delia was also another graduate student. Delia actually went in a little bit different direction with the polymer. She used naturally occurring polymers, so her work with was (phonetic) kitasin, predominantly.
Q. Can you explain -- you said "naturally occurring polymers," what do you mean by that?
A. The polymers that we've been discussing today are synthetic polymers. Naturally occurring polymers, you know, like the name implies, come from nature. So kitazen is a naturally occurring polymer.
Q. And what about Dr. Alikacem, how did he contribute?
A. Excuse me. Dr. Alikacem was into ophthalmology, and so that was the first application of our fibers, in an ophthalmology setting.
Q. What is ophthalmology?
A. Sorry, eye, use -- for use in the eye.

Q. And what about Dr. Hu, Zhibing Hu?

A. Zhibing Hu is a professor at University of North Texas. And his research was on gels, these little nanohydrogels. And so he showed that we can load these nanohydrogels into the fiber with or without an emulsion and still create this concept of, you know, discreet drug-loaded domains, with or without using an emulsion.

Q. And what about Dr. Smith, George Smith, how did he contribute?

A. So Dr. Smith worked with me on bridging a gap in rat's sciatic nerve. So we grew -- or regrew word or nerves across the 10-millileter gap in a rat.

Q. Rat sciatic nerve?

A. Yes. So sciatic nerve is the main nerve that -- in humans it goes down our legs, in rats it goes down the hind legs. And a 10-millimeter gap in a rat is a really big gap. That would be, you know, 6 inches in a human or something.

Q. So what did you do with Dr. Smith with rat's sciatic never?

A. So we created a nerve graph and loaded it with fibers and demonstrated that nerves could grow across using this -- this scaffolding of fibers. We actually published that in the journal of Experimental Neurology.

And to the best of my knowledge, that was the first ever record of fascicle formation in an artificial

nerve graft.
Q. Another word, fascicle?
A. Another word, fascicle.
Q. I don't know that. What is fascicle formation?
A. So if I was running the wiring in a six-story building, I would probably put all the wires going to the fifth floor in the same conduit, and run that conduit to the fifth floor. In nature -- nerve trunks of our body, the same kind of thing happens, nature bundles nerves together that have a common destination.

(Reporter clarification.)

THE WITNESS: I'm sorry.

And so the fascicle is this wrapping that the body puts around nerves.

BY MR. OFFOR:
Q. Now, Dr. Nelson, do you have any documents that show that you came up with these ideas and worked with these others to turn these into a patent?
A. Sure. We have my lab notebook, we have the invention disclosure, and I'm sure there's others.
Q. And, Dr. Nelson, do you recognize the document that's in tab four of your witness notebook?
A. Yes.
Q. Can you tell us what it is?
A. So this is my lab notebook that I used from 1996 to

1999.

Q. And generally, what does -- can you describe the subject of the lab notebook?

A. It's just a place to record my experiments, the results of those experiments, my thoughts, ideas of inventions.

Q. And were those ideas, thoughts related to the '296 patent?

A. Yes. So, you know, the work we've talked about with the stent project, with the work with Dr. Schwed on the microspheres, the things that lead up to the '296 patent.

MR. OFFOR: Your Honor, we move Plaintiffs' Exhibit 17 into evidence.

MR. GROSS: No objection.

THE COURT: All right.

(Exhibit exhibit).

MR. OFFOR: Andrew, can you call up Plaintiffs' Exhibit 17, and let's go to page 3.

BY MR. OFFOR:

Q. Dr. Nelson, my first question -- let me finish your water.

So my first question is: Are these your notes?

A. Yes.

Q. And is that your signature at the bottom of the page?

A. Yes.

Q. So what is the subject of the notes that you're making on this page of your lab notebook?
A. This is the page that basically set the direction for the rest of my career and the '296 patent.
Q. And so what did you memorialize on this page?
A. So pretty much what we discussed today so far.
THE WITNESS: Andrew, if we could look at the middle part of this -- of that.
BY MR. OFFOR:
Q. And let me step back real quickly and ask a question.
A. Yes.
Q. When were these notes made?
A. These notes were made on or about October 17th of '97, I believe. If we could --
Q. Is there a signature --
A. -- verify that --
Q. -- or date by your signature?
A. Yeah, that's correct.
Q. Okay. So when were these notes made, approximately?
A. October 17th of '97.
MR. OFFOR: Andrew, if you could blow up the middle of the page.
BY MR. OFFOR:
Q. And, Dr. Nelson, what's being described here?
A. So what's being described here is this concept that

we've been talking about of having drug-rich domains within the polymer fiber.

So in my scratchy -- being way too kind to call it a drawing, I don't know what a better word would be. But I talked to you about using collagen-based nanoparticles, represented by the little circles here. The swiggly lines are the polymer fiber -- or the polymer molecules within this fiber.

And so we talked about creating this drug-rich domain fiber, I describe a method for how you would make such a drug-rich fiber -- drug-rich domain fiber.

Q. And so are you -- where is the fiber depicted on this page?

A. So the fiber -- the bounds of the fiber, the outside of the fiber are these two lines, the swiggly lines here in the middle are my representation of just randomly oriented polymer chains. And the little circles that are distributed there are collagen beds, that would be this, right, distributed drug-rich domains within that fiber.

Q. And in this picture, are you depicting the little drug-rich domains on top of the fiber or inside of the fiber?

A. Inside the fiber.

MR. OFFOR: Okay. If we could go to the top of the page, Andrew.

BY MR. OFFOR:

Q. And what are you showing on this page of your lab book, Dr. Nelson?

A. And so here is where I talked about having, you know, this -- not -- I just used the word -- coaxial, that's the word I'm looking for. Coaxial fiber where, in this case, rather that one layer, we talked about having potentially three layers or two layers around the -- the core fiber. And, again, the -- all the benefits we talked about with the coaxial fiber.

Q. This is kind of what you were describing with respect to figure 4 of patent?

A. Yes, exactly.

MR. OFFOR: Andrew, if you could go to page 63 of Plaintiffs' Exhibit 17.

BY MR. OFFOR:

Q. Are these your notes, Dr. Nelson?

A. They are.

Q. When are they from?

A. So this is from June 9th of '98.

Q. And what are the notes on this page?

A. So this is the day that Andres extruded the nice pretty blue fiber.

Q. Andres is who?

A. Andres Romero-Sanchez, the coinventor on the patent,

my first graduate student.

Q. And how do you know it was the day that he extruded the first Evans blue fiber?

A. On the invention discloser that I filed with the University, this is the date that I put down as the first date. And so this is Andres using, again, this Evans blue dye to create the fiber.

MR. OFFOR: Andrew, if we can go to Page 82 of Plaintiffs' Exhibit 17.

BY MR. OFFOR:

Q. Are these your notes, Dr. Nelson?

A. Yes.

Q. And when were they made?

A. October 9th of '98.

Q. And just generally, small notes, but what's the subject here?

A. So this was the nerve work that I was doing with Dr. George Smith.

MR. OFFOR: Andrew, if you could go to page 89.

BY MR. OFFOR:

Q. And, Dr. Nelson, are these your notes?

A. Yes.

Q. When approximately were they made?

A. October 29th of '98.

Q. And what are you notating on this page?

A. So this was thoughts about how far I could go with putting a biological molecule in there. As you see at the top second line, not only protein but now I'm thinking about, wow, could I even do this with a live cell? And so that's taking this to a whole new level.

MR. OFFOR: Andrew, if you could go to page 98 of Plaintiffs' Exhibit 17.

BY MR. OFFOR:

Q. Dr. Nelson, are these your notes?

A. Yes.

Q. And approximately when were they made?

A. So this would be December of '98.

Q. And what are these notes about?

A. This is notes of work that Paula Waggoner was doing on her protein-loaded fiber.

MR. OFFOR: Andrew, if we could go to page 103.

BY MR. OFFOR:

Q. Dr. Nelson, are these your notes?

A. Yes.

Q. And approximately when were they made?

A. January of '99.

Q. And what are they about?

A. This was work I was doing with Nadir Alikacem.

Q. And what were you working on with Nadir?

A. This was for ocular applications.

Q. Ocular meaning --
A. Eye, eye work, yeah.
MR. OFFOR: Andrew, can you go to page 123.
BY MR. OFFOR:
Q. Dr. Nelson, are these your notes on page 126 of Plaintiffs' Exhibit 17?
A. Yes.
Q. When did -- approximately when did you make the notes?
A. March of '99.
Q. And are were the notes about?
A. This was work with Dr. Zhibing Hu on the gels, NIPA was the type of gel that he was using at the time.
Q. Dr. Nelson, do you recognize the document behind tab 5 in your witness notebook?
A. Yes.
Q. Can you tell us what it is?
A. This is the invention disclosure I signed with the University.
Q. Could you repeat that answer, Dr. Nelson?
A. Sure, this is the invention disclosure that I signed with the University.
Q. And approximately when did you sign this?
A. August of '98.
MR. OFFOR: Your Honor, can we move -- we move

Joint Exhibit 6 into evidence.

MR. GROSS: No objection.

THE COURT: Okay. So moved.

(Joint Exhibit No. 6 was admitted.)

MR. OFFOR: Andrew, can you call up Joint Exhibit 6.

BY MR. OFFOR:

Q. And, Dr. Nelson, is that your signature at the bottom?

A. Yes, it is.

Q. And when did you submit this invention disclosure statement to the University?

A. I assume I would have submitted it some time around the time I assigned it, so August of '98.

Q. And what was the goal with this document?

A. So this was to describe the invention to the University, to talk about commercial applications, to talk about why I thought it was an original invention, to describe, you know, facts associated with an invention.

MR. OFFOR: Andrew, if we can go to page 2 of Joint Exhibit 6.

BY MR. OFFOR:

Q. Dr. Nelson, briefly, what's described here?

A. In which paragraph? I'm sorry.

Q. Let's go to paragraph one.

A. One -- paragraph one.

And so this summarizes the invention that we've been talking about today, that we can create a device that can be used to load drugs, proteins, other therapeutic agents into these fibers.

Q. And how about paragraph two; what are you describing there?

A. This describes various applications that were possible with this invention over a range of different drug types and different types of clinical applications.

Q. And are stents described in this paragraph?

A. I would have to read it, I'm sorry.

There we go. Thank you, Andrew.

Stents do appear in this paragraph.

MR. OFFOR: Andrew, if you could go to page 4. And let's blow up the second to the last paragraph.

BY MR. OFFOR:

Q. And what are you describing here on the second to last paragraph of page 4?

A. This is the work that I was doing with Dr. George Smith, I talked about the work we did with the rat sciatic nerve. And here we discussed even moving into the spinal cord as well as the next applications.

Q. So here you were just summarizing what -- the work that you were doing with Dr. Smith?

A. Yes.
Q. How can we tell it's a rat sciatic nerve?
A. So --
MR. OFFOR: Andrew -- go ahead.
THE WITNESS: No, I was going to say, the second to the last sentence, the -- so this was before we put these into rats, apparently.
So the next step would be to load these fibers with neurotrophins to stimulate growth in vito, meaning inside of a living animal.
BY MR. OFFOR:
Q. Dr. Nelson, when did you start TissueGen?
A. 24th of July 2000.
Q. And when you started it, did you enter into any agreements with the University of Texas?
A. I did.
Q. Okay. And what was the -- what were those agreements?
A. We had a patent license agreement that we entered into in 2001.
Q. And did you -- is that the agreement that's still operative now?
A. No, we entered into a second one in 2005.
Q. Okay. What was the arrangement in 2005?
A. It was pretty similar to the 2001 version of it.

There was one significant difference in that the 2005 version required that we raise $1 million in funding within two years of the date of signing the agreement.

Q. And did you have exclusive rights to make and sell products covered by patents under that agreement?

A. Yes.

Q. And what patents were those?

A. So that would be the '296 patent, other applications and other patents that I was going to venture on from my University.

Q. And do you recognize tab 6 from in your book -- your notebook?

A. Yes.

Q. What is tab 6 in your witness notebook?

A. Tab 6 is the 2005 license agreement.

MR. OFFOR: Your Honor, we move the 2005 license agreement into evidence.

MR. GROSS: No objection.

MR. OFFOR: That's Plaintiffs' Exhibit 5.

THE COURT: Okay.

(Plaintiff Exhibit No. 5 was admitted.)

MR. OFFOR: Andrew, can you call up Plaintiffs' Exhibit 5, and let's go to page 6.

If you could blow up the section called diligence. And let's highlight section 6.4.

BY MR. OFFOR:
Q. Dr. Nelson, what are we seeing here on the screen?
A. So this is the requirement to raise $1 million within the second anniversary of signing this, and any of their investment capital or funds from the specific product related by a third party.
Q. And how did you go about doing that, how did TissueGen go about doing that?
MR. GROSS: Objection, relevancy. In phase two, Your Honor.
MR. OFFOR: Your Honor, I may.
THE COURT: I'm having trouble understanding the relevancy of it.
MR. OFFOR: It just lead into my next question. There's no more on this.
THE COURT: Okay. Let's go to your next question.
BY MR. OFFOR:
Q. So how did you go about doing that?
A. So I went full time with TissueGen in June of 2005. About that time, we hired a man named Keith Brown to be our president and CEO. And so Keith and I sat down and went through a many-month process of looking at our intellectual property, what our capabilities were, and deciding what product would be the -- the product that would be most

likely to help us meet this $1 million fundraising requirement and be the best product for TissueGen to move forward.

And so after many months, we ended up deciding that a peripheral vascular stent, or a stent that's for the arteries of the leg would be the appropriate thing. So we started working on what we called AAPS, that stood for Advanced All Polymer Stent. And so in late 2005 we started to develop the stent.

Q. So what became of this advanced all polymer stent?

A. Ultimately we clanged its name to ARCHER. And --

MR. GROSS: Objection. Relevancy. And we believe that this relates to a prior ruling the Court made before testimony began.

THE COURT: Okay. Let's have a sidebar.

(Whereupon, a discussion at sidebar was as follows:)

MR. GROSS: Two things, Your Honor. We're not getting into the marking or commercialization or anything leading to the products. They're trying to show we infringed, that's what this phase is about.

THE COURT: Right.

MR. GROSS: The Court already said investment documents exhibits are phase two. We're not getting into investment. There's 403 reasons. We're now getting into

investments and raising $1 million. There's 404 issues related to this investment issue.

We are far astray from his memory leading to the invention of the filing of the patent, way beyond background. We're now in the realm of talking about investment, talking about developing, commercializing products. And it's just not relevant to the phase, Your Honor, and the Court has made a number of rulings support that.

MR. OFFOR: Your Honor, I'm not talking about investment. That was just a lead-in question to where we are going. Yes, we're talking about TissueGen's ARCHER stent that they were developing; however, part of getting a path, part of validity is new and useful, and we are just going ahead and showing that the technology was useful.

Dr. Nelson was disclosed on these topics as a fact witness, as a fact witness, on both this invention story and the commercialization of the inventions in the '296 patent. And so I don't have to show the presentation, but I don't -- the idea that a company is going to come in here and allege infringement, and then only Boston Scientific would be able to show that they've done anything and TissueGen can't show that its -- that its technology was useful, that -- number one that, doesn't seem fair, but, number two, we are trying to show that it's useful and

useful for anything, what is the jury going to think? It's just going to be big of Boston Scientific coming up and saying, hey, we change lives, we advance medicine, and look at these folks, what did they do?

MR. SHORE: It's written description, too.

THE COURT: Okay. I'm going to allow it, but just stick to the parameters of -- we're not talking numbers.

MR. OFFOR: Absolutely not.

THE COURT: And we're only keeping him to -- as a fact witness.

MR. OFFOR: Absolutely.

THE COURT: So what he has knowledge about.

MR. OFFOR: Absolutely.

THE COURT: And be cognizant of what we are trying in phase one.

MR. OFFOR: Again, I have been...

THE COURT: Okay.

MR. OFFOR: That's top of mind.

THE COURT: Okay.

(Whereupon, the discussion held at sidebar concluded.)

THE COURT: You may proceed.

BY MR. OFFOR:

Q. Dr. Nelson, I think you had mentioned ARCHER, can you

tell us what the ARCHER stent was?
A. Yes, the ARCHER stent was a full biodegradable drug-eluting stent that was designed for the arteries of the leg.
Q. And designed by who?
A. By TissueGen.
Q. What was the intended use of ARCHER?
A. To work in the arteries of the leg to -- when they are -- similar to the video that we saw, when there's a narrowing in the artery, for whatever reason, that the stent would open that up and allow blood flow.
Q. And did you intend for ARCHER to be a drug-eluting stent?
A. Yes.
Q. And what does drug-eluting stent mean?
A. It means that we would use the concepts of the '296 patent to deliver drug to the artery wall.
MR. OFFOR: Andrew, can you call up Plaintiffs' Demonstrative 1-15.
BY MR. OFFOR:
Q. Dr. Nelson, can you tell me generally what are we seeing on the screen?
A. So these are pictures of the ARCHER stent.
Q. And what's shown in image A?
A. So image A shows that the ARCHER stent was composed

of two different parts; there's the mesh part that you see, that's on the outside, and then underneath that there are fiber coils.

Q. What's shown in picture B?

A. So picture B is those fiber coils that are just placed in a clear tube so that you can see it easier. The important part of picture C is that it's counter clockwise wound in one direction and clockwise wound the other, so it's two different directions.

Q. How about picture D?

A. Picture D.

Q. D?

A. That's a CT scan of one of our stents in an artery, and you can see the flat shape of the stent -- you know, the coils of the ARCHER stent.

Q. How about picture C?

A. Picture C was a placement of the ARCHER stent in the femoral artery of an animal. If you look closely between -- on this ruler between 13 and 14, you can see these little lines here, those are actually the coils of the ARCHER stent that you can see through the artery wall.

Q. What was unique about ARCHER?

A. Well, we started from scratch to design ARCHER. And this timeframe, 2008, sort of timeframe, there were two basic kinds of stents that were being used in arteries of

And was your intent to release drug from I guess the fiber coil or the fiber mesh?
A. We could release it from either.
Q. And what drug did you intend to release?
A. We were going to use a drug called rapamycin.
Q. Why would you use that drug?
A. Rapamycin was a drug known to prevent that renarrowing of the artery that can happen when a stent is placed, and so it can maintain blood flow.
Q. And did you plan to use the technology of the '296 patent?
A. Yes.
Q. And what would that mean for drug release?
A. Well, so drug release, that would mean, again, we have the same cross-section. So the delivery of the drug is going to be limited and controlled by -- that's the good news, right -- controlled by the degradation of the polymer. And then, in the end, because it's fully biodegradable, there's nothing left than your own tissue in the end.
Q. Now, by September of 2008, had TissueGen done animal trials?
A. Yes. By then we had completed six animal trials.
Q. Can you tell us a little bit more about the animal trials?
A. Sure. So some of them were just functional trials to

say, hey, can we get the stent into the animal? And that would be what you would see in the picture on the upper right, right. That was just a test of can we put this into the femoral artery of an animal?

And then we did two trials that were longer term.

Q. And were the trials successful?

A. Yes. Yeah, we showed that we could place the stent, we showed it was functional, we showed it had good healing and good bio -- you know, good compatibility.

Q. And so at the time -- well, let me step back.

Are trials free or do they cost money?

A. No, they cost money.

Q. And how was TissueGen funding these trials in its development?

A. Well, so you remember the --

MR. GROSS: Objection, relevancy.

THE COURT: I'm going to sustain it in terms of, you know, let's limit the testimony in this area. You understand the concerns and what we've ruled before, so let's limit it. You can ask him about --

MR. OFFOR: I can ask it in a different way.

THE COURT: -- in general, but let's not get into numbers.

MR. OFFOR: Absolutely.

BY MR. OFFOR:

Q. So how was TissueGen funding this?

A. Well, we had the limitation of raising the million dollars by 2007. We did meet that. We had an investor who put in $1.15 million in --

THE COURT: No numbers.

THE WITNESS: Oh, gosh, right. No numbers. I apologize, Your Honor.

THE COURT: Ladies and gentlemen of the jury, please disregard those numbers.

THE WITNESS: I apologize.

So we met the obligation. And so the funding that was used to pay for those animal requirements came from that. As well as there were a number of interventional cardiologists who also had invested.

BY MR. OFFOR:

Q. What are interventional cardiologists?

A. So these are guys that are putting stents in people's legs every day. So they knew the limitations and the shortcomings of the current stents that they had in their tool box. And they loved the ARCHER design, they loved the concept of it being biodegradable, they loved the ability to release drug, and they thought ARCHER was worth investing in.

Q. And so -- so what was next for ARCHER?

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM et al., | ) |
| | ) Case No. 18-392-GBW |
| Plaintiffs, | ) |
| v. | ) |
| | ) |
| BOSTON SCIENTIFIC CORP., | ) |
| | ) |
| Defendant. | ) |

- - - -

Wilmington, Delaware
Wednesday, January 25, 2023
*Trial Volume II*

- - - -

*BEFORE: HONORABLE GREGORY B. WILLIAMS*
*UNITED STATES DISTRICT COURT JUDGE*

- - - -

*Michele L. Rolfe, RPR, CRR*

APPEARANCES:

STAMOULIS & WEINBLATT LLC
BY: STAMATIOS STAMOULIS, ESQ.

-and-

SHORE CHAN DEPUMPO LLP
BY: CHIJIOKE OFFOR, ESQ.
COREY LIPSCHUTZ, ESQ.
MICHAEL SHORE, ESQ.

Counsel for Plaintiffs

FARNAN LLP
BY: MICHAEL FARNAN, ESQ.

-and-

FAEGRE DRINKER BIDDLE & REATH LLP
BY: TIMOTHY GRIMSRUD, ESQ.
CHAD DROWN, ESQ.
LAUREN BARTA, ESQ.
DAVID GROSS, ESQ.
KATHERINE RAZAVI, ESQ.
EVAN KLINE-WEDEEN, ESQ.

Counsel for Defendant

MR. SHORE: Just let me them redact them both. It's -- this is nonsense and they are wasting our time.

MR. GROSS: Your Honor, I apologize, I just want to say one thing --

THE COURT: It's redacted. Don't need to say anything else. All right.

All right. So we'll come back at 9:25, and we'll call the jury in.

(Break taken.)

THE COURT: All right. You may be seated until the jury comes.

MR. OFFOR: Your Honor, should Dr. Nelson take the stand now, or should we wait for the jury?

THE COURT: Wait until the jury comes.

Did the Deputy give you the time remaining?

ALL COUNSEL: Yes, Your Honor.

THE COURT: Okay. Let's see, one of those -- I'll read the time remaining into the record each morning before we start.

Okay. So --

DEPUTY CLERK: All rise.

(Whereupon, the jury entered the room at 9:30 a.m.)

THE COURT: All right. Good morning, ladies and gentlemen of the jury.

So we're going to just get started immediately. So I hope you had a restful night. And with that, we'll go ahead with plaintiff. You can call Dr. Nelson back to the stand.

MR. OFFOR: Plaintiffs call Dr. Nelson back to the stand.

(Dr. Nelson, having been previously sworn, testified as follows:)

(Continuation.)

THE COURT: All right. You may proceed.

DIRECT EXAMINATION

BY MR. OFFOR:

Q. Good morning, Dr. Nelson.

A. Good morning.

Q. When was the '296 patent filed, the application?

A. The application was filed in 1999.

Q. The original, the provisional, when was the final application filed?

A. 2000.

Q. And when did you start working on the two products that inspired the ideas behind the '296 patent?

A. 1996.

Q. And so from 1996 to 2000, were you working on fibers during that time?

A. Yes.

Q. So you were making fibers during that time?

A. Yes.

Q. Did you ever make fibers that were flat, flat like a ribbon?

A. Yes.

Q. And how many processes did you use for making fibers, different processes?

A. Over that timeframe, three different processes.

Q. Did you ever use a casting process for making fibers?

A. Yes.

Q. Did you ever use an extrusion process for making fibers?

A. Yes.

MR. OFFOR: No further questions.

THE COURT: Before we start the cross.

(Whereupon, a discussion was held at sidebar as follows:)

THE COURT: So just putting the remaining time on the record. Time used yesterday by plaintiff was 3 hours and 7 minutes. Time used by defendant was 1 hour, 6 minutes. So as of the start of today, plaintiff has 9 hours, 53 minutes and defendant has 11 hours, 54 minutes remaining.

We didn't charge anyone for the time 9 o'clock when you came in this morning.

MR. SHORE: Your Honor, the only thing, I don't understand how it works, but when we have these objections hearing.

THE COURT: Sidebars, yeah, it's discretion and sometimes it gets charged. Most times it gets split. If -- under certain circumstances, it may just get charged to one side, but for the most part to date, it's been split.

MR. SHORE: Okay.

(Whereupon, the discussion held at sidebar concluded.)

THE COURT: All right. You may proceed.

CROSS-EXAMINATION

BY MR. GROSS:

Q. Good morning, Dr. Nelson.

A. Good morning.

Q. I'm David Gross, we have not met before. Good to meet you.

A. Good to meet you.

Q. Let's get started. Sir, I want to focus on what you believed in the past, what you remember in the past, what you're aware of in the past, that's the area I'm going to be focusing on, all right, sir?

A. Yes.

Q. Why am I telling you this? Because I know you're not listed as an expert in this trial; you're aware of that,

Q. Dr. Allocco, my name is Michael Shore. Have we ever met before?
A. I don't believe so.
Q. And when you gave your deposition earlier in the case, I didn't take your deposition, did I?
A. No.
Q. I believe that was Mr. Offor took your deposition?
A. Yes, I believe that's right.
Q. All right. I'm going to try to start here. Where's my big blue pen?
I'm going to try to start here with a few things we can agree upon, okay. First of all, could you tell the jury who you are?
A. Yeah. My name is Dominic Allocco. I'm a physician, a cardiologist. I work at Boston Scientific, and I'm the vice president of clinical there. I head up the group that runs clinical trials for many of our cardiology products.
Q. Could you move the microphone a little closer to your mouth so the court reporter and me, who is a little deaf, can hear you?
A. Absolutely. Is that better?
Q. Yes.
A. Great.
Q. And give a little background, give me your educational background.

A. Yeah, I studied economics at Harvard University. I was also a premed. Then I went to Stanford University for medical school, and I got a master's of engineering while I was at Sanford. And then I went back to Boston and did training in internal medicine and then cardiology at Beth Israel Deaconess Medical Center. It's one of the Harvard record teaching hospitals. And while there, I also did a joint program at Harvard and MIT studying biomedical informatics.
Q. All right. So you're an engineer and a doctor?
A. I have a master's in engineering, and I'm a doctor.
Q. All right. Good. So let's -- I'm going to try to start out -- I like to start out with things I think we can agree upon, okay.
We can agree upon that the SYNERGY stents that are accused of infringement in this case have a biodegradable polymer coating, correct?
A. Yes.
Q. All right. Now, and we can also agree that the coating is on the outside surface of the SYNERGY stents, the abluminal surface that goes against the wall of the artery?
A. Yes.
Q. And there may be some, a little bit of bleed over on the side of the stents, but that's just an artifact of how it's made, correct?

A. That's correct.
Q. All right. Now -- and we can also agree that that the polymer used on the SYNERGY stent, the biodegradable polymer is made of a -- is PLGA, correct?
A. Yes that's correct.
Q. And PLGA is one of the polymers listed in the '296 patent?
A. I don't know that.
Q. Okay. And we can also agree that the biodegradable polymer coating on the outside surface of the SYNERGY stent has a drug-rich phase and a polymer-rich phase, correct?
A. Yes.
Q. That's two phases, right?
A. Yes.
Q. Now, I believe we can also agree that the drug is a therapeutic agent, it's everolimus?
A. Everolimus is a therapeutic agent, yes, I agree with that.
Q. Now -- and, again, I'm marking on this, so I probably need to make sure that my markings are agreeable, too, so let me go back.

Okay. So we agree there's at least one biodegradable polymer on the outside surface of the SYNERGY stents, correct?
A. SYNERGY definitely has a biodegradable polymer on the

outside surface of the stent.
Q. And when you say "the outside surface," that's the abluminal surface against the artery wall?
A. That's correct.
Q. All right. So I'm going to put DM, Dominic Allocco. You agree with that, what is underlined, biodegradable polymer is in the SYNERGY stent?
A. Sorry, what does the DM mean?
Q. Dominic -- oh, Dominic Allocco, look at that, I messed up my beautiful exhibit. So the DA is Dominic Allocco.
A. Okay.
Q. Do you agree the SYNERGY stent is a biodegradable polymer on the outside surface of the SYNERGY stent?
A. Yes.
Q. Okay. And you agree -- I'm going to put a little square around fiber, I'm sure, but do you agree that the SYNERGY stent's polymer, the coating or whatever we want to call it, has two phases?
MR. DROWN: Objection, Your Honor, these are defined terms by the Court. He's asking the witness to provide expert testimony on infringement.
MR. SHORE: Your Honor, he's a biomechanical engineer, he's a doctor. This is basic stuff.
MR. DROWN: Sidebar, Your Honor.

serpentine, correct?
A. Yes.
Q. Now, if something -- the polymer coating that covers the serpentine rings is also serpentine in shape, isn't it?
A. The polymer takes the shape of the stent.
Q. Right. In other words, if you coat something, it's going to take the same format as what you're coating, correct?
A. Yes.
Q. So, just to start, serpentine is a word that is accurate to describe the polymer coating on top of the serpentine rings that it coats?
A. I suppose so.
Q. Okay. Let's also look at tab 3. First of all, take a look at tab 3 in your notebook. What is tab 3?
A. So tab 3 is our responses to a series of FDA questions.
Q. Actually, it's titled "Deficiency Response," correct?
A. That's correct.
Q. The FDA, before they would approve it, before they approve the use of it, they said, The first time you put this in there, it wasn't quite enough. We have questions. We need more information.
A. That's correct. The FDA asked additional questions.
Q. Now, just because they asked additional questions,

and you had to put in another statement or deficiency statement, does that mean that the SYNERGY stent can never be approved?

A. No.

Q. Okay. And if you have to put in more information to the FDA, does that have any impact on whether the SYNERGY stent, as it's finally made, is an acceptable product?

A. No. I would say it's fairly common in FDA submissions to receive deficiency questions like this.

Q. Okay.

MR. SHORE: And so let's offer Plaintiffs' Exhibit 51, Your Honor.

MR. DROWN: No objection?

THE COURT: All right. It's admitted.

(Plaintiffs' Exhibit 51 is admitted.)

BY MR. SHORE:

Q. In Plaintiffs' Exhibit 51, why don't you turn to page 128.

MR. SHORE: And let's put that up on the screen, if we can, Andrew. And let's highlight the background.

BY MR. SHORE:

Q. And then do you see the sentence there where Boston Scientific describes the SYNERGY stent as ribbon-like? "Underlying geometry results in something resembling a ribbon"?

A. Yes, I see that.

Q. Would you agree with me that if it's accurate to describe the underlying structure as ribbon-like or a ribbon, it would also accurate to describe the coating, what coats it, as ribbon-like?

A. I guess it's accurate to describe the coating, the shape of the coating that has been applied to the stent, as ribbon-like, yes.

Q. Okay.

All right?

A. You say that, I'll say if you painted something on the stent, it would have the same shape, but I'm not sure I would describe the paint as a ribbon.

Q. Nobody is painting the SYNERGY stent, are they?

A. It's actually very similar to how the SYNERGY stent is coated.

Q. So there's paint on the SYNERGY stent?

A. No. There's a liquid that's applied on the SYNERGY stent that dries like paint.

Q. It dries just like paint?

A. I didn't say it dries just like paint.

Q. Okay. Well, again, I'll ask the question. He's going to get a chance to ask you questions, too. If you want to disagree; that's fine.

MR. DROWN: Objection. That's not a question.

MR. SHORE: Your Honor, the witness made a statement unresponsive to any question.

THE COURT: So let's just move on.

BY MR. SHORE:

Q. All right. Let's go to the next tab. And this is tab 4. Would you please describe for me what tab 4 is?

A. Yeah, this is a slide set or copy of the slide set on "Particulate Review and Discussion on Lab Coat and Evolution" that was presented to FDA on July 7, 2009.

Q. Now, if you are going to go to the FDA, and you're going to give them a presentation, Evolution, which is the subject matter of this presentation, that is what became SYNERGY, correct?

A. Yes, the Evolution product ultimately became SYNERGY.

Q. When we're talking about Evolution, we're also talking about SYNERGY?

A. At least a precursor to it, yes.

Q. All right. We would offer into evidence Plaintiffs' Exhibit 50.

MR. DROWN: No objection, Your Honor.

THE COURT: So it's admitted.

(Plaintiffs' Exhibit 50 admitted.)

BY MR. SHORE:

Q. Let's look at page -- and by the way, did you participate in this meeting with the FDA?

A. I don't know the answer to that.
Q. You don't recall whether you did or not?
A. No. I participated in a number of discussions in the FDA about particulates. I don't recall if I was at this meeting or not.
Q. Okay.
A. There's probably a list of -- I don't see a list of attendees here.
Q. All right. Let's look at page 5.
MR. GROSS: Put page 5 up on the Board, please.
BY MR. GROSS:
Q. Now, here, particularly, I wanted to address you to the statement: "One-dimensional characterization of particle size is a useful oversimplification. The particle shape may affect risk" -- "fear of risk" -- "sphere likely worse than long, thin fiber."
Did I read that correctly?
A. Yes.
Q. Would you agree with me that, as Boston Scientific told the FDA, something that's long and thin can be a fiber?
A. Something that's long and thin can be a fiber?
Q. Correct.
A. Yes, I think that's an accurate statement.
Clearly there are things that are long and thin that are not fibers.

MR. SHORE: Objection. Nonresponsive. Move to strike.

THE COURT: Please just answer the question that's being asked. Your counsel can will get a chance to redirect during their presentation.

BY MR. SHORE:

Q. And what we're talking about here are -- as the fiber degrades in the body, pieces of it will break off, correct?
A. What fiber?
Q. I'm sorry. As the coating on the outside of the SYNERGY stent breaks off, some of the pieces that break off are long and thin in the form of a fiber?
A. That's possible, yes.
Q. It's not possible. This is also what you told the FDA, correct?
A. Sorry. Here we're talking about ways of characterizing particles in general.
Q. Okay. The particles that come off -- and we'll get to this. We've got pictures if we need to. Would you agree with me the particles that come off the SYNERGY stent have been described by Boston Scientific as fibers.
A. I don't know about that.
Q. All right. If a piece comes off of something larger as a fiber, doesn't what it comes off of also have to be a fiber?

A. No.

Q. Okay. Let's take a look at the next tab. PTX 49. What is PTX 49, sir?

A. Sorry. That's tab 5?

Q. Tab 5.

A. So this is a document called "SYNERGY System Particulate Assessment."

Q. This is a Boston Scientific document, correct?

A. Yes.

Q. Created for the FDA, correct?

A. Yes.

MR. SHORE: We would move into evidence Plaintiffs' Exhibit 49.

MR. DROWN: Your Honor, we don't have any further objections to 49, 50, or 51, than we've already made, which the Court has ruled on. So nothing further than that, Your Honor.

THE COURT: Okay. So it's admitted.

(Plaintiffs' Exhibit 49 was admitted.)

MR. SHORE: Let's put up the front page of 59 -- Plaintiffs' Exhibit 49.

BY MR. SHORE:

Q. Is this the document you have in your notebook?

A. Yes.

Q. And let's go to page 24.

MR. SHORE: And let's highlight down where it says "shape."

BY MR. SHORE:

Q. And let's see. It says -- why don't we take a look at --

MR. SHORE: Can we highlight the last sentence.

BY MR. SHORE:

Q. Particles with large aspect ratios are fibers, correct?

A. I don't think it says --

MR. DROWN: Objection.

THE WITNESS: It says "are fibers."

BY MR. SHORE:

Q. Let's just read it. This is a Boston Scientific document, correct? It says, "In addition, particles with large aspect ratio (fibers)"?

A. Correct.

Q. So Boston Scientific in a document to the FDA is saying that something with a large aspect ratio, in this instance a particle, is a fiber?

A. It's not clear to me that this document says that the definition of a fiber is a particle with a large aspect ratio.

Q. You don't think so. It says, "Particles with large aspect ratio (fibers)" is not describing a particle with a

large aspect ratio as a fiber?
A. It may be an example.
Q. So it is. It's describing a particle with a large aspect ratio as a fiber?
A. It's not a definition. For example --
MR. SHORE: Objection, Your Honor. It's a yes or no question.
THE COURT: Yeah, but you asked him the question. He does get the chance to elaborate on his answer. You may disagree, and counsel could -- will have a chance to redirect, but the witness does have the opportunity to answer your question and elaborate to the extent --
MR. SHORE: All right.
THE COURT: -- that he needs to.
MR. DROWN: He gets to answer -- finish his answer to his question, right, Your Honor?
BY MR. SHORE:
Q. Do you recall the question --
A. The example here is a large aspect ratio. I have a large example of aspect ratio, where most people are taller than they are wide, but that doesn't mean we're fibers.
Q. Is this talking about the human body, this exhibit? Is it talking about your body?
A. No.

Q. It's talking about particles that come off of the coating of the SYNERGY stent, correct?

A. That's what this document is talking about.

Q. All right. So what it says is Boston Scientific says that something, a particle, of the coating with a large aspect ratio is defined or described as a fiber, correct?

A. No, I don't think that sentence defines fiber as a particle with a large aspect ratio. Again, a particle is a piece. If you took a piece of me and cut off my arm, that would be longer -- that would have a large aspect ratio. It is longer than it is other dimensions, but you wouldn't call my arm a fiber.

Q. I don't see "arm" on this. Is "arm" on this anywhere?

A. No, this document is talking about the SYNERGY stent.

Q. Okay. Well --

A. But what you said was that a definition of a fiber is a particle with a large aspect ratio. And there are examples of things that are particles with large aspect ratios that are not fibers.

Q. Particles of your body, your arm, that's what you're talking about?

A. Could be anything, right.

Q. Okay. Well, let's go back to -- let's go back to planet SYNERGY, and let's take a look at this document, and

what this document from Boston Scientific says, very clearly, is that in the context of particles coming off the SYNERGY stent, those particles that come off the SYNERGY stent that are -- have large aspect ratios are being described as fibers.

A. I think what this sentence says is that fibers as one example of particles with large aspect ratios.

Q. Would you agree with me that Boston Scientific has described particles that have high aspect ratios or large aspect ratios they are being described, not defined, but described as fibers?

A. Yes, I agree that Boston Scientific, in this document, says that fibers, gives an example of fibers, as a particle with large aspect ratios. And then obviously the sentence goes on to say that they may have different biologic responses than other particles.

Q. Well, the biological response has nothing to do with its shape, right?

A. No, I don't think that's correct.

Q. Okay. Let's look at the same exhibit on -- I'm sorry. Would you agree with me that an aspect ratio of 160:1 is large?

A. Yes.

Q. Would you agree with me that an aspect ratio of 687:1 is large?

Q. What evidence did you provide the FDA --

MR. DROWN: Your Honor, Your Honor, if -- I don't want to --

THE COURT: Well, well, well, I'm going to sustain the objection because we're talking about this specific stent. I don't want to hear about other drugs. He's asking about you, as the person who designed the clinical trials, what knowledge, if any, did you have about whether this stent changed?

THE WITNESS: I don't have detailed knowledge about whether the stent changes.

BY MR. SHORE:

Q. You don't have any knowledge about whether the stent changed, do you?

A. I do. I have knowledge that it's possible that the stent changes over time.

MR. SHORE: Objection. Nonresponsive.

BY MR. SHORE:

Q. My question was, sir --

MR. SHORE: I'm sorry.

MR. DROWN: Your Honor --

THE COURT: Well, well, he's saying he has knowledge that it may be possible, so that's responsive.

BY MR. SHORE:

Q. All right. Well, let me ask you this, I'm not asking

you -- very specific question: What knowledge do you have that the SYNERGY stent actually does change from the time it's manufactured to the time it's put into a person's body?
A. The knowledge I have that relates to that is that it is possible for polymers and drugs to change over time, and it is possible that the SYNERGY stent changes over time while remaining safe to implant.
Q. I'm going to try one more time. I didn't ask you what was possible. It's possible that I could dunk a basketball, I would probably need a trampoline to do it, but it's possible.
My question to you is: What knowledge do you have that the SYNERGY stent actually does undergo a change, chemically or any other type of change, from the time it's manufactured to the time it goes into the human body, that it actually doesn't, not that it's possible, that it actually does it?
A. I don't have knowledge beyond the fact that it is possible that it changes.
Q. Let's go to --
MR. SHORE: Could we put up the Court's claims construction, please?
BY MR. SHORE:
Q. All right. I'm going to direct you to "fiber," do you see that? The construction of the word "fiber"?

A. Yes.

Q. And it says -- do you see down there, it says, "Thread-like structure of any length or shape," do you see that?

A. Yes.

Q. Now, I take it that you'd agree with me that a fiber, in cross-section, any shape would include a circle, correct?

A. Yes.

Q. You'd also agree with me that any shape would include a triangle?

A. Yes.

Q. You would also agree with me that any shape, asterisk or a star?

A. That would qualify as any shape, yes.

Q. And any shape would include a half-moon or half circle?

A. Yes.

Q. And any shape would include -- we'll call that a "hairdo" shape.

A. That is any shape, yes.

Q. And so if the cross-section of the fiber has any of those shapes, it's still acceptable under the Court's claim construction?

A. Those are shapes, and, yes, any shape is a shape.

MR. SHORE: Can you pull up the cross-section of

the SYNERGY stent.

I don't think that's the right -- they're working on it. If you could blow that up.

BY MR. SHORE:

Q. That's the hairdo shape, isn't it? The coating on the outside of the SYNERGY stent is the haircut shape?

A. Yes, it is very similar to the shape you drew.

Q. Now, let's go back to the claims construction.

Thread-like. How is thread-like different --

MR. DROWN: Your Honor, objection. We have a continuing 702 objection to any testimony about this.

MR. SHORE: Your Honor --

THE COURT: Okay. I already ruled.

BY MR. SHORE:

Q. All right. Thread-like, how is thread-like any different than thread?

MR. DROWN: Objection. Claim construction, Your Honor. The witness can't construe the claim what you construed.

MR. SHORE: It's plain and ordinary meaning, Your Honor.

THE COURT: But you can ask him about thread-like.

BY MR. SHORE:

Q. Yeah. So in other words -- you weren't here for

opening statement or maybe you were. But counsel for Boston Scientific got up and pulled out a piece of thread. He says, "Thread, it has to be a thread, it has to be a thread, thread-like means thread."

Have you ever seen a thread shaped like a haircut?

A. No, I have never seen a thread shaped like a haircut.

Q. Have you ever seen a thread shaped like a half-moon or a half circle?

A. No.

Q. Have you ever seen a thread shaped like a star or an asterisk?

A. No.

Q. Have you ever seen a thread shaped like a triangle?

A. No.

Q. So, clearly, thread-like means something more than a circular thread-like?

MR. DROWN: Same objection, claim construction of your claim construction.

THE COURT: I think direct -- you can ask him his understanding of "thread-like."

MR. SHORE: Okay.

BY MR. SHORE:

Q. So I got some things for you I'm going to ask you about.

This I pulled off of a shopping bag.

MR. SHORE: May I approach?

THE COURT: Yes.

BY MR. SHORE:

Q. Is this thread-like?

A. Yeah, I think that could be described as thread-like.

Q. It's long and it's thin, right?

Correct?

A. It is long and thin, yes.

Q. Has a high aspect ratio; in other words, if you compared the thickness or the width to the length, it's a high aspect ratio, correct?

A. Yes.

Q. Okay. So this is thread-like?

A. Yes.

MR. SHORE: May I approach the witness, Your Honor?

THE COURT: Yes.

MR. SHORE: And, actually, I'd like to move in my shopping bag handle into evidence.

MR. DROWN: Objection. It's never been disclosed, Your Honor.

MR. SHORE: Your Honor, it's cross-examination.

MR. DROWN: This isn't on any trial list, Your Honor, on any list.

THE COURT: It's a --

MR. DROWN: Demonstrative.

THE COURT: -- demonstrative.

Do you need it to be admitted into evidence?

MR. SHORE: I would just like to then publish it to the jury.

THE COURT: You've already done that.

MR. DROWN: Your Honor, he's walking over to the jury.

THE COURT: I mean, they can see it from where you are.

MR. SHORE: Okay.

Thread-like.

THE COURT: Okay.

BY MR. SHORE:

Q. Dental floss, do you know what dental floss is made out of?

A. No.

Q. Okay. It's flat.

MR. SHORE: Can I approach the witness?

THE COURT: You can approach the witness, yes.

BY MR. SHORE:

Q. Dental floss, is it flat?

A. Somewhat.

Q. Is it long and thin?

A. Yes.
Q. Is it thread-like?
A. Yes, I think dental floss is thread-like.
MR. SHORE: May I approach the witness, Your Honor?
THE COURT: Yes.
BY MR. SHORE:
Q. Rubber band. Is it long?
A. Yes.
Q. High aspect --
A. At least that rubber band is long.
Q. High aspect ratio?
A. Yes.
MR. DROWN: Your Honor, I object to counsel standing in front of the witness asking questions. We have a podium for this.
THE COURT: Overruled.
BY MR. SHORE:
Q. Is it thread-like?
A. Somewhat.
Q. A piece of plastic I took off of a box. I think they call these box binders or something. Is it long?
A. It is long.
Q. Is it thin?
A. Yes.

Q. Is it flat?
A. It is flat.
Q. Is it thread-like?
A. I don't know about that one.
Q. If I can lace my shoes with it, is it thread-like?
A. I don't know if that's how I'd define "thread-like."
Q. All right. So this, unlike the rubber band, you say is not thread-like?
Or are you saying it's not thread-like?
A. I don't know if I would say that's thread-like or not.
Q. Okay. Well, I stripped this little piece off of it, the smaller piece. Do you want to hold that, stretch it out?
Is it long?
A. It is long.
Q. Is it thin?
A. It is thin.
Q. What's it made out of?
A. Plastic, it looks to be.
Q. Polymer. Plastic is a polymer, correct?
A. Yes.
Q. And is this thread-like, this squiggly piece that you can strip off?
A. That's a thread-like piece.

Q. Okay.
A. Yes.
THE COURT: Mr. Shore, at an appropriate time, it's time for a break.
MR. SHORE: Maybe five minutes.
THE COURT: Okay.
BY MR. SHORE:
Q. This is a twist tie that I pulled out from around a cable. Is it long?
A. It is long.
Q. Thin?
A. Yes.
Q. High aspect ratio?
A. Yes.
Q. Is it thread-like?
A. Kind of.
Sorry about that.
MR. SHORE: Just two more, Your Honor.
BY MR. SHORE:
Q. I've straightened out a paper clip. It's made of metal, correct?
A. Yes.
Q. Metal can be thread-like, can't it?
A. It could be, yes.
Q. Is the paper clip stretched out long and thin?

A. Yes.
Q. It's got a high aspect ratio?
A. Yes.
Q. It's thread-like, correct?
A. I don't know if I would say that's thread-like.
Q. Well, one of the things that they said to make it thread-like, you had to be able to wrap it around a bobbin. Can it be wrapped around a bobbin?
A. Can it be wrapped around your finger, yes.
Q. Does that make it thread-like?
A. That it can be wrapped around your finger, no.
Q. Okay. That's -- I'm just -- that's what the lawyer from Boston Scientific said. It's on a bobbin.
MR. DROWN: Objection. Argumentative. Misstates testimony.
BY MR. SHORE:
Q. So you're not sure if this is thread-like, why would this not be thread-like?
A. I don't know if I would consider a deformed paper clip to be thread-like.
Q. Why not? It's long, it's thin, has a high aspect ratio, it's manipulable, why would that not be thread-like?
A. Again, a deformed paper clip doesn't seem thread-like to me.
Q. Why not?

A. It's not like a thread.
Q. It's long and thin like the fibers described by Boston Scientific.
A. My arm is long and thin, but I don't consider that to be a thread.
Q. Okay.
MR. SHORE: Last one, Your Honor.
BY MR. SHORE:
Q. Here's a bolt. What are these things on the outside of the bolt called? What are these called? You're an engineer, I hope you know what it's called.
A. The grooves.
Q. It's called grooves. You don't want to use the word "thread," do you?
A. Well, you could call that the thread.
Q. Oh, oh, shocking, thread.
What makes them threads? What makes these threads?
A. I don't know, that's what you call the things on the outside of a bolt.
Q. They are long and continuous, correct? Because if they weren't continuous, you couldn't screw the nut on, correct?
A. Yeah.
Q. And these threads are thinner, much thinner than they

are long if you were to stretch them out?
A. Yeah, if you cut them off the bolt and stretch them out, they would be longer than they are in other dimensions.
Q. They'd have a high aspect ratio, correct?
A. Yes.
Q. That's a thread.
MR. SHORE: We can take a break, Your Honor.
THE COURT: Okay.
All right. We're going to take a 15-minute break, come back at 11:55.
MR. SHORE: And, Your Honor, I just ask that the witness be reminded not to speak to counsel on the break.
THE COURT: Mr. Allocco, you're not to speak with counsel during break.
THE WITNESS: Understood.
THE COURT: All right. You're still under oath.
(Whereupon, the jury left the room at 11:40 a.m.)
THE COURT: Mr. Shore, let's eliminate the commentary.
MR. SHORE: Yes, sir.
THE COURT: The "oh shocking," and things of that nature.
All right. We're in recess.
(Recess taken.)

THE COURT: All right. You may be seated. Get the jury.

(Whereupon, the jury entered the room at 12:03 p.m.)

MR. SHORE: Your Honor, the parties have agreed to the admission of JTX 008 on Exhibit 8, I believe.

MR. DROWN: No objection, Your Honor.

BY MR. SHORE:

Q. Dr. Allocco, I put in front of you a copy of Joint Exhibit 8, do you see that in front of you?

A. I do.

Q. And could you tell the jury what Joint Exhibit 8 is?

A. I'm sorry, I couldn't hear you, could you repeat that.

Q. Could you tell the jury what Joint Exhibit 8 is?

A. Yes, this is a presentation given by Dr. Ian Meredith on the final five-year results of the EVOLVE clinical trial.

Q. And this is a presentation given at EuroPCR?

A. That's right.

Q. What is EuroPCR?

A. EuroPCR is a major vacular medical conference held in Europe.

Q. And interventional cardiologists go to the conference to get information on new developments in their field?

A. That's correct.

In the first stents, like the first two shown here, the Multi-Link and Express -- Express 2 stents, is what we call bare-metal stents. That's the -- you see the "(BMS)" after that, and that stands for bare-metal stent. It's just a metal stent that you put in. That helps reduce the risk of the blockage coming back, but there's still a risk of blockages coming back.

And so then, you know, we learned that you could put drugs on stents, and the drugs would further reduce the risk of blockages.

So we made a number of stents there using a couple of different kinds of drugs. And you can see all of the different kinds of stents we've made, kind of continued to evolve stents over time.

The dates are the dates when those stents were approved for use, but we worked on them for many years before that.

And really the last stent or our latest generation stent is the SYNERGY stent.

Q. And it looks like you've had coronary stents with polymer coatings for decades?

A. Yeah. Our first one was approved in 2004 and we worked on it for years before that.

Q. Let's talk about SYNERGY.

A. Okay.

Q. Have you seen a SYNERGY stent?
A. Yes.
Q. Did you work on the SYNERGY development?
A. Yes.
Q. Do you know how -- about the SYNERGY stent design?
A. Yes.
Q. Have you done clinical trials with SYNERGY?
A. Yes.

MR. DROWN: Your Honor, may I approach?

THE COURT: Yes.

BY MR. DROWN:

Q. I'm handing you an item.
A. Okay.
Q. What is it?
A. This is a SYNERGY stent.
Q. Open the package for the jury, please.

MR. DROWN: Your Honor, the SYNERGY stent is quite small and intricate, we'd ask permission for Dr. Allocco to come down from the stand and show it to the jury.

THE COURT: Granted.

BY MR. DROWN:

Q. Dr. Allocco, open it up and describe what you see for the jury.
A. So the stent comes coiled up like this so it can fit

in a small box, but it's really a long, thin thing. And the stent itself is on the very end here, and it's compressed down. And the reason it's compressed down is so that it can go up through the body easily.

And then it's on what we call a catheter, which is the rest of this. And the whole point of the catheter is to help get the stent to the coronary artery and the blockage.

And so this stent will be inserted in the artery in the leg, it's going to be advanced up through the body, kind of around and into the heart. And then when it's in the heart, there's a balloon, the stent is on a balloon. And the balloon is going to be inflated and the stent is going to come up and push the blockage out of the way.

Then the balloon will be deflated and everything will be taken out of the body, except the stent will stay behind in the body.

Q. And, Dr. Allocco, is that the largest stent -- there's various sizes of SYNERGY, the actual stent, right, big and small?

A. Yeah, the stents we measure -- we make them in various lengths and diameters. And this, even though it looks small, it's one of the longest stents we make, it's a 48-millimeter stent.

Q. Do you have a SYNERGY stent with you?

A. Because I opened the SYNERGY stent box, took it out, inflated it on the balloon, and put it in that jar.

Q. Roger that.

Dr. Allocco, you can take a seat. And they can just place it on the rail and we'll come get it.

MR. DROWN: Your Honor, there's no objection to Joint Exhibit 5, which we would offer.

THE COURT: Okay. No objection, admitted.

(Joint Exhibit No. 5 was admitted.)

BY MR. DROWN:

Q. Dr. Allocco, we're going to show a clip from a video, and it's just a --

Stop. It happened.

MR. SHORE: It's fine, no objection.

(Video clip played.)

BY MR. DROWN:

Q. What do we see here, Dr. Allocco?

A. So here you see the SYNERGY stent, and it's in its crimped-down state or it's compressed on the balloon. So most of what we see here is the stent. And then just on the outside, you can see the little parts of the balloon -- the ends of the balloon.

Q. So if we play the video, then what do we see?

(Video clip played.)

A. So as you play the video, you see the balloon

inflating and the stent expanding.

(Video clip played.

Q. All right. Let's move on to a new topic: SYNERGY and the FDA, okay, sir?

A. Okay.

Q. Were you involved in the regulatory approval with the FDA for SYNERGY?

A. Yes.

Q. And describe the process in which you get FDA approval for SYNERGY?

A. Yeah, so we submit a lot of information to FDA about the design of the SYNERGY stent, the manufacturing process, the testing we've done, the clinical trial data. And the FDA reviews all of that to evaluate the safety and efficacy of the SYNERGY stent.

Q. And is it important for Boston Scientific to be accurate in its FDA submissions?

A. Absolutely.

Q. And was Boston Scientific accurate?

A. Yes.

Q. There are various called PMA submissions, Dr. Allocco, that have been talked about. What is a PMA submission?

A. So it's a premarket approval, and it's the data and documents that you submit to FDA to support US approval of a

product.

Q. When were the PMA documents submitted to the FDA with this information and data and testing?

A. For SYNERGY, I believe it was either late 2014 or early 2015.

Q. Okay. So we have FDA PMA, and this is 2014?

A. Yeah, the very end of 2014 or maybe early 2015.

Q. So we'll put them both, 2014 and '15, do you see that?

A. Yes.

Q. When was this lawsuit filed?

A. I believe in 2017.

Q. So, just to state the obvious, the FDA submissions were done a few years before this lawsuit was ever filed?

A. Yes.

Q. Now, let's go to Joint Exhibit 3. What is -- what is Joint Exhibit 3?

A. As soon as it appears.

Q. This was not one of the exhibits in defendant's group that they gave you. So we will give you even more binders.

MR. DROWN: Your Honor, may I approach?

THE COURT: Yes.

BY MR. DROWN:

Q. Joint Exhibit 3, Dr. Allocco, what is it?

A. So this is a section from the PMA, the premarket

Q. Have you ever been at a meeting with the FDA where you or anybody at Boston Scientific said the coating on the SYNERGY stent is a fiber or a thread-like structure?

A. No.

Q. Has anybody in the FDA, in the history of any communication you've ever had with them, written, whatever, on the phone, Zoom, web chat, this, that, and the other, where they said the coating on the SYNERGY stent is a fiber or a thread-like structure?

A. No.

Q. Sir, have you written articles published in journals describing the SYNERGY stent?

A. Yes.

Q. How many?

A. Probably about ten.

Q. In your articles published in journals describing the SYNERGY stent, have you ever described the coating as a --

MR. SHORE: Objection --

BY MR. DROWN:

Q. -- fiber or a thread-like structure?

MR. SHORE: Objection. Best evidence rule. Hearsay.

MR. DROWN: Literally just asking if he said those words, Your Honor.

MR. SHORE: Your Honor, I have no way to

cross-examine him. I haven't seen any of these articles if they're not -- they were never produced in discovery. I have no idea what they say. The best evidence rule clearly applied, as does hearsay.

MR. DROWN: I could be heard on this, Your Honor, if you'd like, but this is just a question.

THE COURT: Well, hearsay is applicable. This is direct, but if you can do it in a manner that it doesn't violate the hearsay rule, you can ask the question.

BY MR. DROWN:

Q. I'll just ask this -- I'll be as clear as a bell. Have you ever said, Dominic Allocco, that the coating on the SYNERGY stent is a fiber or a thread-like structure?

A. Never.

Q. If the coating on the SYNERGY stent was a fiber or a thread or a thread-like structure, would you know, sir?

A. Yes.

Q. Why?

A. You know, as the physician in charge of conducting clinical trials on this product, including the first time it was put into patients, I'm familiar with the SYNERGY stent design, the data we submitted to FDA. I know the coating, and there is no fiber.

MR. DROWN: No further questions.

THE COURT: Okay.

All right. At this time we're going to break for lunch. So we're going to take a 45-minute lunch. We'll come back at around five of 2:00.

So take the jury out.

(Whereupon, the jury left the room at 1:08 p.m.)

THE COURT: Okay. Mr. Shore?

MR. SHORE: Your Honor, Dr. Allocco just testified to a couple of things that I believe have opened the door to the fact that -- well, let me tell you what he testified to. He testified to that they are a company full of engineers, they do their own research and development, they did a lot of research and development on the entire history of their stents, they developed all of those stents that he listed on the board themselves, they did it all.

They got sued by Cordis, Johnson & Johnson and lost for violating Johnson & Johnson and Cordis's stent patents and paid $713 million because they went all the way up to Court of Appeals, all the way up to the Federal Circuit, they lost here too.

So for him to come in here and tell the jury that they do it all themselves, they design it all themselves, they do everything, completely opens the door to the fact that they've been sued before for stealing the designs of other people to the tune of $700 million license agreement that they had to pay.

for Boston Scientific, they said if you put a tiny, little dot on the roller and you roll it up, it depends on what kind of paint it is, if you can peel that strip of paint off, correct?
A. Probably.
Q. And if you peel that strip of paint off, it's thread-like, isn't it?
A. Doesn't mean the paint is thread-like.
Q. The strip is thread-like, correct?
A. Could be, yes.
Q. All right.
MR. SHORE: Let's go to JTX 002 -- I'm sorry, DTX 16, page 89.
BY MR. SHORE:
Q. And while he's doing that, I have another question for you. You talked about -- I think you said coffee and sugar will dissolve into one another, right?
A. I said sugar will dissolve in coffee.
Q. Right. But if you have the sugar is in a separate sugar bowl next to a cup of coffee, and the two cups are touching one another, the boundary of the cups are touching one another, will the sugar and the coffee dissolve into one another?
A. If the sugar is in a sugar bowl and the coffee is in a coffee cup and the two cups touch each other?

Q. Right?
A. No, the sugar wouldn't dissolve into the coffee then.
Q. So, in other words, for the sugar to dissolve in the coffee, the sugar has to be placed in the coffee?
A. Yes.
Q. All right.
MR. SHORE: Let's go to -- yeah, blow up this. Let's --
BY MR. SHORE:
Q. Here I believe it says -- this is what was given to the FDA, correct?
A. Correct.
Q. And it says, "This data suggests there was slight immiscibility between the everolimus and PLGA"?
MR. DROWN: Objection, Your Honor. It says "miscible."
BY MR. SHORE:
Q. I guess if it's slightly immiscible or slightly miscible it's the same thing?
THE COURT: Objection sustained. Just read it correctly, please.
BY MR. SHORE:
Q. There was a slight miscibility between everolimus?
A. Everolimus.
Q. Everolimus. And PLGA. Is everolimus a substance?

A. Yes.
Q. Is PLGA a substance?
A. Yes.
Q. So what they are talking about in this document is there's slight miscibility between two substances, not two phases?
A. I mean, the document says, "This data suggests there was slight miscibility between everolimus and PLGA."
Q. Two substances, correct?
A. Yes.
Q. And then it says, "However separated drug and PLGA-rich phases were detected as reflected by two distinct glass transition temperatures," correct?
A. Yes.
Q. If two things are dissolved into one another, they will have one glass transmission temperature, won't they?
A. I don't know the answer to that.
Q. You -- what are your degrees in, again?
A. So I have a degree in economics as an undergraduate. I have a degree in medicine, and I have a degree in engineering. Engineering economic systems and operations research.
Q. All right, so you're telling this jury --
A. And I also have a degree in -- a masters degree in biomedical informatics.

Q. Again, more degrees than a thermometer. Congratulations.

But my point is, nowhere in this document to the FDA does it say, The phases in this SYNERGY stent are slightly miscible, does it? That's not what the document says?

A. No, the document says that there was slight miscibility between everolimus and PLGA.

Q. Two substances, correct?

A. Everolimus is a substance, and PLGA is a substance.

Q. But the -- those -- the separated drug and phases were detected by how many distinct glass transition temperatures?

A. Two.

Q. If something is dissolved into something else, how many glass transition temperatures will there be?

MR. DROWN: Objection, Your Honor. Foundation. Asked and answered.

BY MR. SHORE:

Q. Is this what you don't know?

THE COURT: You can answer the question. If you don't know, you let him know you don't know.

THE WITNESS: I don't know.

BY MR. SHORE:

Q. All right. Pass the witness, Your Honor.

MR. DROWN: No questions.

MR. SHORE: May we have a few minutes to rearrange -- or a minute?

MR. LAHAD: Yes, Your Honor. At this time the plaintiffs would call the next witness, Ms. Teresa Schultz.

THE COURT: Okay.

MR. SHORE: You're excused, Doctor.

THE COURT: You may step down, Dr. Allocco.

Let me just -- well, never mind. The issue we discussed, if you just -- all right.

MR. SHORE: Nope.

May I come up --

MR. LAHAD: Your Honor, may I approach with documents to pass out?

THE COURT: Yes.

Ms. Schultz.

THE COURT CLERK: Please state and spell your name for the record.

THE WITNESS: Teresa Schultz, T-E-R-E-S-A S-C-H-U-L-T-Z.

(Whereupon, Teresa Schultz was sworn in and testified as follows:)

MR. LAHAD: Your Honor, may I approach the witness with a binder and some water?

THE COURT: Yes.

Q. Are you still licensed by the U.S. Patent and Trademark Office as a patent attorney?
A. I'm registered with the patent attorney office as a patent attorney, yes.
Q. Okay. So after -- let me ask you, what did you do after law school?
A. After law school I went to work for a law firm in Austin, Texas.
Q. What was the name of that law firm?
A. Arnold White & Durkee.
Q. How long were you at Arnold White & Durkee?
A. I was at Arnold White & Durkee for about six years, and the last year of that it had merged into another firm.
Q. What did you go after Arnold White & Durkee?
A. After Arnold White & Durkee, I moved up to Fort Worth to go to work for a pharmaceutical company.
Q. What was the name of that pharmaceutical company?
A. It was called Alcon.
Q. What did you do for Alcon?
A. I worked in the legal department in Alcon, and I prosecuted -- wrote and prosecuted patent applications, and I worked with the business development group a lot to evaluate technologies that we might want to bring in-house and develop and commercialize.
Q. How long were you at Alcon?

A. I was there about 12 years.
Q. Where did you go after Alcon?
A. After Alcon I came to UTA, UT Arlington.
Q. And how long have you been are UT Arlington?
A. I have been almost ten years.
Q. I forgot to ask, what is the relationship between UT Arlington and TissueGen, the other plaintiff in this matter?
A. TissueGen is the exclusive licensee of technology that Dr. Nelson created at The University of Texas at Arlington.
Q. So let's go back to the office of Innovation and Commercialization. You touched on this earlier, but what is the purpose or the mission of the office of Innovation and Commercialization at UT Arlington?
A. So, as the name implies, there are two purposes for the office. First, innovation. So as I said, we manage the inventions that are created by the faculty and staff at UT Arlington as a result of the research that they do there. And we evaluate it for patentability and determine whether it would be a good idea for the University to spend its resources to protect that -- those inventions.
And then, the commercialization part, is that we seek partners to help us further develop those technologies and make them into useful products for people to use.
Q. So let's unpack that a touch, and there's innovation,

there's commercialization. Let's break it into two parts and focus on the innovation part.

Can you give us a little bit of what goes into determining whether the University will undertake the time and expense to file for a patent on technology?

A. Sure. So when a faculty or student at UT Arlington develops a new process or product, they submit to my office what's called an "invention disclosure." And we evaluate it to determine whether it's patentable and potentially useful. And we meet with the inventors and work with them all along the way to make -- to understand the technology and analyze it.

Q. What happens after you get an invention disclosure form from a professor or a staff member?

A. So we analyze it initially to understand the technology, and then we meet with the inventors so that we can get a better understanding of the technology, and then we perform an assessment. So we prepare an assessment where we're looking at whether it meets the novel, useful qualifications of a patent and is something that the University would be interested in spending resources to protect. And once we determine that it's patentable and that there's a potential market need, then we make a recommendation to a committee and go from there.

Q. Let me direct your attention to what has previously

MR. LAHAD: Thank you. You can take that down.

BY MR. LAHAD:

Q. So what types of arrangements do you-all look for with respect to -- you mentioned finding partners, what types of arrangements do you-all look for?

A. Mostly licensing arrangements because we don't create products on our own, so mostly licensing.

Q. Can you just briefly describe for the jurors what is a -- what is a license? What is a patent license?

A. So a patent license is a document that grants the rights to -- from the party that owns the patent rights to another party in order to allow that party to make, use, sell, otherwise exploit those patent rights.

Q. And what types of entities have licensed the University's patents, generally?

A. All types, from large companies to mid-sized companies to start-up companies.

Q. Does the University itself undertake any efforts to commercialize or bring to market products based on its patents or technology?

A. Not other than licensing.

Q. Why not?

A. Because we're a state university and our purpose is to conduct basic research. I think there are tax implications to actually sell products, so we seek to

license them.
Q. Who owns the patents that are developed by professors and staff at the University?
A. The Board of Regents of The University of Texas System is the owner of all inventions created at all UT system institutions.
Q. So is that true for the '296 patent?
A. That is true.
Q. If I could have you turn to PTX 4, which I think is the second tab.
A. Got it.
Q. Do you recognize PTX 4, Ms. Schultz?
A. Yes.
Q. What generally is PTX 4?
A. This is a patent assignment document.
MR. LAHAD: Your Honor, I'd seek to admit PTX 4.
MR. DROWN: No objection.
THE COURT: So admitted.
MR. LAHAD: Thank you very much.
(Plaintiffs' Exhibit No. 4 was admitted.)
BY MR. LAHAD:
Q. What is the purpose of an assignment.
A. So the assignment actually acknowledges the ownership of the Board of Regents of the invention that's created by the inventors, so they assign any rights they would have as

an inventor to The Board of Regents of The University of Texas System.

Q. So it says here, "Name of conveying parties," and it's the same list of inventors we've seen over the course of today, correct?

A. That's correct.

Q. And each of the inventors signed this assignment, correct?

MR. LAHAD: If we go to the next page. Next page.

THE WITNESS: Yes, I see signatures from each of the inventors.

BY MR. LAHAD:

Q. Okay. I want to ask you about another signature in this document. Let's go to the first page.

MR. LAHAD: And if you could please blow up the bottom half of the page, a little higher, please. There it is.

BY MR. LAHAD:

Q. Is that your name and your signature on the first page of this assignment?

A. It is.

Q. Why is your name on the first page of this assignment?

A. At the time that this assignment was filed, I was

to commercialize the -- the technology, so there were some milestones that they had to meet.

Q. Does the license agreement have any requirements or obligations related to enforcement against infringers or potential infringers of the patents?

A. It does.

Q. What are those requirements?

A. The license agreement requires TissueGen to enforce the patent against known infringers and the Board of Regents to be a partner in that enforcement.

Q. Let me have you -- if I could direct your attention to Plaintiffs' 7, which is tab 7 in your binder.

A. Got it.

Q. Do you recognize Exhibit 7?

A. Yes.

Q. What generally is Exhibit 7?

A. This is a letter from TissueGen to UT Arlington and to my attention at UT Arlington.

Q. Do you recall receiving this letter?

A. Yes.

MR. LAHAD: Your Honor, I move to admit Plaintiffs' Exhibit 7.

MR. DROWN: No objection.

THE COURT: It's admitted.

(Plaintiff Exhibit No. 7 was admitted.)

BY MR. LAHAD:
Q. And, generally speaking, what is this letter conveying?
A. This letter is informing UT Arlington that TissueGen has identified potential infringement of the '296 patent and intends to hire counsel to look further into that potential infringement and that the parties will work together.
Q. Let me ask you this: Does the University -- does the Board of Regents At The University of Texas System, do they frequently bring patent infringement lawsuits, to your knowledge?
A. Not frequently.
Q. So why did the Board, The University of Texas, why did they decide to become part of this lawsuit?
MR. DROWN: Objection, Your Honor. Foundation. Calls for hearsay.
THE COURT: You need to establish the foundation of this witness and how this witness would have knowledge of the Board.
BY MR. LAHAD:
Q. Were you involved in the decision to bring this lawsuit?
A. Yes.
Q. Do you know why this lawsuit would have been brought?
MR. DROWN: Objection, Your Honor. Calls for

hearsay of the Board, who is not here.

THE COURT: Are you asking for her personal knowledge?

MR. LAHAD: I'm asking if she knows, yes, personal knowledge.

MR. DROWN: Asking what the Board decided. That's hearsay, Your Honor.

THE COURT: He's asking -- you can ask her for her personal -- if she has an understanding, a personal understanding.

BY MR. LAHAD:

Q. Do you have a personal understanding of what brought this lawsuit?

A. I do.

Q. What is that understanding?

A. The Board wanted to partner with our licensee to see that the technology that our licensee is developing and that was created at UT Arlington was respected and...

MR. LAHAD: Thank you for your time this afternoon, Ms. Schultz. We may visit after counsel asks you some questions.

No further questions, Your Honor. We pass the witness.

THE COURT: All right.

CROSS-EXAMINATION.

BY MR. DROWN:

Q. Good afternoon, Ms. Schultz. I'm not sure that we've met, but if we have, I apologize, it's good to see you. Thank you for coming today.

A. Hello. Good afternoon.

Q. Ma'am, you mentioned that you're a patent lawyer and registered with the Patent Office, right?

A. That's correct.

Q. And you've been -- you had done -- filed patent applications for a number of years; fair?

A. Yes.

Q. Worked at, done, seen Patent Office office actions and rejections and responses and the whole thing; fair?

A. That's correct.

Q. All right. In one of these exhibits, you mentioned with your counsel, was the prosecution history of the '296 patent, right?

A. Correct.

Q. And that is the -- just so the jury knows, that prosecution history is essentially just the official certified record of the back and forth, if you will, between the applicants for the patent and the patent examiner at the Patent Office; fair?

A. That's right, mm-hmm.

Q. And there's a patent examiner for the '296 patent

A. That's correct.
Q. And as part of the process, the back and forth between you and the examiner, there could be a narrowing of what you're claiming, correct?
A. That's right.
Q. And the reason behind that process is to make sure that every issued claim -- strike that.
Every issued patent includes claims that both sides feel are valid, correct?
A. That's correct.
Q. Counsel had this mark up -- or had this demonstrative, which bears a striking similarity to what happened when I tried to date my wife. It's true.
But I want to direct your attention, actually, to PTX 2 at number 279.
MR. LAHAD: Mr. Offor, if you can get that. And then if you could highlight the second half of that document, the bottom half of the claim rejection.
BY MR. LAHAD:
Q. Just to be abundantly clear, I just want to focus on one reference here. It says, "This claim was anticipated" -- "or rather rejected under 35 U.S.C. 102 as being anticipated by Martin, et al.," right, that's what it says?
A. Yes.

Q. Okay. And so if we go back to the allowance, given that the patent was allowed, given that Martin, et al., was part of the prosecution, ultimately, the '296 patent was allowed over or despite of what we see in Martin, correct?

MR. DROWN: Objection. Leading.

THE COURT: You can ask your question another way without leading the witness.

MR. LAHAD: Sure.

BY MR. LAHAD:

Q. When a -- based on your experience, when a patent is allowed, is it allowed over all of the references disclosed or raised in the prosecution history?

A. Yeah, when a patent is allowed, basically it means the -- the patentee or the applicant has overcome all of the rejections that the examiner has previously made.

Q. And one of those rejections in this case was the rejection based on Martin, et al., correct?

A. That's right.

Q. There was some questioning about whether or not any of these folks were coming here to stand up for this case or something like that, do you recall that?

A. Yes.

Q. Do you know if Boston Scientific's CEO is going to be here?

A. I do not know.

Q. Do you know if Boston Scientific's CFO is going to be here?
A. I do not know.
Q. Are The Board of Regents of The University of Texas System, is that akin to the CEOs of a major company?
A. Yes.
MR. LAHAD: No further questions, Your Honor.
THE COURT: Okay.
Are we done with this witness?
MR. DROWN: No further questions, Your Honor.
THE COURT: All right. Ms. Schultz, you may step down.
THE WITNESS: Thank you.
THE COURT: Thank you for your time.
MR. LAHAD: Your Honor, may I retrieve the materials from the...
THE COURT: Yes.
MR. LAHAD: Thank you.
THE COURT: So let's have counsel come to sidebar.
(Whereupon, a discussion was held at sidebar as follows:)
THE COURT: What's the plan now?
MR. SHORE: We have some videotaped depositions we want to play. And the last witness will be Dr. Pitt.

And we're going to need the designation and counter-designation times split on these videos.

MR. SHORE: Yes, Your Honor.

UNIDENTIFIED SPEAKER: Your Honor, we have a copy of that.

THE COURT: You have that; okay, thank you.

THE COURT CLERK: All rise.

THE COURT: We won't use it until you guys agree on it.

(Discussion between counsel held off the record.)

(Whereupon, the jury entered the room at 4:08 p.m.)

THE COURT: All right. Plaintiffs, you may proceed.

MR. LAHAD: Thank you, Your Honor. Plaintiff next calls via deposition, Dr. Bluni.

Your Honor, it's about a minute long.

THE COURT: Okay.

(Video deposition played for the jury.)

UNKNOWN ATTORNEY:

BY MR. LAHAD:

Q. What was your first position at Boston Scientific?

A. Intellectual property counsel.

Q. And earlier you said you worked at Boston Scientific

from 1999 to 2007; is that correct?
A. That's correct.
Q. And when you left Boston Scientific in 2007, what was your position at that time?
A. It was -- it was the vice president and chief patent counsel. I should clarify that the chief patent counsel was limited to the cardiovascular group of divisions. It's not -- it wasn't a corporate chief patent counsel.
Q. Do you know an individual by the name of Frederick Strickler?
A. I recall that name as someone who was a Boston Scientific employee.
Q. Do you know who -- do you have any familiarity with Barron Tenney?
A. I recognize the name as someone who was employed by Boston Scientific.
(End of video deposition played for the jury.)
MR. SHORE: Your Honor, we forgot to inform the Court and the jury that the parties have stipulated that Dr. Bluni was under oath at the time that he gave that testimony.
THE COURT: Okay.
MR. LAHAD: Thank you, Your Honor. Plaintiff next calls via deposition testimony, Mr. Rodney Shoenleben, and the clip is about eight minutes, Your Honor.

THE COURT: Okay.

(Video deposition played for the jury.)

RODNEY SCHOENLEBEN,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

BY MR. LAHAD:

Q. And will you confirm that the document marked 05 is titled International Distribution Agreement and has an effective date listed in the first paragraph as the 1st day of January 2020?

A. So 05, I can confirm it's International Distribution Agreement, effective is the first day of January 2020.

Q. Okay. And so Exhibit 4, is it correct Exhibit 4 is an agreement between Boston Scientific Corporation and Boston Scientific, Limited, which is an Irish entity?

A. Confirmed, yes.

Q. And the same goes for Exhibit 5?

A. That is correct.

Q. Okay. And so you reviewed these documents before -- in advance of your deposition today; is that correct?

A. That's correct. I did, yes.

Q. And is it correct that in about January 2005 Boston Scientific and Boston Scientific Limited, which I'll abbreviate BSL, entered into an International Distribution Agreement that is reflected in Exhibit 4?

Q. What is your graduate degree?
A. I have a Ph.D. in pharmaceutical sciences.
Q. Where did you earn your Ph.D.?
A. University of Wisconsin Madison.
Q. And generally, has your work at Boston Scientific been related to coating formulation?
A. Yes.
Q. And that's primarily coating formulations for use with polymer -- with drug-eluting stents?
A. Yes. The first maybe ten years, everybody that's drug-eluting technology. So it could be drug-eluting stents; it could be drug-coated balloon.
Q. And what was the Evolution project?
A. Evolution is looking at combining everolimus instead of paclitaxel mixed with a biodegradable polymer coated on stents abluminally.
Q. So is it your understanding that the product that you know to be Evolution is -- started before the project that you know to be Oddyssey?
A. Yes. So we did parallel development. The decision was one side look at one drug, the other side look at different drugs.
Q. Did both projects involve the use of a biodegradable polymer?
A. Yes.

Q. Okay. Is it your understanding, though, that both the Evolution project and the Odyssey project were projects that involved attempts to abluminally coat a coronary stent?
A. Yes.
Q. And abluminally coat such a stent with a biodegradable polymer?
A. Yes.
Q. Okay. But just to make clear, your understanding is that the Evolution project started out of in Natick, where Boston Scientific is headquartered, in or about 2006, correct?
A. About -- again, I -- it's hard to say when people started doing the exploratory project. But it's about that timeframe.
Q. Okay. And you said that some of the team members would have included Joe Eiken, you said Jerry Frederickson and Mark Bolden.
A. Mark Bolden, Cathy Miller. Those are the key team members.
Q. Okay. But you also indicated that Frederick Strickler may have been on the Evolution team as well?
A. Yes. He might have.
Q. Is it your understanding that the Evolution project eventually morphed into SYNERGY?
A. The coating, yes. The coating. But SYNERGY is more

than just coating.

Q. Okay. And who do you mean when you say that SYNERGY is more than just coating?

A. So SYNERGY is considered our probably the newest generation of drug-eluting stent. We changed, we improved the coating, the drug coating; we improved the stent design; we improved the catheter for deliverabilities. So those are all -- in our world, we always say those are the three key elements for the performance of drug-eluting stents. So it isn't just about one aspect of the design. It's about -- so we made the changes across all those elements.

Q. Ms. Chen, I've shared with you a document that is marked 012. I'll ask the court reporter to mark this as Exhibit 12. Can you just open it and confirm that you've got a -- I believe it's 44 pages?

A. Okay. Yes.

Q. And this is the beginning of the a patient application that was filed, and it lists an inventor, Frederick Strickler, on the patent application.

Do you see Mr. Strickler's name on the third page of the document -- or on the second page of the document in the upper right-hand corner?

A. Yes, I did.

Q. And do you see on the bottom right-hand corner of the document, there are these markings -- these markings that

say UT-BSC0075 and then a few other numbers?
A. Mm-hmm.
Q. Okay. Can you turn to the page that has UT-BSC0075636 at the bottom.
Okay. And do you see the title that says "Medical Devices Containing Multicomponent Fibers"?
A. Yes.
Q. Do you know -- have you seen -- in preparation for your deposition today, did you review any patent or patent applications that listed Mr. Strickler as the inventor?
A. Yes. This document was forwarded to me.
Q. Okay. And so you would -- you would say that you had a chance to look at this before your deposition?
A. Yes.
Q. Okay. And my question to you is that is -- you said Mr. Strickler would have been somebody who worked for Boston Scientific in Natick; is that correct?
A. Yes.
Q. And then do you believe that this -- that the work that's described in this patent would have arose out of the work that Mr. Strickler and perhaps others were performing as Boston Scientific employees?
A. Potentially, yes. But this technology is not relevant to SYNERGY technology. It's not uncommon for us to encourage an employee to file a patent as a sort of defense

patent to protect our primary technology.
Q. You said as a defense patent to protect your primary technology. What did you mean by that?
A. Well, first, this technology that's described here, it's not the same as the SYNERGY technology. It's totally different.
Q. Okay.
A. The only common place it could be described, again, the patent covers just about everything. It probably mentioned biodegradable. But it's not the technology that SYNERGY is using.
Q. And do you mean that it's not the stent platform technology, or do you mean that it's not the coating technology that SYNERGY is using?
A. This coating technology is not relevant to SYNERGY'S coating technology.
Q. Okay. And I'm asking you why do you say that?
A. Because this one, first of all, it's multicomponent layers. And they layered on the fiber. So SYNERGY is not a multilayered component. It's a one layer drug coating.
Q. So where in here do you say that this technology is related to multilayer?
A. It does say the multicomponent in there -- I think even in their -- the diagram that they show the layers, each component forms one layer.

Q. Okay.
A. And if you don't want to read the text, you can see the picture. That's how they depict it, the composition and the layering.
Q. Okay. If you want to turn to the page that is stated to be -- so the page that has the marking UT-BSC0075668. I'm going to share this on the screen.
A. I'm getting there. It's pretty long. 668. Okay.
Q. And on the top of that page, you see the language "What is claimed"?
A. Yes.
Q. And would you just go ahead and take a second and read Claims 1, 2, and 3, and let me know when you're done.
A. Yes.
Q. And do you understand this language to be describing a medical device having a substrate and a fibrous layer disclosed over it?
A. Yes.
Q. And in claim 3, do you see where it says the fibrous layer is a coating layer?
A. Yes.
Q. Is there any reason in your mind that a fiber -- that a coating layer could not be a fibrous layer?
A. Yes. It can be a fibrous layer. It can be a coating layer.

Q. And if you would turn to -- I'll scroll there, but there's a claim here, Claim 31. And that claim reads: "The medical device of Claim 1, wherein said substrate is a metallic substrate -- is a metallic stent where said fibrous layer is disposed over an abluminal surface of stent and wherein a luminal surface of said stent is bare metal."

Do you see that claim?

A. Yes.

Q. So this is describing a scenario where a metal stent has a fibrous layer disposed over it; is that right?

A. Yes.

Q. Does this flow chart generally describe the steps that are involved in coating the SYNERGY stents that were sold in the United States between October of 2015 and August of 2008?

A. Yes.

Q. Okay. And so in each case -- in each case, the manufacturing -- the stent coating process would include a step of drug subdivision step that involves solution formulation, a mixing step, a filtration step, a solution sampling step, and a coating step that utilizes a roll coater?

A. Yes.

Q. And is it the case that all of the stents are -- SYNERGY stents would be -- the bare metal stent platforms

failure. Does science learn from failure?
A. Yes, it does.
Q. Why would -- what type of research was going on in 2003 to create polymer drug delivery systems?
A. Well, there were a lot of new formats of polymers. There were various scaffolds, sponges, and films and fibers, and people were putting drugs on top of these surfaces, sometimes drugs in the surfaces. So there's a lot of that going on at that time.
Q. Now, how many articles did you review in the 2003 timeframe that discussed biodegradable polymer fibers with discreet drug phases inside the polymer itself?
A. I can't recall one that had that specific topic.
Q. Is that because it was new?
MR. GROSS: Objection, Your Honor. Outside the scope of direct. We're now in validity, which if that's what we're doing, no problem, if you want to have a sidebar.
MR. SHORE: This goes to patentability.
MR. GROSS: And I believe this witness is solely testifying on infringement.
MR. SHORE: He's our expert on invalidity. He'll get --
THE COURT: Overruled.
MR. SHORE: -- he'll rebut them later.
THE COURT: Go ahead.

BY MR. SHORE:

Q. You remember a single article -- let's go back. Would the invention disclosed in '296 patent have stood out to you as a breakthrough invention in 2003?

A. I think it probably would have. It would be novel, you know, putting a drug inside a two-phased polymer fiber, that was -- that would be novel in 2003.

MR. GROSS: Objection. Sidebar, please, Your Honor.

(Whereupon, a discussion was held at sidebar as follows:)

THE COURT: Okay.

MR. GROSS: I may have misunderstand and I just want to clarify. It was my understanding the sole purpose of his testimony in their case-in-chief was infringement, and then if we called an invalidity expert, he was reserving the right to give rebuttal testimony to rebut our invalidity expert testimony, but if he's now going to give his invalidity opinion now, even though we have not put on our expert, then I will cross-examine him on that, but he should not do this twice. And I'm just confused because whether something is novel goes to anticipation, which is our defense. It's an invalidity defense.

So I'm okay if we're going to do this, my only point, Your Honor, is I don't want to go down this road if

we're going to try to do this twice. I'm not sure what the plan is, but I thought he was only doing infringement in his case-in-chief.

MR. SHORE: Why are we here? Do I need to respond to this?

THE COURT: You're not going to call him twice if you're going to get into -- he's going to give you a chance to cross-examination him.

MR. SHORE: I'm only going to call the rebuttal what the person says. I'm not going to get into detail of their invalidity opinions. This is general background information on what he was doing at the time, what was going on at the time. He's not going to rebut anything in your invalidity report because I don't know what they are going to put on.

THE COURT: Okay. So it's -- keep it high level.

MR. SHORE: Yes.

THE COURT: But if you get into details that rebut opinions, then he's going to have the opportunity to cross-examine him.

MR. SHORE: I'm not going to even mention Dr. Mooney or even an opinion of Dr. Mooney.

MR. GROSS: I just heard him testimony it was novel, which is an opinion, so my only point very clearly is

if he's going to be testifying about validity, this is their shot in a jury trial, it's a waste of resources and not at all normal if he then talks about it now and then they kind of do it again.

THE COURT: You're going to get one shot at it, so you -- if you -- if you do it now, then he's going to examine him and he's not coming back. So you get one shot at it, so you determine whether you're going to get validity now or later.

MR. SHORE: I asked if anything like that I didn't have Dr. Moses or Dr. Moses's opinion, and we have to be able to call him in rebut to -- to Dr. Moses.

MR. OFFOR: Your Honor, we understand.

MR. GROSS: Your Honor, we don't have --

THE COURT: All right. I ruled.

(Whereupon, the discussion held at sidebar concluded.)

BY MR. SHORE:

Q. Let's take a look at Plaintiff's Exhibit -- I believe in your notebook, tab 1 is Plaintiff's Exhibit 207. Would you take a look at that and don't put it up on the screen yet.

Do you have Plaintiffs' Exhibit 7 in front of you?

A. Yes, I do.

Q. All right. What is it?
A. It is my CV as of May 2, 2022.
Q. CV, Latin, curriculum vitae?
A. Curriculum vitae this is like an oversized resume. It's got everything I've done and written.
Q. Is Exhibit PTX 207 accurate?
A. The one here is accurate as of May 2, 2022.
Q. Now, why are we using the version from May 2022?
A. Because this one was submitted at the time of my deposition and apparently that's what the other -- call them the other side has.
Q. Do you believe your resume would be helpful to the jury in understanding your expertise in the field in which you are testifying today?
A. Yes.
MR. SHORE: Plaintiffs would offer PTX, Plaintiff's Exhibit 207 into evidence, Your Honor.
MR. GROSS: No objection, Your Honor.
THE COURT: All right. It's admitted.
(Plaintiffs' Exhibit No. 207 was admitted.)
BY MR. SHORE:
Q. And we're not going to go through this. The jury can see it if they want to, but it has your publications on it, correct?
A. It does on the subsequent pages.

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM et al., | ) | Case No. 18-392-GBW |
| Plaintiffs, | ) | |
| v. | ) | |
| BOSTON SCIENTIFIC CORP., | ) | |
| Defendant. | ) | |

- - - -

Wilmington, Delaware
Friday, January 27, 2023
*Trial Volume III*

- - - -

*BEFORE: HONORABLE GREGORY B. WILLIAMS*
*UNITED STATES DISTRICT COURT JUDGE*

- - - -

*Michele L. Rolfe, RPR, CRR*

APPEARANCES:

STAMOULIS & WEINBLATT LLC
BY: STAMATIOS STAMOULIS, ESQ.

-and-

SHORE CHAN DEPUMPO LLP
BY: CHIJIOKE OFFOR, ESQ.
COREY LIPSCHUTZ, ESQ.
Michael Shore, ESQ.

Counsel for Plaintiffs

FARNAN LLP
BY: MICHAEL FARNAN, ESQ.

-and-

FAEGRE DRINKER BIDDLE & REATH LLP
BY: TIMOTHY GRIMSRUD, ESQ.
CHAD DROWN, ESQ.
LAUREN BARTA, ESQ.
DAVID GROSS, ESQ.
KATHERINE RAZAVI, ESQ.
EVAN KLINE-WEDEEN, ESQ.

Counsel for Defendant

\- - - - -

P R O C E E D I N G S

(REPORTER'S NOTE: The following trial was held in Courtroom 6B, beginning at 9:30 a.m.)

THE COURT: Good morning, everyone. You may be seated.

Let's deal with -- and, Dr. Pitt, you can go back in the gallery until we deal with these evidence issues.

All right. So first, to start off, time remaining for each side, yesterday plaintiff used 3 hours and 29 minutes, defendants used 3 hours and 9 minutes. So plaintiff has 6 hours and 24 minutes remaining; defendants have 8 hours and 45 minutes remaining.

Now moving to Boston Scientific's objections to plaintiffs' exhibits with respect to Dr. Pitt. PTX 137, that objection is sustained, that term has been construed by the Court.

PTX 143, 147, and 146, those objections are overruled.

All right. Going to the plaintiffs' objections to Boston Scientific's demonstratives with respect to Dr. Mooney.

Question, and this relates to a few of them, and I guess this is for -- question would be for Dr. Mooney. Is Dr. Mooney present?

DR. MOONEY: Yes, Your Honor.

THE COURT: Yes. Is there such a thing as a polymer fiber -- good morning, Dr. Mooney, thank you for coming in.

DR. MOONEY: Good morning.

THE COURT: Is there such a thing as a polymer fiber with a crystalline structure that lacks a common molecular orientation?

DR. MOONEY: Overall orientation within the fiber, is that the question here?

THE COURT: Yes. Is there a -- is there an example of a polymer fiber with a crystalline structure that lacks a common molecular orientation?

DR. MOONEY: Yes, that is feasible. If there is -- when you have crystallinity, the polymer molecules arrange themselves in a particular manner. So locally there would be some common alignment, but over the course of the bulk of the fiber, that may not be consistent across the entire fiber. It's not usually how they are constructed, but it is feasible.

THE COURT: Okay. All right.

All right. So with respect to demonstratives 19

A. Yes.

Q. Were all of these definitions -- were all of these definitions supplied at the same time?

A. No.

Q. Was one definition provided in December?

A. Yes.

MR. GROSS: Your Honor, I apologize, I have a brief sidebar.

THE COURT: Okay.

(Whereupon, a discussion was held at sidebar as follows:)

MR. GROSS: So, I want to just make sure we're all on the same page as follows: My first question is going to be showing Dr. Pitt what the Court answered yes, and ask this question, get the answer, and he says yes. That is any time in this case you had the structure. And the Court has said he has to give that answer.

So that's going to be my first question. So I want to be -- because the Court has said that. So to the extent they are going to open the door to what has happened in court orders, which I understand they have a right to do that if they want to do that, then I believe I will be entitled to ask more than simply that question, but also questions such as he was suggesting X. And that didn't work.

And I don't want to spend any more time on anything, Your Honor, I just want to make sure if counsel is going to be getting into opening the door of when court orders happened and what's going on, that I should be entitled a little by of leeway on what he was talking.

And I just wanted to raise with the Court now rather than in my cross because I was worried that it might be we're not all on the same page, Your Honor. So, again, all my time I apologize for the disruption, but I just don't want to raise this issue.

MR. SHORE: Please don't charge any time to me for this. I have no idea. He's not even making an objection.

THE COURT: Okay. You said what you needed to say, all right. This time will get charged to the defendant.

MR. SHORE: Thank you, Your Honor.

THE COURT: All right.

(Whereupon, the discussion held at sidebar concluded.)

BY MR. SHORE:

Q. Dr. Pitt, was one of the definitions provided this December?

A. Yes.

Q. And which one was that?

A. The definition of fiber.

Q. At the time the definition of fiber was provided, had you already provided written reports and disclosed your opinions in this case?

A. Yes.

Q. At the time the definition of fiber was provided, had you already been deposed, in other words, questioned under oath by the Boston Scientific lawyers?

A. Yes.

Q. How many times had you been deposed?

A. Twice; one by this group of lawyers and one by a previous group.

Q. What was the definition of fiber provided before December of 2022 --

THE COURT: Let's stop.

(Whereupon, a discussion was held at sidebar as follows:)

THE COURT: So I think asking what the definition was before -- you have the definition. The definition is the claim construction.

MR. SHORE: No, no, Your Honor. The definition is just plain and ordinary meaning and then you explained what plain and ordinary meaning meant, there was no definition.

THE COURT: Well, off construction, you have a

construction, what happened before that is irrelevant. It's -- you have a construction. You have to go by the claim construction.

MR. SHORE: And he is, but what I'm saying is they are going to get up and say you never used the word "thread-like-like" before, it wasn't part of the construction before. He use used synonyms. I'm going to say, Your Honor, what did he use, he used synonyms, he used elongated, he used -- you will those other things.

It's not in any way, shape, or form but they are going to cross-examine him, you didn't use thread-like-like, you didn't use thread-like-like. He couldn't because it wasn't part of the construction.

THE COURT: He could have, because there were alternative constructions proposed. He could have given an alternative expert opinion.

MR. SHORE: Why would he know to use the threaded if he used synonyms for the word "thread-like-like," they are the exact same thing, why would he --

THE COURT: He got the answering claim construction brief from defendants, they were using thread-like-like.

MR. SHORE: But it wasn't adopted. It wasn't adopted, why would he use a word that was not adopted? And

"thread-like-like" and they chose, for strategic reasons, I believe that's quoting the Court, to not engage in "thread-like-like." And the consequence is their expert is going to have to answer that question. He can give his opinion on a fiber. The Court has said that, but we can't get into the journal of how we got here on claim construction under 403 and 402.

THE COURT: I agree. "Thread-like-like" was if ultimate claim construction, so you can't -- you can't get into all that, you know, because then you're arguing claim construction.

MR. SHORE: No, sir, we're going to follow it. But what they are saying is because he did not use a word that they offered and was rejected in the first -- in the first order and they said, Oh, you should have used a rejected word -- and, again, we are not going to change the claim constructions. He's just going to say -- I'm going to say, Did you use words synonymous with words like "thread-like-like"? Yes, I used serpentine. All these other words, they mean the exact same thing.

Now, the Court has given us the construction, I'm happy with it, it's fine, it means the same thing.

MR. GROSS: Two quick things: One, the Court has word that in the Ethicon case he literally had an opinion where he used thread-like-like, and the Court has

found it's thread-like-like. And the problem was we were saying this isn't reasonable that he has an opinion of thread-like on the same claim and strategically chooses not to have it in this case.

Your Honor, I'm going to ask that one question, he should give an opinion why it's a fiber, and he literally let me tell you what the jury had claim construction orders let me tell you what my opinion was.

THE COURT: He should just give the opinion about fiber. I agree with the defendants on this.

MR. SHORE: Okay. We'll move forward.

(Whereupon, the discussion held at sidebar concluded.)

BY MR. SHORE:

Q. Dr. Pitt, were you in the courtroom when I read the admission in paragraph 3 of Boston Scientific's answer, that the SYNERGY stents include a composition on the outside abluminal surface of the stent?

A. Yes.

Q. Were you in the courtroom when I read the admission that the bare-metal stent -- the bare-metal of each SYNERGY stent consists of serpentine rings connected by links?

A. Yes.

Q. Let's put up demonstrative 2-13, please.

Are the rings on the SYNERGY stent serpentine?

A. Yes.
Q. The gaps between each ring -- you see these gaps between the rings?
A. Yes.
Q. Is there any dispute about the dimensions of each of these serpentine rings?
A. No.
Q. How many sizes are there for the SYNERGY stents?
A. There are three families of sizes. There's a small diameter stent called SV, small vessel; medium called WH, workhorse; and a large size in diameter called LV, large vessel. And within all of those sizes, there's different lengths.
Q. And did you calculate the dimensions of the three stent sizes?
A. Yes.
Q. And how did you do that?
A. I took the drawings of the stents that were given to me, and I took those numbers and added up, just going down that, zigzag all the way around once.
Q. Now, did Boston Scientific provide you the exact measurements of the stent rings?
A. I was provided with documents that appeared to be from Boston Scientific.
Q. What dimensions of the SYNERGY stents are relevant to

what the jury needs to decide?
A. The length around one time and the width of the -- we call them "struts" because they go back and forth.
Q. Now, with respect to the serpentine rings and lengths of the bare-metal stent, is there any dispute about where the polymer sits on those stents?
A. No.
Q. Sits on the outside surface, correct?
A. Yes.
Q. And it sits on the outside surface covering the entire length of the ring?
A. Yes.
Q. And I guess you saw Dr. Allocco also agreed with that when he testified?
A. Yes.
Q. Does the polymer coating cover the stent struts from one end to the other, the individual struts?
A. Yes.
Q. What is the shape of a polymer layer? If a polymer layer covers a serpentine ring, what will the polymer shape be?
A. The same shape as the underlying zigzag circular column.
Q. I'm going to show you Plaintiffs' Exhibit 51 in your notebook. I believe that will be tab 3.

A. Thank you.

Q. And this is a response that Boston Scientific made to the FDA as part of the process of obtaining approval for the SYNERGY stent, you're aware of that?

A. Yes.

MR. SHORE: And I believe Exhibit 51 is already in evidence, Your Honor.

So can we put up Exhibit 51, the cover page, please.

BY MR. SHORE:

Q. And, again, this is a deficient -- what they call a deficiency response that Boston Scientific gave to the FDA in response that their original premarket approval application was not accepted. It needed more information, you understand this?

A. Yes.

Q. Let's go to page 128, specifically the background section.

All right. Do you see that?

A. Yes.

Q. And take a look at -- it says -- read here, it says, "Stent-coating particles released from the SYNERGY stent upon degradation in common anything particulate testing are patterned on the shape of the underlying stent geometry with resulting structure resembling a ribbon," do you see that?

A. Yes.

Q. When Boston Scientific reported to the FDA that the underlying structure of the stent geometry was a ribbon, is a ribbon another way of saying a fiber?

A. Yes.

Q. As a matter of fact, Dr. Allocco agreed with that.

MR. GROSS: Objection. Not a question, Your Honor.

BY MR. SHORE:

Q. Did Dr. Allocco agree with that in his testimony yesterday?

MR. GROSS: Objection. Leading.

THE COURT: Overruled.

THE WITNESS: Yes.

BY MR. SHORE:

Q. Is there any difference to something being ribbon-like and thread-like-like to an expert in the field?

A. No. Ribbon-like can be thread-like-like and thread-like-like can be ribbon-like.

Q. Is there any claim by Boston Scientific in this case the polymer layer on each of the serpentine rings is not continuous?

A. Can you repeat that, please.

Q. Have you seen any document, any deposition testimony in anything you viewed where Boston Scientific is making the

claim that the polymer on the serpentine rings, the ribbon-like shape, is not continuous?

A. No.

Q. Why did Boston Scientific design the polymer layer to be continuous over the entire course of the stent ring?

A. They wanted to deliver the drug to the arterial wall, and if there was a section missing that didn't have this layer on it, then that part of the artery wouldn't get the drug.

Q. Did Boston Scientific set up quality control procedures to make sure that the polymer layer was ribbon-like and continuous across the entire ring?

A. Yes.

Q. What quality control procedures did you find?

A. I found that they examined the coating they put on the crimped stent with a microscope, and they looked at every section of that stent. And if there were flaws in it, then they counted those flaws, and if the number of flaws exceeded a certain amount, then they rejected that stent, and it was not used or sold.

Q. Were stents that did not have a continuous ribbon-like, thread-like-like structure, were they rejected?

A. Yes.

Q. What does that tell you about whether a continuous ribbon-like, fiber structure was important to the design

consideration?
A. That was very important.
Q. Do you agree with Boston Scientific that the biodegradable polymer layer on the outside surface of the SYNERGY stents is ribbon-like?
A. Yes.
Q. Do you agree with them that it is string-like?
A. Yes.
Q. Do you agree with them that it is serpentine?
A. Yes.
Q. Is it thread-like-like?
A. Yes.
Q. Is it a polymer fiber under the Court's claims construction?
A. Yes.
Q. Now, let's move to the substances in the polymer fiber.
Is there any dispute about what substances Boston Scientific uses?
A. No.
Q. What are the two substances that are found in the SYNERGY polymer fibers on the outside serpentine ribbon-like rings of the SYNERGY stent?
A. There are two substances. One is a polymer. Poly L -- PLGA is the name of the polymer, and there's a drug

called everolimus.
Q. Now, what does "PLGA" stand for?
A. P, poly, L, lactic, G, glycolic, A, acid. Poly(lactic-glycolic acid).
Q. And you heard all the testimony. Did you hear Dr. Allocco agree that that is a biodegradable polymer?
A. Yes.
Q. Is a biodegradable polymer?
A. Yes.
Q. Let's look at the '296 patent, Joint Exhibit 1, page 19. And let's go to the bottom of column 9 under the heading "Biodegradable Polymers." Is PLGA listed as one of the polymers in the '296 patent?
A. Yes.
Q. And let's see, there's polylactic acids. That's the PL, correct?
A. Yes.
Q. And where down here is the GA, polyglycolic acid?
A. That's lactic. It's right there.
Q. There we go. That's the PLGA?
A. And copolymer.
Q. Yes. So is what Boston Scientific is using as the polymer, the biodegradable polymer, actually listed in the '296 patent?
A. Yes.

Q. To your knowledge, from everything you reviewed, deposition testimony, you've sat here and -- have they ever, Boston Scientific ever denied they are using the exact same polymer identified in the '296 patent?
A. No.
Q. Now, you were also here yesterday when I read paragraph 18 of the answer into the record, did Boston Scientific admit -- I'm going to get this wrong -- everolimus, got it right, in the second phase of the polymer is a therapeutic agent?
A. They admitted that.
Q. All right. Let's move to the topic of phases in the polymer.
Dr. Pitt, is the presence of two phases in the polymer on the outside serpentine fiber of the SYNERGY stent -- the fact that there is two phases, is that at issue?
A. No, it's not an issue.
Q. What is the difference between a domain and a phase?
A. Well, in this case with the SYNERGY stent they are synonymous; a domain is a phase, a phase is a domain.
Q. Has any Boston Scientific document, evidence, deposition testimony, expert report, anything denied that domain and phase are synonymous?
A. No.

Q. Now, let's talk about the first phase, the polymer-rich phase.

What is the composition of the polymer-rich phase?

A. There is a lot of poly lactic glycolic acid, and there's a little bit of everolimus.

Q. Is that what Boston Scientific has also admitted?

A. Yes.

Q. What is in the second phase?

A. That is the drug-rich phase, and it has a preponderance of drug and a little bit of the PLGA polymer.

Q. Is it fair to say that the polymer phase, or the first phase, can be called polymer-rich?

A. Yes.

Q. Is that how it's described in the FDA documents?

A. Yes.

Q. Is that how it's described in Boston Scientific's presentation to doctors?

A. Yes.

Q. What does polymer-rich mean?

A. It means that the great majority of that phase is the polymer and the small minority would be the drug.

Q. Is it fair to say that the drug-rich phase -- why is it called drug-rich?

A. Because the largest, overwhelming component is drug,

and there's a small amount of polymer in that phase.

MR. SHORE: All right. Let's put the claim language back on the screen, please.

BY MR SHORE:

Q. When we talk about a first phase and a second phase, is there any restriction in Claim 1 about what can be in the first phase?

A. I don't see any.

Q. So if there's a little bit of the everolimus, is that precluded by the claim?

A. No.

Q. Now, looking at the description of the second phase, the phase with the therapeutic agent, do you see the word "comprises"?

A. Yes.

Q. And do you understand that comprises means include, but is not limited to?

A. Yes.

Q. So that's an open-ended term. So the second phase has to have a therapeutic agent, but can it have other things in it?

A. Yes.

Q. Can it have PLGA in it?

A. Yes.

Q. Let's look at the Court's claims construction.

Is there anything here, the first phase, the polymer portion of the fiber, is there anything in there that requires the polymer portion of the fiber to be pure?

A. No.

Q. Second phase, it says, "Drug-containing regions dispersed throughout the fiber." Is there anything that the Court said that that has to be pure drug?

A. No.

Q. And we know it doesn't have to be pure drug because of the word comprising?

A. Correct.

Q. And I believe the jury will be instructed on that, and they should follow the Court's instructions thereby.

MR. GROSS: Objection. Move to strike, Your Honor.

THE COURT: Sustained. Please disregard that last statement, Jurors.

BY MR. SHORE:

Q. Let's call up JTX 2.1.

Dr. Pitt, what is JTX 2.1?

A. This is a section of a report given to the FDA that discusses the composition of the strip that's on top of the stent.

MR. SHORE: All right. So let's take a look at JTX 002 at page 15. And we want to blow up the "as

described" paragraph.

BY MR. SHORE:

Q. All right. And here we go. It says: "The drug polymer coating matrix" -- the matrix is what?

A. That's the continuous phase.

Q. All right. "Consists of spherically-shaped, microphase separated, drug-rich domains dispersed in the bulk of a continuous polymer-rich phase that forms the bulk of the coating." Is that describing one phase or two phases?

A. That describes two phases.

Q. All right.

MR. SHORE: And I'm going to get a little bit better picture. Can we go to Exhibit 49 -- 49, I believe. I think that's the one with all the images of the cross sections.

I believe we'll talk about, the one with all the images of -- the sheer images of all of the cross sections.

Sorry about that.

BY MR. SHORE:

Q. Oh, by the way, while they are doing that, what does "microphase separated" mean?

A. Well, micro means small, and so it's phase separated and the dispersed phase is very small.

MR. SHORE: Can you put that image back up?

I'm sorry, Your Honor. We would offer Exhibit 47 into evidence, Your Honor.

THE COURT: Any objection?

MR. GROSS: No objection, Your Honor.

THE COURT: All right. It's admitted.

(Plaintiffs' Exhibit No. 47 is admitted.)

MR. SHORE: So let's put that image of 47 -- it's a little sharper than the one in the PMA.

BY MR. SHORE:

Q. All right. So right here, this stuff that looks like torn plastic, what is that?

A. That is the polymer-rich phase.

Q. And the little round or roundish-looking objects, what is that?

A. I'll say that is the drug-rich phase or drug-rich domain.

Q. Looking at this with your eyes, is the polymer, the torn plastic, dissolved into the drug phase?

A. No.

Q. Do you need someone from Harvard to tell you that the white plastic-looking phase is not mixed into the drug-rich phase?

A. I can tell that the white plastic-looking phase is not mixed into the drug-rich phase.

Q. You can see it; is that right?

A. Yes.
Q. Are those two things dissolved into each other?
A. No.
Q. Are they separated?
A. Those phases are separated.
Q. Does this meet the miscibility requirement of claim 1 -- or the immiscibility requirement of Claim 1?
A. Yes.
Q. Take a look at figure -- let's see here. Again, how do we know that the white -- let's take a second. Why is the white looking like ripped tissue or plastic?
A. That is the polymer-rich phase, and the polymer is like plastic. When you stretch it, you stretch it out and then breaks.
Q. And why do these not look stretchy?
A. Those to me look brittle. When they were pulled on, they just broke in a, you know -- just broke with a clean face, so they are not stretchy.
Q. Let's look at JTX 2, Joint Exhibit 2, page 16.
And there is a paragraph that begins with "this coating" up here.
MR. SHORE: Can we highlight that? And then let's highlight beginning with the word "diffusion."
BY MR. SHORE:
Q. Now diffusion and degradation are predominant during

the sustained drug release as trapped drug diffuses through the synchronously degrading polymer (e.g., from discreet drug domains within the continuous phase of the polymer as shown in the morphology images).

Can you be trapped by something you're dissolved into? If the drug is trapped in the polymer, does that mean it's dissolved into the polymer?

A. If the drug is trapped surrounded by polymer, then that phase is separate from the polymer phase.

Q. As a matter of fact, doesn't that say this? What does discrete mean?

A. That means you have a separate domain with drug in it.

Q. All right. Let's look at -- does this mean if they are discrete, does that mean they are immiscible?

A. That means they are immiscible.

Q. Do you agree with Boston Scientific's statements and the FDA, that the morphology images we saw on the prior page shows discrete, separated, drug and polymer phases?

A. Yes.

Q. Is that all the Claim 1 of the '296 patent requires; two discrete and separate phases?

A. That is part of Claim 1.

Q. With one of them having a therapeutic agent?

A. Yes.

Q. Is that another way of describing two immiscible phases?

A. Yes.

Q. I now want to show you a short video clip from the deposition of Dr. Chen. This would be C-99.

And, first of all, is this -- is her deposition one of the things you relied upon in reaching your opinions?

A. Yes.

MR. SHORE: Let's show C-99.

BY MR. SHORE:

Q. And Boston Scientific actually submitted some documents to the FDA, right, describing tests, such as mDSC and some certain microscopy that was done that determined that there were these drug-rich domains and polymer-rich domains in the final coding; is that correct?

A. Correct.

Q. And you would understand that that characterization of drug-rich domains and polymer-rich domains would apply to all of the SYNERGY stents that were marketed since 2015; is that right?

A. Correct.

Q. And, again, what does that tell us about whether all of the SYNERGY stents had these two discrete, separate phases?

A. She said that all of the stents marketed since that

date have the morphology of drug-rich domains in the continuous polymer.

Q. All right. Did you review Dr. Allocco's deposition in preparing to testify?

A. Yes.

Q. Did you reasonably rely upon it?

A. Pardon me?

Q. Did you reasonably rely upon it for parts of your opinions?

A. I did.

Q. All right.

MR. SHORE: Let's show clip A-80, please.

BY MR. SHORE:

Q. And in the middle of this page of Exhibit 3, what's being depicted?

A. The drug and polymer coating.

Q. And do you see the markings, PLGA-rich domain and drug-rich domain?

A. Yes.

Q. What does that convey?

A. You know, that shows that the coating is not homogenous. There are different regions. And some of those regions are rich in PLGA and others are rich in drug.

Q. How is this testimony important in determining if the two phases in the SYNERGY stents are immiscible?

A. Well, he said the coating is not homogenous, so that means there's base separations. And he said there's a drug-rich region and a polymer-rich region.

Q. If two things dissolve into one another, do they become homogeneous?

A. Yes.

Q. What does it mean to an expert in the field when two phases in a polymer have not dissolved into each other in a finished product?

A. Then they are separate.

Q. And are they immiscible?

A. They are immiscible.

Q. Did you also rely upon testimony from Boston Scientific's witnesses that admitted a coating would be a fiber?

A. Yes.

Q. Can a coating result in a fiber?

A. Yes.

Q. Let's take a look at some of the testimony. Did you rely upon Dr. Chen's testimony upon reaching your opinion?

A. Yes.

MR. SHORE: Let's take a look at C-23 and C-24, please.

BY MR. SHORE:

Q. And in Claim 3, do you see where it says "the fibrous

layer is a coating layer?"
A. Yes.
Q. Is there any reason in your mind that a fiber -- that a coating layer could not be a fibrous layer?
A. It can be a fibrous layer, it can be a coating layer.
(Video clip ended.)
BY MR. SHORE:
Q. So do you agree with Dr. Chen that a fibrous layer -- a coating layer can be a fiber?
A. Yes.
Q. Is there any limitation --
MR. SHORE: Let's bring back up the claims, please.
BY MR. SHORE:
Q. Is there anything about this that limits it to any type of manufacturing process?
A. No.
Q. Is there anything that says it has to be spun?
A. No.
Q. Is there anything that says it has to have any extrusion process?
A. No.
Q. Is there anything in this claim that says how the fiber is made is relevant?
A. No. It says "composition."

Q. So I think we heard -- you were here for the opening statements, correct?

A. Yes.

Q. And you remember, I believe as Mr. Grimsrud said, they are on a different road, Boston Scientific was on a different road. I'm paraphrasing, obviously. But they are on one road and TissueGen is on another road; do you remember that?

A. Yes.

Q. What matters, Dr. Pitt, the road or the destination?

A. The destination, it's where you end up.

Q. I'll rephrase. Is the claim here claiming the road or the designation?

A. The claim is a composition, which I think in your analogy means a destination.

Q. Let's talk a little bit -- and we're going to talk only a little bit about biodegradable. Did Boston Scientific scientists confirm that the SYNERGY coating comprises of a biodegradable polymer?

A. Yes, they did.

Q. All right. So we've looked at Dr. Chen's testimony under oath, we've looked at Dr. Allocco's testimony, we've seen him testify here yesterday.

What are the actual Boston Scientific scientists disputing in this case?

A. From my reading of what the scientists say, I don't know what they are disputing.

Q. What are the -- what is in dispute in the documents that they gave to the FDA?

A. I don't see anything in dispute in the documents.

Q. So the only dispute, I believe, as you see it, is the only dispute between TissueGen and Boston Scientific or between TissueGen and Boston Scientific's expert?

A. Yes.

Q. Is Boston Scientific's expert, are his opinions consistent with Boston Scientific's corporate representative, Dr. Chen?

A. I don't think so.

Q. Are they consistent with the opinions or the statements in the FDA documents?

A. I don't think so.

Q. In your opinion, are Dr. Mooney's opinions that the polymer layer on the outside surface of the SYNERGY stents is not a fiber consistent with the sworn testimony of Boston Scientific and its scientists?

A. It does not seem to be consistent.

Q. In your opinion, are Dr. Mooney's opinions that the polymer layer on the outside surface of the SYNERGY stents is not fibrous or in a fiber format consistent with the documents that Boston Scientific gave to the FDA?

A. No.

Q. In your opinion, are Dr. Mooney's opinions that the polymer layer on the outside surface of the SYNERGY stents is not fibrous or a fiber format consistent with the documents and the presentations they made to doctors about the SYNERGY stent?

A. No.

Q. Are Dr. Mooney's opinions that the polymer layer on the outside surface of the SYNERGY stent is not a fiber or in a fibrous format consistent with what they told the European union to get approval of the SYNERGY stent?

A. No.

MR. SHORE: Let's call up claim 1, again. With the Court's claim construction next to it like we did before.

BY MR. SHORE:

Q. And let's look here, it says, "Immiscible, incapable of dissolving into one another," do you see that?

A. Yes.

Q. What is supposed to be incapable of dissolving one another, is it the first and second phases or is it substances that are in first and second phases?

A. It says "the first and second phases are immiscible."

Q. When two compositions or substances in two separate phases dissolve into one another, how many phases remain?

A. They dissolve into one another. There's only one phase.

Q. Is there any document anywhere or any testimony from a Boston Scientific scientist that denies there are two phases?

A. No.

Q. What does that tell you about whether the two phases in the finished product are capable of dissolving into one another?

A. They are not capable of dissolving into one another.

Q. This seems like a very simple concept to grasp, doesn't it?

A. Yes.

Q. Based upon everything you reviewed from Boston Scientific, and we went over a lot of stuff yesterday, did Boston Scientific ever tell physicians in a conference, did they ever state in a video marketing presentation, did they ever state to the FDA, did they ever state to the European union, to anyone that the two phases were not immiscible?

A. Not that I've seen.

Q. To your knowledge, and based upon all the information that has been reviewed, did Boston Scientific ever tell the FDA that the SYNERGY stents included a single-phase polymer?

A. Not to my knowledge.

Q. To your knowledge, based upon everything you reviewed

from Boston Scientific, did Boston Scientific tell the FDA that the SYNERGY stents included two phases?

A. They did say they included two phases.

Q. Now, they -- I believe they -- did they even -- did they say that the two phases were slightly miscible?

A. Well, phases can be miscible or immiscible.

Q. So there's no such thing as slightly miscible, is there?

A. No, that -- when you talk about phases, it's miscible or immiscible.

Q. Now, they did talk about substances, the PLGA and the everolimus drug, were separate and apart from this product, slightly miscible, correct? That the substance -- the raw substances?

MR. GROSS: Objection. Leading, Your Honor.

MR. SHORE: I asked if they ever told them that.

THE COURT: Sustained. You can ask him in a nonleading way.

BY MR. SHORE:

Q. Did Boston Scientific ever tell the FDA that the SYNERGY stents included two phases, phases that were slightly miscible, or did they say that the substances -- the substances in the two phases were slightly miscible before the two fibers were formed -- I mean the two phases were formed?

A. I think the documents talked about the substances being miscible, not about the phases.
Q. If Boston Scientific, or their expert, Dr. Mooney, submitted a paper to one of your journals, where you sit on the editorial board, claiming that the SYNERGY stents do not have a two-phase polymer fiber coating on the outside surface of immiscible phases, would that paper be accepted or rejected?
A. Rejected.
Q. Why would it be rejected?
A. Because the words don't match what the data says. And we want to make sure it's good to get in the journal.
MR. SHORE: Let's go back to JTX 2, the preapproval market document that Boston Scientific submitted to the FDA. And specifically, let's go to page 6. And if you can, please blow up the language beginning with the phrase "glass transition" through the end of the paragraph.
It's right at the top right there, the rest of that paragraph.
BY MR. SHORE:
Q. Now, I'm going to read this into the record. "Glass transition temperatures in SYNERGY clinical shifted slightly in comparison to the raw materials. This data suggests that there was slight miscibility between everolimus and PLGA in the SYNERGY clinical coating layer; however, separated drug-

and PLGA-rich phases are detected as observed in the FESEM images shown in figure 7.2-F1 above."

First of all, were you here when Dr. Allocco was read this sentence and they stopped it at --

A. Yes.

Q. -- right here?

A. Yes, I was.

Q. Is that a period right there or is that a semicolon?

A. A semicolon.

Q. But they stopped it right there. Did you recall that?

A. Yes.

Q. And then, "However, separated drug- and PLGA-rich phases..." what does it mean when the drug releasing- and PLGA-rich phases are separated?

A. When the phases are separated, that means they are immiscible.

Q. And the FESEM image, is that the one that we looked at -- I know it's a different one, but is that the same type of image we looked at with the torn plastic and the gray circles?

A. Yes.

Q. Do you agree that the FESEM images of these products indicate a separate drug- and PLGA-rich phases?

A. Yes.

Q. Do they indicate immiscible phases?
A. The phases are immiscible.
MR. SHORE: Let's go to the next highlighted section on JTX 002 at page 6. I believe the "in summary," this paragraph here, blow that up.
BY MR. SHORE:
Q. Now, you were here, did they show this paragraph to Dr. Allocco?
A. I think I remember this one.
Q. But did they ask Dr. Allocco about it?
A. I believe they did.
Q. All right. "In summary, both FESEM and mDSC data suggest there is no significant physical interaction between the two coating components, everolimus and PLGA..."
Are components phases?
A. Components are not phases.
Q. "And a phase separation is observed in the drug coating layer, with two distinct phases."
What does that tell us?
A. That in the drug coating layer, that's the layer that's on the top of the stent, there are two distinct phases.
Q. Is FESEM -- and I believe that's field emission scanning electron microscope (sic); is that correct?
A. Yes, I would call it.

Q. Is that something you commonly see in your work and on the editorial boards of the journals that we spoke about earlier?
A. Yes.
Q. Is that a test that is used to determine phase separation?
A. It is one of the tests that can be used to determine phase separation.
Q. Is there any indication in any document that Boston Scientific has produced, anything, that after manufacture the two phases in the SYNERGY stent are dissolving into one another?
A. No.
Q. Is there any document that Boston Scientific has produced in this litigation that indicates that after manufacture, after the manufacturing process is complete, that those two phases, the substances in those two phases separately, separate phases are chemically interacting with one another?
A. No.
Q. Let's look at JTX -- Joint Exhibit 8 at page 1.
Do you recall this document from Dr. Allocco's dep- -- testimony?
A. Yes.
Q. And this is the European conference where they were

talking to physicians?
A. Yes.
Q. Do you recall whether or not Dr. Allocco said they were trying to give accurate information?
A. I recall.
Q. And to give accurate information to doctors who might use these products, is that important or unimportant?
A. Very important.
Q. Do you understand what EVOLVE is?
A. I understand that EVOLVE is the name of the development of the SYNERGY stent before it was called SYNERGY.
Q. And I believe Dr. Allocco testified and confirmed that yesterday, do you recall?
A. Yes.
Q. Now, is there anything in this presentation where they told these physicians that the two phases in the SYNERGY stent could dissolve into one another?
A. No.
Q. Is there anything in this presentation where they claim anything about the phases not being separate?
A. No.
Q. Is there anything in this presentation that they gave to physicians that needed to be accurate that those two phases were miscible, that they could mix together?

A. They did not say they were miscible, that they could mix together.

Q. All right. Let's take a look at page 4 of Exhibit 8, Joint Exhibit 8. And, again, the rectangle in the middle, let's blow that up.

And here we've seen this document before. Is this an FESEM image?

A. Yes.

Q. Now, you -- did you put these little boxes on this presentation?

A. No.

Q. That's -- is that originally in the presentation that you reviewed?

A. Yes.

Q. What did Boston Scientific tell all of these doctors from around the world, going to the major European conference that the coating was comprised of?

A. A PLGA-rich domain and a drug-rich domain.

Q. Let's talk about domain. I know that some of the way we think is -- I think it was -- I can't remember the name of the movie, it was a guy who went to India, and they made him a king or something. And he says, "All that I perceive is my domain."

Does domain imply borders or no borders?

A. Domain implies that there's a boundary somewhere and

everything inside that boundary is within the domain.

Q. Okay. If you had two separate domains in a biodegradable polymer fiber, two separate domains, does that mean they dissolve into one another?

A. No.

Q. If they can dissolve into one another, how much domains would you have?

A. There would just be one domain.

MR. SHORE: Andrew, please let's put up Plaintiffs' Exhibit 42, cover page, please.

I'm sorry, we would move Exhibit 42 into evidence.

MR. GROSS: No objection, Your Honor.

THE COURT: All right. It's admitted.

(Plaintiffs' Exhibit No. 42 is admitted.)

BY MR. SHORE:

Q. And, again, this is another document they submitted to the FDA, correct?

A. Correct.

Q. All right. Let's go to page 3.

MR. SHORE: And let's blow up the second paragraph.

BY MR. SHORE:

Q. Now, we have three different tests listed here, correct?

A. Yes.

Q. What is modulated differential scanning calorimetry, mDSC?

A. That is a test that measures energy flow, and it is very good at detecting phase changes and other transitions, particularly sensitive to glass transition temperature.

Q. You say phase change, does that mean crossing from one phase to a different phase?

A. That would be like melting, like ice melting into water.

Q. Okay. And field emission scanning electron microscopy, that's what we've already looked at, correct?

A. Yes.

Q. And Confocal Raman microscopy, what is that?

A. Raman is another analytical technique in which you put energy into a sample and measure what comes out and look at what got absorbed. From what got absorbed, you can tell what molecules were in there, because every molecule has a different absorption pattern.

Q. Then it says, the "Analysis confirmed there were no significant interactions between everolimus and PLGA," do you see that?

A. Yes.

Q. Now, that -- are those two things phases or substances? Everolimus and PLGA, is that phases or

substances?
A. Well, everolimus is a substance and PLGA is a substance.
Q. And specifically the testing confirmed what?
A. The testing confirmed the presence of two distinct phase transition temperatures associated with everolimus and PLGA, as well as a phase separation between everolimus drug domain and PLGA matrix.
Q. The only sentence in that paragraph that talks about phases, what does it -- how does it describe the phases?
A. It say there is a phase separation between the drug-rich domain and the polymer phase. They call it "polymer matrix" here.
Q. Did the mDSC confirm or not confirm two separate phases?
A. It confirmed two separate phases.
Q. Did the glass transition data confirm or not confirm two separate phases?
A. It confirmed two separate phases.
Q. Does the field emission scanning electron microscopy confirm or not confirm two separate phases?
A. It shows two separate phases, so it confirms that.
Q. All right. Let's put up PTX 047 again. I want to start with the first image.
Are the phases separated in this first image?

A. Yes.
Q. Let's go to the next image. Confirmed or not; two phases, confirmed or not?
A. Confirmed, two phases.
Q. Next image. Two phases; confirmed or not?
A. Confirmed, two phases.
Q. Next image; confirmed or not, two phases or one phase?
A. Confirmed, two phases.
Q. Let's go to the next image. Confirmed or not; one or two phases?
A. Confirmed, two phases.
Q. There's dozens of these images. Do you believe that it would be helpful for the jury to go through all of them, or do you think we've done it enough?
A. They all show the same thing.
Q. Okay. All right. Let's go to PTX 42. First page. And I believe it's in evidence, but if not, we would offer it into evidence.
MR. SHORE: We offer it into evidence, Your Honor.
THE COURT: Any objection?
MR. GROSS: No objection, Your Honor.
THE COURT: All right. It's admitted.
(Plaintiffs' Exhibit No. 42 is admitted.)

BY MR. SHORE:

Q. All right. Let's go to page 15, please. And where it says "drug domains" right here. Can we start --

MR. SHORE: Blow that up and then highlight the language "drug domain" -- starting at "drug domains."

The whole thing.

BY MR. SHORE:

Q. Now, let's go back to the figure, so what we're looking at here is they are investigating the presence of drug domains; is that right?

A. Yes.

Q. All right. Let's go back to the picture.

Now, this is the picture that results from the Confocal Raman microscopy. What are we seeing here?

And do you need a pointer?

A. I have one.

So what we're seeing here in this experiment, this is the one where we can tell what the substances are. And "confocal" means that you focus the energy just on a plane and then you scan it rather than -- so you get a plane inside the layer without breaking it open, so you can see how it is before it's broken open.

And the yellow color is high levels of the drug everolimus, and the black is low levels of that, and you can see separate spherical domains of everolimus surrounded by

the dark regions, which are the absence of everolimus. So that's where the polymer is. And so this is different in that it's not broken open; this is how it looks while it's on the stent surface.

Q. Is this consistent with or inconsistent with the field emission scanning microscope data?

A. This is consistent.

Q. All right. Let's go to look at page -- let's -- turn in your tab to PTX 42. I believe that is volume 2 of your -- wait a minute, volume 1 -- sorry. Volume 2 of your notebook, tab 9.

THE COURT: PTX 42?

MR. SHORE: Yes, Your Honor.

THE COURT: Volume 1.

THE WITNESS: I found it in volume 1.

BY MR. SHORE:

Q. Okay.

MR. SHORE: 42 is already in evidence, Your Honor.

BY MR. SHORE:

Q. Let's look at page 10 of PTX 42. Plaintiff's Exhibit 42.

MR. SHORE: Let's blow up the box.

BY MR. SHORE:

Q. What is "TG" again; is that the glass transition

temperature?
A. Yes, that's the glass transition temperature. I can explain, it if you want.
Q. Absolutely.
A. Okay. If you cool a polymer down to a really cold state, it's brittle, and it fractures easily. And we call it glassy because it's so brittle. And then if you warm it up, you reach a transition temperature that absorbs energy. Above this, it's leathery; it's touch and not brittle.
So as you scan temperature, you hit the point where energy is absorbed; that means it's changing from brittle to leathery above it.
Q. All right. And the glass transition temperatures of PLGA raw material is 48. That's what they have on the chart, correct?
A. Correct.
Q. And the everolimus raw material is 87?
A. Correct.
Q. And then in the SYNERGY stents, the PLGA-rich domain is what?
A. 51.
Q. And the everolimus is what?
A. 83.
Q. Are those significant differences in the glass transition temperatures?

A. Yes.

Q. Does that show one or two phases?

A. Well, first of all, it shows two phases because you have two things that are increasing in temperature, and this one hits the glass transition, and the other phase comes up here, and then this one hits it, so you see two different temperatures. So that shows two phases, definitely.

It's also important that the temperature has shifted. It was first here -- it was a pure substance then it shifted up to here, which means it's no longer a pure substance, but it still is one phase because there's that transition temperature.

Q. We're going to skip ahead to Plaintiff's Exhibit 40. And I believe in your notebook Plaintiff's Exhibit 40 is tab 13.

MR. SHORE: Let's put the first page of Plaintiff's Exhibit 40 up.

I believe Plaintiff's Exhibit 40 is in evidence; is that correct? Thank you.

BY MR. SHORE:

Q. And again, this is the design dossier to the European Union, correct?

A. Correct.

MR. SHORE: Could we put pages 37 and 39 side by side, please?

BY MR. SHORE,

Q. And in this document, did they provide the European Union the dimensions of the SYNERGY stent struts?

A. Yes, they did.

MR. SHORE: And let's go to PTX 40, page 44.

And let's blow up this particular part here.

BY MR. SHORE:

Q. And here the struts are separated, for the most part, and then they have, I guess, what are called connectors that make sure that the stent as a whole stays together; is that correct?

A. Correct.

Q. Does the fact that there are connectors change your opinion about whether or not they are fibers?

A. No.

MR. SHORE: All right. Let's go to Plaintiffs' Exhibit 38. And we'll start at 38.86.

And, Your Honor, we would move to admit Plaintiff's Exhibit 38. These are the documents that Boston Scientific provided pursuant to Rule 33(d) as part of a sworn interrogatory response.

MR. GROSS: No objection, Your Honor.

THE COURT: All right. Admitted.

(Plaintiffs' Exhibit No. 38 is admitted.)

MR. SHORE: So let's publish for the jury.

Plaintiff's Exhibit 38.86.

BY MR. SHORE:

Q. 38.86 or page 86. Dr. Pitt, are these the design drawings for the workhorse model of the SYNERGY stent?

A. Can you blow up the lower right corner, please? Yeah, right there. It says "SYNERGY stent 2, WH, workhorse."

Q. All right. And let's look at page 84, 38.84.

MR. SHORE: Blow up the lower right-hand again.

BY MR. SHORE:

Q. And what are these the decision specifications for?

A. That says "SYNERGY 2 SV stents for small vessel."

MR. SHORE: And let's look at 38.8. And blow up the lower right-hand corner of that one.

BY MR. SHORE:

Q. And are these the design specifications for what?

A. "SYNERGY 2 LV, large vessel."

Q. Did you summarize this data on measurements and tolerances in a chart?

A. Yes, I did.

MR. SHORE: All right. Let's pull up Plaintiffs' Exhibit 36, please.

Well, first of all, Your Honor, we would offer Plaintiffs' 36 as a summary of -- under Rule 1006 of the measurements and dimensions in the three other documents

that have been provided.

MR. GROSS: No objection, Your Honor.

MR. SHORE: Let's publish Plaintiffs' Exhibit 36.

BY MR. SHORE:

Q. All right. So Dr. Pitt, does Plaintiffs' Exhibit 36 contain any -- any information not in the documents produced by Boston Scientific as part of their sworn answers to interrogatories?

A. No, all of this information comes from their documents.

BY MR. SHORE:

Q. Dr. Pitt, referring to Plaintiffs' 36, how wide are the metal serpentine fibers in the SYNERGY stents?

A. So, right here, where it says, "average strut width," we have a small vessel, workhorse, large vessel, 74 microns, 89 microns, 94 microns for the width of the strut.

Q. How do these dimensions compare to a human hair?

A. They are very close to the size of a human hair, which is 80 to 100 microns.

Q. How wide is the layer compared to the length? All right, let's just go -- where do you have the width up here?

A. So the polymer layer sits on top of the strut which is this wide or this wide or this wide, so it would be the same width as the metal underneath.

Q. Does the polymer, again, it runs the entire length of the strut, correct?
A. Yes.
Q. Now, we know that the depth or the thickness is 4 microns; is that right?
A. Correct.
Q. How do we know that?
A. In all of the documents that I've seen from Boston Scientific, they, stated it was 4 microns, and, also, I got their raw images and made my own measurements, and it turned out to be 4 microns, which is right there, yeah.
Q. Did you calculate the length to width ratios of the center -- of the coatings on the SYNERGY stents?
A. Yes.
Q. And length-to-width ratio, is that another way of saying aspect ratio?
A. Yes.
Q. And did you do the length -- you did that two different ways, correct, or was it three?
A. I did it three different ways, looking from all angles of, you know, possibilities.
Q. And did you summarize your calculations in a graph or a chart?
A. I summarized them in a table that was submitted in one of my reports.

MR. SHORE: Your Honor, we would offer into evidence PTX 35. This is the chart that takes all of the information on the lengths and widths and calculations to calculate aspect ratios.

MR. GROSS: No objection, Your Honor.

THE COURT: All right. Admitted.

(Plaintiffs' Exhibit No. 365 is admitted.)

BY MR. SHORE:

Q. All right. Let's pull up PTX 35. Dr. Pitt, what does this table show?

A. This table shows -- first of all, the three different families of stents: Workhorse, small vessel, large vessel. And then I could measure the zigzag distance all the way around from those design drawings and that is these numbers right here. Now, microns, that's one one-thousandths of a millimeter, so 14,496, that's about 14 and a half millimeters all the way around. I did that for the small vessel and the large vessel. And this also has -- so these numbers are the same because that doesn't change by what I compared to. And then I have fiber thickness and fiber width.

Q. So when it says "ratio length to width" is that an aspect ratio?

A. Yes.

Q. Were you here when Dr. Allocco was asked about

whether certain values would be large- or high-aspect radios?

A. Yes.

Q. I believe one of the ones he was asked about was 2954:1, 160:1, and 81:1; do you recall that?

A. Yes.

Q. Are all of the aspect ratios as to the length and width of the polymer fiber on the outside of the SYNERGY stent large-aspect ratios?

A. Yes, they are.

Q. When you are determining whether something is thread-like, do you recall Dr. Allocco stating that a high-aspect ratio or a large-aspect ratio is one of the things that goes into the determination of whether something is thread-like?

A. Yes.

Q. Do you agree with him on that?

A. Yes.

Q. Is this consistent with your opinion that all of the polymer fibers on the outside of the SYNERGY stents are fibers?

A. Yes.

Q. Are the polymer fibers thread-like in their format?

A. Yes.

Q. Now, did you make any models of what the polymer

fiber might look like if it was removed from the SYNERGY stent?
A. Yes.
Q. All right. Let's put up Plaintiffs' Demonstrative 2.
BY MR. SHORE:
Q. Are these the models that you created?
A. These are photographs of the models that I created.
Q. And do you have -- I believe, next to you there, there's a tray --
MR. SHORE: May I approach the witness, Your Honor?
THE COURT: Yes.
BY MR. SHORE:
Q. All right. Describe briefly -- we do not have a lot of time -- describe briefly how you made those models?
A. Well, I took the design drawings that were in the documents, took those measurements very carefully and put them into a computer and made a computer-generated image, and then I printed that with 3D printing. So I also expanded it like 25 times or almost 25, times, so it's big enough to see.
Q. So are the models made to scale?
A. They are exactly to scale.
Q. And is the model number 4 in the courtroom today?
A. Yes.

Q. And I believe multiple, I guess, copies of it, correct?
A. Yes.
MR. SHORE: Your Honor, may I publish one of the models to the jury?
THE COURT: Yes.
BY MR. SHORE:
Q. Now, let's take number 4, the -- so can you pull that out, sir? Number 4 -- I'm sorry, the coating, the model of the coating.
A. Do you want me to hold it up or just look at it?
Q. For right now, just look at it. And answer a couple of questions for me.
How did you make these polymer models?
A. Well, I made a model of the polymer that sits on top of the metal underlying thing by buying some polyester films and measuring that thickness. And then I'd say, oh, if I have a film this thick in a piece of polyester film, then I have to scale it this much so I have a truly scaled model. And then the -- that film was placed on a bed and a laser cut out the plastic, and that's what I have. The laser cut model. Exactly scaled.
Q. And would this be a scaled model of the biodegradable polymer, scaled to the model of the stent?
A. Yes.

MR. SHORE: Your Honor, permission to publish to the jury.

BY MR. SHORE:

Q. Now, let's take the little model of the polymer; do you see that?

Now, the polymer also is covering these, what would be the connectors between the rings, correct?

A. There's also polymer over the metal connectors between the metal rings.

Q. All right. Do you have a pair of scissors there?

A. Yes.

Q. On the top ring of your model, could you cut across the connector?

A. Yes.

Q. All right. I think we're ready. So what are you holding in your hand?

A. This a model, scale model, of one serpentine loop around the stent.

Q. Would that be the fiber covering that -- I mean, the polymer fiber covering the one serpentine ring?

A. Yes, this represents the material that's covering one serpentine ring.

Q. Dr. Pitt, is that thread-like?

A. Yes.

Q. Any doubt in your mind?

A. No.

MR. SHORE: Let me -- let's go to Plaintiff's Exhibit 22.

Your Honor, we have an agreement on the admissibility of Plaintiffs' 22, but it will have some redactions to it, but we're not going to go over with the witness that part.

THE COURT: Okay.

MR. GROSS: No objection.

THE COURT: It's admitted.

(Plaintiffs' Exhibit No. 22 is admitted.)

BY MR. SHORE:

Q. Let's though up here Exhibit 22. Dr. Pitt, is this a certified copy of the Strickler patent file history?

A. I believe it is.

Q. And is the first 44 pages the application itself?

A. Yes.

Q. And do you recall that this was the application that Dr. Chen was talking about when she said a coating could be a fiber?

A. Yes.

Q. What does this document inform as to what Boston Scientific, in a non-litigation context, referred to as a fiber?

A. The scientist referred to the polymer on the stent as

a fiber.

MR. SHORE: Let's show Plaintiffs' Demonstrative PD 2-7.

BY MR. SHORE:

Q. Now, with the polymer coating here, what is referred to -- I believe that's 200; do you see that?

A. I think it says 500.

Q. Oh, 500, I'm sorry. Can you read from the Strickler application, what it is referring to when it says 500?

A. Yes. Yeah, right there. "The outer layer of the multicomponent fiber, 620, over stent, 500."

Q. Is that shaped -- stent shaped the same way or similar to the shape of the model that you made of the SYNERGY stent?

A. It is similar to.

Q. Is the shape of the serpentine rings on the Strickler patent similar to the model that you created of the SYNERGY stent?

MR. GROSS: Raise an objection as irrelevant for purposes of infringement, Your Honor. Comparing the product to the figure.

MR. SHORE: Your Honor, I'm not come -- I'm simply comparing the shape of the coating described --

THE COURT: Overruled.

BY MR. SHORE:

Q. Is the shape of the polymer fiber in Strickler similar to the shape of the polymer fiber of the SYNERGY stent?

A. Yes.

Q. If it was a fiber in Strickler, why wouldn't it be a fiber in Nelson -- or -- I'm sorry, if it was a fiber in Strickler, why wouldn't it be a fiber on the SYNERGY stent?

A. It is a fiber on the SYNERGY stent; same thing.

Q. Is Dr. Mooney's arguments about what constitute a fiber consistent or inconsistent with Boston Scientific's use of the term "fiber" in the Strickler application?

A. Inconsistent.

MR. SHORE: Let's go to PTX 52.

And, Your Honor, we would offer PTX 52 into evidence, it's a certified copy of the Weber or Weber application.

MR. GROSS: At this time no objection, obviously everything is subject to...

THE COURT: Okay.

BY MR. SHORE:

Q. Dr. Pitt, did you review -- again, Mr. Weber is from the Netherlands. It's Jan W-E-B-E-R, I don't know if it's Weber or Weber or Weber, but W-E-B-E-R, okay.

Did you review that application?

A. Yes.

Q. Was this application published by the U.S. Patent office?
A. Yes.
Q. How does Plaintiffs' Exhibit 52 relate to Boston Scientific?
A. Mr. Weber was an employee of Boston Scientific and submitted this application. I believe it's named -- the assignee is Boston Scientific.
MR. SHORE: Let's blow that up.
BY MR. SHORE:
Q. And do you understand that Boston Scientific signed that as a wholly owned subsidiary as Boston Scientific?
A. Yes.
Q. And they've admitted to that, correct?
A. Yes.
MR. SHORE: All right. Let's lake a look at PD 2-8.
BY MR. SHORE:
Q. Again, these are figures from the Weber patent. And what we're seeing here, is that -- what is -- what are we seeing here in 4 B?
A. So in 4 B, it shows a cross section from this little B to that little B, there's little dotted lines. So if you cut right through that corner of the stent, you would see metal right here, that's labeled 100 S. And then you see

this rectangular shaped cross-section of material on the top numbered 200.

Q. All right. I'm going to --

MR. SHORE: May I approach?

BY MR. SHORE:

Q. I'm going to appropriate my opposing counsel's marker, but here you have another shape. I guess this would be like a Marine Corps haircut.

Does Boston Scientific refer to that shape as a fiber?

A. Yes.

Q. And looking at these excerpts, what are they describing as a fiber in the Weber application?

A. Right here it says, for example, fibers 200. 200 is right here -- so that's the Marine Corps haircut, I guess, shape -- may be applied to or formed the outer surface of a stent 100, as shown in figure A, which is up here. They are just saying 200 is this coating on top of 100, which is the metal part of the stent.

Q. All right.

How many times in Weber do they refer to that as a fiber?

A. They use the word "fiber" in that patent application over 100 times.

Q. Let's take a look at -- we're going to -- and, again,

I'm sorry, same shape in Weber, same basic shape in Weber as in the model, correct?

A. Yes.

Q. Same basic shape as in the SYNERGY stent?

A. Yes.

Q. All right. I'm going to move to manufacturing, okay?

How many fabrication examples are there in the '296 patent.

A. I think there are at least six.

Q. And what are some of them?

A. Well, there's example one that Dr. Nelson described where the emulsion comes into the water -- or not the water, the solvent and forms a fiber. There are examples of coating a fiber layer on top of another substrate. There's other examples of, you know, making fibers in many ways.

Q. And, in fact --

MR. GROSS: Sidebar, Your Honor.

(Whereupon, a discussion was held at sidebar as follows:)

MR. GROSS: Your Honor, we move that that last answer be stricken because the Court -- the Court recalls a rule with respect to figure 4, which has a couple of coating layers and a single fiber in the middle, that that's a single fiber; in other words, you can have a fiber and it can be coated.

Before trial they argued that the reason the courts should not adopt thread-like structure is that these coatings were extra fibers you actually could do, you could have a coating and it would be a fiber. And the Court said we -- the Court disagrees, figure 4 is not multiple fibers.

And we can talk about this at a break and show Your Honor. I'm only saying this, Dr. Nelson testified consistent with the Court's order, and I thought probably at the direction of counsel, that you can have a fiber and it can have coatings.

Here's what this witness just did very quietly, this witness just said, "This shows fiber coatings on a substrate." So to the extent this witness is in any way saying that figure 4, which shows a fiber with coating, shows multiple fibers, it's inconsistent with the Court's construction and so we would move it be stricken because it's inconsistent with figure 4.

If counsel meant to do something else, we can clarify it. But I'm really concerned right now that they are suggesting that a coating can be a fiber.

MR. SHORE: Your own witness said -- your corporate representative said a coating can be a fiber.

MR. GROSS: In figure 4, I apologize.

MR. SHORE: Anyway, that's not the way I asked him.

THE COURT: He's asking about manufacturing processes. That's what I heard.

MR. GROSS: Okay. I thought you were discussing the patent.

THE COURT: This time is charged to the defendant.

(Whereupon, the discussion held at sidebar concluded.)

BY MR. SHORE:

Q. Thank you, Dr. Pitt. So to recap, I believe you said there are at least six ways the manufacturing disclosed in the '296 patent?

A. Yes.

Q. And does Weber also disclose multiple ways to put a fiber on the outside of the stent?

A. Yes.

Q. At least two or three. I believe one of them was you do a sheath and, I guess, taking our model, one way to do it is like if a piece of paper is a fiber or a polymer, you can put the fiber over the stent and then you can basically use a laser to cut away the parts that aren't covering the stent?

MR. GROSS: Objection. Leading.

THE WITNESS: Yes.

MR. SHORE: It's background information, Your

Honor.

THE COURT: It's background information. I mean, you can -- we'll strike it.

Ask the question in a way that's nonleading, please.

BY MR. SHORE:

Q. If you put a sheath around the stent, as described in Weber, how would you end up with only the polymer on the struts?

A. Weber describes at least one method which includes taking a laser and cutting out the portions that are between the struts and leaving the polymer -- or leaving the material on the fiber -- excuse me, material on the stent.

Q. So you recall Dr. Chen talked about a coating being a fiber, correct? Or do you recall that?

A. I recall that.

Q. And is that what Boston Scientific does?

A. Yes.

Q. And then there's six ways -- how many ways are there in the '296 patent?

A. At least six ways.

Q. And there's more ways described in Weber or not?

A. I don't recall the total number of ways described in Weber.

Q. So at least between Weber, the '296 patent, Dr. Chen,

do we have at least eight?

A. Is that a question?

Q. Yes.

A. Yes, the answer is yes.

Q. Let's go to the summary. And, again, do you agree with Dr. Mooney's statement that the only -- that the way that Boston Scientific makes its stents, the way they apply the polymer fiber to the outside of the stent means that it can't be a fiber?

A. I don't agree.

Q. Have we covered every element in Claim 1?

MR. SHORE: And let's put Claim 1 back up.

THE WITNESS: Yes, we have covered all of those elements.

MR. SHORE: All right. Let's go to claim 26.

BY MR. SHORE:

Q. So this is everything in Claim 1 plus where one or more of the therapeutic agents are released at varying rates over time. Do you see that?

A. Yes.

Q. And you did doctor -- you were here for Dr. Allocco's testimony, correct?

A. Correct.

Q. Did he admit this to be true?

A. Yes.

MR. SHORE: And let's look at JTX 008, page 5.

BY MR. SHORE:

Q. And this is the graph, again, from the conference that they presented to the doctors in European. Does this show "the composition releases a therapeutic agent at varying rates over periods of time"?

A. Yes. You know, I'm a teacher and I like to explain to the jury what's going on, I'll be real quick. This is time down here in days up to 120 days. This axis here is how much drug is released. It's hard to read that.

This blue line shows that over the first couple of days we release -- so that number there is 25. We've released about 20 percent. And then over the next up to, you know, 60 days, release kind of starts to slow down. At 90 days there's a little bit left and it slows down until it's all gone at 120 days.

Q. All right. Let's look at claim 16.

And this is -- Claim 16 is not being asserted, but it's important to understand it for Claim 17; would you agree with that, Doctor?

MR. GROSS: Objection. Irrelevant.

THE COURT: I'm going to sustain it. It's not being asserted.

BY MR. SHORE:

Q. Does Claim 17 depend from Claim 16?

A. Claim 17 depends on Claim 16.

Q. All right. Let's look at Claim 16. "The composition of Claim 1 where the biodegradable polymer is a single polymer, a copolymer or a mixture of polymers selected from the group consisting of polypeptides, poly" -- whatever that says -- "nylon co-polyamides, aliphatic polyesters, polyhydropyrans, poly" -- you read that.

A. Yes, "polydihydropyrans, polyphosphazenes, polyorthoester, polycyanoacrylate, polyanhydride, modified polysaccharide and modified proteins."

Q. Is the biodegradable polymer a single polymer or a copolymer?

A. It is a copolymer on the SYNERGY stent.

Q. And where does it fit in with these long words?

A. That PLGA polymer is an aliphatic polyester.

Q. All right. So let's go to Claim 17.

And we have the composition of Claim 16. Walk us through and tell us why the SYNERGY polymer fibers infringe Claim 17.

A. Because the PLGA polymer is an aliphatic polyester and it is a copolymer. Here's the word "copolymer" here. A bunch of names here, but the important ones are glycolic acid and lactic acid. So it is a copolymer of lactic acid and glycolic acid, PLGA.

Q. Does the outside layer, the fibrous polymer fiber on

the abluminal surface of the SYNERGY stents practice Claim 17?

A. Yes.

Q. Let's go to Claim 26 right quick. We already did 26.

Let's go back to Claim 1, please. Go back to the board.

Now, Dr. Mooney is going to, I believe, testify that the second phase regions are not discrete, do you agree with that?

A. I don't agree with that assessment.

Q. Why not?

A. Because in all of my reading of the documents that I told you about, I saw two distinct phases that were separate, and I looked at their data from the glass transition temperature and the confocal microscopy and Raman microscopy, that is all consistent with the scanning electron microscopy and with their words in the report.

Q. The burden of proof for The University of Texas is preponderance of the evidence, slightly more evidence. The Court will instruct them on that, but basically it's slightly more evidence in favor of infringement than against infringement.

MR. GROSS: Objection. Move to strike, Your Honor.

THE COURT: It's overruled. I mean, if he says

something that's not consistent with the Court's instructions, the jury -- the jury will get the Court's instructions, and they'll make a determination of whether what he's saying is consistent with the Court's instruction.

BY MR. SHORE:

Q. Is your -- are you just slightly thinking that Boston Scientific infringes? Is this a close case to you?

A. No. It's obvious.

Q. And I believe Claim 11 simply required -- and I want to go back to make sure I cover this. Claim 11 -- let's put that up.

Claim 11 is a dependent claim from Claim 1 about what kind of therapeutic agents, do you understand that?

A. Yes.

Q. Does Claim 11 -- does the everolimus included anywhere in Claim 11 and tell us where?

A. Yes, it is. So everolimus is a drug that inhibits angiogenesis. That means it stops new tissue from growing. And we also saw that it is an antibiotic. It stops T cells in your body from proliferating or growing.

Q. All right. And did Boston Scientific admit these things?

A. Those were admitted.

Q. All right. Dr. Mooney, is the SYNERGY stent -- is the SYNERGY stent's polymer fiber covered by Claim 1?

A. Did you call me "Dr. Mooney"?
Q. Oh, my gosh. It's been a lot of long, late nights this week.
Dr. Pitt, does Claim 1, is the SYNERGY stent covered by Claim 1?
A. Yes.
Q. Claim 11?
A. Yes.
Q. Claim 17?
A. Yes.
Q. Claim 26?
A. Yes.
Q. Is that clear to you?
A. Yes.
MR. SHORE: Pass the witness.
THE COURT: All right. Cross-examination?
Actually, it's 11:20. I'm going to take a break at 11:30. It's a good time to take a -- let's take a break.
(Whereupon, the jury left the room at 11:20 a.m.)
THE COURT: All right. Dr. Pitt, you're still under oath. Don't consult with counsel during the break.
THE WITNESS: I understand.
THE COURT: All right. We'll come back at 11:35.

(Recess taken.)

THE COURT: All right. You may be seated.

(Whereupon, the jury entered the room at 11:36 a.m.)

THE COURT: You may proceed.

CROSS-EXAMINATION

BY MR. GROSS:

Q. Good morning, Dr. Pitt. David Gross.

A. Good morning.

Q. Good to meet you.

A. Thank you.

Q. We haven't had the pleasure.

A. Not yet.

Q. But here we go. Sir, first of all, if you don't mind, they are probably similar, but I'm just going to replace the binders you have in front of you with our binders for -- to make things easy, all right, sir.

MR. GROSS: May I approach, Your Honor?

THE COURT: Yes. That's fine.

BY MR. GROSS:

Q. I'm just going to first ask that you store these in a secure location. Do you mind if I put these nearby.

(Discussion held off the record about binders.)

BY MR. GROSS:

Q. Dr. Pitt, I'm going to put up a question and ask you

for your answer. We're going to put it on the screen, sir.

A. Fine.

Q. Sir, at any point in this case, have you opined that the polymer coating on Boston Scientific's accused SYNERGY stents is thread-like?

A. No.

Q. Now, I wanted to talk to you about the people and scientists at Boston Scientific --

MR. SHORE: Your Honor, we object to the question being left up on the screen. It's been asked and answered.

THE COURT: Okay. Can you take the question down, please.

BY MR. GROSS:

Q. Dr. Pitt, I want to ask you about the people, the scientists at Boston Scientific, all right, sir?

A. Yes.

Q. I didn't hear you say in your testimony that you read anything in any depositions from anyone at Boston Scientific that you believed was scientifically inaccurate.

And my question for you is: Did you suggest anything you read in any deposition by any Boston Scientific fact witness was inaccurate when you were talking in the last couple of hours?

A. Um, my discussion the last couple of hours was on

those documents that I was presented and not on those depositions.

Q. Well, I'm sorry, Dr. Pitt, didn't you hear counsel say that you looked at -- have you seen anything at all in Boston Scientific depositions, documents, anything at all, and then you were asked questions, do you remember that, sir?

A. I do.

Q. Okay. So here's my question, in your testimony today so far, have you given one example of anything any Boston Scientific scientist said at any deposition that you believed was scientifically inaccurate?

MR. SHORE: Your Honor, objection. He answered the questions he was asked.

THE COURT: So now he's asking him another question. He can answer the question.

THE WITNESS: No.

BY MR. GROSS:

Q. And right now, give the jury the list of every instance you can remember where you read something and said, That statement in a deposition by a Boston Scientific scientist is scientifically inaccurate. Could you give the jury your list.

A. I cannot remember at this time.

Q. No, I -- I just mean give me the one example where

the fiber hold its shape when it is formed.

Q. Sir, okay. And so I just want to understand. So why is it more difficult to make a fiber than a film; what's the key point?

A. Holding the shape as the fiber is formed.

Q. Okay. So something about holding. Have you ever heard that referred to as tensile strength?

A. Say that again. That was kind of fast.

Q. Have you ever heard to it referred to as tensile strength?

A. Holding is not --

Q. Holding its shape because of tensile strength?

A. No.

Q. What helps it hold its shape? You can tell the jury?

A. Its molecular structure. There's polymer molecules in there; they are tangled together. They were shaped -- they don't untangle unless you put more solvent with it, then it can change its shape. Or if you melt it, but it's the attraction of the molecules to each other that causes it to hold its shape.

Q. Okay. And so when did you learn about the difficulty between making a fiber, that it was more difficult than making a film, again, high level?

A. Graduate school.

Q. Okay. Now, you'll agree with me that the coating on

the Boston Scientific stent is a coating; is that reasonable?

A. Yes.

Q. It's a coated stent, correct, sir?

A. There is a coating on the stent.

Q. You've heard about coated stents, right, sir?

A. Yes.

Q. You're on the Board -- editorial board of a couple of journals, right, sir?

A. Yes.

Q. You literally received articles on coated stents, right, sir?

A. Yes.

Q. Now, you'll agree with me that a coated stent is film-like, but it is not fiber-like? Reasonable?

A. I don't agree with that.

Q. Sir, all right, I'm just going to go ask you a direct question.

You know that fiber has to be a threaded structure -- a thread-like structure of any length or shape, right, sir?

A. Yes.

Q. All right. With that definition in mind, you'll agree with me that the BSC coating is film-like; it is not fiber-like?

A. I don't agree.
Q. Tell the jury why the BSC coating is not film-like?
A. Because it has a long shape. It's much longer than it is thick or wide, so that's the definition of a fiber.
Q. All right. So if I stood here and said, I'm a scientist, Dr. Pitt. That BSC coating is, you know, the continuous material, the coating, you know what that is, right, sir?
A. Yes.
Q. Okay. That -- that continuous material, that coating, that's film-like, and that's a scientific fact, would you say, Mr. Gross, F?
A. I would ask you why you said that.
Q. Well, why don't I show you.
Let's look at tab 7 in your binder. And let's pull it up. And it is Joint Exhibit 2 at 4.
We can pull that up. And let's just pull up that bottom paragraph.
Do you need help, Dr. Pitt? I apologize.
A. I was looking in this binder.
Q. I apologize. Let me help you with this.
MR. GROSS: Sorry, Your Honor. I apologize.
THE COURT: No problem.
BY MR. GROSS:
Q. All right. Can you read that to the jury, sir?

A. Yes. "A cross-section of the SYNERGY clinical coating was scanned by FESEM. Spherical domains dispersing in film-like continuous material were observed as reflected in figure 7.2-F1 below. The presence of distinct particles suggests a phase separation between everolimus-rich domains and PLGA matrix. This is further supported by the findings in mDSC.
Q. All right. Let's go to the next page, sir. At the top of the next page, do you see figure 7.2-F1?
A. Yes.
Q. What is figure 7.2-F1?
A. This is a FESEM of a fracture surface of a coating on a SYNERGY stent.
Q. Okay. In other words, it's been through the process?
A. Which process?
Q. It's been put on the stent?
A. Yes, it was put on the stent.
Q. All right. So, sir, you've discussed this photo with the jury, correct?
A. Yes.
Q. And am I right that, so far at least today, you had not yet said to the jury that Boston Scientific scientists described the figure you are going over with the jury as film-like? You didn't mention that yet today, right, sir?
A. I did not mention that yet today.

Q. Got it. So roller -- I won't take off the roller, but the idea is we have a roll of paint that's continuous, but in a stent there are gaps because it's -- has all those struts, right, sir?
A. Correct.
Q. All right. So with that agreement, okay, sir, we can compare the roller to the stent for explanatory purposes, right, sir?
A. Yes.
Q. And one can see the roller, the paint roller, right, you see that paint roller?
A. I see it.
Q. And do you see the stent, you've seen this video before right, sir?
A. Yes.
Q. Okay. So it's pretty clear to you that the roller is a roller and the stent has those struts, right, sir? I just want to make sure we're being clear.
A. Yes.
Q. Okay. And then below, there's a pool of paint, which we refer to as the polymer drug solution, right, sir, at a high level?
A. Yes.
Q. Understanding that we're talking at a high level, right, sir?

A. Yes.
Q. Okay. So can you simply explain to the jury how -- how is it that BSC has a process that is analogous, at a very high level, to a roller going over a pool of paint?
And you should feel free to use the roller, if that would be helpful. Go right ahead.
A. Well, the stent is on a rod that's lowered down. And the film moves underneath, and that turns the stent and -- as it's in the liquid, then it's lifted out.
Q. And let's bring up this one.
Sir -- sorry. We'll wait for that to turn on.
Well, we're having trouble with the document camera so we're just going to put that on hold for a second and continue going on.
Okay. Sir, let's talk about the Strickler patent. Do you remember talking about the Strickler patent, sir?
A. Yes.
Q. Okay. This is PTX 182.
MR. GROSS: Can we pull that up. Pull up PTX 182.
And I need to come back to Defense -- right? Plaintiffs' 182, sorry, I apologize, plaintiffs' 182.
BY MR. GROSS:
Q. And, sir, do you recall --

A. Yeah, I'm trying --
Q. -- the Strickler, you went over it with your counsel a little bit earlier today?
A. Yes.
Q. I'm just covering the same ground.
Okay. So, let's start at the top. The Strickler patent is obviously not at issue in this case, correct, sir?
A. Correct.
Q. And you have not done any claim construction of any kind relating to the claims of the Strickler patent itself, right, sir?
A. Did you say relating to the claims of the Strickler --
Q. None of the -- yes, exactly. You have not done some type of construction of the claims, like you do in a patent case, for the claims of the Strickler patent specifically, where you talked about the Strickler patent claims, the Strickler patent specification, and then what the construction would be of those claims specifically, correct?
A. Correct.
Q. All right. And you do understand that a patent is an attempt at intellectual property, correct, sir?
A. An attempt?
Q. To get intellectual property?

that we can identify two phases, what's your opinion on the next limitation, immiscible, you would say, it's my opinion that the two phases are immiscible, true?

A. If I have a first phase and a second phase, they are immiscible.

Q. They have to be immiscible, right, Doctor? You talked about this extensively, right, sir?

A. Yes.

Q. That's just a scientific fact, right?

A. Yes.

Q. You have two phases, they are immiscible, true?

A. Yes.

Q. That's your opinion today, right, sir?

A. Yes.

Q. Okay. So there's no reason at all, whatsoever, to have a claim limitation that says first and second phases being immiscible because that literally doesn't change anything in your opinion, correct? Literally doesn't change a thing, correct?

A. If you have a first phase and a second phase, they are immiscible.

Q. Have you heard of the word "superfluous"? I know you have. You know the concept of superfluous?

A. Yes.

Q. What you're saying is that language, first and second

phase as being immiscible, is superfluous, correct? It's not needed?

A. Well, it clarifies the previous phase -- phrase.

Q. Well, but, sir -- well, you don't need to do any scientific investigation of anything -- you don't need to look at anything, if it's agreed upon there are two phases, right, sir?

A. I missed the first part. You said I don't have to do anything if --

Q. Sure --

A. There are two phases.

Q. If it's agreed there are two phases, there is literally no investigation you need to do to determine whether it's immiscible, in your opinion, correct?

A. Except to verify there are two phases, correct.

Q. If we agree on that, right, sir?

A. Yes.

MR. GROSS: Let's bring up --

(Discussion held off the record.)

BY MR. GROSS:

Q. So really what you're doing is the Court's construction is incapable of dissolving into one another, right, sir?

A. That is the Court's construction on immiscible.

Q. But what you're adding today is "incapable of

dissolving into one another to form a single phase," right, sir? That's a sentence you've used repeatedly, correct, sir?

A. Yes.

Q. This isn't the first time you've ever seen that, right, sir?

A. First time I have seen that.

Q. For sure. But I'm saying the idea of having "incapable of dissolving into one another to form a single phase," that is a sentence you've said before, right, sir?

A. I have said that before.

Q. Over and over and over again, correct, sir, in this case?

A. Yes, more than one time.

Q. Okay. You do understand that the Court is going to give jury instructions where the Court tells the jury what the construction is, right, sir?

A. Yes.

Q. And you do understand that, at least as of right now, the claim construction is not incapable of dissolving into one another to form a single phase; you're aware of that, right, sir?

A. Yes.

Q. That's something you have added in your professional judgment, right, sir?

A. As a teacher, I have added that to explain it.
Q. Okay. Now, if we remove that, and we come back to the claim language, and we were just asking whether you have a phase and --
MR. GROSS: We can get the next one too. I want to show the constructions, yes.
BY MR. GROSS:
Q. I want to make sure you have the constructions. Do you see it Dr. Pitt?
A. I see it.
Q. Now, the first phase is a polymer portion. Do you see that, sir?
A. Yes.
Q. And the Court will instruct the jury as to whether there needs to be any more language in that, but right now the construction is "the polymer portion of the fiber," correct?
A. Correct.
Q. And then the second phase is "the drug-containing regions dispersed throughout the fiber," right?
A. Yes. Discrete, the discrete drug-containing regions.
Q. "The discrete drug containing regions dispersed throughout the fiber," right?
A. Yes.
Q. As a matter of science, you'll agree with me that

within the polymer portion, phase 1, are polymer molecules, correct?
A. There are polymer molecules in the polymer portion of phase 1.
Q. And in phase 2, the drug-containing regions there are everolimus molecules, correct?
A. Yes.
Q. And there are also polymer molecules, correct?
A. Yes.
Q. Okay. So I'll -- just to be clear. So in the polymer portion, there's polymer, and am I right, there are also everolimus molecules, correct?
A. Does black mean everolimus?
Q. Yes. Sorry, yes.
A. Okay. There are everolimus molecules in the phase 1.
Q. Yes. And in the drug-containing regions, there are polymer molecules and everolimus molecules, right, sir?
A. Yes.
Q. So there is some -- some overlap in molecules, polymer and everolimus, between the two regions, right, sir?
A. Yes.
Q. And you've heard of like, like means like?
A. Yes.
Q. When we're talking about this?
A. Yes.

Q. All right. Can you explain to the jury the concept of like means like, in this context?
A. Like means like. I don't know --
Q. Sorry, Dr. Pitt, I was looking for a little bit more. When we're talking about miscibility, there's this concept of like means like?
A. Yes, in the concept of miscibility.
Q. I apologize. I mean immiscibility. When you're talking about something is miscible to something else, you're talking about like means like?
A. Yes.
Q. And explain that to the jury, please?
A. So when two substances contact each other, if they like each other, they get together. If they don't like each other, they don't get together.

The laws of thermal dynamics says that -- there's always a little bit of this one that goes over here and a little bit of this one that goes over here, but if they don't like each other very much, then there's not a lot of that happening.
Q. Exactly. Not a lot of that happening, right, sir?
A. Yes.
Q. Could we refer to that as a slight amount?
A. Slight amount of what?
Q. That happening?

A. Oh, yeah, slight amount of that happening, yes.

Q. And you remember when Boston Scientific was talking about slight miscibility?

A. Slight miscibility between -- with the substances.

Q. But am I right that there's slight miscibility involving the substances in phase 1 and the substances in phase 2? Reasonable?

A. Yes, for substances.

Q. So if there ends up not being a construction incapable of dissolving into each other, one another, to form another phase, all right, if instead we're asking, is there any miscibility between the two phases, you would agree there is at least slight miscibility involving the substances in each of the phase? Reasonable?

MR. SHORE: Objection. 403. Misleading.

THE COURT: Overruled. He can answer the question.

BY MR. GROSS:

Q. You don't find that reasonable, sir; is that right? I think I heard you say no, but I want to make sure the jury heard that. You disagree?

A. Yes, because of the words that you used, so I don't know if I heard it wrong or what.

Q. And if the phrase said "incapable of completely dissolving into one another," then you'd be looking at

similar to dissolving into one another to form another phase, correct, sir?

A. You didn't tell me if you're talking about substances or phases.

Q. The substances in the two phases?

A. Okay. Can you add that to your question, and I'll try to answer it.

Q. Okay. Well, let's just, let's just start with your understanding of the Court's -- your application of the Court's claim construction?

A. Immiscible means incapable of dissolving into one another.

Q. But what you mean is completely dissolving, correct, sir?

A. It says, "Immiscible means incapable of dissolving into one another."

Q. And you mean completely dissolving, right, sir?

A. I mean what it says. It says, "Immiscible is incapable of dissolving into one another."

Q. To form a single phase, you talked about that repeatedly, right, sir?

A. I don't know, you didn't tell me if immiscible is talking about phases or substances.

Q. Phases?

A. Okay. Then I won't instruct you, sorry.

Q. No, no, Dr. Pitt, I -- it only helps. It's all right, Dr. Pitt, it only helps.

So with respect to the two phases, if there's slight miscibility between the two phases, slight miscibility between the two phases, can we now agree that there would be no infringement?

A. No.

Q. So if there's slight miscibility between the two phrases you would say it's immiscible?

A. Yeah, if there slight miscibility, that means the -- you still have two phases because you have slight miscibility. So you have two phases so there's still two phases at the end.

Q. Because you have to form a single phase?

A. I said nothing about single phase.

Q. Well, if you don't form a single phase, you're out of luck in terms of showing that it is --

A. Oh, I understand your question now.

Q. Correct?

A. Yeah, you were adding the end of my statement for me.

Q. Going too fast, all right. A couple of more, Dr. Pitt.

Am I right that not all polymers are fiber forming; reasonable?

A. Yes.

Q. And am I also right that an ordinary artisan would know film devices are not fibers and the shapes themselves are no indication of whether the structure can be made filmtous (phonetic)?
A. I believe you're quoting me, yes.
MR. GROSS: No further questions, Your Honor.
THE COURT: Okay. Redirect.
MR. SHORE: This will be quick, Your Honor.
THE COURT: All right.
MR. SHORE: Can you, Andrew, pull up the first image, please.

REDIRECT EXAMINATION

BY MR. SHORE:
Q. You were asked some questions about whether something could start out in two phases and then end up in a single phase; do you remember that?
A. Yes, he asked me that.
Q. All right.
MR. SHORE: Now pull up the image.
BY MR. SHORE:
Q. That's a glass of ice water. Is that in two phases?
A. Yes.
Q. Does it start out in two phases?
A. I don't know how it started out.
Q. Well, I mean, if I take a glass of water and I put

rest.

THE COURT: Okay. Yep.

Ladies and gentlemen of the jury, we're going to take our lunch break now. We're going to take 45 minutes and come back at 1:40.

(Whereupon, the jury left the room at 12:53 p.m.)

THE COURT: All right. We're in recess for lunch.

MR. DROWN: Your Honor?

THE COURT: Yes.

MR. DROWN: Can I ask one question?

THE COURT: Yes.

MR. DROWN: When they rest, we, of course, plan to move for judgment as a matter of law. We suggest we could do it orally and do it quickly, if that would work for the Court.

THE COURT: That works, we can do it orally. You should -- yeah, we can do it orally.

MR. DROWN: Okay, thank you, Your Honor.

MR. SHORE: Your Honor, we just want to make sure that's outside the presence of the jury, obviously.

THE COURT: Yes. So...

MR. DROWN: It could be before we bring the jury back in, if they rest. Then we can just do it right then or

at any point -- just make sure we preserve everything.

THE COURT: They are going to let us know if they rest, unless you're prepared to tell us now.

MR. LAHAD: We're going to let you know, Your Honor, we would like to rest in front of the jury.

THE COURT: Okay. All right.

MR. GROSS: Your Honor, we're streamlining. We're still shooting for closing, if possible, today.

THE COURT: Okay. All right.

All right. So we'll bring the jury back and plaintiffs will let us know what they are going to do and if we -- and then at that time, you know, it may be a quick jury needs to leave and come back, so...

All right.

MR. LAHAD: Thank you, Your Honor.

(Break taken.)

THE COURT: All right. You may be seated.

All right. So before we bring the jury back, let's deal with the deposition designation objections.

With respect to the designations for Delia Dahm, the ones that are sustained are page 43, line 23 to 24; page 44, line 1; page 44, lines 3 to 5; page 108, line 20; to page 108, line 24. Page 109, line 1. 109, line 3 to line 5; 109, line 7; 109, lines 9 through -- I'm sorry, so 109, line 7 stops there. The rest of 109 is through 110, 12 is

fine.

Page 110, lines 14 to line 18, sustained. And the next line -- page 171, line 3 to page 171, line 5.

171, line 7 through 9.

172, line 2 through 4.

172, line 6 and 7.

And Page 232, lines 13 to 20.

Those are the ones that are sustained. All others are overruled.

With respect to Andres Romero-Sanchez, ones that are sustained are page 41, lines 3 to 7 only.

Page 42, lines 11 to 14.

And page 42, line 18.

All others are overruled.

With respect to George Smith, they are all sustained.

Going to the exhibits for Damn, DTX 71, DTX 72, those objections are sustained.

DTX 81, sustained.

Going to plaintiffs' objections to the Nelson exhibit, Exhibit DTX 077, that's overruled.

Same thing with DTX 78.

And that's... and that's what I have.

Oh, yeah, we do also have Nelson deposition designations that was just given to us. The only one that's

sustained on this -- these two pages was page 182, lines 5 through 7.

All right. So, let's bring the jury --

MR. SHORE: Your Honor, before we bring the jury in, what we thought might be more efficient so the jury is not being yo-yoed, is if we -- I think they've agreed that we can rest, they'll make their motions --

THE COURT: We can reserve it until the afternoon.

MR. SHORE: Or when they come back in, we'll rest in front of the jury, and they won't to make -- instead of sending the jury back and forth, we rest formally, they'll make whatever motion they want to make, you'll rule on it. Then you can bring the jury in and then we'll rest again in front of the jury just to do it in front of the jury, that way we don't have to send them back and forth.

THE COURT: That's fine. If the defendants don't have any problem with that, I'm fine with that.

MR. GRIMSRUD: That's fine, Your Honor.

THE COURT: Okay.

MR. SHORE: Your Honor, plaintiffs, The University of Texas Board of Regents and TissueGen, rest their case.

MR. DROWN: Your Honor, defendant Boston Scientific moves for judgment as a matter of law on direct

about the metal structure?
A. Yes, I have.
Q. What's it made out of?
A. So it's a platinum chromium alloy, so it's basically a type of metal, so...
Q. And I think everyone agrees on this, the metal -- the metal platinum chromium stent, that is not a polymer?
A. Yes, I think all scientists would agree that metal is not a polymer.
Q. Not a polymer fiber?
A. Not a polymer fiber.
Q. And for your investigation, did you focus on the actual coating on the stent?
A. Yeah, so the coating is what's at issue here, so I focused on that coating. You know, you can't see just visually the coating, but this is an illustration from Boston Scientific where they try to make it a little more obvious that there's a coating on there, so in this illustration they are showing this kind of lighter blue coating layer that's around the metal stent.
Q. And earlier you were saying the -- I believe you were talking about how the coating is strongly adhered to the stent?
A. Yes.
Q. How does that happen?

A. Yeah, so when they -- you know, very similar to, think, again, going back to the painting analogy, if you've prepped the wall well, and you basically apply the paint to it, it sticks well as it dries, and then you get this coating of paint and the same thing happens. Here they actually make sure they clean the surface of the metal stent, and they apply this polymer solution that adheres. It's very critical that it adheres strongly. You're doing a lot mechanically, and this goes into the artery, and you want it to stay there to prevent the regrowth and closing up of this artery, so the adhesion is critical.

Q. And from examining the coating on the stent and how it's adhered to it, analyzing it, in your opinion, Dr. Mooney, is there anything thread-like about the coating on the SYNERGY stent?

A. No, there's nothing thread-like on this coating.

Q. Why do you say that?

A. It's pretty obvious when you just look at it. If you actually look at the actual stent itself and the coating, as I said, this view or a magnified view, you don't see anything thread-like there.

Q. And you looked at other documents to show the SYNERGY stent coating?

A. Yep, beyond my own observation, I also have available a lot of data from Boston Scientific, a lot of analysis,

some of which we've already seen here in the last few days.

Q. I don't think there's an objection to this document, but if you could look at JTX 19, and just confirm that that is one of the documents that you looked at in the course of your investigation.

A. Yes. I have used this -- I have examined this document.

MR. GRIMSRUD: We offer JTX 19 into evidence, Your Honor.

MR. OFFOR: No objection.

THE COURT: Admitted.

(Joint Exhibit No. 19 is admitted.)

BY MR. GRIMSRUD:

Q. Okay. And this is a page from this JTX 19 exhibit?

A. Yes, that's correct.

Q. And what does this show here? I think we've maybe heard a bit about at least images similar to this previously?

A. Yep. So the scale here is small enough that the best way to look at it is to use a very high-powered type of microscopy, electron microscopy, so this is an electron microscopy view. First of all, in the upper left of some of these stent struts. So you can see those. And then the little red box in the one image in the very upper left, they basically then further magnified that, and they actually cut

liquid?

A. It is liquid, yes. So it's a liquid. And in this liquid -- and it's very clearly described as a liquid. So liquids can be, you know, various viscosities, but it's clearly a liquid, I don't think there's any dispute about that.

And it's a clear liquid also. And so that's actually relevant. If there are fibers in it, then it would presumably not be clear. If it was an emulsion, as we heard the other day from Dr. Nelson, it would actually be milky-white. So it's not an emulsion, it doesn't have fibers in it, it's just a clear liquid solution.

Q. So from your investigation, you can confirm that there are no -- there is no -- there are no fibers in that solution?

A. No, there's no fibers in that solution.

Q. Nothing thread-like?

A. Nothing thread-like.

Q. And when they -- let's just talk about the bare-metal stent, just to back up, too. Which, as we know, it's not a polymer, but how is that stent made?

A. Yeah, they actually start with a cylinder, hollow cylinder of the metal. Kind of the way I like to think about it is, like, if you think about, like, a soda can, you basically have this cylinder.

And what they actually do is use a laser to basically cut out parts of it. So they actually cut out what they don't want, leaving the stent behind. So it's a cutting process to make this bare-metal stent.

Q. And the stent that we've looked at that has this, you know, complex three-dimensional structure, that's actually cut from that tube?

A. Yes, it's cut from -- into a tub like that, yes.

Q. In your investigation, did you come across the term "laser-cut tube"?

A. Yes.

Q. And what does that refer to?

A. So that refers to -- the cutting process uses a laser, and so they actually use a laser and -- you know, that is very hot to then basically cut through the metal. And then cut away all the parts that they don't want.

Q. And then is the bare-metal stent referred to by Boston Scientific as a laser-cut tube?

A. Yes, they refer to the process -- yes, of using a laser cutting process to prepare it.

Q. And then in the process you talked about how the bare-metal stent is dipped into this liquid coating?

A. Yes.

Q. And the liquid coating does -- or the liquid solution doesn't have any polymers, nothing thread-like?

A. No, nothing thread-like there.
Q. And we watched this clip, but when the stent is dipped in the liquid coating, does -- is any thread-like structure or any fiber formed from that process?
A. No, it's dipped in a liquid. And when the stent then is rolled and comes back up, it's still a liquid, but now it's a liquid that's coating the stent.
Q. Let us watch this here.
(Video clip played for the jury.)
BY MR. GRIMSRUD:
Q. So the stent is -- it's dipped in this liquid, rolled, and that's how it's coated?
A. Yeah. And then the last step is it's dried, so the solvent basically dries off like paint. So then you have basically this coating.
Q. And we've used this analogy of taking a paint roller, if you imagined a pool of paint and you rolled your paint roller through the paint, you get a coating of paint on the outside of it. Obviously, the liquid solution is not paint, but how does that analogy compare to this process?
A. I think it's a very appropriate analogy, very accurate analogy.
Q. So -- and what have you summarized here based on your investigation?
A. Yeah, so, you know, the bare-metal stent that they

start with doesn't include a polymer fiber. The coating solution does not have a polymer fiber. And when they apply this coating solution, that does doesn't have a fiber to the bare-metal, that also doesn't have a fiber. There's no resulting polymer fiber that's actually formed on this coated stent, so there's no thread-like object there.

Q. So the investigation of the manufacturing process that Boston Scientific uses for the SYNERGY stent and the coating, did you find any evidence of any kind of any polymer fibers, anything that's thread-like?

A. No, I did not.

Q. And did Boston Scientific in their manufacturing use any type of spinning?

A. No, they did not use any spinning process.

Q. And so all of these lead to what conclusion?

A. Yeah, they all lead to the same conclusion, which is that there is no polymer fiber, no thread-like object on the coating of the stent.

Q. And, Dr. Mooney, in your opinion, would Boston Scientific's manufacturing process and rolling the stent in the coating and then -- and then it goes off and dries, is that process even capable of creating a polymer fiber?

A. No, I do not believe so.

Q. Why's that?

A. You know, they are starting with a polymer that would

A. No, it does not.
Q. And we also heard about the Weber patent. Does the Weber patent have anything to do with the SYNERGY stent?
A. No, so this is another patent, basically where they were making fibers and using fibers, and they were very explicit that they wanted to make fibers, and they described how they make those fibers. And then, you know, as the coat here taken from some of the text of this patent application indicates at one point they specifically compared what they were doing to coated stents, and they said, unlike coated stents, the drug delivery area of the device, where here they've wrap ped the fiber around the device, it's independent of the area corresponding. So they are contrasting what they are doing to coating stents, basically because they think there's an advantage.
Q. With the SYNERGY stent, again, you said there's no thread-like structure of any kind?
A. No, actually, here -- you know, when they say unlike coated stents, so SYNERGY is a coated stents, so they would be comparing them to that.
Q. So the Weber patent says "unlike stents such as SYNERGY"?
A. Yes.
Q. You also -- you reviewed the FDA submissions that Boston Scientific made on this SYNERGY stent?

A. Yes, I did.
Q. Did -- and, again, I want to ask you this now after Dr. Pitt's testimony, here's the question: Dr. Mooney, did Boston Scientific ever say anything -- did you ever see any evidence of Boston Scientific saying anything to the FDA that would suggest the SYNERGY coating is somehow a fiber?
A. No.
Q. Did you see anything where Boston Scientific, in any way, suggested to the FDA that the SYNERGY coating is somehow thread-like?
A. No.
Q. And, you know, the Weber patent, I believe there's references to disclosing a sheath?
A. Yes.
Q. Does that sheath have anything to do with the SYNERGY stent?
A. No. Again in the sheath they are making a fibers, and then they make a collection of fibers and then they use that, but, again, they're starting by making fibers and using fibers.
Q. How is the sheath being discussed in Weber, how is that a fiber?
A. I wouldn't say the sheath is a fiber, but it's made of fibers.
Q. Describe that.

A. So when you have a collection of fibers, you can assemble them in different ways. You know, like talking a couple of times, you could make a shirt out of fibers. You could just cut them and press them and make a mat. So there's a variety of ways you can assemble things from fiber.

Q. And none of that is done in the SYNERGY coating?

A. None of that is done in the SYNERGY coating process.

Q. As far as when Weber, when Weber is talking about taking polymers and actually processing them to make a polymer fiber, what kind of processing techniques does Weber describe?

A. Yeah, again, it's the same kind of thing where they describe actually making fibers with the same processes that we keep talking about, you know, these spinning processes. You know, some of the highlighted text here, you know, fiber-spinning process, spinnerets, melt spinning, dry spinning, you know, take up device of the fibers. So the same type of thing.

Q. And none of that is used in the SYNERGY process?

A. None of that is used in the SYNERGY process.

Q. All right. And so that brings us to your conclusion on whether or not the SYNERGY coating includes a polymer fiber, a thread-like structure?

A. Yes, so my conclusion is that, my opinion, the

MR. SHORE: Well, he is now interpreting incapable, so I guess we have to have -- I guess we have to have a claim construction on incapable.

MR. OFFOR: There's an issue here that we will just have to see. We'll have to go with the decision. I don't think Your Honor is going to rule on this right now. I see what they are doing. We'll deal with it.

MR. SHORE: This is bad-faith. This is bad-faith.

MR. OFFOR: We'll deal with it -- he's a scientist -- on cross-examination.

MR. SHORE: But we maintain our objection that there's been no foundation.

THE COURT: You'll get a chance to cross-examine.

(Whereupon, the discussion held at sidebar concluded.)

BY MR. GRIMSRUD:

Q. Okay. Dr. Mooney, so you looked at a number of evidence that we can go through, but you looked at a number of different things in your opinion that shows that this drug-rich domain that the plaintiffs have referred to as the second phase and the PLGA-rich domain, the first phase, that they are capable of dissolving into each other?

A. Yes, absolutely.

Q. And based on your investigation, Dr. Mooney, do the drug-rich domains and PLGA-rich domains, in fact, dissolve into each other?
A. Yes, they do.
Q. And on this concept of incapable of dissolving into each other, if there's some dissolving, like in the -- we have a first phase and second phase shown in the top here, and a first phase and a second phase in the bottom. If they -- if there's some dissolving between two phases, how does that relate to whether it's immiscible or miscible?
A. Yeah, so I think it's really important to understand that the term "immiscible" is an absolute. It means that they simply cannot dissolve in each other. If they can dissolve a little bit, they are not immiscible. If they can dissolve a lot, they are not immiscible.
So there's a whole spectrum for the term "miscible," but immiscible is the far extreme, which means they just can't do it.
So in this case, you know, if this first and second phase are -- simply cannot dissolve in each other at all, then they would be immiscible, but if they can dissolve to any level into each other, at any level, then they are not immiscible.
Q. And that is consistent -- you've been applying the Court's interpretation of immiscible that's incapable of

dissolving into one another?

A. Yes, I have been using the Court's definition of this term in this analysis.

Q. And, Dr. Mooney, you already discussed this, but the PLGA-rich domain and the everolimus-rich domain, there is, in your opinion, based on your investigation, some dissolving going on?

A. Yes.

Q. And let's look at what you investigated. If you could just describe for us the evidence that you looked at to reach this conclusion that the PLGA-rich domain and the drug-rich domain are not immiscible, that they are not incapable of dissolving into each other?

A. These double negatives are a little bit of a killer here. But yeah, so, again, I wanted to look at this from a variety of perspectives. You know, as a science it's important to think about it from multiple angles.

So I, again, went back and examined the coating solution itself. I then examined some of the testing that Boston Scientific had done, including this glass transition temperature testing that we heard about earlier that they submitted to the FDA.

I looked at the Raman spectroscopy testing that they di as well, we heard a little bit about this earlier, that they also submitted to the FDA. I examined evidence of

diffusion of these different domains and substances in each other.

And something can only diffuse, which means move within it, if it can dissolve. You know, it can't move in something if it can't be there in the first place. And so I examined all four of these lines of evidence to come to my conclusion.

Q. And they all support your conclusion?
A. Yes, they are all consistent.
Q. And let's go through these, try to get through them relatively quickly. But examining the coating solution?
A. Yep.
Q. What did you do there --
A. Yes.
Q. -- what did you conclude from examining it?
A. Yeah, so I concluded here that, clearly, at this state, the drug and the polymer are miscible in each other, so they are not immiscible. This is a clear solution, so it's a liquid that has actually a lot of drug and a lot of polymer dissolved in it. So the drug and polymer are dissolved in each other at this stage.
Q. And then the glass transition temperature testing that you looked at, what was this testing?
A. Yeah, so this is testing that Boston Scientific did to understand the interactions between the polymer and the

drug, which would be important for them in terms of the safety. They want to make sure that, you know, there's not too much interaction where, for example, the drug changes.

Q. And to do that, was Boston Scientific specifically evaluating miscibility?

A. Yes.

Q. Of the drug and the polymer?

A. Yeah, so the -- the output of this analysis would be a determination of the miscibility or immiscibility of these two. And as this statement from the FDA material states: "Physical compatibility between the drug-coating components was assessed by evaluating miscibility between everolimus and PLGA."

Q. And so the FDA, this is something the FDA wanted to know about?

A. Absolutely.

Q. And glass transition temperature testing, that's a Boston Scientific -- it's one of the things they did for the FDA?

A. Yes.

Q. And just -- if you could generally describe for us, how does that relate to whether or not the drug and the polymer have miscibility or not?

A. Yeah, so you heard an explanation earlier, I won't make you listen to it again. Basically, at the end of the

day, what we look for is if there's a change in this temperature, this TG. And if there's a change, it means that the two substances are dissolving in each other.

So in this case, it's indicated by the circle and the red row at the very bottom. The glass transition temperature and the polymer change by 3 degrees, and the glass transition temperature and the drug changes by 3 degrees, showing us that they are at least partially miscible in each other, so they are dissolving in each other.

Q. And with this test -- so this is the shift of 3 degrees that indicates that?

A. Yes.

Q. With this test, would you be able to determine if the drug and the polymer were, in fact, immiscible?

A. Yes, you would. If they were immiscible, there would be no change in the glass transition, so that number would be zero instead of three.

Q. The number on the bottom?

A. Yes.

Q. If they were immiscible, it would be a zero?

A. If they were immiscible, that would be a zero instead of a three.

Q. And how does that indicate to you whether or not the drug-rich domain and the polymer-rich domain are miscible or

immiscible?

A. Yeah, so it tells me that there is some drug in the polymer-rich domain, and there's some polymer in the drug-rich, so they are each partially in each other. And so if each of these phases has both substances, well, obviously, the substance can -- well, what we know from science is the individual molecules are constantly moving back and forth, you know, between these different phases.

And in this case, you know, the drug -- let's say in the polymer-rich zone, there's drug there we all say it's there. There's nothing stopping it from dissolving and diffusing into the drug-rich domain. And as a matter of fact, that's all happen all the time.

Q. And --

A. The like can dissolve in the like.

Q. Sorry for the interruption.

Based on your investigation, Dr. Mooney, then, would the first phase and the second phase, the PLGA-rich domain and the drug-rich domain, does this testing indicate whether or not they are dissolving into each other?

A. Yes, it shows that they are capable of dissolving into each other.

Q. And would they dissolve into each other?

A. This indicates that they are capable of dissolving -- that they -- that the drug and the polymer are dissolving

into each other to some extent. And so, based on the Court's construction, they are capable of dissolving.

THE COURT: Mr. Grimsrud, I don't want to -- if you're going to wrap up soon, we can continue, but I did want to give the jury a break.

MR. GRIMSRUD: We can take a quick break, Your Honor.

THE COURT: All right. So let's take the afternoon break. Give the jury a 15-minute break. We'll come back at 4:20.

(Whereupon, the jury left the room at 4:05 p.m.)

THE COURT: All right. Doctor, you can step down. We'll come back at 4:20.

All right.

(Recess taken.)

THE COURT: You may be seated.

All right. Let's bring in the jury.

(Whereupon, the jury entered the room at 4:22 p.m.)

THE COURT: All right. You may proceed.

MR. GRIMSRUD: Thank you, Your Honor.

BY MR. GRIMSRUD:

Q. Okay. So, Dr. Mooney, we left off -- we wrapped, I believe, on the glass transition temperature testing. In your opinion, it shows that the -- what the plaintiffs are

calling the first phase and the second phase, they are capable of dissolving into each other?

A. Yes, that's correct.

Q. And they are not immiscible?

A. They are not immiscible.

MR. GRIMSRUD: Let's jump, if we could, please -- I'm just going to try to move things along here -- to slide 101. Slide 101.

No, sorry. Sorry, Dr. Mooney, everybody. The numbering got off.

BY MR. GRIMSRUD:

Q. Okay. What I want to ask you about is the other type of testing you looked at, Raman specification testing, and this is on Exhibit DTX 16. The Raman spectroscopy testing, just at a high level, what is the Raman spectroscopy testing that Boston Scientific also did for the FDA?

A. Yeah, so it's another way of looking to see if there is intersections between the drug and the polymer. So this is data that Boston Scientific generated in their testing for the FDA submission.

Q. And how did this Raman spectroscopy testing indicate to you that the drug-rich region and polymer-rich region were incapable of dissolving into each other?

A. Yeah, so the output of this analysis is again look for basically things to shift or change. What the Boston

Scientific scientist noted is that in this technique, there were some changes in basically what's called the numbers.

And, actually, I highlighted these by putting in orange boxes. And so they highlighted in the stent coating, when the two were combined, there are some changes as compared to the drug alone or the polymer alone, again indicating that there are interactions between the drug and the polymer.

Q. And if the drug-rich regions and the polymer-rich regions were immiscible, what would you see -- what would you expect to see on the wavenumber shifts?

A. You'd have no shifts.

Q. And so the shifts to you, how -- how definitive evidence is this as this wave --

A. It's quite clear that there is interactions between the drug and the polymer.

Q. And how does that relate to the drug-rich domain and the polymer-rich domain being capable of dissolving into each other?

A. Yeah, so again it's showing that basically the drug and the polymer interact with each other, they can dissolve in each other. And so you have dug and polymer in both phases. And, of course, you know, something can dissolve in itself. So if it's in both sides, it can go back and forth in dissolving itself.

Q. And then, finally, diffusion. Dr. Mooney, you also looked at evidence relating to diffusion?

A. Yes.

Q. And how did diffusion relate to your opinion that, conclusion that the polymer-rich region and the drug-rich region and the coating are capable of dissolving into each other?

A. Yeah, this data, it's quite important as well. And so the Boston Scientific scientists wanted to understand how the drug got released, because most of the drug is tied up in these drug-rich domains or phases that are within the polymer-rich domain.

And so they studied the release and they recognized that the drug release, as I kind of highlight this one part of their report, "the SYNERGY coating microstructure impacts the mechanism which occurs by combination of dissolution and diffusion and synchronous degradation and the polymeric matrix controlling with the drug release."

And then a little later, they specifically call out and say, "Diffusion and degradation are predominant during sustained drug release, as trapped drug diffuses through the synchronous degrading polymer. So they are saying the drug gets out of this device by diffusing through the polymer-rich region phase.

Q. And if we could pull up JTX 2 at page 16. This is that same image here we're just looking at.

MR. GRIMSRUD: If we could blow up just that image.

THE WITNESS: Yes.

MR. GRIMSRUD: Figure 2 -- or 7.2-F.5.

BY MR. GRIMSRUD:

Q. The drug-rich domains are where?

A. Yeah, so on this image, this is a schematic that the Boston Scientific scientists put together for the FDA to understand how this device worked. And so they have the drug-rich domains are in green, and then the polymer-rich domains are in that kind of yellowish orange. And you can appreciate that the drug-rich domains are originally within the polymer-rich domain.

And what they describe here is that how the release occurs, is there -- we haven't really talked about it, yet there's actually a layer of this drug-rich domain on the top. And that dissolves pretty quickly. But then these drug-rich domains on the interior, they start actually -- the drug starts dissolving into the polymer-rich region, and then it diffuses through the polymer and gets released.

So you can see in the second image, there's a few basically white circles, so those are regions where there used to be a drug-rich domain, but all the drug has

come out of that drug-rich domain, got into the polymer-rich domain, diffused through it and left.

And then the third image there, you can see at this point in time all the drug is out of the device, so all the drug in the drug-rich domains has dissolved into the polymer-rich regions, diffused out and now you just have what's left of the polymer.

And then the polymer -- the last part, is the system is specifically designed, so after the drug is all released, then the polymer goes away, because they don't want to have a polymer there permanently.

So this shows that Boston Scientific understood that these two domains or phases that they were describing truly were capable of dissolving in each other because the drug and the drug-rich domains dissolve into the polymer in each one. And then move through it and leave. So this was very, you know, quite important to understand the mechanism as it relates directly to this question of immiscible.

Q. Thank you, Dr. Mooney. If we go to the next slide.

Did Dr. Pitt, whom we heard from earlier, did he do any testing of immiscibility?

A. No, he did not that I'm aware.

Q. So did he do any testing that would, for example, contradict Boston Scientific's testing they did for the FDA?

A. Not that I'm aware of or have seen.

Q. And so Dr. Mooney, on the immiscibility issue, this is the second independent reason that you believe there's no infringement?
A. Yes. Based on the Court's construction of the term "immiscible," it's my opinion that the SYNERGY coating does not include a first phase and a second phase that are immiscible.
Q. And Dr. Mooney, the -- both of these reasons, the fiber, thread-like not being present in the coding and also no first and second phases that are immiscible, these limitations, both of them, are in all the claims that are at issue in this case, right?
A. Yes, all the other claims are what you call dependent, which they all arise out of Claim 1.
Q. So Claims 11, 17, 26, those are all not infringed for these same reasons, no fiber, no immiscible phases?
A. Yes, exactly, so -- yes.
Q. I want to switch gears now and talk about invalidity. It's also, as you mentioned, your opinion of the claims of the '296 patent are invalid, correct?
A. That is correct.
Q. What I wanted to ask you about first are your opinions on invalidity based on written description.
A. Yes, I've read through the '296 patent.
Q. One of your opinions, Dr. Mooney -- hang on, the

description is a little long.

One of your opinions is that the claims of the '296, all of them, all of the asserted claims are invalid for lack of a written description; is that right?

A. That's correct.

Q. And what I want to talk about again with this is relates, again, to immiscibility. And for reference, we've heard a lot of testimony on that. But saw a timeline like this.

A. Yes.

Q. On just the overall timeline for the prosecution history of the '296 patent?

A. Yes.

Q. And you've reviewed the whole prosecution history?

A. Yes, I have.

Q. And so you're familiar if there are these two rejections?

A. Yes.

Q. Early on or, initially, two rejections. And it wasn't until the third attempt that the plaintiffs' added this immiscibility requirement, this incapable of dissolving into each other to the claims?

A. That's correct.

Q. So the immiscibility of the first phase and second phase, that limitation was added rather late in the history?

patent. What is that?
A. Yeah --
Q. What does that show, I should say?
A. It's an illustration of their invention. And what they are showing us is a polymer fiber with basically a wall material that they describe later is -- can be made from a biodegradable polymer, in orange, and then they have active agents that they describe in the body of the text can be a pharmaceutical or a drug, that basically, then, you have these two regions, two phases, drug phase, polymer phase, and they explicitly tell, as well, as I mention in a minute, that these two must be immiscible.
Q. And you know -- well, let me ask you this question: How do you know the patent examiner did not consider the Song patent?
A. The patent examiner did not list this in the list of materials they made reference to when they were considering the patentability of the '296 patent.
Q. And so, as we were talking about the patent, the patent has a list of the references that were considered by the patent examiner?
A. Yes.
Q. And you reviewed that list?
A. Yes, I have reviewed that list.
Q. And the Song patent is on that list?

A. No, it is not.
Q. And it issued November 15, 1994?
A. That's correct.
Q. It's prior art. It's well before the '296 patent?
A. Yep.
Q. And you were talking about this, at a general level, the Song patent, it discloses a fiber?
A. Yes.
Q. Discloses biodegradable polymer?
A. Yes.
Q. Discloses drug?
A. Yes.
Q. And it discloses the polymer and drug in two different phases that must be immiscible?
A. Yes, explicitly calls out must be immiscible. These are quotes that were taken -- these are in the patent itself.
Q. So your opinion is that a person of ordinary skill in the art, reading the Song patent, they'd understand the Song patent to disclose each and every limitation of Claims 1, 11, 17, and 26 of the '296 patent?
A. That's correct.
Q. Let's start with independent Claim 1 and what I'd like to do is just walk through your opinions and why it is that you believe the Song patent discloses all of the

limitations of each of the claims --

A. Okay.

Q. -- and we'll start with Claim 1, the independent claim?

Okay. So starting with Claim 1, first limitation, Song -- well, by the way, it's a composition comprising Song's composition, right?

A. Yes.

Q. I'm sorry. Yes?

A. Yes.

Q. And the composition has at least one biodegradable polymer fiber. That's the first limitation of Claim 1 of the '296 patent? Where does Song disclose biodegradable polymer fibers?

A. Yeah, so they disclose it in figure 1, where they document that they have invented a fiber.

Q. And they disclose it in other figures?

A. Yes, they describe -- so they have a fiber that has a support matrix, and then they describe that support matrix is made out of a biodegradable foam -- excuse me, biodegradable polymer.

Q. So shown on the screen here as an example, figure 1 from Song that structure is a fiber?

A. Yes.

Q. And the support matrix, number 12, that's colored in

orange, what's that?

A. So that's part of the fiber and what they define as the polymer component of the fiber. I should also mention here this drawing, this was not -- these colors in the patent, I basically put the orange, and the green just to make it easier to see things.

Q. Thank you for the explanation. You annotated just to illustrate?

A. Yes.

Q. The polymer is labeled 12 there?

A. Yes, the support matrix 12, yes.

Q. And the patent also makes clear they are talking about a fiber?

A. Yeah, so in the text they make that very clear in Song column 2, they say the present invention is a fiber.

Q. And what does Song say or disclose as to whether or not they are biodegradable polymer fibers being used?

A. Yeah, so they explicitly describe in column 5, they say, "while any extrudable, thermoplastic is suitable, the use of biodegradable polymers is beneficial for many applications," and also in column 1 they specifically indicate biodegradable polymers.

Q. And by the way, how does Song describe the process that it uses for making the polymers?

A. Yeah, so this is consistent with everything we've

been talking about, in that, you know, people use spinning processes, these extrusion processes to make fibers, so Song describes in column 5, "The wall material can be any spinnable synthetic or natural polymer." In column 2, they describe, "After the fibers are formed by melt spinning, they may be stretched." And in column 5, "The mixture is melt spun to produce fibers. And general principles for melt spinning polymers are well known in the art."

Q. And in that reference to "well known in the art," that's where these types of spinning procedures for making polymers, those have been known for years?

A. Yeah, even well before Song these were known for decades.

Q. So the spinning processes for making the polymer fibers, to assign engineer, those were well-known conventional ways?

A. Very well established.

Q. So in your opinion, Dr. Mooney, person of ordinary skill in the art reading the Song patent, they'd understand to disclose at least one biodegradable polymer fiber?

A. Yes.

Q. And then the next limitation of Claim 1 is, "Wherein said fiber is composed of a first phase and a second phase."

Does the Song reference disclose this?

A. Yes, the Song reference does disclose this.

Q. And let's start with the first phase, the polymer portion of the fiber, where does Song disclose a first phase that's a polymer portion of the fiber?
A. Yep. So, you know, in the drawing you're seeing the very stop of that figure again, and so we have fiber that has this support matrix, and the support matrix is made up of wall material, Song states in column 2. And then in column 5, it states, "The wall material can be any spinnable synthetic or natural polymer."
Q. And the support matrix on the wall material, those are used interchangeably?
A. Yes.
Q. And so that is the polymer portion that is the first -- that is the first phase polymer portion of the fiber?
A. That is correct.
Q. And that is how a person of ordinary skill in the art, in your opinion, would view Song?
A. Yes, very clear.
Q. How about the second phase which is the discrete drug-containing regions dispersed throughout the fiber. Where would a person of ordinary skill in the art understand Song to disclose a discrete drug-containing regions dispersed throughout the fiber?
A. Yeah, the drug drawing that they provided are showing

us discrete regions that have an active agent. And then in column 2, they provide some text, "an active agent is dispersed throughout the support matrix." And in Song column 4, "the active agent can be drugs or pharmaceuticals."

Q. And so in your opinion, Dr. Mooney, Song discloses the second limitation of Claim 1 as well?

A. Yes, it clearly discloses.

Q. The Song patent also refers to contiguous and noncontiguous phases?

A. Yes.

Q. Explain that for us?

A. Yeah, so if these discrete drug regions are contiguous, it means they touch each other. If they are noncontiguous, then they are separated or can be discrete. And Song describes that either situation is part of its invention. So in column 2, Song states, "The active agent does not necessarily have to be in a contiguous phase. In column 3, Song states, "Gradual release by deformation should occur even if the active agent is not in a contiguous phase." And then in column 7, Song tells us, "At 17 percent loading, the solid particles of Aspartame are isolated in the polymer." So Song clearly mentions the possibility of contiguous or noncontiguous drug regions.

Q. So in figure 1, a person of ordinary skill in the art

would understand the active agents regions to be -- they could either be contiguous or noncontiguous?

A. That's correct.

Q. Dr. Mooney, on the third limitation of Claim 1, the first and second phase as being immiscible, would a person of ordinary skill in the art have understood the first and second phases -- or Song to disclose the first and second phases to be immiscible?

A. Yes, very clearly.

Q. Why do you say that?

A. Song actually comes right out and tells us that directly. Song states in column 5, "The active agent in wall material must meet the solubility requirements discussed above, additionally, they must be immiscible with each other," and so on...

Q. And so, Dr. Mooney, is there -- the active agent, again, that's the second phase that you talked about?

A. Yes.

Q. And the wall material would be the first phase?

A. Yes.

Q. And so how clear is it that Song, to a person of ordinary skill in the art, that Song discloses a first phase and second phase that must be immiscible?

A. Yeah, it's crystal clear.

Q. And then the last limitation of Claim 1, "Wherein the

second phase comprises one or more therapeutic agents." Where is that disclosed? Where would a person of ordinary skill in the art understand that to be disclosed in the Song patent?

A. So this is disclosed, as well, in the text. So Song tells us in column 2, you know, this active agent is dispersed throughout the support matrix.

In column 4, it tells us, "The active agent can be any material, such as artificial sweeteners, poly flavor oil, or drugs, which the gradual release of may be desired." And column 4 tells us, "For purposes of illustration possible active agents may be pharmaceuticals, such as" -- and in this list is coronary dialators, antiinfectives, anticoagulants.

Q. And so a person of ordinary skill in the art, they'd understand Song to also be disclosing drugs as the active agent, as -- as options for it?

A. Yes, clearly.

Q. And by the way, Song was assigned to the Wrigley Company; is that right?

A. That's correct.

Q. And they are in the food industry?

A. Yes, that is correct.

Q. And in your experience working in the fields of polymers, polymer engineering, drug delivery, does the food

industry have polymer scientists working in it?

A. Oh, yes, the food industry and the controlled drug delivery industry actually have are very similar in many ways. So if you think about foods, you oftentimes have active agents that may be flavor compounds, that may be enzymes. And you want to protect them so they don't go bad. You may want to control when they become available, for example, when you're eating, when you get the taste.

So very frequently in the pharmaceutical industry, you will encapsulate or separate these agents. So, you know, it's the same general principles as we have in the drug delivery field. And, actually, the Song text, when you start reading it, the first reference they start talking about is a controlled drug delivery technology in the pharmaceutical field. So there's tremendous overlap and crosstalk between these.

Q. And so to sum up Claim 1, Dr. Mooney, what's your opinion on the issue of whether or not these -- a person of ordinary skill in the art would have understood the Song reference to disclose each and every limitation of Claim 1?

A. Yeah, so it's my opinion that independent Claim 1 is invalid as anticipated by the Song patent, which was not considered by the Patent Office.

Q. And it discloses every limitation of Claim 1?

A. It discloses every limitation of Claim 1.

Q. And let's talk briefly about the dependent claims, Claims 11, 17, and 26. These three claims, they all depend from Claim 1, right?
A. Yes, they do.
Q. So we can go through these more quickly. Dependent Claim 11, why, in your opinion, Dr. Mooney, does the Song reference disclose to a person of ordinary skill in the art the limitations of dependent Claim 11?
A. Yeah, so in the '296 patent and dependent Claim 11, it states, "Among the drugs that could be used is anti-inflammatory compounds and anticoagulation agents," as highlighted in yellow.
And in the Song patent, they call out the same agents. In column 4, they say, "The active agent can be anti-inflammatory substances and anticoagulants."
Q. And so Song discloses that very same thing?
A. Yes.
Q. And then dependent Claim 7, where does Song disclose to a person of ordinary skill in the art the limitation of dependant Claim 7 -- sorry, dependent Claim 17?
A. Yeah. Yeah, so in dependant Claim 17, this lists -- provides a list of possible aliphatic polyesters that could be used in the '296 patent, including polyglycolic acid.
In Song, in column 5, tells us that examples of biodegradable polymers useful in this invention include

polyglycolic acid.
Q. And so the Song reference about exposing polyglycolic also anticipates Claim 17?
A. That is correct.
Q. And then claim -- dependant Claim 26 that talks about the one or more therapeutic agents are released at varying rates over time from the fiber?
A. Yes.
Q. Where in Song is Claim 26 disclosed?
A. Okay. So, first of all, this is something that all drug delivery systems -- is a property of all drug delivery systems. If you think about a system, you put some drug in it, it gets released. Eventually, the drug is gone. So the release rate goes to zero. So all drug delivery systems will have a varying release rate with time. It's just part of making one of these systems.

And then, in addition, Song provides this description of how the drug is incorporated in their fiber. And they show us that there's these regions, and what happens here is the drug will dissolve and it will diffuse out.

And what I'm illustrating here is at an intermediate stage where some of these places that used to be green aren't green anymore, meaning the drug has gone out. So now when the drug on the interior parts goes to

leave, it has farther to travel before it gets out of the fiber. It that takes longer, that slows the degradation.

So a person of ordinary skill in the art, when they look at this kind of scheme, they would just know. Basically, this demonstrates a release rate that's going to change with time.

And, actually, it's very, very difficult to get a drug deliver write system where the release rate doesn't change with time. You actually have to do some pretty special things to make that happen.

Q. And so, Dr. Mooney, a person of ordinary skill in the art reading Song and looking at figures 1 and 1A, why would they understand Song to disclose the releasing -- sorry, releasing one or more therapeutic agents at varying rates over time?

A. Yeah, so Song -- you know, in figure 1A, it tells us that it's an illustration of the gradual release structure. And, as I just mentioned a moment ago, you know, the drug will start to diffuse out of the system. And as time goes on, the drug on the interior has further and further to go, to be released. So it will go more slowly, the release rate will slow with time, so it will change.

Q. And so, Dr. Mooney, in your opinion, does Song disclose all of the limitations of dependent Claims 11, 17, and 26 as well?

A. Yes, it is my opinion that it does.

Q. And a person of ordinary skill in the art reading Song would understand to disclose everything in Claims 11, 17, and 26?

A. That is correct.

Q. Dr. Mooney, in your opinion, if the patent examiner had known about the Song patent when the plaintiffs added the immiscibility, would the patent have issued?

A. It is my opinion that this patent would not have issued.

MR. OFFOR: Objection, Your Honor. Oh, excuse me. This calls for hearsay. Speculation.

THE COURT: I'm going to allow it. I mean, you can cross-examine him about it.

THE WITNESS: Yes. I believe that if the patent examiner had basically Song available to them, they would not have issued this patent.

BY MR. GRIMSRUD:

Q. And that's because Song discloses everything in Claims 1, 11, 17, and 26?

A. That is correct.

Q. Okay. Dr. Mooney, to sort of sum it up for noninfringement, what's your opinion on whether or not the SYNERGY coating infringes the '296 patent?

A. Yep. My opinion is that Boston Scientific does not

infringe the '296 patent for two specific and independent reasons. The first is that SYNERGY coating does not include a fiber, there is no thread-like object there. The second is that the SYNERGY coating does not include a first phase and a second phase that are immiscible.

Q. And then on invalidity, Dr. Mooney, you have two opinions on invalidity, the patent's invalid for which reasons?

A. Yes, so I believe that the asserted claims of the '296 are invalid because the written description does not actually convey that the inventors actually had in their possession what they -- what ended up in Claim 1. And then, also, Song anticipated every element of the claims in the '296 patent.

MR. GRIMSRUD: Thank you, Dr. Mooney, pass the witness.

THE COURT: All right. You may proceed.

CROSS-EXAMINATION

BY MR. OFFOR:

Q. Hi, Dr. Mooney, how are you?

A. I'm doing well, nice to see you again.

Q. Good to see you as well.

MR. OFFOR: Andrew, can I get Plaintiffs' Exhibit 47 displayed.

And can I get the claim construction order

I can't really call it my patent. It's the University's patent.

Q. And you filed this patent in May 28, 1997; is that right.

A. That's correct.

MR. GRIMSRUD: I don't mean to interrupt, but does the witness have a copy of the exhibits? Can we get him copies?

MR. OFFOR: Apparently, I don't have a copy of it. It should be here.

THE COURT: You can see it on the screen, Dr. Mooney?

THE WITNESS: I can see it. But if I would -- if there's any, like, significant questions -- I mean, it's a patent that's now, you know, pretty old. If there's any significant questions, it might be very helpful for me to actually be able to read this patent to see what's in it, but we can -- I'm happy to try.

MR. OFFOR: Your Honor, if I can just have a moment to go find the patents?

THE COURT: Yes.

MR. OFFOR: I won't do too much here.

BY MR. OFFOR:

Q. Dr. Mooney, this is your patent?

A. I am an inventor on this patent, yes.

Q. And it was published March 23, 1999; is that right?
A. Yes.
MR. OFFOR: Andrew, if you could, could you go to page 19? And blow up column 11, lines 32 through 35.
BY MR. OFFOR:
Q. And you can just follow along, Dr. Mooney, while I read this out loud and let me know if I read it correctly.
A. Okay, sure.
Q. "Such PLA, PGA, and PLGA matrices may take various forms, including fiber matrices, tubular matrices, and sponge matrices."
Did I read that sentence correctly?
A. Yes, that's what's written there.
MR. OFFOR: Andrew, if we could go back to Plaintiffs' Exhibit --
Your Honor, permission to approach?
THE COURT: Yes.
MR. OFFOR: Thank you.
Andrew, could you go back to Plaintiffs' Exhibit 47.
BY MR. OFFOR:
Q. Dr. Mooney, is a solution a single phase mixture?
A. Typically, yes.
Q. Typically or it is?
A. A solution -- I mean, you can -- I just have to think

about some...

I mean, generally yes, the examples I can think of offhand, a solution could be a single phase.

Q. Okay. So a solution has one phase?

A. That I can think of right now, yes.

Q. And you agree that there are two phases in the SYNERGY coating, right?

A. Yes, there are these drug-rich domains and polymer-rich domains.

Q. Drug-rich domain and polymer-rich domain, right?

A. Yes.

Q. And you agree that's two different phases?

A. Yes, as the Court has construed these -- the definition of "phases," then I concur with -- that there are two phases here based on the Court's definition, yes.

Q. And you were here earlier, maybe a couple of days ago, maybe yesterday, when Dr. Allocco testified?

A. Yes, I was here.

Q. You saw him testimony?

A. Yes.

Q. And you heard Dr. Allocco confirm that the SYNERGY product had a 12 to 13-month shelve life; is that right?

A. Yes, I remember he talked about that, yes.

Q. Are the SYNERGY products made in the United States?

A. I do not believe so, but I don't actually have a lot

of information. I believe they are made in Ireland. But --
Q. Yeah.
A. -- part -- they ship around. They make stents. They make -- they do coatings, so things go -- different parts get put together at different places.
Q. You wrote a report in this case?
A. Yes.
Q. So you studied the manufacturing process, you said?
A. Yes, I did.
Q. So you know that the SYNERGY stents are coated in Ireland?
A. Yes, they are coated in Ireland.
Q. Right. And the -- and that coating was put on in -- on the bare-metal stent in Ireland?
A. That is correct.
Q. Right?
A. Yes.
Q. Okay. And so there's a 13-month shelf life that starts in Ireland. And when we -- when the SYNERGY stents are finished in Ireland, they have two phases, right?
A. Yes.
Q. The coating of the stent has two phases?
A. Yes.
Q. Now, the stents are then shipped to the United States, right, for sale in the united states? You

understand that?
A. Yes, I do.
Q. And when they get to the United States, they still have two phases, right?
A. Yes, they do.
Q. Now, let's assume this is January. In February, do they have -- does the coating still have two phases in it or one?
A. Yes, I would assume it still has two phases if it was stored properly, yes.
Q. Okay. Now, February turns -- January turns to February, February turns to March, does the coating in the SYNERGY stent have two phases or one?
A. I would assume it still has two, but the actual molecules that are in each one of those phases is actually different in March and February because the drug molecules and the pharma molecules will be constantly diffusing back and forth between the phases. So it will still be phases, but it wouldn't actually be the same molecules in those phases because there would be dissolution and diffusion going on.
Q. Let's just -- I'm going to try this again. I just want a yes or no. Your counsel will come back up and --
A. Okay.
Q. -- you can clarify.

A. Okay.
Q. So January to February, does the SYNERGY coating have two phases or one?
A. I would assume it would still have two, as long as it's stored appropriately.
Q. February to March, does the SYNERGY coating have two phases or one?
A. I would assume it will still have two phases.
Q. March to April, does the SYNERGY coating have two phases or one?
A. I would assume two phases.
Q. April to May, two phases or one?
A. I would assume that it would still have two phases.
Q. May to June, two phases or one?
A. Kind of lost track of the number of months, but assuming we're still within the 13 months, I would say yes, it would still have two phases.
Q. Well, you know when we get there because I've got to hit January.
A. Okay. Believe it or not, I'm not necessarily remembering where the question started, but...
Q. So now I think we're in May, May to June, two phases or one?
A. I believe it will be still two phases.
Q. June to July, two phases or one?

A. I believe it would still be two phases.
Q. July to August, two phases or one?
A. I believe it will still be two phases.
Q. August to September, two phases or one?
A. I would believe it would still be two phases.
Q. September to October, two phases or one?
A. Still two phases, to my understanding.
Q. October to November, two phases or one?
A. To my understanding, it would still be two phases.
Q. November to December, two phases or one?
A. I believe it will be still be two phases.
Q. December to January, two phases or one?
A. I believe it will still be two phases.
MR. OFFOR: Andrew, could you call up Plaintiffs' Demonstrative 2-13.
BY MR. OFFOR:
Q. Dr. Mooney, you're familiar with this image, right?
A. Oh, yes.
Q. That's an image of the SYNERGY stent?
A. Yes.
Q. And I guess there's some silver parts on here and there's some blue parts on here, right?
A. Yeah, I'm not quite sure how you call the colors, but, yeah.
Q. I don't know. I might be color blind.

Okay. So the SYNERGY stent is made of a series of serpentine rings connected by links, you agree with that?

A. Yeah, that's how it's described certainly.

Q. And each of the rings has -- is -- each of the rings is made of metal?

A. Yes, this is a metal stent.

Q. And on top of each one of those rings, there is a biodegradable polymer that has everolimus in it and that polymer goes all the way around the outside surface of each ring; is that correct?

A. There's a -- yes, a thin coating of polymer and drug on these stents, and to the best of my knowledge, that it is continuous, though I have not studied in detail, you know, if there are breaks that -- small breaks are allowable. To the best of my knowledge, yes continuous.

Q. So you said you hadn't studied in detail if there were breaks in the coating?

A. Well, I'm saying I didn't study where the -- how do I describe this, where the quality control would be that you'd say it's not continuous. So at what level did they actually look to see if it was continuous? But to the best of my knowledge, it's continuous.

Q. Now, you heard Dr. Pitt testify that he made measurements around the outside surface of each of these serpentine rings, right?

Q. And we've heard aspect ratio before, right?
A. Yes.
Q. And that's a length to width, right? The ratio of length to width; is that correct?
A. That can be a definition of aspect ratio, certainly.
Q. And are you contending that the dimensions of this coating that's around the serpentine rings are -- that it has the same dimensions -- it's the same in all three dimensions?
A. I'm sorry.
Q. Let me say it differently. Are you contending that the coating looks like a microsphere?
A. The coating looks like a microsphere?
Q. Yeah, that it's in the shape of a microsphere?
A. No, I have not expressed any opinion along those lines.
Q. And are you contending that the aspect ratio is too small?
A. Which aspect ratio are you referring to, actually?
Q. I'm talking about the aspect ratio that Dr. Pitt calculated?
A. I'm sorry. I'm just trying to ask for clarification. There's a lot of aspect ratios here, right? It depends on -- it's a very complicated structure. It depends on what length and width you're talking -- I'm just trying to

understand.
Q. We'll get to real numbers, but just look at it. The coating that's around one of the serpentine rings has an aspect ratio. If you measure the distance around the circumference, it has a length, and then a width --
A. Okay. You're saying basically the coating around a single one of these rings; that's what you're referring to?
Q. Yes, sir.
A. Now I understand. Would you mind repeating the question?
Q. You're saying the aspect ratio is too small?
A. To small for --
Q. To be a fiber?
A. I don't believe I have expressed an opinion that there is a particular aspect ratio that is part of the definition of fiber here.
Q. Are you saying that the aspect ratio is too small to be a thread-like structure?
A. I don't believe that I have expressed an opinion along those lines.
Q. So are you saying that this coating is too hard or it's too soft, or you're not saying that -- to be a fiber?
A. To be too hard or too soft? Maybe you could help me out. What do you mean by "too hard" or "too soft"?
Q. Is there any technical characteristic -- well, you're

not pointing to any characteristic that would indicate that this is not a thread-like structure? It's not a fiber; isn't that right?
A. Oh, I'm pointing to a number of them, actually, as I just testified to.
Q. I didn't hear any of them. I heard, "It doesn't look like a thread to me."
A. So the basis of science is observation. So that's where we all start to learn about science, initially, when we are kids; we learn to observe things. So, you know, the first start here is to actually look at the stent, look at various magnifications, and see if there something that looks like a fiber, and there's nothing there that looks like a fiber, and that's fundamental science.
Q. So you agree that that was the extent of what you -- of your conclusion?
A. No, that was the first part. Then actually I went on and explained a little bit about how the second way I looked at this was to actually look at the polymer that was used.
Q. Right. And then we just talked about the polymer that was used, and you said it was PLGA, right?
A. Yes, I did.
Q. And in your patent, you were just writing about how PLGA matrices -- PLGA could be used for fiber matrices; isn't that correct?

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM et al., | ) | Case No. 18-392-GBW |
| Plaintiffs, | ) | |
| v. | ) | |
| BOSTON SCIENTIFIC CORP., | ) | |
| Defendant. | ) | |

\- - - -

Wilmington, Delaware
Monday, January 30, 2023
*Trial Volume III*

\- - - -

*BEFORE: HONORABLE GREGORY B. WILLIAMS*
*UNITED STATES DISTRICT COURT JUDGE*

\- - - -

*Michele L. Rolfe, RPR, CRR*

APPEARANCES:

STAMOULIS & WEINBLATT LLC
BY: STAMATIOS STAMOULIS, ESQ.

-and-

THE SHORE FIRM
BY: CHIJIOKE OFFOR, ESQ.
COREY LIPSCHUTZ, ESQ.
Michael Shore, ESQ.

Counsel for Plaintiffs

FARNAN LLP
BY: MICHAEL FARNAN, ESQ.

-and-

FAEGRE DRINKER BIDDLE & REATH LLP
BY: TIMOTHY GRIMSRUD, ESQ.
CHAD DROWN, ESQ.
LAUREN BARTA, ESQ.
DAVID GROSS, ESQ.
KATHERINE RAZAVI, ESQ.
EVAN KLINE-WEDEEN, ESQ.

Counsel for Defendant

A. Yes, I'm following you.
Q. Okay. We pulled it out of the mold. We put it under a microscope, and it came out looking something like this; do you see this?
A. Yes, I see that.
Q. The serpentine structure I'm holding in my hand?
A. Yes, I do.
Q. My question to you is: Is this a fiber? Can this qualify as a fiber within the '296 claims?
A. Just -- can I ask you a quick question? Is the image on the left supposed to be an exact replica of the design of the stents? I don't see the cross pieces there.
Q. I'm just talking about, we put polymer in one of the serpentine groves?
A. Okay. So it's not intended to represent the entire stent; it's just basically one small part of it?
Q. That's correct, Your Honor -- I mean, that's correct Dr. Mooney.
A. Okay.
Q. So is this a fiber within the meaning of the '296 patent claims?
A. I would not consider that to be a fiber, no.
Q. Is it because of the cross-sectional shape that you would not consider this to be a fiber; just yes or no?
A. Is it because of the cross-sectional shape? Maybe

you could help me out by which cross section you're referring to here?

Q. Let's assume the haircut shape?

A. Haircut shape?

Q. Yes, the haircut cross section we've seen. The cross section --

A. The coating --

Q. That's correct. Is it because of the cross-sectional shape that proves to you that this is not a fiber?

A. No, that's not the reason.

Q. Okay. Is it because of the length that proves to you that this is not a fiber?

A. No.

Q. Is it because of its width?

A. Well, the overall structure and shape, yes.

Q. The overall structure and shape?

A. Yes. So --

Q. I'm saying, is it because of the width -- let's call these the struts on this, that proves to you this is not a serpentine -- that's not a fiber?

A. That's not a fiber? Um --

Q. And, Dr. Mooney, just a yes or no, is it the width?

A. Okay. So, can you tell me the yes-or-no question again.

Q. Is it because of the width that proves to you this is

not a fiber?

A. No, it's not because of the width.

Q. And is it because of its overall size? Is it too big; is it too small?

A. I think it's quite large, yes, but...

Q. I'm talking about if it was a replica of the SYNERGY column, SYNERGY stent column?

A. Okay, so you're saying, actually, if this was scaled down --

Q. Yes. We're looking at --

A. We're talking about this particular object you're holding up.

Q. Yes, Dr. Mooney.

A. Okay. So actually -- I'm sorry. I apologize. I thought you were asking about this object you were holding up, but in any case, let's go back to your last question.

Q. Is it because of the overall size that this would not be a fiber?

A. The overall size of -- you mean the -- okay. No.

Q. So it's not because of the size. It's not because of the width. It's not because of the length. Is it because of the aspect ratio? If I -- is the aspect ratio too small?

A. You couldn't do that on a -- with the PLA.

Q. And I'm asking you, Dr. Mooney, right here, is the aspect ratio of this structure that I'm holding up too

small?

A. Too small to be a fiber?

Q. Yes, too small to be a fiber?

A. I would not say so.

Q. So, again, I didn't hear any reason why this could not be a fiber.

A. Is that a question?

Q. I'm saying yes or no, did you give me a reason why this could not be a fiber?

A. I didn't give you a reason in response to those questions.

Q. And, Dr. Mooney, you understand a fiber can be made by a casting process; is that right?

A. Not my impression that it can be made by a casting process.

Q. Can you repeat that?

A. It is not my understanding that the fiber is typically made by a casting process.

Q. So is that a yes or no, a fiber can be made by a casting process?

A. It's not my understanding that a fiber can be made by a casting process.

Q. Is that a "yes" or a "no"?

A. I'm saying it's my -- not my understanding that that can -- that a fiber can be made with the casting process.

MR. OFFOR: And I'm going to object to nonresponsive.

THE COURT: Please answer his question, Doctor.

THE WITNESS: Okay. So --

BY MR. OFFOR:

Q. Yes or no, in your opinion, can a fiber be made by a casting process?

A. No.

MR. OFFOR: Andrew, can you call up Plaintiffs' Demonstrative 3-7.

BY MR. OFFOR:

Q. Now, Dr. Mooney, you were in the courtroom, right, last week when Dr. Nelson testified about how he made fibers from a casting and winding process; is that correct? And just tell me if you were in the courtroom, yes or no.

A. I was in the courtroom when he was testifying, yes.

Q. Okay. So you heard his testimony?

A. Yes, I heard his testimony.

Q. Okay. And if you would look in --

MR. OFFOR: Your Honor, permission to approach?

THE COURT: You may.

THE WITNESS: Thank you.

MR. LAHAD: Your Honor, may I?

THE COURT: Yes.

BY MR. OFFOR:

Q. Infringement in this case --
A. Yep.
Q. -- does not depend on whether Boston Scientific intended for its structure to be a fiber; is that correct?
A. Yes, I agree with that.
Q. Is the coating on the Boston Scientific stent PLGA; yes or no?
A. It is a type of PLGA.
Q. Yes, it is PLGA, correct?
A. Well --
Q. Dr. Mooney --
A. -- it's a turn that encompasses many, many polymers, so I'm --

MR. OFFOR: Your Honor, I'm going to move to strike.

THE COURT: Sustained.

Dr. Mooney, he's asking you yes or no questions, please respond "yes" or "no" to the extent you can.

THE WITNESS: Okay. Sure.

Yes, it is -- it is PLGA.

BY MR. OFFOR:
Q. Dr. Mooney, is 85:15 PLGA, still PLGA?
A. Yes, it is.
Q. And is PLGA a biodegradable polymer?
A. PLGA is a biodegradable polymer.

Q. Dr. Mooney, are you a registered patent agent?
A. No, I'm not.
MR. OFFOR: Andrew, if you could, please, could we put up an image of PD 3-2.
BY MR. OFFOR:
Q. Dr. Mooney, have you read the manual of patent examining procedure section 904?
A. I think this was actually displayed, wasn't it, for the earlier witness for University of Texas, Counsel?
Q. Dr. Mooney, I'm just asking, have you read this question; yes or no?
A. Not outside if this court.
Q. And were you aware that any time a new term is added to a patent, the examiner does another search. Did you know that; yes or no?
A. I would assume so.
Q. So you did know that?
A. I've always assumed so, but I don't explicitly know that as a fact.
Q. And so when you stated that Song, the Song reference was never considered by the examiner, do you know how many search results came back?
A. No, I do not know how many search results came back.
Q. And do you know what was in the search results that came back?

A. No, I do not.
Q. Did you know the search terms that were used?
A. Trying to think whether that was in -- actually, I don't recall whether that was in the history that I read.
Q. So you don't know what search terms -- as you're sitting here today --
A. Yes, I can't tell you.
Q. -- you don't know?
A. Nope, I can't tell you.
Q. So, really, with respect to Song and what was or was not considered by the Patent Office, the only thing that you know is that Song was not on the face of the '296 patent; isn't that right?
A. I know that Song was not listed in any of the material that I saw related to the prosecution of the patent.
Q. And, Dr. Mooney, let's talk about Claim 26 and whether Song includes information on how to teach a person of ordinary skill in the art on how to make a biodegradable fiber.
Now, you would agree with me that the word "variable" is not in Song at all?
A. Let's see, no, it is not, I do not recall it being in Song.
Q. And your opinion that Song teaches a variable drug

delivery system is in part dependant on the fact that there is no drug left at some point, and, so, the -- of course, the release rate is going towards zero; didn't you testify to that?

A. Yes, I did testify to that.

Q. And doesn't that mean that every drug delivery system out there would have a variable drug release rate?

A. Yes, it does.

Q. And doesn't that mean that there would be no reason to claim a variable drug release rate, is that what you're saying, that's your testimony today?

A. Yes, I did not understand why that word was used in a claim.

Q. And that every patent that claimed a variable drug release rate -- that has a dependent claim with a variable drug release rate would be invalidated?

A. No, not necessarily. There could be many situations in which they would provide appropriate information so we understand --

MR. OFFOR: I'm going to move to strike, Your Honor.

THE WITNESS: I'm sorry, I thought you were --

BY MR. OFFOR:

Q. It's just a yes-or-no question.

A. Okay.

MR. OFFOR: Andrew, could we pull up Plaintiffs' Demonstrative 3-3.

MR. GRIMSRUD: Your Honor --

THE COURT: I'm going to overrule the objection, I think the response was responsive to the question.

BY MR. OFFOR:

Q. So, Dr. Mooney, let's look at some Hubba Bubba gum from Wrigley.

A. Okay.

Q. All right. And each end of this gum has an opening for fruit flavor, right, can you see that?

A. No, actually, I'm afraid I don't know what you're --

Q. Let's look at the package.

A. Okay.

Q. Towards the top. Do you see that?

A. I see the image there, yes.

Q. And that portion, where this drug phase would be, where this fruit would be, that's where the drug phase would be if Wrigley was using Song to load -- to load drug into this bubble gum, to load flavor into the bubble gum, right?

A. This isn't a fiber.

Q. Well, Song is bubble gum patent?

A. Song is a patent about fibers.

Q. Okay. Dr. Mooney, I just want to wrap this up, back at this serpentine structure I'm holding in my hand?

A. Yes.
Q. And you're saying despite its appearance, that it's not the length, it's not the width, it's not the aspect ratio that proves to you that this structure is not a fiber; is that correct? Yes or no?
A. You said appearance; in relation to appearance, that's part of the reason I would say it's not a fiber.
Q. The length, the width, the aspect ratio, those things don't indicate to you that this is not a fiber; is that right?
A. Yes, I said no earlier -- but, yeah.
MR. OFFOR: Nothing further, Your Honor.
THE COURT: Redirect?
MR. GRIMSRUD: No redirect, Your Honor.
THE COURT: All right. Dr. Mooney, you may be excused.
THE WITNESS: Thank you. Do I leave these materials here, or do I...
THE COURT: Yes.
MR. SHORE: Your Honor, from our perspective, the witness can be excused.
MR. GRIMSRUD: We have no redirect, Your Honor.
THE COURT: All right. Dr. Mooney, you can be excused.
THE WITNESS: Thank you.

Q. Do you see that your name is listed under "Inventors"?
A. Yes.
Q. And are you aware that this patent is being asserted against Boston Scientific Corporation in this case?
A. Yes.
Q. You contribute -- you contributed to the inventions claimed in this patent while you were a student at UT working under Dr. Nelson and Dr. Smith, correct?
A. Yes.
Q. So just going back to the earlier section of example 1 for a bit. At the very beginning of example 1, the second sentence says, "The apparatus is depicted in figure 8."
Do you see that?
A. Yes.
Q. So is this an extrusion -- extrusion set up like the one shown in your presentation?
A. Yes.
Q. And, generally speaking, is this a type of setup one would use to extrude a fiber from a chemical exposure?
A. Yeah, it's a general setup for a fiber extrusion, yes.
Q. Right. So do you agree that a biodegradable polymer fiber with two immiscible phases cannot be made without

using an emulsion?
A. Yes.
Q. So when -- I guess, going back to your work with Abbott that we -- we talked about a while ago, you mentioned coating of polymers on top of a stent, correct?
A. Yes.
Q. And you worked on the project for developing that polymer coating on top of a stent, correct?
A. Yes.
Q. And -- and would you have called that coating on top of the stent a fiber?
A. The -- no, the fiber is -- was on 3D object that can stand on its own. The coating needs a substrate. And in the biomedical engineering world, to assess both formats, you actually use a different types of metrics, if you will.
Following the accident, in the -- in case of a fiber, to access a fiber, one of the metrics that you use is a tensile strength. You don't do that for a coating because the fiber has to have structural -- more structural constraints. It has to be stronger. Has to be able to stand, as I said, on its own.
On the other hand, the coating has its own, you know, way of assessing it but is different than the fiber. So you're not going to talk, for example, about the tensile strength when it comes to a coating.

Q. And you also indicated earlier today that you have done consulting for Boston Scientific; is that accurate?
A. Yes, yes.
Q. And during what timeframe have you done -- did you do consulting for Boston Scientific?
A. That was, I think, at the end of 2004, if I remember correctly.
Q. And did the consulting work relate to stents?
A. Yes.
Q. And did the consulting work relate to the application of polymer to stents?
A. Yes.
Q. And did it also relate to the application of drug-containing polymer compositions to stents?
A. Yes.
Q. And how did you get involved in this lawsuit?
A. In this lawsuit here?
Q. This particular one, yes.
A. Because the defendant subpoenaed me.
Q. And that was -- the defendant is Boston Scientific; is that right?
A. Yes.
Q. And so when did the -- approximately, when did the defendant subpoena you?
A. December of this year -- of last year.

Q. So December of 2021?
A. Yes.
Q. And have you been doing work related to the biodegradable polymer fibers over the last 16 years?
A. No.
Q. And have you been doing work related to drug delivery over the last 16 years?
A. No.
Q. And have you been doing work related to any chemistry-related field over the last 16 years?
A. No.
Q. Have you published any papers over the last 16 years?
A. No.
Q. Have you published any scientific papers over the last 16 years?
A. No.
Q. Have you filed any patents over the last 16 years?
A. The last patent I filed was in 2005 or 2006.
Q. Is it your understanding, since 2006, you have not done any work related to polymers and drug delivery?
A. Yes.
Q. And just to be clear, when you say September of last year, you mean September of 2021?
A. Yes.
Q. And the filing that was filed in September of 2021,

already said --

THE COURT: Will you stipulate?

MR. DROWN: We will stipulate that we make and sell the SYNERGY device. I think they read a stipulation into the record of that, so I don't know why they are fighting this.

MR. SHORE: It's --

MR. DROWN: The only reason they are fight this, Your Honor, is because they want to confuse the jury that there's two shots of direct infringement, and there's not.

THE COURT: So if they will stipulate that the only issue is coverage, and then we have a -- the instruction that if you answer no to Question 1, you go directly to Question 3, if you answer yes to Question No. 1, your answer to Question No. 2 has to be yes as well.

MR. SHORE: Correct.

THE COURT: Both sides live with that?

MR. DROWN: Yeah, I think we can -- yes, we'll look at the verdict form.

THE COURT: All right. Let's get the jury in.

(Whereupon, the jury entered the room at 10:48 a.m.)

THE COURT: You may proceed.

MR. LAHAD: Thank you, Your Honor.

For its next witness -- for their next witness,

plaintiffs call in rebuttal Dr. Pitt.

THE COURT: Dr. Pitt, please take the stand.

(Whereupon, Dr. Pitt, having been previously sworn, testified as follows:)

BY MR. LAHAD:

Q. Dr. Pitt, welcome back.

A. Thank you.

Q. You understand you're still under oath, correct?

A. Yes.

Q. I'm going to ask you a very hard-hitting question, so brace yourself: What is a phase?

A. A phase is a volume in which everything within that volume is the same. So the composition would be the same, density is the same. If you move around the phase, things won't change, stiffness, whatever, is going to be the same. The edge of that phase or that boundary is where it's no longer the same. So think of sameness.

Q. How does a phase differ from a substance?

A. The substance is what's in the phase. So the substance is the molecules, we're talking about molecules like PLGA or water or a solvent or everolimus drug, that's the substance in the phase. And within that phase, all that will be uniform.

MR. LAHAD: If you could please put up the slide that we have where it's the construction and the claim

language.

Do you have the one with the claim language as well with it, please. Excellent, thank you.

BY MR. LAHAD:

Q. Dr. Pitt, I'd like to direct your attention to the Court's construction of immiscible. You applied this construction, correct?

A. Yes.

Q. What does this construction mean to you as an expert?

A. So immiscible pertains to phases. And it tells you if you have, like, one phase, then -- you just have one phase. If you have two phases and these two phases have a chance to contact each other and remain two phases, that's immiscible. So immiscible pertains to two phases.

MR. LAHAD: Your Honor, I apologize, may I approach with a couple of binders?

THE COURT: Yes.

MR. LAHAD: Thank you.

BY MR. LAHAD:

Q. This interpretation of "immiscible," is that interpretation -- or rather your interpretation of the Court's construction, is that interpretation, is that a -- is that a Dr. Pitt, one-off special just for this case?

A. No, that's what's taught in chemistry and chemical thermodynamics at the college level, undergraduate level.

Q. In your notebook at PTX 143, this is tab 2. If you could join me there.

Dr. Pitt, are you with me?

A. Yes.

Q. What is a PTX or Plaintiffs' Exhibit 143 at tab 2?

A. This is a document that gives the definition of "dissolution," it's taken from IUPAC 1994 definition of terms. IUPAC stands for international union of pure and applied chemistry. And this is the international governing body that defines things in chemistry so everybody is consistent.

MR. LAHAD: Your Honor, I'd offer Exhibit 143 -- Plaintiffs' Exhibit 143.

MR. GROSS: Other than prior objected objections, Your Honor.

THE COURT: All right. It's admitted.

(Plaintiff Exhibit No. 143 was admitted.)

MR. LAHAD: All right. Mr. Offor, if you could please pull up 143. And zoom in for me, please.

BY MR. LAHAD:

Q. Could you read to the jury the definition of "dissolution"?

A. "The mixing of two phases with the formation of one new homogenous phase (i.e., the solution)."

Q. And "dissolution," how does that word compare to the

word that the Court used in its construction?

MR. LAHAD: If we could go back to that slide.

BY MR. LAHAD:

Q. How does "dissolution" compare to "incapable of dissolving into one another"?

A. So dissolution means dissolving totally, it's a homogeneous phase. That's one phase. So dissolution is not immiscible. Immiscible is incapable of dissolving --

Q. Doctor --

A. -- into one another.

Q. I'm sorry, I stepped on your answer.

Were you finished?

A. Yes.

Q. Let me direct your attention to Dr. Mooney's demonstrative slide number 78.

Dr. Pitt, do you feel that this slide is an accurate representation of the science of phases?

A. No.

Q. Why not?

A. It's not how I would teach about phases to students. The upper figure is okay -- I don't have a laser pointer so I'll just use my fingers.

That shows two phases that are separate from each other. They are not touching yet, they haven't had a chance to come in contact. The bottom figure, though, shows

that apparently these two phases are touching, and so there's a chance to exchange material. And then at -- after that has happened, then you ask the question, is there one phase or two phases?

And the answer is one or two. You don't have one and a half phases. You have one, two, maybe in some cases you can have three.

So this lower figure is not clear. Do I have one phase? Do I have two phases? Do I have 1.8 phases? Well, that's not defined, 1.8 phase. It has to be a one or a two. So I don't think this is an accurate description of the way phases work.

Q. So if I began with two phases, and the molecules from each phase are given an opportunity to mix and mingle and interact, and the phases do not dissolve into one another, how many phases do I have at that point?

A. You have two phases.

Q. If I begin with two phases and the molecules from each phase are given the opportunity to mix and mingle and interact, and the phases do dissolve into one another, how many phases do I have at that point?

A. Then you have one phase.

Q. Dr. Pitt, you would agree that the word "immiscible" is not in the specification of the '296 patent, correct?

A. I agree.

Q. Nevertheless, does the specification of the '296 patent describe two immiscible phases?
A. It does to a person of skill in the art reading the patent.
Q. Where?
A. The --
Q. Where in the specification does it do that?
A. Well, there are at least four places -- and there's more than that, but I'll look at examples. Example 1 is an emulsion of an aqueous phase and a chloroform phase. And a person ordinary skill in the art knows that an aqueous phase is not miscible with a chloroform phase, so you have two phases there, so you have immiscible. There's an example of immiscibility that a person of skill in the art could see.

In example four, you have a hydrogel phase which has lots of water in it. And then you have another chloroform phase, and they are stirred together. And a person of skill in the art know that the hydrogel phase does not dissolve into the chloroform phase.

In example five, you have one solution with a polymer that's called chitosan. It got dissolved in a basic solution. And you have another solution -- when I say "solution" here, this is an aqueous solution. You have another one that's also an aqueous solution but it's acidic.

And when you inject this first solution into

location, so it's not too deep, just enough to cover the surface and a little bit of the sides, with the material that's on the patch. After one revolution it's pulled out and sent to dry.

Q. You mentioned a "patch," Dr. Pitt. How is that patch prepared?

A. That patch is prepared by squirting a, they call it a bead, of this liquid solution on a conveyer belt, and it goes through a gap that's just the right height and just kind of spreads it out to a uniform thickness.

Q. What happens next?

A. Well, after it's -- the material is on the stent, then that stent is sent to a drying process. And as it dries that forms the fiber on the surface of the stent. It's formed in that shape, kind of like a haircut, flat hair goes down on the sides and then comes up and around. Call that the haircut shape, I guess. That's how the fiber is made.

Q. You were in the courtroom this morning when my colleague went through that process of making a fiber using that mold; do you recall that?

A. Yes.

Q. Can you make a fiber using that mold-based process?

A. Yes, there are papers on making fibers from molds.

Q. Do you know what a substrate is?

A. Yes.
Q. What's a substrate?
A. That just means it's kind of underneath whatever you're working on.
Q. Can you make a fiber by directly applying a material to a substrate?
A. Yes.
Q. Can you make a fiber by kind of forming it first and then adhering it or gluing it to the substrate?
A. Yes.
Q. Let's talk about the Song patent that Dr. Mooney says anticipates Dr. Nelson's patent.
Dr. Pitt, is the Song patent directed to stents?
A. No.
Q. Does the Song patent mention stents?
A. No.
Q. Is the Song patent directed to tissue engineering?
A. No.
Q. What is the Song patent directed to?
A. It's directed to making polymer fibers that release agents in -- basically in chewing gum, so it releases by chewing and deforming the fiber.
Q. Who is the assignee on the Song patent?
MR. LAHAD: If we could bring up the first page of DTX, I believe IT'S 18, Mr. Offor. Defendant's

Exhibit 18, please. There it is. Could you please blow up the top half of the patent?

BY MR. LAHAD:

Q. Who is the assignee on the Song patent, Dr. Pitt?

A. Wrigley Jr. Company of Chicago.

Q. To your knowledge, does the Wrigley Company of Chicago make stents?

A. No.

Q. In your opinion, does the Song patent anticipate any asserted claim of the '296 patent?

A. No.

Q. In your opinion, does the Song patent anticipate Claim 1 of the '296 patent?

A. No.

Q. Why not?

A. Well, the patent talks about --

MR. LAHAD: Can we get that claim language up, please?

I'm sorry to cut you off Dr. Pitt. Go ahead.

THE WITNESS: Okay. Claim 1 talks about a biodegradable polymer, and I don't believe that that is taught in the Song patent.

BY MR. LAHAD:

Q. So if Song doesn't teach a biodegradable polymer, what does it teach?

A. It teaches a fiber that releases agent as it is placed in a solvent like saliva or when it's deformed.

Q. Deformed meaning like chewing, right?

A. Yes.

Q. But Dr. Pitt, doesn't the Song patent have the word "biodegradable" in it?

A. Yes, it does.

Q. But you're telling this jury that despite that, Song does not disclose the biodegradable polymer fiber element of Claim 1; is that your testimony?

A. Yes.

Q. Please explain yourself, sir?

A. Okay. So the Song patent teaches a way to release by deforming this fiber. This fiber has pockets of agent in it in channels. And even though biodegradable polymers are mentioned in passing, if you made a polymer fiber that biodegraded or dissolved before the agent was released, that would go contrary to what the Song patent is teaching. That patent teaches that you release the agent by it leaking out the ends of these pores or these channels or by deforming it. And if you had the case where the material dissolved or biodegraded, then you would have the sudden release or release that you're not teaching to create. So it's kind of antithetical to the '296 patent. Song teaches, keep your fiber around while I can do this release, and it's releasing

right through the holes in the fiber, where Nelson teaches, I have to have the fiber biodegrade to release the agent. So they are going in different directions.

Q. So is the Song patent directed to biodegradability in the same manner as the '296 patent?

A. Not in the same manner.

Q. Does the Song patent provide sufficient direction or guidance to a person ordinary skill in the art to make the biodegradable polymer as claimed in Claim 1 of the '296 patent?

A. No.

Q. Does the Song patent provide any working examples of a biodegradable polymer as claimed in Claim 1 of the '296 patent?

A. No.

Q. If, as a person of ordinary skill in the art, you wanted to make a biodegradable polymer fiber as disclosed in Claim 1 of the '296, could you rely on Song to guide you?

A. That wouldn't guide you.

Q. Going back to our blueprints analogy, does the Song patent provide the blueprints for making a biodegradable polymer fiber as set forth in Claim 1 of the '296 patent?

A. No.

Q. So we talked about biodegradable polymer fiber. Is there any other reason why Song does not anticipate Claim 1

of the '296 patent?
A. Yes, the Song patent doesn't teach about the dispersed discrete regions that release the drug.
Q. Okay. So you're talking about this second phase element here, the discrete drug containing regions dispersed throughout the fiber?
A. Yes, the second one down there.
Q. Okay. How is it that Song does not disclose this element?
A. Well, Song teaches that you have contiguous channels. Contiguous means that you've got these regions that are touching each other, stretching out the length of this fiber, and when there's contact with the solution, which is water or saliva, this stuff just starts to dissolve and go out the ends. So that's not a discrete region.
Song also says there are isolated -- he calls them "agents," isolated agents, that are in the fiber, and the only way they get released is if through the defamation and breaking, you expose one of those to the solution and then it can dissolve out from those isolated regions.
Q. Okay. So how does the way that Song releases agents compared to the way that the '296 patent talks about releasing agents?
A. Well, the Song patent teaches that you have these contiguous channels, and when this fiber was first made, it

was long and then they chopped it into smaller fibers and that exposes these channels, and stuff can start to dissolve out the ends, the front end and the back end. So the stuff is going out this way on the Song patent, out the front and the back end.

Whereas in the Nelson '296 patent, you have a fiber, and it's biodegrading, and the drug is coming out in the radial direction instead of going out the ends.

Q. Dr. Pitt, going back to our analogy, does the Song patent provide the blueprints for this second phase as claimed in Claim 1 of the '296 patent?

A. No.

Q. Dr. Pitt, in your opinion, could a person of ordinary skill in the art, looking at the Song patent, make and use the invention set forth in the asserted claims of the '296 patent?

A. No.

Q. Any doubt in your mind?

A. No.

MR. LAHAD: Thank you, Dr. Pitt.

Your Honor, I have no further questions at this time. Pass the witness.

CROSS-EXAMINATION

BY MR. GROSS:

Q. May I approach, Your Honor?

THE COURT: Yes.

BY MR. GROSS:

Q. Dr. Pitt, I'm just going to put some deposition binders in front of you; all right, sir?

A. Yes.

MR. GROSS: Your Honor, I just have a couple of sets of binders.

BY MR. GROSS:

Q. Let's -- if we can, pull up the P 143.1.

Also, good morning, Dr. Pitt.

A. Good morning.

Q. Good to see you again. This will be brief.

A. Thank you.

Q. You're welcome.

So, Dr. Pitt, this dissolution is a dictionary definition, correct?

A. Yes, it's an IUPAC.

Q. It's not a part of the Court's jury instructions or claims construction in this case, correct, sir?

A. I don't believe it is.

Q. And Dr. Mooney was not asked about this, correct, sir?

A. I don't remember that he was.

Q. And the word "mixing" is there, right, not "dissolving"?

A. "Mixing" is there.
Q. Not "dissolving"?
A. I don't see "dissolving."
Q. Okay. And it says, "One new homogeneous face," do you see that, sir?
A. I see that.
Q. Is that similar to "form a single phase"?
A. Would you repeat that? That was kind of --
Q. Is that similar to the expression "to form a single phase" that you keep using?
A. Yes.
Q. And that -- "to form a single phase" is literally not part of the Court's claim construction, you understand that, right, sir?
A. Correct.
Q. Okay. And then it says "the solution," do you see that, sir?
A. Yes.
Q. So is a solution contained in the coating of the Boston Scientific product once it's in the field, once it's finished?
A. Is the solution?
Q. Is there a solution in the coating after it's been applied and adhered to the stent?
A. It's two phases, so it's not a solution.

Q. I didn't ask you to count the phases. I'm sorry, Dr. Pitt. Only because I'm on a time and trying to wrap it up.
A. I'll try to help you.
Q. Sure. Literally, literally the Boston Scientific coating does not contain a solution after it's been manufactured, correct?
A. Correct.
Q. Okay. You can put that down.
Now, sir, we're going to pull up the Song patent, which is D 18.
And let's go to column 4, 57 to 66.
It's DTX 18.10.
So, Dr. Pitt, Song discloses various things that can be the active agent, correct?
A. Correct.
Q. And if you look down up there, you see "pharmaceuticals"?
A. Correct.
Q. Okay. So does Bubblicious have a pharmaceutical in it?
A. I don't know what Bubblicious is. Is that a gum? I don't chew gum, so.
Q. Were you here earlier for the testimony of Dr. Mooney?

A. Oh, that was "Bubba" something, yeah.
Q. Oh. Okay. Does bubble gum have a pharmaceutical in it?
A. Not that kind of bubble gum.
Q. Sure. Have you heard of Nicorette?
A. Yes.
Q. Did you see Nicorette today on the slide --
A. I did not see Nicorette today.
Q. Okay. And then it says, "Ibuprofen, antacids, anti-inflammatory substances," do you see that, sir?
A. Yes.
Q. You didn't hear any questions about that with Dr. Mooney, correct?
A. Correct.
Q. Okay. So I'll keep rolling. Let's go to same exhibit, and let's look at figure 2 of the Song patent. It's on 18.4.
All right. These are these SEPM images, correct, sir?
A. I don't know if they are FESEM or just SEM, but they are images.
Q. Okay. You didn't refer to these in your testimony, correct, sir?
A. I did not today.
Q. Okay. Let's keep rolling.

Let's go to 4, column 4, 20 to 24.

And it says, "Figures 4 and 5 contain SEPMs of fibers made in accordance with the present invention," do you see that, sir?

A. Yes.

Q. And let's now go down to column 7, line 29 to 31.

And here we see a reference to "Solid particles of aspartame" --

Do you know how to pronounce that?

A. Aspartame.

Q. -- "aspartame are isolated in the polymer," do you see that there, sir?

A. Yes.

Q. So there, they are talking about particles that are isolated, right, sir?

A. Yes.

Q. Okay. Let's keep going.

Let's go to column 2, lines 40 to 42.

And where it says, "The active agent however does not necessarily have to be in a contiguous phase," do you see that?

A. Yes.

Q. Means it doesn't have to be touching; true? That's what "contiguous" means?

A. Yes.

Q. Okay.
A. "Contiguous" means they are --
Q. Dr. Pitt, sorry, I'm on a time crunch.
And then column 3, lines 30 to 32.
Here it says, "This gradual release by deformation should occur even if the active agent is not in a contiguous phase," do you see that, sir?
A. Yes.
Q. Now, let's go to the abstract on the first page, and let's go down right under "Abstract." You see that, sir, it says about "Melt-spinning a mixture of particles of active agent and wall material into a fiber," right, sir?
A. Yes.
Q. Would you agree that the Song patent teaches melt-spinning of particles of active agent and wall material into a fiber? You'll agree that that's a true statement?
A. That's correct.
Q. Okay. Let's go to column 5, 26 to 28.
And just to be clear, I mean you agree with that statement, not you agree that I read it correctly. You agree that that's a true statement as a matter of science; what I just read to you?
A. Then I think we need to back up because I was saying that that statement was written in there.
Q. Oh, well, let's back up.

A. Sorry on your time.
Q. No, no. Dr. Pitt, even though I'm in a hurry, that's important that we --
A. I was just agreeing that it says that.
Q. Let's go to abstract. Why I truly didn't mean literally just -- just did that say that.
So this patent states the delivery system is formed. That's the delivery system, right, Dr. Pitt?
A. Yes.
Q. You heard Dr. Mooney talk all about the delivery system, right, sir?
A. Yes.
Q. He gave all kinds of slides and went through it for a while, and you were there, right, sir?
A. Yes.
Q. And this sentence says, "The delivery system is formed by melt-spinning, a mixture of particles of active agent and wall material into a fiber."
Scientifically is that an accurate statement in your opinion, or do you have no opinion?
A. That's an accurate statement.
Q. Let's go to column 5, lines 26 to 28.
You see where it says, "Structures that embody the present invention are made by melt-spinning"?
A. Yes.

Q. Okay. Would you agree that there are structures in this patent that are made by melt-spinning, and those are enabled, for purposes of this patent?
A. Yes.
Q. So we're not disagreeing about whether this patent teaches you how to make what's in this patent?
A. Correct.
Q. You don't have any problem that this patent enables someone to follow the instructions of the patent and make a fiber?
A. There are inconsistencies in this patent.
Q. Well, I didn't hear that at all. You haven't identified them at this jury trial.
A. There are inconsistencies with how they use the word "immiscible."
Q. Sir, I haven't heard you mention them up until this second. Before I just started talking, you have not talked about any inconsistencies, right, sir?
A. No, you didn't ask me until this second.
Q. Your counsel didn't have you tell the jury about any inconsistencies, right?
A. That's correct.
Q. I want to stay within the scope of your direct exam, all right, sir? I don't want to raise a new topic, all right, Dr. Pitt?

A. Yes.
Q. So, sir, am I right that in terms of your opinion, you would agree, that one of Song's examples is using a biodegradable polymer, polymer, and the second phase is solely and only the therapeutic agent; would you agree with that statement?
A. No, I don't agree.
Q. Turn to your deposition.
MR. GROSS: May I approach, Your Honor?
THE COURT: Yes.
MR. GROSS: I have them flagged for you, sir.
BY MR. GROSS:
Q. And in terms of line and page, we're at your deposition, page 93, line 20. Just tell me when you get there, sir.
A. I'm at my deposition for a different case at lines 120 --
Q. Sir, sir, sir, it's really important right now that you not inject anything new without approval from people, all right, sir?
A. Okay.
Q. And that's -- I'm speaking as an officer of the court, all right, sir?
MR. LAHAD: Your Honor, I would object to this sidebar. He's trying to answer the questions. I know he's

in a hurry, but the witness has got to be given an opportunity to speak.

MR. GROSS: To be clear, I just didn't want him to inject.

THE COURT: There was no question pending, so --

BY MR. GROSS:

Q. All right. So, sir --

THE COURT: Please wait for a question.

BY MR. GROSS:

Q. At page 93, line 20, were you asked this question and did you give this answer at your deposition:

"And so Song teaches a fiber with two immiscible phases in which the first phase is a biodegradable polymer and the second phase consists of the therapeutic agent, correct?"

And did you give this answer:

"I think one of his examples is using a biodegradable polymer, and the second phase is solely and only the therapeutic agent."

Did you give that testimony?

A. Yes.

Q. And, sir, am I also right that in the example that you were talking about, the second phase in Song, is immiscible with the first phase, which is the polymer and, in some cases, that could be biodegradable. Do you agree?

Don't look at your deposition, sir, look at me. I'm sorry. I apologize. I'm going to refer to that if necessary. I'm only asking you a question, do you understand? I want to make sure -- okay, so without looking at your deposition testimony, sir, I'm going to ask you a question.

Would you agree that in that example, the second phase is immiscible with the first phase, which is the polymer, and in some cases that could be biodegradable?

A. No, without --

Q. All right. Sir, let's look at your deposition, page 94 at 5.

Are you there, sir? Just don't say anything, just tell me if you're there, sir.

A. I'm there.

Q. Were you asked this question at your deposition:

"And in that example, the second phase is immiscible with the biodegradable polymer, correct?

"ANSWER: The second phase is immiscible with the first phase, which is the polymer, and in some cases that could be biodegradable."

Did you give that testimony, sir?

A. Yes.

Q. And how what I want to do is -- you're aware of Song, that statement "additionally, they must be immiscible with

each other and capable of being uniformly dispersed when mixed together during the melt-spinning procedure."

You're aware of that sentence, sir?

A. Can you say that a little slower? I know you're in a rush but I want to get it right.

Q. Sure. Sure. Song has that reference "must be immiscible"?

A. I believe he says "immiscible."

Q. Yes. And, sir, you interpret the patentee Song's reference to "must be immiscible" as meaning that the phase that is active -- that is the active agent is immiscible with the phase that is the wall material; true?

A. I don't think so.

Q. All right. Let's go to your deposition at page 89, line 14.

Tell me when you're there, sir.

MR. LAHAD: I'm sorry, Your Honor, what page?

MR. GROSS: I apologize 89, line 14.

BY MR. GROSS:

Q. Tell me when you're there, sir.

A. I'm there?

Q. Okay. At your deposition, did you give this testimony question:

"QUESTION: And the very next sentence continues, stating, 'Additionally, they must be immiscible

with each other and capable of being uniformly dispersed when mixed together during the melt-spinning procedure,' that statement refers to the active agent and the wall material being immiscible with each other, correct?"

Witness, that's you: "Well, I interpret that as meaning that the phase is active agent is immiscible with the phase that is the wall material."

Did you give that testimony?

A. Yes.

Q. Now, when you gave the testimony I just read to you, you had sworn to tell the truth; true?

A. True.

Q. You had absolutely reviewed Song, correct?

A. Correct.

Q. You had prepared for your deposition; true?

A. Yes.

Q. You were trying to give clear answers; true?

A. Yes.

Q. Do you have any problem with the jury in this trial relying on your sworn answers at that deposition that I just read to you; yes or no?

A. I don't have any problem.

MR. GROSS: No further questions, Your Honor.

THE COURT: All right. Dr. Pitt?

MR. LAHAD: Very briefly, Your Honor.

Can I get the highlighters, please.

BY MR. LAHAD:

Q. Dr. Pitt, the Court's construction of the second phase is the discrete drug-containing regions dispersed throughout the fiber, correct?

A. Correct.

Q. Does the Song reference teach discrete drug-containing regions dispersed throughout the fiber?

A. I don't believe it does.

Q. You were also shown -- you were also shown this portion or so of Song, right, which talks about contiguous phase, do you see that?

A. Yes.

Q. Let me direct your attention to the next paragraph. It says, "Furthermore, it is theorized that if the active agent is not in a contiguous phase, the deformation of the support matrix may create channels... etc."

When you're looking at a patent and you're looking to do something with that patent, as a person of ordinary skill in the art, would you rely on something that says that it's just merely theorized?

A. No.

Q. Would you want to rely on something that's a little bit more than just theory?

A. Yes.

MR. LAHAD: No further questions.

MR. GROSS: Nothing further.

THE COURT: All right. Dr. Pitt, you may step down, thank you.

MR. LAHAD: Your Honor, plaintiffs next call Ms. Teri Schultz back to the stand in rebuttal.

THE COURT: All right. Mrs. Schultz.

MR. SHORE: Your Honor, Ms. Schultz just asked for a bathroom break, is that okay?

THE COURT: Okay. We can take five minutes, all right.

Take the jury out.

(Whereupon, the jury left the room at 11:35 a.m.)

THE COURT: So I'm just reminded, and looking at the time, we've been going for about 2 hours, so let's take the morning break at this time.

Take 15 minutes.

(Break taken.)

THE COURT: All right. Let's get the jury.

Did the parties reach the agreement on the jury instruction, the language?

MR. GRIMSRUD: I believe we have, Your Honor, we've been exchanging a couple of drafts and they have what I think is the final version now.

Q. You understand you're still under oath?
A. I do.
Q. Ms. Schultz, do you know what inter partes review or IPR of a patent is?

MR. GROSS: Objection. Irrelevant. And outside the scope of our case, Your Honor. We didn't raise this issue.

MR. LAHAD: Your Honor, it's rebuttal as to validity or invalidity. Furthermore, it's relevant because during opening, counsel for Boston Scientific incorrectly said that --

THE COURT: Sidebar, please.

(Whereupon, a discussion was held at sidebar as follows:)

THE COURT: All right. Go ahead.

MR. LAHAD: Yes, on the relevance aspect, it goes to --

THE COURT: But, first he says it's beyond the scope of cross.

MR. GROSS: Of our case -- of our invalidity case had nothing to do with IPR, didn't mention IPR literally.

MR. LAHAD: The invalidity, I think, whether or not Boston Scientific filed ex parte examination goes to the strength of their invalidity case as a whole.

MR. SHORE: They opened the door.

THE COURT: How did they open the door?

MR. SHORE: In opening statement, in opening statement he got up and said, "Ladies and gentlemen of the jury, this is -- this is our only opportunity to ever attack the invalidity of this patent," that is what he said in opening.

They can still file an IPR. They can file that six years after the patent expires. He told them this is their only opportunity. That's a quote: "This is our only opportunity."

MR. GROSS: Your Honor, I don't want to derail the Court's day. I don't think it's an accurate quote. I need to check that quote. But what I did say, the Court has ruled on IPR on 403 issues. I have a stack of IPRs now. One was filed -- electronic one was filed by Ethicon. The Ethicon one, there was no institution because a trial was going on, so now I have to talk about the fact that it wasn't instituted on the merits, so there was no discussion merits med front if I can did an IPR -- basically as soon as they get into an IPR there was IPR activity which I want to be clear the University opposed because they said we have sovereign immunity which the Supreme Court should rule which it ultimately disagreed that they should not be sued. There's multiple issues.

Your Honor, because of 403 and because we did not mention IPR in our case-in-chief, what we respectfully request is that the Court say that -- they should not have this witness -- by the way, who is a fact witness, not an expert witness -- get into inter party review proceedings. The Court has already had rulings on this with respect to whether it's coming in, and we think what counsel said in his opening, which counsel said a lot of things about patent examiners and the like, and what other counsel says in their opening, is literally not evidence. And the proof is in the evidence that we present, and we were adamant to stay away from getting into any IPR procedures based on the Court's ruling.

THE COURT: What quote are you saying?

MR. LAHAD: This is from opening. Plaintiffs were the one talking to the Patent Office, not Boston Scientific, so Boston Scientific never had any input into that patent. Never had a chance to give their opinion, show the patent examiner evidence on whether the '296 patent is even a valid patent. This is the only opportunity that Boston Scientific has to do that. That is incorrect factually; it is incorrect. The jury is left with the misimpression that these proceedings are the only ones in which Boston Scientific could have challenged the validity of the patent. That's inaccurate. Jury is left with that

false misimpression, and I think they opened the door to this. He could have said a million other things, but he characterized it this way, as the only opportunity. I'm entitled I think to show that there were other opportunities that they did not take advantage of.

MR. GROSS: I just want to be clear. I have a cross prepared, but the cross prepared -- this is getting into all kinds of 403 issues, so, for example, the University of Texas took the position there can be no IPRs because they are sovereign immunity. Another example when IPRs were filed, they said they cannot go forward because there's existing trials going on. Another example the Patent Office, when they ruled, they didn't get into the merits. Another example, the Song reference was given, and they didn't dispute the Song reference in their opposition. Literally, they didn't have merits because they were trying to get discretionary review. I'd take out a board and cross-examine the witnesses, but I think we're in 403.

THE COURT: She's a fact witness, so what are you proposing to get in through her about IPRs?

MR. LAHAD: Just whether or not one was filed, that's it. Not going to --

THE COURT: Just that question?

MR. LAHAD: It's going to be -- be -- it was filed --

THE COURT: One question.
MR. LAHAD: What they are?
THE COURT: No, no, just one question: Whether an IPR was filed.
MR. LAHAD: I have a similar question. Respect to ex parte reexaminations, same grounds.
THE COURT: Okay. One IPR, one ex parte reexamination.
MR. GROSS: We will have no cross if those are the questions.
THE COURT: All right.
(Whereupon, the discussion held at sidebar concluded.)
BY MR. LAHAD:
Q. Thank you for your patience, Ms. Schultz.
Did Boston Scientific file an inter partes review request with the Patent Office against the '296 patent?
A. They did not.
Q. Did Boston Scientific file an ex parte re-examination request with the Patent Office on the '296 patent?
A. They did not.
MR. LAHAD: Thank you, Your Honor.
THE COURT: Any cross?
MR. GROSS: I have always wanted to do this,

Your Honor. No further questions.

THE COURT: Ms. Schultz, you may step down.

THE WITNESS: Thank you.

MR. LAHAD: Your Honor, that concludes our rebuttal case.

THE COURT: Okay. At this time, there are no further questions. We're going to allow you, members of the jury, to take your lunch break at this time. We're going to take 50 minutes, so we'll bring you back at 1 o'clock.

(Whereupon, the jury left the room at 12:10 p.m.)

THE COURT: Okay.

MR. DROWN: Your Honor, I'll try to be as brief as I can, but just to preserve the record, we would renew our motion for judgment as matter of law on direct and indirect infringement on the same grounds and for the same reasons we previously asserted on Friday regarding no direct infringement and indirect infringement of any claim, thus moving for JMOL on direct infringement on Claims 1, 11, 17, and 26 by Boston Scientific Corporation and Boston Scientific Limited because a reasonable jury would not have a legally sufficient evidentiary basis to find the SYNERGY stent has at least one biodegradable polymer, that the SYNERGY stent has a fiber composed of a first phase and a second phase with the first and second phases being

or fashion what is contained in the '296 patent.

Because, remember, their whole thing is we are on a different road. The road is not what you're here about. You're here about the destination. Patents last for 20 years. So what happens when you have a patent that invents a thing? That means that that thing is what is claimed. It's like going back to our example of the destination in the roads. There may be new roads built to Wilmington over 17 years, new ways to get to Wilmington may develop over 17 years, it doesn't change the boundaries of Wilmington.

So when you invent something, a car, a transmission, anything like that, it may be the cutting edge of technology. And then remember what we talked about patents, you disclose that, and then other people will come up with better and newer ways to make it. So the fact that it wasn't made a certain way 20 years ago does not mean that that's not covered by the patent.

It's not the road, it's the destination. Keep that in mind.

So here's Claim 1, a composition comprising -- we've seen this a hundred times. We're going to walk through this.

Now, Dr. Pitt -- and we'll get into this more with Dr. Mooney later -- Dr. Pitt is the only credible

expert in this case. You remember, I hope, when I was introducing Dr. Pitt's testimony, I had him go over all the information he reviewed. Dr. Mooney didn't do that. I had Dr. Pitt tell you not only all the information he reviewed, but I had him tell you this is the same kind of information I used and that other people in the field used to do these kind of analysis. Dr. Mooney didn't do that. Dr. Pitt also told you the methodologies that I apply are the same methodologies that I would use if I was not in a courtroom. Dr. Mooney didn't do any of that.

He just came in and said, because I say so. That's called "ipse dixit" in Latin, because I say so. I think what happened was there was a lawsuit filed, Boston Scientific knew it was an unwinnable case, there was no way that they could win this case if they relied upon the methodologies in the field, so they didn't, if they were -- if they -- if they did it the way you would do it outside. So what did they say? Let's find a big, thick resume, have the guy sit up there and say because I say so. And we're going to go through that.

We know Dr. Pitt is credible because his testimony is 100 percent consistent with the FDA documents. It is 100 consistent with SYNERGY marketing materials. It is 100 percent consistent with Boston Scientific prelitigation use of fiber, and it's 100 percent consistent

with the testimony of the Boston Scientific witnesses you saw by deposition and with Dr. Allocco, who you saw on the witness stand. Dr. Mooney contradicts his own client's testimony, and he doesn't explain why.

So the SYNERGY polymer coating is a fiber. They admitted that that shape could be the shape of a fiber. Dr. Allocco said it, yes. There's no limit in the Court's claim construction, Dr. Allocco admitted it, so the shape, that's a fiber, that can be a fiber.

The SYNERGY polymer coating is a fiber. The SYNERGY -- what they told you, this paint thing where they are painting on the wall, that is not how these things are made. And you heard, and there's documents in the record, about how they are made, but what they do is they take that stent, that tiny stent, it is not rolled through paint or painted on a wall, it is put on a mandrel, a little round thing, over the mandrel. And then a pool of polymer is sitting below it, semi-thick. They keep telling you it's like pain, it's liquid, it's liquid. It is technically a liquid, it's very thick, and we know it's thick because, remember, when they roll it and they drop it down, it leaves an impression, and the impression remains.

So they drop it down and it doesn't roll, what happens is the conveyer belt below it moves, it doesn't move, and it turns one time. And it's prepped in a way so

outside the jurisdictional limits of the court. We can't bring her. And then they say she retired. Where is she?

Their use of the term "fiber" before they got sued. Again, they called things shaped exactly like the shape of the SYNERGY stents, fibers. Exactly. And they are going to say, oh, well, that's a different technology. We're not saying that that's the exact same technology, what we're saying is it's the exact same shape, and it's the shape, it's the contour, it's the format, that's what matters.

Same thing for their other patent, and, again, this is their engineers calling something that is disposed over in that shape the same shape. It's a fiber. Same shape.

Now, then their next thing is, oh, well, there's some substances that are inside these phases. There's some substances in them that will mix together. That is not the Court's claim construction. So they can't say the phases dissolve into one another or even that they are capable of dissolving into one another. Why? Because if they were capable and they're sitting right next to each other in the stent, they would. They'd do it. When they are sold, they go out and there's two separate phases and they stay separate. So what they do instead was they say, oh, well -- let me give you an example. If you meet your significant

other in the park and you hold hands and you walk through the park and then you let your hands go, you have transferred DNA to your hand to their hand, and they have transferred DNA from their hand to your hand. You have not dissolved into one another. You're still two people.

So this is what -- this is the kind of stuff that they are bringing forward for you. Yes, there will always be some transfer of molecules between phases, but the ratio within those phases never changes. The phases stay separate phases. It's like if four people get in a car and drive across to Philadelphia and four people in Philadelphia drive across here, it doesn't mean that the boundary between Delaware and Philadelphia has changed. That is what they are arguing to you.

First and second phases being immiscible. Again, phases, not substances in them, phases.

Incapable of dissolving. Now, we'll get into this a little bit more, but they never told you, they didn't dare tell you what "dissolving" means to a chemist and in the field of chemical engineering. He just -- their expert just gets up there and says because I say so without referencing you to a single dictionary definition, a single article, a single textbook, nothing that supports his definition of dissolving of phases.

Boston Scientific admitted two phases to the

FDA. Now, this is the one that I think they tried to pull a fast one where they cut off the discussion at the semicolon. This data suggests there was slightly -- slight miscibility between the drug and the polymer. That's -- those are not phases; those are substances. However, separated -- anyway, you can read it. Separated drug and PLGA phases were detected separately. Not together, not partially together, they're separated.

And, again, Dr. Allocco, when he was on the witness stand.

But my point is, nowhere, nowhere in this document to the FDA does it say the phases in the SYNERGY stents are slightly miscible, does it? That's not what this document says?

He says no.

That's the end of the -- that's the end of the analysis. They admitted it to the FDA. They told the FDA the phases are separate. The phases always remain separate. And there's not a single person from Boston Scientific who came here to tell you anything different.

And, again, we have field emission scanning electron microscopy. Now, they are telling you that this plastic-looking paper -- torn paper-looking stuff is dissolved into those round things you see. Dissolved into. If they were dissolved into, they wouldn't look completely

different. You heard the testimony for that from Dr. Pitt, you heard it from Dr. Allocco, it's in their documents.

Those two things, the white tissue paper, plastic polymer, that is not dissolved into those clearly identifiable drug-rich regions, it's just not. Same thing for the other Confocal Raman Microscopy, identifies completely different phases.

And then they bring up this fact that -- now, unfortunately, somebody at Boston Scientific can't add because 87 minus 83 is four, not three. But setting aside their addition, what happens is, this is the raw material, it's not phase. This is a raw material, it's not a phase. These are the values of the phases, 83 and 51, indicating that there's a little bit of one in the other in phase. Those numbers never change.

If something is actively dissolving into something else, it doesn't stay constant. And you never heard anyone, no one came and told you, testified to you under oath, not even, not even Dr. Mooney, that those numbers ever change.

Once the device is built, and if those glass transition temperatures never change, they are not dissolved into one another. If they dissolve into one another, you get one number, you do not get two numbers.

Dissolution, now this one was kind of funny. He

said, "Does the word 'dissolve' appear in the definition of dissolution?" What? That's like saying the word is the definition, the definition is the word. That's just silly.

But that's -- you're smarter than that, I trust you on that, you're not going to be fooled by that.

But here it is. Dissolution, dissolving, the mixing of two phases with the formation of one new homogeneous phase, the solution.

And what is the source of this? This is the internationally recognized -- these are the people who decide what goes in the periodic table, this is the gold standard of chemistry. This is what we provided to you. Did Dr. Mooney provide you anything like that? No. He just said, Because I say so.

Dr. Mooney. "Dr. Mooney, while we're waiting, how much are you being paid per hour to testify?"

"$800 an hour."

And why is he -- when does he get this $800 an hour? He gets it whenever he starts thinking. He gets $800 an hour to just think about it.

Everybody deserves to be paid, okay, I'm not saying he doesn't deserve to be paid. But when you think about it, you're talking about one of the biggest companies in the world in this type of technology, Boston Scientific. They have relationships with everybody. And the best person

that they could get to bring you is a person who won't tell you that he used scientific methods, he won't even tell you what methods he used, he won't tell you that those methods are accepted in the scientific community, won't provide you any proof about his opinions.

If you look at some of the papers that are written, you know, for a peer-reviewed journal, it's like every sentence has a footnote. The footnotes will be longer than the article. He didn't footnote his testimony. He doesn't tell you where he got his information. It's because I said so.

Dr. Mooney's testimony is only for Dr. Mooney. Never confirmed the information he relied upon was sufficient as to quantity, never said it was the type relied upon outside of litigation, never stated his methods were used outside of his litigation, never said his methods were accepted. Never stated his conclusions.

Important: Never stated his conclusions met the standard to a reasonable degree of scientific certainty.

That is what Dr. Pitt told you, that is what is required by the law. You can't just get up here and make stuff up without support. You have to footnote your testimony. You have to tell us where you got it.

"I don't know, but trust me anyway" method, that's not a method of science. "Is it your opinion that

drug-rich domains are individually separate from one another?"

"Is it my opinion? It's my opinion that they appear to be, but I don't know."

"I don't know" is not evidence.

Does he follow the claims construction? We all know he doesn't follow the claims construction. "And I would consider that to be thread-like."

Why would you say that?

"Well, I mean, if you look at this and you think about a thread, you know, we all use threads. If it doesn't look like a thread in my clothes, it's not a fiber. If it doesn't look like a thread in my shirt, it's not a fiber."

Where is that? Where is that in an article? Where is that in a text book? Where is that in the claims construction?

It is not -- the claims construction is not fiber, something that likes like a thread, in your shirt. This is just made up.

This one got me too. A chemistry professor who does not know how to define a chemical solution. He did not want to admit this on the witness stand. He was waffling -- and back where I'm from it's crawfishing. I don't know if you have crawfish up here or not. You know, a crawfish kind of backs up when it walks.

"Is a solution a single-phase mixture?"

"Typically."

"Typically?"

"A solution, I mean, you can -- I have to just think about some. I mean, generally, yes, the examples I can think of offhand."

"Okay. So a solution has one phase?"

"Not that I can think of right now."

This is -- I'm not going to repeat his resume, but supposedly he teaches Ph.D. level students and he can't even tell you -- look you in the eye and tell you what a solution is. He's a chemistry professor. Why not? Because he knows that definition means infringement. So he can't do it. He wasn't paid $800 an hour to tell you the truth he was paid $800 an hour to get them out of trouble.

This reaches the point of -- you fill in the adjective. If you think about a system, you put some drug in it, it gets released. Well, once the drug is gone, it's variable, because you're not getting any drug anymore.

So I guess that means the aspirin that I took when I was 3 years old is still releasing into my body at a variable rate because it's not releasing anymore than I took when I was 3 years old.

Fill in whatever adjective you want there to describe that testimony. This is ridiculous is the

adjective I would use.

Dr. Mooney is supported by the scientific method of "I looked at it. I looked at it."

So a person of ordinary skill in the art, when you look at it, they would just kind of know. That is not a scientific method. There is nothing scientific about that at all. That is why we call it -- I'm sorry, I got to go backwards -- ipse dixit, because I said so.

Now, you can get away with that until your kids are about, what, 7 or 8. Does anybody -- none of you are 7 or 8, right? I think all of you are about my age, which is maybe the first time I've ever had a jury where everybody is my age, which is kind of cool.

But no one is going to tell me "because I said so." And you should not let them tell you this "because I said so." You're adults. You're smart. You're on this jury because you're a fair cross-section of the community and your combined wisdom as adults, it is not "because I said so."

Zero supporting chemical dictionary definitions, zero supporting research papers, zero supporting textbooks or any other information that says phases, phases that do not dissolve into one another are miscible.

After manufacture, the only relevant time, the only relevant time is after it's made. It's not when they

are mixing up the emulsion before they make it, it's not -- the only time that matters is the finished product.

And you're going to be told by the Court, we're going to clean this -- we're going to clean this road destination thing up. The Court is going to tell you it's -- the process does not matter.

So after manufacture, the stents are stable, they're chemically -- they are not -- they are not chemically capable of dissolving into one another, and we know that because they don't.

Now, do you remember -- it got a little funny when Mr. Offor was saying, well, is it still separated after one month? Is it still separated after two months? And he went all the way through. He had to admit it, yes, yes, it was almost like as the months went on, the air was kind of coming out of him because he kind of realized what was going on. (Mumbles.) Yes. The air comes out of their entire theory. The phases remain separated.

Now, this is -- the really -- this is the first time -- I have got to admit this is the first time, and I have been doing this 32 years. 40th jury trial, first time this has ever happened. An expert gets up there and contradicts the sworn testimony of the chief design engineer of the company he's testifying for and he never explained it.

They never said, well, it appears you disagree with Dr. Chen, could you tell us why? They never asked the question. They never -- I was sitting there going -- I was waiting for it. I actually had notes on my pad waiting to write because I was curious myself. They never asked him.

Boston Scientific's FDA submissions always -- state the phases are always separate. Dr. Mooney never looked at the language about phases. He couldn't -- they didn't even try to explain it. It's not explainable.

And then Dr. Allocco's sworn trial testimony states "The polymer on the SYNERGY stents is thread-like." In other words, the exact to scale, polymer fiber that we held up in front of him, he said it's thread-like. And then, again, how does Dr. Mooney respond to that? "Well, it's not the same -- it's not the same exact fiber, it's not the same exact polymer."

That has nothing to do with it, it has nothing to do with whether it's thread-like. As a matter of fact, when Mr. Offor cross-examined, him he even said that the material is not a consideration.

So if it's not the size, it's not the color, it's not the shape, what is it? Well, it's not thread-like, because if it's thread-like they infringe. That's why it's not thread-like. There's no other reason.

If you're looking at something, what do you see?

You see it's serpentine, you see the course, you see its depth, you see its shape. He was asked about every single thing that you can see and said "does that mean it's not a fiber?" He said no. So what was he looking at?

All right. Let's go to validity. Infringement -- I think that's crystal clear, I hope.

Validity. Clear and convincing evidence, proof by clear and convincing evidence is a higher burden than preponderance of the evidence. And we know why. We know why because patents are presumed valid because you go through, you pay your maintenance fees, you pay your issue fees, you go through years of prosecution. You have your back-and-forth with the examiner. It's looked at carefully.

And that's why, once you get your patent from the United States Government, if someone wants to come in and try to invalidate it, they have to prove it going beyond a preponderance. They have got to prove it by clear and convincing evidence. They did not come close. Because their only evidence -- their only evidence is Dr. Mooney, that's it.

And if any of you think that the quality of evidence provided by Dr. Mooney is a quality of evidence that you feel comfortable being committed to an institution for, wow. If any of you think that the level of evidence that Dr. Mooney provided would be good enough to take the

children away from you by the state, wow. It doesn't even come close. It's not there -- it's not even any evidence because nothing he said had any credibility or basis.

Now, the other thing they completely forgot, and this is in your jury instructions, this is right from the Court, what the Court will give you.

The prior art in this case -- and by the way, we call it prior art because it's dated earlier; that's the only reason why it's called prior art. It doesn't mean it has anything material to do with the patent. Anything dated before the patent is prior art.

It has to disclose everything. Song would have to disclose everything in the '296 patent and arrange -- and as arranged in the claim. So in other words, when you look at something to anticipate, you have to look at it and pretty much say, oh, yeah, that's the same thing.

They are picking odd words from here, odd words from here, odd words from here, and saying, oh, well, the same words, so, therefore, it has to invalidate.

That's not the test. And the test is the words that they claim are invalidating have to be arranged the same way as in the '296 patent so that when you pick it up, you say, oh, that's the '296 patent. That's clear and convincing evidence. That is not what they provided you.

Here is the gum. Here is -- first of all,

these, whatever this is, flavor, raspberry flavor, maybe it has got a little aspartame in it. Anyway, it's not a biodegradable fiber. That is not a biodegradable fiber. They mention it that maybe you could do it with a biodegradable fiber, theoretically. That's not teaching; that's just having a word.

The drug-containing regions are not dispersed -- this is dispersed throughout. This is a -- I don't know what that is. But it's not dispersed throughout the entire fiber.

There's no release at a varying time. In other words, they say, oh, well, here's where the release comes from. You chew it, and you can chew, what, you can chew slow; you can chew fast. The device itself does not release anything in Song. It doesn't release anything. If you want to release in Song, you'd have to chew it. Or if you stick it in your mouth, because it has opening at each end, these are channels, and it's open here, and it's open here. These are not open. Open here and open here. If you just stick the gum in your mouth, I guess some would come out at each end if you didn't chew it, maybe.

Now, I can give you examples of a case; that is not anticipation. If I've got a recipe for one cake and then there's another cake, I can say, oh, there's another cake. That doesn't anticipate. Anticipation requires that

the recipes be the same. Not even the ingredients. It has to be how much sugar, how much flour, how much -- how long you bake it, whatever. It has to be exactly the same, okay.

So what they've given you is they've said the cake or a building. It's not just a building; you got to have the blueprints.

The invalidity, defendant's burden of proof, they put a bubble gum patent up there. It doesn't come close to meeting the clear and convincing evidence standard, especially when you consider the source of the evidence. For my opening, I showed you the A-Rod clip. Mooney is the equivalent to A-Rod; he doesn't back anything except he says so.

Now, they said -- this is what they said in their opening statement. This is our only opportunity that Boston Scientific has to challenge validity. That's false. They could have filed an IPR. They could have filed an ex parte reexam, both of which do not require the clear and convincing evidence standard, and instead they chose to come here, instead of going to the Patent Office, to the experts who they say, oh, remember -- Dr. Mooney is not a patent examiner, but do you remember what he said? If Song had been in front of the patent examiner, this patent would have never issued.

Okay. Why isn't Song before a patent examiner

right now? Why didn't they file an IPR? Why didn't they file an ex parte reexamine? Because Mooney just said, all you got to do is throw Song onto the table before the examiner and no examiner would have allowed this patent. It's not believable. It's not credible. Because they had an opportunity to do it; they have an opportunity to do it right now, and they don't.

Okay. Every single element of Claim 1 has been proven. I don't think that that is reasonably in dispute.

Every single thing of Claim 11, Claim 11 just adds the fact that it gives a specific drug or a specific type of drug. It is undisputed that the drug is an anti-inflammatory. It's not disputed.

The composition of Claim 16, where we have these polymers, these polymers, poly glycolic acid, the PLGA; it's there. It's not disputed. So that's there.

The varying release of time. Now, unless you're going to -- all right. First of all, the word "variable" appears nowhere in Song. Nowhere. The word in Song is gradual. Gradual does not mean variable. Gradual can be at a set rate. It just means in small increments. Small increments, that's all gradual means. Variable means that the increments change, and so they -- so what's their thing? Oh, you would just -- this is Dr. Mooney -- you just know. You just know. Because it goes to zero. The drug at some

point is no longer in your body.

I want to thank you, and I really want to thank you, and I want to thank Judge Williams -- oh, one other thing. Thank you very much.

You're going to get an instruction that all the admissions that we read out of their answer are taken as true. They are -- they are not disputed, indisputable in the case. It's not evidence; it's facts. And in those facts they admitted they imported, they sold, they offered to sell, all those things. So all of those things have been admitted as far as infringement goes. The only thing at issue for infringement is whether the claims cover, one or more claims cover. All of the claims cover. Every single one of them.

So, thank you. Thank you. Thank you, Judge Williams. And on behalf of the University Board of Regents of the University of Texas, on behalf of TissueGen, on behalf of me, thank you.

There's a form that you're going to be asked to fill out. I'm not going to tell you how to fill it out; you know how to fill it out. And, again, it's kind of like the "because I said so." You're not seven years old. I don't need to tell you how to check a box, so, please, I appreciate everything you have done. I appreciate your attention. I can tell you've paid attention, and thank you,

and we look forward to you -- seeing you again soon.

MR. DROWN: Can we have a sidebar?

(Whereupon, a discussion was held at sidebar.)

MR. DROWN: Your Honor, there was extensive argument about IPR, Patent Office procedures which we could have entered to file, including a statement at the very end. We could file an IPR right now, which is literally false, and it was extremely prejudicial. Your Honor limited that at trial, and counsel went way over the top in his arguments, so we object to that, and we would request that the Court instruct the jury that IPRs are not relevant to their decision whether the patent is infringed or whether the patent is invalid. That's point number one.

Point number two is a procedural one, and it goes in arguments. Your Honor explained they cannot raise anything in rebuttal that they didn't raise in opening -- beginning argument. They did not mention the fact that we have a written description in the closing which they are finished with. They did not mention one thing about written description, so we ask that they cannot mention one thing about written in response to rebuttal.

MR. SHORE: I don't have the burden of proof on written description; that's a pure rebuttal topic. I can rebut a full rebuttal topic. I have to -- what I have the burden of proof on, I don't have to say invalidity. Nothing

in my closing argument because I don't know what they are going to say, and I think the Court already said that before, I don't know what they are going to say.

THE COURT: Understood.

MR. SHORE: As to the first step, I agree with one thing what I should have said is they can still file an ex parte reexam. You can file those up to six years after the patents. The IPR deadline has passed. If the Court would like to say, ladies and gentlemen of the jury, they had a deadline to file an IPR. That deadline is passed, but they can still file an ex parte reexam. I apologize. I didn't make it clear I was talking about ex parte. What -- and I'd be happy that the Judge can still file an --

MR. DROWN: This is precisely what we didn't' want IPR on a trial of invalidity, Your Honor. This is nonsense. It's gotten so confusing for the jury about the rules of IPR. This is why it's 403 and why we objected. And they went way over the top, and they shouldn't have done it, and they did -- they cannot -- Your Honor, Courts have very clearly said you cannot sandbag in a closing, and not say what you're going to say and save it for a response.

THE COURT: So with respect to the statements about IPR --

MR. DROWN: We don't want that highlighted.

THE COURT: It seems to me -- so you asked for a

curative instruction.

MR. DROWN: That it be completely disregarded.

MR. SHORE: They are the ones who brought it up in opening, I agree. I thought what I said -- and if I said something different, I thought I said they can still go to the Patent Office right now and --

THE COURT: I think you said more than that. You said more than that, so the question now is -- it seems to me that they should be told to just disregard the statements made about IPR. Is that --

MR. SHORE: Um --

THE COURT: Or we can tell them whether or not a party has filed an IPR bears no burden on whether the accused products meet the claim.

MR. SHORE: I think that's the way to do it.

MR. GROSS: Or invalidity.

MR. SHORE: No, no.

MR. GROSS: Or invalidity. That has nothing to do with whether --

MR. SHORE: That's what he was taking about.

MR. GROSS: The prior art has all the limitations, whether the written description has nothing to do with either. Either what Your Honor said they should disregard it or whether or not a party has filed an IPR has no bearing on the questions of infringement and invalidity

that you are to decide is fine with us.

MR. SHORE: It goes to credibility. They said in opening, this is our one and only chance.

THE COURT: You did say that.

MR. SHORE: That is a false statement. They can file a re-examine ex parte six years after. They had a year before suit was filed to do an IPR, they could have done that. I'm perfectly happy if they want to highlight this. I'm perfectly happy that if you want to instruct them: What Mr. Shore said was not technically correct. A deadline to file an IPR was one year after filing the suit, but the deadline to file an ex parte reexamination is six years after the expiration of the patent.

MR. GROSS: That just -- go ahead, Your Honor. I'm sorry.

THE COURT: I think that, frankly, defendants did say, we did see the statement that the plaintiff claimed the defendant said in the record. With that said, I do think, you know, in your closing you went beyond what we had discussed. So the question now is whether we say anything to further highlight it or whether we say that -- whether or not a party filed an IPR has no bearing on the issues that you're being asked to decide.

MR. SHORE: That's fine.

MR. DROWN: That's fine, Your Honor. And then

the rebuttal, they can't talk about written description because they didn't raise it in their opening argument because if they are going to do that, then we get a rebut to that because we bear the burden of proof.

THE COURT: Right. You bear the burden of proof, so they, with respect to -- you bear the burden of proof on the written description, so they didn't say it because they don't bear the initial burden of proof. You get to say it in your closing and then on his rebuttal, he'll address it.

MR. DROWN: For the first time in the case we don't get to respond to that; that's the problem. The point is, if they get -- they go first on infringement and invalidity, say their whole thing. Then we go up and say our whole thing, they get a rebuttal of five to ten minutes on whatever they want, because we do not know what they are going to say. And if they are holding back, then we should get a rebuttal after them because we bear the burden.

MR. SHORE: If they want to rebut my rebuttal on that one issue of written description, I don't care.

THE COURT: All right. You can have rebuttal on that one issue.

MR. DROWN: Thank you, Your Honor.

(Whereupon, the discussion held at sidebar concluded.)

THE COURT: Ladies and gentlemen of the jury, whether a party filed an IPR or not has no bearing on the issues you're going to be asked to decide.

Defendants.

MR. DROWN: Good afternoon. This is the first time we've had a chance to talk. It's an exciting day, exciting afternoon for many reasons, one of which is after trial every night I call home, I have a 7-year-old, and he knows what a judge is, but he doesn't know what a jury is. I just tell him, you know, it's a bunch of people that get to decide stuff, so he, every night when I call home, asks, Have you got to talk to the people yet? And I said, no, but today I get to tell him I get to talk to the people.

And this is important. This is an important case to Boston Scientific because this is a case where words matter. In patent cases, words matter and rules matter. And this is a case where a party got an invention, got a patent on a very specific polymer fiber that was a thread-like structure, not a thread-like shape, a thread-like structure. And they got that patent after four years of being rejected by the Patent Office. And at the end, they put in the word "immiscible." Despite the fact that when the inventors submitted their invention disclosure to the University, it said nothing about immiscible phases.

When they filed their patent with the Patent Office -- we have the certified record, this is it, it's right here. When they filed their patent application, it said nothing about immiscible phases until the very end. And when you look at the patent, you can read it front to back, the specification is everything before the claims at the very end. The claims that we're talking about, those are at the very end. Everything before that, that's called the written description or the specification of the patent. "Immiscibility" is not mentioned once.

And they got this special patent on a polymer fiber for a reason, because that's what they were doing. They were making only fibers. You saw -- Dr. Nelson was on the stand and Mr. Gross was asking him questions about all of the images, does that have metal, does that have metal, does that have metal? They were all just fibers. The whole thing was a fiber. Everything they were making was just a fiber. There was no metal stents, nothing. They got a patent on a polymer fiber, not a polymer coating. That is scientifically different in polymer science. Words matter in patents.

And we do not have a polymer fiber that is a thread-like structure. And I'm going to walk through all kinds of evidence on that. And I want you to remember those words: Thread-like structure, not shape. That's not my

we do not have a polymer fiber, we do not have immiscibility, it's a distraction.

The other one is this -- all this stuff, okay. The Court construed it, it's not thread-like shapes, so quit talking about shapes of bolts and rubber bands that aren't in evidence. And then we got to, you know, it's thread-like shapes not thread-like -- it's thread-like structure, not shapes. We get to these particulate documents that we keep going to.

The particulate documents are just that, they are trying to say what are the shapes of little pieces that could theoretically chip off. That's it. And they went to this. This one. A lot. And kept saying Boston Scientific kept saying this. Dom Allocco explained that Boston Scientific wasn't saying anything. This is a document where it's a discussion of the literature. And the literature is talking about particulates and saying, all right, let's classify these by size and shape. And then when you get to shape -- okay. Let's go down to shape. It's shape of particulates. And this is a study by Andrews and Binkert talking about shapes, and then Andrews and Binkert are talking about particulates with large aspect ratios. Yeah, the shape of a piece that might break off. It has nothing to do with an actual coating that it's made of.

And it just kept going. They kept talking about

this. But it's a distraction because that's just literally saying, I want to call you, what is the shape, not what is the thing made of.

If your paint chips off your house, it's still paint. It's just in a particulate shape laying on the ground. Dr. Mooney explained that too. I wouldn't look at this and say, oh, the paint on my wall was fiber because it fell on the ground.

And then Strickler and Weber, I mean they briefly touched on this. They made a big deal out in the opening, and then it kind of got dismantled during trial. But this is Strickler and Weber, really quickly. The point is we're talking about Strickler and Weber when it has nothing to do with the SYNERGY stent because your expert admitted that.

Dr. Pitt, here's Dr. Pitt. "You also understand that there can be a commercial embodiment; in other words, an actual thing that's made and sold, that is something sold that can be related to a patent. You know generally that, right, sir?"

"Yeah."

"Okay. Let's keep going. Why don't we do this, tell the jury everything you know about an actual Boston Scientific device, not the patent, apart from a patent, relating to Strickler."

"Well, I don't know of any."

So why are you talking about Strickler when it has nothing to do with any device, let alone SYNERGY? A distraction. You compare the claims of the patent they are asserting to SYNERGY, not some other patent. That's what the Judge is going to tell you to do.

It gets worse. That Weber patent, how about Weber? Can you tell the jury what specific device you've seen that relates to someone named Weber? Well, I haven't seen one.

So quit talking about Weber and trying to say Strickler and Weber have something to do with SYNERGY, they don't; your own expert is admitting it.

Dr. Mooney explained did Strickler had anything to do with the roll-coating process with the SYNERGY stent? No.

And then they did this in the opening and they did it again here, they put this quote up from Dr. Chen, having the implication that Dr. Chen was talking about the SYNERGY patent, but what they didn't do is show you -- or not the SYNERGY patent, the SYNERGY product. What they didn't do is show you that right before this Dr. Chen said something -- and this is what she said, right before this.

(Video clip played.)

"Well, first of all, not the same as the SYNERGY

technology. It's totally different."

(Video clip ended.)

So she, agreeing with Dr. Pitt, is saying in this has nothing to do with SYNERGY. So this is a distraction that they keep talking the Strickler and Weber things.

And Weber -- when you get to Weber, it actually helps us; Weber became our friend. Because Weber -- I don't know if you caught this, but Weber actually distinguishes between fibers and coatings on stents. This is what Weber says, he's talking about the advantages. This -- by the way, these are all -- Strickler and Weber are all made by spinning fibers, that's what these patents are about.

And he's saying, well, additional advantages of the present invention include one or more. Here's two. When one applies a coating directly to a substrate, one generally has to be careful that the processing does not adversely affect the substrate.

With the present invention, this is not necessary. So it's distinguishing between coatings and fibers.

And then it goes, again, number 3, in the case of a stent, the fiber can be better distributed than a cell structure in a stent, being uniform to drug delivery.

In other words, unlike coated stents... this is

the patent.

Coating polymer fibers in polymer coatings are scientifically different.

So here's the big question: What does the evidence show and have they proven it? Their case went backwards. Their only expert got up and said, "I'm not giving" -- "I'm not giving this opinion."

Their inventor didn't even look at the device. And their only other witness, who said nothing.

Let's look at the evidence. Now I'm just going to march through evidence.

Experts. Dr. Mooney -- you know, sometimes in cases you have to lay upon a battle of the experts. In this case, their expert said, "I have no opinion." But let's just talk about, you know, why didn't they go and ask Dr. Mooney about his opinion, why didn't we do that?

Well, this is Claim 1 from the '296 patent, their patent. If you go to Claim 1, the claim with -- the claim at issue, and you go just a smidge up, let's do that. There's Dr. Mooney. Why would Dr. Mooney be cited in their patent?

Because Dr. Mooney, according to even these inventors, is a renowned expert in this area. They couldn't stop citing and quoting Dr. Mooney because he is the preeminent expert in this area, According to their

inventors, who cite them in their own patent.

That's why we went to Dr. Mooney and said, "Dr. Mooney, can you look at this? This is an important case for us."

And sometimes you just want to, like, get a sense, like, who might, you know, have just a touch more experience in this area. These are some things you can look at. One of them -- a number of patents, okay, Dr. Mooney. A number of publication, okay, Dr. Mooney. Scientists on the lab -- and I'm not sure what Dr. Pitt has. Number of times cited, not sure what Dr. Pitt has.

But here is a number -- one that is kind of interesting. Member of the National Academy of Engineering. Do you remember him talking about that? Abraham Lincoln created those to help the United States of America with the most critical scientific problems. That's the type of scientist he is.

When America has the most difficult science problems, it's somebody in these academies, and Dr. Mooney is in two of them. That's why we went to Dr. Mooney.

And he said there's nothing thread-like on this coating.

Dr. Pitt said, "I'm not giving an opinion on that."

And it got worse. If you didn't catch this, I

thread-like.

And here's our process. We have a bare-metal stent made of platinum chromium. Not a fiber. Platinum chromium with no polymer fiber on it. No threads on the bare-metal stent. The bare-metal stent is then spun through one turn of a polymer coating solution. No polymer fibers in the solution; it's just liquid coating, and it's pulled up. That's it. When you take a bare-metal stent with no polymer fibers and roll it through a coating solution with no polymer fibers, you getting a coated stent with no polymer fibers. It's this: One plus -- zero plus zero is zero.

Our process does not cause the stent to have a polymer fiber or a thread-like structure. It causes the stent to have a coating on the outside. And by the way, I mean, it's not around here. It's that thing they dangle around. You can't remove the coating. There's not a thing where you can take the coating off the SYNERGY stent. It's on there. You can't peel it off and say, see, I'm holding it. Anything. Dr. Allocco explained that; you destroy the stent. It's on there.

So this is the process. Their case went backwards. It's their burden. No fiber. And if you don't have each and every limitation, so no fiber, no infringement. And so the first question on the verdict

form -- this is the verdict form you're going to get -- "Did they prove by a preponderance of the evidence that Boston Scientific directly infringed one or more claims of 11 -- 1, 11, 17, or 26 of the '296 patent?" We'd ask you to find No for all of them.

And I just want to explain one thing. Claim 1 is called the independent claim; the other claims, 11, 17, and 26 depend on Claim 1, so that means it has all the things in Claim 1 plus a few more things. If you don't infringe Claim 1, you don't infringe any of the claims. So it's your -- up or down, No on Claim 1. It's No on the rest, because all of those depend on Claim 1. You'll see that in the instructions.

And then there's this highlighted part that says, "If you answered No to Question 1 as to any given claim, you should skip Question 2 as to that claim," because Question 2 is simply the same question, but for Boston Scientific Limited. So one and two rise or fall, and you can follow that direction there. But No because we don't have a fiber; that's the first reason.

The next is immiscible. And the Court's construction of immiscible is "incapable of dissolving into each other," and that means none. Incapable. It doesn't mean relatively immiscible, substantially immiscible, or a little dissolving is okay. That's why words matter. It

says "incapable of dissolving into each other."

And Dr. Mooney explained the drug-rich domains and the PLGA-rich domains, in fact, dissolve into each other; yes, they do. How do we know that? Testing. We tested. We tested.

Before this lawsuit, before there was any issue about this, before we knew this was going to come up, we reported to FDA our findings with actual scientific tests, and this is one of them that they say is scientifically accurate. Dr. Mooney and Dr. Allocco both explained that if the glass transition number in red there, if there was no dissolving into each other, that has to be zero, and it's not. And that's why we reported slight miscibility. Remember, it's incapable, and it's slight miscibility. That means they dissolve into each other.

What did the plaintiffs do? You can do the same tests; say we're wrong. Show us your glass transition tests. It's your burden, remember. You have to prove we're immiscible. It's your burden. Show it. That's what you do in science cases with patents is you show juries science and tests. They didn't do any. It's called not meeting your burden.

There was the viscose test, the Raman spectroscopy, and Dr. Mooney also showed that there was slight immiscibility.

And, by the way, I heard this in the opening, too, so I wrote it down and I put quotes around it: "Only time it matters is the finished product." That's the only time it matters, they say, for the testing.

Let's see if this was testing on the finished product. If we could pull up Defendant's Exhibit 16.4. Dr. Allocco talked about this. We asked him, what was this testing on? And what does it say here, right in the middle note?

"Note: Unless specified, all tests are SYNERGY FHU-type finished products."

All right. Go back.

And why don't they want to test? Because they are afraid what they are going to find is what we found, and that there's no immiscibility; that there's slight miscibility. And there's a consequence to not testing and that means you're not proving your case. Here's another problem: Dr. Pitt said -- this is a question. "So if there's slight miscibility between the two cases, would you say it's immiscible?" And he has says, "Yeah, if there is slight miscibility, there's two phases still." Well, if there's slight miscibility, that means they are capable of dissolving into each other. That's the Court's construction. And this is what Dr. Pitt then said, okay. He said, basically, don't worry about immiscibility. All I

want to know is if there's two phases. If it's agreed there are two phases, okay, we got two phases, there's literally no investigation you need to do to determine whether it's immiscible, in your opinion, correct? Yeah, except to verify there are two phases, correct. Okay. Yeah, but the claim requires the first and second phases to be immiscible; you have to look to see if it's immiscible. He's just trying to throw this away because they don't have testing to show they have this. Because we have testing to show they don't.

No testing. Each and every limitation has to be shown in the SYNERGY. We're missing two. For two independent reasons, there's no infringement. Two brick walls. And this is the thing, if you find that an independent claim is not infringed, there cannot be infringement of any dependent claim. That's the thing, of if you find no infringement for Claim 1, the others are no. So no on Question 1.

Invalidity. We have the burden, and our only burden to prove by clear and convincing evidence that the patent is invalid. So instruction about presumption of validity or anything like that in the jury instructions. We have the burden of clear and convincing evidence. They don't get to tell you the law, the lawyers; Judge Williams tells you the law.

Plaintiffs did not invent the biodegradable polymer fibers with the drug.

And this is the idea. There's several reasons why you're asked to do this because, number one, the Patent Office might not look at the prior art. We know that happened here, and I'll show you the evidence of it. Number two is, you know, no process is perfect. That's what the instructions and the video said. Some mistakes are made. And we'll talk about that.

No written description. Written descriptions requires to ensure that the inventor invented the claimed subject matter and was in possession of the full scope of the claimed invention. And you have to read the patent specification as of the effective filing date. That was back in 1999.

And if the patent lacks adequate written description, it's invalid. So the specification must describe the full scope of the invention, including each element, including this one, immiscibility. We know it happened. We walked through this with Ms. Schultz. This is the sequence rejected on biodegradable polymer fiber with the drug, rejected again. Then they added immiscibility. Dr. Nelson simply wasn't aware when he was working, that somebody else had already had the idea of a biodegradable polymer fiber with a drug. I mean, he just wasn't aware.

Now, words and rules. Dr. Mooney and Dr. Allocco ran away from any words they didn't want to say. They just ran away from them. You saw it. You can judge their credibility on that. Dr. Mooney did not apply the rules of science. He just made stuff up and said it and gave you no explanation where it came.

Now, we didn't run our own test. That's interesting. So why would we rerun tests when the tests they gave the FDA prove our case? I mean, what were we supposed to do? Were we supposed to go out and buy several millions dollars' worth of equipment and go and rerun the test and ask them to help us cooperate and giving us all the samples and run through the whole process?

I got pulled over, unfortunately, the other day running a little fast. I was going 76 in a 70, which does not seem to me like it's too fast. I did not need to go and rerun the radar detector to know that I was going 76 miles an hour. That was there. You don't have to rerun tests when the tests prove your case.

They also said, oh, well, Dr. Pitt answered with leading questions. Calculated that, you can calculate it, too. Dr. Mooney answered "yes" or "correct" 87.3 percent of the time. They told him what to say, and he said "yes" or "correct." And then he would run -- then he might say some other things, but 87 percent of the time he simply answered

"yes" or "correct" when asked a question.

Now, let's talk about Dr. Dahm. Dr. Dahm was on the payroll of Boston Scientific. Dr. Dahm has not been involved in polymer science for 16 years. Nothing to do with this at all for the last 16 years. She did not have the claims construction. She did not have the instructions from the Court about what the claims mean. She also, when they played that clip for her, they said why don't you believe, why do you think it's absurd, and she said, Oh, it's because the patent doesn't use the procedures -- I mean, the -- they don't use the procedures, and then she was talking about the embodiment, not the claims.

So what she was saying is because they don't make it the way the patent describes making something, the procedures, that's why she didn't think there was infringement. You're going to be told the procedures, the processes are not at issue. She's a paid Boston Scientific consultant, she didn't have the claims construction, she didn't have any of the evidence that you've seen, she didn't -- so Dr. Dahm, being their expert, she didn't have anything. She didn't apply any scientific principles, nothing.

Now, this one also, we have not said in our position on Song that Song is -- that Song doesn't include immiscible. That's not -- that wasn't the argument. That's

one thing, but it's weird. It's really weird because they say Song is immiscible. But Song has two phases in contact. Song is doing exactly what the '296 patent does. You have the two phases in contact, they're exchanging molecules, okay, they both have polymer in them, they'll exchange molecules, but they remain distinct, separate. And they're saying, oh, for invalidity, that's not partial dissolving, there's no partial dissolving in invalidity, those two things are separate. They are immiscible. But if you want to do it in infringement, oh, suddenly if they are touching and they're exchanging molecules, that's not immiscible.

When lawyers tell you that Song is immiscible and their product is not immiscible, or the '296 patent is not immiscible, that is what we call junk science. You cannot say that Song is immiscible with two things -- two phases in contact and then say, for the purposes of our patent, that two phases in contact is impossible to be immiscible. So they are taking completely, totally inconsistent positions.

Now, they said, oh, well, Dr. Mooney was cited in the patent. No, the reason why it was cited is they took a table of polymers that was listed in his article, and because they don't violate intellectual property, they have to attribute the source of the table. So that's what they did, and they didn't even use the exact table. They put --

And the fact -- and we're not enforcing a handwritten three-page form that you give to the University to start the process of determining whether or not you're going to get a patent. That is not what we're here enforcing. And they know that.

We're not enforcing his inventor notebook. They say, oh well, the word "immiscible" isn't in his inventor notebook. That inventor notebook is full of examples of emulsions. It's full of examples of the same things that are actually in the patent that included two phases.

And, as a matter of fact, that notebook says two phases constantly. And you heard that if the two phases are there together, in the same place, and they are not actively interacting, they are dissolving into one another to form a single solution, then it is immiscible. He didn't talk about that. They don't want to talk about anything at all that has to actually do with the case or the technology.

Song does not disclose discrete regions.

Can you put up the slide that is Song -- the two figures from Song. If we don't have time to get to it -- remember, the -- hang on, leave this up.

The "discrete drug-containing regions dispersed throughout the fiber." Song doesn't do that. Song has a channel that includes something that can come out of either end, but that channel, the -- there is no dispersion of

discrete regions throughout the fiber. That is the little balls, the little spheres that are all over ours, that is not Song. And they know it. They ignore the language they don't like.

So I want to -- taking little out-of-context snippets, they never answered any of the questions that I brought up in opening. Dr. Chen is not here. She said a coating can be a fiber. And that was now. That wasn't back in 2004. She said now a coating can be a fiber. She's not here.

They don't deny it. They can't deny it. Well, maybe Dr. Mooney denies it, but Dr. Mooney did not design the product, Dr. Chen designed the product, and she said a coating can be a fiber.

And then they said, oh, well -- talking about the Strickler and the other patent, earlier patent. We're not saying that they infringe their own patents. We're not saying the SYNERGY stent practices those inventions. What we're saying is the use of the term "fiber" in those patents, what the shape, the structure of a fiber in those patents is exactly like the structure in the fiber in the '296, and it's exactly the structure in the fiber of the SYNERGY stents.

So, again, you're all here because you have common sense, you can read, you can write, you can see.

There is overwhelming evidence of infringement. There is no evidence of invalidity based upon anything.

If you pick up -- if you pick up Song and you hold it next to the '296 patent, and you look at the claims of Song, and you look at the claims of the '296 patent, they are nothing alike. It is a gum flavor distributor. And yes, if there's a throw-away comment, and it is a throw-away comment. There's nothing about therapeutic agents in the claims of Song. There's nothing about drugs in the claims of Song. Nothing.

So what you end up with is you have -- they want to invalidate a patent, invalidate a man's life work based upon a bubble gum patent. That's what it is.

Use your common sense. I know you will. Do the right thing. I know you will. I'm not worried about this at all. So, please, come back, bring us your results. And we'll wait for you patiently. Take your time, do whatever you need to do. But The University of Texas and TissueGen and my clients are ready to hear your decision and we look forward to seeing you again soon.

MR. GROSS: On written description, just maybe one point, you I'm just going to say one point for 90 seconds.

They said Dr. Pitt showed you four examples of something about immiscibility and emulsions in the '296

claim are often referred to as "claim elements" or "claim limitations." The coverage of a patent is assessed claim-by-claim. When a thing (such as a product or a process) meets all of the requirements of a claim, the claim is said to "cover" that thing and that thing is said to "fall" within the scope of that claim. In other words, a claim covers a product or process where each of the claim elements or limitations is present in that product or process.

You will first need to understand what each claim covers in order to decide whether or not there is infringement of the claim and to decide whether or not the claim is invalid. The first step is to understand the meaning of the words used in the patent claim.

This case involves two types of patent claims: Independent claims and dependent claims.

An "independent claim" sets forth all of the requirements that must be met in order to covered by that claim. Thus, it is not necessary to look at any other claim to determine what an independent claim covers. For example, claim 1 of the '296 patent is an independent claim.

The remainder of the claims in the '296 patent are "dependent claims." A dependent claim does not itself recite all of the requirements of the claim, but refers to another claim for some of its requirements. In this way,

the claim "depends" on another claim. A dependent claim incorporates all of the requirements of the claims to which it refers. The dependent claim then adds its own additional requirements. Therefore, to determine what a dependent claim covers, it is necessary to look at both the dependent claim and the other claim or claims to which it refers. For example, claim 11 of the '296 patent is a dependent claim that depends from claim 1. A product that meets all of the requirements of both the dependent claim and the claim(s) to which it refers is covered by that dependent claim.

It is my job as a judge to define the terms of the claim and to instruct you about the meaning. It is your role to apply my definitions to the issues that you are asked to decide.

In this case, I have determined the meaning of the following terms of the asserted claims of the '296 patent:

First term, "first phase." That's been construed to mean "the polymer portion of the fiber."

"Second phase" has been construed to mean "the discrete drug-containing regions dispersed throughout the fiber."

The claim "immiscible" has been construed to mean "incapable of dissolving into one another."

The term "fiber" has been construed to mean that

it has its "plain and ordinary meaning, to a person of ordinary skill in the art, which is a 'thread-like structure of any length or shape.'"

Further, the Court has found that the '296 patent is not limited to any specific manufacturing process. You must accept my definition of these words as being correct. It is your job to take these definitions and apply them to the issues that you are deciding, including the issues of infringement and validity. The beginning portion, also known as the preamble of a claim, often uses the word "comprising." The word "comprising" when used in the preamble means including, but not limited to, or containing, but not limited to.

When "comprising" is used in the preamble, if you decide that an accused product includes all of the requirements of that claim, the claim is infringed. This is true even if the accused product contains additional elements.

For any words in the claim for which I have not provided you with a definition, you should apply their ordinary meaning in the field of the '296 patent. You should not take my definition of the language of the claims as an indication that I have a view regarding how you should decide the issues that you're being asked to decide, such as infringement and invalidity. These issues are yours to

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

BOARD OF REGENTS, THE UNIVERSITY OF TEXAS SYSTEM et al., ) Case No. 18-392-GBW

Plaintiffs,

v.

BOSTON SCIENTIFIC CORP.,

Defendant.

- - - -

Wilmington, Delaware
Tuesday, January 31, 2023
*Trial Volume 5*

- - - -

*BEFORE: HONORABLE GREGORY B. WILLIAMS*
*UNITED STATES DISTRICT COURT JUDGE*

- - - -

*Michele L. Rolfe, RPR, CRR*

APPEARANCES:

STAMOULIS & WEINBLATT LLC
BY: STAMATIOS STAMOULIS, ESQ.

-and-

THE SHORE FIRM
BY: CHIJIOKE OFFOR, ESQ.
COREY LIPSCHUTZ, ESQ.
MICHAEL SHORE, ESQ.

Counsel for Plaintiffs

FARNAN LLP
BY: MICHAEL FARNAN, ESQ.

-and-

FAEGRE DRINKER BIDDLE & REATH LLP
BY: TIMOTHY GRIMSRUD, ESQ.
CHAD DROWN, ESQ.
LAUREN BARTA, ESQ.
DAVID GROSS, ESQ.
KATHERINE RAZAVI, ESQ.
EVAN KLINE-WEDEEN, ESQ.

Counsel for Defendant

they'll make on all the units imported during this time period. It's just what they've already recognized.
Q. Well, if importation is an active infringement, why wasn't the importation included?
A. Well, as I mentioned, in order to recognize the sale, it needs to have been purchased, you know, by a hospital, and, so, [redacted] they were considered infringing as soon as they were imported into the US.
Q. Does Boston Scientific dispute this number of units sold during the period that you calculated?
A. They don't.
Q. All right. Let's go to slide 10.
How did you go about calculating the per unit profit, the difference between selling the infringing SYNERGY stent and the noninfringing Promus stent?
A. I think that's slide 9, but --
Q. Oh, I'm sorry. Let's go back to slide 9. I skipped one, sorry.
A. That's all right. Step one was to determine the profit per unit of the SYNERGY stent, so that was anywhere

from [redacted] profit per unit. Then we looked over the same time period, and, again, [redacted] And then to the extent that 100 percent is deemed not attributed to the patent at issue, I then looked at other ways of apportioning that, and so we'll talk about all the other different considerations with respect to apportionment. And largely, what Dr. Garratt will tell you, as a clinician, what drove his purchase decision was 90 percent bioabsorbable polymer and 10 percent the other aspects of the SYNERGY stent.

Q. All right. So let's be clear. When we talk about this [redacted], is that difference in part based upon the fact that [redacted]

MR. DROWN: Objection. Leading.

A. Um --

MR. SHORE: Wait, wait. There's an objection.

THE COURT: Sustained.

BY MR. SHORE:

Q. What are some of the reasons why these numbers would

vary so much, [redacted] -- in different customers?

A. Again, yeah, we talked about these rebates, so if you figure out what they -- what they actually plan to make per unit -- in premium, [redacted]. So at the 90 percent margins that would be [redacted] additional profit. What we see that they actually made was [redacted], so that leads me to believe, because I didn't have the data to calculate it, that many customers took them up on their offer to get the rebates because [redacted]

Q. What is a royalty base?

A. So the royalty base is just the number of units, and then ultimately we'll have a royalty rate for this incremental profit that will multiply that to equal our royalties.

Q. All right. Are any of these amounts disputed by Boston Scientific, the SYNERGY profit per unit or the Promus profit per unit?

A. We agree on all the costs of goods sold, and the revenue per unit. I think on mine, I deduct additional royalties paid per unit, where I don't think Mr. Haas has done that in his calculations. But again, his calculations are not really analytical approach; he's taking a different

"What amount of damages have UTBOR and TissueGen proven by a preponderance of the evidence" -- "proven by a preponderance of the evidence that they are entitled to a reasonable royalty for Boston Scientific's infringement of the '296 patent." And then we'd add "between November 20, 2017, and August 18, 2020?"

But I believe --

MR. LAHAD: I just don't think it needs to be in there, Your Honor. The Court is going to have its instructions in section 4.1. I just don't think it's necessary. It's superfluous and --

THE COURT: We all agree that's the damages period, right?

MR. LAHAD: Yes.

THE COURT: So let's just make it clear for them.

MR. GRIMSRUD: Thank you.

MR. LAHAD: Thank you, Your Honor.

-- Question 3 -- between November 2017 and August 18, 2020.

THE COURT: The jury has advised that it would like to stay tonight to try to complete its deliberations and -- but it would like us to wait on dinner, they'll let us know whether they want dinner or not.

(Whereupon, the jury entered the room at

4:11 p.m.)

THE COURT: Okay. Plaintiff?

MR. OFFOR: Plaintiffs call Dr. Kevin Nelson to the stand.

(Kevin Nelson, having been previously sworn, testified as follows:)

THE COURT: All right. You may begin.

MR. OFFOR: Your Honor, before we begin, plaintiffs would like to move exhibits -- Plaintiffs' Exhibits 65, 67, 69, 63 -- sorry, 65, 67, 69 and 73 into evidence.

MR. GRIMSRUD: No objections other than the prior objections.

THE COURT: Admitted subject to the prior objections.

(Plaintiff Exhibit Nos. 65, 67, 69, 73 were admitted.)

DIRECT EXAMINATION

BY MR. OFFOR:

Q. Good afternoon, Dr. Nelson.

A. Good afternoon.

Q. Can you look behind your -- behind Tab 20 in your witness binder and tell us what that document is?

A. This is the investment presentation that I gave in the TCT conference in 20008.

MR. OFFOR: Your Honor, plaintiffs move Plaintiffs' Exhibit 26 into evidence.

MR. GRIMSRUD: No objection, Your Honor.

THE COURT: All right. It's admitted.

(Plaintiff Exhibit No. 26 was admitted.)

MR. OFFOR: Andrew, can you call up plaintiffs' demonstrative 1-14 from Dr. Nelson's presentation from last week.

BY MR. OFFOR:

Q. Dr. Nelson, you mentioned TCT, what is that?

A. TCT is an annual conference of interventional cardiologists and medical devices in that space.

Q. And on October 16th, 2008, did you show Boston Scientific a presentation at TCT?

A. I did.

Q. Who did you show that to?

A. Mary Beth Moynihan and Kevin Ballinger.

Q. And who were they at the time?

A. Both vice presidents at Boston Scientific. Mary Beth was, as I understand it, over companies that Boston Scientific would be interested in acquiring. And Kevin Ballinger was vice president of research and development.

Q. And what are we looking at the screen here?

A. Those are excerpts from that presentation.

Q. And so these are -- this is information that you

would have shown as part of that presentation?
A. That's correct.
Q. And so does that mean that you would have shown that sort of flat coil fiber on the screen?
A. Yes.
Q. And how about this cross-section in the middle of the screen?
A. Yes.
Q. And what are we looking at these two charts at the bottom of the screen?
A. The chart on the left shows the rate that PLGA degrades over time, and the chart on the right shows the rate the drug is released as a function of the degradation of the PLGA.
Q. And what about under here where it says, "Solid patent foundation," would that information have been included in the presentation?
A. Yes.
Q. Is the '296 patent listed?
A. Yes.
Q. Is The University of Texas listed?
A. Yes.
Q. And is TissueGen listed as an exclusive licensee?
A. Yes.
Q. Did you have communications with Boston Scientific

between October 2008 and May of 2009?
A. I did.
Q. And were those communications about TissueGen's technology and plans?
A. Yes.
Q. Was Boston Scientific interested -- or do you believe Boston Scientific was interested in TissueGen's technology?
A. Yes, I do.
Q. And why do you say that?
A. They expressed that in the e-mails.
MR. OFFOR: Andrew, if you could call up Plaintiffs' Exhibit 67, page 2 of that exhibit, and put it on the left, and Plaintiffs' Exhibit 73, page 1 of that exhibit, and put it the right.
BY MR. OFFOR:
Q. Dr. Nelson, what are we looking at on the left-hand side of this screen?
A. So this is an e-mail that Mary Beth Moynihan sent me in November of 2008 stating that she was interested in our technology.
Q. And was this about a month after TCT?
A. Yeah, roughly.
Q. And what are we looking at on the right-hand side of the screen?
A. So this was another e-mail from Mary Beth to me

stating that she and Kevin Ballinger who -- again, she states is vice president of R&D -- had reviewed our materials and were very interested in our technology.
Q. And who was Kevin Ballinger?
A. He was this vice president of research and development at Boston Scientific.
Q. After Ms. Moynihan -- so during this timeframe, are these the only e-mails between you and Ms. Moynihan during this time frame?
A. No.
Q. How many e-mails would you say you exchanged with Ms. Moynihan?
A. Three or four.
Q. At any time --
A. I don't know.
Q. At any time did they indicate they were not interested in your technology?
A. No.
Q. And after this last e-mail, you said it was sent May 26, 2009, right?
A. Correct.
Q. Did you receive any other e-mails from Ms. Moynihan at this time?
A. No, I did not.
Q. Did you hear back from Boston Scientific again?

A. No, I did not.

MR. OFFOR: No further questions.

THE COURT: Cross?

CROSS-EXAMINATION

BY MR. GRIMSRUD:

Q. Good afternoon, Dr. Nelson.

A. Good afternoon.

MR. GRIMSRUD: If we could pull up PTX 67, please. And it would be at page 5.5.

And the bottom e-mail, if you could blow that up, please.

BY MR. GRIMSRUD:

Q. Dr. Nelson, you see the e-mail from Kevin Cordell to Eric Simso, Joe Fitzgerald, and Charles McHann at Boston Scientific, dated October 7, 2008?

A. Yes, I see that.

Q. And who is Kevin Cordell?

A. Kevin Cordell was a member of TissueGen's board of directors.

Q. And you see Eric says -- sorry, this is Kevin Cordell is telling Eric, "Thank you for taking my call today. As stated, I am on the board of directors of TissueGen, a Dallas-based company."

Do you see that?

A. I do.

Q. "They are building a peripheral bioabsorbable drug-eluting stent. I am in the process of helping them make both physician and corporate connections."

Do you see that?

A. I do.

Q. And then do you see in the second paragraph, "I have been successful in getting them in front of all the major companies at the VIVA meeting?"

A. Yes.

Q. And he says then in the third paragraph, "if possible, I would like to arrange a meeting at TCT?"

A. Yes.

Q. To your knowledge, is that the first time TissueGen reached out to Boston Scientific?

A. In our corporate history, is that the question you're asking?

Q. In this interest -- in the interest in discussing this technology?

A. To my knowledge, yes.

Q. Okay. And this -- just to be clear, this was a member of the board of directors of TissueGen reaching out to Boston Scientific?

A. That's correct.

Q. And then a meeting was set up, ultimately, with you, Mary Beth Moynihan, and Kevin Ballinger at TCT as a result

On May 26, 2009, Ms. Moynihan e-mails you back. And she says, "Dear Kevin, thank you very much for your e-mails. I apologize for the delay in responding as we were all in Barcelona at the PCR meeting last week."

Do you see that?

A. Yes.

Q. And then it says. "Kevin Ballinger," and it talks about, "and I have reviewed your material." Do you see that?

A. Yes, that's correct.

Q. And then Ms. Moynihan says, "Our assessment remains that this is still too early a stage for us to invest. We are interested in your progress and very open to receiving your updates as appropriate." Do you see that?

A. Yes, I do.

Q. So on May 26, 2009, Ms. Moynihan again told you that TissueGen was too early stage for Boston Scientific to be interested in investing, correct?

A. That's right.

Q. In the ARCHER presentation that we're looking at, you don't accuse Boston Scientific of infringing the '296 patent, correct?

A. That's correct.

MR. GRIMSRUD: No further questions.

THE COURT: Redirect?

MR. OFFOR: Nothing further.

THE COURT: All right.

Next witness, Plaintiff?

MR. LAHAD: Your Honor, plaintiffs would next call Mary Beth Moynihan via video deposition testimony.

THE COURT: All right. We'll let Dr. Nelson step down.

MR. LAHAD: Your Honor, I don't think he's going anywhere, but can Dr. Nelson be excused?

THE COURT: Yes.

MR. LAHAD: Thank you.

(Video deposition was played for the jury as follows:)

THE CLERK: Would you raise your right hand, please. Do you solemnly swear the testimony you will give in this matter will be the truth, the whole truth, and nothing but the truth, so help you God?

MS. MOYNIHAN: Yes.

BY MR. OFFOR:

Q. Is it accurate that in or about October 2008, you and an individual by the name of Kevin Ballinger met with an individual by the name of Dr. Nelson during the 2008 TCT symposium?

A. I don't remember the meeting. We meet with -- we meet with a lot of people at TCT. I have had several

meetings over the years with Kevin Ballinger and -- and other people at the TCT meetings.

Q. In the middle of the document, do you see that there's an e-mail from you? It appears to be from you, dated November 12, 2008. It appears to be to Kevin Nelson and copying Kevin Ballinger regarding a TCT meeting?

A. I -- I do see it.

Q. Okay. And in 2008, you would have been vice president of business development; is that right?

A. Yes. And it says that on the signature.

Q. Okay. And -- and here, in this -- in this e-mail, you write, "Kevin, it was nice to meet you at TCT and receive an overview of your technology and plans. As we mentioned at the end of the meeting, Kevin and I wanted to take some time to consider your technology and request. As we mentioned during the meeting, BSC has decided not to make passive equity investments in early day technologies. While we think your technology and ideas are interesting, TissueGen is not currently at a stage in which it makes sense for BSC to invest."

Do you see that?

A. I do.

Q. Okay. And -- and so is this something that you would normally do with -- with individuals you have met at TCT, basically follow up with them and consider whether to make

investments in these entities?

A. Yes.

Q. All right. And do you agree, at least based on this e-mail, that Dr. Nelson presented to you an overview of his technology and plans?

A. I don't remember it, but, I mean, it was 14 years ago, so -- but I wrote it in the e-mail.

Q. Okay. And so based on this, these -- these e-mails here, it appears you received this particular e-mail; is that correct?

A. It was sent to me. I don't recall it, but it was sent to me.

Q. Okay. And you also said that you were following up on -- on your end, with folks on your end; is that right?

A. That's what I wrote. Or that's what this paper in front of me says. I don't remember it, but that's what this says.

Q. Okay. And so which -- you -- when you're following up with people on your end, would that have then meant following up with the people in the business groups that you were working with?

A. That is generally -- I don't remember this situation, but that was my general operating mode, yes.

(End of video clip.)

MR. LAHAD: Your Honor that concludes it.

Plaintiffs rest this portion of phase 2.

THE COURT: Okay. Plaintiffs rest.

Defendant?

MS. BARTA: At this time, Boston Scientific would like to call David Haas to the stand.

THE COURT: All right. Mr. Haas, take the stand, please.

(Whereupon, DAVID A. HAAS, having been sworn in, testified as follows:)

BY MS BARTA:

Q. Mr. Haas, would you please introduce yourself to the jury?

A. Hi, I'm David Haas, and I'm a managing director at Stout in our Chicago office. Stout is a financial advisory firm, and I specialize in analyzing the financial aspects of disputes and transactions involving intellectual property, things like patents.

Q. And how long have you been doing that kind of work?

A. I have been doing this -- this is actually my 35th year doing it.

Q. And how many cases have you performed damages accounting in?

A. I've performed damages accountings in well over 200 cases over the years. Quite a few of those have involved medical device technology.

to light until a later time period. It's something that is dictated in a Supreme Court case.

Q. And in this case, would that book of wisdom include the [redacted]?

A. It can, yes.

Q. And would it also include the fact that there was no clinical benefit proven to the biodegradable coating of SYNERGY over comparable second generation permanent coated drug-eluting stents?

A. I believe that would fit within that definition as well.

Q. And is it standard practice to consider the book of wisdom in a hypothetical negotiation?

A. In patent infringement cases, yes, it's commonly used.

Q. And does Mr. Lewis agree that the book of wisdom is an acceptable approach?

A. I believe he had something in his report that indicated as such.

MS. BARTA: No further questions.

MR. SHORE: No further questions.

THE COURT: All right. You may step down.

MR. DROWN: Your Honor, Boston Scientific calls Dominic Allocco.

THE COURT: Okay. Dr. Allocco, would you please

take the stand.

(Whereupon, Dominic Allocco, having been previously sworn, testified as follows:)

MR. DROWN: Your Honor, may I approach?

THE COURT: Yes.

DIRECT EXAMINATION

BY MR. DROWN:

Q. I'm going to be very quick, Dr. Allocco.

If you could look at Defendant's Exhibit 300 in the binder, sir.

Do you see that?

A. Yes.

Q. What is it?

A. This is a slide presentation from a meeting with Boston Scientific and FDA on October 1, 2008, on the project that ultimately became the SYNERGY stent.

MR. DROWN: We offer Defendant's Exhibit 300.

THE COURT: Any objection?

MR. SHORE: I'm sorry.

MR. OFFOR: I believe it's already in evidence, Your Honor.

MR. SHORE: It's already in evidence.

THE COURT: Okay.

BY MR. DROWN:

Q. Dr. Allocco, just generally, what is this

presentation about a drug-eluting biodegradable polymer coating on a metallic stent on October 1, 2008?

A. So it's a description of this stent project for a meeting with the FDA where we discussed several topics related to the stent.

Q. And when did the SYNERGY project development start?

A. I believe it began in 2005.

Q. If we go to page 7. Very quickly, sir, you see abluminal coatings and everolimus and PLGA, generally what is shown here?

A. Yes.

MR. DROWN: If we go to Defendant's Exhibit 301. We offer Defendant's Exhibit 301.

MR. SHORE: No objection, Your Honor.

THE COURT: All right. It's admitted.

(Defense Exhibit No. 301 was admitted.)

BY MR. DROWN:

Q. What is this, sir?

A. These are slides from a follow-up meeting with the FDA, again, also on a drug-eluting biodegradable polymer coating on metallic stents project.

Q. Did this relate to SYNERGY?

A. Yes, this is the project that ultimately became the SYNERGY stent.

Q. If we could turn to page 4. On the right side it

says "evolution," what's that?
A. Evolution was the internal name for the project -- for the stent that ultimately was commercially called SYNERGY.
Q. This presentation to the FDA talks about a coating that's abluminal; do you see that?
A. Yes.
Q. With these struts, do you see the picture there?
A. Yes.
Q. What's the sort of drug?
A. The drug is everolimus.
Q. What's the sort of polymer?
A. PLGA.
Q. What does this tell you about, by this time, Boston Scientific's stage of developing the SYNERGY product?
A. Boston Scientific had done extensive work on the SYNERGY stent by this time.
Q. Sir, before this lawsuit was filed, had you ever seen the '296 patent?
A. No.
Q. Before this lawsuit was filed, had you ever heard of the '296 patent?
A. No.
Q. Before this lawsuit was filed, had you ever heard of Dr. Nelson?

A. No.
Q. And before this lawsuit was filed, had you ever heard of TissueGen?
A. No.
MR. DROWN: Nothing further, Your Honor.
THE COURT: Okay. Cross?
MR. SHORE: No cross, Your Honor.
THE COURT: All right. Dr. Allocco, you may step down. Thank you.
MR. DROWN: Your Honor, the defendants call Aparna Bhave.
THE COURT: Ms. Bhave, you may take the stand.
(Whereupon, Aparna Bhave, having been duly sworn, testified as follows:)
BY MR. DROWN:
Q. Dr. Bhave, I understand that you may be a bit nervous, but this will be fast and painless, okay?
A. My name is Aparna Bhave. I'm a senior research and development fellow with Boston Scientific. I have worked there since 2005, and I lead the team that developed the roll-coat process for the SYNERGY stent.
Q. Ms. Bhave, before this lawsuit was filed, had you ever seen the '296 patent?
A. No, I had not.
Q. Before this lawsuit was filed, had you ever heard of

the '296 patent?
A. No, I had not.
Q. During the development of the roll-coating process that you oversaw and did, did the '296 patent have any role in that process?
A. None whatsoever.
Q. Before this lawsuit was filed, had you ever heard of TissueGen?
A. No.
Q. Ms. Bhave, plaintiffs are saying that Boston Scientific willfully and deliberately infringed the '296 patent; are you aware that?
A. I'm aware of that, yes.
Q. And you designed the coating process for this SYNERGY stent?
A. That's correct, yes.
Q. Ms. Bhave, are you a willful and deliberate infringer of the '296 patent?
A. Absolutely not, no.
Q. And did you have any knowledge of it before this lawsuit ever started?
A. No.
MR. DROWN: Nothing further.
There's no cross, Your Honor. We stipulated.
MR. SHORE: You gave us cross.

MR. DROWN: It's been stipulated.

MR. SHORE: I apologize. I thought you gave us 30 minutes, so I was going to use two questions of it on this witness.

THE COURT: Sidebar.

(Whereupon, a discussion was held at sidebar as follows:)

THE COURT: So, explain to me why --

MR. SHORE: I --

THE COURT: Explain to me why we think he can't depose -- cross?

MR. DROWN: Because they said so. That they weren't going to call -- they weren't going to cross-examine her.

MR. SHORE: I made an offer to Your Honor, if we could get some more time, and I actually said, I'll do this much with this witness. And you said, okay, I'll just give you 33 minutes, and I'll give them that extra time. And she wasn't designated in any discovery as a willfulness witness at all.

THE COURT: Right. My understanding, I mean, besides to -- but with respect to the time allegation, I just gave both sides additional time. You guys use it the way you want. I wasn't limiting anyone to anything. You use it as the way you want. If you want to use this time

for this...

MR. LAHAD: Thank you, Your Honor.

(Whereupon, the discussion held at sidebar concluded.)

CROSS-EXAMINATION

MR. SHORE: Ms. Bhave, first of all, we'd like to offer into evidence Joint Exhibit 11.

BY MR. SHORE:

Q. Just a couple of questions, Ms. Bhave, and I know you -- as I know you're sitting there, you're not a professional.

Two things. You designed the coating process, correct?

A. The roll-coating process? Yes.

Q. All right. How many people are on the SYNERGY developing team, overall, all parts of it?

A. I don't know that I can answer that question. I was responsible for the roll-coating process.

Q. All right.

A. And I wasn't really aware of how many total numbers would have been for the overall project.

Q. Could it have been 100?

A. I can't really say.

Q. Can you say whether or not any of them were aware of the '296 patent?

A. I can't say.

MR. SHORE: Thank you.

MR. DROWN: No questions, Your Honor.

THE COURT: Ms. Bhave, you may step down.

THE WITNESS: Thank you.

THE COURT: Thank you. Next.

MR. DROWN: Defendant rests, Your Honor.

THE COURT: All right. Defendants rest.

All right. Ladies and gentlemen of the jury, we're going to give you a break right now while we deal with some issues that we need to deal with. Then we're going to bring you back, and I'm going to give you -- you're going to hear some arguments from both sides, very brief, and then we're going to give you the jury instructions, and then you'll begin your deliberations.

(Whereupon, the jury left the room at 5:10 p.m.)

(Break taken.)

THE COURT: Okay. I understand the party wants to make some motions.

MR. DROWN: Your Honor, Boston Scientific moves for judgment as a matter of law on all asserted claims, 1, 11, 17, and 26 because a reasonable jury would not have a legally sufficient basis from which to find indirect infringement including because there's insufficient evidence to show acts carried out by Boston Scientific Limited

directly infringed a claim, that Boston Scientific Corporation took action during the time that the '296 patent was enforced, that was intended to cause and lead to infringing acts by Boston Scientific Limited, or that Boston Scientific was aware or knew of the '296 patent, and knew that its acts, if taken, would constitute infringement of that patent, or that Boston Scientific Corporation believed there was a high probability that the acts of -- by Boston Scientific Limited would infringe the '296 patent. And Boston Scientific took deliberate steps to avoid learning of that infringement. There's simply no evidence that they presented in this phase on any of that, Your Honor.

And so we'd move for judgment as a matter of law on that, we move for judgment as a matter of law on willful infringement on all asserted claims 1, 11, 17, and 26, because there's a legally insufficient basis from which a reasonable jury could find that Boston Scientific had knowledge, that Boston Scientific Corporation had knowledge of the '296 patent, or that Boston Scientific's acts were reckless, deliberate, or in disregard or willful of the '296 patent.

We also move for judgment as a matter of law, Your Honor, on damages. The only damages theory presented today was one of an analytical approach, and a reasonable jury would not have a legally sufficient evidentiary basis

for the analytical approach that they presented, the damages expert's testimony was utterly conclusory, relied solely on another doctor who gave a one-word answer to a question of what his opinion on the apportionment was, and he just said, 90 percent, without providing any basis whatsoever. This confirms your Daubert motion. Their damages theory is utterly baseless, and Dr. Garratt provided no opinion and no basis for their opinion in this case, Your Honor. And so there's not a legally sufficient evidentiary basis for any damages presented. The damages should be zero.

THE COURT: All right.

MR. LAHAD: Your Honor, very briefly, judgment as a matter of law -- the motion for judgment as a matter of law should be denied. As to inducement, there was evidence in the record, including PTX 78 and 79, and the testimony of Mr. Shoenleben earlier in the case to now a legally sufficient evidentiary basis for a theory of induced infringement at least by Boston Scientific Limited -- excuse me. Inducing Boston Scientific Limited to infringe. There's also a legally sufficient basis on the issue of willfulness and I'd cross move for judgment as a matter of law on willfulness. Evidence is clear Boston Scientific knew of the '296 patent, sought to exploit it, want on the and deliberate infringement. And as much you can see that in PTX 65, 67, 69, 70, 73 and Plaintiff's Exhibit 26. The

record forms a legally sufficient basis for a finding as a matter of law of willful infringement by Boston Scientific.

They were to borrow the phrase pirates or like pirates. Finally, Your Honor, with respect to damages there's more than a legally sufficient basis for the jury to find the damages sought in this case, the jury heard the testimony of Mr. Lewis who provided an analytical example or an example of a damages model based on an analytical method. I understand that Boston Scientific challenges this method as appropriate, the Court has already ruled on that the Court is going to give an instruction on the analytical method and that method is sufficient and Mr. Lewis provided a sufficient legal basis or evidentiary basis for his damages number. And, of course, there's any question, that's all I've got, thank you.

THE COURT: All right.

MR. DROWN: Your Honor, I don't think we need to because the first phase is over, but we would renew all of our motions for the first phase and incorporate them here.

MR. LAHAD: Likewise, Your Honor, just to perceive them, thank you.

THE COURT: All right.

The Court has heard all the motions for judgment as a matter of law and those renewed and those new ones. First with respect to the judgments for -- the motions for

judgment as a matter of law asserted by the defendant with respect to infringement, direct and indirect infringement, those motions are denied, viewing the evidence in the light most favorable to the nonmoving party and given the nonmovant the benefit of all reasonable inferences, there is sufficient evidence of record to support a jury verdict in favor of the nonmovant. With respect to defendant's judgment -- motion for judgment as a matter of law with respect to damages, that motion is denied. Viewing the evidence in the light most favorable to the nonmoving party and given the nonmovant the benefit of all reasonable inferences, there's sufficient evidence of record to support a jury verdict in favor of the nonmovant.

Moving to plaintiffs' motion for Judgement as a matter of law with respect to willfulness that motion is denied. Viewing the evidence in the light most favorable to the nonmoving party and giving the nonmovant the benefit. There's sufficient evidence of record to support a jury verdict in favor of the nonmovant.

And with respect to all judgments, all motions for judgment as a matter of law that have been renewed, those motions are denied. Viewing the evidence in the light most favorable to the nonmoving party and giving the monomovant the benefit of all reasonable inferences there's sufficient evidence of record to support a verdict in favor

of the nonmovant.

All right. So let's bring the jury back.

So both sides -- so with respect to remaining time, plaintiff has 12 minutes, Boston Scientific has 10 minutes and 30 seconds.

(Whereupon, the jury entered the room at 5:22 p.m.)

MR. SHORE: Your Honor, they are going to give me a signal at 10 minutes, but I want to make sure our times are coordinated so I have 2 minutes for rebuttal, so if you also could? I just want to make sure we're both on the same time. There is so little time remaining.

THE COURT: You want to reserve 2 minutes for rebuttal?

MR. SHORE: Yes, sir.

THE COURT: Okay. In order to make it fair, I'm going to give both sides 12 minutes.

MR. SHORE: Thank you, Your Honor.

UNIDENTIFIED SPEAKER: Thank you, Your Honor.

MR. SHORE: May it please the Court.

It's like a speed-dating phase of the trial, although I have been married longer than speed dating has been around, but anyway. All right. So I'm going to go pretty quick.

So what is required for willfulness is however

**CONFIDENTIAL DOCUMENT REMOVED**

**SUBJECT TO PROTECTIVE ORDER**

**TRIAL EXHIBIT NO. JTX002**

**Appx18778-18799**

**CONFIDENTIAL DOCUMENT REMOVED**

**SUBJECT TO PROTECTIVE ORDER**

**TRIAL EXHIBIT NO. JTX004**

**Appx18842**

TRIAL EXHIBIT
1:18-cv-00392-GBW
JTX008

**JTX008.1**




EXHIBIT
ALLOCCO EXHIBIT 3 2/11/22
exhibitsticker.com

# Disclosures

- Honoraria for speaking/consultancy from Boston Scientific


euro PCR 2016
Bioabsorbable polymer
EVOLVE
• Durable polymer coatings of drug-eluting stents have been associated with chronic inflammation and impaired healing.
• Bioabsorbable polymer drug eluting stents may have potential advantages
Reduced polymer load & short-term polymer exposure may:
• Decrease risk of late events including ST and TLR
• Reduce required duration of DAPT and risk if interrupted


2016 euro PCR
The SYNERGY Stent
EVOLVE
Platinum Chromium Platform
• 74µm (0.0029in) strut thickness
↑ Visibility
↑ Strength
↑ Flexibility
↑ Conformability
↓ Recoil
PLGA rich domain*
Drug rich domain*
Everolimus-Eluting
• 100µg/cm2
• 3 month release time
• 45% / 55% mix of drug and polymer
Ultrathin Abluminal Coating
Bioabsorbable Polymer Coating (PLGA)
• Abluminal
• 4µm thick
• 85:15 ratio
• <4 month absorption time
*FESEM image 10K x



2016 euro PCR
The SYNERGY Stent
Synchronous Drug Release & Polymer Absorption
EVOLVE
Kinetics of Drug Release and Polymer Absorption
in a Preclinical Porcine Model
PLGA Mass Remaining (%)
Everolimus Released (%)
100
75
50
25
0
0
30
60
90
120
Time (Days)
Bennett and Dubois. Biologics: Targets and Therapy. 2013; 7: 149-159



2016 euro PCR
Trial Design and Methods
EVOLVE
Patients with de novo native coronary lesions
≤ 28 mm in length, RVD ≥2.25 mm ≤3.5, %DS>50%
(excluded LM disease, CTO, AMI or recent MI)
Randomized 1:1:1 at 29 sites
(Europe, Australia, New Zealand)
PROMUS Element N=98
SYNERGY N=94
SYNERGY ½ Dose N=99
Single-blind, noninferiority design
Primary Clinical Endpoint: TLF (TV-CD, TV-MI, or TLR) at 30 days
Primary Angiographic Endpoint: In-stent late loss at 6 months
Per protocol patients were treated with clopidogrel, ticlopidine or prasugrel for at least 6 months following the index procedure
Meredith et al. JACC 2012; 59 (15): 1362-70


euro PCR 2016
Patient Disposition
EVOLVE
All Patients with de novo coronary lesions (ITT)
N=291
PROMUS Element
N=98
SYNERGY
N=94
SYNERGY ½ Dose
N=99
5-year Follow-up
N=97/98 (99%)
5-year Follow-up*
N=88/92 (95.7%)
5-year Follow-up
N=95/99 (96%)
*After 1-year follow-up, the prespecified safety analysis patient population, including only those patients treated with a study stent, was analysed. Two SYNERGY patients who did not receive the study stent were not included in the safety analysis.


euro PCR 2016
EVOLVE Primary Endpoint
EVOLVE
Late Loss at 6 Months
P= 0.19*
P=0.56*
Late loss (mm)
0.6
0.5
0.4
0.3
0.2
0.1
0.0
0.15
0.10
0.13
PROMUS Element
SYNERGY
SYNERGY ½ Dose
TLF at 30 days
P=0.49*
P=0.25*
Target Lesion Failure (%)
10.0
8.0
6.0
4.0
2.0
0.0
0
1.1
3.1
PROMUS Element
SYNERGY
SYNERGY ½ Dose
Noninferiority was proven because the upper 95.2% confidence bound of the difference in 6-month late loss is <0.20 for both SYNERGY stents (P noninferiority <0.001)
Intent-to-treat; Mean + Standard Deviation; *P values for superiority comparison
Meredith et al. JACC 2012; 59 (15): 1362-70


euro PCR 2016
Target Lesion Failure
5-year Follow-up
EVOLVE
SYNERGY vs PE HR 0.77 [0.24, 2,42] P=0.65
SYNERGY vs PE ½ HR 0.74 [0.23, 2.32] P=0.60
20
Protocol-required angiogram
TLF (%)
0
7.2%
5.5%
5.2%
0 1 2 3 4 5 Years
Numbers at risk
PE 98 98 93 92 92 67
SYNERGY 92 90 86 83 82 61
SYNERGY ½ Dose 99 92 90 88 88 65
Safety Population; KM Event Rate; log-rank P values


euro PCR 2016
Target Lesion Revascularisation
5-year Follow-up
EVOLVE
SYNERGY vs PE HR 0.18 [0.02, 1.47] P=0.07
SYNERGY vs PE ½ HR 0.17 [0.02, 1.40] P=0.06
20
Protocol-required angiogram
TLR (%)
6.1%
1.1%
1.0%
0
0 1 2 3 4 5 Years
Numbers at risk
PE 98 98 93 92 92 68
SYNERGY 92 90 87 84 83 61
SYNERGY ½ Dose 99 95 93 91 91 67
Safety Population; KM Event Rate; log-rank P values



euro PCR 2016
Death/MI/TVR
5-year Follow-up
EVOLVE
SYNERGY vs PE HR 0.79 [0.33, 1.89] P=0.60
SYNERGY vs PE ½ HR 1.28 [0.60, 2.74] P=0.52
Protocol-required angiogram
Death/MI/TVR (%)
20
0
15.6%
12.3%
9.8%
0
1
2
3
4
5 Years
Numbers at risk
PE 98 96 89 88 88 65
SYNERGY 92 90 84 81 80 59
SYNERGY ½ Dose 99 92 88 85 85 65
Safety Population; KM Event Rate; log-rank P values



euro PCR 2016
5-Year Clinical Outcomes
EVOLVE
PROMUS Element
SYNERGY
SYNERGY ½ Dose
Components of TLF
Patients (%)
10
5
0
7.2
5.5
5.2
6.1
1.1
1.0
1.0
3.3
3.0
0.0
1.1
1.1
0.0 0.0 0.0
(7) (5) (5)
(6) (1) (1)
(1) (3) (3)
(1) (1)
TLF
TLR
TV-MI
Cardiac Death
Def/Prob ST
Number of Events (N)
Safety Population; KM Event Rates; All P values are >0.05


2016 euro PCR
EVOLVE II RCT Summary
EVOLVE
Primary Endpoint
2-year Outcomes
TLF at 1 year
ITT
$P_{noninferiority}$= 0.0005
Per Protocol
$P_{noninferiority}$= 0.0003
Target Lesion Failure (%)
10
8
6
4
2
0
6.5
6.7
6.4
6.4
PROMUS Element
SYNERGY
PROMUS Element
SYNERGY
PROMUS Element Plus
SYNERGY
12
8
4
0
Event Rate (%)
8.5
9.4
Components of TLF
1.5
1.0
5.4
5.5
3.1
4.3
TLF
Cardiac Death
TV-MI
TLR
Definite/Probable ST
4
3
2
1
0
0.8%
0.4%
0
6
12
24
At 1-year, noninferiority was proven because the one-sided upper 97.5% confidence bound for the difference in TLF is <4.4%
Kereiakes et al, Circulation Cardiovascular Interventions 2015; Kereiakes ACC 2016


2016 euro PCR
EVOLVE Short DAPT Study Design
EVOLVE Short DAPT
Prospective, N=2000, ~100 global sites
Key Inclusion Criteria
Patients considered by the treating physician to be at high risk for bleeding
i) ≥75 years of age and high bleeding risk
ii) long term anticoagulation therapy
iii) history of major bleeding
iv) stroke, or renal insufficiency/failure
(excluded LM disease, ostial lesions, >2 lesions, CTO, SVG, ISR, NSTEMI or STEMI)
$P2Y_{12}$ + ASA
ASA Only (for patients eligible for discontinuation of $P2Y_{12}$)
0
3m
15m
Primary Endpoints: Death or MI, ARC def/prob ST
Secondary Endpoint: Rate of major bleeding (GUSTO severe/life-threatening + moderate)
Primary and secondary endpoints evaluated between 3 and 15 months
Propensity adjusted comparison to historical control patients treated with standard DAPT will be performed

euro PCR 2016

## Conclusions and Significance

EVOLVE

- The final 5-year results of EVOLVE demonstrate no significant differences between groups with respect to TLF, cardiac death or MI
    - Trend toward lower rates of TLR with SYNERGY vs PROMUS Element
    - No definite/probable stent thrombosis in any group at 5 years
- These results support the long-term safety and efficacy of the novel abluminal bioabsorbable polymer SYNERGY everolimus-eluting stent for the treatment of patients with *de novo* coronary artery disease
- Additional research is needed to evaluate clinical event rates and the potential for dual antiplatelet therapy reduction with this novel stent

EXHIBIT
ALLOCO EXHIBIT 3 2/11/22
exhibitsticker.com

**CONFIDENTIAL DOCUMENT REMOVED**

**SUBJECT TO PROTECTIVE ORDER**

**TRIAL EXHIBIT NO. PTX026**

**Appx23850-23868**

**CONFIDENTIAL DOCUMENT REMOVED**

**SUBJECT TO PROTECTIVE ORDER**

**TRIAL EXHIBIT NO. PTX036**

**CERTIFICATE OF SERVICE**

I hereby certify that on July 22, 2025, I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Federal Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and a nonconfidential copy of the document will be served by the CM/ECF system. In addition, a confidential copy of the document will be served upon counsel of record via email and overnight delivery.

*/s/ Pratik A. Shah*
Pratik A. Shah