**VOLUME III, PAGES 23781 TO 26101**

**2024-2062, 2024-2063**

**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

---

**BOARD OF REGENTS OF THE UNIVERSITY OF TEXAS SYSTEM, TISSUEGEN, INC.,**

*Plaintiffs-Cross-Appellants,*

v.

**BOSTON SCIENTIFIC CORP.,**

*Defendant-Appellant.*

---

On appeal from the U.S. District Court
for the District of Delaware (Hon. Gregory B. Williams), No. 18-cv-392

---

**NONCONFIDENTIAL JOINT APPENDIX**
**(VOLUME III OF III)**

---


John P. Lahad
Brian D. Melton
Corey M. Lipschutz
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, TX 77002
(713) 651-9366
jlahad@susmangodfrey.com

Michael W. Shore
THE SHORE FIRM LLP
5646 Milton Street, Suite 423
Dallas, TX 75206
(214) 593-9110

*Counsel for Board of Regents of the University of Texas System and TissueGen, Inc.*

Pratik A. Shah
Z.W. Julius Chen
Rachel J. Elsby
Kristen E. Loveland
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, NW
Washington, DC 20006
(202) 887-4000
pshah@akingump.com

Michael P. Kahn
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
Bank of America Tower
New York, NY 10036
(212) 872-1000

*Counsel for Boston Scientific Corp.*

## TABLE OF CONTENTS


| DATE | DESCRIPTION | ECF NO. | APPX NO. |
|---|---|---|---|
| **VOLUME I** | | | |
| 02/15/2023 | Judgment Following Jury Verdict (Case No. 1:18-cv-00392-GBW) | 342 | Appx1-2 |
| 06/28/2024 | Amended Judgment (Case No. 1:18-cv-00392-GBW) | 372 | Appx3-4 |
| 06/05/2024 | Memorandum Opinion on Post Trial Motions (Case No. 1:18-cv-00392-GBW) | 368 | Appx5-40 |
| 06/05/2024 | Order on Memorandum Opinion (Dkt. 368) (Case No. 1:18-cv-00392-GBW) | 369 | Appx41-42 |
| N/A | United States District Court for the Western District of Texas (Austin Division) Docket, Case No. 1:17-cv-01103-LY | N/A | Appx43-48 |
| N/A | United States District Court for the District of Delaware Docket, Case No. 1:18-cv-00392-GBW | N/A | Apx49-93 |
| N/A | U.S. Patent No. 6,596,296 | 1-1 | Appx94-121 |
| N/A | U.S. Patent No. 7,033,603 | 1-3 | Appx122-153 |

| DATE | DESCRIPTION | ECF No. | APPX NO. |
|---|---|---|---|
| 11/20/2017 | Complaint for Patent Infringement with Exhibits A-D and Civil Cover Sheet, filed by Board of Regents, The University of Texas System, TissueGen, Inc. | 1 | Appx154-173; |
| | Exhibit A, U.S. Patent No. 6,596,296 | | Appx174-202; |
| | Exhibit B, Claim Chart for Claim 1 of the ’296 Patent | | Appx203-210; |
| | Exhibit C, U.S. Patent No. 7,033,603 | | Appx211-243; |
| | Exhibit D, Claim Chart for Claim 19 of the ’603 Patent | | Appx244-248; |
| | Civil Cover Sheet | | Appx249-250 |
| 08/25/2020 | Excerpt of Notice of Service of Initial Claim Chart Under Paragraph 7(c) of the Scheduling Order filed by Board of Regents, The University of Texas System, TissueGen, Inc.. (Stamoulis, Stamatios) (Entered: 08/25/2020) | 61 | Appx349; |
| | Excerpt of Exhibit A (Initial Claim Chart Relating Each Known Accused Product to the Asserted Claims Each Such Product Allegedly Infringes) | | Appx351-353 |

| Date | Description | ECF No. | Appx No. |
|---|---|---|---|
| 03/09/2021 | Excerpt of Appendix regarding Joint Claim Construction Brief, filed by Board of Regents, The University of Texas System, TissueGen, Inc. with Exhibits 1-55 | 81 | Appx431; |
| | Excerpt of Exhibit 37, Declaration of Kinam Park, Ph.D. | | Appx1161-1162;<br>Appx1181-1183 |
| 03/15/2021 | Excerpt of Amended Joint Claim Construction Chart, filed by Board of Regents, The University of Texas System, TissueGen, Inc. | 85 | Appx1854-1857 |
| 04/15/2021 | Excerpt of Memorandum Order regarding Claim Construction | 90 | Appx1928;<br>Appx1931-1933 |
| 06/14/2022 | Excerpt of Sealed – Concise Statement on Motion for Summary Judgment of Noninfringement, filed by Boston Scientific Corporation (Redacted version at ECF No. 208) | 202 | Appx2692-2695 |
| 06/14/2022 | Excerpt of Sealed – Declaration of Michael J. Farnan in Support of Defendant's Opening Brief in Support of It's Omnibus Motion for Summary Judgment and Motion to Exclude Expert Testimony with Exhibits 1-54, filed by Boston Scientific Corporation (Redacted version at ECF No. 209) | 203 | Appx2700; |
| | Excerpt of Exhibit 1, Declaration of David J. Mooney, Ph.D. in Support of Boston Scientific's Motion for Summary Judgment and *Daubert* Motion | | Appx2706-2707; |

| DATE | DESCRIPTION | ECF NO. | APPX NO. |
|---|---|---|---|
| | Excerpt of Exhibit 1 to Declaration: Rebuttal Expert Report of David J. Mooney, Ph.D. Regarding Noninfringement of U.S. Patent No. 6,596,296 | | Appx2709-2710; Appx2753-2755; |
| | Excerpt of Exhibit 8, Document produced by Defendant bates-numbered BSC-UTEX-00110553-BSC-UTEX-00110594 | | Appx3062-3063; Appx3082-3084; |
| | Exhibit 9, Video produced by Defendant bates-numbered BSC-UTEX-00284603 | | Appx3105-3106; |
| | Excerpt of Exhibit 12, Document produced by Defendant beginning with bates-number BSC-UTEX-00031766 | | Appx3143-3144; Appx3147-3149; |
| | Excerpt of Exhibit 18, Document produced by Defendant beginning with bates-number BSC-UTEX-00110122 | | Appx3229-3231 |
| 06/21/2022 | Excerpt of Redacted – Opening Brief in Support Motion to Preclude Expert Testimony, Motion for Summary Judgment of Noninfringement, Motion for Summary Judgment of No Willful Infringement, filed by Boston Scientific Corporation (Sealed version at ECF No. 200) | 206 | Appx3812; Appx3820-3822 |
| 10/06/2022 | Excerpt of Memorandum and Order for Summary Judgment of Noninfringement | 243 | Appx8603-8605 |

| DATE | DESCRIPTION | ECF NO. | APPX NO. |
|---|---|---|---|
| 10/26/2022 | Excerpt of Joint Claim Construction Brief | 245 | Appx8621;<br>Appx8623-8625;<br>Appx8627-8629 |
| 10/28/2022 | Motion to Bifurcate, filed by Boston Scientific Corporation | 247 | Appx9777-9778 |
| 10/28/2022 | Excerpt of Sealed – Opening Brief in Support of Motion to Bifurcate, filed by Boston Scientific Corporation (Redacted version at ECF No. 251) | 248 | Appx9779;<br>Appx9783-9785 |
| 11/02/2022 | Excerpt of Redacted – Joint Appendix regarding Joint Claim Construction Brief, filed by Boston Scientific Corporation with Exhibits 1-27 (Sealed version at ECF No. 246)<br><br>Excerpt of Exhibit 2, Declaration of David J. Mooney, Ph.D. in Support of Boston Scientific's Motion for Summary Judgment and *Daubert* Motion<br><br>Excerpt of Exhibit 1 to Declaration: Rebuttal Expert Report of David J. Mooney, PH.D. Regarding Noninfringement of U.S. Patent No. 6,596,296<br><br>Excerpt of Exhibit 3, Excerpts from Callister, William D., Material Science and Engineering: An Introduction, Seventh Edition, John Wiley & Sons, Inc., 2007 | 250 | Appx9839;<br><br>Appx9872-9873;<br><br>Appx9875-9876;<br>Appx9882-9885;<br>Appx9889-9897;<br><br>Appx10020-10021;<br>Appx10054-10056;<br>Appx10068-10070; |

| DATE | DESCRIPTION | ECF No. | APPX NO. |
|---|---|---|---|
| | Excerpt of Exhibit 4, Excerpts from Yasuhiro Murase, Akihiko Nagai, 2 – Melt spinning, Editor(s); T. Nakajima, K. Kajiwara, J.E. McIntyre, Advanced Fiber Spinning Technology, Woodhead Publishing, 1994 | | Appx10078-10079; Appx10093-10095; |
| | Excerpt of Exhibit 7, Excerpts from Rebuttal Expert Report of William G. Pitt, Ph.D and Attachments A-D, dated November 25, 2019, *Bd. of Regents, The Univ. of Tex. Sys., et al. v. Ethicon, Inc., et al.*, Case No. 17-cv-1084-LY (W.D. Tex.) | | Appx10169-10170; Appx10173-10176; |
| | Excerpt of Exhibit 9, Declaration of William G. Pitt, Ph.D. In Support of Plaintiffs' Mini-*Markman* Position | | Appx10182-10185; Appx10190-10194; |
| | Excerpt of Attachment 1, Exhibit A to Exhibit 9: Expert Report of William G. Pitt, Ph.D | | Appx10200-10201; Appx10223-10229; |
| | Excerpt of Exhibit 10, Excerpts from Concise Encyclopedia of Polymer Science & Engineering, 73-74, 374-95 (1990) | | Appx10462-10463; Appx10482-10484; |
| | Excerpt of Exhibit 11, Excerpts from Jastrzcbski, The Nature and Properties of Eng'g Materials, 80-107, 155-195, 372-420 (1987) | | Appx10489-10490; Appx10602-10608; |
| | Excerpt of Exhibit 18, Rebuttal Declaration of David J. Mooney, Ph.D. in Response to Plaintiffs' New Claim Construction and in | | Appx10837-10838; Appx10842-10844 |

| DATE | DESCRIPTION | ECF NO. | APPX NO. |
|---|---|---|---|
| | Support of Boston Scientific's Construction of "Polymer Fiber" | | |
| 11/17/2022 | Memorandum Opinion regarding Claim Construction | 255 | Appx11175-11195 |
| 12/02/2022 | Memorandum Order on Motion to Bifurcate | 260 | Appx11318-11323 |
| 01/19/2023 | Verdict Form - Phase 1 | 296 | Appx13346-13350 |
| 01/25/2023 | Excerpt of Preliminary Jury Instructions (Phase I) | 316 | Appx13691; Appx13695-13697; Appx13699-13701 |
| 01/31/2023 | Excerpt of Final Jury Instructions (Phase 1) | 326 | Appx13823; Appx13828-13830; Appx13837-13839; Appx13845-13847; Appx13849-13851 |
| 02/01/2023 | Excerpt of Final Jury Instructions (Phase 2) | 329 | Appx13863; Appx13867-13869 |
| 02/01/2023 | Redacted – Jury Verdict (Phase 1) (Sealed Version at ECF No. 331) | 332 | Appx13887-13891 |
| 02/01/2023 | Redacted – Jury Verdict (Phase 2) (Sealed Version at ECF No. 333) | 334 | Appx13894-13898 |

| DATE | DESCRIPTION | ECF NO. | APPX NO. |
|---|---|---|---|
| 03/15/2023 | Sealed – Opening Brief in Support of Motion to Alter Judgment and Award Enhanced Damages Under 35 USC 284, filed by Board of Regents, The University of Texas System, TissueGen, Inc. with Exhibits 1-2 (Redacted Version at ECF No. 353) | 350 | Appx13941-13966; |
| | Exhibit 1, Declaration of Justin V. Lewis | | Appx13967-14041; |
| | Exhibit 2, Declaration of Jonathan Gibson in Support of Plaintiffs' Brief in Support of Motion for (1) Enhanced Damages Under §284 and (2) Pre- and Post-Judgment Interest | | Appx14042-14044 |
| | **VOLUME II** | | |
| 03/22/2023 | Redacted – Opening Brief in Support of Motion for New Trial *and, in the Alternative* Motion for Judgment as a Matter of Law, filed by Boston Scientific Corporation (Sealed Version at ECF No. 346) | 351 | Appx14045-14072 |

| Date | Description | ECF No. | Appx No. |
|---|---|---|---|
| 03/22/2023 | Excerpt of Redacted – Declaration in Support of Opening Brief in Support of Motion for New Trial *and, in the Alternative* Motion for Judgment as a Matter of Law, filed by Boston Scientific Corporation with Exhibits 1-8 (Sealed Version at ECF No. 347)<br><br>Exhibit 1Ai, Slide 49 Video of Plaintiffs' Opening Demonstratives<br><br>Exhibit 1Aii, Slide 51 Video of Plaintiffs' Opening Demonstratives<br><br>Excerpt of Exhibit 3, January 27, 2023 Joint Letter | 352 | Appx14073;<br><br>Appx14143;<br><br>Appx14144;<br><br>Appx15291-15292; Appx15295-15297 |
| 04/19/2023 | Excerpt of Redacted – Answering Brief in Opposition to Motion for New Trial and, in the Alternative Motion for Judgment as a Matter of Law filed by Board of Regents, The University of Texas System, TissueGen, Inc. (Sealed Version at ECF No. 354) | 360 | Appx15798; Appx15806-15808 |
| 05/03/2023 | Excerpt of Redacted – Reply Brief on Motion for New Trial and, in the Alternative Motion for Judgment as a Matter of Law, filed by Boston Scientific Corporation (Sealed Version at ECF No. 363) | 364 | Appx16571; Appx16576-16578 |
| 07/03/2024 | Notice of Appeal to the Federal Circuit of Dkt. 342 Judgment and Dkt. 372 Amended Judgment | 373 | Appx17313-17314 |

| DATE | DESCRIPTION | ECF NO. | APPX NO. |
|---|---|---|---|
| 07/03/2024 | Notice of Appeal to the Federal Circuit of Dkt. 368 Memorandum Opinion, Dkt. 369 Order, Dkt. 372 Amended Judgment | 374 | Appx17315-17316 |
| 01/25/2023 | Excerpt of Trial Transcript (Vol. I) | N/A | Appx17317-17318; Appx17369-17371; Appx17379-17429; Appx17447-17450; Appx17452-17454; Appx17470-17473; Appx17484-17544; Appx17547-17549; Appx17551-17553 |
| 01/26/2023 | Excerpt of Trial Transcript (Vol. II) | N/A | Appx17600-17601; Appx17609-17612; Appx17671-17674; Appx17685-17695; Appx17699-17712; Appx17733-17735; Appx17737-17739; Appx17755-17757; Appx17772-17776; Appx17780-17782; Appx17788-17790; Appx17798-17801; Appx17824-17826; Appx17834-17836; Appx17842-17848; Appx17873-17877 |

| DATE | DESCRIPTION | ECF NO. | APPX NO. |
|---|---|---|---|
| 01/27/2023 | Excerpt of Trial Transcript (Vol. III) | N/A | Appx17930-17933; Appx17938-17941; Appx17943-18009; Appx18017-18020; Appx18029-18031; Appx18045-18054; Appx18058-18061; Appx18103-18105; Appx18115-18118; Appx18132-18134; Appx18142-18156; Appx18165-18179; Appx18184-18191; Appx18194-18196 |
| 01/30/2023 | Excerpt of Trial Transcript (Vol. IV) | N/A | Appx18213-18214; Appx18231-18235; Appx18244-18249; Appx18260-18263; Appx18277-18283; Appx18288-18309; Appx18314-18319; Appx18328-18330; Appx18333-18356; Appx18364-18369; Appx18377-18382; Appx18392-18394; Appx18397-18399; Appx18415-18417 |
| 01/31/2023 | Excerpt of Redacted Trial Transcript (Vol. V) | N/A | Appx18472-18473; Appx18525-18527; Appx18634-18641; Appx18644-18648; Appx18671-18684 |

| DATE | DESCRIPTION | ECF NO. | APPX NO. |
|---|---|---|---|
| N/A | Sealed – Trial Exhibit No. JTX002, Synergy § 7.2 PMA, Pharmaceutical Development [BSC-UTEX-00110475-496] | N/A | Appx18778-18799 |
| N/A | Sealed – Trial Exhibit No. JTX004, Synergy Drug Eluting Stent Coating Process [VIDEO] [BSC-UTEX-00284603] | N/A | Appx18842 |
| N/A | Trial Exhibit No. JTX008, Final five-year clinical outcomes in the EVOLVE trial: A randomized evaluation of a novel bioabsorbable polymer-coated, everolimus-eluting stent [BSC-UTEX-00110122-136] [Allocco Ex. 3] | N/A | Appx18849-18863 |
| N/A | Sealed – Trial Exhibit No. PTX026, PPT TissueGen Developing Revolutionary Peripheral Stent Solutions, Jan. 2009 [UT-BSC0009408-426] | N/A | Appx23850-23868 |
| N/A | Sealed – Trial Exhibit No. PTX036, Table E.T1 - Strut and Connector Dimensions for Synergy and Premier | N/A | Appx23870 |

| DATE | DESCRIPTION | ECF NO. | APPX NO. |
|---|---|---|---|
| | **VOLUME III** | | |
| N/A | Sealed – Trial Exhibit No. PTX038, Answer to ROG 2 and ROG 3 [BSC-UTEX-00109806-824, BSC-UTEX-00109825, BSC-UTEX-00109826-842, BSC-UTEX-00109843-858, BSC-UTEX-00109859-867, BSC-UTEX-00109868-873, BSC-UTEX-00109874-875, BSC-UTEX-00109876-877, BSC-UTEX-00109878-879, BSC-UTEX-00109880-881, BSC-UTEX-00109882-883, BSC-UTEX-00109884-885, BSC-UTEX-00109886-936] | N/A | Appx23871-24015 |
| N/A | Sealed – Trial Exhibit No. PTX042, SYNERGY PMA Appx. 7.2 [BSC-UTEX-00110497-552] [BSC1-Chen Ex. 15] | N/A | Appx24271-24326 |
| N/A | Sealed – Trial Exhibit No. PTX047, FESEMs of Coatings of SYNERGY SV, WH, and LV models [BSC-UTEX-00110137-474] | N/A | Appx24371-24708 |
| N/A | Excerpt of Sealed – Trial Exhibit No. PTX049, SYNERGY Particulate Assessment 90761466 [BSC-UTEX-00205005-041] | N/A | Appx24709-24710; Appx24731-24733 |
| N/A | Excerpt of Sealed – Trial Exhibit No. PTX050, 2009.07.07 Particulate Review & Discussion with FDA [BSC-UTEX-00201385-401] | N/A | Appx24746; Appx24749-24751 |

| DATE | DESCRIPTION | ECF NO. | APPX NO. |
|---|---|---|---|
| N/A | Excerpt of Sealed – Trial Exhibit No. PTX051, SYNERGY IDE G120123/S002 Deficiency Response [BSC-UTEX-00213774-069] | N/A | Appx24763; Appx24888-24891 |
| N/A | Trial Exhibit No. PTX052, Weber et al. US2009/0030504 – CERTIFIED [UT-BSC0090954-971] | N/A | Appx25059-25076 |
| N/A | Sealed – Trial Exhibit No. PTX065 Email [Peddle, Ballinger, Moynihan] attaching Color TG handout [BSC-UTEX-00292727-729] | N/A | Appx25077-25079 |
| N/A | Sealed – Trial Exhibit No. PTX067, Email chain (Nelson, Moynihan, Ballinger, Brown, Vbenezia, Davidson) re: Possible TCT Meeting TissueGen, Inc. [UT-BSC0020767-772] [BSC-Moynihan Ex. 1] | N/A | Appx25080-25085 |
| N/A | Sealed – Trial Exhibit No. PTX069, Email chain (Nelson, Moynihan) with attachments ("TissueGen handout April 2009.pdf," "TissueGen Executive Summary April 2009.pdf") [UT-BSC-0020869-894] [BSC-Moyni han Ex.2] | N/A | Appx25086-25111 |
| N/A | Sealed – Trial Exhibit No. PTX072, CDRH Premarket Review Submission Cover Sheet with attached 05.21.09 Letter attaching 06.04.09 FDA PowerPoint [BSC-UTEX-00197895-940 | N/A | Appx25112-25157 |

| DATE | DESCRIPTION | ECF NO. | APPX NO. |
|---|---|---|---|
| N/A | Sealed – Trial Exhibit No. PTX073, Email chain (Moynihan, Nelson, Knowles] re TissueGen [UT-BSC0088278-279] | N/A | Appx25158-25159 |
| N/A | Trial Exhibit No. PTX143, Book, IUPAC Compendium of Chemical Terminology (Dissolution) [UT-BSC0085269] | N/A | Appx25500 |
| N/A | Trial Exhibit No. DTX018, U.S. Patent 5,364,627 to Song, Gradual Release Structures Made From Fiber Spinning Techniques [BSC-UTEX-00029286 BSC-UTEX-00029300] | N/A | Appx25635-25649 |
| N/A | Sealed – Trial Exhibit No. DTX300, BSC-FDA Meeting: Drug-Eluting Biodegradable Polymer Coating on Metallic Stent [BSC-UTEX-00201346 BSC-UTEX-00201359] | N/A | Appx26088-26101 |

**CONFIDENTIAL MATERIAL OMITTED**

The material omitted at Appx2694-2695, Appx2753-2755, Appx3082-3084, and Appx13951 describes the Synergy Stent's coating process; the material omitted at Appx3063 describes the Synergy Stent's manufacturing process; the material omitted at Appx3106 and Appx18842 are video of the Synergy Stent's coating process; the material omitted at Appx3144 describes the commercial Synergy Stent product; the material omitted at Appx3147-3149 describes the Synergy Stent's device and operation; the material omitted at Appx9890 describes the Synergy

Stent's polymer composition; the material omitted at Appx13891 and Appx13898 contains the signature of the jury foreperson; the material omitted at Appx13941 describes the nature of the brief; the material omitted at Appx13948 describes a design submitted to the FDA; the material omitted at Appx13956 describes Synergy Stent sales; the material omitted at Appx13962 describes the relevant Boston Scientific market share; the material omitted at Appx14043 describes TissueGen's financing; the material omitted at Appx14060-14061 describes a coating technology agreement; the material omitted at Appx18525 describes confidential arrangements with hospitals; the material omitted at Appx18526-18527 describes pricing arrangements and per-unit profits; the material omitted at Appx18649 references confidential agreements; the material omitted at Appx18778-18799 and Appx24271-24326 describes the Synergy Stent's development; the material omitted at Appx23850-23868 describe a TissueGen investment; the material omitted at Appx23870 describe strut and connector dimensions for Synergy Stent; the material omitted at Appx23871-24015 are Defendant's objections and responses to Plaintiff's interrogatories; the material omitted at Appx24371-024708 are images of Synergy Stent coatings; the material omitted at Appx24709-24710, Appx24731-24733, Appx24746 and Appx24749-24751 describe particulate assessments of the Synergy Stent system; the material omitted at Appx24763 and Appx24888-24891 describe the Synergy Stent's deficiency response; the material omitted at Appx25077-25079,

Appx25080-25085, Appx25086-25111, and Appx25158-25159 are emails regarding TissueGen; and the material omitted at Appx25112-25157 and Appx26088-26101 are slides regarding Boston Scientific's drug product testing.

**CONFIDENTIAL DOCUMENT REMOVED**

**SUBJECT TO PROTECTIVE ORDER**

**TRIAL EXHIBIT NO. PTX038**

**Appx23871-24015**

**CONFIDENTIAL DOCUMENT REMOVED**

**SUBJECT TO PROTECTIVE ORDER**

**TRIAL EXHIBIT NO. PTX042**

**Appx24271-24326**

**CONFIDENTIAL DOCUMENT REMOVED**

**SUBJECT TO PROTECTIVE ORDER**

**TRIAL EXHIBIT NO. PTX047**

**Appx24371-24708**

**CONFIDENTIAL DOCUMENT REMOVED**

**SUBJECT TO PROTECTIVE ORDER**

**EXCERPT OF TRIAL EXHIBIT NO. PTX049**

**Appx24709-24710**

**Appx24731-24733**

**CONFIDENTIAL DOCUMENT REMOVED**

**SUBJECT TO PROTECTIVE ORDER**

**EXCERPT OF TRIAL EXHIBIT NO. PTX050**

**Appx24746**

**Appx24749-24751**

**CONFIDENTIAL DOCUMENT REMOVED**

**SUBJECT TO PROTECTIVE ORDER**

**EXCERPT OF TRIAL EXHIBIT NO. PTX051**

**Appx24763**

**Appx24888-24891**

TRIAL EXHIBIT
1:18-cv-00392-GBW

PTX052

9289339

# THE UNITED STATES OF AMERICA

TO ALL TO WHOM THESE PRESENTS SHALL COME:

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

**August 31, 2022**

**THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:**

**Pre-Grant Publication Number:** ***2009/0030504***
**Pre-Grant Publication Date:** ***January 29, 2009***

**By Authority of the**
**Under Secretary of Commerce for Intellectual Property**
**and Director of the United States Patent and Trademark Office**

W. Montgomery
**Wanda Montgomery**
**Certifying Officer**

UNITED STATES PATENT AND TRADEMARK OFFICE
DEPARTMENT OF COMMERCE

US 20090030504A1

(19) **United States**

(12) **Patent Application Publication**
**Weber et al.**

(10) **Pub. No.: US 2009/0030504 A1**

(43) **Pub. Date: Jan. 29, 2009**

(54) **MEDICAL DEVICES COMPRISING POROUS INORGANIC FIBERS FOR THE RELEASE OF THERAPEUTIC AGENTS**

(75) Inventors: **Jan Weber**, Maastricht (NL); **Jaydeep Y. Kokate**, Maple Grove, MN (US); **Arif Iftekar**, Santa Rosa, CA (US)

Correspondence Address:
**MAYER & WILLIAMS PC**
**251 NORTH AVENUE WEST, 2ND FLOOR**
**WESTFIELD, NJ 07090 (US)**

(73) Assignee: **Boston Scientific Scimed, Inc.**

(21) Appl. No.: **11/881,660**

(22) Filed: **Jul. 27, 2007**

**Publication Classification**

(51) **Int. Cl.**
*A61F 2/06* (2006.01)

(52) **U.S. Cl.** ........................................................ **623/1.42**

(57) **ABSTRACT**

In accordance with an aspect of the invention, implantable or insertable medical devices are provided which comprise a substrate and a therapeutic-agent-loaded porous inorganic fiber.



PTX052.3






Fig. 1




Fig. 2A




Fig. 2B

UT-BSC0090956

PTX052.4






Fig. 3




Fig. 4A




Fig. 4B

UT-BSC0090957


100
200

Fig. 5


610
610
600
Fig. 6A
610
620
610
600
Fig. 6B
610
630
610
600
Fig. 6C
640f
640
640f
600
Fig. 6D

PTX052.6






FIG. 7



FIG. 8
(Prior Art)

UT-BSC0090959



*FIG. 9*
*(Prior Art)*




*FIG. 10*
*(Prior Art)*

PTX052.8



# MEDICAL DEVICES COMPRISING POROUS INORGANIC FIBERS FOR THE RELEASE OF THERAPEUTIC AGENTS

## FIELD OF THE INVENTION

[0001] The present invention relates to medical devices that release of therapeutic agents.

## BACKGROUND OF THE INVENTION

[0002] The in vivo delivery of therapeutic agents within the body of a patient is common in the practice of modern medicine. In vivo delivery of therapeutic agents is often implemented in conjunction with medical devices that may be temporarily or permanently placed at a target site within the body. These medical devices can be maintained, as required, at their target sites for short or prolonged periods of time, delivering biologically active agents at the target site.

[0003] In accordance with certain delivery strategies, a therapeutic agent is provided within or beneath a biostable or biodegradable polymeric layer that is associated with a medical device. Once the medical device is placed at the desired location within a patient, the therapeutic agent is released from the medical device with a profile that is dependent, for example, upon the nature of the therapeutic agent and of the polymeric layer, among other factors.

[0004] Examples of such devices include drug eluting coronary stents, which are commercially available from Boston Scientific Corp. (TAXUS), Johnson & Johnson (CYPHER), and others. For example, the TAXUS stent contains a smooth, non-porous polymeric coating consisting of an antiproliferative drug (paclitaxel) within a biostable polymer matrix. The drug diffuses out of the coating over time. Due to the relatively low permeability of paclitaxel within the polymer matrix and due to the fact that the polymer matrix is biostable, a residual amount of the drug may remain in the device beyond its period of usefulness.

[0005] Finally, while it is desirable to provide the abluminal surface of the stent with a coating that that is capable of releasing an antiproliferative drug to combat restenosis, such a drug may not be equally desirable on the luminal surface of the stent. Moreover, the presence of a polymeric layer on the luminal surface may not be needed for purposes of promoting biocompatibility, as various stent substrate materials, including stainless steel, are known to support endothelial cell growth.

## SUMMARY OF THE INVENTION

[0006] In accordance with an aspect of the invention, implantable or insertable medical devices are provided which comprise a substrate and a therapeutic-agent-loaded porous inorganic fiber.

[0007] Many other aspects and embodiments of the present invention, as well as various advantages of the invention, will become immediately apparent to those of ordinary skill in the art upon review of the Detailed Description and Claims to follow.

## BRIEF DESCRIPTION OF THE DRAWINGS

[0008] FIG. 1 is a schematic perspective view of a stent that is loosely wrapped with a drug-loaded inorganic fiber, in accordance with an embodiment of the invention.

[0009] FIGS. 2A, 2B, 3 and 5 are schematic perspective views illustrating some different ways that stents may be associated with drug-loaded porous inorganic fibers, in accordance with various embodiments of the invention.

[0010] FIGS. 4A and 4B are schematic perspective and cross-sectional views, respectively, of a stent having struts that are covered with drug-loaded porous inorganic fibers, in accordance with an embodiment of the invention.

[0011] FIGS. 6A through 6C are schematic cross-sectional views illustrating a process of forming a porous inorganic coating that includes porous inorganic fibers, in accordance with an embodiment of the invention.

[0012] FIG. 7 contains three schematic perspective views illustrating a process of loading and capping a hollow porous inorganic fiber, in accordance with an embodiment of the invention.

[0013] FIG. 8 is a micrograph of a fibrous polystyrene network, in accordance with the prior art.

[0014] FIG. 9 is a micrograph of a hollow porous $Al_2O_3$ fiber, in accordance with the prior art.

[0015] FIG. 10 is a micrograph of a fibrous network of mesoporous $T_2O_5$ fibers, in accordance with the prior art.

## DETAILED DESCRIPTION OF THE INVENTION

[0016] In accordance with an aspect of the invention, implantable or insertable medical devices are provided which comprise a substrate and a therapeutic-agent-loaded porous inorganic fiber.

[0017] The device may comprise, for example, a single inorganic fiber or a plurality of inorganic fibers, for instance, a plurality of distinct fibers or a plurality of fibers that are interconnected within a fibrous network.

[0018] The fiber may be, for example, disposed on a surface of the substrate, or it may be disposed within the substrate (e.g., where the substrate is biodegradable).

[0019] Medical devices benefiting from the present invention include a variety of implantable or insertable medical devices, which are implanted or inserted into a subject, either for procedural uses or as implants. Examples include stents (including coronary artery stents, peripheral vascular stents such as cerebral stents, urethral stents, ureteral stents, biliary stents, tracheal stents, gastrointestinal stents and esophageal stents), stent grafts, vascular grafts, catheters (e.g., renal or vascular catheters such as balloon catheters), guide wires, balloons, filters (e.g., vena cava filters), vascular access ports, embolization and bulking devices including cerebral aneurysm filler coils (including Guglilmi detachable coils and metal coils), myocardial plugs, pacemaker leads, left ventricular assist hearts and pumps, total artificial hearts, heart valves, vascular valves, tissue engineering scaffolds for cartilage, bone, skin and other in vivo tissue regeneration, cochlear implants, suture anchors, anastomosis clips and rings, tissue staples and ligating clips at surgical sites, cannulae, metal wire ligatures, orthopedic prosthesis such as bone grafts, bone plates, joint prostheses, as well as various other medical devices that are adapted for implantation or insertion into the body and which release a therapeutic agent.

[0020] The medical devices of the present invention include implantable and insertable medical devices that are used for systemic treatment, as well as those that are used for the localized treatment of any mammalian tissue or organ. Non-limiting examples are tumors; organs including the heart, coronary and peripheral vascular system (referred to overall as "the vasculature"), the urogenital system, including kidneys, bladder, urethra, ureters, prostate, vagina, uterus and ovaries, eyes, ears, spine, nervous system, lungs, trachea,

UT-BSC0090961

PTX052.9



esophagus, intestines, stomach, brain, liver and pancreas, skeletal muscle, smooth muscle, breast, dermal tissue, cartilage, tooth and bone.

[0021] As used herein, "treatment" refers to the prevention of a disease or condition, the reduction or elimination of symptoms associated with a disease or condition, or the substantial or complete elimination of a disease or condition. Subjects (also referred to as "patients") include vertebrate subjects such as mammalian subjects, for example, human subjects, pets and livestock.

[0022] "Therapeutic agents", "pharmaceuticals," "pharmaceutically active agents", "drugs" and other related terms may be used interchangeably herein.

[0023] The substrates with which the inorganic fibers are associated in the practice of the present invention may be biostable or biodegradable. The inorganic fiber may be, for example, disposed on a surface of the substrate (e.g., wrapped around, interwoven with or attached to the substrate) or it may be disposed within the substrate (e.g., embedded within a biodegradable substrate).

[0024] As defined herein, a "biostable" material is one which remains intact over the time period that the medical device is intended to remain implanted within the body. Similarly, as defined herein, a "biodegradable" material is one which does not remain intact over the period which the medical device is intended to remain within the body, for example, due to any of a variety of mechanisms including dissolution, chemical breakdown, and so forth, of the region. Depending upon the device within which the biodegradable material is disposed and the mechanism of degradation of the biodegradable material, this period may vary, for example, from less than or equal to 1 hour to 3 hours to 12 hours to 1 day to 3 days to 1 week to 1 month to 3 months to 1 year or longer.

[0025] Materials for forming the substrate thus include various organic materials (i.e., materials containing one or more types or organic species), such as polymers and various inorganic materials (i.e., materials containing one or more inorganic species), such as metallic materials (e.g., metals and metal alloys) and non-metallic materials (e.g., carbon, semiconductors, glasses, and ceramics containing various metal- and non-metal-oxides, various metal- and non-metal-nitrides, various metal- and non-metal-carbides, various metal- and non-metal-borides, various metal- and non-metal-phosphates, and various metal- and non-metal-sulfides, among others).

[0026] Specific examples of non-metallic inorganic materials may be selected, for example, from materials containing one or more of the following: metal-based ceramics including aluminum oxides and transition metal oxides (e.g., oxides of titanium, zirconium, hafnium, tantalum, molybdenum, tungsten, rhenium, and iridium); semi-metal-based ceramics, such as those containing silicon, silicon oxides (sometimes referred to as glass ceramics), germanium oxides, silicon and germanium nitrides, silicon and germanium carbides, calcium phosphate ceramics (e.g., hydroxyapatite); and carbon and carbon-based, ceramic-like materials such as carbon nitrides, among many others.

[0027] Specific examples of metallic inorganic materials may be selected, for example, from substantially pure metals (e.g., biostable metals such as gold, platinum, palladium, iridium, osmium, rhodium, titanium, tantalum, tungsten, and ruthenium, and biodegradable metals such as magnesium, zinc and iron), metal alloys comprising iron and chromium (e.g., stainless steels, including platinum-enriched radiopaque stainless steel), alloys comprising nickel and titanium (e.g., Nitinol), alloys comprising cobalt and chromium, including alloys that comprise cobalt, chromium and iron (e.g., elgiloy alloys), alloys comprising nickel, cobalt and chromium (e.g., MP 35N) and alloys comprising cobalt, chromium, tungsten and nickel (e.g., L605), alloys comprising nickel and chromium (e.g., inconel alloys), and alloys comprising magnesium and/or iron.

[0028] Further examples of metallic substrate materials include the biodegradable metallic materials described in U.S. Patent App. Pub. No. 2002/0004060 A1, entitled "Metallic implant which is degradable in vivo." These include substantially pure metals and metal alloys whose main constituent is selected from alkali metals, alkaline earth metals, iron, and zinc, for example, metals and metal alloys containing magnesium, iron or zinc as a main constituent and one or more optional additional constituents selected from the following: alkali metals such as Li, alkaline-earth metals such as Ca and Mg, transition metals such as Mn, Co, Ni, Cr, Cu, Cd, Zr, Ag, Au, Pd, Pt, Re, Fe and Zn, Group IIIa metals such as Al, and Group IVa elements such as C, Si, Sn and Pb.

[0029] Examples of polymeric substrate materials include a variety of biostable and biodegradable polymers, with biodegradable polymers being preferred in certain embodiments, particularly those in which the inorganic fiber is embedded in the substrate material. Fibers may also be embedded in a biodegradable polymer coating that is disposed over a substrate.

[0030] Examples of biodegradable polymers for use in the present invention may be selected from suitable members of the following, among many others: (a) polyester homopolymers and copolymers such as polyglycolide (PGA), polylactide (PLA) including poly-L-lactide, poly-D-lactide and poly-D,L-lactide, poly(beta-hydroxybutyrate), poly-D-gluconate, poly-L-gluconate, poly-D,L-gluconate, poly(epsilon-caprolactone), poly(delta-valerolactone), poly(p-dioxanone), poly(trimethylene carbonate), poly(lactide-co-glycolide) (PLGA), poly(lactide-co-delta-valerolactone), poly(lactide-co-epsilon-caprolactone), poly(lactide-co-beta-malic acid), poly(lactide-co-trimethylene carbonate), poly(glycolide-co-trimethylene carbonate), poly(beta-hydroxybutyrate-co-beta-hydroxyvalerate), poly[1,3-bis(p-carboxyphenoxy)propane-co-sebacic acid], and poly(sebacic acid-co-fumaric acid), among others, (b) poly(ortho esters) such as those synthesized by copolymerization of various diketene acetals and diols, among others, (c) polyanhydrides such as poly(adipic anhydride), poly(suberic anhydride), poly(sebacic anhydride), poly(dodecanedioic anhydride), poly(maleic anhydride), poly[1,3-bis(p-carboxyphenoxy) methane anhydride], and poly[alpha,omega-bis(p-carboxyphenoxy)alkane anhydrides] such as poly[1,3-bis(p-carboxyphenoxy)propane anhydride] and poly[1,3-bis(p-carboxyphenoxy)hexane anhydride], among others; and (d) amino-acid-based polymers including tyrosine-based polyarylates (e.g., copolymers of a diphenol and a diacid linked by ester bonds, with diphenols selected, for instance, from ethyl, butyl, hexyl, octyl and benzyl esters of desaminotyrosyl-tyrosine and diacids selected, for instance, from succinic, glutaric, adipic, suberic and sebacic acid), tyrosine-based polycarbonates (e.g., copolymers formed by the condensation polymerization of phosgene and a diphenol selected, for instance, from ethyl, butyl, hexyl, octyl and benzyl esters of desaminotyrosyl-tyrosine), and tyrosine-, leucine- and lysine-based polyester-amides; specific

UT-BSC0090962

examples of tyrosine-based polymers include includes polymers that are comprised of a combination of desaminotyrosyl tyrosine hexyl ester, desaminotyrosyl tyrosine, and various di-acids, for example, succinic acid and adipic acid, among others.

[0031] As used herein, a "nanopore" is a pore having a width that does not exceed 1 micron in width. As used herein, "micropores" are smaller than 2 nm in width, "mesopores" range from 2 to 50 nm in width, and "macropores" are larger than 50 nm in width.

[0032] As used herein a "porous" fiber is a fiber that contains pores. A "nanoporous fiber" is a fiber that contains nanopores; a "macroporous fiber" is a fiber that contains macropores; and so forth.

[0033] As used herein, an "inorganic fiber" is a fiber that contains one or more inorganic materials, such as those described above in conjunction with substrate materials, for example, in an amount ranging from 50 wt % or less to 75 wt % to 90 wt % to 95 wt % to 97.5 wt % to 99 wt % or more inorganic materials.

[0034] As used herein, a "ceramic fiber" is a fiber that contains one or more ceramic materials, such as those described above in conjunction with substrate materials, for example, in an amount ranging from 50 wt % or less to 75 wt % to 90 wt % to 95 wt % to 97.5 wt % to 99 wt % or more ceramic materials.

[0035] As used herein, a "metallic fiber" is a fiber that contains one or more metals, such as those described above in conjunction with substrate materials, for example, in an amount ranging from 50 wt % or less to 75 wt % to 90 wt % to 95 wt % to 97.5 wt % to 99 wt % or more metals.

[0036] As used herein, a "sol-gel derived ceramic fiber" is one that is formed using sol-gel chemistry.

[0037] It is known that certain ceramic materials are bioactive. As defined herein a "bioactive material" is a material that adheres to adjacent tissue or that fosters cell adhesion and/or proliferation (with associated tissue coverage), for example, bone tissue or soft tissue such as endothelial tissue, with minimal adverse biological effects (e.g., the formation of connective tissue such as fibrous connective tissue). Examples of bioactive ceramic materials, sometimes referred to as "bioceramics," include calcium phosphate ceramics, for example, hydroxyapatite; calcium-phosphate glasses, sometimes referred to as glass ceramics, for example, bioglass; and various metal oxide ceramics such as titanium oxide. In this regard, it has been proposed that the formation of bone-like apatite on artificial materials is induced by functional groups, including Si—OH, Ti—OH, Zr—OH, Nb—OH and Ta—OH, among others. T. Kokubo et al., "Novel bioactive materials with different mechanical properties," *Biomaterials*, 2003, 24(13): 2161-75.

[0038] It is also known that bioactivity depends upon the structure of a given surface. See, e.g., the review by E. K. F. Yim et al., "Significance of synthetic nanostructures in dictating cellular response," *Nanomedicine: Nanotechnology, Biology, and Medicine* 1 (2005) 10-21, which reports that smooth muscle cells and endothelial cells have improved cell adhesion and proliferation on nanopatterned surfaces. Both types of cells were sensitive to nanotopography. Yim et al. report improved adhesion and growth for endothelial cells on a substrate with 13 nm high islands relative to 35 and 95 nm high islands. Endothelial cells were also susceptible to surface chemistry. See also, e.g., Viitala R. et al., "Surface properties of in vitro bioactive and non-bioactive sol-gel derived materials," Biomaterials. August 2002; 23(15): 3073-86.

[0039] Certain materials are also known to have excellent hemocompatibility. Titanium oxide films containing tantalum, $Ti(Ta^{+5})O_2$ have been reported to exhibit attractive blood compatibility including and overall excellent antithrombogenic properties (as characterized by clotting time, platelet adhesion measurement and in vivo experiments), which have been hypothesized to be related to physical properties such as surface energy and semiconductivity. J. Y. Chen et al., "Antithrombogenic investigation of surface energy and optical bandgap and hemocompatibility mechanism of $Ti(Ta^{+5})O_2$ thin films," *Biomaterials* 23 (2002) 2545-2552. See also, for example, N. Huang et al., "Hemocompatibility of titanium oxide films," *Biomaterials* 24 (2003) 2177-2187.

[0040] Titanium oxide fibers containing tantalum may be formed, for example, by forming a titanium oxide fiber, followed by the use of a plasma immersion process to create Ta doping within the fibers. As another example, metallic fibers may be formed from titanium and tantalum, after which the titanium/tantalum hybrid fibers are oxidized in air as described in J. Y. Chen et al. to form $Ti(Ta^{+5})O_2$.

[0041] Inorganic fibers for use in the invention can vary widely in width (e.g., diameter for a fiber with circular diameter), ranging, for example, from 1000 microns or more to 500 microns to 100 microns to 50 microns to 10 microns to 5 microns to 1 micron to 0.5 micron (500 nm) to 0.1 micron (100 nm) to 0.05 micron (50 nm) to 0.025 micron (25 nm), or less.

[0042] As used herein a "nanofiber" is one that is less than 1 micron in width.

[0043] In some embodiments of the invention, the inorganic fiber is a linear (non-branched) fiber. In some embodiments, the inorganic fiber is part of a fibrous network.

[0044] In some embodiments of the invention, the inorganic fiber is a solid inorganic fiber. In some embodiments of the invention, the inorganic fiber is a hollow fiber. For example, the hollow fiber may have a hollow core, in which case the core may be filled with a therapeutic agent, either alone or admixed with another material, for instance, a polymeric material (e.g., one of the biodegradable polymers set forth above, among many other possibilities). By capping the ends of such fibers, the release of the therapeutic agent is regulated by the porous walls of the fiber (and by the presence of other optional materials that may be admixed with the therapeutic agent, such as polymers). Therapeutic agent loading in such embodiments is precise, as it can be calculated based on the diameter of the hollow core.

[0045] Depending on the embodiment, the capping material may be biostable or biodegradable. Where the capping material is biodegradable, upon degradation of the capping material, the release of any drug remaining in the core at that time will be accelerated.

[0046] As noted above, in the present invention, the inorganic fiber(s) may be associated with the substrate in a variety of ways. For example, the inorganic fiber(s) may be embedded within the substrate. Inorganic fibers may also be associated with the substrate by means of a variety of suitable fiber-based fabrication techniques including, for example, various woven and non-woven techniques (e.g., by knitting or braiding with substrate elements, winding or wrapping around substrate elements, spraying onto substrate elements, etc.). In certain embodiments, the fibers may be adhered to the substrate, to each other, or both, by various techniques,

including thermal fusion, adhesive binding or simple mechanical entanglement, among others.

[0047] In certain embodiments, the inorganic fibers are associated with a tubular substrate, for example, a stent or another tubular medical device substrate. For example, the fibers may be in the form of a woven or non-woven tubular construction that is concentric with the tubular substrate, the fibers may be interwoven with elements of the tubular substrate (e.g., filaments or stent struts, which give a stent its mechanical integrity), or the fibers may be adhered to elements of the tubular substrate, among other possible methods of association. As an example of the latter, one may simply connect inorganic fibers to an outer stent surface using dots of biodegradable polymer as an adhesive.

[0048] In certain embodiments, the inorganic fibers are associated with an expandable substrate, for example, a balloon-expandable or self-expanding stent, or another expandable medical device substrate.

[0049] In some cases, the inorganic fibers are associated with the substrate (e.g., formed on the substrate, applied to the substrate, etc.) while in an expanded state, after which the substrate is contracted prior to delivery to a patient.

[0050] In other cases, the inorganic fibers may be associated with the substrate while in a contracted state. For example, in certain of these embodiments, the inorganic fiber (s) are in the form of a woven or non-woven construction that is concentric with the tubular substrate but which allows for expansion. For instance, the fiber may be loosely wrapped around the device, the fiber may formed into a woven or non-woven tube (or a woven or non-woven sheet of inorganic fibers may be wrapped into the shape of a tube and the ends joined) that is concentric with the device, and so forth.

[0051] For example, a fiber **200** may be loosely wrapped around an expandable stent **100**, as schematically illustrated in FIG. **1**. FIG. **5** illustrates an embodiment in which a woven or non-woven tubular construction **200** is disposed around a stent **100**. Note that in these embodiments, the fibers may be ultimately pinned between the stent and the lumen wall once the stent expanded in vivo. Such embodiments may be useful, for example, for purposes of maintaining the mechanical integrity of the blood vessel at the site of a balloon angioplasty procedure, for coverage of an aneurism in a blood vessel wall, for coverage of vulnerable plaque, and so forth.

[0052] In certain other embodiments, the fibers are more closely associated with the substrate, for instance, being interwoven with or attached to elements of the substrate (e.g., stent filaments, stent struts, etc., which give a stent its mechanical integrity).

[0053] For example, multiple fibers **200** may be woven through the struts **100**s of an expandable stent **100**, as illustrated in FIG. 2A. The fibers **200** are woven longitudinally, rather than radially, in the embodiment shown. In alternative embodiment shown in FIG. 2B, the fibers **200** are longitudinally disposed along the outer surface of the stent without interweaving the fibers with the stent struts **100***s*, for example, by adhering the fibers to the outer surface of the stent struts **100***s* a various points along the length of the stent.

[0054] In other embodiments, the fibers are wrapped around the substrates in ways that allow for expansion of the substrate. For example, in the case of a tubular substrate that expands radially, the fiber may be wrapped around the tubular substrate such that the fiber extends distally, then proximally, then distally again, then proximally again, and so forth as it circles the substrate. FIG. **3** illustrates such an embodiment in which fibers **200** are wrapped around the stent **100** in a zigzag configuration.

[0055] In other embodiments, inorganic fibers are applied to individual elements of the expandable device. For example, fibers **200** may be applied to or formed on the outer surface of a stent **100** such as that shown in FIG. 4A. FIG. 4B is an expanded cross-section taken along line b-b of FIG. 4A and illustrates the fibrous layer **200**, disposed over an underlying stent strut **100***s*. Such a structure may be formed, for example, by adhering individual fibers to the struts, by adhering a woven or non-woven tubular construction (e.g., a wrapped sheet) to the stent and then removing those portions overlying the openings between the stent struts, by electrospraying a fibrous layer on the struts, and so forth. Because the fibers are found on the struts only, and because the struts themselves do not lengthen significantly during stent expansion, large strains (and thus stresses) on the fibrous layer are avoided.

[0056] Porous inorganic fibers may be formed in various ways and, as indicated above, they may be formed first and then applied to a substrate, or they may be formed directly on a substrate.

[0057] As an example of the latter family of techniques, porous inorganic fibers may be spun onto a substrate (e.g., a stationary substrate, a rotating substrate, etc.) either as individual fibers or as a fibrous network. The porous inorganic fibers themselves may be solid or hollow in nature.

[0058] In certain of these embodiments, electrostatic spinning processes may be employed. Electrostatic spinning processes have been described, for example, in Annis et al. in "An Elastomeric Vascular Prosthesis", *Trans. Am. Soc. Artif. Intern. Organs*, Vol. XXIV, pages 209-214 (1978), U.S. Pat. No. 4,044,404 to Martin et al., U.S. Pat. No. 4,842,505 to Annis et al., U.S. Pat. No. 4,738,740 to Pinchuk et al., and U.S. Pat. No. 4,743,252 to Martin Jr. et al. In electrostatic spinning, electrostatic charge generation components are employed to develop an electrostatic charge between the distributor (e.g., a spinneret) and a target, for example, a rotating substrate. For example, target may be grounded or negatively charged, while the distributor is positively charged. Alternatively, the distributor may be grounded or negatively charged, while the target can be positively charged. The potential that is employed may be constant or variable. As a result of the electrostatic charge that is generated, the fibers experience a force that accelerates them from the distributor to the target.

[0059] As a specific example, M. Macias et al., *Microporous and Mesoporous Materials* 86 (2005) 1-13 describe the production of mesoporous metal oxide ceramic fibers, including $TiO_2$, $Ta_2O_5$ and $TaNbO_5$, with diameters under 1 micron. The fibers were electrospun as a non-woven mesh (or paper) from a fiber precursor gel that further contained a structure-directing organic agent (i.e., a surfactant). The structure-directing organic agent was subsequently removed by heating to elevated temperatures. P. Viswanathamurthi et al., *Chemical Physics Letters* 374 (2003) 79-84, describe similar methods for producing porous niobium oxide fibers. A fibrous network of $Ta_2O_5$ fibers are shown in FIG. **10** (from Macias et al.).

[0060] In accordance with an embodiment of the invention, such fibers may be directly electrospun on a medical device substrate (e.g., a rotating stent). In another embodiment, the fibers may be spun onto a flat substrate forming a so-called

nano-paper, which may then be applied to a medical device substrate. In another embodiment, the fibers may be spun onto a sheath.

[0061] Other methods for forming medical devices in accordance with the invention utilize polymer fibers as templates for the creation of hollow porous inorganic fibers. For example, polymer fibers (e.g., polystyrene fibers, among many others) may be first be applied to a medical device substrate (e.g., by directly spinning the fibers on the substrate or by applying previously formed fibers to the substrate). Such a structure is illustrated schematically in FIG. 6A which shows a medical device substrate **600** (e.g., a stent strut) and two polymer fibers **610** in cross section.

[0062] T. Lin et al. "The charge effect of cationic surfactants on the elimination of fibre beads in the electrospinning of polystyrene," *Nanotechnology* 15 (2004) 1375-1381 and T. Jarusuwannapoom et al., "Effect of solvents on electro-spinnability of polystyrene solutions and morphological appearance of resulting electrospun polystyrene fibers," *European Polymer Journal* 41 (2005) 409-421 describe techniques for electrospinning polystyrene fibers with various textures and sizes (diameters typically on the order of 100 nm to 1 micron). An SEM of a polystyrene fiber network is shown in FIG. **8** (from Lin et al.).

[0063] For example, in an embodiment of the present invention, such processes may be used to create polystyrene fibers on a stent that is held at a suitable potential and rotated during electrospinning, thereby covering the stent in a fibrous network of polystyrene fibers.

[0064] Fiber coated substrates formed using these or other techniques may then be used as templates for the creation of inorganic hollow fibers. For example, hollow ceramic fibers may be formed using a combination of layer-by-layer and sol-gel processing techniques. This combination of processes has been successfully employed to produce hollow $LiNbO_3$ spheres. See *Colloids and Colloids assemblies*, Frank Caruso Ed., Wiley-VCH, ISBN 3-527-30660-9, pp. 266-269.

[0065] By way of background, it is well known that ceramic regions may be formed using sol-gel processing. In a typical sol-gel process, precursor materials, typically selected from inorganic metallic and semi-metallic salts, metallic and semi-metallic complexes/chelates, metallic and semi-metallic hydroxides, and organometallic and organo-semi-metallic compounds such as metal alkoxides and alkoxysilanes, are subjected to hydrolysis and condensation reactions in the formation of ceramic materials. Commonly, an alkoxide of choice (e.g., a methoxide, ethoxide, isopropoxide, tert-butoxide, etc.) of a semi-metal or metal of choice (e.g., silicon, germanium, aluminum, zirconium, titanium, tin, iron, hafnium, tantalum, molybdenum, tungsten, rhenium, iridium, etc.) is subjected to hydrolysis and condensation in the formation of ceramic regions.

[0066] Also well known is the "layer-by-layer" (LBL) method, by which multilayer coatings are formed on substrates via electrostatic self-assembly of charged materials. In the LBL method, a first layer having a first surface charge is typically deposited on an underlying substrate (e.g., a medical device or portion thereof), followed by a second layer having a second surface charge that is opposite in sign to the surface charge of the first layer, and so forth. The charge on the outer layer is reversed upon deposition of each sequential layer. Commonly, 5 to 10 to 25 to 50 to 100 to 200 or more layers are applied in this technique, depending on the desired thickness. LBL techniques commonly employ charged polymer species known as "polyelectrolytes". Commonly, the number of charged groups is so large that the polymers are soluble in polar solvents (including water) when in ionically dissociated form (also called polyions). Depending on the type of dissociable groups, polyelectrolytes may be classified as polyacids and polybases. When dissociated, polyacids form polyelectrolyte anions (also known as polyanions), with protons being split off. Specific examples of polyacids/polyanions include poly(styrenesulfonate) (e.g., poly(sodium styrene sulfonate) (PSS)), polyacrylic acid, polyvinylsulfate, polyvinylsulfonate, sodium alginate, eudragit, gelatin, hyaluronic acid, carrageenan, chondroitin sulfate and carboxymethylcellulose, among many others. Polybases contain groups which are capable of accepting protons, e.g., by reaction with acids, with a salt being formed. By accepting protons, polybases form polyelectrolyte cations (also known as polycations). Specific examples of polybases/polycations include protamine sulfate, poly(allylamine) (e.g., poly(allylamine hydrochloride) (PAH)), polydiallyldimethylammonium species, polyethyleneimine (PEI), polyvinylamine, polyvinylpyridine, chitosan, gelatin, spermidine and albumin, among many others.

[0067] Once polymer fibers **610** are positioned on a suitable substrate **600**, for example, as shown schematically in FIG. 6A, the fiber-covered substrate is then exposed to a series of polycation and polyanion solutions, thereby forming a multilayer polyelectrolyte coating over the structure. A structure of this type is illustrated schematically in FIG. 6B which shows the medical device substrate **600**, polymer fibers **610**, and multilayer polyelectrolyte coating **620**. Note that both the substrate **600** and the fibers **610** are covered by the polyelectrolyte coating **620**. Hence, the polyelectrolyte coating **620** acts to connect the substrate **600** to the fibers **610**.

[0068] In a next step, a sol-gel-type process is carried out within the polyelectrolyte layers. First, the structure of FIG. 6B is washed in an anhydrous solvent, for example, an anhydrous alcohol. This removes essentially all the water from the structure, except of the water that remains adsorbed within the polyelectrolyte coating **620**. The structure is then immersed in an anhydrous sol-gel precursor solution (e.g. a solution of a semi-metal or metal alkoxide in anhydrous alcohol). As the precursor infiltrates the polyelectrolyte coating **620**, the presence of water in the coating **620** leads to the hydrolysis and condensation of the precursor (i.e., a sol-gel reaction takes place), resulting in polyelectrolyte/ceramic hybrid coating **630** as illustrated in FIG. 6C. The thickness of the coating **630** will vary with the number of polyelectrolyte layers in the polyelectrolyte coating **620**, with more layers leading to thicker coatings. For further information on layer-by-layer/sol-gel processing, see, e.g., *Colloids and Colloid Assemblies*, Wiley-VCH, edited by Frank Caruso, ISBN 3-527-30660-9, pp. 266-269.

[0069] Finally, the structure of FIG. 6C is heated to elevated temperature (e.g., 400-600° C.) to remove the polymeric constituents of the structure. As a result, a porous ceramic coating **640** is formed on the substrate **600** as illustrated in FIG. 6D. The ceramic coating **640** includes numerous hollow ceramic fibers **640f**. Assuming that the fibers **610** are completely immersed during the layer-by-layer and sol-gel processing, the ends of the fibers will be closed.

[0070] One advantage of a process of this type is that the hollow fiber network is connected to the substrate surface. Another advantage is that the fiber network can be located on one surface of the substrate, but not another. For example, the

hollow fiber network can be located only on the outer abluminal surface of a stent. To achieve this, one may remove portions of the electrospun polymer fiber network (e.g., from the inner surface of the stent, from the windows between the stent struts, etc.) before applying the LBL coating. After sol-gel processing and calcination, those portions of the substrate from which the fiber has been removed will have less capacity to act as a therapeutic agent reservoir, for example, because no hollow fibers are present and because the ceramic layer that is formed typically has less surface area due to the absence of the fibers.

[0071] In some embodiments, certain portions of the substrate/fiber assembly may be provided with more polyelectrolyte layers than others, such that the final ceramic layer is thicker at some locations than others. For example, one end of a stent/fiber assembly may be dipped in more polyelectrolyte solutions than the other end, leading to a ceramic layer that is thicker on one end of the stent, which will have an effect on drug release.

[0072] In some embodiments, after providing a first fiber network and after providing a first multilayer coating, an additional fiber network is formed over the first one. The additional fiber network is then provided with its initial multilayer coating, during which the underlying fiber network will be provided with further polyelectrolyte layers. This structure is then subjected to sol-gel processing and calcination, forming a ceramic fiber network with two types of ceramic fibers (i.e., thin-walled fibers and thick-walled fibers).

[0073] An advantage of using electrospinning techniques such as those described in Lin et al. and Jarusuwannapoom et al., supra, is that very thin fibers (e.g., 1 micron or less) may be formed. As a result, the ceramic fibers formed using these fibers as templates will also be very thin, allowing them to be deformed (e.g., bent) to a substantial degree without cracking.

[0074] Analogous processing can be conducted on polymer fibers that are formed using fiber spinning processes in which continuous fibers are spun. These processes typically employ extrusion nozzles having one or more orifices, also called distributors, jets, or spinnerets. Fibers having a variety of cross-sectional shapes may be formed, depending upon the shape of the orifice(s). Some examples of fiber cross-sections include polygonal (e.g., triangular, rectangular, hexagonal, etc.), circular, oval and multi-lobed cross-sections, among others. Fiber diameters produced by such techniques vary widely, for example, ranging from 100's of nanometers to 100's microns in width. In melt spinning processes, polymers are heated to melt temperature prior to extrusion. In wet and dry spinning processes, polymers are dissolved in a solvent prior to extrusion. Regardless of the technique, the resulting fiber is generally taken up on a rotating mandrel or another take-up device.

[0075] Such fibers can be subjected to LBL processing, sol-gel processing and calcination prior to or after association with a medical device substrate. Where such processing is conducted before association with a medical device substrate, a ceramic layer will not be formed on the substrate, as described above in conjunction with FIGS. 6A-6D (see in particular FIG. 6D). Nonetheless, the fibers can be associated with the substrate in a variety of ways, various examples of which are discussed above, among others.

*[0076] In some embodiments of the invention, fibers may* be spun onto a rotating substrate (e.g., a medical device substrate or a temporary substrate) where they become bonded to one another. For instance, a polymer solution (or melt) can be extruded from a spinneret, thereby forming a plurality of filaments which are wound onto a rotating mandrel or medical device, as the spinneret reciprocates relative to the mandrel or device. The drying (or cooling) parameters may be controlled such that some residual solvent (or tackiness) remains in the filaments as they are wrapped upon the mandrel or device. Upon further solvent evaporation (or cooling), the overlapping fibers on the mandrel or device become bonded to each other. Complex hollow fiber network structures may be formed, for example, using a tapered or stepped mandrel or using a mandrel that can be dissolved, melted, deflated or other otherwise reduced in size for removal after the structure is formed. The resulting fiber network, can then be subjected to LBL processing, sol-gel processing and calcination as described above.

[0077] As previously indicated, where the fibers are completely immersed during the layer-by-layer and sol-gel processing, the ends of the fibers will be closed. Open ended fibers, on the other hand, can be formed by dipping the fiber (either with or with out an associated medical device substrate) only partially into the LBL polyelectrolyte solutions, the sol-gel precursor solution, or both. For example, a stent with a fiber coating can be dipped into the LBL polyelectrolyte solutions in a way such that one end is not exposed to these solutions. This structure is then dipped into a sol-gel precursor solution such that the opposite end is not exposed to the precursor solution. This results in a structure in which each end has been denied a critical processing step (i.e., either LBL processing or a sol-gel processing). Calcination will create open ended fibers on each end of the stent.

[0078] Of course, processes other than the above can be used to generate hollow porous inorganic fibers for use in the present invention.

[0079] For example, processes other than LBL/sol-gel processing can be used in conjunction with fiber templates such as those described in the preceding paragraphs. In one embodiment, charged particles may be accelerated onto the fibers (where they become fused to one another) by subjecting them to an electric field. For example, one can place the fibers (e.g., organic fibers) in between the source of the charged particles and a grounded plate, such that the particles will form a film on the fibers by collision/fusion on their way to the grounded plate. If desired, the trajectory of the particles may be further influenced through the use of a secondary electric field or a magnetic field, where desired. In this way, a porous structure surrounding the fibers may be formed from the fused particles. Where the particles are magnetic or ferromagnetic particles, they may be accelerated onto the fibers by subjecting them to a suitable magnetic field, with the trajectory of the particles being further influenced, if desired, through the use of a secondary magnetic field. In general, such techniques are performed in a vacuum environment. As a specific example, a system for performing such a deposition is available from Mantis Deposition Ltd., Thame, Oxfordshire, United Kingdom, who market a high-pressure sputtering source which is able to generate particles from a sputter target with as few as 30 atoms up to those with diameters exceeding 15 nm. Systems like the Mantis Deposition Ltd. system can produce particles, the majority of which (approximately 80%) have a charge of one electron. Consequently, a *magnetic field or a secondary electric field can be used to* separate particles of similar weight from one another (be-

cause lighter particles are deflected to a greater degree in a given field than are the larger particles of the same charge). For example, the above Mantis Deposition Ltd. system is able to produce charged particle streams with a very narrow mass distribution. A system similar to the Mantis system can be obtained from Oxford Applied Research, Witney, Oxon, UK. Using these and similar systems, thin nanoporous metallic layers may be deposited on a variety of fibers. Such processes are room temperature processes. Thus one may, for example, electrospin therapeutic-agent containing fibers (e.g., fibers of a biostable polymer such as poly[styrene-b-isobutylene-b-styrene] or a biodegradable polymer such as PLGA that contain a therapeutic agent such as paclitaxel, sirolimus, everolimus, tacrolimus or zotarolimus, among many other possibilities) and cover them with a nanoporous metal coating. As another example, one can deposit a nanoporous metal coating on fibers formed of one or more removable polymers (e.g., polystyrene) and then remove (e.g., burn off, dissolve, etc.) the polymer core, after which one may fill the core with a therapeutic agent. In this way, porous metallic fibers may be formed, including those formed from biostable metals, biodegradable metals or both.

[0080] In conjunction with another example, it is noted that systems such as the above system from Mantis Deposition Ltd. allows one to create non-porous layers of metal particles on a surface, simply by increasing the acceleration voltage to such an extent that the particles fuse/melt fully together. By depositing a metal coating using biodegradable metal particles such as magnesium, zinc or iron particles (which may be optionally co-deposited with non-biodegradable metal particles) a coating is created that becomes porous as a result of biodegradation in the body. Depositing such a coating on a drug-filled fiber (e.g., a drug-loaded biostable polymer fiber, a drug-loaded biodegradable polymer fiber, etc.) allows one to create a drug filled inorganic fiber that becomes porous in vivo and that is at least partially biodegradable in vivo.

[0081] As another example, Fraunhofer Gesellschaft has developed a process for producing hollow ceramic fibers for use in capillary membranes. In this process, cellulose is dissolved in a mixture of an organic solvent and water and a ceramic powder is suspended in the solution. This mass is extruded into a water bath through an annular nozzle while a water jet is injected through an opening in the nozzle center. Upon contact with water, a stable hollow fiber, which contains the suspended ceramic powder, is formed. These fibers are collected on reels, dried and sintered in air. During the sintering the cellulose matrix burns out leaving behind a structure with porous walls. One such fiber, an $Al_2O_3$ fiber having a diameter of 1.1 mm, is shown in FIG. 9.

[0082] Therapeutic agent can be loaded through the porous wall of a closed-end hollow fiber or into a porous non-hollow fiber, by exposure to solutions that contain a therapeutic agent of interest. Loading can be enhanced by using solutions with high therapeutic agent concentrations, by loading at elevated temperature, by prolonged exposure to the therapeutic-agent containing solution, by exposure to therapeutic agent containing supercritical fluids such as carbon dioxide or nitric-oxide (with or without co-solvents such as methanol or ethanol), by exposure to the therapeutic-agent containing solution in a high pressure environment to drive the solution into the fibers (with or without pressure cycling to remove the solvent and allow further solution to penetrate the fiber), or combinations of one or more of these measures, among others.

[0083] For open ended hollow fibers, and with reference to FIG. 7, therapeutic agent **710** can be loaded into the fibers **700** using similar processing techniques. Alternatively, particularly for larger diameter fibers, a solution or melt that contains the therapeutic agent, and optionally a polymer, can be loaded into the hollow fibers by more direct techniques, including, for example, introduction using a micro-pipette. Once loaded, the open ends of the fibers may be capped, for example, by dipping the ends into a solution or melt of a capping material, thereby forming a cap **720** over the ends. The cap **720** may be a biostable or biodegradable. In either case, drug elution is controlled, at least initially, by the porosity of the fiber walls (and will also be affected by any polymer that is admixed with the therapeutic agent). In the case of a biodegradable cap, a more rapid release of any remaining drug will ensue, once the cap dissolves. Such release may approach 100%.

[0084] In accordance with another technique, open ended hollow fibers are first placed in a closed beaker with an inlet and an outlet. A vacuum is applied to the outlet to remove the air from within the fibers. The outlet to the vacuum pump is then closed and the inlet is opened to fill the beaker with a solution containing the drugs. The solution will also enter interior of the fibers. After solvent evaporation, a drug-containing layer exists on both the interior as well as the exterior of the fibers. This process may be repeated multiple times to fill the fibers as much as possible. In order to remove the drug-containing layer from the outside of the fibers, without removing the same from the inside, one can flush the fibers in a solvent bath. The drug-containing layer on the outside of the fibers is exposed directly to the solvent, whereas the drug on the interior has to pass through the ends of the fibers. A small amount of drug will be removed from the ends, however, one can simply cut off a piece of the fiber ends to assure that the remaining piece is filled, if desired. Alternatively, the fibers may be dipped in a polymer to close both ends, followed by washing of the outside (e.g., in a solvent that doesn't dissolve the polymer).

[0085] In one exemplary embodiment of the invention, a stainless steel vascular stent is formed which comprises fibers that are loaded with a therapeutic agent, for example, an antiproliferative agent such as paclitaxel, sirolimus, everolimus, tacrolimus or zotarolimus, among many other possibilities. While it is useful to release such an agent from the abluminal surface of the stent to reduce restenosis, such a drug may not be equally useful on the luminal surface of the stent. Therefore, in this embodiment, inorganic fibers are provided only on the outer abluminal surface of the stent that engages the vessel wall. The inner luminal surface may be a bare stainless steel surface or a ceramic surface, depending on the fabrication method employed, both of which are known to support endothelial cell growth. It is generally believed that, to reduce restenosis, the antiproliferative agent is needed in the first few weeks (e.g., the first 3-4 weeks) of implantation, after which release of the antiproliferative agent preferably ceases, so as not to interfere with endothelialization. In this particular embodiment, the inorganic fiber is therefore an open ended fiber, whose ends are capped with a biodegradable polymer. The biodegradable polymer is selected to degrade in a time frame such that any residual antiproliferative agent is released after the above time period has elapsed, thereby removing the agent from the site of the implant.

[0086] In other related embodiments, rather than leaving the luminal surface bare, inorganic fibers are provided on the

inner luminal surface of the stent, which inorganic fibers are loaded with an endothelial cell growth promoter.

[0087] Additional advantages of the present invention include one or more of the following: (1) There is no problem with adherence of the drug delivery medium to the substrate, which may be a problem with various polymeric and non-polymeric coatings. (2) When one applies a coating directly to a substrate, one generally has to be careful that the processing does not adversely affect the substrate material. With the present invention, this is not necessary. For example, the fiber(s) can be taken to a very high temperature before loading the drug and associating the fiber(s) with a substrate. (3) In the case of a stent, the fiber can be better distributed than the cell structure of the stent, leading to more uniform drug delivery. In other words, unlike coated stents, the drug delivery area of the device is independent of the area corresponding to the stent struts. (4) In the case of a balloon deliverable stent, the inorganic fibers can be loosely wound around the stent after it has been crimped to the balloon or provided within a sheath. After expansion of the stent, the fiber is held in place between the stent and the vessel wall. (5) Where the inorganic fibers are incorporated into a biodegradable polymeric substrate, they can provide a dual function. First, the fibers can deliver a therapeutic agent into the surrounding tissue as the polymer degrades. Second, the fibers can serve as a reinforcement structure for the substrate, helping the structure stay connected as the polymer erodes. (6) Where small diameter fibers are used in conjunction with a biodegradable stent platform (e.g., a magnesium, zinc or iron stent), the fibers will exert very little significant mechanical effect on the vessel wall once the stent erodes. (7) In a design analogous to that described in Pub. No. US 2006/0184237 to Weber, one can form a mesh that contains or consists of inorganic fibers in accordance with the invention, which can be positioned around the outside surface of a self-expanding stent delivery system. After expansion of the stent, the fiber is held in place between the stent and the vessel wall. Such a system may include a self-expanding stent, a sheath adapted to enclose the self-expanding stent in an interior space during deployment, and an inorganic fiber mesh, which may be attached to the distal end self-expanding stent and which may be adapted to lay outside the interior space of the sheath when the self-expanding stent is enclosed in the sheath.

[0088] Therapeutic agents for the practice of the invention include genetic therapeutic agents and non-genetic therapeutic agents. Therapeutic agents may be used singly or in combination.

[0089] Exemplary non-genetic therapeutic agents for use in connection with the present invention include the following, among others: (a) anti-thrombotic agents such as heparin, heparin derivatives, urokinase, and PPack (dextrophenylalanine proline arginine chloromethylketone); (b) anti-inflammatory agents such as dexamethasone, prednisolone, corticosterone, budesonide, estrogen, sulfasalazine and mesalamine; (c) antineoplastic/antiproliferative/anti-miotic agents such as paclitaxel, 5-fluorouracil, cisplatin, vinblastine, vincristine, epothilones, endostatin, angiostatin, angiopeptin, monoclonal antibodies capable of blocking smooth muscle cell proliferation, and thymidine kinase inhibitors; (d) anesthetic agents such as lidocaine, bupivacaine and ropivacaine; (e) anti-coagulants such as D-Phe-Pro-Arg chloromethyl ketone, an RGD peptide-containing compound, heparin, hirudin, antithrombin compounds, platelet receptor antagonists, anti-thrombin antibodies, anti-platelet receptor antibodies, aspirin, prostaglandin inhibitors, platelet inhibitors and tick antiplatelet peptides; (f) vascular cell growth promoters such as growth factors, transcriptional activators, and translational promotors; (g) vascular cell growth inhibitors such as growth factor inhibitors, growth factor receptor antagonists, transcriptional repressors, translational repressors, replication inhibitors, inhibitory antibodies, antibodies directed against growth factors, bifunctional molecules consisting of a growth factor and a cytotoxin, bifunctional molecules consisting of an antibody and a cytotoxin; (h) protein kinase and tyrosine kinase inhibitors (e.g., tyrphostins, genistein, quinoxalines); (i) prostacyclin analogs; (j) cholesterol-lowering agents; (k) angiopoietins; (l) antimicrobial agents such as triclosan, cephalosporins, aminoglycosides and nitrofurantoin; (m) cytotoxic agents, cytostatic agents and cell proliferation affectors; (n) vasodilating agents; (o) agents that interfere with endogenous vasoactive mechanisms; (p) inhibitors of leukocyte recruitment, such as monoclonal antibodies; (q) cytokines; (r) hormones; (s) inhibitors of HSP 90 protein (i.e., Heat Shock Protein, which is a molecular chaperone or housekeeping protein and is needed for the stability and function of other client proteins/signal transduction proteins responsible for growth and survival of cells) including geldanamycin, (t) smooth muscle relaxants such as alpha receptor antagonists (e.g., doxazosin, tamsulosin, terazosin, prazosin and alfuzosin), calcium channel blockers (e.g., verapimil, diltiazem, nifedipine, nicardipine, nimodipine and bepridil), beta receptor agonists (e.g., dobutamine and salmeterol), beta receptor antagonists (e.g., atenolol, metaprolol and butoxamine), angiotensin-II receptor antagonists (e.g., losartan, valsartan, irbesartan, candesartan and telmisartan), and antispasmodic/anticholinergic drugs (e.g., oxybutynin chloride, flavoxate, tolterodine, hyoscyamine sulfate, diclomine), (u) bARKct inhibitors, (v) phospholamban inhibitors, (w) Serca 2 gene/protein, (x) immune response modifiers including aminoquizolines, for instance, imidazoquinolines such as resiquimod and imiquimod, (y) human apolioproteins (e.g., AI, AII, AIII, AIV, AV, etc.).

[0090] Various preferred non-genetic therapeutic agents include taxanes such as paclitaxel (including particulate forms thereof, for instance, protein-bound paclitaxel particles such as albumin-bound paclitaxel nanoparticles, e.g., ABRAXANE and paclitaxel-polymer conjugates, for example, paclitaxel-poly(glutamic acid) conjugates), rapamycin (sirolimus) and its analogs (e.g., everolimus, tacrolimus, zotarolimus, etc.) as well as sirolimus-polymer conjugates and sirolimus analog-polymer conjugates such as sirolimus-poly(glutamic acid) and everolimus-poly(glutamic acid) conjugates, Epo D, dexamethasone, estradiol, halofuginone, cilostazole, geldanamycin, ABT-578 (Abbott Laboratories), trapidil, liprostin, Actinomcin D, Resten-NG, Ap-17, abciximab, clopidogrel, Ridogrel, beta-blockers, bARKct inhibitors, phospholamban inhibitors, Serca 2 gene/protein, imiquimod, human apolioproteins (e.g., AI-AV), growth factors (e.g., VEGF-2), as well a derivatives of the forgoing, among others.

[0091] Exemplary genetic therapeutic agents for use in connection with the present invention include anti-sense DNA and RNA as well as DNA coding for the various proteins (as well as the proteins themselves), for example, the following, among others: (a) anti-sense RNA, (b) tRNA or rRNA to replace defective or deficient endogenous molecules, (c) angiogenic and other factors including growth factors such as acidic and basic fibroblast growth factors,

vascular endothelial growth factor, endothelial mitogenic growth factors, epidermal growth factor, transforming growth factor α and β, platelet-derived endothelial growth factor, platelet-derived growth factor, tumor necrosis factor α, hepatocyte growth factor and insulin-like growth factor, (d) cell cycle inhibitors including CD inhibitors, and (e) thymidine kinase ("TK") and other agents useful for interfering with cell proliferation. Also of interest is DNA encoding for the family of bone morphogenic proteins ("BMP's"), including BMP-2, BMP-3, BMP-4, BMP-5, BMP-6 (Vgr-1), BMP-7 (OP-1), BMP-8, BMP-9, BMP-10, BMP-11, BMP-12, BMP-13, BMP-14, BMP-15, and BMP-16. Currently preferred BMP's are any of BMP-2, BMP-3, BMP-4, BMP-5, BMP-6 and BMP-7. These dimeric proteins can be provided as homodimers, heterodimers, or combinations thereof, alone or together with other molecules. Alternatively, or in addition, molecules capable of inducing an upstream or downstream effect of a BMP can be provided. Such molecules include any of the "hedgehog" proteins, or the DNA's encoding them.

[0092] Vectors for delivery of genetic therapeutic agents include viral vectors such as adenoviruses, gutted adenoviruses, adeno-associated virus, retroviruses, alpha virus (Semliki Forest, Sindbis, etc.), lentiviruses, herpes simplex virus, replication competent viruses (e.g., ONYX-015) and hybrid vectors; and non-viral vectors such as artificial chromosomes and mini-chromosomes, plasmid DNA vectors (e.g., PCOR), cationic polymers (e.g., polyethyleneimine, polyethyleneimine (PEI)), graft copolymers (e.g., polyether-PEI and polyethylene oxide-PEI), neutral polymers such as polyvinylpyrrolidone (PVP), SP1017 (SUPRATEK), lipids such as cationic lipids, liposomes, lipoplexes, nanoparticles, or microparticles, with and without targeting sequences such as the protein transduction domain (PTD).

[0093] Numerous therapeutic agents, not necessarily exclusive of those listed above, have been identified as candidates for vascular treatment regimens, for example, as agents targeting restenosis. Such agents are useful for the practice of the present invention and include one or more of the following: (a) Ca-channel blockers including benzothiazapines such as diltiazem and clentiazem, dihydropyridines such as nifedipine, amlodipine and nicardapine, and phenylalkylamines such as verapamil, (b) serotonin pathway modulators including: 5-HT antagonists such as ketanserin and naftidrofuryl, as well as 5-HT uptake inhibitors such as fluoxetine, (c) cyclic nucleotide pathway agents including phosphodiesterase inhibitors such as cilostazole and dipyridamole, adenylate/Guanylate cyclase stimulants such as forskolin, as well as adenosine analogs, (d) catecholamine modulators including α-antagonists such as prazosin and bunazosine, β-antagonists such as propranolol and α/β-antagonists such as labetalol and carvedilol, (e) endothelin receptor antagonists, (f) nitric oxide donors/releasing molecules including organic nitrates/nitrites such as nitroglycerin, isosorbide dinitrate and amyl nitrite, inorganic nitroso compounds such as sodium nitroprusside, sydnonimines such as molsidomine and linsidomine, nonoates such as diazenium diolates and NO adducts of alkanediamines, S-nitroso compounds including low molecular weight compounds (e.g., S-nitroso derivatives of captopril, glutathione and N-acetyl penicillamine) and high molecular weight compounds (e.g., S-nitroso derivatives of proteins, peptides, oligosaccharides, polysaccharides, synthetic polymers/oligomers and natural polymers/oligomers), as well as C-nitroso-compounds, O-nitroso-compounds, N-nitroso-compounds and L-arginine, (g) Angiotensin Converting Enzyme (ACE) inhibitors such as cilazapril, fosinopril and enalapril, (h) ATII-receptor antagonists such as saralasin and losartin, (i) platelet adhesion inhibitors such as albumin and polyethylene oxide,; platelet aggregation inhibitors including cilostazole, aspirin and thienopyridine (ticlopidine, clopidogrel) and GP IIb/IIIa inhibitors such as abciximab, epitifibatide and tirofiban, (k) coagulation pathway modulators including heparinoids such as heparin, low molecular weight heparin, dextran sulfate and β-cyclodextrin tetradecasulfate, thrombin inhibitors such as hirudin, hirulog, PPACK(D-phe-L-propyl-L-arg-chloromethylketone) and argatroban, FXa inhibitors such as antistatin and TAP (tick anticoagulant peptide), Vitamin K inhibitors such as warfarin, as well as activated protein C, (l) cyclooxygenase pathway inhibitors such as aspirin, ibuprofen, flurbiprofen, indomethacin and sulfinpyrazone, (m) natural and synthetic corticosteroids such as dexamethasone, prednisolone, methprednisolone and hydrocortisone, (n) lipoxygenase pathway inhibitors such as nordihydroguairetic acid and caffeic acid, (o) leukotriene receptor antagonists, (p) antagonists of E- and P-selectins, (q) inhibitors of VCAM-1 and ICAM-1 interactions, (r) prostaglandins and analogs thereof including prostaglandins such as PGE1 and PGI2 and prostacyclin analogs such as ciprostene, epoprostenol, carbacyclin, iloprost and beraprost, (s) macrophage activation preventers including bisphosphonates, (t) HMG-CoA reductase inhibitors such as lovastatin, pravastatin, fluvastatin, simvastatin and cerivastatin, (u) fish oils and omega-3-fatty acids, (v) free-radical scavengers/antioxidants such as probucol, vitamins C and E, ebselen, trans-retinoic acid and SOD mimics, (w) agents affecting various growth factors including FGF pathway agents such as bFGF antibodies and chimeric fusion proteins, PDGF receptor antagonists such as trapidil, IGF pathway agents including somatostatin analogs such as angiopeptin and ocreotide, TGF-β pathway agents such as polyanionic agents (heparin, fucoidin), decorin, and TGF-β antibodies, EGF pathway agents such as EGF antibodies, receptor antagonists and chimeric fusion proteins, TNF-α pathway agents such as thalidomide and analogs thereof, Thromboxane A2 (TXA2) pathway modulators such as sulotroban, vapiprost, dazoxiben and ridogrel, as well as protein tyrosine kinase inhibitors such as tyrphostin, genistein and quinoxaline derivatives, (x) MMP pathway inhibitors such as marimastat, ilomastat and metastat, (y) cell motility inhibitors such as cytochalasin B, (z) antiproliferative/antineoplastic agents including antimetabolites such as purine analogs (e.g., 6-mercaptopurine or cladribine, which is a chlorinated purine nucleoside analog), pyrimidine analogs (e.g., cytarabine and 5-fluorouracil) and methotrexate, nitrogen mustards, alkyl sulfonates, ethylenimines, antibiotics (e.g., daunorubicin, doxorubicin), nitrosoureas, cisplatin, agents affecting microtubule dynamics (e.g., vinblastine, vincristine, colchicine, Epo D, paclitaxel and epothilone), caspase activators, proteasome inhibitors, angiogenesis inhibitors (e.g., endostatin, angiostatin and squalamine), rapamycin (sirolimus) and its analogs (e.g., everolimus, tacrolimus, zotarolimus, etc.), cerivastatin, flavopiridol and suramin, (aa) matrix deposition/organization pathway inhibitors such as halofuginone or other quinazolinone derivatives and tranilast, (bb) endothelialization facilitators such as VEGF and RGD peptide, and (cc) blood rheology modulators such as pentoxifylline.

[0094] Numerous additional therapeutic agents useful for the practice of the present invention are also disclosed in U.S. Pat. No. 5,733,925 assigned to Kunz.

[0095] A wide range of therapeutic agent loadings can be used in conjunction with the medical devices of the present invention, with the pharmaceutically effective amount being readily determined by those of ordinary skill in the art and ultimately depending, for example, upon the condition to be treated, the nature of the therapeutic agent itself, the tissue into which the medical device is introduced, and so forth.

EXAMPLE

[0096] Polystyrene fiber is spun onto a stainless steel stent substrate using electrospinning techniques such as those described in Lin et al. and Jarusuwannapoom et al., supra. The stent may be rotated while holding it at a suitable potential during electrospinning, thereby covering the stent in a meshwork of polystyrene fibers. If desired, the stent surface may be treated with an oxygen plasma prior to deposition of the fibers, in order to clean and charge the surface. To the extent that the stent windows are covered by the resulting fibrous network, they may be cleared of fiber, if desired. Alternatively, the fibrous network may be deposited on an expanded stent, in which case the fibrous network may cover then entire stent without concern that the inorganic network that is ultimately formed will inhibit expansion or be torn apart by expansion forces. The as-covered stent is then dipped into sequential polyanion and polycation solutions, for example, a first layer of PEI, followed by 7 bi-layers of PAH\PSS. The resulting structure is then washed in anhydrous alcohol (e.g., ethanol or isopropanol), followed by immersion in an anhydrous sol-gel precursor solution, for example, containing titanium isopropoxide as a metal alkoxide precursor in anhydrous alcohol, causing it to infiltrate the polyelectrolyte multilayer shell. The presence of adsorbed water in the shell then results in hydrolysis and condensation of the precursor. The resulting polyelectrolyte/sol-gel hybrid coating is then calcined at elevated temperature (e.g., 400-600° C.) to form a porous ceramic coating that includes a hollow ceramic fiber network. The resulting structure is then exposed to a solution of paclitaxel in DMSO (solubility ~500 mg/ml) or in methanol (solubility ~100 mg/ml) within an elevated pressure environment.

[0097] Although various embodiments are specifically illustrated and described herein, it will be appreciated that modifications and variations of the present invention are covered by the above teachings and are within the purview of the appended claims without departing from the spirit and intended scope of the invention.

1. A medical device comprising a substrate and a porous therapeutic-agent-loaded inorganic fiber.

2. The medical device of claim 1 wherein the substrate is a biostable metallic substrate.

3. The medical device of claim 1, wherein the substrate is a biodegradable metallic substrate.

4. The medical device of claim 1, wherein the substrate is a biodegradable polymeric substrate.

5. The medical device of claim 1, wherein the inorganic fiber is a linear fiber.

6. The medical device of claim 1, wherein the inorganic fiber is part of fibrous network.

7. The medical device of claim 1, wherein the fiber is a hollow fiber.

8. The medical device of claim 7, wherein the hollow fiber has closed ends.

9. The medical device of claim 7, wherein the hollow fiber has at least one open end.

10. The medical device of claim 9, wherein the open end is capped with a biodegradable material.

11. The medical device of claim 9, wherein the hollow fiber is loaded with a mixture comprising said therapeutic agent and a polymer.

12. The medical device of claim 1, wherein said inorganic fiber is a ceramic fiber that comprises a metal oxide.

13. The medical device of claim 1, wherein the inorganic fiber is a ceramic fiber that comprises a metal oxide selected from titanium oxide, tantalum oxide, and combinations of the foregoing.

14. The medical device of claim 1, wherein the inorganic fiber is nanoporous.

15. The medical device of claim 1, wherein said inorganic fiber is mesoporous.

16. The medical device of claim 1, wherein the inorganic fiber is disposed on a surface of the substrate.

17. The medical device of claim 1, wherein the inorganic fiber is embedded within a biodegradable polymer substrate.

18. The medical device of claim 1, wherein the inorganic fiber is embedded within a biodegradable polymer coating on the substrate surface.

19. The medical device of claim 1, wherein the inorganic fiber is wrapped around the substrate.

20. The medical device of claim 1, wherein the inorganic fiber is interwoven with elements of the substrate.

21. The medical device of claim 1, wherein the inorganic fiber is attached to the substrate.

22. The medical device of claim 1, wherein the inorganic fiber is not attached to substrate.

23. The medical device of claim 1, wherein the substrate is a tubular substrate.

24. The medical device of claim 23, wherein the inorganic fiber is in the form of a tubular construct that is concentric with the tubular substrate.

25. The medical device of claim 23, wherein the tubular substrate is a radially expandable substrate.

26. The medical device of claim 25, wherein the radially expandable substrate is a stent.

27. The medical device of claim 26, wherein the inorganic fiber is woven into the stent structure.

28. The medical device of claim 26, wherein the inorganic fiber is positioned over the abluminal surface of the stent.

29. The medical device of claim 26, wherein the inorganic fiber is formed on or applied over the stent when it is in an expanded state.

30. The medical device of claim 26, wherein the inorganic fiber is formed on or applied over the stent when it is in a contracted state.

31. The medical device of claim 30, wherein the inorganic fiber is wrapped loosely around the stent.

32. The medical device of claim 30, wherein the inorganic fiber is disposed longitudinally along the substrate.

33. The medical device of claim 30, wherein the inorganic fiber is wrapped around the substrate in a zigzag configuration.

34. The medical device of claim 30, wherein the inorganic fiber is part of a woven or non-woven fiber network that surrounds the stent.

PTX052.18



35. The medical device of claim 1, wherein said therapeutic agent is selected from one or more of the group consisting of anti-thrombotic agents, anti-proliferative agents, anti-inflammatory agents, anti-migratory agents, agents affecting extracellular matrix production and organization, antineoplastic agents, anti-mitotic agents, anesthetic agents, anti-coagulants, vascular cell growth promoters, vascular cell growth inhibitors, cholesterol-lowering agents, vasodilating agents, TGF-β elevating agents, and agents that interfere with endogenous vasoactive mechanisms.

36. The medical device of claim 1, wherein said inorganic fiber is a metallic fiber that comprises a biodegradable metal selected from iron, magnesium, zinc and combinations thereof.

* * * * *

UT-BSC0090971

**CONFIDENTIAL DOCUMENT REMOVED**

**SUBJECT TO PROTECTIVE ORDER**

**TRIAL EXHIBIT NO. PTX065**

**Appx25077-25079**

**CONFIDENTIAL DOCUMENT REMOVED**

**SUBJECT TO PROTECTIVE ORDER**

**TRIAL EXHIBIT NO. PTX067**

**Appx25080-25085**

**CONFIDENTIAL DOCUMENT REMOVED**

**SUBJECT TO PROTECTIVE ORDER**

**TRIAL EXHIBIT NO. PTX069**

**Appx25086-25111**

**CONFIDENTIAL DOCUMENT REMOVED**

**SUBJECT TO PROTECTIVE ORDER**

**TRIAL EXHIBIT NO. PTX072**

**Appx25112-25157**

**CONFIDENTIAL DOCUMENT REMOVED**

**SUBJECT TO PROTECTIVE ORDER**

**TRIAL EXHIBIT NO. PTX073**

**Appx25158-25159**

TRIAL EXHIBIT
1:18-cv-00392-GBW
PTX143



doi:10.1351/goldbook.D01806

# dissolution

The mixing of two phases with the formation of one new homogeneous phase (i.e. the solution).

***Source:***
PAC, 1994, *66*, 577 *(Definitions of terms relating to phase transitions of the solid state (IUPAC Recommendations 1994))* on page 581
Orange Book, p. 83

 Copyright © 2014 IUPAC

US005364627A

# United States Patent [19]

**Song**

[11] **Patent Number: 5,364,627**

[45] **Date of Patent: Nov. 15, 1994**

[54] **GRADUAL RELEASE STRUCTURES MADE FROM FIBER SPINNING TECHNIQUES**

[75] Inventor: **Joo H. Song**, Northbrook, Ill.

[73] Assignee: **Wm. Wrigley Jr. Company**, Chicago, Ill.

[21] Appl. No.: **918,897**

[22] Filed: **Jul. 21, 1992**

**Related U.S. Application Data**

[63] Continuation of Ser. No. 418,662, Oct. 10, 1989, abandoned.

[51] **Int. Cl.**[5] .......... **A61F 13/00**

[52] **U.S. Cl.** .......... **424/443**; 424/405; 424/484; 426/548; 71/64.13

[58] **Field of Search** .......... 424/443, 78, 405, 484

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,224,430 | 12/1940 | Garbutt | 107/8 |
| 3,028,308 | 4/1962 | Zambito et al. | 167/82 |
| 3,201,353 | 8/1965 | Corben | 252/316 |
| 3,329,574 | 7/1967 | Barron et al. | 167/82 |
| 3,435,110 | 3/1969 | Nichols | 424/20 |
| 3,737,521 | 6/1973 | Born | 424/22 |
| 3,795,744 | 3/1974 | Ogawa et al. | 426/3 |
| 3,818,107 | 6/1974 | Yolles | 426/3 |
| 3,923,939 | 12/1975 | Baker et al. | 264/49 |
| 3,928,633 | 12/1975 | Shoat et al. | 426/96 |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2005362 | 6/1990 | Canada | A23G 3/30 |
| 0040048 | 11/1981 | European Pat. Off. | D01F 9/04 |
| 0122808 | 10/1984 | European Pat. Off. | A23G 3/30 |
| 0126827 | 12/1984 | European Pat. Off. | A01N 25/20 |
| 0191986 | 8/1986 | European Pat. Off. | A23G 9/30 |
| 0252374 | 1/1988 | European Pat. Off. | A23P 1/04 |
| 0253554 | 1/1988 | European Pat. Off. | A61K 9/22 |
| 0263224 | 4/1988 | European Pat. Off. | A23G 3/30 |
| 0273009 | 6/1988 | European Pat. Off. | A23G 3/30 |
| 0288909 | 11/1988 | European Pat. Off. | A23G 3/30 |
| 0370296 | 5/1990 | European Pat. Off. | A23G 3/30 |
| 0376549 | 7/1990 | European Pat. Off. | A23G 3/30 |
| 0484124 | 5/1992 | European Pat. Off. | A23G 3/30 |
| 0492981 | 7/1992 | European Pat. Off. | A23G 3/30 |
| 2503989 | 10/1982 | France | A23G 3/30 |
| 2220103 | 4/1987 | France | A23L 1/236 |
| 61-296118 | 10/1986 | Japan . | |
| 62-215010 | 9/1987 | Japan . | |
| 63-175067 | 7/1988 | Japan . | |
| 63-295711 | 12/1988 | Japan . | |
| 1-124619 | 5/1989 | Japan . | |
| 1-174609 | 7/1989 | Japan . | |
| 1-183514 | 7/1989 | Japan . | |
| 1-246411 | 10/1989 | Japan . | |
| 1327761 | 8/1973 | United Kingdom | A23L 1/26 |
| WO85/03414 | 8/1985 | WIPO | A23L 1/22 |
| WO88/08298 | 11/1988 | WIPO | A61K 9/00 |
| WO89/02703 | 4/1989 | WIPO | A23G 3/30 |
| WO90/07859 | 7/1990 | WIPO | A23G 3/30 |
| WO90/07864 | 7/1990 | WIPO . | |
| WO90/08478 | 8/1990 | WIPO | A23L 1/187 |
| WO90/12511 | 11/1990 | WIPO | A23G 3/30 |
| WO91/07103 | 5/1991 | WIPO | A23G 3/30 |

OTHER PUBLICATIONS

F. Billmeyer, Jr., *Textbook of Polymer Science*, 518–22 (Wiley International Edition, 2nd).

R. Dunn, D. Lewis, L. Beck, *Fibrous Polymers for the Delivery of Contraceptive Steroids to the Female Reproductive Tract*, Controlled Release of Pesticides and Pharmaceuticals, 125–46 (D. Lewis Ed. 1981).

*Primary Examiner*—D. Gabrielle Phelan

*Attorney, Agent, or Firm*—Willian Brinks Hofer Gilson & Lione

[57] **ABSTRACT**

A delivery system and a process for making the system is provided for the gradual release of an active agent. The system comprises an active agent and a wall material. The delivery system is formed by melt spinning a mixture of particles of active agent and wall material into a fiber. The fiber has a longitudinal dimension and a cross sectional dimension, the cross sectional dimension being no greater than about 1 mm. The fiber has an exterior surface. The particles of active agent are dispersed throughout the wall material such that the particles of active agent are gradually released from the fiber when the fiber is contacted with a solvent specific to the active agent.

**29 Claims, 6 Drawing Sheets**




DEFENSE EXHIBIT DTX018

BSC-UTEX-00029286

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,951,821 | 4/1976 | Davidson | 252/1 |
| 4,122,195 | 10/1978 | Bahoshy et al. | 426/3 |
| 4,125,519 | 11/1978 | Goodman et al. | 528/363 |
| 4,139,639 | 12/1979 | Bahoshy et al. | 426/3 |
| 4,206,301 | 6/1980 | Yolles | 536/3 |
| 4,226,886 | 10/1980 | Lakes | 428/304 |
| 4,230,687 | 10/1980 | Sair et al. | 424/22 |
| 4,374,858 | 2/1983 | Glass et al. | 426/5 |
| 4,384,004 | 5/1983 | Cea et al. | 426/3 |
| 4,384,005 | 5/1983 | McSweeney | 426/250 |
| 4,386,106 | 5/1983 | Merritt et al. | 426/5 |
| 4,388,328 | 6/1983 | Glass | 426/3 |
| 4,399,154 | 8/1983 | Puglia et al. | 426/5 |
| 4,447,475 | 5/1984 | Lubbock et al. | 427/213.31 |
| 4,485,118 | 11/1984 | Carroll et al. | 426/5 |
| 4,490,395 | 12/1984 | Cherukuri et al. | 426/3 |
| 4,496,592 | 1/1985 | Kuwahara et al. | 426/5 |
| 4,515,769 | 5/1985 | Merritt et al. | 424/49 |
| 4,556,566 | 12/1985 | Bell | 426/96 |
| 4,556,567 | 12/1985 | Meyer | 426/96 |
| 4,568,560 | 2/1986 | Schobel | 427/3 |
| 4,590,075 | 5/1986 | Wei et al. | 426/5 |
| 4,606,940 | 8/1986 | Frank et al. | 427/213.32 |
| 4,643,593 | 1/1987 | Stroz et al. | 426/5 |
| 4,673,565 | 6/1987 | DiLuccio et al. | 424/443 |
| 4,673,577 | 6/1987 | Patel | 426/5 |
| 4,689,235 | 8/1987 | Barnes et al. | 426/89 |
| 4,690,825 | 9/1987 | Won | 424/501 |
| 4,695,463 | 9/1987 | Yang et al. | 424/440 |
| 4,711,784 | 12/1987 | Yang | 426/5 |
| 4,720,384 | 1/1988 | DiLuccio et al. | 424/78 |
| 4,721,620 | 1/1988 | Cherukuri et al. | 426/6 |
| 4,722,845 | 2/1988 | Cherukuri et al. | 426/5 |
| 4,726,953 | 2/1988 | Carroll et al. | 426/5 |
| 4,740,376 | 4/1988 | Yang | 426/5 |
| 4,752,485 | 6/1988 | Sharma et al. | 426/99 |
| 4,766,036 | 8/1988 | Vaughn et al. | 428/364 |
| 4,771,118 | 10/1988 | Takamizawa et al. | 528/14 |
| 4,794,003 | 12/1988 | Cherukuri et al. | 426/6 |
| 4,816,265 | 3/1989 | Cherukuri et al. | 426/5 |
| 4,824,681 | 4/1989 | Schobel et al. | 426/5 |
| 4,828,857 | 5/1989 | Sharma et al. | 426/285 |
| 4,841,968 | 6/1989 | Dunn et al. | 128/335.5 |
| 4,870,035 | 9/1989 | Takamizawa et al. | 501/88 |
| 4,873,085 | 10/1989 | Fuisz | 424/400 |
| 4,885,175 | 12/1989 | Zibell | 426/5 |
| 4,892,736 | 1/1990 | Goodson | 424/435 |
| 4,911,934 | 3/1990 | Yang et al. | 426/5 |
| 4,915,958 | 4/1990 | Faust et al. | 426/3 |
| 4,929,447 | 5/1990 | Yang | 424/440 |
| 4,931,293 | 6/1990 | Cherukuri et al. | 426/5 |
| 4,933,190 | 6/1990 | Cherukuri et al. | 426/5 |
| 4,959,226 | 9/1990 | Chapdelaine et al. | 426/3 |
| 4,978,537 | 12/1990 | Song | 426/5 |
| 4,992,280 | 2/1991 | Chu et al. | 426/5 |
| 4,997,856 | 3/1991 | Fuisz | 514/777 |
| 5,000,965 | 3/1991 | Killeen et al. | 426/5 |
| 5,108,762 | 4/1992 | Broderick et al. | 426/5 |

FIG-1-




FIG-1A-





Fig. 2




Fig. 3




Fig-4




Fig-5




Fig. 6




Fig. 7



Fig. 8



Fig. 9



Fig-10-

## GRADUAL RELEASE STRUCTURES MADE FROM FIBER SPINNING TECHNIQUES

This application is a continuation of U.S. application Ser. No. 07/418,662, filed Oct. 10, 1989, now abandoned.

### FIELD OF THE INVENTION

The invention is related to delivery systems for the gradual release of active agents and processes for making such systems and is particularly directed to delivery systems using heat sensitive active agents with biodegradable polymers and melt spinning processes for making such systems.

### BACKGROUND OF THE INVENTION

The present invention is an advance in the art of delivery systems for the gradual release of active agents. This invention enables an active agent to be gradually released through the direct interaction of the agent and a solvent either within channels in the structure enclosing the active agent or through exposure of the active agent to the solvent when the structure enclosing the active agent is deformed or through diffusion of the active agent through the wall material.

Prior to the present invention, the gradual release of active agents, such as drugs, could be accomplished by the diffusion of the active agent through an encapsulating material. A discussion of such encapsulated structures is found in R. Dunn & D. Lewis, *Fibrous Polymers for the Delivery of Contraceptive Steroids to the Female Reproductive Tract,* Controlled Release of Pesticides and Pharmaceuticals 125–46 (D. Lewis ed. 1981), which describes fiber-like structures. Alternatively, an encapsulating shell around the active agent could be ruptured causing exposure of the active agent to various solvents.

Melt blending is another technique that was used prior to the present invention to obtain a mixture of active agent and support material to form a gradual release structure. In melt blending a polymer and an active agent are mixed and melted together. This molten mixture is then cast and solidified. The solidified mixture could then be ground or otherwise shaped for its intended end use. The present invention provides benefits over melt blending techniques by reducing the processing steps required with that technique and reducing the time that the active agent is exposed to heat during processing.

### SUMMARY OF THE INVENTION

A delivery system is provided for the gradual release of an active agent. The system comprises an active agent and a wall material. The delivery system is formed by melt spinning a mixture of particles of active agent and wall material, having more than about 10 but less than about 55 percent by weight active agent, into a fiber. The fiber has a longitudinal dimension and a cross sectional dimension, the cross sectional dimension being at no greater than about 1 mm. The fiber has an exterior surface. The particles of active agent are dispersed through out the wall material such that the particles of active agent are gradually released from the fiber when the fiber is contacted with a solvent for the active agent.

A process is provided for making a delivery system for the gradual release of an active agent which comprises the steps of preparing a mixture of active agent and wall material, having more than about 10 but less than about 55 percent by weight active agent. This mixture is melt spun into a fiber using a die no greater in diameter than about 1 mm and at a temperature less than about 140° C. The melt spun fibers are then cut.

To aid in understanding the invention one is directed towards the drawings and the detailed description of the present preferred embodiment of the invention.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is an illustration of a gradual release structure in fiber form.

FIG. **1A** is an illustration of the gradual release structure of FIG. **1** after it has been subjected to a solvent.

FIG. **2** is a Scanning Electron Photomicrograph (SEPM) of a gradual release structure showing the end and side of a fiber.

FIG. **3** is a SEPM of a gradual release structure showing the side of a fiber.

FIGS. **4** & **5** are SEPMs of a gradual release structure showing the ends of a fiber and the channels within the encapsulating structure.

FIG. **6** is an SEPM showing the side and end of a fiber.

FIG. **7** is a SEPM showing the side of a fiber.

FIGS. **8** & **9** are SEPMs showing the ends of a fiber.

FIG. **10** is a SEPM of a gradual release structure showing a fiber with a crystalline active agent oriented along the length of the fiber parallel to the longitudinal axis.

### DETAILED DESCRIPTION OF PRESENTLY PREFERRED EMBODIMENT OF THE INVENTION

An embodiment of a structure made in accordance with the present invention is a fiber having a support matrix. The support matrix is made up of a wall material. An active agent is dispersed throughout the support matrix and may be in contact with itself forming a contiguous phase within the support matrix. The active agent, however, does not necessarily have to be in a contiguous phase. The ends of the support matrix have openings, exposing the active agent. Additionally, the active agent may be exposed along openings on the sides of the fiber. This structure may be made by stretching an already formed fiber. It is believed that the stretching action causes the wall material to orient itself longitudinally. The amount of active agent in this structure is from about **10** percent by weight to about 55 percent by weight. It is believed, however, that loading as low as a fraction of a percent of active agent will impart gradual release characteristics to the structure. The loading of the structure is influenced by the characteristics of the active agent such as its solubility or extractability from the support matrix.

After the fibers are formed by melt spinning they may be stretched by applying a draw, or stretching force, to the fibers. The draw can be applied at a winder or by venturi after the fibers exit the die. Other methods of stretching fibers known to the art may also be employed.

In this structure gradual release of the active agent occurs when the fiber is brought in contact with a solvent, or dispersing media, for the active agent. The wall material is less soluble in the solvent then the active agent and preferably the wall material should be substantially insoluble in the solvent under the conditions in which the fiber is being used.

It is presently believed that the solvent first dissolves the active agent in the openings at the ends of the support matrix. If the active agent is in a contiguous phase within the support matrix, the active agent in those openings is dissolved and spaces or channels in the support matrix are created. The solvent fills these channels and begins to dissolve the newly exposed active agent, which was in contact with the now dissolved active agent located in the openings at ends of the support matrix. Thus, the length of the channels in the support matrix gradually increases as the active agent directly in contact with the solvent is dissolved.

It is presently believed that the support matrix does not prevent the dissolution of the active agent because the active agent is in a contiguous phase. Rather, the support matrix serves to limit the rate of dissolution by restricting the area of active agent in direct contact with the solvent of the ends of the channels within the support matrix. Thus, the solvent can gradually work its way into the fiber by following the contiguous phase of active agent.

Additionally, it is presently believed that, depending on the stiffness of the wall material making up the support matrix, the support matrix can be deformed to expose new surface areas of active agent and thus bring them in direct contact with the solvent. For instance, when fibers are incorporated into a chewing material, the pressure from chewing will flatten, stretch, and deform the fibers exposing new surface areas of active agent to the solvent. This gradual release by deformation should occur even if the active agent is not in a contiguous phase. Higher molecular weight polymers used as wall material will not as readily exhibit this gradual release by deformation.

Furthermore, it is theorized that if the active agent is not in a contiguous phase the deformation of the support matrix may create channels, similar to those described above, through which the solvent can be brought in contact with the active agent.

Finally, depending on the wall material chosen, the active agent chosen, and the solvent being used, an extremely small amount of the active agent may dissolve by diffusion through the wall material.

Another embodiment of a gradual release structure made in accordance with the present invention is illustrated in FIG. **1**. In this embodiment the structure is in the form of a fiber **11** having a support matrix **12**. The support matrix is made up of a wall material. An active agent **13** is dispersed throughout the support matrix and is in contact with itself forming a contiguous phase within the support matrix. The ends **14** and **15** of the support matrix have openings, exposing the active agent. Additionally, the active agent may be exposed along the sides of the fiber as can be seen in FIGS. **2** and **3**. The active agent makes up at least about 25 percent of the structure by weight.

Gradual release of the active agent in this embodiment occurs when the fiber is brought in contact with a solvent, or dispersing media, for the active agent. The wall material is less soluble in the solvent then the active agent and preferably the wall material should be substantially insoluble in the solvent under the conditions in which the fiber is being used. As illustrated in FIG. **1**A, the solvent first dissolves the active agent in the openings at the ends **14** and **15** of the support matrix. As this material is dissolved spaces or channels **13***a* in the support matrix are opened. The solvent fills these channels and begins to dissolve the newly exposed active agent, which was in contact with the now dissolved active agent located in the openings at ends of the support matrix. Thus, the length of the channels in the support matrix gradually increase as the active agent directly in contact with the solvent is dissolved.

It is presently believed that the support matrix does not prevent the dissolution of the active agent because the active agent is in a contiguous phase. FIG. **1** and **1**A. Rather, the support matrix serves to limit the rate of dissolution by restricting the area of active agent in direct contact with the solvent to the end of the channels within the support matrix. Thus, the solvent can gradually work its way into the fiber by following the contiguous phase of active agent. Additionally, depending on the wall material chosen, the active agent chosen, and the solvent being used a small amount of the active agent may dissolve by diffusion through the wall material. Gradual release by deformation may also be exhibited by this structure.

FIGS. **4** and **5** contain SEPMs of fibers made in accordance with the present invention. These fibers were subjected to a solvent. The spaces or channels **13***a* where the active agent was dissolved out are shown in these SEPMs.

Another embodiment of a gradual release structure made in accordance with the present invention is illustrated in FIG. **10**. In this embodiment the active agent is crystaline in form. Here it is aspartame. In this embodiment the crystaline active agent is oriented along the length of the fiber or parallel to the longitudinal direction of the fiber.

The active agent can be any material such as artificial sweeteners, powdered flavor oil, or drugs, which the gradual release of may be desired. They must be solid or in the form of powders, including liquids encapsulated by spray drying techniques or liquids adsorbed or absorbed into or onto a supporting matrix, i.e., silica, zeolite, carbon black, or porous matrices. Combinations of different active agents in the same structure may also be employed. For purposes of illustration, possible active agents may be: high intensity sweeteners, such as aspartame, alitame, acesulfam-k and its salts, saccharin and its salts, thaumatin, sucralose, cyclamic acid and its salts, monellin, and dihydrochalcones; acidulents, such as malic acid, citric acid, tartaric acid, and fumaric acid; salt, such as sodium chloride and potassium chloride; bases, such as, magnesium hydroxide and urea; flavors, such as spray dried natural or synthetic flavors, flavor adsorbed onto silica, and absorbed into maltodextrin; flavor modifiers, such as thaumatin; breath fresheners, such as zinc chloride, encapsulated menthol, encapsulated anise, zinc glucinate, and encapsulated chlorophyll; pesticides and herbicides such as Abate®, Malathion® (active ingredient, Diethyl 2-(dimethexyphosphionthioylthio) succinate), Dursban®, Naned®, Fenthion®, and sodium salt of (2,4-Dichlorophienoxy) acetic acid; pharmaceuticals such as ibuprofen, antacids, anti-inflammatory substances, coronary dilators, cerebral dilators, peripheral vasodilators, anti-infectives, psychotropics, anti-manics, stimulants, anti-histamines, laxatives, decongestants, vitamins, gastro-intestinal sedatives, anti-diarrheal preparations, anti-anginal drugs, vasodilators, anti-arrhythmics, anti-hypertensive drugs, anti-coagulants, analgesics, sedatives, neuromuscular drugs, mineral and nutritional additives, anabolic drugs, expectorants, and cough suppressants; and fertilizers.

Care must be taken to avoid the degradation of the active agent from high temperatures, shear, or other

conditions, which may occur during formation. The wall material can be any spinnable synthetic or natural polymer such as polyethylene, polyvinylacetate, polyesters, chitosan, and copolymers and polymer blends of these polymers. The active agent and wall material must meet the solubility requirements discussed above. Additionally, they must be immiscible with each other and capable of being uniformly dispersed when mixed together during the melt spinning procedure.

While any extrudable thermoplastic is suitable, the use of biodegradable polymers is beneficial for many applications. Examples of biodegradable polymers useful in this invention include copolymers of lactic and glycolic acid (PLGA), polypropylene fumarate (PPF), copolymers of fumaric and succinic acids, polyalkyl-L-glutamic acid, polyglycolic acid, poly-methyl-L-glutamic acid, polymers of glutamic acid, copolymers of glutamic acid, poly—1—glutamic acid and lysine.

The release rate of the resulting structure can be modified by crosslinking the polymer. For example, crosslinking of the polylactic/polyglycolic acid copolymer can be achieved by maleic anhydride.

The gradual release structures of the present invention may have an application in any situation in which the gradual release of an active agent is needed.

Gradual release structures that embody the present invention are made by melt spinning a uniform mixture of active agent and wall material into a fiber. The general principles for melt spinning polymers are well known in the art and are described in F. Billmeyer, Jr., *Text Book of Polymer Science;* 518–22 (Wiley International Edition, 2nd), which is incorporated herein by reference. In this process a mixture of a polymer for the wall material and an active agent are prepared in powder or pellet form. The particles of polymer and active agent are mixed together into a homogeneous phase. The concentration of active agent in this mixture is such that the particles of active agent may be in contact with each other. The mixture is melt spun to produce fibers. These fibers are then gently broken into smaller sizes. Any grinding machine or knife which reduces the length of fiber without excessively damaging the support matrix is suitable. Fiber brittleness eases the cutting process of the fiber and can be achieved by concentrating the solid active agent particles.

The fact that a polymer or polymer blend initially shows an unacceptably high pressure for extrusion, does not automatically eliminate the possibility of using it in this process. Processability often can be improved by increasing the processing temperature, introducing plasticizers, changing nozzle dimensions, adding dispersing agents, or modifying it by blending with other polymers.

By way of example, this process is carried out on two types of equipment.

Model 1125 Instron Capillary Rheometer

A Model 1125 Instron Capillary Rheometer, with capillary hole diameter of 152 microns is used to extrude fibers. The barrel diameter is $\frac{3}{8}$ inches. The die has a Length to diameter ratio of 0.083 and has 1 hole. In this application of the process L-aspartyl-L-phenylalanine methyl ester (Aspartame) is used as the active agent. A polyvinylacetate (PVAc) having a molecular weight from about 50,000 to 80,000 is chosen as the wall material.

This laboratory scale Capillary Rheometer can not provide enough mixing action during extrusion. Thus, prior to extrusion, samples are pre-blended by two methods. In one method, PVAc is dissolved in Methylene Chloride ($CH_2Cl_2$) at room temperature, and then Aspartame is mixed into this solution. The solvent is evaporated overnight under vacuum at 60° C. to form a solid material. This material is ground to a powder to facilitate addition into the rheometer.

This method is indicated in Table 1 as "Solution Blended." In the other method, samples are prepared for extrusion by directly blending the Aspartame with a polymer melt of the wall material in a heated beaker at 140° C. The blend is dried under vacuum at 60° C. for about 5 hours to remove water. This method is indicated in Table 1 as "Melt Blended."

Using these two methods of mixing the wall material and the active agent, fibers with varying amounts of Aspartame are produced. The parameters used for these examples are set out in the following Table 1. The Jet Speed is the speed of the material being meltspun in the capillary.

TABLE 1

| | Temp. | Jet Speed (m/min) | Extrusion Load (kgf) |
|---|---|---|---|
| Example 1) | | | |
| Aspartame | 140½ C. | 5 | 13 |
| 17 wt. % | | 10 | 18 |
| in PVAc | | 20 | 32 |
| (Solution Blended) | | 50 | 57 |
| | | 100 | 76 |
| Example 2) | | | |
| Aspartame | 150° C. | 5 | 18 |
| 17 wt. % | | 10 | 23 |
| in PVAc | | 20 | 34 |
| (Solution Blended) | | 50 | 51 |
| | | 100 | 68 |
| Example 3) | | | |
| Aspartame | 140° C. | 5 | 41–59 |
| 17 wt. % | | 10 | 23–68 |
| in PVAc | | 20 | 45–113 |
| (Melt Blended) | | 50 | 68 |
| Example 4) | | | |
| Aspartame | 140° C. | 5 | 13 |
| 29 wt. % | | 10 | 16 |
| in PVAc | | 20 | 20 |
| (Solution Blended) | | 100 | 52 |
| Example 5) | | | |
| Aspartame | 150° C. | 5 | 9 |
| 29 wt. % | | 10 | 13 |
| in PVAc | | 20 | 17 |
| (Solution Blended) | | 50 | 25 |
| | | 100 | 36 |
| | | 200 | 50 |
| | | 500 | 59 |
| Example 6) | | | |
| Aspartame | 140° C. | 5 | 32 |
| 29 wt. % | | 10 | 45 |
| in PVAc | | 20 | 90–180 |
| (Melt Blended) | | 50 | less than 180 |
| Example 7) | | | |
| Aspartame | 140° C. | 5 | 14 |
| 35 wt. % | | 10 | 17 |
| in PVAc | | 20 | 25 |
| (Solution Blended) | | 50 | 36 |
| Example 8) | | | |
| Aspartame | 140° C. | 5 | 10 |
| 35 wt. % | | 10 | 12 |
| in PVAc | | 20 | 18 |
| (Solution Blended) | | 50 | 27 |
| | | 100 | 41 |
| | | 200 | 55 |
| Example 9) | | | |
| Aspartame | 140° C. | 5 | 36–41 |
| 35 wt. % | | 10 | 54–64 |
| in PVAc | | 20 | 113–136 |

TABLE 1-continued

| | Temp. | Jet Speed (m/min) | Extrusion Load (kgf) |
|---|---|---|---|
| (Melt Blended) | | 50 | 272–363 |

Table 1, shows that the spinnability of PVAc blends is good and not highly dependent on the Aspartame loading level. The extrudates of PVAc/ Aspartame blends shown in Table 1 are brittle at 17% Aspartame loading. Brittleness increases as the Aspartame loading level increases. The diameter of the extruded fibers due to die swell is slightly larger than the capillary, which is 152 microns.

The extruded fibers are gently ground with a mortar and pestle. The diameter to length ratio of these ground fibers is narrowly distributed with no major breakage of fibers along the longitudinal direction.

FIGS. **2** through **5** are SEPMs of fibers having 29% by weight Aspartame in PVAc that are prepared by the solution blending technique described above and extruded at 150° C. FIGS. **6** through **9** are SEPMs of fibers having 17% by weight Aspartame in PVAc that are prepared by the melt blending technique described above and extruded at 140° C. Both samples are extracted with water as the solvent for four hours. The spaces shown in the SEPMs are places from which Aspartame is dissolved. FIGS. **8** and **9** show that at 17% loading, the solid particles of Aspartame are isolated in the polymer. Thus, Aspartame could not completely dissolve out into the water without physical deformation of the polymeric structure. At 29% loading, FIGS. **4** and **5**, however, the solid particles of Aspartame form a contiguous phase as illustrated in FIG. **1**. Thus, channels in the encapsulating structure are opened and the Aspartame is gradually released, until virtually none remains.

Liquid Chromatography analysis is carried out on the fibers spun at 140° C. and at 150° C. in examples 1 through 9 to determine the amount of thermal degradation of Aspartame occurring during the melt spinning process discussed above. At 140° C. thermal degradation of Aspartame is less than 10%. At 150° C. the percent thermal degradation of Aspartame approached 20%.

The residence time of Aspartame/polymer blend in the Capillary Rheometer used to prepare the above samples is about twenty minutes. In production scale spinning, residence time could be reduced to around 20 seconds to two minutes. This would greatly reduce the degree of Aspartame degradation. At 90°–100° C. using a twin screw extruder at 2 minutes residence time, no degradation is observed.

## TWIN SCREW EXTRUDER

In Examples 10–28 a type LSM 30:34 twin screw extruder from American Leistritz Extruder Corporation is used to produce the fibers. Generally, a homogeneous mixture of wall material and active agent in powdered form are poured into a hopper on the extruder. The hopper feed screws force the mixture through heated sections of the extruder, melting the polymer, and then through a die. The die consists of a plurality of holes having a specific diameter and length. Upon leaving the die the fibers are stretched by either drawing them with a winder or by blowing air past them with a venturi.

The twin screw extruder consists in this case of two sets of eight element screws. These screws can operate in an intermeshing fashion in either a co-rotational or a counter rotational mode, These screws can function as kneading elements or conveying elements. For the following examples four kneading elements alternating with four conveying elements are used. Other configurations are possible and will depend on the process conditions and the types of materials being melt spun and the degree of mixing required.

The twin screw extruder used in the following examples is divided into eight zones. The temperature of each zone is controlled. For example, a mixture of percent by weight PVAc with a molecular weight of about 30,000, 25 percent by weight PVAc with a molecular weight of about 15,000, and 25 percent by weight Aspartame is melt spun to produce fibers. Operating the extruder with a 1 mm die having 5 holes at 30 rpm, results in the production of 5 pounds of fiber per hour. The following temperatures in degrees centigrade are used for each zone:

| Zone | Temp. |
|---|---|
| Feeding or hopper zone | 85 |
| 2 | 95 |
| 3 | 95 |
| 4 | 95 |
| 5 | 95 |
| 6 | 95 |
| 7 | 95 |
| Die or last zone | 102 |

Operating the extruder with a 1 mm die having holes at 333 rpm, results in the production of 50 pounds of fiber per hour. The following temperatures in degrees centigrade are used for each zone:

| Zone | Temp. |
|---|---|
| Feeding or hopper zone | 85 |
| 2 | 97 |
| 3 | 97 |
| 4 | 97 |
| 5 | 97 |
| 6 | 97 |
| 7 | 97 |
| Die or last zone | 102 |

In the following examples dies having a diameter of 1 mm and 0.3 mm are used. The 1 mm die has holes and has a diameter to length ratio of about 4. The 0.3 mm die has 34 holes and has a diameter to length ratio of 2.3. The temperatures set out in these examples are an average of all heating zones on the extruder.

## EXAMPLE 10

Using a 1 mm die, fibers having 10% by weight Acesulfam-K (a high intensity sweetener purchased from Hoecht, of W. Germany) as the active agent and having PVAc with a molecular weight of about 50,000–80,000 as the wall material are extruded at 110°–115+ C. The fibers are drawn by a winder and have a thickness of 0.2–0.3 mm. The Acesulfam-K particles disperse very well in the fibers and the fibers exhibit a gradual release of the active agent when chewed alone.

## EXAMPLE 11

Using a 1 mm die, fibers having by weight Acesulfam-K as the active agent and having PVAc with a

molecular weight of about 50,000–80,000 as the wall material are extended at 110° C. The fibers are drawn by a winder. The fibers are between 0.3–0.4 mm in thickness. The Acesulfam-K particles disperse very well in the fibers and the fibers exhibit a gradual release of the active agent when chewed alone.

EXAMPLE 12

Using a 1 mm die, fibers having 10% by weight Aspartame as the active agent and having PVAc with a molecular weight of about 50,000–80,000 as the wall material are extruded at 100° C. The fibers are drawn by a winder and have a thickness of 0.2–0.3 mm. The Aspartame disperses very well in the fibers and the fibers exhibit a gradual release of the active agent when chewed alone.

EXAMPLE 13

Using a 1 mm die, fibers having 10% by weight Aspartame as the active agent and having PVAc with a molecular weight of about 50,000–80,000 as the wall material are extruded at 100° C. The fibers are drawn by the winder and have a thickness of about 0.2 mm. The Aspartame disperses very well in the fibers and the fibers exhibit an excellent gradual release of the active agent when chewed alone.

EXAMPLE 14

Using a 1 mm die, fibers having 35% by weight Sodium Saccharin as the active agent and having PVAc with a molecular weight of about 50,000–80,000 as the wall material are extruded at 100° C. The fibers are drawn at the winder and are 0.4–0.5 mm thick. The Sodium Saccharin dispersed very well in the fibers, although the fibers are softer than those of examples 10–13. The fibers exhibit a gradual release of the active agent when chewed alone.

EXAMPLE 15

Using a 1 mm die, fibers having 35% by weight Saccharin Acid as the active agent and having PVAc with a molecular weight of about 50,000–80,000 as the wall material are extruded at 100° C. The fibers are drawn at the winder and are 0.4–0.5 mm thick. The Saccharin Acid disperses very well in the fiber, although the fibers are softer than those of examples 10–13. The fibers exhibit a gradual release of the active agent when chewed alone.

EXAMPLE 16

Using a 1 mm die, fibers having 6.13% by weight NaCl, 3.87% by weight KCl as the active agents and having PVAc with a molecular weight of about 30,000 as the wall material are extruded at 113° C. The fibers are drawn at the winder and are 0.12 mm in thickness. The NaCl and KCl particles are dispersed in the fiber. The fibers exhibit good gradual release of the active agent when chewed alone.

EXAMPLE 17

Using a 1 mm die, fibers having 6.13% by weight NaCl, 3.87% by weight KCl as the active agents and having PVAc with a molecular weight of about 15,000 as the wall material are extruded at 90° C. The fibers are drawn by air blowing and are 0.12 mm in thickness and are slightly weaker than the fibers of Example 16. The fibers exhibit a gradual release of the active agent when chewed alone.

EXAMPLE 18

Using a 1 mm die fibers having 24.52% by weight Na Cl, and 15.48% KCl by weight as the active agents and having Allied Chemical PE 735 as the wall material are extruded at 85°–90° C. The fibers are 0.96 mm thick and are drawn by air blowing. The fibers exhibit gradual release of salts.

EXAMPLE 19

Using a 1 mm die, fibers having 25% by weight Diamonium Phosphate as the active agent and having PVAc with a molecular weight of about 50,000–80,000 as the wall material are extruded at 100° C. The fibers are drawn by air blowing and have a thickness of 0.20–0.38 mm.

EXAMPLE 20

Using a 1 mm die, fibers having 25% by weight NaF as the active agent and having PVAc with a molecular weight of 50,000–80,000 are extruded at 90°–100° C. The fibers are drawn by air blowing and have a thickness of 0.18–0.25 mm.

EXAMPLE 21

Using a 1 mm die, fibers having 25% by weight $Mg(OH)_2$ as the active agent and having PVAc with a molecular weight of about 50,000–80,000 as the wall material are extruded at 90°–100° C. The fibers are drawn by air blowing and have a thickness of 0.25 mm.

EXAMPLE 22

Using a 1 mm die, fibers having 25% by weight Acesulfam-K as the active agent and having PVAc with a molecular weight of about 30,000 as the wall material are extruded at 90°–100° C. The fibers are drawn by air blowing and have a thickness of 0.13 mm.

EXAMPLE 23

Using a 0.3 mm die, fibers having 25% by weight Aspartame as the active agent and having PVAc with a molecular weight of about 50,000–80,000 as the wall material are extruded at 90°–100°½ C. In making the fibers of this example prior to extrusion the PVAc and Aspartame are premixed in methylene chloride, following the solution blended method described above. The fibers are drawn by a winder and have a thickness of 0.127 mm.

EXAMPLE 24

Using a 1 mm die, fibers having 10% by weight ibuprofen as the active agent and having 90% by weight poly-1-glutamic acid as the wall material are extruded at 100° C. The fibers are drawn to a diameter of 0.2–0.3 mm by a winder.

EXAMPLE 25

Using a 1 mm die, fibers having 25% by weight thiamine as the active agent and having 75% by weight poly-methyl-L-glutamic acid as the wall material are extruded at 100° C. The fibers are drawn to a diameter of 0.2–0.3 mm by a winder.

EXAMPLE 26

Using a 0.3 mm die, fibers having 25% by weight ascorbic acid as the active agent and having 75% by weight polypropylene fumarate as the wall material are

extruded at 90° C. The fibers are drawn to a diameter of 0.15 mm by a winder.

EXAMPLE 27

Using a 1.0 mm die, fibers having 10% by weight of 25% spray dried malathion as the active agent and having 75% by weight polyglycolic acid as the wall material are extruded at 140° C. No draw is applied.

EXAMPLE 28

Using a 1.0 mm die, fibers having 50% by weight of a sodium salt 2, 4-D as the active agent and having 50% by weight polylactic acid as the wall material are extruded at 130° C. No draw is applied.

Many variations of the invention suggest themselves to those skilled in the art in view of the above disclosure without departing from the spirit and scope of this invention.

I claim:

**1**. A delivery system for the gradual release of an active agent, the delivery system comprising an active agent and a wall material, wherein the delivery system is formed by meltspinning into a fiber a mixture of active agent and wall material, the mixture having more than zero but less than about 55 percent by weight active agent, the resulting fiber having a longitudinal dimension and a cross sectional dimension, wherein the cross sectional dimension is no greater than about 1 mm, the fiber further having an exterior surface wherein the wall material comprises a majority of the exterior surface and the active agent comprises a minority of the exterior surface with particles of active agent dispersed throughout the wall material and substantially contiguously throughout the fiber, the fiber further having openings on either end thereby exposing the active agent to a solvent specific to the active agent.

**2**. A delivery system for the gradual release of an active agent, the delivery system comprising an active agent and a wall material, wherein the delivery system is formed by meltspinning into a fiber a mixture of active agent and wall material, the mixture having more than about 10 but less than about 55 percent by weight active agent, the resulting fiber having a longitudinal dimension and a cross sectional dimension, wherein the cross sectional dimension is no greater than about 1 mm, the fiber further having an exterior surface, the particles of active agent dispersed throughout the fiber and the exterior surface such that the particles of active agent are gradually released from the fiber when the fiber is contacted with a solvent specific to the active agent.

**3**. The delivery system of claim **2** wherein the active agent comprises flavor.

**4**. The delivery system of claim **2** wherein the active agent comprises sweetener.

**5**. The delivery system of claim **2** wherein the active agent comprises fertilizer.

**6**. The delivery system of claim **2** wherein the active agent comprises pesticide.

**7**. The delivery system of claim **2** wherein the active agent comprises a pharmaceutical.

**8**. The delivery system of claim **2** wherein the active agent comprises acesulfam K.

**9**. The delivery system of claim **2** wherein the active agent comprises aspartame.

**10**. The delivery system of claim **2** wherein the wall material comprises poly-l-glutamic acid and the active agent comprises ibuprofen.

**11**. The delivery system of claim **2** wherein the wall material comprises poly-methyl-L-glutamic acid and the active agent comprises thiamine.

**12**. The delivery system of claim **2** wherein the wall material comprises polypropylene fumarate and the active agent comprises ascorbic acid.

**13**. The delivery system of claim **2** wherein the wall material comprises polyglycolic acid and the active agent comprises Diethyl 2-(dimethoxyphosphinothioythio) succinate.

**14**. The delivery system of claim **2** wherein the wall material comprises polylactic acid and the active agent comprises a sodium salt of (2,4-Dichlorophenoxy) acetic acid.

**15**. A delivery system for the gradual release of an active agent, the delivery system comprising an active agent and a wall material, wherein the delivery system is formed by meltspinning into a fiber a mixture of active agent and wall material, the mixture having more than about 25 but less than about 55 percent by weight active agent, the resulting fiber having a longitudinal dimension and a cross sectional dimension, the cross sectional dimension being no greater than about 1 mm, the fiber further having particles of active agent dispersed throughout the wall material; the fiber further having openings on either end thereby exposing the active agent to a solvent specific to the active agent.

**16**. The delivery system of claim **15** wherein the wall material comprises poly-methyl-L-glutamic acid and the active agent comprises thiamine.

**17**. The delivery system of claim **15** wherein the wall material comprises polypropylene fumarate and the active agent comprises ascorbic acid.

**18**. The delivery system of claim **15** wherein the wall material comprises polyglycolic acid and the active agent comprises Diethyl 2-(dimethoxyphosphinothioythio) succinate.

**19**. The delivery system of claim **15** wherein the wall material comprises polylactic acid and the active agent comprises a sodium salt of (2,4-Dichlorophenoxy) acetic acid.

**20**. A delivery system for the gradual release of an active agent, the delivery system comprising a crystalline active agent and a wall material wherein the delivery system is formed by melt spinning into a fiber a mixture of active agent and wall material, the mixture having more than 10 but less than about 55 percent by weight active agent, the resulting fiber having a longitudinal dimension and a cross sectional dimension, the cross sectional dimension being no greater than about 1 mm, wherein the crystalline active agent is oriented parallel to the longitudinal dimension of the fiber, and dispersed throughout the fiber whereby the particles of active agent are gradually released from the fiber when the fiber is contacted with a solvent specific to the active agent.

**21**. The delivery system of claim **20** wherein the active agent is aspartame.

**22**. The drug delivery system of claim **1** in which the mixture of active agent and wall material is free from solvent for the wall material.

**23**. The drug delivery system of claim **2** in which the mixture of active agent and wall material is free from solvent for the wall material.

**24**. The drug delivery system of claim **15** in which the mixture of active agent and wall material is free from solvent for the wall material.

25. The drug delivery system of claim 20 in which the mixture of active agent and wall material is free from solvent for the wall material.

26. A delivery system for the gradual release of an active agent comprising:

a) a mixture of an active agent and a wall material in a fiber having a longitudinal surface;

b) the mixture having less than about 55 percent by weight active agent;

c) the wall material forming a support matrix within the fiber;

d) the support matrix having a plurality of interconnected channels with openings in the longitudinal surface of the fiber;

e) the active agent in the channels and in the longitudinal surface of the fiber;

f) whereby the active agent is gradually released from the fiber when the fiber is contacted with a solvent specific to the active agent,

27. A delivery system for the gradual release of an active agent comprising:

a) a support matrix in a fiber having a longitudinal and two end surfaces;

b) the support matrix having a plurality of interconnected channels with openings on the longitudinal and end surfaces of the fiber;

c) an active agent in the channels and in the longitudinal and end surfaces of the fiber;

d) the fiber having more than about 10 and less than about 55 percent by weight active agent;

e) whereby the active agent is gradually released from the fiber when the fiber is contacted with a solvent specific to the active agent.

28. A delivery system for the gradual release of an active agent comprising:

a) an active agent and a wall material, wherein the delivery system is formed by melt spinning a mixture of active agent and wall material into a fiber;

b) the mixture having less than about 55 percent by weight active agent;

c) the resulting fiber having:

i) a longitudinal and two end surfaces;

ii) a support matrix comprising the wall material;

iii) the active agent dispersed substantially contiguously throughout the support matrix and being present in the longitudinal and end surfaces of the fiber;

d) whereby the active agent is gradually released from the fiber when the fiber is contacted with a solvent specific to the active agent.

29. A delivery system for the gradual release of an active agent comprising:

a) an active agent and polyvinyl acetate, wherein the delivery system is formed by melt spinning a mixture of active agent and polyvinyl acetate into a fiber;

b) the mixture having less than about 55 percent by weight active agent;

c) the resulting fiber having:

i) a longitudinal and two end surfaces;

ii) a support matrix comprising the polyvinyl acetate;

iii) the active agent dispersed substantially contiguously throughout the support matrix and being present in the exterior longitudinal and end surfaces of the fiber;

d) whereby the active agent is gradually released from the fiber when the fiber is contacted with a solvent specific to the active agent.

* * * * *

**CONFIDENTIAL DOCUMENT REMOVED**

**SUBJECT TO PROTECTIVE ORDER**

**TRIAL EXHIBIT NO. DTX300**

**Appx26088-26101**

## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2025, I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Federal Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and a nonconfidential copy of the document will be served by the CM/ECF system. In addition, a confidential copy of the document will be served upon counsel of record via email and overnight delivery.

*/s/ Pratik A. Shah*
Pratik A. Shah